# EXHIBIT B

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| ANOUSH BURMAYAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 2:23-cv-01788 |
| | ) | FMO-AGR |
| CVS PHARMACY, INC., a | ) | |
| corporation doing business in | ) | |
| California, et al., | ) | VOLUME I |
| | ) | |
| Defendants. | ) | |
| ______________________________ | ) | |
| | ) | |
| (FULL CAPTION ON NEXT PAGE) | ) | |
| | ) | |

ZOOM DEPOSITION OF ANOUSH BURMAYAN
(All parties appearing remotely.)
OCTOBER 11, 2023

MAGNA LEGAL SERVICES
866-624-6221
www.MagnaLS.com
REPORTED BY: CHRISTINA M. LOPEZ, CSR NO. 13048
FILE NO.: 1030904

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

ANOUSH BURMAYAN,
Plaintiff,
vs.
CVS PHARMACY, INC., a corporation doing business in California; GUY GARCIA, an individual; JOE JOHNSON, an individual; CITY OF GLENDALE, Officer JAMES ROSS #22471, individually and as a peace office, Officer GRIFFIN ARMENDARIZ #27999, individually and as a peace officer, and DOES 1-10,
Defendants.

No. 2:23-cv-01788 FMO-AGR

VOLUME II

APPEARANCES:

For the Plaintiff:

MKRTCHYAN LAW
BY: NARINE MKRTCHYAN, ESQ.
P.O. Box 2288
Toluca Lake, California 91610
(818) 388-7022
narine57@gmail.com

For the Defendants Garfield Beach CVS, LLC (erroneously sued as CVS Pharmacy, Inc.) Guy Garcia and Joe Johnson:

PAYNE & FEARS
BY: DANIEL F. FEARS, ESQ.
4 Park Plaza
Suite 1100
Irvine, California 92614
(949) 851-1100
(949) 851-1212 (Fax)
dff@paynefears.com

For the Defendants City of Glendale, James Ross and Griffin Armendariz:

CITY OF GLENDALE OFFICE OF THE CITY ATTORNEY
BY: EDWARD B. KANG, ESQ.
613 East Broadway
Room 220
Glendale, California 91206
(818) 548-2080
ekang@glendaleca.gov

Also Present:

Matt Miller, Videographer

# I N D E X

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| Anoush Burmayan | By Mr. Fears | 7 |
| | By Mr. Kang | 265 |
| Afternoon Session | | 140 |

# E X H I B I T S

| DEFENDANTS' | | PAGE |
|---|---|---|
| 1 | - Written statement, CVS-00000858 to CVS-00000862 | 155 |
| 2 | - City of Glendale Claim for Damages | 178 |
| 3 | - November 23, 2020 Progress Note | 188 |
| 4 | - 11/30/2020 Progress Note | 206 |
| 5 | - 12/7/2020 Progress Note | 216 |
| 6 | - Standard Progress Note | 220 |
| 7 | - Facebook pages | 242 |
| 8 | - Video | 275 |
| 10 | - Google Maps image of CVS | 286 |
| | - Google Maps image of CVS parking lot | 293 |
| 11 | - Broader view CVS parking lot | 294 |

I N D E X

(Continued)

QUESTIONS INSTRUCTED NOT TO ANSWER

| PAGE | LINE |
|---|---|
| 99 | 24 |
| 180 | 8 |
| 244 | 11 |
| 248 | 14 |

RECORD MARKED

| PAGE | LINE |
|---|---|
| 96 | 19 |
| 117 | 5 |
| 119 | 8 |
| 135 | 14 |
| 150 | 18 |
| 166 | 7 |
| 169 | 4 |
| 203 | 13 |
| 203 | 23 |
| 214 | 1 |
| 252 | 1 |
| 301 | 5 |
| 321 | 2 |
| 321 | 19 |

WEDNESDAY, OCTOBER 11, 2023

10:11 A.M.

THE VIDEOGRAPHER: Good morning, everyone. We are now on the record. This begins Videotape Number 1 10:10:58AM in the deposition of Anoush Burmayan, in the matter of Anoush Burmayan versus CVS Pharmacy, Incorporated, in the United States District Court, Central District, California.

Today's date is October 11th, 2023, and the 10:11:18AM time is 11:18 [sic] a.m. This deposition is being taken remotely via Zoom at the request of Payne & Fears LLP -- I apologize, the time is 10:11 a.m. Read the seconds wrong there -- at the request of Payne & Fears LLP.

The videographer today is Matt Miller of Magna 10:11:40AM Legal Services, and the court reporter is Christina Lopez of Magna Legal Services.

Will counsel and all parties present please state their appearances and whom they represent, beginning with the noticing attorney. 10:11:53AM

MR. FEARS: Daniel Fears of Payne & Fears on behalf of the CVS as well as Mr. Garcia and Mr. Johnson.

MR. KANG: Good morning. Edward Kang on behalf of defendants, City of Glendale, Officers James Ross and Officer Griffin Armendariz. 10:12:15AM

MS. MKRTCHYAN: Good morning. Narine Mkrtchyan on behalf of plaintiff, Anoush Burmayan, who is present.

THE VIDEOGRAPHER: And then Ms. Rubina?

MS. MKRTCHYAN: Oh, I'm sorry. That, she is 10:12:27AM
my assistant, Rubina Khachatryan. Thank you.

THE VIDEOGRAPHER: Copy that. Thank you very much.

Okay. Madam reporter, will you please swear in the witness.

ANOUSH BURMAYAN,

called as a witness by and on behalf of the Defendants, being first duly sworn, was examined and testified as follows:

THE VIDEOGRAPHER: All right. Thank you

The floor is yours, Counsel.

MR. FEARS: Thank you.

EXAMINATION

BY MR. FEARS:

Q. Good morning, Ms. Burmayan. My name is Daniel Fears. We've introduced each other on the record 10:12:58AM

already, and I'll be commencing the deposition asking you questions about the lawsuit that you filed.

Do you understand that?

A. Yes.

Q. Okay. First of all, can you start off by telling me where you reside? 10:13:08AM

A. You want my exact address or the city?

Q. The address and city, please.

A. 147 West Acacia Avenue, Unit 109, Glendale, California, 91204. 10:13:23AM

Q. And how long have you resided there?

A. Approximately since 2001.

Q. Have you ever had your deposition taken before, Ms. Burmayan?

A. Yes. 10:13:32AM

Q. On how many occasions?

A. Two times.

Q. And when were those occasions where you had your deposition taken?

A. One was approximately 2010, and then the other 10:13:41AM one was approximately 2020.

Q. And with respect to the deposition in 2020, were you a party to the litigation or simply a witness to someone else's litigation?

A. I was the party. 10:14:00AM

Q. And were you a plaintiff or a defendant?
A. Plaintiff.
Q. And who was it that you were suing in the 2020 time frame that caused you to have your deposition taken? 10:14:14AM
A. Los Angeles Unified School District.
Q. Okay. And that was your employer; correct?
A. Correct.
Q. What was the nature of the lawsuit that you filed against the Los Angeles Unified School District? 10:14:27AM
A. Hostile work environment, harassment.
Q. Okay. Anything else that you can remember?
A. Yes. It was orthopedic issues.
Q. Anything else you can remember?
A. No. 10:14:52AM
Q. And did it involve a work-related injury at Los Angeles Unified School District?
A. Yes.
Q. Was it a workers' compensation matter, to the best of your knowledge? 10:15:04AM
A. Yes.
Q. And is that matter still open?
A. No.
Q. It was resolved at some point?
A. There was -- yes, it was closed. There was a 10:15:12AM

settlement offer.
Q. Okay. And I take it that settlement offer was accepted and the matter was closed?
A. Yes.
Q. With respect to that matter, the workers' compensation matter, what -- what injuries were you claiming that you had? 10:15:25AM
A. Just for clarification, you're asking about the 2020; correct?
Q. 2020, that's correct. 10:15:41AM
A. Orthopedic and stress, psychological.
Q. All right. And then you were represented by counsel, I take it, when you were deposed in 2020; correct?
A. I had an attorney, yes. 10:16:02AM
Q. Do you remember the name of your attorney?
A. Not at the moment, no.
Q. Okay. You mentioned that you had a second deposition, one you think approximately in 2010. Were you a party to the litigation or just a witness? 10:16:18AM
A. I was the client.
Q. Okay. And were you a plaintiff or a defendant?
A. Plaintiff.
Q. And what type of matter did the 2010 10:16:27AM

deposition involve, to the best of your recollection?
A. Workers' comp.
Q. And who was that workers' compensation matter against?
A. L.A. Unified School District. 10:16:44AM
Q. And what was the nature of the injury that was claimed with respect to that matter?
A. Orthopedic.
Q. And what type of orthopedic injury?
A. Lower back, upper lack, carpal tunnel, 10:16:55AM headaches, migraines, and foot pain, leg pain.
Q. And was that matter settled as well?
A. No. It was left open with future medical care.
Q. So there was some resolution that allowed you 10:17:16AM to have future medical care?
A. My attorney explained to me that it was left open with future medical care, yes.
Q. Did you also receive any type of settlement amount, like some type of monetary compensation, at the 10:17:36AM time?
A. Yes.
Q. You did? Yes?
A. Yes.
Q. Were there any other injuries that were 10:17:45AM

claimed in that first workers' compensation matter that you mentioned?

MS. MKRTCHYAN: Objection; asked and answered.

But you may answer.

THE WITNESS: It was mainly orthopedic. As I said, it was headaches, leg pain, foot pain. I do have IBS. I'm not sure if that's included in the orthopedic. And there was some stress involved, but I don't know if that was also included in the orthopedic. But the main claim was orthopedic, which included the leg pain, carpal tunnel, migraines, upper back, lower back. 10:17:57AM 10:18:18AM

Q. Okay. Have you had any -- let me withdraw that.

Other than those two depositions, can you think of any other time in which your deposition was taken other than today, Ms. Burmayan? 10:18:34AM

A. Other than today, it was in 2010, approximately, and then 2020, approximately --

Q. And that's it -- and that's it; correct?

A. Yes, correct. 10:18:48AM

Q. Have you been a party in any other litigation or lawsuits other than those two workers' compensation cases that you just mentioned and this case for which you're here today in a deposition?

A. I had a hit-and-run car accident. 10:19:06AM

Q. Was there a lawsuit involved in that?
A. Yes.
Q. And when was that lawsuit?
A. Probably around 2018.
Q. Okay. And is that lawsuit still pending? 10:19:21AM
A. No, it's closed. It settled.
Q. Okay. And when did it settle?
A. Roughly, a year after -- a year or two -- one or two years, roughly, after the accident.
Q. Did you claim injuries in that hit-and-run accident? 10:19:36AM
A. Yes.
Q. And what injuries did you claim you had sustained?
A. The main ones were lower back, upper back, orthopedic issues. 10:19:48AM
Q. Were there any other issues for which -- well, let me withdraw that.
Were there any other claims for injuries that you made with respect to that hit-and-run incident? 10:20:02AM
A. Headaches, maybe some stomach pains, but the main ones were orthopedic.
Q. Okay. And when you say "hit and run," were you in your vehicle when you were hit or were you not in a vehicle when you were hit? 10:20:22AM

A. I was in the vehicle.
Q. Okay. And I take it somebody hit your vehicle and then they drove off?
A. Yes.
Q. All right. Other than those three lawsuits that you -- well, let me withdraw that. 10:20:33AM
Do you know where that hit-and-run incident occurred?
A. Yeah. That was in Hollywood area on Wilton -- around Wilton Place. 10:20:46AM
Q. And do you know where that lawsuit was filed?
A. You mean what city?
Q. Yes.
A. I don't know the city, but maybe L.A., I'm assuming -- 10:20:59AM
Q. You believe --
A. -- because it happened in L.A.
Q. You believe it to be Los Angeles Superior Court?
A. Perhaps, or Van Nuys, I'm not sure which one, 10:21:06AM but it was in the -- the accident happened in L.A. so I'm not sure where it was filed, but I'm assuming L.A. I don't know.
Q. Okay. And do you remember who your attorney was? 10:21:19AM

A. Yes. Tamar Poladian.
Q. Can you spell that last name?
A. P-o-l-a-d-i-a-n.
Q. Okay. And have you now told me about all of the lawsuits that you have been involved in, in one way or another? 10:21:37AM
A. Yes. From my recollection, those are the ones that I remember, yes.
Q. With the hit-and-run accident that occurred in Hollywood, I take it you did not have your deposition taken; is that correct? 10:21:49AM
A. Correct.
Q. All right. I take it you have had an opportunity, if you so desire, to speak with your counsel about the purpose and effect of this deposition? 10:22:00AM
A. Yes.
Q. Okay. And in doing so, did you review any documents or materials to prepare yourself for this deposition?
A. Yes. 10:22:13AM
Q. And what documents did you review to prepare yourself for this deposition?
A. Some of the audio and video clips.
Q. Anything else?
A. No. 10:22:26AM

Q. All right. Even though you had an opportunity to speak with your counsel about a deposition, let me just mention to you what the general ground rules will be during this deposition. You've probably heard something very similar in the two other depositions that you've taken, but just bear with me, I'm just going to share with you, by way of reminder, what we're going to do here today and just generally the process, procedure, or protocol that we'll go by; okay? 10:22:45AM
A. Okay. 10:23:01AM
Q. All right. The first thing that I'll mention is, at the outset of this deposition, you were administered an oath and that oath is the same oath that you would take in a courtroom if you were testifying before a judge or a jury, in this case, federal court because this lawsuit is pending in federal court. So even though we're doing this via Zoom and you're in either a conference room or an office with your counsel present next to you, it has -- your testimony has the same effect as if you were testifying in federal court before a judge or a jury because it's under oath. 10:23:14AM 10:23:36AM
Do you understand that?
A. Yes.
Q. Okay. And when you're testimony is under oath, it means it is under penalty of perjury. In the 10:23:46AM

state of California, there are certain criminal penalties if someone willfully testifies in a false way during a deposition. So that's why it's very important for you to give honest, accurate information in response to my questions. 10:24:03AM

Do you understand?

A. Yes.

Q. Okay. Is there any reason why you can't go forward here today and give honest, accurate and complete responses to my questions? 10:24:13AM

A. No.

Q. If, for some reason, that changes, if you weren't feeling well or got sick or whatever it may be, if you didn't feel you could give honest, accurate and complete testimony for some reason, then you should let 10:24:26AM your counsel know, you should let me know, you should let Mr. Kang know so that we can discuss it and make appropriate arrangements. But otherwise, we'll assume that you're perfectly capable of going forward and giving honest, accurate and complete testimony under 10:24:40AM penalty of perjury; okay?

A. Okay.

Q. I'll be asking you a lot of questions, and at some point, Mr. Kang will be asking you a lot of questions about your lawsuit. If you -- first of all, 10:24:54AM

you should listen carefully to those questions and you should answer only those questions.
Do you understand?
A. Yes.
Q. Many of my questions can be answered with a simple yes or no, like you just did. If they can be answered with a yes or no, will you endeavor to do so? 10:25:04AM
A. Yes.
Q. Other questions, I may ask you for an explanation, like what happened and so forth, and then that obviously can't be answered with a yes or no; that means I need some type of explanation or narrative regarding what you recall. 10:25:18AM
Do you understand?
A. Yes. 10:25:30AM
Q. All right. None of the attorneys on this call, I believe none -- I believe none of the attorneys on this call want you to guess or speculate in response to any questions that are asked. In other words, because, as I mentioned before, your testimony is under penalty of perjury, no one wants you to speculate because your testimony -- you're swearing to your testimony. And if you're just guessing or speculating, you shouldn't do that. 10:25:46AM
So please don't guess or speculate in response 10:26:00AM

to the questions; okay?

A. Okay.

Q. And on the other hand, if I ask you a question and it would call -- you would be guessing or speculating, then you should tell me you don't know the 10:26:12AM answer to the question instead of guessing or speculating.

Do you understand?

A. Yes.

Q. So telling me you don't know the answer is a 10:26:20AM perfectly appropriate answer. Just because I ask the question doesn't mean I -- I know you know the answer. It just means it's a question I have, and maybe you know the answer and maybe you don't know the answer. If you do know the answer, I'm entitled to your answer. If you 10:26:38AM don't know the answer, you should tell me you don't know the answer; okay?

A. Okay.

Q. Other questions I may ask you about your recollection of something that you know you have some 10:26:47AM recollection of, but I may ask you some specifics. And if you don't remember the specifics, you can tell me you don't remember. That's an acceptable answer as well if you honestly don't remember.

Do you understand? 10:27:04AM

A. Yes.
Q. But if you do remember, Ms. Burmayan, if you do remember the answer to the question, then I'm entitled to know that answer.
Do you understand? 10:27:19AM
A. Yes.
Q. Okay. And throughout the day, your counsel who's -- I believe she's seated to your left; correct?
A. Correct.
Q. Yeah, she -- she may make objections from time 10:27:25AM to time as she made an objection a few minutes ago. But she may make an objection. As you know, there's not a judge sitting with us during this proceeding. So those objections will not be ruled upon today. So it basically means she's making that objection for the 10:27:46AM record and, later on, a judge may determine whether or not he agrees with that objection or she agrees with that objection or not.
But for today, your counsel would just make the objection for the record and you can just go ahead 10:28:03AM and answer the question after she has objected, unless she specifically tells you not to answer the question.
Do you understand?
A. Can you repeat the last part? It was a little -- 10:28:19AM

Q. Sure. Sure.
So lawyers can make objections during the deposition, but you should still -- after the objection is made, you should still answer the question unless your attorney specifically says, "Ms. Burmayan, do not answer that question." 10:28:31AM
Do you understand?
A. Yes.
Q. Okay. So the default, the normal procedure is question asked, if there's an objection, you should go ahead and answer. The exception to that would be if your counsel said, Ms. Burmayan, do not answer that question; okay? 10:28:43AM
A. Okay.
Q. And that -- that occurs rarely. If, for some reason, your counsel thought maybe there was something attorney-client privilege or something subject to a privilege, she may instruct you not to answer. But normally, during a deposition, there are objections made periodically, but you should still answer the question unless you're specifically told by someone not to answer the question; okay? 10:28:58AM 10:29:14AM
A. Okay.
Q. As I ask you questions, Ms. Burmayan, if you don't understand the question, you can ask me to clarify 10:29:28AM

and I'll attempt to clarify. I may try to find out what you don't understand about it. But if you don't understand the question, you should ask for clarification. Otherwise, we will assume that you understood the question; okay? 10:29:45AM

A. Okay.

Q. All right. And then throughout the day, at various times, we may take breaks here and there. If you feel you need a break, restroom break or a comfort break -- we'll probably take a lunch break at some 10:30:01AM point. If you feel you need a break, then please advise me in advance, maybe a couple minutes in advance and I will attempt to finish up the area that I'm asking you about; is that agreeable?

A. Yes. 10:30:17AM

Q. Okay. And finally, at the conclusion of the deposition, the court reporter will prepare a transcript that will contain all of my questions, all of your answers, all of your counsel's objections. It will contain Mr. Kang's questions and your answers to his 10:30:37AM questions as well and any objections, if any, to those. And you'll have an opportunity to review that transcript, if you so desire, and you can make changes to your answers, if you desire.

However, I'll caution you that if you make 10:30:54AM

changes of substance, in other words, of any significance, where you're changing a "yes" answer to a "no" answer or you're completely changing your testimony that you gave here today, if you do that, either myself or Mr. Kang or anyone else involved in this case may 10:31:08AM comment upon the fact that you testified in a certain way on October 11th of 2023, but later on you changed your testimony, and that may have an effect on your credibility.

Do you understand? 10:31:25AM

A. Yes.

Q. Okay. All right. Do you have any questions before we begin a little bit more of the substance of your deposition?

A. Not at the moment, no. 10:31:36AM

Q. Okay. Let me start by asking you, where are you physically right now?

A. I'm in a conference room.

Do you want the address or the city?

Q. Are you in your counsel's legal offices? 10:31:49AM

A. Yes.

Q. And what city is that?

A. L.A.

Q. Okay. And is there anyone there other than you and your counsel to your immediate left? 10:32:04AM

A. No.
Q. And what kind of device or screen are you looking at for this Zoom deposition, Ms. Burmayan?
A. Computer laptop.
Q. Okay. Is -- is it a single picture lap -- screen that you're looking at? 10:32:14AM
A. Can you clarify what you mean by single?
Q. Yeah. Is there more than one screen open? Sometimes you can split screens on computers. You can have two different things open looking at a document while also looking at a video, or something like that. Is there anything open other than this Zoom video? 10:32:35AM
A. No. I can tell you what I see, which is myself and then about -- one, two, three, four -- five other people on top of my picture. But as far as the screen, it's only one. 10:32:49AM
Q. Okay. So there's nothing else opened up, any other document or anything like that open on the screen; right?
A. No. 10:33:00AM
Q. Is that correct?
A. Correct.
Q. Okay. And do you have your telephone with you?
A. I do, yes. 10:33:05AM

Q. Is it turned off?
A. Yes, it is.
Q. Okay. And you don't have any other computer screen elsewhere in -- in the vicinity of where you are that is open that you can look at? 10:33:19AM
A. Now I do. Correct.
Q. Okay. Do you have any documents or notes or papers or anything else that are in front of you?
A. No, I do not.
Q. Okay. If, for some reason, you -- any 10:33:35AM documents are put in front of you or if there's any screen that's open or if you're looking at your phone or anything like that, will you please tell me?
A. Yes.
Q. Normally, in a deposition, in the pre-COVID 10:33:48AM days, we would be in the same conference room, generally speaking, and I'd be able to see if you had any documents or anything you were looking at during the deposition, just like in court -- in a courtroom, if you're on the witness stand, you can see what the 10:34:03AM witness is looking at. But because we're doing this via Zoom, I need you to tell me if you're looking at anything during the deposition.
Do you understand?
A. Yes. 10:34:13AM

Q. Okay. So if anything -- if anything changes, if a document is shown to you or a screen is opened or anything like that, please tell us and we'll address that subject at the time; okay?

A. Okay. 10:34:26AM

Q. All right. And if anybody else comes in the room other than your counsel, please advise us of that as well; okay?

A. Okay.

Q. All right. Any questions that you have before 10:34:37AM we begin the substance of your deposition?

A. Not at the moment, no.

MS. MKRTCHYAN: Just excuse me, I'm sorry for interrupting. I have a question for the court reporter.

Do I have permission to record this? Is there 10:34:51AM any way I can record on my end?

THE REPORTER: I don't know if you're able to record it. There is a videographer recording the deposition so I would think --

MS. MKRTCHYAN: Okay. 10:34:56AM

THE VIDEOGRAPHER: This is the videographer. I don't think that you have a button on your end. I mean if in your laptop somewhere it might have a screen record function, but I don't know --

MS. MKRTCHYAN: Yeah, the host -- the host has 10:35:21AM

to --

MR. FEARS: Counsel --

MS. MKRTCHYAN: -- the host has to provide me. I'm sorry.

MR. FEARS: Counsel, the deposition was noticed pursuant to a videographer. That was in the notice, and that's required if there is going to be any type of videotape. And that will be available to you. Obviously, you can request that. But to have your own video of the deposition would be, in my view, inappropriate because that is something that is subject to notice. 10:35:27AM 10:35:45AM

And there's various procedures and process, and the videographer, as you can tell, has to do certain things that you wouldn't necessarily be doing. So I think it would be a violation of the Code of Civil Procedure for you on your own videotape to do a videotape that is not pursuant to Code. 10:35:58AM

MS. MKRTCHYAN: We are not subject to Civil Code of Procedure. This is a federal case. And if you are doing a Zoom deposition, all I wanted to know if you're going to object for me to record. If you're objecting, objection noted for the record. That's fine. 10:36:14AM

MR. FEARS: Yeah, and I believe the same is true under the federal rules as well, so -- but there 10:36:25AM

will be -- the Zoom video deposition will be available to you like it will be to all other parties to the litigation.

BY MR. FEARS:

Q. Okay. You mentioned, Ms. Burmayan, that you reviewed certain video clips and audio clips in preparation for your deposition; is that correct? 10:36:36AM

A. Yes, correct.

Q. And can you describe for me what video clips that you reviewed in preparation for the deposition? 10:36:54AM

A. Yes. I reviewed a videotape of myself inside CVS, as I'm exiting the store -- a few minutes right before I'm exiting the store. And then also I reviewed a videotape of myself sitting in the patrol car having dialogue or exchange with the police officer. And then as well audiotape of myself and the three police officers after I have exited. And then also a videotape of the officer when he returns to the car and hands me the citation. 10:37:16AM

So I reviewed several different videotapes and audiotapes. 10:37:35AM

Q. Okay. And with respect to the videotape of you exiting the CVS store, I assume that you are referring to the CVS store on San Fernando Road in Glendale, 3943 San Fernando Road? 10:37:56AM

A. Yes, correct. I don't know the exact address or the number of the store, but it was on San Fernando, correct.

Q. In Glendale, California?

A. Glendale, California, correct. 10:38:08AM

Q. And with respect to that video of you exiting the store, do you know what the source of that video was? In other words, who took that video?

A. It was explained to me or my understanding is that it is the CVS store's video. 10:38:21AM

Q. And then you said secondly the video of the you in the patrol car, and I believe you said outside of CVS. Do you know what the source of that video was?

A. I believe it was explained to me that it was from the police officer's video. I don't know if it's 10:38:40AM body or the video of inside the car, as far as if there's a camera inside the car, but I'm -- I believe the source would be the patrol car or the police officer.

Q. Okay. And then the third thing that you 10:38:54AM mentioned was an audio with you speaking with the police officers. Do you know who the source of that audiotape was?

A. Again, I believe that it would be one or all three of the police officers' body camera or audio 10:39:10AM

camera. I'm not quite sure how that works, but it would be, I believe, from also the police officers.

Q. Okay. And then the same question with respect to the audio of you receiving the citation after you got out of the police car, do you know who the source of that was? 10:39:27AM

A. Yes. Again, that was video footage and it was probably -- I believe it would be from the police officer's either body camera or camera inside the patrol car. 10:39:43AM

Q. Yeah. And when you refer to police officers, are you referring to the Glendale Police Department officers?

A. Yes, correct.

Q. Did you -- other than those videotapes and audiotapes that you just mentioned, have you looked at any other videotape or audiotape that is in any way related to your experience at CVS on either January 13th or January 19th of 2021? 10:39:51AM

A. No, not from my recollection. Those are the videos and audios that were provided to me. 10:40:16AM

Q. Okay. Did you personally take any pictures or audio or video of the inside of the CVS store? And when I refer to the CVS store, I'll be referring to the San Fernando Road store in Glendale that you mentioned. 10:40:41AM

I'll be referring to that unless I specify a different CVS.

Do you understand?

MS. MKRTCHYAN: Objection; compound.

BY MR. FEARS: 10:40:53AM

Q. Do you understand?

MS. MKRTCHYAN: Yes, you have to answer.

THE WITNESS: Yes. I don't know what compound means, but if you want me to answer the question, the answer would be yes. 10:41:04AM

BY MR. FEARS:

Q. Okay. Just to be -- to clarify what I told you or mentioned before as part of the ground rules, that's an example where your counsel objected and she's making the objection for the record. And after she is 10:41:13AM finished, you should just go ahead and answer the question. You don't have to ask me if you can answer the question or ask anybody. You should just answer the question unless somebody specifically says "Don't answer that question"; okay? 10:41:29AM

A. Okay. Yes, I was waiting for my counsel to finish and then I answered the question.

Q. Right. I get that. And that's why I'm clarifying because you don't -- you don't have to wait unless your counsel tells you not to answer. So she may 10:41:39AM

make, you know, five objections during this deposition, she may make 500, but there's no need to wait unless she tells you not to answer.

Do you understand?

A. Yes. I was waiting for the dialogue between the two of you to be over for me to answer. That's what I meant. 10:41:59AM

Q. Yeah, no worries. I'm just -- it looked like you paused and then you asked if you should answer or something. So I just wanted to clarify again the rules. I get you have been deposed a couple of times, but it's an unusual kind of procedure. 10:42:08AM

Okay. Let me get back to my question, Ms. Burmayan.

With respect -- when I -- I just want to be clear. You understand when I'm referring to the CVS store in this case that -- related to you, I'm referring to the store at 3943 San Fernando Road in Glendale where you visited on January 13th and January 19th of 2021. 10:42:20AM

Do you understand? 10:42:45AM

A. Can you repeat the question? It was a little bit -- it got -- it went in circles. Can you repeat the question again?

Q. Yes.

If I refer to a CVS store, an incident at the 10:42:54AM

CVS store, I'm referring to the store at 3943 San Fernando Road in Glendale, where you visited that store on January 13th and January 19th of 2021.
Do you understand that?
A. Yes. 10:43:17AM
Q. Okay. If I'm referring to a different CVS store, I'll specifically mention the different store, but otherwise, I'll be generally referring to that San Fernando Road store that you visited on January 13th and January 19th of 2021; okay? 10:43:31AM
A. Okay.
Q. All right. So my question then is, have you reviewed any pictures or audio or video that you took on your own phone, if any, at the CVS store on either January 13th or January 19th of 2021? 10:43:52AM
A. Yes.
Q. And when did you review the pictures, audio or video?
A. About almost six months to a year after the incident. 10:44:07AM
Q. All right. Did you review those pictures, audio or video in preparation for your deposition?
MS. MKRTCHYAN: Objection; compound.
The whole time, Counsel, you're referencing audio, video, photo, there's no -- the answer is not 10:44:18AM

clear whether it references audio, video, photo. Please break it down. Thank you.

BY MR. FEARS:

Q. You can respond, Ms. Burmayan.

A. Can you repeat the question? Because I'm confused right now. 10:44:29AM

Q. Okay. Did you review -- those pictures, audio or video that you just referenced, did you review that in preparation for your deposition here today?

A. Yes. 10:44:48AM

Q. Okay. With respect to the video, audio or pictures, can you specify what it was? In other words, was it video? Was it audio? Was it pictures? All three? Or two of the three? Or one of the three? Can you -- can you tell me what it was you actually reviewed? 10:45:13AM

A. Pictures.

Q. Did you take any audio of what was occurring at the CVS store on January 13th or January 19th of 2021? 10:45:28AM

A. For clarification, I attempted to take video. I did press the button of the video. But because of my anxiety and because I was also shaking, it turns out, later on, when I reviewed, that I actually had not taken a video and it was pictures. 10:45:42AM

Q. Okay. And I take it then you also did not have any audio when you later looked at your phone for the -- for what you had taken on the 13th and 19th of 2021?
A. No, because the audio would have been part of the video. But because there was no video taken, so that's why I only have pictures. 10:46:00AM
Q. So it's fair to say then the only images you took on your phone on January 13th or January 19th of 2021 were pictures on your phone; is that correct? 10:46:20AM
A. Yes.
Q. How many pictures did you take?
A. Two.
Q. Okay. And on which date or dates did you take those pictures? 10:46:37AM
A. January 19th.
Q. Were there any taken on January 13th?
A. No.
Q. Okay. So just to be clear, you don't -- fair to say that you didn't take any audio, video or pictures on January 13th of 2021 at the CVS store; right? 10:46:46AM
A. Right.
Q. Okay. And with respect to the two pictures that you took on your phone, those were both taken on January 19th of 2021; correct? 10:47:08AM

A. Correct.

Q. And do you remember what it was that you took pictures of on January 19th of 2021?

A. I took pictures of the two employees, Guy Garcia and Joe Jackson. 10:47:22AM

Q. And at what point in your visit to the CVS store on January 19th of 2021 did you take those pictures?

A. The point when I was exiting the store.

Q. And was that just immediately prior to the time when the Glendale Police Department engaged you? 10:47:39AM

A. Yes, it was before the Glendale Police Department engaged me.

Q. And approximately how long before they engaged you? 10:47:59AM

A. I did not have a watch on me so I don't know the exact amount, but from my recollection, I was at the exit about two minutes before I exited. So the police officer came right after those two minutes. So I would say about two minutes. 10:48:18AM

Q. Okay. Other than -- well, let me withdraw that.

Have you ever been convicted of any crime, Ms. Burmayan?

A. No, I have not. 10:48:41AM

Q. Have you ever been arrested?

A. No, I have not.

Q. Are you currently employed?

A. No, I am not. If I can explain that, I am still employed with L.A. Unified School District, but I was on the workers' comp case. So technically, yes, I'm still employed. 10:48:56AM

Q. Okay. And for how long have you been employed by L.A. Unified School District?

A. Since 1993. 10:49:09AM

Q. Okay. And has that -- have you been -- other than time off, leaves of absence, perhaps for workers' comp, or whatever you're on right now, have you been continually employed by L.A. Unified School District from 1993 up until the present? 10:49:31AM

A. Yes.

Q. And what has your position or positions been at L.A. Unified School District from 1993 to the present?

A. The first four years I was a teacher assistant, then I was an elementary school teacher for five years, after the first four years. And then after about five years when I received my teaching credential and my master of arts in education, I then took some time off, became a substitute teacher for about two 10:49:47AM 10:50:05AM

years to go back to school and get my master's of science in school psychology.

So then, after I received my master's, I worked for about two years at John Marshall High School as an extended learning academics coordinator. 10:50:20AM

Q. I'm sorry, two years as a what?

A. Extended learning academics coordinator. It was a Title 1 funded program. And when the funding ended, I then automatically went on the waiting list to become a school psychologist. So I have been a school 10:50:36AM psychologist from that period after I was an extended learning academics coordinator until the present.

Q. And so as a school psychologist, what is the period of time when you first commenced being a school psychologist? 10:50:52AM

A. Roughly around 2016 until the present.

Q. Okay. And you mentioned that you're still employed by L.A. Unified School District. What is your current status with L.A. Unified School District?

A. I am still employed, but also we're waiting on 10:51:13AM the settlement papers. There's a possibility that I might either voluntarily resign or separated. So that is something that my attorney's talking, I'm assuming with the employer.

Q. So what you're saying is that you're still -- 10:51:31AM

well, let me withdraw that.
I take it you are on a leave of absence of some sort, possibly a workers' compensation leave of absence, with L.A. Unified School District; correct?
A. Yes, correct, I'm on a leave of absence. But because you asked me about my status, that's the best way I can answer, which is that I'm still employed with LAUSD, but as far as my status, whether I'm separated or voluntary resignation, that is something that I'm not sure of yet. I'm waiting for my attorney to tell me. 10:51:47AM 10:52:03AM
Q. Okay. So that -- let me back up for a second then.
When was the last time you were actively working as a psychologist for L.A. Unified School District? 10:52:18AM
A. When you say "actively working," do you mean like walk -- physically attending a school, walking in, doing job -- doing work?
Q. Yes. And I mean -- but it doesn't have to be working or going to school because, obviously, there is also the COVID period of time, but where you were engaged and working, not on some type of leave of absence where you were excused of all work. 10:52:29AM
A. That would be approximately January of 2020, right before I filed the workers' comp case. 10:52:46AM

Q. Okay. So January 2020 was the last time that you were reporting to work as a psychologist at L.A. Unified School District?
A. Yes, correct.
Q. And where were you assigned at that period of time immediately before you stopped working in January of 2020? 10:53:01AM
A. I was assigned to psychological services, which is part of Los Angeles Unified School District.
Q. And physically where? 10:53:21AM
A. Vermont Elementary.
Q. For how long did you work at Vermont Elementary?
A. About a year, approximately.
Q. Was that the last year of what I'm referring to as your active employment where you were reporting to work? 10:53:29AM
A. Yes, that was the last year where I was physically attending a job site.
Q. Okay. And then prior to that, as I understand it, you have been a psychologist employed by the L.A. Unified School District since 2016. Where were the -- starting in 2016, where were the other locations where you were physically assigned to work? 10:53:39AM
A. Yes. Every year, it was almost a different 10:54:00AM

school. I don't know if I can remember every single school, but some of the ones I can remember is Thomas King Middle School, Belmont High School, Holmes Elementary, Vermont Elementary, as I mentioned. I don't recall the others at the moment. 10:54:24AM

Q. Okay. And in your role as a psychologist for L.A. Unified School District from 2016 through 2020, can you just describe generally what your work or job duties were?

A. Yes. A large part was counseling. So I have 10:54:40AM a list of students that I was doing specific counseling for that were part of their IEP, which is an individualized education program. So it was roughly between 20 to 30 minutes of counseling per student, or sometimes I had groups and I would cater to their needs 10:55:00AM if they had Special Ed eligibility, for example, autism, emotional disturbance, ADHD. So that was the counseling portion.

And then I had something called psychological assessments, which took about 60 days. And that 10:55:16AM included when a student was reported for having either a learning disability or emotional issue, we would first meet at a school and go over the information. For example, if a parent reported some behavior problems, we would go over what those issues were and then we would 10:55:36AM

offer counseling or intervention. And then we would reconvene about six weeks later to see what has helped and what hasn't.

And if it hasn't helped, then perhaps we would offer psychological assessment, which is where I came in. And that included about 60 days of record reviews, medical exams, and then my standardized examinations, and then also report writing, and then the actual meeting which is called an IEP. 10:55:51AM

Q. Okay. And that was -- that description you just gave, is that a general description for what you were doing from roughly that 2016 until January of 2020 time frame when you went out on a workers' comp leave? 10:56:08AM

A. Yeah. That's a very general description, yes.

Q. And were you doing that psychologist work that you described full-time during that 2016 through 2020 -- or January 2020 time frame? 10:56:30AM

A. Yes, correct.

Q. Okay. And during that period of time -- or why don't you start with the -- at the last period of time that you were actively working as a psychologist up to January 2020, can you tell me what your compensation was, in other words, your salary annually for being a psychologist for the L.A. Unified School District? 10:56:46AM

A. Can you repeat the question? Did you mean for 10:57:10AM

every year or the last year?

Q. Starting with the last -- I'm really interested in the last year. So I'm looking for what your salary was at the time that you started your January 2020 leave of absence. 10:57:24AM

A. Roughly about 50- to 60,000.

Q. And during the period of time from January of 2020 up until the present, have you continued to receive your salary? I'm not asking about workers' compensation benefits. I'm asking whether or not you were on some 10:57:49AM type of paid leave of absence.

A. When I filed the workers' comp case in January of 2020, the way it works is first you have to use your own illness time as far as full illness time, half illness time. And then once you exhaust your full and 10:58:06AM half illness time, you're considered unpaid medical leave. So July 2020, I exhausted my full illness days and my half illness days, so I received zero paycheck starting from 2020 until now.

Q. Okay. So then other than any type of workers' 10:58:29AM compensation benefits you may have received, if any -- and I'll ask you about that in a moment -- from July of 2020 until the present, you have not been receiving your regular salary for working as a psychologist or in any other position at L.A. Unified School District; is that 10:58:47AM

correct?

A. Correct, I have not received a paycheck from July 2020 until now from LAUSD.

Q. Okay. And then were you, during that same period of time -- any time from January of 2020 all the way up until the present, were you receiving any type of workers' compensation payments, temporary disability payments or any other type of payments that workers' compensation provided to you? 10:59:00AM

A. No, I did not receive any payments from workers' comp. 10:59:19AM

Q. Okay. Have you had any source of income at all from July of 2020 up to the present?

A. Yes. My workers' comp attorney suggested that I file for disability through EDD, and I attempted to file disability through EDD. 10:59:38AM

Q. Okay. And when did you file for disability through the Employment Development Department, or EDD, as you mentioned?

A. July 2020, right when I ran out of my full-time and half-time illness days at LAUSD. 10:59:54AM

Q. Did you qualify for a disability through EDD?

A. I believe I qualified for unemployment, which is what they gave me. So I received unemployment through EDD. 11:00:14AM

Q. And so when you say "unemployment," you received unemployment compensation as opposed to disability compensation through EDD; is that correct?
A. Yes. That's what was explained to me.
Q. And for how long did you receive unemployment compensation once you filed for that? 11:00:30AM
A. I believe about a year. So probably around 2021 July or August is when I stopped receiving EDD unemployment.
Q. Okay. Did you ever file for any type of federal Social Security disability benefits since January of 2020, at any time all the way up until the present? 11:00:47AM
A. No.
Q. Have you filed for any other type of disability through any state or federal program at any time from January 20th -- I'm sorry, from January 2020 up till the present? 11:01:02AM
A. No.
Q. Okay. And other than the unemployment compensation that you received from the Employment Development Department for -- I think you said approximately a year starting in July or August of 2020, other than that, have you had any source of income since January of 2020, when you went out on a leave of 11:01:19AM 11:01:40AM

absence?
A. Yes.
Q. And what other source of income?
A. I worked as a home school teacher at an Armenian private school for about a month. 11:01:52AM
Q. And what was the name of that school?
A. I don't recall. It was on -- it was in the Valley in North Hollywood. I don't recall the name of the school. It was a church and a school.
Q. And what time frame was that one-month period 11:02:08AM of time?
A. Roughly between August and September.
Q. Of what year?
A. Of last year.
Q. 2022? 11:02:23AM
A. Yes, correct.
Q. Okay. Other than that brief stint of work, Ms. Burmayan, have you had any other source of income from January 2020 to the present, and also other than the unemployment compensation that you mentioned for 11:02:42AM about a year during that 2020 to 2021 time frame?
A. No, I have not.
Q. With respect to your condition that you had in January of 2020, you said you went out on a workers' comp matter; right? 11:03:09AM

A. Uh-huh.
Q. Yes?
A. Yeah. Sorry. I was swallowing the water.
Q. No problem. No problem. I understand.
So with respect to the injury that you claimed 11:03:17AM occurred in January -- that caused you to go out in January of 2020, what was it specifically that occurred that caused you to take a leave of absence commencing in January of 2020?
MS. MKRTCHYAN: Objection; vague and 11:03:36AM ambiguous.
But you may answer.
THE WITNESS: For clarification, are you asking me what was the reason for the workers' comp case I filed? 11:03:48AM
BY MR. FEARS:
Q. I wasn't asking so much that because maybe your lawyer would answer that question.
What I was asking was why, in your own words, starting in January of 2020, did you go out on a leave 11:03:58AM of absence?
A. It was a harassment and hostile work environment situation with my supervisor at LAUSD and coordinator.
Q. And was that while you were working at this 11:04:16AM

Vermont Elementary School?
A. No. That was at King Middle School.
Q. And who was it that you claim the supervisor -- who was the supervisor that was creating this hostile environment that caused you to go out in January of 2020 -- I'm sorry, January of 2020? 11:04:38AM
A. Yes, it was both the supervisor and coordinator. Supervisor's name is Sergio Aviles, and the coordinator's is Mariam Chow.
Q. I'm sorry, Sergio Aviles? 11:04:56AM
A. Yes.
Q. A-v-a-l-e-s [sic] or Z?
A. S.
Q. And the coordinator was whom?
A. Mariam Chow. 11:05:08AM
Q. Okay. And were you actually working at King Middle School immediately before going out on this January of 2020 leave of absence?
A. Yes, I was working at King Middle School when with the incident happened. But then it continued to the following year at my night school, which is at Vermont. 11:05:30AM
Q. Okay. So that's what I was trying to understand. So this -- this alleged harassment or hostile environment started about a year before January 11:05:43AM

of 2020 when you were working at King Elementary?

A. Yes. And because I had the same supervisor, it continued all the way until I went on the work -- leave on absence.

Q. So even though you transferred to another school, you would maintain the same supervisor; is that correct? 11:05:56AM

A. Correct. Yeah, same supervisor at psychological services.

Q. And same coordinator as well? 11:06:06AM

A. The coordinator was different. Her name was Lynn. I forget -- Elias. Lynn Elias.

Q. Okay. And you referred to an incident that occurred. What was the incident that occurred that, in your mind, constituted this harassment or -- and/or hostile environment with Mr. Avales and Ms. Chow? 11:06:21AM

A. Yes. I was placed at King Middle School. I replaced a psychologist who had committed suicide. I was not told that. And what happened was I inherited her workload. And so it was a lot of work to catch up because I had to complete one year of her work plus my work caseload. I asked for assistance. Typically, when you ask for assistance from your coordinator, you're given another psychologist that works part-time usually, at least to help you with the case load for the 11:06:42AM 11:07:01AM

counseling or with the assessment.

I asked several times because I knew that I was not going to be able to catch up with the workload. And instead of giving assistance, I was not given the assistance and I ended up falling into what is called with the red zone, which is when you can't keep up with the workload, and I was, I believe informally or formally, written up as a result. 11:07:17AM

Q. Okay. And so was the incident you were referring to, the -- the write-up that you received as a result, in your mind, of not getting the sufficient help when you took over this workload? 11:07:33AM

A. Yes. For clarification, when you say "in my mind," what does that mean like as far as what factually happened or -- 11:07:52AM

Q. Yeah, you -- you've -- well, you characterized something as harassment and hostile environment. And so I'm just asking, in your mind or in your view, in your opinion, that the fact that you were not given sufficient help to take over this workload and then ultimately were written up for falling behind into the red zone, that that was the harassment and/or hostile environment that you were referring to; correct? 11:08:08AM

A. Yes. I can elaborate on that if you'd like.

Q. Probably not necessary. I just wanted to get 11:08:26AM

a general sense there of what it was.

And then was there something that occurred in January of 2020 that was either an incident or final straw or something that occurred that caused you to finally go out on the leave of absence? 11:08:47AM

A. Yes. It was the case load again, that I was asking for help. And as a result, I was put in a situation where instead of receiving help, it made it look like I was the one who was not competent. So what happened was I went to work and I wasn't feeling well 11:09:07AM and I asked my administrator on-site that I need to go see a doctor.

So on that day, I called up my doctor. I told my doctor I'm not feeling well and I need to come in to have a visit. And so I e-mailed everybody on-site and 11:09:26AM off-site and I left the school to go see my doctor.

Q. And who was the doctor you went to see?

A. On that day, it was a nurse practitioner that was at Cedars-Sinai, and it was part of Cedars-Sinai, but it was considered like a sister building of 11:09:43AM Cedars-Sinai. It was in Santa Monica. And because it was an emergency, they placed me with her.

Q. Okay. And I take it you saw her on that day?

A. Yes.

Q. And was that the last day you actually 11:09:55AM

worked -- you were actively working for L.A. Unified School District?

A. Yes.

Q. Okay. And was there a doctor that put you off work or gave you some type of medical note placing you on a leave of absence? 11:10:06AM

A. Yes. Stephanie Jones.

Q. Is that the nurse practitioner?

A. Yes, correct.

Q. And for what period of time did Stephanie Jones put you off work? 11:10:17AM

A. It was roughly about 30 days. So sometime before January 20th, about 30 days after that. So maybe January 19 to February 19. I don't recall the exact dates, but it was for 30 days. 11:10:36AM

Q. And was that extended by someone after the first 30 days?

A. Yes. By Dr. Neely.

Q. Can you spell his last name?

A. It's a female, and it's N-e-e-l-y. 11:10:48AM

Q. Do you know what kind of doctor Dr. Neely is?

A. I believe it's a general doctor. She replaced my medical primary doctor because my doctor went on retirement.

Q. And for how long did Dr. Neely put you out? 11:11:05AM

And when I say "put out," I mean put off work.
A. I would say about a few weeks. I don't recall the exact amount, but a few weeks.
Q. Okay. I take it that was extended as well?
A. Yes, it was. 11:11:20AM
Q. And what doctor or doctors or medical practitioners extended that?
A. Dr. Mulakias.
Q. Can you spell that, please?
A. From my best recollection, it's 11:11:32AM M-u-l-a-k-i-a-s.
Q. And what kind of doctor is Dr. Mulakias?
A. Psychiatrist.
Q. And for how long did Dr. Mulakias put you out?
A. It could have been roughly two weeks to a 11:11:55AM month. I don't recall exactly.
Q. And was that extended?
A. Yes.
Q. By whom?
A. I believe right around that time is when my 11:12:04AM workers' comp case started, so then I was being treated by my lien doctors from the workers' comp case. So there was two doctors around that time, one of them was Dr. Joukar, and then one of them was Dr. Halidatmed (phonetic). 11:12:27AM

Q. Okay. And they put you out on workers' compensation leave?
A. Yes, correct.
Q. And what kind of doctors -- or doctor was Dr. Ahmed [sic]? 11:12:38AM
A. Dr. Halidatmed was lien orthopedic doctor.
Q. And Dr. Joukar?
A. He was my acupuncture doctor.
Q. Okay. Did you claim in the workers' compensation case that you suffered some type of 11:12:56AM physical injury?
A. Yes.
Q. And I take it you also claimed in the workers' compensation case against L.A. Unified School District that you claimed psychological or psychic injury as 11:13:11AM well; correct?
A. Psychological, yes.
Q. And with respect to the physical injuries that you claimed as a result of your job, what was it physically that you injured or, you know, what did you 11:13:26AM injure as a result of working as a psychologist at L.A. Unified School District?
MS. MKRTCHYAN: Vague and ambiguous, asked and answered.
THE WITNESS: Should I answer? 11:13:37AM

MS. MKRTCHYAN: Yes, yes.
THE WITNESS: Okay. So I injured orthopedic lower back and upper back and then carpal tunnel, also headaches, migraines. I also have physical pain, which I believe falls under stress or maybe internal, which is 11:13:51AM IBS and gastritis.
So to review, basically, the orthopedic would be lower back, upper back, leg pain, foot pain, carpal tunnel, and then migraines, headaches, and then also internal, which is IBS and gastritis. 11:14:11AM
BY MR. FEARS:
Q. With respect to the upper and lower back, the orthopedic injury that you're referring to, did you have some type of physical accident that occurred at L.A. Unified School District? 11:14:27AM
A. It was mainly from prolonged periods of sitting and typing, repetitive movements, and from long driving, which I had asked many times to be placed closer to my home. So it was from work, yes.
Q. But as I understand it then, it was from some 11:14:43AM type of repetitive activity, but not from a slip and fall or accident or specific injury that caused the back injury; correct?
A. No, not from a slip and fall. It was work related as far as repetitive typing, and also carrying 11:14:58AM

large number of heavy books up and down the stairs and elevator.

Q. Okay. And prior to 2000 -- January of 2020, had you ever received treatment for back or orthopedic injury to your -- your lower and upper back? 11:15:23AM

A. I'm sorry, can you repeat the question?

Q. Yeah.

Prior to January of 2020, did you receive any type of medical treatment for any kind of orthopedic back injury? 11:15:39AM

A. Yes.

Q. Was that going back to 2010?

A. Yes.

Q. Any other -- and that related to your workers' comp matter in 2010? 11:15:51AM

A. Yes.

Q. Any other treatment you received other than the -- the workers' compensation care associated with the 2010 claim you made?

A. Yes, the hit-and-run accident. 11:16:00AM

Q. Okay. Anything else?

A. No.

Q. What about psychological injury, prior to January of 2020, had you ever received any type of treatment from a psychologist, psychiatrist or any type 11:16:16AM

of mental health therapist?

A. Not prior to 2020.

Q. When was the first time you had -- after January of 2020, that you started receiving treatment from a psychologist, psychiatrist or mental health therapist? 11:16:32AM

A. Right away, January 2020, February 2020, I was already starting to see a therapist.

Q. Okay. And with respect to the names of those therapists or doctors, chronologically, can you give me 11:16:49AM the names starting from January of 2020 up to the present whom you have received any type of psychological or mental counseling or therapy or treatment or medication, if it was a psychiatrist, can you give me the names of those individuals? 11:17:12AM

A. Yes. I'll try my best with chronological order.

Q. Okay.

A. But when I did have insurance through LAUSD, the main psychiatrist was Dr. Mulakias. And then in 11:17:25AM between for therapy was Emily, but she was only a few times in between. And then basically that continued until I exhausted my private insurance, which was July 2020. That's right around the time when I exhausted my full-time sickness days and my half-time sickness days. 11:17:49AM

So then, as a result, I went on Medi-Cal in July 2020.
So right around that time is also when I started my workers' comp lien doctors, and I was alternating between my medical -- Medi-Cal therapist and my workers' comp lien doctor therapist. So right around 11:18:11AM July 2020, I was alternating between -- there was somebody from Anchor Therapy, Shushan Kalantaryan.
And then there was also Heyday therapy --
Q. I'm sorry, can you repeat that name again from Anchor Therapy, Shushan? 11:18:34AM
A. Yes, Kalantaryan.
Q. Can you spell that for me, I'm sorry?
A. I'll try my best. K-a-l-e-n [sic] --
Q. I'm sorry, J-a-l?
A. No. It's K-a-l-e-n-t-a-r-y-a-n. 11:18:46AM
And then Heyday therapy, Sevan Tahmassian.
Q. Can you spell that for me, please?
A. T-o-m-v-a-s-i-a-n [sic].
So those were for Medi-Cal, as far as therapy goes. And then right around that time, the workers' 11:19:09AM comp case started. So -- and for clarification, you're asking strictly about the therapy services I received; right?
Q. I'm asking about any psychological, psychiatric or mental health therapy or treatment or 11:19:27AM

psychiatrist giving medication, any type of mental health treatment you received from that January 2020 going forward, and I'm just asking about the names of the doctors, hopefully in chronological order.

A. Right. Yeah, I just wanted to clarify it was strictly psychological services. 11:19:47AM

Okay. So, like I said, initially it was Dr. Mulakias, and then a few times there was Emily, which was a therapist here and there.

Q. And let me just stop you on Emily. Emily, maybe you mentioned this, Emily who? 11:20:01AM

A. I don't recall the last name.

Q. Associated with whom?

A. It was part of my private medical insurance. I don't remember her company. 11:20:15AM

Q. She wasn't a part of Mulakias's office or anything?

A. I don't recall if she was part of Mulakias's office, but she was a therapist, she was not a psychiatrist. 11:20:25AM

Q. Okay. And I interrupt -- I interrupted you. You said Mulakias, then Emily, and then?

A. Uh-huh. And then I went on Medi-Cal. So right around that time, it was Anchor Therapy, Heyday therapy, Shushan Kalantaryan, and then Sevan Tahmassian. 11:20:39AM

Also, on occurrence where I -- you know, outside of the Medi-Cal, if I needed therapy here and there, I would call an 800 counseling number, but it was nobody specific that I would talk to. That was if I needed extra resources. But then a stable resource came 11:20:59AM from the workers' comp case, which was Dr. Tribble and Dr. Flores. And those were my last therapists. And also, on occasion there were their assistants, but as far as stable and formal, it was Dr. Tribble and Dr. Flores. 11:21:20AM

Q. And are you currently under treatment from anybody currently?

A. Dr. Flores.

Q. And when was the last time you were treated by Dr. Flores? 11:21:32AM

A. A few weeks ago.

Q. And what kind of doctor is Dr. Flores?

A. Psychiatrist.

Q. And what about Dr. Tribble?

A. He's also a psychiatrist. 11:21:47AM

Q. Okay. And as I understand your testimony, right now it's unclear whether you're going to resign as part of the workers' compensation settlement with L.A. Unified School District; correct?

A. Correct. Yes, they're trying to figure out 11:22:09AM

the settlement papers.
Q. Okay. Are you currently under any medical restrictions from any of your doctors, orthopedic or mental health doctors, are you under any restrictions that prevent you from working? 11:22:26AM
MS. MKRTCHYAN: Vague and ambiguous as to term "restrictions," calls for expert opinion.
If you can answer.
THE WITNESS: Yes, I have several accommodations that were written up by Dr. Flores. 11:22:38AM Would you like me to give you what the accommodations are?
BY MR. FEARS:
Q. First -- in a moment, I will, but -- so Dr. Flores, the psychiatrist, has placed you on certain 11:22:51AM restrictions; is that correct?
A. Yes.
Q. Has he authorized you to resume work subject to those restrictions?
A. Yes. That's a little bit detailed, but can 11:23:11AM I --
Q. And I'll ask you about them in a second, I'm not trying to prevent you, but sometimes people will be on restrictions where they've told they can't work at all, stay off work type of thing. I just want to 11:23:24AM

clarify, you are not -- have not been told by your doctors you can't work at all; rather, you've been told you can work, but it's subject to certain restrictions that you haven't yet shared with me; right?
A. Yes. 11:23:39AM
Q. Okay. And is there any doctor who has -- is there any doctor other than Dr. Flores currently who you are allowed to work subject to restrictions?
A. Sorry, can you repeat that? You said allowed to work? 11:23:58AM
Q. Yeah, bad question. Let met ask it again.
Is there any other doctor right now other than Dr. Flores who has you under certain restrictions if you're going to work?
A. No. 11:24:12AM
Q. Okay. So with respect to the Dr. Flores restrictions -- first of all, how long have you been seeing Dr. Flores?
A. A year and a half.
Q. Okay. So that would have started roughly 11:24:24AM in -- sometime in the early part of 2022 -- I'm sorry, 2021?
A. 2021, the beginning of 2021.
Q. Okay. And then with respect to Dr. Flores putting you under -- allowing you to work subject to 11:24:42AM

restrictions, when did he tell you you could work, but subject to some detailed restrictions?

A. About a month ago.

Q. Okay. So that was the first time you've been released to return to work, about a month ago? 11:24:57AM

A. He does a six-week follow-up every six weeks. And during that time, he has to write up if I can go back to work or if I can't. And then the last one that he wrote up, he said that I can go back to work but with restrictions. 11:25:22AM

Q. Okay. So that -- was that the first time since January of 2020 that a doctor has released you to return to work with restrictions?

A. Yes.

Q. Okay. So from basically that January of 2020 11:25:33AM up until approximately a month ago or so, you were on, as you understand it, doctor's orders not to return to work with or without restrictions; correct?

A. Yes, correct.

Q. Okay. So then approximately a month ago, 11:25:50AM Dr. Flores said you can go back to work, but here are my restrictions that you have if you go back to work; right?

A. Yes.

Q. And what were those restrictions that 11:26:00AM

Dr. Flores gave you approximately a month ago?

A. He gave me restrictions regarding it has to be virtual academy. I cannot do on-site work, physical. It has to be with breaks every 30 minutes. I cannot be in an office with students or staff. And that was more or less the guidelines. 11:26:18AM

So breaks every 30 minutes and then virtual academy, and I also cannot have any interaction with my supervisor, Sergio Aviles.

MS. MKRTCHYAN: Speaking of breaks, Counsel, can we take a five-minute break, please? 11:26:36AM

MR. FEARS: Sure. Sure. I just want to finish up this question, in this area.

BY MR. FEARS:

Q. So you left off with no interaction with Sergio Avales or the coordinator; is that right? 11:26:45AM

A. Yes.

Q. Any other restrictions other than -- I wrote down four of them -- virtual break every 30 minutes, not in office with students or staff, and no interaction with Sergio or the coordinator; is that correct? 11:27:02AM

A. Yes, correct.

Q. Any other restrictions that Flores has you under other than those?

A. That's the general, from my recollection. 11:27:14AM

Q. Okay. And did he put that in a document, like a written doctor's note where he said you can return to work but subject to the following restrictions, or words to that effect?

MS. MKRTCHYAN: Calls for speculation, vague and ambiguous. 11:27:25AM

If you know.

THE WITNESS: Yes, he did.

BY MR. FEARS:

Q. Did he give you a copy of that document? 11:27:29AM

A. Yes. It was via e-mail.

Q. So I take it you have a copy of that electronic doctor's note allowing you to return to work but subject to those restrictions; right?

A. Yes. 11:27:43AM

Q. Okay. Good enough.

MR. FEARS: Counsel, you asked for a break. So what do you want to take, 5, 10 minutes? I have about, you know, 11:00 -- almost 11:30. So what time do you want to come back? 11:27:56AM

MS. MKRTCHYAN: Five minutes, maybe ten.

How long do you want the break?

THE WITNESS: Five is fine.

MS. MKRTCHYAN: Five is fine.

MR. FEARS: Why don't we, just out of -- so 11:28:04AM

everybody can use the restroom facilities, water, coffee, whatever, why don't we make it about 10 minutes; okay?

MS. MKRTCHYAN: Thank you.

THE VIDEOGRAPHER: Okay. We're going off the 11:28:11AM record. The time is 11:28 a.m.

(Recess.)

THE VIDEOGRAPHER: Okay. We are back on the record. The time is 11:42 a.m.

BY MR. FEARS: 11:42:14AM

Q. Okay. Ms. Burmayan, I was asking you about medical restrictions before we went off the record and you testified regarding certain medical restrictions that Dr. Flores placed you on approximately a month ago or so; correct? 11:42:29AM

A. Yes.

Q. Okay. Other than the restrictions that Dr. Flores placed you on approximately one month ago, from January of 2020, when you went out on a leave of absence, all the way up until about a month ago, did any 11:42:45AM of your doctors place you on any restrictions regarding your activities other than Dr. Flores a month ago?

A. Yes. Dr. Halidatmed, the orthopedic.

Q. And when did Dr. Akmed [sic] place you on restrictions? 11:43:12AM

A. From the beginning of the workers' comp case, so January 2020, February 2020, around then.

Q. And for what period of time did he have you on restrictions?

A. He does follow-ups every six weeks. So every 11:43:25AM six weeks he's been putting me on restrictions.

Q. From January 2020 until what period of time have you been under restrictions by Dr. Akmed?

A. Approximately three to six months ago is when the services ended with him. 11:43:43AM

Q. When you say "the services ended," but did he place you on restrictions that would continue or were the restrictions lifted?

A. The restrictions were never lifted because about three to six months ago was my last visit; and per 11:44:01AM my last visit, the restrictions were still there.

Q. Okay. So then, if I understand your testimony, then, since January of 2020 all the way to the present, you have been under restrictions from Dr. Akmed, the orthopedist; correct? 11:44:20AM

A. Yes, correct.

Q. And what have those restrictions been that Dr. Akmed placed you under?

A. It's regarding lifting heavy items. I believe I cannot lift anything more than 5 or 10 pounds, breaks 11:44:33AM

every 20 minutes, and nonrepetitive movements, regarding carpal tunnel, typing and my lower back pain, I'm supposed to be taking breaks regarding those areas.

Q. Okay. Anything else?

A. I -- it's required that I should be placed 11:44:54AM closer to my house regarding work.

Q. Are you finished?

A. Yes.

Q. Okay. And are these restrictions reduced to writing, some kind of either electronic note or a 11:45:10AM physical paper note that Dr. Akmed gave you?

A. Can you elaborate?

Q. Yeah. You mentioned before that Dr. Flores would give you an electronic note, an e-mail or something that lifted the restrictions that he placed 11:45:27AM you on to return to work, and I think you said that was approximately a month ago.

I'm just asking, has Dr. Akmed given you a document, either an electronic document or a paper document, that placed you on the restrictions that you 11:45:44AM just mentioned?

A. Yes. Almost always he gave me in writing physical paperwork when I was done with the visit. Sometimes also he would include e-mails.

Q. And do you still have those writings that 11:45:57AM

contain the restrictions that Dr. Akmed placed you on?
A. Yes.
Q. Other than the restrictions you've described that Dr. Flores more recently placed you on and that Dr. Akmed has placed you on since January 2020 to the present, are you under any other restrictions by any other doctor or mental health practitioner from the January 2020 up to the present time frame? 11:46:11AM
A. The acupuncture doctor as well has put me on similar restrictions, but it was, I believe, once or twice during the 2020 period, towards the end. So a couple of times I got restrictions from him as well. 11:46:32AM
Q. Were those in writing?
A. Yes.
Q. And you still have a copy of those? 11:46:46AM
A. Yes.
Q. And you still have a copy of Dr. -- both Dr. Flores and Dr. Akmed's restrictions; correct?
A. Yes, all three, Dr. Akmed, Dr. Flores and Dr. Joukar. 11:47:00AM
Q. Dr. Joukar is the acupuncturist?
A. Acupuncture.
Q. Okay. And so you said -- I think you said something to the effect of Dr. Joukar put you on restriction sometime in 2020? 11:47:12AM

A. Yes.
Q. And for what period of time did he have you on restrictions?
A. For about two months between August -- August, September, October, November, December. Maybe around 11:47:26AM two to four months, around then.
Q. From August -- roughly August of 2020 through December of 2020?
A. Yes.
Q. Okay. That was the period of time that you 11:47:38AM were under Dr. Joukar's restrictions; right?
A. Yes. It may have continued until 2021 as well.
Q. Possibly into the early part of 2021?
A. Yes. 11:47:52AM
Q. Okay. But your doctor's notes that -- that he gave you would give the time frame for those restrictions; right?
A. Yes.
Q. And with respect to Dr. Joukar's restrictions, 11:48:02AM what were they?
A. My stomach pains, which include IBS and gastritis, I'm supposed to be taking Gas-X for that. So bathroom breaks because sometimes I go between diarrhea and constipation. So it was mainly revolving around my 11:48:19AM

bathroom breaks for gastritis and IBS. And then also for my orthopedic lower back and upper back, I have to do breaks, stretches to relieve the pain symptoms.

Q. And all of that is summarized in these writings that Dr. Joukar would give you with his medical 11:48:43AM notes; correct?

A. Yes.

Q. Okay. All right. So let me ask the question again. From January of 2020 up to the present, have you been -- have you had any medical or doctor restrictions 11:48:59AM from anyone else other than Dr. Flores, Dr. Akmed and Dr. Joukar, as you've testified about?

A. No, not to my recollection.

Q. Okay. All right. Let's focus on January 13th of 2021. Specifically, as I understand it, you visited 11:49:27AM the CVS store where the incidents took place, the CVS store that I mentioned previously at 3943 San Fernando Road in Glendale; correct?

A. Yes.

Q. Now, is that a CVS store that you have visited 11:49:49AM before?

A. Yes.

Q. Before January 13th of 2021?

A. Yes. I've been going there since around 2001.

Q. Okay. And is that the CVS store that is 11:50:02AM

closest or was closest to your residence?
A. Yes.
Q. Okay. So you would go to that CVS store out of convenience because it was close by; correct?
A. Yes. And I knew most of the workers. 11:50:16AM
Q. Okay. And approximately how far away was that CVS store from where you resided from 2001?
A. Five minutes.
Q. Okay. Just literally a five-minute drive?
A. Yes. 11:50:33AM
Q. And you said you knew most of the workers?
A. Yes.
Q. And when you say "know most of the workers," is that the workers both in the front of the store area as well as the pharmacy? 11:50:43AM
A. I'm focusing more on the -- not on the pharmacy, but on --
Q. Front end -- front end --
A. Sorry.
Q. The front end of the store? 11:50:55AM
A. Yes.
Q. Yeah. Okay. And with respect -- when you say you knew most of the workers, did you have a good relationship with the workers in the front end of the store, at least prior to January 13th of 2021? 11:51:07AM

A. Yes.
Q. Did you have any issue or problem with anyone prior to January 13th of 2021?
A. No.
Q. So generally a good relationship that you had 11:51:19AM with your local CVS store, at least up until January 13th of 2021; correct?
A. Yes.
Q. And then on January 13th of 2021, you went to the CVS store to shop; correct? 11:51:35AM
A. Yes.
Q. Do you remember approximately how long you shopped -- let me withdraw that.
Do you remember approximately how long you were in the store -- the CVS store on January 13th of 11:51:50AM 2021?
A. Well, I watched a video and it's roughly overall, from beginning to end, I -- it appears it's about 30 minutes.
Q. Okay. And that was one of the videos you 11:52:06AM reviewed as part of your preparation for this deposition?
A. Yes.
Q. Okay. And is that consistent with your recollection that you were there for approximately 30 11:52:15AM

minutes, plus or minus?
A. Yes, more or less 30 minutes.
Q. Okay. And when you went there, did you go with anyone?
A. No. 11:52:26AM
Q. You drove yourself?
A. Yes.
Q. Okay. And then during that visit, did you speak with anyone?
A. Yes. 11:52:41AM
Q. Did you speak with more than one person?
A. Yes.
Q. With whom did you speak on January 13th, 2021, at the CVS store?
A. The initial person was Guy Garcia. 11:52:58AM
Q. And had you met Guy Garcia before that day?
A. No.
Q. Had you ever seen him before?
A. No.
Q. On any of your prior visits, had you ever seen 11:53:10AM him working there?
A. No.
Q. Approximately what time was it when you went to the CVS store on January 13th?
A. Approximately midnight. Around midnight. 11:53:24AM

Q. Okay. And is it fair to say that Guy Garcia was the first person you remember speaking with at the CVS store?

A. Yes.

Q. Okay. With respect to your first -- well, let me withdraw that. 11:53:42AM

Did you speak with him more than one time?

A. Can you elaborate, do you mean the same day?

Q. Yeah, the same day, on January 13th.

A. I spoke to him throughout the first, I would say, block of the incident, he was the main one that I spoke to, but many times because he was following me aisle to aisle. 11:54:01AM

Q. Do you remember the first time on January 13th of 2021 that you encountered Mr. Garcia and the two of you -- or at least one of you spoke to the other? 11:54:20AM

A. Yes. It was at one of the first aisles, which I don't remember what they were selling at that aisle, but I was trying to get to my Gas-X, which is the reason why I was there. 11:54:43AM

Q. So somewhere around the first aisle, you and Mr. Garcia had your first communication; correct?

A. Yes.

Q. And was it Mr. Garcia who initiated the communication? 11:54:56AM

A. Yes.
Q. And did Mr. Garcia say to you something to the effect that you needed to have your mask covering both your nose and your mouth?
A. It was specifically covering my nose is what he wanted, because my mouth was already covered. 11:55:08AM
Q. Right. Okay. So his initial encounter with you was that he asked you that you would have to have your mask, which was then covering just your mouth, but you would have to have it covering your nose as well in the store; correct? 11:55:28AM
A. Yes. He was telling me to close my nose area, yes.
Q. When you say "close your nose," put the mask over -- to have the mask covering both your nose and your mouth; correct? 11:55:39AM
A. Yes, including my nose. My mask covering my nose and mouth, yes.
Q. Okay. And so that was his -- his first statement to you; right? 11:55:50AM
A. Yes.
Q. Okay. Do you remember what your response was to Mr. Garcia when he advised you that you needed to have the mask covering your nose as well?
A. Yes. I told him that I have a medical 11:56:03AM

disability and I'm not feeling well and can he please leave me alone because I'm here to get my Gas-X and leave.

Q. Did you say anything else?

A. Well, he repeated at that point to -- 11:56:22AM

Q. No, no --

A. You want me to say what I said?

Q. Yeah. I've already -- you've already mentioned what he said first and then you just told me a response. So was that the end of the response? 11:56:32AM

A. Yes, that's the end of my response.

Q. Okay. And so I take it Mr. Garcia responded to you?

A. Yes.

Q. And he told you words to the effect that you 11:56:41AM needed to have your mask covering your nose as well?

A. Yes, correct.

Q. Anything else you remember him saying?

A. He kept repeating over and over again to close my nose, even though I was saying that I have a medical 11:56:56AM disability.

Q. You keep saying "close your nose" and I don't know what that means.

He was telling you you had to have the mask over your nose; right? 11:57:10AM

A. Right. That's basically what he meant.

Q. Okay. So you understood it -- whatever he was saying, you understood it to mean that you had to lift your mask over your nose because the top of it was on your upper lip; is that correct? 11:57:23AM

A. Yes, but he just said saying close my nose. "You need to close your nose."

Q. Okay. But you understood that to mean to put the mask over your nose; correct?

A. Right. 11:57:35AM

Q. And you were aware that there was a Glendale city ordinance that required -- it was a basic mask mandate that required essential businesses to have both workers and customers with masks that covered their mouth and nose when they were inside those businesses; 11:57:54AM correct?

MS. MKRTCHYAN: Objection; calls for speculation, vague and ambiguous as to essential workers.

THE WITNESS: I was aware of the mandate. 11:58:05AM

BY MR. FEARS:

Q. Okay. And you were not in favor of that mandate; correct?

MS. MKRTCHYAN: Objection; argumentative, vague and ambiguous. 11:58:20AM

THE WITNESS: It was not that I was unaware. It was because I had a medical disability for which I had walked into that store many times when I didn't feel well and none of the other four employees had ever forced me to cover my nose with a mask. 11:58:37AM

MR. FEARS: Move to strike as nonresponsive.

MS. MKRTCHYAN: Objection; argumentative. Badgering the witness.

BY MR. FEARS:

Q. Ms. Burmayan, my question was simply, you 11:58:48AM personally were not in favor of the mask mandate; correct?

MS. MKRTCHYAN: Same objection; vague and ambiguous, argumentative.

You may answer. 11:59:02AM

THE WITNESS: Are you accusing me of being not in favor of the mask mandate? If you can clarify?

BY MR. FEARS:

Q. I'm not accusing you of anything, Ms. Burmayan. I'm asking you a simple question. 11:59:12AM

There are people that were against the mask mandate. There were people that were against the vaccines, and there were people that are for them and there were people in between. So I'm not -- I'm not accusing you of anything. I'm simply asking you a 11:59:28AM

question.

And my question is, you were -- you've told me you were aware of the mask mandate ordinance in Glendale. Were you personally against that mandate, that is you didn't agree with it, you didn't think it should be in place in Glendale? 11:59:46AM

A. No, but I have a disability so I need to be accommodated. And my accommodations were not met at the store.

Q. So you did not speak out at all about mask mandates in 2021 and beyond? 12:00:01PM

MS. MKRTCHYAN: Speak out, vague and ambiguous, to whom, argumentative. Speak out to whom, guy Garcia or -- I don't understand your question.

MR. FEARS: Counsel, these are legal objections -- please make a legal objection, not a speaking objection, Counsel. 12:00:22PM

MS. MKRTCHYAN: Thank you. You should remind that to your co-counsel.

Incomprehensible, badgering the witness, argumentative. Thank you. 12:00:32PM

MR. FEARS: You're welcome.

BY MR. FEARS:

Q. You can answer.

A. Can you repeat the question? 12:00:41PM

Q. Yeah.
Did you speak out in 2021 against the general mask mandate?
A. To whom?
Q. Anyone. 12:00:53PM
A. I have mentioned it to my therapist.
Q. Okay. Which therapist?
A. Dr. Tribble.
Q. Anyone else other than Dr. Tribble?
A. No. Those were my private thoughts that I shared about the political environment that was happening around the time. 12:01:08PM
Q. Okay. Well, did you not go on social media and speak out against mask mandates?
A. I have -- I might have made comments on my Facebook, which is my private Facebook. 12:01:25PM
Q. You said you might have made comments. Did you make comments on your Facebook regarding your views against both mask mandates and vaccinations?
A. I don't recall. 12:01:44PM
Q. Okay. And you say it was your private Facebook. Your Facebook was also open to members of the public as well; correct?
A. I don't recall.
Q. Okay. All right. So what I want you to do, 12:01:58PM

though, is remember back to the 2000 -- early 2021 time frame when there was an ordinance in Glendale requiring masks to be worn. Is it your testimony that you were not against the mandate?

A. Can you repeat the question? Can you elaborate? 12:02:25PM

Q. Yeah, well, you told me a moment ago that you told your therapist your views on the mask mandate; right?

A. Yes. 12:02:36PM

Q. What were your views that you told your therapist?

A. I told my therapist that I have a disability and I need to be accommodated for my disability regarding the mask mandate. 12:02:47PM

Q. Okay. And this therapist, just so I'm clear on who you're referring to and when, what was your therapist's name at that time?

A. Dr. Tribble.

Q. And Tribble, I think you said, was a psychiatrist; right? 12:03:01PM

A. Yes.

Q. Okay. Did you have any other discussion with Dr. Tribble just about your views of the mask mandate, separate and apart from your alleged disability? 12:03:20PM

A. I don't recall.
Q. You don't recall; okay.
As you sit here right now, looking back, do you remember ever having a view, a personal view, political or otherwise, in favor of or against mask mandates? 12:03:40PM
A. I've shared those thoughts with my therapist in confidentiality.
Q. And when you say your therapist, you're referring to whom? 12:03:56PM
A. Dr. Tribble.
Q. And so, again, I assume that when you shared your views with Dr. Tribble, you were being honest about your views; correct?
A. Correct. 12:04:13PM
Q. And so whether -- I'm not so much asking you right now what you told Dr. Tribble, but I'm asking you what your honest views were at the time the mask mandate existed, whether you were for it or against it?
A. I was for someone who has a disability like myself to have an accommodation for the mask mandate. 12:04:33PM
Q. Were you for people without a disability to be required to wear masks when they were inside retail establishments?
MS. MKRTCHYAN: Vague and ambiguous. 12:04:54PM

THE WITNESS: I don't recall.
BY MR. FEARS:
Q. You have no recollection of sharing any communication with anyone in 2021 your general view on whether people should be required to wear a mask in public establishments; is that -- 12:05:11PM
A. I shared those views with my therapist, Dr. Tribble.
Q. I understand that. You told me about that. And yet you're telling me you don't remember what your views were other than your view about people with disabilities; is that correct? 12:05:29PM
A. Correct.
Q. Did you tell Dr. Tribble that you didn't believe the mask mandate was appropriate? 12:05:43PM
A. I said for someone like myself who has a medical disability.
Q. So you're saying you -- you're saying you limited your comments to Dr. Tribble to people like yourself who you claim have a disability; is that correct? 12:05:57PM
A. Correct.
Q. But you're saying you have no recollection of telling Dr. Tribble your general view about mask mandates; is that correct? 12:06:13PM

A. Correct.
Q. Do you remember your general view about required vaccines for employees of certain employers?
A. I've shared those thoughts with Dr. Tribble as well. 12:06:28PM
Q. Okay. And what thoughts have you shared with Dr. Tribble on that subject?
A. I am for medical freedom. If somebody would like to get the vaccine, that's fine. If they don't want to get the vaccine, that's fine as well. 12:06:41PM
Q. It's another way of saying that if an employer, say L.A. Unified School District, required teachers or workers at school to have the vaccine, you would be against that mandate; correct?
A. I'm not against it, but we can provide 12:06:58PM accommodations that are medical or religious for which, if we are allergic to the vaccine and if we have doctor proof for that. And I myself had a religious reason for not taking the vaccine.
Q. So I'm asking beyond that, just in general, 12:07:17PM many people are outspoken that they don't believe that the government should mandate people who are otherwise healthy and may not have a religious objection, but they believe that the government should not mandate that someone take a vaccine that they don't want to take. 12:07:39PM

Are you saying that you have never communicated that to others?

MS. MKRTCHYAN: Vague and ambiguous.

Counsel, what is the relevance -- objection; relevance, badgering the witness, asked and answered. 12:07:51PM

THE WITNESS: I can repeat what I previously answered, which is the same response, that I am for medical freedom. If someone has an accommodation that they're allergic to the vaccine, if the doctor can prove that, they can give a letter which was required from 12:08:08PM LAUSD as well as religious exception, which I myself had.

BY MR. FEARS:

Q. So when you say you're for medical freedom, does that mean if a person is perfectly healthy and 12:08:22PM doesn't have a religious objection, in your mind, that person should not be mandated to take a vaccine?

A. I cannot answer for other people. I'm specifically talking about someone who has a religious exemption or medical exemption. 12:08:40PM

Q. And you've said that about five times, so you don't have to keep telling me that. I'm not asking about that right now because I've got your answer on that. So I'm talking about whether or not you had a view and/or spoke out about generally the mandate for 12:08:57PM

people, and I'm not including people with either religious or a medical exemption?

A. It would be the same answer for the sixth time, I don't recall.

Q. Is it fair to say that -- let me -- let me withdraw that. 12:09:16PM

Do you recall attending L.A. City Council meeting and speaking out against the vaccine mandate?

A. No, I do not recall.

Q. Do you recall attending any type of government meeting, local government meeting in which you spoke out about either mask or vaccine mandates? 12:09:43PM

A. I do not recall.

Q. When you -- referring back to January 13, Ms. Burmayan, when you spoke to Mr. Garcia, did you have any type of medical note saying you were somehow exempt from the Glendale ordinance that required masks to be worn that covered the nose and mouth in a retail establishment? 12:10:18PM

A. Yes, I had a medical note. 12:10:36PM

Q. And from whom did you have that medical note?

A. Dr. Tribble.

Q. Do you still have that note?

A. Yes.

Q. And what's the date of that note? 12:10:49PM

A. I don't recall.
Q. Do you have any general estimate as to the time frame in which Dr. Tribble gave you a note telling you that you should not wear a mask, or words to that effect? 12:11:14PM
A. It was prior to the January 13th incident.
Q. I asked you before about any restrictions you were under and you told me about restrictions from Dr. Tribble, but you didn't mention any restriction about wearing or not wearing masks. 12:11:27PM
Do you remember your testimony?
A. Yes, because you were asking me about the workers' comp case.
Q. No, I asked you about any restrictions that you were placed on from -- my specific question, I'll 12:11:38PM remind you, Ms. Burmayan, was from January of 2020 all the way to the present, has any doctor placed you on any restrictions? And you went through the restrictions that your three doctors have placed you on, including from Tribble. I did not limit it to workers' comp in 12:12:02PM any way, the record will show that.
So let me ask again. Is there some reason why you did not tell me that Dr. Tribble had given you some type of medical note telling you you didn't have to wear a mask? 12:12:19PM

MS. MKRTCHYAN: Objection; misstates the testimony, argumentative.

First of all, I also would like to ask the counsel to pronounce my client's name, Burmayan, Burmayan, because it goes to showing that, you know, 12:12:29PM there is some respect for cultural sensitivity here, which was not given to her by the defendants. So please, you know, pronounce her name appropriately, Counsel.

And also misstates the evidence. The question 12:12:46PM was asked about if there were restrictions for work, from work. Thank you.

You can answer the question.

MR. FEARS: I disagree, and object to counsel's coaching objection and speaking objection. 12:12:56PM And I don't have any problem trying to do a better job pronouncing Ms. Burmayan's name properly. This is the first time anyone has corrected my pronunciation. I apologize for not getting it right. It's -- it's not a name that I probably ever pronounced before in my life. 12:13:17PM

BY MR. FEARS:

Q. So I'm sorry if I get the pronunciation wrong, Ms. Burmayan, or the accent wrong or anything like that. It's not intentional. It's just that, with a new word, sometimes it's an awkward pronunciation, so I apologize. 12:13:30PM

In any event, my question stands. I asked you previously about restrictions that Tribble had placed you on. Is there any reason you did not tell me about the restrictions that you're talking about now that Dr. Tribble allegedly placed you on regarding mask wearing? 12:13:53PM

A. Yes, because you were asking me about the workers' comp case related to work. This has nothing to do with a work environment. This was talking about public forums, such as stores, wearing the mask. 12:14:09PM

Q. Well, in any event, we'll let the record speak for itself as to what I was asking you. So I'll ask the question now again, since apparently you've -- you've added another restriction.

Since January of 2020 all the way to present, has any doctor placed you on any restrictions, things you couldn't do, lifting weight like you told me about, or needing to take breaks, or needing to move around, or whatever it may be, other than what you've told me about with respect to the three doctors and now your testimony that Dr. Tribble said in some note that -- something about a mask, is there anything else? 12:14:27PM 12:14:48PM

A. No. That is all. And this is specifically around a public forum, not work related.

Q. I'm not -- I wasn't asking about work. I'm -- 12:15:07PM

I wasn't -- and I'm still not asking about work. So if you're thinking I'm asking about work and you're -- and you're answering only as to work, then I'm disabusing you of that and telling you it's not about just work, it's just restrictions. 12:15:26PM

Like if I go to my doctor today and he tells me, "Dan, don't lift more than 10 pounds over your head," I will assume that he means at work and not at work. It's a medical restriction. The doctor is telling me don't do something; okay. Or he may give me 12:15:40PM a restriction in which he tells me to do something. Dan, make sure you get up and walk at least 20 minutes a day, or something like that.

Now, that doesn't necessarily mean work or non-work. It means I should walk at least 20 minutes a 12:15:55PM day; that's a medical order or restriction. So, again, I'm just clarifying for you, Ms. Burmayan, that I'm asking if there are any other restrictions or medical orders that you had from January 2020 to the present other than those that you've now told me about, 12:16:14PM including this most recent one from Dr. Tribble that was prior to January 13th of 2021?

A. No. In general, that is all. But for clarification one more time, workers' comp doctors can only talk about work. So if he's telling me not to lift 12:16:31PM

items more than 10 pounds, he's not saying it at home. He's saying only for work when I can go back to work.

So what I do in my private life, if I want to lift 20 pounds, that's my choice. But that's why I said earlier, you were talking about work-related letters, so 12:16:50PM those restrictions were specifically to work. The mask one was for the public forums.

Q. I'll respectfully disagree with you, and I think a doctor might have a different view of that. A doctor may say if he doesn't want you lifting 50 pounds 12:17:05PM over your head at work, he probably doesn't want you lifting 50 pounds, or whatever weight, when you go home because that's not necessarily going to make a difference. But I don't want to argue with you about that. 12:17:21PM

I am just making clear, Ms. Burmayan, that I was asking you about doctor's restriction, whether it's a workers' comp doctor, your own private therapist, any doctor, it doesn't matter to me, I wanted to know whether or not a doctor or medical practitioner had 12:17:35PM placed you under certain orders or restrictions regarding your activities. And what I'm understanding is you can't think of any others.

The only new one you have thought of is that Dr. Tribble note that related to masks; correct? 12:17:52PM

MS. MKRTCHYAN: Objection; argumentative, incomprehensible, vague and ambiguous, calls for medical conclusion.

THE WITNESS: So the only one I can think of that is not work related, but in addition to certain 12:18:08PM recommendations, would be the mask one, which is to not cover my note.

BY MR. FEARS:

Q. Okay. And with respect to this -- this most recent one that you told me about from Dr. Tribble, do 12:18:22PM you remember what specifically it says?

A. Yes. Because I have PTSD, I have anxiety, I have claustrophobia, I have depression, I have panic disorder, and I have had bronchitis in the past. So the recommendation for me is to leave my nose open when I'm 12:18:41PM wearing a mask.

MR. FEARS: So I move to strike as nonresponsive.

BY MR. FEARS:

Q. But before I do, I'll ask you, does the note 12:18:50PM say everything you just stated on the record?

A. Can you explain to me what nonresponsive means?

MS. MKRTCHYAN: Objection. Well, you know, no. Argumentative. 12:19:02PM

BY MR. FEARS:

Q. My question -- well, my question was, what does the note say, okay, and then you went on to give me an explanation, I believe, as to all the reasons for the note -- 12:19:16PM

MS. MKRTCHYAN: Argumentative.

BY MR. FEARS:

Q. -- excuse me, all of your conditions and so forth.

So all I'm asking right now is -- 12:19:23PM

MR. FEARS: I move to strike nonresponsive, the last question.

BY MR. FEARS:

Q. I just want to know what the note said that Dr. Tribble gave to you, because I haven't seen it. 12:19:31PM

A. Well, I'm under oath, and it is told that I cannot lie; correct? So if I cannot lie, I'm telling you what the note says. The note says I have those conditions and, for that reason, I cannot wear my mask with my nose closed. It cites my conditions. 12:19:49PM

Q. Okay. That's what I was asking. So --

A. You told me it's nonresponsive when I answered you.

Q. The way you responded.

But so, just to confirm, this note that you're 12:20:00PM

referring to lists all of your conditions and then says, therefore, you should not wear a mask that covers your nose?

A. Correct. Because a doctor cannot just say this person needs to leave their nose open with a mask. 12:20:13PM
It must cite the conditions.

Q. You keep saying what doctors can do.

I take it you're not a medical doctor; correct?

MS. MKRTCHYAN: Objection. You know, Counsel, 12:20:23PM
listen, here is the thing, I'm going to object to this. You're continuously badgering the witness. My client has PTSD, anxiety, panic --

MR. FEARS: Counsel, please, this is a speaking objection -- 12:20:36PM

MS. MKRTCHYAN: Excuse me --

MR. FEARS: -- it's inappropriate.

MS. MKRTCHYAN: Excuse me --

(Speaking simultaneously.)

(Whereupon the court reporter gives 12:20:36PM
an admonishment not to speak over
each other.)

MR. FEARS: And I'll ask the reporter to mark this in the record. Counsel is giving now another speaking objection. It's inappropriate. 12:20:47PM

MS. MKRTCHYAN: Okay. Well, first --

MR. KANG: And I join in Mr. Fears' objections.

MS. MKRTCHYAN: Well, first of all, we agreed to seven-hour joint session. My client has a series of 12:20:55PM medical conditions. She's cooperating. She's answering your questions. However, you're continuously arguing with her and badgering the witness, and I object to this line of questioning continuously accusing my client of something. Okay. Thank you very much. 12:21:13PM

And I'm entitled to making objections the way I perceive them under Evidence Code. Perhaps you should remember when it comes to your turn, with your clients, what kind of objections to make. I am entitled to make such objections. I will stop this session if I believe 12:21:25PM that my client is subjected to further harassment and embarrassment and degradation.

Thank you. Please continue your questioning.

MR. FEARS: Okay. Christina, please mark the record here as an example of inappropriate coaching and 12:21:40PM speaking objection, in my view.

BY MR. FEARS:

Q. Ms. Burmayan, I just want to be clear about the Dr. Tribble note. And I think I understand from multiple questions and answers, but I just want to 12:21:57PM

clarify. This Dr. Tribble note that you've referred to, it contains all of your conditions and then states something about you're not being able to wear a mask covering your nose; is that correct?
A. Correct. That's how doctor letters usually write their letters. 12:22:17PM
Q. And do you have more than one of those notes? Or just one?
A. I have more than one.
Q. How many of those notes do you have from Dr. Tribble? 12:22:26PM
A. Between two and three.
Q. And do you still have a copy of all three of those?
A. Yes. 12:22:35PM
Q. Okay. With respect to those notes, did you ever show any of those notes to anyone at CVS?
A. Yes. I attempted to go in and show those notes; however, my attempt was turned down by Guy Garcia. 12:22:59PM
Q. Okay. So let's break that down. On January 13th of 2021, when you told me about your interaction with Mr. Garcia, did you show him any note from Dr. Tribble stating that you somehow had an exception from wearing a mask covering your nose? 12:23:18PM

A. No. Because I told him to -- if he can see the note, and he refused to listen to me. He ignored me. He never gave me a chance to show him the note.

Q. Did you have the note with you at that time?

A. Yes. 12:23:36PM

Q. Did you show that note to anyone at CVS on January 13th of 2021?

A. No. Because my attempts were always failed; nobody wanted to listen to me and they ignored me.

Q. So let's get back to the interaction. Where 12:23:55PM we left off was Mr. Garcia approached you and told you that you had to have the mask covering your nose, and you told me that you responded with a medical condition, and he told you, no, you had to have the mask over your nose, words to that effect; correct? 12:24:15PM

A. Yeah. Can you repeat that? And I also need to take a bit of a stretch because my back is starting to hurt.

Q. Okay. I'll repeat it, but I was just summarizing what you told me before, that on January 13, 12:24:26PM 2021 -- and we'll take a break for you.

On January 13th of 2021, when you came into the CVS store, you said Mr. Garcia approached you and said you had to have the mask over your nose, and you told him you couldn't, you had a medical condition, and 12:24:44PM

his response was you needed to have the mask over your nose; correct?

A. Yes. He told me, I need to close my nose with the mask.

Q. Are you saying you need to take a break for your condition right now? 12:24:58PM

A. I need like a one-minute break to stretch my back.

MR. FEARS: Okay. Why don't we go off the record for one minute, so you can take that stretching break. 12:25:09PM

THE VIDEOGRAPHER: Okay. We're going off the record. The time is 12:25 p.m.

(Recess.)

THE VIDEOGRAPHER: All right. We're back on the record. The time is 12:30 p.m. 12:30:08PM

BY MR. FEARS:

Q. Doctor -- I'm sorry, Ms. Burmayan, with respect to this Dr. Tribble note that you've referred to that you have two or three copies of, have you ever turned that over to your counsel? 12:30:31PM

MS. MKRTCHYAN: Attorney-client privilege. Objection.

You're instructed not to answer. Thank you.

///

BY MR. FEARS:

Q. Have you ever --

MR. FEARS: Counsel, I object. I mean, that's evidence. And whether she's turned documents over to you is not privileged, as she's required to do that, and 12:30:56PM you're required then to produce those documents pursuant to Rule 26 and -- and any request for production of documents. So whether she's turned over a piece of evidence to her lawyer is not privileged.

MS. MKRTCHYAN: Well, Counsel, with all due 12:31:16PM respect, I oppose that -- I disagree with that. First of all, regardless of what she produces, this involves attorney-client privileged communications and attorney work product as well.

Everything that has been produced is in the 12:31:32PM documents. The defendants also have subpoenaed the entirety of Dr. Flores's, Dr. Tribble's notes. The defendants have that -- all those records in custody possession. Plaintiff also made supplemental disclosures. But whatever Ms. Burmayan gave to the 12:31:50PM attorney is involving attorney-client privileged communications and attorney work product; therefore, I instruct her not to answer. Thank you.

MR. FEARS: I disagree. That's inappropriate and it's essentially a way to prevent us from getting 12:32:05PM

evidence. But we'll take it up at another time, and my deposition will not be concluded until we resolve that issue.

And, Counsel, you are correct, we subpoenaed documents and I don't have a doctor's note from 12:32:24PM Dr. Tribble indicating that the witness cannot wear a mask over her nose, that I'm aware of.

Have you produced any such document pursuant to Rule 26 and/or any requests being made? Counsel?

MR. FEARS: Mr. Kang, I see you moving, but I 12:32:47PM don't see them moving. So I think they've frozen.

Do you have any such document?

MR. KANG: No.

THE VIDEOGRAPHER: This is the videographer. Just an FYI, their screen completely dropped off. 12:32:56PM

MR. FEARS: Yeah. Okay. Got you. We'll wait for them to get back on.

But, Mr. Kang, do you have any such document from Dr. Tribble?

MR. KANG: I was -- while you were doing that 12:33:05PM questioning, I was looking through our records to see if I missed something and I do not have that as well.

MR. FEARS: Lonnie is not aware -- Lonnie is not aware of it either. If you don't mind looking, because we've subpoenaed documents as well, and all of a 12:33:14PM

sudden I'm hearing for the first time that there's -- at least from my perspective, what I'm hearing for the first time.

MR. KANG: Yeah, no, I went through all 200-something pages while you were in that line of questioning and I do not have any note of any kind, whether it be for anything, especially that, though, nothing. 12:33:29PM

MR. FEARS: Yeah. Interesting. Interesting. Okay. And then they dropped off. 12:33:40PM

MS. MKRTCHYAN: That was on purpose or it was an accident.

MR. FEARS: I wouldn't doubt it.

THE VIDEOGRAPHER: I'm still recording.

THE REPORTER: We're on the record. Do you still want this on the record? 12:33:49PM

MR. FEARS: We should be off the record ever since they're off.

THE VIDEOGRAPHER: Okay. We're going off the record. The time is 12:34 p.m. 12:33:59PM

(Recess.)

THE VIDEOGRAPHER: Okay. We're back on the record. The time is 12:38 p.m.

MR. FEARS: Okay. Before -- well, just for the record, the witness and her counsel froze and then 12:38:56PM

dropped off and then have had to reestablish a connection, so we've been off the record for the last five or -- five-plus minutes. But now that we're back on the record, let me state, Counsel, what I was saying when you dropped off. 12:39:15PM

This doctor's note from Dr. Tribble regarding the mask, that has not been produced to us, either through subpoena from Dr. Tribble's office nor pursuant to Rule 26 from your office nor pursuant to any response to document requests. We have not received that. 12:39:37PM Mr. Kang has confirmed that he also has not received that.

So my question is -- my sense is that is an important document and it would have had to have been produced pursuant to Rule 26. Is there any reason why 12:39:52PM it wasn't produced?

MS. MKRTCHYAN: Well, are you doing a meet and confer on discovery, Counsel? Is this --

MR. FEARS: I'm just -- I'm asking you, Counsel -- 12:40:06PM

MS. MKRTCHYAN: Everything has been -- excuse me. First of all, this is not an appropriate venue. We are at a seven-hour deposition ordered by court. If you want to spend your time on discovery issues, that's fine, I will answer. Every -- every piece of evidence 12:40:18PM

that we have in our possession, in plaintiff's possession has been produced.

Reminder, Dr. Tribble worked for Dr. Flores. Dr. Flores and Tribble were at the same clinic at the same session. We produced all letters, all doctor letters from Dr. Flores's office in our supplemental disclosures. There may not be Dr. Tribble's signature on any of those letters, but it can be Dr. Flores's signature, but Dr. Tribble was working for Dr. Flores as the treating provider. Therefore, since you have subpoenaed also entirety of the medical records from Dr. Flores's office, any notes, any letters are included in those. 12:40:34PM 12:40:53PM

I could -- if you would like, during lunch break, I can look at what the plaintiff produced in supplemental disclosures and I can provide to you the Bates stamp page of Dr. Flores's signed letters stating that Ms. Burmayan has problems of breathing and she has to be accommodated for wearing a face mask. That's the letter that my client references without disclosing attorney-client privileged communications. 12:41:10PM 12:41:32PM

Going back to your question to my client, I will allow her to answer aside from attorney-client communications, only as to records produced. So that qualification, I will look at my supplemental 12:41:45PM

disclosures. There's no hiding -- there's no suppression of evidence here. I will give you that information during lunch break.

But going back to your question, you can go into that line of questioning with my client. I withdraw my objection, instruction not to answer, but as to attorney-client privileged communications, I still have an objection. Thank you. 12:41:58PM

MR. FEARS: Okay. And I appreciate your offer and I accept your offer to identify over the lunch break the Bates stamp numbers of what you're now describing as a Dr. Flores letter or communication regarding a restriction relating to the wearing of face masks. 12:42:13PM

BY MR. FEARS:

Q. So going back to my question, Ms. Burmayan, I previously was asking you about whether or not this Dr. Tribble note was turned over to your counsel, and there was an instruction not to answer. Your counsel has said this may have been something that Dr. Flores signed or provided. 12:42:32PM 12:42:53PM

With respect to whatever form it took, whether it was a Dr. Tribble or Dr. Flores note, was that turned over to your counsel?

A. Yes. And had I been given the opportunity to -- without the confusion, to answer that, I would 12:43:09PM

then have explained as I had said before in the earlier meeting, which is that Dr. Tribble was the one treating me, but it was Dr. Flores's office; therefore, the signature would be from Dr. Flores. The letterhead would be Dr. Flores because Dr. Tribble is the one who worked for Dr. Flores. 12:43:26PM

So during the time of the disabilities that I had, Dr. Flores is the one that I was seeking therapy with, but the actual letterhead came from Dr. Flores's office. 12:43:42PM

Q. I was just asking whether or not you turned those documents over -- or that document or documents over to your counsel. And the answer is yes?

A. Yes. But that's not what you asked me earlier, but now I'm answering yes. 12:43:54PM

Q. Well, I was asking you about -- you told me about Dr. Tribble placed you on restrictions that related to a mask. And so I asked you about Dr. Tribble's restrictions; correct?

A. Yes, but it's coming from Dr. Flores's letterhead. 12:44:07PM

Q. I understand that now because your counsel said something like that and then you repeated that a moment ago. But in any event, whether it was Tribble or Flores, you're saying you turned that over to your 12:44:20PM

counsel; correct?
A. Yes.
Q. And how long ago did you do so?
A. When I started seeking counsel with her.
Q. And approximately when was that? 12:44:30PM
A. About a year ago, year and a half.
Q. Okay. All right. Getting -- have you ever turned over a copy -- let me withdraw that.
We were talking about your January 13, 2021 visit to the CVS store, but I'm going to jump ahead to 12:44:48PM January 19th of 2021 for just a moment, when you interacted with the Glendale Police Department.
Do you remember that?
A. Yes.
Q. And that was at a second visit of the CVS 12:45:02PM store, some six days -- some six days after the January 13th visit; right?
A. Yes. Can you repeat the question?
Q. Yeah. The January 19th visit -- January 19th, 2021 visit was about six days after your January 13th, 12:45:21PM 2021 visit; right?
A. About a week later, yes.
Q. Okay. When you -- when you had that January 19th, 2021 visit in which you interacted with the Glendale Police Department, did you ever provide to 12:45:35PM

the Glendale Police Department a medical note from either Dr. Tribble or Dr. Flores providing that you should not wear a mask over your nose, or words to that effect?

A. I attempted to show the letter to Ross, and he ignored my request. He did not even bother to look at my letter. 12:45:52PM

Q. And is this on any of the audio recording that you referred to earlier in your testimony?

A. It's on the video recording of the CVS store. 12:46:08PM

Q. You say it's on the video recording. But is it on the audio recording in which you offered to Ross the doctor's note that you're referring to?

A. I probably stated over 20 times that I have a doctor letter in the audio recording and video recording, that I have a doctor letter and I have a disability. And I want to show the letter, I want to talk about my disability, but I'm being ignored every single time I'm bringing up the letter and I'm bringing up my disability. 12:46:27PM 12:46:44PM

Q. And in that doctor letter that you're referring to, was this the Tribble doctor letter?

A. Tribble was my doctor, but again, it was signed by Dr. Flores, as far as the office goes.

Q. Okay. Did -- and where did you have that note 12:46:59PM

on January 19th of 2021?
A. In my pocket.
Q. And so did you ever just simply pull it out and show it to one of the police officers?
A. Yes, Ross. 12:47:14PM
Q. Okay. So you physically showed him a note?
A. I attempted to, but he said, "Turn around, put your hands behind your back. You're under arrest."
Q. And you had the note in your hand at that time because you were physically showing it to him when he 12:47:27PM said "Turn around and put your hands behind your back"?
A. Right before he said "Turn around and put your hands behind your back," I am waving the letter, and it can be seen in the video of CVS.
Q. Fair to say there was nothing on any CVS video 12:47:42PM showing you waving a letter; correct?
MS. MKRTCHYAN: Objection; vague and ambiguous, incomprehensible.
BY MR. FEARS:
Q. Let me withdraw -- I'll withdraw that 12:47:57PM question.
Let's go back to January 13th of 2021. On January 13th of 2021, you did not show a Dr. Flores or Dr. Tribble letter to anyone at CVS?
MS. MKRTCHYAN: Asked and answered. 12:48:17PM

THE WITNESS: Should I answer?
MS. MKRTCHYAN: Yes, answer.
THE WITNESS: On January 13, I did not show it because I had not been -- as far as the service goes, I had not been denied service on January 13th yet when he 12:48:30PM was following me aisle to aisle. So the reason I did not show it is because of the fact that the service had not been denied yet. That's why I went back on the 19th to ask to speak to the manager and show the letter.
MR. FEARS: Move to strike everything other 12:48:50PM than, "no, I did not [sic]."
BY MR. FEARS:
Q. On January 13th, picking up where we left off, as I understand it, Mr. Garcia several times told you that you had to have your mask covering your nose, or 12:49:03PM words to that effect; correct?
A. Yes. He said close my nose with the mask.
Q. And you understood that, each time he said that, that that meant you had to have the mask that would cover your nose and mouth; correct, pursuant to 12:49:20PM the Glendale ordinance?
MS. MKRTCHYAN: Asked and answered objection.
Go ahead.
THE WITNESS: Yes.
///

BY MR. FEARS:

Q. And on January 13th of 2021, it's fair to say that at no time did you cover your nose with your mask as requested by Mr. Garcia; correct?

A. Yes. 12:49:43PM

Q. All right. And approximately how many times do you remember Mr. Garcia asking you to cover your nose with the mask?

A. I don't recall.

Q. It was several times, though? 12:49:55PM

A. Probably.

Q. Okay. And it's fair to say that you spent approximately 30 minutes or so inside the CVS store with your mask not covering your nose; correct?

A. I don't recall. 12:50:17PM

Q. In addition to going to the store to pick up some -- what you said was Gas-X, you also went into the cosmetics department, were looking at cosmetics; correct?

A. I initially started with the cosmetics 12:50:31PM department, walking my way towards the Gas-X, because he started following me starting from the cosmetics department.

MR. FEARS: Move to strike as nonresponsive.

///

BY MR. FEARS:
Q. In addition to getting Gas-X, you also did go into the cosmetics department and look at cosmetics; correct?
A. I started with the cosmetics, yes. 12:50:53PM
Q. And there were several other areas of the store you went and visited in addition to the cosmetics aisle as well as the aisle where Gas-X is available; correct?
A. Yes. As I said earlier, I was going to 12:51:10PM different aisles, and he was following me to all the aisles until I got to the Gas-X.
MR. FEARS: Move to strike as nonresponsive everything other than "yes."
BY MR. FEARS: 12:51:22PM
Q. And then, ultimately, you came to the checkout counter to make a purchase; correct?
A. Yes.
Q. Do you remember any other conversations that you had with Mr. Garcia other than those that you've 12:51:38PM already mentioned where he several times told you you needed to put the mask covering your nose and you refrained from doing so?
A. The only conversation that I had was with him stalking me, harassing me, following me from aisle to 12:51:59PM

aisle, and that is why I kept going to different aisles, because he kept following me to every aisle until I got to the Gas-X. So the conversation was basically telling him, "Please leave me alone. I have a medical disability. I have been to this store many times. No one has ever bothered me. Please leave me alone. I have a medical disability." 12:52:16PM

Q. Do you recall Mr. Garcia telling you you'd have to leave the store if you do not put the mask above your nose? 12:52:30PM

A. No, he never told me I have to leave the store.

Q. He just kept repeating that you needed to have the mask over your nose?

A. Yes. 12:52:38PM

Q. All right. Then ultimately -- have you told me everything about your discussions with Mr. Garcia?

A. From what I recall, yes.

Q. Then, ultimately, you went to the checkout area. And did you encounter anyone else there? 12:52:52PM

A. The cashier.

Q. And do you remember who the cashier was?

A. I don't know his name, but he was a middle-aged, average height, I believe Filipino, male.

Q. You said average height. Approximate age? 12:53:10PM

A. Middle age, 45 and above.
Q. Do you remember a conversation with the cashier?
A. Yes. I took out the Gas-X, placed it on the table. There was a Plexiglass between us. He was wearing a mask and gloves. I placed the Gas-X. There was no other customer around us. And then the conversation was where he said, "Close your nose if you want to buy this item." 12:53:26PM
Q. And what was your response? 12:53:44PM
A. I said, "Sir, I'm not feeling well. I have a medical condition. Please let me buy this item and leave. I don't feel well. I'm sweating. I think I'm going to pass out. Please let me buy this item and leave." 12:54:06PM
Q. And his response to that?
A. "I am not going to allow you to buy your item until you cover your nose."
Q. Anything else said between you and him, the cashier? 12:54:18PM
A. The final thing was he refused service. He did not allow me to buy my own item with my own money, after I pleaded with him that I have a medical condition, I'm not feeling well, I'm sweating, I'm not feeling well, I'm going to pass out, he refused to let 12:54:33PM

me buy my item. So I turned around and walked to the self-checkout center.
Q. So, but was there any other conversation that you had with the cashier or have you told me about the entire conversation that you had with the cashier? 12:54:49PM
A. Yes. The whole conversation was me telling him I have a medical condition and him refusing service.
Q. Anything else?
A. That's all.
Q. Okay. So then you proceeded to do the 12:55:02PM self-checkout; correct?
A. Yes.
Q. And what happened there?
A. I went to the self-checkout to buy my Gas-X because it was an emergency, I had to go home, I had to 12:55:13PM use the bathroom. As I said, I have IBS and gastritis. So if I have to use the restroom, it's an emergency. I was trying my best to rush and get the item. And I recall another male came behind me, started stalking me, harassing me. And that was Joe Jackson [sic]. 12:55:31PM
MS. MKRTCHYAN: Johnson.
THE WITNESS: Johnson.
MR. FEARS: Counsel, I object. I heard you make a statement on the record --
MS. MKRTCHYAN: Yes, I made the statement, 12:55:43PM

Counsel. Thank you. I said "Johnson." That's a clarification.

Do you have a problem with that?

MR. FEARS: I have two problem -- counsel, I have -- are you finished? 12:55:51PM

MS. MKRTCHYAN: Well, no --

MR. FEARS: I have two problems with it. I have two problems with it, Counsel. First you're interrupting --

(Speaking simultaneously.) 12:55:57PM

(Whereupon the court reporter gives an admonishment not to speak over each other.)

MR. FEARS: You're interrupting me, first.

MS. MKRTCHYAN: Apparently -- 12:56:00PM

MR. FEARS: Please don't interrupt me when I'm -- when I'm talking, and I'll pay you the same courtesy.

MS. MKRTCHYAN: Well, no, because --

MR. FEARS: So, yes, please don't interrupt. 12:56:05PM

Secondly, yes, I do have a problem with a lawyer correcting her own client with a name. That's testifying. You're not under oath and it's inappropriate. And you're seated right next to her, literally shoulder to shoulder. And, you know, I don't 12:56:22PM

know if you're saying other things or not, but I think it's inappropriate for you to say anything on the record other than a legal objection.

So I do object, and I want the record marked here as well. I object, Counsel. And we're going to 12:56:35PM terminate this deposition, or suspend it, at least, if we have to. If you --

MS. MKRTCHYAN: You know, I don't appreciate --

(Speaking simultaneously.) 12:56:43PM

(Whereupon the court reporter gives an admonishment not to speak over each other.)

MR. FEARS: If you continue to engage in such conduct, we will suspend the deposition, Counsel. 12:56:50PM

MS. MKRTCHYAN: Yes, we will, we will. I will, I will. And first of all, you -- first of all, let me now talk.

Have you finished?

MR. FEARS: You tried to interrupt me about 12:56:59PM five times, but I've finished now, Counsel.

MR. KANG: I join in Mr. Fears' objection.

MS. MKRTCHYAN: Okay. You guys can join all day long with your nonsense, you know, but I would like to say this. First of all, you don't know me well 12:57:13PM

enough, you never had interaction of me. I'm not going to tolerate any kind of abuse of my client who's already suffering from anxiety. She has a series of medical conditions. Okay.

What I did, yes, and I'm not -- you know, I'm not refusing to say, there was, you know, a last name that was mispronounced by her, Jackson versus Johnson, and I just basically clarified that as if we were sitting in a conference room. It was your request to do this on Zoom. I never asked for Zoom. It's your prerogative to do this on Zoom. If they're in a room -- in a conference room, I would have said the same thing without you, you know, step -- you know, going up and down. 12:57:25PM 12:57:46PM

So, you know, that was what was made, you know, of -- to my client. I did not make any other references or -- I don't even feel the need to do that, but, you know, you are badgering my client. I will stop this session if I see continuous abuse. She's already suffering. We have doctors letters. She is -- she has suffered enough. So please continue with your deposition and do not make frivolous objections. 12:58:00PM 12:58:18PM

I did not refuse to admit that I did correct the mispronunciation. You know, that was a -- you know, versus Jackson versus Johnson. You know, so anyway, 12:58:38PM

quite frankly, I'm astonished with this unprofessionalism.

So you can continue with this deposition, but if I feel like you're -- you're, you know, abusing and doing this kind of frivolous nonsense on me, I will stop 12:58:54PM this deposition. I will ask -- I will ask for protective order of my client.

MR. FEARS: Christina, please mark the record here. I object to counsel again taking up even more time, trying to defend her providing an answer to the 12:59:08PM witness and suggesting that if she were in a conference room, she could provide an answer to the witness. It's inappropriate, and it's especially inappropriate under Zoom circumstances here where I may not be able to hear it. Fortunately, I did hear it. It's inappropriate. 12:59:28PM

And if counsel wants to suspend the deposition of her client because I am objecting to her whispering an answer to her client who then corrects her testimony, then be my guest. Bring that one to Judge Olguin and we'll address that at the time. But I object to 12:59:50PM counsel's conduct here. It's inappropriate.

I also object to the personal attacks, and suggesting something is being done and it's frivolous. It's an appropriate objection. And, Counsel, in my view, you're not allowed to make such comments on the 01:00:04PM

record correcting a witness, just like you would not be able to do so if she was on the stand in court testifying, you would not be able to blurt out the last name of a person. It's just inappropriate, Counsel.

So please -- I am asking you again, please stop and don't do that again. 01:00:19PM

BY MR. FEARS:

Q. Let's go back to the question. So, Ms. Burmayan, then you encountered a third person at CVS that evening, and that, as I understand the testimony now, as clarified, was Mr. Johnson. You said something about him stalking you. And when you say "stalking you," what do you mean by Mr. Johnson was stalking you? 01:00:35PM

A. He was hovering over me on my back, as I was attempting to buy my Gas-X. 01:00:53PM

Q. Were --

A. There was hardly any space between me and him, regarding the six feet rule.

Q. Have you finished?

A. Yeah. 01:01:05PM

Q. Okay. So you said "hovering." And I know there's videotape of it. So how close do you claim that Mr. Johnson was to you when you claim he's either stalking or hovering over you?

A. Literally right behind me as I'm trying to 01:01:23PM

purchase my Gas-X.
Q. For how long?
A. I can't recall the exact time, but it was to the point where I could no longer take standing there because I was feeling very uncomfortable, so I had to 01:01:34PM move myself to a different station.
Q. Do you remember if you needed assistance with respect to the self-checkout?
A. I was probably having a hard time checking myself out because of the fact that he was hovering over 01:01:48PM me.
Q. Do you remember whether or not you needed assistance with the self-checkout?
A. I don't recall. I only recall getting annoyed and feeling extremely uncomfortable because he was 01:01:58PM hovering all over me.
Q. Do you recall -- did he ever touch you?
A. I don't recall him touching me.
Q. Did Mr. Garcia ever touch you?
A. I don't recall Garcia touching me. 01:02:11PM
Q. And did -- I assume the cashier didn't touch you either; correct?
A. I don't recall him touching me either.
Q. Did -- at any time, did Mr. Garcia, Mr. Johnson or the cashier you've described, did any of 01:02:26PM

them ever threaten you with violence?
A. I don't recall any threats of violence.
Q. With respect to -- going back to your checking out, do you remember -- in the self-checkout area, do you recall any discussion with Mr. Johnson regarding the checkout before you left the CVS store on January 13th? 01:02:43PM
A. The only thing I remember is me having a hard time checking myself out because he was hovering over me. I couldn't -- I couldn't touch the buttons. I was having a hard time using my card, using the buttons because I was so uncomfortable and nervous, and I was shaking, in additional to all the incidents that had led up to me getting to the self-checkout because I had been denied service at the cashier. 01:03:00PM
MR. FEARS: Move to strike as nonresponsive. 01:03:13PM
BY MR. FEARS:
Q. Do you recall any discussion that you had with Mr. Johnson in the self-checkout area when you claim he was near you, hovering and/or stalking you?
A. Yes. As I said earlier, the discussion was about him leaving me alone because he's hovering over me and he's making me feel uncomfortable because he's not allowing me to buy my own item at the self-checkout. 01:03:26PM
Q. Do you recall any words that Mr. Johnson used or stated during this period of time where you were 01:03:42PM

checking yourself out in the self-checkout area?

A. I don't recall what he said. I recall what I said, which is "Please leave me alone, let me buy my item and leave."

Q. So as you sit here now, you don't remember anything said by Mr. Johnson, if or whether he said anything; correct? 01:03:52PM

A. I recall him giving me a hard time and not allowing me to even use the self-checkout because he was hovering over me. 01:04:06PM

Q. I don't know what that means, so I'll ask you again. Do you recall any words or statements or concepts, you don't have to remember exact words, but anything he said to you, and I'm referring to Mr. Johnson, when you were in the self-checkout area? 01:04:19PM

A. No. I only recall him hovering over me.

Q. Okay. Do you recall whether you were told that you should not return to that CVS store?

A. No. I was never told that.

Q. Do you recall whether you were yelling at any individuals there at the CVS store? 01:04:35PM

A. I was frustrated, but I was not yelling.

Q. Do you recall whether or not you ever spoke with an elevated voice to Mr. Garcia, Mr. Johnson or the cashier? 01:04:54PM

A. Yes, I recall having an elevated voice because of my frustration since they were denying me service and not meeting my accommodations regarding my disability.
Q. Then all you had to do was put the mask over your nose to comply with CVS's rule and the city ordinance; correct? 01:05:08PM
A. That would be defying the purpose of what my medical doctor wrote on that letter.
Q. They didn't see that letter and they're not doctors and they don't make that judgment. But you'd agree with me if you had put the mask over your nose, then you would not have had to have had these conversations with Mr. Garcia and Mr. Johnson and maybe even the cashier; correct? 01:05:23PM
A. I cannot answer that because I'm not an attorney, but the only thing I could advise is there's something called American Disability Act [sic] and they have to honor and accommodate you in a public store. That accommodation was not met. 01:05:38PM
Q. And who -- where did you get that information from if you're not an attorney? 01:05:51PM
A. From the ADA website.
Q. Something you read; right?
A. Yes. And that's where my medical doctor comes in with accommodation. 01:06:03PM

Q. Did you, from the time that Dr. Flores -- Dr. Tribble through Dr. Flores's office, from the time that you got this note that you referenced, did you ever wear a mask covering your nose?

A. Yes. 01:06:33PM

Q. What period of time did you wear a mask covering your nose?

A. January 19th.

Q. Okay. Any other time?

A. I have often worn my mask with my nose 01:06:43PM covered.

Q. Often you have?

A. Yes. When I'm feeling okay and I can breath well, I have.

Q. Have you been directed or -- in the 2021 time 01:06:54PM frame, were you directed by any other retail establishment to cover your nose and mouth with your mask?

A. The only person who directed me was Guy Garcia at CVS. 01:07:09PM

Q. Did you ever get into any dispute with any other retail establishment regarding your failure to cover your nose with your mask in the 2020 and '21 time frame?

A. No, I do not recall. 01:07:23PM

Q. Okay. Have you told me everything regarding this -- this incident that occurred on January 13th, 2021 in which you went to the CVS store and were told repeatedly that you had to have your mask above your nose? 01:07:45PM
MS. MKRTCHYAN: Objection; vague and ambiguous as to everything.
THE WITNESS: According to my recollection, yes, I have told you everything.
BY MR. FEARS: 01:07:52PM
Q. Okay. Then, as I understand your testimony -- let me withdraw that.
Did you return to the CVS store any time after January 13th, but before January 19th?
A. No, not from my recollection. 01:08:11PM
Q. Did you ever drive through the parking lot?
A. No, not from my recollection.
Q. What kind of car do you drive? And I'm -- what kind of car do you drive during the 2021 time frame, the first two months of 2021? 01:08:29PM
A. I myself have a black BMW. I don't recall if I was driving my black BMW or my dad's gray Porsche.
Q. And what kind of Porsche is it?
A. I'm not very good with the names, but it's gray and it's a Porsche. 01:08:50PM

Q. Do you know if it's a 911?
A. I cannot give you a correct answer. That does sound familiar, but I don't know if it's 911. Like I said, I'm not good with names.
Q. And you sometimes would drive your father's gray Porsche? 01:09:03PM
A. Yes.
Q. Okay. If you were seen driving a gray Porsche in the CVS parking lot between January 13th, but prior to January 19th of 2021, would you have any reason to doubt that? 01:09:18PM
MS. MKRTCHYAN: Objection; vague and ambiguous, incomprehensible, unintelligible.
If you understand the question.
THE WITNESS: The question sounded like it was going in circles. Can you clarify? 01:09:34PM
BY MR. FEARS:
Q. Yeah. If someone were to say that they saw you in the CVS parking lot in a gray Porsche between January 13th, after you left, and prior to January 19th when you had the second encounter with Mr. Garcia, would you have any reason to doubt that? 01:09:50PM
MS. MKRTCHYAN: Objection as to vague and ambiguous, reason to doubt that.
THE WITNESS: Can you rephrase the question, 01:10:08PM

maybe in a more direct --
BY MR. FEARS:
Q. Do you deny under oath and penalty of perjury that you visited the CVS parking lot after your first encounter with Mr. Garcia on January 13th, but before 01:10:21PM your second encounter -- encounter with him on January 19th?
MS. MKRTCHYAN: Same objection; vague and ambiguous.
THE WITNESS: Again, it's going in circles. 01:10:38PM Can you be more direct with your question?
BY MR. FEARS:
Q. What don't you understand? I'm asking if --
A. Saying so I deny deny, what does that mean?
Q. I didn't say deny deny. I said "deny." 01:10:48PM
Can you deny?
A. Can I deny what?
Q. That you drove through the CVS parking lot during that time frame that I just mentioned?
A. Can I deny if I drove between the 13th and the 01:11:00PM 19th?
Q. In a gray Porsche?
A. I did not drive in a gray Porsche between the 13th and the 19th, if you want to be more specific and simple. 01:11:14PM

Q. That's -- that's all I was asking.
A. Yeah, it would help if you asked it that way.
Q. Turning to January 19th of 2021, you decided to go back to the CVS store; correct?
A. Yes. 01:11:32PM
Q. And what was your purpose for returning to the CVS store on January 19th?
A. I wanted to speak to a manager because I had been a very good client of CVS since 2001, so I wanted to tell the manager about what had happened on the 13th 01:11:49PM and that I was seeking an apology and an explanation of the incident. And then, two, I wanted to say that if you -- I'm to continue shopping at this specific CVS, I would like an explanation as to why this is happening. And if it's not a reasonable explanation, then I can go 01:12:07PM somewhere else. But that opportunity was never given to me.
Q. Okay. And you had previously had discussions with the CVS store manager prior to January 13th of 2021; correct? 01:12:26PM
A. I had had several discussions with four of the employees; one, Adriana, the Armenian lady with the blonde hair, who I thought was the manager of CVS. Also, there was a Filipino middle-aged lady as well who I think is one of the managers, possibly, as well as a 01:12:42PM

younger Filipino male, maybe below the 30s age; and then as well a Peruvian or Ecuadorian male in his middle age. For over 20 years about various topics throughout the pandemic, asking for Gas-X, various discussions with those four employees. 01:13:05PM
Q. And you thought Adriana was the store manager; correct?
A. Yes, correct.
Q. On January 19th of 2021, what time was it that you visited the store? 01:13:21PM
A. Around midnight.
Q. Wasn't it around 1:00 a.m.?
A. I don't recall the exact time, but it was around midnight, like I said.
Q. Okay. Did you have any reason to believe that 01:13:32PM Adriana was there at the store?
A. Yes. I had seen her work in the evening before.
Q. Okay. Did you have any reason to believe that she was there on that shift that evening on January 21st 01:13:45PM of -- I'm sorry, January 19th of 2021?
A. Yes. Like I said, I had seen her before in that time frame.
Q. Okay. But what I'm asking a little more specific. Like did you call ahead and say, she's 01:14:04PM

working there at midnight or 1 o'clock? Or did you -- did she tell you her schedule for that day? I'm not just asking whether or not you've seen her work late before.

So my question is, did you have any specific information that she would be working that evening? 01:14:17PM

MS. MKRTCHYAN: Asked and answered, vague and ambiguous.

THE WITNESS: Like I said a few times before this question, I had a very friendly relationship with all of the employees. I had no reason to call and ask for anybody's schedule. I simply popped in whenever I had to buy an item or if I had to talk to someone about an item. So I did not have a specific schedule of her nor did I felt that I had the right to ask somebody's schedule, but I walked in thinking she would be there because I had seen there -- her in that store around that time before. 01:14:32PM 01:14:49PM

BY MR. FEARS:

Q. Okay. When you -- when you came back to the store on January 19th, were you anxious? 01:14:59PM

A. I was not anxious because my plan was to resolve the situation from the 13th.

Q. So, so you were -- as I understand it, you were going to speak to a manager, you were going to seek 01:15:13PM

an apology and you were going to ask about, you know, how they're going to address this so that you could keep shopping there. So you had no anxiety about that potential conversation?

A. Other than my own personal anxieties, I had no anxiety whatsoever because my plan was for it to be a positive interaction since I had my doctor letter. 01:15:31PM

Q. And if I understand it, you did walk into the store and you knew from your last visit that the expectation was that you would have the mask over your nose; correct? 01:15:47PM

A. Yes. As I stated before, if I felt --

Q. It calls for just a yes or no. I mean --

MS. MKRTCHYAN: Objection. Do not interrupt the witness. Excuse me. And by the way, this is 1:16. I'd like to have a lunch break. So please do not interrupt the witness. I object interruption. Let her finish. 01:15:57PM

BY MR. FEARS:

Q. You previously told me before -- 01:16:07PM

MS. MKRTCHYAN: Excuse me, Counsel, I'm not going to let you interrupt my client. Yesterday we had a defendant's deposition, which any time I had any -- by any chance, interrupted in any shape or form, quoting the defendant, I was objected to. So please provide the 01:16:23PM

same courtesy to my client as the plaintiff in this action; okay. She was not finished with her answer.

And after this question, I'd like to have a half an hour break for lunch. Thank you.

BY MR. FEARS: 01:16:35PM

Q. If you have something further to say that is responsive, Ms. Burmayan, please do so.

A. Can you repeat the question?

Q. We can have it read back, the question. And -- and I'll mention to you, at the beginning of this 01:16:49PM deposition, and because of time, I asked you if the question could be answered with a simple yes or no, will you endeavor to do so, and you said yes. And then on other questions, I asked if it calls for an explanation, give me an explanation? 01:17:09PM

So with that in mind, please listen to the question that the reporter will read back, and if you could provide a response -- a responsive answer.

A. So what you said earlier was if I can give a simple yes or no or if it needs an explanation. In this 01:17:17PM case, it was not a simple yes or no. It needed an explanation. And due to my anxiety, I often have to repeat the same question several times. So if I need to repeat the question, I have to have that question repeated to me again because of my anxiety issues. 01:17:36PM

Q. If you could, if -- for instance, if I ask you if you had the mask covering your nose, that calls for a yes or no. What reason you may have, that's a follow-up question and that may be asked later on, but if it does call for a yes or no, it can be answered with a yes or no, you should answer with a yes or no. Then if I ask you why or what's the reason or justification, then you can give me the reason or justification, or your counsel can. 01:17:53PM

But in any event, let me have the question read back to you, listen to the question, and I ask you so that we can conserve time and get through with the deposition that you respond as you agreed to at the outset of the deposition. 01:18:05PM

MR. FEARS: Christina, if you could read back that last question. 01:18:15PM

THE REPORTER: Yes.

(The previous question was read back by the court reporter as follows:

"QUESTION: And if I understand it, you did walk into the store and you knew from your last visit that the expectation was that you would have the mask over your nose; correct?")

THE WITNESS: I can't answer that with a yes 01:18:44PM

or no because you're also mentioning in there that I know that I have to wear my mask completely covered. That's not a simple yes-or-no question. That's a two-part question.

If you simply ask me did I wear my mask when I 01:18:58PM walked in, I would say "yes." But then you're also mixing in there, did I know from the past to wear the mask and all that stuff, then I have to explain, which is that, no, I have a medical disability. And on the letter, it says that if I'm not feeling well, I am to 01:19:09PM not wear my mask completely covered -- with my nose area covered.

MR. FEARS: Christina, please mark the record here as well.

BY MR. FEARS: 01:19:22PM

Q. So when you had left the CVS store on January 13th, you had been advised that you needed to have your mask above your nose while -- while walking around in the store; correct?

A. Yes, on January 13, I was told I have to close 01:19:33PM my nose area, even though I tried pleading with Guy Garcia and saying that I cannot wear my mask covered when I have my breathing anxiety coming back.

Q. And when you walked into the store on January 19th at midnight or 1:00 a.m., whatever the time 01:19:51PM

was, you had the mask covering your nose; correct?

A. On the 19th, yes, I had my mask covering my nose.

Q. And when you walked in, do you remember approximately -- well, let me withdraw that. 01:20:05PM

Do you remember approximately how long you were in the CVS store this second time on January 19th of 2021?

A. Less than 10 minutes. And upon watching the video, it was about eight minutes. 01:20:17PM

Q. Okay. And --

MS. MKRTCHYAN: Counsel, I already asked for a lunch break. This is 1:20. I need a lunch break.

MR. FEARS: Can we just finish, Counsel, this subject matter? 01:20:29PM

MS. MKRTCHYAN: No, we can't because I am hungry and I need to have a lunch break, otherwise I will pass out already. Thank you. You know, can we have some courtesy here? This is 1:20.

MR. FEARS: Yes -- yes, we can. And courtesy 01:20:36PM goes both ways, Counsel. I had mentioned at the beginning of the deposition, if you want breaks, please give me notice in advance. And I would have appreciated if you would have said 15 minutes ago you'd like to take a lunch break, which is typically done, as opposed to I 01:20:51PM

want to take a lunch break right now.

But, Counsel, I'll accommodate you. I'll give you that courtesy because you're demanding a lunch break this minute while I'm asking the witness questions about a certain subject matter that I wanted to finish up. If you do not want to give me the courtesy of finishing up this area, then that's fine. You can take the lunch break and we'll take a lunch break. 01:21:02PM

How long would you like, Counsel?

MS. MKRTCHYAN: Well, as I've already indicated, I need at least a half an hour break. And I've asked you several times within this last 15 minutes. 01:21:18PM

MR. FEARS: Let's go off the record. Let's please go off the record -- 01:21:24PM

MS. MKRTCHYAN: You know, I don't appreciate your attitude. You know, we're going to have a lot of problems, you and I together, Mr. Fears -- or I'm sorry, your last name, I can't even -- you and I are going to have a lot of problems if you do not respect me as a female attorney. I know very well the sexist attitude of male attorneys of law firms. And I have Mr. Kang sitting there as well. I'm not going to tolerate that kind of sexist attitude. I've had no problems so far -- 01:21:32PM

MR. FEARS: I object to this, Counsel. This 01:21:49PM

is -- this is totally inappropriate and you're making assumptions. It's completely inappropriate and -- and I've given you no reason to think that. That's objectionable. Counsel, I'm -- I just -- I just --

MS. MKRTCHYAN: I just asked for a lunch break. 01:22:04PM

MR. FEARS: If you want a lunch break, you can take it. Tell me how long and then I get this kind of a response that -- implying that I'm a sexist and you know nothing about me, Counsel. So please stop. Let's go off the record. You can take your lunch break, but please just tell me what time you want to come back. That's all I was really getting at with my last question. 01:22:14PM

MS. MKRTCHYAN: Well, I asked you half an hour, until basically right now, 1:22, I need at least half an hour of a break. 01:22:22PM

MR. FEARS: Right, you said "at least." Let's go off the record. You said at least a half-hour, and I still want to know, what time do you want to come back? Tell me -- give me the time and we'll come back then. 01:22:33PM

MS. MKRTCHYAN: 2:00 p.m.

MR. FEARS: Okay. We'll go off the record.

MS. MKRTCHYAN: Thank you.

THE VIDEOGRAPHER: We're going off the record, 01:22:41PM

and the time is 1:22 p.m.

(Whereupon, at the hour of 1:22 p.m., a luncheon recess was taken, the deposition to be resumed at 2:00 p.m.)

WEDNESDAY, OCTOBER 11, 2023

2:04 P.M.

ANOUSH BURMAYAN,

having been previously duly sworn,

was examined and testified as follows:

THE VIDEOGRAPHER: We're back on the record.
The time is 2:04 p.m. 02:04:48PM

MR. FEARS: Okay. Thank you.

EXAMINATION

BY MR. FEARS:

Q. Ms. Burmayan, referring back to the 02:04:53PM
January 19th, 2021 second visit that you made to CVS, when you went in to register your complaint, was there any reason why you didn't simply call CVS and complain?

A. I had never thought about that option, simply because as I stated before the break, I had a very 02:05:19PM
relationship between all four of the employees. Never did imagine in my wildest dreams that I would be treated this way, so I just thought a friendly visit would solve the situation.

Q. Is there any reason why you didn't write a 02:05:35PM

letter and register a complaint?
A. I never knew that option was available during the time that I went to visit CVS that day.
Q. Okay. So focusing on January 19th, when you walked into the CVS store, I think where we left off is you had your mask that was covering your nose; correct? 02:05:48PM
A. I'm sorry, can you repeat what you said?
Q. Yeah. Referring to January 19th, I think you testified already that you walk into the CVS store and you had the mask that was covering both your nose and your mouth this -- on this second visit; correct? 02:06:06PM
A. Yes.
Q. And do you remember where you went when you walked in the store?
A. Yes. I walked in and I was looking for Adriana, the Armenian manager. 02:06:15PM
Q. You didn't find her. So what happened next?
A. Well, right away, Guy Garcia approached me and I went up to him and I said, "Can you speak to Adriana? And I have a letter explaining my disability, I would like to speak to the manager." 02:06:34PM
Q. What did he say?
A. He ignored me and -- he didn't say anything. He just pretty much ignored me.
Q. All right. So then what did you do next? 02:06:45PM

A. I continued walking to the next aisle to see if I can find Adriana, and who I found next was the younger Filipino male who was probably in his 30s.

Q. Okay. What did you do?

A. I saw him. I said, "Hi. Do you remember me? 02:07:08PM I'd like to tell you what's going on here. Where's Adriana? I want to talk to her, and can you please come out and explain to this guy that you know me, that I'm a customer who comes here all the time, and that I wear my nose open with the mask often and nobody has bothered me 02:07:26PM before."

Q. And what did the younger Filipino male say to you?

A. He followed me out. He was walking with me and we walked towards Guy Garcia. And he started 02:07:37PM approaching Guy Garcia and, you know, he was about to tell him he knows me, and right away Guy Garcia shut him down and give him a direct command to turn around and to walk away and to not talk me. He ordered -- he commanded him to not talk to me. 02:07:53PM

Q. And then what happened next?

A. He left, the younger Filipino guy left. So I standed [sic] there and I proceeded to explain, "Why are you doing this to me? I don't understand what's going on. Can you explain why you are doing this to me? I 02:08:07PM

have a medical disability letter. Why are you treating me this way? I do not deserve to be treated this way."

Q. Do you recall whether or not Mr. Garcia told you that you needed to leave the store?

A. No, I do not recall. 02:08:21PM

Q. Okay. So then after you explained that to Mr. Garcia, what, if anything, happened next?

A. Probably a minute or two later, I recall Joe Johnson walking towards Guy Garcia's direction. And so I started explaining to Joe Johnson the same thing, "I'm 02:08:41PM here to see Adriana. I want to speak to the manager. I need to explain why I'm here. I need a resolution to this problem. I need information as to why I'm being treated this way, why I'm being discriminated against --

THE REPORTER: I'm sorry, ma'am, just a little bit slower; okay?

THE WITNESS: Yeah. Where do you want me to start from?

THE REPORTER: "I want to explain why I'm here. I need a resolution to this."

THE WITNESS: Yes. I need an explanation as to why I'm being treating this way, why am I being discriminated.

BY MR. FEARS:

Q. And what response, if any, did you get from 02:09:14PM

Mr. Johnson?
A. Same, ignoring me. Just standing there ignoring me, both of them.
Q. What happened next then?
A. I believe one of them, Joe Johnson probably 02:09:28PM turned around and walked away. And the last thing that I remember be is Guy Garcia take out his cell phone from his pocket and he started texting on his phone. I don't know who he was texting, because he didn't talk to me, obviously. 02:09:48PM
Q. Okay. And then what happened next?
A. Well, I felt that I needed to, at that point, turn around and leave because I was being ignored again. So I turned around to walk -- walk away and exit the store. 02:10:01PM
Q. Anything else happen before you exited the store?
A. No. The last thing I remember is I turned around to walk the store. And then as I turned around to walk out the store, I saw a police officer walking 02:10:10PM in.
Q. Okay. And then, then what happened?
A. Well, I was very happy to see a police officer because I thought he was randomly walking in. I had no idea that he was called for me, since nobody told me. 02:10:26PM

And when I saw him, I just very, you know -- took the letter out of my pocket. And he said, "What's going on here?"

I started explaining to him very calmly that this is my store, I come here all the time and these 02:10:40PM people are treating me this way. I have a letter. I have a disability. I don't understand why they're treating me this way.

Q. And so as of this point then, when you engage the officer, had you completed all discussions with the 02:10:55PM CVS employees that you encountered on January 19th?

A. Yes, at this point, I had finished my conversation with Guy Garcia, who, I believe, was the last person I talked to and then I turn around. Half of my body was almost out the door, half of my body was in, 02:11:16PM and then that's when I saw the police officer walking into the store.

Q. And have you told me everything that you said and that any CVS employee said all the way up to the time in which you engaged the police officer at or near 02:11:34PM the exit to the CVS store?

MS. MKRTCHYAN: Objection; vague and ambiguous as to everything.

THE WITNESS: From what I recall, I have told you what I recall. 02:11:49PM

BY MR. FEARS:
Q. Okay. And so just to be clear, I'm, of course, talking about your second visit to the CVS store in this roughly one-week period of time, specifically on January 19th, and you've told me everything that you recall being said between you and/or the CVS employees on January 19th; correct? 02:12:02PM
A. From what I recall, yes.
Q. And from that point on, all of your interaction was with the police officers at or outside the exit of the CVS store; correct? 02:12:17PM
A. At that point, my main conversation was with Ross.
Q. Okay. But you didn't have any further discussion with any CVS employees after Ross and you spoke; correct? 02:12:34PM
A. Not at that point because I pretty much blanked out and the only thing I was doing was talking to the police officer.
Q. Okay. 02:12:53PM
MR. FEARS: Counsel, do you have that Bates stamp number?
MS. MKRTCHYAN: Counsel, within half an hour time that we had a lunch break, I didn't have a chance to look at all the records that have been produced or 02:13:06PM

even the supplemental production by your firm. From what I have seen, it should be in the first batch of our supplemental disclosures that were produced. They should be within P24 through P51. So that was the first batch or -- first batch of discovery of supplemental disclosures. 02:13:27PM

But as I said, within a half an hour, I have not had a chance to look at the entirety of the records that have been subpoenaed from Dr. Flores's office. So that's the offer of proof that we have. 02:13:42PM

MR. FEARS: Okay. We -- we've checked and we cannot locate it, and I think Mr. Kang has also checked and he cannot locate it. And so I'm asking again, at whatever break or whatever, if you can locate this document because it obviously would be relevant and hasn't been produced, and I want to examine your client regarding that document. But I have not seen it in the production and nor has Mr. Kang. 02:14:00PM

The second thing is your client -- let me withdraw that. So let me -- let me go on. 02:14:19PM

BY MR. FEARS:

Q. Ms. Burmayan, where we left off, you were going to the exit and you encountered Officer Ross. Before doing so, I think you testified at the outset of your deposition, you turned around and tried to video, 02:14:35PM

but you ended up taking a couple of pictures; correct?
A. Yes.
Q. Okay. So what pictures did you -- what were you attempting to video before you left the CVS store on January 19th? 02:14:55PM
A. I was attempting to show this to Adriana about the mistreatment that these two employees, I don't know their titles at that moment, was giving regarding ignoring me, which clearly they were doing. And then the only thing I was able to get was those two pictures. 02:15:07PM But the purpose was to show that I'm talking to them, I'm trying to plead with them, explain my situation to them, and they're ignoring me.
Q. Were you trying to take these pictures while you were speaking with them or while you were at the 02:15:23PM door just before you were leaving?
A. While I was at the door before I was leaving, more or less around that time, as I said the first time when you asked me that question.
Q. Okay. So, so, and the two actual pictures 02:15:32PM that you took, what were those pictures of?
MS. MKRTCHYAN: Asked and answered, Counsel. Asked and answered.
THE WITNESS: I did already answer it, but since you asked again, it was of Joe Johnson and of Guy 02:15:46PM

Garcia.

BY MR. FEARS:

Q. And did it depict them doing anything that -- other than just being there in the CVS store? In other words, is there anything -- because I haven't seen those 02:15:56PM either and I was about to ask your counsel for them. I haven't seen those two pictures. They don't appear to have been produced. So please describe for me what Mr. Johnson and Mr. Garcia are doing in those two pictures that we don't have. 02:16:09PM

MS. MKRTCHYAN: First of all, Counsel, if you have not looked at the records, then don't make such representations. Everything that has been in plaintiff's custody, possession and control from the day of the incident have been produced, including those 02:16:18PM photographs. So perhaps you should take the time to look at the photographs before making such representations. They were produced in the first batch of discovery with the same batch of discovery supplemental disclosures. So don't make such 02:16:34PM misrepresentations.

MR. FEARS: Yes. Whatever you say, ma'am, but we did look and we do not have those two pictures and --

MS. MKRTCHYAN: What do you mean we have looked? What is this? This is ridiculous. You know, I 02:16:48PM

do not appreciate this kind of misrepresentations of the record. Do you want -- you know what, we'll stop this right now, I will provide the date of the supplemental disclosures.

If you have not looked at the photographs, why 02:17:04PM are you making such misrepresentations? You know, taking the time of this, you know -- and again, I would be happy to actually share my screen and show those photographs for you since you have not even taken the time to look at the discovery. So do not make such 02:17:16PM accusations, conspiratorial fashion, misrepresentations, and you have -- when you have everything in your possession, but you have neglected, frankly, to look at them prior to this deposition. Thank you.

So look at the supplemental disclosures of 02:17:30PM plaintiff in June through August before, you know, making such accusations.

MR. FEARS: Please mark the record here Christina as well, and counsel interrupted me.

But in any event, if, Counsel, you can 02:17:45PM identify by Bates stamp number where that was produced, that would be greatly appreciated.

In other event, let me move on.

BY MR. FEARS:

Q. Ms. Burmayan, with respect to those two photos 02:17:57PM

so that I know what you're referring to, do you remember what they captured Mr. Johnson and/or Mr. Garcia, the two subjects of those photos you've described, do you recall what they captured those individuals doing, if anything? 02:18:17PM

A. I don't recall, but it would pretty much be them ignoring me.

Q. And do you remember how far away they were from you at the time that you took their photographs while you were at the exit door? 02:18:29PM

A. I was at the exit door and they were towards the lanes that you wait to go and purchase the item.

Q. And other than your description of them ignoring you, is there anything else that either one of them, that you can remember them doing in the pictures? 02:18:45PM

A. I do not recall.

Q. Okay. Do you -- with respect to Mr. Garcia and Mr. Johnson, as I understand it, you don't recall having ever observed them or seen them working in the CVS store prior to January 13th; correct? 02:19:11PM

A. I do not recall them before the 13th.

Q. And so the only two times that you ever encountered them that you can recall would have been January 13th and January 19th of 2021; correct?

A. Yes. 02:19:31PM

Q. Okay. Are you aware of Mr. Garcia or Mr. Johnson knowingly allowing any CVS customer, other than you, to have a mask on that was below the nose, that is not covering the nose?

MS. MKRTCHYAN: Calls for speculation, vague and ambiguous, unintelligible. 02:19:56PM

THE WITNESS: When I walk into a store, my purpose is to buy my merchandise or talk to someone. I don't walk around and watch what other people are doing or how Guy Garcia is treating other customers. My concern is myself. 02:20:13PM

So to answer your question, I do not recall how or what they said to other customers other than myself.

BY MR. FEARS: 02:20:27PM

Q. And do you know whether or not Mr. Garcia has ever asked any other customers of CVS to make sure that their mask is covering both their nose and mouth?

A. I do not recall because my purpose at the store is not to encounter how he treats other customers. 02:20:43PM

MR. FEARS: Move to strike everything other than "I do not recall."

BY MR. FEARS:

Q. Do you know whether Mr. Johnson has asked other CVS customers to make sure that their mask is 02:20:54PM

completely covering both their nose and mouth?

A. Again, I do not recall because my purpose is not to stalk other employees and how they're treating other customers.

MR. FEARS: Move to strike everything other than "I do not know [sic]." 02:21:10PM

BY MR. FEARS:

Q. And --

A. I said "I do not recall."

MR. FEARS: Move to strike everything other than "I don't" -- "do not recall." 02:21:16PM

BY MR. FEARS:

Q. And with respect to the cashier that you encountered on January 13th of 2021 that did not ring up your sale, do you know whether he ever required the 02:21:35PM customers that were in his line to make sure that their mask was completely covering their nose and mouth?

MS. MKRTCHYAN: Same objection; calls for speculation, vague and ambiguous.

THE WITNESS: As I said earlier, there was 02:21:56PM nobody in the line other than myself, so there's no way to witness how he treated other customers. I've only seen him once, which was that day, so I do not recall how he has treated any other customer other than myself because I was the only person in line. 02:22:13PM

BY MR. FEARS:
Q. So it's fair to say you don't know one way or another whether or not the cashier that you encountered on January 13th, I think you said he was -- was a Filipino cashier, at least based on your observation; 02:22:24PM correct?
A. Yes, he was a Filipino cashier, middle age and above.
Q. Okay. You don't know whether or not that cashier that you encountered on January 13th of 2021 had 02:22:36PM asked other CVS customers to make sure their mask covered their nose and mouth before ringing them up; correct?
A. There's no way I can answer that because he was not with another customer other than myself on that 02:22:52PM day at that time.
Q. You just have no information on that subject one way or another; right?
A. No. Because I have only encountered him once on the 13th in line with no other customer. 02:23:07PM
Q. Okay. And Mr. Garcia, when he encountered you on January 13th, he did tell you that it was CVS policy to make sure the nose and mouth was covered up; correct?
A. No. He said, "Cover your nose. Cover your nose. Cover your nose." 02:23:25PM

Q. And Mr. Johnson, he advised you that it was CVS policy to make sure that the mask covered both your nose and mouth; correct?

A. I never had conversation with Mr. Johnson. He stopped me behind and hovered over me during my transaction at the self-checkout center. 02:23:40PM

Q. Let me show you a document we'll mark Exhibit 1 to this deposition.

(Defendants' Exhibit 1 was marked for identification by the court reporter and is attached hereto.) 02:24:00PM

BY MR. FEARS:

Q. Do you see a document that has the number 6020210727038192?

A. Yes. 02:24:32PM

Q. Okay. That's the first page. And then the next page is -- it says "Possible claim number," has some numbers, claimant attorney letter, claimant written statement. And it looks like an e-mail from Matthew Walton to, and there's an address, it's dated July 27, 2021, at 3:43 and 42 seconds p.m. 02:24:51PM

And then I'll turn to the third page, first page I'll ask you a question about, Marla Brown, there's letterhead here, Marla Brown, dated July 27, 2021.

Do you recognize that name Marla Brown? 02:25:11PM

A. Yes.
Q. Okay. Was she a former attorney of yours?
A. She was not so much an attorney, but she was someone who was investigating the case to see if she will take the case. 02:25:25PM
Q. Okay. Was she assisting you in any way, that you know of?
A. Yeah. She was looking at my case.
Q. Okay. And was she looking at your case in this July 27th of 2021 time frame? 02:25:34PM
MS. MKRTCHYAN: You know, subject to the attorney-client privileged communications, I would object to going into privileged communications between attorney client. So I would instruct my client not to answer questions directly related to communications 02:25:51PM between herself and her attorney.
So, therefore, please -- if you can answer that question without going into the communications between yourself and your attorney, you may answer that.
THE WITNESS: If your question is, was she 02:26:07PM looking at my case, yes, she was.
BY MR. FEARS:
Q. Yeah, and I was just looking at the time frame. There's a letter here July 27th of 2021. Was she looking at it in this time frame, to your knowledge? 02:26:18PM

A. In this time frame, yes.

Q. Okay. And so there's a letter here to Matthew Walton at Sedgwick, has a re. line of Anoush Burmayan. It has a date of loss and a claim number, and then it goes on to say, "Dear Mr. Walton, as a follow-up to your 02:26:37PM correspondence to prior counsel, we are attaching Ms. Burmayan's written summary of the incidents at issue." And it goes on to talk about theories of liability. And this document is Bates stamped CVS-0000860, which means it's been produced in this 02:26:57PM case.

Have you ever seen this letter before?

A. I don't recall.

Q. Okay. All right. Let me go on to the next page of the letter, that referred to the statement, and 02:27:09PM the next page of the letter is Bates stamped 00000861 through 862. It's -- there's two pages to it. And I'll refer to the top of 861, which starts off with, "My name is Anoush," and it goes on to say "I was arrested at my local CVS on 1/19/21." And then there's a long text 02:27:38PM after that.

Go ahead and look at this, but I just want to know if you remember -- if you -- well, whether or not you wrote this.

A. If I remember if I wrote this? 02:27:53PM

Q. Yes.
A. Yes, I wrote this.
Q. Okay. And this was something that -- in which you wrote this summarizing what had happened at CVS; correct? 02:28:07PM
A. Yes.
Q. Okay. And this was part of, you know, something that was submitted by Marla Brown to Sedgwick Claims Management Services; correct?
A. Yes. I assume. I don't know what she did. 02:28:21PM She was handling my case. I don't know who she turned it into, but she asked me to write a testimony, and this testimony had already been written by me after the incident because I was going to have a meeting with the hearing officer over the phone. 02:28:38PM
Q. And when did you write up this two-page typed written statement that we have in front of us in this Exhibit 1?
A. I would say after my arrest, but before the appointment with the hearing officer. So before March 02:28:52PM or April of 2021.
Q. Okay. And were the events, at that time, were they reasonably fresh in your mind?
A. From my recollection, yes.
Q. And when you wrote this statement up, in your 02:29:06PM

mind, did you believe that this was accurate information?

A. From my recollection, yes.

Q. Let me -- you told me before that when you went into the CVS store on January 13th, when you walked in, you had the mask -- the top of the mask below your nose; correct? 02:29:32PM

A. Correct.

Q. And it remained below your nose the entire time you were in the store on January 13th of 2021; correct? 02:29:45PM

A. Yes, for the most part. When he told me to cover it, maybe I tried to lift it up, but because I wasn't feeling well, for the most part, it was remaining below my nose. 02:29:59PM

Q. Okay. In looking at your statement, if you look down about five lines, or six lines, it says, "I was reaching down to get my credit card, I pulled the nose area away because I was having a hard time breathing and also from gastritis attack I was having which is why I was buying the Gas-X." 02:30:13PM

According to this, you're saying that when you went to reach for your credit card, that's when you pulled the nose area away.

Do you see that? 02:30:34PM

A. Yes.
Q. But that's not consistent with what you said before when you were in the aisles when you were speaking to Mr. Garcia and you walked in with the mask below your nose? 02:30:46PM
A. How is it not consistent when I myself told you he approached me because I did not have my nose closed.
Q. Right. Well, this --
A. That's why he approached me. 02:30:56PM
Q. When you were reaching for your credit card, that's when you went to check out and purchase the Gas-X; correct?
A. Yes.
Q. Okay. And it says, "As I was reaching to get 02:31:04PM my credit card, I pulled the nose area away." You already had it below your nose before that; correct?
MS. MKRTCHYAN: Objection; argumentative, vague and ambiguous as to time, as to when, et cetera.
So please make it clear as to what time and 02:31:17PM when.
BY MR. FEARS:
Q. Prior to approaching the cashier's checkout stand where the gentleman who you described as a middle-aged Filipino man was there as a cashier, you had 02:31:28PM

already had the mask below your nose; correct?
A. Yes, but as I said several times, I was opening and closing the nose. So at that time, when I wasn't feeling well, I pulled my nose down because I was getting my credit card. 02:31:47PM
Q. Down below here, it says that when you went to buy your item, "another cashier who is wearing a mask, has Plexiglass between us and it's just me and no one else at the store. He tells me if I don't close my nose, he's not going to ring my item"; is that an 02:32:12PM accurate statement?
A. Yes. That's the cashier I'm referring to.
Q. Okay. And that's what he said to you; right?
A. Yes.
Q. And so at that point, as you say here in your 02:32:21PM statement, you took the item to the self-checkout and you -- and you bought it there; right?
A. Yes.
Q. Okay. Down below, it says -- and I'm pointing to the area, it's about halfway down, it says, "I took 02:32:50PM pics and video of the workers." You've already told me about the two pictures, Johnson and Garcia, but it also says "video of the workers."
Why did you state that you took video of the workers when you've told me today that you did not 02:33:06PM

actually take video?

A. I'll be happy to answer that, even though you already asked me that about two hours ago and I gave you the answer, which is that I attempted to take video, but because of my nervousness and anxiety, there was no actual video, it ended up being pictures. I answered this about two hours ago. 02:33:22PM

Q. No, I remember that. I remember what you said, but this is something you just told me that you wrote in the March of 2021 time frame, and you would have known by then that you did not take video; right? 02:33:35PM

A. No. Because you asked me when did I look at my picture and video, I said six months to a year later --

Q. Okay. 02:33:51PM

A. -- so I never looked at anything.

MS. MKRTCHYAN: Please do not interrupt the answer. Please finish your. . .

THE WITNESS: As I said about two hours ago, I never actually looked at my videos or pictures till almost six months to a year later because I was so severely traumatized that I did not want to relive that night. So from my recollection, when I wrote this, which was right before the hearing officer's appointment, I assumed I had taken video, but I never 02:33:58PM 02:34:11PM

checked it until almost six months to a year later.
BY MR. FEARS:
Q. Do you see anywhere in your statement that you provided -- and you can read through the whole thing, anywhere in your statement where you off -- where you attempted to show a medical note to either the CVS employees or the police officers? 02:34:22PM
MS. MKRTCHYAN: Objection; vague and ambiguous, and intelligible.
THE WITNESS: I can scroll down and look. 02:34:40PM
BY MR. FEARS:
Q. Yeah. And let me know when you want me to scroll further.
MS. MKRTCHYAN: Well, you know, first of all, this letter, we cannot see the entirety of this on our screen, so -- and, you know -- so can you please scroll up so she can read the entirety of the letter. We can't read this right now on our screen. 02:34:49PM
MR. FEARS: I started at the very beginning. I take it, Counsel, you can see the width of it; right? Right? 02:35:10PM
MS. MKRTCHYAN: Well, you know, I have hard time looking because I'm not even sitting in front it.
But can you see -- can you read it?
THE WITNESS: Yeah. 02:35:21PM

MS. MKRTCHYAN: Okay. Read it and then tell him to scroll down when you're finished. Thank you.
MR. FEARS: That's fine, I'll scroll down, but I just want to make sure the width was okay on your computer. 02:35:29PM
THE WITNESS: Can you scroll down?
BY MR. FEARS:
Q. Can I first get an answer to the question about the width? In other words --
A. Are you asking me or the counsel? 02:35:31PM
MS. MKRTCHYAN: The width -- width, I have hard time because the -- we have gallery of the, you know, speakers that are on the right side. So if -- let me see if I can change the speakers to get on top. Or no, it's impossible. 02:35:51PM
Well, I think the width is fine. We can read the letter. So tell him when to --
THE WITNESS: Are you asking me if I can see the width?
BY MR. FEARS: 02:36:01PM
Q. Yes.
A. I can see the width.
Q. Okay. So the first line you can read, "My name is Anoush. I was arrested at my local CVS on 1/19/21. I have a medical"; right, you can read that? 02:36:12PM

A. Yes.

Q. Okay. So read through and read down, and then let me know when you're ready for me to scroll down further, because I agree with your counsel that you can't see the whole letter because it's on a screen and 02:36:26PM I want it big enough so you can read it. So I'll scroll down as you request; okay?

A. Yes.

Q. Just let me know.

A. Can you scroll down? 02:36:33PM

Q. Sure.

A. Okay. You can stop there.

What is your question?

Q. My question was, can you see anywhere in your statement that you wrote and that your attorney provided 02:37:07PM that says you -- you provided or attempted to provide a medical note to the CVS workers, the employees or the police department officers?

MS. MKRTCHYAN: I object because -- I object because of -- it's unfair to ask the plaintiff to read a 02:37:26PM letter at a deposition in, you know, time frame that we have without the benefit of even understanding the context of this. It takes things out of context and it's un- -- incomprehensible. So -- so I object because this questioning is very unfair to plaintiff. 02:37:47PM

I myself cannot even read right now.
Plaintiff has had, you know, two minutes to read it under this -- the condition is an unfair request, so --
But if you can answer based on what you have read so far, you can go. 02:38:03PM
MR. FEARS: Please mark the record, Christina, as to this speaking -- speaking and coaching objection.
BY MR. FEARS:
Q. And just let me know, Ms. Burmayan, when you are ready and I'll scroll down further so you can read. 02:38:15PM
A. You're asking me if I went back, and when I went back, did I explain my situation regarding a letter?
Q. No. No, that wasn't my question.
My question was very simply whether or not 02:38:26PM there's anywhere in this letter in which you document having shown to either the CVS employees or the police department a medical note or attempting to do so?
A. Yes.
Q. Where? 02:38:43PM
A. I thought about it a few days and how unfair it was the harassment and discrimination they did to me, and moving forward, if I am going to the same store, they need to know my condition. Also, I had been going to the store since the beginning of the lockdown and no 02:38:57PM

one ever gave me problems. I went back a few days later to talk to one of the workers. There is a lady that I know, we usually have conversations. Sadly, she was not there that night.

Q. And you're telling me that that says I pulled 02:39:09PM the note out of my pocket and tried to give it to the CVS worker or the police department employees?

A. No. Your question was did I try to go back and explain or talk to anyone to explain my condition.

Q. No, that wasn't my question? 02:39:27PM

MR. FEARS: Move to strike nonresponsive.

BY MR. FEARS:

Q. That was not my question, and I'll ask it again. Is there any --

MS. MKRTCHYAN: Argumentative. 02:39:34PM

Counsel, you know, here's the thing, do you understand that I have a right to object or do you have a problem with me representing Ms. Burmayan?

MR. FEARS: There's no question pending right now. I was responding to your client, Counsel, and I 02:39:43PM was going to ask my next question, but I move to strike and I'm explaining my question --

MS. MKRTCHYAN: Any time -- every time you don't like the answer, you're moving to strike, making my client, you know, in a very -- you are badgering the 02:39:57PM

witness --

MR. FEARS: No, I don't dislike the answer. I love the answer --

(Speaking simultaneously.)

(Whereupon the court reporter gives an admonishment not to speak over each other.) 02:40:06PM

MS. MKRTCHYAN: That's how she understood the question. If you don't like the answer, please do not badger her. She's entitled to, you know, her 02:40:13PM understanding of the question. So if you can phrase the questions in a more fair way, in a more comprehensible way, in a more -- you know, you're asking questions that I personally cannot answer myself. It's unintelligible.

At what point in time? She went to CVS twice, 02:40:32PM January 13, January 19. You are continuously not providing actual time frame what your question is.

Why don't you ask her, on January 13, did you do this? On January 19, did you do that? Does this letter reference only the January 13th or January 19th? 02:40:49PM Because there are two incidents in this. So, therefore, you're confusing my client. And the record, what I'm concerned is the record is not going to be clear from this transcript; therefore, I am entitled to object so that the magistrate later sees that you are confusing 02:41:08PM

the witness.

MR. FEARS: I object to counsel's speaking coaching objection, and wasting time. Please mark the record here as well, Christina.

BY MR. FEARS: 02:41:20PM

Q. Ms. Burmayan, I'm asking you the question again. Can you identify anywhere in this two-page statement that is part of Exhibit 1 in which you specifically state that you attempted to give a doctor's note to the CVS employees and/or to the police 02:41:34PM department officers that appeared -- the latter appearing on January 19th of 2021?

A. Yes. One more time, to repeat myself regarding the CVS employee, I thought about it a few days and how unfair it was, the harassment and 02:41:57PM discrimination they did to me. And moving forward, if I am going to go to the same store, they need to know my condition.

Also, I had been going to the store since the beginning of the lockdown and no one ever gave me 02:42:06PM problems. I went back a few days later to talk to one of the workers. There is a lady that I know, we usually have conversations. Sadly, she was not there that night.

Can you scroll down? 02:42:16PM

In addition, when I was trying to talk to the police officer, he came and he was standing behind me. I had no idea they called the police. They did not tell me. I turned around and one officer started asking me what happened. Very -- 02:42:49PM

THE REPORTER: I'm so sorry, just a little bit slower, please.

THE WITNESS: The police came and were standing behind me. I had no idea they called the police, they did not tell me. I turned around and one 02:43:02PM officer started asking me what happened. Very calmly, I told him what happened, that I was there a few days before and I tried to buy Gas-X and they harassed me even though I was wearing a mask.

As I was telling my story, the officer cut me 02:43:17PM off and told me to turn around and put my hands behind my back, and he took out his handcuffs and arrested me.

Q. And you told me -- tell me which words you say that you tried to give a note to either the workers at CVS or the police officers? 02:43:33PM

A. If you can scroll up, I'll read it for the third time.

Q. No, no. Show me what specific words say that --

A. I can't see it now. You need to scroll up. 02:43:42PM

Q. Okay. Let me -- let me finish my question, if I could --
A. Okay.
Q. -- Ms. Burmayan. I'm trying to be very patient. 02:43:52PM
A. Me, too.
Q. Tell me the specific words that say you tried to hand a note to either CVS employees or police department officers.
MS. MKRTCHYAN: I object, Counsel, to that 02:44:02PM characterization. You are now badgering the witness. She answered your question several times. If you don't like the answer, you know, she's entitled to her answer. You know, it's not your prerogative. And I don't like those kind of comments, I'm trying to be patient. For 02:44:15PM goodness sake, that's inappropriate. You're complaining about me making speaking objections. Perhaps you should just not behave like that inappropriately. Thank you.
Please show him where do you believe you see those. 02:44:29PM
THE WITNESS: If you can scroll up, I'll show you for the third time.
BY MR. FEARS:
Q. Are you just -- are you going to tell me the same words that you -- 02:44:35PM

A. Yes.
Q. -- read before?
A. Yes.
Q. Yes?
A. Yes. 02:44:39PM
Q. Okay. So other than what you've told me already, are there any other words in your statement in which you specifically state that you attempted to show a doctor's note to the CVS employees or the police officers? 02:44:53PM
A. Can you scroll through the rest of the letter? I would like to see the rest of the letter.
Q. Sure. Sure. This is to the bottom of the first page.
A. He forced me in the car, he shoved me, and I 02:45:15PM kept asking nicely, sir, why are you arresting me? I have not done anything wrong. I kept telling him I have a medical condition, I can't breathe. I was yelling in the car. He said he was going to take me to jail and someone can bail me out in the morning. 02:45:28PM
Those my three attempts to try to communicate with both the police officer and the employees to try to have them listen to me so that I can show my letter, and every single time I am being ignored.
Q. Have you finished your answer or do I -- 02:45:47PM

should I scroll down further? And you're -- there's more places where you specifically refer to a letter that you tried to give to the officers and employ- -- or employees?

A. Are you asking me? I didn't -- can you rephrase your question? 02:46:00PM

Q. Yeah. Is -- have you finished your answer or would you like me to --

A. For this part of the --

MS. MKRTCHYAN: Let him finish. Let him finish. 02:46:09PM

THE WITNESS: Yeah. For what you have showed me, yes, I have answered it.

BY MR. FEARS:

Q. Have you -- and that's all the way through the first page of your note, or your statement; right? 02:46:15PM

A. Yes, those three times that I showed you.

Q. Okay. Now going to Page 862. I'm showing you from the top of that page. Please go ahead and read that and -- and then let me know where it specifically indicates in your statement that you attempted to hand a medical note to the CVS employees or the police department. 02:46:30PM

MS. MKRTCHYAN: Objection; argumentative, asked and answered. 02:46:45PM

Are you doing this the third, fourth time just to kind of -- for the kick of it, Counsel, just to have fun? You're asking the same question. She went through this already.

MR. FEARS: No, I'm not. I'm letting her read the whole letter, Counsel. So please don't interrupt and let her review the letter. 02:46:54PM

MS. MKRTCHYAN: Read what letter? She already read the letter. You are -- you've asked her to read it. You've provided -- she provided answers. Are you asking her to reread this letter again? I object. This is badgering the witness and argumentative, and you're basically going over the same issues when we have time limits. 02:47:05PM

I also would like to point out that this is a joint deposition -- 02:47:19PM

MR. FEARS: Counsel, please -- I have to interrupt. Please stop.

MS. MKRTCHYAN: No.

MR. FEARS: She said she hadn't read this -- let me finish. She hadn't read this section -- 02:47:25PM

MS. MKRTCHYAN: You interrupted me.

MR. FEARS: -- of the letter so I'm letting her read the section page of the statement that she prepared. 02:47:33PM

MS. MKRTCHYAN: That's -- she just read that already.

MR. FEARS: No. That was the first page, Counsel. I finished --

MS. MKRTCHYAN: (Inaudible.) 02:47:39PM

MR. FEARS: Page 861, I stopped down here at the bottom of 861. Now I'm going to the top of 862.

MS. MKRTCHYAN: Well, because it's not clear to me how -- how many pages is this letter from where the screen is going up and down -- 02:47:53PM

MR. FEARS: It's two pages. Counsel, it's two pages, as I've stated before.

MS. MKRTCHYAN: It's an unfair questioning because I cannot see what's -- what is on the screen.

Go ahead, please read it. 02:48:04PM

THE WITNESS: Well, I'm not sure if you have read the letter yourself, but at this point I'm handcuffed, so there's no way I can hand anybody any letters, unless you can think of some way I can go to my pocket and take out a letter. 02:48:15PM

BY MR. FEARS:

Q. I wasn't asking you that. I was just asking, within your statement, is there anyplace on the second page where you mention that you handed or tried to hand a note to a police officer or a CVS employee? 02:48:26PM

A. I need a minute to look at it, but from my recollection, because my hands were tied behind my back, there is no way that I could have possibly reached into the pocket, even though I tried to, but I was ignored.

Q. No, I'm just asking about the content of your letter. And you just said you haven't read it yet so your counsel seemed to think you had read it, but please go ahead and read it -- 02:48:43PM

A. Well, I have read it because I wrote it, but I need a minute right now to check over the second page. 02:48:58PM

Q. Okay. Please do that.

A. Can you scroll down?

Q. Sure.

A. "I have a medical condition and waiver. This is discrimination and harassment and illegal. I have a medical condition and waiver. My hands were hurting from the handcuffs. I was screaming and crying so hard they had all the windows closed. I thought I was going to die. I asked the officer why did you even bother to ask me my side of the story since you had already made up your mind to arrest me, you didn't even let me finish my story. I asked him, aren't you supposed to be on the side of justice? He said, "This CVS calls us nonstop, that's why we arrest people right away." 02:49:49PM 02:50:04PM

So that's an example again of me trying to 02:50:17PM

talk to either the employee or the officer and explain that I have a waiver.

Q. Anywhere else in this document where it says you specifically tried to hand a copy of the doctor's note to the CVS employees or the police department? 02:50:37PM

A. I can't see the rest of the letters. You can scroll down.

So there's about three examples on the first page and roughly about one example on the second page of me trying to plead and explain to them that I have a 02:51:03PM medical condition and that I have the waiver.

Q. Okay. And is there any -- in reading those two pages of your statement, did you see any specific language that mentioned that you had in your hand or pocket a doctor's letter or note? 02:51:24PM

A. "I have a medical condition and waiver. This is discrimination and harassment and illegal."

If you scroll up, I can read it again.

Q. I think you just stated that. You don't need to read that again. 02:51:42PM

A. Well, you're asking me the same question so I'm giving you the same answer.

Q. Did you see the word "doctor's note" -- the two words "doctor's note" anywhere in your statement?

A. I did not see the word "doctor note." I was 02:51:54PM

not instructed to write the word "doctor note" in my own testimony. But what that implies is that I have a medical condition and I was there to discuss my medical condition and my doctor note, which I was never given that opportunity. 02:52:09PM

MR. FEARS: And move to strike as nonresponsive except for no mention of doctor note.

BY MR. FEARS:

Q. Let me show --

A. Doctor note waiver. 02:52:18PM

Q. Let me -- let me show you an exhibit that we'll mark Exhibit 2.

(Defendants' Exhibit 2 was marked for identification by the court reporter and is attached hereto.) 02:52:25PM

BY MR. FEARS:

Q. And this document, on the first page, it says, "Claim for Damages to Person or Property," and it was something that appears to have been filed with the clerk's office, City of Glendale. It has some 02:52:42PM information on the first page, an address of claimant and the -- your name, address.

Do you see your name and address on the first page?

A. Yeah. It's spelled wrong the last name, but I 02:52:56PM

see it.

Q. Okay. Was the address accurate as of the time frame when this was filed?

A. Yes.

Q. And then going down to the bottom of this first page, it says, "See attachment." It says, "Describe in detail how damage or injury occurred." It says, "See attachment." 02:53:08PM

Do you see that?

A. Yes. 02:53:24PM

Q. And then the second page is a lot of blanks, there's also a statement saying "See attachment" and there's, you know, a diagram there for what I assume would be a diagram of the streets where an incident occurred or an accident occurred. 02:53:38PM

Then on the third page, which is Bates stamped P11 -- and this document, by the way, is produced by plaintiff and it has a Bates stamp on it. It says, "Describe in detail how damage or injury occurred" on the third page of this Exhibit 2? 02:53:59PM

A. I just have to stretch my back.

Q. Sure.

And it starts off with, "On January 19th, 2021 at 1:32 a.m."

So what I want to ask you is, do you remember 02:54:14PM

preparing this statement?
MS. MKRTCHYAN: Objection; it's attorney-client privilege. So the question is going into attorney-client privileged communications. This is a letter drafted by attorney, not Anoush Burmayan. As 02:54:28PM
you can see from the description, there's no signature under oath by Anoush Burmayan, sir.
Therefore, I instruct my client not to answer to anything that is involving attorney-client communications. 02:54:46PM
MR. FEARS: Please mark this in the record, Christina.
BY MR. FEARS:
Q. So given that instruction, I assume when your lawyer instructs you, you're not going to respond to the 02:54:55PM
question; correct?
A. Correct.
Q. Okay. So looking at this -- this description that starts on Page 3, where it says "Describe in detail how damage or injury occurred," my question to you is, 02:55:05PM
have you ever seen this before?
A. Perhaps. I'm sorry, I don't recollect. I don't -- I don't remember.
Q. Okay. Can -- can you read it to yourself?
MS. MKRTCHYAN: I object, Counsel. This is 02:55:25PM

very hard for my client. She's having pain in the back. You know, sitting here in front of a laptop, small screen, generally -- you know, right now we're at the deposition. You're going on a Zoom deposition. It's an unfair request of my client, so therefore, I object, 02:55:40PM
but --

MR. FEARS: We can -- we can resume the deposition in person, if you'd like.

MS. MKRTCHYAN: Well, no, we're not going to resume. It was your request to do this on Zoom. We've 02:55:50PM
already agreed to produce her per your request on Zoom. I don't have all the time in the world to come back here. And by the way, this is a joint session between the defendants, so please make sure you use your time wisely. Thank you. 02:56:06PM

MR. FEARS: And I'll state -- I'll state for the record that it's a Zoom deposition. There's been no objection to it being a Zoom deposition.

BY MR. FEARS:

Q. So, Ms. Burmayan, are -- is -- I've heard from 02:56:14PM
your counsel. Is it your testimony that you cannot read the documents that I'm putting on the screen in front of you?

A. That I cannot read the documents?

Q. Right. 02:56:29PM

A. I've read every single documents that you showed me.
Q. Okay. So you're able to read these documents that I'm putting on the screen in front of you; correct?
A. I'm capable of reading English, yes. 02:56:38PM
Q. Okay. So fair enough. Then why don't you read this document, Exhibit 2, starting with the description, and let me know when to scroll down.
A. You want me to read this entire document right now? 02:56:52PM
Q. I do?
MS. MKRTCHYAN: To yourself.
THE WITNESS: To myself; okay.
BY MR. FEARS:
Q. Yes, just to yourself. 02:56:56PM
A. Okay. I'm on January 19. I need for it to be scrolled down.
Q. Let me know when you're ready.
A. Okay. I'm on although.
I'm on the handcuffing. 02:59:11PM
I'm on where I think it says why.
Q. Right. Okay. I'll stop you there, because the next part is legal claims and, you know, it mentions various things.
But reading that first page and a half that 02:59:31PM

you read all the way up through "Why do you claim the City of Glendale is responsible," do you remember reading that before?
A. Before when?
Q. Before today. Just reading it? 02:59:45PM
A. What part? Can you repeat again?
Q. Yeah. The Page 1, all the way up to the top portion of Page 2 of that narrative that you just read, have you -- have you seen that before today?
A. I need a minute break because I'm getting 03:00:03PM overwhelmed.
Q. Okay. Are you able to answer that question before we take a break?
A. (No response.)
Q. I'm sorry? 03:00:15PM
A. I can't answer that question. I'm getting overwhelmed.
Q. Whatever you need to do.
MS. MKRTCHYAN: So we request a five-minute break for the -- for plaintiff to, you know, calm down. 03:00:24PM
MR. FEARS: Okay. We'll go off the record for five minutes.
MS. MKRTCHYAN: Why is this -- can you stop sharing the screen, Counsel, so that we can actually -- okay. 03:00:45PM

MR. FEARS: Off the record, Matt.

THE VIDEOGRAPHER: We're going off the record, and the time is 3 o'clock.

(Recess.)

THE VIDEOGRAPHER: We are back on the record 03:08:19PM and the time is -- give me one moment, please. I apologize, it's having a glitch here. It's very slow. All right. There it goes. Now it is 3:08, we're back on the record.

BY MR. FEARS: 03:08:41PM

Q. Okay. Ms. Burmayan, we were talking about Exhibit 2, specifically the third and fourth pages, which are Pages 1 and 2 of a narrative that were prepared and submitted to the City of Glendale, and I'm asking you whether or not that page and about a third 03:08:59PM that you've just read before the break, whether you remember seeing that before?

A. No. I already answered that five minutes ago. I said I do not recall seeing that.

Q. Okay. With respect to that summary that you 03:09:20PM just read, does that accurately summarize what occurred on January 13th and 19th of 2021?

MS. MKRTCHYAN: Objection; calls for legal conclusion, vague and ambiguous, unintelligible.

THE WITNESS: I would have to go back and 03:09:41PM

reread it again if you're asking me all over if it summarizes the incidents. I would need to take time and study the whole letter again.

BY MR. FEARS:

Q. Okay. You did read through it one time already; correct? 03:09:52PM

A. Yes, but I didn't know it was for the purposes of telling you if that's what happened that night or not.

Q. So my question of you then simply, in the interest of saving time, when you read through it, do you have any recollection of reading anything that you think was wrong or inaccurate? 03:10:01PM

MS. MKRTCHYAN: Objection; vague and ambiguous, unintelligible. 03:10:19PM

THE WITNESS: I can't -- I can't answer that without reading the whole thing all over again.

BY MR. FEARS:

Q. Actually, I'm just asking for your memory now. This is a test of your memory. You read this document a few minutes ago and then you asked for a break before you answered the question. 03:10:27PM

So what I want to know, do you remember -- five minutes ago or so when you read this summary, do you remember reading anything that you would say was 03:10:42PM

wrong or inaccurate when you read it?
A. I can't answer that because I get very overwhelmed. I'm traumatized from the accident still of the arrest, so there's moments where, when the whole night comes up again, I don't remember events, I don't 03:10:59PM recall and I blank out. So I can't answer the question about the letter.
Q. So as you sit here right now, having read that -- that page and a third summary, right now you're telling me in your mind you can't remember if there was 03:11:14PM or was not something inaccurate in that; correct?
MS. MKRTCHYAN: Objection; misstates the testimony, argumentative, vague and ambiguous.
THE WITNESS: Again, I would have to go back and reread because the first time you asked me if I can 03:11:29PM read the letter, I said yes, but you didn't ask me that you were going to ask me questions about the letter so I didn't take the time to pay attention and see what is right, what is wrong. So I cannot answer the question about the letter. 03:11:44PM
BY MR. FEARS:
Q. No, I'm just -- right now, I'm now asking you about the nature and extent of your condition because you're telling me you don't remember or you blackout or something to that effect. So I just want to be clear on 03:11:56PM

the record. I know the record will show that you read that page and a third within the last 10 minutes or so. I just want to know, as you're sitting here right now talking with me, can you remember anything you read that you know was wrong? 03:12:13PM

MS. MKRTCHYAN: Well, objection. Same objection, Counsel. You keep going, you know -- same question again and again. She answered. She provided the answer. You don't like the answer. You don't understand the answer. This is the last time I'm going 03:12:27PM to allow her to answer that question. It's vague and ambiguous.

BY MR. FEARS:

Q. It calls for -- it calls for a yes or no, Ms. Burmayan. Either you do remember something that was 03:12:37PM inaccurate or you don't remember reading something inaccurate because you just can't remember. But you are -- you are giving me the why answer without telling me if you can remember something inaccurate or not.

MS. MKRTCHYAN: Well, again, this is not a 03:12:55PM yes-or-no answer, but please provide the answer.

THE WITNESS: I cannot answer that question with a simple yes or no because I don't remember what I read in its entirety because you're asking me as a professor -- as a pop quiz, do I remember what I just 03:13:08PM

read five minutes ago. I cannot tell you what I remember that I read every single sentence or word for me to tell you if there was a mistake. Perhaps there was a mistake, perhaps there was not a mistake. But since I can't remember everything I read, I can't answer the question if there was a mistake or not. 03:13:19PM

BY MR. FEARS:

Q. Let me show you a document we'll mark Exhibit 3. It's a one-page progress note. And at the bottom of the page, there's a name of somebody, Sevan Tahmassian, and there's a date here of November 23rd of 2020. 03:13:39PM

(Defendants' Exhibit 3 was marked for identification by the court reporter and is attached hereto.) 03:13:46PM

BY MR. FEARS:

Q. Do you know who Sevan Tahmassian is?

A. Yes. He was one of the therapists I was seeing in between.

Q. Okay. And when was the -- do you remember when the first time was that you saw -- is it Dr. Tahmassian? 03:13:58PM

A. I don't recall his title.

Q. Okay. So let's go with Mr. Tahmassian for now. Do you remember the first time you started seeing 03:14:10PM

him?
A. It was after the arrest. I don't know the exact month.
Q. Okay. And do you remember how it was that you came to -- how it came to be that you started seeing Tahmassian? In other words, did somebody refer him to you? Did you look him up, you know, online? Did a friend refer him? Do you remember how it came to be that Tahmassian was somebody that you treated with? 03:14:21PM
A. During my workers' comp therapy sessions, there was often times where there wasn't an appointment scheduled, there was not an appointment scheduled and I needed to talk to someone. So I went online and I believe I found someone or someone referred me, I cannot remember the exact details, either if it was a referral or I did it myself. And that's how I ended up talking to Tahmassian. 03:14:39PM 03:14:53PM
Q. Okay. And so would -- did you -- is it fair to say then that you did not get treated by Tahmassian, you know, in years prior to the incident that occurred in January of 2021? 03:15:10PM
A. I was not treated by Tahmassian before my arrest.
Q. Okay. So let me show you this document. It's very short. It's dated November 23rd of 2020. 03:15:27PM

Do you see that?
MS. MKRTCHYAN: Well, I don't see anything yet on the screen.
MR. FEARS: Oh, I'm sorry. I'm sorry. I thought I was sharing it, but I'm not. My apologies. 03:15:39PM
So let me show you the medical note that I have, it's a progress note. It's dated 11/23/2020, and let me scroll down. I thought I'd showed you this, but I didn't. I wasn't sharing it on the screen, inadvertently.
At the bottom, it has Mr. Tahmassian's name 03:16:00PM
and there's a date and there's a clinician's signature there as well. It says, "Patient's name: Anoush Burmayan."
A. Right. Is your question if I being treated by him when I was -- had my arrest; is that what you're 03:16:15PM
asking?
Q. No. There's no question pending at all right now. So just if you could wait a minute.
Have you seen this progress note before?
A. No, never. 03:16:27PM
Q. Okay. Is it fair to say that when you met with doctor -- or Mr. Tahmassian or Dr. Tahmassian, whichever it was, that you would tell him about circumstances that were bothering you?
A. Yes. He was the therapist at the time. 03:16:41PM

Q. Okay. And did you have a good relationship with Dr. or Mr. Tahmassian?
A. It was regular. I wouldn't say good, I wouldn't say bad. Just normal, regular.
Q. Okay. Did he help you? 03:16:54PM
A. I don't think that I got the help I was seeking, that's why I discontinued with him.
Q. Okay. Did you have any specific complaint or issue with Tahmassian?
A. It wasn't so much a complaint or issue. It 03:17:06PM was just I was not being -- I was not getting from him what I was seeking, and so I didn't feel that I was getting any better from the time that I started being treated with him. So I just decided to move on to somebody else that maybe might be able to treat me 03:17:24PM better. That's how I ended up with Dr. Flores.
Q. And what were you seeking that you were not getting from Tahmassian?
A. What I was seeking was basically to go a little bit more deeper into the therapy discussions. 03:17:36PM
Q. Okay. And did Dr. Flores do that with you?
A. Yes.
Q. Okay. Has -- has that improved your condition at all by virtue of your treatment with Dr. Flores?
A. I would say that compared to Tahmassian, 03:17:51PM

Dr. Flores has helped me a lot more than Sevan Tahmassian did.

Q. Okay. In looking at this document, this progress note, you see the date of November 23rd, 2020; right? 03:18:08PM

A. Yes.

Q. Okay. And you know that that date was prior to your incident or incidents at CVS in January of 2021; correct?

A. Yes. I was being treated by Sevan Tahmassian 03:18:17PM before the arrest, yes.

Q. Okay. So this refreshes your recollection that you started treating with Tahmassian before the incidents and arrest involving Glendale Police Department and CVS; correct? 03:18:37PM

A. Yes. If the date says November 2020, then I was seeing Tahmassian already.

Q. Do you remember what the reason was why, prior to January of '21 when the two incidents occurred, one on January 13, one on January 19th, 2021, do you know 03:18:53PM why you started seeing Tahmassian?

MS. MKRTCHYAN: Vague and ambiguous as to why.

THE WITNESS: Why did I start seeing Tahmassian, because I had a workers' comp case and I needed to see a therapist for stress. 03:19:11PM

BY MR. FEARS:
Q. So this had to do with stress relating to your L.A. Unified School District workers' compensation case?
A. Yes. Because I was not yet assigned a therapist, I had to go seek my own therapist through my own Medi-Cal. 03:19:25PM
Q. Go ahead -- why don't you go ahead and read the data portion there, and let me know when you're ready.
A. You just want me to read it to myself? 03:19:43PM
Q. Sure.
A. Okay.
Q. With respect to the information that Tahmassian puts in that data portion, does this fairly characterize at least some of the things that you shared with him? 03:20:13PM
A. No.
MS. MKRTCHYAN: Vague and ambiguous -- objection; vague and ambiguous.
THE WITNESS: No, it does not. 03:20:26PM
BY MR. FEARS:
Q. And -- and what do you think is not a fair characterization of what you shared with him?
A. One example, although -- what CLT claimed?
Q. Yes. 03:20:41PM

A. "Had encountered many circumstances in her life that distressed her. She justified her parents' emotional unavailability and reported she would forget about those" --

THE REPORTER: I'm sorry, when you're reading, just a little bit slower. 03:20:59PM

THE WITNESS: "Circumstances in her life that distressed her. She justified her parents' emotional unavailability and reported she would forget about the unpleasant emotional experiences by playing with her cousins." 03:21:00PM

I don't even know what that means.

BY MR. FEARS:

Q. Okay. Is it fair to say that you're saying you did not share that with Mr. Tahmassian? 03:21:12PM

A. That is correct because I didn't say anything about my parents' emotional unavailability and whatever that means about playing with my cousins. I have idea what that means.

Q. Is there anything else in that data portion that you believe is not fairly characterized based on something what you -- that you said to Mr. Tahmassian? 03:21:28PM

A. I need a minute to reread it.

Okay. So, basically, what it's saying, my understanding is I was upset because my doctor had not 03:21:56PM

written the family medical -- I do remember that part because I had a deadline I had to meet, I had to turn in to my supervisor. So there was an incident where I had, I think asked the doctor to fill it out and they hadn't. And maybe I had asked this Dr. Sevan to fill it out. So 03:22:14PM I do remember an incident regarding that.

Q. Okay. So that's a fair summary of something you told Dr. Tahmassian?

A. That first sentence is decent.

Q. Okay. Have you finished your answer? 03:22:28PM

A. For the first sentence, yeah. The last sentence, I don't --

Q. You tell me, it's in front of you, it's on the screen in front of you.

A. Yeah. 03:22:39PM

Q. I'm asking if there's anything else that you claim doctor -- that is not a fair characterization of what you told Dr. Tahmassian?

A. Yeah, starting with -- what does this mean, thanks later explored, Thx? 03:22:53PM

Q. Yeah, "Thx" is referring to the therapist.

A. Oh.

Q. That's Tahmassian, when you see Thx.

MS. MKRTCHYAN: Well, counsel is testifying, but at this point, you know, I object because this line 03:23:06PM

of questioning is calling for records that are -- lacks foundation, calls for speculation. Client does not know what some of the terms are put in here. So I object to foundation and speculation.

BY MR. FEARS: 03:23:22PM

Q. You can respond.

A. I can't answer for behalf of Thx, what he was try to go imply. I can only answer my part when it says "client." And I do not agree when he's saying that "client had encountered many circumstances in her life 03:23:37PM that distressed her. She justified her parents' emotional unavailability and reported she would forget about unpleasant emotional experiences by playing with her cousins."

Q. Yeah, you already testified to -- 03:23:49PM

A. But the rest is Thx, which is therapist. So I don't -- I can't answer on his behalf what he was trying to say with all these things.

Q. It seems to indicate therapist later explored about plaintiff's history with distressing emotions and 03:24:02PM her coping mechanisms. Do you remember Dr. Tahmassian speaking with you about things in your life that distressed you and how you coped with those events?

MS. MKRTCHYAN: Vague and ambiguous as to time, unintelligible. 03:24:18PM

THE WITNESS: As I said, the one thing I remember is being upset about the family medical leave of absence being not turned in on time, so I did -- I do have a -- remember a discussion about that.

BY MR. FEARS: 03:24:32PM

Q. Okay. The rest of it you don't remember; correct?

A. I don't remember and I don't agree.

Q. Okay. Down below under "Assessment," there's a reference there to being engaged with conspiracy 03:24:45PM theories. Do you remember whether or not you shared with Tahmassian certain conspiracy theories that you had?

MS. MKRTCHYAN: Objection. Counsel, where are you reading and -- lacks foundation, calls for 03:25:01PM speculation.

Are you reading it from the report? Or are you asking her question outside the report? That is not clear to me because we don't see that on the screen.

MR. FEARS: It's on the screen under 03:25:11PM "Assessment."

MS. MKRTCHYAN: Well, now that you're scrolling down, now we can see that.

MR. FEARS: It was there on my screen --

MS. MKRTCHYAN: Well, there was no way. I 03:25:19PM

could not see that. It was cut off.
MR. FEARS: It was -- it was right like this.
Right now, do you see it or not?
THE WITNESS: The only thing I could see was the word "Assessment" and that very first sentence. 03:25:26PM
MR. FEARS: Okay.
THE WITNESS: But now that you scrolled it a little bit more so --
MR. FEARS: All right. All right.
MS. MKRTCHYAN: That's why I had -- 03:25:32PM
MR. FEARS: On my screen it showed, but in event, now that you can see the whole thing --
THE WITNESS: Yeah, that's your screen. So I see assessment now and --
MR. FEARS: Please stop. Make a legal 03:25:43PM objection, but let me ask questions of the witness, please.
MS. MKRTCHYAN: It was my client talking.
THE WITNESS: I'm talking.
Excuse me. Sorry. 03:25:52PM
MS. MKRTCHYAN: That was my client talking. Are our voices that similar?
MR. FEARS: My apologies then. You know, you guys are so close together, I thought that was you. My -- my apologies. 03:25:58PM

MS. MKRTCHYAN: It's not the closeness, Counsel --
BY MR. FEARS:
Q. Let me -- let me clarify the question then, Ms. Burmayan. 03:26:03PM
You see the portion that says "Assessment"?
A. Yes, I do. Now I do.
Q. Okay. Do you see the portion that says that you engaged with conspiracy theories?
A. I'm going to read that -- I'm going to read 03:26:16PM that whole thing because I think --
Q. Of course?
A. -- I need to read the whole thing instead of focusing on the word "conspiracy theory."
Q. Go ahead. 03:26:26PM
A. Okay. So can -- can you clarify for me what this means; is this the therapist assessment of the therapy session?
Q. It says what it says, but that's my reading of it, that there's an assessment being made by the 03:26:41PM therapist, not by you, by the therapist.
A. Okay.
Q. He signed the document, so that's -- that's my view of this. And he's saying, "Although claimant [sic] is insightful about her emotional experience, she tends 03:26:54PM

to avoid them by different mechanisms, including intellectualizing, justifying, laughing, changing topics, and being engaged with conspiracy theories."

So I get this is not something you wrote. He wrote this. This is his report. Do you -- 03:27:12PM

A. I understand.

MS. MKRTCHYAN: Let him finish the question.

BY MR. FEARS:

Q. Okay. So the question is, do you -- all I was asking is, do you remember whether or not in the course 03:27:20PM of speaking with Dr. Tahmassian, you talked with him about any conspiracy theories?

MS. MKRTCHYAN: Objection; lacks foundation, calls for medical expert opinion, calls for speculation.

And, Counsel, this line of questioning has 03:27:38PM nothing to do about the incident related to CVS pharmacy January 13, January 19, 2021. This is 3:30. I'd like to request the court reporter to provide us time that we've been on, because we haven't even gotten to the City defendant's questioning of my client. 03:27:55PM

I have agreed to seven-hour session only when it's a joint session --

MR. FEARS: Counsel, stop filibustering. You're wasting our time --

MS. MKRTCHYAN: Well, then ask questions about 03:28:06PM

the incident.

MR. FEARS: -- and you're interrupting a question, Counsel. This is not a legal objection. Let her answer the question --

MS. MKRTCHYAN: This is before the incident -- 03:28:12PM

MR. FEARS: Please mark the record again, Christina --

(Speaking simultaneously.)

(Whereupon the court reporter gives an admonishment not to speak over each other.)

MR. FEARS: Please mark the record again. Counsel's interrupted the examination, and she wants time and she wants all kinds of things in the middle of a question. It's totally inappropriate. 03:28:24PM

MS. MKRTCHYAN: Oh, really? I made an objection. This is a November 23, 2020 therapy note prior to incident --

MR. FEARS: I know what it is, Counsel --

MS. MKRTCHYAN: Asking her questions -- excuse 03:28:34PM me --

MR. FEARS: Counsel, you are wasting our time.

MS. MKRTCHYAN: Oh, really?

MR. FEARS: You -- it is your fault --

MS. MKRTCHYAN: You're asking her questions 03:28:37PM

about --

(Speaking simultaneously.)

(Whereupon the court reporter gives an admonishment not to speak over each other.) 03:28:43PM

MR. FEARS: We will not finish in seven hours because you're wasting our time and you are not making legal -- legal objections that you can make in court. You're doing speaking objections, coaching objections, and you're filibustering and you're wasting time. 03:28:55PM

MS. MKRTCHYAN: Well, thank you for that characterization, filibustering. Perhaps you should go to Congress, work there, run for office. But at this point this is a November 23, 2020 therapy note, not having anything to do with the incident related to my 03:29:06PM client's injuries, damages or the activity in the CVS; therefore, I object because this is taking -- prolonging this deposition.

If you're going to not, it's fine, it's your time. But if you're going to later on ask the 03:29:20PM magistrate to bring this client for another session, you will see what kind of headache I will bring it out for you. I will not produce my client for another, you know, nonsense deposition when you're asking questions about therapy note by someone before the incident. Why 03:29:37PM

does November 23, 2020 have any relevance to the claims in this case?

Therefore, I object to this line of questioning. You are badgering my client with something that she -- is calls for conclusion -- legal conclusion, 03:29:51PM medical expert opinion, and lacks foundation, calls for speculation. How does she know what is Sevan Tahmassian thinking when writing this stuff?

And I'd like to ask the court reporter for the time that we've been on the record minus breaks. When 03:30:07PM you get a chance, please, Ms. Court Reporter, tell us the time.

MR. FEARS: Please, please mark this in the record, and we will do that when we take the next break not, while I'm examining the witness, because we're 03:30:20PM clearly in the seven hours right now.

BY MR. FEARS:

Q. Now, can you answer my question now, Ms. Burmayan?

A. No, I can't. 03:30:30PM

Q. Do you remember the question?

A. No, I don't.

MR. FEARS: Okay. Please mark this record.

BY MR. FEARS:

Q. I'll ask the question again, it will be 03:30:35PM

subject to all of counsel's objections and comments, and whatever that was.

Ms. Burmayan, I've referred you to the assessment portion on Exhibit 3 here, and I specifically read the assessment. I've read all of that language 03:30:51PM where it ends with "engaged with conspiracy therapies."

My question of you was simply, do you remember whether, when you met with Dr. Tahmassian, you discussed with him conspiracy theories?

A. First of all, one would have to discuss and 03:31:08PM analyze what exactly are conspiracy theories, which I'm assuming we don't have time for that. I cannot answer on behalf of the therapist what he was thinking to label me as someone who is engaging conspiracy therapies. So this is a mistake on his end. 03:31:27PM

That's why I was asking earlier, even though I know how to read and I was reading it to myself, but I had clarify because I've never seen such a letter in my life. He's -- the therapist never shared it with me. So that's why I needed to understand if this is a -- 03:31:41PM this paragraph of assessment is something coming from the therapist's opinion of me.

So it says here, "Although client is insightful about her emotional experience" -- that's what he's thinking of me -- "she tends to avoid them by 03:31:54PM

different mechanisms." So he's saying that I tend to avoid different -- okay, by different mechanisms, including intellectualizing. I don't know how that would be -- I don't understand how intellectualizing would be avoidance. But that's his opinion. 03:32:09PM

And then he's saying I'm justifying and I'm laughing and I'm changing topics. Again, that's his opinion. And then he's saying that I'm engaging of conspiracy therapies; again, his opinion. I don't agree with any of this. 03:32:25PM

Q. Do you recall whether you spoke with him about any government action that you objected to at the time?

A. No, I do not recall.

Q. Do you recall whether or not you spoke with him about vaccines and mask mandates? 03:32:37PM

A. No, I do not recall.

Q. Can you deny that you spoke with him about vaccine and mask mandates?

MS. MKRTCHYAN: Objection; argumentative, vague and ambiguous, deny. 03:32:49PM

THE WITNESS: As I said, I do not recall.

BY MR. FEARS:

Q. So you may have, you may not have, you just don't remember one way or another; correct?

A. I do not recall. 03:33:00PM

Q. Okay. Do you remember that, by the end of 2020, you had voiced criticism of vaccine and mask mandates?

MS. MKRTCHYAN: Objection; vague and ambiguous, voiced criticism. Unintelligible. 03:33:21PM

THE WITNESS: Can you -- is this a statement or you're asking me a question?

BY MR. FEARS:

Q. I asked you a question.

A. What's the question? 03:33:32PM

Q. Subject to your counsel's objections, so she doesn't have to make them again, do you remember whether by the end of 2020, late November of 2020, you had begun voicing criticism of mask and vaccine mandates?

A. Voicing it where? 03:33:53PM

Q. To anyone.

A. I do not recall to anyone.

Q. Let me show you a document that we'll mark Exhibit 4.

(Defendants' Exhibit 4 was marked for identification by the court reporter and is attached hereto.) 03:34:17PM

BY MR. FEARS:

Q. Do you see Exhibit 4 in front of you?

A. Kind of. It's kind of covered by the videos 03:34:36PM

of people.

Q. Do you see a progress note?

A. Yeah. It starts with "Data" -- I guess it's a progress note. I've never seen this in my life. It starts with "Data," yes. 03:34:51PM

Q. Yeah. And above that, there's a date of November 30th of 2020?

A. Yes.

Q. On the right-hand portion; okay.

And at the bottom of the page, I'll just show 03:35:02PM you, it also has Tahmassian's signature and a date of November 30th of 2020, same format as the one I showed you, Exhibit 3.

Why don't you go ahead and read through the data portion -- and you can read the whole thing, and 03:35:16PM when you're ready, I'm -- when you're ready, please let me know and I'll ask you some questions.

A. Okay. I'm done.

Q. Okay. There's reference under the data section, starting off with the patient, being you, began 03:36:03PM session with "claiming more people have been able to realize what the government has been doing, and she claimed it was all" -- it was called, quote, great awakening, closed quote. And then it goes on to address discussions between family members about government and 03:36:26PM

frustration and so forth.

My question of you, Ms. Burmayan, is whether or not you remember in your second visit with Dr. Tahmassian having a discussion of this nature with him about government-type issues? 03:36:46PM

A. I do not recall. And to clarify, it was not a visit. It was, I believe, Facetime or Zoom or one of those things, so it was never in person. Just wanted to --

Q. Fair enough. Thanks for clarifying that. 03:36:59PM

So were all of your visits with Tahmassian via Zoom or -- or Facetime?

A. Yes. Due to the pandemic and the lockdown, we were not allowed to interact with human beings.

Q. Okay. Do you remember talking with 03:37:13PM Mr. Tahmassian about issues relating to the government?

A. I do not recall.

Q. Do you deny that you spoke to Tahmassian about issues relating to the government?

MS. MKRTCHYAN: Objection; vague and ambiguous 03:37:30PM as to deny.

THE WITNESS: I do not recall.

BY MR. FEARS:

Q. Do you remember whether or not, in 2020, L.A. Unified School board -- District had mask mandates? 03:37:39PM

A. I do not recall because I was already at home from the workers' comp situation.

Q. So you weren't following anything involving L.A. Unified School District because you were on leave of absence? 03:37:59PM

MS. MKRTCHYAN: Objection as to were anything, vague and ambiguous, argumentative.

THE WITNESS: Well --

BY MR. FEARS:

Q. Let me -- let me put it this way: With your 03:38:05PM answer -- I mean I didn't work with L.A. Unified School District either, but I would hear about school districts having mask mandates, and then ultimately vaccine mandates and so forth, and I wasn't employed by them and not representing them. 03:38:17PM

You were an employee of L.A. Unified School District. Are you saying that you did not follow any of the occurrences that were going on with respect to either mask or vaccine mandates in 2020 and '21?

A. Well, for clarification, first you said did I 03:38:38PM hear, and then you said did I follow. So there's a difference between following and hearing. No, I did not follow. I was not required to follow because I was at home on a workers' comp case. I myself was exempt from vaccine and mask because I was on a workers' comp case. 03:38:52PM

Now, did I hear about it, the whole world was under lockdown. So I think there was nowhere you could not hear about it.

Q. And -- and so my question then is, do you deny that you spoke to your therapist, Mr. Tahmassian, about your -- your views of government having mandates? 03:39:05PM

MS. MKRTCHYAN: Objection; vague and ambiguous as to word "deny," argumentative, asked and answered.

THE WITNESS: As I said earlier, I don't recall. 03:39:23PM

BY MR. FEARS:

Q. Let's see. What about this discussion relating to -- later on in the data where it says that you witnessed a great deal of conversation, arguments among family members, particularly your father regarding the Soviet Union and the lack of trust in the government, do you recall having conversation with Tahmassian about that? 03:39:43PM

A. I do not recall.

Q. Was your father from the Soviet Union? 03:39:54PM

A. My father was born in Armenia.

Q. Okay. Did he have -- did he live in the Soviet Union?

A. He was born in Armenia. I'm not quite sure what that means, if he lived in the Soviet Union. He 03:40:09PM

lived in Armenia.

Q. Was he ever part of -- was he ever living there as part of the Soviet Union?

A. He was living there as part of being born in -- actually, I need to fix that. He was actually born in Greece. So no, he was not part of Soviet Union. 03:40:19PM

Q. Did -- did he ever live in Soviet Union?

A. He lived in Armenia.

Q. Is Armenia part of the Soviet Union?

A. Not anymore. 03:40:34PM

Q. Was it?

MS. MKRTCHYAN: As to time. Vague as to time.

THE WITNESS: I can't answer that.

BY MR. FEARS:

Q. And why not? 03:40:44PM

A. Historically, I'm not good as to the time in which Armenia was part of the Soviet Union.

Q. Did your father speak of the Soviet Union?

A. He spoke about Armenia.

Q. Did he speak of the Soviet Union? 03:40:58PM

A. No.

Q. Did he speak of his mistrust of the Soviet Union?

A. No.

Q. Where, other than you, would Mr. Tahmassian 03:41:06PM

get this information that is referred to in the data section of this interview?

MS. MKRTCHYAN: Well, calls for speculation, lacks foundation, and argumentative, badgering the witness. This is a November -- for the record, 03:41:21PM November 23, 2020 therapy note by a doctor she has not seen for three years, and -- you know, and nothing to do with this incident that she's testifying here. And I still haven't gotten the time from the court reporter.

Madam Court Reporter, please can we get the 03:41:40PM time -- or can we take a break so that you can tell us what is the time? Because this is a joint session and the -- and the attorney has spent 20 minutes on therapy notes prior to incident when we haven't gotten to the police incident. We haven't gotten to damages in this 03:41:56PM case. This is ridiculous. You are setting this up for an argument, so to speak, to have another session and I'm not going to allow that.

Please the time --

MR. FEARS: I object. 03:42:10PM

MS. MKRTCHYAN: -- let's have the time how long we've been on the record so that you can actually confine your questions to what is relevant and admissible in this case. And by the way, what is the relevance on a treatment note in November 2020 of this 03:42:23PM

incident when it occurred on January 13 through January 19, 2021, and her damages that were after this incident?

So, therefore, I object to this line of questioning. It consumes time. We have multiple defendants. We have the City defendant who wants to ask questions. So please refrain from argue -- you know, and then you're going into Soviet Union. Seriously? I mean this is already becoming really kind of stretch on -- Counsel, do you want to tell us your ancestral history right now, where you were born, where your parents were born, et cetera. 03:42:34PM 03:42:52PM

So please, Madam Court Reporter, please tell us, so that I don't continue with these objections, what is the time that we've been on the record? 03:43:06PM

MR. FEARS: Objection to counsel's speech taking several minutes and it's repetitive. It was already given already, and it's while a question is pending. I object to that, Counsel.

BY MR. FEARS: 03:43:20PM

Q. Ms. Burmayan, can you please answer the question?

A. Well, I can't because I don't remember what you asked.

MR. FEARS: Okay. Please mark the record, 03:43:24PM

Christina, another example of counsel's long objection throwing the witness off or causing me to have to ask the question again.

BY MR. FEARS:

Q. Ms. Burmayan, do you know where Dr. Tahmassian would receive information regarding your father and his attitude from -- or his attitude about the Soviet Union other than potentially you? 03:43:41PM

A. I think that's a question you would need to ask him -- 03:44:01PM

Q. No.

A. -- because you're asking me what I'm thinking about how or where he got this information.

Q. No. I'm asking you if you know. I'm asking -- 03:44:09PM

A. I don't know. I don't know where --

Q. You might -- you might know. You might -- you might tell me something I don't know, like you might say, well, my father visited with Tahmassian. Maybe -- maybe he got it from -- from my father directly. But I'm asking you if you know. If you don't know, then -- then we'll go on. I'm asking -- 03:44:17PM

A. You're also yelling at me, and I don't appreciate that because that brings me back to my anxiety and nervousness, the way I was yelled at by the 03:44:30PM

police officer.

Q. I'm not yelling at all --

A. I would appreciate you not yelling and raising your voice.

Q. Okay. I'm not, and I'm sorry you interpreted it that way. But in any event, can you -- are you able to answer the question, do you know where Tahmassian would get this information other than you? 03:44:36PM

A. For the fifth time, I said I don't know and I don't recall. But you still ask me the same question, you're going to get the same answer. I don't know where Tahmassian got information from my dad, if my dad visited him behind my back. No idea. 03:44:49PM

Q. Okay. Let me show you another exhibit. This one is the December 7th, 2020 progress note. 03:45:15PM

Do you have that on the screen up in front of you?

A. Well, I see, starting from the word "Progress Note," Session 5. And then now we're going to move the faces. So now I see "Data" and then "Thx" which I don't -- 03:45:30PM

Q. Do you see the date of December 7th, 2020?

A. I can see it now, yes.

Q. Okay. So looking at the data, go ahead and read through that. It's the same format as the other 03:45:43PM

two that I've shown you. And this will be Exhibit 5.

(Defendants' Exhibit 5 was marked for identification by the court reporter and is attached hereto.)

THE WITNESS: Okay. Now I have stopped at the word "issues" and then period. 03:46:41PM

BY MR. FEARS:

Q. Okay. In that section of data that describes, at least in part, conversation between you and Dr. Tahmassian, do you remember whether you had any portion of that discussion with Dr. Tahmassian? 03:46:53PM

A. I do not recall.

Q. Do you see in the first two lines after the portion about your location, it says you were "upset and worried about the new lockdown"; do you see that? 03:47:11PM

A. Yes.

Q. Were you, back in December of 2020, worried and upset about a new lockdown?

A. I do not recall.

Q. Do you remember ever being worried or upset about a lockdown that was occurring during the COVID period? 03:47:24PM

A. No, I do not recall.

Q. Do you see where it says, "Claimant also reported a potential civil war and mandatory 03:47:36PM

vaccinations"; do you remember having a discussion with Dr. Tahmassian about that?

A. I do not recall.

Q. Do you deny that you spoke with Tahmassian about mandatory vaccinations? 03:47:51PM

MS. MKRTCHYAN: Objection; vague and ambiguous as to term "deny," badgering the witness, argumentative.

THE WITNESS: I do not recall.

BY MR. FEARS:

Q. You don't recall if you deny it or you don't recall -- 03:47:58PM

A. I don't recall if it -- can you repeat the question since you messed me up again.

Q. Yeah. I'm sorry for messing you up. But if you tell me you don't remember one way or another, I understand that, then I ask a question, can you deny that you had such a discussion? That's a little different. 03:48:08PM

MS. MKRTCHYAN: Objection; vague and ambiguous of the term "deny," argumentative. 03:48:23PM

BY MR. FEARS:

Q. Can -- let me -- I'll ask it very clearly, Ms. Burmayan. Can you deny under penalty of perjury that you ever had a discussion with Tahmassian about mandatory vaccinations; yes or no? 03:48:38PM

A. I can't deny it because I don't recall it.
Q. Okay. Do you see that there's reference here about an incident with a security guard in a market, that the security guard had asked you to wear a mask and -- do you see that, those couple of lines that indicates that? 03:48:59PM
A. Yes.
Q. Does that refresh your recollection about an incident in which, prior to January 2021, a security guard in a market told you that you had to wear a mask appropriately? 03:49:10PM
A. I do not recall that incident.
Q. Do you deny that that occurred?
A. I do not deny it. I don't recall it.
Q. Okay. And then it goes on to say, "And since claimant" -- I'm sorry, and it says -- "And since claimant does not believe COVID-19 exists, she refused it which caused an argument between claimant and the security guard and eventually claimant left the store." 03:49:23PM
Did you deny to Dr. Tahmassian that COVID-19 existed? 03:49:45PM
MS. MKRTCHYAN: Objection. This -- did you deny? That's a very incomprehensible question, argumentative, lacks foundation, calls for speculation, assumes facts not in evidence. 03:49:59PM

MR. FEARS: I'll withdraw the question as phrased.
BY MR. FEARS:
Q. Did you tell Dr. Tahmassian that you did not believe that COVID-19 existed? 03:50:07PM
A. I do not recall telling doctor -- or whatever, him, the therapist, that COVID-19 did not -- did or did not exist.
Q. Okay. Do you -- can you deny that you told Dr. Tahmassian that -- words to the effect that you did 03:50:25PM not believe COVID-19 existed?
A. I cannot deny it because I don't recall it.
Q. Do you -- does this -- reading those two lines that I just showed you and where it says you eventually left the store, referring to you as C-L-T, does that 03:50:39PM refresh your recollection about an incident in which you left the store rather than wear a mask appropriately?
A. I do not recall that incident.
Q. Do you deny that that occurred?
MS. MKRTCHYAN: Objection; vague and 03:50:55PM ambiguous, badgering the witness, argumentative.
THE WITNESS: I do not deny it because I do not recall that incident.
BY MR. FEARS:
Q. Okay. Let me refer you to next exhibit, which 03:51:04PM

will be Exhibit 6.

(Defendants' Exhibit 6 was marked for identification by the court reporter and is attached hereto.)

MS. MKRTCHYAN: Still, you know, there's no question pending. Is there any reason why we cannot get the time when -- 03:51:16PM

MR. FEARS: Let's go off the record. Let's go off the record for the purpose of giving you the time. Matt, I think you're probably keeping it. 03:51:27PM

So let's -- let's go off the record, Counsel, then.

THE VIDEOGRAPHER: Okay. We're going off the record, and the time is 3:51 p.m.

(Recess.) 11:28:20AM

THE VIDEOGRAPHER: We are back on the record. The time is 3:52 p.m.

BY MR. FEARS:

Q. Okay. We just went off the record at your counsel's request, and Mr. Burmayan -- 03:52:47PM

MS. MKRTCHYAN: Ms.

BY MR. FEARS:

Q. -- Ms. Burmayan, and I'm showing you now a document that we're marking Exhibit 6. You should have it on your screen in front of you. At the very top of 03:52:59PM

the page, it's -- it says "Anchor Counseling Group" on the right-hand portion; and then on the left it has your name, date of birth, and the provider, Sevan Tahmassian.
Have you ever seen this progress note, to your knowledge? 03:53:19PM
A. I haven't seen any progress notes from him.
Q. Okay. With respect to the date of birth, or DOB listed on the upper left, is that an accurate DOB?
A. Yes.
Q. Okay. And you mentioned before Anchor 03:53:32PM Counseling Group in your testimony. Is that where Tahmassian practiced out of?
A. I believe it was Anchor, if I recall correctly.
Q. Let me -- this is a little different format 03:53:47PM for Tahmassian. It has "Observations," then followed by "Risk Factors; Medications; Current Functioning, Symptoms, or Impairments; Content or Topics Discussed." So instead of "Data," it has a different format here.
And I'll show you Page 2 of this document. It 03:54:09PM ends with "Provider, Signed by Sevan Tahmassian." Has his recommendations right above that. Treatment plan progress above that as well on Page 2.
So let me go back to Page 1. And the portion that I want to focus on is the top portion under 03:54:30PM

"Current Functioning, Symptoms, or Impairments." Do you see the first few lines there, and it's referencing interaction at CVS pharmacy and the fact that you were arrested?

MS. MKRTCHYAN: It's hard to read, Counsel. 03:54:52PM You need to go down. I can't -- I can't read it myself. Are you talking -- you know, you need to scroll down.

MR. FEARS: I'm circling it right now. Do you see my circling?

THE WITNESS: Can you repeat what you want me 03:55:04PM to look at?

BY MR. FEARS:

Q. I just -- I'll highlight it right here.

MS. MKRTCHYAN: Yes, please highlight what you're asking because -- 03:55:12PM

BY MR. FEARS:

Q. Do you see that?

A. I see what you're highlighting now, but I don't recall what you said earlier about where you want me to look. 03:55:19PM

Q. No, I was responding to your counsel. She said scroll down, but it's right in the middle of the page. I haven't scrolled down.

I said under "Current Functioning, Symptoms, or Impairments," do you see the first three lines that 03:55:26PM

are highlighted there?
A. Yes. I see "C-L-T had began."
Q. Okay. So -- and if you look at the date of this, the date down below at the bottom of the page is February 1, 2021. And the same date at the top of the page, it says February 1 of 2021, here individual appointment. 03:55:43PM
So February 1 of 2021 was after your incident at CVS that involved the Glendale Police Department; right? 03:56:07PM
A. It's not an incident. It was an arrest, but yes, it was after the arrest.
Q. Okay. And do you recall speaking with Tahmassian at the Anchor Counseling Group about the fact that you were arrested for trespassing by the police and it was at the CVS pharmacy, and it says, "Due to claimant's noncompliant behaviors"? 03:56:27PM
A. I don't recall.
Q. Okay. So you have no recollection whatsoever -- 03:56:43PM
MS. MKRTCHYAN: Objection.
BY MR. FEARS:
Q. -- as to whether or not you spoke with Tahmassian about what occurred at CVS involving the Glendale Police Department; correct? 03:56:54PM

MS. MKRTCHYAN: Objection; whatsoever as to the term, argumentative, vague and ambiguous.

THE WITNESS: Can you repeat the question?

BY MR. FEARS:

Q. Yeah. I'm trying to find out if you have any recollection at all of speaking with Tahmassian about what happened at CVS in January of 2021 when you claim you were arrested by the Glendale Police Department? 03:57:03PM

A. I do not recall.

Q. All right. Looking down below this -- that portion, there's the "Contents or Topics Discussed." 03:57:20PM

Do you see that portion?

A. Can you highlight it so I can see what you're talking about?

Q. Sure. 03:57:36PM

Do you see the highlighted portion?

A. Yeah.

Q. Okay. Why don't you read through that?

A. So this is content or topics discussed. Can you somebody explain to me what this means, who wrote it, what's going with -- I don't -- what am I supposed to be looking for? Why am I reading this? 03:58:01PM

Q. Did you meet with Tahmassian on February 1, 2021?

A. I don't recall the date, but I met with him. 03:58:17PM

Q. Okay. Do you have any reason to believe you did not meet with him on February 1 of 2021?
A. I can't recall the date so there's a possibility that I may not have met with him on February 2021. 03:58:32PM
Q. Okay. And which if you didn't meet with him -- let me withdraw that.
Do you have any reason to believe that Tahmassian's note that I've shown you that's dated February 1 of 2021 is either wrong or falsified 03:58:47PM regarding the date and time of the meeting that he had with you?
MS. MKRTCHYAN: Lacks foundation, calls for speculation, argumentative, assumes facts not in evidence, vague and ambiguous, unintelligible. 03:59:01PM
First of all, let her read it, Counsel, and then we'll go from there. You have highlighted the section and you are asking questions about it without even giving her opportunity to read it for herself.
MR. FEARS: I'm only asking about the date 03:59:19PM right now, Counsel.
BY MR. FEARS:
Q. So I've shown you the date on this document. Do you have any reason to believe you did not meet with him on that date? 03:59:25PM

A. Yes, because I don't recall what dates I met with him.

Q. So the fact that you don't recall gives you reason to believe you do not meet with him on February 1? 03:59:36PM

MS. MKRTCHYAN: Objection; vague and ambiguous, argumentative.

Perhaps you can rephrase it, Counsel. If she doesn't remember the date, how else do you want her to answer? You -- you are sitting as an attorney asking 03:59:47PM questions of a person who is not an attorney. Perhaps you can just speak in layperson's terms. Do you remember or do you not remember, but you're asking do you have --

MR. FEARS: Counsel, please stop interrupting 03:59:58PM the deposition again.

MS. MKRTCHYAN: No. Excuse me, because this record is not clear. You're asking questions of a layperson. The record is not clear, and you're making my client get more anxious and anxious. This is a 04:00:08PM person who was traumatized from this incident, and you're asking her for a date. How does she remember the date?

Ask her, do you remember the date when you met him; yes or no? Period. You're asking do you have any 04:00:22PM

reason. How does she know? How does she know the upkeeping of note-taking of this doctor is accurate? What if the doctor's office is not accurate in maintaining notes? How can she testify to the doctor's accuracy of his notes? Is there any -- why -- 04:00:35PM

That lacks foundation, calls for speculation. And you're badgering my client without even getting to the damages in this case. You're not even letting the co-defendant to ask a single question yet. We are in already five hours of this deposition. 04:00:50PM

MR. FEARS: I object --

MS. MKRTCHYAN: So I will allow you ask last time that question, and we have to move on to another line of questioning.

MR. FEARS: I object to counsel filibustering 04:01:00PM and making inappropriate coaching speaking objections. And I'll -- but I'll answer the question. Yes, she could -- she might have been in Alaska on -- she may remember she was in Alaska on February 1 of 2021, and so she could say, no, I know I didn't meet with him on that 04:01:20PM date because I was in Alaska and we were camping and I didn't have access to a computer and I would not have been able to do it. That would be a reason to believe that his -- that Dr. Tahmassian's date is wrong.

Now, I know that's hypothetical, but it could 04:01:37PM

be any number of things that she might remember, Counsel. So the question is a fair question. Dr. Tahmassian, I'm quite certain, is going to testify that his medical records are fine. This is your client's doctor. 04:01:52PM

And so the question I'm simply asking is, in looking at it, does she currently have any reason to believe that this date of February 1, 2021 in Dr. Tahmassian's record that was produced pursuant to subpoena is wrong? And it's either a yes or no. 04:02:07PM

She doesn't have any reason as she sits here right now or she does, because maybe if she does, she'll tell me why. Like I said, she could have been in Alaska, et cetera, and a person could give that kind of reason. Then I'd go, Oh, I'd better ask Dr. Tahmassian 04:02:20PM how is it you could have had a meeting with the witness when she claims she was in Alaska and she was incommunicado and had no access to the Internet?

So I'm tired to these kind of objections, Counsel, and interruption. It's inappropriate and 04:02:38PM you're wasting time. It's perfectly obvious what you're doing it, and I -- and I really object to it.

BY MR. FEARS:

Q. Let me ask you this way, Ms. Burmayan. Do you deny that you met with Tahmassian on February 1, 2021? 04:02:50PM

And when I say met with him, I mean via Zoom or some other electronic platform, as you've testified you would have consultations with him?

A. I don't deny meeting on him -- with him on February 1 because I don't recall if I met with him on that date or not. 04:03:07PM

Q. Okay. In -- in looking at the narrative that I've highlighted, do you deny that you told Dr. Tahmassian the contents of that narrative that is under "Content or Topics Discussed"? And I've highlighted the portion that is the second paragraph which starts with "Inquired about claimant's mood during the past few weeks" and it goes all the way to the end where it refers to "angry reactions." 04:03:24PM

A. I need a minute to read it because it's very overwhelming. 04:03:41PM

Q. Okay. Please take whatever time you need.

THE WITNESS: I'm becoming overwhelmed. I need like a minute to --

MS. MKRTCHYAN: We need to take a break because the client is getting anxious. So can we take five-minute break, perhaps? Five minute? 04:04:06PM

BY MR. FEARS:

Q. Are you saying, Ms. Burmayan, you cannot read this without -- 04:04:17PM

A. I get overwhelmed. Yes. I'm having an anxiety.

MS. MKRTCHYAN: She's getting anxious so we request five-minute break.

MR. FEARS: We'll go off the record. 04:04:26PM

THE VIDEOGRAPHER: Okay. We're going off the record. The time is 4:04 p.m.

(Recess.)

THE VIDEOGRAPHER: Okay. We're back on the record. The time is 4:04 p.m. 04:04:52PM

MR. FEARS: I want to state an objection. This is happening multiple times. And part of it, in my view, it was suggested by counsel that we take a break while a question is pending, which is inappropriate to take breaks while a question is pending. I should be -- 04:05:08PM we should be getting an answer to a question before a break.

And I had mentioned at the outset of the deposition, if for any reason the witness cannot testify honestly, accurately, completely, she should advise us 04:05:21PM and we'll make appropriate arrangements, but this is inappropriate to be taking breaks just because a question is pending and the witness is saying that she can't testify.

MS. MKRTCHYAN: Excuse me, you made your 04:05:34PM

record. Let me respond to that.

First of all, we were off the record already, but you know, here is the funny thing. You asked her to read a long document. She tried to read it. This is a person who is suffering from a PTSD. Her medical conditions are well known to defendants. You have gone over five years of badgering and arguing with my client, demeaning her, demeaning her counsel. She's getting anxious. And we told -- we put the -- we put the -- every defendant on notice that she may not be able to go through seven hours without breaks. So you're giving her attitude for taking breaks? You know, that is so inappropriate, and I will object to this. 04:05:51PM 04:06:10PM

So there has been no coaching by me. She requested a break because she has anxiety. So. 04:06:27PM

THE WITNESS: And you did ask me when --

MR. FEARS: We're off the record. Let's go off the record.

THE VIDEOGRAPHER: Okay. We're going off the record. The time is 4:06 p.m. 04:06:36PM

(Recess.)

MR. FEARS: Ms. Burmayan, we're back on the record. I'm going to --

THE VIDEOGRAPHER: Oh; sorry. We're back on the record. It's 4:16 p.m. I apologize. 04:16:28PM

BY MR. FEARS:
Q. Ms. Burmayan, I'm putting back up on the screen Exhibit 6, Page 1, with the highlighted version we were talking about before we took the break.
Do you remember the question? 04:16:44PM
A. I do not. And just for clarification, you did tell me from the beginning of this session that if I don't feel well, I can ask to take a break. And that is the reason I'm asking to take the breaks because I -- when I get overwhelmed and there's too much to read, 04:16:58PM also these letters are very small, that is why I am asking to take breaks.
Q. Okay. So looking at -- do you see the highlighted portion --
A. Yes. 04:17:09PM
Q. -- of this letter?
A. Yes.
Q. Have you had a chance to review that during the break?
A. No, because the screen was off. 04:17:17PM
Q. Okay. Have you had a chance to read it already?
A. No.
Q. Okay. So why don't you read through it and then let me know when you're ready. 04:17:29PM

THE WITNESS: Can I just read?
MS. MKRTCHYAN: Uh-huh.
THE WITNESS: Yeah, I think I'm done.
BY MR. FEARS:
Q. Okay. Is there any statement in that portion 04:18:34PM that's highlighted under "Content or Topics Discussed" that is the whole second paragraph, is there anything in there that's attributed to you that you deny that you told Dr. Tahmassian?
MS. MKRTCHYAN: Objection; vague and 04:18:52PM ambiguous, argumentative.
THE WITNESS: I would say the entire paragraph.
BY MR. FEARS:
Q. Okay. So you claim that you didn't say any of 04:19:01PM that information that's in the whole second paragraph under "Content or Topics Discussed" on Page 1 of Exhibit 6 --
MS. MKRTCHYAN: Misstates the testimony --
BY MR. FEARS: 04:19:19PM
Q. -- correct?
MS. MKRTCHYAN: Misstates the testimony, vague and ambiguous, argumentative.
THE WITNESS: I'm not denying it. I'm saying I don't recall this entire paragraph. 04:19:26PM

BY MR. FEARS:
Q. Okay. So you just don't remember one way or another; right?
A. Yes, I don't remember one way or another.
Q. Okay. Do you see that in the first and second lines, it indicates that -- well, the first line, it says you were not able to attend your sessions. 04:19:35PM
Do you remember whether or not you missed some sessions that had been set up?
A. I don't recall missing sessions. 04:19:55PM
Q. Okay. Do you deny that you missed some sessions that had been scheduled for you?
MS. MKRTCHYAN: Objection; vague and ambiguous as to term "deny," argumentative.
THE WITNESS: I'm not denying. I'm saying I don't recall missing sessions. 04:20:07PM
BY MR. FEARS:
Q. Okay. Then it goes on to say that you immediately reported about an event -- an event in which you were noncompliant due to your, quote, medical condition, closed quote, to the request made by a CVS pharmacy store employee and, consequently, claimant was requested by the store manager to leave the store. 04:20:17PM
Do you deny making such statement to Mr. Tahmassian? 04:20:35PM

A. I don't deny it. I'm saying I don't recall making the statement.

Q. Okay. It goes on to say that you shared that -- that it didn't sit well with you. You felt you were a victim and so you went back to the same store a few days later. 04:20:48PM

Do you deny that you told Dr. Tahmassian that?

A. I don't deny it. I'm saying I don't recall making that statement.

Q. Okay. It says that you claimed that you asked to speak with the store manager, the employees refused to comply and eventually the police were involved and you were arrested for trespassing. 04:21:02PM

Do you deny that you told Tahmassian that information? 04:21:21PM

A. Yes, I do not deny it. I don't recall it. The only thing I told Tahmassian is that I went to CVS and I was arrested.

Q. That's the only thing you remember telling him; right? 04:21:35PM

A. Correct, that's the only thing I recall telling him.

Q. Then it goes on to say claimant went -- then claimed she was, quote, pissed off, closed quote, since her, quote, rights were taken away, closed quote, and 04:21:44PM

quote, America has become a communist state, period, closed quote.

Do you deny telling Dr. Tahmassian that information?

A. I don't deny it. I just do not recall saying that to him. 04:21:54PM

Q. Okay. Then it goes on to say that he, the therapist, explored your emotional experiences -- experiences regarding the recent events and that you share that you felt powerless and helpless. 04:22:11PM

Do you remember him exploring with you your emotional experiences and you indicating that you felt powerless and helpless?

A. I do not recall him exploring my emotional experiences regarding the recent events, and I'm just reading back, shared powerless and -- I don't recall any of this. 04:22:28PM

Q. And then it goes on to say, as the therapist was reflecting on your experiences, that you reported of another conflict between your negative and distrusting belief regarding the, quote, mass vaccinations, closed quote, and LAUSD's requirement for its employees. 04:22:43PM

Do you deny that you shared with Tahmassian that you had a negative and distrusting belief regarding mass vaccines and the L.A. Unified School District's 04:23:07PM

requirements for its employees in that regard?
A. So I need a minute to reread it because it was very long and overwhelming. I will read it to myself.
Q. Sure. Go ahead.
A. Did you stop off after the word "LAUSD"? 04:23:38PM
Q. I stopped off after "requirements for its employees."
A. Mass --
Q. Right after "LAUSD's."
A. Well, after LAUSD, it says, "Client 04:23:53PM requested" -- oh; you're talking about the first LAUSD; okay. Got it.
I do not recall telling anything to him about a conflict, negative distrusting belief regarding the mass vaccination and LAUSD's requirements for its 04:24:09PM employees.
Q. Do you deny telling him that information?
A. I don't deny it. I simply do not recall.
Q. Okay. It goes on to say that you later noted you'd file a lawsuit against the police officer and the 04:24:25PM CVS pharmacy. Do you -- do you deny telling Dr. Tahmassian that you were going to file that lawsuit?
A. I'm sorry, can you repeat that? It was a little bit low.
Q. Do you deny telling Tahmassian that you were 04:24:39PM

going to file a lawsuit against the police officer and CVS?

A. I have to reread that to myself.

I don't recall talking to him about filing a lawsuit against the police officer and CVS pharmacy store. 04:24:58PM

Q. But you don't deny telling him that, do you?

A. I don't deny it because I don't recall it.

Q. Okay. And then it goes on to say and would -- that you would find a religious reason to avoid the vaccination and still be able to work for LAUSD. 04:25:11PM

Do you recall telling Tahmassian words to that effect?

A. He completely took my words out of context. It's not that I would find a religious reason. I actually had a religious letter from my priest. 04:25:28PM

Q. And what was the religious reason for you avoiding the vaccination?

A. I cannot recall what the priest's letter said.

Q. Do you still have a copy of that letter? 04:25:49PM

A. I have it in my computer files.

Q. And was it signed by a priest?

A. Yes.

Q. What priest?

A. I don't recall his name. 04:25:59PM

Q. And from which church?
A. I don't recall the church.
Q. Is it a church that you attended?
A. Yes. Armenian Orthodox Christian. I attend Armenia church. 04:26:14PM
Q. Okay. Is this an Armenian Orthodox Christian church that you attended with any regularity?
A. Not with regularity.
Q. But you don't know the name of it?
A. No, I don't recall. 04:26:26PM
Q. Do you know where it's located?
A. No, I don't recall.
Q. Okay. Do you recall whether or not you submitted this note from the Armenian Orthodox Christian priest to L.A. Unified School District? 04:26:48PM
A. I do not recall.
Q. Do you know if you submitted it to anyone?
A. I do not recall.
Q. You still have a copy of this on your computer; is that correct? 04:27:00PM
A. Yes, correct.
Q. And is it, you know, something that was e-mailed to you by the priest?
A. Yes, correct.
Q. Okay. And then it says that you requested 04:27:11PM

that the therapist, Mr. Tahmassian, provide you with some suggestions and guidance, yet the therapist refused and psycho educated you about the therapist's role and psychotherapy.

Do you deny that that occurred? 04:27:31PM

A. I need to reread that because it's very confusing.

Q. All right.

A. I don't know if you can answer this because I don't know if you can speak on behalf of the therapist 04:27:46PM since he's not present. I'm trying to understand what this means, which is that the client requested the therapist to provide suggestions and guidance. On what?

And then the therapist refused -- refused what? And psycho educated the client about -- I don't 04:28:07PM understand what I asked him and what he refused.

MS. MKRTCHYAN: All right. So this line of questioning asks the client to interpret notes that she didn't write by another therapist. It's lacks foundation, calls for speculation, calls for expert 04:28:24PM opinion, assumes facts not in evidence.

BY MR. FEARS:

Q. I'll accept your answer, Ms. Burmayan, that you don't understand what it's saying, so let me go to the last sentence there. It says that, at the end of 04:28:42PM

the session -- it says, "Therapist, at the end of the session, reminded the client, or claimant, whichever it is, about the use of paced breathing and mindfulness practices to calm herself down when angry and anxious until next session which would focus on the client's belief and angry reactions."

Do you -- do you deny that that discussion occurred between you and Mr. Tahmassian at the end of your session on February 1st of 2021?

A. I need to reread that to myself.

Q. All right.

A. Two things. I don't deny that because I don't recall it. And then I'd like to clarify what you said earlier about the sentence before you said that, I didn't understand it, so you're taking that answer. It's not that I didn't understand it. It's because I cannot speak on behalf of what the therapist said. So --

Q. That's what I meant --

A. Yeah.

Q. -- that you don't understand what he's referring to there.

A. Right. Correct.

Q. Okay. Let me show you a document that we'll mark Exhibit 7.

(Defendants' Exhibit 7 was marked for identification by the court reporter and is attached hereto.)

BY MR. FEARS:

Q. Before I do, do you know the name Anoush Phoenix? 04:30:21PM

A. Yes, I do.

Q. Do you sometimes use that name?

A. That's my Facebook profile.

Q. Okay. And what's the significance of Phoenix? 04:30:30PM

A. I like the bird, Phoenix.

Q. Anything else?

A. I haven't really done my research about Phoenix and other -- pretty much just I like the bird Phoenix. 04:30:55PM

Q. Let me show you Exhibit 7.

MS. MKRTCHYAN: Counsel, is this -- are these records that has not -- not been produced to us in discovery?

I object because you are showing stuff that 04:31:16PM I've never seen. It's not produced in discovery to us. Do you believe that you have the prerogative and ability to ask my client -- my client questions at a deposition when you had not produced them in discovery? I don't see this -- is this Bates stamped? Has this been 04:31:33PM

produced?

MR. FEARS: You know, I don't know if it has been or not. I'm not aware of it being produced.

MS. MKRTCHYAN: Okay. Then how is it that --

MR. FEARS: Hold on, Counsel. You asked me a question. 04:31:45PM

MS. MKRTCHYAN: Okay.

MR. FEARS: Let me finish, please.

MS. MKRTCHYAN: Okay. All right.

MR. FEARS: I don't know that it is necessarily responsive or not to anything. 04:31:51PM

MS. MKRTCHYAN: Doesn't matter.

MR. FEARS: Hold on. Hold on. This is public information that is out there, and I believe, but I don't know, maybe your client will -- will swear under penalty of perjury that this is information that someone else prepared or drafted, there's a miscommunication. I don't know what it is, quite frankly. I just know it's on the Internet; that's all I know. 04:32:06PM

MS. MKRTCHYAN: Well -- 04:32:22PM

MR. FEARS: And it hasn't -- hold on. Hasn't been authenticated. I don't -- I couldn't produce it in response to anything because I don't yet know what it is until your client testifies as to it.

MS. MKRTCHYAN: Well, really? So okay, then 04:32:37PM

here's the thing, you know, you're violating discovery rules. Any questions you're posing of my client have to be based on information that has been produced to us. We've had -- we've been in discovery since March -- February of this year. None of this has been produced. 04:32:52PM None of this has been authenticated or produced to us. Therefore, I'm going to instruct my client not to answer questions based on discovery, sandbagging my client or me at this sworn deposition as something she has never seen or her counsel has never seen. Therefore, I'm 04:33:09PM going to instruct my client not to answer this unless you produce it in discovery and we have the opportunity to review and prepare.

So, therefore, this is not like, you know -- you know, some sandbagging session. Therefore, you can 04:33:23PM just go ahead and produce this to us in discovery, et cetera, and we'll go -- we'll take it from there. But you've had the opportunity. You've come through this discovery period for months and months, and now I'm not going to allow us, me or my client to ask questions 04:33:40PM about stuff we have never seen in this litigation.

It is unfair surprise. It is against express provisions of this discovery. I've requested, I've requested the defendants to produce all -- all evidence they have in this case. In their initial disclosure, 04:33:57PM

supplemental disclosure, we've been going through this over and over. We had a motion to compel. The court has made certain orders. Therefore, I'm not going to allow my client to be sent back here about certain stuff that she or I have never seen. 04:34:12PM

So please, this is already five -- I'm sure we are beyond five hours already. The City defendants have not asked a single question. We have agreed -- we have agree by court order to produce my client for seven-hour sessions, joint session. If you are not going to allow 04:34:27PM City defendants to ask a single question, that's on you. It's between you and you. I assume you've had an agreement how long you're going to ask questions, how long he's going to ask questions.

I will give some leeways, obviously, of a 04:34:41PM certain time that I'm objecting. I'm not going to use my time using objections against you, that's fine. But you are moving at a snail's pace. You haven't even finished the incident on January 19. We've stopped at the point in time when my client was arrested. You're 04:34:57PM going into treatment notes prior to incident she can't remember. You're going through treatment notes she has never seen.

And now you're going into some other stuff you got from Internet and you're trying to ask questions of 04:35:10PM

what, of my client? No. That is inappropriate. And you are attributing it -- as I can see, you're attributing it somehow to some, you know, Anoush Phoenix, something that her attorney has not seen or she has not seen. 04:35:24PM

Therefore, I'm just going to ask for an offer of proof when the City defendants are going to ask questions because it sounds like you're going to violate the court order of a joint session. We have never agreed to separate sessions. I expressly agreed to 04:35:38PM produce my client for seven hours only if it's a joint session. So please provide an offer of proof.

First of all, I'm going to object to this discovery of sandbagging --

MR. FEARS: How many times are you going to 04:35:51PM say the same thing, Counsel? Sorry for interrupting, but how many times -- you've said --

MS. MKRTCHYAN: Several times so that it gets there.

MR. FEARS: You've said everything two or 04:35:55PM three times. Please stop.

MS. MKRTCHYAN: Yes, because you need to remember that I have a problem with sandbagging. I have not sandbagged you or your clients and --

MR. FEARS: You're filibustering again. 04:36:04PM

You've said this. You've said it over and over and over. Please stop.

MS. MKRTCHYAN: So then right now please tell us -- tell us -- first of all, produce to us everything, comply with the discovery rule. Secondly, tell us when 04:36:14PM the City defendants are going to ask questions. If they are waiving their right to ask questions, that's fine with me. Absolutely. I have no problem with that. But we need to move this past your effort in irrelevant questioning of my client, interrogation on irrelevant 04:36:30PM issues when we haven't even finished the January 19 incident. And I want to have enough time to ask questions of my client too, as I am entitled to do that too. So I --

You know, is my objection clear. 04:36:41PM

MR. FEARS: Your objection is completely inappropriate. It's another filibuster. You're wasting time. You've made the same objection over and over. It's inappropriate. I want to move on, Counsel.

MS. MKRTCHYAN: Well, then move on. Thank 04:36:56PM you.

BY MR. FEARS:

Q. Okay. So, Ms. Burmayan, you have in front of you Exhibit 7 on the screen. And your counsel has stated many times on the record, repeatedly over and 04:37:10PM

over, you've never seen this before. So I want you to look at the content of this first page, which has been on the screen now for five minutes or so during your counsel's objection, and then I want to show you some of these other pages, and I just want to know whether it is 04:37:34PM
true that you've never seen this content before.

MS. MKRTCHYAN: Well, excuse me. I objected already. I already told you -- you're acting like you didn't hear my objection. I already told you that I am instructing my client not to answer questions on 04:37:53PM
discovery that her attorney, her attorney has not seen, and it's been in express violations of supplemental discovery rules, initial disclosures under Rule 26. Therefore, I'm -- I'm instructing my client not to answer. 04:38:10PM

You can move on from this line of questioning. Any time you ask a question at a deposition is subject to FRCP 26. Perhaps you should read it.

So, therefore, it's a representation that I make that I have not seen this in discovery. It has not 04:38:24PM
been stamped. I'm not making representation one way -- one way or another for my client, but as far as I, as an attorney sitting here, I have not seen this in discovery produced to us and, therefore, this is sandbagging. This is in violation of the rules. 04:38:38PM

I will, in fact, be asking for sanctions for this kind of behavior because you have the impression that you can just do this for -- you know, without any explanation or anything. You cannot do that. You're violating discovery rules by suddenly bringing out 04:38:53PM issues at a deposition, sworn deposition. So, therefore, I'm instructing my client not to answer. Move on, Counsel.

If you have any question that pertains to any discovery or any other questions related to this 04:39:05PM incident, not, you know, related to records that I have not seen, you can move on to that. If not, then we are going to stop this deposition and I'm going to seek express sanctions for not only harassing my client now, you know, violating discovery rules, and not moving this 04:39:22PM deposition in an efficient -- at an efficient pace.

Are you going to move on or not? Or we are going to stop this session.

MR. FEARS: Okay. I object to counsel once again filibustering, making inappropriate objections, 04:39:37PM long speaking objections, and just delaying the conclusion of this deposition by a long period of time, as she has done all day. I object to the -- what I think, but I don't know for sure are misrepresentations by counsel on the record over and over that her client 04:39:57PM

has never seen these documents. I don't know whether that is true or not. I don't know if counsel is testifying or not.

All I'm trying to do is lay a foundation to find out whether or not these are, in fact, documents 04:40:14PM that the plaintiff has posted on social media or not. I don't know the answer to that. I am not in a position to produce this or present it as evidence or produce it as documents because they're not CVS documents. All I know is they're out there on the Internet. 04:40:38PM

And I'm reasonably intelligent person and I can look at Facebook and I can reach a conclusion. But until 10 minutes ago, I didn't know who Anoush Phoenix was. But now the witness has said Anoush Phoenix is a name she uses on Facebook. This document has Anoush 04:40:57PM Phoenix on it, on Page 1 and throughout the documents, which further suggest to me that this is information posted by the plaintiff on the Internet.

So she actually does have this information on her Facebook page. She -- obviously, if she posted it, 04:41:17PM she's seen it before. Yet counsel has represented as an officer of the court several times, I believe irresponsibly, but I haven't been able to ask the witness a question as to whether or not this is material that has been produced on her Facebook page -- 04:41:32PM

MS. MKRTCHYAN: (Inaudible.)

MR. FEARS: -- but I think irresponsibly and as an officer of the court, made misrepresentations that the witness has never seen this information. And that may be patently false, but I would like to find out 04:41:45PM whether or not these pages which I'm scrolling through right now, whether or not these are, in fact, Ms. -- the plaintiff's Facebook pages. I believe they are based on the contents because I look at stuff like the third page where it says, "I'm disgusted at my school psychologist 04:42:01PM friends. For 16 months you never spoke up about the harm vaccines and masks are doing to children." And it just goes on and on. I would like to authenticate this and find out.

And then if, in fact, the witness 04:42:17PM authenticates this as information that is on her Facebook page, and we get testimony to that effect, I'm happy to produce it and reproduce it over and over. But until then, all I know is right now I have suspicions about it and, therefore, it's not something I could 04:42:35PM produce either pursuant to Rule 26 or anything else. Plus this is information that was recently gathered on the Internet.

So in any event, I would like to proceed, Counsel, and I object to your commandeering the 04:42:45PM

deposition. I want Christina to mark this session of the deposition as well so she can show it to the judge, show the judge what has happened throughout this whole day. We will bring it to the court's attention, and we will ask for more time because of counsel's interruption 04:43:02PM constantly in the deposition with speaking objections, coaching objections, insistence upon stopping the deposition so she can find out how much time we've used, even though we're not at seven hours even yet. It's completely inappropriate conduct by counsel. I object 04:43:19PM to it and disagree with it.

I would like to go forward, Counsel, and -- and ask some questions to authenticate this to see whether or not this is something the witness recognizes.

MS. MKRTCHYAN: Well, okay, have you finished 04:43:35PM your lecture, professor?

MR. FEARS: Now condescending. I object to the condescending statements by counsel.

MS. MKRTCHYAN: Professor Fears.

MR. FEARS: The insults -- the insults -- 04:43:42PM

MS. MKRTCHYAN: Excuse me, now it's my time to speak. Excuse me.

MR. FEARS: I object to the insults as well.

MS. MKRTCHYAN: Then we are going to stop this -- this deposition because, frankly, my client is 04:43:48PM

getting overwhelmed by this colloquy by a professor, you know, and this is already two minute -- you are complaining about my objections, that I am the one who's doing this filibusters. Your objection right now lasted five minutes. And I already responded to that. There was no need for you to go into five-minute diatribe. 04:44:07PM

I objected based on discovery violations, and I've already instructed my client not to answer this line of questioning. If you have a problem with that, take it up with the court. Move on. 04:44:23PM

MR. FEARS: Let -- let's --

MS. MKRTCHYAN: Therefore, you should move on. Any time counsel says, I'm instructing my client not to answer, my client is going to follow that. Therefore, you should move on. 04:44:30PM

If you don't want to move on to another line of questioning, then perhaps we should cease this deposition, stipulate that we are ceasing this, and then you can go get a court order. Meanwhile, I will ask for sanctions for violating discovery rules and not 04:44:42PM producing anything. Even if you have a suspicion that something is relevant to this lawsuit, apparently you are now asking questions. You have suspicions, you want to learn information, but the duty for you is to produce them in discovery so that, you know, we are not taken by 04:45:00PM

surprise.

Any time at a deposition, under Federal Rules of Civil Procedure, a person is subjected to undue harassment, humiliation, embarrassment, that person can stop the deposition and ask for a protective order. So 04:45:16PM if you do not -- if you do not want to move on from this line of questioning, Professor Fears, and continue with lecturing me and my client as if we are these children, like kindergarten children, that's how you've been treating us, then we will just have to ask for a 04:45:34PM protective order.

Are you going to move on from this line of questioning, sir, or not?

MR. FEARS: I have just --

MS. MKRTCHYAN: That's the option you have. 04:45:41PM That's the only option you have.

MR. FEARS: I object to your conduct, Counsel, once again. I won't reiterate those objections again. I've already stated them.

Counsel, if you could clarify for me, I'll 04:45:49PM answer your question. Are -- there are several pages to this document, Exhibit 7 that I've put on the screen, and all of them appear, but I don't know, appear to be postings by your client. I intended to ask her as to each one of them or scroll through them, as to each one, 04:46:14PM

whether or not these were, in fact, postings that she placed on the Internet on Facebook. And so I would go through and ask her for each one whether or not this is something she placed on her Facebook page.

And are you telling me that you are 04:46:35PM instructing her not to answer as to each of those foundational questions and that she would refuse to respond to each of those foundational questions?

MS. MKRTCHYAN: I am actually right now going to, you know, at this point, not just do that, but 04:46:53PM because you are not moving on, I am no -- I have no representation about this documents you are showing to me, because I have not seen it, I have no idea what you're showing. I have no idea what you are trying to produce in this deposition. But in any event, I have 04:47:10PM never seen it produced to us in discovery so I have no idea what this is; okay. So that's Number 1.

And you, as an attorney, have an obligation to produce everything that you're supposed to be asking my client about this incident in discovery. You have not 04:47:24PM done so. So these are some Facebook pages downloaded from some public social media, which I don't even understand how -- in what format it is shown to us, so I do not know what this is. You need to produce it to us in timely fashion in discovery. You have not done so. 04:47:42PM

This is the deposition in October. We've had -- our discovery begun as of February of this year. February of this year. There was no reason for you, instead of sandbagging me or my client with some public social media pictures, there was no reason for you not 04:48:00PM to produce it to us in discovery before the deposition.

If you have not done your job, your due diligence, you are trying to do this tricky defense, you know, sandbagging tactics that you are allowed to do, I am not going to allow you to do that. You are violating 04:48:15PM the discovery rules. Furthermore, if you are going to continue insisting asking questions about this, I will stop this deposition because that's embarrassing and humiliating my client and imposing undue burden.

She has appeared at this deposition. It's 04:48:33PM already over five hours. She has had to take breaks because you keep badgering her, arguing with her, going over issues that have no relevance to this incident. We have not even finished asking questions about this incident. 04:48:49PM

What makes you think that you can bring this woman who has medical conditions, mental health issues, anxiety and PTSD, whom you badgered for taking a break, you complained to her for taking a break when she has issues? And right now she's sitting here having anxiety 04:49:03PM

with all this nonsense attorney colloquy between a professor and her counsel.

So -- anyway, at this point, I've already made my record. If you're not going to move on, yes, we are not going -- my client is not going to ask -- answer any 04:49:19PM questions related to something that has not been produced in discovery because that's undue harassment. She -- she was already overwhelmed reading some treatment notes she had never seen before by some psychologist three years before today's date. So now 04:49:31PM you're asking -- you're going to ask her to look at something again she has never seen before, and when her attorney has never seen before without any explanation why this has not been produced to us.

In any -- in any event, that's violation of 04:49:47PM the discovery rules. Instead of apologizing vehemently and saying, look, oh, why don't you take maybe one-hour break, review these records and come back, answer questions, which we might have taken that approach, but, you know, you are going over -- this is already 5 04:50:03PM o'clock. 5 o'clock, and we have not even finished this deposition in terms of you asking questions about the incident.

So please move on. Otherwise, I'm going to stop this deposition. I'm going to seek protective 04:50:14PM

order and I'm not going to produce my client again because you are playing dirty tricks of sandbagging my client and me by irrelevant questioning.

Are you going to move on from this line of questioning or not? Or we are just leaving. We are just going to leave. I'm going to ask for protective order because this is outrageous to me. My client is already having anxiety attack. So that's it, you know. 04:50:27PM

So please tell us if you're going to move on to your next line of questioning or -- and you're going to produce everything that you've had, you know, then we can look at it timely. And then if there is a court order, then we can, you know, come back for another session. Otherwise, we are -- we are not going to do this. So. 04:50:42PM 04:50:57PM

MR. FEARS: Okay. I object to that long soliloquy, and once again, just wasting time and making the same objections over and over. But I will take from counsel's representation there that she is saying that she will not allow questions, even foundational questions regarding these documents in Exhibit 10, which I've scrolled through. And there are some 42 pages of documents that I've been scrolling through. 04:51:16PM

And I will take counsel's representation that she will not allow foundational questions of the witness 04:51:37PM

and that she would terminate the deposition if I continued to try to get a specific answer as to these documents from the witness because she's instructing her client not to answer and her client would not answer those foundational questions. 04:51:56PM

So on that basis, I reserve on this. I completely disagree with counsel's objections. I think, if anything, if these are the Facebook pages of the plaintiff, plaintiff should have produced them because she can authenticate that they're realistic. I can't, 04:52:15PM and I can't without her testimony, and I -- so, Counsel, we'll just have to agree to disagree. And if you want to make that motion, I welcome it and we'll bring it up with the judge and we'll talk to the judge about it.

So I'm going to assume that you're instructing 04:52:32PM her not to answer, and I'll take -- on that basis, I will take this document down and move on subject to my objections.

BY MR. FEARS:

Q. Ms. Burmayan, do you remember whether or not 04:52:43PM you sent a letter to the Los Angeles Board of Supervisors in which you stated, in substance, that you wanted them to stop mandatory masks, PCR testing and vaccines?

A. I do not recall doing that. 04:53:07PM

Q. Do you deny doing that?
A. I don't deny it, but I don't recall doing that.
Q. Okay. And -- and I know I asked you a question related to this, but it was probably 04:53:16PM
technically wrong. Do you recall whether or not you attended a City of Burbank meeting on April 13th of 2021 in which you made some type of presentation at? And that could be either in person or it could be electronically, I believe it would have been 04:53:42PM
electronically, that is via Zoom or some platform.
A. Yes. You already asked me that in the beginning of this deposition, and I said I do not recall doing that.
Q. I don't think I related it to Burbank. 04:53:55PM
So did you call in to the Burbank -- City of Burbank meeting, did you call in, in some way, either telephonically or via Zoom, and make an appearance in which you raised an issue with respect to masks or vaccines? 04:54:16PM
A. Okay. You're saying Burbank. No, I do not recall doing that.
Q. Do you deny doing that?
A. No, I don't -- I didn't say I deny it. You -- you said do I recall. 04:54:25PM

Q. Right.
A. My answer to you was, I do not recall doing that.
Q. Okay. And have you ever -- do you remember whether you've ever read Glendale Public Order Number 2020-07, which relates to the face coverings for workers and customers of essential services in the City of Glendale? 04:54:34PM
MS. MKRTCHYAN: Objection; calls for legal conclusion, vague and ambiguous, unintelligible. 04:54:55PM
THE WITNESS: I'm completely lost at what your question is. I have no idea what you're asking me.
BY MR. FEARS:
Q. Let me ask you again, clarify.
Do you recall whether or not you ever read Glendale Public Order Number 2020-07 which relates to face coverings for workers and customers in -- that provide essential services? 04:55:08PM
A. Did I read it?
Q. Yes. Do you recall whether or not you read -- ever read the City of Glendale ordinance relating -- essentially relating to masks? 04:55:29PM
A. I don't recall any of those numbers you gave. I don't even know what you're talking about. I don't recall any of that. 04:55:46PM

Q. Well, you testified earlier that you were aware that the City of Glendale had an ordinance that mandated masks in retail businesses.

Do you remember that?

MS. MKRTCHYAN: Misstates the testimony. She testified that she was aware of the mandate, not of the Glendale city ordinance. So please do not misstates -- misstate the evidence. 04:55:58PM

Answer the question.

THE WITNESS: You're saying if I read, not if I knew, so these are two different things. And then you're saying the policy number or something. I don't remember reading a policy number that you said. I don't remember anything about that at all, reading it. 04:56:07PM

BY MR. FEARS: 04:56:22PM

Q. I understand that you don't remember reading it. But do you remember testifying that you were aware that Glendale had a mask mandate in retail stores?

A. Yes, I'm aware that there was a mask mandate in Glendale stores. However, I do not know the policy number or any of those numbers you mentioned. 04:56:37PM

Q. Yeah, do you -- with respect to that mask mandate in Glendale, do you recall whether or not you ever read the actual ordinance?

A. I do not recall reading the actual ordinance. 04:56:56PM

Q. Do you deny reading that ordinance?
MS. MKRTCHYAN: Objection; you know, vague and ambiguous, asked and answered, argumentative.
THE WITNESS: I do not recall -- I don't -- can you repeat the question? I don't -- I don't know if it was a statement or a question, but can you repeat it? 04:57:16PM
BY MR. FEARS:
Q. Do you deny that you ever read the Glendale mask mandate law or ordinance?
A. I do not deny reading it because I don't recall reading it. 04:57:28PM
Q. Do you remember specifically how you learned about the Glendale mask mandate or ordinance?
A. Yes. It was from a newscaster on television.
Q. Okay. And after you learned about it from a newscaster on television, do you remember whether or not you ever looked into it to it actually read about that mask mandate? 04:57:44PM
A. I do not recall.
Q. Okay. But you don't deny having done so either; correct? 04:57:56PM
MS. MKRTCHYAN: Objection; vague and ambiguous, argumentative, deny.
THE WITNESS: Having denied what exactly?
///

BY MR. FEARS:

Q. You don't deny that you actually read about the Glendale city mask mandate?

MS. MKRTCHYAN: Vague and ambiguous.

THE WITNESS: You're asking that before. I said I don't deny it because I don't recall it. Then you asked me how did I find out about it. I said I found out about it from a newscaster on the television. 04:58:21PM

BY MR. FEARS:

Q. I heard that. I heard that. Okay. I'll accept -- I'll accept that answer. 04:58:31PM

THE REPORTER: Excuse me, Counsel, when you get a chance, can we take a break, please?

MS. MKRTCHYAN: Yes, and I would like to know how much we've been on the record, please. Thank you. 04:58:45PM

MR. FEARS: Why don't we go off the record. Christina, if you'd like to take that break, it's fine. This would be a good point to change.

THE VIDEOGRAPHER: Okay. We're going off the record. The time is 4:58 p.m. 04:58:54PM

(Recess.)

THE VIDEOGRAPHER: All right. We're back on the record. The time is 5:06 p.m.

MR. FEARS: Okay. At this point, I am going to turn the questioning over to, you know, counsel for 05:06:37PM

the City of Glendale, but reserving my rights to further examine the witness because of, one, the lack of production of the Dr. Flores medical note which we still have not been able to locate. Counsel indicated she'd give a Bates stamp number, but did not give a Bates stamp number over the lunch break. 05:07:00PM

Secondly, we've been impaired in our ability to ask questions regarding what I've marked as Exhibit 7, the -- what appear to be Facebook pages.

And third, based on the waste of time, speaking objections, coaching objections, long objections that have taken probably, you know, 45 minutes to an hour of time. So I -- I've made my objections known to that. I've reserved additional time. And if -- if necessary, we'll bring a motion before the magistrate on that issue. 05:07:16PM 05:07:34PM

But with that, I'll turn the examination over to Mr. Kang.

MR. KANG: All right. Thank you.

05:07:45PM

EXAMINATION

BY MR. KANG:

Q. Good afternoon, Ms. Burmayan. My name is Edward Kang. I represent the City of Glendale and the officers that you have sued in this lawsuit. So I'm 05:07:54PM

going to ask you questions. I'm just going to go back to January 19th, 2021, the date that you encountered the Glendale police officers at the CVS located on San Fernando Road.

So going back to your time at CVS on 05:08:09PM
January 19th, can you please describe your demeanor throughout your duration at -- while you were inside the CVS on January 19th?

MS. MKRTCHYAN: Objection; vague and ambiguous as to time, and vague and ambiguous as to demeanor. 05:08:23PM

MR. KANG: Sure, I can specify.

BY MR. KANG:

Q. At any time, did you raise your voice at any CVS employees?

A. I was frustrated because they were not hearing 05:08:35PM me out, and so I was simply voicing my concerns regarding my disability letter.

Q. Okay. And did you raise your voice at any time?

A. I was frustrated because they were not hearing 05:08:47PM me out. So if my voice became raised, it is because of the fact that I was frustrated they were ignoring me.

Q. Do you specifically recall your voice being raised at any point in time while you were having a conversation with any CVS employees on January 19th? 05:09:03PM

A. I do not recall.
Q. And the first time that you encountered a Glendale police officer was at the entrance of the CVS; correct?
A. Yes. It was towards my exit and then him entering. 05:09:17PM
Q. And you earlier testified that you did not know that any CVS employee had called the Glendale Police Department; is that correct?
A. I did not know they had called the police. 05:09:31PM
Q. Okay. So you didn't hear any conversation between either Guy Garcia or Joe Johnson with any representative from the Glendale Police Department; correct?
A. I did not hear any conversation. I was too far away from them and they did not speak to me. 05:09:44PM
Q. Okay. So you have no idea as you sit here today any discussions that occurred between any CVS employee and any Glendale Police Department employee on January 19th, 2023 [sic]; correct? 05:09:58PM
MS. MKRTCHYAN: Vague and ambiguous -- vague and ambiguous, argumentative, assumes facts not in evidence. Vague and ambiguous as to time as well.
BY MR. KANG:
Q. You have no recollection as you sit here today 05:10:12PM

or you have no knowledge as you sit here today of any -- the contents of any conversation between any CVS employee and Glendale Police Department employee that occurred on January 19th, 2023 before you encountered a Glendale police officer; correct? 05:10:30PM
MS. MKRTCHYAN: Again, are you talking from right now she's sitting here today, Counsel, or at the time of the incident? That's why vague as to time.
BY MR. KANG:
Q. Yes. Right now as you sit here today. 05:10:38PM
A. What is your question? Can you repeat?
Q. Sure.
As you sit here today, do you have any knowledge of any conversations that occurred between any CVS employee and any Glendale Police Department employee 05:10:51PM that occurred prior to you encountering a Glendale police officer on January 19th, 2021?
A. I have no knowledge, I have no recollection of any conversation between them.
Q. Okay. And you earlier testified that as you 05:11:05PM encountered the Glendale police officer, you attempted to explain to him the situation; is that correct?
A. As I was exiting the store, the police officer was walking in. He said something along the lines of what's going on here. I started explaining to him about 05:11:24PM

what's happening between the exchange of myself and the store employees.

Q. Okay. And you testified that you had a letter in your hand; is that correct?

A. That is correct. 05:11:37PM

Q. And that letter --

A. Excuse me, I had a letter in my pocket.

Q. And did you take that letter out at some point to show to the officer?

A. Yes, correct. 05:11:49PM

Q. And that's the letter that we're still trying to locate that was drafted by Dr. Nelson Flores; correct?

MS. MKRTCHYAN: Objection; vague and ambiguous, argumentative. 05:11:59PM

BY MR. KANG:

Q. You can answer the question.

A. I have all the letters that I have given to my attorney, and it includes the letter that I had in my pocket that night. 05:12:10PM

Q. Okay. And then you've testified earlier that the officer then turned you around and he placed you in handcuffs; is that correct?

A. Yes. Without listening to my side of the story, he -- he told me to turn around, put my hands 05:12:22PM

behind my back. He put handcuffs on me and he told me I was under arrest.

Q. And did you say anything to him after you had been placed in handcuffs?

A. Yes. I asked him why I was under arrest. 05:12:35PM

Q. And did he respond to you?

A. He did not.

Q. Okay. And what happened after that?

A. I need a minute because I'm not remembering right now. Can we please put the video footage of me in 05:12:51PM the car?

Q. Well, do you remember any conversations between you and the Glendale police officer from the time that you were placed in handcuffs being placed into the patrol vehicle? 05:13:06PM

A. The only thing I recall is me asking the police officer about why I'm being arrested, crying, pleading, begging him to tell me why I was being arrested.

Q. Other than that, did you have any other 05:13:19PM communications with that officer?

A. I told him multiple times, "Please remove the mask, I cannot breathe. I have a disability. Please, I'm having anxiety attack. Please remove the mask, I cannot breathe. Please help me." 05:13:35PM

Q. Okay. Was this while you were in the vehicle or was this on the way to the vehicle?
A. As he was pulling me to the vehicle.
Q. And then he placed you in the vehicle; is that correct? 05:13:46PM
A. Correct.
Q. Okay. At any point in time, did you tell him that the handcuffs were too tight?
A. Yes, I did several times. In addition, I'd like to be reiterate that he did not put me, he pushed 05:14:04PM me into the car. And I stated many times that the handcuffs are too tight, please release my handcuffs a little bit or maybe put my handcuffs in the front. And he refused to do any of it.
Q. And when was this? What time period was this? 05:14:22PM
A. I can -- he took my phone from me. He frisked me. He touched me as a male police officer. He took -- he had no right doing that. So I cannot tell you what time because he took my cell phone from my pocket and he frisked me, even though he's a male. 05:14:38PM
Q. How many police officers did you encounter at that point in time when you were first put into handcuffs? Did you see any other police -- Glendale police officers besides the one that placed you in handcuffs? 05:14:48PM

A. Yes. There was a total of three.
Q. At the time you were placed in handcuffs?
A. Yes.
Q. And were they all male?
A. Yes. 05:14:56PM
Q. And he frisked you at the point in time when you -- after you had been placed in handcuffs?
A. Right around the same time as he was putting me in handcuffs, he was also frisking me.
Q. So immediately after he placed you in 05:15:10PM handcuffs, he pushed you?
A. I cannot recall exactly immediately, but it was right around the same time. It is in the video footage, if you would like to play it.
Q. And then how -- how -- how much time can 05:15:19PM you -- can you estimate how much time elapsed from the time that you were placed into handcuffs and then placed into the patrol vehicle?
A. I cannot estimate it.
Q. Okay. At any point -- and so you said that 05:15:33PM you had one -- asked the officer -- told the officer that your handcuffs were too tight; is that correct?
A. Can you repeat the question? You were going fast.
Q. Sure. 05:15:44PM

You had -- your testimony is that you had told the officer that your handcuffs were too tight; is that correct?

A. Yes, several times.

Q. Okay. How many times can you estimate that you told the officer that? 05:15:52PM

A. I cannot estimate. It's several times.

Q. Did you -- did you tell the officer that your handcuffs were too tight both outside as well as in the patrol vehicle? 05:16:03PM

A. Yes. As he was dragging me to the car, I told him it was too tight. And when he was pushing me into the car, I was telling him it's too tight. And while I was sitting there.

Q. Okay. And you also told him that you suffer from a disability while he was taking you to the patrol vehicle and then while you were in the patrol vehicle as well? 05:16:13PM

A. Yes. I was screaming and crying and I was saying, "Please, I can't breathe. Please, I can't breathe. I have a disability. Please open my nose, please." 05:16:23PM

Q. Okay. So you said those exact words "I have a disability"; correct?

A. Yes. I had told him, "I have anxiety. I 05:16:34PM

can't breathe, I have breathing problems. Please open my nose."

Q. And at some point, one of the allegations -- well, one of the allegations that you're making in this lawsuit is that one of the officers made fun of your name; is that correct? 05:16:48PM

MS. MKRTCHYAN: Objection. Counsel, you're going very fast. First of all, my client is having a very hard time following you and I am also having a hard time following you. Argumentative as to allegations. Vague and ambiguous as to time, as to when. 05:17:02PM

BY MR. KANG:

Q. One of the allegations that you're making in this lawsuit is that one of the officers made fun of your name; correct? 05:17:13PM

A. Correct.

Q. And that was while you were sitting in the back of the patrol vehicle?

A. Yes, correct.

Q. And this is when he asked you what your name was? 05:17:19PM

A. What was when he asked me what my name was?

Q. When he made fun of your name.

A. When he asked me what my name was and he said, "How do you spell it?" And then he said, "What kind of 05:17:31PM

a name is that? Where are you from?" So that is when he was making fun of me is when he was asking me to tell him my name and to spell it.

Q. Okay. And -- all right, let's play the video of you in the back of the patrol vehicle. 05:17:49PM

MR. KANG: So I'm going to mark this -- I don't remember where we left off.

(A discussion was held off the record.)

MR. FEARS: I think the last one marked was Exhibit 7, which was the potential Facebook pages that 05:18:10PM weren't identified -- weren't authenticated.

(A discussion was held off the record.)

MR. FEARS: It was previously premarked 10 on the screen, but it -- Exhibit 7 would be the Facebook pages that we ended with, and there were instructions 05:18:35PM not to answer as to those 42 Facebook pages.

MR. KANG: So what exhibit are we on?

MR. FEARS: 8, I think, would be next in this deposition.

MR. KANG: Okay. So I'm going to mark this as 05:18:53PM Exhibit 8.

(Defendants' Exhibit 8 was marked for identification by the court reporter and is attached hereto.)

///

BY MR. KANG:
Q. And I'm going to show you the video of you in the back of the patrol vehicle.
Can you see my screen?
A. Yeah. 05:18:59PM
Q. So I'm going to play this video. I don't necessarily need to go through the whole thing, but I do want you to tell me -- or tell me to stop at any point in time where you say the words "I have a disability" or "my handcuffs are too tight," or words to that effect. 05:19:12PM
And then I have -- and then I'll have specific questions about certain points of time.
(Video playing.)
THE WITNESS: Where is the audio?
MR. KANG: There is 30 seconds of audio. Let 05:19:29PM
me skip to that point.
(Video playing.)
THE WITNESS: I can't hear the audio.
(Video playing.)
BY MR. KANG: 05:19:49PM
Q. You can't hear the audio?
A. No.
MS. MKRTCHYAN: We can't hear the audio, Counsel. This is -- it's disruptive.
MR. KANG: What's disruptive? 05:20:00PM

MS. MKRTCHYAN: I -- it's interrupting. We can't hear the audio.
MR. KANG: Is it chopping in and out?
MS. MKRTCHYAN: Yes.
(Video playing.) 05:20:13PM
MR. KANG: Still?
MS. MKRTCHYAN: Yeah, it's chopping, yeah.
MR. KANG: Let me try it again.
BY MR. KANG:
Q. All right. Can you see my screen still? 05:20:23PM
A. It paused.
MR. KANG: Yeah, let me try playing it now and let me know if there's still audio issues.
(Video playing.)
THE WITNESS: I can't hear anything. 05:20:53PM
MR. FEARS: Well, I don't think there's anything being said right now, but I heard "Please, sir."
(Video playing.)
MS. MKRTCHYAN: It's still very difficult to hear on our end, Counsel. 05:21:02PM
MR. FEARS: I -- I heard it.
MS. MKRTCHYAN: Well, it's totally cutting out. What did you hear? It's choppy.
MR. KANG: Is it choppy to you, Dan? 05:21:15PM

MS. MKRTCHYAN: Yes, I can play on my end. If you want me to play on my end and share my screen with you, I can try to play my tape. Because I cannot -- I cannot hear your tape.

MR. FEARS: I don't have a problem with that, 05:21:28PM but yeah, I -- I hear it. There's -- by choppy, I mean there's portions that are silent and then there are statements that are being made. But if counsel plays hers just to check it, that's fine with me.

MR. KANG: That's fine with me, too. Let me 05:21:45PM stop sharing.

MS. MKRTCHYAN: Let me just play this on my end.

(Video playing.)

MS. MKRTCHYAN: Yes, it's starting to -- so 05:22:26PM wait.

(Video playing.)

MS. MKRTCHYAN: I'm sorry, you guys, Counsel, my client is visibly distressed right now. She's crying. I think we need to take a break because any 05:23:46PM time she watches this tape, she starts crying. So I can't -- I don't think she will be able to answer questions calmly about this video. So I mean. . .

MR. FEARS: So, Counsel, are you asking to go off the record? 05:24:10PM

MS. MKRTCHYAN: Well, yeah, because she's visibly -- as you can see, she's visibly distressed. She -- any time she hears this, she's like this. So I -- I don't think she will be able to answer questions right now, continuing watches this. 05:24:22PM

Are you able to answer? No?

I mean, do you want me to continue playing or --

THE WITNESS: Well, let's try.

MS. MKRTCHYAN: Okay. Well, let's -- let's 05:24:36PM try.

(Video playing.)

MR. KANG: Okay. Narine, you can stop because the whole purpose of this is for her to identify a point in time where she either states "I have a disability" to 05:25:23PM any of the officers or "my handcuffs are too tight." And if she can't watch the video, then, obviously, she cannot be able to do that.

I also wanted her to identify the portion in time where she believes that a Glendale police officer 05:25:34PM made any sort of racist comment to her. But, again, if she cannot watch the video --

MS. MKRTCHYAN: Yeah.

MR. KANG: -- she can't do that.

MS. MKRTCHYAN: Yeah, the thing is the videos 05:25:44PM

will speak for itself, but obviously, there's points in time when -- I mean obvious -- I don't know, do you want to take a five-minute break to answer questions or, you know -- because I know every time she hears this tape, she starts crying, so I have to take breaks. 05:25:59PM

So, I mean, I would want her to answer questions, but at the same time, I don't want her to go through this emotional situation.

MR. FEARS: Well, I'm just going to state on the record that if the witness is going to say that 05:26:15PM those comments were made, then she does have to listen to the tape and watch the tape and tell the lawyers when and how and where on the tape that that was said. And so if she needs a break to compose herself, nobody has ever denied that. I know -- 05:26:44PM

MS. MKRTCHYAN: You've denied it several times, Counsel, but anyway, finish your thought.

MR. FEARS: No, I didn't. No, I didn't. I just asked -- I didn't want to break while a question was pending, but -- but we still did that anyhow. So, 05:26:58PM in any event, I think eventually these questions have to be answered. And -- and so if your client --

MS. MKRTCHYAN: Counsel --

MR. FEARS: -- if your client needs a break, let's take five. 05:27:09PM

MS. MKRTCHYAN: Well, okay, here is the thing that I would like also to object. Right now we were -- we are -- she's being questioned by City defendant attorney, and I object to two attorneys ganging up on my client. I do not appreciate that. You finished your 05:27:22PM line of questioning, Professor Fears. If you don't mind, I'm going to call you "Professor Fears" because that's how --

MR. FEARS: I do mind. It's condescending and inappropriate and I object. And I'm not ganging up on 05:27:35PM your client, Counsel.

MS. MKRTCHYAN: You are.

MR. FEARS: What I'm doing is responding to your comments.

MS. MKRTCHYAN: No, the record -- 05:27:41PM

MR. FEARS: And I think --

MS. MKRTCHYAN: I didn't finish.

MR. FEARS: And I was trying to accommodate --

MS. MKRTCHYAN: I did not finish.

MR. FEARS: I'm trying to accommodate your 05:27:44PM request for a break and say let's --

MS. MKRTCHYAN: You're not accommodating --

(Speaking simultaneously.)

(Whereupon the court reporter gives an admonishment not to speak over 05:27:47PM

each other.)

MS. MKRTCHYAN: Okay. You know, here is the thing. We are starting -- we are starting on a very bad footing today, you and I specifically. Perhaps you and I should have a conversation sometime over the phone to clear up any confusion about each other's roles. You are the defendant's lawyers. I'm the plaintiff's counsel. So let's have some boundaries here and let's respect each other. 05:27:59PM

So, number one, the record speaks for itself. I am happy, more than happy to take a break, give my client some time to compose. However, I can tell that, first of all, the objection is this, record speaks for itself. The video is -- you know, speaks for itself, what she said, what -- you know, she can interpret the video. I would love her to do that. 05:28:12PM 05:28:28PM

We will take a break. If she can come back and can answer questions without crying, more than happy to do that. But if she's going to continue what she has done with me as well -- I can represent every time she watches this tape, I have hard time asking her any questions, or even having her watch this calmly. And you know what, I myself watching this, I get pretty much traumatized, emotionally distressed. 05:28:42PM

MR. FEARS: This is just wasting the record 05:28:56PM

right now.

MS. MKRTCHYAN: Oh, really? Okay, well --

MR. FEARS: Let's take the break that you had requested and we'll see whether or not your client can stay composed or not after the break. 05:29:04PM

MS. MKRTCHYAN: Okay.

THE VIDEOGRAPHER: Okay. So we're going off the record?

MR. FEARS: Yes.

MR. KANG: Yes. 05:29:11PM

THE VIDEOGRAPHER: Okay. We're going off the record. The time is 5:29 p.m.

(Recess.)

THE VIDEOGRAPHER: Okay. We're back on the record. The time is 5:37 p.m. 05:37:08PM

BY MR. KANG:

Q. Okay. So we had a little bit of a conversation off the record. And, Ms. Burmayan, you're going to try to watch this video and identify some points in time that identified earlier, which are, one, 05:37:23PM at any point if you say "I have a disability" to the police officers; two, any point in time where you say that the handcuffs are too tight; and three, any point in time where you believe that any of the Glendale police officers present make any sort of racist comment 05:37:40PM

to you.

You also noted that the first 30 seconds of the video has no sound and that there was an interaction between you and Glendale police officers from the time that you were handcuffed to the point in time where you were placed into the patrol vehicle. And so as a follow-up to that, I want to ask you some questions about the portion of time that you were handcuffed and being taken to the patrol vehicle, but before you were in the patrol vehicle.

So you testified that there was three officers present; correct?

A. Correct.

Q. And they were all with -- how close would you say they were to you as you were being taken to the patrol vehicle?

A. Well, the Ross -- Ross was the closest, and then there was Armendariz, which is, I guess, his partner. And then there was a third, Ruiz, which was -- he was pretty much staying by the -- his police car, because there was two police cars.

Q. Okay. How far would you say Ruiz was from you as you were being taken from the point of being handcuffed to being placed in the patrol vehicle?

A. I cannot answer that exact measurement, but he

was furthest away from all of us.

Q. Was he within hearing distance of you?

MS. MKRTCHYAN: Calls for speculation, lacks -- calls for speculation.

THE WITNESS: I can't really answer that question because I don't know what he could hear and how -- I can't answer on behalf what he could hear. 05:39:04PM

BY MR. KANG:

Q. And you have zero ability as you sit here today to estimate how far Officer Ruiz was from you as you were being led from the CVS to the patrol vehicle? 05:39:15PM

MS. MKRTCHYAN: Asked and answered objection, calls for speculation. The witness cannot provide measurements.

Can you provide an estimate? 05:39:29PM

THE WITNESS: As far as with measurements, I cannot provide, but what I can say is there were two police cars. The first one was Ross's. The second was, I think, Ruiz's. So right in front of CVS was Ross's car, and behind Ross was Ruiz's car. As to how many feet measurement, I cannot answer that. 05:39:46PM

BY MR. KANG:

Q. And when you say that Ross's car was right in front of CVS, how far -- well.

How long did it take you to walk from the 05:40:03PM

entrance of CVS to the patrol vehicle?
A. I cannot answer in minutes because I did not have my watch on me and he had taken my phone away from me.
Q. Okay. And how -- where was Officer Armendariz in relation to you and Officer Ross as he was leading you to the patrol vehicle? 05:40:20PM
A. From my recollection, he may have been standing next to Ross's police car.
MR. KANG: I'm going to mark Exhibit 10 an image, it's a Google Maps image of the CVS located on San Fernando Road. 05:40:59PM
(Defendants' Exhibit 10 was marked for identification by the court reporter and is attached hereto.) 05:41:06PM
BY MR. KANG:
Q. Can you see my screen?
A. Yes.
Q. Is this the CVS where the incident occurred?
A. Is this the CVS where the incident occurred? I really can't tell based on -- this looks like multiple CVS's. 05:41:13PM
Q. Why do you believe that this looks like multiple CVS's?
A. Well, it has a CVS sign with the -- with the 05:41:29PM

parking lot.
Q. So you believe that there is two CVS's located here at this location?
MS. MKRTCHYAN: No. Vague and ambiguous. Objection; misstates the testimony, Counsel. She just 05:41:39PM
said she could -- okay. Clarify -- vague and ambiguous.
Can you show us the entirety of the Google map, because you are not showing us the Google -- not that. Yeah, if you can circle around and show it on the Google map if this is the area where -- 05:41:55PM
BY MR. KANG:
Q. San Fernando Road and Los Feliz Road, is that the CVS that you -- where the incident occurred?
A. As far as the map goes, yes, but from the picture, it's hard to tell because I don't see any 05:42:10PM
street names.
Q. Is this the CVS that you went to?
A. Yes, this is the CVS. And the incident happened in the parking lot behind, but I now see Los Feliz name so -- 05:42:26PM
Q. So this is the parking lot behind; correct?
MS. MKRTCHYAN: Well, you interrupted her, but in any event, she was finishing up her answer.
Yeah, is that --
THE WITNESS: This appears to be the front of 05:42:37PM

CVS, from what I can see.

BY MR. KANG:

Q. Okay. And do you see the parking lot to the left of the CVS?

A. From this picture, it appears that this parking lot is probably most likely right behind there. 05:42:46PM

Q. Is this the parking lot where Officer Ross and Officer Ruiz's patrol vehicles were parked the night of the incident?

A. It appears so. Most likely they were parked in the parking lot back here. And when they pulled me out, it looks like they probably took me to the -- to their car. Of course, this incident happened at night so it's hard to tell. 05:43:00PM

Q. Okay. Is this the entrance that you were exiting out of? 05:43:15PM

MS. MKRTCHYAN: And by the way, Counsel, for the record, though, you're asking her questions and the record is not clear of what you're showing her. So, you know, right now you're doing Google overview. How is this going to be reflected in the record in the exhibit because you're just going online and playing the Google -- so I just -- it's not -- 05:43:30PM

MR. KANG: Right now -- right now, Narine, all I'm trying to do is establish that this CVS is where the 05:43:47PM

incident occurred. What I want to ask her about is a picture of the parking lot and if she can locate or identify for me where Officer Ross's and Officer Ruiz's vehicles were parked in the parking lot relative to where she was the night of the incident. That's what I'm trying to -- 05:44:00PM

MS. MKRTCHYAN: Yeah, but -- yes, but if you don't have a printout of this photograph, right now you're doing Google map overview online, whatever answer she provides about the location of the cars is not going to be clear on the record. 05:44:11PM

Do you have actual photographs of this location so that when she answers, her answer will be recorded accurately? Because right now this is the Google map overview. What you're trying to do is just not going to be reflected on the record, and I object to that because that's a -- it's just -- at the end of the day, we're not going to have an accurate record. 05:44:27PM

Do you have photographs as opposed to Google.com image that you're overlaying right now online? 05:44:41PM

BY MR. KANG:

Q. Okay. What exactly is it that you're seeing? Do you see right now a picture of the CVS parking lot? Or are you looking at an overview? Because what I'm 05:44:54PM

showing you right now should be a picture of the CVS pharmacy parking lot.

A. I see a parking lot, and then I see CVS building.

Q. Okay. That's what I want to show you. That's what I want to show you. That's exactly what I want to show you. 05:45:03PM

Okay. From this image that I'm showing you right now, can you -- is the location of where Officer Ross's and Steven Ruiz's -- Officer Ruiz's vehicles depicted? 05:45:18PM

MS. MKRTCHYAN: Well, objection, Counsel. Again, you are not showing an image. You are showing a Google map printout -- or not even a printout. You're going online and you're circling around. So her answer whether she recognizes something or whether not recognizes something is not going to be recorded accurately. I mean I don't understand how else am I going to object to this. 05:45:31PM

You're -- you're not showing her a photograph. You're showing her -- you know, your overlaying of Google map online is the GPS overlaying. So I object because her answer is not going to be accurate representation on the photograph. What exhibit is this and how are you going to produce this as an exhibit 05:45:42PM 05:45:57PM

right now? And how do you want her to point out?

The best way to do this is to produce a photograph and she can circle on a photograph where she saw the cars. Otherwise, I object because this is not an appropriate way to get a location of the incident. 05:46:14PM It's not an accurate representation and it's -- it's just it's not accurate at this point.

MR. KANG: Okay. So this is a Google Map image of the CVS pharmacy parking lot. Your client testified that she recognizes it as such. And I'm 05:46:27PM asking her right now if, in this image, which is a -- it can be a photograph, if you want. I can print it out and then it's a photograph -- whether or not the locations of where Officer Ross and Officer Ruiz's vehicles are depicted in this particular image. That's 05:46:43PM all I'm asking. It's a simple yes-or-no question.

MS. MKRTCHYAN: What is the --

MR. KANG: If she can't do it, she can't do it. If she can do it, she can do it.

MS. MKRTCHYAN: Well, she can't -- 05:46:47PM

MR. KANG: It's yes-or-no question, Narine. If she can do it, she can do it. If she can't, she can't. But you --

MS. MKRTCHYAN: That's not the issue, Counsel. Again -- 05:46:59PM

MR. KANG: No, that is the issue, Narine.
(Speaking simultaneously.)
(Whereupon the court reporter gives an admonishment not to speak over each other.) 05:46:59PM
MR. KANG: That is the issue, Narine.
MS. MKRTCHYAN: No. The objection -- okay, you know, you are -- you're really -- this is such a level of unprofessionalism that I cannot even imagine. I have never seen anything like this in my life. It's 05:47:07PM not like she can nod yes or no. The quest -- I am trying to make the record as clear as possible.
You are showing her -- as I said, for the record, you're showing her not an exhibit of a photograph. Can you produce -- can you show her a 05:47:21PM photograph instead of a Google map that you are -- you know, you are basically, you know -- you're online right now, you're online. You haven't done your job preparing this deposition, basically. You're online. You're going to Google.com GPS, circling the area. 05:47:37PM
So, because this is not -- this is a fluid online, you know, representation of the area, any response by her is not going to be accurately recorded. That's my objection.
And your questioning is not going to be 05:47:53PM

effective. So it's up to you, but I'm making an objection for the record that this is not a photograph. If you can print a printout of a photograph, she can answer the questions and she can circle so that it's clear. That's -- 05:48:10PM

MR. KANG: All right. What did I previously mark this exhibit as?

MR. FEARS: I think 10.

MR. KANG: Okay. Then I withdraw that previous photograph as Exhibit 10. I'm remarking this 05:48:24PM as Exhibit 10.

BY MR. KANG:

Q. Looking at Exhibit 10, which is a photograph of CVS pharmacy, can you see where Officer Ross and Officer Ruiz's vehicles were the night of the incident? 05:48:30PM

A. No.

(Defendants' Exhibit 10 was re-marked for identification by the court reporter and is attached hereto.)

MR. KANG: Okay. I'm going to mark as 05:48:39PM Exhibit 11, if this is how you want to do it. Okay. I'm going to mark as Exhibit 11 a more broad view of the CVS parking lot.

///

///

(Defendants' Exhibit 11 was marked
for identification by the court
reporter and is attached hereto.)

BY MR. KANG:

Q. Looking at this image which I'm marking as Exhibit 11, can you see where Officer Ross and Officer Ruiz's vehicles were located in the CVS parking lot? 05:49:08PM

A. No.

Q. Okay. And looking at this image, are you able to tell if Officer Ruiz and Officer Ross's vehicles were closer to the entrance, farther away from the entrance? Can you have any sort of estimation as to where their vehicles were that night of the incident? 05:49:24PM

MS. MKRTCHYAN: Object. She already answered that question. Vague and ambiguous, argumentative. 05:49:41PM

THE WITNESS: I can't tell from this picture.

BY MR. KANG:

Q. So as you sit here today, you have no recollection of where Officer Ross and Officer Ruiz's vehicles were? 05:49:50PM

MS. MKRTCHYAN: Objection; misstates the testimony. You're asking her from the photograph or based on her recollection from the night of the incident, which she already answered? Vague and ambiguous. 05:49:57PM

BY MR. KANG:

Q. Well, what is the recollection of where their vehicles were?

A. The car was -- when I exited, they took me to the car. Based on this picture, I cannot tell where the car was. 05:50:09PM

Q. Okay. How far away from the entrance was -- was their vehicle?

A. I can't answer that because I did not have the capability to measure how far away it was. 05:50:18PM

Q. Okay. Where were the CVS employees at the point in time where you got handcuffed and started being taken to the patrol vehicle?

A. They were inside the store, I'm assuming. I don't remember what happened to them. I was focused on me being handcuffs. 05:50:33PM

Q. Okay. Other than Officer Ross, did you have any conversations with any other police officers as you were being taken from the CVS into the patrol vehicle?

A. I believe with Armendariz. 05:50:45PM

Q. And did you also say to Officer Armendariz that your handcuffs were too tight?

A. I was screaming that my handcuffs are too tight, please release my handcuffs.

Q. And were you also screaming that I have a 05:51:01PM

disability and I have a note?

A. I was more or less screaming that I have a disability, please take my mask off, I cannot breathe. I do not feel well. Please remove my mask.

Q. Okay. So you were screaming this; correct? 05:51:16PM

A. Correct.

Q. Okay.

MR. KANG: Let's play that video, Narine.

MS. MKRTCHYAN: Can you -- okay. Let me just share my screen again. 05:51:26PM

(Video playing.)

THE WITNESS: Right there, he's -- right there, right there, he's mocking me. He's saying, "Do you know any other words other than please?"

MR. KANG: Okay. What -- 05:51:57PM

THE WITNESS: That is when his mocking starts.

MS. MKRTCHYAN: Okay.

MR. KANG: What is the time stamp?

MS. MKRTCHYAN: 2:25.

Okay. Let's continue. 05:52:08PM

(Video playing.)

MS. MKRTCHYAN: 2:31 seconds.

THE WITNESS: I'm saying, "I can't breathe. I don't feel well. Take my mask off. Lower my nose."

What more do you need for somebody to say I 05:52:24PM

have -- I'm not feeling well.
BY MR. KANG:
Q. No, I understand. But I specifically want you to identify any point in time where you tell an officer "I have a disability." 05:52:33PM
(Video playing.)
THE WITNESS: He's saying, "I can't lower your nose, it needs to go" -- my mask. And I'm saying, "I can't breathe. Please lower my nose."
I don't know what language to explain this in. 05:52:51PM
Somebody else he needs to translate for me.
BY MR. KANG:
Q. Again -- again -- again, the only thing I'm asking you to stop the video on is whenever you say "I have a disability," you hear a racist comment, or when 05:53:01PM
you say "my handcuffs are too tight." Other than that, I don't -- I don't need you to stop the video. I understand you want -- you may want to, but that's not my question. Okay.
MS. MKRTCHYAN: Okay. Counsel, I object to 05:53:13PM
that. It's argumentative. If you're asking her to interpret this video, her state of mind which is a more fair characterization of your questioning, if you want to know her state of mind, what she believed was ongoing, you need to allow her to elaborate. If you 05:53:29PM

don't want --

MR. KANG: No, Narine, I don't. I don't. I'm specifically asking for her to stop the video when she hears the words "I have disability" or something to that effect; right? 05:53:43PM

MS. MKRTCHYAN: Exactly. Okay --

MR. KANG: No, no, no, no. Narine, I'm asking --

MS. MKRTCHYAN: Excuse me. Okay. You're saying to the effect, and that's what she interprets. 05:53:47PM And she's telling you what -- if you're -- listen, if you're not happy with an answer, then don't ask the question. I don't --

MR. KANG: My question is this then, I want her to stop the video when she hears the phrase "I have 05:53:58PM a disability" or the word "disability," a racist comment, or "my handcuffs are too tight" or the word "handcuffs." Okay. That's what I want to hear. That's it. Nothing else.

MS. MKRTCHYAN: Listen, you know what, your 05:54:13PM attitude is not appreciated. You know, I don't think you're allowing my client to fairly and adequately represent her state of mind, what she interpreted, you know, and, therefore --

MR. KANG: I'm not asking for that. 05:54:24PM

MS. MKRTCHYAN: -- I'm objecting to this, therefore. That's fine. I'm going to object to go this because you're not letting her to -- you're saying -- first of all, your question is compound, number one. Number two, disability to defective disability, you know, to her that means several things, you know. And she is entitled to provide an answer. If you don't want her to provide an answer, that's fine. 05:54:34PM

Right now, we are not going to -- this is 6:00 p.m. We've gone through a whole day of this, you know, back and forth between your co-counsel now, between you and I. If you don't want to have an answer for this questioning, that's find. Let me then finish my line of questioning with her or we can just recess this deposition, you know. 05:54:47PM 05:55:05PM

You don't want her basically to interpret this video and how she understood the word "disability," how she -- you know, you don't want her to provide you answers. Why are you asking question if you don't want an answer? Why are you asking question when you don't want an answer? 05:55:16PM

You're rudely telling her, Oh, do not stop the video unless you hear the express word of this and that. That's her best answer. That's her best explanation. If you're not wanting to listen, then let's just stop 05:55:29PM

this. This is 6:00 p.m.

MR. KANG: Okay. I want her to answer my question. I don't want her to answer your question. I want her to answer the question that she wants to answer. I want her to answer my question. 05:55:43PM

MS. MKRTCHYAN: She's the deponent.

MR. KANG: Yes. And she's here to answer my questions, so I want her to answer my questions --

MS. MKRTCHYAN: Then your question is vague and ambiguous and argumentative. Your question is -- 05:55:52PM you're telling her compound question, you know, unless you hear these -- these words, then you stop the tape. What is this? This is like, you know -- that's incomprehensible. She's telling you what she believes she has -- you know, she's got to say about that, the 05:56:08PM word --

MR. KANG: All right. Let's do this -- let's do this differently; okay.

BY MR. KANG:

Q. Ms. Burmayan, have you reviewed this video -- 05:56:13PM

MR. FEARS: Wait. Before you do -- before you do --

MS. MKRTCHYAN: Don't even -- don't even go there, Counsel. I don't want to hear from you; okay. You've already had a whole day of professorial lectures. 05:56:20PM

I'm fed up with this. This is 6:00 p.m. Let's finish this up already.

MR. FEARS: Let me object to counsel's behavior. It's unprofessional. But I want, Christina, if you could mark the record here, at this point, I 05:56:34PM think counsel is inappropriate. The objection it's coaching.

It's very clear counsel just simply wanted the witness to identify whether she spoke certain words. That's a legitimate question. And counsel for the 05:56:45PM plaintiff is resisting that and suggesting that the witness can identify any words, and if she had an understanding or belief, she can testify to that. This is totally inappropriate and it's taking a lot longer than it should. 05:57:04PM

MS. MKRTCHYAN: Well, then you play the tape. You know what, this is ridiculous. I am trying to help you playing the tape. You are not letting us to do this. I -- I tried to cooperate playing the tape. Your tape is not, you know, audible. 05:57:17PM

I would like to know from court reporter how much have we been on the record thus far? This is already 6:00 p.m. and you're going on and on and on.

She's trying to answer in good faith. I am even cooperating playing the tape on my end, but you're 05:57:29PM

interrupting her. You're telling her, no, I don't like your answer; therefore, move on. I don't like your answer; therefore, move on. This is badgering the witness. Argumentative. And it -- it's really making my client really feel like this is a joke. This sounds 05:57:44PM like a joke right now.

I tried to play it for you something that you cannot play on your end. So why don't you just, you know, wrap this up if you don't want to hear her answers? You know, you just are not happy with her 05:57:58PM answers. Why don't you -- she took a break to get better, to calm down to answer questions about this goddamn video. And you are still harassing her and telling, no, I'm not happy with your answer. Unless you hear express word "disability," unless you hear this and 05:58:13PM that, that's her interpretation. She's trying to tell you. She's in good faith answering your questions. You keep interrupting.

And you're making me to get involved. I'm not going to play the tape. You play the tape on your end. 05:58:23PM And if my client can hear that tape, she will answer your questions. If she cannot, then she will not. Thank you.

MR. KANG: First of all --

MR. FEARS: I object to counsel now -- I 05:58:32PM

object to counsel now swearing on the record.

MR. KANG: I join that objection. I -- it's inappropriate to be cursing.

MR. FEARS: And terribly unprofessional, inconsistent with Los Angeles rules. 05:58:44PM

MR. KANG: All right. Let me try this a different way.

BY MR. KANG:

Q. Ms. Burmayan, you have reviewed that video; correct? 05:58:53PM

A. Correct.

Q. How many times would you say you have reviewed that video?

A. Approximately five times, three to five times.

Q. When was the last time before just now that 05:59:00PM you reviewed that video in full?

A. From my recollection, this morning.

Q. And were you able to watch the video from the beginning to the end this morning?

A. I was -- I don't recall. I tried and I 05:59:13PM started crying.

Q. Okay. At any point in time have you watched that video from the beginning to the end?

A. I have tried multiple times and I have cried all throughout, and I have gone through watching it from 05:59:26PM

the beginning to the end.

Q. Okay. So, and I'm not trying to be harassing. I'm just trying to be clear here. So you have at some point watched that video from the beginning to the end; correct? 05:59:43PM

A. Correct.

Q. And at no point in that video do you ever mention the word "disability," do you?

A. I do not recall if I mention the word "disability" or not, but to the best of my 05:59:50PM recollection -- let me explain something to you. I don't know if you have a disability or know somebody with a disability, but when are -- a person is having a panic attack or anxiety attack, it is very difficult for them to try to find the correct words because this is 06:00:05PM not a PowerPoint presentation or a lecture.

My focus at that point is to not die and to survive. And I was thinking I'm going to have a heart attack, and I was thinking I'm going to die in the backseat and the police officer is going to shoot me and 06:00:17PM kill me. So the last thing I was thinking about is how do I put this in correct terminology, if I'm going to put -- use the word "disability" or not.

I would also like to add the entire portion of the clip is missing from when he pulled me out of the 06:00:32PM

CVS store to the car. So I can't answer on that behalf if I used that word while we were walking. I cannot answer if I used the handcuff word while we were walking.

What I can answer is I was pleading for my life. I was very scared of my life because he was not telling me why he was doing all this to me. He was not giving me an answer. So if I do not recall if I used the exact word "disability" or not, it doesn't mean that I used it or didn't use it, I just don't recall, but I was begging and pleading to the best way that I can to please help me take off my mask, I have a disability. That's what I can say. 06:00:45PM 06:01:02PM

Q. Okay. So that testimony was a little bit different from testimony that you gave earlier. 06:01:16PM

So as you were walking from the CVS to the patrol vehicle, you don't recall specifically using the word "disability"; correct? That's what you just testified?

MS. MKRTCHYAN: Objection -- 06:01:27PM

THE WITNESS: That's not what I said.

MS. MKRTCHYAN: You know, misstates the testimony, argumentative, and badgering the witness, harassment already.

THE WITNESS: You're changing my words -- 06:01:36PM

you're changing my words and you're saying that's not what I said. I said there's no video footage or audio footage of me walking from the store to the car, so we cannot prove if I used the word "disability" or not because that entire clip is missing. I don't know why, 06:01:52PM but it's not there so I can't prove if I used it during that time.

What I am saying is that I was begging and pleading for my life in the car. I was asking for help in the car. I was saying, "Please, I don't feel well, I 06:02:02PM have anxiety, please open my nose." That is a person who has a disability. And I told him I have anxiety, I don't feel well. I had this conversation with him while I was walking. There's no video of that. I don't understand why. 06:02:19PM

He had a body camera. He had audio on him. Why is that part missing?

BY MR. KANG:

Q. Okay. So do you specifically remember using the words "disability" as you were walking from the CVS 06:02:31PM to the --

A. Yes.

Q. -- to the vehicle?

But you did not use --

MR. FEARS: Excuse me. Excuse me. On the 06:02:36PM

video, there's -- I -- Counsel, I don't know if it's you or someone else, but somebody keeps getting up and getting between the sun and the witness, and it then casts a shadow, it goes dark and then it goes light. I can see the shadow of a person standing in front of -- 06:02:55PM blocking the sun and then backing up. And it's happening right now, and it's very distracting and it's going to make for a very bad video.

So I would -- I would request that that not continue to occur, or whatever it is that's occurring. 06:03:06PM I don't know, but I can just see back and forth -- there it is right there. You're leaning in and -- and the shadow goes across the witness. So I'd ask that there just be some level of separation so we can get a good video. 06:03:23PM

MS. MKRTCHYAN: Well, you know what, Counsel, I'm already -- this is 6:03 p.m. I'd like to know what -- how long we've been on the record because you keep getting in, into City defendant's questioning time period. So please, I would like to know why are you -- 06:03:35PM why do you keep getting involved in this session when it's City defendant specifically asking questions? Why are you interrupting this questioning, so that there is a reason for them to come back? I'm not going to allow that to happen. 06:03:49PM

MR. FEARS: No, it's not -- not that at all. It's that I'm paying for a record, a videographer, and I don't want somebody blocking the light of the witness. It's inappropriate --

MS. MKRTCHYAN: No one is blocking. 06:03:58PM

MR. FEARS: It has nothing -- it has nothing to do with any question. I'm just asking politely, and I would ask that -- that whatever is occurring that is blocking the light, that that stop.

MS. MKRTCHYAN: There is no blocking of the 06:04:12PM light. Okay. So you're just paranoid right now.

Anyway, I would like to know, first of all, you know, this is 6:04. My client is getting anxious and more and more. We'd like to finish this. We'd like to have the benefit to the City defendant answering the 06:04:26PM questions. Can we just move on without you getting involved -- involved, unless it's absolutely necessary? You have an objection, not a speaking objection. There was no need for you to -- there was no interference here. So I object. 06:04:41PM

And I'd like to make sure that this is clear, this is 6:04 p.m. We've been here since 10:00 a.m. You've covered a lot of issues that have no bearing to this case.

MR. FEARS: I disagree, but let's go on. 06:04:55PM

BY MR. KANG:

Q. Okay. So, but again, you have reviewed the video from beginning to end; correct?

A. Correct.

Q. While in the patrol vehicle, you never used the word "disability"; correct? 06:05:08PM

A. I didn't say I never used it. I said I don't recall using the word, but I tried to the best of my ability to plead with the police officer and ask him for help. I had mentioned on the video many times that I have a breathing problem, I don't feel well, I have anxiety, and can he take my mask off or lower my nose, or perhaps loosen up my handcuffs, maybe bring me to the front. 06:05:21PM

Why did he take my handcuffs to the back? Why couldn't he put it to the front so that I could at least release my nose. Why didn't he take my note from my pocket when I offered it? Why is that entire discussion missing from inside the CVS to the car? Why is there no audio of me telling him all this when we're walking inside the -- where is that? Why is there no discussion, why we can't hear that. 06:05:34PM 06:05:50PM

MR. KANG: Move to strike everything after "I don't recall" as nonresponsive.

///

BY MR. KANG:

Q. And you never say the word "handcuffs" during that video; correct?

A. I don't recall if I used the word "handcuffs" or not, but I had used the word "handcuffs" throughout 06:06:08PM the period of time because my hands were hurting and I was pleading and telling him to loosen up my handcuffs.

MR. KANG: Move to strike everything after "I don't recall" as nonresponsive.

MS. MKRTCHYAN: And I object. There was 06:06:22PM nothing -- it was responsive.

Can we have the time for this -- you know, I'd like to know how long we've been on time because it keeps getting extended and extended.

MR. KANG: There's a reason for that, Narine. 06:06:31PM

MS. MKRTCHYAN: Oh, yeah, okay. So let's get the -- let's get the time, please. Because your -- your co-counsel yesterday was very anal about the time yesterday. So I -- you know, I have the right to be anal about the time too. My client is suffering here. 06:06:48PM

THE VIDEOGRAPHER: So I have six hours and 16 minutes.

MS. MKRTCHYAN: Okay. Thank you.

BY MR. KANG:

Q. You never used the word "anxious" in that 06:07:01PM

video either; correct?

A. I did use the word anxious.

I have a question to right before this one. You're not asking me yes-or-no questions. You're asking me -- 06:07:11PM

Q. Correct.

A. -- questions and I'm elaborating, but then you're not taking the entire sentence. You're only taking what you want to hear. So I don't -- unless it's a yes-or-no question, then I can elaborate. So when I 06:07:21PM am elaborating, you're telling me I'm not allowed to elaborate and you're erasing the rest of the sentence and you're taking only what you want to hear. So it's --

Q. Okay. I'll respond to that. 06:07:33PM

So when I ask a question about -- so, for example, my previous question was, in that video, you never used the word "anxious"; correct? It's a yes-or-no question. Is it correct or is it not correct. You can either say yes, it's correct or it's not 06:07:45PM correct. I'm not asking an open-ended question or asking for an explanation. I'm asking is it correct or not, the previous statement that I just made. And if you disagree with the statement, then no, it's not correct. Or if you do agree with the statement, then 06:07:58PM

yes, it is correct. So that's all I want to say, it is a yes-or-no question.

MS. MKRTCHYAN: Objection; argumentative. And there are some situations when there can be no yes-or-no answer, and the witness has asked for clarification and 06:08:07PM that was incomprehensible clarification to her.

MR. KANG: Okay. Another speaking objection, Narine. I would really appreciate it if you would not do that, please.

BY MR. KANG: 06:08:21PM

Q. And then at some point during the video, you calm down; correct? Do you remember that?

A. At some point, for a few seconds, I probably calmed down, not for the entire video.

Q. Well, let me ask you this: So going back to 06:08:37PM the racist comment that you said was -- well, actually, you didn't say it was racist.

You said there was a point in time at 2:25 of the video where he says, "Are the only words you know sir and please?" 06:08:51PM

Do you remember that?

A. That was the beginning of him starting to belittle me. Yes, I have said it's a racist comment, many times.

Q. Okay. How is that -- why is that racist to 06:09:02PM

you?

A. We haven't gotten to the racist part. I said that was the beginning of him starting to belittle me.

Q. Okay. What -- where in the video at that point is the racist part? 06:09:09PM

A. If you can play it, I can tell you.

Q. Okay. Is it immediately after that portion or a little bit more after that?

A. I can't recall the exact time, but at some point he asked me what is my name, how do I spell it, 06:09:20PM what kind of a name is that, where am I from. And if -- do I know how to speak English. After I've had a prolonged discussion with him in English, why would he ask me that? Why would he say what kind of a name is that? Why would he ask me if I know how to speak 06:09:41PM English? What is -- where is he getting to? What is his motive? What is his intention? Is that how a professional police officer talks to someone?

Q. I'm going to show you --

A. I feel like a dog. 06:09:53PM

Q. I'm going to show you a video. Hopefully you can hear it this time.

MS. MKRTCHYAN: Well, you didn't -- you didn't let her finish the answer, Counsel.

MR. KANG: She's not answering the question. 06:10:04PM

She's asking me questions. I'm not here to be deposed, Narine. She's not here to ask me questions. I'm here to ask her questions. That's what the purpose of --

MS. MKRTCHYAN: She was answering the question. She wasn't asking you questions. She was 06:10:11PM answering the question in a rhetorical manner and you interrupted her. In any event, move on.

MR. KANG: And I'll move to strike the witness's last response as nonresponsive.

BY MR. KANG: 06:10:24PM

Q. Okay. I'm going to play this video, and this is the portion of the video -- and I'm going to represent that it begins at approximately 6:25 of the video, or 6 -- yeah, 6:25 of the video. And this is the portion in time where Officer Ross asks you how to spell 06:10:35PM your last name.

And I want you to be able to identify for me exactly the point where one -- well, just identify for me any racist comment that he makes to you during that interaction. 06:10:54PM

Can you see my screen?

A. No.

MR. FEARS: Not yet.

MR. KANG: Can you see my screen?

MR. FEARS: Not yet. 06:11:27PM

THE WITNESS: No.

THE VIDEOGRAPHER: I don't think any of the settings changed.

MR. KANG: Yeah, I'm trying to -- I'm clicking share screen and then it's giving me this weird message, 06:12:00PM select a window or an application that you want to share -- oh, sorry. I see it. Okay.

(A discussion was held off the record.)

BY MR. KANG:

Q. Can you see my screen now? 06:12:49PM

A. Yeah, I can see it.

Q. Okay. So I'm going to fast forward the video to 6:25 --

A. Can you start it from where you left off before we took the break? 06:13:00PM

Q. No, I'm starting from 6:25, which is when he asked you how to spell your last name.

(Video playing.)

THE WITNESS: You see, awwww, awwww. Why is he talking to me like this? What am I, a dog? 06:13:15PM

And by the way, when I'm asking questions, I'm not asking you questions. I'm saying it rhetorically.

MS. MKRTCHYAN: And it's not very -- I can't hear very well.

Can you hear very well? 06:13:29PM

THE WITNESS: (Shakes head.)

MS. MKRTCHYAN: Yeah, it's hard to hear your tape. I don't know what's going on with your tape.

(Video playing.)

THE WITNESS: I can't hear what I'm saying, it's not clear. 06:13:42PM

(Video playing.)

THE WITNESS: He's saying, "I don't believe you." Who is he to not believe me?

BY MR. KANG: 06:13:58PM

Q. Okay. Where does he say -- where does he say -- where does he say -- ask you, do you speak English?

A. If you let --

Q. Before this or after this? 06:14:02PM

A. I can't hear anything that I'm saying or he's saying. It's cutting off.

Q. Well, you just heard that, didn't you?

A. I heard that, but that's it.

MS. MKRTCHYAN: Well, Counsel, you know what, first of all, again, I cannot hear myself. Your tape is just not audible very well and, you know, I tried to play on my end, but you gave me attitude. I'm not going to play it. So, you know, my client cannot hear it. 06:14:10PM

THE WITNESS: And I'm not selectively hearing 06:14:28PM

what I want to hear. I am hearing when it's clear. When it's clear, I'm hearing something. When it's not clear, I can't hear it.

(Video playing.)

MS. MKRTCHYAN: Yeah, this is all cutting out -- 06:14:39PM

THE WITNESS: I'm hearing words, but I can't hear what I'm saying.

MS. MKRTCHYAN: Anyway, you know, this is clearly not audible on our end. So I would object to any other questions right now. 06:14:46PM

BY MR. KANG:

Q. Okay. Let me ask you if you hear this.

(Video playing.)

THE WITNESS: It's sounding like I'm under water. 06:14:57PM

MS. MKRTCHYAN: Yeah, we can't hear anything on our end.

BY MR. KANG:

Q. Do you hear that portion where you said "I have my receipt in my hand"? 06:15:03PM

A. I can't hear anything. It's not clear.

Q. Do you recall saying "I have my receipt in my hand" during your time in the back of the patrol vehicle? 06:15:14PM

A. Yes, I also mentioned that I have a receipt.
Q. Was that the receipt in your hand, that was in your hand when Officer Ross came upon you and arrested you?
A. No. What I had in my hand was the disability papers. 06:15:27PM
MR. KANG: And, again, Narine, are you going to be producing that disability letter?
MS. MKRTCHYAN: You know what, I -- you know, I already told you everything has been produced to you; okay. You go -- 06:15:36PM
MR. FEARS: It has not been -- it has not been produced and --
MS. MKRTCHYAN: Well, then, go ahead and make an issue of that. You know, everything has been produced. You have records. She said that her disability was provided Dr. Flores, Dr. Tribble. You have subpoenaed. You have access of those records, aside from supplemental disclosures. 06:15:45PM
I have also given you Bates stamp pages of anything that was given to us by doctor, P24 through P27 through 51. Go and find it. It's your job to find it. I'm not sitting here to be your babysitter. 06:15:59PM
And plus, on top of that, like I said, you have issued subpoenas. You have gotten entirety of the 06:16:18PM

Dr. Flores's records. If you are having difficulties in finding, it's on your end. So there has been no refusal by the plaintiff to produce anything. I will be happy, more than happy to go back and search all the supplemental disclosures, all records by us, to make 06:16:38PM sure that everything has been produced.

Unlike you, I'm not sandbagging anyone. That's the evidence that has been produced to you. Plus you have received multiple -- you have issued subpoenas to Dr. Flores. You have every single record in your 06:16:53PM disposal. So, you know, do not turn tables against us. Everything has been produced to you, unlike your behavior today when you suddenly have attempted to ask questions of us of stuff that you never produced in discovery, which is sanctionable conduct. And I'm going 06:17:13PM to make sure, I will bring that, you know, up later on.

So at this point we're not going to discuss this, you know, unless -- you know, this is not the appropriate time at the deposition of my client to discuss discovery issues. If you have any further 06:17:30PM questions of my client, you can -- you know, you can ask, but we are not going to -- you know, she's not able to answer questions about what her attorney produced and what she didn't produce.

So unless you have more questions of my 06:17:41PM

client, we're going to stop this because this is 6:17 p.m. already. And we're getting -- my client is getting tired. I'm getting tired. This is unfair to us.

MR. KANG: We can stop this deposition and resume at another date -- 06:17:53PM

MS. MKRTCHYAN: No.

MR. KANG: -- on a date mutual to all the parties.

MS. MKRTCHYAN: Oh, really? 06:17:59PM

MR. KANG: Yes.

MS. MKRTCHYAN: Oh, really?

MR. KANG: Or we're going to keep going and, you know, eventually --

MS. MKRTCHYAN: Really? 06:18:01PM

MR. KANG: -- we are going to be asking for an additional session. I mean, that is the truth.

MS. MKRTCHYAN: Well, okay, seriously, you can, you know, go try and do that. At this point you've had how many hours, and you, you know -- finish it up. 06:18:10PM How many hours you've had and how many more do you want? Of course we're going object. So go ahead, finish up this deposition, the seven hours that you've got and you'll move on.

MR. KANG: Okay. 06:18:22PM

MR. FEARS: Christina, please -- please mark the record here, once again, counsel engaging in inappropriate colloquy, speaking objections and wasting time.

MS. MKRTCHYAN: Oh, you asked me a question and I answered. You know, 6:18 p.m., I need to have dinner myself. You asked me a question, are you going to produce something because if you haven't produced, and I answered it. So do not ask me questions that you don't want me to answer. You're meeting and conferring on discovery, Counsel. 06:18:30PM 06:18:44PM

MR. FEARS: I'm not. No, I'm objecting to your --

MS. MKRTCHYAN: You're not.

MR. FEARS: -- I'm objecting to your conduct, to your unprofessional conduct, Counsel. 06:18:49PM

MS. MKRTCHYAN: Oh, really?

MR. FEARS: And I'm going to ask that Christina mark the record again because you've shouted out as well. You've sworn. You've said, gee damn it, in the deposition. You've made accusations inappropriate. You promised that you would give Bates stamp during the lunch of the Dr. Flores disability letter and you have not done that. Yes, you've said five times that -- 06:18:59PM 06:19:16PM

MS. MKRTCHYAN: I have not --
(Speaking simultaneously.)
(Whereupon the court reporter gives an admonishment not to speak over each other.) 06:19:22PM
MR. FEARS: You've said five times -- at least fives that we've subpoenaed records. Yes, we have, and the document is not in there. Both Mr. Kang and I have -- have searched our records for a Dr. Flores disability letter that existed as of January 19th, 2021 06:19:36PM and January 13th of 2021. It hasn't been produced by you. Yet your client said on the record today that she has copies of it.
So if she has copies of it, she has to turn them over to you and -- and they should have been 06:19:48PM produced. They haven't been produced. You keep representing they have. Please give us the Bates stamp number like you promised over the lunch hour. But I object to your conduct, Counsel.
THE REPORTER: If we can take a break when we 06:20:14PM can, please?
MS. MKRTCHYAN: And I need to know how long we've been already on the record because, you know, I --
THE VIDEOGRAPHER: Okay. We're going off the record and the time is 6:20 p.m. 06:20:23PM

(Recess.)

THE VIDEOGRAPHER: Okay. We're back on the record, and the time is 6:28 p.m.

MR. KANG: So at this point, I'm going to be suspending the deposition, and I'm going to be asking 06:28:57PM the magistrate to schedule another session along with orders in terms of how this deposition is to be conducted going forward. I believe that I have been unable to adequately ask my questions because of Ms. Mkrtchyan's long speaking objections, which have 06:29:13PM occurred repeatedly throughout this deposition.

I am also not being told that when I'm ask -- I'm asking a question that the deponent gets to just answer whatever question she wishes, which is not how a deposition works. And so I do not feel that proceeding 06:29:34PM for another half-hour is going to be beneficial or is going to be productive. I'm not going to be able to ask the questions I want without being interrupted, and it's just going to further stress out the witness, which is not something that I want to do. And it is going to 06:29:50PM waste everybody's time here, whose time is valuable and I don't want to waste it.

So I'm suspending this deposition and I will be asking for relief from the court in the form of scheduling another deposition as well as providing 06:30:04PM

guidance as to how this deposition should be conducted going forward.

MS. MKRTCHYAN: Well, and I will object to that. I will make my record that this is 6:30 p.m. My client has been present, cooperative on Zoom, despite 06:30:14PM her anxiety, medical disability and mental disability, since 10:00 a.m. this morning. We had counsel for CVS spending the majority of his time for the entirety of the morning going over the unrelated background history of my client. 06:30:37PM

Until 1:00 p.m., he started talking about the incident, going into therapy notes that had -- prior to the incident that have nothing to do with the incident in this case. Then he was asking me to meet and confer with him regarding some discovery issues that he was not 06:30:52PM happy about, taking the time with that, which is not the time for depositions.

He also expressly violated Rules of Civil Procedure 26 by introducing records at this deposition that have not been produced to us. I objected to that 06:31:09PM on that basis. I've been -- the City's defendants did not start their questioning, but have exhausted their questioning about the incident. The City defendant asked questions of my client about video, but was unhappy with my client's answers. 06:31:27PM

We have 30 minutes left. Whether you're suspending or not, it's your prerogative, but I am -- I am entitled to ask questions of my client and I'm going to do that as of right now. I want to ask some follow-up questions of my client since you did not do that on your end. So not -- 06:31:42PM

MR. FEARS: Wait a minute. Before you do, let me make a record as well.

MS. MKRTCHYAN: But I didn't finish. I didn't finish, you know. Can I -- 06:31:55PM

MR. FEARS: I thought you said you were going to ask questions. So as soon as you get to the point before you're going to ask questions, I don't have any problem, Counsel, go ahead and make your record, but just stop at the point that you are going to or claim you're going to ask questions. 06:32:10PM

MS. MKRTCHYAN: Well, what I said is that it is highly inappropriate, we are not going to produce my client because she -- you've exhausted all the relevant questions about this incident. You had the opportunity to ask all the relevant questions and you have not. 06:32:22PM

As to any discovery issues, this was not the right time or place or moment to discuss them or meet and confer. It was your prerogative to ask me to meet and confer, therefore, it's -- you cannot complain about 06:32:37PM

that.

You know, so -- and I'm entitled to make objections. You've asked me to meet and confer on a variety of issues, and I had to make a record. So at this point I'm going to follow up, I have just a couple 06:32:51PM of follow-up questions of my client. And, you know, since you're suspending -- you don't want to continue, but we are going to object coming back, so -- because you've had plenty of opportunity in this entirety of all day, 6:33 p.m. now to ask questions. 06:33:05PM

MR. FEARS: Are you finished, Counsel?

MS. MKRTCHYAN: Yes.

MR. FEARS: I don't want to interrupt.

MS. MKRTCHYAN: Yes.

MR. FEARS: Okay. I join in Mr. Kang's 06:33:18PM objections to counsel's behavior and suspending the deposition at this time, which he absolutely has a right to do, and which means the deposition is over for the day. Counsel cannot ethically go forward with the deposition once it has been suspended by one side. 06:33:38PM

I object to the conduct ranging from multiple, multiple speaking objections and coaching objections, repeating over and over the same objections, making inappropriate objections to counsel about questions being either ridiculous and using inappropriate 06:34:06PM

language, swearing on the record.

I object to counsel instructing the witness not to respond to certain questions, including questions regarding foundation and/or authenticity of information that is on the Internet to determine whether or not it 06:34:31PM was Facebook pages from the plaintiff. I object to the instructions -- other instructions not to answer.

I also further object the -- on the grounds that the coaching objections have led to the witness being emboldened and not responding to the questions and 06:34:52PM instead using the deposition as a platform to just say whatever she wants rather than addressing the questions.

I object to some of the histrionics where the witness has said that she has listened several times to a videotape at least five times, as recently as this 06:35:14PM morning, but then counsel suggesting unilaterally and objecting to going on with the -- the videotape testimony -- I'm sorry, the videotape playing, saying her client can't answer those questions when it is potential evidence and she would have to answer 06:35:34PM questions regarding that if she were on the stand.

This has been a travesty of a deposition from the start based upon counsel's inappropriate behavior that violates any number of rules. And so I join in counsel and -- and state that the deposition needs to be 06:35:52PM

brought to the attention of the magistrate so that ground rules can be given and we can be very clear and the deposition can be resumed and concluded in due course.

THE VIDEOGRAPHER: All right. Madam Reporter, 06:36:09PM do you need anything else on the record?

THE REPORTER: Mr. Kang, did you want to order a copy of the transcript?

MR. KANG: Yes, I do.

MS. MKRTCHYAN: Well, I didn't finish. I was 06:36:22PM going to ask questions of my client.

MR. FEARS: This deposition has been suspended.

MS. MKRTCHYAN: Well, you know, I am objecting to that. So you are not allowing plaintiff's counsel to 06:36:28PM ask question, that's inappropriate. So with that, you know, that's fine, we'll make that on the record.

MR. KANG: I will say that when this deposition is resumed, we will give you every opportunity to do that, so. 06:36:40PM

MS. MKRTCHYAN: Oh, really? And that is not going to be resumed. I will make sure it will not be resumed. Thank you.

THE VIDEOGRAPHER: All right. Can I also get video -- 06:36:49PM

MR. FEARS: Counsel, and with all do respect, I'm not sure that's your decision.

MS. MKRTCHYAN: Thank you, Professor Fears.

MR. FEARS: There is it again. I forgot to add to the condescending, inappropriate comments to 06:37:01PM counsel. And I don't appreciate that, Counsel. And also accusation -- because we've had our differences and accusation of counsel of sexism, which was totally inappropriate.

MR. KANG: I agree. 06:37:17PM

MS. MKRTCHYAN: Well, that's what you should search your soul and find out why I made such a comment, so --

MR. FEARS: I'm also told -- I wasn't part of the communication, but it's -- counsel has also made 06:37:26PM comments suggesting other counsel involved in this case are racist, which if true -- again, I didn't personally witness, I've been told about it, but if true, once again, it's part of a pattern of conduct by counsel, completely inappropriate. And if so, it will be brought 06:37:44PM to the attention of the magistrate as part of this record.

THE VIDEOGRAPHER: Any video orders on the record, please?

MR. FEARS: Yes. CVS orders a copy of the 06:37:56PM

transcript as well as the video, please.

THE VIDEOGRAPHER: And would you like it synced?

MR. FEARS: Please.

THE VIDEOGRAPHER: Okay. 06:38:03PM

MR. KANG: Glendale as well.

THE VIDEOGRAPHER: Okay. Thank you very much.

This concludes today's deposition on October 11th, 2023 at 6:38 p.m. of Ms. Anoush Burmayan. We are going off the record. 06:38:17PM

(Whereupon the deposition was adjourned at 6:38 p.m.)

STATE OF CALIFORNIA )
) ss.
COUNTY OF LOS ANGELES )

I, ANOUSH BURMAYAN, having appeared for my deposition on Wednesday, October 11, 2023, do this date declare under penalty of perjury that I have read the foregoing deposition, I have made any corrections, additions or deletions that I was desirous of making in order to render the within transcript true and correct.

IN WITNESS WHEREOF, I have hereunto subscribed my name this _____ day of___________, 2023.

_________________________________
ANOUSH BURMAYAN

REPORTER'S CERTIFICATE

I, CHRISTINA M. LOPEZ, CSR No. 13048, Certified Shorthand Reporter, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the actions.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

Dated this 11th day of October, 2023.

CHRISTINA M. LOPEZ, CSR. No. 13048

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ANOUSH BURMAYAN, Plaintiff,

vs.

CVS PHARMACY, INC., a corporation doing business in California, GUY GARCIA, an individual, JOE JOHNSON, an individual; CITY OF GLENDALE, Officer JAMES ROSS #22471, in individually and as a peace officer, Officer GRIFFIN ARMENDARIZ #27999, individually and as a peace officer, and DOES 1-10, Defendants.

No. SL23-CV-01788 FMO-AGR

REMOTE VIDEO DEPOSITION

OF ANOUSH BURMAYAN

VOLUME 2

DATE: Monday, February 19, 2024

TIME: 10:05 a.m. - 12:41 p.m.

LOCATION: Via Web Video Conference

APPEARANCES

For the Plaintiff:

Mkrtchyan Law
P.O. Box 2288
Toluca Lake, CA 91610
818-388-7022
narine57@gmail.com
BY: Narine Mkrtchyan, Esq.

For Defendant Garfield Beach CVS:

Payne & Fears, LLP
4 Park Plaza, Suite 1100
Irvine, CA 92614
949-851-1100
dff@paynefears.com
llj@paynefears.com
BY: Daniel Fears, Esq.
BY: Leilani Jones, Esq.

For Defendants City of Glendale, James Ross, and Griffin Armendariz:

Office of the City Attorney
613 E. Broadway, Room 220
Glendale, CA 91206
818-548-2080
carias@glendaleca.gov
BY: Carl Arias, Esq.

Also present:

Honorable Alica Rosenberg
Philip Knowles, Videographer

---oOo---

INDEX OF EXAMINATIONS


| | PAGE |
|---|---|
| ANOUSH BURMAYAN | |
| Examination by Mr. Fears | 338 |


---oOo---

INDEX OF EXHIBITS


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 7 | Facebook Posts | 343 |


---oOo---

REMOTE VIDEO-RECORDED DEPOSITION OF ANOUSH BURMAYAN, taken on behalf of the Defendant, commencing at 10:05 a.m. and terminating at 12:41 p.m., on Monday, February 19, 2024, reported by JAMIE DAVIS, CSR No. 14209, a Certified Shorthand Reporter in and for the State of California.

---oOo---

THE VIDEOGRAPHER: Good morning, Counsel. Here begins the Volume 2 deposition of Anoush Burmayan in the matter of Burmayan versus CVS Pharmacy, Inc. And this is before the US District Court for the Central District of California. The case number is 2:23-CV-01788-FMO-AGR. Today is Monday, February 19, 2024, and the time is now approximately 10:06 a.m.

This deposition is taking place remotely via Zoom and was made at the request of counsel for defendants. The videographer host is Philip Knowles representing Magna Legal Services, and the court reporter is Jamie Davis also with Magna Legal.

Will counsel and all parties present state their appearances and whom they represent?

MR. FEARS: Good morning.

THE COURT: This is -- sorry.

MR. FEARS: Go ahead. Please go ahead.

THE COURT: This is Judge Rosenberg. I just wanted to remind everyone that the court is closed today, so there will not be an independent recording of today's proceedings.

Thank you.

MR. FEARS: Thank you, Your Honor.

Counsel, do you want to go first?

MS. MKRTCHYAN: Sure. Narine Mkrtchyan on behalf of plaintiff, Anoush Burmayan. Thank you.

MR. FEARS: Daniel Fears of Payne & Fears on behalf of CVS.

MR. ARIAS: Carl Arias on behalf of the defendants, City of Glendale and the police officers.

MR. FEARS: And is this Dan Fears again. I will mention that Leilani Jones is also on the Zoom line, but she will just be observing or listening in.

THE VIDEOGRAPHER: Did we lose our deponent? Okay. Never mind.

At this time, I will ask the court reporter to swear in the deponent and we will get started.

ANOUSH BURMAYAN,

having been duly sworn, was examined

and testified as follows:

THE WITNESS: I do.
THE COURT REPORTER: Thank you.
EXAMINATION
BY MR. FEARS:
Q. Good morning, Ms. Burmayan.
A. Good morning.
Q. As you may recall, I am Dan Fears. I represent CVS, and we are here for day two of your deposition, a deposition that began on October 11 of 2023.
Do you understand that this is a resumption of your deposition?
A. Yes.
Q. Okay. Do you remember at the outset of that deposition I mentioned various ground rules or admonitions regarding how we would proceed during the day?
A. Yes.
Q. And do you understand that those ground rules are generally still in effect for this session of your deposition?
A. Yes.
Q. Okay. You understand your testimony today, like last time, is under oath and penalty of perjury?

A. Yes.
Q. Is there any reason, Ms. Burmayan, that you believe you cannot give honest, accurate, and complete testimony in response to the questions that I ask today?
A. No reason.
Q. If for some reason that changes, if you are not feeling well or something occurs, please let me know or let your counsel know and we will discuss the matter; but otherwise, if we hear nothing regarding that subject, we will assume that you are perfectly capable of going forward this morning and giving honest, accurate, and complete testimony in response to the questions that are asked. Okay?
A. Correct.
Q. Okay. Just preliminarily, I wanted to find out -- since this is a Zoom deposition, just want to find out whether or not you are -- first of all, where are you?
A. I am in my house.
Q. Okay. And are you alone in your house?
A. Yes, I am.
Q. And do you have any other devices -- do you have any other devices, phones, computers, or anything else open other than the device for which

we are connected via this Zoom conference?
A. No, I do not.
Q. Okay. If that changes, please let us know. Is that agreeable?
A. Yes, I will.
Q. And do you have any documents with you, papers, documents, or anything, computer screen open that has any information on it?
A. No, I do not.
Q. Okay. If that changes, please let us know as well. Is that agreeable, Ms. Burmayan?
A. Yes, it is.
Q. Okay. And --
THE COURT: Sorry. This is -- if I could, Mr. Fears, just interrupt for one moment. This is Judge Rosenberg. I just wanted to make a couple of comments because I am listening in on the proceedings today, and I was not here before.
So I just want to remind counsel to state any objections in the deposition as concisely as possible. The objections are stated on the record, but the examination proceeds forward. In other words, anything Ms. Burmayan says in terms of giving an answer is stated subject to that objection.
I will not be here ruling on those

objections. Those objections will be addressed to the trial judge who will decide the admissibility. However, I will address any, what I hope does not occur, but if they do, instructions not to answer. And I have already gone over with counsel by order and orally about the basic rules about instructions not to answer. So I will be addressing those if they occur. But otherwise, nothing changes in terms of stating an objection on the record concisely, no speaking objections, and then the witness's answer subject to the objection.

That is all I need to add here.

MR. FEARS: Thank you very much.

THE COURT: Thank you.

MR. FEARS: Thank you.

BY MR. FEARS:

Q. Finally, Ms. Burmayan, since we have had a period of time since the last session of your deposition, just want to know if you have reviewed any additional documents between the last session of your deposition and this session of your deposition.

Have you reviewed any documents to prepare for the deposition or to otherwise refresh your recollection regarding this deposition?

A. Yes, I have.

Q. And can you share with me what documents you have reviewed to prepare for this deposition?
A. I did get a copy of the transcript, so I took a look at that from the first deposition and then also Facebook posts.
Q. Okay. Anything else other than the transcript and Facebook posts?
A. Not that I recall at the moment.
Q. Okay. If you do recall something later, please feel free to share or I will ask you to share or otherwise I will assume your best estimate was that it was just the transcript and the Facebook posts. Okay?
A. Yes.
Q. Okay. On the subject of Facebook posts, you will recall -- I think you will recall, especially if you reviewed the transcript, that we -- or I asked or tried to ask a little bit about social media.
You do use social media, correct?
A. Yes.
Q. And do you post on Instagram?
A. No.
Q. How about do you have a LinkedIn page?
A. I do have a LinkedIn page. I don't believe

I am active on it.
Q. Okay. In terms of social media, other than your inactive status on LinkedIn, do you post on Facebook?
A. I have posted on Facebook, yes, correct.
Q. Okay. And are you still active on Facebook?
A. Not at the moment as much as I was before.
Q. Okay. And when did that change?
A. Let's see here. I don't know if I can give you an exact date, but maybe a year I have not been as active as I used to be.
Q. Okay. Let me show you some documents, perhaps you have reviewed them, that appear to be Facebook pages. And I will share these on the screen. And let me know if you can see these.
This is Exhibit 7, which was already marked at the last deposition. That will be Exhibit 7 for this session of your deposition.
Do you see on your screen a document that says Facebook 4 and then it appears to have a message and then it is followed by some metadata?
(Exhibit 7 marked.)
A. Yes, I do see it.
Q. Okay. On the far right there is a name.

It says Anoush Phoenix.
Do you see that?
A. Yes, I do.
Q. Is that a -- the Facebook username that you would utilize when you would post on Facebook?
A. Yes.
Q. Okay. Did you use any other names on Facebook?
A. I don't remember if maybe 10, 15 years ago I started with a different name. But this is the name that I pretty much used, is this one that we see here on the screen.
Q. Okay. So for the last few years, at least, last two or three years, if you would have posted, you would have used the Anoush Phoenix name?
A. Yes.
Q. Okay. And you said you have reviewed Facebook posts in preparation for this deposition.
Did you look at your Facebook posts that you had under the name Anoush Phoenix?
A. Yes.
Q. Okay. And did you look at those posts actually online on your Facebook account, or did you look at copies that have been produced in this case?
A. I looked at this e-mail link that my

attorney provided me, so it was basically via the e-mail.

Q. Okay. So it would have been e-mails, electronic version but via e-mail, right?

A. Yes.

Q. All right. So this first page that we have on the screen here, Ms. Burmayan, this is a copy of a post that you placed on Facebook?

A. Yes.

Q. All right. And do you understand the subject matter of this?

MS. MKRTCHYAN: That is a vague and ambiguous. Objection.

You can answer any time there is an objection.

THE WITNESS: Can you explain what you mean by do I understand the -- what was it you said again?

BY MR. FEARS:

Q. Yes. So if I could refer your attention to this first page, which is labeled Facebook 4.

A. Uh-huh.

Q. And there is a four-paragraph message there under the informedmama_209. Feel free to read it if you don't already have a good recollection of it,

but feel free to take whatever time you would like to read it and then let me know when you are ready.

A. I am ready.

Q. Okay. This message that you posted, do you understand or have any understanding as to what this message is about?

A. Well, it is a post from another page that I reposted on my Facebook, so I am aware that I posted it. When you are saying do I understand what it is about, can you explain what that means? Do I understand what that is about?

Q. Sure. Does this subject matter that is on Facebook 4, Exhibit 7, relate in any way to COVID?

A. Yes.

Q. Okay. Does it relate to max -- I'm sorry, mask mandates?

A. I need a moment to read that again.

Q. Okay.

A. It relates to the entire pandemic and the COVID period, yes.

Q. Okay. And is it fair to say that you posted various Facebook posts regarding your views about the pandemic?

A. Yes.

Q. And you posted various Facebook posts about

your views on vaccine mandates?
A. Yes.
Q. And you posted on Facebook your views about mask mandates?
A. Yes.
Q. And fair to say that you posted your views regarding the federal and state government's mandates in general relating to the COVID pandemic?
MS. MKRTCHYAN: Calls for -- objection. Vague and ambiguous as to state and federal. Calls for a legal conclusion.
THE WITNESS: I posted at the time posts that either I wrote myself or reposted regarding things that were concerning me during that period of time regarding the COVID vaccine, the lockdowns, and the mask mandates, which were impacting students and family and friends of mine.
BY MR. FEARS:
Q. Okay. And it is fair to say that you were against the mandated lockdowns during --
MS. MKRTCHYAN: Objection.
MR. FEARS: -- during the pandemic; is that correct?
MS. MKRTCHYAN: Objection. Argumentative. Vague and ambiguous as to term "against."

THE WITNESS: No, that is not fair to say and that is not correct.

BY MR. FEARS:

Q. Okay. Were you in favor of lockdowns during the pandemic?

A. Was I in favor of lockdowns during the pandemic?

Q. Yes.

A. I was concerned at the time for those people that needed to be locked down, that were ill and sick and maybe perhaps passing the virus to one another. But I was also thinking about supporting those people who are healthy and could leave their homes. So if there was a period of time that we needed to be locked down, yes, I was in favor for it.

Q. Did you ever place any posts on Facebook or any other social media indicating that you were in favor in part of lockdowns?

A. Yes.

Q. Okay. And do you remember what, if anything, you said about your being in favor of lockdowns?

A. In the beginning of the pandemic around 2020 when we were locked down because there was a

virus going on and people were scared and they were not feeling well, they were unhealthy, I was very much in favor of the lockdown during that period. So there was a period in the beginning where I was in favor of people staying home and taking care of themselves and protecting themselves against the virus.

Q. My question was a little different, Ms. Burmayan. My question was, do you remember whether or not on Facebook or any other social media you posted messages stating that you were in favor of lockdowns?

MS. MKRTCHYAN: Objection.

THE WITNESS: Yes.

MS. MKRTCHYAN: Asked and answered.

BY MR. FEARS:

Q. Okay.

A. Yes, I remember.

Q. Do you remember where on social media you made such posts?

A. Facebook.

Q. And do you remember the time frame on social media, Facebook, that you made such posts?

A. Yes.

Q. And what was the approximate time period?

And you can give me a range of the time period, if that helps.

A. March, April, May 2020.

Q. Okay. And do you remember what you specifically said in March, April, May of 2020 regarding being in favor of lockdown?

MS. MKRTCHYAN: Objection. Vague and ambiguous.

THE WITNESS: Sorry. Just a moment.

Okay. I'm back. Can you repeat the question?

BY MR. FEARS:

Q. Sure. Do you remember what you said in these Facebook posts in March, April, and May of 2020 regarding being in favor of lockdown?

A. Yes. I was afraid of the virus at that time, and I was in agreement with everyone to stay home until we can figure out what is going on.

Q. And you said that online, right?

A. Yes.

Q. And do you still have copies of those posts?

A. Yes.

Q. Are they still on your public Facebook page?

A. They are on my Facebook page. The setting could -- at times was on private and sometimes was on public.

Q. Okay. So as you sit here right now, you don't know whether those posts that you are referring to are on your public Facebook page, correct?

A. I cannot recall because I have thousands of posts, and I can't recall if -- which posts were on public and which was on private because sometimes the setting was switching as well unbeknownst to me.

Q. Okay. Fair enough. So although you don't remember specifically whether it was public or private, your testimony is that you still have access to those March, April, May of 2020 posts in which you have stated either publicly or privately that you are in favor of lockdowns; is that correct?

A. Yes.

Q. All right. So if we asked you to produce copies of those pages, you and/or your counsel would be able to produce those pages, correct?

A. Yes.

Q. All right. Then after -- it sounds like after May of 2020 you did not have any posts, at least public posts, favoring the lockdown --

MS. MKRTCHYAN: Misstates.

MR. FEARS: -- is that correct?

MS. MKRTCHYAN: Misstates -- objection. Misstates the testimony.

THE WITNESS: I cannot recall exactly what I put after April or May. There was a variety of posts that I was putting some in favor and some not in favor.

BY MR. FEARS:

Q. Okay. At some point, Ms. Burmayan, did you generally turn against lockdowns in the posts that you placed on your public page of Facebook?

MS. MKRTCHYAN: Argumentative. Objection. Vague and ambiguous as to term "against."

THE WITNESS: I would say the word to describe what happened is after my arrest I became more upset and angry because of the trauma that was caused by the police department, so there were posts that were more against what happened to me with my arrest after the arrest of January 2021.

BY MR. FEARS:

Q. Okay. Do you remember any specific posts public or private that you posted on Facebook between May of 2020 -- so in other words, after May of 2020 up to January of 2021 in which you

articulated that you were in favor of lockdowns during the pandemic?

A. Sorry. I need a moment, because I have to get some water. I am getting a little bit overwhelmed.

Q. Okay. Fair enough.

A. Okay. Can you repeat the question?

Q. I sure can. Can you recall any public or private Facebook posts after May of 2020 in which you stated that you were in favor of lockdowns during the COVID pandemic?

A. So if I understand your question correctly, although I said in March, April, May around that time, I was posting posts in favor -- so if I understand your question correctly, you are saying after the time period that I said, do I recall if I was posting posts in favor of the lockdown?

Q. Essentially. I used your time frame in which you said you have recollection of posts in March, April, and May, which we will request. But now I am asking about after May of 2020.

Do you have any specific recollection of Facebook posts in which you articulated your view that you were in favor of lockdowns during the COVID pandemic?

A. So you are asking if after March, April, or May, if I still have some posts that I am in favor of the lockdowns?

Q. I was asking after May of 2020.

A. Right. After May even though I said March, April, or May I was in favor, and then you are asking after May if I have posts that I am in favor of the lockdown.

Q. Yes, I am asking about after May 2020.

A. I don't recall. Right now I cannot recall what I posted after May.

Q. Okay. With respect to your Facebook posts, have you ever posted on Facebook any message in which you stated you were in favor of vaccines? And I am referring to COVID vaccines, of course.

MS. MKRTCHYAN: Objection. Vague and ambiguous as to in favor of vaccines.

THE WITNESS: Can you clarify the question? Are you asking me if I have posts where I am supporting or promoting or encouraging the vaccine, or what do you mean by in favor?

BY MR. FEARS:

Q. You can use those terms, advocating as well. Any such messages that you put on Facebook?

A. Encouraging the vaccine, I do not recall.

Q. Okay. Have you ever posted on Facebook any messages in which you encouraged, favored, or advocated use of masks during the COVID pandemic?
A. I do not recall.
Q. Do you recall that on Facebook on several occasions you criticized the mask mandate?
A. Yes.
Q. And do you recall on Facebook on several occasions you criticized lockdowns?
MS. MKRTCHYAN: Vague as to time. Objection.
THE WITNESS: Can you repeat that question, and maybe some more clarity because I --
BY MR. FEARS:
Q. Do you recall whether on Facebook after May of 2020 you criticized COVID lockdowns?
A. Yes.
Q. And do you recall -- and did you do so -- I asked whether.
Did you, in fact, criticize lockdowns for COVID after May of 2020?
A. Yes. I have posts and reposts of other people sharing my views.
Q. Okay. And after May of 2020, did you post and repost overviews that were against the vaccine?

A. Yes.
Q. All right. With respect to the document that is on the screen, Ms. Burmayan, Exhibit 7, Facebook 4, you have had a chance to review that, correct?
A. Yes.
Q. Okay. This -- this message, after you have reviewed it, can you tell me whether or not this is a statement against the government's efforts to have vaccines and masks mandated during the COVID pandemic?
MS. MKRTCHYAN: Objection. Vague and ambiguous.
THE WITNESS: So for clarification, you are asking me if this is -- I did not understand the government part. You are asking me if this is -- can you -- can you clarify what you mean?
BY MR. FEARS:
Q. Yes. The subject matter of this four-paragraph message that you posted on June 30, 2021, is this a criticism of the government's efforts relating to the COVID pandemic?
A. No. It is not a criticism of the government. It is basically a post about mothers who have children who were impacted with the

underlying conditions they had prior to taking the vaccine and they got sick. And it was basically about those children and those parents who were concerned about what is happening with the lockdowns, because they could not send their kids to school and also some of them were depressed and suicidal. Some of them started taking drugs and fentanyl.

And the post that I put was from another mother who was concerned about what they were doing to the children. So basically my post as a school psychologist, I was being reached out by different parents and I was sharing some information that might help them or other people regarding some of what was happening in their household.

Q. Okay. And you used the phrase in your answer a moment ago, "they," and I notice in the first paragraph of this message it says, "They are trying to mentally exhaust you and break you down."

Who is it that is being referred to as they are trying to mentally exhaust you and break you down?

MS. MKRTCHYAN: Objection. Calls for speculation. Lacks foundation.

THE WITNESS: In this post I am referring

to the school that was closing and mandating children to take the vaccine.

BY MR. FEARS:

Q. And that is the public school system you are referring to, correct?

A. My public school system, yes.

Q. And the public school system is part of the state or local government, correct?

A. I am not sure if it is part of the state or local government.

Q. Well, you worked for them, didn't you?

MS. MKRTCHYAN: Objection. Argumentative.

BY MR. FEARS:

Q. Did you --

A. I do work for -- I did used to work for LA Unified School District. I don't know if it is part of the state or the federal government.

Q. No, I did not say federal. I said local government. State or local government.

MS. MKRTCHYAN: Call for legal conclusion. Objection. Argumentative.

THE WITNESS: Well, I thought I heard you say federal government. You could have said local government. But again --

/////

BY MR. FEARS:
Q. I did. Let's clarify. Let's clarify.
You were a public employee when you worked for LA Unified School District, correct?
A. Yes, I worked for LA Unified School District.
Q. And you realized that you were a public employee working for a school district that was part of local government, correct?
A. Yes.
Q. Los Angeles County?
A. Yes.
Q. Okay. So when it is referring to "they" here, you are referring to the LA Unified School District, correct?
MS. MKRTCHYAN: Objection. Objection. Misstates the testimony. Lacks foundation. Misstates the testimony.
THE WITNESS: I was referring to my school specifically and because there were different counties that had different policies at the time, not every county was following the same policy, I was referring to my school at the time.
BY MR. FEARS:
Q. Okay. Let me go to the next post, which is

marked Facebook 8. Go ahead and take whatever time you need to review that and let me know when you are ready. This one should be on your screen, and it says Breaking 911. Los Angeles County reinstates mask mandate.

A. Yes, I read it.

Q. Okay. And this is a post that you placed on Facebook, right?

A. Yes.

Q. And this was referring -- this was a criticism by you of the mask mandate in Los Angeles County, correct?

MS. MKRTCHYAN: Objection. Vague and ambiguous.

THE WITNESS: I would not use the word criticism. I was reposting a post I found on the website.

BY MR. FEARS:

Q. Well, do you see the message that you posted when you reposted this message on the website?

A. You are asking me about the post, and I answered your question about the post to which was repost. But now if you are moving towards the comment section, that is different from what you

asked me.

Q. Okay. So I am referring -- it is another question. I am referring to your comment regarding the post.

Do you understand?

A. Yes. We are moving towards the comment section now.

Q. All right. And do you see your comment?

A. Yes.

Q. And do you see it says, "Do the idiots who got the vaccine feel really stupid now? All that for nothing. I warned you guys." And then there is some emojis after that.

Do you see that?

A. Yes.

Q. And that is your comment to the 911 -- Breaking 911 message about LA County reinstating the mask mandate, right?

A. Yes.

Q. Okay. So fair to say that you are criticizing LA County's reinstatement of the mask mandate, right?

A. Based on my comment, yes.

Q. Okay. And essentially, you were against the mask mandate, correct?

MS. MKRTCHYAN: Objection. Misstates the testimony. Vague and ambiguous. "Against."

THE WITNESS: Can you repeat the question?

BY MR. FEARS:

Q. Yes. You were against the Los Angeles County mask mandate, correct?

A. Not correct.

Q. Okay. You were in favor of it, then?

MS. MKRTCHYAN: Objection. Vague and ambiguous.

THE WITNESS: What I was, I was in favor for protecting those of us, like myself, including students who had underlying health conditions and disabilities who need to be protected against the vaccine that was causing more health problems.

I will give you an example. My cousin, who is a physical therapist, was mandated at her job to take the vaccine. After she took the vaccine, she no longer has the same condition with her heart. Her heart is palpating all the time and she has breathing problems and she is tired. And she said she wished she never took the vaccine.

I know many examples I can give you with people who took the vaccine without knowing what it was going to do to them and as a result, they feel

worse now than they did before.

MR. FEARS: Okay. So my question -- move to strike as nonresponsive.

BY MR. FEARS:

Q. My question, though, was the intent -- I will change the question a little bit, so please listen to my question Ms. Burmayan.

Was the intent of your comment regarding this Breaking 911 message, was the intent of your comment to state that you were in favor of the Los Angeles County reinstating the mask mandate?

MS. MKRTCHYAN: Objection. Argumentative. Vague and ambiguous. Incomprehensible.

THE WITNESS: Can you repeat the question and explain what you mean when you are saying was I in favor?

BY MR. FEARS:

Q. Was the -- I will restate the question.

Was the intent of your comment to this Breaking 911 message that indicates Los Angeles County is reinstating the mask mandate, was the intent of your comment to express your agreement with the mask mandate being reinstated?

MS. MKRTCHYAN: Vague and ambiguous. Same objection.

THE WITNESS: This post says Los Angeles County reinstates mask mandate. Nation's largest county to require masks indoors even for fully vaccinated people.

The post I am sharing that they're reinstating the mask mandate. And the comment, I am upset because people like myself and my cousin are not being protected against the mask and the vaccine mandate.

BY MR. FEARS:

Q. Can you answer my question, though?

MS. MKRTCHYAN: Objection. Argumentative.

THE WITNESS: Can you repeat your question?

BY MR. FEARS:

Q. It calls for a yes or no, Ms. Burmayan, whether or not your comment was intended to support or agree with LA County reinstating the mask mandate, yes or no?

MS. MKRTCHYAN: Objection. Argumentative. Badgering the witness.

I would like to put this on the record that this is the same style of questions that derailed the deposition --

THE COURT: Counsel, there are -- I said at the beginning and I said at the hearing there are

not going to be any speaking objections at the deposition, particularly in front of the witness.

So, Ms. Burmayan, you may answer.

THE WITNESS: If you are asking me if this post is in favor for the mask mandate and the vaccine mandate, it is not.

BY MR. FEARS:

Q. Let me go to Exhibit 7, Facebook page 9, where there is another posting. It is dated July 17, 2021. Please take whatever time you need to review it, and then let me know when you are ready, Ms. Burmayan.

A. Okay.

Q. Okay. Is this a post that you placed on Facebook?

A. Yes.

Q. Okay. And fair to say that you were critical of the vaccines and masks that children, according to this post, were asked to wear and have in the case of a vaccine?

MS. MKRTCHYAN: Objection. Vague and ambiguous as to term "critical."

THE WITNESS: Can you repeat the question and explain?

/////

BY MR. FEARS:

Q. Is it fair to say, Ms. Burmayan, that this is a message critical of your school psychologist friends who did not speak up about the alleged harm of vaccines and masks to children?

A. Yes.

MS. MKRTCHYAN: Misstates the evidence.

THE WITNESS: I was upset in this post, yes.

BY MR. FEARS:

Q. Okay. And you say -- it says, "For 16 months you never spoke up about the harm vaccines and masks are doing to children."

As of July 17 of 2021, are you saying that vaccines had been used on children for the last 16 months?

MS. MKRTCHYAN: Objection. Argumentative. Misstates the evidence.

THE WITNESS: I can do a time line right now. I am not sure if I can be exact accurate of when the mask -- excuse me, the vaccine mandate happened. And then the time line, which I guess here says -- just a moment, July 2021, you said.

And is your question for me to go back and count how many months, if it is exactly 16 months to

when the mask -- or the vaccine mandate started?
Can you clarify what your question is about 16 months?
BY MR. FEARS:
Q. Yeah. You used 16 months and you refer to vaccines and masks, correct?
A. That is what I said in this post, yes.
Q. Okay. So I am just breaking it down. On vaccines, is it your understanding that from July 17, 2021, going backwards for 16 months, that children had been receiving COVID vaccines?
MS. MKRTCHYAN: Vague as to time. Understanding now? Understanding then?
THE WITNESS: I would have to calculate exactly how much back in time I can go of when the vaccine mandates started and the lockdown period. But that is what I wrote there, "For 16 months you never spoke up about the harm vaccines and masks are doing for children."
BY MR. FEARS:
Q. Okay. So let me try to refresh your recollection. And just based on math, 16 months would go back to March of 2020.
Do you understand that?
A. Approximately, yes.

Q. Okay. You would agree with me that in March of 2020 there was not even a vaccine that was available, right?

MS. MKRTCHYAN: Objection. Calls for speculation. Lacks foundation.

THE WITNESS: That's a -- I don't remember if there was a vaccine available or not. I believe that there was talk about a vaccine. And if I remember correctly, I don't -- it is very hard for me to tell if in March 2020 there was a vaccine available, but it could have been and they were starting to talk about a vaccine. Maybe I added an additional month, rounded it off. I can't quite recall why I put 16 months exactly instead of 15 or 14 or 13 or 12 or 10, but that is what I put in the post, 16 months.

BY MR. FEARS:

Q. Okay. Do you remember whether the vaccine was first released at the end of 2020 or beginning of 2021 for elderly people first?

MS. MKRTCHYAN: Objection. Calls for expert conclusion.

THE WITNESS: It has been almost four years since 2020. I cannot recall the time line of who got the vaccine first. If I had time to do some

research about that before we went on the Zoom, I could have done the research. But it is very hard for me to remember who got the vaccine first or who was allowed to get the vaccine first or what was the time line and the order of events of who was able to get the vaccine first.

BY MR. FEARS:

Q. Okay. So, Ms. Burmayan, fair to say that you are not sure what the time line was for vaccine and mask mandates for children, correct?

A. Can you repeat the question?

Q. Yes. You are just not sure of the time line when mask mandates and/or vaccine mandates for children began; is that a fair statement?

A. I recall when the mask mandate started, which was probably around March 2020.

Q. Okay. And so with respect to that, this message that you placed on Facebook was critical of mask mandates for children starting in roughly March of 2020, correct?

MS. MKRTCHYAN: Objection. Vague and ambiguous as to term "critical."

THE WITNESS: This is a public post that I shared among thousands of posts that I had that were private or public. And this was a post that I

shared about concerns that I had about masks and vaccines in the period of time that I shared it and I put 16 months. It could have been rounded off, maybe a month or two in addition to what I had. But this post I am very upset about what is happening to the children.

MR. FEARS: Move to strike as nonresponsive.

BY MR. FEARS:

Q. It calls, Ms. Burmayan, for a simple yes or no. I see in your message you say you are disgusted with your psychologist friends. You say shame. You say you don't deserve your title. I would prefer to risk it all than live like cowards, like you.

My question very simply is, based on your message that I just summarized, isn't it true that you were being critical of the fact that there had been mask mandates for which your psychologist friends apparently did not speak up against?

MS. MKRTCHYAN: Objection. Argumentative. Misstates the testimony. Vague and ambiguous. And badgering the witness.

THE WITNESS: To clarify, are you asking me if in this post I am being critical about --

/////

BY MR. FEARS:
Q. Yes.
A. -- about that mask --
Q. Yes.
A. Yes, I am upset.
Q. Okay.
A. But to clarify, you also mentioned about the 16 months. So this is why I was confused.
Q. That was my earlier question.
A. Okay.
MS. MKRTCHYAN: I object. I object. The witness is being interrupted.
THE WITNESS: But you are asking me two questions in one. And then when I am answering one question and then you are mentioning the 16 months, so I don't understand which part you want me to focus on, the 16 months or the overall post?
BY MR. FEARS:
Q. Ms. Burmayan, my last question -- my last two questions did not mention anything about 16 months. Those were earlier questions. I was just asking you whether or not this was critical of the mask mandate for children, yes or no? I think you have answered it, so we will move on. Okay?
MS. MKRTCHYAN: Objection. Argumentative.

Badgering the witness.

MR. FEARS: Okay.

THE WITNESS: Yes.

MR. FEARS: There is no question.

THE COURT: There is no question pending, Ms. Burmayan. Just please wait for the question and then answer. If you talk over each other, it becomes very difficult to have a transcript.

THE WITNESS: Okay.

BY MR. FEARS:

Q. Okay. I am referring to now to Exhibit 7, Facebook 11, is the page number.

Do you see that in front of you, Ms. Burmayan?

A. Yes.

Q. Okay. Is this a page that you posted on Facebook?

A. Yes.

Q. Okay. Go ahead and read it and let me know when you are ready and I will ask you a couple questions about it.

A. Okay.

Q. Okay. Is this a message -- first of all, there is a picture, looks like, of a house that's in this post.

Do you recognize that?
A. There is a house, yes.
Q. Okay. And what was -- what was the point of the picture of the house in this post?
MS. MKRTCHYAN: Objection. The screen does not show the entire page. Please increase the screen. Thank you.
THE WITNESS: I need to see the article.
MR. FEARS: I'm sorry. I'm sorry.
THE WITNESS: Can you repeat the question?
BY MR. FEARS:
Q. Yes. There is a picture of a house. And I see that there is a foxLA.com, and it looks like there is some type of headline or something like that.
Was the house the place in which there was this killing that apparently occurred?
A. I was resharing a news article where it says, "California 14-year-old found covered in blood, allegedly killed mother, injured father in stabbing."
Q. And was this something that you saw on the news?
A. No. It was something that I saw online.
Q. Okay. On a foxLA.com post?

A. I can't recall if it was on the post itself or it was from a friend's post that I reposted, but it says foxLA.com.

Q. And to your knowledge, was there any association made in the news story of this 14-year-old who allegedly killed mother, injured father in stabbing, was there any association of that incident with vaccines or mask mandates?

MS. MKRTCHYAN: Vague and ambiguous. Objection.

THE WITNESS: Can you repeat the question?

BY MR. FEARS:

Q. To your knowledge, was there any association of this child, this 14-year-old, who allegedly killed mother and injured father, was there any association made between that incident and COVID mask and vaccine mandates?

MS. MKRTCHYAN: Calls for speculation.

THE WITNESS: This article is about three or four years old. I cannot -- I would have to click on the article to open it and see exactly what was written in it. But from my brief recollection, it had to do with the lockdowns and it had to do with the fact that the child might have been taking drugs or already depressed and part of the reason

why this happened was during the lockdown and depression that was going on in the household. But I would have to check on the article to see exactly what it was about.

BY MR. FEARS:

Q. Okay. And in the message that you posted you referred to, "Your kids are suffering but you are hoeing around taking pics." And you refer to, at the end of it, "Depressed, drug-addicted, homicidal hoes like you."

What were you talking about, Ms. Burmayan?

A. I would have to read that statement again.

Q. Go ahead. And that is where I started, at the top of the page. Sorry.

A. So I said here, "Good job parents, educators, and school psychologists. This is a result of your selfishness. Keep taking your ugly face selfies, paid vacations, and food pics. Your kids are suffering, but are you hoeing around, taking pics. I don't have kids and speak up more than you. I can't be the only voice in this fight. Your selfishness has blood on your hands and your kids future will show exactly like this when they end up depressed, drug-addicted, homicidal hoes like you."

Are you asking what I mean by this when they end up depressed, homicidal hoes like you?

Q. No. I am actually asking what you meant by hoeing around taking pics and referring to someone, "they" end up depressed, drug-addicted, homicidal hoes like you. I am asking what you meant by that.

MS. MKRTCHYAN: Objection.

THE WITNESS: Yes. There was probably some news article that I saw or maybe in this news article, like I said, I would have to click on this news article to remember what caused me to write that. But it was probably a parent who had abandoned the child during the lockdown period. It is very hard for me to recall -- or basically it was about parents who were not focussing on their children and not attending to their children's needs.

BY MR. FEARS:

Q. Okay. And when you refer to hoeing around, do you mean whoring around, is that what you are referring to?

A. Yes. It was probably -- or maybe something about a parent who was out partying or not taking care of their children.

Q. Okay. So is it fair to say that this is

critical of the lockdown and specifically regarding parents, educators, and school psychologists not speaking out against the lockdown like you were?

MS. MKRTCHYAN: Objection. Vague and ambiguous. Vague and ambiguous. Argumentative as to term "critical." Misstates the testimony.

THE WITNESS: Can you expand or explain what you mean, because it is very confusing how are you saying it?

BY MR. FEARS:

Q. What part do you not understand, Ms. Burmayan?

MS. MKRTCHYAN: Objection. Argumentative.

THE WITNESS: I don't understand when -- I don't understand the whole thing, and I am getting overwhelmed right now.

MS. MKRTCHYAN: I ask for a break, Your Honor.

THE COURT: Well, yeah. We have been going for about an hour, so it seems to me to be a good time for a short break.

How long of breaks do you generally take?

MR. FEARS: I usually accommodate whatever they would like, Your Honor, but I would ask, could I just finish up this screen and this question

before there is a break?
MS. MKRTCHYAN: No. I object, because the witness is overwhelmed and cannot continue answering.
THE COURT: Yeah. I think we can go ahead -- is this the last Facebook post?
MR. FEARS: No, it is not. It is not.
THE COURT: It is not. Okay. So let's just go ahead and take a break now.
MR. FEARS: Okay. Okay. Ten minutes is good or whatever -- Counsel, what do you think?
MS. MKRTCHYAN: About ten minutes. Yes. Thank you.
MR. FEARS: Okay.
THE VIDEOGRAPHER: Okay. Let me get us off the record. Hearing no objection, we are now going off the record at 11:02 a.m.
(Break taken.)
THE VIDEOGRAPHER: Back on the record at 11:19 a.m.
BY MR. FEARS:
Q. Okay. Ms. Burmayan, are you ready to proceed?
A. Yes.
Q. All right. Do you still see that we have

Exhibit 7 and specifically Facebook page number 11 on the screen?

A. Yes.

Q. Okay. Is it fair to say that this post that you made accurately reflects your views?

MS. MKRTCHYAN: Objection. Vague and ambiguous. Views as to what?

MR. FEARS: As to the subject matter stated.

MS. MKRTCHYAN: Vague and ambiguous.

BY MR. FEARS:

Q. Calls for a yes-or-no, Ms. Burmayan?

A. I can't answer that with a yes or no.

Q. Those are your words, correct?

A. I typed those words, yes, I did.

Q. Okay. And when you typed those words, they reflected your views, correct?

A. When I typed those words I was upset at the article where a boy killed his mother. Those were my views.

Q. Okay. Let's go to Facebook 12, which is still part of Exhibit 7, and we will remain on Exhibit 7 until further notice. Exhibit 7 looks like a -- Facebook 12, Exhibit 7 looks like another post from you. Go ahead and take whatever time you

need, Ms. Burmayan, to review it.
A. Okay.
Q. This was a post that you put on Facebook on July 22, 2021?
A. Yes.
Q. And this post reflected your views regarding the lockdown, correct?
A. I need a second to recall why I posted this on July 20, 2021. So I am saying here, Enjoy your last month of freedom. Restaurants are locking down again, stores are clearing items off shelves. That is what you get for being P and then two of those things there, S-S-I-E-S and not putting up a fight. Don't say I didn't warn you.
If I recall, there was a period of time when we were not on lockdown anymore. So this was probably the time where we were going back into lockdown. Because there was several times we were on lockdown and then open and then back and again. And so this was probably the time where we went back into lockdown again.
Q. These were your views about that subject matter, correct?
A. Yes, about this lockdown.
Q. Okay. And the P with the at symbols, you

are referring to pussies, correct?
A. I can't answer that. I don't know if I am referring to pussies. I must have put two of those. I don't know what they are called.
Q. Well, what is the word, then? If it is not pussies -- the way I am reading it is that is what you get for being -- and I read that as pussies and not putting up a fight. That is the meaning I take from it, but I am not testifying. And I can't think of any other word that would be the substitute for that.
So is there some other word that you intended other than pussies?
MS. MKRTCHYAN: Objection. Argumentative.
THE WITNESS: The basic idea of this post was I was upset that we were back into lockdown again. And I don't remember what I meant by that word.
BY MR. FEARS:
Q. Can you think of any other word?
A. I was upset.
Q. I get you were upset. I get the rest of the message. I am only focussing on that word.
Can you think of any other word that you intended other than pussies?

MS. MKRTCHYAN: Objection. Argumentative. Badgering the witness. Calls for speculation.
THE WITNESS: I don't know if I can think of any other word.
BY MR. FEARS:
Q. Okay. Let's go to Facebook 13. This is a post that you put on Facebook, correct?
A. I have to take a look at it. Yes, I do.
Q. And your comment just a triple hundred percent up here, correct?
A. That is what it looks like, yes.
Q. Okay. Let me go to the next, Facebook 14. Is this a post that you placed on Facebook?
A. I have to take a look at that. Yes, I did.
Q. Okay. And your message was, Nazis in full force with the middle finger twice and then looks like a clown emoji twice, right?
A. I can't tell -- yes, it is.
Q. And those were your views regarding the City of Monte Claire requiring city employees to wear vaccine stickers to work without masks?
MS. MKRTCHYAN: Objection. Vague and ambiguous. Misstates the testimony.
THE WITNESS: I need a few seconds to try to recall what I meant when I posted this on July

23, 2021, because it has been a couple of years since I posted this and some of my views have changed.

Q. I'm --

A. Uh-huh.

Q. -- I am not even asking your views. I am just asking whether this was your view -- your message there, Nazis in full force, double finger and clown emojis, that was your view at the time you posted this?

MS. MKRTCHYAN: Objection. Vague and ambiguous. "View."

THE WITNESS: So that is what I was trying to clarify, was, as I said earlier before you cut me off -- but I said I am trying to recall what my views were at the time regarding that post since this was posted in July 2021.

BY MR. FEARS:

Q. Yes or no, Ms. Burmayan. When you posted this at the time, whatever you now believe your view was or wasn't, you posted your honest views at the time you posted it, correct?

MS. MKRTCHYAN: Objection. Argumentative. Asked and answered.

THE WITNESS: I would like to go back and

read the news article. It says Monte Claire to require city employees to wear vaccine stickers to work without masks.

So I guess from my recollection basically Monte Claire was requiring city employees to wear vaccine stickers to work without masks. So I can't recall if they were making the workers wear vaccine stickers to say that they had the vaccine or they didn't have the vaccine. But basically it would be proof to show outside of their body if they had taken the vaccine or not to display this, so I was probably upset as to why somebody would have to wear a sticker on their clothing to show if they have taken the vaccine or not.

BY MR. FEARS:

Q. Okay. And if that was the message, your view of that message was that that meant these were Nazis in full force, right?

MS. MKRTCHYAN: Objection. Vague and ambiguous.

THE WITNESS: Okay. Let me try to recall what I was thinking at the time when I posted that.

BY MR. FEARS:

Q. No. Those were your words, Nazis in full force, correct?

A. Yes, I put that.
Q. And there is a middle finger there twice, correct?
A. Yes, I put two middle fingers.
Q. Do you know what the middle finger means?
A. Yes, I do.
Q. Okay. And then there is two clown emojis that you placed there, correct?
A. Yes.
Q. Okay. Let's go to Facebook page 18, still Exhibit 7.
This is -- is this a Facebook post that you made on your public page?
A. I need to take a look at that a little bit closely.
Q. And I will -- let me scroll down a little further. The portion below is just the metadata.
So can you see the whole thing now?
A. Right now I see my comment, what I wrote, but I can't see what the -- I would have to go up a little to see what the article says.
Q. Okay. I can see it on my screen, but I will go -- I will scroll. It says LAUSD to require students staff -- staff be tested for COVID weekly when school resumes this fall.

And that is from a LosAngeles.CBS.local.com site apparently.

Do you see that on your screen?

A. Yes.

Q. All right. Now I will go back up to your post, and there is a post under your name, Anoush Phoenix, that is responding to that LAUSD article apparently, correct, or the LosAngelesCBSlocal.com article about LAUSD requiring students and staff to be tested?

A. Yes, I put a comment about this article.

Q. Okay. And you were obviously critical of the idea that students and staff had to be tested for COVID weekly when school would resume in the fall, correct?

A. I was upset about this post, yes.

Q. Okay. And you -- the message that you have in the two lines under your name that expresses your view about this message conveyed in the CBSlocal.com article, right?

A. I have to read that again. So I said, Good job everyone. So proud of all you school psychologists, parents, and teachers that spoke up. Sarcasm. You must love being someone's bitch, tortured, and imprisoned. Yes, I put that.

Q. With the triple middle fingers on that one too, right?
A. Yes, triple middle fingers.
Q. And that was your view at the time, correct?
A. I was upset about this post, yes.
Q. Okay. Go to Facebook 22, there is another post by you. And just I want to make sure you can read the whole thing. But there was a post by you at the top reading, For all the idiots who got the poisonous jab, with some emojis. And then there is -- it looks like pictures of the Moderna vaccine with the NBCLosAngeles.com article about Moderna saying there's a third dose of its COVID-19 will be needed before winter.
Can you read -- can you see all that?
A. Yeah. Right now I can see the article where it says Moderna says the third dose of its COVID-19 vaccine will be needed before winter.
Q. Okay. And so you were commenting upon that article, right?
A. For all the idiots who got the poisonous jab, yes, I wrote that comment.
Q. Obviously critical of people that did, in fact, take the vaccine, correct?

A. For some of the people who took the vaccine, yes, I was upset.
Q. It says for all the idiots who got the poisonous jab. Who were you referring to?
A. I can't recall who I was referring to.
Q. Okay. Did you take the vaccine?
A. No, I did not.
Q. Okay. All right. Let's go to -- the next is Facebook 24. This appears to be a posting by you; is that correct?
A. This is a post that I reposted from somebody else.
Q. Okay. And you put -- your comment was a hundred percent three times, right?
A. Yes, three one hundred percents.
Q. All right. And that was in reference to the post that you were reposting on this date, correct?
A. Yes, the three one hundred percents were regarding the post that I reposted on -- I can't see the date. Can you go down?
Q. Yeah. I am always confused. When you say down, I'm going up but --
A. Okay. So it is the --
Q. No. No. It is -- some people say down,

up. But I just went up on the page. So you see the August 9, 2021?
A. Yes.
Q. Okay. Does that help you answer as to whether or not your hundred percent three times was to the message that you posted?
A. I need to read the message. The pandemic is to force you to get the vaccine. The vaccine is to force you to get the vaccine passport. The passport is to force you to get the social credit score. The social credit score is to force you to obey the government. The government can now deny you food, medicine, house, and travel.
Yes, at that time, the hundred percent was regarding that post in 2021 when I put it.
Q. And you were indicating your agreement with that, correct?
MS. MKRTCHYAN: Objection. Vague and ambiguous as to the word "agreement."
THE WITNESS: In agreement to what?
BY MR. FEARS:
Q. With the post that you reposted, Ms. Burmayan.
A. You are asking if I agreed to the post?
Q. No. When you said one hundred percent

three times, you're indicating when you -- let me withdraw that.

When you reposted this post about the pandemic is to force you to get the vaccine, et cetera, when you reposted this, and put a comment up there saying one hundred percent three times, you were stating that you agree with this post that you had reposted, correct?

MS. MKRTCHYAN: Objection. Vague and ambiguous.

THE WITNESS: It is not so much that I agree or disagree. It was a post that I found interesting, so I reposted it and I put three one hundred percents.

BY MR. FEARS:

Q. What is the one three -- my reading of the three one hundred percents is that you agree 300 percent with this post.

What is your reading of your own comment there three times putting a hundred percent?

MS. MKRTCHYAN: Objection. Argumentative.

THE WITNESS: Three hundred percent? I don't know if I could -- so you are adding one hundred plus one hundred plus one hundred, and you are saying that I agree to this post 300 percent?

BY MR. FEARS:
Q. Ms. Burmayan, please listen to my question. What was your understanding of your own comment of putting one hundred percent three times above this message that you reposted?
A. It is a good post, and I want to reshare it.
Q. Okay. All right. Let's go to Facebook 25. This is another post you put on your Facebook page?
A. Let's take a look here, August 2021. Yes.
Q. Yes or no?
A. Oh, I answered yes.
Q. Okay. I did not hear you. Sorry. So -- and your comment was -- it looks like seven middle fingers to this article that indicated that Long Beach Unified requiring teachers and staff to get COVID vaccine or undergo regular testing, correct?
A. I put one, two -- let me count them again. One, two, three, four, five -- yes, seven middle fingers.
Q. And the middle fingers are -- you understand that means F you?
MS. MKRTCHYAN: Objection. Argumentative.
THE WITNESS: Middle finger to me can mean many things, but mostly I was upset.

BY MR. FEARS:

Q. You agree with me it is derogatory, right?

A. It is not a good thing, yes, correct, depending on how you look at it. But it was a sign that I was upset.

Q. And you were upset about the fact that a different school district, not the one that you worked for, but a different school district was requiring teachers and staff to get the COVID vaccine or undergo regular testing, right?

A. So yes. Let me take a look at that again. Long Beach Unified requiring teacher, staff to get COVID vaccine -- or yes, I was upset about Long Beach Unified, correct.

Q. Okay. Referring you to Facebook 28 with a message from you and a posting or reposting of a message. Take whatever time you need to read it and let me know when you are ready.

A. Okay.

Q. Okay. This is a message that you posted on your Facebook page?

A. Yes.

Q. And in the actual message, in this one it says, "Due to the increase of pussies in America," so actually you used the word pussies in this one as

opposed to the prior one I showed you that had the two little at symbols, correct?

MS. MKRTCHYAN: Objection. Misstates the evidence. Misstates the testimony.

THE WITNESS: If you are asking me if I see the word pussies in this post, yes, I do.

BY MR. FEARS:

Q. Okay. And you posted that on your public page, right?

A. Let me take a look. Can you scroll up or down, whatever -- whichever way that means to you. No, the other way because I wanted to see if it was a public post. Yes, it is.

Q. Okay. And your comment above that message is accurately reflected there, right?

A. Yes, I am upset about this repost that I posted.

Q. Okay. And you are saying -- it says, "A big FCK you for not having the courage to speak up." This is what you are -- you are saying that to the psychologists, selfish parents, and teachers -- and teachers, so-called friends, right?

A. To all my coward school psychologists, selfish parents, and teachers, so-called friends, yes, that is what I am saying in this post.

Q. Okay. And what does the next phrase say?

A. A big FCK you for not having the courage to speak up in replace of your comfortable vacations the last 18 months.

Q. Okay. This was your view at the time, correct?

MS. MKRTCHYAN: Well, objection. Vague and ambiguous as to "view."

THE WITNESS: Yes, so at the time, there was a --

MR. FEARS: Just calls for a yes or no.

MS. MKRTCHYAN: Objection. Objection. Interrupting the witness.

MR. FEARS: It is nonresponsive. The witness is not responding.

THE COURT: Yeah. I think there is a misunderstanding here. I don't think -- the question simply was, is this your view?

THE WITNESS: At the time, I was upset. Yes, this was my view.

BY MR. FEARS:

Q. Let's move on, then. Facebook 46. Looks like another message from you. And on my screen I can see the LA -- LosAngeles.CBS local article down below. Let me know if you can't.

MS. MKRTCHYAN: I cannot. Objection.
THE WITNESS: I can't --
BY MR. FEARS:
Q. Okay. Do you see it now? I scrolled down so you can read it. I understand you are on a smaller device.
A. LAUSD Teachers Union wants mandatory COVID vaccination for eligible students.
Q. Okay. And then it looks like you had a posting in response to that, correct?
A. I have to look up. Yes, I put a comment about that.
Q. And that is at the top of the page where it says, To all bitch selfish parents, teachers, et cetera, all of that, those were your comments in response to this article about mandatory COVID vaccinations, right?
A. Yeah. That was my response to that news article that I read and posted.
Q. And those three lines that I started to read, those were your views in response to that mandatory COVID vaccination article, correct?
MS. MKRTCHYAN: Objection. Vague and ambiguous as to "views." Misstates the testimony.
THE WITNESS: LAUSD's teachers union wants

mandatory COVID vaccination.

BY MR. FEARS:

Q. No. If you could -- I'm not asking you to read that. I am just asking you about your -- whether those three lines at the top of the page were your views, Ms. Burmayan?

MS. MKRTCHYAN: Objection. Vague and ambiguous.

THE WITNESS: Well, at the time I was upset at the fact that they were mandating the students to get the vaccinations, and some parents were calling me up and asking me what they can do because they are worried about what might happen to their student's health. So I decided to repost some information for parents to, you know, find out what is going on and to educate them because most of the time we were on lockdown and we could not really go out. And that was my way of expressing myself and my outlet. And I was hoping to educate others and to learn more about the vaccine. So at the time, that was my view about what I posted.

MR. FEARS: Move to strike everything other than, at the time that was my view.

Your Honor, this is what happened last time after --

THE COURT: No. No. I understand the problem, and I think if I could try to explain just as an observer of this. There is a difference between a question that asks is -- you know, looking at the message is -- was this your view at the time.

A different question is, explain your view. And I think that is the distinction that is getting lost here.

The question simply was, this message that you posted, was that your view at the time?

MS. MKRTCHYAN: And I object, Your Honor, because this is exactly what happened last time. Some questions cannot be answered yes or no. This --

THE COURT: No. No. No. Is it not -- I am not trying to suggest what the answer is. I am trying to distinguish two different kinds of questions. So it is -- you know, whatever the answer is, the answer is. But it is two different questions. One question is, was this your view at the time. A different question is, explain that view. Those are two different questions. That is just what I am trying to clarify because I think it is getting -- maybe people are miscommunicating with each either. So --

MS. MKRTCHYAN: There is no --

THE COURT: -- that is all I am trying to do just to get this to move along.

So Mr. Fears, do you have any other questions about this particular Facebook 46?

MR. FEARS: I do not, Your Honor. But if I could just state that this is what happened last time. After objections, then we start hearing long answers like in that long answer we just heard about parents calling and so forth.

THE COURT: That -- again --

MR. FEARS: Some questions can be answered with a simple yes or no, especially when I am asking were these your views on the subject matter when you wrote it.

MS. MKRTCHYAN: And I would like to make my record.

THE COURT: I think we can just move on from this. I think the -- you know, as I said, in this case the lawyer's argument with each other. I just don't want the witness to get confused about the two types of questions. That is all I am saying. Because I think there is some confusion about that issue, when somebody asks, was this your view, and then there is an objection. And then the

answer comes and it is answering a slightly different question, which is explaining what the view was, which is a different issue. That is the only thing I am trying to point out to Counsel and the witness, is that there seems to be a miscommunication here. But let's, please, move on.

MS. MKRTCHYAN: Yes. And I feel like my client right now is overwhelmed. I think she is crying. You know, this is exactly what happened last time.

THE COURT: I understand, you know, this is -- it is not easy. It is not easy, depositions, just not easy, but it is okay. There is nothing that is happening here that does not, you know, usually happen. There is sometimes miscommunications. It has been going fine up to now. It has been actually fairly straightforward.

So please, Ms. Burmayan, do not get upset. This is just fine. I am just trying to help move this along so that everybody understands each other.

This has been going very well so far. I just need the -- the lawyers now need to step back, and let's go back to question and answer just the way we have been doing.

MS. MKRTCHYAN: Therefore I request

instruction for the witness -- to the lawyer not to say move to strike, because that is --

THE COURT: No. No. No. I cannot -- as I said, it is not for me here to decide what comes in and what does not. As I explained at the beginning, a motion to strike is simply that, a motion to strike on the record. I cannot order a lawyer not to say motion to strike.

The ruling will come from the trial judge at the time of trial, not here. So there is no point arguing about it. It is just like an objection. It is the other side of the objection. Objection made, motion to strike is made, that ruling is made later at the trial and should not be impacting this witness. That is why we say in the rules, objections made, motion to strike is made, but the examination goes on and the answer is given subject to the objection or subject to the motion to strike.

This is usual. That is what I am trying to explain to Ms. Burmayan. This is just the way it goes. It is not anything to be upset about. It is just what happens. The lawyers put their statements on the record. The trial judge will decide what comes in and what does not come in. We can just go

back to what -- the way this was going the first hour.

MS. MKRTCHYAN: Well, and I request a break because my client is overwhelmed and she is crying, visibly crying.

THE COURT: Well, let me ask you, Ms. Burmayan, is there something that is -- that I have said that is confusing? Is there something upsetting? What seems to be the issue?

THE WITNESS: I just feel that I am being attacked and I am trying -- not by you, Your Honor. But I just feel like I am being -- I am trying my best. I feel like a criminal. I am really trying my best to explain why I put those posts the way I did. And it was not anything malicious. I was just very upset at the time that I -- you know, kids were suffering. I was suffering. Families were suffering. And I am trying to explain, but I feel like I am just being put -- like I am looking, you know -- trying to --

THE COURT: Well, and some of that may be -- so let me explain a bit about a deposition.

MS. MKRTCHYAN: Your Honor, I am -- I object, Your Honor, because this is like interrogation of my client now by the judge. I

object to this because -- I objected to this second session, you know --

THE COURT: I understand that and I wish that you could explain this to your client. But I think the issue is she is -- you are feeling like you have to explain your views. All you need to do is answer the questions.

This is the opportunity that the other side has to ask you questions. At trial or maybe if there is cross-examination, your counsel will give you the chance to tell your story.

But this is -- it is -- this is just an opportunity that the other side has under our rules to ask you questions. And you don't need to explain yourself unless that is what the question asks for you to do.

THE WITNESS: Okay. I just --

MS. MKRTCHYAN: Well, I request a break because my client cannot right now articulate even comments -- I object, Your Honor. We need to take a --

THE COURT: I understand that you object, but I don't know that having this argument is really helpful for the witness, that is what I am trying to get to. I think this is more agitating than not.

And I want to make sure that the witness does not have a misconception about what the deposition is about.

MS. MKRTCHYAN: Well, we had already one session with the same attorney --

THE COURT: Again, this is not helpful. This is not helpful.

I want to -- let's take five minutes, and then when everyone comes back, I want to have question-and-answer just like we did the first hour.

THE WITNESS: I just feel like, you know --

THE COURT: There is no need to --

MS. MKRTCHYAN: And I'll -- objection.

THE COURT: And maybe during this break you can talk with your attorney if you have other kinds of questions about this. I understand that being a deponent is difficult because you are here to answer questions and not necessarily, you know, give your side of the story. This is their opportunity to ask you questions, and it is not your opportunity to tell your side because you're answering their questions. I understand it is difficult. I just think it is important that we get through this.

All right. So let's take a five-minute break. We will return at noon by my clock. And as

I said, I want in the interim everyone to just take a deep breath, calm down. When we get back on the record, we will go back to Mr. Fears asking questions. Ms. Burmayan, you will answer questions, just like we did the first hour.

All right. Thank you, everyone. We will see you at noon.

MR. FEARS: Thank you, Your Honor.

THE VIDEOGRAPHER: We are going off the record at 11:52 a.m.

(Break taken.)

THE VIDEOGRAPHER: Back on the record now, Counsel, at 12:03 p.m.

MR. FEARS: Thank you.

BY MR. FEARS:

Q. Ms. Burmayan, all set to go?

A. Uh-huh, yes.

Q. Okay. I am -- in the interest of time, I am skipping through some of these pages. I have gone down to Facebook page 84.

Do you recognize this as a posting that you placed on your Facebook page?

A. Yes, I posted that.

Q. Okay. And let me go to Facebook page 86 -- I'm sorry -- 85.

Q. Is this another page that you posted on your Facebook public page?

MS. MKRTCHYAN: Objection. I don't see the whole -- can we scroll down through the entire page?

BY MR. FEARS:

Q. Stuff on the lower part is just metadata.

A. It looks like some of us were tagged in a post or if you can scroll up -- I can't quite tell from this post if I reposted it or if I was tagged in it.

Q. I have gone to the top of it. Do you see your name followed by the picture that was posted with, "It is not about a virus. It is about control."

MS. MKRTCHYAN: Objection. It is not showing the entire page.

THE WITNESS: I can't see on the bottom -- because I saw that some people were tagged, so I can't really tell if I reposted it or I was tagged in it or if I reposted and tagged. It is --

BY MR. FEARS:

Q. I'm showing you the bottom now, Ms. Burmayan.

A. Yeah. There is some tags of people.

Q. Okay.

A. Adrian Constantin Cucu is with Eu Ra and three others, so I can't see from this if I was tagged in it.

Q. So you can't tell whether or not you posted this on your Facebook page?

A. That is what I am saying. I can't quite tell if I reposted it or if it was tagged in it. Because sometimes a tag and repost you can't tell, but on the bottom it looks like I was tagged.

Q. And tell me what it is that you are referring to that suggests to you that you did not or possibly did not repost this?

MS. MKRTCHYAN: Objection. Asked and answered. Vague and ambiguous.

THE WITNESS: The bottom of the page says Adrian Constantin Cucu is with Eu Ra and three others. I can't tell from this post if I was one of them, if I was tagged. It is hard to tell.

BY MR. FEARS:

Q. Let me refer your attention to Facebook page 90. Do you see this page on your screen?

A. I am scrolling up to December 31, 2021.

MS. MKRTCHYAN: Not entirely.

BY MR. FEARS:

Q. Let me know when you are ready for me to

scroll down.
A. Okay. Right now what I see is "Get vaccinated and boosted." That is all I can see.
Q. I'm now showing you the bottom of it. Let me know when you are ready.
A. Okay.
Q. Okay. Is this a page that you reposted on your Facebook page in December of '21?
A. Yes, it looks like -- go ahead.
Q. With emojis comments.
A. Yes, it looks like a news article. Can you scroll back down again or up or whatever that means to you.
Q. I just wanted to know whether it appears as though you posted this on your Facebook page.
A. Yes, that is what I am trying to figure out, if it is a news article that I posted or if it was a post that I reposted.
Q. Whether it is a news article or not, I have shown you -- it says County of Los Angeles at the bottom. I just want to know, Ms. Burmayan, is this something that you posted or reposted on your Facebook page?
A. Yes.
Q. Whatever it is. Okay. The answer is yes.

Thank you.

And you with respect to this message about COVID-19 cases rising so our protection levels must rise too, get vaccinated and boosted, when you posted or reposted this message, you put three laughing emojis under your name, correct?

A. Take a look, yes, it looks like three laughing emojis.

Q. Okay. And is there some reason why you would laugh about a message saying that COVID-19 cases are rising so our protection levels must rise too, get vaccinated and boosted?

MS. MKRTCHYAN: Objection. Misstates the testimony.

THE WITNESS: Can you explain what you mean -- can you clarify? I did not understand your question.

BY MR. FEARS:

Q. Is there some reason why you would post laughing emojis in response to the message that is immediately below your laughing emojis?

A. Is there some reason? No, there is no reason.

Q. Okay. Let me refer your attention -- I will skip ahead to Facebook 93. I'm showing you the

upper portion now. Let me know when you are ready for the lower portion. And you should have in front of you on the screen, If you're a man wearing -- and it goes on with a message and some additional message.

A. Okay. I can now see the rest. Right now what I see is legs and a mask wrapped around it.

Q. No question, just want to make sure you see the bottom of it.

A. That is what I am saying. I can see the legs with no -- I did not ask you a question. I know you did not ask me a question. I am telling you what I can see.

Q. Have you seen the whole message now?

A. No.

Q. What portion do you need to see?

A. The bottom.

Q. Let me know when you are ready, please.

A. I see the word "pee."

Q. Are you ready?

A. Ready for what?

Q. Well, you say you see the word pee, and I want to make sure, do you see also the rest of the message at the bottom where it says post day, capture date, page, hash, URL?

A. I see post date, capture date, page, hash, URL.

Q. Okay. So you don't just see pee alone, right?

MS. MKRTCHYAN: Objection. Argumentative. You know, this is badgering the witness.

THE WITNESS: Thus far you have never asked me to read the URL or anything like that. You have always asked me to focus on the post itself, so that is why I answered you with the word pee. Had you asked me if I could see the hashtag, I would have answered that.

BY MR. FEARS:

Q. Have you seen it all now, Ms. Burmayan, this whole message?

A. I saw it earlier. And then right now, I am on pee -- part of pee, and then two legs and a mask.

Q. Okay. Going back to your message at the top of the page, is that your message, If you are a man wearing a mask especially, in all caps, while working out and, in all caps, taking pics, not only do you look like a clown, in all caps, but also a bitch, in an all caps?

Is that your message?

A. I typed that, yes.

Q. Okay. You were being critical of men who wear masks especially when they are working out?

MS. MKRTCHYAN: Objection. Vague and ambiguous as to term "critical."

THE WITNESS: I found it interesting how if a person can work out and wear a mask at the same time, so that is what I was -- the post was very interesting to me of how a person can wear a mask and work out at the same time.

BY MR. FEARS:

Q. Okay. That was your view at the time, right?

MS. MKRTCHYAN: Objection.

THE WITNESS: Yeah.

MS. MKRTCHYAN: Vague and ambiguous as to "view."

THE WITNESS: At the time because of my own health condition, I found it interesting how a person can work out and wear a mask at the same time.

BY MR. FEARS:

Q. Let me refer you to Facebook page 97, showing the top of the page.

Has your username, Anoush Phoenix, dated January 5, '22, with two laughing emojis, followed

by a message regarding masks.
A. I just need to get up and stretch because my back is hurting.
Q. Have you had a chance to read the message?
A. No. I am just stretching my back.
Okay. Now I am looking at that screen again.
Q. Have you finished?
A. Not yet. Okay. I read it.
Q. Okay. Going back up to the top with respect to this message, you posted this message with two laughing with tears emojis, right?
A. Yes, there is laughing emojis with tears.
Q. Okay. And what was your intent in placing laughing emojis with tears to this message that talks about which masks provide the best protection?
A. Can you go down a little because I could not see what the message of the article was? And then a little bit more because I think there was some words.
Q. Nothing down there, other than the --
A. Well, it says here an entire article.
Q. I had that up. There is nothing -- there is only metadata below that.
A. Yeah. I understand, but I need to

understand why I put that and try to remember it since it is almost a year and a half ago. You are asking me if I recall why I put those emojis, so I have to read the rest of the article.

Q. Have you finished?

A. Not yet.

Okay. I read it. I don't recall why I put that. It has been almost a year and a half.

Q. It is fair to say that you had a lot of posts on your Facebook regarding masks and vaccines, right?

MS. MKRTCHYAN: Vague as to time. Objection.

THE WITNESS: It is fair to say after my arrest I had a lot of posts about the masks because I was traumatized and I was very upset at what happened to me.

BY MR. FEARS:

Q. Calls for a yes-or-no, Ms. Burmayan.

Fair to say that you still have on your Facebook page messages regarding masks and vaccines that are critical?

MS. MKRTCHYAN: Objection. Vague and ambiguous.

THE WITNESS: Are you asking me if I still

have at the moment right now posts about the vaccine mandate or mask mandate?
BY MR. FEARS:
Q. That was not exactly my question, but let me ask it differently.
These messages that you have said you had on your Facebook page -- I need to see your face.
A. I was looking because I think the post is gone, so I was looking to see if I could see the post again since I thought your question was about this particular post.
Q. The messages that I have shown you, do you have a specific recollection of taking them off of your Facebook page?
MS. MKRTCHYAN: Objection. Vague as to time and taking off. That is, you know --
THE WITNESS: So first you asked me one question. Now you are asking me another question.
BY MR. FEARS:
Q. Mr. Burmayan, I don't want to argue with you. Let me ask a question. Forget about any other question. I am asking you a question right now.
With respect to the Facebook pages I have shown you that you have testified are your Facebook pages, do you have a recollection of removing those

pages from your public Facebook page?

MS. MKRTCHYAN: Objection.

MR. FEARS: Yes or no?

MS. MKRTCHYAN: Objection. Vague as to time. And argumentative. Badgering the witness.

THE WITNESS: I need some more clarification. Are you asking me if I removed any post recently regarding my posts from the past? I don't understand what you are asking me.

BY MR. FEARS:

Q. I am asking you about the Facebook posts that I have shown you over the last hour and a half.

Do you understand that?

A. Yes.

Q. Do you have a recollection of removing any of those posts from your Facebook page at any time?

A. No.

Q. Yes or no?

A. If I put something, it is there. If I took it off at that time, that is what I did. But I know I did not recently remove any posts that I put from the past.

Q. I didn't say anything about --

MS. MKRTCHYAN: Objection. This is -- this is why the question is vague and ambiguous.

THE WITNESS: Are you asking me if I put a post --

MS. MKRTCHYAN: There is no question -- okay. There is no question pending. Listen carefully to the question.

For the record, my client is getting overwhelmed again and anxious by the line of questions

THE COURT: Again, I don't see that. I don't see Ms. Burmayan getting overwhelmed, actually. I think, again, this is one of those that may be a miscommunication, so let me take a shot at it.

I think the question since you have been looking, Ms. Burmayan, at several Facebook posts, do you recall ever removing those posts?

THE WITNESS: Do I -- it is very confusing.

THE COURT: Do you remember?

THE WITNESS: No, I don't recall, because if I put a post, how am I supposed to remember if I removed it after I put it? It is very difficult for me to say what I did two years ago for a post that I put in 2021, if I put a post and I removed it. If I put a post, most likely it is there.

But if I removed it, then I removed it. I

can't tell from all of these hundreds of posts what is still there, what is not there, what has been removed. But I don't recall putting a post and then removing it. But if I did remove it at the time, then I put it and I removed it.

I just -- it is very hard for me to recall what I did with the post. I mean, the posts are there, so how could it be removed? I don't understand.

THE COURT: Okay.

MS. MKRTCHYAN: And I object. You know --

THE COURT: Have you answered the question, Ms. Burmayan. You've answered it. Thank you very much.

MS. MKRTCHYAN: And I object for the record. This deposition was supposed to be lasting two hours at the most.

THE COURT: Well, that is probably without my -- you know, I don't know that we can -- I have no idea how long this has been going because I don't have the time.

THE VIDEOGRAPHER: I --

MR. FEARS: Mr. Knowles has.

THE VIDEOGRAPHER: Yeah. I have been tracking it. And we are at an hour and 50 minutes,

so if it was two hours, I guess we would have exactly ten minutes left.

THE COURT: Okay. Excellent. Thank you very much.

Mr. Fears, please continue.

MR. FEARS: Thank you.

BY MR. FEARS:

Q. Ms. Burmayan, you were aware that the City of Glendale had a mask mandate in early 2021, correct?

MS. MKRTCHYAN: Objection as to face mask mandate. Calls for legal conclusion.

And by the way, the deposition was supposed to be hours --

THE COURT: Let's just try and get the -- motion to terminate, the motion is denied.

Let's just please get the questions and answers in the time remaining. Thank you.

Mr. Fears.

MR. FEARS: Your Honor -- Your Honor, I just have to state this for the record. I have been trying to be as patient as possible, but this is -- we get constant interruptions from Counsel, which then affects the witness's testimony. We have the interruption for about 15 minutes of dialog where

counsel was objecting to even Your Honor's questions and directions and so forth, and it is obviously an effort to run out the clock. And I just object to it.

I have been trying to ask these questions and just get a responsive answer, and Counsel either objects or the witness prevaricates even after she has been directed to answer questions and not just --

THE COURT: All right. So now you are going over the time for the speaking objections. I understand everyone is frustrated. My time is not going to count against Counsel, so I think let's go back to the questions and answers just like we have been doing.

BY MR. FEARS:

Q. Ms. Burmayan, you were aware that in early 2021 the City of Glendale had a mask mandate?

MS. MKRTCHYAN: Asked and answered. Objection.

THE COURT: It was asked. It was never answered, please.

MS. MKRTCHYAN: No, this question was --

THE COURT: Please, Ms. Burmayan, answer the question.

THE WITNESS: First of all, I would like to know what he meant by the witness is pre -- are you -- because I have a different --

THE COURT: That is not a question. All you need to do, please -- you don't need to worry about the lawyer argument. Please don't worry about the lawyer argument. All you need to do is listen to his question right now.

MS. MKRTCHYAN: Your Honor, I feel like my client is being badgered. And the only objection --

THE COURT: If you are making a motion to terminate, the motion is denied.

MS. MKRTCHYAN: May I make my objections?

THE COURT: No. The motion is denied. I told you, no speaking objections. If you are making a motion to termination, that motion is denied.

Mr. Fears, back to your question.

Ms. Burmayan, please listen to the question and answer it.

THE WITNESS: I understand that, Your Honor, but he just insulted me and said that I was not answering the -- or like he said something that the witness is doing --

THE COURT: Don't worry about it.

MS. MKRTCHYAN: -- I just want to make sure

that my rights are protected because I feel like just because I have a different political view from the counsel or something, that I am speaking about my freedom of speech or protection, he is making me look like a criminal.

THE COURT: Okay. No. No. No. Ms. Burmayan -- Ms. Burmayan, this is an important point. Please don't feel defensive about the questions. This is not about that. This is simply question and answer. You have the feelings you have. You have the answers you have. That is it. That is -- it is not a -- you don't need to feel defensive about it. Let's just get through the rest of this. The Facebook pages are now history. Let's please go onto the rest of the questions.

Mr. Fears, please.

MR. FEARS: Thank you.

THE WITNESS: I understand, Your Honor. I just want to make sure that I am being protected also and not being insulted by the counselor that I have a different viewpoint and I put different viewpoints because all he is doing is tearing me up and insulting me because I have different viewpoints of what I thought about the mask mandate and the vaccine mandate at the time.

THE COURT: And you are --

MS. MKRTCHYAN: There is no need to talk.

THE COURT: It is hard to tell on Zoom when you're finished talking. All I am saying is your views about counsel are on the record, and therefore we don't need to worry about this anymore. Let's just please go on.

THE WITNESS: Okay.

BY MR. FEARS:

Q. Ms. Burmayan, you were aware that in early 2021 the City of Glendale had a mask mandate for retail stores, correct?

MS. MKRTCHYAN: Objection. Calls for speculation. Legal conclusion.

THE WITNESS: I was aware. I was following the California State guidelines.

BY MR. FEARS:

Q. Okay. With respect to January 13, of '20 -- I'm sorry, January 13, 2021, when you went to the CVS store that is the subject of this lawsuit, you were asked several times to have your mask cover your nose, correct?

MS. MKRTCHYAN: Objection. These same questions were asked at the first deposition. The Court's order specifically limited this second

deposition to damages and Facebook posts, not to areas where it was covered. So now they're having a second bite at the apple by asking the same exact questions that were asked at the seven-, eight-hour deposition. That is my objection for the record.

And I object. I asked for terminating this deposition.

THE COURT: Motion is denied.

Please continue, Mr. Fears.

BY MR. FEARS:

Q. Are you able to answer the question, Ms. Burmayan?

A. No. Can you repeat the question?

Q. Okay. On January 13 of 2021 when you went to the CVS store that is the subject of this litigation, several times you were asked to have your mask cover your nose, correct?

A. I was asked by Guy Garcia to cover my nose, yes.

Q. Okay. At any time did Mr. Garcia or the cashier or Mr. Johnson ever make any reference whatsoever to your race or national origin?

A. You're asking if any of the three people you mentioned, if they made a comment about my race?

Q. Or national origin.

A. No.
Q. And on January 19, when you revisited the CVS store, did any CVS employee make any reference to your race or national origin?
A. So for clarification, now you're asking if on the 19th any of the people you mentioned made a comment about my race?
Q. That's correct. Any of those people or any other CVS employee make any reference to your race or national origin?
A. Not CVS employees, no.
Q. Okay. All right. What -- do you claim or believe that CVS treated you differently because you are Armenian?
MS. MKRTCHYAN: Calls for legal conclusion. Calls for expert opinion.
THE WITNESS: Well, if you can clarify your question because what I am understanding is -- are you asking me if basically the same question you asked me a minute ago, which is did anyone make any comments about me being Armenian?
BY MR. FEARS:
Q. I'm talking about CVS employees only.
A. Uh-huh.
Q. And are -- is it your belief that any CVS

employee treated you differently because of the fact that you were Armenian?

MS. MKRTCHYAN: Attorney work product. Attorney-client privilege. Objection. Calls for legal conclusion.

THE WITNESS: I don't know what they believed or what their beliefs were. All I can tell you is I did not hear any comments that they made about me being Armenian, but I can't assume or speculate what their thoughts were about Armenians.

THE VIDEOGRAPHER: Hey, Dan, this is the videographer speaking, there are two minutes left.

MR. FEARS: Understand.

BY MR. FEARS:

Q. Prior -- well, let me withdraw that.

Did any CVS employee say anything to you about your alleged disability?

A. Okay. I need to make sure that I understand this question correctly. You are asking me if any employee said anything to me about my disability?

Q. Yes.

A. No, because they were ignoring me the whole time and the only thing they were saying is to cover my nose.

Q. And at the last session of your deposition, do you recall I asked you about a note that you said you had with you on January 13, 2021, and January 19, 2021, that allegedly indicated that you did not have to wear the mask over your nose?

Do you recall that?

MS. MKRTCHYAN: Objection. This is going over the same line of questioning that the first deposition. Time is up. I request terminating this deposition.

THE COURT: Denied.

Please answer the question.

THE WITNESS: Can you repeat the question because it was very lengthy and I can't recall what the --

BY MR. FEARS:

Q. Do you remember -- do you remember referring to a note that you had from a doctor. I think you mentioned it was from either Dr. Tribble or Dr. Flores that allegedly said something about whether or not you could wear a mask over your nose?

MS. MKRTCHYAN: Misstates the testimony. Objection. Vague and ambiguous.

THE WITNESS: What I do remember is I kept telling Guy Garcia I have a disability. I have a

disability. Please listen to me. I have a disability. I have a note. Can you look at my note? I have a disability. I can't breath well, sir. Can you look at my note? I have a disability. And every time I was bringing that up, he was ignoring it.

MR. FEARS: Move to strike as nonresponsive.

MS. MKRTCHYAN: Objection.

BY MR. FEARS:

Q. Ms. Burmayan, I am focussing on the note only right now. And last time I asked you about the note you said you had two to three copies of this note that somehow related to a mask.

Have you been able to locate this note that you referenced in your last deposition in the period of time since your last deposition?

MS. MKRTCHYAN: Objection. Misstates the testimony and compound.

THE WITNESS: That is not true. I never said I had two to three different copies. I said I had two, three different doctors that were confirming my disability.

BY MR. FEARS:

Q. And I won't argue with you about the

transcript, but have you located any doctor's note
since the last session of your deposition that
refers to your inability to wear a mask in any way?
MS. MKRTCHYAN: Objection.
THE WITNESS: Yes.
MS. MKRTCHYAN: Vague and ambiguous.
Attorney-client privilege. Attorney work product.
Your Honor, I will request this -- I
instruct the witness not to answer because it goes
into attorney-client privileged communications at
this point.
THE COURT: The question did not ask about
any communications. The question is simply whether
she located the document.
MS. MKRTCHYAN: Well, but if the attorney
located the document, not her, she would not know
the answer. That goes into attorney-client
privileged communication.
THE COURT: Then that would be the answer.
He is not asking for her to tell him what you have
done. He is simply asking whether she located the
document.
MS. MKRTCHYAN: Then it should be made
clear, because vague and ambiguous as to --
THE COURT: I think it is clear. I think

it is clear. He is not asking --

Do you understand, Ms. Burmayan? He is not asking you to describe what your lawyer has done, just what you have done.

THE WITNESS: I have a note from Dr. Tribble saying that I can open my nose area of the mask and lower it when I don't feel well.

BY MR. FEARS:

Q. And where is that note?

MS. MKRTCHYAN: Objection. Again, attorney-client privilege. Attorney work product. Instruct not to answer. This is going, again, into attorney-client privileged communications. It is improper for the witness to know where it is without disclosing attorney-client privileged communications.

THE COURT: I am going to -- since it is a counsel issue, I think we can deal with this with counsel only at the end, so I will ask Mr. Fears to just move on to the next question.

MR. FEARS: Okay. I would like to have a discussion about this, Your Honor, because we have been trying to get this mysterious note which would be responsive to the early disclosures as well as specific discovery responses. It has not been

produced. Counsel said she would produce it if it existed. Counsel is now referring to the existence of it. We have not seen it. And I am not even --

THE COURT: Right.

MR. FEARS: -- able to take -- conclude the deposition without seeing it. And it's obviously important if it does exist. And I am afraid there is some gamesmanship that is going on here and a failure to produce that prevents discovery here, so I very much would like to talk about that note. But I will move on as you have requested.

THE COURT: Okay.

BY MR. FEARS:

Q. Ms. Burmayan, with respect to the -- the testimony that you have given about the individual employees at CVS, not the police officer, but the employees at CVS that you spoke with on January 13, and January 19, what damages are you claiming you incurred as a result of your communications with the CVS employees?

MS. MKRTCHYAN: Well, objection. This is going over the time. You know, I object that this -- we have had two and a half -- I need to have lunch myself. I cannot continue. I will get a migraine headache if I do not have timely lunch.

My client is getting, you know, overwhelmed. What is this? So now you are going into damages after exhausting the time limit, you know, for questioning, Your Honor. I object to this. This is no --

THE COURT: Well, I think I have to say this is the first time I have had a counsel for plaintiff object to a question about the damages in the case. But if what you need is a break, I think we can accommodate that.

MS. MKRTCHYAN: Well, no, it is not just --

THE COURT: And in the interim, if you could find this document -- I am concerned. I don't want to have a situation where the party produces a document and then the other side asks for additional deposition time because there is a document that they did not have at the time of the deposition. So if you could look into this and -- in the meantime during the break so that we don't have to go through that. I am just concerned to avoid any unnecessary motion practice.

But how much time do you need?

MS. MKRTCHYAN: Well, Your Honor, I object. First of all, I allocated only two hours of my day for this. I have other deadlines. I have to have

lunch break. I need to have other motions to be filed today. I cannot come back after lunch. This is --

THE COURT: Okay. Okay. All right. Well, we have -- so we have a couple of issues. One is going to be the damages. The other is a document that apparently has not been produced unless you have a Bates stamped number that you can give us quickly.

So why don't we pick this up tomorrow since we are going to be -- I think we have a hearing anyway, maybe we could just add to this and adjourn for today subject to the issues that we will need to discuss tomorrow about this document production.

MS. MKRTCHYAN: I'm not sure what you mean by --

MR. FEARS: That's fine, Your Honor.

MS. MKRTCHYAN: I am not going to produce my client tomorrow.

THE COURT: No. No. No. No.

MS. MKRTCHYAN: Okay.

THE COURT: I am talking about the hearing we are going to have tomorrow, and we can address this question about the document that came up the last time as well so that, you know, we can address

that because --

MS. MKRTCHYAN: Yes. Sure.

THE COURT: -- I think there is going to be another session. So what I am trying to avoid, as I said, is a situation where we have motion practice over whether there should be an additional time of deposition for documents that are produced later. So I am trying to avoid that. I am trying to avoid that. So tomorrow, let's discuss these document.

MS. MKRTCHYAN: Uh-huh. Sure.

MR. FEARS: That would be fine, Your Honor. I will just note for the record at the October 11 session, Counsel on the record stated that the -- she would identify the document, but then she stated later in the deposition that it could be found somewhere between plaintiff's Bates stamped 21 through 54. We have checked. It is not there. We looked. It has not been produced in the meantime.

Counsel on the record here a moment ago claimed attorney-client privilege as to that document and the witness's knowledge of where it is, yet it has not been produced in the meantime. I have some grave concerns about that, Your Honor. And yes, I think we should take it up tomorrow and address it in a robust manner.

THE COURT: All right. Great. I don't want to take up more of the witness's time, so let's adjourn and we will take up the remaining matters tomorrow. Thank you.

MR. FEARS: Thank you, Your Honor.

THE VIDEOGRAPHER: Okay. This marks the end of the Volume 2 of the deposition. We're now going off the record at 12:41 p.m. Thank you, Counsel.

THE COURT REPORTER: Before we go off the written record, did anybody want to order a copy of the transcript?

MR. ARIAS: Yes.

MR. FEARS: Jamie, we will, yes.

THE COURT REPORTER: And Narine, what about you?

MS. MKRTCHYAN: No, thank you.

THE COURT REPORTER: Okay. Thank you.

(Proceedings concluded at 12:41 p.m.)

--oOo--

REPORTER'S CERTIFICATE

I, JAMIE DAVIS, CSR No. 14209, a Certified Shorthand Reporter, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition, ANOUSH BURMAYAN, was by me duly sworn to testify the truth, the whole truth, and nothing but the truth;

That said deposition was taken before me at the time and place set forth and was taken down by me in shorthand and thereafter reduced to computerized transcription under my direction and supervision; and I hereby certify the foregoing deposition is a full, true and correct transcript of my shorthand notes so taken.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [X] was not requested.

I further certify that I am neither counsel for nor related to any party to said action nor in any way interested in the outcome thereof.

IN WITNESS WHEREOF, I have hereunto subscribed my name on February 29, 3024.

Jamie Davis
_______________________
Jamie Davis,
CSR No. 14209

PENALTY OF PERJURY

I, ANOUSH BURMAYAN, do hereby declare under penalty of perjury that I have read the foregoing transcript; that I have made any corrections as appear noted, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct.

EXECUTED this _____day of _____________,
20____, at _______________, _________________.
(City) (State)

________________________
ANOUSH BURMAYAN

DEPOSITION ERRATA SHEET

Page No. ______ Line No. ______ Change to: __________
Reason for change: ________________________________________
Page No. ______ Line No. ______ Change to: __________
Reason for change: ________________________________________
Page No. ______ Line No. ______ Change to: __________
Reason for change: ________________________________________
Page No. ______ Line No. ______ Change to: __________
Reason for change: ________________________________________
Page No. ______ Line No. ______ Change to: __________
Reason for change: ________________________________________
Page No. ______ Line No. ______ Change to: __________
Reason for change: ________________________________________
Page No. ______ Line No. ______ Change to: __________
Reason for change: ________________________________________
Page No. ______ Line No. ______ Change to: __________
Reason for change: ________________________________________
Page No. ______ Line No. ______ Change to: __________
Reason for change: ________________________________________
Page No. ______ Line No. ______ Change to: __________
Reason for change: ________________________________________
Page No. ______ Line No. ______ Change to: __________
Reason for change: ________________________________________
Page No. ______ Line No. ______ Change to: __________
Reason for change: ________________________________________

DEPOSITION ERRATA SHEET

Page No. _____ Line No. _____ Change to: ________

Reason for change: ________________________________

Page No. _____ Line No. _____ Change to: ________

Reason for change: ________________________________

Page No. _____ Line No. _____ Change to: ________

Reason for change: ________________________________

Page No. _____ Line No. _____ Change to: ________

Reason for change: ________________________________

Page No. _____ Line No. _____ Change to: ________

Reason for change: ________________________________

Page No. _____ Line No. _____ Change to: ________

Reason for change: ________________________________

Page No. _____ Line No. _____ Change to: ________

Reason for change: ________________________________

Page No. _____ Line No. _____ Change to: ________

Reason for change: ________________________________

Page No. _____ Line No. _____ Change to: ________

Reason for change: ________________________________

Page No. _____ Line No. _____ Change to: ________

Reason for change: ________________________________

SIGNATURE _____________________ DATE: ___________
ANOUSH BURMAYAN



# Magna Key Contacts

**Schedule a Deposition:**
Scheduling@MagnaLS.com | 866-624-6221

**Order a Transcript:**
CustomerService@MagnaLS.com | 866-624-6221

**General Billing Inquiries:**
ARTeam@MagnaLS.com | 866-624-6221

**Scheduling Operations Manager:**
Patricia Gondor (E: PGondor@MagnaLS.com | C: 215-221-9566)

**Customer Care:**
Cari Hartley (E: CHartley@MagnaLS.com | C: 843-814-0841)

**Director of Production Services:**
Ron Hickman (E:RHickman@MagnaLS.com | C: 215-982-0810)

**National Director of Discovery Support Services:**
Carmella Mazza (E: CMazza@MagnaLS.com | C: 856-495-1920)

**Billing Manager:**
Maria Capetola (E: MCapetola@MagnaLS.com | C: 215-292-9603)

**Director of Sales Operations:**
Kristina Moukina (E: KMoukina@MagnaLS.com | C: 215-796-5028)

MAGNA LEGAL SERVICES

**A**

**a.m**
333:19 336:3,15 378:17,20 404:10
**abandoned**
376:13
**able**
351:21 369:5 423:11 427:15 430:5
**access**
351:15
**accommodate**
377:23 431:10
**account**
344:23
**accurate**
339:3,13 366:20
**accurately**
379:5 393:15
**action**
435:20
**active**
343:1,6,12
**actual**
392:23
**add**
341:12 432:12
**added**
368:12
**adding**
390:23
**addition**
370:4
**additional**
341:20 368:13 409:4 431:15 433:6
**address**
341:3 432:23,25 433:25
**addressed**
341:1
**addressing**
341:7
**adjourn**
432:12 434:3
**admissibility**
341:2
**admonitions**
338:16
**Adrian**
406:1,16
**advocated**
355:3
**advocating**
354:23
**afraid**
350:16 430:7
**agitating**
402:25
**ago**
344:9 357:17 413:2 416:22 424:20 433:19
**agree**
364:17 368:1 390:7 390:12,17,25 392:2
**agreeable**
340:4,11
**agreed**
389:24
**agreement**
350:17 363:22 389:16,19,20
**ahead**
336:25,25 360:1 372:19 375:13 378:6,9 379:25 407:9 408:25
**Alica**
334:20
**alleged**
366:4 425:17
**allegedly**
373:20 374:6,15 426:4,20
**allocated**
431:24
**allowed**
369:4
**ambiguous**
345:13 347:10,25 350:8 352:14 354:17 356:13 360:14 362:2,10 363:13,24 365:22 369:22 370:21 374:9 377:5,5 379:7 379:10 382:23 383:12 384:20 389:19 390:10 394:8 395:24 396:8 406:14 411:4,15 413:24 415:25 426:23 428:6,24
**America**
392:24
**and/or**
351:20 369:13
**Angeles**
359:11 360:4,11 362:5 363:11,20 364:1 407:20
**angry**
352:17
**Anoush**
333:4,16 335:3 336:1 336:9 337:9,23 344:1,15,20 386:6 411:24 435:5 436:2 436:15 438:23
**answer**
340:24 341:4,7,10 345:14 357:17 364:11 365:3 372:7 379:13 381:2 389:4 397:16,19,19 398:9 399:1,23 400:17 402:7 403:17 404:4 407:25 419:6,8,24 420:19 421:10 423:11 426:12 428:9,17,19 429:12
**answered**
349:15 360:23 371:24 383:24 391:12 397:13 398:12 406:14 410:10,12 417:12 417:13 419:19,22
**answering**
371:14 378:4 399:1 403:21 420:22
**answers**
398:9 418:18 419:14 421:11
**anxious**
416:7
**anybody**
434:11
**anymore**
380:16 422:6
**anyway**
432:12
**apparently**
370:19 373:17 386:2 386:8 432:7
**appear**
343:14 436:5
**appearances**
334:1 336:22
**appears**
343:21 388:9 407:14
**apple**
423:3
**approximate**
349:25
**approximately**
336:15 367:25
**April**
350:3,5,14 351:15 352:6 353:13,20 354:1,6
**area**
429:6
**areas**
423:2
**argue**
414:20 427:25
**arguing**
400:11
**argument**
398:20 402:23 420:6 420:7

**argumentative**
347:24 352:13 358:12,21 363:12 364:12,19 366:17 370:20 371:25 377:5,13 381:14 382:1 383:23 390:21 391:23 410:5 415:5
**Arias**
334:18 337:12,12 434:13
**Armendariz**
333:11 334:14
**Armenian**
424:14,21 425:2,9
**Armenians**
425:10
**arrest**
352:16,20,20 413:15
**article**
373:8,18 374:19,21 375:3 376:9,10,11 379:19 384:1 385:21 386:7,9,11 386:20 387:13,17 387:21 391:15 394:24 395:16,19 395:22 407:11,17 407:19 412:18,22 413:4
**articulate**
402:19
**articulated**
353:1,23
**asked**
339:14 342:18 349:15 351:19 355:19 361:1 365:19 383:24 406:13 410:7,9,11 414:17 419:19,21 422:21,24 423:4,6 423:16,18 424:20 426:2 427:12
**asking**
353:21 354:1,4,7,9 354:19 356:15,16 360:22 365:4 370:23 371:13,22 376:1,3,6 383:6,7 389:24 393:5 396:3 396:4,12 398:13 404:3 413:3,25 414:18,22 415:7,9 415:11 416:1 423:3 423:23 424:5,19 425:19 428:20,21 429:1,3
**asks**
397:4 398:24 402:15 431:15
**association**
374:5,7,14,16
**assume**
339:11 342:11 425:9
**attached**
436:5
**attacked**
401:11
**attending**
376:16
**attention**
345:20 406:20 408:24
**attorney**
334:15 345:1 403:5 403:15 425:3 428:7 428:15 429:11
**attorney-client**
425:4 428:7,10,17 429:11,13,15 433:20
**August**
389:2 391:10
**available**
368:3,7,11
**avoid**
431:20 433:4,8,8
**aware**
346:8 418:8 419:17 422:10,15

**B**

**back**
350:10 366:24 367:15,23 378:19 380:17,19,20 381:16 383:25 386:5 399:22,23 401:1 403:9 404:2,3 404:12 407:12 410:18 412:3,5,10 419:14 420:17 432:2
**backwards**
367:10
**badgered**
420:10
**badgering**
364:20 370:22 372:1 382:2 410:6 415:5
**based**
361:23 367:22 370:15
**basic**
341:6 381:15
**basically**
345:1 356:24 357:2 357:11 376:14 384:4,9 424:19
**Bates**
432:8 433:16
**Beach**
334:8 391:16 392:12 392:14
**began**
338:9 369:14
**beginning**
348:24 349:4 364:25 368:19 400:5
**begins**
336:9
**behalf**
336:2 337:9,11,12
**belief**
424:25
**beliefs**
425:7
**believe**
339:3 342:25 368:7 383:20 424:13
**believed**
425:7
**best**
342:11 401:13,14 412:16
**big**
393:19 394:2
**bit**
342:18 353:4 363:6 385:14 401:22 412:19
**bitch**
386:24 395:14 410:23
**bite**
423:3
**blood**
373:20 375:22
**body**
384:10
**boosted**
407:3 408:4,12
**bottom**
405:17,22 406:9,15 407:4,21 409:9,17 409:24
**Box**
334:4
**boy**
379:19
**break**
357:19,21 377:17,21 378:1,9,18 401:3 402:18 403:14,25 404:11 431:9,19 432:1
**breaking**
360:4 361:17 363:9 363:20 367:8
**breaks**
377:22
**breath**

404:2 427:3
**breathing**
362:21
**brief**
374:22
**bringing**
427:5
**Broadway**
334:16
**Burmayan**
333:4,16 335:3 336:2 336:10,10 337:9,23 338:5 339:2 340:11 340:23 341:17 345:7 349:9 352:10 356:3 363:7 364:15 365:3,12 366:2 369:8 370:10 371:19 372:6,14 375:11 377:12 378:22 379:12 380:1 383:19 389:23 391:2 396:6 399:18 400:21 401:7 404:4,16 405:23 407:21 410:14 413:19 414:20 416:10,15 417:13 418:8 419:17,24 420:18 421:7,7 422:10 423:12 427:11 429:2 430:14 435:5 436:2,15 438:23
**business**
333:7

**C**

**CA**
334:5,10,16
**calculate**
367:14
**California**
333:2,7 336:6,12 373:19 422:16
**Call**
358:20
**called**
381:4
**calling**
396:11 398:10
**calls**
347:9,10 357:23 364:15 368:4,21 370:10 374:18 379:12 382:2 394:11 413:19 418:12 422:13 424:15,16 425:4
**calm**
404:2
**capable**
339:12
**caps**
410:20,21,22,23
**capture**
409:25 410:1
**care**
349:5 376:24
**carefully**
416:5
**carias@glendaleca...**
334:17
**Carl**
334:18 337:12
**case**
336:13 344:24 365:20 398:20 431:9 435:17
**cases**
408:3,11
**cashier**
423:21
**caused**
352:18 376:11
**causing**
362:15
**CBSlocal.com**
386:19
**Central**
333:2 336:12
**CERTIFICATE**
435:1
**Certified**
336:5 435:2
**certify**
435:3,12,19
**cetera**
390:5 395:15
**chance**
356:4 402:11 412:4
**change**
343:9 363:6 437:2,3 437:4,5,6,7,8,9,10 437:11,12,13,14,15 437:16,17,18,19,20 437:21,22,23,24,25 438:2,3,4,5,6,7,8,9 438:10,11,12,13,14 438:15,16,17,18,19 438:20,21
**changed**
383:3
**changes**
339:7 340:3,10 341:8
**check**
375:3
**checked**
433:17
**child**
374:14,24 376:13
**children**
356:25 357:3,11 358:2 365:18 366:5 366:13,15 367:11 367:19 369:10,14 369:19 370:6 371:23 376:16,24
**children's**
376:16
**city**
333:9 334:14,15 337:13 382:20,20 384:2,5 418:8 419:18 422:11 436:11
**claim**
424:12
**claimed**
433:20
**claiming**
430:18
**Claire**
382:20 384:1,5
**clarification**
356:14 415:7 424:5
**clarify**
354:18 356:17 359:2 359:2 367:2 370:23 371:7 383:14 397:23 408:16 424:17
**clarity**
355:13
**clear**
428:24,25 429:1
**clearing**
380:11
**click**
374:21 376:10
**client**
399:8 401:4,25 402:4 402:19 416:6 420:10 431:1 432:19
**clock**
403:25 419:3
**closed**
337:3
**closely**
385:15
**closing**
358:1
**clothing**
384:13
**clown**
382:17 383:9 385:7 410:22
**come**
400:9,25 432:2
**comes**
399:1 400:4,25 403:9
**comfortable**
394:3

**commencing** 336:3
**comment** 360:25 361:3,6,8,16 361:23 363:8,10,19 363:22 364:6,16 382:9 385:19 386:11 387:23 388:13 390:5,19 391:3,14 393:14 395:11 423:24 424:7
**commenting** 387:20
**comments** 340:17 395:15 402:20 407:10 424:21 425:8
**communication** 428:18
**communications** 428:10,13 429:13,16 430:19
**complete** 339:4,13
**completion** 435:17
**compound** 427:19
**computer** 340:7
**computerized** 435:11
**computers** 339:24
**concerned** 348:9 357:4,10 431:13,20
**concerning** 347:14
**concerns** 370:1 433:23
**concisely** 340:20 341:9
**conclude** 430:5
**concluded** 434:19
**conclusion** 347:11 358:20 368:22 418:12 422:14 424:15 425:5
**condition** 362:19 411:18
**conditions** 357:1 362:13
**conference** 333:20 340:1
**confirming** 427:23
**confused** 371:8 388:22 398:21
**confusing** 377:8 401:8 416:17
**confusion** 398:23
**connected** 340:1
**constant** 418:23
**Constantin** 406:1,16
**contained** 436:6
**continue** 378:3 418:5 423:9 430:24
**control** 405:14
**conveyed** 386:19
**copies** 344:24 350:21 351:20 427:13,21
**copy** 342:3 345:7 434:11
**corporation** 333:7
**correct** 339:15 342:20 343:5 347:23 348:2 351:7 351:17,21 352:2 356:5 358:5,8 359:4 359:9,15 360:12 361:25 362:6,7 367:6 369:10,20 379:14,17 380:7,23 381:1 382:7,10 383:22 384:25 385:3,8 386:8,15 387:5,25 388:10,18 389:17 390:8 391:17 392:3,14 393:2 394:6 395:10 395:22 408:6 418:10 422:12,22 423:17 424:8 435:13 436:7
**corrected** 436:7
**corrections** 436:4
**correctly** 353:12,15 368:9 425:19
**counsel** 336:8,17,21 337:7 339:9 340:19 341:5 351:20 364:24 378:11 399:4 402:10 404:13 418:23 419:1,6,13 421:3 422:5 429:18 429:19 430:1,2 431:7 433:13,19 434:9 435:19
**counselor** 421:20
**count** 366:25 391:18 419:13
**counties** 359:21
**county** 359:11,22 360:4,12 361:17 362:6 363:11,21 364:2,3 364:17 407:20
**County's** 361:21
**couple** 340:16 372:20 383:1 432:5
**courage** 393:19 394:2
**course** 354:15
**court** 333:1 336:12,19,24 337:1,2,21 338:2 340:14 341:14 364:24 372:5 377:19 378:5,8 394:16 397:1,15 398:2,11,18 399:11 400:3 401:6,21 402:3,22 403:6,12 403:14 416:9,18 417:10,12,18 418:3 418:15 419:10,21 419:24 420:4,11,14 420:24 421:6 422:1 422:3 423:8 426:11 428:12,19,25 429:17 430:4,12 431:6,12 432:4,20 432:22 433:3 434:1 434:10,15,18
**Court's** 422:25
**cousin** 362:16 364:7
**cover** 422:21 423:17,18 425:24
**covered** 373:19 423:2
**COVID** 346:13,20 347:8,15 353:11,24 354:15 355:3,16,21 356:10 356:22 367:11 374:17 385:24

386:14 391:17 392:9,13 395:7,16 395:22 396:1
**COVID-19** 387:14,19 408:3,10
**coward** 393:23
**cowards** 370:14
**credit** 389:10,11
**criminal** 401:13 421:5
**critical** 365:18,22 366:3 369:18,22 370:17 370:24 371:22 377:1,6 386:12 387:24 411:1,4 413:22
**criticism** 356:21,23 360:11,16
**criticize** 355:20
**criticized** 355:6,9,16
**criticizing** 361:21
**cross-examination** 402:10
**crying** 399:9 401:4,5
**CSR** 336:5 435:2,25
**Cucu** 406:1,16
**cut** 383:14
**CVS** 333:6 334:8 336:10 337:11 338:8 422:20 423:15 424:3,3,9,11,13,23 424:25 425:16 430:16,17,20

**D**

**damages** 423:1 430:18 431:3,8 432:6
**Dan** 337:15 338:7 425:11
**Daniel** 334:12 337:10
**date** 333:18 343:11 388:17,21 409:25 410:1,1 438:23
**dated** 365:9 411:24
**Davis** 336:5,20 435:2,24
**day** 338:8,17 409:24 431:24 436:10
**deadlines** 431:25
**deal** 429:18
**December** 406:22 407:8
**decide** 341:2 400:4,24
**decided** 396:14
**declare** 436:2
**deep** 404:2
**Defendant** 334:8 336:2
**defendants** 333:13 334:14 336:18 337:13
**defensive** 421:8,13
**denied** 418:16 420:12,14,16 423:8 426:11
**deny** 389:12
**department** 352:18
**depending** 392:4
**deponent** 337:20,22 403:17
**deposition** 333:15 336:1,9,16 338:9,9,12,15,21 339:17 340:20 341:19,21,21,23,24 342:2,4 343:18,19 344:18 364:23 365:2 401:22 403:2 417:16 418:13 422:24 423:1,5,7 426:1,9,10 427:16 427:17 428:2 430:6 431:16,17 433:7,15 434:7 435:5,8,13,16 437:1 438:1
**depositions** 399:12
**depressed** 357:6 374:25 375:9 375:24 376:2,5
**depression** 375:2
**derailed** 364:22
**derogatory** 392:2
**describe** 352:16 429:3
**DESCRIPTION** 335:7
**deserve** 370:13
**device** 339:25 395:6
**devices** 339:23,24
**dff@paynefears.com** 334:11
**dialog** 418:25
**difference** 397:3
**different** 344:10 349:8 357:12 359:20,21 360:25 392:7,8 397:6,17,19 397:21,22 399:2,3 420:3 421:2,21,21 421:23 427:21,22
**differently** 414:5 424:13 425:1
**difficult** 372:8 403:17,22 416:21
**directed** 419:8
**direction** 435:11
**directions** 419:2
**disabilities** 362:14
**disability** 425:17,21 426:25 427:1,2,3,4,23
**disagree** 390:12
**disclosing** 429:15
**disclosures** 429:24
**discovery** 429:25 430:9
**discuss** 339:9 432:14 433:9
**discussion** 429:22
**disgusted** 370:11
**display** 384:11
**distinction** 397:7
**distinguish** 397:17
**district**

333:1,2 336:11,12 358:16 359:4,6,8,15 392:7,8
**doctor**
426:18
**doctor's**
428:1
**doctors**
427:22
**document**
343:20 356:2 428:14 428:16,22 431:13 431:15,16 432:6,14 432:24 433:9,14,21
**documents**
340:6,7 341:20,22 342:1 343:13 433:7
**doing**
333:7 357:10 366:13 367:19 399:24 419:15 420:23 421:22
**dose**
387:14,18
**double**
383:8
**Dr**
426:19,20 429:6
**drug-addicted**
375:9,24 376:5
**drugs**
357:7 374:25
**Due**
392:24
**duly**
337:24 435:6

**E**

**E**
334:16
**e-mail**
344:25 345:2,4
**e-mails**
345:3
**earlier**
371:9,21 383:14 410:16
**early**
418:9 419:17 422:10 429:24
**easy**
399:12,12,13
**educate**
396:16,19
**educators**
375:16 377:2
**effect**
338:20
**effort**
419:3
**efforts**
356:9,22
**eight-hour**
423:4
**either**
347:13 351:16 397:25 419:6 426:19
**elderly**
368:20
**electronic**
345:4
**eligible**
395:8
**emoji**
382:17
**emojis**
361:13 383:9 385:7 387:11 407:10 408:6,8,20,21 411:25 412:12,13 412:15 413:3
**employee**
359:3,8 424:3,9 425:1,16,20
**employees**
382:20 384:2,5 424:11,23 430:16 430:17,20
**encouraged**
355:2
**encouraging**
354:20,25
**Enjoy**
380:9
**entire**
346:19 373:6 405:4 405:16 412:22
**entirely**
406:23
**ERRATA**
437:1 438:1
**especially**
342:17 398:13 410:20 411:2
**Esq**
334:6,12,12,18
**essentially**
353:18 361:24
**estimate**
342:11
**et**
390:4 395:14
**Eu**
406:1,16
**events**
369:5
**everybody**
399:20
**evidence**
366:7,18 393:4
**exact**
343:11 366:20 423:3
**exactly**
352:5 366:25 367:15 368:14 374:21 375:3,23 397:12 399:9 414:4 418:2
**examination**
335:3 338:3 340:22 400:17
**EXAMINATIONS**
335:1
**examined**
337:24 435:4
**example**
362:16
**examples**
362:23
**Excellent**
418:3
**excuse**
366:21
**EXECUTED**
436:10
**exhaust**
357:19,21
**exhausting**
431:3
**Exhibit**
335:7 343:17,18,23 346:13 356:3 365:8 372:11 379:1,22,23 379:23,24 385:11
**EXHIBITS**
335:6
**exist**
430:7
**existed**
430:2
**existence**
430:2
**expand**
377:7
**expert**
368:22 424:16
**explain**
345:16 346:10 363:15 365:24 377:7 397:2,6,21 400:21 401:14,18 401:22 402:4,6,14 408:15
**explained**
400:5
**explaining**
399:2
**express**
363:22
**expresses**
386:18
**expressing**
396:18

F

**F**
391:22
**face**
375:18 414:7 418:11
**Facebook**
335:8 342:5,7,12,15 343:4,5,7,15,21 344:4,5,8,18,19,23 345:8,21 346:8,13 346:22,25 347:3 348:17 349:10,21 349:23 350:14,24 351:1,6 352:12,23 353:9,23 354:12,13 354:24 355:1,5,8,15 356:4 360:1,8 365:8 365:15 369:18 372:12,17 378:6 379:1,21,24 380:3 382:6,7,12,13 385:10,12 387:7 388:9 391:8,9 392:15,21 394:22 398:5 404:20,22,24 405:2 406:5,20 407:8,15,23 408:25 411:22 413:10,21 414:7,14,23,24 415:1,11,16 416:15 421:14 423:1
**fact**
355:20 370:17 374:24 387:25 392:6 396:10 425:1
**failure**
430:9
**fair**
346:21 347:6,19 348:1 351:12 353:6 361:20 365:17 366:2 369:8,14 376:25 379:4 413:9 413:14,20
**fairly**
399:17
**fall**
385:25 386:15
**Families**
401:17
**family**
347:17
**far**
343:25 399:21 410:7
**father**
373:20 374:7,15
**favor**
348:4,6,15,19,22 349:3,5,11 350:6,15 351:17 352:7,8 353:1,10,14,17,24 354:2,6,7,14,17,21 362:8,11 363:10,16 365:5
**favored**
355:2
**favoring**
351:25
**FCK**
393:19 394:2
**Fears**
334:9,12 335:3 336:23,25 337:6,10 337:10,10,15,15 338:4,7 340:15 341:13,15,16 345:19 347:18,22 348:3 349:16 350:12 352:2,9,21 354:22 355:14 356:18 358:3,13 359:1,24 360:18 362:4 363:2,4,17 364:10,14 365:7 366:1,10 367:4,20 368:17 369:7 370:7 370:9 371:1,18 372:2,4,10 373:9,11 374:12 375:5 376:18 377:10,23 378:7,10,14,21 379:8,11 381:19 382:5 383:18 384:15,23 389:21 390:15 391:1 392:1 393:7 394:11,14,21 395:3 396:2,22 398:4,6,12 404:3,8 404:14,15 405:5,21 406:19,24 408:18 410:13 411:10,21 413:18 414:3,19 415:3,10 417:23 418:5,6,7,19,20 419:16 420:17 421:16,17 422:9,17 423:9,10 424:22 425:13,14 426:16 427:7,10,24 429:8 429:19,21 430:5,13 432:17 433:11 434:5,14
**February**
333:18 336:4,14 435:23
**federal**
347:7,10 358:17,18 358:23 435:16
**feel**
342:10 345:24 346:1 361:11 362:25 399:7 401:10,12,13 401:18 403:11 420:9 421:1,8,12 429:7
**feeling**
339:8 349:2 402:5
**feelings**
421:10
**fentanyl**
357:8
**fight**
375:21 380:13 381:8
**figure**
350:18 407:16
**filed**
432:2
**Finally**
341:17
**find**
339:16,18 396:15 431:13
**fine**
399:16,19 432:17 433:11
**finger**
382:16 383:8 385:2,5 391:24
**fingers**
385:4 387:1,3 391:15 391:20,21
**finish**
377:25
**finished**
412:8 413:5 422:4
**first**
337:7 339:18 342:4 345:6,21 357:18 368:19,20,25 369:3 369:4,6 372:23 401:1 403:10 404:5 414:17 420:1 422:24 426:8 431:7 431:24
**five**
391:19 403:8
**five-minute**
403:24
**Flores**
426:20
**FMO-AGR**
333:9
**focus**
371:17 410:9
**focussing**
376:15 381:23 427:11
**followed**
343:22 405:12 411:25
**following**
359:22 422:15
**follows**

337:25
**food**
375:18 389:13
**force**
382:16 383:8 384:18 384:25 389:8,9,10 389:11 390:4
**foregoing**
435:5,12,15 436:3
**Forget**
414:21
**forth**
398:10 419:2 435:9
**forward**
339:12 340:22
**found**
360:16 373:19 390:12 411:5,18 433:15
**foundation**
357:24 359:17 368:5
**four**
368:23 374:20 391:19
**four-paragraph**
345:23 356:20
**foxLA.com**
373:13,25 374:3
**frame**
349:22 353:18
**free**
342:10 345:24 346:1
**freedom**
380:10 421:4
**friend's**
374:2
**friends**
347:17 366:4 370:12 370:19 393:22,24
**front**
365:2 372:13 409:2
**frustrated**
419:12
**full**
382:15 383:8 384:18 384:24 435:13
**fully**
364:3
**further**
379:23 385:17 435:15,19
**future**
375:23

**G**

**gamesmanship**
430:8
**Garcia**
333:8 423:18,20 426:25
**Garfield**
334:8
**general**
347:8
**generally**
338:20 352:11 377:22
**getting**
353:4 377:15 397:7 397:24 416:6,10 431:1
**give**
339:3 343:10 350:1 362:16,23 402:10 403:18 432:8
**given**
400:17 430:15
**giving**
339:13 340:23
**Glendale**
333:9 334:14,16 337:13 418:9 419:18 422:11
**go**
336:25,25 337:7 359:25 360:1 365:8 366:24 367:15,23 372:19 375:13 378:5,9 379:21,25 382:6,12 383:25 385:10,20,23 386:5 387:7 388:8,21
391:8 396:17 399:23 400:25 404:3,16,24 407:9 412:17 419:13 421:15 422:7 431:19 434:10
**goes**
400:17,22 409:4 428:9,17
**going**
339:12 349:1 350:18 362:25 365:1 367:10 375:2 377:19 378:16 380:17 388:23 396:16 399:16,21 401:1 404:9 410:18 412:10 417:20 419:11,13 426:7 429:12,17 430:8,22 431:2 432:6,11,18 432:23 433:3 434:8
**good**
336:8,23 338:5,6 345:25 375:15 377:20 378:11 386:21 391:6 392:3
**government**
356:16,24 358:8,10 358:17,19,19,23,24 359:9 389:12,12
**government's**
347:7 356:9,21
**grave**
433:23
**Great**
434:1
**Griffin**
333:11 334:14
**ground**
338:15,19
**guess**
366:22 384:4 418:1
**guidelines**
422:16
**Guy**
333:8 423:18 426:25
**guys**
361:12

**H**

**half**
413:2,8 415:12 430:23
**hands**
375:22
**happen**
396:13 399:15
**happened**
352:16,19 366:22 375:1 396:24 397:12 398:7 399:9 413:17
**happening**
357:4,15 370:5 399:14
**happens**
400:23
**hard**
368:9 369:2 376:14 406:18 417:6 422:3
**harm**
366:4,12 367:18
**hash**
409:25 410:1
**hashtag**
410:11
**headache**
430:25
**headline**
373:14
**health**
362:13,15 396:14 411:18
**healthy**
348:13
**hear**
339:10 391:13 425:8
**heard**
358:22 398:9
**hearing**
364:25 378:16 398:8

432:11,22
**heart**
362:19,20
**help**
357:14 389:4 399:19
**helpful**
402:24 403:6,7
**helps**
350:2
**hereto**
436:6
**hereunto**
435:22
**Hey**
425:11
**history**
421:14
**hoeing**
375:8,19 376:4,19
**hoes**
375:10,24 376:2,6
**home**
349:5 350:18
**homes**
348:14
**homicidal**
375:10,24 376:2,5
**honest**
339:3,13 383:21
**Honor**
337:6 377:18,24
396:24 397:11
398:6 401:11,23,24
402:20 404:8
418:20,20 420:9,21
421:18 428:8
429:22 431:4,23
432:17 433:11,23
434:5
**Honor's**
419:1
**Honorable**
334:20
**hope**
341:3
**hoping**
396:19
**host**
336:18
**hour**
377:20 401:2 403:10
404:5 415:12
417:25
**hours**
417:17 418:1,14
431:24
**house**
339:20,21 372:24
373:2,4,12,16
389:13
**household**
357:15 375:2
**hundred**
382:9 388:14,15,19
389:5,14,25 390:6
390:14,17,20,22,24
390:24,24 391:4
**hundreds**
417:1
**hurting**
412:3

**I**

**idea**
381:15 386:13
417:20
**identify**
433:14
**idiots**
361:10 387:10,22
388:3
**ignoring**
425:23 427:6
**ill**
348:10
**immediately**
408:21
**impacted**
356:25
**impacting**
347:16 400:15
**important**
403:23 421:7 430:7
**imprisoned**
386:25
**improper**
429:14
**inability**
428:3
**inactive**
343:3
**incident**
374:8,16
**including**
362:12
**Incomprehensible**
363:13
**increase**
373:6 392:24
**incurred**
430:19
**independent**
337:3
**INDEX**
335:1,6
**indicated**
391:15 426:4
**indicates**
363:20
**indicating**
348:18 389:16 390:1
**individual**
333:8,9 430:15
**individually**
333:10,12
**indoors**
364:3
**information**
340:8 357:13 396:15
**informedmama_209**
345:24
**initialed**
436:5
**injured**
373:20 374:6,15
**ink**
436:5
**Instagram**
342:22
**instruct**
428:9 429:12
**instruction**
400:1
**instructions**
341:4,6
**insulted**
420:21 421:20
**insulting**
421:23
**intended**
364:16 381:13,25
**intent**
363:5,8,9,19,22
412:14
**interest**
404:18
**interested**
435:21
**interesting**
390:13 411:5,8,18
**interim**
404:1 431:12
**interrogation**
401:25
**interrupt**
340:15
**interrupted**
371:12
**Interrupting**
394:13
**interruption**
418:25
**interruptions**
418:23
**Irvine**
334:10
**issue**
398:24 399:3 401:9
402:5 429:18
**issues**
432:5,13
**items**
380:11

**J**

**jab**
387:11,23 388:4
**James**
333:9 334:14
**Jamie**
336:5,20 434:14 435:2,24
**January**
352:20,25 411:25 422:18,19 423:14 424:2 426:3,3 430:17,18
**job**
362:17 375:15 386:22
**JOE**
333:8
**Johnson**
333:8 423:21
**Jones**
334:12 337:16
**judge**
337:1 340:16 341:2 400:9,24 401:25
**July**
365:9 366:14,23 367:9 380:4,9 382:25 383:17
**June**
356:20

**K**

**Keep**
375:17
**kept**
426:24
**kids**
357:5 375:7,19,20,23 401:16
**killed**
373:20 374:6,15 379:19
**killing**
373:17
**kinds**
397:17 403:15
**know**
339:9,9 340:3,10 341:19 343:10,16 346:2 351:5 358:16 360:2 362:23 365:11 372:19 381:2,4 382:3 385:5 390:23 392:18 394:25 396:15 397:4,18 398:19 399:9,11,14 401:16 401:20 402:2,23 403:11,18 406:25 407:5,14,21 409:1 409:12,18 410:6 414:16 415:20 417:11,19,19 420:2 425:6 428:16 429:14 430:22 431:1,4 432:25
**knowing**
362:24
**knowledge**
374:4,13 433:21
**Knowles**
334:20 336:18 417:23

**L**

**LA**
358:15 359:4,5,14 361:17,21 364:17 394:24
**labeled**
345:21
**Lacks**
357:24 359:17 368:5
**Lake**
334:5
**largest**
364:2
**lasting**
417:16
**laugh**
408:10
**laughing**
408:6,8,20,21 411:25 412:12,13,15
**LAUSD**
385:23 386:7,9 395:7
**LAUSD's**
395:25
**Law**
334:4
**lawsuit**
422:20
**lawyer**
400:1,7 420:6,7 429:3
**lawyer's**
398:20
**lawyers**
399:22 400:23
**learn**
396:20
**leave**
348:13
**left**
418:2 425:12
**legal**
333:22 336:19,20 347:11 358:20 418:12 422:14 424:15 425:5
**legs**
409:7,11 410:17
**Leilani**
334:12 337:16
**lengthy**
426:14
**let's**
343:10 359:2,2 378:8 379:21 382:6 385:10 388:8 391:8 391:10 394:22 399:6,23 403:8,24 418:15,17 419:13 421:13,14 422:6 433:9 434:2
**levels**
408:3,11
**limit**
431:3
**limited**
422:25
**line**
337:17 366:19,22 368:24 369:5,9,13 416:7 426:8 437:2,4 437:6,8,10,12,14,16 437:18,20,22,24 438:2,4,6,8,10,12 438:14,16,18,20
**lines**
386:18 395:20 396:5
**link**
344:25
**LinkedIn**
342:24,25 343:3
**listen**
363:7 391:2 416:4 420:7,18 427:1
**listening**
337:17 340:17
**litigation**
423:16
**little**
342:18 349:8 353:4 363:6 385:14,16,21 393:2 412:17,19
**live**
370:14
**llj@paynefears.com**
334:11
**LLP**
334:9
**local**
358:8,10,18,19,23 359:9 394:24
**locate**
427:15
**located**
428:1,14,16,21
**LOCATION**
333:20
**lockdown**

349:3 350:6,15
351:25 353:17
354:8 367:16 375:1
376:13 377:1,3
380:7,16,18,19,21
380:24 381:16
396:17
**lockdowns**
347:15,20 348:4,6,19
348:23 349:12
351:17 352:11
353:1,10,24 354:3
355:9,16,20 357:5
374:23
**locked**
348:10,15,25
**locking**
380:10
**long**
377:22 391:15
392:12,13 398:8,9
417:20
**longer**
362:19
**look**
342:4 344:19,22,24
382:8,14 385:14
391:10 392:4,11
393:10 395:11
408:7 410:22 421:5
427:2,4 431:18
**looked**
344:25 433:18
**looking**
397:4 401:19 412:6
414:8,9 416:15
**looks**
372:24 373:13
379:23,24 382:11
382:16 387:12
391:14 394:22
395:9 405:7 406:9
407:9,11 408:7
**Los**
359:11 360:4,11
362:5 363:10,20
364:1 407:20
**LosAngeles.CBS**
394:24
**LosAngeles.CBS.lo...**
386:1
**LosAngelesCBSloc...**
386:8
**lose**
337:19
**lost**
397:8
**lot**
413:9,15
**love**
386:24
**lower**
405:6 409:2 429:7
**lunch**
430:24,25 432:1,2

**M**

**Magna**
333:22 336:19,20
**making**
384:7 420:11,15
421:4
**malicious**
401:15
**man**
409:3 410:20
**mandate**
355:6 360:5,11
361:18,22,25 362:6
363:11,21,23 364:2
364:6,9,18 365:5,6
366:21 367:1
369:15 371:23
414:2,2 418:9,12
419:18 421:24,25
422:11
**mandated**
347:20 356:10
362:17
**mandates**
346:16 347:1,4,8,16
367:16 369:10,13
369:13,19 370:18
374:8,17
**mandating**
358:1 396:10
**mandatory**
395:7,16,22 396:1
**manner**
433:25
**March**
350:3,5,14 351:15
353:13,20 354:1,5
367:23 368:2,10
369:16,19
**marked**
343:17,23 360:1
**marks**
434:6
**mask**
346:16 347:4,16
355:6 360:5,11
361:18,21,25 362:6
363:11,21,23 364:2
364:6,8,17 365:5
366:21 367:1
369:10,13,15,19
370:18 371:3,23
374:8,17 409:7
410:17,20 411:6,8
411:19 414:2 418:9
418:11 419:18
421:24 422:11,21
423:17 426:5,21
427:14 428:3 429:7
**masks**
355:3 356:10 364:3
365:18 366:5,13
367:6,18 370:1
382:21 384:3,6
411:2 412:1,16
413:10,15,21
**math**
367:22
**matter**
336:10 339:10
345:11 346:12
356:19 379:8
380:23 398:14
**matters**
434:3
**max**
346:15
**mean**
345:16 354:21
356:17 363:15
376:1,20 377:8
391:24 408:16
417:7 432:15
**meaning**
381:8
**means**
346:10 385:5 391:22
393:11 407:12
**meant**
376:3,6 381:17
382:25 384:17
420:2
**media**
342:19,20 343:2
348:18 349:10,19
349:23
**medicine**
389:13
**men**
411:1
**mentally**
357:19,21
**mention**
337:16 371:20
**mentioned**
338:15 371:7 423:24
424:6 426:19
**mentioning**
371:15
**message**
343:22 345:23 346:4
346:6 354:13 356:7
356:20 357:18
360:19,20 361:17
363:9,20 366:3
369:18 370:11,16
372:23 375:6
381:23 382:15

383:8 384:16,17 386:17,19 389:6,7 391:5 392:16,17,20 392:23 393:14 394:23 397:5,9 408:2,5,10,20 409:4 409:5,14,24 410:15 410:18,19,24 412:1 412:4,11,11,15,18
**messages**
349:11 354:24 355:2 413:21 414:6,12
**metadata**
343:22 385:17 405:6 412:24
**middle**
382:16 385:2,4,5 387:1,3 391:14,19 391:21,24
**migraine**
430:25
**mind**
337:20
**mine**
347:17
**minute**
424:20
**minutes**
378:10,12 403:8 417:25 418:2,25 425:12
**miscommunicating**
397:24
**miscommunication**
399:6 416:12
**miscommunications**
399:16
**misconception**
403:2
**Misstates**
352:1,3,4 359:17,18 362:1 366:7,18 370:21 377:6 382:23 393:3,4 395:24 408:13 426:22 427:18
**misunderstanding**
394:17
**Mkrtchyan**
334:4,6 337:8,8 345:12 347:9,21,24 349:13,15 350:7 352:1,3,13 354:16 355:10 356:12 357:23 358:12,20 359:16 360:13 362:1,9 363:12,24 364:12,19 365:21 366:7,17 367:12 368:4,21 369:21 370:20 371:11,25 373:5 374:9,18 376:7 377:4,13,17 378:2,12 379:6,10 381:14 382:1,22 383:11,23 384:19 389:18 390:9,21 391:23 393:3 394:7 394:12 395:1,23 396:7 397:11 398:1 398:16 399:7,25 401:3,23 402:18 403:4,13 405:3,15 406:13,23 408:13 410:5 411:3,13,15 413:12,23 414:15 415:2,4,24 416:3 417:11,15 418:11 419:19,23 420:9,13 420:25 422:2,13,23 424:15 425:3 426:7 426:22 427:9,18 428:4,6,15,23 429:10 430:21 431:11,23 432:15 432:18,21 433:2,10 434:17
**Moderna**
387:12,13,18
**moment**
340:15 342:8 343:8 346:17 350:9 353:3 357:17 366:23 414:1 433:19
**Monday**
333:18 336:4,14
**Monte**
382:20 384:1,5
**month**
368:13 370:4 380:10
**months**
366:12,16,25,25 367:3,5,10,17,22 368:14,16 370:3 371:8,15,17,21 394:4
**morning**
336:8,23 338:5,6 339:12
**mother**
357:10 373:20 374:6 374:15 379:19
**mothers**
356:24
**motion**
400:6,6,8,13,16,18 418:16,16 420:11 420:12,14,16,16 423:8 431:21 433:5
**motions**
432:1
**move**
363:2 370:7 371:24 394:22 396:22 398:3,18 399:6,19 400:2 427:7 429:20 430:11
**moving**
360:24 361:6
**mysterious**
429:23

N

**name**
343:25 344:10,11,15 344:20 386:6,18 405:12 408:6 435:23
**named**
435:5
**names**
344:7
**Narine**
334:6 337:8 434:15
**narine57@gmail.c...**
334:6
**Nation's**
364:2
**national**
423:22,25 424:4,10
**Nazis**
382:15 383:8 384:18 384:24
**NBCLosAngeles.c...**
387:13
**necessarily**
403:18
**need**
341:12 346:17 353:3 360:2 362:14 365:10 373:8 380:1 380:8 382:24 385:14 389:7 392:17 399:22,22 402:6,14,20 403:12 409:16 412:2,25 414:7 415:6 420:5,5 420:7 421:12 422:2 422:6 425:18 430:23 431:9,22 432:1,13
**needed**
348:10,15 387:15,19
**needs**
376:17
**neither**
435:19
**never**
337:20 362:22 366:12 367:18 410:7 419:21 427:20
**news**
373:18,23 374:5

376:9,9,11 384:1 395:18 407:11,17 407:19
**nonresponsive**
363:3 370:8 394:14 427:8
**noon**
403:25 404:7
**nose**
422:22 423:17,18 425:25 426:5,21 429:6
**note**
426:2,18 427:2,3,4 427:11,13,14,15 428:1 429:5,9,23 430:10 433:12
**noted**
436:5
**notes**
435:14
**notice**
357:17 379:23
**number**
336:13 372:12 379:1 432:8

**O**

**oath**
338:24
**obey**
389:12
**object**
371:11,11 378:2 397:11 401:24 402:1,20,22 417:11 417:15 419:3 423:6 430:22 431:4,8,23
**objected**
402:1
**objecting**
419:1
**objection**
340:24 341:9,11 345:13,15 347:9,21 347:24 349:13 350:7 352:3,13 354:16 355:11 356:12 357:23 358:12,21 359:16 359:16 360:13 362:1,9 363:12,25 364:12,19 365:21 366:17 368:4,21 369:21 370:20 371:25 373:5 374:10 376:7 377:4 377:13 378:16 379:6 381:14 382:1 382:22 383:11,23 384:19 389:18 390:9,21 391:23 393:3 394:7,12,12 395:1,23 396:7 398:25 400:12,12 400:13,18 403:13 405:3,15 406:13 408:13 410:5 411:3 411:13 413:13,23 414:15 415:2,4,24 418:11 419:20 420:10 422:13,23 423:5 425:4 426:7 426:23 427:9,18 428:4 429:10 430:21
**objections**
340:20,21 341:1,1,10 365:1 398:8 400:16 419:11 420:13,15
**objects**
419:7
**observer**
397:3
**observing**
337:17
**obviously**
386:12 387:24 419:2 430:6
**occasions**
355:6,9
**occur**
341:4,8
**occurred**
373:17
**occurs**
339:8
**October**
338:9 433:12
**Office**
334:15
**officer**
333:9,11,11,12 430:16
**officers**
337:14
**Oh**
391:12
**okay**
337:20 338:14,23 339:14,16,21 340:3 340:10,13 342:6,9 342:13,15 343:2,6,9 343:13,25 344:7,13 344:17,22 345:3 346:4,15,18,21 347:19 348:4,21 349:17 350:4,10 351:4,12 352:10,22 353:6,7 354:12 355:1,24 356:7 357:16 359:13,25 360:7 361:2,20,24 362:8 363:2 365:13 365:14,17 366:11 367:8,21 368:1,18 369:8,17 371:6,10 371:24 372:2,9,11 372:16,19,22,23 373:3,25 375:6 376:19,25 378:8,10 378:10,14,15,22 379:4,16,21 380:2 380:25 382:6,12,15 384:16,21 385:7,10 385:22 386:12,17 387:7,20 388:6,8,13 388:24 389:4 391:8 391:13 392:15,19 392:20 393:8,14,18 394:1,5 395:4,9 399:13 402:17 404:18,24 405:25 407:2,6,7,25 408:9 408:24 409:6 410:3 410:18 411:1,11 412:6,9,10,14 413:7 416:4 417:10 418:3 421:6 422:8,18 423:14,20 424:12 425:18 429:21 430:12 432:4,4,21 434:6,18
**old**
374:20
**online**
344:23 350:19 373:24
**oOo--**
434:20
**oOo---**
334:21 335:4,10 336:7
**open**
339:25 340:7 374:21 380:19 429:6
**opinion**
424:16
**opportunity**
402:8,13 403:19,20
**opposed**
393:1
**orally**
341:6
**order**
341:5 369:5 400:7 422:25 434:11
**origin**
423:22,25 424:4,10
**original**
435:16
**outcome**
435:21
**outlet**

396:19
**outset**
338:14
**outside**
384:10
**overall**
371:17
**overviews**
355:25
**overwhelmed**
353:5 377:16 378:3
399:8 401:4 416:7
416:10 431:2

**P**

**P**
380:12,25
**p.m**
333:19 336:4 404:13
434:8,19
**P.O**
334:4
**page**
335:2,7 342:24,25
345:6,21 346:7
350:25 351:1,6
352:12 365:8
372:12,16 373:6
375:14 379:1
385:10,13 389:1
391:9 392:21 393:9
395:13 396:5
404:20,22,24 405:1
405:2,4,16 406:5,15
406:21,21 407:7,8
407:15,23 409:25
410:1,19 411:22,23
413:21 414:7,14
415:1,16 437:2,4,6
437:8,10,12,14,16
437:18,20,22,24
438:2,4,6,8,10,12
438:14,16,18,20
**pages**
343:15 351:20,21
404:19 414:23,25
415:1 421:14
**paid**
375:18
**palpating**
362:20
**pandemic**
346:19,23 347:8,22
348:5,7,24 353:2,11
353:25 355:3
356:11,22 389:7
390:4
**papers**
340:7
**paragraph**
357:18
**parent**
376:12,23
**parents**
357:3,13 375:15
376:15 377:2
386:23 393:21,24
395:14 396:11,15
398:10
**Park**
334:9
**part**
348:19 356:16 358:7
358:9,16 359:8
371:16 374:25
377:11 379:22
405:6 410:17
**particular**
398:5 414:11
**particularly**
365:2
**parties**
336:21
**party**
431:14 435:20
**partying**
376:23
**passing**
348:11
**passport**
389:9,10
**patient**
418:22
**Payne**
334:9 337:10
**peace**
333:11,12
**pee**
409:19,22 410:3,10
410:17,17
**penalty**
338:24 436:1,3
**pending**
372:5 416:4
**people**
348:10,13 349:1,5
355:23 357:14
362:24 364:4,7
368:20 387:24
388:1,25 397:24
405:18,24 423:23
424:6,8
**percent**
382:10 388:14 389:5
389:14,25 390:6,18
390:20,22,25 391:4
**percents**
388:15,19 390:14,17
**perfectly**
339:12
**period**
341:18 346:20
347:14 348:14
349:3,4,25 350:1
353:16 367:16
370:2 376:13
380:15 427:16
**perjury**
338:25 436:1,3
**person**
411:6,8,19
**pertains**
435:15
**Pharmacy**
333:6 336:11
**Philip**
334:20 336:18
**Phoenix**
344:1,15,20 386:7
411:24
**phones**
339:24
**phrase**
357:16 394:1
**physical**
362:17
**pick**
432:10
**pics**
375:8,18,20 376:4
410:21
**picture**
372:24 373:4,12
405:12
**pictures**
387:12
**place**
336:16 348:17
373:16 435:9
**placed**
345:8 352:12 360:7
365:14 369:18
382:13 385:8
404:22
**placing**
412:14
**plaintiff**
333:4 334:3 337:9
431:8
**plaintiff's**
433:16
**Plaza**
334:9
**please**
336:25 339:8 340:3
340:10 342:10
363:6 365:10 372:6
373:6 391:2 399:6
399:18 409:18
418:5,17 419:22,24
420:5,6,18 421:8,15
421:16 422:7 423:9
426:12 427:1
**plus**

390:24,24
**point**
352:10 373:3 399:4
400:11 421:8
428:11
**poisonous**
387:11,22 388:4
**police**
337:13 352:18
430:16
**policies**
359:21
**policy**
359:22
**political**
421:2
**portion**
385:17 409:1,2,16
**possible**
340:21 418:22
**possibly**
406:12
**post**
342:22 343:3 344:5
345:8 346:7 355:24
356:24 357:9,11,25
359:25 360:7,16,22
360:23 361:4 364:1
364:5 365:5,14,19
366:8 367:7 368:16
369:23,25 370:5,24
371:17 372:25
373:4,25 374:1,2
378:6 379:4,25
380:3,6 381:15
382:7,13 383:16
385:12 386:6,6,16
387:6,8,9 388:11,17
388:20 389:15,22
389:24 390:3,7,12
390:18,25 391:6,9
393:6,13,25 405:8,9
406:17 407:18
408:19 409:24
410:1,9 411:7 414:8
414:10,11 415:8
416:2,20,22,23,24
417:3,7
**posted**
343:5 344:14 346:4,8
346:22,25 347:3,6
347:12 349:11
352:23 354:11,13
355:1 356:20
360:20 372:16
375:6 380:8 382:25
383:2,10,17,19,21
383:22 384:22
389:6 392:20 393:8
393:17 395:19
396:21 397:10
404:23 405:1,12
406:4 407:15,17,22
408:5 412:11
**posting**
353:14,17 365:9
388:9 392:16
395:10 404:21
**posts**
335:8 342:5,7,13,15
344:18,19,22
346:22,25 347:12
348:17 349:20,23
350:14,22 351:5,9,9
351:15,24,25 352:7
352:11,18,22 353:9
353:14,17,19,23
354:2,7,12,19
355:22 369:24
401:14 413:10,15
414:1 415:8,11,16
415:21 416:15,16
417:1,7 423:1
**practice**
431:21 433:5
**pre**
420:2
**prefer**
370:13
**preliminarily**
339:16
**preparation**
344:18
**prepare**
341:22 342:2
**present**
334:19 336:21
**pretty**
344:11
**prevaricates**
419:7
**prevents**
430:9
**prior**
357:1 393:1 425:15
435:4
**private**
351:2,10,14 352:23
353:9 369:25
**privately**
351:16
**privilege**
425:4 428:7 429:11
433:20
**privileged**
428:10,18 429:13,15
**probably**
369:16 376:8,12,22
380:17,20 384:12
417:18
**problem**
397:2
**problems**
362:15,21
**proceed**
338:16 378:23
**proceedings**
337:4 340:18 434:19
435:17
**proceeds**
340:22
**produce**
351:19,21 430:1,9
432:18
**produced**
344:24 430:1 432:7
433:7,18,22
**produces**
431:14
**product**
425:3 428:7 429:11
**production**
432:14
**promoting**
354:20
**proof**
384:10
**protected**
362:14 364:8 421:1
421:19
**protecting**
349:6 362:12
**protection**
408:3,11 412:16
421:4
**proud**
386:22
**provide**
412:16
**provided**
345:1
**psychologist**
357:12 366:3 370:12
370:18
**psychologists**
375:16 377:2 386:23
393:21,23
**public**
350:24 351:3,6,10,13
351:25 352:12,23
353:8 358:4,6,7
359:3,7 369:23,25
385:13 393:8,13
405:2 415:1
**publicly**
351:16
**pussies**
381:1,3,6,7,13,25
392:24,25 393:6
**put**
352:6 354:24 357:9
364:21 368:14,15
370:3 380:3 381:3
382:7 385:1,4

386:11,25 388:13 389:15 390:5,13 391:9,18 395:11 400:23 401:14,19 408:5 413:1,3,7 415:19,21 416:1,20 416:21,23,23,24 417:5 421:21

**putting**
352:7 380:13 381:8 390:20 391:4 417:3

**Q**

**question**
349:8,9 350:11 353:7 353:12,15 354:18 355:12 360:23 361:3 362:3 363:2,5 363:6,7,14,18 364:11,13 365:23 366:24 367:2 369:11 370:15 371:9,15,19 372:4,5 372:6 373:10 374:11 377:25 391:2 394:18 397:4 397:6,9,20,21 399:2 399:23 402:15 408:17 409:8,11,12 414:4,10,18,18,21 414:22,22 415:25 416:3,4,5,14 417:12 419:23,25 420:4,8 420:17,18 421:10 423:11,13 424:18 424:19 425:19 426:12,13 428:12 428:13 429:20 431:8 432:24

**question-and-answ...**
403:10

**questioning**
426:8 431:4

**questions**
339:4,14 364:22 371:14,20,21 372:21 397:13,18 397:20,22 398:5,12 398:22 402:7,9,14 403:16,18,20,22 404:4,4 416:8 418:17 419:1,5,8,14 421:9,15 422:24 423:4

**quickly**
432:9

**quite**
368:13 405:8 406:6

**R**

**Ra**
406:1,16

**race**
423:22,24 424:4,7,9

**range**
350:1

**reached**
357:12

**read**
345:24 346:2,17 360:6 372:19 375:12 381:7 384:1 386:21 387:9,16 389:7 392:17 395:5 395:19,21 396:4 410:8 412:4,9 413:4 413:7 436:3

**reading**
381:6 387:10 390:16 390:19

**ready**
346:2,3 360:3 365:11 372:20 378:22 392:18 406:25 407:5 409:1,18,20 409:21

**realized**
359:7

**really**
361:11 396:17 401:13 402:23 405:19

**reason**
339:2,6,7 374:25 408:9,19,22,23 437:3,5,7,9,11,13 437:15,17,19,21,23 437:25 438:3,5,7,9 438:11,13,15,17,19 438:21

**recall**
338:7 342:8,9,16,16 351:8,9 352:5 353:8 353:16 354:10,10 354:25 355:4,5,8,15 355:18 368:14,24 369:15 374:1 376:14 380:8,15 382:25 383:15 384:7,21 388:5 413:3,7 416:16,19 417:3,6 426:2,6,14

**receiving**
367:11

**recognize**
373:1 404:21

**recollection**
341:24 345:25 353:19,22 367:22 374:22 384:4 414:13,25 415:15

**record**
340:21 341:9 364:21 378:16,17,19 398:17 400:7,24 404:3,10,12 416:6 417:16 418:21 422:5 423:5 433:12 433:13,19 434:8,11

**recording**
337:4

**reduced**
435:10

**refer**
345:20 367:5 375:8 376:19 406:20 408:24 411:22

**reference**
388:16 423:21 424:3 424:9

**referenced**
427:16

**referred**
357:20 375:7

**referring**
351:6 354:15 357:25 358:5 359:13,14,19 359:23 360:10 361:2,3 372:11 376:4,21 381:1,3 388:4,5 392:15 406:11 426:18 430:2

**refers**
428:3

**reflected**
379:17 380:6 393:15

**reflects**
379:5

**refresh**
341:23 367:21

**regarding**
338:16 339:11 341:24 346:22 347:7,13,15 350:6 350:15 357:14 361:3 363:8 377:1 380:7 382:19 383:16 388:20 389:15 412:1 413:10,21 415:8

**regular**
391:17 392:10

**reinstated**
363:23

**reinstatement**
361:21

**reinstates**
360:4 364:2

**reinstating**
361:17 363:11,21 364:6,17

**relate**
346:13,15

**related**
427:14 435:20
**relates**
346:19
**relating**
347:8 356:22
**released**
368:19
**remain**
379:22
**remaining**
418:18 434:3
**remember**
338:14 344:9 348:21 349:9,18,19,22 350:4,13 351:13 352:22 368:6,9,18 369:3 376:11 381:17 413:1 416:18,20 426:17 426:17,24
**remind**
337:2 340:19
**REMOTE**
333:15 336:1
**remotely**
336:16
**remove**
415:21 417:4
**removed**
415:7 416:21,23,25 416:25 417:3,5,8
**removing**
414:25 415:15 416:16 417:4
**repeat**
350:10 353:7 355:12 362:3 363:14 364:13 365:23 369:11 373:10 374:11 423:13 426:13
**replace**
394:3
**reported**
336:4
**reporter**
336:6,20 337:21 338:2 434:10,15,18 435:3
**REPORTER'S**
435:1
**repost**
355:25 360:24 393:16 396:14 406:8,12
**reposted**
346:8 347:13 360:20 374:2 388:11,20 389:22 390:3,5,8,13 391:5 405:9,19,20 406:7 407:7,18,22 408:5
**reposting**
360:16 388:17 392:16
**reposts**
355:22
**represent**
336:22 338:8
**representing**
336:19
**request**
336:17 353:20 399:25 401:3 402:18 426:9 428:8
**requested**
430:11 435:18
**require**
364:3 384:2 385:23
**requiring**
382:20 384:5 386:9 391:16 392:9,12
**research**
369:1,2
**reshare**
391:6
**resharing**
373:18
**respect**
354:12 356:2 369:17 408:2 412:11 414:23 422:18 430:14
**responding**
386:7 394:15
**response**
339:4,14 395:10,16 395:18,21 408:20
**responses**
429:25
**responsive**
419:6 429:24
**rest**
381:22 409:6,23 413:4 421:13,15
**restate**
363:18
**Restaurants**
380:10
**result**
362:25 375:17 430:19
**resume**
386:14
**resumes**
385:25
**resumption**
338:11
**retail**
422:12
**return**
403:25
**review**
356:4 360:2 365:11 380:1 435:17
**reviewed**
341:19,22 342:2,17 343:14 344:17 356:8
**revisited**
424:2
**right**
343:25 345:4,6,10 350:19 351:4,19,23 354:5,10 356:2 360:8 361:8,18,22 366:19 368:3 377:16 378:25 382:17 384:18 385:19 386:5,20 387:2,17,21 388:8 388:14,16 391:8 392:2,10 393:9,15 393:22 395:17 399:8 402:19 403:24 404:6 407:2 409:6 410:4,16 411:12 412:12 413:11 414:1,22 419:10 420:8 424:12 427:12 430:4 432:4 434:1
**rights**
421:1
**rise**
408:4,11
**rising**
408:3,11
**risk**
370:14
**robust**
433:25
**Room**
334:16
**Rosenberg**
334:20 337:1 340:16
**Ross**
333:10 334:14
**roughly**
369:19
**rounded**
368:13 370:3
**rules**
338:15,20 341:6 400:16 402:13
**ruling**
340:25 400:9,14
**run**
419:3

**S**

**S-S-I-E-S**
380:13

**Sarcasm**
386:24
**saw**
373:22,24 376:9
405:18 410:16
**saying**
346:9 353:15 363:15
366:14 377:9 380:9
387:14 390:6,25
393:18,20,25
398:23 406:6
408:10 409:10
422:4 425:24 429:6
**says**
340:23 343:21 344:1
357:18 360:4
361:10 364:1
366:11,23 373:19
374:3 384:1 385:21
385:23 387:18,18
388:3 392:24
393:18 395:14
406:15 407:20
409:24 412:22
**scared**
349:1
**school**
357:6,11 358:1,4,6,7
358:16 359:4,5,8,14
359:19,23 366:3
375:16 377:2
385:25 386:14,22
392:7,8 393:23
**score**
389:11,11
**screen**
340:7 343:16,20
344:12 345:7 356:3
360:3 373:5,7
377:25 379:2
385:22 386:3
394:23 406:21
409:3 412:6
**scroll**
385:16,23 393:10
405:4,8 407:1,12
**scrolled**
395:4
**scrolling**
406:22
**second**
380:8 402:1 422:25
423:3
**seconds**
382:24
**section**
360:25 361:7
**see**
343:10,16,20,24
344:2,12 360:19
361:8,10,14 370:11
372:13 373:8,13
374:21 375:3
378:25 385:18,19
385:20,21,22 386:3
387:16,17 388:20
389:1 393:5,12
394:24 395:4 404:7
405:3,11,17 406:2
406:21 407:2,3
409:6,7,8,10,13,16
409:19,22,23 410:1
410:3,11 412:18
414:7,9,9 416:9,10
**seeing**
430:6
**seen**
409:14 410:14 430:3
**selfies**
375:18
**selfish**
393:21,24 395:14
**selfishness**
375:17,22
**send**
357:5
**Services**
333:22 336:19
**session**
338:20 341:18,20,21
343:19 402:2 403:5
426:1 428:2 433:4
433:13
**set**
404:16 435:9
**setting**
351:1,11
**seven**
391:14,19
**seven-**
423:4
**shame**
370:12
**share**
342:1,10,10 343:15
**shared**
369:24 370:1,2
**sharing**
355:23 357:13 364:5
**SHEET**
437:1 438:1
**shelves**
380:11
**short**
377:21
**shorthand**
336:5 435:3,10,14
**shot**
416:12
**show**
343:13 373:6 375:23
384:10,13
**showed**
393:1
**showing**
405:16,22 407:4
408:25 411:23
**shown**
407:20 414:12,24
415:12
**sick**
348:11 357:2
**side**
400:12 402:8,13
403:19,21 431:15
**sign**
392:4
**SIGNATURE**
438:23
**simple**
370:10 398:13
**simply**
370:15 394:18 397:9
400:6 421:9 428:13
428:21
**sir**
427:4
**sit**
351:4
**site**
386:2
**situation**
431:14 433:5
**skip**
408:25
**skipping**
404:19
**SL23-CV-01788**
333:8
**slightly**
399:1
**smaller**
395:6
**so-called**
393:22,24
**social**
342:19,20 343:2
348:18 349:10,19
349:23 389:10,11
**somebody**
384:12 388:12
398:24
**someone's**
386:24
**sorry**
336:24 340:14
346:15 350:9 353:3
373:9,9 375:14
391:13 404:25
422:19
**sounds**
351:23
**speak**
366:4 370:19 375:20

393:19 394:3
**speaking**
341:10 365:1 377:3 419:11 420:15 421:3 425:12
**specific**
352:22 353:22 414:13 429:25
**specifically**
350:5 351:13 359:20 377:1 379:1 422:25
**speculate**
425:10
**speculation**
357:24 368:5 374:18 382:2 422:14
**speech**
421:4
**spoke**
366:12 367:18 386:23 430:17
**stabbing**
373:21 374:7
**staff**
385:24,24 386:9,13 391:16 392:9,12
**stamped**
432:8 433:16
**start**
398:8
**started**
337:22 344:10 357:7 367:1,16 369:15 375:13 395:20
**starting**
368:12 369:19
**state**
336:6,21 340:19 347:7,10 358:8,9,17 358:19 363:10 398:7 418:21 422:16 436:11
**stated**
340:21,24 351:16 353:10 354:14 379:9 433:13,14
**statement**
356:9 369:14 375:12
**statements**
400:23
**STATES**
333:1
**stating**
341:9 349:11 390:7
**status**
343:3
**stay**
350:17
**staying**
349:5
**step**
399:22
**sticker**
384:13
**stickers**
382:21 384:2,6,8
**store**
422:20 423:15 424:3
**stores**
380:11 422:12
**story**
374:5 402:11 403:19
**straightforward**
399:17
**stretch**
412:2
**stretching**
412:5
**strike**
363:3 370:7 396:22 400:2,6,7,8,13,16 400:19 427:7
**student's**
396:14
**students**
347:16 362:13 385:24 386:9,13 395:8 396:10
**Stuff**
405:6
**stupid**
361:11
**style**
364:22
**subject**
339:11 340:24 341:11 342:15 345:11 346:12 356:19 379:8 380:22 398:14 400:18,18 422:20 423:15 432:13
**subscribed**
435:23
**substitute**
381:10
**suffering**
375:7,19 401:17,17 401:18
**suggest**
397:16
**suggests**
406:11
**suicidal**
357:7
**Suite**
334:9
**summarized**
370:16
**supervision**
435:12
**support**
364:16
**supporting**
348:12 354:20
**supposed**
416:20 417:16 418:13
**sure**
337:8 346:12 350:13 353:8 358:9 366:20 369:9,12 387:8 403:1 409:8,23 420:25 421:19 425:18 432:15 433:2,10
**swear**
337:22
**switching**
351:11
**sworn**
337:24 435:6
**symbols**
380:25 393:2
**system**
358:4,6,7

**T**

**tag**
406:8
**tagged**
405:7,9,18,19,20 406:3,7,9,18
**tags**
405:24
**take**
346:1 358:2 360:1 362:18 365:10 377:22 378:9 379:25 381:8 382:8 382:14 385:14 387:25 388:6 391:10 392:11,17 393:10 402:20 403:8,24 404:1 408:7 416:12 430:5 433:24 434:2,3
**taken**
336:2 378:18 384:11 384:14 404:11 435:8,9,14
**talk**
368:8,12 372:7 403:15 422:2 430:10
**talking**
375:11 422:4 424:23 432:22
**talks**
412:16
**teacher**
392:12
**teachers**
386:23 391:16 392:9

393:21,22,24 395:7 395:14,25
**tearing**
421:22
**tears**
412:12,13,15
**tell**
356:8 368:10 382:18 402:11 403:21 405:8,19 406:4,7,8 406:10,17,18 417:1 422:3 425:7 428:20
**telling**
409:12 426:25
**ten**
378:10,12 418:2
**term**
347:25 352:14 365:22 369:22 377:6 411:4
**terminate**
418:16 420:12
**terminating**
336:3 423:6 426:9
**termination**
420:16
**terms**
340:23 341:8 343:2 354:23
**tested**
385:24 386:10,13
**testified**
337:25 414:24
**testify**
435:6
**testifying**
381:9
**testimony**
338:23 339:4,13 351:14 352:4 359:17,18 362:2 370:21 377:6 382:23 393:4 395:24 408:14 418:24 426:22 427:19 430:15
436:6
**testing**
391:17 392:10
**thank**
337:5,6,9 338:2 341:13,14,15 373:7 378:13 404:6,8,14 408:1 417:13 418:3 418:6,18 421:17 434:4,5,8,17,18
**therapist**
362:17
**thereof**
435:21
**thing**
377:15 385:18 387:9 392:3 399:4 425:24
**things**
347:14 380:13 391:25
**think**
342:16 371:23 378:5 378:11 381:9,20,24 382:3 394:16,17 397:2,7,23 398:18 398:19,23 399:8 402:5,25 403:23 412:19 414:8 416:11,14 419:13 426:19 428:25,25 429:18 431:6,9 432:11 433:3,24
**thinking**
348:12 384:22
**third**
387:14,18
**thought**
358:22 414:10 421:24
**thoughts**
425:10
**thousands**
351:8 369:24
**three**
344:14 374:19 388:14,15,19 389:5
390:1,6,13,16,17,20 390:22 391:4,19 395:20 396:5 406:2 406:16 408:5,7 423:23 427:13,21 427:22
**time**
333:19 336:14 337:21 338:24 341:18 345:14 346:1 347:12,15 348:9,14 349:22,25 350:1,17 353:14,16 353:18 355:10 359:21,23 360:1 362:20 365:10 366:19,22 367:12 367:15 368:24,25 369:5,9,12 370:2 377:21 379:25 380:15,17,20 383:9 383:16,20,22 384:22 387:4 389:14 392:17 394:5,9,19 396:9,17 396:20,23,24 397:5 397:10,12,21 398:8 399:10 400:10 401:16 404:18 411:7,9,11,17,20 413:12 414:16 415:5,16,20 417:4 417:21 418:18 419:11,12 421:25 423:20 425:24 426:9 427:5,12,17 430:22 431:3,7,16 431:17,22 432:25 433:6 434:2 435:9
**timely**
430:25
**times**
351:2 380:18 388:14 389:5 390:1,6,20 391:4 422:21 423:16
**tired**
362:21
**title**
370:13
**today**
336:13 337:3 338:23 339:5 340:18 432:2 432:13
**today's**
337:4
**told**
420:15
**Toluca**
334:5
**tomorrow**
432:10,14,19,23 433:9,24 434:4
**top**
375:14 387:10 395:13 396:5 405:11 410:19 411:23 412:10
**tortured**
386:25
**tracking**
417:25
**transcript**
342:3,7,12,17 372:8 428:1 434:12 435:13,16,18 436:4
**transcription**
435:11
**trauma**
352:17
**traumatized**
413:16
**travel**
389:13
**treated**
424:13 425:1
**trial**
341:2 400:9,10,14,24 402:9
**Tribble**
426:19 429:6
**tried**

342:18
**triple**
382:9 387:1,3
**true**
370:16 427:20 435:13 436:7
**truth**
435:6,7,7
**try**
367:21 382:24 384:21 397:2 413:1 418:15
**trying**
357:19,21 383:13,15 397:16,17,23 398:2 399:4,19 400:20 401:11,12,13,18,20 402:24 407:16 418:22 419:5 429:23 433:4,8,8
**turn**
352:11
**twice**
382:16,17 385:2
**two**
338:8 344:14 370:4 371:13,20 380:12 381:3 385:4,7 386:18 391:18,19 393:2 397:17,19,22 398:22 410:17 411:25 412:12 416:22 417:17 418:1 425:12 427:13,21,22 430:23 431:24
**type**
373:14
**typed**
379:15,16,18 410:25
**types**
398:22

**U**

**ugly**
375:17
**Uh-huh**
345:22 383:5 404:17 424:24 433:10
**unbeknownst**
351:11
**undergo**
391:17 392:10
**underlying**
357:1 362:13
**understand**
338:11,19,23 345:10 345:17 346:5,9,11 353:12,15 356:15 361:5 367:24 371:16 377:11,14 377:15 391:22 395:5 397:1 399:11 402:3,22 403:16,22 408:16 412:25 413:1 415:9,13 417:9 419:12 420:20 421:18 425:13,19 429:2
**understanding**
346:5 367:9,13,13 391:3 424:18
**understands**
399:20
**unhealthy**
349:2
**Unified**
358:16 359:4,5,14 391:16 392:12,14
**union**
395:7,25
**UNITED**
333:1
**unnecessary**
431:20
**upper**
409:1
**upset**
352:17 364:7 366:8 370:5 371:5 379:18 381:16,21,22 384:12 386:16 387:6 388:2 391:25 392:5,6,13 393:16 394:19 396:9 399:18 400:22 401:16 413:16
**upsetting**
401:9
**URL**
409:25 410:2,8
**use**
342:20 344:7 354:23 355:3 360:15
**username**
344:4 411:24
**usual**
400:20
**usually**
377:23 399:15
**utilize**
344:5

**V**

**vacations**
375:18 394:3
**vaccinated**
364:4 407:3 408:4,12
**vaccination**
395:8,22 396:1
**vaccinations**
395:17 396:11
**vaccine**
347:1,15 354:20,25 355:25 357:2 358:2 361:11 362:15,18 362:18,22,24 364:8 365:6,20 366:21 367:1,16 368:2,7,8 368:10,12,18,25 369:3,4,6,9,13 374:17 382:21 384:2,6,7,8,9,11,14 387:12,19,25 388:2 388:6 389:8,8,9 390:4 391:17 392:10,13 396:20 414:1 421:25
**vaccines**
354:14,15,17 356:10 365:18 366:5,12,15 367:6,9,11,18 370:2 374:8 413:10,21
**vague**
345:12 347:10,25 350:7 352:14 354:16 355:10 356:12 360:13 362:2,9 363:13,24 365:21 367:12 369:21 370:21 374:9 377:4,5 379:6 379:10 382:22 383:11 384:19 389:18 390:9 394:7 395:23 396:7 406:14 411:3,15 413:12,23 414:15 415:4,25 426:23 428:6,24
**variety**
352:6
**various**
338:15 346:22,25
**version**
345:4
**versus**
336:10
**Video**
333:15,20
**VIDEO-RECORD...**
336:1
**videographer**
334:20 336:8,18 337:19 378:15,19 404:9,12 417:22,24 425:11,12 434:6
**view**
353:23 383:7,9,12,20 384:17 386:19 387:4 394:5,8,18,20 396:21,23 397:5,6 397:10,20,22 398:25 399:3

411:11,16 421:2
**viewpoint**
421:21
**viewpoints**
421:22,23
**views**
346:22 347:1,3,6 355:23 379:5,7,17 379:20 380:6,22 382:19 383:2,6,16 383:21 395:21,24 396:6 398:14 402:6 422:5
**virus**
348:11 349:1,7 350:16 405:13
**visibly**
401:5
**voice**
375:21
**Volume**
333:16 336:9 434:7
**vs**
333:5

**W**

**wait**
372:6
**want**
337:7 339:17 340:19 341:19 371:16 387:8 391:6 398:21 403:1,8,9 404:1 407:21 409:8,23 414:20 420:25 421:19 431:14 434:2,11
**wanted**
337:2 339:16 340:16 393:12 407:14
**wants**
395:7,25
**warn**
380:14
**warned**
361:12
**wasn't**
383:21
**water**
353:4
**way**
346:13 381:6 393:11 393:12 396:18 399:24 400:21 401:1,14 418:13 428:3 435:21
**We're**
434:7
**wear**
365:19 382:21 384:2 384:5,7,12 411:2,6 411:8,19 426:5,21 428:3
**wearing**
409:3 410:20
**Web**
333:20
**website**
360:17,21
**weekly**
385:24 386:14
**went**
369:1 380:20 389:1 422:19 423:14
**whatsoever**
423:22
**WHEREOF**
435:22
**whichever**
393:11
**whoring**
376:20
**winter**
387:15,19
**wish**
402:3
**wished**
362:22
**withdraw**
390:2 425:15
**witness**
338:1 345:16 347:12 348:1 349:14 350:9 352:5,15 354:18 355:12 356:14 357:25 358:22 359:19 360:15 362:3,11 363:14 364:1,13,20 365:2,4 365:23 366:8,19 367:14 368:6,23 369:23 370:22,23 371:12,13 372:1,3,9 373:8,10 374:11,19 376:8 377:7,14 378:3 381:15 382:2 382:3,24 383:13,25 384:21 389:20 390:11,22 391:24 393:5 394:9,13,15 394:19 395:2,25 396:9 398:21 399:5 400:1,15 401:10 402:17,24 403:1,11 405:17 406:15 408:15 410:6,7 411:5,14,17 413:14 413:25 414:17 415:5,6 416:1,17,19 419:7 420:1,2,20,23 421:18 422:8,15 424:17 425:6 426:13,24 427:20 428:5,9 429:5,14 435:4,22
**witness's**
341:10 418:24 433:21 434:2
**word**
352:15 360:15 381:5 381:10,12,18,20,23 381:24 382:4 389:19 392:25 393:6 409:19,22 410:10
**words**
340:23 352:24 379:14,15,16,18 384:24 412:20
**work**
358:15,15 382:21 384:3,6 411:6,9,19 425:3 428:7 429:11
**worked**
358:11 359:3,5 392:8
**workers**
384:7
**working**
359:8 410:21 411:2
**worried**
396:13
**worry**
420:5,6,24 422:6
**worse**
363:1
**wrapped**
409:7
**write**
376:11
**written**
374:22 434:11
**wrote**
347:13 367:17 385:19 387:23 398:15
**www.MagnaLS.com**
333:23

**X**

**X**
435:18

**Y**

**yeah**
367:5 377:19 378:5 387:17 388:22 394:16 395:18 405:24 411:14 412:25 417:24
**year**
343:11 413:2,8
**years**
344:9,13,14 368:23 374:20 383:1

416:22
**yes-or-no**
379:12 413:19

**Z**

**Zoom**
336:17 337:16 339:17 340:1 369:1 422:3

**0**

**1**

**1-10**
333:13
**10**
344:9 368:15
**10:05**
333:19 336:3
**10:06**
336:15
**11**
338:9 372:12 379:1 433:12
**11:02**
378:17
**11:19**
378:20
**11:52**
404:10
**1100**
334:9
**12**
368:15 379:21,24
**12:03**
404:13
**12:41**
333:19 336:3 434:8 434:19
**13**
368:15 382:6 422:18 422:19 423:14 426:3 430:17
**14**
368:15 382:12
**14-year-old**
373:19 374:6,14
**14209**
336:5 435:2,25
**15**
344:9 368:14 418:25
**16**
366:11,15,25 367:3,5 367:10,17,22 368:14,16 370:3 371:8,15,17,20
**17**
365:10 366:14 367:10
**18**
385:10 394:4
**19**
333:18 336:4,14 424:2 426:4 430:18
**19th**
424:6

**2**

**2**
333:16 336:9 434:7
**2:23-CV-01788-F...**
336:13
**20**
380:9 422:19 436:11
**2020**
348:25 350:3,5,15 351:15,24 352:24 352:25 353:9,21 354:4,9 355:16,21 355:24 367:23 368:2,10,19,24 369:16,20
**2021**
352:20,25 356:21 365:10 366:14,23 367:10 368:20 380:4,9 383:1,17 389:2,15 391:10 406:22 416:23 418:9 419:18 422:11,19 423:14 426:3,4
**2023**
338:10
**2024**
333:18 336:4,14
**21**
407:8 433:16
**22**
380:4 387:7 411:25
**220**
334:16
**22471**
333:10
**2288**
334:4
**23**
383:1
**24**
388:9
**25**
391:8
**27999**
333:12
**28**
392:15
**29**
435:23

**3**

**30**
356:20
**300**
390:17,25
**3024**
435:23
**31**
406:22
**338**
335:3
**343**
335:8

**4**

**4**
334:9 343:21 345:21 346:13 356:4
**46**
394:22 398:5

**5**

**5**
411:25
**50**
417:25
**54**
433:17

**6**

**613**
334:16

**7**

**7**
335:8 343:17,18,23 346:13 356:3 365:8 372:11 379:1,22,23 379:23,24 385:11

**8**

**8**
360:1
**818-388-7022**
334:5
**818-548-2080**
334:17
**84**
404:20
**85**
404:25
**86**
404:24
**866-624-6221**
333:22

**9**

**9**
365:8 389:2
**90**
406:21
**911**
360:4 361:16,17 363:9,20
**91206**

334:16
**91610**
334:5
**92614**
334:10
**93**
408:25
**949-851-1100**
334:10
**97**
411:22

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANOUSH BURMAYAN,<br>Plaintiff,<br><br>vs.<br><br>CVS PHARMACY, INC., a corporation doing business in California, GUY GARCIA, an individual, JOE JOHNSON, an individual; CITY OF GLENDALE, Officer JAMES ROSS #22471, in individually and as a peace officer, Officer GRIFFIN ARMENDARIZ #27999, individually and as a peace officer, and DOES 1-10,<br>Defendants. | No. SL23-CV-01788 FMO-AGR |

REMOTE VIDEO DEPOSITION

OF ANOUSH BURMAYAN

VOLUME 2

DATE: Monday, February 19, 2024

TIME: 10:05 a.m. - 12:41 p.m.

LOCATION: Via Web Video Conference

Magna Legal Services
866-624-6221
www.MagnaLS.com

APPEARANCES

For the Plaintiff:

Mkrtchyan Law
P.O. Box 2288
Toluca Lake, CA 91610
818-388-7022
narine57@gmail.com
BY: Narine Mkrtchyan, Esq.

For Defendant Garfield Beach CVS:

Payne & Fears, LLP
4 Park Plaza, Suite 1100
Irvine, CA 92614
949-851-1100
dff@paynefears.com
llj@paynefears.com
BY: Daniel Fears, Esq.
BY: Leilani Jones, Esq.

For Defendants City of Glendale, James Ross, and Griffin Armendariz:

Office of the City Attorney
613 E. Broadway, Room 220
Glendale, CA 91206
818-548-2080
carias@glendaleca.gov
BY: Carl Arias, Esq.

Also present:

Honorable Alica Rosenberg
Philip Knowles, Videographer

---oOo---

INDEX OF EXAMINATIONS


| | PAGE |
|---|---|
| ANOUSH BURMAYAN | |
| Examination by Mr. Fears | 338 |


---oOo---

INDEX OF EXHIBITS


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 7 | Facebook Posts | 343 |


---oOo---

REMOTE VIDEO-RECORDED DEPOSITION OF ANOUSH BURMAYAN, taken on behalf of the Defendant, commencing at 10:05 a.m. and terminating at 12:41 p.m., on Monday, February 19, 2024, reported by JAMIE DAVIS, CSR No. 14209, a Certified Shorthand Reporter in and for the State of California.

---oOo---

THE VIDEOGRAPHER: Good morning, Counsel. Here begins the Volume 2 deposition of Anoush Burmayan in the matter of Burmayan versus CVS Pharmacy, Inc. And this is before the US District Court for the Central District of California. The case number is 2:23-CV-01788-FMO-AGR. Today is Monday, February 19, 2024, and the time is now approximately 10:06 a.m.

This deposition is taking place remotely via Zoom and was made at the request of counsel for defendants. The videographer host is Philip Knowles representing Magna Legal Services, and the court reporter is Jamie Davis also with Magna Legal.

Will counsel and all parties present state their appearances and whom they represent?

MR. FEARS: Good morning.

THE COURT: This is -- sorry.

MR. FEARS: Go ahead. Please go ahead.

THE COURT: This is Judge Rosenberg. I just wanted to remind everyone that the court is closed today, so there will not be an independent recording of today's proceedings.

Thank you.

MR. FEARS: Thank you, Your Honor.

Counsel, do you want to go first?

MS. MKRTCHYAN: Sure. Narine Mkrtchyan on behalf of plaintiff, Anoush Burmayan. Thank you.

MR. FEARS: Daniel Fears of Payne & Fears on behalf of CVS.

MR. ARIAS: Carl Arias on behalf of the defendants, City of Glendale and the police officers.

MR. FEARS: And is this Dan Fears again. I will mention that Leilani Jones is also on the Zoom line, but she will just be observing or listening in.

THE VIDEOGRAPHER: Did we lose our deponent? Okay. Never mind.

At this time, I will ask the court reporter to swear in the deponent and we will get started.

ANOUSH BURMAYAN,

having been duly sworn, was examined

and testified as follows:

THE WITNESS: I do.
THE COURT REPORTER: Thank you.

EXAMINATION

BY MR. FEARS:
Q. Good morning, Ms. Burmayan.
A. Good morning.
Q. As you may recall, I am Dan Fears. I represent CVS, and we are here for day two of your deposition, a deposition that began on October 11 of 2023.
Do you understand that this is a resumption of your deposition?
A. Yes.
Q. Okay. Do you remember at the outset of that deposition I mentioned various ground rules or admonitions regarding how we would proceed during the day?
A. Yes.
Q. And do you understand that those ground rules are generally still in effect for this session of your deposition?
A. Yes.
Q. Okay. You understand your testimony today, like last time, is under oath and penalty of perjury?

A. Yes.
Q. Is there any reason, Ms. Burmayan, that you believe you cannot give honest, accurate, and complete testimony in response to the questions that I ask today?
A. No reason.
Q. If for some reason that changes, if you are not feeling well or something occurs, please let me know or let your counsel know and we will discuss the matter; but otherwise, if we hear nothing regarding that subject, we will assume that you are perfectly capable of going forward this morning and giving honest, accurate, and complete testimony in response to the questions that are asked. Okay?
A. Correct.
Q. Okay. Just preliminarily, I wanted to find out -- since this is a Zoom deposition, just want to find out whether or not you are -- first of all, where are you?
A. I am in my house.
Q. Okay. And are you alone in your house?
A. Yes, I am.
Q. And do you have any other devices -- do you have any other devices, phones, computers, or anything else open other than the device for which

we are connected via this Zoom conference?

A. No, I do not.

Q. Okay. If that changes, please let us know. Is that agreeable?

A. Yes, I will.

Q. And do you have any documents with you, papers, documents, or anything, computer screen open that has any information on it?

A. No, I do not.

Q. Okay. If that changes, please let us know as well. Is that agreeable, Ms. Burmayan?

A. Yes, it is.

Q. Okay. And --

THE COURT: Sorry. This is -- if I could, Mr. Fears, just interrupt for one moment. This is Judge Rosenberg. I just wanted to make a couple of comments because I am listening in on the proceedings today, and I was not here before.

So I just want to remind counsel to state any objections in the deposition as concisely as possible. The objections are stated on the record, but the examination proceeds forward. In other words, anything Ms. Burmayan says in terms of giving an answer is stated subject to that objection.

I will not be here ruling on those

objections. Those objections will be addressed to the trial judge who will decide the admissibility. However, I will address any, what I hope does not occur, but if they do, instructions not to answer. And I have already gone over with counsel by order and orally about the basic rules about instructions not to answer. So I will be addressing those if they occur. But otherwise, nothing changes in terms of stating an objection on the record concisely, no speaking objections, and then the witness's answer subject to the objection.

That is all I need to add here.

MR. FEARS: Thank you very much.

THE COURT: Thank you.

MR. FEARS: Thank you.

BY MR. FEARS:

Q. Finally, Ms. Burmayan, since we have had a period of time since the last session of your deposition, just want to know if you have reviewed any additional documents between the last session of your deposition and this session of your deposition.

Have you reviewed any documents to prepare for the deposition or to otherwise refresh your recollection regarding this deposition?

A. Yes, I have.

Q. And can you share with me what documents you have reviewed to prepare for this deposition?
A. I did get a copy of the transcript, so I took a look at that from the first deposition and then also Facebook posts.
Q. Okay. Anything else other than the transcript and Facebook posts?
A. Not that I recall at the moment.
Q. Okay. If you do recall something later, please feel free to share or I will ask you to share or otherwise I will assume your best estimate was that it was just the transcript and the Facebook posts. Okay?
A. Yes.
Q. Okay. On the subject of Facebook posts, you will recall -- I think you will recall, especially if you reviewed the transcript, that we -- or I asked or tried to ask a little bit about social media.
You do use social media, correct?
A. Yes.
Q. And do you post on Instagram?
A. No.
Q. How about do you have a LinkedIn page?
A. I do have a LinkedIn page. I don't believe

I am active on it.
Q. Okay. In terms of social media, other than your inactive status on LinkedIn, do you post on Facebook?
A. I have posted on Facebook, yes, correct.
Q. Okay. And are you still active on Facebook?
A. Not at the moment as much as I was before.
Q. Okay. And when did that change?
A. Let's see here. I don't know if I can give you an exact date, but maybe a year I have not been as active as I used to be.
Q. Okay. Let me show you some documents, perhaps you have reviewed them, that appear to be Facebook pages. And I will share these on the screen. And let me know if you can see these.
This is Exhibit 7, which was already marked at the last deposition. That will be Exhibit 7 for this session of your deposition.
Do you see on your screen a document that says Facebook 4 and then it appears to have a message and then it is followed by some metadata?
(Exhibit 7 marked.)
A. Yes, I do see it.
Q. Okay. On the far right there is a name.

It says Anoush Phoenix.
Do you see that?
A. Yes, I do.
Q. Is that a -- the Facebook username that you would utilize when you would post on Facebook?
A. Yes.
Q. Okay. Did you use any other names on Facebook?
A. I don't remember if maybe 10, 15 years ago I started with a different name. But this is the name that I pretty much used, is this one that we see here on the screen.
Q. Okay. So for the last few years, at least, last two or three years, if you would have posted, you would have used the Anoush Phoenix name?
A. Yes.
Q. Okay. And you said you have reviewed Facebook posts in preparation for this deposition.
Did you look at your Facebook posts that you had under the name Anoush Phoenix?
A. Yes.
Q. Okay. And did you look at those posts actually online on your Facebook account, or did you look at copies that have been produced in this case?
A. I looked at this e-mail link that my

attorney provided me, so it was basically via the e-mail.

Q. Okay. So it would have been e-mails, electronic version but via e-mail, right?

A. Yes.

Q. All right. So this first page that we have on the screen here, Ms. Burmayan, this is a copy of a post that you placed on Facebook?

A. Yes.

Q. All right. And do you understand the subject matter of this?

MS. MKRTCHYAN: That is a vague and ambiguous. Objection.

You can answer any time there is an objection.

THE WITNESS: Can you explain what you mean by do I understand the -- what was it you said again?

BY MR. FEARS:

Q. Yes. So if I could refer your attention to this first page, which is labeled Facebook 4.

A. Uh-huh.

Q. And there is a four-paragraph message there under the informedmama_209. Feel free to read it if you don't already have a good recollection of it,

but feel free to take whatever time you would like to read it and then let me know when you are ready.

A. I am ready.

Q. Okay. This message that you posted, do you understand or have any understanding as to what this message is about?

A. Well, it is a post from another page that I reposted on my Facebook, so I am aware that I posted it. When you are saying do I understand what it is about, can you explain what that means? Do I understand what that is about?

Q. Sure. Does this subject matter that is on Facebook 4, Exhibit 7, relate in any way to COVID?

A. Yes.

Q. Okay. Does it relate to max -- I'm sorry, mask mandates?

A. I need a moment to read that again.

Q. Okay.

A. It relates to the entire pandemic and the COVID period, yes.

Q. Okay. And is it fair to say that you posted various Facebook posts regarding your views about the pandemic?

A. Yes.

Q. And you posted various Facebook posts about

your views on vaccine mandates?
A. Yes.
Q. And you posted on Facebook your views about mask mandates?
A. Yes.
Q. And fair to say that you posted your views regarding the federal and state government's mandates in general relating to the COVID pandemic?
MS. MKRTCHYAN: Calls for -- objection. Vague and ambiguous as to state and federal. Calls for a legal conclusion.
THE WITNESS: I posted at the time posts that either I wrote myself or reposted regarding things that were concerning me during that period of time regarding the COVID vaccine, the lockdowns, and the mask mandates, which were impacting students and family and friends of mine.
BY MR. FEARS:
Q. Okay. And it is fair to say that you were against the mandated lockdowns during --
MS. MKRTCHYAN: Objection.
MR. FEARS: -- during the pandemic; is that correct?
MS. MKRTCHYAN: Objection. Argumentative. Vague and ambiguous as to term "against."

THE WITNESS: No, that is not fair to say and that is not correct.
BY MR. FEARS:
Q. Okay. Were you in favor of lockdowns during the pandemic?
A. Was I in favor of lockdowns during the pandemic?
Q. Yes.
A. I was concerned at the time for those people that needed to be locked down, that were ill and sick and maybe perhaps passing the virus to one another. But I was also thinking about supporting those people who are healthy and could leave their homes. So if there was a period of time that we needed to be locked down, yes, I was in favor for it.
Q. Did you ever place any posts on Facebook or any other social media indicating that you were in favor in part of lockdowns?
A. Yes.
Q. Okay. And do you remember what, if anything, you said about your being in favor of lockdowns?
A. In the beginning of the pandemic around 2020 when we were locked down because there was a

virus going on and people were scared and they were not feeling well, they were unhealthy, I was very much in favor of the lockdown during that period. So there was a period in the beginning where I was in favor of people staying home and taking care of themselves and protecting themselves against the virus.

Q. My question was a little different, Ms. Burmayan. My question was, do you remember whether or not on Facebook or any other social media you posted messages stating that you were in favor of lockdowns?

MS. MKRTCHYAN: Objection.

THE WITNESS: Yes.

MS. MKRTCHYAN: Asked and answered.

BY MR. FEARS:

Q. Okay.

A. Yes, I remember.

Q. Do you remember where on social media you made such posts?

A. Facebook.

Q. And do you remember the time frame on social media, Facebook, that you made such posts?

A. Yes.

Q. And what was the approximate time period?

And you can give me a range of the time period, if that helps.

A. March, April, May 2020.

Q. Okay. And do you remember what you specifically said in March, April, May of 2020 regarding being in favor of lockdown?

MS. MKRTCHYAN: Objection. Vague and ambiguous.

THE WITNESS: Sorry. Just a moment.

Okay. I'm back. Can you repeat the question?

BY MR. FEARS:

Q. Sure. Do you remember what you said in these Facebook posts in March, April, and May of 2020 regarding being in favor of lockdown?

A. Yes. I was afraid of the virus at that time, and I was in agreement with everyone to stay home until we can figure out what is going on.

Q. And you said that online, right?

A. Yes.

Q. And do you still have copies of those posts?

A. Yes.

Q. Are they still on your public Facebook page?

A. They are on my Facebook page. The setting could -- at times was on private and sometimes was on public.

Q. Okay. So as you sit here right now, you don't know whether those posts that you are referring to are on your public Facebook page, correct?

A. I cannot recall because I have thousands of posts, and I can't recall if -- which posts were on public and which was on private because sometimes the setting was switching as well unbeknownst to me.

Q. Okay. Fair enough. So although you don't remember specifically whether it was public or private, your testimony is that you still have access to those March, April, May of 2020 posts in which you have stated either publicly or privately that you are in favor of lockdowns; is that correct?

A. Yes.

Q. All right. So if we asked you to produce copies of those pages, you and/or your counsel would be able to produce those pages, correct?

A. Yes.

Q. All right. Then after -- it sounds like after May of 2020 you did not have any posts, at least public posts, favoring the lockdown --

MS. MKRTCHYAN: Misstates.

MR. FEARS: -- is that correct?

MS. MKRTCHYAN: Misstates -- objection. Misstates the testimony.

THE WITNESS: I cannot recall exactly what I put after April or May. There was a variety of posts that I was putting some in favor and some not in favor.

BY MR. FEARS:

Q. Okay. At some point, Ms. Burmayan, did you generally turn against lockdowns in the posts that you placed on your public page of Facebook?

MS. MKRTCHYAN: Argumentative. Objection. Vague and ambiguous as to term "against."

THE WITNESS: I would say the word to describe what happened is after my arrest I became more upset and angry because of the trauma that was caused by the police department, so there were posts that were more against what happened to me with my arrest after the arrest of January 2021.

BY MR. FEARS:

Q. Okay. Do you remember any specific posts public or private that you posted on Facebook between May of 2020 -- so in other words, after May of 2020 up to January of 2021 in which you

articulated that you were in favor of lockdowns during the pandemic?

A. Sorry. I need a moment, because I have to get some water. I am getting a little bit overwhelmed.

Q. Okay. Fair enough.

A. Okay. Can you repeat the question?

Q. I sure can. Can you recall any public or private Facebook posts after May of 2020 in which you stated that you were in favor of lockdowns during the COVID pandemic?

A. So if I understand your question correctly, although I said in March, April, May around that time, I was posting posts in favor -- so if I understand your question correctly, you are saying after the time period that I said, do I recall if I was posting posts in favor of the lockdown?

Q. Essentially. I used your time frame in which you said you have recollection of posts in March, April, and May, which we will request. But now I am asking about after May of 2020.

Do you have any specific recollection of Facebook posts in which you articulated your view that you were in favor of lockdowns during the COVID pandemic?

A. So you are asking if after March, April, or May, if I still have some posts that I am in favor of the lockdowns?

Q. I was asking after May of 2020.

A. Right. After May even though I said March, April, or May I was in favor, and then you are asking after May if I have posts that I am in favor of the lockdown.

Q. Yes, I am asking about after May 2020.

A. I don't recall. Right now I cannot recall what I posted after May.

Q. Okay. With respect to your Facebook posts, have you ever posted on Facebook any message in which you stated you were in favor of vaccines? And I am referring to COVID vaccines, of course.

MS. MKRTCHYAN: Objection. Vague and ambiguous as to in favor of vaccines.

THE WITNESS: Can you clarify the question? Are you asking me if I have posts where I am supporting or promoting or encouraging the vaccine, or what do you mean by in favor?

BY MR. FEARS:

Q. You can use those terms, advocating as well. Any such messages that you put on Facebook?

A. Encouraging the vaccine, I do not recall.

Q. Okay. Have you ever posted on Facebook any messages in which you encouraged, favored, or advocated use of masks during the COVID pandemic?
A. I do not recall.
Q. Do you recall that on Facebook on several occasions you criticized the mask mandate?
A. Yes.
Q. And do you recall on Facebook on several occasions you criticized lockdowns?
MS. MKRTCHYAN: Vague as to time. Objection.
THE WITNESS: Can you repeat that question, and maybe some more clarity because I --
BY MR. FEARS:
Q. Do you recall whether on Facebook after May of 2020 you criticized COVID lockdowns?
A. Yes.
Q. And do you recall -- and did you do so -- I asked whether.
Did you, in fact, criticize lockdowns for COVID after May of 2020?
A. Yes. I have posts and reposts of other people sharing my views.
Q. Okay. And after May of 2020, did you post and repost overviews that were against the vaccine?

A. Yes.
Q. All right. With respect to the document that is on the screen, Ms. Burmayan, Exhibit 7, Facebook 4, you have had a chance to review that, correct?
A. Yes.
Q. Okay. This -- this message, after you have reviewed it, can you tell me whether or not this is a statement against the government's efforts to have vaccines and masks mandated during the COVID pandemic?
MS. MKRTCHYAN: Objection. Vague and ambiguous.
THE WITNESS: So for clarification, you are asking me if this is -- I did not understand the government part. You are asking me if this is -- can you -- can you clarify what you mean?
BY MR. FEARS:
Q. Yes. The subject matter of this four-paragraph message that you posted on June 30, 2021, is this a criticism of the government's efforts relating to the COVID pandemic?
A. No. It is not a criticism of the government. It is basically a post about mothers who have children who were impacted with the

underlying conditions they had prior to taking the vaccine and they got sick. And it was basically about those children and those parents who were concerned about what is happening with the lockdowns, because they could not send their kids to school and also some of them were depressed and suicidal. Some of them started taking drugs and fentanyl.

And the post that I put was from another mother who was concerned about what they were doing to the children. So basically my post as a school psychologist, I was being reached out by different parents and I was sharing some information that might help them or other people regarding some of what was happening in their household.

Q. Okay. And you used the phrase in your answer a moment ago, "they," and I notice in the first paragraph of this message it says, "They are trying to mentally exhaust you and break you down."

Who is it that is being referred to as they are trying to mentally exhaust you and break you down?

MS. MKRTCHYAN: Objection. Calls for speculation. Lacks foundation.

THE WITNESS: In this post I am referring

to the school that was closing and mandating children to take the vaccine.

BY MR. FEARS:

Q. And that is the public school system you are referring to, correct?

A. My public school system, yes.

Q. And the public school system is part of the state or local government, correct?

A. I am not sure if it is part of the state or local government.

Q. Well, you worked for them, didn't you?

MS. MKRTCHYAN: Objection. Argumentative.

BY MR. FEARS:

Q. Did you --

A. I do work for -- I did used to work for LA Unified School District. I don't know if it is part of the state or the federal government.

Q. No, I did not say federal. I said local government. State or local government.

MS. MKRTCHYAN: Call for legal conclusion. Objection. Argumentative.

THE WITNESS: Well, I thought I heard you say federal government. You could have said local government. But again --

/////

BY MR. FEARS:
Q. I did. Let's clarify. Let's clarify.
You were a public employee when you worked for LA Unified School District, correct?
A. Yes, I worked for LA Unified School District.
Q. And you realized that you were a public employee working for a school district that was part of local government, correct?
A. Yes.
Q. Los Angeles County?
A. Yes.
Q. Okay. So when it is referring to "they" here, you are referring to the LA Unified School District, correct?
MS. MKRTCHYAN: Objection. Objection. Misstates the testimony. Lacks foundation. Misstates the testimony.
THE WITNESS: I was referring to my school specifically and because there were different counties that had different policies at the time, not every county was following the same policy, I was referring to my school at the time.
BY MR. FEARS:
Q. Okay. Let me go to the next post, which is

marked Facebook 8. Go ahead and take whatever time you need to review that and let me know when you are ready. This one should be on your screen, and it says Breaking 911. Los Angeles County reinstates mask mandate.

A. Yes, I read it.

Q. Okay. And this is a post that you placed on Facebook, right?

A. Yes.

Q. And this was referring -- this was a criticism by you of the mask mandate in Los Angeles County, correct?

MS. MKRTCHYAN: Objection. Vague and ambiguous.

THE WITNESS: I would not use the word criticism. I was reposting a post I found on the website.

BY MR. FEARS:

Q. Well, do you see the message that you posted when you reposted this message on the website?

A. You are asking me about the post, and I answered your question about the post to which was repost. But now if you are moving towards the comment section, that is different from what you

asked me.

Q. Okay. So I am referring -- it is another question. I am referring to your comment regarding the post.

Do you understand?

A. Yes. We are moving towards the comment section now.

Q. All right. And do you see your comment?

A. Yes.

Q. And do you see it says, "Do the idiots who got the vaccine feel really stupid now? All that for nothing. I warned you guys." And then there is some emojis after that.

Do you see that?

A. Yes.

Q. And that is your comment to the 911 -- Breaking 911 message about LA County reinstating the mask mandate, right?

A. Yes.

Q. Okay. So fair to say that you are criticizing LA County's reinstatement of the mask mandate, right?

A. Based on my comment, yes.

Q. Okay. And essentially, you were against the mask mandate, correct?

MS. MKRTCHYAN: Objection. Misstates the testimony. Vague and ambiguous. "Against."

THE WITNESS: Can you repeat the question?

BY MR. FEARS:

Q. Yes. You were against the Los Angeles County mask mandate, correct?

A. Not correct.

Q. Okay. You were in favor of it, then?

MS. MKRTCHYAN: Objection. Vague and ambiguous.

THE WITNESS: What I was, I was in favor for protecting those of us, like myself, including students who had underlying health conditions and disabilities who need to be protected against the vaccine that was causing more health problems.

I will give you an example. My cousin, who is a physical therapist, was mandated at her job to take the vaccine. After she took the vaccine, she no longer has the same condition with her heart. Her heart is palpating all the time and she has breathing problems and she is tired. And she said she wished she never took the vaccine.

I know many examples I can give you with people who took the vaccine without knowing what it was going to do to them and as a result, they feel

worse now than they did before.

MR. FEARS: Okay. So my question -- move to strike as nonresponsive.

BY MR. FEARS:

Q. My question, though, was the intent -- I will change the question a little bit, so please listen to my question Ms. Burmayan.

Was the intent of your comment regarding this Breaking 911 message, was the intent of your comment to state that you were in favor of the Los Angeles County reinstating the mask mandate?

MS. MKRTCHYAN: Objection. Argumentative. Vague and ambiguous. Incomprehensible.

THE WITNESS: Can you repeat the question and explain what you mean when you are saying was I in favor?

BY MR. FEARS:

Q. Was the -- I will restate the question.

Was the intent of your comment to this Breaking 911 message that indicates Los Angeles County is reinstating the mask mandate, was the intent of your comment to express your agreement with the mask mandate being reinstated?

MS. MKRTCHYAN: Vague and ambiguous. Same objection.

THE WITNESS: This post says Los Angeles County reinstates mask mandate. Nation's largest county to require masks indoors even for fully vaccinated people.

The post I am sharing that they're reinstating the mask mandate. And the comment, I am upset because people like myself and my cousin are not being protected against the mask and the vaccine mandate.

BY MR. FEARS:

Q. Can you answer my question, though?

MS. MKRTCHYAN: Objection. Argumentative.

THE WITNESS: Can you repeat your question?

BY MR. FEARS:

Q. It calls for a yes or no, Ms. Burmayan, whether or not your comment was intended to support or agree with LA County reinstating the mask mandate, yes or no?

MS. MKRTCHYAN: Objection. Argumentative. Badgering the witness.

I would like to put this on the record that this is the same style of questions that derailed the deposition --

THE COURT: Counsel, there are -- I said at the beginning and I said at the hearing there are

not going to be any speaking objections at the deposition, particularly in front of the witness.

So, Ms. Burmayan, you may answer.

THE WITNESS: If you are asking me if this post is in favor for the mask mandate and the vaccine mandate, it is not.

BY MR. FEARS:

Q. Let me go to Exhibit 7, Facebook page 9, where there is another posting. It is dated July 17, 2021. Please take whatever time you need to review it, and then let me know when you are ready, Ms. Burmayan.

A. Okay.

Q. Okay. Is this a post that you placed on Facebook?

A. Yes.

Q. Okay. And fair to say that you were critical of the vaccines and masks that children, according to this post, were asked to wear and have in the case of a vaccine?

MS. MKRTCHYAN: Objection. Vague and ambiguous as to term "critical."

THE WITNESS: Can you repeat the question and explain?

/////

BY MR. FEARS:
Q. Is it fair to say, Ms. Burmayan, that this is a message critical of your school psychologist friends who did not speak up about the alleged harm of vaccines and masks to children?
A. Yes.
MS. MKRTCHYAN: Misstates the evidence.
THE WITNESS: I was upset in this post, yes.
BY MR. FEARS:
Q. Okay. And you say -- it says, "For 16 months you never spoke up about the harm vaccines and masks are doing to children."
As of July 17 of 2021, are you saying that vaccines had been used on children for the last 16 months?
MS. MKRTCHYAN: Objection. Argumentative. Misstates the evidence.
THE WITNESS: I can do a time line right now. I am not sure if I can be exact accurate of when the mask -- excuse me, the vaccine mandate happened. And then the time line, which I guess here says -- just a moment, July 2021, you said.
And is your question for me to go back and count how many months, if it is exactly 16 months to

when the mask -- or the vaccine mandate started?
Can you clarify what your question is about 16 months?
BY MR. FEARS:
Q. Yeah. You used 16 months and you refer to vaccines and masks, correct?
A. That is what I said in this post, yes.
Q. Okay. So I am just breaking it down. On vaccines, is it your understanding that from July 17, 2021, going backwards for 16 months, that children had been receiving COVID vaccines?
MS. MKRTCHYAN: Vague as to time. Understanding now? Understanding then?
THE WITNESS: I would have to calculate exactly how much back in time I can go of when the vaccine mandates started and the lockdown period. But that is what I wrote there, "For 16 months you never spoke up about the harm vaccines and masks are doing for children."
BY MR. FEARS:
Q. Okay. So let me try to refresh your recollection. And just based on math, 16 months would go back to March of 2020.
Do you understand that?
A. Approximately, yes.

Q. Okay. You would agree with me that in March of 2020 there was not even a vaccine that was available, right?

MS. MKRTCHYAN: Objection. Calls for speculation. Lacks foundation.

THE WITNESS: That's a -- I don't remember if there was a vaccine available or not. I believe that there was talk about a vaccine. And if I remember correctly, I don't -- it is very hard for me to tell if in March 2020 there was a vaccine available, but it could have been and they were starting to talk about a vaccine. Maybe I added an additional month, rounded it off. I can't quite recall why I put 16 months exactly instead of 15 or 14 or 13 or 12 or 10, but that is what I put in the post, 16 months.

BY MR. FEARS:

Q. Okay. Do you remember whether the vaccine was first released at the end of 2020 or beginning of 2021 for elderly people first?

MS. MKRTCHYAN: Objection. Calls for expert conclusion.

THE WITNESS: It has been almost four years since 2020. I cannot recall the time line of who got the vaccine first. If I had time to do some

research about that before we went on the Zoom, I could have done the research. But it is very hard for me to remember who got the vaccine first or who was allowed to get the vaccine first or what was the time line and the order of events of who was able to get the vaccine first.

BY MR. FEARS:

Q. Okay. So, Ms. Burmayan, fair to say that you are not sure what the time line was for vaccine and mask mandates for children, correct?

A. Can you repeat the question?

Q. Yes. You are just not sure of the time line when mask mandates and/or vaccine mandates for children began; is that a fair statement?

A. I recall when the mask mandate started, which was probably around March 2020.

Q. Okay. And so with respect to that, this message that you placed on Facebook was critical of mask mandates for children starting in roughly March of 2020, correct?

MS. MKRTCHYAN: Objection. Vague and ambiguous as to term "critical."

THE WITNESS: This is a public post that I shared among thousands of posts that I had that were private or public. And this was a post that I

shared about concerns that I had about masks and vaccines in the period of time that I shared it and I put 16 months. It could have been rounded off, maybe a month or two in addition to what I had. But this post I am very upset about what is happening to the children.

MR. FEARS: Move to strike as nonresponsive.

BY MR. FEARS:

Q. It calls, Ms. Burmayan, for a simple yes or no. I see in your message you say you are disgusted with your psychologist friends. You say shame. You say you don't deserve your title. I would prefer to risk it all than live like cowards, like you.

My question very simply is, based on your message that I just summarized, isn't it true that you were being critical of the fact that there had been mask mandates for which your psychologist friends apparently did not speak up against?

MS. MKRTCHYAN: Objection. Argumentative. Misstates the testimony. Vague and ambiguous. And badgering the witness.

THE WITNESS: To clarify, are you asking me if in this post I am being critical about --

/////

BY MR. FEARS:
Q. Yes.
A. -- about that mask --
Q. Yes.
A. Yes, I am upset.
Q. Okay.
A. But to clarify, you also mentioned about the 16 months. So this is why I was confused.
Q. That was my earlier question.
A. Okay.
MS. MKRTCHYAN: I object. I object. The witness is being interrupted.
THE WITNESS: But you are asking me two questions in one. And then when I am answering one question and then you are mentioning the 16 months, so I don't understand which part you want me to focus on, the 16 months or the overall post?
BY MR. FEARS:
Q. Ms. Burmayan, my last question -- my last two questions did not mention anything about 16 months. Those were earlier questions. I was just asking you whether or not this was critical of the mask mandate for children, yes or no? I think you have answered it, so we will move on. Okay?
MS. MKRTCHYAN: Objection. Argumentative.

Badgering the witness.

MR. FEARS: Okay.

THE WITNESS: Yes.

MR. FEARS: There is no question.

THE COURT: There is no question pending, Ms. Burmayan. Just please wait for the question and then answer. If you talk over each other, it becomes very difficult to have a transcript.

THE WITNESS: Okay.

BY MR. FEARS:

Q. Okay. I am referring to now to Exhibit 7, Facebook 11, is the page number.

Do you see that in front of you, Ms. Burmayan?

A. Yes.

Q. Okay. Is this a page that you posted on Facebook?

A. Yes.

Q. Okay. Go ahead and read it and let me know when you are ready and I will ask you a couple questions about it.

A. Okay.

Q. Okay. Is this a message -- first of all, there is a picture, looks like, of a house that's in this post.

Do you recognize that?
A. There is a house, yes.
Q. Okay. And what was -- what was the point of the picture of the house in this post?
MS. MKRTCHYAN: Objection. The screen does not show the entire page. Please increase the screen. Thank you.
THE WITNESS: I need to see the article.
MR. FEARS: I'm sorry. I'm sorry.
THE WITNESS: Can you repeat the question?
BY MR. FEARS:
Q. Yes. There is a picture of a house. And I see that there is a foxLA.com, and it looks like there is some type of headline or something like that.
Was the house the place in which there was this killing that apparently occurred?
A. I was resharing a news article where it says, "California 14-year-old found covered in blood, allegedly killed mother, injured father in stabbing."
Q. And was this something that you saw on the news?
A. No. It was something that I saw online.
Q. Okay. On a foxLA.com post?

A. I can't recall if it was on the post itself or it was from a friend's post that I reposted, but it says foxLA.com.

Q. And to your knowledge, was there any association made in the news story of this 14-year-old who allegedly killed mother, injured father in stabbing, was there any association of that incident with vaccines or mask mandates?

MS. MKRTCHYAN: Vague and ambiguous. Objection.

THE WITNESS: Can you repeat the question?

BY MR. FEARS:

Q. To your knowledge, was there any association of this child, this 14-year-old, who allegedly killed mother and injured father, was there any association made between that incident and COVID mask and vaccine mandates?

MS. MKRTCHYAN: Calls for speculation.

THE WITNESS: This article is about three or four years old. I cannot -- I would have to click on the article to open it and see exactly what was written in it. But from my brief recollection, it had to do with the lockdowns and it had to do with the fact that the child might have been taking drugs or already depressed and part of the reason

why this happened was during the lockdown and depression that was going on in the household. But I would have to check on the article to see exactly what it was about.

BY MR. FEARS:

Q. Okay. And in the message that you posted you referred to, "Your kids are suffering but you are hoeing around taking pics." And you refer to, at the end of it, "Depressed, drug-addicted, homicidal hoes like you."

What were you talking about, Ms. Burmayan?

A. I would have to read that statement again.

Q. Go ahead. And that is where I started, at the top of the page. Sorry.

A. So I said here, "Good job parents, educators, and school psychologists. This is a result of your selfishness. Keep taking your ugly face selfies, paid vacations, and food pics. Your kids are suffering, but are you hoeing around, taking pics. I don't have kids and speak up more than you. I can't be the only voice in this fight. Your selfishness has blood on your hands and your kids future will show exactly like this when they end up depressed, drug-addicted, homicidal hoes like you."

Are you asking what I mean by this when they end up depressed, homicidal hoes like you?

Q. No. I am actually asking what you meant by hoeing around taking pics and referring to someone, "they" end up depressed, drug-addicted, homicidal hoes like you. I am asking what you meant by that.

MS. MKRTCHYAN: Objection.

THE WITNESS: Yes. There was probably some news article that I saw or maybe in this news article, like I said, I would have to click on this news article to remember what caused me to write that. But it was probably a parent who had abandoned the child during the lockdown period. It is very hard for me to recall -- or basically it was about parents who were not focussing on their children and not attending to their children's needs.

BY MR. FEARS:

Q. Okay. And when you refer to hoeing around, do you mean whoring around, is that what you are referring to?

A. Yes. It was probably -- or maybe something about a parent who was out partying or not taking care of their children.

Q. Okay. So is it fair to say that this is

critical of the lockdown and specifically regarding parents, educators, and school psychologists not speaking out against the lockdown like you were?

MS. MKRTCHYAN: Objection. Vague and ambiguous. Vague and ambiguous. Argumentative as to term "critical." Misstates the testimony.

THE WITNESS: Can you expand or explain what you mean, because it is very confusing how are you saying it?

BY MR. FEARS:

Q. What part do you not understand, Ms. Burmayan?

MS. MKRTCHYAN: Objection. Argumentative.

THE WITNESS: I don't understand when -- I don't understand the whole thing, and I am getting overwhelmed right now.

MS. MKRTCHYAN: I ask for a break, Your Honor.

THE COURT: Well, yeah. We have been going for about an hour, so it seems to me to be a good time for a short break.

How long of breaks do you generally take?

MR. FEARS: I usually accommodate whatever they would like, Your Honor, but I would ask, could I just finish up this screen and this question

before there is a break?

MS. MKRTCHYAN: No. I object, because the witness is overwhelmed and cannot continue answering.

THE COURT: Yeah. I think we can go ahead -- is this the last Facebook post?

MR. FEARS: No, it is not. It is not.

THE COURT: It is not. Okay. So let's just go ahead and take a break now.

MR. FEARS: Okay. Okay. Ten minutes is good or whatever -- Counsel, what do you think?

MS. MKRTCHYAN: About ten minutes. Yes. Thank you.

MR. FEARS: Okay.

THE VIDEOGRAPHER: Okay. Let me get us off the record. Hearing no objection, we are now going off the record at 11:02 a.m.

(Break taken.)

THE VIDEOGRAPHER: Back on the record at 11:19 a.m.

BY MR. FEARS:

Q. Okay. Ms. Burmayan, are you ready to proceed?

A. Yes.

Q. All right. Do you still see that we have

Exhibit 7 and specifically Facebook page number 11 on the screen?

A. Yes.

Q. Okay. Is it fair to say that this post that you made accurately reflects your views?

MS. MKRTCHYAN: Objection. Vague and ambiguous. Views as to what?

MR. FEARS: As to the subject matter stated.

MS. MKRTCHYAN: Vague and ambiguous.

BY MR. FEARS:

Q. Calls for a yes-or-no, Ms. Burmayan?

A. I can't answer that with a yes or no.

Q. Those are your words, correct?

A. I typed those words, yes, I did.

Q. Okay. And when you typed those words, they reflected your views, correct?

A. When I typed those words I was upset at the article where a boy killed his mother. Those were my views.

Q. Okay. Let's go to Facebook 12, which is still part of Exhibit 7, and we will remain on Exhibit 7 until further notice. Exhibit 7 looks like a -- Facebook 12, Exhibit 7 looks like another post from you. Go ahead and take whatever time you

need, Ms. Burmayan, to review it.
A. Okay.
Q. This was a post that you put on Facebook on July 22, 2021?
A. Yes.
Q. And this post reflected your views regarding the lockdown, correct?
A. I need a second to recall why I posted this on July 20, 2021. So I am saying here, Enjoy your last month of freedom. Restaurants are locking down again, stores are clearing items off shelves. That is what you get for being P and then two of those things there, S-S-I-E-S and not putting up a fight. Don't say I didn't warn you.
If I recall, there was a period of time when we were not on lockdown anymore. So this was probably the time where we were going back into lockdown. Because there was several times we were on lockdown and then open and then back and again. And so this was probably the time where we went back into lockdown again.
Q. These were your views about that subject matter, correct?
A. Yes, about this lockdown.
Q. Okay. And the P with the at symbols, you

are referring to pussies, correct?
A. I can't answer that. I don't know if I am referring to pussies. I must have put two of those. I don't know what they are called.
Q. Well, what is the word, then? If it is not pussies -- the way I am reading it is that is what you get for being -- and I read that as pussies and not putting up a fight. That is the meaning I take from it, but I am not testifying. And I can't think of any other word that would be the substitute for that.
So is there some other word that you intended other than pussies?
MS. MKRTCHYAN: Objection. Argumentative.
THE WITNESS: The basic idea of this post was I was upset that we were back into lockdown again. And I don't remember what I meant by that word.
BY MR. FEARS:
Q. Can you think of any other word?
A. I was upset.
Q. I get you were upset. I get the rest of the message. I am only focussing on that word.
Can you think of any other word that you intended other than pussies?

MS. MKRTCHYAN: Objection. Argumentative. Badgering the witness. Calls for speculation.

THE WITNESS: I don't know if I can think of any other word.

BY MR. FEARS:

Q. Okay. Let's go to Facebook 13. This is a post that you put on Facebook, correct?

A. I have to take a look at it. Yes, I do.

Q. And your comment just a triple hundred percent up here, correct?

A. That is what it looks like, yes.

Q. Okay. Let me go to the next, Facebook 14. Is this a post that you placed on Facebook?

A. I have to take a look at that. Yes, I did.

Q. Okay. And your message was, Nazis in full force with the middle finger twice and then looks like a clown emoji twice, right?

A. I can't tell -- yes, it is.

Q. And those were your views regarding the City of Monte Claire requiring city employees to wear vaccine stickers to work without masks?

MS. MKRTCHYAN: Objection. Vague and ambiguous. Misstates the testimony.

THE WITNESS: I need a few seconds to try to recall what I meant when I posted this on July

23, 2021, because it has been a couple of years since I posted this and some of my views have changed.

Q. I'm --

A. Uh-huh.

Q. -- I am not even asking your views. I am just asking whether this was your view -- your message there, Nazis in full force, double finger and clown emojis, that was your view at the time you posted this?

MS. MKRTCHYAN: Objection. Vague and ambiguous. "View."

THE WITNESS: So that is what I was trying to clarify, was, as I said earlier before you cut me off -- but I said I am trying to recall what my views were at the time regarding that post since this was posted in July 2021.

BY MR. FEARS:

Q. Yes or no, Ms. Burmayan. When you posted this at the time, whatever you now believe your view was or wasn't, you posted your honest views at the time you posted it, correct?

MS. MKRTCHYAN: Objection. Argumentative. Asked and answered.

THE WITNESS: I would like to go back and

read the news article. It says Monte Claire to require city employees to wear vaccine stickers to work without masks.

So I guess from my recollection basically Monte Claire was requiring city employees to wear vaccine stickers to work without masks. So I can't recall if they were making the workers wear vaccine stickers to say that they had the vaccine or they didn't have the vaccine. But basically it would be proof to show outside of their body if they had taken the vaccine or not to display this, so I was probably upset as to why somebody would have to wear a sticker on their clothing to show if they have taken the vaccine or not.

BY MR. FEARS:

Q. Okay. And if that was the message, your view of that message was that that meant these were Nazis in full force, right?

MS. MKRTCHYAN: Objection. Vague and ambiguous.

THE WITNESS: Okay. Let me try to recall what I was thinking at the time when I posted that.

BY MR. FEARS:

Q. No. Those were your words, Nazis in full force, correct?

A. Yes, I put that.
Q. And there is a middle finger there twice, correct?
A. Yes, I put two middle fingers.
Q. Do you know what the middle finger means?
A. Yes, I do.
Q. Okay. And then there is two clown emojis that you placed there, correct?
A. Yes.
Q. Okay. Let's go to Facebook page 18, still Exhibit 7.
This is -- is this a Facebook post that you made on your public page?
A. I need to take a look at that a little bit closely.
Q. And I will -- let me scroll down a little further. The portion below is just the metadata.
So can you see the whole thing now?
A. Right now I see my comment, what I wrote, but I can't see what the -- I would have to go up a little to see what the article says.
Q. Okay. I can see it on my screen, but I will go -- I will scroll. It says LAUSD to require students staff -- staff be tested for COVID weekly when school resumes this fall.

And that is from a LosAngeles.CBS.local.com site apparently.

Do you see that on your screen?

A. Yes.

Q. All right. Now I will go back up to your post, and there is a post under your name, Anoush Phoenix, that is responding to that LAUSD article apparently, correct, or the LosAngelesCBSlocal.com article about LAUSD requiring students and staff to be tested?

A. Yes, I put a comment about this article.

Q. Okay. And you were obviously critical of the idea that students and staff had to be tested for COVID weekly when school would resume in the fall, correct?

A. I was upset about this post, yes.

Q. Okay. And you -- the message that you have in the two lines under your name that expresses your view about this message conveyed in the CBSlocal.com article, right?

A. I have to read that again. So I said, Good job everyone. So proud of all you school psychologists, parents, and teachers that spoke up. Sarcasm. You must love being someone's bitch, tortured, and imprisoned. Yes, I put that.

Q. With the triple middle fingers on that one too, right?

A. Yes, triple middle fingers.

Q. And that was your view at the time, correct?

A. I was upset about this post, yes.

Q. Okay. Go to Facebook 22, there is another post by you. And just I want to make sure you can read the whole thing. But there was a post by you at the top reading, For all the idiots who got the poisonous jab, with some emojis. And then there is -- it looks like pictures of the Moderna vaccine with the NBCLosAngeles.com article about Moderna saying there's a third dose of its COVID-19 will be needed before winter.

Can you read -- can you see all that?

A. Yeah. Right now I can see the article where it says Moderna says the third dose of its COVID-19 vaccine will be needed before winter.

Q. Okay. And so you were commenting upon that article, right?

A. For all the idiots who got the poisonous jab, yes, I wrote that comment.

Q. Obviously critical of people that did, in fact, take the vaccine, correct?

A. For some of the people who took the vaccine, yes, I was upset.
Q. It says for all the idiots who got the poisonous jab. Who were you referring to?
A. I can't recall who I was referring to.
Q. Okay. Did you take the vaccine?
A. No, I did not.
Q. Okay. All right. Let's go to -- the next is Facebook 24. This appears to be a posting by you; is that correct?
A. This is a post that I reposted from somebody else.
Q. Okay. And you put -- your comment was a hundred percent three times, right?
A. Yes, three one hundred percents.
Q. All right. And that was in reference to the post that you were reposting on this date, correct?
A. Yes, the three one hundred percents were regarding the post that I reposted on -- I can't see the date. Can you go down?
Q. Yeah. I am always confused. When you say down, I'm going up but --
A. Okay. So it is the --
Q. No. No. It is -- some people say down,

up. But I just went up on the page. So you see the August 9, 2021?

A. Yes.

Q. Okay. Does that help you answer as to whether or not your hundred percent three times was to the message that you posted?

A. I need to read the message. The pandemic is to force you to get the vaccine. The vaccine is to force you to get the vaccine passport. The passport is to force you to get the social credit score. The social credit score is to force you to obey the government. The government can now deny you food, medicine, house, and travel.

Yes, at that time, the hundred percent was regarding that post in 2021 when I put it.

Q. And you were indicating your agreement with that, correct?

MS. MKRTCHYAN: Objection. Vague and ambiguous as to the word "agreement."

THE WITNESS: In agreement to what?

BY MR. FEARS:

Q. With the post that you reposted, Ms. Burmayan.

A. You are asking if I agreed to the post?

Q. No. When you said one hundred percent

three times, you're indicating when you -- let me withdraw that.

When you reposted this post about the pandemic is to force you to get the vaccine, et cetera, when you reposted this, and put a comment up there saying one hundred percent three times, you were stating that you agree with this post that you had reposted, correct?

MS. MKRTCHYAN: Objection. Vague and ambiguous.

THE WITNESS: It is not so much that I agree or disagree. It was a post that I found interesting, so I reposted it and I put three one hundred percents.

BY MR. FEARS:

Q. What is the one three -- my reading of the three one hundred percents is that you agree 300 percent with this post.

What is your reading of your own comment there three times putting a hundred percent?

MS. MKRTCHYAN: Objection. Argumentative.

THE WITNESS: Three hundred percent? I don't know if I could -- so you are adding one hundred plus one hundred plus one hundred, and you are saying that I agree to this post 300 percent?

BY MR. FEARS:

Q. Ms. Burmayan, please listen to my question. What was your understanding of your own comment of putting one hundred percent three times above this message that you reposted?

A. It is a good post, and I want to reshare it.

Q. Okay. All right. Let's go to Facebook 25. This is another post you put on your Facebook page?

A. Let's take a look here, August 2021. Yes.

Q. Yes or no?

A. Oh, I answered yes.

Q. Okay. I did not hear you. Sorry. So -- and your comment was -- it looks like seven middle fingers to this article that indicated that Long Beach Unified requiring teachers and staff to get COVID vaccine or undergo regular testing, correct?

A. I put one, two -- let me count them again. One, two, three, four, five -- yes, seven middle fingers.

Q. And the middle fingers are -- you understand that means F you?

MS. MKRTCHYAN: Objection. Argumentative.

THE WITNESS: Middle finger to me can mean many things, but mostly I was upset.

BY MR. FEARS:
Q. You agree with me it is derogatory, right?
A. It is not a good thing, yes, correct, depending on how you look at it. But it was a sign that I was upset.
Q. And you were upset about the fact that a different school district, not the one that you worked for, but a different school district was requiring teachers and staff to get the COVID vaccine or undergo regular testing, right?
A. So yes. Let me take a look at that again. Long Beach Unified requiring teacher, staff to get COVID vaccine -- or yes, I was upset about Long Beach Unified, correct.
Q. Okay. Referring you to Facebook 28 with a message from you and a posting or reposting of a message. Take whatever time you need to read it and let me know when you are ready.
A. Okay.
Q. Okay. This is a message that you posted on your Facebook page?
A. Yes.
Q. And in the actual message, in this one it says, "Due to the increase of pussies in America," so actually you used the word pussies in this one as

opposed to the prior one I showed you that had the two little at symbols, correct?

MS. MKRTCHYAN: Objection. Misstates the evidence. Misstates the testimony.

THE WITNESS: If you are asking me if I see the word pussies in this post, yes, I do.

BY MR. FEARS:

Q. Okay. And you posted that on your public page, right?

A. Let me take a look. Can you scroll up or down, whatever -- whichever way that means to you. No, the other way because I wanted to see if it was a public post. Yes, it is.

Q. Okay. And your comment above that message is accurately reflected there, right?

A. Yes, I am upset about this repost that I posted.

Q. Okay. And you are saying -- it says, "A big FCK you for not having the courage to speak up." This is what you are -- you are saying that to the psychologists, selfish parents, and teachers -- and teachers, so-called friends, right?

A. To all my coward school psychologists, selfish parents, and teachers, so-called friends, yes, that is what I am saying in this post.

Q. Okay. And what does the next phrase say?
A. A big FCK you for not having the courage to speak up in replace of your comfortable vacations the last 18 months.
Q. Okay. This was your view at the time, correct?
MS. MKRTCHYAN: Well, objection. Vague and ambiguous as to "view."
THE WITNESS: Yes, so at the time, there was a --
MR. FEARS: Just calls for a yes or no.
MS. MKRTCHYAN: Objection. Objection. Interrupting the witness.
MR. FEARS: It is nonresponsive. The witness is not responding.
THE COURT: Yeah. I think there is a misunderstanding here. I don't think -- the question simply was, is this your view?
THE WITNESS: At the time, I was upset. Yes, this was my view.
BY MR. FEARS:
Q. Let's move on, then. Facebook 46. Looks like another message from you. And on my screen I can see the LA -- LosAngeles.CBS local article down below. Let me know if you can't.

MS. MKRTCHYAN: I cannot. Objection.
THE WITNESS: I can't --
BY MR. FEARS:
Q. Okay. Do you see it now? I scrolled down so you can read it. I understand you are on a smaller device.
A. LAUSD Teachers Union wants mandatory COVID vaccination for eligible students.
Q. Okay. And then it looks like you had a posting in response to that, correct?
A. I have to look up. Yes, I put a comment about that.
Q. And that is at the top of the page where it says, To all bitch selfish parents, teachers, et cetera, all of that, those were your comments in response to this article about mandatory COVID vaccinations, right?
A. Yeah. That was my response to that news article that I read and posted.
Q. And those three lines that I started to read, those were your views in response to that mandatory COVID vaccination article, correct?
MS. MKRTCHYAN: Objection. Vague and ambiguous as to "views." Misstates the testimony.
THE WITNESS: LAUSD's teachers union wants

mandatory COVID vaccination.

BY MR. FEARS:

Q. No. If you could -- I'm not asking you to read that. I am just asking you about your -- whether those three lines at the top of the page were your views, Ms. Burmayan?

MS. MKRTCHYAN: Objection. Vague and ambiguous.

THE WITNESS: Well, at the time I was upset at the fact that they were mandating the students to get the vaccinations, and some parents were calling me up and asking me what they can do because they are worried about what might happen to their student's health. So I decided to repost some information for parents to, you know, find out what is going on and to educate them because most of the time we were on lockdown and we could not really go out. And that was my way of expressing myself and my outlet. And I was hoping to educate others and to learn more about the vaccine. So at the time, that was my view about what I posted.

MR. FEARS: Move to strike everything other than, at the time that was my view.

Your Honor, this is what happened last time after --

THE COURT: No. No. I understand the problem, and I think if I could try to explain just as an observer of this. There is a difference between a question that asks is -- you know, looking at the message is -- was this your view at the time.

A different question is, explain your view. And I think that is the distinction that is getting lost here.

The question simply was, this message that you posted, was that your view at the time?

MS. MKRTCHYAN: And I object, Your Honor, because this is exactly what happened last time. Some questions cannot be answered yes or no. This --

THE COURT: No. No. No. Is it not -- I am not trying to suggest what the answer is. I am trying to distinguish two different kinds of questions. So it is -- you know, whatever the answer is, the answer is. But it is two different questions. One question is, was this your view at the time. A different question is, explain that view. Those are two different questions. That is just what I am trying to clarify because I think it is getting -- maybe people are miscommunicating with each either. So --

MS. MKRTCHYAN: There is no --

THE COURT: -- that is all I am trying to do just to get this to move along.

So Mr. Fears, do you have any other questions about this particular Facebook 46?

MR. FEARS: I do not, Your Honor. But if I could just state that this is what happened last time. After objections, then we start hearing long answers like in that long answer we just heard about parents calling and so forth.

THE COURT: That -- again --

MR. FEARS: Some questions can be answered with a simple yes or no, especially when I am asking were these your views on the subject matter when you wrote it.

MS. MKRTCHYAN: And I would like to make my record.

THE COURT: I think we can just move on from this. I think the -- you know, as I said, in this case the lawyer's argument with each other. I just don't want the witness to get confused about the two types of questions. That is all I am saying. Because I think there is some confusion about that issue, when somebody asks, was this your view, and then there is an objection. And then the

answer comes and it is answering a slightly different question, which is explaining what the view was, which is a different issue. That is the only thing I am trying to point out to Counsel and the witness, is that there seems to be a miscommunication here. But let's, please, move on.

MS. MKRTCHYAN: Yes. And I feel like my client right now is overwhelmed. I think she is crying. You know, this is exactly what happened last time.

THE COURT: I understand, you know, this is -- it is not easy. It is not easy, depositions, just not easy, but it is okay. There is nothing that is happening here that does not, you know, usually happen. There is sometimes miscommunications. It has been going fine up to now. It has been actually fairly straightforward.

So please, Ms. Burmayan, do not get upset. This is just fine. I am just trying to help move this along so that everybody understands each other.

This has been going very well so far. I just need the -- the lawyers now need to step back, and let's go back to question and answer just the way we have been doing.

MS. MKRTCHYAN: Therefore I request

instruction for the witness -- to the lawyer not to say move to strike, because that is --

THE COURT: No. No. No. I cannot -- as I said, it is not for me here to decide what comes in and what does not. As I explained at the beginning, a motion to strike is simply that, a motion to strike on the record. I cannot order a lawyer not to say motion to strike.

The ruling will come from the trial judge at the time of trial, not here. So there is no point arguing about it. It is just like an objection. It is the other side of the objection. Objection made, motion to strike is made, that ruling is made later at the trial and should not be impacting this witness. That is why we say in the rules, objections made, motion to strike is made, but the examination goes on and the answer is given subject to the objection or subject to the motion to strike.

This is usual. That is what I am trying to explain to Ms. Burmayan. This is just the way it goes. It is not anything to be upset about. It is just what happens. The lawyers put their statements on the record. The trial judge will decide what comes in and what does not come in. We can just go

back to what -- the way this was going the first hour.

MS. MKRTCHYAN: Well, and I request a break because my client is overwhelmed and she is crying, visibly crying.

THE COURT: Well, let me ask you, Ms. Burmayan, is there something that is -- that I have said that is confusing? Is there something upsetting? What seems to be the issue?

THE WITNESS: I just feel that I am being attacked and I am trying -- not by you, Your Honor. But I just feel like I am being -- I am trying my best. I feel like a criminal. I am really trying my best to explain why I put those posts the way I did. And it was not anything malicious. I was just very upset at the time that I -- you know, kids were suffering. I was suffering. Families were suffering. And I am trying to explain, but I feel like I am just being put -- like I am looking, you know -- trying to --

THE COURT: Well, and some of that may be -- so let me explain a bit about a deposition.

MS. MKRTCHYAN: Your Honor, I am -- I object, Your Honor, because this is like interrogation of my client now by the judge. I

object to this because -- I objected to this second session, you know --

THE COURT: I understand that and I wish that you could explain this to your client. But I think the issue is she is -- you are feeling like you have to explain your views. All you need to do is answer the questions.

This is the opportunity that the other side has to ask you questions. At trial or maybe if there is cross-examination, your counsel will give you the chance to tell your story.

But this is -- it is -- this is just an opportunity that the other side has under our rules to ask you questions. And you don't need to explain yourself unless that is what the question asks for you to do.

THE WITNESS: Okay. I just --

MS. MKRTCHYAN: Well, I request a break because my client cannot right now articulate even comments -- I object, Your Honor. We need to take a --

THE COURT: I understand that you object, but I don't know that having this argument is really helpful for the witness, that is what I am trying to get to. I think this is more agitating than not.

And I want to make sure that the witness does not have a misconception about what the deposition is about.

MS. MKRTCHYAN: Well, we had already one session with the same attorney --

THE COURT: Again, this is not helpful. This is not helpful.

I want to -- let's take five minutes, and then when everyone comes back, I want to have question-and-answer just like we did the first hour.

THE WITNESS: I just feel like, you know --

THE COURT: There is no need to --

MS. MKRTCHYAN: And I'll -- objection.

THE COURT: And maybe during this break you can talk with your attorney if you have other kinds of questions about this. I understand that being a deponent is difficult because you are here to answer questions and not necessarily, you know, give your side of the story. This is their opportunity to ask you questions, and it is not your opportunity to tell your side because you're answering their questions. I understand it is difficult. I just think it is important that we get through this.

All right. So let's take a five-minute break. We will return at noon by my clock. And as

I said, I want in the interim everyone to just take a deep breath, calm down. When we get back on the record, we will go back to Mr. Fears asking questions. Ms. Burmayan, you will answer questions, just like we did the first hour.

All right. Thank you, everyone. We will see you at noon.

MR. FEARS: Thank you, Your Honor.

THE VIDEOGRAPHER: We are going off the record at 11:52 a.m.

(Break taken.)

THE VIDEOGRAPHER: Back on the record now, Counsel, at 12:03 p.m.

MR. FEARS: Thank you.

BY MR. FEARS:

Q. Ms. Burmayan, all set to go?

A. Uh-huh, yes.

Q. Okay. I am -- in the interest of time, I am skipping through some of these pages. I have gone down to Facebook page 84.

Do you recognize this as a posting that you placed on your Facebook page?

A. Yes, I posted that.

Q. Okay. And let me go to Facebook page 86 -- I'm sorry -- 85.

Is this another page that you posted on your Facebook public page?
MS. MKRTCHYAN: Objection. I don't see the whole -- can we scroll down through the entire page?
BY MR. FEARS:
Q. Stuff on the lower part is just metadata.
A. It looks like some of us were tagged in a post or if you can scroll up -- I can't quite tell from this post if I reposted it or if I was tagged in it.
Q. I have gone to the top of it. Do you see your name followed by the picture that was posted with, "It is not about a virus. It is about control."
MS. MKRTCHYAN: Objection. It is not showing the entire page.
THE WITNESS: I can't see on the bottom -- because I saw that some people were tagged, so I can't really tell if I reposted it or I was tagged in it or if I reposted and tagged. It is --
BY MR. FEARS:
Q. I'm showing you the bottom now, Ms. Burmayan.
A. Yeah. There is some tags of people.
Q. Okay.

A. Adrian Constantin Cucu is with Eu Ra and three others, so I can't see from this if I was tagged in it.
Q. So you can't tell whether or not you posted this on your Facebook page?
A. That is what I am saying. I can't quite tell if I reposted it or if it was tagged in it. Because sometimes a tag and repost you can't tell, but on the bottom it looks like I was tagged.
Q. And tell me what it is that you are referring to that suggests to you that you did not or possibly did not repost this?
MS. MKRTCHYAN: Objection. Asked and answered. Vague and ambiguous.
THE WITNESS: The bottom of the page says Adrian Constantin Cucu is with Eu Ra and three others. I can't tell from this post if I was one of them, if I was tagged. It is hard to tell.
BY MR. FEARS:
Q. Let me refer your attention to Facebook page 90. Do you see this page on your screen?
A. I am scrolling up to December 31, 2021.
MS. MKRTCHYAN: Not entirely.
BY MR. FEARS:
Q. Let me know when you are ready for me to

scroll down.

A. Okay. Right now what I see is "Get vaccinated and boosted." That is all I can see.

Q. I'm now showing you the bottom of it. Let me know when you are ready.

A. Okay.

Q. Okay. Is this a page that you reposted on your Facebook page in December of '21?

A. Yes, it looks like -- go ahead.

Q. With emojis comments.

A. Yes, it looks like a news article. Can you scroll back down again or up or whatever that means to you.

Q. I just wanted to know whether it appears as though you posted this on your Facebook page.

A. Yes, that is what I am trying to figure out, if it is a news article that I posted or if it was a post that I reposted.

Q. Whether it is a news article or not, I have shown you -- it says County of Los Angeles at the bottom. I just want to know, Ms. Burmayan, is this something that you posted or reposted on your Facebook page?

A. Yes.

Q. Whatever it is. Okay. The answer is yes.

Thank you.

And you with respect to this message about COVID-19 cases rising so our protection levels must rise too, get vaccinated and boosted, when you posted or reposted this message, you put three laughing emojis under your name, correct?

A. Take a look, yes, it looks like three laughing emojis.

Q. Okay. And is there some reason why you would laugh about a message saying that COVID-19 cases are rising so our protection levels must rise too, get vaccinated and boosted?

MS. MKRTCHYAN: Objection. Misstates the testimony.

THE WITNESS: Can you explain what you mean -- can you clarify? I did not understand your question.

BY MR. FEARS:

Q. Is there some reason why you would post laughing emojis in response to the message that is immediately below your laughing emojis?

A. Is there some reason? No, there is no reason.

Q. Okay. Let me refer your attention -- I will skip ahead to Facebook 93. I'm showing you the

upper portion now. Let me know when you are ready for the lower portion. And you should have in front of you on the screen, If you're a man wearing -- and it goes on with a message and some additional message.

A. Okay. I can now see the rest. Right now what I see is legs and a mask wrapped around it.

Q. No question, just want to make sure you see the bottom of it.

A. That is what I am saying. I can see the legs with no -- I did not ask you a question. I know you did not ask me a question. I am telling you what I can see.

Q. Have you seen the whole message now?

A. No.

Q. What portion do you need to see?

A. The bottom.

Q. Let me know when you are ready, please.

A. I see the word "pee."

Q. Are you ready?

A. Ready for what?

Q. Well, you say you see the word pee, and I want to make sure, do you see also the rest of the message at the bottom where it says post day, capture date, page, hash, URL?

A. I see post date, capture date, page, hash, URL.

Q. Okay. So you don't just see pee alone, right?

MS. MKRTCHYAN: Objection. Argumentative. You know, this is badgering the witness.

THE WITNESS: Thus far you have never asked me to read the URL or anything like that. You have always asked me to focus on the post itself, so that is why I answered you with the word pee. Had you asked me if I could see the hashtag, I would have answered that.

BY MR. FEARS:

Q. Have you seen it all now, Ms. Burmayan, this whole message?

A. I saw it earlier. And then right now, I am on pee -- part of pee, and then two legs and a mask.

Q. Okay. Going back to your message at the top of the page, is that your message, If you are a man wearing a mask especially, in all caps, while working out and, in all caps, taking pics, not only do you look like a clown, in all caps, but also a bitch, in an all caps?

Is that your message?

A. I typed that, yes.

Q. Okay. You were being critical of men who wear masks especially when they are working out?

MS. MKRTCHYAN: Objection. Vague and ambiguous as to term "critical."

THE WITNESS: I found it interesting how if a person can work out and wear a mask at the same time, so that is what I was -- the post was very interesting to me of how a person can wear a mask and work out at the same time.

BY MR. FEARS:

Q. Okay. That was your view at the time, right?

MS. MKRTCHYAN: Objection.

THE WITNESS: Yeah.

MS. MKRTCHYAN: Vague and ambiguous as to "view."

THE WITNESS: At the time because of my own health condition, I found it interesting how a person can work out and wear a mask at the same time.

BY MR. FEARS:

Q. Let me refer you to Facebook page 97, showing the top of the page.

Has your username, Anoush Phoenix, dated January 5, '22, with two laughing emojis, followed

by a message regarding masks.

A. I just need to get up and stretch because my back is hurting.

Q. Have you had a chance to read the message?

A. No. I am just stretching my back.

Okay. Now I am looking at that screen again.

Q. Have you finished?

A. Not yet. Okay. I read it.

Q. Okay. Going back up to the top with respect to this message, you posted this message with two laughing with tears emojis, right?

A. Yes, there is laughing emojis with tears.

Q. Okay. And what was your intent in placing laughing emojis with tears to this message that talks about which masks provide the best protection?

A. Can you go down a little because I could not see what the message of the article was? And then a little bit more because I think there was some words.

Q. Nothing down there, other than the --

A. Well, it says here an entire article.

Q. I had that up. There is nothing -- there is only metadata below that.

A. Yeah. I understand, but I need to

understand why I put that and try to remember it since it is almost a year and a half ago. You are asking me if I recall why I put those emojis, so I have to read the rest of the article.

Q. Have you finished?

A. Not yet.

Okay. I read it. I don't recall why I put that. It has been almost a year and a half.

Q. It is fair to say that you had a lot of posts on your Facebook regarding masks and vaccines, right?

MS. MKRTCHYAN: Vague as to time. Objection.

THE WITNESS: It is fair to say after my arrest I had a lot of posts about the masks because I was traumatized and I was very upset at what happened to me.

BY MR. FEARS:

Q. Calls for a yes-or-no, Ms. Burmayan.

Fair to say that you still have on your Facebook page messages regarding masks and vaccines that are critical?

MS. MKRTCHYAN: Objection. Vague and ambiguous.

THE WITNESS: Are you asking me if I still

have at the moment right now posts about the vaccine mandate or mask mandate?
BY MR. FEARS:
Q. That was not exactly my question, but let me ask it differently.
These messages that you have said you had on your Facebook page -- I need to see your face.
A. I was looking because I think the post is gone, so I was looking to see if I could see the post again since I thought your question was about this particular post.
Q. The messages that I have shown you, do you have a specific recollection of taking them off of your Facebook page?
MS. MKRTCHYAN: Objection. Vague as to time and taking off. That is, you know --
THE WITNESS: So first you asked me one question. Now you are asking me another question.
BY MR. FEARS:
Q. Mr. Burmayan, I don't want to argue with you. Let me ask a question. Forget about any other question. I am asking you a question right now.
With respect to the Facebook pages I have shown you that you have testified are your Facebook pages, do you have a recollection of removing those

pages from your public Facebook page?
MS. MKRTCHYAN: Objection.
MR. FEARS: Yes or no?
MS. MKRTCHYAN: Objection. Vague as to time. And argumentative. Badgering the witness.
THE WITNESS: I need some more clarification. Are you asking me if I removed any post recently regarding my posts from the past? I don't understand what you are asking me.
BY MR. FEARS:
Q. I am asking you about the Facebook posts that I have shown you over the last hour and a half.
Do you understand that?
A. Yes.
Q. Do you have a recollection of removing any of those posts from your Facebook page at any time?
A. No.
Q. Yes or no?
A. If I put something, it is there. If I took it off at that time, that is what I did. But I know I did not recently remove any posts that I put from the past.
Q. I didn't say anything about --
MS. MKRTCHYAN: Objection. This is -- this is why the question is vague and ambiguous.

THE WITNESS: Are you asking me if I put a post --

MS. MKRTCHYAN: There is no question -- okay. There is no question pending. Listen carefully to the question.

For the record, my client is getting overwhelmed again and anxious by the line of questions

THE COURT: Again, I don't see that. I don't see Ms. Burmayan getting overwhelmed, actually. I think, again, this is one of those that may be a miscommunication, so let me take a shot at it.

I think the question since you have been looking, Ms. Burmayan, at several Facebook posts, do you recall ever removing those posts?

THE WITNESS: Do I -- it is very confusing.

THE COURT: Do you remember?

THE WITNESS: No, I don't recall, because if I put a post, how am I supposed to remember if I removed it after I put it? It is very difficult for me to say what I did two years ago for a post that I put in 2021, if I put a post and I removed it. If I put a post, most likely it is there.

But if I removed it, then I removed it. I

can't tell from all of these hundreds of posts what is still there, what is not there, what has been removed. But I don't recall putting a post and then removing it. But if I did remove it at the time, then I put it and I removed it.

I just -- it is very hard for me to recall what I did with the post. I mean, the posts are there, so how could it be removed? I don't understand.

THE COURT: Okay.

MS. MKRTCHYAN: And I object. You know --

THE COURT: Have you answered the question, Ms. Burmayan. You've answered it. Thank you very much.

MS. MKRTCHYAN: And I object for the record. This deposition was supposed to be lasting two hours at the most.

THE COURT: Well, that is probably without my -- you know, I don't know that we can -- I have no idea how long this has been going because I don't have the time.

THE VIDEOGRAPHER: I --

MR. FEARS: Mr. Knowles has.

THE VIDEOGRAPHER: Yeah. I have been tracking it. And we are at an hour and 50 minutes,

so if it was two hours, I guess we would have exactly ten minutes left.

THE COURT: Okay. Excellent. Thank you very much.

Mr. Fears, please continue.

MR. FEARS: Thank you.

BY MR. FEARS:

Q. Ms. Burmayan, you were aware that the City of Glendale had a mask mandate in early 2021, correct?

MS. MKRTCHYAN: Objection as to face mask mandate. Calls for legal conclusion.

And by the way, the deposition was supposed to be hours --

THE COURT: Let's just try and get the -- motion to terminate, the motion is denied.

Let's just please get the questions and answers in the time remaining. Thank you.

Mr. Fears.

MR. FEARS: Your Honor -- Your Honor, I just have to state this for the record. I have been trying to be as patient as possible, but this is -- we get constant interruptions from Counsel, which then affects the witness's testimony. We have the interruption for about 15 minutes of dialog where

counsel was objecting to even Your Honor's questions and directions and so forth, and it is obviously an effort to run out the clock. And I just object to it.

I have been trying to ask these questions and just get a responsive answer, and Counsel either objects or the witness prevaricates even after she has been directed to answer questions and not just --

THE COURT: All right. So now you are going over the time for the speaking objections. I understand everyone is frustrated. My time is not going to count against Counsel, so I think let's go back to the questions and answers just like we have been doing.

BY MR. FEARS:

Q. Ms. Burmayan, you were aware that in early 2021 the City of Glendale had a mask mandate?

MS. MKRTCHYAN: Asked and answered. Objection.

THE COURT: It was asked. It was never answered, please.

MS. MKRTCHYAN: No, this question was --

THE COURT: Please, Ms. Burmayan, answer the question.

THE WITNESS: First of all, I would like to know what he meant by the witness is pre -- are you -- because I have a different --

THE COURT: That is not a question. All you need to do, please -- you don't need to worry about the lawyer argument. Please don't worry about the lawyer argument. All you need to do is listen to his question right now.

MS. MKRTCHYAN: Your Honor, I feel like my client is being badgered. And the only objection --

THE COURT: If you are making a motion to terminate, the motion is denied.

MS. MKRTCHYAN: May I make my objections?

THE COURT: No. The motion is denied. I told you, no speaking objections. If you are making a motion to termination, that motion is denied.

Mr. Fears, back to your question.

Ms. Burmayan, please listen to the question and answer it.

THE WITNESS: I understand that, Your Honor, but he just insulted me and said that I was not answering the -- or like he said something that the witness is doing --

THE COURT: Don't worry about it.

MS. MKRTCHYAN: -- I just want to make sure

that my rights are protected because I feel like just because I have a different political view from the counsel or something, that I am speaking about my freedom of speech or protection, he is making me look like a criminal.

THE COURT: Okay. No. No. No. Ms. Burmayan -- Ms. Burmayan, this is an important point. Please don't feel defensive about the questions. This is not about that. This is simply question and answer. You have the feelings you have. You have the answers you have. That is it. That is -- it is not a -- you don't need to feel defensive about it. Let's just get through the rest of this. The Facebook pages are now history. Let's please go onto the rest of the questions.

Mr. Fears, please.

MR. FEARS: Thank you.

THE WITNESS: I understand, Your Honor. I just want to make sure that I am being protected also and not being insulted by the counselor that I have a different viewpoint and I put different viewpoints because all he is doing is tearing me up and insulting me because I have different viewpoints of what I thought about the mask mandate and the vaccine mandate at the time.

THE COURT: And you are --
MS. MKRTCHYAN: There is no need to talk.
THE COURT: It is hard to tell on Zoom when you're finished talking. All I am saying is your views about counsel are on the record, and therefore we don't need to worry about this anymore. Let's just please go on.
THE WITNESS: Okay.
BY MR. FEARS:
Q. Ms. Burmayan, you were aware that in early 2021 the City of Glendale had a mask mandate for retail stores, correct?
MS. MKRTCHYAN: Objection. Calls for speculation. Legal conclusion.
THE WITNESS: I was aware. I was following the California State guidelines.
BY MR. FEARS:
Q. Okay. With respect to January 13, of '20 -- I'm sorry, January 13, 2021, when you went to the CVS store that is the subject of this lawsuit, you were asked several times to have your mask cover your nose, correct?
MS. MKRTCHYAN: Objection. These same questions were asked at the first deposition. The Court's order specifically limited this second

deposition to damages and Facebook posts, not to areas where it was covered. So now they're having a second bite at the apple by asking the same exact questions that were asked at the seven-, eight-hour deposition. That is my objection for the record.

And I object. I asked for terminating this deposition.

THE COURT: Motion is denied.

Please continue, Mr. Fears.

BY MR. FEARS:

Q. Are you able to answer the question, Ms. Burmayan?

A. No. Can you repeat the question?

Q. Okay. On January 13 of 2021 when you went to the CVS store that is the subject of this litigation, several times you were asked to have your mask cover your nose, correct?

A. I was asked by Guy Garcia to cover my nose, yes.

Q. Okay. At any time did Mr. Garcia or the cashier or Mr. Johnson ever make any reference whatsoever to your race or national origin?

A. You're asking if any of the three people you mentioned, if they made a comment about my race?

Q. Or national origin.

A. No.
Q. And on January 19, when you revisited the CVS store, did any CVS employee make any reference to your race or national origin?
A. So for clarification, now you're asking if on the 19th any of the people you mentioned made a comment about my race?
Q. That's correct. Any of those people or any other CVS employee make any reference to your race or national origin?
A. Not CVS employees, no.
Q. Okay. All right. What -- do you claim or believe that CVS treated you differently because you are Armenian?
MS. MKRTCHYAN: Calls for legal conclusion. Calls for expert opinion.
THE WITNESS: Well, if you can clarify your question because what I am understanding is -- are you asking me if basically the same question you asked me a minute ago, which is did anyone make any comments about me being Armenian?
BY MR. FEARS:
Q. I'm talking about CVS employees only.
A. Uh-huh.
Q. And are -- is it your belief that any CVS

employee treated you differently because of the fact that you were Armenian?

MS. MKRTCHYAN: Attorney work product. Attorney-client privilege. Objection. Calls for legal conclusion.

THE WITNESS: I don't know what they believed or what their beliefs were. All I can tell you is I did not hear any comments that they made about me being Armenian, but I can't assume or speculate what their thoughts were about Armenians.

THE VIDEOGRAPHER: Hey, Dan, this is the videographer speaking, there are two minutes left.

MR. FEARS: Understand.

BY MR. FEARS:

Q. Prior -- well, let me withdraw that.

Did any CVS employee say anything to you about your alleged disability?

A. Okay. I need to make sure that I understand this question correctly. You are asking me if any employee said anything to me about my disability?

Q. Yes.

A. No, because they were ignoring me the whole time and the only thing they were saying is to cover my nose.

Q. And at the last session of your deposition, do you recall I asked you about a note that you said you had with you on January 13, 2021, and January 19, 2021, that allegedly indicated that you did not have to wear the mask over your nose?

Do you recall that?

MS. MKRTCHYAN: Objection. This is going over the same line of questioning that the first deposition. Time is up. I request terminating this deposition.

THE COURT: Denied.

Please answer the question.

THE WITNESS: Can you repeat the question because it was very lengthy and I can't recall what the --

BY MR. FEARS:

Q. Do you remember -- do you remember referring to a note that you had from a doctor. I think you mentioned it was from either Dr. Tribble or Dr. Flores that allegedly said something about whether or not you could wear a mask over your nose?

MS. MKRTCHYAN: Misstates the testimony. Objection. Vague and ambiguous.

THE WITNESS: What I do remember is I kept telling Guy Garcia I have a disability. I have a

disability. Please listen to me. I have a disability. I have a note. Can you look at my note? I have a disability. I can't breath well, sir. Can you look at my note? I have a disability. And every time I was bringing that up, he was ignoring it.

MR. FEARS: Move to strike as nonresponsive.

MS. MKRTCHYAN: Objection.

BY MR. FEARS:

Q. Ms. Burmayan, I am focussing on the note only right now. And last time I asked you about the note you said you had two to three copies of this note that somehow related to a mask.

Have you been able to locate this note that you referenced in your last deposition in the period of time since your last deposition?

MS. MKRTCHYAN: Objection. Misstates the testimony and compound.

THE WITNESS: That is not true. I never said I had two to three different copies. I said I had two, three different doctors that were confirming my disability.

BY MR. FEARS:

Q. And I won't argue with you about the

transcript, but have you located any doctor's note since the last session of your deposition that refers to your inability to wear a mask in any way?

MS. MKRTCHYAN: Objection.

THE WITNESS: Yes.

MS. MKRTCHYAN: Vague and ambiguous. Attorney-client privilege. Attorney work product.

Your Honor, I will request this -- I instruct the witness not to answer because it goes into attorney-client privileged communications at this point.

THE COURT: The question did not ask about any communications. The question is simply whether she located the document.

MS. MKRTCHYAN: Well, but if the attorney located the document, not her, she would not know the answer. That goes into attorney-client privileged communication.

THE COURT: Then that would be the answer. He is not asking for her to tell him what you have done. He is simply asking whether she located the document.

MS. MKRTCHYAN: Then it should be made clear, because vague and ambiguous as to --

THE COURT: I think it is clear. I think

it is clear. He is not asking --

Do you understand, Ms. Burmayan? He is not asking you to describe what your lawyer has done, just what you have done.

THE WITNESS: I have a note from Dr. Tribble saying that I can open my nose area of the mask and lower it when I don't feel well.

BY MR. FEARS:

Q. And where is that note?

MS. MKRTCHYAN: Objection. Again, attorney-client privilege. Attorney work product. Instruct not to answer. This is going, again, into attorney-client privileged communications. It is improper for the witness to know where it is without disclosing attorney-client privileged communications.

THE COURT: I am going to -- since it is a counsel issue, I think we can deal with this with counsel only at the end, so I will ask Mr. Fears to just move on to the next question.

MR. FEARS: Okay. I would like to have a discussion about this, Your Honor, because we have been trying to get this mysterious note which would be responsive to the early disclosures as well as specific discovery responses. It has not been

produced. Counsel said she would produce it if it existed. Counsel is now referring to the existence of it. We have not seen it. And I am not even --

THE COURT: Right.

MR. FEARS: -- able to take -- conclude the deposition without seeing it. And it's obviously important if it does exist. And I am afraid there is some gamesmanship that is going on here and a failure to produce that prevents discovery here, so I very much would like to talk about that note. But I will move on as you have requested.

THE COURT: Okay.

BY MR. FEARS:

Q. Ms. Burmayan, with respect to the -- the testimony that you have given about the individual employees at CVS, not the police officer, but the employees at CVS that you spoke with on January 13, and January 19, what damages are you claiming you incurred as a result of your communications with the CVS employees?

MS. MKRTCHYAN: Well, objection. This is going over the time. You know, I object that this -- we have had two and a half -- I need to have lunch myself. I cannot continue. I will get a migraine headache if I do not have timely lunch.

My client is getting, you know, overwhelmed. What is this? So now you are going into damages after exhausting the time limit, you know, for questioning, Your Honor. I object to this. This is no --

THE COURT: Well, I think I have to say this is the first time I have had a counsel for plaintiff object to a question about the damages in the case. But if what you need is a break, I think we can accommodate that.

MS. MKRTCHYAN: Well, no, it is not just --

THE COURT: And in the interim, if you could find this document -- I am concerned. I don't want to have a situation where the party produces a document and then the other side asks for additional deposition time because there is a document that they did not have at the time of the deposition. So if you could look into this and -- in the meantime during the break so that we don't have to go through that. I am just concerned to avoid any unnecessary motion practice.

But how much time do you need?

MS. MKRTCHYAN: Well, Your Honor, I object. First of all, I allocated only two hours of my day for this. I have other deadlines. I have to have

lunch break. I need to have other motions to be filed today. I cannot come back after lunch. This is --

THE COURT: Okay. Okay. All right. Well, we have -- so we have a couple of issues. One is going to be the damages. The other is a document that apparently has not been produced unless you have a Bates stamped number that you can give us quickly.

So why don't we pick this up tomorrow since we are going to be -- I think we have a hearing anyway, maybe we could just add to this and adjourn for today subject to the issues that we will need to discuss tomorrow about this document production.

MS. MKRTCHYAN: I'm not sure what you mean by --

MR. FEARS: That's fine, Your Honor.

MS. MKRTCHYAN: I am not going to produce my client tomorrow.

THE COURT: No. No. No. No.

MS. MKRTCHYAN: Okay.

THE COURT: I am talking about the hearing we are going to have tomorrow, and we can address this question about the document that came up the last time as well so that, you know, we can address

that because --

MS. MKRTCHYAN: Yes. Sure.

THE COURT: -- I think there is going to be another session. So what I am trying to avoid, as I said, is a situation where we have motion practice over whether there should be an additional time of deposition for documents that are produced later. So I am trying to avoid that. I am trying to avoid that. So tomorrow, let's discuss these document.

MS. MKRTCHYAN: Uh-huh. Sure.

MR. FEARS: That would be fine, Your Honor. I will just note for the record at the October 11 session, Counsel on the record stated that the -- she would identify the document, but then she stated later in the deposition that it could be found somewhere between plaintiff's Bates stamped 21 through 54. We have checked. It is not there. We looked. It has not been produced in the meantime.

Counsel on the record here a moment ago claimed attorney-client privilege as to that document and the witness's knowledge of where it is, yet it has not been produced in the meantime. I have some grave concerns about that, Your Honor. And yes, I think we should take it up tomorrow and address it in a robust manner.

THE COURT: All right. Great. I don't want to take up more of the witness's time, so let's adjourn and we will take up the remaining matters tomorrow. Thank you.

MR. FEARS: Thank you, Your Honor.

THE VIDEOGRAPHER: Okay. This marks the end of the Volume 2 of the deposition. We're now going off the record at 12:41 p.m. Thank you, Counsel.

THE COURT REPORTER: Before we go off the written record, did anybody want to order a copy of the transcript?

MR. ARIAS: Yes.

MR. FEARS: Jamie, we will, yes.

THE COURT REPORTER: And Narine, what about you?

MS. MKRTCHYAN: No, thank you.

THE COURT REPORTER: Okay. Thank you.

(Proceedings concluded at 12:41 p.m.)

--oOo--

REPORTER'S CERTIFICATE

I, JAMIE DAVIS, CSR No. 14209, a Certified Shorthand Reporter, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition, ANOUSH BURMAYAN, was by me duly sworn to testify the truth, the whole truth, and nothing but the truth;

That said deposition was taken before me at the time and place set forth and was taken down by me in shorthand and thereafter reduced to computerized transcription under my direction and supervision; and I hereby certify the foregoing deposition is a full, true and correct transcript of my shorthand notes so taken.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [X] was not requested.

I further certify that I am neither counsel for nor related to any party to said action nor in any way interested in the outcome thereof.

IN WITNESS WHEREOF, I have hereunto subscribed my name on February 29, 3024.

Jamie Davis

Jamie Davis,
CSR No. 14209

PENALTY OF PERJURY

I, ANOUSH BURMAYAN, do hereby declare under penalty of perjury that I have read the foregoing transcript; that I have made any corrections as appear noted, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct.

EXECUTED this _____day of _____________, 20____, at _______________, _________________.
(City) (State)

________________________
ANOUSH BURMAYAN

DEPOSITION ERRATA SHEET

Page No. _____ Line No. _____ Change to: ________

Reason for change: _________________________________

Page No. _____ Line No. _____ Change to: ________

Reason for change: _________________________________

Page No. _____ Line No. _____ Change to: ________

Reason for change: _________________________________

Page No. _____ Line No. _____ Change to: ________

Reason for change: _________________________________

Page No. _____ Line No. _____ Change to: ________

Reason for change: _________________________________

Page No. _____ Line No. _____ Change to: ________

Reason for change: _________________________________

Page No. _____ Line No. _____ Change to: ________

Reason for change: _________________________________

Page No. _____ Line No. _____ Change to: ________

Reason for change: _________________________________

Page No. _____ Line No. _____ Change to: ________

Reason for change: _________________________________

Page No. _____ Line No. _____ Change to: ________

Reason for change: _________________________________

Page No. _____ Line No. _____ Change to: ________

Reason for change: _________________________________

Page No. _____ Line No. _____ Change to: ________

Reason for change: _________________________________

DEPOSITION ERRATA SHEET

Page No. _____ Line No. _____ Change to: ________

Reason for change: ________________________________

Page No. _____ Line No. _____ Change to: ________

Reason for change: ________________________________

Page No. _____ Line No. _____ Change to: ________

Reason for change: ________________________________

Page No. _____ Line No. _____ Change to: ________

Reason for change: ________________________________

Page No. _____ Line No. _____ Change to: ________

Reason for change: ________________________________

Page No. _____ Line No. _____ Change to: ________

Reason for change: ________________________________

Page No. _____ Line No. _____ Change to: ________

Reason for change: ________________________________

Page No. _____ Line No. _____ Change to: ________

Reason for change: ________________________________

Page No. _____ Line No. _____ Change to: ________

Reason for change: ________________________________

Page No. _____ Line No. _____ Change to: ________

Reason for change: ________________________________

SIGNATURE _____________________ DATE: ___________
ANOUSH BURMAYAN