# EXHIBIT O

# Deposition Transcript

Case Number: 2:23-cv-01788 FMO-AGR
Date: October 10, 2023

In the matter of:

# BURMAYAN v CVS PHARMACY, INC., et al.

## OFFICER GRIFFIN ARMENDARIZ

CERTIFIED
COPY

Reported by:
Karen A. Nickel
Notary Public

Steno
Official Reporters

315 W 9th St.
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: FIRM #108F

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

\- - -

| | |
|---|---|
| ANOUSH BURMAYAN,<br><br>Plaintiff,<br><br>-vs-<br><br>CVS PHARMACY, INC., a Corporation doing business in California, GUY GARCIA, an individual, JOE JOHNSON, an individual; CITY OF GLENDALE, Officer JAMES ROSS #22471, individually and as a peace officer, Officer GRIFFIN ARMENDARIZ #27999, individually and as a peace officer, and DOES 1-10,<br><br>Defendants. | ) Case No 2:23-cv-01788 FMO-AGR<br><br>) REMOTE DEPOSITION OF OFFICER GRIFFIN ARMENDARIZ |

\- - -

REPRODUCTION OF THIS TRANSCRIPT IS PROHIBITED WITHOUT AUTHORIZATION FROM THE CERTIFYING AGENCY

REMOTE DEPOSITION OF OFFICER GRIFFIN ARMENDARIZ, a Defendant herein, called by the Plaintiff, for examination, taken pursuant to the Federal Rules of Civil Procedure, by and before Karen A. Nickel, a Court Reporter and a notary public in and for the Commonwealth of Pennsylvania, taken remotely with all parties appearing from their respective locations, on Tuesday, October 10, 2023, at 10:01 a.m. PST.

COUNSEL PRESENT:

For the Plaintiff:
Narine Mkrtchyan, Esq.
MKRTCHYAN LAW
P.O. BOX 2288
Toluca Lake, CA 91610
Email: Narine57@gmail.com

For the Defendant, CVS:
Taylor Brown, Esq.
PAYNE & FEARS LLP
Attorneys at Law
4 Park Plaza, Suite 1100
Irvine, California 92614
Tbb@paynefears.com

For the Defendant, Mr. Armendariz and the City of Glendale;
Carl Arias, Esq.
613 E. Broadway, Suite 220
Glendale, CA 91206
Carias@glendaleca.gov

# I N D E X


| | Page |
|---|---|
| EXAMINATION | |
| BY ATTORNEY MKRTCHYAN | 5 |

P R O C E E D I N G S

ATTORNEY MKRTCHYAN: I would like to, I guess just for the court reporter, to have some identification presented for the witness.

THE WITNESS: Yes, ma'am. Just give me one second.

(Discussion held off the record.)

THE COURT REPORTER: The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room and that I will be reporting this deposition remotely.

They further acknowledge that, in lieu of an oath administered in person, the witness will verbally declare his testimony in this matter is under penalty of perjury.

The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting. Please indicate your agreement by stating your name and your agreement on the record.

ATTORNEY MKRTCHYAN: Yes, good morning. Narine Mkrtchyan on behalf of

Plaintiff, agreed.

ATTORNEY ARIAS: Carl Arias on behalf of Mr. Armendariz and the City of Glendale, agreed.

ATTORNEY BROWN: Taylor Brown on behalf of Defendant CVS, agreed.

GRIFFIN ARMENDARIZ, a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY ATTORNEY MKRTCHYAN:

Q. Okay. Good morning. So once again, I am the Plaintiff's counsel. I represent Anoush Burmayan in this Federal Civil Rights action. I do see your attorney, Carl Arias, present and on behalf of co-Defendants CVS counsel present.

So please state and spell, for the record, your full name, please.

A. My first name is Griffin. That's spelled G-R-I-F-F-I-N. And my last name is Armendariz. That's spelled A-R-M-E-N-D-A-R-I-Z, like zebra.

Q. Very good. So can you hear me well?

A. Yes, ma'am, I can hear you just fine

right now.
Q. Very good. So any time you have any computer glitches here, please raise your hand, let me know. We want to have this done on Zoom, which has certain problems.
So where are you testifying from?
A. I am testifying from my apartment in Nebraska.
Q. Okay. And how long have you lived in Nebraska?
A. I moved here a little over a year ago, but my residence is still in California. So I'm just here for school right now.
Q. Very good. And so have you ever had a deposition taken?
A. I have participated in one other deposition about a year ago.
Q. Okay. Was it in your capacity as a police officer or as a civilian?
A. It was related to my employment with the City of Glendale, but it was a personal matter.
Q. Okay. So you did have a lawsuit before as a Plaintiff in a case?
A. No.

Q. Okay. What kind of a lawsuit was that? Was it an employment-related lawsuit?
A. It wasn't -- I'm happy to share, but it wasn't a lawsuit. It was a workers' comp claim.
So I had shoulder surgery pertaining to an incident at the job, and so it was very straightforward and no lawsuit, to my knowledge, was ever filed. It just went through that administrative process. So forgive me for not being intimately familiar with how those mechanisms work, but that's my understanding of it.
Q. Understood. That's fine. No problem. Thank you.
So and you stopped working for City of Glendale about a year ago?
A. I officially resigned, I believe it was December 27th of 2022.
Q. Okay. And the reason for your resignment was injury, workers' -- industrial injury?
A. No, ma'am. It was -- I had the opportunity to go to law school and, you know, I've always wanted to give back to my community

and participate in ways that I could do the most good, and this opportunity to go to law school just drew me away from the police department, and I'm very grateful for that. So it was really just to go to school.

Q. Congratulations on that shift in career. I think that will be very successful and very rewarding for you. And having that background as a police officer will be an additional asset for you. I'm sure you are aware of that.

A. Thank you for your kind words. I appreciate that.

Q. So you are going, in Nebraska, which law school is it?

A. The University of Nebraska College of Law. It's located in Lincoln, Nebraska.

Q. Got you. Very good. So I wish you the best of luck in that.

And so how long did you work at Glendale Police Department prior to your resignation?

A. Well, I started my academy, which I attended the Los Angeles Sheriff's Department, their academy, in October of 2018 was my start.

And then, like I said, I was continuously employed as a full-time patrol officer with the City of Glendale up until December 27, 2022.

So, approximately, four years, a little bit more.

Q. Approximately four years. Okay. So you graduated from the police academy, the sheriff's -- Los Angeles County Sheriff's Department?

A. Yes, ma'am.

Q. Okay. Prior to that, did you have any law enforcement job?

A. No, ma'am.

Q. So before we actually go into your background, I just wanted to set up certain ground rules for taking depositions. So, you know, I understand that you did have a workers' comp claim and you had a deposition. This might be a little bit different.

So this is, you know, a federal case. You are testifying under oath. All penalties of perjury are associated with this.

So despite the fact it's a very informal setting, you don't have a judge, you were sworn to testify to the truth in this

case.
Are you aware of that; do you understand that fully?
A. Yes, ma'am, I understand that.
Q. And so, obviously, we will be asking you to provide -- I mean, the questions will be posed and if you answer, given your training and experience and now, legal education now, it is presumed that you understood the question unless you ask for clarification. So make sure, you know, if my question is not clear, ask for clarification.
Otherwise, the answer will stand and, you know, you are bound by the answer provided.
Do you understand?
A. I understand.
Q. There is going to be a transcript prepared by the court reporter of everything that happens today, and it's also -- this is recorded.
You will have the opportunity and we request that you do review your transcript to correct any mistakes, to amend your answers. There is going to be notice of errata sheet or

errata sheet at the end of the deposition transcript. You are welcome to make any amendments to that. Again, it's going to be under penalty of perjury. You can declare that it's a true and accurate transcript of today's proceedings. But if you make any changes, obviously, you will be bound by them. It will be used against you.

Do you understand?

A. Yes.

Q. Okay. So we want an accurate transcript of today. And if we speak above each other or over each other, it's going to be very difficult for the court reporter to take answers down or questions down.

So I request that you let me finish my question. I'm going to try to take pauses in between. And I do have a slight accent, so if you -- you know, let me finish my question and then you provide your answer.

Are we clear?

A. Yes, ma'am. I understand that.

Q. And from time to time, your attorney will object to the form or substance or content of the questions. Because this is a

deposition, there is no judge to make rulings, you know, as it happens in trials or in hearings in court.

You are still obligated to answer the question, unless your attorney specifically instructs you not to answer. So you've just got to be clear on that.

A. I understand what you're saying, yeah.

Q. Okay. A lot of the times I will be asking you to provide estimates. I don't -- you know, I will make it clear that I am asking for estimates. You don't necessarily have to provide exact dates, measurements, times, et cetera, but we are entitled to the best estimate based on your training, experience, and common sense and recollection and memory.

So you understand that any estimate you provide, it will not be -- you can make it very clear that this is only an estimate, that it's not an exact number or it's not -- it's an approximation. However, I don't want you to speculate or assume anything.

So, you know, you can provide estimates as requested, but please do not

assume facts or speculation -- or provide speculation.

Are you clear on that?

A. Yes, ma'am.

Q. Okay. So, you know, so you finished the academy in 2018. Prior to your -- prior to this job with Glendale Police Department, did you hold any law enforcement position?

A. No. The only thing slightly related was, I was in -- in between graduating from my -- from UC Santa Barbara with my degree, I was an intern with the Los Angeles County District Attorney's office. I simply -- I wasn't paid. It was a student intern position.

But that's the only other slightly law enforcement-related experience.

Q. Uh-huh. Uh-huh. And, you know, so you do have a Bachelor of Arts degree from UC Santa Barbara. When did you get that? What year was that?

A. 2018.

Q. And so you graduated, you know, basically, prior to getting Bachelor's degree, you went to high school; right?

A. Yes, ma'am.

Q. When did you graduate from high school?
A. I graduated from high school in 2015.
Q. Between high school and college, did you -- or during college, did you have any employment, other employment, non-law enforcement?
A. Yes, I did.
Q. Where did you work?
A. I worked a variety of odd jobs in various capacities. So I worked fencing construction, digging holes and painting fences for a summer. I also worked in the women's shoe department at Macy's selling shoes during the holiday season.
I worked on campus at UC Santa Barbara at the recreation center while I was attending school there for about a year. Those, I think, are the main jobs I had. Forgive me if I'm forgetting one. It feels like a long time now.
Q. Sure. And those were like part-time positions while going to college?
A. Yes, or during my summers, during

winter break.
And then, like I said, I worked on campus at the recreation center while I was in school as well.
Q. I see. Okay. So, you know, it sounds like you didn't really have a career, like full-time career, before going to Glendale Police Department; is that accurate?
A. Yes.
Q. Okay. And so what drew you to law enforcement? If you -- what was it -- strike that.
What was your Bachelor's major, what was your major in?
A. I was a history major.
Q. Okay. So, you know, what drew you to law enforcement? Do you have family in law enforcement?
A. I have extended family who is in law enforcement. I also have extended family in the military. And I just have a lot of respect for police officers, especially after my own experiences, and I just -- I enjoy talking to people and helping people, and it was a way for me to actively engage in the community and

solve personal problems, practical incidents and -- yeah. That's, I think, in a nutshell, what drew me to law enforcement.

Q. Got you. So in 2018, when you finished the academy, what was your first assignment within the Glendale Police Department?

A. The patrol bureau. I was assigned a training officer and I went through that process.

Q. And you were on probation for a certain period of time?

A. Yes, ma'am.

Q. And how long was your probationary period, if you recall, approximately?

A. I believe probationary period is one year from the date of your swearing in, but I don't recall exactly.

Q. Okay. So you did have a training officer assigned, and you were being trained for that period of time, for a year, by a training officer?

A. No, not for the full year. The training officer portion is about half of that time frame. I don't remember exactly.

Q. Okay. And who was your training officer, if you recall?
A. I had three different officers -- three different training officers supervised my training as was the department's protocol at that time.
Q. Uh-huh. And do you recall their names by any chance?
A. I do. The first training officer I had was now Sergeant Gunn, G-U-N-N, Glendale Police Department, and then I moved to, now I believe he is still a detective, but Detective Hanson, H-A-N-S-O-N, and then at the conclusion of my training program, I had -- she is a sergeant now, Sergeant Kim, K-I-M.
Q. All right. And so after you finished your training, you know, and the probationary period, what was your next assignment, in 2019, apparently? What would be your next assignment after that; still patrol?
A. Yes, ma'am.
Q. Okay. Glendale City is pretty small, although it's growing. So it's divided into, what is it called, beats? Is it divided into beats?

A. The terminology that we used at the department was usually district. So if my memory serves me correctly, City of Glendale is divided into five districts and, throughout my time at Glendale, I worked across all of them. As a newer officer, I never had a particular district I was solely assigned to.

Q. Uh-huh. Okay. So -- and were you also POST certified?

A. Yes, ma'am.

Q. Okay. And you know what POST stands for, obviously. When did you get your POST certification?

A. I'm not sure I understand your question because my understanding of POST certification is that when you graduate from your academy, you're awarded the basic POST certificate, but then there's various other forms of POST certification compliance that officers partake in various classes or trainings put on by the department throughout their tenure, and I have been -- I was in compliance with anything put forth to me by the department.

Q. I understand. So POST, there is

various levels of training, as you're aware, basic, intermediate and advanced; right? You're aware of that?

A. Yes.

Q. Okay. And which level did you finish by the time you resigned from the Glendale PD?

A. At the time I resigned, I believe I had my intermediate POST. Because of my Bachelor's degree, that allowed me to get the intermediate POST certification a little bit sooner than someone without a degree.

Q. Okay. So during your training and the entirety of the period in the Glendale Police Department, did you work with Officer Ross as partners?

A. I would caution against using the word "partner" because in Glendale, we were, you know, we were assigned patrol units individually. We didn't work as pairs.

But I did work with Officer Ross on a variety of incidents. As you're aware, the police department isn't that big, so every officer worked with one another at various times.

Q. Right. So in Glendale PD, as I understand, they don't assign you to partners. You worked solo?

A. Yes. The majority of the time, that would be fair to say.

Q. Okay. And when you get assigned calls for service, et cetera, you do work with other officers, obviously?

A. Yes. One officer will be assigned as the handling officer, or kind of like the primary officer on that incident, and they will take responsibility for the arrest and various other nuances of the call.

But then other officers can be dispatched in assisting capacities.

Q. And how many officers overall, approximately, were working for Glendale PD as of 2019?

A. I can't speculate on that. My figure would be wildly random.

Q. Okay. And so during your -- 2019 -- so let's, as of January 2021, let's go to 2021, actually. January 2021, were you equipped with body-worn cameras?

A. I don't remember the specific date

that our body-worn program was implemented.

Q. Okay. So at the time you left Glendale PD in December 2022, were you equipped with body-worn cameras?

A. Yes.

Q. So you don't remember, approximately, how long, while working with Glendale PD, you had the benefit of body-worn cameras?

A. No. Prior to that, we had audio recorders, which were colloquially referred to as the DARs. And I really don't remember when we got the body-worn.

It was not too long before I left.

Q. Okay. And DARs, is it Axon audio recordings; do you know?

A. I am not familiar with the exact technology, but no, those -- those audio cameras were not affiliated with Axon. That was its own system.

Q. Okay. And how does it work; is it from your patrol vehicle or on your body independently? How does this audio work?

A. Well, the DAR, that device, that audio recording device, was personally issued

to officers, and we carried it on our person.

Q. On your person. So it's not connected to the patrol vehicle recorder?

A. No. It's -- no.

Q. And you're aware that patrol cars also are equipped with video/audio recording; right?

A. Yes. And that is the Axon system.

Q. Okay.

A. Although prior to the Axon system, there was a different one. So it has a lot of technological changes over a very short period of time.

Q. Right. So while you were working with Glendale PD four years, you were aware of DARs which you used regularly, right, on audio -- audio recording on your body; right?

A. Yes. I frequently used my DAR, my audio recorder.

Q. Do you remember when it was implemented within the department?

A. Before I was there.

Q. Okay. So in 2021, you did have that equipment with you as a police officer; right?

A. I'm not sure if I had video. I

don't believe I did. I would have had an audio recorder most likely.
Q. I'm sorry, I interrupted you. So I'm talking about only audio right now, not -- not video.
A. Okay. I thought I heard you say video. I apologize.
Q. We are talking about DARs that you referenced, the audio. So as of January 2021, you did have that equipment with you, right, DAR audio recording?
A. I had one issued to me, yes.
Q. And you also had a patrol car that you were driving as of January 2021; right?
A. Yes. For my shifts, yes.
Q. Okay. And in that patrol car, you also had the, you know, video/audio recording, the Axon; correct?
A. I'm not sure if the car I was driving in 2021 had Axon cameras. Some of the cars still had the older system.
Q. Oh.
A. So I don't recall, without any further specificity of any incident or something else, which car I might have been

driving during that transitionary period.

Q. Okay. And what kind of a system was before the Axon was instituted on your patrol car; do you remember the name?

A. We referred to it as Coban, C-O-B-A-N. And that was recorded videos, like a dash cam, similar to what the Axon cameras are now.

Q. Okay. So Coban was, you know, transitioned into Axon for some period of time. Do you remember when the transitioning occurred?

A. I do not.

Q. Okay. But throughout your tenure with the Glendale PD, there was always some sort of video/audio recording capacity in the patrol car; right? If you place someone in the patrol car or if you, you know, get out of the car, the audio will pick up some of the activities that are ongoing; right?

A. Yeah. The audio from the patrol car may capture noises from outside the vehicle, but I don't think it was designed to do that.

Q. Oh. Okay.

A. Sometimes it did, but --

Q. So let me ask you this. When you have this video recording system in the car, did you have a microphone attached to you when you leave the car so that it can actually record activities when you are away from your car?

A. No.

Q. No?

A. I was not issued one. I believe on the old Coban systems, some of the more senior officers had systems like that. That was not issued to everyone.

Q. I see. So the patrol vehicle recording only records what happens in the car or in the immediate vicinity of the car picking up noises; is that what you're telling me?

A. Yes. If I understand what you're saying correctly, yes, we're in agreement that that's what that system was designed to do.

Q. Okay. So, basically, the only way you could record any incidents was the DAR that you were assigned to on your body; correct?

A. To some extent. But the patrol unit could also pick up incident video and audio as well.

Q. That's what I'm trying to understand. So how is it picking up? If you don't have a microphone attached to you for the video recording in the car, how does it pick up noises?

A. Well, just like any other camera, if people are talking loud enough or the windows are rolled down, it depends on a variety of factors. But that system inside the patrol unit has the potential to pick up audio from -- external audio outside of the car.

But it is, obviously, limited by ambient noise or other factors.

Q. I see. So I understood you correctly that, basically, if you walk away from your car, let's say, it's not going to pick up, you know, your activity like ten feet away or 20 feet away from the car, for example, because you don't have a microphone attached to you or video attached to you on your body; correct?

A. To some extent. I mean, like I said, it's limited by practical considerations. But, I mean, there are instances where you could be a considerable distance away from the

car and if that system, that recording system was running, it still would pick up conversations or other noises that are outside of the car.

Q. Right. The only thing I'm trying to understand is that there is no external microphone on your body that is connected to the patrol vehicle recorder; correct?

A. To my knowledge, that is correct.

Q. Okay. Understood. So until the time that you had the body-worn cameras implemented, you could not actually video record activities as you were engaged in your duties; correct?

A. Correct. It would be limited to audio recording.

Q. Okay. And you don't remember, you know, approximately, when the body-worn cameras were implemented?

A. I don't.

Q. Before you left the Glendale PD, did you use -- do you remember using body-worn cameras and downloading them and using them in court as evidence?

A. Yes. I was issued a body-worn

camera prior to my resignation.
Q. Okay. And as far as the training that you received in audio/video recording, before even the body-worn cameras were implemented, were you given specific training when you need to utilize DARs when investigating or assigned to calls?
A. I know that I was in compliance with all department policies and I had been trained as the department saw fit. So to the extent that that answers your question, that's all I can offer.
Q. Well, but, you know, I understand that you were -- you know, you believe you were in compliance. I just want to know if you remember, specifically, what was the requirement, as you understood, based on your training and experience, when you are obligated to turn on your audio when assigned to calls?
A. I'm not going to speculate on what I thought the policy was three years ago. I -- that part seems irrelevant to me today, so --
Q. Okay. Well, you know, I am not asking you to speculate. And as far as relevance, obviously, you know, the judge will

decide what is relevant and what is not.

But, as I told you, unless your attorney advises you to not answer a specific question, I would request that you answer the question based on your training and experience.

All I'm trying to figure out is that if you knew the policy on when to turn on your audio recording, what was your understanding? I don't need the verbatim policy, but you were trained, presumably, in this policy. What is your understanding when you are supposed to turn on your DAR, for example, when assigned to calls?

A. Well, as common practice, I would use my audio recorder whenever I interacted with people. That was my -- that was, I guess you could say, my understanding. So I did my best to facilitate that, but there were times where I didn't always record everything, whether that was my -- the battery on my audio recorder had died because I had been using it so much and it was a busy night or, you know, if there were other times where an incident unfolded very quickly and I maybe didn't have time to turn it on, or I was more concerned

with the safety of the people on scene than fidgeting with an electronic device.
But I did my absolute best to, you know, record all conversations I had with anybody for the sake of transparency.
Q. Right. And so you're -- you know, you're saying that there was no mandatory duty by the department for you to turn on your audio recording when you are involved in or you are assigned to calls; is that what your understanding was?
A. No, that's not what I'm saying.
Q. So but there was? Is there a mandatory -- was there a mandatory policy/expectation to turn on the audio recording activity -- the audio recording device when you are assigned to calls; yes or no?
A. Well, it's not really a yes or no question. I don't remember if there was a specific policy on that, but I used common sense in, you know, navigating my interactions with various members of the public, so --
Q. Okay. So what about the body-worn camera, did you get a specific training when

you are obligated to turn on your body-worn camera?

A. Yes. I believe there was a body-worn camera policy, and I couldn't tell you what section of the policy, and I know that was -- but I do believe there was.

Q. I don't need the section. Obviously, like I said, obviously, you will not remember, and you're not obligated to give me any section numbers, but I just want to know, you were trained how to and when to turn on your body-worn camera when interacting with the public; correct?

A. Yes. I believe that is correct.

Q. And what was your understanding? Were you supposed to, let's say -- at what point in time were you obligated to turn on your body-worn camera?

A. At the same manner that I would have used audio recording, you know, interactions with the public is good practice, and for the sake of transparency and safety to, activate that device when interacting with individuals.

Q. Were there any exceptions? For example, was the department telling you that

there are exceptions to this policy?
A. I don't remember any conversations about exceptions or anything like that.
Q. Did your department supervisor ever tell you that, you know, you didn't turn on your audio recording, why, what was the reason? Were you ever questioned about that?
A. No, ma'am.
Q. So at all times when you were working as a police officer, your understanding was you have to turn on your audio recorder; true?
A. No.
Q. No?
A. No. I never was under the impression that I had to turn it on at all times. I was under the impression that it was good practice, for the sake of transparency and safety, to utilize that device when practical.
Q. Sure. Okay. All right.
And this equipment that you used, you also had to charge the battery; right? You had to put a battery -- you had to charge it before your shift; right?
A. Yes. It had to be charged.

Q. Okay. And how long did the battery last?
A. I don't remember.
Q. Okay. What training did you receive on private citizen's arrest in your tenure as a police officer?
A. Well, I attended the Los Angeles Sheriff's Department academy, as I explained earlier, and their various trainings on different types of arrest, arrest mechanisms during that academy. And there were continuous updates on applicable law during my time as a sworn officer.
Q. Okay. So what are the requirements, as you understood, for private citizen's arrest? As an officer, what are the requirements for you to make such an arrest?
A. I don't remember anymore. It's been a long time since I worked patrol, and my mind has been preoccupied with other aspects of my life as I've moved on from that career.
Q. Understood. But you did, in your training and experience as an officer for four years, you did conduct patrol assignments and you were involved in private citizen's arrests;

true?
A. Correct.
Q. Okay. And, generally speaking, you don't remember at all what were, you know, if you come to a scene and you are asked to make a private citizen's arrest, what are the requirements for that; you don't remember that?
A. No, I don't.
Q. Okay.
A. I vaguely do, but I am not going to -- I don't feel comfortable laying out an elements test for a private person's arrest right now so --
Q. I don't want -- like I said, I am not asking you to lay out the actual elements unless I ask for it, no. I am asking you your general understanding, training and experience on making a private citizen's arrest. Can you answer that question or not?
A. No. I mean, the best way I can answer that is my understanding, at the time I was a police officer, of when to make private person's arrest can be seen via reports that I authored involving private person's arrests.
Q. Okay. So you made certain arrests

that involved private citizens' arrests; right?
A. Yes, ma'am, I'm sure during the course of my tenure as an officer I made private person's arrests on behalf of various entities.
Q. Right. And how many, approximately, during the four years that you worked as a police officer, just give an estimate, approximately, how many times did you make a private citizen's arrest?
A. I don't remember.
Q. If I showed you the policy in your department for the citizen's arrest, will that refresh your memory about the requirements of the private arrests that you have to make as a police officer?
A. It might.
Q. Okay. So let me start by sharing my screen. Do you see what is on my screen?
A. Yes, ma'am. I can see clearly.
Q. Okay. This is, for the record, Policy No. 335, Glendale Police Department, on private person's arrest and the requirements that police officers are trained in. This was valid as of January 7, 2021.

And I'm going to go over this and try to understand if you were trained on this.

So officer responsibilities states, 33 -- this is Policy No. 335.4 -- any officer presented with a private person wishing to make an arrest must determine whether or not there is reasonable cause to believe that such an arrest would be lawful.

Does this policy refresh your memory about the requirements of private citizen's arrest or not?

A. Yes, it does.

Q. Okay. So isn't it true, according to this policy, which verbatim states, "should any officer determine that there is no reasonable cause to believe that a private person's arrest is lawful, the officer should take no action to further detain or restrain the individual beyond that which reasonably appears necessary to investigate the matter, determine the lawfulness of the arrest and protect the public safety."

Are you with me so far? Did I read it correctly?

A. Yes, ma'am.

Q. Are you aware of this responsibility imposed by the department when conducting private citizens' arrests?

A. Yes. That is in keeping with the standard practice of all officers during the time that I was with the Glendale Police Department.

Q. Okay. So this, at least according to this policy that you were trained in, it is not a mandatory duty to make an arrest if you believe there is no reasonable cause that is lawful; correct?

A. Correct. That seems to be what that is saying.

Q. Okay. So the officer is given, in other words, a degree of discretion to make a private citizen's arrest, true, under this policy?

A. Correct. I think that's fair to say. Yeah, in keeping with the words written right there, yes.

Q. Were you aware of this, though? When you were conducting private citizens' arrests of various requests, were you aware that, as an officer, you can deny that if you

believe there is no reasonable cause that a
crime was committed?

A. Absolutely. Absolutely. I firmly
believe in spirit of the law and letter of the
law, and I think that that, in a practical
sense, that extends, that premise of discretion
extends far beyond a simple private person's
arrest.

Q. Okay. So generally speaking, what
kinds of, you know, entities, in your
experience and your training in the four years
as a police officer, what kind of entities
request private citizen's arrests?

A. All different types, from individual
persons through major businesses such as, I
don't know, Home Depot and convenience stores.
So it wasn't limited to any one type of person.

Q. Okay. So within your tenure, as I
understand, you cannot give me an estimate of
how many times you did a private citizen's
arrest; true?

A. Correct.

Q. And you cannot tell me, in the
ballpark, what percentage or how many of those
were involving retail establishments such as

Home Depot or CVS Pharmacy?
A. Correct. It would not be proper for me to speculate on that as I know it's all been entered into various databases and records available through the police department.
Q. Okay. Were there any situations when you were called on a private citizen's arrest and you refused to make the arrest?
A. I would imagine there are.
Q. Okay. But you can't tell me any percentage of how many times, out of all the times you were called on for a private citizen's arrest, you refused to make the arrest?
A. No, but I could tell you that oftentimes I was dispatched to various calls and the calls did not result in an arrest because there was -- using discretion, as we talked about, there was -- that wasn't the proper course of action.
So there were many times when I did not, or on incidents that I was part of, the handling officer did not arrest someone simply because they were called there.
Q. Right. Because a lot of times there

can be false calls; true?
A. I would agree with that, yes.
Q. And a lot of times you may disagree on the legal aspect of the arrest request; true?
A. I'm not sure I understand the point you're trying to make.
Q. Let me paraphrase that. So if someone calls and says, you know, I want to make an arrest of this person, but you believe that the person did not commit anything unlawful based on the statement provided to you, then you don't make the arrest; true?
A. Correct. If I felt someone was not giving an accurate account based on various factors, then, no, it wouldn't be proper to facilitate an arrest at that point.
Q. Right. And this is a powerful -- this gives -- the private citizen's arrest, you know, gives a lot of power to private citizens, true, to call the police and ask them to make an arrest; true?
ATTORNEY ARIAS: I object as vague and ambiguous. You can answer the question.

BY ATTORNEY MKRTCHYAN:
Q. So, yes, you have to answer the question unless, if you want me to rephrase it, I can do that. That's fine.
A. Can you just repeat it?
Q. My question is basically, you know, private citizen's arrest allows you, as a police officer, to make arrests of individuals for crimes that were not committed in your presence; true?
A. True, yes.
Q. Okay. So, specifically, if someone comes and tells you, -- calls you and tells you, this person assaulted me, I want you to arrest this person, that crime was not committed in your presence; right?
A. As I understand it, no, in that hypothetical scenario, no.
Q. Right. But if you determined during your investigation that that was not -- if you talked to both sides, both parties, and you determined that that was a false accusation, then you don't make the arrest, right, as required by law; true?
A. Well, I would rather get away from

these hypothetical examples, but I will say that it was my goal, on every incident I respond to, to hear from both sides or whatever parties are present to gain a full understanding of the situation and make a factual, to the best of my ability, determination based on all the available evidence.

Q. Right. Okay. Another thing I wanted to tell you, at a deposition, we can ask hypothetical questions in order to understand, you know -- we are entitled to provide hypotheticals and you can answer based on a hypothetical.

But, you know, now I just want to understand, as a police officer, your job was just to investigate calls; right?

A. I mean, it's much more comprehensive than that, but that was a component of my job as a police officer.

Q. Right. So you are, you know, obligated when you are making arrests, an arrest has to be based on probable cause; true?

A. Yes.

Q. Right. And so how do you determine

-- let me -- you know, in a private citizen's arrest, how do you determine, as a police officer, whether there is probable cause to arrest someone?

A. I mean, as basic practice and common sense, you try and compile -- you compile all the evidence provided to you, and sometimes that takes the form of statements or it can take the place of physical things left behind on scene, and you use your best judgment to determine what the truth of the matter was, what really happened, and you take action based upon that available evidence.

Q. Right. And that includes also speaking with all parties, right, the person who is the alleged offender and the person who is making the complaint; true?

A. Yes. Oftentimes, the best course of action is to talk to everyone involved in the incident.

Q. Right. So you don't, as a police officer, you don't discount the offender's statement; do you?

A. No, no. It would be prudent on anyone to listen to all parties involved.

Q. So in another policy requirement, scrolling down to reporting requirements for private citizen's arrest, Policy No. 335.5 states, "In most circumstances in which a private person is claiming to have made an arrest, the individual should complete and sign a department private person's arrest form under penalty of perjury.

In addition to the private person's arrest form and any other related documents, such as citations, booking forms, et cetera, officers shall complete a narrative report regarding the circumstances and disposition of the incident."

Did I read that correctly?

A. Yes.

Q. How do you understand the first paragraph, as a police officer -- first of all, does this sound familiar to you? Were you aware of this policy?

A. Yes, I am aware of the private person's arrest form. It is something that was frequently used throughout my time there.

Q. Okay. And when do you use that form?

A. It was used in incidents where someone was arrested via private person's arrest.

Q. Okay. You know, so is it your policy to give it to the person who calls you to make the arrest to have them sign under penalty of perjury to verify the truthfulness of the arrest?

A. Well, that is the purpose of the private person's arrest form, yes.

Q. Okay. Is there any time in your career and tenure as a police officer that you missed having this form filled out by the person who wanted the arrest?

A. Yes. Oftentimes that form was not used because it was not available, and I recall being on a variety of incidents where a private person's arrest was made, but that form was not completed.

Q. I see. So this form was not made always available to you by the department; is that what you're telling me, or did I understand you correctly?

A. No. That's -- I mean, that's one -- it wasn't -- it wasn't not provided because it

wasn't made available by the department, per se. But in some instances, if it had been a particularly busy time, those forms where we would -- the room where we would gather various forms for might have been out of copies of that one to take or -- and there's a variety of reasons why that form may not have been filled out for some arrests.

Q. In your experience, did you try to follow this policy and fill out these forms when making private citizen's arrests?

A. Yes. I did my best to comply with all policies with the department during my time.

Q. And what is the purpose of this policy as you understand it? What is the reason why we have this form filled out?

A. Well, I'm not going to speculate on the city or the department's rationale for implementing a policy, but it helps put the -- yeah. It's another piece of liability insurance and coverage to ensure that the person who wants someone else arrested for a misdemeanor not committed in that officer's presence, it is, you know, asserting that they

have told the officers the truth and it's affirming that they would, in fact, like that other person to be arrested under a private person's arrest authority.

Q. Right. And based on your recollection of the times that you made private citizen's arrests, what were some of the issues that you were arresting people for? What were the penal code sections?

A. I don't remember specific sections, but, oftentimes, private person arrests were made for -- the two that come to mind right now would be shoplifting and, say, trespassing.

Q. Okay. And those are involving mostly retail establishments; true?

A. I would say that most shoplifting occurred at retail establishments, but trespassing was oftentimes at private residences to warehouses to retail establishments. So trespassing incidents were not confined to one type of location.

Q. Okay. Right.

And, you know, in your -- obviously, in the academy, you received training in California Penal Code sections; true?

A. Yes.
Q. You were charged a duty to enforce California Penal Code sections, all of the California Penal Code; right?
A. Yeah. As a police officer, I had the ability to enforce California Penal Code, yes, ma'am.
Q. Within your department, were you assigned a pocket book or certain small book that you could look at, you know, in your assignments on call of the penal code sections? Did you have the benefit of a cheat sheet, for example?
A. I was not assigned one by the department, no.
Q. So how would you go about enforcing the penal code? Was it just by memory, by training? How would you go about doing it?
A. Oftentimes it was based on memory. In other incidences, I compiled my own cheat codes, as would you call it.
But just quick reference guides. I compiled my own for standard incidents that we respond to, so that way I knew that I was meeting the criteria. And sometimes I would

include jury instructions on there just to make sure that we were properly exercising authority to arrest people.

Q. Right. And, you know, you mentioned trespass. You did receive training on the elements for trespass; true?

A. During my time at the department, yes.

Q. Okay. And I'm not asking you to provide me specific elements for trespass. I understand that's not a fair request. But I want you just to give me your basic understanding of what constitutes trespass at a retail establishment?

A. Well, trespass at any establishment is all synonymous in my mind, to the best of my knowledge, and it would include someone being on someone else's property without their permission and -- yeah, that's the general basis of trespassing.

Q. Okay. Did you also receive training on Glendale Municipal Code sections related to any violations?

A. Yes. We frequently discussed the context of many incidents to help resolve

problems.
Q. Did you carry the municipal code book with you at any point in time to try to refresh your memory of what are the municipal code violations on top of the California Penal Code?
A. I was not issued a municipal code booklet.
Q. Okay. But did you ever cite anyone or arrest someone for a violation of a Glendale Municipal Code violation, any Glendale Municipal Code violation?
A. I believe so, but you would have to check. It wasn't something I was in the habit of frequently using.
Q. What are some of the things that comes in your mind that you cited someone under Glendale Municipal Code? What are some of the things?
A. I don't remember specifically. I think during Fourth of July celebrations, I think the city had a municipal code section for fireworks. And I think there was some other traffic or road safety-related ordinances, but it's been a long time since I've seen those.

Q. Right. Do you remember if Glendale Municipal Code had a violation on trespassing?
A. I don't remember.
Q. Do you remember what penal code section was the trespass under; do you remember the number?
A. I don't remember.
Q. Okay. Did you distinguish -- there is a variety of -- well, strike that. Let me start all over.
You were aware there was a variety of subsections in the trespass penal code?
A. Yeah. I mean, I know there's various -- if I recall correctly, there were trespassing codes for various types of trespassing, yes.
Q. Right. And were you aware of any distinction for private property -- among private properties or retail establishments open to public?
A. I don't remember, no.
Q. Okay. Did you ever make arrests for trespass at a retail establishment that was open to public?
A. I can't think of a specific incident

where I did, but I might have. It wouldn't surprise me if I did, but I can't think of a specific incident where I have.

Q. Okay. So I'm trying to understand, from your training and experience as a police officer within the four years that you worked there, was it your understanding that you could arrest someone for trespassing at a retail establishment open to public?

A. Your question requires me to infer what "open to the public" means. So I'm not sure what your definition of "open to the public" is.

Q. Well, under penal code section, there is -- you know, and your training, a retail establishment open to public is like, you know, CVS Pharmacy, malls, those are open to public, to general public; aren't they?

A. Sure, yes. People can go in there to shop, yeah.

Q. Right. So it's not a warehouse or private business that closes its doors, it's closed to any individuals. It's a business that is open to public, conducts business and people are welcome; right?

Is it your understanding -- my question is this. Is it your understanding that you can arrest someone for trespassing without any more requirements at a retail establishment open to public?

ATTORNEY ARIAS: Object. Calls for a legal conclusion. But you can answer the question if you understand it.

THE WITNESS: I finally understand your question.

I think you would need something more because the presumption in most incidences involving a trespassing is that that trespassing would have occurred not in your presence unless you've arrived on scene and that person was still at the location or inside that business.

So there's -- in some instances, you might need more than simply what you just said, and in other cases, that might be sufficient.

BY ATTORNEY MKRTCHYAN:

Q. You know, I'm not talking about generalities here. I'm asking you specifically.

If you're called to a retail

establishment, any kind of retail establishment, Macy's, Glendale Galleria, for example, any type of grocery store, any type of market that is open to public, and you are told that the person has trespassed, what is your understanding of the penal code section on trespassing? In your training and experience as a police officer, what was your understanding of the requirements of a trespass at a retail establishment open to the public? That's all. Did you have an understanding or not?

ATTORNEY ARIAS: Objection, vague and ambiguous. You can answer the question if you understand it.

THE WITNESS: My brain is getting a little bit confused, if I'm being completely honest with you. And...

BY ATTORNEY MKRTCHYAN:

Q. Yes or no, that's all I'm asking you. If you have a hard time, you know, understanding this, you can ask me to show you the policy or the penal code section. Do you want me to show you the penal code section on trespass that will help you to determine?

A. Can you ask the question one more time, please?

Q. Sure. My only understanding is this. If you are in charge -- you were in charge with enforcing trespass penal code section; true?

A. Yes. As a police officer, I could arrest people for trespassing, yes.

Q. Okay. So hypothetically, someone working at the retail establishment, as I told you, open to public, calls you and makes the complaint, requests you to make a private citizen's arrest at the -- for a person. What are the requirements for you, as a police officer, to make a private citizen's arrest for trespass, for example, at -- in such an incident?

ATTORNEY ARIAS: Object as calls for a legal conclusion.

ATTORNEY MKRTCHYAN: Counsel, it's not calling for a legal conclusion. I just want to make it clear that he is a police officer. I'm asking on his specific training and experience. He is the one, not --

BY ATTORNEY MKRTCHYAN:

Q. Anyway, please answer the question if you can.

ATTORNEY ARIAS: The judge can either sustain it or not. But he can answer the question if he understands it.

THE WITNESS: Yeah, I slightly understand your question but it's hypothetical and, I mean, mostly I'm here to answer the questions about the incident that you're concerned about, and this is -- there's too many other factors that can be interjected to the blanket statement that I have -- does a police officer have the authority to arrest someone who is accused of trespassing in any location.

I mean, that's -- we can go off on various tangents for that.

BY ATTORNEY MKRTCHYAN:

Q. No, that's not -- I'm not asking you -- first of all, I'm entitled to ask you about your training and experience as a police officer in a deposition, because -- so those are the issues that we are entitled to ask you. And before we even get to specific questions related to the incident of this lawsuit, I am

entitled to know your training and experience as a police officer.

And, you know, my question was very specific, how you enforce a trespass penal code section. Someone calls you and says this person is trespassing. What are the requirements for you to make an arrest of that person at a retail establishment open to public? Can you answer that question or not, based on your training and experience?

There was some interruption. You know, please, can you answer the question?

A. I understand. So based on my training and experience, I would gather all the information I had available, talk to the various parties involved in that incident, and make a determination from there. That's what I would do.

Q. That's not what I'm asking, sir. Sorry. I'm asking you, what are the legal requirements as you -- as a police officer, you are charged with duty to enforce the California Penal Code on trespass, what are the legal requirements for you to arrest someone for a trespass at a retail establishment? Can you

answer that question?
ATTORNEY ARIAS: Same objection.
THE WITNESS: No, I can't answer that question. I don't remember all of the elements and requirements of an arrest for trespassing.
BY ATTORNEY MKRTCHYAN:
Q. Okay. If I show you the California Penal Code section on trespass, will that refresh your memory about the requirements?
A. Well, that contains the requirements so, sure, I could read those to you if that would help.
Q. Okay. Please let me know if you see what is on my screen.
A. Yes, ma'am, I see it.
Q. Okay. Do you recognize this California Penal Code Section 602?
A. Yes. I have seen Section 602 before.
Q. Okay. And isn't this true, California Penal Code Section 602 relates to trespassing, to trespass, so to speak?
A. Give me a second. I'm reading

through it. I believe it does relate to trespassing.

Q. Okay. Do you remember getting training on this specific code section in the academy or within the Glendale Police Department?

A. It was one of various penal codes that was commonly enforced --

Q. Okay.

A. -- during my time as a police officer. So, yes, I --

Q. Okay.

A. -- am familiar with various codes to enforce trespassing.

Q. Okay. And this states that every person who wilfully commits a trespass by any of the following acts is guilty of a misdemeanor. And I am going to scroll down to Section O.

Subsection O states, "refusing or failing to leave land, real property or structures belonging to or lawfully occupied by another and not open to the general public, upon being requested to leave by a peace officer at the request of the owner, the

owner's agent, or the person in lawful possession, and upon being informed by the peace officer that they are acting at the request of the owner, the owner's agent or the person in lawful possession, or, subsection 2, the owner, the owner's agent or the person in lawful possession."

Are you with me so far? Did I read it accurately?

A. Yes, I believe so.

Q. Okay. Do you see the distinction that is drawn in this Section 602, 0 -- O, it's actually O -- about property that is not open to the general public? Do you see the distinction that is drawn within this section; yes or no?

A. I'm really not following you. I've had a super long day and you're asking me to evaluate a portion of the penal code and asking me to look at distinctions. I'm not trying to be difficult with you, I promise. I just am not --

Q. Well, sir, you know, it's so funny. I would like to say that the Court has scheduled this deposition by an Order, and your

attorneys have agreed to produce you.

I understand you have difficulties with your schedule. We have accommodated your school schedule. There was no other time for you to be deposed. You agreed to do this on Zoom.

And unless -- you know, you are telling us that you don't want to be deposed. We will have to ask for further Court Orders and sanctions for your inability to answer questions.

Do you understand? Because if you don't answer my questions and if I believe you are not cooperating, I will be asking for another session.

I am not being difficult. I understand you are a student. But are you telling me you are refusing to answer -- excuse me. Are you telling me you are refusing to answer questions?

ATTORNEY ARIAS: Counsel, your question wasn't clear. You asked the same question.

ATTORNEY MKRTCHYAN: Well, I feel like -- no. I feel like the witness is

just not doing his best and he doesn't -- he is evasive. I'm not being difficult, but you are telling me that you don't want to answer my questions.

ATTORNEY ARIAS: I have to respectfully disagree with you. So, you know --

ATTORNEY MKRTCHYAN: Well, if I believe that this is not going in the right direction, I will be asking for another session.

ATTORNEY ARIAS: Counsel, you can ask for whatever you want, but this is your time for the depo, so why don't you just move on.

BY ATTORNEY MKRTCHYAN:

Q. I read to you the section; didn't I? I read it to you and you read it with me; true?

A. Yes. You read the section to me, yes.

Q. And I asked you, my last question was that -- you were having difficulty answering -- was that, do you see the words "not open to the general public"? Do you see it here?

A. Yes, I see the words "not open to the general public."
Q. How do you understand this section, that it does or does not apply to property that is open to the general public?
ATTORNEY ARIAS: Objection, calls for a legal conclusion, vague and ambiguous.
BY ATTORNEY MKRTCHYAN:
Q. You may answer the question, sir.
A. Are you asking -- I'm trying to understand. You're trying to -- are you asking me what "not open to the general public" means?
Q. No. That's not what I asked you, sir. Please listen to the question carefully.
Listen to the question carefully. And you are trained, as a police officer, to enforce this Penal Code 602. For four years, you were in charge of enforcing this penal code; true?
A. There's thousands of penal codes. This was one of the tools that we used to enforce the law, yes.
Q. And you made arrests based on Penal Code Section 602; true?

A. I believe so.

Q. Okay. So are you having difficulty of -- interpreting this code section, how it applies and to what property it applies?

ATTORNEY ARIAS: Objection, vague and ambiguous.

THE WITNESS: Yes, right now I am. I'm no longer a police officer and I haven't seen this in a long time. And you're asking me about specific verbiage in the penal code. So I'm just trying to make sure that I understand your question properly.

BY ATTORNEY MKRTCHYAN:

Q. Okay. And you are now a law student, though. You have been a law student for a year; true?

A. Yes, ma'am.

Q. And you have taken criminal law and procedure already within this first year; true?

A. That's not true, actually.

Q. What classes have you taken the first year of law school?

A. I really don't feel the need to give you my whole legal experience thus far, but I have not taken criminal procedure.

Q. You know, okay. Here is another thing I would like to tell you again.

If you are not willing to answer any of my questions, I will ask the Court to bring another session back. So if you want to do that, that's fine. I can --

ATTORNEY MKRTCHYAN: Please, Court Reporter, make a mark of this question. Are you there? Karen, are you there?

THE COURT REPORTER: Yes, I'm here.

ATTORNEY MKRTCHYAN: So mark this question is that not being answered.

BY ATTORNEY MKRTCHYAN:

Q. Again, I would like to give you an opportunity to answer the question because, otherwise, we can ask for a second session. This is -- we are entitled to all answers unless your attorney instructs you not to answer based on privilege. Unless I ask you any question that is privileged or involves privacy or attorney-client communications, then you are not obligated to answer.

This is a question I asked you about your law school training. You have been in law

school for, as I understand, a year now or two years?

A. We're not here to talk about my law school, ma'am. We're here to talk about an incident during my time as a police officer so --

Q. Let me tell you what you are here about, sir. I am the one who is asking you questions and you are the one to answer.

I just want to understand, are you refusing to answer the question about your law school classes?

A. No, I'm not refusing to answer that.

Q. How long have you been in law school?

A. I am currently in my second year of law school.

Q. Okay. And during this first and second year of law school, you're telling me that you did not take criminal law?

A. I took criminal law, but I have not taken criminal procedure.

Q. So you did take criminal law and you are very familiar, not only as a law student, but also as a police officer, of California

Penal Code and how to interpret and how to understand this penal code; true?

ATTORNEY ARIAS: Objection, vague and ambiguous question.

THE WITNESS: Yes, I spent a lot of time looking at various penal codes, but, you know, I will say that I am currently in law school in Nebraska so I don't have any experience in law school looking at California Penal Codes --

BY ATTORNEY MKRTCHYAN:

Q. But for the four years that --

A. -- because of law school.

Q. But for the four years as a police officer, you were in charge of enforcing this specific California Penal Code, among others; true?

A. Yes. This is one -- one penal code that was enforced.

Q. Okay. And they have this one, the section that I brought your attention to, this specifically talks about refusing to leave property that is not open to the general public; true, yes or no, I don't know?

A. Yes, this penal code addresses

property that is not open to the general public.

Q. Okay. So let's scroll down. Is there any section in this 602, Penal Code 602, that you're aware of in your training and experience, that speaks to trespassing on a property that is open to general public?

A. I do not remember a specific section number in Penal Code Section 602. And I also can't read it while you're scrolling through like that because of the latency.

Q. Okay. So let me go back and ask you some questions again.

So in preparation for this deposition, have you reviewed any materials with your lawyer?

A. Yes, ma'am, I have.

Q. What have you reviewed?

A. We had a Zoom conference where we reviewed things like the police report that Officer Ross authored, as well as just other information surrounding the incident and the Complaint that was filed.

Q. Well, "other information" is very vague. I want to know what records you

reviewed. I don't need to know your communications with your attorney, but I am entitled to know what specific records you reviewed in preparation for this deposition.

So you mentioned one police report by Officer Ross; true?

A. Yes, ma'am.

Q. Did you watch any audio/video of this incident?

A. I have watched the video recording from the back seat of the patrol unit while the Plaintiff was seated back there.

Q. Did you watch any audio, did you hear any audio, radio or DAR, of this incident?

A. No, ma'am. Just the -- just the video recording.

Q. Did you watch any other video?

A. No, ma'am.

Q. Any other documents you watched aside from the record by Officer Ross?

A. No.

Q. So you were not -- you have not seen any policy documents in preparation of your deposition?

A. No, ma'am.

Q. You have not even seen any of the Internal Affairs interview or disposition in this case?
A. No, ma'am.
Q. Were you interviewed by the Internal Affairs related to this incident?
A. No, ma'am.
Q. Prior to -- by the way, when did you learn of this lawsuit? You are a Defendant in this action; right?
A. Yes, ma'am.
Q. When did you learn of this lawsuit, aside from communications with your attorney?
A. I only learned about this lawsuit via communications with my attorney. I believe I learned about this in the spring of this year.
Q. How did you learn? Was it given by your attorney or was it sent to you via E-mail?
A. I received a phone call from the Glendale City Attorney's office.
Q. So even though you were no longer working with the Glendale Police Department, you were assigned a Glendale City attorney to represent you?

A. Yes, ma'am. That's my understanding.
Q. Was it part of the contract with the City that you would always be represented by them regardless of whether you are working with them, or was it by your choice?
A. I do not know.
Q. So could you choose to hire another attorney yourself to represent yourself; do you know?
A. I don't know what my legal options are for that, no.
Q. Okay. So -- but you did not object to Glendale City attorneys representing you?
A. No, ma'am, I did not.
Q. Did you speak with any of the involved officers in this case when you learned of this lawsuit?
A. No, I did not.
Q. Did you speak with Officer Ross?
A. No, I did not.
Q. When was the last time you had interaction with Officer Ross?
A. Yesterday during a Zoom call. I said hello to him.

Q. Okay. So -- and your attorney was present there?
A. Yes, ma'am.
Q. So prior to that, prior to that, you know, before you -- well, prior to that, when was the last time you had any interaction with Officer Ross?
A. If I had to guess, a year and a half ago.
Q. No, don't guess. But -- so was it before you left the Glendale PD?
A. Yes, correct. I have had no contact with Officer Ross since I resigned.
Q. Okay. So in that -- you know, in those interactions with Officer Ross, did you discuss this incident?
A. No, I did not.
Q. After this incident, did you have any further discussions with Officer Ross, before filing of this lawsuit, about this incident?
A. No, ma'am. Not to my knowledge.
Q. Okay. So when you looked at the police report in this case by Officer Ross, did you also look at the citation that he wrote and

-- in this case, the citation, the misdemeanor citation?

A. No, I did not.

Q. Did you write, yourself, as you were involved in this incident, did you, yourself write any reports?

A. No, I did not.

Q. So going back to this Penal Code Section 602, if you would like, I can let you read this and -- you know, if that refreshes your memory. I can scroll down quickly or slowly. You can read this and tell me if there is any section in this penal code that you were trained on that references trespassing at a location that is open to public.

Okay? Do you want to read it and I will have this on the screen? You can tell me when to scroll down?

ATTORNEY ARIAS: Objection. The document speaks for itself. But you can answer the question if you understand it.

BY ATTORNEY MKRTCHYAN:

Q. I want to understand your training, experience and understanding about this pol -- of this penal code section. So please read it

for yourself and tell me when to scroll down, and then I'm going to ask you some more questions. Okay?

A. Okay. Do you mind scrolling down, please? Scroll down, please.

I'm sorry. Can you refresh my memory of what your question is exactly?

Q. Well, I just want you to first read these right now and let me know when you're done, and then I will have some questions.

A. Well, if I'm reading, I'm not really retaining all this. I'm looking for something specific. So --

Q. Okay.

A. My eyes are tired from school this morning and all the reading I've been doing, and I feel like I'm being asked to evaluate the penal code here. So I'm trying to read it with a fine-tooth comb, but there's numerous pages here. So I just -- my mind is in various directions, so it would help me a lot if you could help me by repeating the question or just asking me what you want me to look for and try to bring your attention to.

Q. Okay. My question was,

specifically, is there any section here that pertains, specifically, to trespassing on a property that is open to public, as opposed to number O that we read, refusing to leave land not open to general public.

I just want you to read this and tell me if there is any section that specifically states -- references trespassing on private property open to general public, period. That's all?

ATTORNEY ARIAS: Objection. Calls for a legal conclusion and the document speaks for itself.

Counsel, you need to allow me an opportunity to object. I would appreciate it if you would at least let me put that on the record, and then you can restate your question or whatever.

ATTORNEY MKRTCHYAN: I don't need to restate the question, sir, and I have allowed you to make your objections every time, so --

ATTORNEY ARIAS: Take it down. That's the rules, counsel.

ATTORNEY MKRTCHYAN: Oh,

really? Thank you for reminding me of the rules. You know, I was not aware of them.

ATTORNEY ARIAS: You're not aware of the rules.

ATTORNEY MKRTCHYAN: Okay. This is conduct that I can actually get sanctions on. So, please, you have made your objection for the record. Let him read and answer the question.

BY ATTORNEY MKRTCHYAN:

Q. And let me know when you want me to scroll down, sir.

A. Could I -- could I ask you to help me help you? Could you go to the section that -- where this can be found and I can read it and I can affirm to you that it, in fact, does -- I imagine that what you're looking for, what you've asked me to find is somewhere in this document, and I think that we could move on from this quicker if you could point me to what you would like me to read, and I can let you know what I think about that.

Q. Well, sir, you are the one who is, you know, in charge of enforcing this code.

All I'm trying to ask you, if you

are summoned to a retail establishment -- let me paraphrase this question because you're having difficulties.

If you are summoned, as a police officer, to a retail establishment that is open to public, what penal code section does that apply to for you to make an arrest; can you tell me?

ATTORNEY ARIAS: Objection, calls for a legal conclusion.

THE WITNESS: I believe, from what you have shown me in Penal Code 602, that the answer to that question is somewhere in this document.

Off the top of my head, I do not know where it is. I know that you're giving me the opportunity to read the document, but I am focusing on a lot of things right now and I am not able to process through all of this. We would be here for a while because I don't remember where in the code that section might be.

BY ATTORNEY MKRTCHYAN:

Q. So in other words, the way I understand it is that you cannot tell me, if

you are arresting someone for trespass, what code section you are going to put them on for trespassing on a private property open to public; yes or -- that's all I want to know.

ATTORNEY ARIAS: Objection, misstates the testimony.

THE WITNESS: Off the top of my head right now, I don't know.

BY ATTORNEY MKRTCHYAN:

Q. Okay. So if you go to a scene and you are writing a citation, you do not know what code section you are citing them for?

ATTORNEY ARIAS: Objection, misstates the testimony.

THE WITNESS: No, that's not what I'm saying. I'm saying that there are other -- I had reference guides available to me that I had compiled for routine arrests that were made. And if I was still a police officer, I would be more familiar with what those codes are.

In my position, no longer as a police officer, I don't remember specific code sections anymore.

BY ATTORNEY MKRTCHYAN:

Q. Understood. But you were there until recently of 2022. Last year you left. It's recent. It's not like years ago. And you are a Defendant in this action.

Do you understand that?

A. I understand that I'm a Defendant, yes, ma'am.

Q. Okay. So you agree with me that the subsection that I read for you, 602(0), 602(0) that we just read, applies to refusing property -- to leave property not open to the general public; true?

A. Yes --

ATTORNEY ARIAS: Objection, calls for a legal conclusion.

THE WITNESS: -- that's what Section O says.

BY ATTORNEY MKRTCHYAN:

Q. And do you agree with me that a CVS Pharmacy is open to general public?

ATTORNEY ARIAS: Objection, vague and ambiguous.

THE WITNESS: Yes. I think that, from my understanding of open to general public, CVS Pharmacy would be open to the

general public.
BY ATTORNEY MKRTCHYAN:
Q. And that's open 24/7; true?
ATTORNEY ARIAS: Objection.
THE WITNESS: I don't remember.
BY ATTORNEY MKRTCHYAN:
Q. So, you know, CVS Pharmacy -- how many times have you patrolled around CVS Pharmacy?
A. I don't know. Hundreds of times. It's part of the City of Glendale, and as a patrol officer responsible in the City of Glendale, it was just like any other building, one that we would frequently drive by.
Q. You didn't go there as a customer and purchase items?
A. No, I never purchased items from CVS in Glendale.
Q. Okay. For this incident, you were called to CVS Pharmacy in Glendale, 3943 San Fernando Road; true?
A. Yes, ma'am, for the incident in this Complaint, yes, ma'am.
Q. Was this a location that you had

been before as a police officer?
A. Yes. Yes, it is.
Q. So you were familiar with the location and the establishment; true?
A. I was familiar with that CVS. I had been there before, yes.
Q. Had you been called there again for trespass violations prior to 2021?
A. There were other CVSs. I may have. I don't remember correctly, but I know I had been to various CVS throughout the City of Glendale for trespassing-type calls for service.
Q. Okay. And when you were called on those calls, were you the officer -- the primary officer or assisting officer?
A. I don't remember exactly. I imagine there's some combination. In some incidents, I was the primary officer. In other incidents, I was probably an assisting officer on it.
Q. Did you ever make arrests for trespass at a CVS Pharmacy prior to 2021?
A. I believe so.
Q. What kind of issues were those?
A. I can't remember. I can't remember

any specific incident off the top of my head. I know that I have been to CVS prior to the incident at discussion today, and I know arrests have been made there. I can't think of a specific one.

Q. Okay. But you, generally, talked about some of the things that you recall for trespass, generally, were shoplifting or refusing to leave property; right?

A. Well, I was never really called for trespassing because of shoplifting, per se. It was -- I don't know. It's -- a lot of trespassing calls originated as unruly customers or someone that the management felt was being disruptive, and they would then notify the police department and generate a call for service asking for officers to come and keep the peace.

In some of those incidents, they -- the management or the employees at those locations would then ask Glendale police officers for a private person's arrest.

Q. Okay. But at this CVS Pharmacy, for example, that's on San Fernando Road, were you called before?

A. Yes, I have responded there for calls for service before.
Q. Were there similar calls for someone who was disturbing or trespassing?
A. I don't remember exactly, but I'm inclined to say, most likely, yes.
Q. Okay. But isn't it true that the penal code section -- code sections are different for trespassing, per se, refusing to leave land, and disrupting business?
ATTORNEY ARIAS: Objection, calls for a legal conclusion.
THE WITNESS: I don't remember anymore. I know that there are different trespassing codes for different types of trespassing.
BY ATTORNEY MKRTCHYAN:
Q. Okay. Different types of trespassing. As a police officer, what was your understanding of different types of trespassing? Just give me some guidance. What was your understanding?
A. Well, there was trespassing on federal property. There is trespassing on -- there's different types of ownership. I don't

remember the specific codes and how they applied or the different even types of it.

It's kind of information that I have, I guess in some way you could say, purged from my memory because there's been more important things in my life since than to remember the distinction between, you know, minute codes.

Q. Well, I understand that, but you worked there for four years. You were called on various calls. And if you want me to refresh your memory with any policy or penal code section, you can ask me to show it to you.

But all I'm trying to ask you is, based on your training and experience, isn't it true that trespass, per se, refusing to leave the land is a different code section from disrupting a business operation, for example?

ATTORNEY ARIAS: Objection, calls for a legal conclusion. Vague and ambiguous.

THE WITNESS: That sounds probable. I don't know. I don't know is the honest answer anymore. I don't remember.

BY ATTORNEY MKRTCHYAN:

Q. We just read the actual penal code section on trespass, true, 602; true?
A. Yes, we read portions of it.
Q. Okay. And that portion 602(0) that we spoke about, we read, did not speak about disrupting business; true?
ATTORNEY ARIAS: Objection.
BY ATTORNEY MKRTCHYAN:
Q. It says, specifically refusing to leave the land; true?
ATTORNEY ARIAS: Objection. The document speaks for itself and it calls for a legal conclusion.
BY ATTORNEY MKRTCHYAN:
Q. Yes or no?
A. It seemed to apply to an area that was not open to the public. That's what 602(0) --
Q. Can you tell me, what are the requirements for you to make an arrest of someone, as a police officer, for disrupting business? What are the requirements?
ATTORNEY ARIAS: Objection, calls --
THE WITNESS: I don't remember

anymore.

BY ATTORNEY MKRTCHYAN:

Q. Okay. So if you were summoned to CVS Pharmacy, based on someone disrupting business, how are you going to go about investigating that call?

ATTORNEY ARIAS: Objection. It's an incomplete hypothetical, calls for speculation.

BY ATTORNEY MKRTCHYAN:

Q. You can answer the question, sir. I don't want to repeat it every time, you know.

A. I'm really not interested in making hypothetical speculations. There is --

Q. Sir, if you are not interested in answering my questions, we can get the magistrate on board. Okay? I can ask the magistrate to come on board or I can actually bring you back to another session because I don't want to waste my time.

You are here -- here's the thing.

ATTORNEY MKRTCHYAN: Counsel --

ATTORNEY ARIAS: You don't like the answer to the question.

ATTORNEY MKRTCHYAN: Okay. Excuse me.

BY ATTORNEY MKRTCHYAN:

Q. You were brought here as a witness -- as a Defendant in this action to testify in this case. Okay? And if you are going to refuse to answer my questions, I will ask -- I will take a minute and I will bring the judge on board, and I may ask for sanctions because this is ridiculous, you know.

I'm not -- you know, are you refusing to answer my questions? You are not the one to decide what questions I can ask and what questions I cannot ask.

ATTORNEY ARIAS: He answered all of your questions. You just didn't like the responses. If you want to contact the magistrate, you go right ahead.

ATTORNEY MKRTCHYAN: I will be asking for sanctions. This is ridiculous, Counsel, you know. Listen, any time -- I am the one who decides what questions to ask. Okay?

BY ATTORNEY MKRTCHYAN:

Q. Sir, do you understand that, you

know, I am the one who decides? Unless -- I told you previously, unless your attorney objects and instructs you not to answer, which we will take up with the magistrate, you are obligated to answer all my questions. And if you're refusing to do that, that's your prerogative. I will stop this session. I will bring you back for another full seven-hour session.

Do you want to do that?

A. I want to make it clear that I'm not refusing to answer your questions. I'm just --

Q. Well, you're telling me that you don't want to answer -- excuse me. You're telling me again and again you don't want to answer hypotheticals.

What prerogative do you have to refuse to answer -- to refuse to answer some hypotheticals? I can give you any hypothetical I want. You are, as a witness/Defendant, obligated to answer any questions to the best of your ability.

If you need me to clarify something, you can do that. But you are telling me, "I am not interested in answering hypotheticals."

What prerogative do you think you have to do that?

I am going to take a break right now. We have been on the record for some time. You are going to, first of all, talk to your attorney about your duties as a witness/Defendant now.

If we come back and if you are going to continue refusing answering any questions, I will stop this session and I am going to involve the magistrate.

So we are going to take a five-minute break, and I want you to, specifically, talk about your obligations as a witness in this case. I'm not trying to be difficult, but you keep refusing to answer hypotheticals. I am entitled to give you hypotheticals.

So it is 11:36. Have a brief discussion with your attorney and come back and tell me if you are refusing to answer questions I have posed. Okay?

A. I understand what you're asking.

ATTORNEY MKRTCHYAN: Okay. Thank you.

So Miss Reporter, we are going to take a five-minute break. Thanks.

(Short recess taken.)

BY ATTORNEY MKRTCHYAN:

Q. So a reminder, you are under oath, sir. I just want to reiterate my question. Are you refusing to answer any of my questions?

A. No, I am not.

Q. Okay. So going back to the question that I was asking you, if you are called to a retail establishment, such as CVS Pharmacy based on a complaint that the customer or anyone is disruptive, how -- what penal code section does that reference to? Is that trespass? Is there any other penal code section?

ATTORNEY ARIAS: Objection, vague and ambiguous, calls for legal conclusion.

THE WITNESS: I don't know which penal code section that is in reference to.

BY ATTORNEY MKRTCHYAN:

Q. The penal code section that I just read to you, the one that's 602(0), or O,

602(O) that we read, would that apply under that circumstance?

ATTORNEY ARIAS: Objection. That's a hypothetical, incomplete facts, calls for speculation and calls for a legal conclusion.

THE WITNESS: I have no opinion on that. I'd need more information and more facts.

BY ATTORNEY MKRTCHYAN:

Q. So as a police officer, you wouldn't know what code section to cite that person? I mean, you would go ask your supervisor? What would -- how would you go about citing someone, as a police officer four years in Glendale PD, in that circumstance?

ATTORNEY ARIAS: Same objection.

THE WITNESS: Well, in the broad sense, like I said, applying it to any other investigation, if I had a question about what code should be utilized -- can you hear me okay?

BY ATTORNEY MKRTCHYAN:

Q. Yes, I can, of course.

A. Okay. I apologize. My screen just changed and I was trying to understand.

I would use various mechanisms to figure out which code best applies to the incident at hand.

So I might call more senior officers and explain the situation to them, and they might direct me towards a specific portion of the penal code. I might reference one of the guides that I personally compiled to assist myself in investigations.

I may use the Internet to facilitate some sort of a search with key terms and key words to find the section that applies, or I might know the section off memory.

Those are the tools that I would use to appropriately, to the best of my ability, charge someone with a crime.

Q. Right now, I'm giving you this incident that CVS calls and says someone is disruptive. Would 602(0) -- O -- 602(O), Penal Code Section 602(O) that we just read on the record, would that apply to that scenario; yes or no, I don't know?

ATTORNEY ARIAS: Same

objection.

THE WITNESS: I don't know if that would apply or not because this is -- as we talked about, this is a trespassing section. And per your hypothetical that you gave me, I would just be responding to a call where someone was creating a disturbance, so that wouldn't necessarily rise to the level of trespassing.

BY ATTORNEY MKRTCHYAN:

Q. Okay. Well, how does that answer my question? So all right. I'm not clear on your answer.

So you read the verbatim 602(O) and the scenario, and I gave you that city is called, as in this case, that someone is disruptive.

A. I understand what you're saying.

Q. Would that -- right now my question is this. Would that 602(O) apply to that scenario; yes or no?

ATTORNEY ARIAS: Same objection.

THE WITNESS: I have no opinion on that, because I would need more

information.
BY ATTORNEY MKRTCHYAN:
Q. Right now --
A. This section applies to some form of trespassing. But the facts, the limited facts that you have given me only demonstrate that someone has been disruptive inside the store. So it would be incumbent upon, in your hypothetical, the store manager, the store employees, then asking that person to leave, failing to leave, before we even begin the discussion about a trespassing situation.
Q. I just highlighted for you the term in this 602(O) that says "not open to the general public."
Do you remember that?
A. Yes, ma'am, I do.
Q. Okay. And CVS Pharmacy, you testified to earlier, is open to public; true?
A. Yes, my understanding, CVS is open to the general public, yes.
Q. Okay. So how can you have difficulty answering this question, whether this subsection would apply to a retail establishment that is open to public? When it

says it applies only to private property not open to the general public, how -- how can you not answer that question, whether this penal code applies to that scenario at CVS Pharmacy that is open to public?

ATTORNEY ARIAS: Objection, argumentative, vague and ambiguous.

THE WITNESS: Ma'am, in the way that you said that right there, that helped me understand what you are trying to ask me. And I agree, based on the terminology in this statute, my best inference is that because it states it's not open to the general public, it would not apply to a retail establishment like CVS, which is open to the general public.

BY ATTORNEY MKRTCHYAN:

Q. Okay. But this is not the first time you know about this penal code section; right? You studied this, you were trained in this; right? This is not the first time you read this with me; true?

A. I don't remember the last time, if ever, I read the entirety of Section 602.

Q. But you did, you were trained in enforcing penal code sections; true?

A. I was trained to utilize the penal codes in California for enforcement, yes.
Q. Okay. And so -- but right now, I'm asking you this question, you know, if this section that we just read does not apply, are you aware of any other section that would apply to that scenario to a public -- to a property that is open to public, do you know of the code section that applies?
A. I know --
ATTORNEY ARIAS: Objection, calls for a legal conclusion, vague and ambiguous.
THE WITNESS: I know there is a section that applies to a retail establishment that is open to the general public. However, I do not recall what the specific code section is.
BY ATTORNEY MKRTCHYAN:
Q. I understand. I'm not asking you the code section, and I understand that you would not remember the code sections.
I'm asking you if you were aware, in your training and experience, if there was a code section that would apply to retail

establishment open to the general public and scenario where that retail establishment calls for police and complains that the person is disruptive, do you know if there was a code section like that available to you?

ATTORNEY ARIAS: Same objection.

THE WITNESS: I'm just getting a little confused because the answer to that question is, yes, I am aware that there is a code section that applies. That's what I said before.

I'm just trying to understand --

BY ATTORNEY MKRTCHYAN:

Q. Yeah, but what code section? I mean, right now, I'm giving you, you're -- as a police officer, you arrive to the call; right? You were assigned. Let's go to the incident.

What shift were you working on January 21, 2021?

A. What shift was I working?

Q. Yes. What is the -- what shift were you working, watch or beat?

A. I was working patrol that night.

Q. But night shift, day shift? That's

what I'm asking. Graveyard shift? What was your shift?

A. That would have been a graveyard shift, I believe.

Q. Okay. But you were not working 24 hours; right? You were working 12-hour shifts; right?

A. Well, yes, ma'am. Our shifts are 12 and a half hours.

Q. Okay. That's what I'm asking. Was this the night shift you were working or daily shift? When did your shift begin?

A. I believe that was a graveyard shift. It could have been an overlap shift, which is a different type. I believe it was a graveyard shift. And if it was a graveyard shift, I would have either started work that night at 6:30 p.m. or 7:30 the -- you know, the previous day because this incident occurred at about 1:30 in the morning.

Q. 6:30 p.m. up until when, 6:30 in the morning?

A. Well, I apologize. It either would have been 6:00 p.m. to -- sorry, 5:30 p.m. to 6:00 a.m., or it would have been 6:30 p.m. to

7:00 a.m.
Q. Okay. And you were assigned to work solo, right, as we established?
A. Yes, ma'am. That night, I was working as a solo officer.
Q. And you had a patrol car assigned to you?
A. Yes, ma'am.
Q. And have you reviewed the radio call log in this case prior to your deposition?
A. Some months ago. Are you referring to the incident report where it has the times listed and --
Q. Not the arrest report. I'm talking about the radio call log of the Glendale Police Department, the incident recall.
A. I believe we're referring to the same thing, the CAD report, where it has the times listed and when people responded to it. I have not seen that document in some months, but I have seen it.
Q. So what time were you dispatched to this call for service at CVS Pharmacy that night?
A. I don't recall specifically. Do you

have the incident report that you could pull up? Because I can -- I would happily direct you to the portions of that that are relevant to my involvement.

Q. Right. Let's go to that. This is detailed history for police call, Bates stamped number -- let me just get the Bates stamp page here -- COG 248 for the record.

Do you recognize this is the CAD printout of the call for service in this case for this incident?

A. Yes, ma'am. I recognize the CAD for that.

Q. Okay. And you're familiar with this document. What unit number were you, on that day, assigned?

A. That night, if you -- on the left-hand side, it says, 01:28 hours, and then it says, 5L 26 27999 Armendariz, Griffin. That was when I was dispatched to the call, like you had asked. So my unit designation would have been 5L 26 that night.

Q. Okay. And so "disbur" means dispatched?

A. Yes. That's what I interpreted it

to mean. I mean, that was when I would have received the call from our Glendale Police Department dispatch center.

Q. So when you get dispatched on calls for service, you do not hear the actual 911 calls; true?

A. Correct.

Q. You hear what the dispatch tells you interpreting the 911 calls; true?

A. Yes, ma'am.

Q. And do you remember where were you when you received the call for service?

A. I do not.

Q. Where would you be if you are assigned to a night shift? Was it your practice to just patrol the neighborhoods or were you stationed at a location at Glendale City Police Department location?

A. The overwhelming majority of that time I would have been expected to just drive around the district that I was assigned to that night, which I imagine I was doing then.

Q. Okay. So you would not be stationed at the station. You would be actually driving around patrolling the neighborhood in your

district?
A. Correct. It's possible. I mean, I did respond to calls from the station on various incidents, you know, if I needed to use the restroom or if I was eating lunch or if I was turning in a report. There could be various reasons -- or writing a report for that incident. But I would be responding from somewhere within the City of Glendale without a doubt.
Q. And you mentioned there were five districts in the City of Glendale for the Glendale Police Department. The 3943 San Fernando Road in Glendale, what district was it assigned to? What district was it in?
A. It would be District 2. It might have been District 3.
Q. How big are these districts? Are they -- are they divided equally?
A. I'm not sure how they're apportioned. Geographically, some are larger than others. Population, density or zoning. I'm not sure how they divided the districts up.
Q. Okay. So -- but you were aware of what District 2 encompassed; right?

A. Yes. At the time I was working, yes.
Q. How big, like just give me an approximation, how many, you know, feet or, you know, how many -- how big was this District 2? I mean, I am very familiar with City of Glendale, having lived there for pretty much the entirety of my adult life. So if you can tell me the streets, what it covers, from, you know, generally cross-sections, I can have an understanding how big was this District 2.
A. Generally speaking, it's like the southwest portion of the City of Glendale. So everything -- oh, goodness, testing my geography now. Everything west of Brand, but south of the 34 freeway.
Q. 134?
A. Yes, ma'am.
Q. Okay. So if we take -- so given the fact that it's not that big of a district, how many minutes would it take you to get to the area of the call for service?
A. It depends on where I was responding from.
Q. Okay. So based on this radio call

log, if it says here, dispatched en route, I would interpret "ER" as meaning en route; do you agree with me?

A. Yes. I am looking at the document right now. I see --

Q. Right. So dispatched, en route, you were for yourself, Armendariz, Griffin, and James Ross is actually at the same time, 1:28:13 seconds; true?

A. Yes. That's what time -- well, that's what time I would have been dispatched to the call from Glendale dispatch center, yeah.

Q. Okay. And you received the call. How did you hear about the call to get dispatched to the scene?

A. Well, presuming I was sitting in my patrol car, I would have received an alert on the computer and I would have been notified via our radio communications.

Q. So you have -- do you have, you know, audio or -- what is it called -- radio center in your car where you can talk with your dispatch and hear the dispatch calls?

A. Yes. There is a radio in each

patrol unit that would enable me to communicate with other officers as well as the dispatchers.

Q. Okay. And to get assigned to a call, do you have to push a button? How do you actually assign yourself to the call; is it you, yourself, doing it or the dispatcher assigns you?

A. Either/or dispatchers would put -- well, the dispatchers would assign you to the call and they would initiate that process of your response. So I suppose dispatch is responsible.

Q. In other words, how does it work out here, how does it work that James Ross becomes the primary officer handling this call as opposed to you when you were assigned to the call at the same time?

A. That's a matter of the dispatcher's discretion, so --

Q. Okay.

A. -- how they coordinate.

Q. Is it based on the availability? So because I can see on scene, scroll down here, on scene for 5L 25, who is James Ross, the unit for Officer Ross is on scene at 1:28:37

seconds; true?
A. Yes, that's what the document shows.
Q. Which is basically about, within seconds, he is at scene after this call comes in, after he is dispatched; true?
A. Yes. I'm trying to see where -- yeah. It looks like he was there about 30 seconds after he was sent there. So he was presumably already in that immediate area.
Q. Right. But you came on scene after him at 1:31:06 seconds, which is about, give or take, three minutes; right?
A. Yes, ma'am. Yep.
Q. Is it because of the priority of your arrival at scene that you became the secondary or was it the dispatcher who decided? Who decided Officer Ross became the primary unit?
A. The dispatchers at the time that they sent the call.
Q. Okay. So based on your training and experience, are the calls assigned based on the availability of the police officer or based on seniority; how does this work?
A. I have no idea. I think that, in my

practical experience, I believe that the handling officers are assigned based on their workload for the night.

So, for instance, there are many nights where, say, I, working, had taken four or five reports and another officer working that same area had only taken one report.

At a certain point in the night, the dispatchers might start sending that other officer as the primary unit because I have more paperwork to do than they do already. So --

Q. So the --

A. -- other than that, that's just me speculating.

Q. Okay. Do you, have within your department, a document where you record your daily activities?

A. No. That would be contained in the electronic database system. It would be tracked via the printout that you have right here in that software.

Q. CAD log?

A. Yes, the CAD log, yes, ma'am.

Q. Okay. So you don't have like a -- like a diary sort of a formal report, recording

of your activities within the department, like daily watch activity report? You don't have that?
A. No, nothing that I would manually input, no, ma'am.
Q. So for the dispatcher to track or identify the load of the officer for that day to assign calls, they have to have this system, right, to see how many calls per night did each officer respond to; right?
A. Yes. It's one streamlined system.
Q. Okay. And do you remember if you had any other calls for service that night?
A. I don't remember any specifically. This was at 1:30 in the morning I received this call. I imagine that there were calls prior to this call because I had already been working for, give or take, six or seven hours.
Q. But you don't remember, one way or the other, if you had been handling some call prior to this incident?
A. No, I don't.
Q. Okay. And what was the nature of this call based on your memory? Strike that.
Do you have kind of independent

memory of this or are you going by the records I'm showing you?

A. I'm -- I am primarily going off the records you are showing me based on the initial reporting. I do not have any independent memory of what the dispatchers told me I was responding to, although I know that that is recorded virtually verbatim in the document in front of you.

Q. Right. No. I just want to understand, when you -- you know, prior to your reviewing the police report in this case, before this deposition, when you got the lawsuit papers, did you review the Complaint?

A. Yes, ma'am, I did.

Q. Okay. When you reviewed the Complaint, did that strike you that "I remember this incident" or not?

A. No, I did not remember the incident.

Q. Okay. So you, basically, had forgotten about this incident and you had to refresh your memory by looking at the reports and the Complaint, et cetera?

A. Yes, ma'am.

Q. Okay. So let's look, based on this

CAD log, the nature of this call, the call comes in at 1:26:36 seconds, create -- it says, "create," and gives the location of the incident. They have CVS Pharmacy, GL standing for Glendale; true? That's what it stands for?

A. Oh, you're asking me. I'm sorry. Yes, GL stands for Glendale.

Q. I want you to confirm what I'm reading this for the record. So location is CVS Pharmacy Glendale; type, 415 FEM, female, that's what it states; true?

A. Yes.

Q. And that means 415 is what? What penal is that? What does that reference to?

A. I remember that as indicating a matter of maintaining the peace, so some sort of dispute between persons, requesting police response to maintain the peace.

Q. Does 415 stand for disturbing the peace under the penal code section?

A. I don't remember where 415 comes from.

Q. Okay. But in your training and experience, you had this term many times, right, on calls, 415?

A. Yes, yes. That was a common shorthand to notify officers of what type of call they might be responding to.
Q. Right. Continuing, it says, "group city Area 277." Is that referencing the District, 277?
A. No, I don't think so. I cannot remember what the area codes are for. But if you look above on that document, right above where it says the case number -- yes, your cursor is right there -- it says "District 2, Area 277." I am not particularly sure what Area 277 references.
Q. Okay. That's fine. So type DESC 415 female, we already covered that, location description, 3943 San Fernando Road, Glendale. That's the location of the CVS Pharmacy; true?
A. Yes, ma'am.
Q. It gives the location, cross between South Central Avenue and West Los Feliz Road; true?
A. Yes, ma'am.
Q. And you knew this area, you've covered this, you knew this area from patrolling the neighborhood; true?

A. Yes, ma'am.
Q. Priority says, 2. So you have different priority of calls assigned within the police agency; true?
A. Yes. I believe so.
Q. And what are the priority of calls; do you remember?
A. I do not remember.
Q. Well, Priority 1 is urgent; true? Urgency?
A. Yes. That wasn't a distinction that patrol officers acknowledged. I'm not sure if that was for reporting requirements for the dispatchers or how they organized. That wasn't necessarily relevant information. That wasn't information that we were really affirmatively passed on.
I see that it's in the call, but it was not something that was notified. The officers weren't notified, hey, this is a Priority 2 caller or what priority.
Q. Okay. But there is a distinction between priority of calls, for example, if something is ongoing, if there is urgency?
A. Sure, of course.

Q. Right. Let me finish my question for the record. We want to make sure we don't speak over each other.

There is a priority of calls assigned within the department so that you know, as a police officer, whether you are responding on an urgent call or non-priority call; true?

A. As the document shows, yes.

Q. I don't want to -- just your understanding, did you turn on lights and sirens when approaching this -- when responding to this call?

A. No, ma'am.

Q. Okay. And you know the distinction when you -- when do you have to turn on your lights and sirens when responding to a call as a police officer?

A. I would turn on my lights and sirens in response to a high priority call, on a call in which I was authorized by the watch commander or the dispatchers who had received approval to authorize the officers in a lights and sirens response. And those were typically incidents involving serious injuries.

Q. Okay. But this is not that kind of an incident; right? There is no urgency to this call. You didn't have to turn on your lights and sirens; true?

A. I did not have to turn on my lights and sirens.

Q. Okay. And you didn't have to respond at a high speed; true?

A. True, I did not need to respond at a high speed to this.

Q. Okay. So then it says, "comment" entry, female W -- female woman, I guess -- I don't know -- "F/W wearing purple shirt, green pants, black shoes, refusing to leave, taking video of the RP, reporting party, and employees, no weapons."

Are you with me so far? Did I read it accurately?

A. Yes, ma'am.

Q. Was this information transmitted to you as you were dispatched to the scene?

A. Yes, ma'am.

Q. So when you arrived to the scene, you were aware what you were looking for; true?

A. Yes, ma'am.

Q. And what is the significance of the comment "no weapons" to you, a police officer, training -- trained officer?

A. Well, the significance is that the parties who -- the reporting party who called the Glendale dispatch told Glendale dispatch that the person they were complaining about or has a problem with does not have weapons, in their opinion. That's what that means.

So to me, it's, as a responding officer, it's one thing that I can take into account when approaching the situation to ensure safety.

Q. It's an important consideration, right, as a police officer, when you are arriving to the scene, whether there are weapons involved; true?

A. Absolutely. That's a major concern.

Q. Okay. And then we have change at 1:27:46 seconds, comment states, "RP, reporting party, advises suspect does not appear sick, reporting party is negative Covid."

So are you with me? Did I read it correctly?

A. Yes, ma'am.

Q. Okay. And this occurred in January 2021, going back to that time. This was after the pandemic of 2020; true?

A. I don't dispute the time that it occurred, but I don't -- whether it was after or during the pandemic is a matter of opinion. So I'm not sure what that really --

Q. Well, I want your opinion, though. You know, I mean, if we have a pandemic, let's -- you know, the pandemic officially began in what year, do you remember, officially?

A. I don't remember.

Q. Oh. Okay. March 2020, does that sound right?

A. Okay.

Q. The global pandemic, the lockdowns; right?

A. Okay.

Q. Right. But do you agree with me, though?

A. I don't remember exactly, but, sure, I'll agree with you for that if March 20 -- if that's when the President declared the pandemic, then that sounds fitting to me.

Q. Okay. And then we had some periods

of time when, you know, we had recurrence of the pandemic. We had lockdowns for a certain period of time, then we had reopenings of everything, and then sometime in wintertime, we had some degree of, again, Covid resurfacing; true, you remember?

A. Yes. Yeah, I remember the waves of concern.

Q. All right. So the Covid consideration was still ongoing at the time of January 2021; true?

A. Yes.

Q. You, as a police officer in the Glendale Police Department, were you wearing a face mask at the time of this incident?

A. I don't remember, but I am quite certain that I was. That was department policy, I believe, at that time frame, and I was personally concerned about bringing Covid to my family. So I typically wore both a face mask and -- a blue medical mask and another mask over that, so --

Q. Uh-huh. Was there any requirement for the Glendale Police Department, at this point in time, when they are getting calls for

service, to be advised if the reporting party had Covid or not? Why -- strike that.
Why do you believe that this comment, "our reporting party advised suspect does not appear sick, reporting party is negative Covid," why do you think this comment is there? Was there some sort of requirement by Glendale Police Department at the time?
A. I believe that the department implemented a policy for the dispatchers to ask that question to anyone who was calling and asking for assistance so that officers responding would be aware and could take appropriate precautionary measures if someone was reporting that they were positive for Covid or if they had a cough.
So I really think that that was implemented as like a safety measure just to protect officers and other people involved, to limit the spread of Covid.
Q. Okay. So -- but this reference is, specifically, to -- when it says, "RP advises suspect does not appear sick," and then next "RP is negative Covid," do you believe, from interpreting this call, if it references the

Covid?
A. In saying that the reporting party is negative for Covid, yes, I believe that's referencing -- that is referencing the Covid virus.
Q. I'm talking about "the RP advising suspect does not appear sick," and next to that, in that context, does that appear to you relating to Covid?
ATTORNEY ARIAS: Objection, calls for speculation.
THE WITNESS: I'm a little bit confused, but I'll break it down. I'm not trying to not answer your question.
The way I read that is that the reporting party is advising Glendale dispatch that the person he is interacting with does not appear to be sick, does not appear to have a cough. And then, in addition to that, the reporting party is also telling dispatchers that he, himself, or she, herself, is negative, has tested negative for Covid.
So it's signalling that the parties who the officers are going to need to interact with, one does not appear sick, and the other

one does not have Covid.
BY ATTORNEY MKRTCHYAN:
Q. Okay. So we can hear the 911 call, of course, to see what was the context of this, but let's move on for now.
We have another change after the dispatcher assigns calls to you and Officer Ross at 1:28:24 seconds, it says, "comment, inside store next to doors, female was banned from location last week"; correct? Did I read it accurately?
A. Yes. That's what that says.
Q. So as you are arriving, you are hearing this comment from your car; true?
A. Presumably, yes.
Q. Okay. So -- now, when it says, "female was banned from location last week," how do you interpret that as a police officer?
A. That there was a prior incident involving the same individual that resulted in the private retail store advising that same individual that she was not welcome back at the store in the future.
Q. Okay. So you, as a police officer in charge of enforcing California Penal Code,

do you believe that a retail establishment open to public could ban anyone they wanted from a location?

A. Well, subject to certain limitations, yes, private establishments have the right to refuse service to people.

Q. What kind of limitations? Please identify them generally speaking. I'm not asking you to cite me code sections. What is your understanding of the limitations?

ATTORNEY ARIAS: Objection, calls for a legal conclusion. You can answer the question.

THE WITNESS: I mean, that's difficult. There's Constitutional protections involved regarding discrimination with that, but if someone is -- someone can be banned from a store for what that store genuinely deems as unruly behavior or causing issues.

BY ATTORNEY MKRTCHYAN:

Q. But what kind of issues could there be that the person could be banned from, from your perspective as a police officer enforcing the penal code?

ATTORNEY ARIAS: Same

objection.

THE WITNESS: Someone could be banned for -- as a result of them stealing merchandise from that store.

BY ATTORNEY MKRTCHYAN:

Q. Uh-huh. Okay. What else could there be?

A. There's a variety of other ramifications, but as general practice, a private store has the right to refuse service to people.

Q. Based on circumstances; right? There must be specific circumstances, true, as you said, limitations; true?

A. Yes, of course. Like anything else, there is criteria that needs to be met prior.

Q. So let's say I go to a store. Hypothetically, I go to a store, and I don't shoplift, I don't do anything, I just enter the store. I just enter the store and I'm interacting in the store.

Is your understanding, as a police officer, that a retail establishment that is open to public, such as CVS Pharmacy, can ban that individual without any cause; just say,

look, we don't want you here, get out of here? Can that happen under penal code, California?

A. I really have no opinion on that matter. I mean, there's other factors. I would have to infer what exactly their rationale is for banning.

Q. Are you refusing to answer my question?

A. No. I just simply don't have an opinion on that.

Q. Well, I'm giving you a hypothetical. I'm telling -- I'm giving you a specific hypothetical and you covered this already.

I'm telling you that I entered the store. I am not shoplifting. I'm just entering the store. I'm interacting with the employees, customers. Can that retail establishment, such as CVS Pharmacy, just refuse to serve me and tell me, you are banned from here? Can that happen under penal code that you are enforcing? That's all.

ATTORNEY ARIAS: Objection, calls for a --

BY ATTORNEY MKRTCHYAN:

Q. I'm not asking for your personal

opinion, sir. I'm asking you in your training and experience as a police officer.

THE COURT REPORTER: Excuse me. I'm sorry. But if you were objecting, I'm not hearing that.

ATTORNEY ARIAS: I object, hypothetical, insufficient facts, calls for speculation. And I also object, it calls for a legal conclusion.

BY ATTORNEY MKRTCHYAN:

Q. Okay. So can you please answer the question or are you refusing to answer?

A. I'm not refusing to answer that question. I don't have an opinion on that based on those facts.

Q. Well -- but you just told me that -- I asked you, under what circumstances can a person be banned from a location. You told me some circumstances and limitations; true?

ATTORNEY ARIAS: Same objection.

BY ATTORNEY MKRTCHYAN:

Q. True?

A. Yes, in some instances, a private establishment can lawfully prohibit someone

from being in there on their private property.
Q. Okay. So -- but when you are entering -- let's go back to the incident.
So you are arriving to the scene with this information in mind. You have heard there is a female there refusing to leave, taking video, no weapons, and female was banned from location last week?
A. Uh-huh.
Q. That's the basic facts that you're responding to; true? Did I narrate it correctly?
A. Yes, ma'am. That sounds accurate.
Q. Okay. So if you are responding to that call, what is your second step in responding -- what is your duty to do in this circumstance? What are you supposed to do?
A. Well, in responding to an incident like that, I'm going to talk to the parties involved in the matter and find out what the source of the problem is, why they're having this disagreement, why this establishment is calling the police department for help with another citizen.
Q. So under that circumstance, we have

already covered your duty is to investigate; true?

A. Yes, ma'am. I would say that that's a pretty good summary of what the goal is. Investigate is a good first step.

Q. And that investigation entails talking with all parties, the reporting party and the offender, alleged offender, the female in this case; true?

A. Best practice would be to talk to everyone involved.

Q. Okay. And to determine if there is a violation of the penal code as a police officer; true?

A. Just to determine what happened.

Q. Right. And so when you arrived to the scene, you arrived second after Officer Ross, as we've established on the radio call log or the CAD log; true?

A. Yes, ma'am.

Q. Were there any other officers at the scene when you arrived?

A. There were two other officers who were on the scene during the incident. I'm not sure at what time they arrived.

Q. Let's go back, actually, to the call log and see. So -- but from your memory, when you arrived, you were -- based on this call log, the first officer who was on scene, if you take this as true, was James Ross at 1:28:37 seconds; true?

A. Yes, ma'am.

Q. Is that consistent with your memory, that when you arrived, Officer Ross was at the scene already?

A. Yes, ma'am.

Q. And according to this CAD, you arrived second at scene, 5L 26, at 1:31:06 seconds; true?

A. Yes, ma'am.

Q. After that, we see, at 1:31:42 seconds, which is, basically, 30 seconds or so, we have assisting units backing officers, assisting units arriving, we have Bryan Duncan and Anthony Ruiz?

A. Yes, ma'am.

Q. Do you remember them on scene arriving?

A. I remember them at the scene, yes.

Q. Did they arrive in their patrol

cars, separate patrol cars?
A. No. I think a helpful distinction here is their call sign is 4A 64. "A" designates a two-person car. I believe, at that time, that Officer Duncan was a training officer and Officer Anthony Ruiz was a trainee.
Q. Did you see them getting involved in interactions or assisting you with the calls?
A. Yes.
Q. So when you arrived to the scene, you know, you arrived in your car. Did you see the patrol car of Officer Ross?
A. Yes.
Q. Where did you guys park?
A. In front of the business, in front of CVS and the parking lot on the -- well, it's the only parking lot, but I suppose that's the south side, the south entrance of the building.
Q. How far were you from the entrance -- how far did you park your car from the entrance of the store?
A. Oh, goodness, I'm not sure.
Q. Is there any police-designated parking spots in that parking unit, if you recall?

A. Not that I'm aware of.
Q. You're aware some retail establishments have specifically designated parking spots? Another CVS Pharmacy, for example, in Glendale has a specific designated parking spot for police officers; are you aware of that?
A. No, I'm not aware of that.
Q. Okay. In any event, so you parked -- you got out of your car; true?
A. Yes, ma'am.
Q. Your understanding, you're responding to a call for service; true?
A. Yes, ma'am.
Q. Did you turn on your audio recording device, DAR, as you discussed previously, your audio recorder as you approached the scene?
A. I don't remember.
Q. Have you reviewed any audio recordings from you prior to this deposition?
A. No, ma'am.
Q. So, to your understanding, then, there is no, that you're aware of, audio recording from your body in this incident; true?

A. Correct.
Q. Why would there be no audio recording? If you're assigned to a call, you're responding to a call, and we've covered your policy that advises officers, trains officers to record their involvement in calls for service, why did you not turn on your audio recorder, sir?
A. I think it's important to note that I may have turned it on. It may have been dead. I'm not sure why there's no audio recording from that incident.
Q. Well, if there was one, we would be receiving it in discovery; would you agree with me?
A. Yes, that sounds right, if there was audio --
Q. Right.
A. -- that you would have received it and I would have probably been able to listen to it as well.
Q. Right. So are you aware right now, as you are sitting here today, of any audio recording of this call from your equipment?
A. No, I am not.

Q. How about your patrol car, did you have your patrol vehicle video turned on?
A. No. I would have had no need to turn on my --
Q. So -- but if you are responding -- you're understanding that you were responding to a call for service; true?
A. Yes, ma'am.
Q. Okay. So do you have any understanding as to why, you know, you don't have audio recorder turned on? I mean, if you had it, we would have received it. We have already covered it.
Do you have any understanding why we do not have any of your audio recording for this incident?
A. No. I can only speculate, and one thing that comes to mind is that I knew that I was responding to the incident as an assisting officer. And when I arrived there, another officer was already -- Officer Ross was already there, and the incident appeared to be under control. There was no immediate chaos unfolding in front of me. And I simply might have just forgotten to turn it on because of a

false sense of security or something like that.

I apologize, I wish I had that recording as well because I think it would shed light and show that -- well, I don't need to get into any specifics, but I'm not sure why there is no audio recording, and I wish there was.

Q. Okay. So -- but then, you know, your testimony is that if there was a heightened need, if you believed it was necessary, that there was some chaos, as you said, unfolding, you would have turned it on; true?

A. Yes. I think that my mind would have been more in tune with turning it on. But like I said, I -- I am not sure that my audio recorder wasn't dead. I don't know why there isn't audio recording from the incident.

Q. Okay. But in any event, your policy does not distinguish, does not give you exceptions saying whether you are assisting the call or whether you are the primary unit handling the call. You are advised, you are trained to turn on your audio recorder when you are responding to calls for service; true?

A. I don't remember what the policy specifically, says or said at that time that the audio recorders were in effect.

Q. Okay. So you're telling me that the, you know, policy's there but officers are not enforcing it; they are not turning on their audio?

ATTORNEY ARIAS: Objection, misstates testimony.

THE WITNESS: I'm not saying that at all. I'm saying that I'm not aware of what the policy from that time frame, specifically, requires. And per our previous discussion, I had mentioned that my best practice in using these recording devices was to turn it on during all encounters with public individuals.

And so I really don't -- I don't remember what the specific policy was for the audio recorders at the time.

BY ATTORNEY MKRTCHYAN:

Q. Were you ever told by your department that you violated the policy on audio recording, not turning it on in any of the incidents?

A. No, ma'am. I have never been accused of violating any policy.

Q. In this incident, did you have any of the sergeants or supervisors or your -- you know, training officers, tell you, admonish you why you didn't turn on your audio recording?

A. No, ma'am.

Q. Okay. You said that when you arrived, the scene was under control, you testified that earlier, right, by Officer Ross; true?

A. Yes. And when I said "under control," I mean there was no physical altercation unfolding in front of me. The parties and individuals involved appeared to be talking. I don't have a very specific recollection of what that looked like.

I can say there was no altercation when I arrived on scene, though.

Q. When you arrived, what did you see?

A. To the best of my memory, I recall Officer Ross talking to both CVS employees as well as the Plaintiff in this matter.

Q. Okay. Describe the Plaintiff for us.

A. Could you be more specific?
Q. Yeah. What did she look like, the Plaintiff in this case?
A. I don't recall.
Q. Well, you have looked at the CAD log right now with me; true?
A. Yes, I have.
Q. It provides description of the female wearing purple shirt, gray pants, black shoes; right?
A. Yes, ma'am. That's what the CAD log indicates.
Q. Does that refresh your memory of how the female looked?
A. No, ma'am. I have no independent memory of what she looked like.
Q. Okay. Officer Ross had taken pictures of Plaintiff in this case; true? You were present, I assume?
A. I am not sure. I don't remember. If that is indicated in the police report that he authored, I imagine he did, but my involvement on the incident was strictly limited to ensuring everyone's safety.
Q. Okay. But you, in preparation for

your deposition, you have not seen any photographs taken by Officer Ross or any other photographs?

A. No, ma'am.

Q. Okay. And your audio recorder is also capable of taking pictures; is that accurate?

A. No, ma'am. I don't believe that it had that capability.

Q. Okay. So what kind of equipment that you were assigned allowed you to take pictures of anyone, citizens, suspects, victims? What kind of equipment is it?

A. At that time, I'm not sure. Some officers had department-issued cell phones that they would take pictures with that had limited functionality beyond preloaded apps, and some officers had department-issued cameras. There's a variety of different means of capturing photographic evidence.

Q. Did you -- I'm asking you, for example, for your purposes, you, as of January 2021, did you have any equipment on you to take pictures of someone?

A. I don't recall, and on this

incident, I didn't take any pictures, so I can't speak to what I may have used or not.

Q. In other words, if you have a victim who is injured, you don't remember what kind of equipment you used to take pictures of the victim?

A. In the future -- typically what I would use, I would use my department-issued phone that had the Axon app on it, and that's how I would take photos.

Q. Okay. So your cell phone is issued by the department and it has an Axon app that permits you to take pictures of suspects or anyone?

A. Yes. Whether or not that app was preloaded, I cannot recall exactly, but that was one very common method.

However, the department-issued cell phones -- some people had them and some people didn't. And then over time, everyone ultimately had one issued to them. So I know that that was -- how I typically uploaded photos was via that method.

Q. So did the body-worn cameras that you were assigned there afterward in time, did

they have the ability to take pictures of someone as opposed to video record? Could you just shift from taking pictures and video?

A. I don't believe so. If they had that feature, I wasn't aware of its functionality. I never used that.

Q. In other words, so you don't have an independent memory or you have not seen any pictures of Plaintiff in this case?

A. No, ma'am. The only -- the only images I have seen of her were, like I said, yesterday with my attorneys, I reviewed the video footage from the back seat of the patrol unit that the Plaintiff was detained in, but that footage is grainy, and I don't have a mental image of what she looked like at the time of the incident.

Q. Okay. But based on reading the police report of Officer Ross, and you were there observing, what could you tell us, at the point in time you arrived, what was the female doing when you arrived?

A. I don't recall. Like I said, to the best of my knowledge, I remember her speaking with Officer Ross and the CVS employees also

speaking to Officer Ross. I don't -- there was -- I don't remember.

Q. Okay. Well, sir, you know, I mean, you have reviewed the police reports. You have reviewed the CAD log now with me. You have reviewed the patrol vehicle. Are you telling me that that has not refreshed your memory about the incident in this case that you are testifying?

A. Correct. And the reason why is I didn't write that police report, and I didn't -- I wasn't involved in the majority of the incident. So it's not surprising to me that, given this incident occurred, you know, three years ago now, that I don't necessarily recall what someone looked like during the course of a 20-, 25-minute interaction.

Q. I didn't ask -- the question was different now. I was asking you, specifically, what was the female doing. We moved from the description of the female that you couldn't identify to what she was doing based on the report, based on, you know, your -- the peers there, being there and involved in the interactions, I asked you what was the female

doing. Are you having difficulty recalling that?

A. I don't recall what the Plaintiff was doing other than speaking to Officer Ross.

Q. Okay.

A. Or -- yeah.

Q. Where were they standing when they were talking when you arrived?

A. My vague recollection is they were to the front of the store, outside that south entrance.

Q. So they were outside, no longer inside of the store?

A. When I arrived on scene, that is correct, to the best of my knowledge.

Q. Did you enter the store yourself after you arrived?

A. I do not believe so.

Q. At any point in time during the entirety of that investigation of that call for service, did you enter the store and speak with anyone?

A. I do not think so.

Q. Okay. Did you speak with the Plaintiff, Anoush Burmayan? You learned her

name at some point in time; true?
A. Yes. While other officers were asking her for her name, I overheard it.
Q. Okay. Other officers, who? Officer Ross or officers -- the other officers, Duncan, Ruiz? Who -- who asked for her name?
A. Officer Ruiz asked for her name and her information so that he could look up her information on the computer in the car, in the patrol unit.
Q. Okay. Wait. So I thought that Officer Ross was the primary unit handling this call, primary officer assigned to this call; true?
A. Yes, ma'am, he was.
Q. Okay. So where was Officer Ross when Officer Ruiz was asking the name of the Plaintiff, Anoush Burmayan? Where was Officer Ross?
A. I can only speculate, but I believe he was talking to the CVS employees to get their side of the incident.
Q. Okay. So let's go step by step here. So you arrive. You are standing -- as I understand, you saw them standing outside the

CVS Pharmacy near the entrance, not inside; true? That's what I understand from your testimony.
A. Yes. That's what I remember as well.
Q. You approached them; true?
A. Yes, ma'am.
Q. How many people from the CVS, the employees of CVS, did you see standing outside of CVS?
A. I don't remember if it was more than one, but definitely one. I just don't remember how many.
Q. Could you provide their descriptions?
A. No, I cannot.
Q. Have you watched any video surveillance recordings from the CVS store before your deposition?
A. No, ma'am, I have not.
Q. Okay. So Officer Ross is the one who is talking to them?
A. Yes. He obtained their statement during the course of the incident.
Q. Were you present there when he

obtained their statements?
A. No.
Q. How far were you standing from them when he was talking to the CVS employees?
A. I don't know.
Q. Were you within the earshot of hearing what they were talking about? How do you know he was asking them about the incident?
A. I know that he obtained their statements regarding the matter because he wrote about it in their police report, and during the time frame where I was supervising the Plaintiff and making sure that she was okay in the back seat of the patrol car, Officer Ross was not there, and so I imagine he was obtaining the statements from the CVS employees during that time frame.
Q. I understand at some point you were supervising, as you said, Anoush Burmayan, but I'm going step by step, sir, so please follow my chronology of events.
Initially when you approached and you saw them standing and talking -- I'm talking about step by step before Anoush Burmayan was taken to the patrol vehicle. So

can we go chronologically in the incident? I'm asking you, when you arrived, you saw Officer Ross talking with the female, Anoush, and speaking with the employees of CVS. That's the point in time I'm talking about, initially when you arrived.

Are you with me so far?

A. Yes, ma'am.

Q. How close did you approach them?

A. I don't remember, but I am -- my best belief is that I walked up to Officer Ross and asked him how I could help or assist on the case, but that is purely my speculation because in order to be as helpful as possible to other officers at any call, that was typically what I would do as an assisting unit.

I don't remember any more specifics.

Q. So how did you even make a conclusion that he is the one who is the primary officer handling this call? What made you conclude that?

A. Because he was dispatched to the call first by --

Q. How did you know? How did you know the time that he was dispatched to the call

first when you arrived?
A. Because we were both dispatched to the call, and when this Glendale City dispatch sends officers to a call, the order in which they dispatch the officers indicates who is the primary officer, meaning that the first officer's call sign that is used is designated as the primary officer.
Q. Okay. So your understanding when you arrived from the dispatch call is that Officer Ross was the handling unit?
A. Yes, ma'am.
Q. And you were assisting?
A. Yes, ma'am.
Q. And your practice -- actually, not practice, just training and experience, when you are assisting another officer, is what? What is your obligation and duty in assisting another officer in calls?
A. To assist them in maintaining the peace in an incident like the one that we're of today when I was called. I didn't mean to obtain statements from the CVS employees or any other witnesses, then my goal and my responsibility falls to ensuring the safety of

everyone on scene and assessing accordingly.
Q. Okay. In response to any request for help, true, by the officer who is doing the investigation; true?
A. Yes. He might ask me to help him with certain tasks.
Q. Okay. So when you arrived second, you know, you said that the situation was under control. Let's -- let's break it down.
When you saw the female, was the female, in any manner, aggressive in her behavior?
A. I don't remember. The only thing I remember is that she was talking very loud, but I don't remember anything besides that.
Q. Okay, loud, there is a lot of things, you know, loud. You know, there is many, many ways we can describe loud, you know.
First of all, you saw her wearing a face mask; true?
A. Yes. I believe the face mask was slightly pulled down, but that's also me building off memory, and I'm not trying to be out of chronological order, but I recall her having a face mask on in the back seat of the

patrol unit because I reviewed that video.
Q. So if she had a face mask covering her face, why are you having difficulties telling me whether she had a face mask or not?
ATTORNEY ARIAS: Objection.
BY ATTORNEY MKRTCHYAN:
Q. If you recall, in the patrol vehicle, she had a face mask, why is it difficult to answer that question?
ATTORNEY ARIAS: Objection, argumentative.
THE WITNESS: I'm happy to tell you -- so you're asking if I remembered her wearing a face mask at the time that I arrived, and I don't remember if she was wearing a face mask or not at the time she arrived -- that I arrived.
BY ATTORNEY MKRTCHYAN:
Q. Well, but we have, as you know, her sitting inside of the patrol car wearing a face mask; true? That's within minutes of her --
A. Yes.
Q. Let's finish -- let me finish the question. That's within minutes of her being arrested; true? She is in the patrol car

wearing a face mask fully covering her face; true?
A. It's true, except she wasn't arrested when she was put in the patrol unit.
Q. Well, you know what, let me just -- you're going to get there as far as your understanding of what is arrest.
She was placed in handcuffs, true, in the patrol car; true?
A. Yes, ma'am.
Q. Okay. And arrest, there are different definitions of arrest. But when someone is placed in handcuffs, that person is fully detained within your understanding; true?
A. Yes, ma'am. She was detained.
Q. Okay. Are you aware of any training and policy that if you -- first of all, strike that.
You are not the one who made the arrest of Ms. Anoush Burmayan; correct?
A. That is correct, I did not.
Q. Okay. So how do you know whether she was actually under arrest seated in the patrol car or not when you did not make the arrest of her?

A. Because she was merely detained at that time.

Q. How do you know? You were not the one that placed her under arrest. You were not the one who placed her in the patrol car; true?

A. That is true.

Q. Okay. So don't make -- see I asked you, specifically, do not speculate.

So from what you know right now, you are sitting here today, you did not make the arrest of Ms. Burmayan; true?

A. Correct, I did not make the arrest.

Q. It is Officer Ross who made the arrest of her; true?

A. That is correct.

Q. But you were present there; right?

A. Yes, ma'am, I was on the scene.

Q. And she was seated in the patrol car in handcuffs; true? The entirety of the time, she was seated in the patrol car with handcuffs; true?

A. Not the entirety of the time, but she was seated in the back seat of the patrol car for a portion of the incident.

Q. What portion of the incident are you

talking about? I'm talking about while she is seated in the patrol car. While she is seated in the patrol car, does she have handcuffs on behind her back?
A. Yes, ma'am.
Q. Okay. And then she was taken out -- we didn't even get to that, but she was taken out of the patrol car still in handcuffs; true?
A. Yes, ma'am.
ATTORNEY MKRTCHYAN: It is 12:55. I would like to take a brief lunch break. So Ms. Court Reporter, and everyone, I guess, is half an hour sufficient for lunch break for you? Because we would like to finish this as practicable as possible.
(Discussion held off the record.)
(Lunch break until 1:50 p.m. PST.)
BY ATTORNEY MKRTCHYAN:
Q. So let's get back on this. Reminder, you are still under oath. So, also, during the lunch, did you review any records pertaining to this incident?
A. No, I did not.

Q. Did you talk with anyone other than your lawyer during lunch break?
A. No, I did not.
Q. Going back to where we stopped off, you -- I was asking you, when you came to the scene, what you observed.
You testified that when you approached the store, got out of the patrol vehicle and approached the store, you saw Officer Ross speaking outside the store, speaking with Plaintiff Anoush Burmayan; true? That's what you testified?
A. Yes, ma'am, that's what I remember.
Q. So -- and there were CVS employees also there standing by as Officer Ross was talking with Anoush Burmayan?
A. Yes, ma'am.
Q. So they were outside. Can you tell us, how many feet away were they from the entrance of the store standing outside?
A. No, I don't recall.
Q. Were they still near the entrance, or were they in the parking lot?
A. My best recollection is somewhere in between that area, probably about halfway. So

not fully in the parking lot, but kind of on that threshold. I don't know if that makes sense to you. That's the best that I kind of remember.

Q. Okay. And at this point in time, Anoush Burmayan was not yet in handcuffs, true, when you saw her first?

A. Correct.

Q. So she was standing outside and yet she was not in handcuffs and she was talking with Officer Ross?

A. Correct. I believe that is accurate.

Q. And what was Officer Ross asking her? What was the conversation?

A. I don't remember.

Q. Okay. So you said that she was talking loudly?

A. Uh-huh.

Q. What -- you know, elaborate on that, because there are different definitions of "loud." Was she screaming?

A. I remember hearing her voice as I walked up to help assess what kind of a situation we were dealing with. Other than

that, I don't remember any content of any conversation that transpired or occurred.
Q. Well, but you read the police report of Officer Ross; true?
A. Yes, ma'am.
Q. Did that somehow not refresh your memory about what transpired that night in that incident?
A. No. That does very little to refresh my memory. I didn't write that report. That's written from his perspective, not mine, and our involvements in the matter were very different.
Q. So -- but you -- so I don't understand. So how are you testifying today? If none of this, you know, none of this material has refreshed your memory in any shape or form, how are you testifying?
A. I didn't say they didn't refresh my memory at all. The police report does not refresh my memory regarding my initial approach and arrival at the incident.
Q. Okay. So -- but you said -- the only thing you can tell us about her conduct at the point in time you approached her was that

she was talking loudly; is that all you can tell us?
A. Yes, ma'am.
Q. So you cannot tell us whether she was screaming?
A. No. I would say -- no, I really can't remember. I can't remember the content of what she said. If she -- if there was a specific word that she had maybe exclaimed, maybe I would remember that, but I don't remember any substantial -- substantial content of words, conversations that were had in the beginning of that incident.
Q. Okay. But if you are approaching the scene, your job is to assist the officer in responding to the call; true?
A. That's one of my jobs, yes.
Q. Right. And did you ask Officer Ross what was going on?
A. I don't remember, specifically, what I asked. But in accordance with my common practice, training and experience as a police officer, that is something that I would normally do.
Q. Okay. And do you remember if

Officer Ross told you if he needed your help?
A. No, I don't remember him asking me to do anything.
Q. What was the demeanor of Anoush Burmayan at the point in time you first observed her? What was her demeanor?
A. I remember her talking loudly and being upset, which is completely understandable when someone calls the police and accuses you of something, but that's all I remember. And that's in keeping with many calls that I responded to over the course of my time as a police officer. Oftentimes we encounter people who are just physically upset, and I would describe her as that as well.
Q. Okay. So other than visibly upset, you didn't see her walking away from Officer Ross; did you?
A. No, I don't remember.
Q. Did you see her making any physical gestures that appeared to be aggressive in any shape or form?
A. I don't remember anything like that.
Q. Do you remember seeing her combative in any shape or form?

A. No.
Q. Did she appear that she was going to -- well, stop that. Strike that.
Did you see the point in time when Officer Ross placed her in handcuffs?
A. Yes, but I don't remember much about it.
Q. Why don't you remember? You were there.
ATTORNEY ARIAS: Objection, argumentative.
THE WITNESS: Because people are often, when they are detained, placed in handcuffs. So to me, that was a very common event. There was nothing unique about that incident. There was nothing unique about her being placed in handcuffs that would allow me to recall specific facts regarding that portion of the incident.
BY ATTORNEY MKRTCHYAN:
Q. Well, do you remember when she was taken to the patrol car?
A. I don't remember specific facts, but I know she was.
Q. Well, okay. I'm trying to

understand here, you were there and yet you are telling me that you cannot remember when she was taken to the patrol car?

A. In the broad context, I remember when she was taken to the patrol car. She was taken to the patrol car after she was encountered by Officer Ross and myself initially, and then a conversation transpired between her and Officer Ross with the CVS employee or employees, plural, around. And at some point after that, minutes, she was placed into handcuffs and seated upright in the back of the patrol unit.

Q. Okay. So -- but your characterization of -- strike that.

Did she resist in any shape or form when she was placed in handcuffs?

A. I do not remember her resisting. I don't remember -- I don't really remember her being placed in handcuffs. I know she was, but that's what I'm saying and trying to explain.

There was nothing unique. I don't remember her resisting.

Q. Okay. So you don't remember anything. Let's make this clear on the record.

You don't remember anything. You don't have audio video recording from you; correct?

A. It's not that I don't remember anything. I'm sharing with you what I do remember and --

Q. Right.

A. -- I'm happy to do so.

Q. And every question I'm asking you about what transpired after you approached, and you were the assisting officer, you don't seem to remember; is that an accurate characterization?

ATTORNEY ARIAS: No question pending.

ATTORNEY MKRTCHYAN: What do you mean no question pending? There is a question pending. Are you instructing him not to answer?

ATTORNEY ARIAS: That is an argument. That's not a question.

ATTORNEY MKRTCHYAN: That's a question.

BY ATTORNEY MKRTCHYAN:

Q. Did I understand you correctly that, from the point in time you approached, you

don't remember what transpired in this incident?

A. No. I do remember. I just don't remember the specific facts you're asking me. I remember her being placed in handcuffs, but I don't remember what position she was facing. I don't remember --

Q. I did not ask you the position.

A. -- what she said.

Q. Excuse me. Here is the --

ATTORNEY ARIAS: Let the witness finish his answer, okay, because the reporter can only --

ATTORNEY MKRTCHYAN: No. Because our time is limited. Excuse me, counsel. If you're going to -- excuse me.

ATTORNEY ARIAS: You're interrupting me when I'm trying to object.

ATTORNEY MKRTCHYAN: No. You are not objecting. These are speaking objections. Excuse me. You know, I had enough of this already with you.

Do you understand the concept of objections in a deposition? You cannot do speaking objections. And you need to let me --

excuse me. You need to let me finish the question. I can guide the questioning.

Let me finish the question. You make objection. But it cannot be speaking objection because, otherwise, it is obstructing the deposition. I will seek further involvement by the Court.

ATTORNEY ARIAS: I don't know what you're talking about. I have not made one single speaking objection.

ATTORNEY MKRTCHYAN: I cannot -- right now, you are talking to me. This is not a colloquy. I am not interviewing you. Am I interviewing you?

ATTORNEY ARIAS: You should ask your next question and quit wasting time.

ATTORNEY MKRTCHYAN: Counsel, you are obstructing. Make your objections pertaining to evidence code section. Thank you very much.

What is your objection to my question now? Please state for the record.

ATTORNEY ARIAS: What's your question? There's no question pending.

ATTORNEY MKRTCHYAN: Okay.

Let me decide what is the question pending. And by the way, that is not an objection. Please reference the evidence code for objections.

Going back to my question to the witness and, again, if you continue just going into this colloquy, I will stop this deposition and I will recess and I will take another day for this deposition.

BY ATTORNEY MKRTCHYAN:

Q. I asked you, going back to my question, you seem to be having difficulties answering questions about the chronology of what happened. I have asked you if you reviewed any documents. You said, yes, I have reviewed the police report of Officer Ross.

And you testified also that that refreshed your memory about this incident; true? That's what you testified; true?

A. Yes, it refreshed my memory to some extent.

Q. Okay. And you also reviewed the patrol car video where Ms. Burmayan was placed in; true?

A. Yes, ma'am.

Q. Okay. So if that refreshed your memory, I'm asking you specific questions about her demeanor, about what was transpiring when you came. You were involved in this incident, and yet you are having difficulties of answering questions.

Do you have some amnesia? Do you have some degree of difficulty of remembering this incident or is it selective memory? I don't understand.

ATTORNEY ARIAS: Objection, argumentative.

THE WITNESS: You are absolutely right. I do have difficulty remembering very specific things in this incident. And the questions you're asking are very specific.

I remember the chronology of events, like you said. I remember walking out. I remember responding to the call. I remember approaching the Plaintiff and Officer Ross and the CVS employees. I remember shortly thereafter, at some point, she was placed in handcuffs and she was placed in the back seat of the patrol car, sitting upright.

So I do remember the chronology of the events. I believe that answers your question. You asked me if I had trouble remembering the order of things. That's the order that I recall. So --

BY ATTORNEY MKRTCHYAN:

Q. What else do you remember? Let's hear from you, what else do you remember? Aside from that point in time, what else do you remember about this incident, after reviewing the police report and reviewing the patrol car video?

A. Could you be more specific, please?

Q. Well, I'm asking you what else you remember because you are telling me -- I'm asking you very specific questions and you are not able to answer them. Okay? You told me that these are specific facts that you are remembering.

And by the way, another thing I would like to say, evading to answer questions can be sanctionable. I can ask the judge, based on this transcript, based on the testimony you have provided in some of this deposition, to sanction you because you are

evading my question. I asked you, what else do you remember aside from what you just told us.

What else do you remember about your involvement in this incident? Please tell us for the record.

ATTORNEY ARIAS: Objection, vague and ambiguous.

THE WITNESS: Where would you like me to start?

BY ATTORNEY MKRTCHYAN:

Q. From the beginning until the end. Tell us, in your own words, what else do you remember. You told us you remember her being handcuffed, placed in a patrol car. What else do you remember?

ATTORNEY ARIAS: Objection, calls for a narrative, vague and ambiguous.

THE WITNESS: Well, I'll continue, then, from the time she was placed in the back seat of the patrol car, sitting upright. She repeatedly said the words, "sir, please, sir, please," indicating she wanted to have a conversation, to which I was standing just outside of the patrol unit right there.

And at that point in time, I was

concerned about her overall well-being as well as the safety of other people in the area. And given the fact that it was 1:30 in the morning, I was concerned her loud voice and her words might wake up residents in the area or draw attention to the situation, which would not be ideal for overall safety and just community welfare.

So I proceeded to try and interact with her. I told her and asked her to try and take a deep breath and calm down for me because it was difficult to have a conversation with someone who was only repeating the same words over and over again.

At some point during our limited interaction, I did ask her what happened, and she had tried to explain to me that what CVS was telling Officer Ross and other people involving the incident was not accurate, and so she disputed that. And I heard her saying that.

I believe in active listening and I believe in taking her complaints seriously and her concerns. And I understood that she was upset. So I tried my best to address her in a

very calm and respectful tone.
I believe I referred to her as "ma'am," trying to, you know, really show her that I am there to help her. And so I just remember that going on for some time.
When she did ultimately kind of settle down a little bit and stop repeating the same words over and over, like I said, that's when we began to have a little bit more of a conversation. I rolled down the window for her so she could get a little bit more air, not feel as claustrophobic, because it seemed like that was something that was bothering her. And after that, I remember Officer Ross walking back up, opening the door and beginning to talk to her and issue the citation.
And then I remember her driving away in her own -- in her own vehicle. Where she went after that, I don't know. But I promise, I'm not trying to be evasive, that's the extent of my involvement that I really remember at this point in time.
Q. Okay. This is what you testified based on the review of the patrol vehicle recording; true?

A. Yes, ma'am. That recording helped refresh my memory.
Q. And that was not your patrol car. That was Officer Ross's patrol car; true?
A. Yes, ma'am. It was either Officer Ross' patrol car or the other officers who responded. I'm not sure whose unit that was assigned to that night.
Q. It was not yours? In any event, it was not your patrol car?
A. No, ma'am.
Q. And you don't have, as we have already covered this, we have established this, you did not have your audio on from -- on your own body, on your own equipment; true?
A. I don't know if it was on. I don't know if there was an issue with it being transmitted over, but I do understand that there is no audio from my audio recorder.
Q. Okay. So from what you heard, it was only your voice, some parts of your conversation picked up on the video/audio of the patrol car, true, of that patrol car; true?
A. Correct. The entirety of the conversation that I had with the Plaintiff

while she was seated upright in the back seat of the patrol car, the entirety of that conversation was captured by that interior camera.

Q. But your voice was not very audible, right, because it was from outside of the patrol car, her voice was most audible; true?

A. I would say it was harder to hear my voice because it wasn't as illuminated as her voice was, but I could still hear. You could follow the conversation and hear my exact words as well as the other officers who were there.

Q. So you could hear everything you said on that video?

A. Well, I would be careful to say "everything," but I could understand -- I could hear my own voice clearly when I listened to the video.

Q. Here is the interesting part. Every answer you provide is with qualifications. So either yes or no; did you or did you not hear what was said by you on that patrol vehicle; yes or no?

A. It's not a yes on no question. It's not an absolute thing. I heard what I heard

and I didn't hear what I didn't hear. But I was able to follow the conversation fluently.

Q. Sir, is there anything that you could not hear, your -- your statements on that patrol video that you can tell us? Is there anything that you could not hear?

A. No. I don't remember anything specifically. That seemed to capture the entire conversation.

Q. Okay. So if I play that patrol video recording, will you be able to tell me exactly what you are telling -- what you're talking with Anoush Burmayan?

ATTORNEY ARIAS: Objection, vague and ambiguous.

THE WITNESS: Yes, ma'am, I would be happy to watch the video with you and let you know at what points I was talking. And as long as we can hear through the computers, I would be happy to clarify or discuss anything that I may have said.

BY ATTORNEY MKRTCHYAN:

Q. Okay. We are going to do exactly that. You are going to play for the record the patrol video/audio or audio of this incident

that was produced to us and I'm going to ask you some questions about that.

So can you see the screen that I have in front of you?

A. Yes, ma'am. I see a picture that appears to show the back of the -- back seat of the patrol unit.

Q. Let me just get --

THE COURT REPORTER: I'm sorry, but I'm not hearing anything.

I'm sorry, I was not hearing anything when that video was showing. Can you hear me?

THE WITNESS: Yes, ma'am. I can hear you. I wasn't able to hear anything either.

THE COURT REPORTER: Okay. Thank you.

ATTORNEY MKRTCHYAN: I'm sorry, I got disconnected on the -- on the audio aspect of it.

BY ATTORNEY MKRTCHYAN:

Q. I didn't hear your response. I mean, maybe you didn't even hear my question.

On this patrol video, isn't it true

we can't see when Plaintiff is placed in the car?

A. I don't have the entire video, so I don't know.

Q. Well, the video that you watched, the video that you watched in the patrol vehicle, that's what I'm talking about, from that video, do you see when she is placed in the car in that video?

A. In the video that I reviewed yesterday, it began while she was seated in the car.

Q. Okay. That's the question. I don't understand why every question you're having difficulty answering, sir.

Here is the problem I have. We have time limits, and your attorney has given me a lot of hard time in scheduling this given your school schedule. We had to get the Court's interference in bringing you to this deposition.

If I'm going to have continuous problems of getting an answer, a straight answer to a single question in this deposition, I'm going to have to bring you back.

Excuse me. I didn't finish. Excuse me. So I asked you -- let me rephrase this question again if it's not clear.

From the patrol vehicle recording that you have seen, and I can play it right now, do you see her being placed in the car; yes or no? Yes or no? I mean, is there any other way to ask that question?

Why is it that difficult for you to say? You're qualifying your answer is a real Socratic method. You are using Socratic method of a law student on me. I am not your professor. You are testifying as a Defendant in a Federal Civil Rights action, and I can ask for sanctions for this kind of continuous evasion.

So, once again, I am going to play this patrol vehicle from the beginning until the end. You are going to watch it. And I am going to ask you if you ever see when Plaintiff is placed in that patrol car. Okay? Is my question clear?

A. Yes, ma'am. You asked me that question, but you hadn't shown me the video yet.

Q. But you watched the same patrol video recording; have you?

A. There could be multiple video recordings. I don't know that the one you're going to show me is an exact replica or mirror of the one that I watched yesterday. So I'm just trying to clarify my answers such that they're in keeping with what I am being shown.

Q. I asked you about the patrol vehicle. There is only one patrol vehicle recording that you watched; true?

A. Yes, ma'am.

Q. Okay. And in that patrol vehicle recording, did you ever see Plaintiff being placed in the car?

A. No, ma'am.

Q. Okay. So please watch this carefully and I'm going to ask questions about what you said and what you talked about with the Plaintiff.

A. Should I hear audio right now?

Q. There is no audio yet.

A. Okay. Thank you.

Q. Meaning you must be aware, in your training and experience, that when you turn on

the body or the patrol car video, there is a portion of time, seconds of time that it takes until audio turns on; true? You're aware of that?

A. Yes, ma'am.

Q. Okay. So why are you surprised when there is no audio when I just turned this on?

A. Because this could have been a portion of the clip. I didn't understand that this is the entire event that was recorded.

Q. Okay. So let me make -- I'm going to play this again and, you know, you're going to find out how many seconds it takes for the audio to turn on.

30 seconds within this recording, only then we can hear audio; true?

A. Yes, ma'am. If the audio starts right now, that's correct.

Q. Okay. So in this audio or this video, we have not seen, as we've established, her being placed in the car; true?

A. Correct.

Q. But she is placed in the car in handcuffs, her hands are behind her back; true?

A. Yes, ma'am.

Q. And she is wearing a face mask fully covering her face -- her nose and mouth; true?
A. I haven't seen her face mask, but if it's covering her whole face, then the video will speak for itself.
Q. Well, I'm asking you from your watching. This is the same video you watched yesterday prior to your deposition; true?
A. I wasn't focused on her face mask the last 30 seconds so I'm not sure if it was covering her face. If you want me to be as specific as possible --
Q. I'm asking, when you watched the patrol vehicle recording, did you see her covering her face with a mask; yes or no?
A. Yes, it appeared she had a face mask on.
Q. Okay. Within this 30 seconds that this audio -- we didn't -- is not turned on yet, do you see her actually -- does it appear to you that she is still talking?
A. I can't tell.
Q. You cannot tell, one way or the other, that she is talking or making movements in the car, she is in distress?

A. Well, if you would like to allow me to watch the first 30 seconds, I wasn't focused on her mouth movements or if she was talking. I was simply waiting for the audio to kick in.

Q. I asked you to watch the tape. You didn't watch the tape? I asked you to watch the tape and I'm going to ask you specific questions.

Do you want me to replay it again so that you can ask -- now answer that question now?

A. Yes, ma'am. If you would like to ask me specific questions about the first 30 seconds of this video, I would appreciate it if you could restart.

Q. Okay. So you watched 30 seconds and now this is at 37 seconds of this patrol video recording, you can hear her actually screaming, "please stop, please," and she is wearing a face mask; true?

ATTORNEY ARIAS: Objection, the video speaks for itself.

BY ATTORNEY MKRTCHYAN:

Q. True. I need you to actually answer the questions based on this video and confirm

with me what we are watching.

A. And one more time. I apologize. I'm not trying to be difficult. Can you just repeat what you want me to answer?

Q. You know, I'm going to definitely ask for another session of this deposition given this kind of behavior. This is evasive conduct I have never seen, never seen. I have deposed many officers in my career. And you are a relatively young officer, and you are a law student right now, and I have never seen anything like this.

You are evading to answer questions. This is done deliberately. I have asked you several times what you see, observe on this patrol vehicle recording that you watched in preparation of your deposition and, in fact, you are unable to answer a single question without either evading or asking me to repeat.

And this is my time. This is my time. I am allotted time to ask questions. And, you know, if you are going to continue this same conduct, I'm going to stop this session, I'm going to make sure that I am going to bring you back on a day when you are not

available in terms of your school.

Do you want to come back and disrupt your school schedule? That's fine. I have all the time in the world for doing this.

But if you are here based on a Court Order, based on agreement by party, your attorney, to produce you, please be aware that I can bring you back if you continue with this behavior.

I'm going to ask again. I'm going to give you the benefit of the doubt. I'm going to ask you again. Are you going to answer my questions today or not? Are you going to answer my questions?

ATTORNEY ARIAS: Argumentative.

THE WITNESS: Yes, ma'am, I'm happy to answer your questions.

BY ATTORNEY MKRTCHYAN:

Q. Okay. And I don't appreciate that sarcastic tone, and I don't appreciate that kind of grin on your face. Everything is being recorded, by the way.

ATTORNEY ARIAS: Objection harassing.

BY ATTORNEY MKRTCHYAN:
Q. I am asking you specifically. You are watching this video recording. Is this what you watched prior to your deposition, this patrol vehicle recording?
A. Yes, ma'am.
Q. Is the background noise that we just heard her talking to, is that your voice?
A. I have not heard but for three seconds of this, ma'am. As it plays, if this is the same video that I watched yesterday, yes, that's my voice. But during the course of this video, there are other people's voice -- other officer's voices heard as well, such as asking her how to spell her name. That's not my voice.
Q. I asked right now, I said up to this point in time that we watched. Listen carefully. Maybe you are having difficulty listening today. Listen carefully again.
Up to this point, 37 seconds that we watched on this tape, did you hear your voice?
A. Yes, I think so, but it's been a few minutes since we've now listened to this.
Q. Okay, because you're evading my

questions. You heard yourself up to this point 37 seconds. You said, "stop yelling" to her; true? Is that what you said?

A. No, I did not hear that. Could you go back and play that, please?

(Playing video.)

Q. So did you hear you say, "stop yelling"?

A. Yes, ma'am, I did.

Q. And that was your voice?

A. Yes, ma'am. It sounded like my voice.

Q. Okay. And before the audio turned on, did it appear to you that she was moving and she was still making statements in the car?

A. Yes, ma'am. She was moving and motioning towards the door.

Q. Okay. And you were standing by the door; true?

A. Yes, ma'am.

Q. And she is asking -- what is she asking on this video?

ATTORNEY ARIAS: Objection. The video speaks for itself.

THE WITNESS: So far, she has

just repeated herself in the video saying, "sir, please," something along those lines. She hasn't inversed that I have been able to hear.

BY ATTORNEY MKRTCHYAN:

Q. Was she asking you to open the door and lower her face mask so that she can breathe; she is telling you she can't breathe?

A. I would be happy to play that again if she can hear it and I will affirm that if that's what she was saying.

Q. Well, you were there. You just testified that you remember standing by the door, and Officer Ross had been gone; right? You were the one who was standing by the door; true? That was your involvement in this case, as you testified; true?

A. Yes, ma'am. I remember standing by the door. But it doesn't necessarily mean I remember verbatim everything she said.

Q. Okay. And you testified also that she was claustrophobic and that that was bothering her and she was asking for help in closed -- in this closed space in the patrol vehicle; true?

ATTORNEY ARIAS: Objection, misstates testimony.

THE WITNESS: Yes, ma'am. That's not what I said. I said it appeared she might have been a little bit claustrophobic and that might have been something that was bothering her. So I was doing my best to alleviate that, if that was, in fact, an issue. But she never vocalized that to me.

BY ATTORNEY MKRTCHYAN:

Q. I see. So from her comments here in the patrol vehicle recording, you could not surmise that she was having a hard time of breathing?

ATTORNEY ARIAS: Objection, misstates the evidence.

THE WITNESS: No. I couldn't tell that she was having a hard time breathing because she was motioning and she was talking very loud, if not yelling, and to me, that displayed to me that she was getting an adequate intake. And seated upright in the patrol car, there was no obstructions to her airway, or -- nor was she in a position that would prohibit her from being able to breathe.

So I had no reason to believe that she was having difficulty breathing.
BY ATTORNEY MKRTCHYAN:
Q. But you did testify that it seemed to you she was in distress, she was upset; true?
A. Yes, ma'am. She seemed upset, just as many people who are placed in handcuffs usually are.
Q. Okay. And the fact that you testified that it appeared to be -- to you, it appeared that she might have been claustrophobic didn't translate to you that she needs to be released from the patrol car?
ATTORNEY ARIAS: Objection to form.
THE WITNESS: No, ma'am. Her behavior was entirely consistent with numerous other people that had been placed in handcuffs and placed in the back seat of the patrol car.
BY ATTORNEY MKRTCHYAN:
Q. Let me ask you this. What is your training and experience in terms of providing medical care to detainees who need help?
ATTORNEY ARIAS: Objection,

vague and ambiguous.

THE WITNESS: Well, in my training and experience, I would always request the fire department if someone said that they needed medical attention, and I have been through a basic EMT course, as well as the POST certifications for first aid.

I don't remember if those were an annual or biannual requirement, but --

BY ATTORNEY MKRTCHYAN:

Q. Uh-huh. Okay. So -- but aside from calling the EMT and paramedics, you are trained as a police officer to be sensitive of individuals who have medical conditions; true?

A. Yes, ma'am.

Q. And you are also trained in providing medical care to -- like, first aid care, for example, CPS, any kind of first aid care to detainees under your custody; true?

A. In limited circumstances, we can provide medical attention, yes, ma'am.

Q. So if someone passes out, if someone passes out in your car, in your custody, you are obligated, you have a duty to provide medical care or first aid before paramedics

arrive; true?
A. Yes, ma'am. I would say that as civility requires, too, it would be prudent upon me to give someone care who was clearly in a position of needing medical attention.
Q. Right. And you are also trained to provide reasonable accommodations to any disabled individuals; true?
A. Yes, ma'am.
Q. If someone is disabled; true?
A. Yes, ma'am.
Q. Okay. And you are aware that, you know, if you are placing someone who -- you are trained that if someone has claustrophobia or any type of problems with being in an enclosed space, what is your training in terms of providing or transporting that individual in a patrol car?
A. Well, all I will say is that I would be happy to accommodate them as much as possible. But in this particular incident, as much as I sympathize with her discomfort, just like I do anyone who is placed in handcuffs, which is not a comfortable position to be in, I didn't know that she had a disability. She

didn't tell me. It's not apparent at all. So as much as she might have said a few times that "I'm uncomfortable," or intimated that to me, there was no immediate need for medical care.

Q. I see. So but in your training and experience, you are trained to provide accommodations to someone who is claustrophobic, seated in the patrol car and cannot breathe; true?

A. If someone cannot breathe, we are trained to provide certain medical help to them.

Q. Okay. But like what kind of medical treatment that -- are you providing to someone who can't breathe?

A. Well, if someone can't breathe, the first hurdle would be check their airway and put them in the recovery position or put them on their back and check their airway, make sure that they're -- they do have -- they are breathing, check their pulse, check their chest to make sure it's rising or falling.

But she was alert, awake. She was responsive. She was talking loudly. She was seated upright. She was moving around. All of

those indicated that she did not have an affected airway, that she was fine.

And prior to that, she had been walking around. So I saw no indications. And like I said, I do sympathize with her if she has a disability or had a disability at that time, but that was not something that I was ever aware of. She never told me this.

Q. I would like to ask you to respond, specifically, to questions posed to you.

I asked you, specifically, what kind of care you are supposed to provide to someone who has difficulty breathing, and you went on about this Plaintiff.

Please respond to the question that is posed to you. Move to strike, nonresponsive.

But now you are telling me that you actually had seen her walking around, yet you told us that you couldn't remember anything about, you know, the details of when she was handcuffed, when she was placed in the patrol car. And so how is this consistent with your testimony earlier that you couldn't remember specific details of this interaction?

ATTORNEY ARIAS: Objection, argumentative, misstates his testimony.

THE WITNESS: It's entirely consistent because when I first arrived at CVS, as I testified earlier, she was standing up talking to Officer Ross. So that implies to me that she was standing on her own two feet. And usually people with an obstructed airway or who are having difficulty breathing are unable to stand on their own feet.

BY ATTORNEY MKRTCHYAN:

Q. Okay. As an officer, have you ever received any training on people suffering from panic disorder?

A. I can't recall a specific training, although I know that we had various discussions about assisting people suffering from various disabilities and/or mental illness or in conditions that would induce trauma.

Q. So if someone is wearing a face mask, is seated in an enclosed space, and is repeatedly screaming, asking for help, she is telling you she can't breathe, and we can hear this entirety of the tape as you've heard before, that doesn't in any way indicate to

you, as a trained police officer, that the person needs help?

ATTORNEY ARIAS: Objection. It's an incomplete hypothetical. Calls for speculation.

BY ATTORNEY MKRTCHYAN:

Q. No?

A. In the instance of the Plaintiff here, I think that that leaves out some important factors, like the fact that she was seated upright and moving around. So she didn't appear to be in any distress. That was a very common demeanor for people in her position, meaning handcuffed and seated in the back seat of a patrol car, to display.

Q. So, in other words, you don't have specific training on what panic disorder entails; yes or no?

A. I don't recall any specific trainings of panic disorders, no.

Q. Okay. So if someone is seated in the upright position and is moving, to you, that translates into -- strike that.

So just because someone is moving and seated in the upright position means that

that person does not need help with breathing; is that what it means to you?
A. No. There's other factors that would need to be taken into account. For instance, in this case, she was talking very loudly, and she was alert.
So --
Q. Okay.
A. -- that in conjunction with her sitting upright and --
Q. So you never encountered people, in other words, as a police officer, neither you received training nor you have encountered people getting in panic -- anxiety attacks; true? Is that what you're telling me?
ATTORNEY ARIAS: Object to the form of the question.
THE WITNESS: I'm not in a position, as a police officer, to give a clinical diagnosis for anyone that I encountered --
BY ATTORNEY MKRTCHYAN:
Q. I'm not asking you for a clinical diagnosis, sir. You are again acting like a law student engaged in a Socratic method with

me, which I will use it against you down the road. I am going to ask for another session if I do not get satisfactory answers to my questions.

Did I ask you for a medical diagnosis? Did -- you're answering that in an argument session, no. Please answer the question.

I asked you, specifically, are you trained to recognize, as a police officer, symptoms of someone suffering from a panic disorder? Yes or no, I don't know, I don't care, I'm not going to answer, Ms. Mkrtchyan. Just I want to be very clear here, are you trained to recognize symptoms of a panic disorder; yes or no?

ATTORNEY ARIAS: Objection, vague and ambiguous, compound.

THE WITNESS: I'm trained to recognize and assist people who are in situations of distress. A panic disorder, specifically, I was never given training on, that I can remember. That specifically, no.

BY ATTORNEY MKRTCHYAN:

Q. And if someone is in distress,

recognized symptoms of distress, and if someone is asking for help, are you, as an officer, obligated to take any action in alleviating that person's distress?

ATTORNEY ARIAS: Objection. Incomplete hypothetical. Calls for speculation. Lack of foundation.

THE WITNESS: Reiterating what I said before, I would do everything I could to accommodate them and make sure they are as comfortable as possible, while also maintaining officer safety and safety of the individual themselves. So --

BY ATTORNEY MKRTCHYAN:

Q. What did you do in this case to alleviate -- let me continue playing with this and establish for the record what was the condition of the Plaintiff. Please watch it carefully about what you observe, and then I'm going to ask more questions.

(Playing video.)

Q. 1:23 seconds, 1:23 seconds. And you may understand my tone of voice. When you, as an officer, are standing there near that door and the individual here is telling you, "I

can't breathe," she is wearing a face mask, she is seated in an enclosed space, and she is telling you, "I cannot breathe," did you hear that?

ATTORNEY ARIAS: Objection. The video speaks for itself.

BY ATTORNEY MKRTCHYAN:

Q. Did you hear her say, "I can't breathe"?

A. It sounded to me like she was saying, "sir, please, please, sir." And for a portion of that clip as well, she was moving around not saying anything. So what I did is I maintained the position that I was in, standing right next to the door and monitoring her to make sure that she was okay, to make sure that she could, in fact, breathe, that she was safe.

Q. So you didn't answer my question again. I asked you specifically. I want you to make sure you are listening carefully to the question and answering only the question I asked you.

I asked you, did you hear her say, "I can't breathe"; yes or no?

A. No, right there, I did not.

Q. Okay. Let's play this again.
(Playing video.)
Q. 1:30 seconds, did you hear her say, "please, please, please, I can't breathe"?
A. No, I never heard her say, "I can't breathe." I heard her say "please" and "sir."
Q. So on this patrol video, you are refusing to -- I mean you are denying that she is audibly complaining she can't breathe?
A. It could be an issue with my computer. I know at some point in the video, she says, "I can't breathe." That's what I --
Q. Then why are you having difficulty answering my question? You heard this tape; right? When was the last time you heard this tape?
A. I heard the recording yesterday when I watched it.
Q. And isn't it true you can hear her audibly, several times while this is audio recorded, to say she can't breathe; yes or no?
A. In the clip you just played for me --
Q. I asked you not in the clip I played. Excuse me. Excuse me once again.

Please answer the question posed to you.
In the patrol video recording that you watched -- otherwise, I'm going to stop this question because this is already -- I'm getting fed up with this. This is turning out to be -- I'm asking you a question. You are not responding directly to my question. I am going to ask for sanctions for this. This is ridiculous.
ATTORNEY ARIAS: All right, counsel. We're going to ask for sanctions against you.
ATTORNEY MKRTCHYAN: Oh, really? Oh, really? Okay.
ATTORNEY ARIAS: Sanctions is a two-way street, counsel.
ATTORNEY MKRTCHYAN: Okay. I see. So I am here to depose this witness who is refusing to respond specifically to direct question.
BY ATTORNEY MKRTCHYAN:
Q. I didn't ask about the clip. No. I asked, in the patrol vehicle recording that you heard the entirety of the recording, prior to your deposition, and you said that you heard

your voice. You have acknowledged for us that you have heard your conversation with her.

Now my question is, in that tape, you have heard her several times to say, "I can't breathe"; yes or no?

ATTORNEY ARIAS: Objection. The video speaks for itself.

THE WITNESS: Yes. When I watched the video yesterday, ma'am, I heard the Plaintiff say, I believe it was twice, that "I can't breathe."

BY ATTORNEY MKRTCHYAN:

Q. And what did you do when you heard that? At the time of this incident, did you do anything to alleviate that concern?

A. Yes, ma'am. I continued to monitor her because it appeared she could breathe. And as evidenced by her conduct throughout the video, she could breathe. So taking her concerns seriously and her statements seriously, I stood right there and I continued to monitor her.

Q. Monitor in what way? What does monitoring mean to you?

A. Observe her as she took in breaths

of air and continued to speak and move around freely.

Q. Okay. So you're standing outside the patrol car; right? Right?

A. (Witness nodded head affirmatively.)

Q. Yes?

A. Yes, ma'am.

Q. Okay. Please respond audibly. You're standing outside the patrol car; true?

A. Yes, ma'am.

Q. You're not inside the car with her; true?

A. I was not inside the car with her.

Q. And the door is closed; true? The door is closed, shut; true?

A. Yes, ma'am.

Q. The window was up or down?

A. I don't recall specifically. At some points it was up. At some points -- towards the second half, it is down.

Also, while I was speaking to her, every time that you hear my voice, it's -- I'm opening the door to speak to her. So she is getting fresh air every time I open the door to do that.

Q. We don't see that on this video, true, that you're actually opening the door and talking to her; true?

ATTORNEY ARIAS: The video speaks for itself.

THE WITNESS: I believe I opened the door. But I --

BY ATTORNEY MKRTCHYAN:

Q. Okay. So --

A. Otherwise, I don't think you could hear the video.

Q. I'm asking you from this, again, you are now telling me that -- I'm not clear because you're telling me you have no independent memory of what happened on that day. Now you're saying, I believe I opened the window -- the door. And yet you don't see that on the recording that you ever opened the door.

What do I understand from your answer? Do you see yourself opening the door in this patrol vehicle while she is screaming for help?

A. It's very hard to tell from the video. I do believe the video speaks for itself. I won't dispute anything that's in the

video. I am -- I'm not trying to be difficult. I'm trying to --

Q. Excuse me, sir. I'm not asking you to dispute anything, and you are not here to be your attorney. Apparently you think that you are an attorney in this case. You are not an attorney. You are a witness deponent.

And I asked you, from your observations, I am entitled to have your observations of this patrol vehicle recording testimony on the record. I can watch this myself. That's not the issue here.

The issue is your observations of this video. From your observations of this patrol vehicle recording, do you see yourself opening the door for her?

ATTORNEY ARIAS: Objection. The video speaks for itself.

ATTORNEY MKRTCHYAN: That's not a valid objection, counsel.

THE WITNESS: I can't tell from the video. It was dark outside and that portion of the car is very dark, and I'm not sure.

BY ATTORNEY MKRTCHYAN:

Q. Okay. But meanwhile, your voice is always in the background, it's hard to hear sometimes; true? It's not like you're actually seated in the car and we can hear your voice as good as hers; true?

A. Correct. Her voice is more audible than mine is.

Q. Okay. But if the door was open, if the window was open, we would hear your voice as well as her voice; true?

A. No, not necessarily, because I would still be further away from the camera than she is.

Q. Further away from the camera. So this patrol vehicle recording, do you know even where the cameras are installed on the car?

A. I don't know where all of them are, but I know there's one in the back seat of the patrol unit and one in the front cabin of the patrol unit.

Q. Okay. So from both, you know, areas of the patrol car on this video, you know, we can tell that your voice is in the background, sometimes not audible, but hers is very audible and very loud; true?

A. Yes. I can hear her clearly.
Q. And sometimes it is -- let's continue playing this.
(Playing video.)
Q. At 1:30 seconds, we are going to continue playing this.
So from 1:37 seconds to 2:02, she is screaming, "please, sir, please, sir," in apparent distress, several times; true?
ATTORNEY ARIAS: Objection. Video speaks for itself.
BY ATTORNEY MKRTCHYAN:
Q. True?
A. She is repeating "please" and "sir" over and over, yes, ma'am.
Q. Is it appearing to you that she is in distress based on the patrol video recording as of right now, this clip?
A. No. She appears upset.
ATTORNEY ARIAS: Lack of foundation.
BY ATTORNEY MKRTCHYAN:
Q. And you don't hear, in this segment that I just played from 1:37 to 2:02, anything that you said; true?

A. Correct.
Q. So she is screaming but no one is responding at that juncture that we just played; true?
A. Correct.
Q. Okay. 2:23 seconds. So between 2:02 on this tape to 2:23, she is screaming, "please, sir, please, sir," in apparent distress. And what do you say that we can hear audibly on this tape?
ATTORNEY ARIAS: Objection. The audio speaks for itself.
BY ATTORNEY MKRTCHYAN:
Q. I want you to tell us what you observe yourself hearing.
A. I was about to ask her if she knows any words besides "sir" and "please."
Q. Okay. And why would you ask such a question of someone who is in distress screaming for help, sir?
A. Because I wanted her to calm down. And by me pointing out the obvious like that, I was showing her that she was simply repeating herself and that in order to have a conversation, that we needed her to calm down

so that we could -- we could talk. But while she continued to repeat the same words over and over, it was impossible to talk to her.

Q. Well, it doesn't sound to you sarcastic and demeaning that you're asking her, oh, do you know any other words besides "please, sir, please, sir"? That doesn't sound to you sarcastic and demeaning?

ATTORNEY ARIAS: Objection, argumentative.

THE WITNESS: No, ma'am, it doesn't.

BY ATTORNEY MKRTCHYAN:

Q. Does that sound like you are helping her, actually? Because, you testified that, you know, you are monitoring her. You are monitoring her. And as an officer, your first duty is what? Your first duty as an officer, isn't it true, is safety of inmates in your custody; true?

A. It's the preservation of life, yes, ma'am.

Q. Okay. And if this woman passed out in that patrol car from inability of breathing or heart palpitations, if she passed out in

that patrol car, would that be your liability?

ATTORNEY ARIAS: Objection, calls for a legal conclusion, assumes facts not in evidence, lack of foundation.

BY ATTORNEY MKRTCHYAN:

Q. Based on your training and experience, would that be your liability, if she passed out while you were monitoring her, as you say?

ATTORNEY ARIAS: Same objection.

THE WITNESS: I have no opinion on that.

BY ATTORNEY MKRTCHYAN:

Q. What do you mean? Are you refusing to answer, based on your training and experience, about the safety of detainees in your custody?

ATTORNEY ARIAS: Objection, argumentative, calls for a legal conclusion.

BY ATTORNEY MKRTCHYAN:

Q. Are you refusing to answer that question, sir?

A. No, ma'am. I don't have an opinion on what might happen if someone passed out in

the back seat of a patrol car that I was driving or monitoring.

Q. Well, based on your training and experience, this is what I am trying to understand, and listen carefully to the question, is it your duty to make sure that if people are taken in custody, they are safe?

A. Yes, ma'am, to do the utmost I can to ensure their safety, absolutely.

Q. Okay. And is it your duty, if someone is having a medical urgency, medical emergency, to provide first aid or assistance in some manner or shape or form?

A. Yes, ma'am.

Q. And so right now, here in this segment, we have heard her repeatedly, repeatedly asking for help, in distress, screaming, "please, sir," and you testified earlier, earlier, that you were concerned, her voice was so loud that you were more concerned about her, you know, awakening neighbors in other buildings nearby than her own safety when she is screaming for help; is that what you're telling me?

ATTORNEY ARIAS: Objection,

misstates the evidence, compound and confusing question.

BY ATTORNEY MKRTCHYAN:

Q. Is that what you're telling me?

A. No, ma'am, not at all. Her repeated yelling showed me that her airway was not obstructed and that she could, in fact, breathe and that she was getting adequate oxygen supply to stay alert and --

Q. Okay. So -- but you didn't do anything to, at this point in time as you are monitoring her, so to speak, her safety, you didn't do anything; true? Up to, we see 2:23 seconds, did you do anything to alleviate her situation; yes or no, I don't know?

A. Yes, ma'am, I did.

Q. What did you do?

A. I stood by and I monitored her airway and her ability to breathe --

Q. And how did --

A. -- to be sure that she was safe.

Q. How do you monitor someone's airway when you are standing outside the patrol car, behind a closed door, and she is wearing a face mask? How are you monitoring her airway?

A. Well, based on the fact that she was able to audibly communicate with me by yelling "sir" and "please," that indicated that her airway was not obstructed and she could, in fact, breathe.

Q. I see. So if someone, you know, in your experience -- strike that.

You are not trained, in other words, to recognize symptoms of someone who is having an anxiety attack, which is common experience in the United States of America as of 2023, especially in 2021, after Covid, people suffering from a variety of mental health illnesses, is that what you are telling me, that, as a police officer in Glendale Police Department, you are not trained to provide that kind of -- to recognize those kind of symptoms; yes or no?

ATTORNEY ARIAS: Objection, assumes facts not in evidence, lack of foundation, compound, confusing.

THE WITNESS: No, that's not what I'm saying. What I'm saying is I would have been happy to provide her with additional care had she requested it. She clearly had the

ability to communicate, but she didn't communicate with me or to me that she needed medical assistance and --

BY ATTORNEY MKRTCHYAN:

Q. How else is she going to communicate to you when she keeps saying, "I can't breathe, please, sir, can I get out," how else is she going to communicate to you that she is having a medical distress?

ATTORNEY ARIAS: Objection, argumentative, calls for speculation.

THE WITNESS: Well, she could have said, I'm having an anxiety attack, could you please call the fire department.

BY ATTORNEY MKRTCHYAN:

Q. I see. So that's -- that's -- short of saying that, and if someone is, you know, acting like this, that person -- strike that.

So short of saying that, you're not going to provide help to someone who is -- maybe she's already passing out. Maybe she can't even articulate her medical condition.

I mean, you are standing there. This woman is screaming for help in the patrol car. You did testify that you believed she

might have been claustrophobic. And yet now you're telling me that, oh, I monitored her, I monitored her. You know, she didn't say that she was having an anxiety attack. You're an officer. You're trained to recognize if someone is having an anxiety attack or passing out or having some sort of a medical illness situation.

What kind of officer are you to allow this to happen? I don't understand.

ATTORNEY ARIAS: Objection, argumentative, compound, confusing question, assumes facts not in evidence.

THE WITNESS: Is your question what kind of officer was I, because that's the only question that I heard, ma'am?

BY ATTORNEY MKRTCHYAN:

Q. No. My question was very clear that your in understanding that -- of what surfaced in this patrol car, you did everything that you were trained to do; true?

That's what your testimony is. You were trained to provide this kind of care to this woman on this day when she was experiencing this kind of a situation in the

patrol car. That's your testimony; you didn't have to do anything more?

ATTORNEY ARIAS: Objection, lack of foundation, assumes facts not in evidence, compound and confusing.

BY ATTORNEY MKRTCHYAN:

Q. Go ahead.

A. Yes, ma'am. I fulfilled my obligation to ensure her safety.

Q. Is there any reason why you couldn't -- by the way, she was seated in the patrol car while Officer Ross was talking with CVS employees investigating the call; true? Yes?

A. I believe so.

Q. Okay. So you were the only officer standing by, near the patrol vehicle as she was seated here, at this point in time that we just watched; true?

A. No, ma'am.

Q. Who else was standing by?

A. Officer Ruiz and Officer Duncan.

Q. Okay. But we don't hear them interacting with her, true, on this video; true?

A. That is incorrect. You will hear

Officer Ruiz interacting with her as well.
Q. At what point in time?
ATTORNEY ARIAS: Objection.
THE WITNESS: I can't point to a specific timestamp, but you will.
BY ATTORNEY MKRTCHYAN:
Q. But you were there interacting with her. We've established this. You were standing. You said that you were monitoring; true?
A. Yes, ma'am.
Q. Okay. But Officer Ross was not there until later, he came back to give her a citation; true?
A. Yes, ma'am.
Q. Okay. And you were the one assisting Officer Ross in this call; true?
A. I was one of two other officers assisting him, yes, ma'am.
Q. Okay. But your duty, as you testified earlier, was to ensure safety of everyone and see if I can help the primary officer handling the call; true?
A. Yes, ma'am.
Q. Okay. So when Officer Ross was

gone, it was your duty to ensure safety of the Plaintiff seated in the car; true?

A. It was my responsibility, in conjunction with the two other officers on scene, yes, ma'am.

Q. And if there were two other officers at the scene, as you're telling me, one to three officers at the scene near the patrol car with the Plaintiff, Ross was inside the store.

Was there any particular reason, Officer, that you couldn't take out the Plaintiff who was screaming for help and in apparent distress, complaining of breathing problem in the enclosed space, is there any particular reason that you couldn't just remove her physically from the patrol car and stand outside while Officer Ross was finishing her investigation? Is there any particular reason, please?

ATTORNEY ARIAS: Objection, compound, assumes facts not in evidence.

THE WITNESS: Yes, ma'am. It was safer for her to be seated in the patrol car, especially if there were concerns that she was having difficulty breathing, she would be

in a better position to breathe sitting down than she would standing up or seated on, say, the asphalt, because there is no seating areas in the parking lot where the patrol car was.

BY ATTORNEY MKRTCHYAN:

Q. But if she's telling you that she is having difficulty breathing and -- I mean, if you wear a face mask, it's common sense that you might be having difficulty breathing with a face mask, especially if you are claustrophobic sitting in a patrol car. It was apparent at some point. You recognized that she might have been that.

So did you try, at any point in time, to take her outside the car, while you were waiting for Officer Ross to finish his investigation, to remove her from the enclosed space outside and perhaps lower her face mask, open her nose, so that she can have easier time to breathe? Did you try to do that, sir?

ATTORNEY ARIAS: Objection, assumes facts not in evidence. Misstates the testimony. Compound question.

THE WITNESS: No, I did not try and have her exit the vehicle prior to

Officer Ross coming back.
BY ATTORNEY MKRTCHYAN:
Q. Okay. Is there any particular reason, aside from those you described? Aside from those that you believed it was not going to alleviate her situation of breathing, aside from that reason, is there any other reason, that you could point out right now, that you could not take her out of the enclosed space, alleviate her claustrophobia, and provide her opportunity to breathe if you lowered her face mask or opened her face?
ATTORNEY ARIAS: Objection, assumes facts not in evidence, compound.
THE WITNESS: The reason why I didn't take her out of the car is because she didn't appear to have trouble breathing.
BY ATTORNEY MKRTCHYAN:
Q. To you? When she says, "I can't breathe," to you, that doesn't sound like the person is having hard time of breathing? I don't understand, sir.
A. In her situation, no, it did not indicate that she was having a hard time breathing.

Q. So to you, she's lying? So when someone says, "I can't breathe," and she's in distress, she is screaming for help, to the point that you did recognize she might be claustrophobic, now you're telling me that you didn't find it credible? Is that what you're telling me; you didn't find it credible?

ATTORNEY ARIAS: Objection, compound, assumes facts not in evidence.

THE WITNESS: Combined with her body language and her ability to converse, it did not appear that she was having a hard time breathing. It seemed that it was something that she was saying but did not actually mean and nor did it seem like she could not breathe.

She was speaking, sitting upright, taking deep breaths of air in, and that's -- she did not seem --

BY ATTORNEY MKRTCHYAN:

Q. In other words, you did not take any steps to alleviate her condition that you observed on this patrol vehicle? Aside from just standing by the door of the patrol vehicle and telling her, "stop yelling," is there any

other word you are aware of?

ATTORNEY ARIAS: Objection, misstates the testimony.

THE WITNESS: As the video progresses, you will hear me calmly ask her to please try and take a deep breath, and you will see how her demeanor changes after my initial statement, pointing out the absurdity of her repeating the same words over and over.

BY ATTORNEY MKRTCHYAN:

Q. I see. In other words, you know, I'm asking you again. We keep going in circles. I ask you question, you don't respond directly.

I am asking you, did you do anything else -- listen carefully again. Maybe my English may not be so good, you know, because apparently Glendale Police Department is not even concerned -- anyway, strike that.

You know, I am asking you a very specific question. Did you do anything else, aside from what you testified, in alleviating her situation in the patrol car; yes or no?

ATTORNEY ARIAS: Objection, vague and ambiguous.

THE WITNESS: Yes. Later on in the video, I rolled the window down so that she could receive even more air.

BY ATTORNEY MKRTCHYAN:

Q. Okay. Can we see that on the patrol vehicle recording, that actually the window is rolled down?

A. I'm not sure.

Q. Okay. Well, let's watch that and you're going to tell me if actually, at any point in time on this video, you can actually see the window being rolled down.

But aside from that, aside from you said you're standing by the patrol car and, you know, you said that you rolled the window down, is there anything else you did to alleviate her situation?

A. I talked to her with respect and just tried to communicate with her so that she wasn't focused on the discomfort of the handcuffs or whatever else might be upsetting her.

Q. What made you believe she had discomfort in handcuffs?

A. Because everyone does. Handcuffs

aren't comfortable. I have been handcuffed numerous times and they're not particularly comfortable. It's something I have always been aware of, and I don't mean to put people deliberately in uncomfortable positions.

Q. Okay. Her handcuffs were behind her back; true?

A. Yes, ma'am.

Q. And she had to sit back, as we can see in this patrol vehicle recording. Seatbelts were on, true, while she was not even being driven yet? The seatbelt was on. She had the handcuffs behind her back. She had the face mask on. True?

A. No, ma'am, I don't believe the seatbelt is on. The way that the seatbelts are designed, they clip into the corners of the patrol unit. If the seatbelt was on, she would not be able to freely turn or move around in the back seat.

Q. But the seatbelts aren't placed in a position that -- in fact, it's -- you know, while she is seated, you can see the seatbelts, too, you know. It's interfering with her even sitting position. We can see the seat belt,

true, extended in the patrol car; true?

ATTORNEY ARIAS: Objection, misstates the testimony, the evidence.

THE WITNESS: Yes. That is -- if the seatbelts weren't like that, there would be no seatbelts in the back seat of the car. They are visible because they're attached to their mounting points.

BY ATTORNEY MKRTCHYAN:

Q. In any event, at this point in time, your testimony is that aside from standing by the patrol vehicle door and at some point rolling the window down and talking in the manner you talked to her, you did not do anything else; true?

A. No. I can't think of anything else that I would have done to make sure she was okay and as comfortable as one can be in handcuffs.

Q. Did you take her outside the patrol car while she was screaming for help; yes or no?

A. No, I did not.

Q. Did you release her from the car while she was screaming for help and make her

stand there; did you do any of those steps?
A. No, ma'am. I would just like to point out, I think it's unfair to say that she's screaming for help because at no point in the video does she, specifically, say the word "help."
Q. I see. Okay. So, you know, the video speaks for itself, as your counsel states. But it didn't appear to you that this woman was in distress?
A. No, ma'am. She appeared uncomfortable and upset.
Q. Okay. And you did not, at any point in time, summon medical care for her; true?
A. Correct. I did not.
Q. Okay. So let's continue -- again, 2:26 seconds, she explains and elaborates, again, this is the third time I can hear her say, "I can't breathe." Did you hear that? Confirm with me you heard that.
A. I did not hear that right there. It played for about a second and a half on my end.
Q. Are you having difficulty hearing this tape on your audio?
A. A little bit. It's not as clear as

it was yesterday.

Q. On speakerphone, okay.

ATTORNEY MKRTCHYAN: Is anyone else -- is the court reporter having a hard time of hearing this or is it just the witness?

THE COURT REPORTER: I cannot hear the video very well either.

ATTORNEY MKRTCHYAN: Okay. Let me see what can be done.

BY ATTORNEY MKRTCHYAN:

Q. So -- but you did watch this before, and you do hear her say several times she can't breathe, we've already established that; true?

A. Yes. I believe it's two or three times throughout the entirety of the video.

Q. That did not translate for you the fact that she was having hard time of breathing?

A. No, it did not. That's something that people detained frequently say.

Q. So you found it not credible?

A. I took her words seriously, but her statement, her interspersed statement two or three times throughout the entire video that she couldn't breathe wasn't enough, on its own,

to suggest that I needed to call for medical attention.
Q. Well, aside from calling medical attention, it did not translate for you to act on it and do something to alleviate her ability to breathe; yes or no?
A. No, that's not correct, because as I continued to stand by and monitor her, and the way that I addressed her after the fact was a very calm tone, and I would be happy to sit through and watch the rest of this video with you.
Q. Well, you're having hard time of hearing it, you know, so -- but -- okay. When you tell her that, is there any other word that you can -- you know, aside from -- aside from "please" or "sir," she explained to you; right? She responded, "sir, yes, I can't breathe"? True, she responded? True?
A. I heard her say something. I can't hear exactly what she said.
Q. Okay. Well, we have to figure this out. If you are having hard time of hearing this, can you please -- let me do this.
Off the record, please, for a

second.

THE COURT REPORTER: We're off the record.

(Discussion held off the record.)

ATTORNEY MKRTCHYAN: Now, I just want to make this very clear. You know, I don't do Zoom depositions for this reason, because there is constantly technological problems of playing tapes, audio/video. This deposition was scheduled on Zoom at your attorney's request because you are out of state.

If we cannot sort out audio/video and if you cannot help me in playing this for you efficiently and adequately so that you can respond to questions, I will have to order, get a Court Order, to have you come here, testify live. So --

ATTORNEY ARIAS: Ask him questions. If the video is not audible, and it's not clear to me what she's saying because she's kind of hysterical, that's not his fault.

ATTORNEY MKRTCHYAN: What are you talking about, counsel? First of all, if

you're not going to -- you asked this deposition to be done on Zoom. Okay. It was your request. And I have accommodated that. And now you are not cooperative in terms of, you know, video. I have played video/audio on Zoom, but there is -- you know, I believe that there is a situation here ongoing that, you know, it's not audible.

So either you have to play it for your client, because you need to cooperate with this deposition as much as I have. I have cooperated by agreeing to do this on Zoom. Now it's incumbent on you to cooperate and have your client watch this tape while he is answering questions. So why don't you do it on your end?

ATTORNEY ARIAS: Well, first of all, I'm not the one questioning the witness, No. 1. Second of all, I think the issue is that the original video just doesn't clearly capture what she's saying. I mean, she's not speaking very --

ATTORNEY MKRTCHYAN: Are you testifying? I have heard everything so that's not the issue, and he said that he actually

heard it better. The issue is on Zoom, it's not audible. So --

ATTORNEY ARIAS: Counsel --

ATTORNEY MKRTCHYAN: Okay. Well, you know what, I'm sorry, but that's not what he's telling us. He heard this audiotape and he can't hear better on the Zoom. So either you're going to help me. Here's what I'm telling you --

ATTORNEY ARIAS: -- video. We're --

ATTORNEY MKRTCHYAN: You're going to play this for your client in answering questions. There must be a way to do this in the system so that it switches the settings. If you're not going to help me cooperate in having him hear this tape and answer questions, then I am going to get an Order, have him come back to California so that we can do a live deposition.

ATTORNEY ARIAS: No. 1, good luck with that. No. 2 --

ATTORNEY MKRTCHYAN: I'll do it.

ATTORNEY ARIAS: What do you

expect me to do?

ATTORNEY MKRTCHYAN: Why don't you help us -- I'm sure you know how to do this -- to -- first of all, let him play, on your end, play the tape. Why don't you play on your computer, you have the patrol tape and we can stop and have him -- and have me ask questions, or you can tell me how to switch the audio so that the sound is better. There is a way to do this. I know it for a fact, but I just don't know how to do it right now.

ATTORNEY ARIAS: Let me just say that, first of all, I wasn't the one that played the video for him. It was Mr. Kang did that. But I'm happy -- you know, if you want me to try, I'll certainly try.

ATTORNEY MKRTCHYAN: Do you know how, in your computer, do you know how to switch -- do you know how to switch to the audio within the Zoom, because there is -- right now, what he is hearing is the external speakerphone that I have, external. But there is a way to turn, switch it to internal audio. Do you know how to do this?

ATTORNEY ARIAS: I mean, I

just go to share screen and then I just play it, and I'm happy to do that to you if that's what you want.

ATTORNEY MKRTCHYAN: Okay. Well, let's try to do that to move this along because that entire tape is just a few minutes, 18 minutes or something. Let's do this and we can have this ongoing.

ATTORNEY ARIAS: Okay. So I'm going to go to share screen. It says "host disabled participant screen-sharing."

ATTORNEY MKRTCHYAN: Oh. Okay. Well, let me do that. Let me -- okay. Now I switched that. You can actually share your screen as well.

ATTORNEY ARIAS: Can everyone see the video up here?

THE WITNESS: Yes, sir.

ATTORNEY ARIAS: Counsel, what time would you like me to go to? And I'll do that and play it.

ATTORNEY MKRTCHYAN: Okay. Well, we stopped at 2:27ish, I believe. Let me look. I believe it was about two -- two minutes. Let's just start at two minutes.

ATTORNEY ARIAS: Hang on. Now I'm going to go to two minutes and I'm going to let it play, and you tell me when you want me to stop.

(Playing video.)

ATTORNEY MKRTCHYAN: This is also not very audible. Is this audible for everyone?

(Playing video.)

ATTORNEY MKRTCHYAN: Yeah, this is not very audible for me, counsel. I can't hear it very well.

ATTORNEY ARIAS: I can hear it. I can hear the officer as well.

ATTORNEY MKRTCHYAN: Yeah, well, on your end, yes, you can hear. But on Zoom, I cannot hear. So apparently you have the same setting as I do. So this is not very good.

THE WITNESS: May I interject? This appears to be the same quality that I heard yesterday. So I think it's just an issue of sharing it over Zoom. So I can hear what I'm saying very clearly, but it's very difficult for me to hear what she is saying.

BY ATTORNEY MKRTCHYAN:
Q. Well, I have a better -- I clearly hear what she is saying on my end on my tape. So you are telling me that this quality that we just heard is the same you heard on your end?
A. Yes, ma'am.
ATTORNEY MKRTCHYAN: Okay. Well, apparently it's not the same -- it's not better quality, counsel.
BY ATTORNEY MKRTCHYAN:
Q. So let me just, you know, play on my end but -- so let's, then, if you are hearing your voice -- you said that you heard your voice?
A. Yes, ma'am.
Q. Tell us what you heard yourself state in response to her pleas?
A. Oh, gosh, I don't remember what I just said verbatim. If you play it again, I can hear it.
Q. Okay. So -- but can you -- let me -- let me try it again on my end. Tell me if you can hear what you are telling her.
A. Okay. I'm ready for it to be played.

(Playing video.)

Q. Okay. At 2:27 through 2:31, did you hear her say that she wants her mask lowered a little bit; did you hear that?

A. No, I didn't.

Q. Okay. Let's continue playing this.

(Playing video.)

Q. So did you hear what you said in this juncture, at 2:47 I stopped?

A. Yes.

Q. What did you say?

A. I believe I said, "I can't lower your mask. It needs to cover your mouth and your nose."

Q. And this was in response, though, she complained about her not breathing, true, not able to breathe?

A. No. It's been indicated to me that in the video, the clip that we've seen up until 2:47, she has said, "I can't breathe." I have not heard her say that.

Q. You didn't hear anything she said in this segment about her requesting to lower the face mask, you know, or not being able to breathe with the face mask; you didn't hear

that?

A. I didn't hear that, but that makes sense based on my response to her.

Q. Right, because that's the conversation you are having. But let me ask you this. So if she is saying, "please lower my face mask," is there any particular reason why you didn't do that?

A. Yes.

Q. Why?

A. Because we were dealing at that time with the Covid pandemic. The masks were only effective if they were covering mouth and nose. And so as police officers, we were instructed to have our masks above our mouth and our nose, covering both mouth and nose. So that was our policy or the initiative passed down to the officers was that every person that we came in contact with or anyone that was detained also was required to have a mask covering their face.

Q. Okay. But every time there is someone who is in your custody, your priority -- first of all, you have to use also common sense, right, as a police officer;

right?
A. Yes, ma'am. Just like any other profession.
Q. Right. And any policy is given to you, your first duty is to ensure the safety of the person; right?
A. Yes, ma'am. Preservation of life is --
Q. Right.
A. -- important.
Q. So, you know, if someone is having difficulty breathing with a face mask, were you not trained to accommodate that person?
A. Reasonable -- we were trained to give reasonable accommodations at any given point in time, but she did not tell me that she had any sort of disability or anything that would require a change in the policy of a full facial mask cover.
Q. But if she is telling you she needs her face mask lowered because she can't breathe, that didn't raise any concern for you?
So, for example, you know, to lower her face mask or maybe release her from the car and stand there outside, that didn't occur to

you at all?
A. No, ma'am, it didn't seem necessary at that time because she was conversing with me, and it did not appear that she truly did have an issue breathing.
Q. Okay. And officer safety concern was not an issue, right, at this point? You were two, three -- three officers nearby; true?
A. Well, officer safety is always an ongoing issue, and it's much safer to have someone detained in the back of a patrol car than anywhere else.
Q. Sir, at this point in time, what officer safety did you have? You have this female in handcuffs. She didn't -- I haven't heard any testimony from you that she was violent. I didn't hear any testimony from you that she had weapons. In fact, the call, 911 call said no weapons. Prior to her being placed in the car, she was searched. And there were three officers with you, you, Ruiz and Duncan, as you've testified; true?
A. Yes. I'm not sure exactly where everyone was at that given point in time but, yes, there were three officers, at a minimum,

in the area.
Q. Right. And at this point in time, if she was handcuffed in the patrol car, she had been searched according to the police protocol; right?
A. I was not the one who searched her. I imagine a cursory weapons pat-down was conducted.
Q. Did you see Officer Ross actually patting her down prior to placing her in the patrol car?
A. I don't remember that.
Q. But you were there; right?
A. I was, but I don't remember.
Q. Okay. But it's a standard police procedure, before placing someone in a patrol car, to pat them down for any weapons; true?
A. Yes, ma'am.
Q. And if she was actually placed in handcuffs, then she was also searched for any cell phones, you know, or any wallets or any personal belongings on her; true?
A. I can't speak to what Officer Ross may or may not have done while he conducted the weapons pat-down.

Q. I'm not asking you to speak to that. But anyway, you were there present; right? How could you have missed Officer Ross searching and patting her down?

A. Because I don't remember that part of the incident.

Q. Okay. But according to procedure, he must have done that prior to placing her in the patrol car for officer safety; right?

A. He should have done that. I'm not certain that he definitively did.

Q. Okay. Well, sir, I mean, are you saying that Officer Ross could have violated standard procedure?

A. What I'm saying is that it's very common for basic safety protocols to be overlooked and to be forgotten.

Q. And there is no reason why, if you truly believed there were any officer safety concerns that I'm not hearing, you could have taken her out, patted her down yourself to see if she had any weapons for officer safety concerns; true?

A. I could have done that, but there was no need to do that.

Q. Okay. Why was there no need to do that?

A. Because there were no extenuating circumstances that would have required, let alone suggested, that she should be removed from the car.

Q. So, in other words, you know, she is going to be -- let's continue playing this. At 2:47, I'm going to continue playing, and you're going to tell us what you hear yourself or her saying.

(Video playing.)

Q. Okay. What did you tell her at this juncture at 2:58 that you can tell us?

A. It sounded like I said, "You weren't supposed to be here."

Q. So it sounded like that you actually were aware of why she was placed in the patrol car and why she was taken under custody?

A. Yes, ma'am.

Q. So is that based on your investigation at scene or is it based on -- what information did you have that she was not supposed to be here, as you said?

A. Well, that was indicated in the

preliminary -- the CAD call log. Dispatch had entered something to the effect of she was advised last week she wasn't allowed to return. That would have been some of the first information that I had in responding to this call.

Q. Yeah, but as a police officer, you have a duty to verify 911 calls; right? We already covered that; true?

A. Yes, ma'am, due diligence of investigations.

Q. And you're not supposed to take verbatim the 911 calls. You have a duty to actually verify, corroborate 911 calls to see if they are accurate or if they are truthful; true?

A. Yes, to the best of our ability.

Q. Okay. So you didn't speak with CVS employees, as far as I understood from your testimony, true, when you arrived?

A. That's correct.

Q. You didn't speak with Officer Ross at this time when, you know, she is seated in the patrol car; true?

A. Well, that's inaccurate. I must

have had some interaction with Officer Ross when I first arrived on the scene. What the exact content of that interaction was, I don't know. But in accordance with standard procedure and my standard experience, I probably asked him what was going on and he reiterated that there was some claim of a trespassing situation so --

Q. You're saying could have happened or must have happened. I want to know if you remember actually your conversation. This is what -- this is -- you know, because I'm not asking you -- the whole time you're talking about could have happened, would have happened, standard.

No, I'm asking you, specifically, do you remember talking with Officer Ross about why she was placed in the patrol car?

A. I remember talking with Officer Ross. I don't remember the specifics of our conversation.

Q. Okay. So -- but do you know, at the point in time when you spoke to Officer Ross, if he had already spoken to CVS employees or not?

A. I don't know.
Q. You're standing here near the patrol car when he is gone, he is not there; right? He is actually doing the investigation of talking to the CVS employees; true?
A. Yes, ma'am. That's my impression.
Q. Okay. So -- but from what we understand from your comments is that "you were not supposed to be here," meaning that you had some knowledge, some information why she was being arrested already; true?
A. She wasn't under arrest, to my knowledge, at that point. She was simply detained in the back seat of the car.
But, yes, I did have some knowledge. At a minimum, that knowledge came from the information that dispatch provided me.
Q. So you didn't hear, when Ms. Burmayan was placed in the patrol car, you didn't hear the conversation between her and Officer Ross about her being under arrest?
A. The only conversation I recall hearing about Plaintiff being under arrest is towards the conclusion of this video when Officer Ross reemerges from talking to the CVS

employees and notifies her that she is being given a misdemeanor citation and notice to appear.

Q. So prior to that, your understanding was that she was only being detained, not under arrest yet; true?

A. Yes, ma'am.

Q. If she was only being detained, as you're telling me -- and detention is different from arrest; right? You made it very clear already; true?

A. Yes, ma'am.

Q. Okay. So if she was being only detained, if she was not yet under arrest, why was there any need for her to be seated in the patrol car in handcuffs?

A. Well, that's standard operating procedure for officer safety. But in addition to that, her behavior and her demeanor was extremely upset and she was talking very loud, if not yelling. So putting her in a more confined environment, like the backseat of a patrol car, would alleviate concerns of waking up residents in the area or alerting attention.

Q. Well, you testified -- I didn't hear

any testimony from you that she was aggressive; true?
A. That's correct.
Q. She didn't lunge at anyone; true?
A. That's correct. I don't remember her being combative or aggressive.
Q. And the call for service never said that the person is aggressive, assaultive or combative; true?
A. I mean, the call for service centered around a disruptive person inside CVS, so --
Q. Disruptive can be different things. Disruptive can be someone loudly speaking; true? That's noise disturbance; true?
A. Yes. I would say disruptive could be that, yes.
Q. Okay. No comments were made by the call or, you know, any one of the 911 dispatcher that this person was physically violent; true? No comments of that nature?
A. Correct. I don't recall anything like that.
Q. And no weapons were involved; true?
A. Not that I'm aware of.

Q. And when you arrived, you didn't see that kind of behavior by Ms. Anoush Burmayan; true? We have already covered that.
A. Correct.
Q. And she was also not resisting. She was complying when Officer Ross placed her in handcuffs and placed her in a patrol car; true?
A. I don't recall that portion of the incident.
Q. Well, did you see her, when you arrived, at any point in time, trying to walk away from the officers?
A. No, I don't remember that.
Q. Or escaping?
A. Not to my knowledge.
Q. Did anyone chase after her?
A. No.
Q. Did she resist being placed in handcuffs or in the patrol car?
A. Not to my knowledge.
Q. If you haven't seen that kind of behavior, you are saying officer safety, and that only because she is screaming for help, necessitated her being placed in a patrol car when she cannot breathe?

A. She wasn't screaming for help. She was simply talking very loud, which, rather than leaving her sitting criss-cross applesauce in the cold, hard asphalt of the parking lot, the better alternative would be to place her in the back seat of the car.

Q. When someone is claustrophobic, do you imagine -- and, as a police officer, you testified that you believed at some point she was claustrophobic, do you believe you could have actually removed that person out of the patrol car and stood there by your side until Ross comes back; didn't that occur to you?

A. I would like to clarify and just note that I feel like you're twisting my words with what I intended when I said "claustrophobic." I didn't believe she was claustrophobic, but her demeanor and how upset she was was consistent with somebody who just didn't want to be in a confined space anymore. And that's what the back seat of a patrol car is.

And everyone is, I say, quote/unquote, claustrophobic to that extent when they are placed in the back seat of a

patrol car. Her situation is no different than the hundreds of people that I've placed under arrest and placed in the back seat of a patrol car.

Q. I see. So, in other words, basically, you didn't take any steps to somehow, somehow provide -- alleviate the stress she was undergoing while seated in the patrol car in handcuffs, detained, while this Officer Ross is going in CVS doing his investigation? You didn't do anything else aside from what you told us; true? Did we miss anything?

A. Well, I'll repeat again that, you know, what I did was I stood by, monitored her condition, monitored her airway, as well as the various other things, such as later on in the video when I rolled down the window when she was no longer yelling so that she would have more air as -- although I'll have you know, right before we paused on the last time, my voice, as I begin talking, suddenly becomes more audible and I believe you can hear the seal of that door opening as I begin to converse with her.

So I think that -- I'm happy to point to that as kind of evidence that I did open the door to give her even more air and make it feel like a less confined environment.

Q. Let's continue playing this.

(Video playing.)

Q. Okay. 3:35 seconds, did you hear her say several times, "please, sir, please, sir, I'm begging you"? Did you hear that?

A. I heard, "please, sir, please, sir." I could not make out the rest of what she was saying.

Q. So you could not make out anything else that she said during this segment that I played?

A. No, ma'am, I couldn't not.

Q. Did you hear what you said?

A. Yes.

Q. What did you say?

A. I calmly asked her to take a deep breath so that we could have a conversation.

Q. Okay. And what made you say that, "take a deep breath"?

A. Well, as we indicated, at least once, she had said that she couldn't breathe or

that she was having a hard time breathing, and she was talking very fast, almost like she was hyperventilating, but not to that extent nearly. She just kept repeatedly talking over herself like she was so excited. And in a situation like that, I felt like it was best to just remind her to take a deep breath because I knew that her airway was unobstructed and that she could breathe. She was just being her own worst enemy at that point.

And so once I asked her to try and slow it down, take a deep breath so that we could talk, her demeanor slowly changed throughout the rest of the encounter, such that we did ultimately have conversation.

Q. Did you ever observe, as a police officer, people who have had panic disease or panic attack?

A. I apologize, I missed the first part. As a police officer, did I ever --

Q. Let me ask you this in general. Have you ever observed someone having a panic attack?

A. I think so.

Q. Okay. As a police officer, did you

receive any training about recognizing symptoms of having someone in a panic attack?

A. No, ma'am.

Q. Okay. So you are placed on patrol, and you are not trained about how to recognize symptoms of someone who is having a panic disorder; is that what your testimony is?

A. We never had specific trainings on panic disorders, specifically. What our medical training focused on was primarily combat-type medicine and rectifying serious injuries, such as impalement, as well as basic first aid courses, such as CPR, and recognizing other signs of mental illness.

So I don't know if that helps answer anything, but I never had a specific training class on panic disorders.

Q. But in your training, you said that you have seen someone having a panic attack; right? Was it in your capacity as a police officer?

A. I have seen people my whole life who react differently to different situations, and some people, you know, exhibit stress in various ways.

So my answer to your question was I think I've seen someone having a panic attack, but I have never given first aid to anyone or called the fire department for anyone who said they were having a panic attack or after the fact said they had a panic attack.

Q. I'm not saying what they said, sir. Again, you're changing the answer or you're changing the question. I didn't say what, based on what the person says.

I'm telling you, you have been trained, training, trained to recognize, yourself, based on your observations, symptoms of someone having an anxiety attack or panic attack.

A. And to reiterate my answer, I have never had a specific training on panic attacks, but I have been a part of trainings that have taught me how to alleviate people who are experiencing shock from trauma.

Q. Okay. Didn't that seem to you that this person who is repeatedly screaming, "please, sir, please, sir, I'm begging you," based on this patrol video that you have heard, didn't it seem to you she was experiencing

shock?
A. Not at all.
Q. Not at all. Okay. All right. So -- and yet you are telling her that she needs to take a deep breath, calm down; true? It's based on her demeanor that you're making such statements; right?
A. Yes. I believe the video speaks for itself. I asked her to calm down and take a deep breath so we could have a conversation, and that's ultimately what we did do.
Q. Okay. And yet she's still asking you, she is begging you, to lower her face mask because she can't breathe. She also at some point says, "Roll the window down because I can't breathe." Doesn't -- don't you hear that, her say that?
A. I cannot make out her words, no.
Q. So when you heard this patrol video recording, you also could not make out what she said at all?
A. There are times where I can hear what she is saying, but it's much harder for me to recall explicitly what she's saying when we're frequently pausing it in various portions

rather than me being able to review it.
Q. Okay. Well, here's the thing that I have to say. Do you want me to play the entirety of this point until she is taken out of her patrol car and then -- to refresh your memory? Because then you are going to say, "I forgot. You played this. I forgot. Can you ask specific segments?"
So choose, tell me which way you want to go. Do you want me to play the entirety of this tape for you to answer questions or do you want me to go segment by segment, sir?
A. I'm happy to have you continue this way, but I just --
Q. I ask you --
A. There are times where I can't hear. Let's continue the way we have been doing it.
Q. I asked you, specifically, at this segment, did you hear her asking you to roll the window because she is having hard time of breathing?
A. No, I didn't hear that.
Q. Okay. See, okay. I want to distinguish, is this because we are playing it

on Zoom or is it because the tape recording is not, you know, good quality for you on your end?

A. I have only heard this video via Zoom, and the first time I heard it was yesterday. The quality appears to be consistent across both viewings that I have seen. I believe it is simply the quality of the audio. But I'm not sure because I have not been able to watch this video in its original format, not being shared over Zoom.

Q. Oh. So you've heard it on Zoom as well?

A. Yes, ma'am.

Q. I see. So nobody sent you this video by E-mail?

A. No, ma'am.

Q. Is there any reason, if you couldn't hear the tape very well, couldn't you ask your lawyers to provide it to you by E-mail?

A. I suppose I could have. I'm not familiar with depositions. I haven't participated in many. So I have many other things going on that preoccupy my attention.

Q. Okay. So -- but you're taking this

seriously enough, right, that you are a Defendant in a Federal Civil Rights action and you are testifying under oath?

A. Yes, ma'am. I fully understand that this is a federal action and I am happy to cooperate and participate, and I'm here.

Q. It does not appear to be. But in any event, you know, let's continue playing, and tell us what you can hear on this tape.

(Video playing.)

Q. At this point, 3:47 seconds, what did you hear yourself saying?

A. "I can crack the window and roll it down if you calm down a little bit."

Q. Okay. And this was in response to what? What was she saying when you said that?

A. I can't hear her words and what she's saying in this Zoom recording.

Q. Okay. So you -- from what I hear, she is saying, "I can't breathe because the window, can you lower the window," and that's what you are responding to; right? Makes sense that that's what you're going to respond to?

A. Sure. That sounds plausible, yes.

Q. Okay. And then she is saying that,

"I didn't know that I couldn't come back," she is responding to your accusation that "You were not supposed to be here."

Did you hear that?

A. No, I --

Q. You didn't?

A. Nothing that she said was intelligible to me.

Q. Wow. So I really -- is it because -- why is -- on this tape, even though her voice is more audible than yours; true?

A. Based on the recording that I am hearing now, my voice is significantly more audible than hers is.

Q. Well, you know, you are outside of the patrol car, she is inside of the patrol car; right?

A. Yes, ma'am.

Q. And yet you are telling me that you can hear your voice but not hers?

A. I'm stating the obvious of what I can hear based on the video that's been provided.

Q. Okay. All right. Let's continue playing this. So for me, it's appearing that

you can hear only yourself but not her; is that accurate?

A. I can hear bits and pieces of what she says, but it's very difficult to make out coherent sentences.

Q. Okay.

(Video playing.)

Q. Okay. At 3:58, did you hear her say something?

A. I did. It appears she said, "Sir, nobody told me I couldn't come back here."

Q. Okay. So -- and that was in response to what? Did you say something to her that made her respond to that?

A. I have no idea because we're breaking this up in five-second increments, so it's is hard to remember, after we talk about the five-second clip, what I may have said before. I don't dispute what's in the video at all, and it flowed for me yesterday when I could watch it.

Q. Well, then I gave you an option to play this in its entirety. Do you want me to play it in its entirety instead of bits and pieces? I gave you an option.

A. At this point, yes, I think that that would be best if you would be willing to do that.
Q. Okay. So then please listen carefully so that you can remember what is being discussed. I'm not going to obviously hold you in specific verbatim of what you say or what she says, but I want to get answers to some of my questions about this conversation that is occurring on this tape between, specifically, you and her.
And I'm going to play it in its entirety. Okay?
A. Fantastic. Thank you.
Q. So I'm going to continue -- actually, not continue. I'm going to play it from the beginning when we start having audio segment of this.
(Video playing.)
BY ATTORNEY MKRTCHYAN:
Q. I wanted to play the portion where she is seated in the patrol car. I stopped the patrol video recording at 18:25 seconds when she is removed by Officer Ross from the patrol car; correct? Do you see that? You heard

that?
A. Yes, ma'am.
Q. Okay. Since this is not being transcribed by the court reporter, this video, and, of course, we took the time to play this for your benefit even though you had heard this before. You know, I had asked you, specifically, if you heard the same tape before. I played this for your benefit, took the time to do that.
But you agree with me, based on this patrol vehicle recording, at the very least, which didn't show when she was placed in the patrol car but shows when she was taken out, based on this patrol vehicle recording, she was sitting in that patrol car for at least 18 minutes?
A. Based on the timestamp of the video, yes.
Q. And we don't know when she was actually seated in that patrol car by Officer Ross because we don't see that on this tape; true?
A. Yes, ma'am.
Q. And we heard your voice on several

occasions conversing with Ms. Burmayan, Plaintiff; true?
A. Yes, ma'am.
Q. And several times, we heard you say, not verbatim, you said, you know, you can breathe better if you calm down; true? You said that?
A. Something along those lines, yes.
Q. You also said something to the lines of, you know, you were not supposed to be here; true?
A. Yes.
Q. And you were telling her that, you know, she is screaming so loudly that everyone is going to wake up around the neighborhood; true?
A. Yeah. I did explain she was talking very loud and that's why she was in the car.
Q. And we can hear her say, "help, I'm going to pass out"; did you hear that?
A. I did not hear that.
Q. So you didn't hear her say, "I need more -- I need you to please lower my mask, I am having hard time of breathing, please lower the windows," et cetera; you didn't hear her

say that?

A. I ultimately did lower the window. You can hear me at one point say, here, I'll give you some more air, something like that, and that's when I rolled down the window. And that was after she had effectively calmed down and she was willing to have a conversation, so --

Q. We don't see that on patrol video, that you actually lowered the window; true? We don't see that on the patrol video?

A. No, but you can obviously infer that from my statement that, hey, here, I'll give you some more air, and I remember doing that. And, I believe, if you listen very closely on the original recording, you might even be able to hear the sound of the window being cracked.

Q. Okay. Well, but you were standing from outside the car; true?

A. Yes, for the majority of the video.

Q. Okay. Well, how were you able to roll the window down if you're standing from outside the car?

A. Because I walked around the driver's door and rolled it down.

Q. Okay. Well, we cannot tell that. We don't see any of that in the patrol -- this recording; true?

A. You can't see that, I don't believe you can see the window going down, but it's my belief that if you listen closely, you can probably hear the motor rolling it down and that, in conjunction with my statement that, here, I'll give you some more air, just to make her feel better and not feel confined.

Q. I see. And you said earlier that, you know, you believed you opened the door. We don't see, at any point in time, you actually opening the door or you even appearing anywhere in the frame of the video recording; true?

A. I don't remember seeing the door open, although at five minutes, I think I might have cracked it. I think I might have seen my hand somewhere around that five-minute mark. It's hard because the timestamp at the bottom disappeared. But I think there might -- you might see my hand cracking the door open to talk to her.

Q. We don't see, though, you talking to her while the door is open throughout; right?

That's not happening; true?
A. Correct. No, the door wasn't constantly open because that would have defeated the purpose of putting her in the car to reduce the noise level from the area.
Q. I see. So you were more concerned about the noise level in the area in this retail establishment rather than what she was experiencing in the car and asking for help?
A. No, not at all. You have repeatedly asked me that, and I've unequivocally said no.
Q. Okay. And then you also -- she was telling you her side of the story; right?
As a police officer, you told me that your duty is to investigate calls to determine if there is, you know, a crime committed; true?
A. Yes, ma'am. That's what an investigation is.
Q. And she told you, specifically, certain comments. Could you make it out on this video what she was telling you?
A. Yeah. The gist of what she was saying was that she was never told that she wasn't supposed to be there, and I think that

everything else falls in line under that.
Q. So if she is not, you know, told -- let me, you know, ask you this. If someone is telling you that, I was never told that I am not allowed to come back to this establishment, is there any reason why you would not take that as true?
Why would you -- you know, if the person says that to you, was there anything particularly not credible about what she said to you that you discounted that?
A. I never discounted anything she said. Like we explained earlier, I didn't make the decision to arrest her or not. And Officer Ross had the opportunity and time to speak with the Plaintiff, and he did that, to my knowledge.
So there is a portion in that clip where you can hear me interacting with the Plaintiff, and I was simply having a very civil discussion with her. And we were --
Q. You're going into another tangent. I asked you specific question, a specific question. Again, you're going on and off onto other areas. Please let's make sure we are

answering the question that is posed.

I asked you, specifically, you were talking to her as the assisting officer of Officer Ross; true?

A. One of three assisting officers, yes, ma'am.

Q. Okay. And she was telling you, while Officer Ross was talking with CVS employees as you understood, she was telling you, "I was not told not to be back"; true?

A. Yes, ma'am.

Q. Okay. Based on that information, based on that information, did you believe there was probable cause to arrest her for trespass if she was not told not to come back?

A. I have no way to make that judgment because I have never spoken to the CVS employees.

Q. What do you mean? If, you know, if the person is arrested for specifically being banned from a location and returning, without permission, let's say, as what the nature of the call was, right, that she was banned from the location and she was refusing to leave; right? That was the nature of the call; right?

A. Yes, in --
Q. And you were investigating that call; yes?
A. Yes.
Q. And she is telling you -- let me stop this sharing -- and she is telling you that "I was never told not to come back." Is that significant information to you?
A. Yes, ma'am. Absolutely.
Q. Okay. When Officer Ross came back, did you relay to him what statements she provided to you about her side of the story and her -- her, you know, statements? Did you relay that to Officer Ross?
A. I didn't need to. He was sitting in the front seat of the patrol unit and she said the same thing to him.
Q. Okay. So you're saying the whole time Officer Ross was sitting in the front seat when she was talking, conversing with you?
A. No, ma'am, not the whole time, but there is a significant portion where she's alleviating and making her frustrations known to Officer Ross while he is sitting in the front seat of that car.

And there's a -- we played 18 minutes of that recording. And I would say for less than half of that, I am privy to the conversation or even there.

At one point on the radio, you hear me ask -- I'm sorry, not on the radio. You hear me ask the Plaintiff which vehicle she drove to get there. And that refreshes my memory and reminds me that I was actually walking in the parking lot trying to locate her vehicle to see where she was parked and get her license plate information.

So there is -- during that time frame, Officer Ross and Officer Ruiz are right there. And per that video, which kind of speaks for itself, she is telling Officer Ross that no one told her that she couldn't be back.

Q. Okay. In other words, when were you looking for her car? Was it after she was released from the patrol car so that she can drive away or during the time she was placed in the patrol car?

A. Well, we only reviewed the video before -- before she left, so, of course, it was during the time that she was seated in the

patrol car.
Q. Why would you go look for her patrol -- I mean her car when you don't even know whether she is being cited or released or taken to the station?
A. Because there's another officer sitting in the front seat of the car now and two more officers there, so now they are taking the responsibility of monitoring her while I can go assist on other parts of the investigation.
Q. No, but that's not my question. My question is this. Why would you even go look for her car? You said that you went and looked for her car so that she drives back home. Did I understand you right?
A. I didn't say so she drives back home. I went to look for her car.
Q. For what, impounding her car? Why would you go look for her car? I didn't understand that part.
A. No, absolutely not. I wanted to see how she arrived at the scene. And oftentimes, when an arrest is needed or detention is made, during the scope of that investigation, we'll

look for all available evidence in plain sight, including vehicles. So --

Q. I don't understand your thought process. Why would a vehicle have any bearing on a trespass investigation?

A. Well, it's what she used to get there. And oftentimes, when people are acting upset or something, it's good to get all the information you can. So one of the things that we do is identify who else is potentially involved in the incident. At that point in time, we weren't aware if she drove by herself.

There's a million different ways I could go down and explain my rationale for wanting to know which vehicle she drove. And quite honestly, I think that -- I don't have a copy of the citation, but on the citation that she received, it might have her vehicle information on it. So Officer Ross may have asked me to go get her vehicle information so that he can include it on the citation to make sure that all of her information was properly accounted for in the coming report, whatever he was going to choose to do with that.

So I don't -- those are a few of the

many reasons why, on even very routine calls, police officers would check the registration or identify the vehicle of someone that they are speaking to.

Q. Okay. But at this point in time, you know, while you were talking to her, what else can you tell us you could hear yourself say on that patrol video recording?

A. Oh, goodness. Well, the most lengthy conversation we had is when I felt like I was speaking to her on a very sincere basis. She was no longer upset. She wasn't speaking loud. And I had advised her about the opportunity to contact CVS corporate management and lodge a complaint if she felt like she was treated unfairly by the CVS employees that she dealt with during the incident. And I wanted to make sure that she felt like her frustrations were being heard and they were being addressed.

Q. Okay. Did it sound like actually, you know, her frustrations were being heard when she was released from the patrol car? Do you believe that she was calm when she was released?

A. Are you speaking about when Officer Ross took her out of the car?

Q. I'm talking about the time when she was taken out of the car in your observations of the patrol vehicle recording. Did it appear to you that either your conversation or the conversation with Officer Ross had any effect of alleviating her concerns or calming her down?

A. Yes. Throughout the time frame in which I interacted with her, she calmed down substantially. She was no longer repeating the words "please" and "sir." She was no longer asking for help. She was no longer saying, in any way, that she couldn't breathe. She was simply sitting there and listening and then we would listen and she would talk.

I believe that that might have changed a little bit when Officer Ross began speaking with her, but I can't take responsibility or accountability for what other officers, how other officers choose to interact with a potential -- anyone.

Q. Okay. Very interesting. So were you trained, in your training and experience,

that the policy for you to -- you have a duty to intercede in other officers' actions?
A. Yes, ma'am, I'm familiar with that.
Q. How are you familiar with that duty? What kind of policy or training did you receive on that?
A. It's a pretty self-explanatory value. If someone is doing something that is -- an officer is doing something that's illegal, then you have a duty to notify them and stop that behavior to prevent future harm.
Q. Okay. Illegal, you said illegal. You know, is it your understanding that -- what does that encompass, illegal, to you? What kind of behavior that you are obligated to intercede?
A. Something that violates the penal code.
Q. Okay. Is making a false arrest, to you, are you aware that that violates the penal code?
A. A false arrest, yes, ma'am, that -- that is a crime.
Q. So if you arrest someone falsely or if you fabricate facts, isn't that a violation

of the California Penal Code?

A. Fabricating facts in a police report, absolutely.

Q. Okay. So -- and if an officer conducts himself like, for example, uses excessive force, is it your understanding that you have also duty to intercede with that situation?

A. There are many factors which -- that could influence a situation like that. But if I believe that an officer was using excessive force, absolutely, I would hope that during my time as a police officer, I would intervene in that situation and --

Q. Okay. So you are aware of that. So why are you saying, then, that you have absolutely no responsibility? You just said that, in your testimony, that you have no -- absolutely no accountability, no responsibility whatsoever what Officer Ross does or does not do. You just said that. Did I understand you wrong?

A. I wasn't making a blanket statement that I have no responsibility or no ability to influence Officer Ross. What I said is that in

the way that Officer Ross spoke to the Plaintiff, whether or not that made her upset or agitated, I have no control over that.

Q. Okay. Well -- but if Officer Ross is making an arrest here based on incomplete facts, based on not getting correct facts from the suspect, the Plaintiff, and not investigating properly the 911 call, is that a lawful arrest to you?

ATTORNEY ARIAS: Objection. That's a hypothetical with incomplete facts. Calls for speculation. Lack of foundation.

THE WITNESS: As we spoke of earlier, if someone is making fake facts to put in a report, then that is absolutely unlawful.

BY ATTORNEY MKRTCHYAN:

Q. I gave you scenario, hypothetical, sir. I asked you, if the officer is making an arrest that to you is not supported by probable cause, are you obligated to say something about that or report that to supervisors?

A. I have no opinion on this hypothetical scenario. But tying it back into this case, I never spoke to the CVS employees and I didn't have all of the facts. I didn't

talk to all of the parties because I was not the primary handling officer. So it would be improper of me to assume that I know what is or isn't a lawful arrest when I, myself, don't have all the facts.
Q. Well, okay. But you were assisting Officer Ross; true?
A. Yes, ma'am. I was one of the two other officers there.
Q. Right. And as part of your duties, you were talking with the Plaintiff who is a critical witness there; right? She is a witness in this crime, so to speak; true?
A. That is correct. I was speaking to her.
Q. Okay. And you're gathering facts from her, even though she's in distress in the patrol car, while Officer Ross is not there and he's speaking with CVS employees. We've heard that; right?
A. Correct.
Q. Was it your duty -- you know, was it your duty as an officer to inform Ross that, you know, she is maintaining that she was never told not to come back? Was it your duty or

not? That's what I'm trying to know.
A. I had no duty to tell Officer Ross information that he already knew. She had already told Officer Ross -- at the conclusion of that investigation, she had told Officer Ross exactly what she had told me.
So there would be no point in me then telling Officer Ross the exact same thing he already heard from her directly.
Q. And if you see Plaintiff in the car, in the enclosed space seeking -- you know, screaming for help and complaining of lack of breathing, was it your duty as a police officer, as you understood, to alleviate that situation? Was it your duty or not as you understood?
A. There was no situation that needed alleviating.
Q. So, in other words -- you know, I want a specific answer to my question. Did you believe you took all the action in alleviating the concerns that Ms. Burmayan was having while seated in the patrol car in your custody?
A. Yes, ma'am. As I understand your question, I did everything I am obligated to do

under law to ensure her safety.

Q. So do you always take -- you said that, you know, you were also -- let me strike that.

While you were talking to her, I can hear you saying, "You should maybe complain to the CVS corporate, you should not come back to the store, you should not give them your business." We heard you say comments like that to her; true?

A. Yes.

Q. Okay. So it didn't appear that you were not taking her words as true. It appeared that you actually found them credible enough to tell her, look, if you don't like it, don't come back here and, you know, complain to the corporate department; true? You said that?

A. I was giving her potential solutions to the concerns that she had addressed.

Q. Okay. So -- but then, you did find her statement credible if you were giving that kind of advice to her?

A. I only had her side of the story, so for purposes of my involvement in that case, of course, I was inclined to believe her because

she is the only person that I spoke to.
Q. I see. So, basically, you didn't have any -- aside from what you saw Ross talking with Burmayan and getting her conversation with her ongoing, you did not, specifically, tell Ross about what you conversed with her; true?
A. I do not believe I had a conversation with Ross independent of anything else regarding the statements that she had told me, no.
Q. And when he made the decision to arrest her and place her in handcuffs, you did not question it; right? You didn't question it?
A. No, because he had all of the information. And as the handling officer, that was his decision to decide whether or not he wanted to arrest her and --
Q. Okay. But you didn't go and, in any way, you know, since you didn't -- strike that.
You didn't question, you didn't criticize, you didn't say, you know, Ross, maybe you should give her just warning and let her go, because doesn't sound like she might be

guilty; you didn't say anything of that sort?
A. No, ma'am. Not that I recall.
Q. Okay. But you could have the option, true, to just give her a warning if she truly said that, you know, first of all, I didn't even know that I can't come back, and you didn't even speak to the CVS employees, you, yourself. You had the option to tell Ross that, look, you know, it appears to me there might not be a crime here. Let's just give her a warning. Let her go her way. You didn't do that; true?
A. There would be no point in me doing that because for me to do that, I would be overstepping my authority as an assisting officer to proclaim that I think his course of action is wrong when he has compiled all the information. That would be ludicrous.
Q. Okay. So, in other words, you did not personally take any steps to corroborate the 911 call, whether, you know, this woman's statements were credible or not credible? You didn't take any steps like yourself; true?
A. Correct. I never spoke to the CVS employees.

Q. Okay. But you had the option, you could have done that; true? When you heard the Plaintiff consistently maintaining that she was just there to talk to a manager, she was never told not to come back, you heard that from the patrol video, you have the option to go back yourself, as a police officer, and talk to CVS employees and confirm if that is true; true?

A. I always have the option to do that. But the standard you suggest indicates that all police officers should always talk to all witnesses prior to one officer choosing whether or not to make an arrest, and that's an intensely laborious standard that has no practical value. It would be --

Q. In other words, you completely relied on Officer Ross as the primary unit handling this call in investigating this call; true?

A. I didn't entirely rely on anybody. I spoke to her. But it also wasn't my decision to arrest the Plaintiff.

Q. Well, then you didn't arrest her; right? You didn't -- you were not the one to cite her and make the citation; true?

A. That's correct. I did not arrest her.

Q. Okay. And so it was Officer Ross who placed her and cited her and released her, but you were there standing by and you agreed with all the actions he conducted, he took with respect to the Plaintiff; true?

A. I don't even know all of the actions he took because I wasn't standing by his side following her around the entire time. I trust that his evaluation and decision to arrest her is based on probable cause and a complete and thorough investigation.

Q. Well, sir, but you did not leave the scene until the scene was closed and the arrest was made by Officer Ross; true?

A. Correct.

Q. Okay. And based on the radio call, you left pretty much at the same time, the scene; true?

A. I don't have the CAD record in front of me, but I imagine that's what it says.

Q. Okay.

A. It sounds right. I don't have any memory pointing otherwise.

Q. Okay. So -- but, in any event, did you ever see Officer Ross produce to her any paper telling -- any paper that he got from CVS that she has been banned from that location, any type of recent documentation presented to Burmayan?

A. I don't remember.

Q. Okay. Did you ever hear any discussion about Ms. Burmayan being served with that kind of a documentation on this audio/video?

A. To the extent of the video that I have reviewed, I have not seen anything. I haven't seen that entire video. The most I have seen is the 18 minutes that we watched today, so -- but no, I don't remember any paperwork being exchanged besides the citation.

Q. Okay. In your experience, if someone is banned from a location, how is that person going to be notified of that?

A. Verbally by the officers or by the person banning them from that location.

Q. Verbally. So it's -- you know, that is your understanding, that a person is going to be placed on notice verbally not to come

back to a location; is that sufficient under the law?

A. Oftentimes. But there are other mechanisms that the Glendale Police Department used while I was there. One of them was private person's arrests as a hard copy. Another type was a document in the police reports themselves. And another way of creating that record that someone is banned from a location is putting it in the CAD incident history reports in the event that a full report was not written or completed.

Q. Well, before the police get involved -- I guess you didn't understand my question.

In this scenario, it was told to you that -- it was communicated to you that she was banned from the location, not by police, but by CVS; true?

A. Well, that's what the CAD, the call log history and the notes placed by -- the notes input by dispatch indicated that, that she was previously banned from the location.

Q. Okay. But that's what I'm asking you. How is the person supposed to be notified, noticed by a private establishment or

private business, that she is banned from a location, to your understanding as a police officer?
A. That's up to that individual business to decide for that.
Q. Well, you have -- you testified earlier that you have been dispatched to other trespass calls; true?
A. Yes, ma'am.
Q. Okay. In your experience, how does a private business notify someone, place them on notice that you are banned from this location?
A. It takes various forms, but most oftentimes, it is an E-mail or it's a printed copy. I know Macy's provides written notices for people that they have banned from their premises.
Q. CVS, you have been dispatched to the CVS pharmacies, as you testified earlier, before; true?
A. Yes, ma'am.
Q. Okay. And did you ever see any form produced by CVS, you know, notification form of someone being banned from that location?

A. I don't remember. I can't picture a form --
Q. So you don't remember Ross producing that kind of documentation on that day; true?
A. That's correct.
Q. You have not seen that attached to his police report; true?
A. Correct. If there are attachments to that report, I don't know about them.
Q. So it's basically based -- your entire investigation of Ross and you on that day, before you arrested, you know, Ms. Burmayan, which was based on he said/she said, the CVS statements, employee statements, and Ms. Burmayan's statements; true? That is, basically, on what was said to you based on he said/she said; true?
ATTORNEY ARIAS: Objection, misstates testimony.
THE WITNESS: Officer Ross is the one who made the decision to arrest Ms. Burmayan. He has all the facts and the evidence in making that decision. I have no factor in that determination. I don't have all the information or the evidence to make that

call.

BY ATTORNEY MKRTCHYAN:

Q. Yes, but, sir, you were present at the scene, you were assisting him. And as you established, you had a duty to intercede if you learn that an officer is making a false arrest; true?

ATTORNEY ARIAS: Objection, misstates the testimony. Lack of foundation.

BY ATTORNEY MKRTCHYAN:

Q. True?

A. Can you repeat that question for me one more time?

Q. You have a duty -- we already covered this -- you have a duty to intercede if an officer makes a false arrest of an individual; true?

ATTORNEY ARIAS: Same objection.

THE WITNESS: Sure. I would hope that most people would step in and question that decision if they believed another officer was making a false arrest. But at this incident, at no point in time did I feel like Officer Ross was making a false arrest.

BY ATTORNEY MKRTCHYAN:

Q. On what basis -- let me ask you this. If you didn't know what the CVS employees said, you didn't even have any interaction with them, you did not see any form produced to you that Ms. Burmayan was banned from the location, on what basis then did you believe that Officer Ross' decision to make an arrest of Ms. Burmayan was not false, was not in violation of the law?

A. Because --

ATTORNEY ARIAS: Objection, misstates testimony. Lack of foundation.

THE WITNESS: Because the basic tenets of the workplace, a police department, a shopping center, anything along those lines, is that you have to rely on some independent action by your coworkers. Otherwise, nothing will ever get done.

And so as police officers, we are all POST certified to conduct investigations and compile relevant evidence and information in making a determination whether or not to arrest somebody.

So if I were to question or examine

all of Officer Ross' evidence in making that arrest, it would defeat the purpose of that independent action.

BY ATTORNEY MKRTCHYAN:

Q. Understood. But you are also there to assist him; right? He is also relying on you and the quality of your investigation as a police officer, true, in making his arrest; true?

A. That's correct, if he asks me to participate in the investigation, sure.

Q. Okay. Are you telling me that you were there and you were not doing anything, you were just standing there? You know, you already testified that your job was to ensure safety and your job was also to respond to any request for assistance by the officer who is doing this call; true?

A. Yeah, absolutely.

Q. Okay. And so obviously, you know, Ross was also -- you're saying that you're relying on each other's work; right? Obviously as officers, you work together, you have to rely on each other's input and training and work, you work together as a collective

experience; true?
A. Yes, every officer relies on other officers.
Q. And that means that each of you -- understanding is that each of you have a certain amount of communicative duty, you have to communicate with each other about the truth of the investigation; true?
A. Not necessarily.
Q. Oh, really? So how is it, then, you're saying that -- if you are learning important information about the statements of a party and you are not telling the investigating officer, how is that competent police work to you?
A. Because he already had that information. That other party, in this case, the Plaintiff, told Officer Ross the exact same information she told me.
So it would be redundant for me to then pull Officer Ross aside and tell him what she told me because that information was already covered.
Q. Oh. But, you know, you were talking with her more, as we can see on this patrol

video recording, for more period of time than Officer Ross when he arrived, true, on this patrol video segment; true?

ATTORNEY ARIAS: Objection, assumes facts not in evidence, lack of foundation.

THE WITNESS: I actually think that, overall, Officer Ross probably talked to her significantly more than I did. But the duration, the length of the time in which I talked to Officer -- or talked to the Plaintiff has no bearing on the substantive value of the conversation that I had with her. We could have been talking about unicorns and stuffed animals. That would be not completely -- it wouldn't have been relevant at all.

BY ATTORNEY MKRTCHYAN:

Q. Excuse me. Here is the thing. It is 4:45. Time is valuable for us and, you know, you're not answering my questions.

You were not talking about -- about, with her, stuffed animals. You were talking about, specifically, what was ongoing. She was complaining. She was screaming of help. She was telling you she had difficulty breathing,

as we can hear on this patrol audio. And you were responding to her before Officer Ross returns; right? So you were talking to her, right, not about stuffed animals, as you said, but about this incident; true?

ATTORNEY ARIAS: Objection, compound question, confusing.

THE WITNESS: The portion of the incident that you just referred to had no bearing on the investigation.

BY ATTORNEY MKRTCHYAN:

Q. Why do you say that? I don't understand. When she said, "Sir, I was not aware I could not come back," how is that not having bearing for a trespass arrest, sir?

A. That does, but what you were just referring to was her complaints about being upset and "sir, please, sir." So in that context, the first portion of the conversation I had with her had absolutely no bearing on the investigation at all.

But her comments that she was never advised not to return to that CVS absolutely has bearing towards the investigation. And while she told me that, she also told Officer

Ross the exact same thing while he was sitting in the front seat of the patrol car.

So it does me no good to contribute the same information that Officer Ross already has.

Q. So, in other words, you did not share your observations with Officer Ross before he made the arrest; true? Yes or no?

A. I don't remember having a conversation about what she had told me because I heard her tell Officer Ross the same thing.

Q. And you did not tell Officer Ross that you had some doubts about the arrest of her for trespass?

A. I didn't have doubts about the arrest. I trusted his investigation.

Q. What was your understanding he was arresting her for when he was citing her?

A. Well, when he explained to her that she was no longer welcome back at the location.

Q. What crime is that, no longer be welcome at a location, what crime is that?

A. That would be a by-product of trespassing.

Q. So you believed Officer Ross was

arresting her for trespass?
A. Yes, ma'am.
Q. Okay. And we just covered -- we looked at the code section on trespass. That doesn't apply to retail establishments open to public; true?
ATTORNEY ARIAS: Objection, calls for legal conclusion.
THE WITNESS: Which code section are you referring to?
BY ATTORNEY MKRTCHYAN:
Q. The Code Section 602 that we read before. We read 602(O) didn't apply to retail establishments, such as CVS Pharmacy; true?
ATTORNEY ARIAS: Objection.
THE WITNESS: That's correct, I believe Section 602 is not open to public.
BY ATTORNEY MKRTCHYAN:
Q. Okay. So what code section do you believe Officer Ross could arrest her for? What code section was he arresting her for?
ATTORNEY ARIAS: Objection.
THE WITNESS: I don't remember the code sections, and I didn't write the citation so I don't know what code he put down

on the citation.
BY ATTORNEY MKRTCHYAN:
Q. You said trespass. You told us that you had no doubts, you had absolutely no question that Officer Ross was making a valid arrest of Ms. Burmayan; true?
A. Well, you're twisting my words because you just put like four qualifying words in front of --
Q. Well, you tell me. You said that you didn't believe -- I said -- I asked you, specifically, did you believe you had a duty to intercede if Officer Ross was making an unlawful arrest. You said, no, I had no doubt, I did not believe that he was making an unlawful arrest. You said that; true? That is your testimony?
A. That's correct, I did not believe Officer Ross was making an unlawful arrest.
Q. Okay. And what was he arresting for? You told me, testified earlier, that he was trespassing her for arrest -- I mean he was arresting her for trespass; true?
ATTORNEY ARIAS: Objection, calls for speculation, lack of foundation.

THE WITNESS: My understanding was that, yes, he was arresting her for trespassing. But he did not show me the citation that he wrote nor tell me the specific code section that he was going to use. That's something --

BY ATTORNEY MKRTCHYAN:

Q. Sir, you read his police report prior to your testimony today; true?

A. Yes, ma'am.

Q. Okay. And in that police report, did you read him state what he was arresting her for?

A. I don't remember the report, but I assume that it has why he arrested her and what the cause was. But that's not my police report so I don't remember everything about it.

Q. Okay. So did you ever -- first of all, let me ask you this. During the entirety of your conversation with Ms. Burmayan, and, you know, you -- when you told her that you were not supposed to be here and she was telling you that she didn't know, that she was not banned, she was not told, did you ever read her Miranda rights?

A. No, I never -- no, I never read Miranda rights to her.

Q. You are trained, right, before questioning witnesses or suspects and eliciting any incriminating statements by your questioning or by your statements, you are supposed to read Miranda rights about the rights to remain silent, right to counsel to be present, right not to be -- not to incriminate themselves, you are aware of that; right?

A. I am aware of what the Miranda rights are, yes, ma'am.

Q. Okay. And you didn't read those Miranda rights when you were talking to her, eliciting statements about the incident; true?

A. I never read her her Miranda rights while I was talking to her.

Q. And you were still talking to her, though, about the incident. You told her, in an accusatory tone, you told her, you were not supposed to be here; right? You did say that?

ATTORNEY ARIAS: Objection, misstates evidence and testimony.

BY ATTORNEY MKRTCHYAN:

Q. Yes?

A. I don't believe I ever used an accusatory tone with her. I --

Q. When you tell someone, you are not supposed to be here, that is telling her that you are in violation of the law; true?

A. Or just that someone didn't want you there.

Q. Okay. Well, that's -- to you, that translates into trespass; right? And that's in response to her question about, you know, I need help, you know, et cetera, why am I being placed in this car? Why am I being arrested? What is happening? Right? You are telling her that you are not supposed to be here and that's why we are placing you in the patrol car. That's -- right?

ATTORNEY ARIAS: Objection, compound question, confusing.

BY ATTORNEY MKRTCHYAN:

Q. Yes?

A. In the greater context of the investigation, absolutely, I would like to inform her because, as you indicated, part of her concern in the back seat of that car seemed to be she did not understand why she was in the

back seat. And me having arrived a little bit later to the incident than Officer Ross and not having all of the information and the benefit of speaking to everyone involved, I did my best to help her understand why she was in the back seat. And so what I told her was that she was in the back seat because she wasn't supposed to be at the location and yet she was there.

That's not me affirmatively telling her, you're not allowed to be here. It's just notifying her that that's -- why the investigation is being conducted is because it was alleged that she had trespassed and that was what CVS was complaining about.

It wasn't me telling her that she was guilty of trespassing by any means. It was simply me notifying her, hey, this is why we're here. Maybe you can help me understand more of what's going on.

Q. Okay. And she is telling you about what's going on. She might be making incriminating statements that requires you to actually read her Miranda rights by the policy; true?

A. Well, I'm only required to read her

her Miranda rights if she is in custody and being interrogated, but --

Q. When she is placed in handcuffs seated in the patrol car, to you that is not in custody?

ATTORNEY ARIAS: Objection, argumentative.

THE WITNESS: Well, all I can do is speculate because I wasn't the one who placed her in the patrol unit. But I know that it is standard practice for Glendale police officers to notify people who are detained, even if they are placed in the back seat of a patrol car, that they're not under arrest, they're just being detained.

BY ATTORNEY MKRTCHYAN:

Q. Did you ever --

A. And I'd have to defer on whether or not a Court will hold that to the in custody and under interrogation if they're subsequently questioned.

Q. Well -- and, you know, did you ever tell her, during this conversation on patrol video, that you can tell me, that you can point to me by time frame that she was only being

detained, she was not under arrest?
A. No, I don't recall ever saying that myself.
Q. Okay. So you didn't make it clear to her that she was just being detained pending further investigation of the incident call; true?
A. I never advised her of Miranda rights and I never -- I was just there to make -- watch out for her and make sure she was safe.
Q. Okay, but answer my specific question. Did you ever tell her that she is only detained, not under arrest?
A. I never heard myself say that in the video but --
Q. Okay. And she was asking you specifically, am I being arrested? Why am I being arrested? Why is it happening to me? Why am I in the patrol car? Please let's talk. Can I get out? I can't breathe.
She is specifically trying to find out what is happening to her, why she is placed in a patrol car. And you never tell her, though, right, in response to those inquiries

by her in distress, that, ma'am, you are simply being detained and you are not under an arrest; true?

ATTORNEY ARIAS: Objection, compound question, confusing.

THE WITNESS: I feel like you're asking me the same question about four times in a row now, but that's -- I never -- no, I don't think I ever told her that she was just under -- just being detained.

BY ATTORNEY MKRTCHYAN:

Q. Right. But the whole time, your conversation with her sounds like -- what we're gathering from your conversation with her is that you are confirming to her that you are actually under arrest, because, you know, we cannot lower your mask, you were telling her, you know, you cannot get out of the patrol car. You are under arrest because you are not supposed to be here, and what you are supposed to do is just go complain to the CVS. You never -- that's the understanding we are getting from your conversation with her, that she is under arrest; true?

ATTORNEY ARIAS: Objection,

compound question.
THE WITNESS: I mean, if that's your understanding, then that's your understanding. I can't speak to what your understanding of it is.
BY ATTORNEY MKRTCHYAN:
Q. That's a reasonable understanding based on what you are telling her because you did not really take her out of the patrol car, as you told us; true? You did not; true?
ATTORNEY ARIAS: Objection, argumentative, compound.
BY ATTORNEY MKRTCHYAN:
Q. True?
A. I never removed her from the patrol unit, no.
Q. She asked to lower her mask for breathing problem. You did not do that; true?
A. I did not do that to remain in compliance with Covid protocols.
Q. Okay. And the protocols have exceptions for individuals who have breathing problems; true?
A. And yet she had no obvious disability at all and she did not make that

known to me.

Q. And obvious disability to you translates what? So someone needs to have a broken leg or wheelchair to have, you know, obvious disability? How does the obvious disability -- what does obvious disability mean to you in your terminology, sir? What does obvious disability mean?

A. Well, yeah, my friend in Afghanistan who had his leg blown off by an IED, yeah, he has an obvious disability, but I couldn't give you an example absent something like that.

Q. But if someone tells you -- anyway, we went through this but, you know, throughout the period of time that we heard the tape, her screaming, she said, "help, I'm going to pass out," which you conveniently cannot hear, "I need more air, I cannot breathe," you respond to her saying, "oh, I'm going to -- if you calm down, if you take a deep breath, you will be able to breathe better, and I'm going to crack the window so that you can breathe better," that conversation makes us believe that you were aware that she was having difficulty breathing; true? Yes or no?

ATTORNEY ARIAS: Objection, argumentative.
THE WITNESS: No, not at all, because once she did those things I suggested, she recovered from whatever ailment she was experiencing and was completely calm, conversational, and no longer made any more complaints.
BY ATTORNEY MKRTCHYAN:
Q. I see. So that's your understanding and interpretation of what was going on with her in the patrol vehicle; is that your understanding?
A. Yes. Prior to me asking her to try and focus and take a deep breath, calm down and have a conversation with me, she was speaking over herself and repeating the same words. And after I asked her to take that deep breath, our interaction improved tremendously to the point that we were able to converse, as, you know, we discussed, the various things that we talked about just now.
Q. And the various things you were talking about, you were maintaining that she was actually being arrested for trespassing at

this location; in other words, that she was not supposed to be here and she -- you know, she should not come back to this location, she should not give her business to this business; true?

A. No. I never intimated that she was under arrest. I was simply talking to her about the incident. And it was not my determination to make whether or not she was under arrest. That was something under the discretion of the handling officer.

Q. Okay. So you believe that -- well, first of all, you also did not loosen her handcuffs; right? Even though she was seated there and she was complaining to release her, you did not take any steps to loosen her handcuffs while she was seated in that position in the car?

A. No, ma'am.

Q. And yet she was complaining the whole time that, you know, she is having hard time, she -- you know, "please take me out, I can't breathe," she was complaining of this discomfort and distress seated in the patrol car; true?

ATTORNEY ARIAS: Objection, misstates --

THE WITNESS: You said "the whole time." It's less than, what, about four minutes of the -- I would say maybe even one and a half minutes of that entire interaction she was complaining about various reasons for being uncomfortable. So I don't think it's fair to say that the whole time, she was complaining.

BY ATTORNEY MKRTCHYAN:

Q. Four minutes? You know, we watched this tape. She was in the patrol car for 18 minutes. We've covered this. 18 minutes she was in the patrol car in handcuffs, and we don't even see when she is placed in the patrol car. All we can see is she is already placed in the patrol car, she's screaming, she's starting to have a conversation with you, and she is placed in the patrol car in handcuffs for 18 minutes, not four minutes.

Where did you get the four minutes, sir?

ATTORNEY ARIAS: Objection.

THE WITNESS: I'm not saying

she was placed in the patrol car for 18 minutes. I'm answering your question, telling you that she was only complaining of various discomfort for, my best ballpark figure and recalling that video footage, about four minutes was she complaining.

The rest of that she was simply conversing with the officers, telling them various reasons why she wasn't notified or during interaction where she and I were talking about options to contact the corporate offices.

BY ATTORNEY MKRTCHYAN:

Q. That's your interpretation of the video; right?

A. Well, that's my interpretation based on her not asking for -- to help, saying that -- making complaints that she couldn't breathe or any other claims but for that limited amount of time at the beginning.

Q. Okay. Were you present when Officer Ross opened the door and started talking to her and citing her?

A. I don't remember. I don't have any independent memory of him citing her.

Q. Where were you? Where would you be?

A. Somewhere in that area. I might have been talking to the other assisting officers on the scene. I don't recall.
Q. Okay. So you don't remember actually having a conversation with her while standing outside the control car?
A. I don't recall that, no.
Q. Have you heard the audio recording of the conversations that happened between officers and Ms. Burmayan outside of the patrol car?
A. No, ma'am, I have not.
Q. Okay. So your attorneys have not -- haven't helped you to play that?
A. No, ma'am. The only video recorded evidence I have seen is from the back seat of the patrol car.
Q. Okay. Let's play that audiotape.
ATTORNEY MKRTCHYAN: For the benefit -- for court reporter, Ms. Karen, do you need a brief break? We have been on the record for some time. Do you need a break or no?
THE COURT REPORTER: I'm fine, thank you.

ATTORNEY MKRTCHYAN: Okay. Very good. So -- because I wanted to make sure your fingers are not suffering here.

But let's play that audiotape of the recording from, I believe, Officer Ross' tape or body-worn audio recorder.

(Playing audiotape.)

BY ATTORNEY MKRTCHYAN:

Q. Can you hear this?

A. Yes, ma'am, I can hear.

Q. Okay. Very good. So I am going to play the entirety of this, and then I want you to listen carefully and I am going to ask some questions, specifically, about you, what you hear yourself saying, and the conversation you have. Okay?

(Playing audiotape.)

BY ATTORNEY MKRTCHYAN:

Q. Did you hear that? This was the tape provided to us, the audio recording from Officer Ross' audio recorder, portable audio recorder. Did you hear that?

A. Yes, ma'am.

Q. Okay. So while this conversation that was about ten minutes, you heard your

voice there, right, interchangeably with Officer Ross?

A. Yes, ma'am, I did.

Q. So this is the first time you heard this tape ever?

A. Yes, ma'am.

Q. So, now, during that conversation, you -- and you heard Officer Ross conversing with Ms. Burmayan. She was asking questions about the citation, why she needs to be cited, why she was arrested, et cetera.

And Officer Ross is explaining to her that the reason she is being arrested was because she was not supposed to come back to this location, et cetera, and that she is banned, expressly banned from this location; true?

A. That's what I heard as well.

Q. And when she continues to ask what's going to happen, she needs some understanding what's going to happen next, you tell her, you personally tell her, you can file a complaint -- not verbatim of course, I'm paraphrasing your words -- you can file a complaint with corporate department of CVS

since you can't come back to speak with the manager; true?

A. Yeah, I advise her that just to make sure that she didn't accidentally get into another altercation with those people.

Q. She didn't have an altercation on that date. She had a verbal exchange.

A. That's what I mean. I apologize. It's been a long day.

Q. I understand it's the end of the day, but let's make it through this so that you don't have to come back. So let me adjust my microphone. Okay.

So -- and then she was asking, generally, what's going to happen in court. You, again, told her, you told her -- she added -- strike that.

She asked about why she was handcuffed, why she was taken into the patrol car. You said -- this is your words -- that "you were placed under arrest for trespass"; true? Do you remember that?

A. Yeah, I do.

Q. Okay. You were here in this testimony today, under oath, you said that, "I

don't believe she was arrested yet, she was detained." And yet you told her, in response to her question, "why was I handcuffed," you told her "because you were placed under arrest for trespass"; true?

A. That's what the video indicates, but it fails to take into account the context of it. I wasn't there for the handcuffing. I don't remember her being handcuffed. And the most recent event in my mind associated with handcuffs is the fact she was just told she was under arrest.

So I totally understand your point of view right there because it makes it look like, rather than being placed in handcuffs just to be detained, it sounds like I explicitly just told her, "You were being placed in handcuffs to be arrested." That's a mistake of -- a mistake of words.

Q. I don't know, but the thing is, you are testifying under oath, and how is that consistent? And you know very well, even as a law student now, having studied criminal law, that there is a difference between detention and arrest; true? You know the difference?

A. Yes, absolutely.
Q. Detention is what? What do you need to place someone in a detention, temporary detention?
ATTORNEY ARIAS: Objection, calls for a legal conclusion.
THE WITNESS: I would prefer we just moved past this.
BY ATTORNEY MKRTCHYAN:
Q. I'm sorry. You know, you prefer a lot of things. I prefer not to have this deposition done on Zoom. I gave you that option to have this done by Zoom.
This is not a preference, sir. I'm asking you questions, I'm entitled to answers. Unless you want to come back with another Order, I prefer not. I prefer not?
So my question is this. Legally, your training and experience, you are trained as a police officer to know the difference between detention and arrest; true?
A. Yes, that is correct. Detention requires reasonable suspicion.
Q. Okay. And you also -- you know, you are trained, imposed of Terry versus Ohio, that

detentions must be temporary, true, in scope and time; true?
A. I recall the Terry versus Ohio case.
Q. You don't?
A. I do recall the Terry versus Ohio case.
Q. Okay. And that means that detentions must be temporary in scope and time; true?
ATTORNEY ARIAS: Objection, calls for legal conclusion.
THE WITNESS: I don't remember the exact holding of that case, except --
BY ATTORNEY MKRTCHYAN:
Q. I'm not asking you about the holding. I'm asking you about, specifically, your training and experience. What is your understanding about detention versus arrest under POST or your policy, what is your understanding?
A. Reasonable suspicion. Reasonable -- detentions require reasonable suspicion. Arrests require probable cause.
Q. No, but I asked you the difference in terms of like not -- not the standards of

arresting or detaining someone. I'm asking you the difference. What is the qualitative difference between a detention and an arrest as an officer?

ATTORNEY ARIAS: Objection, calls for a narrative, vague and ambiguous.

THE WITNESS: I don't understand your question right now.

BY ATTORNEY MKRTCHYAN:

Q. If someone --

A. A qualitative difference?

Q. Yeah. Are you trained by POST, POST standards, that a detention must be brief in order just to investigate the call, must be brief, in scope and time?

Are you trained that or not?

A. I do not remember my training anymore. It's been a long time since I worked patrol.

Q. You were -- you're talking as if it's been years. You resigned from the Glendale Police Department just last year and you went to the police academy just in 2018. I've deposed officers who were, you know, in the police, at the police academy training for

25 years?
A. Yeah, they have 25 years of experience to remember things with.
Q. Well, you have made arrests within the four years as a police officer. Are you saying that you do not know the difference between the scope of intrusion on the citizen in detention versus arrest?
A. I do understand the scope. But there is a difference between detention and arrest.
Q. Do you understand that if -- you testified earlier that you believe Ms. Burmayan was detained as opposed to arrest. Do you believe placing someone in a patrol car, in an enclosed space for 20 minutes, 18 minutes, that was proper detention?
A. Yes. People are detained inside patrol units all the time.
Q. Well, so you're saying that even if she was only detained, not arrested yet, that would have been a proper detention under your training and experience, to place her in a patrol car, without making an arrest, for 18 minutes?

A. Me, personally, I would probably advise against using that as a means of detention, but it can be a lawful means of detention, yes.
Q. I don't understand your answer. So what would you advise someone to do in that situation? You said you, personally, would not advise. What --
A. No, I --
Q. Please do not interrupt me because the court reporter has to take -- what would you have done differently if -- if you did not make the arrest of Anoush Burmayan, was that proper for her to sit there for 18 minutes in handcuffs without determination of the arrest?
A. Yes.
Q. Okay. So that's your understanding. All right. And you are also trained in use of force policy; right? You have specific policy on use of force; right?
A. Yes, ma'am.
Q. Are handcuffs considered restraints on an individual?
A. I do not remember the Glendale use of force policy, but they are, in my

understanding and my experience, completely lawful to be used on anyone who is detained or placed under arrest.
Q. That's not my question. Again, you are not responding to my question. I asked you, specifically, what is your understanding of whether handcuffs are considered use of force. I mean, that's my question. You know --
A. I don't remember the policy. I don't remember the use of force standards.
Q. Okay. So -- but, generally speaking, I don't -- I'm not asking you, specifically, to remember verbatim the policy. Were you trained to use restraint in force?
A. Yes, various types of restraint.
Q. Were you trained also, when you are handcuffing someone, to consider a medical condition or any frail, vulnerable individuals?
A. Yes, absolutely.
Q. And so if you are, you know, you are -- you were the officer here who were watching, monitoring, as you said, Ms. Burmayan seated in the patrol car, and she was placed in handcuffs while you believe she was still detained, not

under arrest, and she was asking for help on several occasions, you said four minutes, five minutes, but the video speaks for itself. At the very least, you were aware that she was asking for help.

Is there any reason why you did not loosen her handcuffs if she was screaming for help?

A. Because she had the ability to articulate specific concerns that she had and she chose not to do that. If she had asked or notified me that it was, specifically, her handcuffs that were causing her discomfort, it's my standard practice and it was my standard practice to inspect the handcuffs and ensure that there was adequate room and not cutting off circulation. But she never told me that. She never told me the handcuffs were an issue.

Q. Oh, but, sir, you know, does the person have to actually verbalize every single time what is bothering them for you to get an understanding that she is suffering or if she is having distress?

A. I can't be expected to read people's

minds and know exactly what things are bothering them. So in an instance like this, she never alerted my attention to anything specifically.

Q. Well, sir, she -- the whole time she was in distress, she was crying out for help, she was telling you she cannot breathe, she was wearing a face mask. It appears she was making movements in the car, showing appearance from the patrol video that she was in discomfort; is it not true?

ATTORNEY ARIAS: Objection, misstates the evidence.

BY ATTORNEY MKRTCHYAN:

Q. Is it not true?

A. By nature of the plastic seats and handcuffs in the back seat of a patrol car, that is not a comfortable experience. So by that standard, no one is comfortable in the back seat of a patrol car.

Q. But this woman was not just sitting there quietly. She was screaming for help. And you were concerned enough that other neighbors were going to hear that, and yet under these circumstances, you did not believe

it was necessary to loosen her handcuffs or take her out of the patrol car while you still believe she was only detained. She was not under arrest, according to your testimony today.

ATTORNEY ARIAS: Object, misstates the testimony and compound.

BY ATTORNEY MKRTCHYAN:

Q. True?

A. What are you asking me to affirm?

Q. I asked you a question. Are you having difficulty answering?

A. Your question was very compound. I don't understand what your question is.

Q. Very compound. Interesting. Okay.

So your attorney is making objections, and you are taking cues from those objections, as a law student not to answer a question. Clearly that's what is happening.

A. I'm happy to answer the question if you would repeat it.

Q. It doesn't look like it. I will ask again.

My question is this. So based on the review of the patrol video recording, you

did not -- it did not appear to you that this woman was in distress and in discomforting position for you to take any action to either loosen her handcuffs or release her from the patrol car?

A. No, ma'am.

Q. And meanwhile, though, according to your testimony, you believed she was only being detained, not under arrest for any crime; true?

A. Correct. I believe she was detained.

Q. And then during this conversation, on audio that we heard, although you, you know, told her specifically that, you know, she needs to just follow up with the Court system, all her answers are going to be answered -- all her questions are going to be answered by the Court and that's it; right? That's what you told her, that basically that's what her next recourse is in this situation; true?

A. Yeah. I respectfully suggested that she go to sleep, try and wake up with a clear mind and contact an attorney because, as police officers, we're not -- we weren't allowed to give her legal advice.

Q. Okay. And though -- she was photographed at that point in time; right? She was -- though here is the interesting part. She was asked by Ross to open her mouth so that she -- he can take photographs of her during the so-called booking process on the -- near the patrol car; true?

A. I don't know. I don't remember what -- how Ross took pictures.

Q. Oh, we hear that on audio. We hear on audio -- didn't you hear that -- that he is asking her, "Please open your -- lower your mask, I'm going to take a picture of you," and she -- there is a conversation about that. You didn't hear that?

A. I heard him ask her to lower her mask. I think lowering your mask and opening your mouth are two different things. He was just trying to get an accurate depiction of her headshot such that he wouldn't have to take her to the Glendale City jail for a formal booking procedure.

Q. Well, okay, but he did ask her to lower her face mask. Have you seen the photographs taken by Ross from the day of the

incident?
A. No. As I said earlier, I have seen no photographs.
Q. Okay. Well, let's look at the photographs because, you know, you have claimed to us that, oh, we have this policy, you know, I cannot lower her face mask because that is not compliant with our policy, you know, even though she is screaming for help, she can't breathe, and yet it's okay for you guys to ask her to open her face so you can take pictures of her? Is that what -- here is the pictures that we received. Do you see the pictures?
A. I see the picture on your screen.
Q. And in this picture taken by Officer Ross, near the patrol car that we can see, her face mask is lowered, her nose and mouth are opened at this point in time, true, in this picture; yes or no?
A. Her mask is lowered, but her mouth isn't open.
Q. You don't see her -- seriously, I'm having a hard time --
A. The picture that I am seeing, her eyes are closed and her mouth is closed.

Q. What picture are you seeing? I don't understand. What picture are you seeing that I -- I see her mask lowered, her nose and mouth are open. Is that not --
A. Correct. Now her mask -- yes, her mask is underneath her chin.
Q. Okay. And her -- how is that responding to my question? We can see that her nose and mouth are visible, true, in this picture taken by Ross?
A. Yes, ma'am.
Q. But before that, it was not; right? Before that, while you were talking to her in the patrol car, she was wearing her face mask fully covering her face; true?
A. Yes, ma'am.
Q. And while she was talking with Ross again outside, before she was photographed, again, she was wearing her face mask fully covering her face; true?
A. Yes, ma'am.
Q. So the only time you allowed her to open her face mask and start breathing actually was only when you wanted to take a picture of her, the mugshot for a crime that she

questionably committed, that, you know, she yelled at someone at the CVS store, so she was banned from this location, according to you, you know, and the only time you allowed her to open her mouth and nose and start breathing is when you needed to take a picture of her; true?

ATTORNEY ARIAS: Objection, misstates the evidence, lack of foundation.

BY ATTORNEY MKRTCHYAN:

Q. True?

A. First of all, I didn't take that photo. Second of all --

Q. Excuse me. You were present when this picture was taken and we hear it on audio, and you were present there; right?

ATTORNEY ARIAS: You need to let the witness finish. You can't just cut the witness off like that.

ATTORNEY MKRTCHYAN: No, because time is valuable.

BY ATTORNEY MKRTCHYAN:

Q. You were present. We heard this audio. You were there standing while Ross is questioning her and asking her to lower her face mask, and you were there, we can hear you

talk with her; true?
A. Yes, ma'am. I was there.
Q. Then why are you saying you were not present? Here is the thing. You know, I'm getting interrupted.
I'm going to bring you back again. I'm sorry. I'm going to come back with this because if you are going to provide -- these evasive answers are not going to fly by me.
Please answer the question. Were you there or not there when we hear on audio you speaking with her while her -- she is being photographed by Ross?
A. I was there.
Q. Okay. So before she lowered her face mask to be photographed, she had her face covered by the mask; true?
A. Correct.
Q. Okay. So -- and then it's true that despite your policy of compliance with Covid-19, you were okay to have her open her face so that you took a picture of her. So that was more important than her safety and her breathing issue and her distress that she was experiencing in the claustrophobic car?

ATTORNEY ARIAS: Objection.
THE WITNESS: That's not correct.
BY ATTORNEY MKRTCHYAN:
Q. I see.
A. Her mask was required to be lowered such that an accurate photo of her could be taken at the scene. Otherwise, the alternative was to book and process her at the Glendale City jail.
Q. And then there is another voice at the end, there is a female voice, third voice we hear on this tape. Is that Nairi Gazandjian officer that says, "Now you need to, you know, cover your face and you are banned from this location and you need to go to court to sort it out"; do you remember that?
A. I don't remember that, but that sounded like Nairi's voice.
Q. Okay. You knew this officer. Okay.
So -- and then she was let go. You know, did you see her actually leave the scene?
A. I recall seeing her drive away, but other than that, I don't remember what her car looked like or anything like that. I just -- I

remember she drove away.
Q. Okay. And Officer Ross is heard -- is being heard telling her, and you also, three officers are telling her, specifically and expressly, that "you can no longer come back to this location, you are banned from this location for good, you should go to another CVS Pharmacy", true, that's what you told her?
A. I think the audio speaks for itself. I don't remember saying that. I think I said that at some point while she was seated in the back seat of the car but, I mean, I definitely advised her not to come back personally.
Q. Right. And what authority, what penal code section gave you that authority to tell someone that regardless of what her defense is, regardless of what she's got to say, whether this was a lawful trespass or not, regardless of anything else, that you simply are banned from this location; what authority did you have, Officer, to say that to this woman?
ATTORNEY ARIAS: Objection, calls for a legal conclusion.
BY ATTORNEY MKRTCHYAN:

Q. Tell me.

A. I believe that's being said on behalf of the private persons who are requesting that arrest. So that's -- rather than having the CVS employees come back out and reiterate that she was not welcome at that location, police officers do it on their behalf.

That's my understanding, if I remember correctly. I can't cite a specific penal code or authority for that.

Q. Well, so you have read the private citizen's arrest policy within your department; right? You have read that policy, earlier?

A. Earlier today, I recall looking at it, yeah.

Q. Okay. And that policy actually doesn't say that you can just go by what the private citizen or private retail establishment says or does; right? That policy puts affirmative responsibility on you, as a police officer, to determine validity of a private citizen's arrest; true?

A. If that's what the policy says, I won't dispute that.

Q. Well, we covered that this morning. Did you forget that?

A. It was about eight hours ago, so I don't recall everything specifically.

Q. Do you want us to go back to that policy? Do you want us to go back to that policy that states that, you know, your duty about making the arrest of someone in a private citizen's arrest? Do you remember -- you read this, you know, earlier this morning. Did you forget?

A. Yes, I have forgotten.

Q. Okay. So -- but you're saying that, you know, you banned her from this location and the only authority you had was that, you know, the CVS tells you. So the CVS tells you and then you just, basically, without any other, you know, responsibility, you convey that to the person and you banned her from that location.

Is that your understanding of the law and the policy?

A. I don't remember because I don't remember the substantial policy, I don't remember the substantial law, and I wasn't the

officer who made the arrest.

Q. Well, sir, I am asking you. You are sitting here as a Defendant. You participated and assisted in this arrest. And we established that you did not ever tell Officer Ross not to make her arrest, not to arrest her; true? You did not intercede. You did not, in any shape or form, tell Officer Ross, "sir, I believe you are making an unlawful arrest." You did not do that; true?

ATTORNEY ARIAS: Objection, asked and answered.

Excuse me. Madam Court Reporter, how much time do we have left in this deposition?

ATTORNEY MKRTCHYAN: Well, we have question pending. I would object that you are -- there is a question pending. Let her answer -- let him answer the question and then we'll ask the time. Thank you.

BY ATTORNEY MKRTCHYAN:

Q. So please tell me the answer to the question. I'm waiting.

A. I no longer remember your question.

Q. Oh, really? Okay. Very nice. This

is, quite frankly, very evasive.

ATTORNEY MKRTCHYAN: And, you know, counsel, you can ask for time, but if I am not satisfied with his responses and his evasive behavior today, I am going to ask for another session. But for the benefit of the court reporter and -- you know, please tell us how much time, if you can accurately, how long have we been on the record?

THE COURT REPORTER: Give me a minute to add it up.

(Discussion held off the record.)

BY ATTORNEY MKRTCHYAN:

Q. Sir, I asked you specifically, you've already testified that you never told Officer Ross that you had any doubts about this arrest of Ms. Burmayan; true?

A. I didn't have any doubts about the arrest.

Q. And you, specifically, told us that you had no -- in fact, no doubts that this was a lawful arrest by Officer Ross, even though you never spoke with CVS employees on that day; true?

A. I never said I had no doubt it was a lawful arrest. I trusted that it was a lawful arrest. I had no reason to believe otherwise.
Q. In any event, you didn't take any steps to tell Officer Ross that you disagreed with this arrest. You didn't -- you didn't tell him. You were okay with this arrest; true?
A. I supported his investigation. I believed it was conclusive and I trusted his judgment.
Q. And yet you never spoke with CVS employees; true?
A. Correct. Not to my knowledge.
Q. Okay. And when he told her that "you are being banned from this location," you also agreed with that; right? You told Ms. Burmayan, while she was even seated in the patrol car, that she could no longer come to the location and all she could do is to complain to the corporate department; true?
A. I referenced the earlier notes that were input into the CAD history saying that she was previously banned from the location. So in the context of the conversation I had with the

Plaintiff, I was notifying her that part of the reason why we were in the situation and interacting together was because it seemed that she had been banned from the store previously.

Q. Well, but you also told her that she can no longer come back; right? And Officer Ross was there; true? You all told her, "You cannot come back"; true?

A. Yeah, during the audio recording I think that speaks for itself what was said and what --

Q. I'm not asking about audio recording. I'm asking you to confirm what you heard on audio recording, sir. This is not being transcribed, the audio. You heard yourself and Officer Ross and Officer Gazandjian, all three of you telling her, "You no longer are allowed to come back on the location"; true?

ATTORNEY ARIAS: Objection. The audio speaks for itself.

THE WITNESS: Everyone said it in a different way. The way that I said it was clarifying and advising her not to come back because it didn't appear that CVS was welcome,

whether that was for a legal reason or simply in the best interest of her, because CVS and her clearly had a dispute.

BY ATTORNEY MKRTCHYAN:

Q. Officer Ross, specifically, told her, "You are expressly not allowed to come back to this location, and if you come back, you will be arrested." On patrol -- on the audiotape he says that; true?

A. If that's what Officer Ross says, yes. I wasn't focusing -- I wasn't focusing on what he said. I was more focusing on what I said.

Q. Do you believe that he had no authority to say that? Do you believe he had no authority to say that to Ms. Burmayan?

ATTORNEY ARIAS: Objection, argumentative, calls for legal conclusion.

THE WITNESS: I believe Officer Ross' explanation to Ms. Burmayan is justified and accurate.

BY ATTORNEY MKRTCHYAN:

Q. No, that's not my question, sir. Again, you are not answering my question. I will have you come back if you continue not

responding to my questions.
I asked you, do you believe Officer Ross had the legal authority to tell Ms. Burmayan that she no longer can come back to this location?
ATTORNEY ARIAS: Objection, calls for legal conclusion.
THE WITNESS: I'll repeat what I said before. I think Officer Ross was justified in what he said, so --
BY ATTORNEY MKRTCHYAN:
Q. Okay. Justified means that you believe that was lawfully appropriate; true?
A. Yeah. Based on my knowledge and common verbiage used in advising people what their best course of action is post-arrest, nothing Officer Ross said was out of the ordinary.
Q. Okay. And you never told Officer Ross that, "Sir, you are committing something unlawful by telling this woman not to come back to this location"; true?
ATTORNEY ARIAS: Objection, asked and answered.
BY ATTORNEY MKRTCHYAN:

Q. True?

A. Correct. I never told Officer Ross he was doing something unlawful.

Q. And you never believed that if what he told her -- and let's look at his police report. He wrote in his police report, that you have reviewed, that he agreed, he admitted, that "I also advised Anoush that she is no longer allowed at the CVS and if she returned again, she would be arrested for trespassing." You read that, correct, in his police report?

A. Yes, ma'am.

Q. Okay. And he said that right there on the audio that we heard; true?

A. Yes, I believe so.

Q. And you believe that, you know, as an officer, in your training and experience, that this -- that he had lawful authority to just simply ban her from this location?

ATTORNEY ARIAS: Objection, calls for a legal conclusion, lack of foundation.

BY ATTORNEY MKRTCHYAN:

Q. Yes?

A. That sentence in that report as well

as the statements made are -- were commonly made by all officers involving -- involved in trespassing incidents during my time at the City of Glendale. I have no reason to believe that anything about that statement or the authority it was being made under was unlawful.

Q. Sir, I am asking you, what specific authority would Officer Ross have, and you corroborated and you supported him fully in that decision, to ban Ms. Burmayan from CVS? What authority did he have?

ATTORNEY ARIAS: Objection, calls for a legal conclusion.

THE WITNESS: I don't know what the authority is. I don't remember.

BY ATTORNEY MKRTCHYAN:

Q. Sir, you are the one that's an officer in charge of enforcing penal code section; true?

A. That's one thing that police officers can enforce, yes.

Q. Are you saying -- are you saying that these officers, you know, are just going around and enforcing, you know, some law that does not exist?

A. That's not what I'm saying at all.

Q. Okay. Then can you point to me, you know, what authority did you or Officer Ross have, penal code section or what authority did you have to ban this woman from this location for trespassing?

ATTORNEY ARIAS: Objection, asked and answered. Calls for a legal conclusion.

THE WITNESS: I do not remember the authority.

BY ATTORNEY MKRTCHYAN:

Q. In other words, you cannot tell us right now, under oath, what legal authority you and other officers had on this day to ban Ms. Burmayan permanently and indefinitely from coming to the CVS; true?

ATTORNEY ARIAS: Objection, misstates the evidence, asked and answered.

BY ATTORNEY MKRTCHYAN:

Q. True?

A. I do not remember the specific legal authority.

Q. Okay. But do you believe that you did have that authority?

A. Yes, ma'am.
Q. Okay. Let's look at the citation that was given to Ms. Burmayan by Officer Ross. And this was the citation that was given to Ms. Burmayan while you were present at the scene and had -- Officer Ross had her sign this before she was released; true?
A. Sure. That sounds right. I wasn't the one who issued it to her.
Q. Okay. Well, you were there. You never told Officer Ross that, you know, you had any disagreement with his decision to arrest her or cite her for anything; true?
ATTORNEY ARIAS: Objection, asked and answered.
THE WITNESS: Correct.
BY ATTORNEY MKRTCHYAN:
Q. This is COG 107. And on this citation, and you know this is a citation, standard, non-traffic criminal ticket citation for misdemeanors that you issue by your department; true?
A. Yes, that looks like the standard citation.
Q. And in this citation, the Vehicle

Code violation or the penal code section violation that is listed is 602(O), trespassing; true?

A. That's what the citation says.

Q. So Ms. Burmayan, on that day, according to this citation, was cited and released for that Penal Code Section 602(O); correct?

A. I didn't cite her, arrest her or issue that citation.

Q. Based on this --

A. If you're telling me that's the one that was provided to her, then I agree.

Q. Okay. Do you believe that Officer Ross had the authority on that day, based on the facts you know right now, to -- authority to cite her for this code section?

ATTORNEY ARIAS: Objection, calls for a legal conclusion, lack of foundation.

BY ATTORNEY MKRTCHYAN:

Q. Go ahead.

A. I believe he had the authority to arrest her for trespassing based on his investigation, yes.

Q. I'm asking specifically this code, Section 602(O), trespassing, this specific section. Do you believe he had the facts to arrest her for that section?

ATTORNEY ARIAS: Same objection.

THE WITNESS: I don't recall the specific language of that section and whether or not it applies. There may be a different code section that applies to that incident more better. I don't know, more precisely.

BY ATTORNEY MKRTCHYAN:

Q. Sir, but we see the specific section code, 602(O), and you cannot tell me whether that was appropriately applied to these facts; yes or no?

A. I am seeing the citation for the first time. I did not write that citation, so I -- I don't understand what information I am supposed to provide regarding a piece of paper that I did not create or author or --

Q. Well, you know, seriously, that's not what I'm asking you. I'm asking you based on what you looked at, the citation that was

given to Ms. Burmayan, do you believe that the facts supported that citation code Section 602(O)?

ATTORNEY ARIAS: Objection, calls for a legal conclusion.

THE WITNESS: Sitting here today, I do not know whether that section, specifically, applies to the incident.

BY ATTORNEY MKRTCHYAN:

Q. Uh-huh. I see.

A. And it seems to indicate an arrest for trespassing. I don't remember what that code is.

ATTORNEY MKRTCHYAN: Okay. Let me take a brief break to review my notes and I will come back. So Ms. Court Reporter, stand by. Just take five-minute break. Thank you.

ATTORNEY ARIAS: We're not going off the record.

ATTORNEY MKRTCHYAN: What do you mean, we're not going off the record? I asked to get off the record to take a look at my notes. Excuse me.

THE COURT REPORTER: I'm

sorry, are we off the record?

ATTORNEY MKRTCHYAN: Yes.
Ms. Reporter, I asked to get off the -- this is not --

THE COURT REPORTER: I do need both attorneys to agree to go off the record or I cannot go off.

ATTORNEY ARIAS: You have ten minutes, counsel. But go ahead and review if you want.

ATTORNEY MKRTCHYAN: Okay.
You know what, you are not going to decide this. Are you going to obstruct this deposition? Are you going to not allow me to finish what I need to finish? You want me to come back? That's fine. I am not going to finish this deposition if you continue with this attitude. Okay?

So I am going to take a break. You asked to go on a break. Maybe I need to use the restroom. What kind of an idiotic situation is this?

I am taking a break, Karen, and we need to get off the record. Thank you.

And if you obstruct this deposition,

I'm going to ask for sanctions.

ATTORNEY ARIAS: I'm not agreeing to that, but take your -- I'm not agreeing to that.

THE COURT REPORTER: I'm sorry, are you agreeing to go off the record or not?

ATTORNEY ARIAS: No, I'm not.

THE COURT REPORTER: Then I have to stay on the record.

BY ATTORNEY MKRTCHYAN:

Q. So I have some -- a couple of followup questions. Are you knowledgeable in Penal Code Section 849?

A. No, I do not remember that penal code.

Q. It's the authority in the penal code to cite and release someone without taking them into custody into jail. You're aware that you are authorized to do that, right, in misdemeanor citations?

A. Yes, ma'am.

Q. Is there any reason, on this day, when it was necessary to actually handcuff and place Ms. Burmayan in a patrol car instead of

just citing her and releasing her under penal code section that I cited?

A. I can think of a variety of reasons why that discretion might be authorized or might not be. Ultimately, that's up to, in that incident, Officer Ross' discretion.

Q. Okay. So -- but can you tell us -- you were there present. Was there any particular reason that you believed, personally, that it was necessary to actually place her in that patrol car instead of citing and releasing her?

A. Well, the two aren't incompatible. She was placed in the patrol car and cited and released. So I don't --

Q. No. I'm talking about initially, initially. Instead of handcuffing her and putting her in the patrol car initially, was there any reason you didn't cite her and release her initially?

A. Well, I wasn't the first officer there and it wasn't my decision to make whether or not she would be arrested and booked at the Glendale City jail, arrested at all, or cited and released. That wasn't my decision to make.

Q. Sir, you did have the decision -- when Officer Ross was gone, you had the authority as a police officer to remove her from the patrol car, take her out of the patrol car, and even cite her and release her; true? You could have done that?

ATTORNEY ARIAS: Objection.

THE WITNESS: As a police officer --

ATTORNEY ARIAS: Asking for a legal conclusion.

THE WITNESS: As a police officer, I had the power to arrest, yes.

BY ATTORNEY MKRTCHYAN:

Q. Okay. So -- but you did not do that; right? You did not exercise the authority, that discretion within your power?

A. I did not exercise my arrest authority the night of that incident.

Q. No, my question was very different. My question was, could you have actually released her from the patrol car and just cited her, given her a ticket with a warning not to come back to this location?

A. That is what happened. She was

released from the car, issued a citation and then left.

Q. After 20 minutes seated in the patrol car, though; right? And that's all we have even just visible on the patrol video or audio video, she was placed, at the very least, for 18 minutes in the car before she was cited and released; true?

A. Yes, per the video.

Q. And the entire interaction, at least based on audio logs, based on the audio patrol, if you combine them all together, was at least 30 minutes; true?

A. At most 30 minutes, yes.

Q. Well, okay. And out of that period of time, 18 minutes that we could tell, she was still seated in the patrol car; true?

A. Yes. During the time frame in the video that we reviewed, she was seated in the patrol car.

Q. Okay. And yet you never received any counseling or training by your department that, you know, you could have handled this incident differently?

ATTORNEY ARIAS: Objection,

vague and ambiguous.
THE WITNESS: There are always different ways to handle every incident.
BY ATTORNEY MKRTCHYAN:
Q. Well, okay. Looking back at this right now, can you come up with any way you would have handled this differently from Officer Ross, or you, yourself?
ATTORNEY ARIAS: Objection, lack of foundation.
THE WITNESS: I will not. I'm not going to speculate on what could or couldn't have been done differently.
BY ATTORNEY MKRTCHYAN:
Q. Well, you know, I'm asking you, so you could have, though. You did have the authority instead of, you know, just the -- the penal code does allow you, on minor misdemeanors such as trespass -- which trespass is considered a minor misdemeanor, isn't it?
ATTORNEY ARIAS: Objection, argumentative.
THE WITNESS: I would say so.
BY ATTORNEY MKRTCHYAN:
Q. Okay. And there was no violence

committed here, no assault. She was not seen attacking someone. No weapons involved; true?

A. Not to my knowledge.

Q. Okay. And you had the authority, under penal code section that I cited, to just -- you know, you come here, CVS employees are unhappy, they tell you she is trespassing, okay, whatever, you could have, instead of placing her in the patrol car, you could have just said, look, okay, we will give you a citation, go, give her a warning and do not come back, instead of placing her in a patrol car and aggravating the situation and causing her such a panic disorder; true?

ATTORNEY ARIAS: Assumes facts not in evidence, compound. Ms. Mkrtchyan, your time is officially out, but I'm going to give you -- we're going to give you the four minutes you took for your break. Go ahead.

ATTORNEY MKRTCHYAN: Very gracious of you, counsel. I will do the same for the rest of the depositions for you. But anyway, this deposition has been a joke because we have been going through all this Zoom experience. We have been unable to play

videos. You can't, you know, do this.

Anyway, so I just -- I have only a couple of questions, followups, and, you know, I, myself, want to finish this up.

BY ATTORNEY MKRTCHYAN:

Q. So going back to -- this attorney colloquy takes the time. Can we just finish this off?

My question is this. You had the authority to, basically, cite her and release her, make that decision, instead of taking her to jail on this minor misdemeanor and placing her in the patrol car; true?

ATTORNEY ARIAS: Objection, assumes facts not in evidence, calls for a legal conclusion.

THE WITNESS: As police officers, there is a lot of discretion, authority to do different things. Ultimately, on this incident, it was Officer Ross' discretion to determine what the best course of action was because he conducted the entire investigation.

It would not have been prudent for me to exercise any type of arrest authority

without conducting the investigation and being aware of all of the facts myself.

BY ATTORNEY MKRTCHYAN:

Q. Okay. I understand that. But you were still involved and assisting Officer Ross in a substantial manner in this incident; true?

ATTORNEY ARIAS: Objection.

BY ATTORNEY MKRTCHYAN:

Q. We covered -- we covered that?

A. I don't think I assisted in a substantial manner. I didn't contribute to the report. I didn't obtain any statements that he did not obtain.

So I contributed no evidentiary value to the investigation. I was simply there to keep the peace.

Q. Okay. But meanwhile, you were still the officer present at scene and the opportunity available to you -- options available to you while she was screaming for help in the patrol car to either release her from the patrol car, wait for Officer Ross outside, or just cite her and release her; true? You had those options?

ATTORNEY ARIAS: Objection,

misstates testimony.
THE WITNESS: At no point was she screaming in the patrol car so --
BY ATTORNEY MKRTCHYAN:
Q. So at no point she was screaming in the patrol car; that's what your testimony is?
A. I don't believe she was screaming at all in the patrol car. And I had the authority, I could have let her out of the car if I wanted to, but that was not the best course of action on this incident.
Q. Okay. So you did not believe it was the best course of action to alleviate the situation she had?
ATTORNEY ARIAS: Objection, misstates his testimony.
THE WITNESS: That's not what I'm saying at all. That wasn't the best course of action to preserve the peace and maintain safety at the scene.
BY ATTORNEY MKRTCHYAN:
Q. Okay. So, in other words, as I understand, releasing her from the patrol car so that she could breathe better or loosening her handcuffs or even just lowering her face

mask, taking her out of the closed space was not the best course of action?

ATTORNEY ARIAS: Objection, misstates the testimony, the evidence.

THE WITNESS: That's not what I'm saying at all.

BY ATTORNEY MKRTCHYAN:

Q. Then what are you saying?

ATTORNEY ARIAS: Objection.

BY ATTORNEY MKRTCHYAN:

Q. I asked a specific question. Could you have released her from the patrol car while she was screaming that she could not breathe? Could you, yes or no?

ATTORNEY ARIAS: Objection, assumes facts not in evidence, misstates testimony.

THE WITNESS: Well, she was never screaming that she couldn't breathe. At any given point in time, any officer on scene could have opened the door and escorted her outside of the vehicle if that was deemed proper.

BY ATTORNEY MKRTCHYAN:

Q. I'm asking you.

ATTORNEY ARIAS: Objection --

BY ATTORNEY MKRTCHYAN:

Q. I'm asking you. You were standing there and you were -- you were the one who was standing there. Why are you putting it on other officers?

ATTORNEY ARIAS: Sorry. Your time is up. It's been seven hours and four minutes. The deposition is concluded.

ATTORNEY MKRTCHYAN: Well, counsel, you know, you are going to do this and I will then ask for another session. I have only followup questions. You are not letting me finish. We had a lot of time in trying to accommodate -- I'm finishing up with this line of questioning.

ATTORNEY ARIAS: How much do you have?

ATTORNEY MKRTCHYAN: I have one or two questions I am finishing up. This is ridiculous.

ATTORNEY ARIAS: No, it is time. I'm sorry.

ATTORNEY MKRTCHYAN: Yeah, okay. Well, you know then we will not -- you

know, we will finish this deposition now because I don't appreciate this. Well, you know, at this point, I don't believe this is fair because we had multiple times where the witness could not hear the Zoom. I had to play -- take time, I had to take time to determine audio/video. This is not fair to us. So I will have to bring you back because I didn't finish this line of questioning.

ATTORNEY ARIAS: Go ahead and ask one more question.

ATTORNEY MKRTCHYAN: This is funny. It's like, you know, we are not playing games, counsel, here.

ATTORNEY ARIAS: I've been cooperative with you. I'm trying to, you know --

ATTORNEY MKRTCHYAN: You need to work in this -- I did not want this to be done on Zoom. You wanted this, and that affected my ability to do an efficient deposition. I could have finished this deposition in person at 4:00 p.m.

Anyway, I would like to finish this by -- I want to make sure that we are done with

this so that we don't have to bring him back.

ATTORNEY ARIAS: If you have one or two questions, go ahead and ask them.

ATTORNEY MKRTCHYAN: Well, okay, but if he keeps evasive -- providing evasive questions, you know --

BY ATTORNEY MKRTCHYAN:

Q. So, okay. Well, let me ask you just this question that -- while you were -- you know, you spoke to -- I didn't understand your last answer. I want to maybe paraphrase the question. I didn't understand.

You said it is not the best course of action for you to have done something to, you know, take her out of the patrol car or loosen her handcuffs while she was screaming in the car.

Is that what your testimony is? Do you want to stand by that or do you want to change it somehow? I'm just not clear on this.

A. Well, what I said immediately after that was that that would not have been in the best interest of preserving the peace at the scene and it wouldn't have been in the best interest of safety on scene.

Q. Okay. I see. So the preserving of the peace -- those are the two only issues. You're preserving of the peace and what was the other one?

A. Safety of people.

Q. Safety of who?

A. Everyone.

Q. Officers?

A. All people involved in the incident.

Q. Okay. But she was in handcuffs; right? She was in handcuffs in the car?

A. Yes, ma'am.

ATTORNEY ARIAS: That's it. You've asked -- I gave you three additional questions. Time is up.

ATTORNEY MKRTCHYAN: Well, anyway, so, you know, we are going to -- I am going to determine if we are going to ask for another session, but for these purposes, for this deposition for tonight, we will adjourn. I am going to offer the following stipulation.

Well, first of all, you are going to be reviewing the transcript with your attorney for any corrections or amendments. I would like to provide 30 days' time for you to do

that, sir.

And following stipulation is offered, that if, for any reason, the signed copy under oath of this witness' review of the transcript is misplaced, lost or stolen or, you know, cannot be found, the unsigned certified copy of this transcript will be acceptable for all purposes in this litigation.

Is that a stipulation you will enter, counsel?

ATTORNEY ARIAS: Yes, I will stipulate to that.

ATTORNEY MKRTCHYAN: Okay. So then we are adjourned for today's purposes. Right now, it is 6:11 p.m. So court reporter is going to send the transcript of the proceeding, the original transcript to the defense counsel for review and certification of it or with any amendments. Okay?

ATTORNEY ARIAS: Madam Reporter, may I please order a rough copy of the transcript?

THE COURT REPORTER: Yes.

ATTORNEY ARIAS: Do you have my E-mail?

THE COURT REPORTER: Please give it to me.

ATTORNEY ARIAS: Sure. It's carias@glendaleca.gov.

THE COURT REPORTER: And Attorney Brown, would you like a copy of the transcript?

ATTORNEY BROWN: Yes, please.

THE COURT REPORTER: And would you like the rough draft also?

ATTORNEY BROWN: No, we don't need the rough draft.

(At 6:13 p.m. PST, the deposition was concluded. Signature was not waived.)

C E R T I F I C A T E

\- - -

I, OFFICER GRIFFIN ARMENDARIZ, do hereby certify that I have read the foregoing transcript and it is a true and correct copy of my deposition, except for the changes, if any, made by me on the attached Deposition Correction Sheet.

__________________________

__________________________
Date

ERRATA SHEET

| PAGE | LINE | REASON FOR CHANGE/CORRECTION |
|---|---|---|
| ______ | ______ | ______________________________ |
| ______ | ______ | ______________________________ |
| ______ | ______ | ______________________________ |
| ______ | ______ | ______________________________ |
| ______ | ______ | ______________________________ |
| ______ | ______ | ______________________________ |
| ______ | ______ | ______________________________ |
| ______ | ______ | ______________________________ |
| ______ | ______ | ______________________________ |
| ______ | ______ | ______________________________ |
| ______ | ______ | ______________________________ |
| ______ | ______ | ______________________________ |
| ______ | ______ | ______________________________ |
| ______ | ______ | ______________________________ |
| ______ | ______ | ______________________________ |
| ______ | ______ | ______________________________ |
| ______ | ______ | ______________________________ |
| ______ | ______ | ______________________________ |
| ______ | ______ | ______________________________ |
| ______ | ______ | ______________________________ |
| ______ | ______ | ______________________________ |
| ______ | ______ | ______________________________ |

COMMONWEALTH OF PENNSYLVANIA )
) SS
COUNTY OF ALLEGHENY )

CERTIFICATE

I, Karen A. Nickel, a notary public in and for the Commonwealth of Pennsylvania, do hereby certify that the witness, OFFICER GRIFFIN ARMENDARIZ, was by me first duly sworn to testify the truth, the whole truth, and nothing but the truth; that the foregoing deposition was taken at the time and place stated herein; and that the said deposition was recorded stenographically by me and then reduced to typewriting under my direction, and constitutes a true record of the testimony given by said witness.

I further certify that I am not a relative, employee or attorney of any of the parties, or a relative or employee of either counsel, and that I am in no way interested directly or indirectly in this action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office this 24th day of October 2023.

/S/Karen A. Nickel
Notary Public
Certified Realtime Reporter

My Commission Expires:
March 19, 2024
Commission No. 1120579

**0**

**0** 60:12
**01:28** 100:18

**1**

**1** 112:9 224:19 225:21
**107** 338:18
**11:36** 89:19
**12** 98:8
**12-hour** 98:6
**12:55** 150:11
**134** 103:17
**18** 227:7 256:16 264:1 279:15 303:13,14,21 304:1 313:16,24 314:14 346:7,16
**18:25** 255:23
**1:23** 192:22
**1:26:36** 110:2
**1:27:46** 115:20
**1:28:13** 104:9
**1:28:24** 120:8
**1:28:37** 105:25 127:5
**1:30** 98:20 108:15 165:3 194:3 201:5
**1:31:06** 106:11 127:13
**1:31:42** 127:16
**1:37** 201:7,24
**1:50** 150:18

**2**

**2** 60:5 102:16,25 103:5, 11 111:11 112:2,21 225:22
**20** 26:18 116:22 313:16 346:3
**20-** 139:17
**2015** 14:4
**2018** 8:25 13:6,21 16:4 312:23
**2019** 17:19 20:18,21
**2020** 116:3,13
**2021** 20:22,23 22:23 23:9,14,20 35:25 81:8, 22 97:20 116:2 117:11 136:23 207:12
**2022** 7:19 9:3 21:3 79:2
**2023** 207:11
**21** 97:20
**24** 98:5
**24/7** 80:3
**248** 100:8
**25** 105:24 313:1,2
**25-minute** 139:17
**26** 100:19,22 127:13
**27** 9:3
**277** 111:5,6,12,13
**27999** 100:19
**27th** 7:19
**2:02** 201:7,24 202:7
**2:23** 202:6,7 206:13
**2:26** 220:17
**2:27** 230:2
**2:27ish** 227:23
**2:31** 230:2
**2:47** 230:9,20 236:9
**2:58** 236:14

**3**

**3** 102:17
**30** 106:7 127:17 174:15 175:10,18 176:2,13,16 346:13,14 356:25
**33** 36:4
**335** 35:22
**335.4** 36:4
**335.5** 44:3
**34** 103:16
**37** 176:17 179:21 180:2
**3943** 80:21 102:13 111:16
**3:35** 245:7
**3:47** 252:11
**3:58** 254:8

**4**

**415** 110:10,13,19,21,25 111:15
**4:00** 354:23
**4:45** 287:19
**4A** 128:3

**5**

**5:30** 98:24
**5L** 100:19,22 105:24 127:13

**6**

**602** 58:19,20,23 60:12 63:18,25 68:4,9 73:9 77:12 85:2 95:23 290:12,17
**602(0)** 79:9 85:4,18 90:25 92:21
**602(O)** 91:1 92:21,22 93:14,20 94:14 290:13 339:2,7 340:2,15 341:3
**64** 128:3
**6:00** 98:24,25
**6:11** 357:15
**6:13** 358:13
**6:30** 98:18,21,25

**7**

**7** 35:25
**7:00** 99:1
**7:30** 98:18

**8**

**849** 343:14

**9**

**911** 101:5,9 120:3 233:18 237:8,13,14 241:19 271:8 276:21

**A**

**A-R-M-E-N-D-A-R-I-Z** 5:23
**a.m.** 98:25 99:1
**ability** 42:6 48:6 88:22 92:17 138:1 206:19 208:1 215:11 222:5 237:17 270:24 316:9 354:21
**absent** 300:12
**absolute** 30:3 168:25
**absolutely** 38:3 115:18 162:14 205:9 263:9 265:22 270:3,12,17,19 271:15 285:19 288:20, 23 291:4 294:22 310:1 315:20
**absurdity** 216:8
**academy** 8:23,25 9:7 13:6 16:5 18:17 33:8,11 47:24 59:5 312:23,25
**accent** 11:18
**acceptable** 357:7
**accidentally** 308:4
**accommodate** 185:20 192:10 232:13 353:15
**accommodated** 61:3 224:3
**accommodations** 185:7 186:7 232:15
**accordance** 154:21 238:4

**account** 40:15 115:12 190:4 309:7
**accountability** 268:21 270:19
**accounted** 266:23
**accurate** 11:5,11 15:8 40:15 125:13 136:7 152:13 158:11 165:19 237:15 254:2 320:19 325:7 333:21
**accurately** 60:9 114:18 120:11 330:8
**accusation** 41:22 253:2
**accusatory** 293:20 294:2
**accused** 56:14 134:2
**accuses** 155:9
**acknowledge** 4:12,15
**acknowledged** 112:12 196:1
**act** 222:4
**acting** 60:3 190:24 208:18 266:7
**action** 5:15 36:18 39:20 43:12,19 70:10 79:4 87:5 172:14 192:3 252:2,5 273:21 276:17 284:18 285:3 319:3 334:16 349:22 351:11, 13,19 352:2 355:14
**actions** 269:2 278:6,8
**activate** 31:22
**active** 165:22
**actively** 15:25
**activities** 24:20 25:5 27:13 107:17 108:1
**activity** 26:17 30:16 108:2
**acts** 59:17
**actual** 34:15 85:1 101:5
**add** 330:11
**added** 308:16
**addition** 44:9 119:19 240:18
**additional** 8:10 207:24 356:14
**address** 165:25
**addressed** 222:9 267:20 274:19
**addresses** 67:25
**adequate** 182:22 206:8 316:16
**adequately** 223:16
**adjourn** 356:20
**adjourned** 357:14
**adjust** 308:12
**administered** 4:16
**administrative** 7:10
**admitted** 335:7
**admonish** 134:5
**adult** 103:8
**advanced** 19:2
**advice** 274:22 319:25
**advise** 308:3 314:2,6,8
**advised** 118:1,4 132:23 237:3 267:13 288:23 297:8 326:13 335:8
**advises** 29:3 115:21 118:22 130:5
**advising** 119:6,16 120:21 332:24 334:15
**Affairs** 70:2,6
**affected** 187:2 354:21
**affiliated** 21:19
**affirm** 76:16 181:10 318:10
**affirmative** 327:21
**affirmatively** 112:16 197:5 295:9
**affirming** 47:2
**Afghanistan** 300:9
**afterward** 137:25
**agency** 112:4
**agent** 60:1,4,6
**aggravating** 348:13
**aggressive** 146:11 155:21 241:1,6,8
**agitated** 271:3
**agree** 40:2 79:8,19 95:11 104:3 116:19,22 130:14 256:11 339:13 342:6
**agreed** 5:1,4,6 61:1,5 278:5 331:17 335:7
**agreeing** 224:12 343:3, 4,6
**agreement** 4:22,23 25:18 178:6
**ahead** 87:18 210:7 339:22 342:9 348:19 354:10 355:3
**aid** 184:7,17,18,25 205:12 247:13 248:3
**ailment** 301:5
**air** 166:11 197:1,24 215:18 217:3 244:20 245:3 258:4,14 259:9 300:18
**airway** 182:24 186:17, 19 187:2 188:8 206:6, 19,22,25 207:4 244:16 246:8
**alert** 104:18 186:23 190:6 206:9
**alerted** 317:3
**alerting** 240:24
**alleged** 43:16 126:8 295:13
**alleviate** 182:8 192:16 196:15 206:14 214:6,10 215:22 217:16 222:5 240:23 244:7 248:19 273:14 351:13
**alleviating** 192:3 216:22 263:23 268:8 273:18,21
**allotted** 177:21
**allowed** 19:10 75:21 136:11 237:3 261:5 295:10 319:24 322:22 323:4 332:18 333:6 335:9
**altercation** 134:14,18 308:5,6
**alternative** 243:5 325:8
**ambient** 26:13
**ambiguous** 40:24 54:14 63:8 64:6 67:4 79:22 84:21 90:18 95:7 96:13 164:7,17 169:15 184:1 191:18 216:25 312:6 347:1
**amend** 10:24
**amendments** 11:3 356:24 357:19
**America** 207:11
**amnesia** 162:7
**amount** 286:6 304:19
**and/or** 188:18
**Angeles** 8:24 9:8 13:12 33:7
**animals** 287:15,22 288:4
**annual** 184:9
**Anoush** 5:14 140:25 141:18 143:19,24 144:3 148:20 151:11,16 152:6 155:4 169:13 242:2 314:13 335:8
**answering** 62:23 86:16 88:25 89:9 94:23 161:13 162:6 171:15 191:6 193:21 194:14 224:15 225:13 262:1 287:20 304:2 318:12 333:24
**answers** 10:24 11:15 28:11 65:18 163:2 173:7 191:3 255:8 310:15 319:16 324:9
**Anthony** 127:20 128:6
**anxiety** 190:14 207:10 208:13 209:4,6 248:14

**anymore** 33:18 78:24 83:14 84:24 86:1 243:20 312:18

**apartment** 6:7

**apologize** 23:7 92:1 98:23 132:2 177:2 246:19 308:8

**app** 137:9,12,15

**apparent** 186:1 201:9 202:8 212:13 213:11

**apparently** 17:19 199:5 216:18 228:17 229:8

**appearance** 317:9

**appeared** 131:22 134:15 155:21 175:16 182:4 183:11,12 196:17 220:11 274:13

**appearing** 201:16 253:25 259:14

**appears** 36:20 170:6 201:19 228:21 251:6 254:10 276:9 317:8

**applesauce** 243:3

**applicable** 33:12

**applied** 84:2 340:16

**applies** 64:4 79:10 92:4,14 94:4 95:1,4 96:9,15 97:11 340:9,10 341:8

**apply** 63:4 77:7 85:16 91:1 92:23 93:3,20 94:24 95:14 96:5,6,25 290:5,13

**applying** 91:20

**apportioned** 102:21

**approach** 144:9 153:21

**approached** 129:17 142:6 143:22 151:8,9 153:25 158:9,25

**approaching** 113:12 115:12 154:14 162:21

**appropriately** 92:17 340:16

**approval** 113:23

**approximately** 9:4,6 16:15 20:17 21:7 27:18 35:6,9

**approximation** 12:22 103:4

**apps** 136:17

**area** 85:16 103:22 106:9 107:7 111:5,8,12, 13,23,24 151:25 165:2, 5 234:1 240:24 260:5,7 305:1

**areas** 200:21 213:3 261:25

**argument** 158:20 191:7

**argumentative** 95:7 147:11 156:11 162:12 178:16 188:2 203:10 204:20 208:11 209:12 296:7 299:12 301:2 333:18 347:22

**Arias** 5:2,15 40:23 53:6 54:13 55:18 56:3 58:2 61:21 62:5,12 63:6 64:5 67:3 73:19 75:11,23 76:3 77:9 78:5,13 79:14,21 80:4 83:11 84:19 85:7,11,23 86:7, 24 87:15 90:17 91:3,17 92:25 93:22 95:6 96:11 97:6 119:10 121:11,25 123:22 124:6,20 133:8 147:5,10 156:10 158:13,19 159:11,17 160:8,15,23 162:11 164:6,16 169:14 176:21 178:15,24 180:23 182:1,15 183:15,25 188:1 189:3 190:16 191:17 192:5 193:5 195:10,15 196:6 198:4 199:17 201:10,20 202:11 203:9 204:2,10, 19 205:25 207:19 208:10 209:11 210:3 211:3 212:20 213:21 214:13 215:8 216:2,24 219:2 223:20 224:17 225:3,10,21,25 226:12, 25 227:9,16,19 228:1, 13 271:10 282:18 283:8,18 284:12 287:4 288:6 290:7,15,22 291:24 293:22 294:17 296:6 298:4,25 299:11 301:1 303:1,24 310:5 311:10 312:5 317:12 318:6 323:7,16 325:1 326:23 329:11 332:20 333:17 334:6,23 335:20 336:12 337:7,18 338:14 339:18 340:5 341:4,19 342:8 343:2,8 345:7,10 346:25 347:9,21 348:15 349:14 350:7,25 351:15 352:3,9,15 353:1,7,17, 22 354:10,15 355:2 356:13 357:11,20,24 358:3

**Armendariz** 5:3,7,22 100:19 104:7

**arrangement** 4:20

**arrest** 20:12 33:5,10, 16,17 34:6,12,18,23 35:10,13,23 36:6,8,11, 17,21 37:10,17 38:8,21 39:8,13,14,17,23 40:4, 10,13,17,19,22 41:7,15, 23 42:23 43:2,4 44:3,6, 7,10,22 45:3,6,8,10,14, 18 47:4 49:3 50:10 52:8 53:3 55:8,13,15 56:13 57:7,24 58:6 77:7 82:22 85:20 99:14 148:7,11, 12,20,23,25 149:4,11, 12,14 239:12,21,23 240:6,10,14 244:3 261:14 262:14 265:24 269:19,22,24 271:5,9, 19 272:4 275:13,19 277:13,22,23 278:1,11, 15 282:21 283:6,16,23, 25 284:9,24 285:2,8 288:15 289:8,13,16 290:20 291:6,14,16,19, 22 296:14 297:1,14 298:2,16,19,24 302:7, 10 308:21 309:4,12,25 310:21 311:18 312:3 313:8,11,14,24 314:13, 15 315:3 316:1 318:4 319:9 327:4,13,23 328:8,9 329:1,4,6,9 330:18,20,23 331:2,3,6, 7 338:12 339:9,24 340:4 341:11 345:13,18 349:25

**arrested** 45:2 46:23 47:3 147:25 148:4 239:11 262:20 282:12 292:15 294:12 297:18, 19 301:25 307:11,13 309:1,18 313:21 333:8 335:10 344:23,24

**arresting** 47:8 78:1 289:18 290:1,21 291:20,23 292:2,12 312:1

**arrests** 33:25 34:24,25 35:1,4,15 37:3,24 38:13 41:8 42:22 46:8,11 47:7,11 51:22 63:24 78:18 81:21 82:4 280:6 311:23 313:4

**arrival** 106:15 153:22

**arrive** 97:17 127:25 141:24 185:1

**arrived** 53:15 114:23 126:16,17,22,25 127:3, 9,13 128:10,11 131:20 134:9,19,20 138:21,22 140:8,14,17 144:2,6 145:1,10 146:7 147:15, 17 188:4 237:20 238:2 242:1,11 265:23 287:2 295:1

**arriving** 115:16 120:13 125:4 127:19,23

**articulate** 208:22 316:10

**Arts** 13:18

**asks** 285:10

**aspect** 40:4 170:21

**aspects** 33:20

**asphalt** 213:3 243:4

**assault** 348:1

**assaulted** 41:14

**assaultive** 241:8

**asserting** 46:25

**assess** 152:24

**assessing** 146:1

**asset** 8:10

**assign** 20:2 105:5,9 108:8

**assigned** 16:8,20 18:7 19:19 20:6,9 25:22 28:7,19 29:12 30:10,17 48:9,14 70:24 97:18 99:2,6 100:16 101:15, 21 102:15 105:3,16 106:22 107:2 112:3 113:5 130:3 136:11 137:25 141:13 167:8

**assignment** 16:6 17:19,20

**assignments** 33:24 48:11

**assigns** 105:7 120:7

**assist** 92:10 144:12 145:20 154:15 191:20 265:10 285:6

**assistance** 118:12 205:12 208:3 285:17

**assisted** 329:4 350:10

**assisting** 20:15 81:16, 20 127:18,19 128:8 131:19 132:21 144:16 145:13,17,18 158:10 188:17 211:17,19 262:3,5 272:6 276:15 283:4 305:2 350:5

**assume** 12:23 13:1 135:19 272:3 292:15

**assumes** 204:3 207:20 209:13 210:4 212:21 213:22 214:14 215:9 287:5 348:15 349:15 352:16

**attached** 25:3 26:3,19, 20 219:7 282:6

**attachments** 282:8

**attack** 207:10 208:13 209:4,6 246:18,23 247:2,19 248:2,5,6,14, 15

**attacking** 348:2

**attacks** 190:14 248:17

**attended** 8:24 33:7

**attending** 14:19

**attention** 67:21 74:24 165:6 184:5,21 185:5 222:2,4 240:24 251:24 317:3

**attitude** 342:18

**attorney** 4:2,24 5:2,5, 11,15 11:23 12:5 29:3 40:23 41:1 53:6,21 54:13,19 55:18,20,25 56:3,18 58:2,8 61:21,24 62:5,8,12,16 63:6,9 64:5,13 65:7,12,14,19 67:3,11 69:2 70:13,15, 19,24 71:9 72:1 73:19, 22 75:11,19,23,25 76:3, 5,10 77:9,23 78:5,9,13, 25 79:14,18,21 80:2,4,7 83:11,17 84:19,25 85:7, 8,11,14,23 86:2,7,10, 22,24 87:1,3,15,19,24 88:2 89:6,20,24 90:4, 17,23 91:3,10,17,24 92:25 93:10,22 94:2 95:6,16 96:11,19 97:6, 14 119:10 120:2 121:11,20,25 122:5 123:22,24 124:6,10,20, 22 133:8,21 147:5,6,10, 18 150:10,20 156:10,20 158:13,15,19,21,23 159:11,14,17,19 160:8, 11,15,17,23,25 161:10 162:11 163:6 164:6,10, 16 169:14,22 170:19,22 171:17 176:21,23 178:7,15,19,24 179:1 180:23 181:5 182:1,10, 15 183:3,15,21,25 184:10 188:1,11 189:3, 6 190:16,22 191:17,24 192:5,14 193:5,7 195:10,13,15,17,21 196:6,12 198:4,8 199:5, 6,7,17,19,25 201:10,12, 20,22 202:11,13 203:9, 13 204:2,5,10,14,19,21 205:25 206:3 207:19 208:4,10,15 209:11,17 210:3,6 211:3,6 212:20 213:5,21 214:2,13,18 215:8,20 216:2,10,24 217:4 219:2,9 221:3,8, 10 223:6,20,24 224:17, 23 225:3,4,10,12,21,23, 25 226:2,12,17,25 227:4,9,12,16,19,22 228:1,6,10,13,15 229:1, 7,10 255:20 271:10,16 282:18 283:2,8,10,18 284:1,12 285:4 287:4, 17 288:6,11 290:7,11, 15,18,22 291:2,24 292:7 293:22,24 294:17,19 296:6,16 298:4,11,25 299:6,11, 13 301:1,9 303:1,11,24 304:12 305:19 306:1,8, 18 310:5,9 311:10,14 312:5,9 317:12,14 318:6,8,16 319:23 323:7,9,16,19,21 325:1, 4 326:23,25 329:11,16, 21 330:2,14 332:20 333:4,17,22 334:6,11, 23,25 335:20,23 336:12,16 337:7,12,18, 20 338:14,17 339:18,21 340:5,13 341:4,9,14,19, 21 342:2,8,11 343:2,8, 11 345:7,10,14 346:25 347:4,9,14,21,24 348:15,20 349:5,6,14 350:3,7,8,25 351:4,15, 21 352:3,7,9,10,15,24 353:1,2,7,10,17,19,22, 24 354:10,12,15,18 355:2,4,7 356:13,16,23 357:11,13,20,24 358:3, 6,8,11

**attorney's** 13:13 70:21 223:12

**attorney-client** 65:22

**attorneys** 4:11 61:1 71:14 138:12 305:13 342:6

**audible** 168:5,7 200:6, 24 223:21 224:8 225:2 228:7,11 244:23 253:11,14

**audibly** 194:9,20 197:8 202:10 207:2

**audio** 21:10,15,18,23, 25 22:17,19 23:1,4,9,11 24:19,21 25:24 26:10, 11 27:16 28:19 29:8,15, 20 30:8,15,16 31:20 32:6,11 69:13,14 104:22 129:15,17,19,23 130:2,7,11,17,23 131:11,15 132:6,16,18, 24 133:3,7,20,24 134:6 136:5 158:2 167:14,19 169:25 170:21 173:21, 22 174:3,7,14,16,17,19 175:19 176:4 180:13 194:20 202:12 220:24 226:8,20,23 251:9 255:17 288:1 305:8 306:6,20,21 319:13 320:10,11 323:14,23 324:11 326:9 332:9,12, 14,15,21 335:14 346:6, 11

**audio/video** 28:3 69:8 223:10,14 279:11 354:7

**audiotape** 225:6 305:18 306:4,7,17 333:9

**author** 340:22

**authored** 34:24 68:21 135:22

**authority** 47:4 49:2 56:13 276:15 326:14, 15,20 327:11 328:15 333:15,16 334:3 335:18 336:6,8,11,15 337:3,4, 11,14,23,25 339:15,16, 23 343:17 345:3,17,19 347:17 348:4 349:10, 19,25 351:9

**authorize** 113:23

**authorized** 113:21 343:20 344:4

**availability** 105:22 106:23

**Avenue** 111:20

**awake** 186:23

**awakening** 205:21

**awarded** 18:17

**aware** 8:11 10:2 19:1,3, 22 22:5,15 37:1,22,24 44:20,21 51:11,17 68:5 76:2,4 96:6,23 97:10 102:24 114:24 118:13 129:1,2,6,8,23 130:22

133:11 138:5 148:16 173:24 174:3 178:7 185:12 187:8 216:1 218:4 236:18 241:25 266:12 269:20 270:15 288:14 293:10,11 300:24 316:4 343:19 350:2

**Axon** 21:15,19 22:8,10 23:18,20 24:3,7,10 137:9,12

**B**

**Bachelor** 13:18

**Bachelor's** 13:23 15:13 19:10

**back** 7:25 65:5 68:12 69:11,12 73:8 86:19 88:8 89:8,20 90:9 116:2 120:22 125:3 127:1 138:13 143:14 146:25 149:23 150:4,21 151:4 157:12 161:5,11 162:24 164:20 166:15 168:1 170:6 171:25 174:24 177:25 178:2,8 180:5 183:20 186:19 189:15 200:18 205:1 211:13 214:1 218:7,9,13,20 219:6 225:19 233:11 239:14 243:6,13,21,25 244:3 253:1 254:11 261:5 262:10,15 263:7, 10 264:17 265:15,17 271:23 272:25 274:7,16 276:6 277:5,6 280:1 288:14 289:20 294:24 295:1,5,7 296:13 302:3 305:16 307:14 308:1,12 310:16 317:17,20 324:6,7 326:5,12,13 327:5 328:5,6 332:6,8, 18,24 333:7,25 334:4, 21 341:16 342:16 345:24 347:5 348:12 349:6 354:8 355:1

**background** 8:9 9:15 179:7 200:2,23

**backing** 127:18

**backseat** 240:22

**ballpark** 38:24 304:4

**ban** 121:2 122:24 335:19 336:10 337:5,15

**banned** 120:9,17 121:17,22 122:3 123:19 124:18 125:7 262:21,23 279:4,19 280:9,17,22 281:1,12,17,25 284:6 292:24 307:16 323:3 325:15 326:6,20 328:14,19 331:16,24 332:4

**banning** 123:6 279:22

**Barbara** 13:11,19 14:18

**based** 12:16 28:17 29:5 40:12,15 42:7,13,23 43:12 47:5 48:19 57:10, 13 63:24 65:20 84:15 86:4 90:12 95:11 103:25 105:22 106:21, 22,23 107:2 108:24 109:4,25 122:12 124:15 127:3 138:18 139:22,23 163:23 166:24 176:25 178:5,6 201:17 204:6, 16 205:3 207:1 231:3 236:21,22 248:10,13,24 249:6 253:12,22 256:11,15,18 262:12,13 271:5,6 278:12,18 282:10,13,16 299:8 304:15 318:24 334:14 339:11,15,24 340:24 346:11

**basic** 18:17 19:2 43:5 49:12 125:10 184:6 235:16 247:12 284:15

**basically** 13:23 25:20 26:15 41:6 106:3 109:20 127:17 244:6 275:2 282:10,16 319:19 328:17 349:10

**basis** 49:20 267:11 284:2,7

**Bates** 100:6,7

**battery** 29:20 32:22,23 33:1

**bearing** 266:4 287:12 288:10,15,20,24

**beat** 97:23

**beats** 17:24,25

**began** 116:10 166:9 171:11 268:19

**begging** 245:9 248:23 249:13

**begin** 94:11 98:12 244:22,24

**beginning** 154:13 164:11 166:15 172:18 255:17 304:19

**behalf** 4:25 5:3,6,16 35:4 327:3,8

**behavior** 121:19 146:12 177:7 178:9 183:18 240:19 242:2,22 269:11,15 330:5

**belief** 144:11 259:6

**believed** 132:10 208:25 214:5 235:19 243:9 259:12 283:22 289:25 319:8 331:10 335:4 344:9

**belonging** 59:22

**belongings** 234:22

**belt** 218:25

**benefit** 21:8 48:12 178:11 256:6,9 295:3 305:20 330:6

**biannual** 184:9

**big** 19:23 102:18 103:3, 5,11,20

**bit** 9:5,19 19:11 54:17 119:12 166:7,9,11 182:5 220:25 230:4 252:14 268:19 295:1

**bits** 254:3,24

**black** 114:14 135:9

**blanket** 56:12 270:23

**blown** 300:10

**blue** 117:21

**board** 86:17,18 87:9

**body** 21:22 22:17 25:22 26:20 27:7 129:24 167:15 174:1 215:11

**body-worn** 20:24 21:1, 4,8,13 27:11,18,22,25 28:4 30:24 31:1,4,12,18 137:24 306:6

**book** 48:9 50:3 325:9

**booked** 344:23

**booking** 44:11 320:6, 21

**booklet** 50:8

**bothering** 166:13 181:23 182:7 316:22 317:2

**bottom** 259:20

**bound** 10:14 11:7

**brain** 54:16

**Brand** 103:15

**break** 15:1 89:3,13 90:2 119:13 146:9 150:12, 14,18 151:2 305:21,22 341:15,17 342:19,20,23 348:19

**breaking** 254:16

**breath** 165:11 216:6 245:21,23 246:7,12 249:5,10 300:20 301:15,18

**breathe** 181:8 182:25 186:9,10,15,16 188:23 193:1,3,9,17,24 194:4, 6,9,12,21 196:5,11,17, 19 206:7,19 207:5 208:6 213:1,20 214:11, 20 215:2,16 220:19 221:13,25 222:6,18 230:17,20,25 232:22 242:25 245:25 246:9 249:14,16 252:20 257:6 268:15 297:21 300:18, 21,22 302:23 304:18 317:7 321:10 351:24 352:13,19

**breathing** 182:14,18 183:2 186:21 187:13 188:9 190:1 203:24 212:13,25 213:7,9 214:6,17,21,25 215:13 221:18 230:16 232:12

233:5 246:1 250:22 257:24 273:13 287:25 299:18,22 300:25 322:23 323:5 324:24

**breaths** 196:25 215:18

**bring** 65:4 74:24 86:19 87:8 88:8 171:25 177:25 178:8 324:6 354:8 355:1

**bringing** 117:19 171:20

**broad** 91:20 157:4

**broken** 300:4

**brought** 67:21 87:4

**Brown** 5:5 358:6,8,11

**Bryan** 127:19

**building** 80:14 128:18 146:23

**buildings** 205:22

**bureau** 16:8

**Burmayan** 5:14 140:25 141:18 143:19,25 148:20 149:11 151:11, 16 152:6 155:5 161:23 169:13 239:19 242:2 257:1 273:22 275:4 279:6,9 282:13,22 284:6,9 291:6 292:20 305:10 307:9 313:13 314:13 315:23 330:18 331:18 333:16,20 334:4 336:10 337:16 338:3,5 339:5 341:1 343:25

**Burmayan's** 282:15

**business** 52:22,23,24 53:17 83:10 84:18 85:6, 22 86:5 128:15 274:9 281:1,5,11 302:4

**businesses** 38:15

**busy** 29:22 46:3

**button** 105:4

**by-product** 289:23

**C**

**C-O-B-A-N** 24:6

**cabin** 200:19

**CAD** 99:18 100:9,12 107:22,23 110:1 126:19 127:12 135:5,11 139:5 237:1 278:21 280:10,19 331:23

**California** 6:12 47:25 48:3,4,6 50:5 57:22 58:9,19,23 66:25 67:9, 16 96:2 120:25 123:2 225:19 270:1

**call** 20:13 40:21 48:11, 21 70:20 71:24 82:17 86:6 92:6 93:6 97:17 99:9,15,23 100:6,10,20 101:2,12 103:22,25 104:12,14,15 105:4,5, 10,15,17 106:4,20 108:16,17,20,24 110:1 111:3 112:18 113:7,8, 13,17,20 114:3 118:25 120:3 125:15 126:18 127:1,3 128:3 129:13 130:3,4,24 131:7 132:22,23 140:20 141:13 144:15,20,23,25 145:3,4,7,10 154:16 162:20 208:14 210:13 211:17,23 222:1 233:18,19 237:1,6 241:7,10,19 262:23,25 263:3 271:8 276:21 277:18 278:18 280:19 283:1 285:18 297:6 312:14

**called** 17:24 39:7,12,24 53:25 80:21 81:7,14 82:10,25 84:10 90:10 93:16 104:22 115:5 145:22 248:4

**caller** 112:21

**calling** 55:21 118:11 125:23 184:12 222:3

**calls** 20:7 28:7,19 29:13 30:10,17 39:16,17 40:1, 9 41:13 42:17 45:5 53:7 55:11,19 57:5 63:7 75:12 77:10 79:15 81:12,15 82:13 83:2,3, 12 84:11,20 85:12,24 86:8 90:18 91:4,5 92:20 96:12 97:2 101:4,6,9 102:3 104:24 106:22 108:8,9,13,16 110:25 112:3,6,23 113:4 117:25 119:11 120:7 121:12 123:23 124:7,8 128:8 130:6 132:25 145:19 155:9,11 164:17 189:4 192:6 204:3,20 208:11 237:8,13,14 260:15 267:1 271:12 281:8 290:8 291:25 310:6 311:11 312:6 326:24 333:18 334:7 335:21 336:13 337:8 339:19 341:5 349:15

**calm** 165:11 166:1 202:21,25 222:10 249:5,9 252:14 257:6 267:24 300:19 301:6,15

**calmed** 258:6 268:11

**calming** 268:8

**calmly** 216:5 245:20

**cam** 24:7

**camera** 26:6 28:1 30:25 31:2,4,12,18 168:4 200:12,14

**cameras** 20:24 21:4,9, 19 23:20 24:7 27:11,18, 23 28:4 136:18 137:24 200:16

**campus** 14:17 15:3

**capability** 136:9

**capable** 136:6

**capacities** 14:12 20:15

**capacity** 6:18 24:16 247:20

**capture** 24:22 169:8 224:21

**captured** 168:3

**capturing** 136:20

**car** 23:13,16,19,25 24:4,17,18,19,21 25:2, 4,6,14,15 26:4,11,16,18 27:1,4 99:6 104:18,23 120:14 128:4,11,12,20 129:10 131:1 141:9 143:14 147:20,25 148:9,24 149:5,18,20, 24 150:2,3,8 156:22 157:3,5,6 161:23 162:25 163:11 164:14, 20 167:3,4,6,10,23 168:2,7 171:2,9,12 172:6,21 173:15 174:1, 21,23 175:25 180:15 182:23 183:14,20 184:23 185:18 186:8 187:23 189:15 197:4,9, 11,13 199:23 200:4,16, 22 203:24 204:1 205:1 206:23 208:25 209:20 210:1,11 212:2,8,16,24 213:4,11,15 214:16 216:23 217:14 219:1,6, 21,24 232:24 233:11,20 234:3,11,17 235:9 236:6,19 237:24 238:18 239:3,14,19 240:16,23 242:7,19,24 243:6,12, 21 244:1,4,9 250:5 253:16,17 255:22,25 256:14,16,21 257:18 258:19,23 260:4,9 263:25 264:19,20,22 265:1,3,7,14,15,18,19, 20 267:23 268:2,4 272:18 273:10,23 289:2 294:12,15,24 296:4,14 297:20,24 298:18 299:9 302:18,25 303:13,15, 17,18,20 304:1 305:6, 11,17 308:20 313:15,24 315:24 317:9,17,20 318:2 319:5 320:7 321:16 322:14 324:25 325:24 326:12 331:19 343:25 344:11,14,18 345:4,5,22 346:1,4,7, 17,20 348:9,13 349:13 350:21,22 351:3,6,8,9, 23 352:12 355:15,17 356:11

**care** 183:24 184:17,18, 19,25 185:4 186:4 187:12 191:13 207:25 209:23 220:14

**career** 8:7 15:6,7 33:21 45:12 177:9

**careful** 168:15

**carefully** 63:15,16 173:18 179:19,20 192:19 193:20 205:5

216:16 255:5 306:13
**carias@glendaleca.gov.** 358:4
**Carl** 5:2,15
**carried** 22:1
**carry** 50:2
**cars** 22:5 23:21 128:1
**case** 6:24 9:21 10:1 70:3 71:17 72:24 73:1 87:6 89:15 93:16 99:10 100:10 109:12 111:10 126:9 135:3,18 138:9 139:8 144:13 181:16 190:5 192:15 199:6 271:24 274:24 286:17 311:3,6,13
**cases** 53:20
**causing** 121:19 316:13 348:13
**caution** 19:17
**celebrations** 50:21
**cell** 136:15 137:11,18 234:21
**center** 14:18 15:3 101:3 104:12,23 284:16
**centered** 241:11
**Central** 111:20
**certificate** 18:18
**certification** 18:13,16, 19 19:11 357:18
**certifications** 184:7
**certified** 18:9 284:21 357:6
**cetera** 12:15 20:7 44:11 109:23 257:25 294:11 307:11,15
**chance** 17:8
**change** 115:19 120:6 232:18 355:20
**changed** 92:2 246:13 268:19
**changing** 248:8,9
**chaos** 131:23 132:11
**characterization** 157:15 158:12
**charge** 32:22,23 55:4,5 63:19 67:15 76:24 92:18 120:25 336:18
**charged** 32:25 48:2 57:22
**chase** 242:16
**cheat** 48:12,20
**check** 50:14 186:17,19, 21 267:2
**chest** 186:21
**chin** 322:6
**choice** 71:6
**choose** 71:8 250:9 266:24 268:22
**choosing** 277:12
**chose** 316:11
**chronological** 146:24
**chronologically** 144:1
**chronology** 143:21 161:13 162:18 163:1
**circles** 216:13
**circulation** 316:17
**circumstance** 91:2,16 125:17,25
**circumstances** 44:4, 13 122:12,13 124:17,19 184:20 236:4 317:25
**citation** 72:25 73:1,2 78:11 166:16 211:14 240:2 266:17,21 277:25 279:17 290:25 291:1 292:4 307:10 338:2,4, 19,20,24,25 339:4,6,10 340:18,19,25 341:2 346:1 348:11
**citations** 44:11 343:21
**cite** 50:9 91:12 121:9 277:25 327:10 338:13 339:9,17 343:18 344:19 345:5 349:10 350:23
**cited** 50:17 265:4 278:4 307:10 339:6 344:2,14, 24 345:22 346:7 348:5
**citing** 78:12 91:14 289:18 304:22,24 344:1,11
**citizen** 125:24 313:7 327:19
**citizen's** 33:5,15,25 34:6,18 35:10,13 36:10 37:17 38:13,20 39:7,13 40:19 41:7 43:1 44:3 46:11 47:7 55:13,15 327:13,23 328:9
**citizens** 40:20 136:12
**citizens'** 35:1 37:3,23
**city** 5:3 6:21 7:16 9:3 17:22 18:3 46:19 50:22 70:21,24 71:4,14 80:12, 13 81:11 93:15 101:18 102:9,12 103:6,13 111:5 145:3 320:21 325:10 336:4 344:24
**civil** 5:14 172:14 252:2 261:20
**civilian** 6:19
**civility** 185:3
**claim** 7:5 9:18 238:7
**claimed** 321:5
**claiming** 44:5
**claims** 304:18
**clarification** 10:10,12
**clarify** 88:23 169:20 173:7 243:14
**clarifying** 332:24
**class** 247:17
**classes** 18:20 64:21 66:12
**claustrophobia** 185:14 214:10
**claustrophobic** 166:12 181:22 182:5 183:13 186:8 209:1 213:10 215:5 243:7,10, 17,18,24 324:25
**clear** 10:11 11:21 12:7, 12,20 13:3 55:22 61:22 88:11 93:12 157:25 172:3,22 191:14 198:13 209:18 220:25 223:7,22 240:10 297:4 319:22 355:20
**client** 224:10,14 225:13
**clinical** 190:20,23
**clip** 174:9 193:12 194:22,24 195:22 201:18 218:17 230:19 254:18 261:18
**close** 144:9
**closed** 52:23 181:24 197:14,15 206:24 278:15 321:25 352:1
**closely** 258:15 259:6
**closes** 52:22
**co-defendants** 5:16
**Coban** 24:5,9 25:10
**code** 47:9,25 48:3,4,6, 11,17 49:22 50:2,5,6,7, 11,12,18,22 51:2,4,12 52:14 54:6,23,24 55:5 57:4,23 58:10,19,23 59:4 60:19 63:18,20,25 64:3,11 67:1,2,16,18,25 68:4,9 73:8,13,25 74:18 76:24 77:6,12,21 78:2, 12,23 83:8 84:13,17 85:1 90:13,15,21,24 91:12,22 92:4,9,22 95:4,18,25 96:8,18,21, 22,25 97:4,11,15 110:20 120:25 121:9,24 123:2,20 126:13 160:19 161:3 269:18,21 270:1 290:4,9,12,19,21,24,25 292:5 326:15 327:11 336:18 337:4 339:1,7, 17 340:1,10,15 341:2, 13 343:14,16,17 344:2 347:18 348:5
**codes** 48:21 51:15 59:7,13 63:21 67:6,10 78:21 83:15 84:1,8 96:2 111:8
**COG** 100:8 338:18
**coherent** 254:5

**cold** 243:4

**collective** 285:25

**college** 8:16 14:5,6,24

**colloquially** 21:11

**colloquy** 160:13 161:7 349:7

**comb** 74:19

**combat-type** 247:11

**combative** 155:24 241:6,9

**combination** 81:18

**combine** 346:12

**Combined** 215:10

**comfortable** 34:11 185:24 192:11 218:1,3 219:18 317:18,19

**commander** 113:22

**comment** 114:11 115:2,20 118:4,6 120:8, 14

**comments** 182:11 239:8 241:18,21 260:21 274:9 288:22

**commit** 40:11

**commits** 59:16

**committed** 38:2 41:9, 16 46:24 260:17 323:1 348:1

**committing** 334:20

**common** 12:17 29:14 30:21 43:5 111:1 137:17 154:21 156:14 189:13 207:10 213:8 231:25 235:16 334:15

**commonly** 59:8 336:1

**communicate** 105:1 207:2 208:1,2,5,8 217:19 286:7

**communicated** 280:16

**communications** 65:22 69:2 70:13,15 104:20

**communicative** 286:6

**community** 7:25 15:25 165:7

**comp** 7:4 9:18

**competent** 286:14

**compile** 43:6 284:22

**compiled** 48:20,23 78:18 92:10 276:17

**complain** 274:6,16 298:21 331:21

**complained** 230:16

**complaining** 115:7 194:9 212:13 273:12 287:24 295:14 302:15, 20,23 303:7,10 304:3,6

**complains** 97:3

**complaint** 43:17 55:12 68:23 80:24 90:12 109:14,17,23 267:15 307:23,25

**complaints** 165:23 288:17 301:8 304:17

**complete** 44:6,12 278:12

**completed** 45:19 280:12

**completely** 54:18 155:8 277:16 287:15 301:6 315:1

**compliance** 18:19,23 28:8,15 299:20 324:20

**compliant** 321:8

**comply** 46:12

**complying** 242:6

**component** 42:19

**compound** 191:18 206:1 207:21 209:12 210:5 212:21 213:23 214:14 215:9 288:7 294:18 298:5 299:1,12 318:7,13,15 348:16

**comprehensive** 42:18

**computer** 6:3 104:19 141:9 194:11 226:6,18

**computers** 169:19

**concept** 159:23

**concern** 115:18 117:8 196:15 232:22 233:6 294:24

**concerned** 29:25 56:10 117:19 165:1,4 205:19,20 216:19 260:6 317:23

**concerns** 165:24 196:20 212:24 235:20, 23 240:23 268:8 273:22 274:19 316:10

**conclude** 144:21

**concluded** 353:9 358:14

**conclusion** 17:13 53:7 55:19,21 63:7 75:12 77:10 79:15 83:12 84:20 85:13 90:19 91:6 96:12 121:12 124:9 144:19 204:3,20 239:24 273:4 290:8 310:6 311:11 326:24 333:18 334:7 335:21 336:13 337:9 339:19 341:5 345:11 349:16

**conclusive** 331:10

**condition** 192:18 208:22 215:22 244:16 315:19

**conditions** 184:14 188:19

**conduct** 33:24 76:6 153:24 177:8,23 196:18 284:21

**conducted** 234:8,24 278:6 295:12 349:22

**conducting** 37:2,23 350:1

**conducts** 52:24 270:5

**conference** 68:19

**confined** 47:21 240:22 243:20 245:4 259:10

**confirm** 110:8 176:25 220:20 277:8 332:13

**confirming** 298:15

**confused** 54:17 97:9 119:13

**confusing** 206:1 207:21 209:12 210:5 288:7 294:18 298:5

**Congratulations** 8:6

**conjunction** 190:9 212:4 259:8

**connected** 22:3 27:7

**consent** 4:20

**considerable** 26:25

**consideration** 115:14 117:10

**considerations** 26:23

**considered** 314:22 315:7 347:20

**consistent** 127:8 183:18 187:23 188:4 243:19 251:7 309:22

**consistently** 277:3

**constantly** 223:9 260:3

**constitutes** 49:13

**Constitutional** 121:15

**construction** 14:13

**contact** 72:12 87:17 231:19 267:14 304:11 319:23

**contained** 107:18

**content** 11:24 153:1 154:7,11 238:3

**context** 49:25 119:8 120:4 157:4 288:19 294:21 309:7 331:25

**continue** 89:9 161:6 164:19 177:22 178:8 192:16 201:3,6 220:16 230:6 236:8,9 245:5 250:14,18 252:8 253:24 255:15,16 333:25 342:17

**continued** 196:16,21 197:1 203:2 222:8

**continues** 307:19

**Continuing** 111:4

**continuous** 33:11 171:22 172:15

**continuously** 9:1

**contract** 71:3

**contribute** 289:3 350:11

**contributed** 350:14

**control** 131:23 134:9, 13 146:9 271:3 305:6

**convenience** 38:16

**conveniently** 300:17

**conversation** 152:15 153:2 157:8 164:23 165:12 166:10 167:22, 25 168:3,11 169:2,9 196:2 202:25 231:5 238:11,21 239:20,22 245:21 246:15 249:10 255:9 258:7 264:4 267:10 268:6,7 275:5,9 287:13 288:19 289:10 292:20 296:23 298:13, 14,23 300:23 301:16 303:19 305:5 306:15,24 307:7 319:12 320:14 331:25

**conversational** 301:7

**conversations** 27:3 30:4 32:2 154:12 305:9

**converse** 215:11 244:25 301:20

**conversed** 275:7

**conversing** 233:3 257:1 263:20 304:8 307:8

**convey** 328:18

**cooperate** 224:10,13 225:16 252:6

**cooperated** 224:12

**cooperating** 61:14

**cooperative** 224:4 354:16

**coordinate** 105:21

**copies** 46:5

**copy** 266:17 280:6 281:16 357:4,7,21 358:6

**corners** 218:17

**corporate** 267:14 274:7,17 304:11 307:25 331:21

**correct** 10:24 23:18 25:22 26:21 27:8,9,14, 15 31:13,14 34:2 37:12, 13,19 38:22 39:2 40:14 72:12 101:7 102:2 120:10 130:1 139:10 140:15 148:20,21 149:12,15 152:8,12 158:2 167:24 174:18,22 200:6 202:1,5 220:15 222:7 237:21 241:3,5, 22 242:4 255:25 260:2 271:6 272:14,21 276:24 278:1,17 282:5,8 285:10 290:16 291:18 310:22 319:10 322:5 324:18 325:3 331:14 335:2,11 338:16 339:8

**corrections** 356:24

**correctly** 18:3 25:18 26:15 36:24 44:15 45:23 51:14 81:10 115:24 125:12 158:24 327:10

**corroborate** 237:14 276:20

**corroborated** 336:9

**cough** 118:16 119:19

**counsel** 4:19 5:13,17 55:20 61:21 62:12 75:14,24 86:23 87:21 159:16 160:17 195:11, 16 199:20 220:8 223:25 225:3 227:19 228:11 229:9 293:8 330:3 342:9 348:21 353:11 354:14 357:10,18

**counseling** 346:22

**County** 9:8 13:12

**couple** 343:12 349:3

**courses** 247:13

**court** 4:3,10 10:19 11:14 12:3 27:24 60:24 61:9 65:4,8,10 124:3 150:12 160:7 170:9,17 178:5 221:4,6 223:2,18 256:4 296:19 305:20,24 308:15 314:11 319:15, 17 325:16 329:13 330:7,10 341:16,25 342:5 343:5,9 357:15, 23 358:1,5,9

**Court's** 171:19

**cover** 230:13 232:19 325:15

**coverage** 46:22

**covered** 111:15,24 123:13 126:1 130:4 131:13 167:13 237:9 242:3 283:15 286:23 290:3 303:14 324:17 328:1 350:9

**covering** 147:2 148:1 175:2,4,11,15 231:13, 16,20 322:15,20

**covers** 103:9

**Covid** 115:22 117:5,9, 19 118:2,6,15,20,24 119:1,3,4,9,22 120:1 207:12 231:12 299:20

**Covid-19** 324:21

**coworkers** 284:18

**CPR** 247:13

**CPS** 184:18

**crack** 252:13 300:21

**cracked** 258:17 259:18

**cracking** 259:22

**create** 110:2,3 340:22

**creating** 93:7 280:9

**credible** 215:6,7 221:21 261:10 274:14, 21 276:22

**crime** 38:2 41:15 92:18 260:16 269:23 272:13 276:10 289:21,22 319:9 322:25

**crimes** 41:9

**criminal** 64:18,25 66:20,21,22,23 309:23 338:20

**criss-cross** 243:3

**criteria** 48:25 122:16

**critical** 272:12

**criticize** 275:23

**cross** 111:19

**cross-sections** 103:10

**crying** 317:6

**cues** 318:17

**cursor** 111:11

**cursory** 234:7

**custody** 184:19,23 203:20 204:18 205:7 231:23 236:19 273:23 296:1,5,19 343:19

**customer** 80:16 90:12

**customers** 82:14 123:17

**cut** 323:17

**cutting** 316:17

**CVS** 5:6,16 39:1 52:17 79:19,25 80:8,9,18,21 81:5,11,22 82:2,23 86:4 90:11 92:20 94:18,20 95:4,15 99:23 110:4,10 111:17 122:24 123:18 128:16 129:4 134:22 138:25 141:21 142:1,8, 9,10,18 143:4,16 144:4 145:23 151:14 157:9 162:22 165:17 188:4 210:12 237:18 238:24 239:5,25 241:11 244:10 262:8,17 267:14,16 271:24 272:19 274:7 276:7,24 277:7 279:3 280:18 281:19,20,24 282:14 284:3 288:23 290:14 295:14 298:21 307:25 323:2 326:7 327:5 328:16 330:24 331:12 332:25 333:2 335:9 336:10 337:17

348:6
**CVSS** 81:9

## D

**daily** 98:11 107:17 108:2
**DAR** 21:24 22:18 23:11 25:21 29:12 69:14 129:16
**dark** 199:22,23
**DARS** 21:12,15 22:16 23:8 28:6
**dash** 24:7
**database** 107:19
**databases** 39:4
**date** 16:17 20:25 308:7
**dates** 12:14
**day** 60:18 97:25 98:19 100:16 108:7 161:8 177:25 198:16 209:24 282:4,12 308:9,11 320:25 330:24 337:15 339:5,15 343:23
**days'** 356:25
**dead** 130:11 132:17
**dealing** 152:25 231:11
**dealt** 267:17
**December** 7:19 9:3 21:3
**decide** 29:1 87:13 161:1 275:18 281:5 342:12
**decided** 106:16,17
**decides** 87:22 88:1
**decision** 261:14 275:12,18 277:21 278:11 282:21,23 283:22 284:8 336:10 338:12 344:22,25 345:1 349:11
**declare** 4:17 11:4
**declared** 116:23
**deemed** 352:22
**deems** 121:18
**deep** 165:11 215:18 216:6 245:20,23 246:7, 12 249:5,10 300:20 301:15,18
**defeat** 285:2
**defeated** 260:4
**Defendant** 5:6 70:9 79:4,6 87:5 172:13 252:2 329:3
**defense** 326:17 357:18
**defer** 296:18
**definition** 52:12
**definitions** 148:12 152:21
**definitively** 235:11
**degree** 13:11,18,23 19:10,12 37:16 117:5 162:8
**deliberately** 177:14 218:5
**demeaning** 203:5,8
**demeanor** 155:4,6 162:3 189:13 216:7 240:19 243:18 246:13 249:6
**demonstrate** 94:6
**density** 102:22
**deny** 37:25
**denying** 194:8
**department** 8:4,21,24 9:9 13:7 14:15 15:8 16:7 17:11 18:2,21,24 19:15,23 22:21 28:9,10 30:8 31:25 32:4 33:8 35:13,22 37:2,7 39:5 44:7 45:21 46:1,13 48:8,15 49:7 59:6 70:23 82:16 99:16 101:3,18 102:13 107:16 108:1 113:5 117:14,17,24 118:8,9 125:23 133:23 137:12 184:4 207:16 208:14 216:18 248:4 274:17 280:4 284:16 307:25 312:22 327:13 331:21 338:22 346:22
**department's** 17:5 46:19
**department-issued** 136:15,18 137:8,18
**depends** 26:8 103:23
**depiction** 320:19
**depo** 62:14
**deponent** 199:7
**depose** 195:18
**deposed** 61:5,8 177:9 312:24
**deposition** 4:11,13,14 6:15,17 9:18 11:1 12:1 42:10 56:22 60:25 68:15 69:4,24 99:10 109:13 129:20 136:1 142:19 159:24 160:6 161:7,9 163:25 171:21, 24 175:8 177:6,17 179:4 195:25 223:11 224:2,11 225:20 310:12 329:15 342:14,17,25 348:23 353:9 354:1,22, 23 356:20 358:14
**depositions** 9:16 223:8 251:22 348:22
**Depot** 38:16 39:1
**DESC** 111:14
**describe** 134:24 146:18 155:15
**description** 111:16 135:8 139:21
**descriptions** 142:15
**designated** 129:3,5 145:7
**designates** 128:4
**designation** 100:21
**designed** 24:23 25:19 218:17
**detailed** 100:6
**details** 187:21,25
**detain** 36:18
**detained** 138:14 148:14,15 149:1 156:13 221:20 231:19 233:11 239:14 240:5,8,14 244:9 296:12,15 297:1, 5,14 298:2,10 309:2,16 313:14,18,21 315:2,25 318:3 319:9,11
**detainees** 183:24 184:19 204:17
**detaining** 312:1
**detective** 17:12
**detention** 240:9 265:24 309:24 310:2,3, 4,21,22 311:18 312:3, 13 313:8,10,17,22 314:3,4
**detentions** 311:1,8,22
**determination** 42:7 57:17 282:24 284:23 302:9 314:15
**determine** 36:6,15,21 42:25 43:2,11 54:25 126:12,15 260:16 327:22 349:21 354:6 356:18
**determined** 41:19,22
**device** 21:24,25 30:2, 17 31:23 32:19 129:16
**devices** 133:15
**diagnosis** 190:20,24 191:6
**diary** 107:25
**died** 29:21
**difference** 309:24,25 310:20 311:24 312:2,3, 11 313:6,10
**differently** 247:23 314:12 346:24 347:7,13
**difficult** 11:14 60:21 61:16 62:2 89:16 121:15 147:9 165:12 172:9 177:3 199:1 228:25 254:4
**difficulties** 61:2 77:3 147:3 161:12 162:5

**difficulty** 62:22 64:2 94:23 140:1 162:8,14 171:15 179:19 183:2 187:13 188:9 194:13 212:25 213:7,9 220:23 232:12 287:25 300:24 318:12

**digging** 14:13

**diligence** 237:10

**direct** 92:8 100:2 195:19

**direction** 62:10

**directions** 74:21

**directly** 195:7 216:14 273:9

**disabilities** 188:18

**disability** 185:25 187:6 232:17 299:25 300:2,5, 6,8,11

**disabled** 185:8,10 227:11

**disagree** 40:3 62:6

**disagreed** 331:5

**disagreement** 125:22 338:12

**disappeared** 259:21

**disbur** 100:23

**discomfort** 185:22 217:20,24 302:24 304:4 316:13 317:10

**discomforting** 319:2

**disconnected** 170:20

**discount** 43:22

**discounted** 261:11,12

**discovery** 130:14

**discretion** 37:16 38:6 39:18 105:19 302:11 344:4,6 345:17 349:18, 21

**discrimination** 121:16

**discuss** 72:16 169:20

**discussed** 49:24 129:16 255:6 301:21

**discussion** 4:8 82:3 89:20 94:12 133:14 150:16 223:4 261:21 279:9 330:12

**discussions** 72:19 188:16

**disease** 246:17

**disorder** 188:14 189:17 191:12,16,21 247:7 348:14

**disorders** 189:20 247:9,17

**dispatch** 101:3,8 104:12,24 105:11 115:6 119:16 145:3,5,10 237:1 239:17 280:21

**dispatched** 20:15 39:16 99:22 100:20,24 101:4 104:1,6,11,16 106:5 114:21 144:22,25 145:2 281:7,19

**dispatcher** 105:6 106:16 108:6 120:7 241:20

**dispatcher's** 105:18

**dispatchers** 105:2,8,9 106:19 107:9 109:6 112:14 113:22 118:10 119:20

**display** 189:15

**displayed** 182:21

**disposition** 44:13 70:2

**dispute** 110:17 116:4 198:25 199:4 254:19 327:25 333:3

**disputed** 165:20

**disrupt** 178:2

**disrupting** 83:10 84:18 85:6,21 86:4

**disruptive** 82:15 90:13 92:21 93:17 94:7 97:4 241:11,13,14,16

**distance** 26:25

**distinction** 51:18 60:11,15 84:7 112:11, 22 113:15 128:2

**distinctions** 60:20

**distinguish** 51:8 132:20 250:25

**distress** 175:25 183:5 189:12 191:21,25 192:1,4 201:9,17 202:9, 19 205:17 208:9 212:13 215:3 220:10 272:17 298:1 302:24 316:24 317:6 319:2 324:24

**district** 13:12 18:2,7 101:21 102:1,14,15,16, 17,25 103:5,11,20 111:6,11

**districts** 18:4 102:12, 18,23

**disturbance** 93:7 241:15

**disturbing** 83:4 110:19

**divided** 17:23,24 18:4 102:19,23

**document** 73:20 75:12 76:19 77:14,17 85:12 99:20 100:15 104:4 106:2 107:16 109:8 111:9 113:9 280:7

**documentation** 279:5, 10 282:4

**documents** 44:10 69:19,23 161:15

**door** 166:15 180:17,19 181:6,14,15,19 192:24 193:15 197:14,15,23,24 198:2,7,17,18,20 199:16 200:8 206:24 215:24 219:12 244:24 245:3 258:25 259:12, 14,16,22,25 260:2 304:21 352:21

**doors** 52:22 120:9

**doubt** 102:10 178:11 291:14 331:1

**doubts** 289:13,15 291:4 330:17,19,22

**downloading** 27:23

**draft** 358:10,12

**draw** 165:5

**drawn** 60:12,15

**drew** 8:3 15:10,16 16:3

**drive** 80:15 101:20 264:21 325:23

**driven** 218:12

**driver's** 258:24

**drives** 265:15,17

**driving** 23:14,20 24:1 101:24 166:17 205:2

**drove** 264:8 266:12,15 326:1

**due** 237:10

**duly** 5:8

**Duncan** 127:19 128:5 141:5 210:21 233:22

**duration** 287:10

**duties** 27:14 89:6 272:10

**duty** 30:7 37:10 48:2 57:22 125:16 126:1 145:18 184:24 203:18 205:6,10 211:20 212:1 232:5 237:8,13 260:15 269:1,4,10 270:7 272:22,23,25 273:2,13, 15 283:5,14,15 286:6 291:12 328:7

**E**

**E-MAIL** 70:19 251:16, 20 281:15 357:25

**earlier** 33:9 94:19 134:10 187:24 188:5 205:19 211:21 259:11 261:13 271:14 281:7,20 291:21 313:13 321:2 327:14,15 328:10 331:22

**earshot** 143:6

**easier** 213:19

**eating** 102:5

**education** 10:8

**effect** 133:3 237:2 268:7

**effective** 231:13
**effectively** 258:6
**efficient** 354:21
**efficiently** 223:16
**Either/or** 105:8
**elaborate** 152:20
**elaborates** 220:17
**electronic** 30:2 107:19
**elements** 34:12,15 49:6,10 58:6
**eliciting** 293:4,15
**else's** 49:18
**emergency** 205:12
**employed** 9:2
**employee** 157:10 282:14
**employees** 82:20 94:10 114:16 123:17 134:22 138:25 141:21 142:9 143:4,16 144:4 145:23 151:14 157:10 162:22 210:13 237:19 238:24 239:5 240:1 262:9,18 267:16 271:24 272:19 276:7,25 277:8 284:4 327:5 330:24 331:13 348:6
**employment** 6:20 14:7
**employment-related** 7:2
**EMT** 184:6,12
**en** 104:1,2,6
**enable** 105:1
**enclosed** 185:15 188:21 193:2 212:14 213:17 214:9 273:11 313:16
**encompass** 269:14
**encompassed** 102:25
**encounter** 155:13 246:14
**encountered** 157:7 190:11,13,21
**encounters** 133:16
**end** 11:1 164:11 172:19 220:22 224:16 226:5 228:16 229:3,5,12,22 251:3 308:10 325:12
**enemy** 246:10
**enforce** 48:2,6 57:4,22 59:14 63:18,23 336:21
**enforced** 59:8 67:19
**enforcement** 9:12 13:8 14:8 15:11,17,18, 20 16:3 96:2
**enforcement-related** 13:16
**enforcing** 48:16 55:5 63:19 67:15 76:24 95:25 120:25 121:23 123:21 133:6 336:18,24
**engage** 15:25
**engaged** 27:13 190:25
**English** 216:17
**enjoy** 15:23
**ensure** 46:22 115:13 205:9 210:9 211:21 212:1 232:5 274:1 285:15 316:16
**ensuring** 135:24 145:25
**entails** 126:6 189:18
**enter** 122:19,20 140:16, 21 357:10
**entered** 39:4 123:14 237:2
**entering** 123:16 125:3
**entire** 169:9 171:3 174:10 221:24 227:6 278:10 279:14 282:11 303:6 346:10 349:22
**entirety** 19:14 95:23 103:8 140:20 149:19,22 167:24 168:2 188:24 195:24 221:15 250:4,11 254:23,24 255:13 292:19 306:12
**entities** 35:5 38:10,12
**entitled** 12:15 42:12 56:20,23 57:1 65:18 69:3 89:17 199:9 310:15
**entrance** 128:18,19,21 140:11 142:1 151:20,22
**entry** 114:12
**environment** 240:22 245:4
**equally** 102:19
**equipment** 22:24 23:10 32:21 130:24 136:10,13,23 137:5 167:15
**equipped** 20:23 21:3 22:6
**ER** 104:2
**errata** 10:25 11:1
**escaping** 242:14
**escorted** 352:21
**establish** 192:17
**established** 99:3 126:18 167:13 174:20 211:8 221:13 283:5 329:5
**establishment** 49:14, 15 51:23 52:9,16 53:5 54:1,2,10 55:10 57:8,25 77:1,5 81:4 90:11 94:25 95:14 96:16 97:1,2 121:1 122:23 123:18 124:25 125:22 260:8 261:5 280:25 327:19
**establishments** 38:25 47:15,17,20 51:19 121:5 129:3 290:5,14
**estimate** 12:16,18,20 35:8 38:19
**estimates** 12:11,13,25
**evading** 163:21 164:1 177:13,19 179:25
**evaluate** 60:19 74:17
**evaluation** 278:11
**evasion** 172:16
**evasive** 62:2 166:20
177:7 324:9 330:1,5 355:5,6
**event** 129:9 132:19 156:15 167:9 174:10 219:10 252:8 279:1 280:11 309:10 331:4
**events** 143:21 162:18 163:2
**everyone's** 135:24
**evidence** 27:24 42:8 43:7,13 136:20 160:19 161:3 182:16 204:4 206:1 207:20 209:13 210:5 212:21 213:22 214:14 215:9 219:3 245:2 266:1 282:23,25 284:22 285:1 287:5 293:23 305:16 317:13 323:8 337:19 348:16 349:15 352:4,16
**evidenced** 196:18
**evidentiary** 350:14
**exact** 12:14,21 21:17 168:11 173:5 238:3 273:8 286:18 289:1 311:13
**EXAMINATION** 5:10
**examine** 284:25
**examined** 5:8
**examples** 42:1
**exceptions** 31:24 32:1, 3 132:21 299:22
**excessive** 270:6,11
**exchange** 308:7
**exchanged** 279:17
**excited** 246:5
**exclaimed** 154:9
**excuse** 61:18 87:2 88:14 124:3 159:10,15, 16,21 160:1 172:1 194:25 199:3 287:18 323:13 329:13 341:24
**exercise** 345:16,18 349:25
**exercising** 49:2

**exhibit** 247:24
**exist** 336:25
**exit** 213:25
**expect** 226:1
**expected** 101:20 316:25
**experience** 10:8 12:16 13:16 28:18 29:5 33:23 34:17 38:11 46:9 52:5 54:7 55:24 56:21 57:1, 10,14 64:24 67:9 68:6 73:24 84:15 96:24 106:22 107:1 110:24 124:2 145:16 154:22 173:25 183:23 184:3 186:6 204:7,17 205:4 207:7,10 238:5 268:25 279:18 281:10 286:1 310:19 311:17 313:3,23 315:1 317:18 335:17 348:25
**experiences** 15:23
**experiencing** 209:25 248:20,25 260:9 301:6 324:25
**explain** 92:7 157:21 165:17 257:17 266:14
**explained** 33:8 222:17 261:13 289:19
**explaining** 307:12
**explains** 220:17
**explanation** 333:20
**explicitly** 249:24 309:17
**expressly** 307:16 326:5 333:6
**extended** 15:19,20 219:1
**extends** 38:6,7
**extent** 25:23 26:22 28:10 161:21 166:20 243:24 246:3 279:12
**extenuating** 236:3
**external** 26:11 27:6 226:21,22
**extremely** 240:20
**eyes** 74:15 321:25

**F**

**F/w** 114:13
**fabricate** 269:25
**Fabricating** 270:2
**face** 117:15,20 146:20, 21,25 147:2,3,4,8,14, 16,20 148:1 175:1,2,3, 4,9,11,15,16 176:20 178:22 181:7 188:20 193:1 206:24 213:8,10, 18 214:11,12 218:14 230:24,25 231:7,21 232:12,21,24 249:13 317:8 320:24 321:7,11, 17 322:14,15,19,20,23 323:25 324:16,22 325:15 351:25
**facial** 232:19
**facilitate** 29:18 40:17 92:12
**facing** 159:6
**fact** 9:23 47:2 76:16 103:20 165:3 177:17 182:8 183:10 189:10 193:17 206:7 207:1,5 218:22 221:17 222:9 226:10 233:18 248:6 309:11 330:22
**factor** 282:24
**factors** 26:9,13 40:16 56:11 123:4 189:10 190:3 270:9
**facts** 13:1 91:4,9 94:5 124:7,15 125:10 156:18,23 159:4 163:18 204:3 207:20 209:13 210:4 212:21 213:22 214:14 215:9 269:25 270:2 271:6,11,14,25 272:5,16 282:22 287:5 339:16 340:3,16 341:2 348:15 349:15 350:2 352:16
**factual** 42:6
**failing** 59:21 94:11
**fails** 309:7
**fair** 20:5 37:19 49:11 303:9 354:4,7
**fake** 271:14
**falling** 186:22
**falls** 145:25 261:1
**false** 40:1 41:22 132:1 269:19,22 283:6,16,23, 25 284:9
**falsely** 269:24
**familiar** 7:11 21:17 44:19 59:13 66:24 78:20 81:3,5 100:14 103:6 251:22 269:3,4
**family** 15:17,19,20 117:20
**Fantastic** 255:14
**fast** 246:2
**fault** 223:23
**feature** 138:5
**fed** 195:5
**federal** 5:14 9:20 83:24 172:14 252:2,5
**feel** 34:11 61:25 64:23 74:17 166:12 243:15 245:4 259:10 283:24 298:6
**feels** 14:21
**feet** 26:17,18 103:4 151:19 188:7,10
**Feliz** 111:20
**felt** 40:14 82:14 246:6 267:10,15,18
**FEM** 110:10
**female** 110:10 111:15 114:12 120:9,17 125:6, 7 126:8 135:9,14 138:21 139:20,21,25 144:3 146:10,11 233:15 325:12
**fences** 14:13
**fencing** 14:12
**Fernando** 80:22 82:24 102:14 111:16
**fidgeting** 30:2
**figure** 20:20 29:6 92:4 222:22 304:4
**file** 307:22,24
**filed** 7:9 68:23
**filing** 72:20
**fill** 46:10
**filled** 45:13 46:7,17
**finally** 53:9
**find** 76:18 92:14 125:20 174:13 215:6,7 274:20 297:22
**fine** 5:25 7:14 41:4 65:6 111:14 178:3 187:2 305:24 342:16
**fine-tooth** 74:19
**fingers** 306:3
**finish** 11:16,19 19:6 113:1 147:23 150:14 159:12 160:1,3 172:1 213:16 323:17 342:15, 17 349:4,7 353:14 354:1,9,24
**finished** 13:5 16:5 17:17 354:22
**finishing** 212:17 353:15,20
**fire** 184:4 208:14 248:4
**fireworks** 50:23
**firmly** 38:3
**fit** 28:10
**fitting** 116:24
**five-minute** 89:13 90:2 259:19 341:17
**five-second** 254:16,18
**flowed** 254:20
**fluently** 169:2
**fly** 324:9
**focus** 301:15

**focused** 175:9 176:2 217:20 247:10

**focusing** 77:18 333:11, 12

**follow** 46:10 143:20 168:11 169:2 319:15

**followup** 343:13 353:13

**followups** 349:3

**footage** 138:13,15 304:5

**force** 270:6,12 314:19, 20,25 315:8,11,15

**forget** 328:2,11

**forgetting** 14:21

**forgive** 7:11 14:21

**forgot** 250:7

**forgotten** 109:21 131:25 235:17 328:12

**form** 11:24 43:8 44:7, 10,22,25 45:10,13,15, 18,20 46:7,17 94:4 153:18 155:22,25 157:16 183:16 190:17 205:13 281:23,24 282:2 284:5 329:8

**formal** 107:25 320:21

**format** 251:11

**forms** 18:19 44:11 46:3,5,10 281:14

**found** 76:15 221:21 274:14 357:6

**foundation** 192:7 201:21 204:4 207:21 210:4 271:12 283:9 284:13 287:6 291:25 323:8 335:22 339:20 347:10

**Fourth** 50:21

**frail** 315:19

**frame** 16:25 117:18 133:12 143:12,17 259:15 264:14 268:10 296:25 346:18

**frankly** 330:1

**freely** 197:2 218:19

**freeway** 103:16

**frequently** 22:18 44:23 49:24 50:15 80:15 221:20 249:25

**fresh** 197:24

**friend** 300:9

**front** 109:9 128:15 131:24 134:14 140:10 170:4 200:19 263:16, 19,25 265:7 278:21 289:2 291:9

**frustrations** 263:23 267:19,22

**fulfilled** 210:8

**full** 5:19 16:23 42:4 88:8 232:18 280:12

**full-time** 9:2 15:7

**fully** 10:3 148:1,14 152:1 175:1 252:4 322:15,19 336:9

**functionality** 136:17 138:6

**funny** 60:23 354:13

**future** 120:23 137:7 269:11

**G**

**G-R-I-F-F-I-N** 5:21

**G-U-N-N** 17:10

**gain** 42:4

**Galleria** 54:2

**games** 354:14

**gather** 46:4 57:14

**gathering** 272:16 298:14

**gave** 93:5,15 254:22,25 271:17 310:12 326:15 356:14

**Gazandjian** 325:13 332:17

**general** 34:17 49:19 52:18 59:23 60:14 62:24 63:2,5,13 67:23 68:1,7 75:5,9 79:11,20, 24 80:1 94:15,21 95:2, 13,15 96:16 97:1 122:9 246:21

**generalities** 53:23

**generally** 34:3 38:9 82:6,8 103:10,12 121:8 308:15 315:12

**generate** 82:16

**genuinely** 121:18

**Geographically** 102:21

**geography** 103:15

**gestures** 155:21

**get all** 266:8

**gist** 260:23

**give** 4:7 7:25 31:9 35:8 38:19 45:5 49:12 58:25 64:23 65:15 83:21 88:19 89:17 103:3 106:11 108:18 132:20 178:11 185:4 190:19 211:13 232:15 245:3 258:4,13 259:9 274:8 275:24 276:4,10 300:11 302:4 319:25 330:10 348:10,11,17,18 358:2

**giving** 40:15 77:16 92:19 97:16 123:11,12 274:18,21

**GL** 110:4,7

**Glendale** 5:4 6:21 7:17 8:21 9:3 13:7 15:7 16:6 17:10,22 18:3,5 19:7, 14,18 20:1,17 21:3,8 22:15 24:15 27:21 35:22 37:6 49:22 50:10, 11,18 51:1 54:2 59:5 70:21,23,24 71:14 72:11 80:12,14,19,21 81:12 82:21 91:15 99:15 101:2,17 102:9, 12,13,14 103:7,13 104:12 110:5,7,10 111:16 115:6 117:14,24 118:8 119:16 129:5 145:3 207:15 216:18 280:4 296:11 312:22 314:24 320:21 325:9 336:4 344:24

**glitches** 6:3

**global** 116:16

**goal** 42:2 126:4 145:24

**good** 4:24 5:12,24 6:2, 14 8:2,18 31:21 32:18 126:4,5 200:5 216:17 225:21 228:19 251:2 266:8 289:3 306:2,11 326:7

**goodness** 103:14 128:22 267:9

**gosh** 229:18

**gracious** 348:21

**graduate** 14:1 18:16

**graduated** 9:7 13:22 14:3

**graduating** 13:10

**grainy** 138:15

**grateful** 8:4

**graveyard** 98:1,3,13, 16

**gray** 135:9

**greater** 294:21

**green** 114:13

**Griffin** 5:7,20 100:19 104:7

**grin** 178:22

**grocery** 54:3

**ground** 9:16

**group** 111:4

**growing** 17:23

**guess** 4:3 29:16 72:8, 10 84:4 114:12 150:13 280:14

**guidance** 83:21

**guide** 160:2

**guides** 48:22 78:17 92:10

**guilty** 59:17 276:1 295:16

**Gunn** 17:10

**guys** 128:14 321:10

H

**H-A-N-S-O-N** 17:13

**habit** 50:14

**half** 16:24 72:8 98:9 150:13 197:20 220:22 264:3 303:6

**halfway** 151:25

**hand** 6:3 92:5 259:19, 22

**handcuff** 343:24

**handcuffed** 164:14 187:22 189:14 218:1 234:3 308:19 309:3,9

**handcuffing** 309:8 315:18 344:17

**handcuffs** 148:8,13 149:19,21 150:3,8 152:6,10 156:5,14,17 157:12,17,20 159:5 162:24 174:24 183:8,19 185:23 217:21,24,25 218:6,13 219:19 233:15 234:20 240:16 242:7,19 244:9 275:13 296:3 302:14,17 303:15,20 309:11,15,18 314:15,22 315:7,24 316:7,13,15, 18 317:17 318:1 319:4 351:25 355:16 356:10, 11

**handle** 347:3

**handled** 346:23 347:7

**handling** 20:10 39:23 105:15 107:2 108:20 132:23 141:12 144:20 145:11 211:23 272:2 275:17 277:18 302:11

**hands** 174:24

**Hang** 228:1

**Hanson** 17:13

**happen** 123:2,20 204:25 209:10 307:20, 21 308:15

**happened** 43:12 126:15 161:14 165:16 198:15 238:9,10,14 305:9 345:25

**happening** 260:1 294:13 297:19,23 318:19

**happily** 100:2

**happy** 7:3 147:12 158:7 169:17,20 178:18 181:9 185:20 207:24 222:10 226:15 227:2 245:1 250:14 252:5 318:20

**harassing** 178:25

**hard** 54:21 171:18 182:13,18 198:23 200:2 214:21,24 215:12 221:4,17 222:13,23 243:4 246:1 250:21 254:17 257:24 259:20 280:6 302:21 321:23

**harder** 168:8 249:23

**harm** 269:11

**head** 77:15 78:8 82:1 197:5

**headshot** 320:20

**health** 207:13

**hear** 5:24,25 42:3 69:14 91:22 101:5,8 104:15, 24 120:3 163:8 168:8, 10,11,13,17,21 169:1,4, 6,19 170:13,15,23,24 173:21 174:16 176:18 179:22 180:4,7 181:4, 10 188:23 193:3,8,23 194:3,19 197:22 198:11 200:2,4,9 201:1,23 202:9 210:22,25 216:5 220:18,19,21 221:7,12 222:21 225:7,17 228:12,13,14,16,17,23, 25 229:3,20,23 230:3,4, 8,22,25 231:2 233:17 236:10 239:18,20 240:25 244:23 245:7,9, 17 249:16,22 250:17, 20,23 251:19 252:9,12, 17,19 253:4,20,22 254:1,3,8 257:19,20,21, 22,25 258:3,17 259:7 261:19 264:5,7 267:7 274:6 279:8 288:1 300:17 306:9,10,15,19, 22 317:24 320:10,11,15 323:14,25 324:11 325:13 354:5

**heard** 23:6 125:5 165:20 167:20 168:25 179:8,9,14 180:1 188:24 194:5,6,14,15, 17 195:24,25 196:2,4,9, 13 205:16 209:16 220:20 222:20 224:24 225:1,6 228:22 229:5, 13,16 230:21 233:16 245:10 248:24 249:19 251:4,5,12 255:25 256:6,8,25 257:4 267:19,22 272:19 273:9 274:9 277:2,5 289:11 297:15 300:15 305:8 306:25 307:4,8,18 319:13 320:16 323:22 326:2,3 332:14,15 335:14

**hearing** 120:14 124:5 143:7 152:23 170:10,11 202:15 220:23 221:5 222:14,23 226:21 229:12 235:20 239:23 253:13

**hearings** 12:3

**heart** 203:25

**heightened** 132:10

**held** 4:8 150:16 223:4 330:12

**helped** 95:9 167:1 305:14

**helpful** 128:2 144:14

**helping** 15:24 203:14

**helps** 46:20 247:15

**hey** 112:20 258:13 295:17

**high** 13:24 14:1,3,5 113:20 114:8,10

**highlighted** 94:13

**hire** 71:8

**history** 15:15 100:6 280:11,20 331:23

**hold** 13:8 255:7 296:19

**holding** 311:13,16

**holes** 14:13

**holiday** 14:16

**home** 38:16 39:1 265:15,18

**honest** 54:18 84:24

**honestly** 266:16

**hope** 270:12 283:21

**host** 227:10

**hour** 150:13

**hours** 98:6,9 100:18 108:18 328:3 353:8

**hundreds** 80:11 244:2

**hurdle** 186:17

**hyperventilating** 246:3

**hypothetical** 41:18 42:1,11,14 56:7 86:8,14 88:19 91:4 93:5 94:9 123:11,13 124:7 189:4 192:6 271:11,17,23

**hypothetically** 55:9 122:18

**hypotheticals** 42:13 88:16,19,25 89:17,18

**hysterical** 223:23

I

**idea** 106:25 254:15

**ideal** 165:7

**identification** 4:4

**identify** 108:7 121:8 139:22 266:10 267:3

**idiotic** 342:21

**IED** 300:10

**illegal** 269:10,12,14

**illness** 188:18 209:7 247:14

**illnesses** 207:14

**illuminated** 168:9

**image** 138:16

**images** 138:11

**imagine** 39:9 76:17 81:17 101:22 108:16 135:22 143:15 234:7 243:8 278:22

**immediately** 355:21

**impalement** 247:12

**implemented** 21:1 22:21 27:12,19 28:5 118:10,18

**implementing** 46:20

**implies** 188:6

**important** 84:6 115:14 130:9 189:10 232:10 286:12 324:23

**imposed** 37:2 310:25

**impossible** 203:3

**impounding** 265:19

**impression** 32:16,17 239:6

**improper** 272:3

**improved** 301:19

**inability** 61:10 203:24

**inaccurate** 237:25

**incidences** 48:20 53:12

**incident** 7:7 20:11 23:24 25:24 29:23 42:2 43:20 44:14 51:25 52:3 55:17 56:9,25 57:16 66:5 68:22 69:9,14 70:6 72:16,18,21 73:5 80:20, 23 82:1,3 92:5,20 97:18 98:19 99:12,16 100:1, 11 102:8 108:21 109:18,19,21 110:4 114:2 117:15 120:19 125:3,18 126:24 129:24 130:12 131:16,19,22 132:18 134:3 135:23 137:1 138:17 139:8,13, 14 141:22 142:24 143:8 144:1 145:21 149:24,25 150:24 153:8,22 154:13 156:16,19 159:2 161:18 162:4,9,16 163:10 164:4 165:19 169:25 185:21 196:14 235:6 242:9 266:11 267:17 280:11 283:24 288:5,9 293:15,19 295:2 297:6 302:8 321:1 340:11 341:8 344:6 345:19 346:24 347:3 349:20 350:6 351:11 356:9

**incidents** 16:1 19:22 25:21 39:22 45:1,17 47:20 48:23 49:25 81:18,19 82:19 102:4 113:25 133:25 336:3

**inclined** 83:6 274:25

**include** 49:1,17 266:21

**includes** 43:14

**including** 266:2

**incompatible** 344:13

**incomplete** 86:8 91:4 189:4 192:6 271:5,11

**incorrect** 210:25

**increments** 254:16

**incriminate** 293:9

**incriminating** 293:5 295:22

**incumbent** 94:8 224:13

**indefinitely** 337:16

**independent** 108:25 109:5 135:15 138:8 198:15 275:9 284:18 285:3 304:24

**independently** 21:23

**indicating** 110:15 164:22

**indications** 187:4

**individual** 36:19 38:14 44:6 120:20,22 122:25 185:17 192:12,25 281:4 283:17 314:23

**individually** 19:20

**individuals** 31:23 41:8 52:23 133:17 134:15 184:14 185:8 299:22 315:19

**induce** 188:19

**industrial** 7:21

**infer** 52:10 123:5 258:12

**inference** 95:12

**influence** 270:10,25

**inform** 272:23 294:23

**informal** 9:24

**information** 57:15 68:22,24 84:3 91:8 94:1 112:15,16 114:20 125:5 141:8,9 236:23 237:5 239:10,17 262:12,13 263:8 264:12 266:9,19, 20,22 273:3 275:17 276:18 282:25 284:22 286:12,17,19,22 289:4 295:3 340:20

**informed** 60:2

**initial** 109:4 153:21 216:7

**initially** 143:22 144:5 157:8 344:16,17,18,20

**initiate** 105:10

**initiative** 231:17

**injured** 137:4

**injuries** 113:25 247:12

**injury** 7:21,22

**inmates** 203:19

**input** 108:5 280:21 285:24 331:23

**inquiries** 297:25

**inside** 26:9 53:16 94:7 120:9 140:13 142:1 147:20 197:11,13 212:9 241:11 253:16 313:18

**inspect** 316:15

**installed** 200:16

**instance** 107:4 189:8 190:5 317:2

**instances** 26:24 46:2 53:18 124:24

**instituted** 24:3

**instructed** 231:14

**instructing** 158:17

**instructions** 49:1

**instructs** 12:6 65:19 88:3

**insufficient** 124:7

**insurance** 46:22

**intake** 182:22

**intelligible** 253:8

**intended** 243:16

**intensely** 277:14

**interact** 119:24 165:9 268:22

**interacted** 29:15 268:11

**interacting** 31:12,23 119:17 122:21 123:16 210:23 211:1,7 261:19 332:3

**interaction** 71:23 72:6 139:17 165:16 187:25 238:1,3 284:5 301:19 303:6 304:10 346:10

**interactions** 30:22 31:20 72:15 128:8 139:25

**intercede** 269:2,16 270:7 283:5,15 291:13 329:7

**interchangeably** 307:1

**interest** 333:2 355:23, 25

**interested** 86:13,15 88:25

**interesting** 168:19 268:24 318:15 320:3

**interference** 171:20

**interfering** 218:24

**interior** 168:3

**interject** 228:20
**interjected** 56:11
**intermediate** 19:2,9,11
**intern** 13:12,14
**internal** 70:2,5 226:23
**Internet** 92:12
**interpret** 67:1 104:2 120:18
**interpretation** 301:11 304:13,15
**interpreted** 100:25
**interpreting** 64:3 101:9 118:25
**interrogated** 296:2
**interrogation** 296:20
**interrupt** 314:10
**interrupted** 23:3 324:5
**interrupting** 159:18
**interruption** 57:11
**interspersed** 221:23
**intervene** 270:13
**interview** 70:2
**interviewed** 70:5
**interviewing** 160:13, 14
**intimated** 186:3 302:6
**intimately** 7:11
**intrusion** 313:7
**inversed** 181:3
**investigate** 36:20 42:17 126:1,5 260:15 312:14
**investigating** 28:7 86:6 210:13 263:2 271:8 277:18 286:13
**investigation** 41:20 91:21 126:6 140:20 146:4 212:18 213:17 236:22 239:4 244:11 260:19 265:11,25 266:5 273:5 278:13 282:11 285:7,11 286:8 288:10, 21,24 289:16 294:22 295:12 297:6 331:9 339:25 349:23 350:1,15
**investigations** 92:11 237:11 284:21
**involve** 89:11
**involved** 30:9 33:25 35:1 43:19,25 57:16 71:17 73:5 115:17 118:19 121:16 125:20 126:11 128:7 134:15 139:12,24 162:4 241:24 266:11 280:13 295:4 336:2 348:2 350:5 356:9
**involvement** 100:4 130:6 135:23 160:7 164:4 166:21 181:16 274:24
**involvements** 153:12
**involves** 65:21
**involving** 34:24 38:25 47:14 53:13 113:25 120:20 165:19 336:2
**irrelevant** 28:22
**issue** 166:16 167:17 182:8 194:10 199:12,13 224:20,25 225:1 228:22 233:5,7,10 316:19 324:24 338:21 339:10
**issued** 21:25 23:12 25:9,12 27:25 50:7 137:11,21 338:9 346:1
**issues** 47:7 56:23 81:24 121:19,21 356:2
**items** 80:17,18

**J**

**jail** 320:21 325:10 343:19 344:24 349:12
**James** 104:8 105:14,24 127:5
**January** 20:22,23 23:9, 14 35:25 97:20 116:1 117:11 136:22
**job** 7:7 9:12 13:7 42:16, 19 154:15 285:15,16
**jobs** 14:11,20 154:17
**joke** 348:23
**judge** 9:24 12:1 28:25 56:3 87:8 163:22
**judgment** 43:10 262:16 331:11
**July** 50:21
**juncture** 202:3 230:9 236:14
**jury** 49:1
**justified** 333:21 334:10,12

**K**

**K-I-M** 17:15
**Kang** 226:14
**Karen** 65:9 305:20 342:23
**keeping** 37:4,20 155:11 173:8
**key** 92:13
**kick** 176:4
**Kim** 17:15
**kind** 7:1 8:12 20:10 24:2 38:12 54:1 81:24 84:3 108:25 114:1 121:7,21 136:10,13 137:4 152:1,3,24 166:6 172:15 177:7 178:22 184:18 186:13 187:11 207:17 209:9,15,23,25 223:23 242:2,21 245:2 264:15 269:5,15 274:22 279:10 282:4 342:21
**kinds** 38:10
**knew** 29:7 48:24 111:23,24 131:18 246:8 273:3 325:20
**knowledge** 7:9 27:9 49:17 72:22 138:24 140:15 239:10,13,15,16 242:15,20 261:17 331:14 334:14 348:3
**knowledgeable** 343:13

**L**

**laborious** 277:14
**lack** 192:7 201:20 204:4 207:20 210:4 271:12 273:12 283:9 284:13 287:5 291:25 323:8 335:21 339:19 347:10
**land** 59:21 75:4 83:10 84:17 85:10
**language** 215:11 340:8
**larger** 102:21
**latency** 68:11
**law** 7:24 8:2,15,17 9:12 13:8,16 15:10,17,19 16:3 33:12 38:4,5 41:24 63:23 64:14,15,18,22 65:25 66:3,11,14,17,19, 20,21,23,24 67:8,9,13 172:12 177:11 190:25 274:1 280:2 284:10 294:5 309:23 318:18 328:22,25 336:24
**lawful** 36:8,17 37:12 60:1,5,7 271:9 272:4 314:3 315:2 326:18 330:23 331:2 335:18
**lawfully** 59:22 124:25 334:13
**lawfulness** 36:21
**lawsuit** 6:23 7:1,2,4,8 56:25 70:9,12,14 71:18 72:20 109:14
**lawyer** 68:16 151:2
**lawyers** 251:20
**lay** 34:15
**laying** 34:11
**learn** 70:9,12,18 283:6
**learned** 70:14,16 71:17 140:25
**learning** 286:11
**leave** 25:4 59:21,24 67:22 75:4 79:11 82:9

83:10 84:16 85:10 94:10,11 114:14 125:6 262:24 278:14 325:22

**leaves** 189:9

**leaving** 243:3

**left** 21:2,14 27:21 43:9 72:11 79:2 264:24 278:19 329:14 346:2

**left-hand** 100:18

**leg** 300:4,10

**legal** 10:8 40:4 53:7 55:19,21 57:20,23 63:7 64:24 71:11 75:12 77:10 79:15 83:12 84:20 85:13 90:18 91:5 96:12 121:12 124:9 204:3,20 290:8 310:6 311:11 319:25 326:24 333:1,18 334:3,7 335:21 336:13 337:8, 14,22 339:19 341:5 345:11 349:16

**Legally** 310:18

**length** 287:10

**lengthy** 267:10

**letter** 38:4

**letting** 353:13

**level** 19:5 93:8 260:5,7

**levels** 19:1

**liability** 46:21 204:1,7

**license** 264:12

**lieu** 4:16

**life** 33:21 84:6 103:8 203:21 232:7 247:22

**light** 132:4

**lights** 113:11,17,19,23 114:4,5

**limit** 118:20

**limitations** 121:5,7,10 122:14 124:19

**limited** 26:12,23 27:15 38:17 94:5 135:24 136:16 159:15 165:15 184:20 304:19

**limits** 171:17

**Lincoln** 8:17

**lines** 181:2 257:8,9 284:17

**listed** 99:13,19 339:2

**listen** 43:25 63:15,16 87:21 130:20 179:18,20 205:5 216:16 255:4 258:15 259:6 268:17 306:13

**listened** 168:17 179:24

**listening** 165:22 179:20 193:20 268:16

**litigation** 357:8

**live** 223:19 225:19

**lived** 6:9 103:7

**load** 108:7

**locate** 264:10

**located** 8:17

**location** 47:21 53:16 56:15 73:15 80:25 81:4 101:17,18 110:3,9 111:15,17,19 120:10,17 121:3 124:18 125:8 262:21,24 279:4,19,22 280:1,10,17,22 281:2, 13,25 284:7 289:20,22 295:8 302:1,3 307:15, 16 323:3 325:16 326:6, 7,20 327:7 328:14,20 331:16,20,24 332:19 333:7 334:5,22 335:19 337:5 345:24

**locations** 82:21

**lockdowns** 116:16 117:2

**lodge** 267:15

**log** 99:10,15 104:1 107:22,23 110:1 126:19 127:2,4 135:5,11 139:5 237:1 280:20

**logs** 346:11

**long** 6:9 8:20 14:22 16:14 21:7,14 33:1,19 50:25 60:18 64:9 66:14 169:19 308:9 312:18 330:8

**longer** 64:8 70:22 78:22 140:12 244:19 267:12 268:12,13,14 289:20,21 301:7 326:5 329:24 331:19 332:6,18 334:4 335:9

**looked** 72:23 134:17 135:5,14,16 138:16 139:16 265:14 290:4 325:25 340:25

**loosen** 302:13,16 316:7 318:1 319:4 355:16

**loosening** 351:24

**Los** 8:24 9:8 13:12 33:7 111:20

**lost** 357:5

**lot** 12:10 15:21 22:11 39:25 40:3,20 67:6 74:21 77:18 82:12 128:16,17 146:16 151:23 152:1 171:18 213:4 243:4 264:10 310:11 349:18 353:14

**loud** 26:7 146:14,16,17, 18 152:22 165:4 182:20 200:25 205:20 240:20 243:2 257:18 267:13

**loudly** 152:18 154:1 155:7 186:24 190:6 241:14 257:14

**lower** 181:7 213:18 230:12,23 231:6 232:23 249:13 252:21 257:23, 24 258:2 298:17 299:17 320:12,16,24 321:7 323:24

**lowered** 214:11 230:3 232:21 258:10 321:17, 20 322:3 324:15 325:6

**lowering** 320:17 351:25

**luck** 8:19 225:22

**ludicrous** 276:18

**lunch** 102:5 150:11,13, 18,23 151:2

**lunge** 241:4

**lying** 215:1


## M


**Macy's** 14:15 54:2 281:16

**Madam** 329:13 357:20

**made** 34:25 35:3 44:5 45:18,20 46:1 47:6,12 63:24 76:7 78:19 82:4 144:20 148:19 149:13 160:9 217:23 240:10 241:18 245:22 254:14 265:24 271:2 275:12 278:16 282:21 289:8 301:7 313:4 329:1 336:1,2,6

**magistrate** 86:17,18 87:18 88:4 89:11

**main** 14:20

**maintain** 110:18 351:19

**maintained** 193:14

**maintaining** 110:16 145:20 192:11 272:24 277:3 301:24

**major** 15:13,14,15 38:15 115:18

**majority** 20:4 101:19 139:12 258:20

**make** 10:10 11:2,6 12:1,12,19 33:17 34:5, 22 35:9,15 36:5 37:10, 16 39:8,13 40:7,10,13, 21 41:8,23 42:5 45:6 49:1 51:22 55:12,15,22 57:7,17 64:11 65:8 75:21 77:7 81:21 85:20 88:11 113:2 144:18 148:24 149:7,10,12 157:25 160:4,18 174:11 177:24 186:19,22 192:10 193:16,20 205:6 219:17,25 223:7 245:4, 11,13 249:18,20 254:4 259:9 260:21 261:13,25 262:16 266:21 267:18 277:13,25 282:25 284:8 297:4,9,10 299:25 302:9 306:2 308:3,11

314:13 329:6 344:22,25 349:11 354:25

**makes** 55:11 152:2 231:2 252:22 283:16 300:23 309:14

**making** 34:18 42:22 43:17 46:11 86:13 143:13 155:20 175:24 180:15 249:6 263:23 269:19 270:23 271:5, 14,18 282:23 283:6,23, 25 284:23 285:1,8 291:5,13,15,19 295:21 304:17 313:24 317:8 318:16 328:8 329:9

**malls** 52:17

**management** 82:14,20 267:14

**manager** 94:9 277:4 308:2

**mandatory** 30:7,14 37:10

**manner** 4:21 31:19 146:11 205:13 219:14 350:6,11

**manually** 108:4

**March** 116:13,22

**mark** 65:8,12 259:19

**market** 54:4

**mask** 117:15,21,22 146:20,21,25 147:2,4,8, 14,16,21 148:1 175:1,3, 9,15,16 176:20 181:7 188:21 193:1 206:25 213:8,10,18 214:12 218:14 230:3,13,24,25 231:7,20 232:12,19,21, 24 249:13 257:23 298:17 299:17 317:8 320:13,17,24 321:7,17, 20 322:3,5,6,14,19,23 323:25 324:16,17 325:6 352:1

**masks** 231:12,15

**material** 153:17

**materials** 68:15

**matter** 4:18 6:22 36:20 43:11 105:18 110:16 116:6 123:4 125:20 134:23 143:10 153:12

**meaning** 104:2 145:6 173:24 189:14 239:9

**means** 52:11 63:13 100:23 110:13 115:9 136:19 189:25 190:2 286:4 295:16 311:7 314:2,3 334:12

**measure** 118:18

**measurements** 12:14

**measures** 118:14

**mechanisms** 7:12 33:10 92:3 280:4

**medical** 117:21 183:24 184:5,14,17,21,25 185:5 186:4,11,13 191:5 205:11 208:3,9, 22 209:7 220:14 222:1, 3 247:10 315:18

**medicine** 247:11

**meeting** 48:25

**members** 30:23

**memory** 12:17 18:3 35:14 36:9 48:17,19 50:4 58:11 73:11 74:7 84:5,12 92:15 108:24 109:1,6,22 127:2,8 134:21 135:13,16 138:8 139:7 146:23 153:7,10, 17,20,21 161:18,20 162:2,9 167:2 198:15 250:6 264:9 278:25 304:24

**mental** 138:16 188:18 207:13 247:14

**mentioned** 49:4 69:5 102:11 133:14

**merchandise** 122:4

**met** 122:16

**method** 137:17,23 172:11 190:25

**microphone** 25:3 26:3, 19 27:7 308:13

**military** 15:21

**million** 266:13

**mind** 33:19 47:12 49:16 50:17 74:4,20 125:5 131:18 132:14 309:10 319:23

**minds** 317:1

**mine** 153:11 200:7

**minimum** 233:25 239:16

**minor** 347:18,20 349:12

**minute** 84:8 87:8 330:11

**minutes** 103:21 106:12 147:21,24 157:11 179:24 227:6,7,25 228:2 256:17 259:17 264:2 279:15 303:5,6, 12,14,21,22 304:2,6 306:25 313:16,25 314:14 316:2,3 342:9 346:3,7,13,14,16 348:18 353:9

**Miranda** 292:25 293:2, 7,11,14,16 295:23 296:1 297:8

**mirror** 173:5

**misdemeanor** 46:24 59:18 73:1 240:2 343:21 347:20 349:12

**misdemeanors** 338:21 347:19

**misplaced** 357:5

**missed** 45:13 235:3 246:19

**misstates** 78:6,14 133:9 182:2,16 188:2 206:1 213:22 216:3 219:3 282:19 283:9 284:13 293:23 303:2 317:13 318:7 323:8 337:19 351:1,16 352:4, 16

**mistake** 309:19

**mistakes** 10:24

**Mkrtchyan** 4:2,24,25 5:11 41:1 53:21 54:19 55:20,25 56:18 58:8 61:24 62:8,16 63:9 64:13 65:7,12,14 67:11 73:22 75:19,25 76:5,10 77:23 78:9,25 79:18 80:2,7 83:17 84:25 85:8,14 86:2,10,22 87:1,3,19,24 89:24 90:4,23 91:10,24 93:10 94:2 95:16 96:19 97:14 120:2 121:20 122:5 123:24 124:10,22 133:21 147:6,18 150:10,20 156:20 158:15,21,23 159:14,19 160:11,17,25 161:10 163:6 164:10 169:22 170:19,22 176:23 178:19 179:1 181:5 182:10 183:3,21 184:10 188:11 189:6 190:22 191:13,24 192:14 193:7 195:13,17,21 196:12 198:8 199:19,25 201:12,22 202:13 203:13 204:5,14,21 206:3 208:4,15 209:17 210:6 211:6 213:5 214:2,18 215:20 216:10 217:4 219:9 221:3,8,10 223:6,24 224:23 225:4, 12,23 226:2,17 227:4, 12,22 228:6,10,15 229:1,7,10 255:20 271:16 283:2,10 284:1 285:4 287:17 288:11 290:11,18 291:2 292:7 293:24 294:19 296:16 298:11 299:6,13 301:9 303:11 304:12 305:19 306:1,8,18 310:9 311:14 312:9 317:14 318:8 323:9,19,21 325:4 326:25 329:16,21 330:2,14 333:4,22 334:11,25 335:23 336:16 337:12,20 338:17 339:21 340:13 341:9,14,21 342:2,11 343:11 345:14 347:4, 14,24 348:16,20 349:5 350:3,8 351:4,21 352:7, 10,24 353:2,10,19,24 354:12,18 355:4,7 356:16 357:13

**monitor** 196:16,22,23 206:22 222:8

**monitored** 206:18 209:2,3 244:15,16

**monitoring** 193:15 196:24 203:16,17 204:8 205:2 206:12,25 211:9 265:9 315:23

**months** 99:11,20

**morning** 4:25 5:12 74:16 98:20,22 108:15 165:3 328:1,10

**motioning** 180:17 182:19

**motor** 259:7

**mounting** 219:8

**mouth** 175:2 176:3 230:13 231:13,15,16 320:4,18 321:17,20,25 322:4,9 323:5

**move** 62:14 76:19 120:5 187:16 197:1 218:19 227:5

**moved** 6:11 17:11 33:21 139:20 310:8

**movements** 175:24 176:3 317:9

**moving** 180:14,16 186:25 189:11,22,24 193:12

**mugshot** 322:25

**multiple** 173:3 354:4

**municipal** 49:22 50:2, 4,7,11,12,18,22 51:2

**N**

**Nairi** 325:13

**Nairi's** 325:19

**names** 17:8

**Narine** 4:25

**narrate** 125:11

**narrative** 44:12 164:17 312:6

**nature** 108:23 110:1 241:21 262:22,25 317:16

**navigating** 30:22

**nearby** 205:22 233:8

**Nebraska** 6:8,10 8:14, 16,17 67:8

**necessarily** 12:13 93:8 112:15 139:15 181:19 200:11 286:9

**necessitated** 242:24

**needed** 102:4 155:1 184:5 202:25 208:2 222:1 265:24 273:17 323:6

**needing** 185:5

**negative** 115:22 118:6, 24 119:3,21,22

**neighborhood** 101:25 111:25 257:15

**neighborhoods** 101:16

**neighbors** 205:21 317:24

**newer** 18:6

**nice** 329:25

**night** 29:22 97:24,25 98:11,18 99:4,24 100:17,22 101:15,22 107:3,8 108:9,13 153:7 167:8 345:19

**nights** 107:5

**nodded** 197:5

**noise** 26:13 179:7 241:15 260:5,7

**noises** 24:22 25:16 26:5 27:3

**non-law** 14:7

**non-priority** 113:7

**non-traffic** 338:20

**nonresponsive** 187:17

**nose** 175:2 213:19 230:14 231:13,15,16 321:17 322:3,9 323:5

**note** 130:9 243:15

**notes** 280:20,21 331:22 341:15,24

**notice** 10:25 240:2 279:25 281:12

**noticed** 280:25

**notices** 281:16

**notification** 281:24

**notified** 104:19 112:19, 20 279:20 280:25 304:9 316:12

**notifies** 240:1

**notify** 82:16 111:2 269:10 281:11 296:12

**notifying** 295:11,17 332:1

**nuances** 20:13

**number** 12:21 51:6 68:9 75:4 100:7,15 111:10

**numbers** 31:10

**numerous** 74:19 183:18 218:2

**nutshell** 16:2

**O**

**oath** 4:16 9:21 90:5 150:22 252:3 308:25 309:21 337:14 357:4

**object** 11:24 40:23 53:6 55:18 71:13 75:15 124:6,8 159:18 190:16 318:6 329:17

**objecting** 124:4 159:20

**objection** 54:13 58:3 63:6 64:5 67:3 73:19 75:11 76:8 77:9 78:5,13 79:14,21 80:4 83:11 84:19 85:7,11,23 86:7 90:17 91:3,18 93:1,23 95:6 96:11 97:7 119:10 121:11 122:1 123:22 124:21 133:8 147:5,10 156:10 160:4,5,10,21 161:2 162:11 164:6,16 169:14 176:21 178:24 180:23 182:1,15 183:15,25 188:1 189:3 191:17 192:5 193:5 196:6 199:17,20 201:10 202:11 203:9 204:2,11, 19 205:25 207:19 208:10 209:11 210:3 211:3 212:20 213:21 214:13 215:8 216:2,24 219:2 271:10 282:18 283:8,19 284:12 287:4 288:6 290:7,15,22 291:24 293:22 294:17 296:6 298:4,25 299:11 301:1 303:1,24 310:5 311:10 312:5 317:12 323:7 325:1 326:23 329:11 332:20 333:17 334:6,23 335:20 336:12 337:7,18 338:14 339:18 340:6 341:4 345:7 346:25 347:9,21 349:14 350:7,25 351:15 352:3, 9,15 353:1

**objections** 4:21 75:21 159:21,24,25 160:18 161:4 318:17,18

**objects** 88:3

**obligated** 12:4 28:18 31:1,9,17 42:22 65:23 88:5,21 184:24 192:3 269:15 271:20 273:25

**obligation** 145:18 210:9

**obligations** 89:14

**observations** 199:9, 10,13,14 248:13 268:4 289:7

**observe** 177:15 192:19 196:25 202:15 246:16

**observed** 151:6 155:6 215:23 246:22

**observing** 138:20

**obstruct** 342:13,25

**obstructed** 188:8 206:7 207:4

**obstructing** 160:5,18

**obstructions** 182:23

**obtain** 145:23 350:12, 13

**obtained** 142:23 143:1, 9

**obtaining** 143:16

**obvious** 202:22 253:21 299:24 300:2,5,6,8,11

**occasions** 257:1 316:2

**occupied** 59:22

**occur** 232:25 243:13

**occurred** 24:12 47:17 53:14 98:19 116:1,5 139:14 153:2

**occurring** 255:10

**October** 8:25

**odd** 14:11

**offender** 43:16 126:8

**offender's** 43:22

**offer** 28:12 356:21

**offered** 357:3

**office** 13:13 70:21

**officer** 6:19 8:9 9:2 16:9,20,22,24 17:2,9 18:6 19:15,21,24 20:9, 10,11 22:24 32:10 33:6, 13,16,23 34:22 35:3,8, 16 36:3,4,15,17 37:15, 25 38:12 39:23 41:8 42:16,20 43:3,22 44:18 45:12 48:5 52:6 54:8 55:7,15,23 56:13,22 57:2,21 59:11,25 60:3 63:17 64:8 66:5,25 67:15 68:21 69:6,20 71:20,23 72:7,13,15,19, 24 77:5 78:20,23 80:13 81:1,15,16,19,20 83:19 85:21 91:11,15 97:17 99:5 105:15,25 106:17, 23 107:6,10 108:7,10 113:6,18 115:2,3,11,15 117:13 120:7,18,24 121:23 122:23 124:2 126:14,17 127:4,9 128:5,6,12 131:20,21 134:10,22 135:17 136:2 138:19,25 139:1 140:4 141:4,7,12,13,16,17,18 142:21 143:14 144:2, 11,20 145:6,8,11,17,19 146:3 149:13 151:10,15 152:11,14 153:4 154:15,18,23 155:1,13, 17 156:5 157:7,9 158:10 161:16 162:21 165:18 166:14 167:4,5 177:10 181:14 184:13 188:6,12 189:1 190:12, 19 191:10 192:2,12,24 203:17,18 207:15 209:5,9,15 210:12,15, 21 211:1,12,17,23,25 212:11,17 213:16 214:1 228:14 231:25 233:6,9, 14 234:9,23 235:3,9,13, 19,22 237:7,22 238:1, 17,19,23 239:21,25 240:18 242:6,22 243:8 244:10 246:17,20,25 247:21 255:24 256:21 260:14 261:14 262:3,4, 8 263:10,14,19,24 264:14,16 265:6 266:19 268:1,7,19 269:9 270:4, 11,13,20,25 271:1,4,18 272:2,7,18,23 273:2,4, 5,8,14 275:17 276:16 277:7,12,17 278:3,16 279:2 281:3 282:20 283:6,16,23,25 284:8 285:1,8,17 286:2,14,18, 21 287:2,8,11 288:2,25 289:4,7,11,12,25 290:20 291:5,13,19 295:2 302:11 304:20 306:5,21 307:2,8,12 310:20 312:4 313:5 315:22 321:15 325:14, 20 326:2,21 327:22 329:1,5,8 330:17,23 331:5 332:6,16 333:5, 10,20 334:2,9,17,19 335:2,17 336:8,18 337:3 338:3,6,11 339:14 344:6,21 345:2, 3,9,13 347:8 349:20 350:5,18,22 352:20

**officer's** 46:24 145:7 179:14

**officers** 15:22 17:3,4 18:20 20:8,14,16 22:1 25:11 35:24 37:5 44:12 47:1 71:17 82:17,22 92:6 105:2 107:2 111:2 112:12,20 113:23 118:12,19 119:24 126:21,23 127:18 129:6 130:5,6 133:5 134:5 136:15,18 141:2,4,5 144:15 145:4,5 167:6 168:12 177:9 211:18 212:4,6,8 231:14,18 233:8,21,25 242:12 262:5 265:8 267:2 268:22 272:9 277:11 279:21 284:20 285:23 286:3 296:12 304:8 305:3,10 312:24 319:24 326:4 327:7 336:2,21, 23 337:15 349:18 353:6 356:8

**officers'** 269:2

**offices** 304:11

**officially** 7:18 116:10, 11 348:17

**oftentimes** 39:16 43:18 45:15 47:11,18 48:19 155:13 265:23 266:7 280:3 281:15

**Ohio** 310:25 311:3,5

**older** 23:21

**ongoing** 24:20 112:24 117:10 224:7 227:8 233:10 275:5 287:23

**open** 51:20,24 52:9,11, 12,16,17,24 53:5 54:4, 10 55:11 57:8 59:23 60:13 62:24 63:1,5,13 67:23 68:1,7 73:15 75:3,5,9 77:5 78:3 79:11,20,24,25 80:3 85:17 94:14,19,20,25 95:2,5,13,15 96:8,16 97:1 121:1 122:24 181:6 197:24 200:8,9 213:19 245:3 259:17, 22,25 260:3 290:5,17 320:4,12 321:11,21 322:4,23 323:5 324:21

**opened** 198:7,16,18 214:12 259:12 304:21 321:18 352:21

**opening** 166:15 197:23 198:2,20 199:16 244:24 259:14 320:17

**operating** 240:17

**operation** 84:18

**opinion** 91:8 93:25 115:9 116:6,8 123:3,10 124:1,14 204:13,24 271:22

**opportunity** 7:24 8:2 10:22 65:16 75:15 77:17 214:11 261:15 267:14 350:19

**opposed** 75:3 105:16 138:2 313:14

**option** 254:22,25 276:4,8 277:1,6,9 310:13

**options** 71:11 304:11 350:19,24

**order** 42:11 60:25 144:14 145:4 146:24 163:4,5 178:6 202:24 223:17,18 225:18 310:17 312:14 357:21

**Orders** 61:9

**ordinances** 50:24

**ordinary** 334:18

**organized** 112:14

**original** 224:20 251:10 258:16 357:17

**originated** 82:13

**other's** 285:22,24

**overheard** 141:3

**overlap** 98:14

**overlooked** 235:17

**overstepping** 276:15

**overwhelming** 101:19

**owner** 59:25 60:4,6

**owner's** 60:1,4,6

**ownership** 83:25

**oxygen** 206:8

P

**p.m.** 98:18,21,24,25

150:18 354:23 357:15 358:13

**pages** 74:19

**paid** 13:13

**painting** 14:13

**pairs** 19:20

**palpitations** 203:25

**pandemic** 116:3,6,9, 10,16,24 117:2 231:12

**panic** 188:14 189:17,20 190:14 191:11,15,21 246:17,18,22 247:2,6,9, 17,19 248:2,5,6,14,17 348:14

**pants** 114:14 135:9

**paper** 279:3 340:21

**papers** 109:14

**paperwork** 107:11 279:17

**paragraph** 44:18

**paramedics** 184:12,25

**paraphrase** 40:8 77:2 355:11

**paraphrasing** 307:24

**park** 128:14,20

**parked** 129:9 264:11

**parking** 128:16,17,24 129:4,6 151:23 152:1 213:4 243:4 264:10

**part** 28:22 39:22 71:3 80:12 168:19 235:5 246:20 248:18 265:21 272:10 294:23 320:3 332:1

**part-time** 14:23

**partake** 18:20

**participant** 227:11

**participate** 8:1 252:6 285:11

**participated** 6:16 251:23 329:3

**participating** 4:11

**parties** 4:19 41:21 42:4 43:15,25 57:16 115:5 119:23 125:19 126:7 134:15 272:1

**partner** 19:18

**partners** 19:16 20:2

**parts** 167:21 265:10

**party** 114:15 115:5,21, 22 118:1,4,5 119:2,16, 20 126:7 178:6 286:13, 17

**pass** 257:20 300:16

**passed** 112:17 203:23, 25 204:8,25 231:17

**passes** 184:22,23

**passing** 208:21 209:6

**past** 310:8

**pat** 234:17

**pat-down** 234:7,25

**patrol** 9:2 16:8 17:20 19:19 21:22 22:3,5 23:13,16 24:3,17,18,21 25:13,23 26:9 27:8 33:19,24 69:11 80:13 97:24 99:6 101:16 104:18 105:1 112:12 127:25 128:1,12 131:1, 2 138:13 139:6 141:10 143:14,25 147:1,7,20, 25 148:4,9,24 149:5,18, 20,23 150:2,3,8 151:8 156:22 157:3,5,6,13 161:23 162:25 163:11 164:14,20,24 166:24 167:3,4,6,10,23 168:2, 7,22 169:5,10,25 170:7, 25 171:6 172:4,18,21 173:1,9,10,13 174:1 175:14 176:17 177:16 179:5 181:24 182:12,23 183:14,20 185:18 186:8 187:22 189:15 194:7 195:2,23 197:4,9 198:21 199:10,15 200:15,19,20,22 201:17 203:24 204:1 205:1 206:23 208:24 209:20 210:1,11,16 212:8,16, 23 213:4,11 215:23,24 216:23 217:5,14 218:10,18 219:1,12,20 226:6 233:11 234:3,11, 16 235:9 236:18 237:24 238:18 239:2,19 240:16,23 242:7,19,24 243:12,21 244:1,3,9 247:4 248:24 249:19 250:5 253:16 255:22, 23,24 256:12,14,15,16, 21 258:9,11 259:2 263:16 264:20,22 265:1,3 267:8,23 268:5 272:18 273:23 277:6 286:25 287:3 288:1 289:2 294:15 296:4,10, 14,23 297:20,24 298:18 299:9,15 301:12 302:24 303:13,15,16,18,20 304:1 305:10,17 308:19 312:19 313:15,19,24 315:24 317:10,17,20 318:2,25 319:5 320:7 321:16 322:14 331:19 333:8 343:25 344:11, 14,18 345:4,22 346:4,5, 11,17,20 348:9,12 349:13 350:21,22 351:3,6,8,23 352:12 355:15

**patrolled** 80:9

**patrolling** 101:25 111:25

**patted** 235:21

**patting** 234:10 235:4

**paused** 244:21

**pauses** 11:17

**pausing** 249:25

**PD** 19:7 20:1,17 21:3,8 22:15 24:15 27:21 72:11 91:15

**peace** 59:24 60:3 82:18 110:16,18,20 145:21 350:16 351:19 355:23 356:2,3

**peers** 139:23

**penal** 47:9,25 48:3,4,6, 11,17 50:5 51:4,12 52:14 54:6,23,24 55:5 57:4,23 58:10,19,23 59:7 60:19 63:18,19,21, 24 64:10 67:1,2,6,10, 16,18,25 68:4,9 73:8, 13,25 74:18 77:6,12 83:8 84:12 85:1 90:13, 15,21,24 92:9,21 95:3, 18,25 96:1 110:14,20 120:25 121:24 123:2,20 126:13 269:17,20 270:1 326:15 327:11 336:18 337:4 339:1,7 343:14, 15,17 344:1 347:18 348:5

**penalties** 9:22

**penalty** 4:18 11:4 44:8 45:7

**pending** 158:14,16,17 160:24 161:1 297:5 329:17,18

**people** 15:24 26:7 29:16 30:1 47:8 49:3 52:19,25 55:8 99:19 118:19 121:6 122:11 137:19 142:8 155:13 156:12 165:2,18 183:8, 19 188:8,13,17 189:13 190:11,14 191:20 205:7 207:12 218:4 221:20 244:2 246:17 247:22,24 248:19 266:7 281:17 283:21 296:12 308:5 313:18 334:15 356:5,9

**people's** 179:13 316:25

**percentage** 38:24 39:11

**period** 16:12,15,16,21 17:18 19:14 22:12 24:1, 10 75:10 117:3 287:1 300:15 346:15

**periods** 116:25

**perjury** 4:18 9:22 11:4 44:8 45:7

**permanently** 337:16

**permission** 49:19 262:22

**permits** 137:13

**person** 4:16 22:1,2 36:5 38:17 40:10,11 41:14,15 43:15,16 44:5

45:5,14 46:23 47:3,11 53:16 54:5 55:13 57:6,8 59:16 60:1,5,6 91:12 94:10 97:3 115:7 119:17 121:22 124:18 148:13 189:2 190:1 208:18 214:21 231:18 232:6,13 241:8,11,20 243:11 248:10,22 261:9 262:20 275:1 279:20, 22,24 280:24 316:21 328:19 354:23

**person's** 34:12,23,24 35:4,23 36:17 38:7 44:7,9,22 45:2,10,18 47:4 82:22 192:4 280:6

**personal** 6:21 16:1 123:25 234:22

**personally** 21:25 92:10 117:19 276:20 307:22 314:1,7 326:13 344:10

**persons** 38:15 110:17 327:3

**perspective** 121:23 153:11

**pertaining** 7:6 150:24 160:19

**pertains** 75:2

**pharmacies** 281:20

**Pharmacy** 39:1 52:17 79:20,25 80:8,10,21 81:22 82:23 86:4 90:11 94:18 95:4 99:23 110:4, 10 111:17 122:24 123:18 129:4 142:1 290:14 326:8

**phone** 70:20 137:9,11

**phones** 136:15 137:19 234:21

**photo** 323:12 325:7

**photographed** 320:2 322:18 324:13,16

**photographic** 136:20

**photographs** 136:2,3 320:5,25 321:3,5

**photos** 137:10,23

**physical** 43:9 134:13 155:20

**physically** 4:12 155:14 212:16 241:20

**pick** 24:19 25:24 26:4, 10,17 27:2

**picked** 167:22

**picking** 25:15 26:2

**picture** 170:5 282:1 320:13 321:14,15,19,24 322:1,2,10,24 323:6,14 324:22

**pictures** 135:18 136:6, 12,16,24 137:1,5,13 138:1,3,9 320:9 321:11, 12,13

**piece** 46:21 340:21

**pieces** 254:3,25

**place** 24:17 43:9 243:5 275:13 281:11 310:3 313:23 343:25 344:11

**placing** 185:13 234:10, 16 235:8 294:15 313:15 348:9,12 349:12

**plain** 266:1

**Plaintiff** 5:1 6:24 69:12 134:23,24 135:3,18 138:9,14 140:3,25 141:18 143:13 151:11 162:21 167:25 171:1 172:20 173:14,20 187:14 189:8 192:18 196:10 212:2,9,12 239:23 257:2 261:16,20 264:7 271:2,7 272:11 273:10 277:3,22 278:7 286:18 287:11 332:1

**Plaintiff's** 5:13

**plastic** 317:16

**plate** 264:12

**plausible** 252:24

**play** 169:10,24 172:5, 17 174:12 180:5 181:9 194:1 224:9 225:13 226:4,5 227:1,21 228:3 229:11,19 250:3,10 254:23,24 255:12,16,21 256:5 305:14,18 306:4, 12 348:25 354:5

**played** 194:22,25 201:24 202:4 220:22 224:5 226:14 229:25 245:15 250:7 256:9 264:1

**playing** 180:6 192:16, 21 194:2 201:3,4,6 223:10,15 228:5,9 230:1,6,7 236:8,9,12 245:5,6 250:25 252:8, 10 253:25 254:7 255:19 306:7,17 354:13

**plays** 179:10

**pleas** 229:17

**plural** 157:10

**pocket** 48:9

**point** 31:17 40:6,17 50:3 76:20 107:8 117:25 138:21 140:19 141:1 143:18 144:5 152:5 153:25 155:5 156:4 157:11 158:25 162:23 163:9 164:25 165:15 166:22 179:18, 21 180:1 194:11 206:11 210:17 211:2,4 213:12, 14 214:8 215:4 217:11 219:10,12 220:3,4,13 232:16 233:7,13,24 234:2 238:23 239:13 242:11 243:9 245:2 246:10 249:15 250:4 252:11 255:1 258:3 259:13 264:5 266:11 267:5 273:7 276:13 283:24 296:24 301:19 309:13 320:2 321:18 326:11 337:2 351:2,5 352:20 354:3

**pointing** 202:22 216:8 278:25

**points** 169:18 197:19 219:8

**pol** 73:24

**police** 6:19 8:3,9,21 9:7 13:7 15:8,22 16:6 17:11 19:15,23 22:24 32:10 33:6 34:22 35:8,16,22, 24 37:6 38:12 39:5 40:21 41:8 42:16,20 43:2,21 44:18 45:12 48:5 52:5 54:8 55:7,14, 22 56:13,21 57:2,21 59:5,10 63:17 64:8 66:5,25 67:14 68:20 69:5 70:23 72:24 77:4 78:19,23 81:1 82:16,21 83:19 85:21 91:11,15 97:3,17 99:15 100:6 101:2,18 102:13 106:23 109:12 110:17 112:4 113:6,18 115:2,15 117:13,14,24 118:8 120:18,24 121:23 122:22 124:2 125:23 126:13 129:6 135:21 138:19 139:4,11 143:11 153:3,20 154:22 155:9, 13 161:16 163:11 184:13 189:1 190:12,19 191:10 207:15 216:18 231:14,25 234:4,15 237:7 243:8 246:16,20, 25 247:20 260:14 267:2 270:2,13 273:13 277:7, 11 280:4,7,13,17 281:2 282:7 284:15,20 285:8 286:14 292:8,11,16 296:11 310:20 312:22, 23,25 313:5 319:23 327:7,21 335:5,6,11 336:20 345:3,8,12 349:17

**police-designated** 128:23

**policies** 28:9 46:13

**policy** 28:21 29:7,9,10 30:21 31:4,5 32:1 35:12,22 36:4,9,14 37:9,18 44:1,3,20 45:5 46:10,16,20 54:23 69:23 84:12 117:18 118:10 130:5 132:19 133:1,12,19,23 134:2 148:17 231:17 232:4,18 269:1,5 295:23 311:19 314:19,25 315:10,14 321:6,8 324:20 327:13, 14,17,20,24 328:6,7,22, 24

**policy's** 133:5

**policy/expectation** 30:15

**Population** 102:22

**portable** 306:21

**portion** 16:24 60:19 85:4 92:8 103:13 149:24,25 156:18 174:2,9 193:12 199:23 242:8 255:21 261:18 263:22 288:8,19

**portions** 85:3 100:3 249:25

**posed** 10:7 89:22 187:10,16 195:1 262:1

**position** 13:8,14 78:22 159:6,8 182:24 185:5, 24 186:18 189:14,22,25 190:19 193:14 213:1 218:22,25 302:17 319:3

**positions** 14:24 218:5

**positive** 118:15

**possession** 60:2,5,7

**POST** 18:9,11,12,15,17, 19,25 19:9,11 184:6 284:21 311:19 312:12

**post-arrest** 334:16

**potential** 26:10 268:23 274:18

**potentially** 266:10

**power** 40:20 345:13,17

**powerful** 40:18

**practicable** 150:15

**practical** 16:1 26:23 32:19 38:5 107:1 277:15

**practice** 29:14 31:21 32:18 37:5 43:5 101:16 122:9 126:10 133:15 145:15,16 154:22 296:11 316:14,15

**precautionary** 118:14

**precisely** 340:12

**prefer** 310:7,10,11,17

**preference** 310:14

**preliminary** 237:1

**preloaded** 136:17 137:16

**premise** 38:6

**premises** 281:18

**preoccupied** 33:20

**preoccupy** 251:24

**preparation** 68:14 69:4,23 135:25 177:17

**prepared** 10:19

**prerogative** 88:7,17 89:1

**presence** 41:10,16 46:25 53:15

**present** 4:12 5:16,17 42:4 72:2 135:19 142:25 149:16 235:2 283:3 293:9 304:20 323:13,15,22 324:4 338:5 344:8 350:18

**presented** 4:4 36:5 279:5

**preservation** 203:21 232:7

**preserve** 351:19

**preserving** 355:23 356:1,3

**President** 116:23

**presumed** 10:9

**presuming** 104:17

**presumption** 53:12

**pretty** 17:22 103:7 126:4 269:7 278:19

**prevent** 269:11

**previous** 98:19 133:13

**previously** 88:2 129:16 280:22 331:24 332:4

**primarily** 109:3 247:10

**primary** 20:11 81:16,19 105:15 106:17 107:10 132:22 141:12,13 144:20 145:6,8 211:22 272:2 277:17

**printed** 281:15

**printout** 100:10 107:20

**prior** 8:21 9:11 13:6,23 21:10 22:10 28:1 70:8 72:4,5 81:8,22 82:2 99:10 108:16,21 109:11 120:19 122:16 129:20 175:8 179:4 187:3 195:24 213:25 233:19 234:10 235:8 240:4 277:12 292:9 301:14

**priority** 106:14 112:2,3, 6,9,21,23 113:4,20 231:24

**privacy** 65:22

**private** 33:5,15,25 34:6,12,18,22,24 35:1, 4,10,15,23 36:5,10,16 37:3,17,23 38:7,13,20 39:7,12 40:19,20 41:7 43:1 44:3,5,7,9,21 45:2, 10,17 46:11 47:3,6,11, 18 51:18,19 52:22 55:12,15 75:9 78:3 82:22 95:1 120:21 121:5 122:10 124:24 125:1 280:6,25 281:1, 11 327:3,12,19,22 328:8

**privilege** 65:20

**privileged** 65:21

**privy** 264:3

**probable** 42:23 43:3 84:23 262:14 271:19 278:12 311:23

**probation** 16:11

**probationary** 16:14,16 17:18

**problem** 7:15 115:8 125:21 171:16 212:14 299:18

**problems** 6:5 16:1 50:1 171:23 185:15 223:10 299:23

**procedure** 64:19,25 66:22 234:16 235:7,14 238:5 240:18 320:22

**proceeded** 165:9

**proceeding** 357:17

**proceedings** 11:6

**process** 7:10 16:10 77:19 105:10 266:4 320:6 325:9

**proclaim** 276:16

**produce** 61:1 178:7 279:2

**produced** 170:1 281:24 284:6

**producing** 282:3

**profession** 232:3

**professor** 172:13

**program** 17:14 21:1

**progresses** 216:5

**prohibit** 124:25 182:25

**promise** 60:21 166:19

**proper** 39:2,20 40:16 313:17,22 314:14 352:23

**properly** 49:2 64:12 266:22 271:8

**properties** 51:19

**property** 49:18 51:18 59:21 60:13 63:4 64:4 67:23 68:1,7 75:3,9 78:3 79:10,11 82:9 83:24 95:1 96:7 125:1

**protect** 36:22 118:19

**protections** 121:15

**protocol** 17:5 234:5

**protocols** 235:16 299:20,21

**provide** 10:6 11:20 12:11,14,19,24 13:1 42:12 49:10 142:14 168:20 184:21,24 185:7 186:6,11 187:12 205:12 207:16,24 208:20 209:23 214:10 244:7 251:20 324:8 340:21 356:25

**provided** 10:15 40:12 43:7 45:25 163:24 239:17 253:23 263:12 306:20 339:13

**providing** 183:23 184:17 185:17 186:14 355:5

**prudent** 43:24 185:3 349:24

**PST** 150:19 358:13

**public** 30:23 31:13,21 36:22 51:20,24 52:9,11, 13,16,18,24 53:5 54:4, 10 55:11 57:9 59:23 60:14 62:24 63:2,5,13 67:24 68:2,7 73:15 75:3,5,9 77:6 78:4 79:12,20,25 80:1 85:17 94:15,19,21,25 95:2,5, 13,15 96:7,8,17 97:1 121:2 122:24 133:16 290:6,17

**pull** 100:1 286:21

**pulled** 146:22

**pulse** 186:21

**purchase** 80:17

**purchased** 80:18

**purely** 144:13

**purged** 84:4

**purple** 114:13 135:9

**purpose** 45:9 46:15 260:4 285:2

**purposes** 136:22 274:24 356:19 357:8,14

**push** 105:4

**put** 18:21,23 32:23 46:20 75:16 78:2 105:8 148:4 186:18 218:4 271:14 290:25 291:8

**puts** 327:20

**putting** 240:21 260:4 280:10 344:18 353:5

**Q**

**qualifications** 168:20

**qualifying** 172:10 291:8

**qualitative** 312:2,11

**quality** 228:21 229:4,9 251:2,6,8 285:7

**question** 10:9,11 11:17,19 12:5 18:15 28:11 29:4,5 30:20 34:19 40:25 41:3,6 52:10 53:2,8,10 54:15 55:1 56:1,5,7 57:3,9,12 58:1,5 61:22,23 62:21 63:10,15,16 64:12 65:8, 13,16,21,24 66:11 67:4 73:21 74:7,22,25 75:17, 20 76:9 77:2,13 86:11, 25 90:6,9 91:21 93:12, 19 94:23 95:3 96:4 97:10 113:1 118:11 119:14 121:13 123:8 124:12,14 139:18 147:9,24 158:8,13,16, 17,20,22 160:2,3,16,22, 24 161:1,5,12 163:3 164:1 168:24 170:24 171:13,14,24 172:3,8, 22,24 176:10 177:18 187:15 190:17 191:8 193:18,21 194:14 195:1,4,6,7,20 196:3 202:19 204:23 205:6 206:2 209:12,14,16,18 213:23 216:13,21 248:1,9 261:23,24 262:1 265:12,13 273:20,25 275:14,22 280:14 283:12,22 284:25 288:7 291:5 294:10,18 297:13 298:5,7 299:1 304:2 309:3 310:18 312:8 315:4,5,8 318:11,13,14, 19,20,24 322:8 324:10 329:17,18,19,23,24 333:23,24 345:20,21 349:9 352:11 354:11 355:9,12

**questionably** 323:1

**questioned** 32:7 296:21

**questioning** 160:2 224:18 293:4,6 323:24 353:16 354:9

**questions** 10:6 11:15, 25 42:11 56:9,24 61:11, 13,20 62:4 65:4 66:9 68:13 74:3,10 86:16 87:7,12,13,14,16,22 88:5,12,21 89:9,21 90:7 161:13 162:2,6,16 163:16,21 170:2 173:18 176:8,13,25 177:13,21 178:13,14,18 180:1 187:10 191:4 192:20 223:17,21 224:15 225:14,17 226:7 250:12 255:9 287:20 306:14 307:9 310:15 319:17 334:1 343:13 349:3 353:13,20 355:3,6 356:15

**quick** 48:22

**quicker** 76:20

**quickly** 29:24 73:11

**quietly** 317:22

**quit** 160:16

**quote/unquote** 243:24

**R**

**radio** 69:14 99:9,15 103:25 104:20,22,25 126:18 264:5,6 278:18

**raise** 6:3 232:22

**ramifications** 122:9

**random** 20:20

**rationale** 46:19 123:6 266:14

**react** 247:23

**read** 36:23 44:15 58:13 60:8 62:17,18,19 68:10 73:10,12,16,25 74:8,18 75:4,6 76:8,15,21 77:17 79:9,10 85:1,3,5 90:25 91:1 92:22 93:14 95:21, 23 96:5 114:17 115:23 119:15 120:10 153:3 290:12,13 292:8,12,24 293:1,7,13,16 295:23, 25 316:25 327:12,14 328:9 335:11

**reading** 58:25 74:11,16 110:9 138:18

**ready** 229:24

**real** 59:21 172:10

**reason** 7:20 32:6 46:17 139:10 183:1 210:10 212:10,15,18 214:4,7, 15 223:8 231:7 235:18 251:18 261:6 307:13 316:6 331:3 332:2 333:1 336:4 343:23 344:9,19 357:3

**reasonable** 36:7,16 37:11 38:1 185:7 232:14,15 299:7 310:23 311:21,22

**reasons** 46:7 102:7 267:1 303:7 304:9 344:3

**recall** 16:15,18 17:2,7 23:23 45:16 51:14 82:7 96:17 99:16,25 128:25 134:21 135:4 136:25 137:16 138:23 139:15 140:3 146:24 147:7 151:21 156:18 163:5 188:15 189:19 197:18 239:22 241:22 242:8 249:24 276:2 297:2 305:3,7 311:3,5 325:23 327:15 328:4 340:7

**recalling** 140:1 304:5

**receive** 33:4 49:5,21 217:3 247:1 269:5

**received** 28:3 47:24 70:20 101:2,12 104:14, 18 108:15 113:22 130:19 131:12 188:13 190:13 266:18 321:13 346:21

**receiving** 130:14

**recent** 79:3 279:5 309:10

**recently** 79:2

**recess** 90:3 161:8

**recognize** 58:18 100:9, 12 191:10,15,20 207:9, 17 209:5 215:4 247:5 248:12

**recognized** 192:1 213:12

**recognizing** 247:1,13

**recollection** 12:17 47:6 134:17 140:9 151:24

**record** 4:9,23 5:19 25:5,21 27:13 29:19 30:4 35:21 69:20 75:17 76:8 89:4 92:23 100:8 107:16 110:9 113:2 130:6 138:2 150:17 157:25 160:22 164:5 169:24 192:17 199:11 222:25 223:3,5 278:21 280:9 305:22 330:9,13 341:20,22,23 342:1,6, 24 343:6,10

**recorded** 10:21 24:6 109:8 174:10 178:23 194:21 305:15

**recorder** 22:3,19 23:2 27:8 29:15,21 32:11 129:17 130:8 131:11 132:17,24 136:5 167:19 306:6,21,22

**recorders** 21:11 133:3, 20

**recording** 21:25 22:6, 17 23:11,17 24:16 25:2, 14 26:4 27:1,16 28:3 29:8 30:9,16 31:20 32:6 69:10,16 107:25 129:15,24 130:3,12,24 131:15 132:3,6,18 133:15,24 134:6 158:2 166:25 167:1 169:11 172:4 173:2,11,14 174:15 175:14 176:18 177:16 179:3,5 182:12 194:17 195:2,23,24 198:18 199:10,15 200:15 201:17 217:6 218:10 249:20 251:1 252:18 253:12 255:23 256:12,15 258:16 259:3,15 264:2 267:8 268:5 287:1 305:8 306:5,20 318:25 332:9, 13,14

**recordings** 21:16 129:20 142:18 173:4

**records** 25:14 39:4 68:25 69:3 109:1,4 150:23

**recourse** 319:20

**recovered** 301:5

**recovery** 186:18

**recreation** 14:18 15:3

**rectifying** 247:11

**recurrence** 117:1

**reduce** 260:5

**redundant** 286:20

**reemerges** 239:25

**reference** 48:22 78:17 90:14,21 92:9 110:14 118:21 161:3

**referenced** 23:9 331:22

**references** 73:14 75:8 111:13 118:25

**referencing** 111:5 119:4

**referred** 21:11 24:5 166:2 288:9

**referring** 99:11,17 288:17 290:10

**refresh** 35:14 36:9 50:4 58:11 74:6 84:12 109:22 135:13 153:6, 10,19,21 167:2 250:5

**refreshed** 139:7 153:17 161:18,20 162:1

**refreshes** 73:10 264:8

**refuse** 87:7 88:18 121:6 122:10 123:19

**refused** 39:8,13

**refusing** 59:20 61:18, 19 66:11,13 67:22 75:4 79:10 82:9 83:9 84:16 85:9 87:12 88:6,12 89:9,16,21 90:7 114:14 123:7 124:12,13 125:6 194:8 195:19 204:15,22 262:24

**registration** 267:2

**regularly** 22:16

**reiterate** 90:6 248:16 327:6

**reiterated** 238:7

**Reiterating** 192:8

**relate** 59:1

**related** 6:20 13:9 44:10 49:22 56:25 70:6

**relates** 58:23

**relating** 119:9

**relay** 263:11,14

**release** 219:24 232:24 302:15 319:4 343:18 344:20 345:5 349:10 350:21,23

**released** 183:14 264:20 265:4 267:23,25 278:4 338:7 339:7 344:15,25 345:22 346:1,8 352:12

**releasing** 344:1,12 351:23

**relevance** 28:25

**relevant** 29:1 100:3 112:15 284:22 287:16

**relied** 277:17

**relies** 286:2

**rely** 277:20 284:17 285:24

**relying** 285:6,22

**remain** 293:8 299:19

**remember** 16:25 20:25 21:6,12 22:20 24:4,11 27:17,22 28:16 30:20 31:9 32:2 33:3,18 34:4, 7 35:11 47:10 50:20 51:1,3,4,5,7,21 58:5 59:3 68:8 77:21 78:23 80:6 81:10,17,25 83:5, 13 84:1,7,24 85:25 94:16 95:22 96:22 101:11 108:12,14,19 109:17,19 110:15,21 111:8 112:7,8 116:11, 12,21 117:6,7,16 127:22,24 129:18 133:1,19 135:20 137:4 138:24 139:2 142:4,11, 12 144:10,17 146:13, 14,15 147:15 151:13 152:4,16,23 153:1 154:7,10,11,20,25 155:2,7,10,19,23,24 156:6,8,21,23 157:2,4, 18,19,23,24 158:1,3,5, 11 159:1,3,4,5,6,7 162:18,19,20,22 163:1, 7,8,10,15 164:2,3,13,15 166:5,14,17,21 169:7 181:13,18,20 184:8 187:20,24 191:23 229:18 234:12,14 235:5 238:11,17,19,20 241:5 242:13 254:17 255:5 258:14 259:16 279:7,16 282:1,3 289:9 290:23 292:14,17 304:23 305:4 308:22 309:9 311:12 312:17 313:3 314:24 315:10,11,14 320:8 325:17,18,24 326:1,10 327:10 328:9,23,24,25 329:24 336:15 337:11, 22 341:12 343:15

**remembered** 147:13

**remembering** 162:8, 15 163:4,19

**remind** 246:7

**reminder** 90:5 150:22

**reminding** 76:1

**reminds** 264:9

**remotely** 4:14

**remove** 212:15 213:17 345:3

**removed** 236:5 243:11 255:24 299:15

**reopenings** 117:3

**repeat** 41:5 86:12 177:4,19 203:2 244:14 283:12 318:21 334:8

**repeated** 181:1 206:5

**repeatedly** 164:21 188:22 205:16,17 246:4 248:22 260:10

**repeating** 74:22 165:13 166:7 201:14 202:23 216:9 268:12 301:17
**rephrase** 41:3 172:2
**replay** 176:9
**replica** 173:5
**report** 44:12 68:20 69:5 72:24 99:12,14,18 100:1 102:6,7 107:7,25 108:2 109:12 135:21 138:19 139:11,23 143:11 153:3,10,20 161:16 163:11 266:23 270:3 271:15,21 280:12 282:7,9 292:8,11,14,16 335:6,11,25 350:12
**reporter** 4:3,10 10:19 11:14 65:8,10 90:1 124:3 150:12 159:13 170:9,17 221:4,6 223:2 256:4 305:20,24 314:11 329:13 330:7,10 341:16,25 342:3,5 343:5,9 357:15,21,23 358:1,5,9
**reporting** 4:14,21 44:2 109:5 112:13 114:15 115:5,20,22 118:1,4,5, 15 119:2,16,20 126:7
**reports** 34:23 73:6 107:6 109:22 139:4 280:8,11
**represent** 5:13 70:25 71:9
**represented** 71:4
**representing** 71:14
**request** 10:23 11:16 29:4 38:13 40:4 49:11 59:25 60:4 146:2 184:3 223:12 224:3 285:17
**requested** 12:25 59:24 207:25
**requesting** 110:17 230:23 327:4
**requests** 37:24 55:12
**require** 232:18 311:22, 23
**required** 41:24 231:20 236:4 295:25 325:6
**requirement** 28:17 44:1 117:23 118:7 184:9
**requirements** 33:14, 17 34:7 35:14,23 36:10 44:2 53:4 54:9 55:14 57:7,21,24 58:6,11,12 85:20,22 112:13
**requires** 52:10 133:13 185:3 295:22 310:23
**residence** 6:12
**residences** 47:19
**residents** 165:5 240:24
**resignation** 8:22 28:1
**resigned** 7:18 19:6,8 72:13 312:21
**resignment** 7:21
**resist** 157:16 242:18
**resisting** 157:18,23 242:5
**resolve** 49:25
**respect** 15:21 217:18 278:7
**respectful** 166:1
**respectfully** 62:6 319:21
**respond** 42:3 48:24 102:3 108:10 114:8,9 187:9,15 195:19 197:8 216:13 223:17 252:23 254:14 285:16 300:18
**responded** 83:1 99:19 155:12 167:7 222:18,19
**responding** 93:6 102:8 103:23 109:7 111:3 113:7,12,17 115:10 118:13 125:11,14,16,18 129:13 130:4 131:5,6, 19 132:25 154:16 162:20 195:7 202:3 237:5 252:22 253:2 288:2 315:5 322:8 334:1
**response** 105:11 110:18 113:20,24 146:2 170:23 229:17 230:15 231:3 252:15 254:13 294:10 297:25 309:2
**responses** 87:17 330:4
**responsibilities** 36:3
**responsibility** 20:12 37:1 145:25 212:3 265:9 268:21 270:17, 19,24 327:21 328:18
**responsible** 80:13 105:12
**responsive** 186:24
**rest** 222:11 245:11 246:14 304:7 348:22
**restart** 176:15
**restate** 75:17,20
**restrain** 36:18
**restraint** 315:15,16
**restraints** 314:22
**restroom** 102:5 342:21
**result** 39:17 122:3
**resulted** 120:20
**resurfacing** 117:5
**retail** 38:25 47:15,17,19 49:14 51:19,23 52:8,16 53:4,25 54:1,10 55:10 57:8,25 77:1,5 90:11 94:24 95:14 96:15,25 97:2 120:21 121:1 122:23 123:17 129:2 260:8 290:5,13 327:19
**retaining** 74:12
**return** 237:3 288:23
**returned** 335:9
**returning** 262:21
**returns** 288:3
**review** 10:23 109:14 150:23 166:24 250:1 318:25 341:15 342:9 357:4,18
**reviewed** 68:15,18,20 69:1,4 99:9 109:16 129:19 138:12 139:4,5, 6 147:1 161:15,16,22 171:10 264:23 279:13 335:7 346:19
**reviewing** 109:12 163:10,11 356:23
**rewarding** 8:8
**ridiculous** 87:10,20 195:9 353:21
**rights** 5:14 172:14 252:2 292:25 293:2,7,8, 12,14,16 295:23 296:1 297:9
**rise** 93:8
**rising** 186:22
**road** 50:24 80:22 82:24 102:14 111:16,20 191:2
**roll** 249:15 250:20 252:13 258:22
**rolled** 26:8 166:10 217:2,7,12,15 244:18 258:5,25
**rolling** 219:13 259:7
**room** 4:13 46:4 316:16
**Ross** 19:16,21 68:21 69:6,20 71:20,23 72:7, 13,15,19,24 104:8 105:14,24,25 106:17 120:8 126:18 127:5,9 128:12 131:21 134:10, 22 135:17 136:2 138:19,25 139:1 140:4 141:5,12,16,19 142:21 143:15 144:3,11 145:11 149:13 151:10,15 152:11,14 153:4 154:18 155:1,18 156:5 157:7,9 161:16 162:21 165:18 166:14 181:14 188:6 210:12 211:12,17,25 212:9,17 213:16 214:1 234:9,23 235:3,13 237:22 238:1,17,20,23 239:21,25 242:6 243:13 244:10 255:24 256:22 261:15 262:4,8 263:10, 14,19,24 264:14,16 266:19 268:2,7,19 270:20,25 271:1,4 272:7,18,23 273:2,4,6,8

275:3,6,9,23 276:8 277:17 278:3,16 279:2 282:3,11,20 283:25 285:21 286:18,21 287:2,8 288:2 289:1,4, 7,11,12,25 290:20 291:5,13,19 295:2 304:21 307:2,8,12 320:4,9,25 321:16 322:10,17 323:23 324:13 326:2 329:6,8 330:17,23 331:5 332:7, 16 333:5,10 334:3,9,17, 20 335:2 336:8 337:3 338:3,6,11 339:15 345:2 347:8 350:5,22

**Ross'** 167:6 284:8 285:1 306:5,21 333:20 344:6 349:20

**Ross's** 167:4

**rough** 357:21 358:10, 12

**route** 104:1,2,6

**routine** 78:18 267:1

**row** 298:8

**RP** 114:15 115:20 118:22,24 119:6

**Ruiz** 127:20 128:6 141:6,7,17 210:21 211:1 233:21 264:14

**rules** 9:16 75:24 76:2,4

**rulings** 12:1

**running** 27:2

## S

**safe** 193:17 205:7 206:21 297:11

**safer** 212:23 233:10

**safety** 30:1 31:22 32:19 36:22 115:13 118:18 135:24 145:25 165:2,7 192:12 203:19 204:17 205:9,22 206:12 210:9 211:21 212:1 232:5 233:6,9,14 235:9,16,19, 22 240:18 242:22 274:1 285:16 324:23 351:20

355:25 356:5,6

**safety-related** 50:24

**said/she** 282:13,17

**sake** 30:5 31:22 32:18

**San** 80:21 82:24 102:13 111:16

**sanction** 163:25

**sanctionable** 163:22

**sanctions** 61:10 76:7 87:9,20 172:15 195:8, 11,15 343:1

**Santa** 13:11,19 14:17

**sarcastic** 178:21 203:5,8

**satisfactory** 191:3

**satisfied** 330:4

**scenario** 41:18 92:23 93:15,21 95:4 96:7 97:2 271:17,23 280:15

**scene** 30:1 34:5 43:10 53:15 78:10 104:16 105:23,24,25 106:4,10, 15 114:21,23 115:16 125:4 126:17,22,24 127:4,10,13,22,24 128:10 129:17 134:9,19 140:14 146:1 149:17 151:6 154:15 212:5,7,8 236:22 238:2 265:23 278:15,20 283:4 305:3 325:8,22 338:6 350:18 351:20 352:20 355:24, 25

**schedule** 61:3,4 171:19 178:3

**scheduled** 60:25 223:11

**scheduling** 171:18

**school** 6:13 7:24 8:3,5, 15 13:24 14:2,3,5,19 15:4 61:4 64:22 65:25 66:1,4,12,15,17,19 67:8,9,13 74:15 171:19 178:1,3

**scope** 265:25 311:1,8 312:15 313:7,9

**screaming** 152:22 154:5 176:18 188:22 198:21 201:8 202:2,7, 20 205:18,23 208:24 212:12 215:3 219:21,25 220:4 242:23 243:1 248:22 257:14 273:12 287:24 300:16 303:18 316:7 317:22 321:9 350:20 351:3,5,7 352:13,19 355:16

**screen** 35:19 58:16 73:17 92:1 170:3 227:1, 10,15 321:14

**screen-sharing** 227:11

**scroll** 59:18 68:3 73:11, 18 74:1,5 76:12 105:23

**scrolling** 44:2 68:10 74:4

**seal** 244:24

**search** 92:13

**searched** 233:20 234:4,6,20

**searching** 235:3

**season** 14:16

**seat** 69:11 138:13 143:14 146:25 149:23 162:24 164:20 168:1 170:6 183:20 189:15 200:18 205:1 218:20,25 219:6 239:14 243:6,21, 25 244:3 263:16,19,25 265:7 289:2 294:24 295:1,6,7 296:13 305:16 317:17,20 326:12

**seatbelt** 218:12,16,18

**seatbelts** 218:11,16, 21,23 219:5,6

**seated** 69:12 148:23 149:18,20,23 150:2 157:12 168:1 171:11 182:22 186:8,25 188:21 189:11,14,21,25 193:2 200:4 210:11,17 212:2, 23 213:2 218:23 237:23 240:15 244:8 255:22 256:21 264:25 273:23

296:4 302:14,17,24 315:23 326:11 331:18 346:3,17,19

**seating** 213:3

**seats** 317:16

**secondary** 106:16

**seconds** 104:9 106:1, 4,8,11 110:2 115:20 120:8 127:6,14,17 174:2,13,15 175:10,18 176:2,14,16,17 179:10, 21 180:2 192:22 194:3 201:5,7 202:6 206:14 220:17 245:7 252:11 255:23

**section** 31:5,7,10 50:22 51:5 52:14 54:6, 23,24 55:6 57:5 58:10, 19,20,23 59:4,19 60:12, 15 62:17,19 63:3,25 64:3 67:21 68:4,8,9 73:9,13,25 75:1,7 76:14 77:6,21 78:2,12 79:17 83:8 84:13,17 85:2 90:14,16,21,24 91:12 92:14,15,22 93:4 94:4 95:18,23 96:5,6,9,15, 18,21,25 97:5,11,15 110:20 160:19 290:4, 10,12,17,19,21 292:5 326:15 336:19 337:4 339:1,7,17 340:2,3,4,8, 10,14 341:2,7 343:14 344:2 348:5

**sections** 47:9,10,25 48:3,11 49:22 78:24 83:8 95:25 96:22 121:9 290:24

**security** 132:1

**seek** 160:6

**seeking** 273:11

**segment** 201:23 205:16 230:23 245:14 250:12,13,20 255:18 287:3

**segments** 250:8

**selective** 162:9

**self-explanatory** 269:7

**selling** 14:15
**send** 357:16
**sending** 107:9
**sends** 145:4
**senior** 25:10 92:6
**seniority** 106:24
**sense** 12:17 30:22 38:6 43:6 91:20 132:1 152:3 213:8 231:3,25 252:22
**sensitive** 184:13
**sentence** 335:25
**sentences** 254:5
**separate** 128:1
**sergeant** 17:10,15
**sergeants** 134:4
**serve** 123:19
**served** 279:9
**serves** 18:3
**service** 20:7 81:13 82:17 83:2 99:23 100:10 101:5,12 103:22 108:13 118:1 121:6 122:10 129:13 130:7 131:7 132:25 140:21 241:7,10
**session** 61:15 62:11 65:5,17 86:19 88:7,9 89:10 177:6,24 191:2,7 330:6 353:12 356:19
**set** 9:15
**setting** 9:24 228:18
**settings** 225:15
**settle** 166:7
**seven-hour** 88:8
**shape** 153:17 155:22, 25 157:16 205:13 329:8
**share** 7:3 227:1,10,14 289:7
**shared** 251:11
**sharing** 35:18 158:4 228:23 263:6
**shed** 132:3
**sheet** 10:25 11:1 48:12
**sheriff's** 8:24 9:8 33:8
**shift** 8:6 32:24 97:19, 21,22,25 98:1,2,4,11, 12,14,16,17 101:15 138:3
**shifts** 23:15 98:6,8
**shirt** 114:13 135:9
**shock** 248:20 249:1
**shoe** 14:15
**shoes** 14:15 114:14 135:10
**shop** 52:20
**shoplift** 122:19
**shoplifting** 47:13,16 82:8,11 123:15
**shopping** 284:16
**short** 22:12 90:3 208:16,19
**shorthand** 111:2
**shortly** 162:22
**shoulder** 7:6
**show** 54:22,24 58:9 84:13 132:4 166:3 170:6 173:5 256:13 292:3
**showed** 35:12 206:6
**showing** 109:2,4 170:12 202:23 317:9
**shown** 77:12 172:24 173:8
**shows** 106:2 113:9 256:14
**shut** 197:15
**sick** 115:21 118:5,23 119:7,18,25
**side** 100:18 128:18 141:22 243:12 260:13 263:12 274:23 278:9
**sides** 41:21 42:3
**sight** 266:1
**sign** 44:6 45:6 128:3 145:7 338:6
**signalling** 119:23
**Signature** 358:14
**signed** 357:3
**significance** 115:1,4
**significant** 263:8,22
**significantly** 253:13 287:9
**signs** 247:14
**silent** 293:8
**similar** 24:7 83:3
**simple** 38:7
**simply** 13:13 39:23 53:19 123:9 131:24 176:4 202:23 239:13 243:2 251:8 261:20 268:16 295:17 298:1 302:7 304:7 326:19 333:1 335:19 350:15
**sincere** 267:11
**single** 160:10 171:24 177:18 316:21
**sir** 57:19 60:23 63:10,15 66:8 75:20 76:12,23 86:11,15 87:25 90:6 124:1 130:8 139:3 143:20 164:21,22 169:3 171:15 181:2 190:24 193:11 194:6 199:3 201:8,14 202:8,17,20 203:7 204:23 205:18 207:3 208:7 213:20 214:22 222:17,18 227:18 233:13 235:12 245:8,9,10 248:7,23 250:13 254:10 268:13 271:18 278:14 283:3 288:13,15,18 292:8 300:7 303:23 310:14 316:20 317:5 329:2,8 330:15 332:14 333:23 334:20 336:7,17 340:14 345:1 357:1
**sirens** 113:12,17,19,24 114:4,6
**sit** 218:9 222:10 314:14
**sitting** 104:17 130:23 147:20 149:10 162:25 164:20 190:10 213:1,11 215:17 218:25 243:3 256:16 263:15,19,24 265:7 268:16 289:1 317:21 329:3 341:6
**situation** 42:5 92:7 94:12 115:12 146:8 152:25 165:6 206:15 209:8,25 214:6,23 216:23 217:17 224:7 238:8 244:1 246:6 270:8,10,14 273:15,17 314:7 319:20 332:2 342:22 348:13 351:14
**situations** 39:6 191:21 247:23
**sleep** 319:22
**slight** 11:18
**slightly** 13:9,15 56:6 146:22
**slow** 246:12
**slowly** 73:12 246:13
**small** 17:23 48:9
**so-called** 320:6
**Socratic** 172:11 190:25
**software** 107:21
**solely** 18:7
**solo** 20:3 99:3,5
**solutions** 274:18
**solve** 16:1
**someone's** 206:22
**sooner** 19:12
**sort** 24:16 92:13 107:25 110:16 118:7 209:7 223:14 232:17 276:1 325:16
**sound** 44:19 116:14 203:4,7,14 214:20 226:9 258:17 267:21 275:25
**sounded** 180:11 193:10 236:15,17 325:19

**sounds** 15:6 84:22 116:24 125:13 130:16 252:24 278:24 298:13 309:16 338:8

**source** 125:21

**south** 103:16 111:20 128:18 140:10

**southwest** 103:13

**space** 181:24 185:16 188:21 193:2 212:14 213:18 214:9 243:20 273:11 313:16 352:1

**speak** 11:12 58:24 71:16,20 85:5 113:3 137:2 140:21,24 175:5 197:1,23 206:12 234:23 235:1 237:18,22 261:15 272:13 276:7 299:4 308:1

**speakerphone** 221:2 226:22

**speaking** 34:3 38:9 43:15 103:12 121:8 138:24 139:1 140:4 144:4 151:10,11 159:20,25 160:4,10 197:21 215:17 224:22 241:14 267:4,11,12 268:1,20 272:14,19 295:4 301:16 315:13 324:12

**speaks** 68:6 73:20 75:13 85:12 176:22 180:24 193:6 196:7 198:5,24 199:18 201:11 202:12 220:8 249:8 264:16 316:3 326:9 332:10,21

**specific** 20:25 28:5 29:3 30:21,25 47:10 49:10 51:25 52:3 55:23 56:24 57:4 59:4 64:10 67:16 68:8 69:3 74:13 78:23 82:1,5 84:1 92:8 96:18 122:13 123:12 129:5 133:19 134:16 135:1 154:9 156:18,23 159:4 162:2,15,17 163:13,16,18 175:12 176:7,13 187:25 188:15 189:17,19 211:5 216:21 247:8,16 248:17 250:8 255:7 261:23 273:20 292:4 297:12 314:19 316:10 327:10 336:7 337:22 340:2,8,14 352:11

**specifically** 12:5 28:16 41:12 50:20 53:24 67:22 75:1,2,8 85:9 89:14 99:25 108:14 118:22 129:3 133:2,13 139:19 149:8 154:20 169:8 179:2 187:10,11 191:9,22,23 193:19 195:19 197:18 220:5 238:16 247:9 250:19 255:11 256:8 260:20 262:2,20 275:6 287:23 291:12 297:18,22 306:14 311:16 315:6,14 316:12 317:4 319:14 326:4 328:4 330:15,21 333:5 340:1 341:8

**specificity** 23:24

**specifics** 132:5 144:17 238:20

**speculate** 12:23 20:19 28:20,24 39:3 46:18 131:17 141:20 149:8 296:9 347:12

**speculating** 107:14

**speculation** 13:1,2 86:9 91:5 119:11 124:8 144:13 189:5 192:7 208:11 271:12 291:25

**speculations** 86:14

**speed** 114:8,10

**spell** 5:18 179:15

**spelled** 5:21,22

**spent** 67:5

**spirit** 38:4

**spoke** 85:5 238:23 271:1,13,24 275:1 276:24 277:21 330:24 331:12 355:10

**spoken** 238:24 262:17

**spot** 129:6

**spots** 128:24 129:4

**spread** 118:20

**spring** 70:16

**stamp** 100:7

**stamped** 100:6

**stand** 10:13 110:19 188:10 212:16 220:1 222:8 232:25 341:17 355:19

**standard** 37:5 48:23 234:15 235:14 238:4,5, 15 240:17 277:10,14 296:11 316:14,15 317:19 338:20,23

**standards** 311:25 312:13 315:11

**standing** 110:4 140:7 141:24,25 142:9 143:3, 23 151:15,20 152:9 164:23 180:18 181:13, 15,18 188:5,7 192:24 193:14 197:3,9 206:23 208:23 210:16,20 211:9 213:2 215:24 217:14 219:11 239:2 258:18,22 278:5,9 285:14 305:6 323:23 353:3,5

**stands** 18:11 110:5,7

**start** 8:25 35:18 51:10 107:9 164:9 227:25 255:17 322:23 323:5

**started** 8:23 98:17 304:21

**starting** 303:19

**starts** 174:17

**state** 5:18 160:22 223:13 229:17 292:12

**statement** 40:12 43:23 56:12 142:23 216:8 221:23 258:13 259:8 270:23 274:21 336:5

**statements** 43:8 143:1,10,16 145:23 169:4 180:15 196:20 249:7 263:11,13 275:10 276:22 282:14,15 286:12 293:5,6,15 295:22 336:1 350:12

**states** 36:3,14 44:4 59:15,20 75:8 95:13 110:11 115:20 207:11 220:9 328:7

**stating** 4:22 253:21

**station** 101:24 102:3 265:5

**stationed** 101:17,23

**statute** 95:12

**stay** 206:9 343:10

**stealing** 122:3

**step** 125:15 126:5 141:23 143:20,24 283:21

**steps** 215:22 220:1 244:6 276:20,23 302:16 331:5

**stipulate** 357:12

**stipulation** 356:21 357:2,9

**stolen** 357:5

**stood** 196:21 206:18 243:12 244:15

**stop** 88:7 89:10 156:3 161:7 166:7 176:19 177:23 180:2,7 195:3 215:25 226:7 228:4 263:6 269:11

**stopped** 7:16 151:4 227:23 230:9 255:22

**store** 54:3 94:7,9 120:9, 21,23 121:18 122:4,10, 17,18,20,21 123:15,16 128:21 140:10,13,16,21 142:18 151:8,9,10,20 212:9 274:8 323:2 332:4

**stores** 38:16

**story** 260:13 263:12 274:23

**straight** 171:23

**straightforward** 7:8

**streamlined** 108:11

**street** 195:16

**streets** 103:9
**stress** 244:8 247:24
**strictly** 135:23
**strike** 15:11 51:9 108:24 109:17 118:2 148:17 156:3 157:15 187:16 189:23 207:7 208:18 216:19 274:3 275:21 308:17
**structures** 59:22
**student** 13:14 61:17 64:15 66:24 172:12 177:11 190:25 309:23 318:18
**studied** 95:19 309:23
**stuffed** 287:14,22 288:4
**subject** 121:4
**subsection** 59:20 60:5 79:9 94:24
**subsections** 51:12
**subsequently** 296:20
**substance** 11:24
**substantial** 154:11 328:24,25 350:6,11
**substantially** 268:12
**substantive** 287:12
**successful** 8:7
**suddenly** 244:22
**suffering** 188:13,17 191:11 207:13 306:3 316:23
**sufficient** 53:20 150:13 280:1
**suggest** 222:1 277:10
**suggested** 236:5 301:4 319:21
**summary** 126:4
**summer** 14:14
**summers** 14:25
**summon** 220:14
**summoned** 77:1,4 86:3
**super** 60:18
**supervised** 17:4
**supervising** 143:12,19
**supervisor** 32:4 91:13
**supervisors** 134:4 271:21
**supply** 206:8
**supported** 271:19 331:9 336:9 341:2
**suppose** 105:11 128:17 251:21
**supposed** 29:11 31:16 125:17 187:12 236:16, 24 237:12 239:9 253:3 257:10 260:25 280:24 292:22 293:7,21 294:4, 14 295:7 298:20 302:2 307:14 340:21
**surfaced** 209:19
**surgery** 7:6
**surmise** 182:13
**surprise** 52:2
**surprised** 174:6
**surprising** 139:13
**surrounding** 68:22
**surveillance** 142:18
**suspect** 115:21 118:4, 23 119:7 271:7
**suspects** 136:12 137:13 293:4
**suspicion** 310:23 311:21,22
**sustain** 56:4
**swearing** 16:17
**switch** 226:8,19,23
**switched** 227:14
**switches** 225:15
**sworn** 5:8 9:25 33:13
**sympathize** 185:22 187:5
**symptoms** 191:11,15 192:1 207:9,17 247:1,6 248:13
**synonymous** 49:16
**system** 21:20 22:8,10 23:21 24:2 25:2,19 26:9 27:1 107:19 108:8,11 225:15 319:15
**systems** 25:10,11

**T**

**takes** 43:8 174:2,13 281:14 349:7
**taking** 9:16 114:14 125:7 136:6 138:3 165:23 196:19 215:18 251:25 265:8 274:13 318:17 342:23 343:18 349:11 352:1
**talk** 43:19 57:15 66:3,4 89:5,14 104:23 125:19 126:10 151:1 166:15 203:1,3 246:13 254:17 259:23 268:17 272:1 277:4,7,11 297:20 324:1
**talked** 39:19 41:21 82:6 93:4 173:19 217:18 219:14 287:8,11 301:21
**talking** 15:23 23:4,8 26:7 53:22 99:14 119:6 126:7 134:16,22 140:8 141:21 142:22 143:4,7, 23,24 144:3,5 146:14 150:1 151:16 152:10,18 154:1 155:7 160:9,12 169:13,18 171:7 175:21,24 176:3 179:8 182:19 186:24 188:6 190:5 198:3 210:12 219:13 223:25 238:13, 17,19 239:5,25 240:20 243:2 244:22 246:2,4 257:17 259:24 262:3,8 263:20 267:6 268:3 272:11 274:5 275:4 286:24 287:14,21,22 288:3 293:14,17,18 301:24 302:7 304:10,21 305:2 312:20 322:13,17 344:16
**talks** 67:22
**tangent** 261:22
**tangents** 56:17
**tape** 176:5,6,7 179:22 188:24 194:14,16 196:3 202:7,10 220:24 224:14 225:17 226:5,6 227:6 229:3 250:11 251:1,19 252:9 253:10 255:10 256:8,22 300:15 303:13 306:5,20 307:5 325:13
**tapes** 223:10
**tasks** 146:6
**taught** 248:19
**Taylor** 5:5
**technological** 22:12 223:9
**technology** 21:18
**telling** 25:16 31:25 45:22 61:8,18,19 62:3 66:19 88:13,15,24 119:20 123:12,14 133:4 139:6 147:4 157:2 163:15 165:18 169:12 181:8 187:18 188:23 190:15 192:25 193:3 198:13,14 205:24 206:4 207:14 209:2 212:7 213:6 215:5,7,25 225:6, 9 229:4,23 232:20 240:9 248:11 249:4 253:19 257:13 260:13, 22 261:4 262:7,9 263:5, 6 264:16 273:8 279:3 285:12 286:13 287:25 292:23 294:4,13 295:9, 15,20 298:17 299:8 304:2,8 317:7 326:3,4 332:17 334:21 339:12
**tells** 41:13 101:8 300:13 328:16
**temporary** 310:3 311:1,8
**ten** 26:17 306:25 342:8
**tenets** 284:15
**tenure** 18:22 24:14 33:5 35:3 38:18 45:12

**term** 94:13 110:24
**terminology** 18:1 95:11 300:7
**terms** 92:13 178:1 183:23 185:16 224:4 311:25
**Terry** 310:25 311:3,5
**test** 34:12
**tested** 119:22
**testified** 5:9 94:19 134:10 151:7,12 161:17,19 166:23 181:13,17,21 183:11 188:5 203:15 205:18 211:21 216:22 233:22 240:25 243:9 281:6,20 285:15 291:21 313:13 330:16
**testify** 9:25 87:5 183:4 208:25 223:18
**testifying** 6:6,7 9:21 139:9 153:15,18 172:13 224:24 252:3 309:21
**testimony** 4:17 78:6,14 132:9 133:9 142:3 163:24 182:2 187:24 188:2 199:11 209:22 210:1 213:23 216:3 219:3,11 233:16,17 237:20 241:1 247:7 270:18 282:19 283:9 284:13 291:17 292:9 293:23 308:25 318:4,7 319:8 351:1,6,16 352:4, 17 355:18
**testing** 103:14
**thing** 13:9 27:5 42:9 65:2 86:21 99:18 115:11 131:18 146:13 153:24 163:20 168:25 250:2 263:17 273:8 287:18 289:1,11 309:20 324:4 336:20
**things** 43:9 50:16,19 68:20 77:18 82:7 84:6 146:17 162:15 163:4 241:13 244:17 251:24 266:9 301:4,21,23 310:11 313:3 317:1 320:18 349:19
**thought** 23:6 28:21 141:11 266:3
**thousands** 63:21
**threshold** 152:2
**ticket** 338:20 345:23
**time** 6:2 11:23 14:22 16:12,21,25 17:6 18:5 19:6,8 20:4 21:2 22:13 24:10 27:11 29:25 31:17 33:12,19 34:21 37:6 44:23 45:11 46:3, 14 49:7 50:3,25 54:21 55:2 59:10 61:4 62:14 64:9 66:5 67:6 71:22 72:6 75:21 86:12,20 87:21 89:4 95:18,20,22 99:22 101:20 103:1 104:8,10,11 105:17 106:19 116:2,4 117:1,3, 10,15,18,25 118:8 126:25 128:5 133:2,12, 20 136:14 137:20,25 138:17,21 140:19 141:1 143:12,17 144:5,25 147:14,16 149:2,19,22 152:5 153:25 155:5,12 156:4 158:25 159:15 160:16 163:9 164:19,25 166:5,22 171:17,18 174:2 177:2,20,21 178:4 179:18 182:13,18 187:7 194:15 196:14 197:22,24 206:11 210:17 211:2 213:15,19 214:21,24 215:13 217:11 219:10 220:14, 18 221:5,17 222:13,23 227:20 231:11,22 232:16 233:3,13,24 234:2 237:23 238:13,23 242:11 244:21 246:1 250:21 251:5 256:5,10 257:24 259:13 261:15 263:19,21 264:13,21,25 266:12 267:5 268:3,10 270:13 278:10,19 283:13,24 287:1,10,19 296:25 298:12 300:15 302:21,22 303:4,9 304:19 305:22 307:4 311:2,8 312:15,18 313:19 316:22 317:5 320:2 321:18,23 322:22 323:4,20 329:14,20 330:3,8 336:3 340:19 346:16,18 348:17 349:7 352:20 353:8,14,23 354:6 356:15,25
**times** 12:10,14 19:25 29:18,23 32:9,17 35:9 38:20 39:11,12,21,25 40:3 47:6 80:9,11 99:12,19 110:24 177:15 186:2 194:20 196:4 201:9 218:2 221:12,15, 24 245:8 249:22 250:17 257:4 298:8 354:4
**timestamp** 211:5 256:18 259:20
**tired** 74:15
**today** 10:20 11:12 28:22 82:3 130:23 145:22 149:10 153:15 178:13 179:20 279:16 292:9 308:25 318:5 327:15 330:5 341:7
**today's** 11:5 357:14
**told** 29:2 47:1 54:4 55:10 88:2 109:6 115:6 124:16,18 133:22 155:1 163:17 164:2,13 165:10 187:8,20 244:12 254:11 260:14,20,24 261:2,4 262:10,15 263:7 264:17 272:25 273:4,5,6 275:10 277:5 280:15 286:18,19,22 288:25 289:10 291:3,21 292:21,24 293:19,20 295:6 298:9 299:10 308:16 309:2,4,11,17 316:17,18 319:14,18 326:8 330:16,21 331:15,17 332:5,7 333:5 334:19 335:2,5 338:11
**tone** 166:1 178:21 192:23 222:10 293:20 294:2
**tonight** 356:20
**tools** 63:22 92:16
**top** 50:5 77:15 78:7 82:1
**totally** 309:13
**track** 108:6
**tracked** 107:20
**traffic** 50:24
**trained** 16:20 28:9 29:10 31:11 35:24 36:2 37:9 63:17 73:14 95:19, 24 96:1 115:3 132:24 184:12,16 185:6,14 186:6,11 189:1 191:10, 15,19 207:8,16 209:5, 21,23 232:13,14 247:5 248:12 268:25 293:3 310:19,25 312:12,16 314:18 315:15,17
**trainee** 128:6
**training** 10:7 12:16 16:9,19,22,24 17:1,4,5, 9,14,17 19:1,13 28:2,5, 18 29:5 30:25 33:4,23 34:17 38:11 47:24 48:18 49:5,21 52:5,15 54:7 55:23 56:21 57:1, 10,14 59:4 65:25 68:5 73:23 84:15 96:24 106:21 110:23 115:3 124:1 128:5 134:5 145:16 148:16 154:22 173:25 183:23 184:3 185:16 186:5 188:13,15 189:17 190:13 191:22 204:6,16 205:3 247:1, 10,16,18 248:12,17 268:25 269:5 285:24 310:19 311:17 312:17, 25 313:23 335:17 346:22
**trainings** 18:21 33:9 189:20 247:8 248:18
**trains** 130:5
**transcribed** 256:4 332:15
**transcript** 10:18,23 11:2,5,12 163:23 356:23 357:5,7,16,17, 22 358:7
**transitionary** 24:1
**transitioned** 24:10
**transitioning** 24:11
**translate** 183:13

221:16 222:4

**translates** 189:23 294:9 300:3

**transmitted** 114:20 167:18

**transparency** 30:5 31:22 32:18

**transpired** 153:2,7 157:8 158:9 159:1

**transpiring** 162:3

**transporting** 185:17

**trauma** 188:19 248:20

**treated** 267:16

**treatment** 186:14

**tremendously** 301:19

**trespass** 49:5,6,10,13, 15 51:5,12,23 54:9,25 55:5,16 57:4,23,25 58:10,24 59:16 78:1 81:8,22 82:8 84:16 85:2 90:15 262:15 266:5 281:8 288:15 289:14 290:1,4 291:3,23 294:9 308:21 309:5 326:18 347:19

**trespassed** 54:5 295:13

**trespassing** 47:13,18, 20 49:20 51:2,15,16 52:8 53:3,13,14 54:7 55:8 56:14 57:6 58:7,24 59:2,14 68:6 73:14 75:2,8 78:3 82:11,13 83:4,9,15,16,19,21,23, 24 93:4,9 94:5,12 238:8 289:24 291:22 292:3 295:16 301:25 335:10 336:3 337:6 339:3,24 340:2 341:12 348:7

**trespassing-type** 81:12

**trials** 12:2

**trouble** 163:3 214:17

**true** 11:5 32:12 34:1 36:13 37:17 38:21 40:1, 5,13,21,22 41:10,11,24 42:23 43:17 47:15,25 49:6 55:6 58:22 62:18 63:20,25 64:16,19,20 67:2,17,24 69:6 79:12 80:3,22 81:4 83:7 84:16 85:2,6,10 94:19 95:21, 25 101:6,9 104:9 106:1, 5 110:5,11 111:17,21, 25 112:4,9 113:8 114:4, 8,9,24 115:17 116:3 117:6,11 120:14 122:13,14 124:19,23 125:11 126:2,9,14,19 127:5,6,14 129:10,13, 25 131:7 132:13,25 134:11 135:6,18 141:1, 14 142:2,6 146:3,4,20 147:21,25 148:2,3,8,9, 14 149:5,6,11,14,19,21 150:8 151:11 152:6 153:4 154:16 161:19,24 166:25 167:4,15,23 168:7 170:25 173:11 174:3,16,21,24 175:2,8 176:20,24 180:3,19 181:16,17,25 183:6 184:14,19 185:1,8,10 186:9 190:15 194:19 197:9,12,14,15 198:2,3 200:3,5,10,25 201:9,13, 25 202:4 203:19,20 206:13 209:21 210:13, 18,23,24 211:10,14,17, 23 212:2 218:7,11,14 219:1,15 220:14 221:13 222:19 230:16 233:8,22 234:17,22 235:23 237:9,16,20,24 239:5, 11 240:6,11 241:2,4,9, 15,21,24 242:3,7 244:12 249:5 253:11 256:23 257:2,6,11,16 258:10,19 259:3,15 260:1,17 261:7 262:4, 10 272:7,13 274:10,13, 17 275:7 276:4,12,23 277:2,8,19,25 278:7,16, 20 280:18 281:8,21 282:4,7,15,17 283:7,11, 17 285:8,9,18 286:1,8 287:2,3 288:5 289:8 290:6,14 291:6,16,23 292:9 293:15 294:5 295:24 297:7 298:3,24 299:10,14,18,23 300:25 302:5,25 307:17 308:2, 22 309:5,25 310:21 311:1,2,9 317:11,15 318:9 319:9,20 320:7 321:18 322:9,15,20 323:6,10 324:1,17,19 326:8 327:23 329:7,10 330:18,25 331:8,13,21 332:7,8,19 333:9 334:13,22 335:1,14 336:19 337:17,21 338:7,13,22 339:3 345:5 346:8,13,17 348:2,14 349:13 350:6, 24

**trust** 278:10

**trusted** 289:16 331:2, 10

**truth** 9:25 43:11 47:1 286:7

**truthful** 237:15

**truthfulness** 45:7

**tune** 132:15

**turn** 28:19 29:7,12,25 30:8,15 31:1,11,17 32:5,11,16 113:11,16, 19 114:3,5 129:15 130:7 131:4,25 132:24 133:16 134:6 173:25 174:14 218:19 226:23

**turned** 130:10 131:2,11 132:12 174:7 175:19 180:13

**turning** 102:6 132:15 133:6,24 195:5

**turns** 174:3

**twisting** 243:15 291:7

**two-person** 128:4

**two-way** 195:16

**tying** 271:23

**type** 38:17 47:21 54:3 98:15 110:10 111:2,14 185:15 279:5 280:7 349:25

**types** 33:10 38:14 51:15 83:15,18,20,25 84:2 315:16

**typically** 113:24 117:20 137:7,22 144:15

**U**

**UC** 13:11,18 14:17

**Uh-huh** 13:17 17:7 18:8 117:23 122:6 125:9 152:19 184:11 341:10

**ultimately** 137:21 166:6 246:15 249:11 258:2 344:5 349:19

**unable** 177:18 188:9 348:25

**uncomfortable** 186:3 218:5 220:12 303:8

**undergoing** 244:8

**underneath** 322:6

**understand** 9:17 10:3, 4,16,17 11:9,22 12:8,18 18:14,25 20:2 25:17 26:2 27:6 28:13 36:2 38:19 40:6 41:17 42:11, 16 44:17 45:23 46:16 49:11 52:4 53:8,10 54:15 56:7 57:13 61:2, 12,17 63:3,12 64:12 66:1,10 67:2 73:21,23 77:25 79:5,6 84:9 87:25 89:23 92:2 93:18 95:10 96:20,21 97:13 109:11 141:25 142:2 143:18 153:15 157:1 158:24 159:23 162:10 167:18 168:16 171:14 174:9 192:23 198:19 205:5 209:10 214:22 239:8 252:4 265:16,21 266:3 270:21 273:24 280:14 288:13 294:25 295:5,18 308:10 309:13 312:8 313:9,12 314:5 318:14 322:2 340:20 350:4 351:23 355:10,12

**understandable** 155:8

**understanding** 7:13 18:15 29:8,11,17 30:11 31:15 32:10 34:17,21 42:5 49:13 52:7 53:1,2 54:6,9,11,22 55:3 71:2 73:24 79:24 83:20,22 94:20 103:11 113:11

121:10 122:22 129:12, 22 131:6,10,14 145:9 148:7,14 209:19 240:4 269:13 270:6 279:24 281:2 286:5 289:17 292:1 298:22 299:3,4,5, 7 301:10,13 307:20 311:18,20 314:17 315:1,6 316:23 327:9 328:21

**understands** 56:5

**understood** 7:14 10:9 26:14 27:10 28:17 33:15,22 79:1 165:24 237:19 262:9 273:14,16 285:5

**unequivocally** 260:11

**unfair** 220:3

**unfairly** 267:16

**unfolded** 29:24

**unfolding** 131:24 132:12 134:14

**unhappy** 348:7

**unicorns** 287:14

**unique** 156:15,16 157:22

**unit** 25:23 26:10 69:11 100:15,21 105:1,24 106:18 107:10 128:24 132:22 138:14 141:10, 12 144:16 145:11 147:1 148:4 157:13 164:24 167:7 170:7 200:19,20 218:18 263:16 277:17 296:10 299:16

**United** 207:11

**units** 19:19 127:18,19 313:19

**University** 8:16

**unlawful** 40:12 271:15 291:14,16,19 329:9 334:21 335:3 336:6

**unobstructed** 246:8

**unruly** 82:13 121:19

**unsigned** 357:6

**updates** 33:12

**uploaded** 137:22

**upright** 157:12 162:25 164:21 168:1 182:22 186:25 189:11,22,25 190:10 215:17

**upset** 155:8,14,16 165:25 183:5,7 201:19 220:12 240:20 243:18 266:8 267:12 271:2 288:18

**upsetting** 217:21

**urgency** 112:10,24 114:2 205:11

**urgent** 112:9 113:7

**utilize** 28:6 32:19 96:1

**utilized** 91:22

**utmost** 205:8

V

**vague** 40:24 54:14 63:7 64:6 67:4 68:25 79:22 84:20 90:18 95:7 96:12 140:9 164:7,17 169:15 184:1 191:18 216:25 312:6 347:1

**vaguely** 34:10

**valid** 35:25 199:20 291:5

**validity** 327:22

**valuable** 287:19 323:20

**variety** 14:11 19:22 26:8 45:17 46:6 51:9,11 122:8 136:19 207:13 344:3

**vehicle** 21:22 22:3 24:22 25:13 27:8 131:2 139:6 143:25 147:8 151:9 166:18,24 168:22 171:7 172:4,18 173:10, 13 175:14 177:16 179:5 181:25 182:12 195:23 198:21 199:10,15 200:15 210:16 213:25 215:23,24 217:6 218:10 219:12 256:12,15 264:7,11 266:4,15,18, 20 267:3 268:5 301:12 338:25 352:22

**vehicles** 266:2

**verbal** 308:7

**verbalize** 316:21

**verbally** 4:17 279:21, 23,25

**verbatim** 29:9 36:14 93:14 109:8 181:20 229:19 237:13 255:7 257:5 307:23 315:14

**verbiage** 64:10 334:15

**verify** 45:7 237:8,14

**versus** 310:25 311:3,5, 18 313:8

**vicinity** 25:15

**victim** 137:3,6

**victims** 136:13

**video** 22:25 23:5,7 25:2,24 26:4,20 27:12 69:10,16,17 114:15 125:7 131:2 138:2,3,13 142:17 147:1 158:2 161:23 163:12 168:14, 18 169:5,11,17 170:12, 25 171:3,5,6,8,9,10 172:24 173:2,3 174:1, 20 175:4,7 176:14,17, 22,25 179:3,11,13 180:6,22,24 181:1 192:21 193:6 194:2,7, 11 195:2 196:7,9,19 198:1,4,11,24 199:1,14, 18,22 200:22 201:4,11, 17 210:23 216:4 217:2, 11 220:5,8 221:7,15,24 222:11 223:21 224:5,20 225:10 226:14 227:17 228:5,9 230:1,7,19 236:12 239:24 244:18 245:6 248:24 249:8,19 251:4,10,16 252:10 253:22 254:7,19 255:19,23 256:4,18 258:9,11,20 259:15 260:22 264:15,23 267:8 277:6 279:12,14 287:1, 3 296:24 297:16 304:5, 14 305:15 309:6 316:3 317:10 318:25 346:5,6, 9,19

**video/audio** 22:6 23:17 24:16 167:22 169:25 224:5

**videos** 24:6 349:1

**view** 309:14

**viewings** 251:7

**violated** 133:23 235:13

**violates** 269:17,20

**violating** 134:2

**violation** 50:10,11,12 51:2 126:13 269:25 284:10 294:5 339:1,2

**violations** 49:23 50:5 81:8

**violence** 347:25

**violent** 233:17 241:21

**virtually** 109:8

**virus** 119:5

**visible** 219:7 322:9 346:5

**visibly** 155:16

**vocalized** 182:9

**voice** 152:23 165:4 167:21 168:5,7,9,10,17 179:8,12,13,16,22 180:10,12 192:23 196:1 197:22 200:1,4,6,9,10, 23 205:20 229:13,14 244:22 253:11,13,20 256:25 307:1 325:11, 12,19

**voices** 179:14

**vulnerable** 315:19

W

**wait** 141:11 350:22

**waiting** 176:4 213:16 329:23

**waive** 4:20

**waived** 358:15

**wake** 165:5 257:15

319:22
**waking** 240:23
**walk** 26:15 242:11
**walked** 144:11 152:24 258:24
**walking** 155:17 162:19 166:14 187:4,19 264:10
**wallets** 234:21
**wanted** 7:25 9:15 42:10 45:14 121:2 164:22 202:21 255:21 265:22 267:17 275:19 306:2 322:24 351:10 354:20
**wanting** 266:15
**warehouse** 52:21
**warehouses** 47:19
**warning** 275:24 276:4, 11 345:23 348:11
**waste** 86:20
**wasting** 160:16
**watch** 69:8,13,17 97:23 108:2 113:21 169:17 172:19 173:17 176:2,5, 6 192:18 199:11 217:9 221:11 222:11 224:14 251:10 254:21 297:10
**watched** 69:10,19 142:17 171:5,6 173:1,6, 11 175:7,13 176:16 177:16 179:4,11,18,22 194:18 195:3 196:9 210:18 279:15 303:12
**watching** 175:7 177:1 179:3 315:22
**waves** 117:7
**ways** 8:1 146:18 247:25 266:13 347:3
**weapons** 114:16 115:2,8,17 125:7 233:18,19 234:7,17,25 235:22 241:24 348:2
**wear** 213:8
**wearing** 114:13 117:14 135:9 146:19 147:14, 16,20 148:1 175:1 176:19 188:20 193:1
206:24 317:8 322:14,19
**week** 120:10,17 125:8 237:3
**welfare** 165:8
**well-being** 165:1
**west** 103:15 111:20
**whatsoever** 270:20
**wheelchair** 300:4
**wildly** 20:20
**wilfully** 59:16
**window** 166:10 197:17 198:17 200:9 217:2,6, 12,15 219:13 244:18 249:15 250:21 252:13, 21 258:2,5,10,17,22 259:5 300:22
**windows** 26:7 257:25
**winter** 15:1
**wintertime** 117:4
**wishing** 36:5
**witness'** 357:4
**witness/defendant** 88:20 89:7
**witnesses** 145:24 277:12 293:4
**woman** 114:12 203:23 208:24 209:24 220:10 317:21 319:2 326:22 334:21 337:5
**woman's** 276:21
**women's** 14:14
**word** 19:18 154:9 216:1 220:5 222:15
**words** 8:12 37:16,20 62:23 63:1 77:24 92:14 105:13 137:3 138:7 154:12 164:12,21 165:4,13 166:8 168:11 189:16 190:12 202:17 203:2,6 207:8 215:21 216:9,11 221:22 236:7 243:15 244:5 249:18 252:17 264:18 268:13 273:19 274:13 276:19 277:16 289:6 291:7,8
301:17 302:1 307:24 308:20 309:19 337:13 351:22
**wore** 117:20
**work** 7:12 8:20 14:10 19:15,20,21 20:7 21:21, 23 98:17 99:2 105:13, 14 106:24 285:22,23,25 286:14 354:19
**worked** 14:11,12,14,17 15:2 18:5 19:24 20:3 33:19 35:7 52:6 84:10 312:18
**workers'** 7:4,21 9:17
**working** 7:16 20:17 21:7 22:14 32:10 55:10 70:23 71:5 97:19,21,23, 24 98:5,6,11 99:5 103:1 107:5,6 108:17
**workload** 107:3
**workplace** 284:15
**world** 178:4
**worst** 246:10
**Wow** 253:9
**write** 73:4,6 139:11 153:10 290:24 340:19
**writing** 78:11 102:7
**written** 37:20 153:11 280:12 281:16
**wrong** 270:22 276:17
**wrote** 72:25 143:11 292:4 335:6

**Y**

**year** 6:11,17 7:17 13:20 14:19 16:17,21,23 64:16,19,22 66:1,16,19 70:17 72:8 79:2 116:11 312:22
**years** 9:4,6 22:15 28:21 33:24 35:7 38:11 52:6 63:18 66:2 67:12,14 79:3 84:10 91:15 139:15 312:21 313:1,2, 5
**yelled** 323:2
**yelling** 180:2,8 182:20 206:6 207:2 215:25 240:21 244:19
**yesterday** 71:24 138:12 171:11 173:6 175:8 179:11 194:17 196:9 221:1 228:22 251:6 254:20
**young** 177:10

**Z**

**zebra** 5:23
**zoning** 102:22
**Zoom** 6:5 61:6 68:19 71:24 223:8,11 224:2,6, 12 225:1,7 226:20 228:17,23 251:1,5,11, 12 252:18 310:12,13 348:24 354:5,20