# EXHIBIT P

# Deposition Transcript

Case Number: 2:23-cv-01788 FMO-AGR
Date: November 21, 2023

In the matter of:

# BURMAYAN v CVS PHARMACY, INC., et al.

## OFFICER JAMES ROSS

**CERTIFIED COPY**

Reported by:
Ellen C. Shore
CSR No. 7210

Steno
Official Reporters

315 W 9th St.
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: FIRM #108F

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ANOUSH BURMAYAN,

Plaintiff,

vs.

Case No. 2:23-cv-01788 FMO-AGR

CVS PHARMACY, INC., a corporation doing business in California, GUY GARCIA, an individual; JOE JOHNSON, an individual; CITY OF GLENDALE Officer JAMES ROSS #22471, Officer GRIFFIN ARMENDARIZ #27999, individually and as a peace officer, and DOES 1-10,

Defendants.
_____________________________/

VIDEOTAPED DEPOSITION OF OFFICER JAMES ROSS #22471

Glendale, California

November 21, 2023

9:08 a.m. - 4:47 p.m.

Reported By:
Ellen C. Shore
CSR No. 7210
Steno Job No.: 759410

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ANOUSH BURMAYAN,

Plaintiff,

vs.

Case No.
2:23-cv-01788 FMO-AGR

CVS PHARMACY, INC., a corporation doing business in California, GUY GARCIA, an individual; JOE JOHNSON, an individual; CITY OF GLENDALE Officer JAMES ROSS #22471, Officer GRIFFIN ARMENDARIZ #27999, individually and as a peace officer, and DOES 1-10,

Defendants.
_____________________________/

Videotaped deposition of OFFICER JAMES ROSS #22471, taken by and on behalf of Plaintiff, at 655 North Central Avenue, Seventeenth Floor, Glendale, California, commencing at 9:08 a.m., Tuesday, November 21, 2023, before Ellen C. Shore, Certified Shorthand Reporter No. 7210.

APPEARANCES:

For Plaintiff, ANOUSH BURMAYAN:

MKRTCHYAN LAW
BY: NARINE MKRTCHYAN, Esq.
P.O. Box 2288
Toluca Lake, California 91610
818.388.7022
Narine57@gmail.com

For Defendants CITY OF GLENDALE, OFFICER JAMES ROSS #22471 and OFFICER GRIFFIN ARMANDARIZ #27999 individually and as a peace officer:

CITY OF GLENDALE, CALIFORNIA
BY: EDWARD KANG
Principal Assistant City Attorney
613 East Broadway
Suite 220
Glendale, California 91206-4308
818.548.2080
818.547.3402 F
EKang@glendaleca.gov

For CVS PHARMACY, INC., a corporation doing business in California; GUY GARCIA, an individual; and JOE JOHNSON, an individual:

PAYNE & FEARS
BY: CONNOR LANE KRIDLE, Esq.
(Present Telephonically)
4 Park Plaza
Suite 1100
Irvine, California 92614
949.851.1100
Clk@paynefears.com

Videographer:

NARINE MKRTCHYAN, Esq.

Also Present:

ARYA SHARIFAN (Pages 248-419)

# I N D E X


| DEPONENT | EXAMINATION BY | PAGE |
|---|---|---|
| OFFICER JAMES ROSS #22471 | | |
| | MS. MKRTCHYAN | 6 |


## E X H I B I T S

(None)

## INFORMATION REQUESTED:

(None)

## QUESTIONS DEPONENT INSTRUCTED NOT TO ANSWER:

| PAGE | LINE |
|---|---|
| 20 | 22 |
| 54 | 3 |
| 242 | 1 |
| 242 | 22 |

Glendale, California
Tuesday, November 21, 2023
9:08 a.m.
-oo0oo-

(The following was read into the record):

THE REPORTER: We are on the record.

My name is Ellen Shore. My business address is 315 West 9th Street, Suite 807, Los Angeles, California 90015.

It is November 21, 2023, 9:08 a.m. Pacific Time, and this deposition is being taken in Glendale, California. This is the deposition of Officer James Ross, in the matter of Burmayan vs. CVS Pharmacy, et al.

The case number is 2:23-cv-01788 FMO-AGR.

Present are Narine Mkrtchyan, with Mkrtchyan Law, Edward Kang with the City of Glendale, Connor Kridle with Payne & Fears, LLP;

Officer Ross, please raise your right hand.

OFFICER JAMES ROSS #22471,
having been first administered the oath,
was examined and testified as follows:

EXAMINATION

BY MS. MKRTCHYAN:

09:08 Q. Okay. So good morning, Officer.

09:08 A. Morning.

09:08 Q. State and spell your name for the record.

09:08 A. James Ross, J-a-m-e-s, R-o-s-s.

09:09 Q. Okay. So I am Plaintiff's counsel, Narine Mkrtchyan. You are here for a deposition in this federal civil rights action, Burmayan versus CVS Pharmacy --

09:09 THE REPORTER: You're going to have to speak up.

09:09 MS. MKRTCHYAN: We'll try.

09:09 BY MS. MKRTCHYAN:

09:09 Q. So please identify how -- how old are you, for the record?

09:09 A. 37.

09:09 Q. 37 years old.

09:09 Have you ever had your deposition taken in any case?

09:09 A. No.

09:09 Q. Have you testified in court previously?

09:09 A. Yes.

09:09 Q. In the ballpark, in criminal cases or whatnot, how many times have you testified in court?

A. Maybe around the area of 20, 20 times.
Q. 20 times. Okay.
A. Maybe more.
Q. Okay. And that was only in your career as a police officer?
A. Yes.
Q. Now, so the same rules apply, the penalties of perjury, testifying under oath. Despite the fact we do not have a judge here present, this is a formal proceeding, and all the testimony that you offer is under oath and can be used against you down the road.
Do you understand?
A. Yes.
Q. From time to time, your attorney is going to make objections for the record. Okay? Since we don't have a judge making rulings -- okay? -- you just -- I advise you to pause before giving an answer --
A. Uh-huh.
Q. -- so your attorney could make objections for court reporter to take it down, and then provide an answer. Unless there is an instruction for you by your counsel not to answer any questions, you are obligated to provide an answer.

Do you understand?
A. Yes.
Q. We have this wonderful court reporter. She's taking -- she's going to have a very important job to do. She's going to take word by word what you're testifying and my questions and answers.
So we have to be very respectful and cognizant of her difficulties and her time; right? And we have to speak slowly, audibly, and with pauses so that she can actually -- because we want to have an accurate record of your testimony; correct?
A. Yes.
Q. So what I ask you to do, if -- you provide audible answers loud enough for her to take it down, and if you don't understand a question, for example, please ask for clarification.
Because what will happen at the end, I will be asking you, when she finishes the transcript, for you to review with your counsel to certify the truth that that's accurate transcript of what you testified; okay?
So that's why it's important for you to slow down and -- so that we're not to speak over each other.

09:12 So for this deposition, I will be asking you to review a lot of documents on the screen. I assume you have also prepared for this deposition with your counsel and have looked at some records?
09:12 A. Yes.
09:12 Q. I see that you have your -- some police report.
09:12 Is that your police report in front of you?
09:12 A. Yes.
09:12 Q. So you reviewed your police report in this case?
09:12 A. Yes.
09:12 Q. All right. What other documents have you reviewed in preparation for your deposition?
09:12 A. The audio and the in-car camera.
09:12 Q. Okay. So anything else?
09:12 A. Not to my knowledge, no.
09:12 Q. Okay. Have you, for example, looked at any policy documents at your department?
09:12 A. Regarding this case, no.
09:12 Q. Okay. And have you looked at the Internal Affairs interview by Sergeant Robinson in
09:13 this case related to this incident?
09:13 THE DEPONENT: I don't remember if --
09:13 MR. KANG: Yeah, don't ask me. If you

09:13 recall.
09:13 THE DEPONENT: Sorry. Sorry. Sorry about that. First time. I don't -- I don't really know the rules.
09:13 BY MS. MKRTCHYAN:
09:13 Q. Yes.
09:13 A. Yeah, I -- I -- I don't recall --
09:13 Q. Okay.
09:13 A. -- if we did or did not.
09:13 Q. Gotcha. All right.
09:13 So in any event, I will be reviewing some documents and all your video reviews, refresh your memory. I will be asking you to provide some estimates.
09:13 So, you know, main thing for you is not to speculate. If you don't recall anything, you can ask for documents to refresh your memory.
09:13 A. Okay.
09:13 Q. And we can go over them together.
09:13 A. Okay.
09:13 Q. So let me just ask you a couple of background-related questions.
09:13 As I understand, you've been hired with the Glendale PD since 2017? 2017.
09:13 A. As a police officer, yes.

09:13 Q. Okay. And before that, you were working in custody department?
09:14 A. Yes.
09:14 Q. Custody division?
09:14 A. Yes.
09:14 Q. How long were you working there?
09:14 A. Nine-and-a-half years.
09:14 Q. I'm sorry?
09:14 A. About nine years.
09:14 Q. Nine years?
09:14 A. Yes.
09:14 Q. And you were doing there, like, it was -- what were your assignments there?
09:14 A. So we would -- we would book inmates, we would regularly do tank checks. And pretty much just the overall well-being -- or check the overall well-being of inmates that were brought into custody.
09:14 Q. Glendale City; right?
09:14 A. In the Glendale City Jail, yes.
09:14 Q. So Glendale city has a jail within their the police department?
09:14 A. Yes.
09:14 Q. Okay. So that's where you were working?
09:14 A. Yes.

09:14 Q. Okay. Was that a sworn peace officer position?
09:14 A. No.
09:14 Q. So in order to become a sworn peace officer, you had to graduate or --
09:14 (Reporter clarification.)
09:14 BY MS. MKRTCHYAN:
09:14 Q. In order to become a police officer, sworn police officer, you had to pass the academy?
09:14 A. Yes.
09:14 Q. And when did you graduate?
09:15 A. 2017.
09:15 Q. And what department did you go with -- where did you get your police academy graduation?
09:15 A. LA County Sheriff's.
09:15 Q. Sheriff's Department. Okay.
09:15 Did you apply to other law enforcement positions prior to working for Glendale?
09:15 A. Yes.
09:15 Q. Where did you apply?
09:15 A. There were -- there's a lot of departments that I applied for.
09:15 Q. Okay. So -- so are you -- as I understand, you went to high school?
09:15 A. Uh-huh.

09:15 Q. Your educational?
09:15 A. Yes.
09:15 Q. Okay. And after that, did you go through some college?
09:15 A. Yes.
09:15 Q. Where did you go to college?
09:15 A. Chaffey College, Citrus College, Boise State. I believe those are the only ones.
09:15 Q. Okay. Did you --
09:15 A. Yeah.
09:15 Q. What courses were you taking?
09:15 A. Just general ed. Just regular basic classes. I wasn't really aiming for a certain degree at that time.
09:15 Q. Okay.
09:15 A. I was going to -- undetermined, or undecided.
09:15 Q. Okay. So you did not graduate?
09:15 A. No.
09:15 Q. And then your -- did you have any other non-Glendale City jobs prior to working with Glendale City?
09:16 A. Yes.
09:16 Q. Where did you work most recently before being hired by Glendale City?

09:16 A. I believe it was CalArt West, if I remember right, or UPS.
09:16 Q. And what were you doing there? What were your jobs?
09:16 A. CalArt West, I was working in catering as the restaurant business. And then UPS, it was loading and unloading airplanes of packages.
09:16 Q. Okay. So basically if you were working for Glendale City for nine years, when -- what year did you start with them?
09:16 A. 2008.
09:16 Q. 2008.
09:16 Did you live in Glendale?
09:16 A. No.
09:16 Q. Where do you live? I don't need your address, just city.
09:16 A. In the city of Phelan.
09:16 Q. (Indicating.)
09:16 A. Phelan. P-h-e-l-a-n.
09:16 Q. Where is that, Phelan?
09:16 A. High desert.
09:16 Q. Oh. I see. Okay.
09:16 So -- and you've -- after the academy, when you graduated, did you receive POST training?
09:17 A. Yes.

09:17 Q. Tell me when you got your certificate from POST training?
09:17 A. It -- I believe it was 2017, the same month.
09:17 Q. Is it the basic POST training?
09:17 A. Yes.
09:17 Q. Have you gotten intermediate or advance levels yet?
09:17 A. I don't believe I've met the -- the years or the -- I definitely don't have the education, but the -- the years of service for the intermediate. I haven't looked into that yet.
09:17 Q. Okay. So but you have formally gotten a certificate for intermediate level?
09:17 A. Correct.
09:17 Q. Okay. So but you've received training within the office?
09:17 A. Yes.
09:17 Q. Did you receive any other law enforcement agency training during this period from 2017?
09:17 A. I've taken several classes, yes.
09:17 Q. Where at?
09:17 A. All over the police. I can't recall exactly all the locations I've taken --
09:17 Q. Okay.

A. -- classes.
Q. Okay. And what kind of classes were you taking?
A. There's, like, DUI enforcement classes, there's drug-related classes, FTO classes. Along those lines.
Q. Okay. Your first assignment after you graduated from the academy, where was it?
A. Patrol.
Q. Patrol.
So were you under training via field -- FTO --
A. Yes.
Q. -- during that period?
A. Sorry.
Q. We need to finish.
A. Sorry. Sorry.
Q. How long were you on probation?
A. One year.
Q. One year.
And who was your field training officer?
A. It was Chris Ayad and Nick Orloff.
Q. Can you spell the last names?
A. Yes. Ayad, A-y-a-d.
Q. R-i?

09:18 A. A-y-a-d.
09:18 Q. Ayad. Uh-huh.
09:18 A. And Orloff, O-r-l-o-f-f.
09:18 Q. Okay. And so this is, like, informal training you received on patrol, and they were supervising you?
09:18 A. Yes.
09:18 Q. Okay. And was there any specific division you were assigned during that period within Glendale City?
09:19 A. Patrol.
09:19 Q. No. But, like, there are different districts; right?
09:19 A. Normally, how it works is when you're on training, you're a citywide car. That way you can get as many calls as possible. So we weren't assigned to a district unless we were extremely short that day on patrol --
09:19 Q. Uh-huh.
09:19 A. -- which I don't recall ever being. When I was there, it was always citywide, but I can't be certain on that.
09:19 Q. Okay. So basically, you -- you don't work specifically in a district, you are assigned on patrol, and you can be -- you're responding to any

09:19 calls within city of Glendale?
09:19 A. While we're on training, yes.
09:19 Q. Oh, while you're on training. Okay.
09:19 A. Yeah.
09:19 Q. So after the year of training, were you assigned to a specific district?
09:19 A. So it's six months of training.
09:19 Q. Uh-huh.
09:19 A. And then six months by yourself while you finish out that probation period. And then, yes, you're -- you'll be -- so after the training process and you complete the FTO part of it, then you'll be assigned to a district, unless that sergeant or whoever is making the deployment sheet --
09:19 Q. Uh-huh.
09:20 A. -- puts you as a citywide car.
09:20 Q. Gotcha.
09:20 So in 2019 of January, you were off probation already?
09:20 A. Yes.
09:20 Q. Were you working patrol -- I mean -- partnered with -- as a partner with someone or solo?
09:20 A. It depends on what shift I was working.
09:20 Q. So you -- let me ask you this: In Glendale PD, are you assigned to a patrol car?

09:20 A. Yes.
09:20 Q. Okay. Do you work, generally, with partners or solo?
09:20 A. Solo.
09:20 Q. Solo.
09:20 A. Uh-huh.
09:20 Q. So you're driving the car alone?
09:20 A. Yes.
09:20 Q. And for this specific incident, were you working solo?
09:20 A. Yes.
09:20 Q. Okay. Was there anyone there on that day you was working with someone else, like partners?
09:20 A. Off the top of my head, I know there was two that would -- that showed up to our call.
09:20 Q. Uh-huh.
09:20 A. But one of the those officers was on training.
09:20 Q. Gotcha.
09:20 So this is --
09:20 (Reporter clarification.)
09:20 BY MS. MKRTCHYAN:
09:20 Q. -- Duncan, D-u-n-c-a-n, and Ruiz, R-u-i-z?
09:20 A. Yes.
09:21 Q. So these were two other officers who

09:21 arrived on scene. And one of them -- who was the trainee?

09:21 A. Ruiz.

09:21 Q. Ruiz.

09:21 So unless, though, there is the training process, you guys are assigned solo to one car?

09:21 A. Yes.

09:21 Q. Okay. Now, during your period from 2017 -- and let me back up a little bit.

09:21 When you applied to other law enforcement agencies, were you at any point in time rejected?

09:21 A. Yes.

09:21 Q. Which agency rejected you? If you recall.

09:21 A. Riverside Sheriff's, San Diego Sheriff's. There's other agencies. But as far as rejection -- rejection or just not --

09:21 Q. Qualified.

09:21 A. -- passing --

09:21 Q. Right.

09:21 A. -- the interview process or stuff like that, there's -- there were several.

09:22 Q. Okay. So, for example, you know, were you ever disqualified for the position of law enforcement?

09:22 MR. KANG: Objection. Vague, regards to

09:22 privacy. I'm going to instruct him not to answer
09:22 this question.
09:22 MS. MKRTCHYAN: On what?
09:22 MR. KANG: We've already done this.
09:22 MS. MKRTCHYAN: What did we do?
09:22 MR. KANG: You know, we put this before the
09:22 judge. She did not order any of this stuff
09:22 disclosed. We're not -- I'm going to instruct him
09:22 not to answer that question.
09:22 If you want to bring it up to the judge,
09:22 you can. I don't want to fight about it. Just --
09:22 I'm going to instruct him not to answer the
09:22 question.
09:22 MS. MKRTCHYAN: Okay. All right. Fine.
09:22 She actually made the ruling that his
09:22 employment history was produced to us --
09:22 MR. KANG: That's not his employment
09:22 history.
09:22 MS. MKRTCHYAN: Yeah, that is --
09:22 MR. KANG: That's not his employment
09:22 history. Where he worked? And we did produce that.
09:22 MS. MKRTCHYAN: Yes.
09:22 MR. KANG: And we produced the -- the
09:22 employment history of where he had worked.
09:22 MS. MKRTCHYAN: Right.

MR. KANG: If you want to get into details as to past employment applications --

MS. MKRTCHYAN: Okay.

MR. KANG: -- and reasons for that, we're not doing that. So I'm instructing him not to answer. I'm not going to get into it with you, so.

MS. MKRTCHYAN: Well --

MR. KANG: You can bring it up to the judge.

MS. MKRTCHYAN: Okay. So -- all right. So let's continue with this. Then we'll decide we're going to raise this issue with the judge.

BY MS. MKRTCHYAN:

Q. I notice you are wearing your uniform assigned by the Glendale Police Department today; right?

A. Yes.

Q. Okay. On the day of this incident in January of 2021, you were also wearing the same uniform; right?

A. Yes.

Q. Okay. So let us go --

A. Not this exact uniform, but yes.

Q. Sure. Pretty much a similar uniform.

A. Yeah.

09:23 Q. Right?
09:23 Let's go over your equipment, for the record, so that it's clear for us, what you carry as a police officer, normally.
09:23 So please tell us all the equipment you are carrying today.
09:23 A. I have my radio, flashlight, my taser, my duty gun. I have a knife; tourniquet; and my body cam, my body camera.
09:23 Q. Okay. Your body camera --
09:23 A. And I have handcuffs as well.
09:24 Q. Okay. So you have, also, a walkie-talkie, sort of, like?
09:24 A. Yes.
09:24 Q. And there's a radio?
09:24 A. Yes.
09:24 Q. Okay. So your body cam, why is your body cam on your waist? Because you are not right now assigned to a case?
09:24 A. It doesn't -- there's no policy that says I have to put it anywhere. It just has to be on my person.
09:24 Q. Okay. So you can actually put it on your waist?
09:24 A. Yes.

09:24 Q. Does it capture --
09:24 A. Yes.
09:24 Q. -- incidents? Okay.
09:24 A. Yes.
09:24 Q. All right. And when did you get assigned the body cam?
09:24 A. Sometime in '21, like -- in 2021, but I can't remember exactly when.
09:24 Q. Okay. And I notice you also have a recorder? You have other kind of recorder here?
09:24 A. I do not.
09:24 Q. No, you don't.
09:24 So aside from body cam, you don't have any other recorder?
09:24 A. No.
09:24 Q. What is this -- this is the Motorola radio that you have, is that to communicate with dispatch?
09:24 A. Yes.
09:24 Q. Or other officers?
09:24 A. Yes.
09:24 Q. Okay. And that walkie-talkie, what is that for?
09:24 A. This?
09:24 Q. Yeah. Yeah.
09:24 A. The radio?

09:25 Q. Yeah, radio.
09:25 A. It's so I can get radio trans- -- traffic from our dispatcher or other officers.
09:25 Q. So basically those two things are connected together? They're working together?
09:25 A. Yes.
09:25 Q. Okay. And on your patrol car, you also have some equipment -- right? -- video recorder?
09:25 A. Yes.
09:25 Q. And what is that called?
09:25 A. The MAV.
09:25 Q. What is --
09:25 A. It's a forward-facing camera. It's a MAV.
09:25 Q. Okay.
09:25 A. A mobile audio/video recorder.
09:25 Q. Gotcha.
09:25 And at the time of this incident in January of 2021, were you assigned that in your car?
09:25 A. Yes.
09:25 Q. On January 2021, did you have body-worn camera assigned to you?
09:25 A. No.
09:25 Q. As of January 2021, do you have an audio recorder called VAR that was assigned to you that you could capture recording incidents?

A. Yes.
Q. How does it work, that system?
MR. KANG: Objection. Vague. Potentially calls for speculation.
BY MS. MKRTCHYAN:
Q. What do you have to do to turn that on?
A. You have to press a button --
Q. Okay.
A. -- to turn it on.
Q. How is it that you don't have it here with you today?
A. Because we don't have to carry it. If we have other -- if we have a body-worn camera.
Q. Okay. So when the body-worn cameras were assigned to you, they discontinued the audio recorder?
A. Yes.
Q. Did that audio recorder also allow you to capture photographs?
A. Which camera?
Q. That VAR recorder.
A. The VAR? No. That's audio only.
Q. Okay. So you just press a button and it records?
A. Yes.

09:26 Q. Okay. And what is the policy by your department in using audio recorders or body-worn cameras, when you do -- when are you obligated to turn it on?

09:26 A. In contact with the public.

09:26 MR. KANG: Objection. Compound.

09:26 BY MS. MKRTCHYAN:

09:26 Q. Okay. In contact with public.

09:26 Like, for example, responding to calls? Yes?

09:26 A. Yes.

09:26 Q. Investigating calls?

09:26 A. Yes.

09:26 Q. Do you have an understanding as to when you are obligated to turn it on when you're initiating a contact?

09:27 A. Yes.

09:27 Q. When?

09:27 A. When I contact somebody -- or when I contact someone from the public.

09:27 Q. Okay. And the same thing for the body-worn camera; right?

09:27 A. Yes.

09:27 Q. Okay. So in a situation like this that we have, you were responding to a 911 call from

09:27 CVS Pharmacy; right?
09:27 A. Yes.
09:27 Q. Okay. And working in Glendale for that
09:27 period of time, how often had you gone to this
09:27 CVS Pharmacy?
09:27 A. Several.
09:27 Q. Like, in the ballpark, within a year, let's
09:27 say, how often would you go to that location?
09:27 A. I actually couldn't tell you. It's -- it's
09:27 a lot.
09:27 Q. Regularly?
09:27 A. Yes.
09:27 Q. And the address was -- do you recall the
09:27 address of this CVS Pharmacy where the incident
09:27 happened?
09:27 A. It's 3943 San Fernando.
09:28 Q. Okay. And which district was this?
09:28 A. 2's.
09:28 Q. And so in the ballpark, you can't tell me,
09:28 like, estimate, how many times, like, in a month,
09:28 for example, you would go there?
09:28 A. I mean, for calls or -- or just regular
09:28 patrolling? I mean, daily.
09:28 Q. Daily?
09:28 A. Uh-huh.

09:28 Q. And you were working nightshift at the time?
09:28 A. Yes.
09:28 Q. And when does nightshift, graveyard shift start for you?
09:28 A. It depends on if it's -- what day of the week it falls on. If it's my first day on patrol or back to work or it's my second two days of work -- 'cause we work three-12s -- just the first day, it would be 17:30, or 5:30 p.m. If it's the second day, it would be 18:30, or 6:30 p.m.
09:28 Q. Okay. And how late you would work? Like, when does it end, 5:00 a.m.?
09:28 A. So the 5:30 p.m. shift -- so 17:30 -- would end at 6:00 --
09:28 Q. Uh-huh.
09:28 A. -- in the morning.
09:28 Q. Uh-huh.
09:28 A. And then the 18:30 start time, 6:30 p.m., would end at 7:00 a.m.
09:29 Q. I see.
09:29 And in the -- like, generally, what kind of issues you were responding to the CVS Pharmacy?
09:29 A. All kinds of issues.
09:29 Q. Like, give me an example. Most prevalent.

09:29 A. Trespassing, disturbance calls, petty thefts, robberies, SD robberies. Things like that.
09:29 Q. Did you make a lot of arrests at that location?
09:29 A. I have, yes.
09:29 Q. Did you go to court in any of those incidents to testify?
09:29 A. I don't recall.
09:29 Q. And did you know the employees by face?
09:29 A. I have had interactions. As far as knowing names, though, no.
09:29 Q. So -- and would you say that overall, the calls were more at night or during the day for disturbance?
09:29 A. Any time of the day, really, there.
09:29 Q. Any?
09:29 A. Yes.
09:29 Q. Was this CVS Pharmacy particular making more calls for service, or in general, you were getting the same kind of calls from other retail establishments in Glendale?
09:30 A. I would say this one is pretty heavy on the -- the calls for service.
09:30 Q. Do you have an understanding as to why?

A. I mean, it borders -- it borders Los Angeles. There's several bus stops around in that area that bring a lot of homeless people.
Q. Uh-huh.
A. Transients that, you know, often commit thefts.
Q. Uh-huh.
A. So we would get a lot of calls just in that area. They would often, you know, get dropped off and then go into that parking lot.
Q. I see. I see.
So -- but this CVS Pharmacy is Los Feliz and San Fernando; right?
A. Yes.
Q. Okay. All right.
So -- and but you can't tell me, like, let's say within that month of January 2021, how many arrests you made at that location?
A. I could not, not off the top of my head, no.
Q. Recently, most recently, have you been there responding to a call or complaint?
A. I can't remember the last time I actually responded there recently.
Q. Uh-huh. And you're still assigned to

patrol right now; right?
A. Right. Yes.
Q. Have you -- let me see.
Are you still working for the same area?
A. Currently I'm in the agent -- I -- I have the role of agent, or FTO position.
Q. Uh-huh.
A. So I am citywide. So I -- I go all throughout the city. So, yeah, I -- I -- that's why I can't remember the last time I've been there.
Q. Currently -- so you're an FTO.
Who are you training right now?
A. Officer Tran, T-r-a-n.
Q. Okay. How long have you been an FTO?
A. Going on three years now. Two years to be precise.
Q. So, you know, this CVS Pharmacy -- let me back up a little bit.
So during this period of time, you know, working with Glendale, have you had any complaints against you, personnel complaints related to similar calls for service, like traffic, disturbance of the peace, or use of force?
MR. KANG: Objection. Compound.
THE DEPONENT: No, not that I know of.

09:32 BY MS. MKRTCHYAN:
09:32 Q. Okay. So your department has not ever told you, you know, that you are under investigation for any type of use-of-force incident, for example?
09:32 A. Under investigation, no, not that I -- not that I recall.
09:32 Q. Okay. And who's your supervising sergeant right now?
09:32 A. Currently? I -- it's Sergeant Aliaga. A-l-i-a-g-a.
09:32 Q. Okay. And --
09:32 A. He's currently out right now. So I report to several sergeants, mainly Sergeant Heinbechner. It's H-e-i-n-b-e-c-h-n-e-r.
09:33 Q. Uh-huh. Okay.
09:33 So -- so you never have been -- during this period of time from 2017 to today, you've never been told that you -- you're using force too much or that you're being scrutinized for using force?
09:33 A. No.
09:33 Q. And no other complaints that you've been told about, this is a complaining about your actions in any shape or form?
09:33 A. Not to my recollection.
09:33 Q. Okay. So in -- with regard to

CVS Pharmacy, have you ever been requested by any CVS employee at that location to make a private citizen's arrest or not?
A. Yes.
Q. Uh-huh.
A. Yes.
Q. When was last time you remember that happening?
A. Besides this case, I have no idea. I can't remember.
Q. Okay. But it happened before?
A. I believe so.
Q. Was it before this incident or after?
A. I don't know.
Q. And how do you understand your obligations as a police officer in making a private citizen's arrest?
A. Can you ask that one more time?
Q. Yeah.
What -- what -- what process do you go through when someone like retail establishment employee tells you that they want to arrest someone?
What process do you go through?
A. So if that crime had not occurred in my presence --

09:34 Q. Yes.
09:34 A. -- and I'm making that arrest on behalf of the store -- the store.
09:34 Q. Okay. And -- but what are the parameters for you to -- what do you have to do to determine if you can make an arrest?
09:34 A. I have to determine if there's actually a crime --
09:34 Q. Okay.
09:34 A. -- that occurred.
09:34 Q. How do you determine?
09:34 A. Based on their statement.
09:34 Q. Okay. Do you also speak with the person who is the suspect?
09:34 A. Yes.
09:34 Q. Okay. When you speak with retail establishment employee, like, what do you understand the trespass mean to you? Like, what is -- what is the penal code definition of trespassing?
09:35 A. Someone who is on a property and refuses to leave.
09:35 Q. Okay. So --
09:35 A. After being told.
09:35 Q. All right. So is it your understanding that any retail establishment can ban a customer

09:35 from their business?
09:35 A. Yes.
09:35 Q. On any grounds?
09:35 A. Yes. They have the right to refuse
09:35 service.
09:35 Q. Okay. So are you aware of the Glendale
09:35 Municipal Code on trespass?
09:35 A. I am.
09:35 Q. Okay. Are you aware of any exceptions to
09:35 that rule?
09:35 A. I don't know it in detail. I'd have to
09:35 look at it. I'd have to review it.
09:35 Q. Right. But in general.
09:35 I mean, you know, are there any exceptions
09:35 that you're aware of when you're going in -- going
09:35 to enforce the municipal code in Glendale?
09:35 A. I can't answer to exceptions. I'd have to
09:35 review it.
09:35 Q. So right now, you cannot tell me from what
09:35 you're -- you know, remember, recollect any
09:35 exceptions to that rule?
09:36 A. No.
09:36 Q. Okay. And for making a private citizen's
09:36 arrest, have you ever rejected a private citizen's
09:36 arrest?

09:36 A. I can't recall.
09:36 Q. Okay. So, for example, are you aware that you can actually reject a retail establishment and tell them, no, there's no crime committed, I'm not going to make the arrest?
09:36 Have you ever done -- are you aware of that?
09:36 A. I am aware of this.
09:36 Q. Okay. And let me -- so are you aware of your policy on private persons arrest, Glendale PD?
09:36 A. I am.
09:36 Q. And so what process -- let me ask you this.
09:36 You know, does the policy allow you to tell the -- the retail establishment employee or anyone, the business owner --
09:37 A. Uh-huh.
09:37 Q. -- that "Look, you know, I don't believe there's a crime committed here. I'm not going to make the arrest"?
09:37 A. I am aware of these.
09:37 Q. Okay. And what are some of the things you look at, for example, in making such determination?
09:37 A. Based on the interview -- or the interview and the statement that they gave, that's what I base it on.

09:37 Q. Okay. But so what -- like, for trespass, for example, what are the elements that you need to establish to make an arrest of someone for trespassing?
09:37 A. If the person's there, and they are -- that the store does not want them there, and they have given them -- they have told them that they need to leave and they refuse to leave --
09:37 Q. Uh-huh.
09:37 A. -- then that -- that meets the elements.
09:37 Q. Okay. So if any of those elements are not met, then you don't make the arrest for trespass; true?
09:37 A. Yes.
09:37 Q. So if the person was never told that she cannot come back there, then do you make the arrest?
09:37 A. I would not.
09:37 Q. Okay. And if the person was never refusing to leave, for example, then do you make the arrest?
09:38 A. Depends on the circumstances.
09:38 Q. What circumstances would that be?
09:38 A. Well, are they refusing or are they -- is there -- was there ample enough time to give that person to leave? You know, it -- it depends on the circumstances.

09:38 Q. Okay. So in other words, you're aware that the policy, you know, gives you some degree of discretion in making the arrest, even in a private citizen's arrest; true?
09:38 A. Yes. Yes.
09:38 Q. So you can tell the business owner, "Sorry, sir, you know, I don't believe a crime was committed. I'm just not going to do this"?
09:38 A. Yes.
09:38 Q. But you've never had -- you've never rejected a private citizen's arrest?
09:38 A. I said I can't remember if I have.
09:38 Q. Okay. In this case, in the CVS Pharmacy incident with Anoush Burmayan, you made that arrest; true?
09:38 A. Yes.
09:38 Q. Based on the CVS employee request?
09:38 A. Yes.
09:38 Q. And you believed that crime was committed and the elements of the trespass were met and you made the arrest; true?
09:39 A. Yes.
09:39 Q. Okay. And that, to you, was qualified as a private persons arrest?
09:39 A. Yes.

09:39 Q. So let me back up a little bit. Let's look at the Glendale Municipal Code for trespassing. Okay.

09:39 So we have -- this is the Glendale Municipal Code, trespasses on private property prohibited. I asked you about some exceptions. And here's some of the exceptions. This is COG 108. I wanted to ask you if you're aware of these exceptions.

09:39 So it says, "Exceptions. This section shall not apply in any of the following circumstances where it's application results in or is coupled with acts prohibited by the Unruh Civil Rights Act or any other provision of law relating to prohibited discrimination against any person on account of color, race, religion, creed, ancestry, or national origin," et cetera.

09:40 It gives several exceptions. One, two, three, four, five -- five exceptions at the very least.

09:40 Do you see that?

09:40 A. I do.

09:40 Q. Were you aware of this? Like, when you're going on enforcement, are you aware that if someone is, for example, being discriminated against, you

know, or other -- for example, there's another one says, "Inhibition of peaceful labor picketing or other labor activities" -- "lawful labor activities or freedom of speech," are you aware of these exceptions for making arrests for trespass by Glendale Municipal Code?

A. I would have had to review that section.

Q. I'm sorry?

A. I would have had to review that section.

Q. So last time, you know, you -- you don't recall when was the last time you have reviewed this?

A. Correct.

Q. Okay. So right now, you're aware that there are exceptions to this -- to this code?

A. Now that you've showed it to me, yes.

Q. Okay. Now, for -- let's look at the trespass ticket that you gave Ms. Burmayan. So the penal code section -- we have also penal code section; right? We have Glendale Municipal Code and the penal code sections that you're enforcing; right?

A. Yes.

Q. And you received training in both of those?

A. Yes.

09:41 Q. And when you are going into patrol, you were there working for the department for about two years at the time?
09:41 A. In -- from '17 to '21, a little -- a little more, yes.
09:41 Q. Okay. Did you carry a penal code, like, pocket penal code with you, to look at the penal code sections to see who you're going to cite and who you are not going to cite?
09:41 A. I don't carry that because I have my cell phone so I look that up.
09:41 Q. Okay. So from the top of your head, would you know the penal code sections, generally, that apply to violations of the law?
09:42 A. As far as the penal code? Yes.
09:42 Q. Okay.
09:42 A. As far as the subsections, not every single one.
09:42 Q. Okay. Do you have -- did you try to check to see what you can cite someone with, to be accurate?
09:42 A. I do.
09:42 Q. Okay. In this case -- let's look at this.
09:42 For Ms. Burmayan, on January 19, 2021, you've cited her COG 1074, 6020 Penal Code Section,

trespassing, misdemeanor; right?
A. Yes.
Q. True? Okay.
And this is your citation you filled out that day, James Ross, serial number, and her signature to appear; right?
A. Yes.
Q. Okay. So what are the elements for this penal code section, 6020?
A. I would have to look that up.
Q. In general. I mean, you cited her for this.
Did you believe that this is the penal code section that she was violating when you cited her and gave her a ticket for this?
A. At the time, yes.
Q. Right now, you're sitting here today, do you believe this is the correct citation you gave her?
A. It was brought to my attention it was not.
Q. When was it brought to your attention?
A. During my -- during my discussions with my attorney.
Q. Yeah. Yeah. Without -- look, we don't want you to discuss attorney-client

09:43 communications --
09:43 A. Sorry.
09:43 Q. -- unless, obviously, your attorney waives that, but we don't want that.
09:43 So aside from your attorney-client communications, during any period of time from the time you make this arrest until this lawsuit --
09:43 A. Uh-huh.
09:43 Q. -- were you ever told that this citation was wrong violation?
09:43 A. It was never brought up to me.
09:43 Q. During Internal Affairs with Sergeant Pete Robinson -- you were interviewed about this incident; right? Do you recall?
09:43 A. Yes.
09:43 Q. Do you remember when you were interviewed about this?
09:43 A. I don't.
09:43 Q. And it was before this lawsuit was filed; true?
09:44 A. Yes.
09:44 Q. When this lawsuit was filed, how did you learn of the lawsuit?
09:44 A. I can't remember if it was an email or if someone had told me. I can't remember.

09:44 Q. Okay. So in any event, Sergeant Pete Robinson interviewed you about this incident sometime last year; right?
09:44 A. Yes.
09:44 Q. Okay. Do you remember that interview?
09:44 A. Briefly. I don't -- I don't remember, like -- like, a lot of it, though. I remember having the interview. But as far as, like, all the details in it? No.
09:44 Q. Sure. And were you represented at that interview?
09:44 A. I was not.
09:44 Q. Do you recall him advising you that this was the wrong violation?
09:44 A. He might have. I don't recall though.
09:44 Q. Okay. So but right now, you're aware that this is not the right citation you gave her?
09:44 A. I am.
09:44 Q. Right?
09:44 A. Yes.
09:44 Q. Okay. What was the -- for example, what is the right citation that, you know, you believe right now you were supposed to give?
09:44 A. Off the top of my head, I don't -- I couldn't tell you the appropriate subsection.

Q. Okay. So but let's look at misdemeanor, 602.0, that you cited her for. This is Penal Code Section 602. And scrolling down to zero, we have -- it states that, you know, "Refusing or failing to leave land, real property, or structures belonging to or lawfully occupied by another and not open to the general public upon being requested to leave by a peace officer at the request of the owner, the owner's agent, or the person in lawful possession, and you are being informed by the peace officer that they are acting at the request of the owner, the owner's agent, or the person in lawful possession; or, two, the owner, the owner's agent, or the person in lawful possession."
So did I read it accurately?
A. Yes.
Q. Okay. So but this applies to refusing to leave from private property or land not open to the general public; right?
A. Yes.
Q. Do you understand this distinction?
A. Yes.
Q. Were you aware of the distinction that if a retail establishment that is open to public and, you know, they are -- the person is refusing to leave

09:46 that area, there are certain elements that needs to be met before you cite that person for a crime?

09:46 A. Yes.

09:46 Q. What kind of element did that -- did you have to meet in order to cite someone for trespass in a retail establishment open to public?

09:46 A. One that's open to the general public.

09:46 Q. Right. Okay.

09:46 So what are the elements, I'm asking you, for trespass in a retail establishment open to public?

09:46 A. It would be the same elements, other than it would just be open to the general public.

09:46 Q. Okay. So basically you're saying that if someone is just refusing to leave, you know, being requested to leave without any other grounds, they can -- it's a violation of the trespass?

09:47 MR. KANG: Objection. Misstates prior testimony.

09:47 BY MS. MKRTCHYAN:

09:47 Q. Yes?

09:47 A. If they are advised --

09:47 Q. Uh-huh.

09:47 A. -- by the -- by the store or a store owner --

09:47 Q. Uh-huh.
09:47 A. -- and they refuse to leave, then yes.
09:47 Q. Okay.
09:47 A. And they meet the elements of trespassing.
09:47 Q. So mere refusal to leave is sufficient?
09:47 A. If they would -- if the business and the establishment is requesting them to leave, and they do not, and they do not want their business, then yes.
09:47 Q. Okay. So that's your understanding?
09:47 A. Yes.
09:47 Q. And you believe that -- what code section is that, then, do you know?
09:47 A. I would have to review that.
09:47 Q. So right now, if you were called again to CVS Pharmacy on a similar call, someone is refusing to leave -- okay? -- and you would go to that department -- to that place, what citation would you give to that person for that crime for trespassing?
09:47 A. It would be the same process. I would have to look it up and read through the elements and make sure that it met the -- it met that section, that subsection.
09:48 Q. So you don't know from the -- I'm sorry, did you finish?

09:48 A. Yes.
09:48 Q. So you cannot tell me right now what code section would apply in that instance?
09:48 A. There are several subsections within the 602 section, so no, I do not know that off the top of my head.
09:48 Q. Okay.
09:48 A. I would have to review it.
09:48 Q. Okay. So let's look at penal code sections here. I want to see your understanding and training in terms of this.
09:48 So, you know, I'm talking about specifically that kind of situation with Anoush Burmayan; right? She's refusing to leave, CVS calls the police, and basically she's at the store, she's refusing to leave. And I want you to tell me which penal code section would be a violation of. Let's look at all of this.
09:48 So --
09:48 MR. KANG: Objection. Are you going to allow him to search as he said he would have to do, or are you just going to go through this penal code section? Try to --
09:48 MS. MKRTCHYAN: This is a speaking objection.

09:48 MR. KANG: Yeah, it is, because you're trying to trick him.
09:48 MS. MKRTCHYAN: I'm not tricking. Excuse me.
09:48 MR. KANG: It's inappropriate.
09:48 MS. MKRTCHYAN: Excuse me.
09:48 MR. KANG: If you want him to look for the proper penal code section, he will do that, as he just said he would.
09:49 MS. MKRTCHYAN: No, but he cannot look -- excuse me.
09:49 MR. KANG: If you're going to show the Penal Code Section 602.1?
09:49 MS. MKRTCHYAN: Yes.
09:49 MR. KANG: Then do that.
09:49 MS. MKRTCHYAN: Oh. Counsel, very inappropriate.
09:49 (Simultaneous dialogue.)
09:49 (The reporter requests the parties speak one at a time.)
09:49 MR. KANG: If you want to Penal Code Section 602.1 --
09:49 MS. MKRTCHYAN: Oh, you're coaching the witness. Thank you.
09:49 MR. KANG: -- then you -- then you could do

that.

MS. MKRTCHYAN: Oh, yeah. Okay. You're coaching the witness.

MR. KANG: Well, he said he would need to search --

(Simultaneous dialogue.)

(The reporter requests the parties speak one at a time.)

MS. MKRTCHYAN: Objection. This is -- you know what? -- highly inappropriate behavior. I would like to put on the objection here. Okay.

This counsel is here to obstruct this deposition, making speaking objections and coaching the witness. We are asking questions the way we want. This is not a trick session.

You are entitled to go and ask any questions you want of your client; okay? So let's do this in a very professional manner without us having to bring in the magistrate. And let's try to do this in a way that this witness can answer. There are no speaking objections. Thank you.

BY MS. MKRTCHYAN:

Q. So let's go back to my question.

Do you want to use your phone, or do you want me to use -- open my computer and show you

09:50 penal code sections for trespass so that you can tell me which citation you need to apply in this instance?

09:50 A. Which -- whichever you like.

09:50 Q. Okay. So I was looking at -- I asked you a hypo- -- I asked you a question. I said, right now, you -- you basically accepted that you were advised that this penal code section was not right; right? And we looked at it.

09:50 A. Yes.

09:50 Q. 602.0 applied to establishments not open to public; right?

09:50 A. Yes.

09:50 Q. Okay. So I want to know, right now, based on your understanding, looking at that trespass -- penal code sections on trespass, which one would be the right one and what are the elements, from the top of your head? Or if you want me to open, you tell me.

09:51 A. If you would like to go through it, then we can go through it.

09:51 Q. Okay. So 602, we have A, B, C, D, E, F, G, H, I, J, K, L. Lot of subsections here; right?

09:51 Have you read this recently?

09:51 A. No.

Q. No. Okay.
So, basically, we have eight. Cutting down, destroying, injuring any kind of wood.
That doesn't apply to us; right?
A. No.
Q. Carrying away any kind of the wood also doesn't apply; right?
A. No.
Q. So maliciously injuring or severing from the freehold of another, that also don't apply; true?
A. True.
Q. Okay. Making, taking -- you know, we have damaging, mutilating, destroying any signs, from B through E, F, also do not apply; right?
Do you want me to ask you to read this and tell me for yourself if any of these code sections apply to this situation?
A. I mean, that's a lot for her to type.
Q. No, no, no. For yourself. You can read it for yourself.
A. Oh. No, it's --
Q. I can scroll it down, and you can tell me if any of those apply to this situation.
A. We've already -- we've already gone over

09:52 the appropriate section. I should have -- it was 602.1. So if we can read that, then let's do that.

09:52 Q. So you took the cue from your counsel that was the appropriate code section?

09:52 MR. KANG: Objection. Argumentative.

09:52 BY MS. MKRTCHYAN:

09:52 Q. Yes? Did you?

09:52 MR. KANG: Objection. Argumentative.

09:52 Instruct you not to answer.

09:52 MS. MKRTCHYAN: Oh, really? So you -- you are just sitting here, Counsel, you think you can just do whatever you want, instruct him not to answer.

09:52 On what grounds? Do you understand when you're allowed to instruct someone not to answer.

09:52 MR. KANG: Yes. When you are --

09:52 MS. MKRTCHYAN: Okay.

09:52 MR. KANG: -- badgering the witness --

09:52 MS. MKRTCHYAN: Oh.

09:52 MR. KANG: -- being abusive to the witness.

09:52 MS. MKRTCHYAN: Abusive?

09:52 MR. KANG: Yes.

09:52 MS. MKRTCHYAN: I asked a simple question. Where do you think it's abusive, Counsel?

09:52 MR. KANG: Can you let me finish what I'm

09:52 saying --

09:52 MS. MKRTCHYAN: No.

09:52 MR. KANG: -- before you interject?

09:52 MS. MKRTCHYAN: Because you are -- you are asking --

09:52 MR. KANG: Then you're not going to get a record of anything --

09:52 MS. MKRTCHYAN: Wow.

09:52 MR. KANG: -- because she can't take down two people at one time. So it's up to you. I -- I don't care. This is your record. So you can do whatever you want with it. If you want to speak when I'm speaking, it's fine by me. I don't care.

09:53 But you're badgering the witness. You're asking him questions that you know are inappropriate. And so when you do something like that, I'm going to instruct him not to answer.

09:53 MS. MKRTCHYAN: Okay. Well, you know what? We will take this up at a later time.

09:53 But your behavior is highly inappropriate. You know, I would admonish -- I would ask you to kind of behave a little bit more professionally. This is a deposition, and I can just adjourn this deposition and bring your client back another time after four rescheduling.

09:53 MR. KANG: And what's more appropriate? Cursing during a deposition like you've done in the past?

09:53 MS. MKRTCHYAN: Cursing? Oh, really. Okay. Yes. Okay. Sure.

09:53 Anyway, at this point, we are here -- sitting here after four reschedulings.

09:53 BY MS. MKRTCHYAN:

09:53 Q. Let's continue with this. So let's look at 602.1.

09:53 After your counsel has told you about that, let's look at 602.1.

09:54 We have Section A -- subsection A says, "Any person who intentionally interferes with any lawful business or occupation carried on by the owner or agent of a business establishment open to the public by obstructing or intimidating those who attempting to carry on business or their customers and who refuses to leave the premises of the business establishment after being requested to leave by the owner or the owner's agent or by peace officer acting at the request of the owner or owner's agent is guilty of the misdemeanor," et cetera.

09:54 Is this the code section that you believe

09:54 applied to that situation?
09:54 A. Yes.
09:54 Q. You didn't cite her for that, though, on
09:54 that day; true?
09:54 A. I did not.
09:54 Q. Okay. So when -- at what point in time
09:54 were you -- you became aware that you basically gave
09:54 her wrong citation?
09:54 A. If Sergeant Robinson at the time told me
09:54 that that was the wrong -- or the wrong section
09:54 during the interview --
09:54 Q. Uh-huh.
09:54 A. -- then I was probably made aware at that
09:54 time when he did.
09:54 Q. Uh-huh.
09:54 A. Or it was during this -- when -- when this
09:55 lawsuit was brought to my attention.
09:55 Q. Okay. Earlier I asked you what are the
09:55 elements that you have to follow in citing someone
09:55 for trespass; right?
09:55 A. Uh-huh.
09:55 Q. Right? Yes?
09:55 A. Yes.
09:55 Q. And you told me refusal to leave is
09:55 sufficient; true?

09:55 A. Yes.
09:55 Q. Okay. But here in this penal code section, there's an additional element; true? That is required; true?
09:55 A. Which part?
09:55 Q. Well --
09:55 A. The interfering?
09:55 Q. Yeah. Obstructing, interfering.
09:55 True?
09:55 A. Not -- not leaving an establishment can meet the interfering part also.
09:55 Q. Well, let's read this code section. Let's analyze this.
09:55 You know, in -- let me ask you this.
09:55 In the police academy, you received training in penal code sections; right?
09:55 A. Yes.
09:55 Q. Okay. And you are enforcing penal code sections, you're the law enforcement peace officer; true?
09:55 A. Yes.
09:55 Q. So you need to understand what are the elements before you cite someone for a crime; true?
09:55 A. Yes.
09:55 Q. Like a robbery, petty theft, et cetera;

true?
A. Yes.
Q. So here we have what it states, intentional interference with any lawful business by obstructing or intimidating and refuses to leave; right? Do you see?
Let's analyze this. How many elements --
A. Okay.
Q. -- do you see here in this penal code section?
A. You just broke it down already.
Q. We're -- so we have -- aside from refusing to leave, just by standing and refusing to leave, you need to obstruct, intentionally interfere and intimidate, et cetera; right? It provides for that element; true?
A. So someone who is refusing to leave, they are interfering with that business because now the employees have to take their time away from their duties working at that establishment to deal with this now person that --
Q. Okay.
A. -- they're trying to -- or who's refusing to leave.
Q. So in other words, the way I understand

09:56 your understanding of this penal code section, is that if someone is refusing to leave, in and of itself, that's obstruction?

09:56 A. I didn't say it was obstruction. I said it was interfering.

09:56 Q. Okay. But if someone is -- for example, a customer, a grieved customer is going to the store and is asking to speak with the manager and doesn't want to leave until she speaks with the manager, that, to you, is trespass?

09:57 A. No.

09:57 Q. Okay. So what is -- what constitutes trespass --

09:57 A. Having --

09:57 Q. Let me finish.

09:57 A. Sorry.

09:57 Q. Let me finish.

09:57 Under this penal code section, what constitutes trespassing? What are the elements of trespassing?

09:57 A. If they refuse to leave and they were told to leave by the establishment.

09:57 Q. So in other words, you know, the -- like I said, you know, the CVS or the retail establishment can decide, for whatever reason, to tell someone to

09:57 leave, and if that person leaves -- doesn't leave,
09:57 that's a violation of this penal code section?
09:57 A. I also said they have -- if they give them
09:57 the appropriate amount of time to leave.
09:57 Q. Okay.
09:57 A. I also included that.
09:57 Q. Okay. So if I'm just standing there, I'm
09:57 being told, "You've got to leave," and if I'm not
09:57 leaving, that's violation of Penal Code Section
09:58 602.1 to you?
09:58 A. Depends on the circumstances.
09:58 Q. What circumstances?
09:58 A. Like I just said, if they give them --
09:58 Q. Uh-huh.
09:58 A. -- if they tell them to leave --
09:58 Q. Uh-huh.
09:58 A. -- they refuse to leave, and there was
09:58 ample amount of time -- or enough time for this
09:58 person to leave, and they still refuse to leave,
09:58 then yes.
09:58 Q. Without more. So I'm just standing there
09:58 and I'm not leaving, without more, that's violation
09:58 of Penal Code Section 602.1?
09:58 A. Again, it depends on the circumstances.
09:58 Q. Well, okay. Let's go to the incident with

09:58 Ms. Burmayan.
09:58 A. Okay.
09:58 Q. Okay? So when you arrive to the scene --
09:58 first of all, let's -- you know, let's back up a
09:58 little bit.
09:58 You were working nightshift that night;
09:58 right?
09:58 A. Yes.
09:58 Q. Okay. And you were working solo; right?
09:58 A. Yes.
09:58 Q. And what time were you dispatched to this
09:58 call?
09:58 A. It was 1:20 -- around approximately
09:58 1:28 a.m.
09:59 Q. Okay. Did you hear that 911 call to --
09:59 from the dispatch?
09:59 A. I don't remember if I heard it get aired or
09:59 if I just saw it on the -- my computer in the car.
09:59 Q. How did you get assigned to this call?
09:59 A. Again, I don't remember if I got dispatched
09:59 or if I saw it on the computer in my car --
09:59 Q. Uh-huh.
09:59 A. -- and I started responding.
09:59 Q. Okay. So the officers have the opportunity
09:59 to pick up calls what they receive from radio?

09:59 A. Yes. If we're dispatched, then we go to that call. Or if we see a call pending --
09:59 Q. Uh-huh.
09:59 A. -- and me and my district partner are available, we're not doing anything and there's nothing else pending in -- in our district --
09:59 Q. Uh-huh.
09:59 A. -- we can let dispatch know, and we start heading that way to take care of that call.
09:59 Q. Okay. And who was your district partner, for example, on that night?
09:59 A. Officer Armendariz.
09:59 Q. So this is Defendant Griffin Armendariz.
09:59 A. Yes.
09:59 Q. Now, so let's look at the radio call.
10:00 Do you remember if you had to put yourself at scene or en route for this call?
10:00 A. I don't remember if I was dispatched or if I self-dispatched myself.
10:00 Q. Okay. Do you -- do you have a device in your car where you can communicate with the dispatch?
10:00 A. Yes. We have a radio, and we have in-car computers.
10:00 Q. Okay. So you were the first officer who

10:00 responded to this call; true?
10:00 A. Yes.
10:00 Q. Okay. Let's look at the radio call COG 248.
10:00 We have the call for service from -- have you reviewed this document --
10:00 A. Yes.
10:00 Q. -- prior to this deposition?
10:00 A. Yes.
10:00 Q. Okay. And so do you have an independent recollection aside from this document about the call you received that night?
10:00 A. Brief recollection.
10:00 Q. Okay. But -- so the call -- what was the call saying? What was the call about?
10:00 A. That there was a female causing a disturbance and was trespassing.
10:01 Q. Okay. So -- and this was at the CVS Pharmacy?
10:01 A. Yes.
10:01 Q. Okay. Did you actually hear the 911 call en route to the -- the CVS?
10:01 A. I don't remember if I was dispatched or if I self-dispatched.
10:01 Q. No. But you usually can hear the 911

callers on the dispatch; true?
A. No.
Q. You hear the dispatch communicating to you --
A. Yes.
Q. -- what is ongoing?
A. Yes.
Q. Okay. And this call said that basically -- let's look at the call.
Comment at 1:27:30, "Female wear" -- "Female wearing purple shirt, gray pants, black shoes, refusing to leave, taking video of the RP employees. No weapons"; right?
Did I read it accurately?
A. Yes.
Q. Okay. And once -- immediately, like, what -- when you get this kind of a call, what does this transmit to you? What kind of information is relevant to you in getting this kind of a call?
A. That they're refusing to leave, and they might be uncooperative.
Q. Okay. So is this -- like, what is this? What does that translate to?
Is this a high priority call or low priority call?

10:02 A. It -- it all -- it all depends on -- on the call itself. I mean, it could escalate at any point. I mean, each call is its -- I take each call seriously.
10:02 Q. I understand.
10:02 But right now, this was a priority two call; right?
10:02 A. Yes.
10:02 Q. Not a high priority; right?
10:02 A. I mean, depends on how you want to see a high priority.
10:02 Q. Well, on this call at 1:26:36 seconds, it says priority two; right? You see on the call?
10:02 A. Yes.
10:02 Q. Okay.
10:02 A. But just because it's a priority two doesn't mean it's not a priority call.
10:02 Q. Well, but for officer -- no, let's look at this.
10:02 For officer terminology, you didn't have your light and sirens on, or Code 3 --
10:02 A. No.
10:03 Q. -- when arriving to this call; true?
10:03 A. True.
10:03 Q. And when it says no weapons, it also

10:03 doesn't trans- -- you know, there's -- there's no lights and sirens on or high priority when it states no weapons; true?
10:03 A. Just because it says there's no weapons, it doesn't mean they don't have a weapon.
10:03 Q. Understood.
10:03 But when you're arriving to this call, basically what is this, this is a trespass call?
10:03 A. They're refusing to leave, so probably.
10:03 Q. Okay. And you knew this CVS location; right?
10:03 So how many minutes did it take you to get to this area?
10:03 A. I don't -- I don't know how long it was or where I was responding from.
10:03 Q. Okay. So let's look at -- it says when the call is created, 1:26:36 seconds, you were on scene within -- 5L25, that's your unit; right? Officer Ross James?
10:03 A. Yes.
10:03 Q. So on scene at 1:28:37 seconds, within two minutes; true?
10:03 A. Yes.
10:03 Q. And when -- how do you communicate to the
10:04 dispatch you're on scene? Do you have to tell the

radio?
A. I can either do it on my radio or there's a button that you can press on the computer to put yourself on scene.
Q. Okay. So in other words, this document is accurate in terms of when you arrived on scene?
A. Yes.
Q. And then 5L26 is Officer Armendariz who arrived within three minutes after you; true?
A. Yes.
Q. But you arrived first; true?
A. Yes.
Q. And so it took you about two minutes from the time the call was created until you arrived to the scene?
A. Yes.
Q. That meant that you were in the parameter, very close to the area; true?
A. Yes.
Q. When you arrived, did you have your weapons on -- I mean, did you draw your weapon?
A. No.
Q. Because why?
A. I didn't need to.
Q. Okay. Why? The nature of the call? Was

it requiring you to have -- to have weapons drawn?
A. I didn't see any -- I didn't see any weapons, and it didn't meet the parameters of that --
Q. Okay.
A. -- to draw my weapon.
Q. Okay. So in other words, you arrived, you entered the store; right?
A. Yes.
Q. This was in January 2021 where you're wearing the face mask?
A. I can't recall if I was or not.
Q. Okay. So but you were aware this was at the time of the -- pretty much pandemic; true?
A. Yes.
Q. Okay. Did the Glendale Police Department have requirements or City of Glendale have any requirements of that face mask mandate?
A. They did. I just don't know when it was implemented. If it was a mandatory or what. I don't know. I don't recall when it was actually --
Q. Okay.
A. -- established.
Q. So when you arrived, it was not in the back of your mind to see if someone is complying with

face masks, et cetera?
A. I can't recall that.
Q. So generally, during the pandemic -- let me ask you this: When you were responding to calls, you were mindful of the face mask?
A. Yes.
Q. Okay. And you were required to wear a face mask?
A. I don't recall when I -- it was mandated.
Q. I see.
So but right now on this call, you don't remember if it was a consideration for you in the back of your mind when you arrived to the scene?
A. Correct.
Q. And you don't even remember if any of the employees were wearing face masks?
A. Correct.
Q. If the suspect, Anoush Burmayan, was wearing a face mask, do you?
A. I do remember that, because I saw the video.
Q. Which video did you see?
A. The in-car video.
Q. Okay. So she was wearing a fully -- fully cover face mask?

A. She did have it in the back of the car. But I don't remember when I contacted her or if she put it on after the fact.
Q. Okay.
A. I don't remember if she had it on in the store when I walked into the store.
Q. Okay. So when you arrived to the store, you walked -- you got out of your car, you were alone; right? As the peace officer, we've established that, you were working solo; right?
A. Yes.
Q. You approached the store; right?
A. Yes.
Q. And you knew the store very well, you knew how to enter the store; right?
A. Yes.
Q. And you were walking at that face pace or slow pace? How were you walking?
A. I don't remember.
Q. But this was not a high priority call; right?
A. Based on this, no.
Q. Okay. When you entered the store, what do you recall happening?
A. I heard -- I heard loud talking.

Q. Uh-huh.
A. Almost screaming. And when I walked in there, I saw a female being loud and also filming the employees.
Q. Okay. Where was she standing?
A. That, I don't remember.
Q. And did you turn on your audio recorder that you were initiating a call -- I mean, contact with the -- with the public?
A. At some point I believe I did.
Q. Why didn't you turn on initially when you entered the store?
A. I don't remember.
Q. You were responding to a call for service; true?
A. Yes.
Q. And you were on scene, specifically responding to this call; true?
A. Yes.
Q. And your departmental policy assigning you with recorders requires you to turn on your audio; right?
A. Yes.
Q. Okay. So were you obligated to turn on your audio?

10:08 A. Yes.
10:08 Q. And do we have an audio of your entry to the store?
10:08 A. I don't know.
10:08 Q. Okay. But you heard audio/video in the system prior to this deposition; true?
10:08 A. Yes. But I don't remember when it was turned on.
10:08 Q. Okay. Isn't it true, the video here, the tapes -- isn't it true that the audio that you had was turned on after you came back to the patrol car when Ms. Burmayan was sitting in the patrol car?
10:08 A. I don't remember.
10:08 Q. Okay. When was -- when was the last time you heard this audio?
10:09 A. Maybe a few weeks ago.
10:09 Q. Okay. How many times have you heard this audio prior to this date?
10:09 A. Maybe once or twice.
10:09 Q. So you don't remember when the audio recording starts during this incident?
10:09 A. I don't.
10:09 Q. But you were obligated -- right? -- by your department to turn it on as soon as you are initiating the contact with the public in response

to a call?
A. Yes.
Q. And if you did not turn it on, then would it be a violation of policy?
A. Just because it's not on doesn't mean I didn't turn it on. Sometimes if you press the audio button, sometimes it wouldn't turn on.
There's a button on the side that actually had to tape -- so if there was a hold button on there, sometimes you'd have to make sure it comes on.
Just like this body-warn cameras, sometimes they don't turn on. You have to actually make sure they're on. And I may have -- it may have been a time where I didn't realize it may -- it may have not actually turned on.
Q. Is there any, you know -- first of all, how to use this audio recorder, so you get training; true?
A. Yes.
Q. Departments assigns you this equipment, and they train you how to use it adequately and efficiently; true?
A. Yes.
Q. Has it ever happened before that you had

10:10 turned on your audio recorder or body-worn camera but it did not record?

10:10 A. Can't remember that.

10:10 Q. So in other words, right now, you cannot tell us, you do not have independent recollection whether you actually turned on your audio when you entered the store?

10:10 A. Yes.

10:10 Q. So you do not have an independent recollection, "yes" or "no"?

10:10 A. I don't have a recollection if I turned it on.

10:10 Q. Okay. So -- and then you told us so the female was standing there. What else was she doing? You said that she was yelling.

10:10 Who else did you see there?

10:10 A. One of the store employees.

10:10 Q. Okay. Did you recognize the store employees?

10:10 A. I have, from previous contacts.

10:10 Q. How many store employees did you see?

10:10 A. I don't recall. But I know I spoke to one of the employees.

10:10 Q. Guy Garcia?

10:11 A. Yes.

Q. Okay. Can you describe him to me?
A. Hispanic, heavier set.
Q. Did you speak with the black manager there, Joe Johnson?
A. I don't believe so.
Q. And you knew these people, though, you knew these employees from previous occasions?
A. I know him. I know Guy.
Q. Guy Garcia?
A. Yes.
Q. Okay. And when you approached, can you tell us, how far did you enter the store when you interacted with Ms. Burmayan?
A. I don't recall how far I actually went into the building.
Q. Okay. When did you learn of her name?
A. When I was speaking to her.
Q. At that point --
A. Yes.
Q. -- initially?
A. At some point.
Q. Well, initially.
A. Well, when I talked to her, when I approached people, I don't immediately ask for their names. So at some point during my conversation with

10:11 her --
10:11 Q. Uh-huh.
10:11 A. -- I learned of her name.
10:11 Q. Oh, at some point. So I want to know --
10:11 let's go step by step.
10:11 So you entered the store, you interacted
10:11 with her; right?
10:11 A. Uh-huh.
10:11 Q. How far was she standing from the door?
10:12 A. I don't recall.
10:12 Q. Okay. How far were the employees standing
10:12 from the door?
10:12 A. I don't recall.
10:12 Q. Have you seen any CVS videos before this
10:12 deposition?
10:12 A. No.
10:12 Q. Are you aware --
10:12 A. Not to my knowledge, no. I don't remember
10:12 if I have. It's been a long, ongoing process.
10:12 Q. Okay. But -- okay.
10:12 So after this lawsuit, you don't remember
10:12 if you've watched any CVS video surveillance
10:12 recordings?
10:12 A. Correct.
10:12 Q. What about before this lawsuit? When you

10:12 went to -- you know, to that store on previous occasions, did you ever look at their -- at their video surveillance recordings?
10:12 A. Regarding this incident?
10:12 Q. Yes.
10:12 A. No.
10:12 Q. What about other incidents, are you aware that they have video?
10:12 A. I am aware they have video.
10:12 Q. Have you ever asked the CVS to produce video in response to subpoena or any other incidents?
10:12 A. Their subpoenas, no, that's not my -- that's not my job description. That's for the detectives.
10:12 Q. Okay.
10:12 A. I mean, if we need to get video footage for the detectives for a crime, then yes, we can do. But it's not an obligation that we have to.
10:13 Q. Okay. So when you enter, you see her. You said she was loudly talking.
10:13 Describe to me what was she saying?
10:13 A. I don't recall what she was saying. I just heard someone -- a female being loud, a female voice being loud.

10:13 Q. Okay. But was it her, loud?
10:13 A. When I walked in there, yes.
10:13 Q. Okay. You know, I want to know, if you're investigating this call, you -- obviously you need to find out what's going on; right?
10:13 A. Yes.
10:13 Q. The call says, "Female is refusing to leave, taking video," et cetera.
10:13 You are there to do what?
10:13 A. To determine what's going on and if there's a crime that occurred.
10:13 Q. Right. And so, you know, are you there only to find out from CVS employees what happens or to talk, also, to suspect?
10:13 A. I talk to all parties.
10:13 Q. Right. So, you know, when you talk to Ms. Burmayan initially, before even you arrested her, what did you ask her?
10:14 A. I don't recall the exact line of questioning that I asked her.
10:14 Q. What would you be asking her in this situation?
10:14 A. What was -- she was doing there. You know, was she told to leave.
10:14 (Audio interruption.)

10:14 THE DEPONENT: Along those lines of questioning.
10:14 BY MS. MKRTCHYAN:
10:14 Q. Gotcha. Did you learn from her what she was doing there?
10:14 A. She said -- I'd have to refer to exactly, but it was along the lines of she was there to talk to the manager.
10:14 Q. Okay. Did she ever tell you that she was upset about something?
10:14 A. A previous purchase that she had made.
10:14 Q. She didn't tell you that she was there complaining about the treatment she received from CVS managers and employees?
10:14 A. She might have. But I don't recall exactly what.
10:14 Q. Do you remember her showing you some paperwork?
10:14 A. Not exactly what the paperwork was.
10:15 Q. Okay. But you do remember her pointing some paperwork to you -- towards you?
10:15 A. I do.
10:15 Q. Do you remember her telling you that she had a medical condition, and showing you paperwork?
10:15 A. I do not.

10:15 Q. Do you remember her telling you that she had a disability, medical disability, and CVS Pharmacy employees were not accommodating her disability?

10:15 A. I do not.

10:15 Q. Okay. And you didn't have a recorder to record that conversation; true?

10:15 A. If it was not captured, it was not on.

10:15 Q. But you did have a recorder to capture this; true?

10:15 A. I did have a recorder.

10:15 Q. Okay. And so if you had your recorder on, it would have captured this conversation -- right? -- between you --

10:15 MR. KANG: Objection.

10:15 MS. MKRTCHYAN: Excuse me.

10:15 BY MS. MKRTCHYAN:

10:15 Q. -- between -- if you had your recorder on, assigned by your department, you would have this conversation between you and Ms. Burmayan; true?

10:15 MR. KANG: Objection. Assumes facts not in evidence. Calls for speculation.

10:15 BY MS. MKRTCHYAN:

10:15 Q. You have to answer.

10:15 A. Yes.

10:15 Q. Okay. So -- and then how long was that conversation between you and her?
10:16 A. I don't recall.
10:16 Q. Okay. And there was no other officers yet at the scene, it was only you; right?
10:16 A. Well, it depends on what I had that conversation with her.
10:16 Q. Well, I want to know initially, when you entered the store.
10:16 A. Initially?
10:16 Q. Initially, yes.
10:16 A. Initially, it was probably just me. Based on this call and when Griffin showed himself on scene --
10:16 Q. Uh-huh.
10:16 A. -- it was probably just me.
10:16 Q. Okay. Do you remember other employees -- well, like this Guy Garcia, what he was saying at the time you were speaking with Burmayan?
10:16 A. I don't recall exactly what he was saying other than what our conversation was, which was noted in my report.
10:16 Q. You can go over your report later, but I want to know -- before we get to your report, I want to know what you remember, the sequence of events.

10:16 The sequence; okay?
10:16 So you entered the store, you speak with
10:16 Burmayan; right?
10:16 A. Possibly. I don't remember the order of
10:16 events.
10:16 Q. Okay. So -- but, you know, in your
10:17 practice, when you're entering the store, you're
10:17 investigating a call, you would need to speak with
10:17 the parties; right?
10:17 A. Yes.
10:17 Q. And you need to speak with reporting party;
10:17 right?
10:17 A. Yes.
10:17 Q. Reporting party was who?
10:17 A. Guy Garcia.
10:17 Q. Okay. Did you speak with him at this time?
10:17 A. I may have spoke to him first. I may have
10:17 spoke to your client first. I don't remember who I
10:17 spoke to first.
10:17 Q. Okay. So, you know, when you -- did you
10:17 see Ms. Burmayan actually recording someone?
10:17 A. I did.
10:17 Q. Okay. How did you -- did you have an
10:17 independent recollection of that?
10:17 A. Based on my report.

10:17 Q. Okay. Based on your report.
10:17 But that's only based on your report?
10:17 A. Yes.
10:17 Q. Did you actually look at her phone at any point in time and see if she had any video recording there?
10:17 A. I did not ask her to look at anything on her phone.
10:17 Q. Okay. So you did not actually examine her phone at any point in time to see if she had recorded anything; true?
10:18 A. True.
10:18 Q. Did you arrest her then?
10:18 A. After speaking with the RP, I made a determination to arrest her.
10:18 Q. So you're saying you did not immediately handcuff Ms. Burmayan and take her to the patrol car?
10:18 A. Well, there's a difference between handcuffing and detaining and handcuffing and arresting.
10:18 Q. Sure. I understand. But let's, then, back up a little bit and put this this way.
10:18 Did you handcuff Ms. Burmayan and take her to the patrol car?

A. I did.
Q. Okay. Immediately; right? Pretty much immediately, you handcuffed her and took her to the patrol car?
A. It might not have been immediately, but at some point, yes, I did.
Q. How many minutes, would you say, passed from the time you spoke to her and determined the crime was committed and you two had cuffed her?
A. Couldn't tell you. Maybe been a few minutes.
Q. Okay. Did you speak with Guy Garcia prior to handcuffing her and placing her in the patrol car?
A. I believe it was -- I believe I handcuffed her and put her in the patrol car before I spoke with Guy Garcia.
Q. Why? Why would you handcuff her first before determining if crime was committed?
A. Based on her demeanor and the way she was acting, the time of night and where we are at, I made the best decision. I felt I made the best decision to alleviate any conflict or possible use of force or things escalating.
And I placed her in handcuffs and detained

10:19 her, placed her in the back of my car for safety reasons.
10:19 Q. Did you tell her that she was under arrest at this time when you handcuffed her?
10:19 A. No, not at this time.
10:19 Q. You did not?
10:19 A. No.
10:19 Q. So if she were testifying in this case that she was actually told by you, "You're under arrest, I'm going to take you to jail" at the time you handcuffed her, that would not be true?
10:19 A. No.
10:19 Q. And we don't have the benefit of your recorder that you had assigned by your department to prove one way or another; true?
10:19 A. True.
10:19 Q. Okay. So but tell us, you said her demeanor was such that you wanted to detain her.
10:20 What was her demeanor to you? Tell me, you know, what -- what was her demeanor?
10:20 A. She was very -- she was very loud.
10:20 Q. Uh-huh.
10:20 A. And based on, you know, the way she was acting and she didn't want to listen to anything that I had -- I was trying to say, I made that

decision to detain her in handcuffs.
Q. Was she walking away from you when you were talking to her?
A. No. But it's was also to prevent things like that from happening.
Q. Sorry. Please answer my question.
Was she walking away, evading in any, shape, or form contact with you?
A. To my knowledge, no.
Q. Did she resist you when you placed her in handcuffs?
A. I can't remember if there was any resisting.
Q. Okay.
A. Or --
Q. Did she use any type of gesture that would put you in danger as a police officer, that she was armed or dangerous?
A. Well, like I said, I don't know if Griffin was there -- or Officer Armendariz was there, so if I was by myself --
Q. Uh-huh.
A. -- then any moment, it could go dangerous. It could become dangerous --
Q. Okay.

A. -- for me. So I made that decision to place her in handcuffs.
Q. Okay. Describe Ms. Burmayan to us. Let me show you her, first, to refresh your memory.
How tall was this woman?
A. I don't recall exactly how tall she was.
Q. For the record, how tall are you?
A. 5-9.
Q. 5-9.
And you were fully equipped with your uniform; right?
A. Yes.
Q. You had weapons, you had a kind of -- you have your ballistic vest; true?
A. Yes.
Q. As well?
A. Yes.
Q. Okay. And this woman was -- let's look at her clothing. On that day -- this is the pictures you took of her; true? On that day?
A. Yes.
Q. This was photographs produced to us by Glendale Police Department.
She was wearing, you know, sweat pants and a shirt, you know, sweat shirt; true? Purple sweat

10:22 shirt; true?
10:22 A. Yes.
10:22 Q. And, I mean, in the ballpark, can you tell
10:22 us how tall she was?
10:22 A. Maybe 5-8, 5-7. I don't know.
10:22 Q. Okay. And how her built was? Was she,
10:22 like a, you know, athletic woman?
10:22 A. Just average.
10:22 Q. Okay. So you believe that, you know, she
10:22 was dangerous to you as a police officer armed, in
10:22 uniform, that necessitated you placing her in
10:22 handcuffs?
10:22 A. I've dealt with people a lot smaller than
10:22 that. They give a really good fight.
10:22 Q. Okay.
10:22 A. So it doesn't matter --
10:22 Q. Uh-huh.
10:22 A. -- how she looks or appears. Anybody can
10:22 become very dangerous.
10:22 Q. But the meaning you describe to me, the
10:22 only thing she said she was loud and was not
10:22 listening; true? That's all you said.
10:22 A. Yes. There are people --
10:22 Q. Is there anything else she was doing?
10:22 A. People can turn very quickly, and I did not

want things to escalate, which is why I did what I did.

Q. Okay. So I just want to know what her demeanor was.

You said loud and not listening; true?

A. Yes.

Q. She didn't physically aggress on you; right?

A. Doesn't mean she can't.

Q. Please answer the question.

Did she physically aggress on you?

A. At that time, no.

Q. At any point in time, at any point in time, did she physically in any way show any aggression towards you?

A. No. But I took precautions.

Q. Okay. Understood.

So officer safety; right?

A. Yes.

Q. Okay. But officer safety has to be reasonable; right?

A. Yes.

Q. Okay. So I just want to know her demeanor that put your officer safety heightened.

So you have, you know, her, you know, did

10:23 not physically make any aggressive movement towards you; right?
10:23 A. Doesn't mean she can't.
10:23 Q. Please answer the question directly.
10:23 Did she or did she not make any physical gesture, aggression towards you?
10:23 A. That I can think of, no.
10:23 Q. Okay.
10:23 A. That I remember, no.
10:23 Q. Okay. Did she at any point in time walk away from you, evading or fleeing, making an effort to run away, when you were talking to her?
10:24 A. No.
10:24 Q. She was listening to you; right?
10:24 A. No.
10:24 Q. Well, okay.
10:24 A. I just said she was not listening.
10:24 Q. She was upset. She was upset customer; true?
10:24 A. Yes.
10:24 Q. And you said she was loud; true?
10:24 A. Yes.
10:24 Q. Other than that, you didn't tell us that she was physically resisting you; true?
10:24 A. True.

Q. She did not physically aggress on you; true?
A. True.
Q. She was not combative?
A. True.
Q. She was not assaultive?
A. True.
Q. And she was responding to your questions; true?
A. She wasn't listening.
Q. What do you mean, like, she wasn't listening?
A. She -- she was giving -- she may have -- I would ask her something, and she would ask me something else. And she just wasn't going with what I was trying to ask her.
Q. And what were you asking her?
A. Like I say, I don't remember the questions, but I remember her being very argumentative.
Q. Okay. Argumentative.
So is being argumentative violation of the penal code section -- any penal code section?
A. No.
Q. Okay. So if someone is loud, is that a penal code section violation --

A. Yes.
Q. -- in of itself?
A. Yes.
Q. What -- what --
A. 415.
Q. Oh. So that's disturbance of the peace?
A. Yes.
Q. Okay. So did you see any customers there that were -- that seemed to be disturbed by her behavior?
A. I don't recall.
Q. Okay. So -- so other than being loud and not listening to you, you cannot tell us her -- anything else from her demeanor?
A. Yes.
Q. Okay. And then so you placed her in handcuffs based on that demeanor that you described to us and took her to the patrol car before you spoke to Guy Garcia; true?
A. Yes.
Q. And then you came back -- you placed her in the patrol car; right?
A. Uh-huh.
Q. Yes.
A. Yes.

10:25 Q. Was Officer Armendariz there --
10:25 A. Yes.
10:25 Q. -- already? Okay.
10:25 Now, before you placed her in the patrol car, did you search her?
10:25 A. No. I may have pat her down, but I did not do a search.
10:25 Q. Okay. So there's a difference. Let's pars out the difference.
10:26 What is the pat down and what is a search?
10:26 A. Pat down is just a basic search, make sure they don't have any weapons in their pockets and their waistband.
10:26 Q. Okay. Did you do that?
10:26 A. Yes.
10:26 Q. Okay. Did you actually also take her cell phone from her?
10:26 A. I did.
10:26 Q. Okay. That's a search; right? That's not a pat down. If you're taking someone's cell phone confiscating --
10:26 A. Uh-huh.
10:26 Q. -- wallet or cell phone, that's a search; true?
10:26 A. No.

Q. 'Cause you're looking into their pocket.
A. Doesn't mean I was in their pockets.
Q. Okay. So how did you get her cell phone?
A. It may have been in her hands.
(The reporter requests the parties speak one at a time.)
MR. KANG: At some point, can we take a break? We've been going for --
MS. MKRTCHYAN: Let's finish one more question, couple more questions.
BY MS. MKRTCHYAN:
Q. So she -- you did take her cell phone away from her; right?
A. Yes.
Q. And you patted down, her?
A. Yes.
Q. Okay. Did you take her wallet as well?
A. I don't recall.
Q. Okay. Did you at that point in time find out her name?
A. At some point, I got her name. I don't remember when I got her name.
Q. Okay. So are you aware that your department requires you to have same sex officer to search or pat down --

A. Yes.
Q. -- a person?
A. If one's available, yes.
Q. Okay. And we had Nairi Gazandjian who was appearing on that day at scene; true? She came at scene?
A. Eventually, yes, she did.
Q. Do you remember when she came?
A. I did not.
Q. Was she there when you patted down Ms. Burmayan?
A. No, not to my recollection.
Q. Well, wasn't -- you know, couldn't you ask a female officer to search this woman prior to putting her in the car?
A. If I put her in my car before anybody got there, then no, I needed to put her in my car. So I pat her down.
Q. Yeah. But there was no -- you know, you could have radioed for someone; right? She could have stood there with Officer Armendariz waiting for a female officer to come for her to be patted down; true?
A. But I'm not doing a full search, and I can do a pat down.

10:28 Q. I'm sorry, say that again?
10:28 A. I'm not doing a full search, and I can conduct a pat down.
10:28 Q. Can or can't?
10:28 A. I can --
10:28 Q. Can.
10:28 A. -- conduct a pat down of just the exterior.
10:28 Q. I see.
10:28 So you're saying that you did not do a full search of Ms. Burmayan?
10:28 A. Correct.
10:28 Q. And your policy does not cover the pat downs?
10:28 A. No, I can -- if there's not one available, immediately available, then I can conduct that pat down.
10:28 Q. Understood.
10:28 But the policy applied to pat downs, too; right? That if you're going to pat down someone -- and what is a pat down? Can you describe to us what is a pat down?
10:28 A. Going over basic -- pockets, the exterior, the waist band. Things like that.
10:28 Q. You're actually covering -- you're touching their leg; right? From top to bottom; right?

10:28 A. Yes. And I have to do it with the backside of my hand, not the front side of my hand.
10:28 Q. Okay. So but pat down means that you're touching someone's thighs and legs and waist area to see if I have a weapon; true?
10:29 A. No.
10:29 Q. You're touching them; no?
10:29 A. No.
10:29 Q. Okay. How do you pat down? Can you show me it on the camera, please.
10:29 A. For a female, if they're wearing baggy clothing, then I would grab the exterior and pull it away. That way I can see if there's any bulges within the pants.
10:29 But I'm not actually conducting a full search and -- up and down their legs or their extremities. And the back -- I'm doing it with the back of my hand and the front also.
10:29 Q. I'm sorry.
10:29 A. I'm going along their waistband to make sure there's no bulges or weapons in their waistband.
10:29 Q. But you're still touching her waistband; right?
10:29 A. With the back of my hand, yes.

10:29 Q. Right.
10:29 A. As I'm -- as I was trained.
10:29 Q. Okay. So if Ms. Burmayan felt uncomfortable, and she described that, that you touched her, are you saying that that never happened?
10:29 A. She never made any -- to my knowledge, she never made any comments like that.
10:29 Q. Okay. Well, but -- so you did touch her, though, during the pat down?
10:29 A. I conducted a pat down search, so yes.
10:29 Q. Okay. And you did have the opportunity to wait on that and call, according to your policy, another police officer, Nairi, for example, Gazandjian was at the scene at some point to do that; true?
10:30 MR. KANG: Objection. Asked and answered. Misstates prior testimony.
10:30 You can answer it again.
10:30 BY MS. MKRTCHYAN:
10:30 Q. You had the opportunity to do that?
10:30 A. Based on her demeanor, I did what I did because I needed her to get into the back of the police car, based on where we were at.
10:30 There was a -- she was being loud. She was

10:30 being argumentative. She wasn't listening. I detained her in handcuffs. I placed her in the back of my car. There was a lot of apartment buildings in the area, I did not want her disturbing the peace of where we were at.

10:30 Q. Okay. But you still had the opportunity to wait on that -- have Officer Arman- --

10:30 A. If I -- sorry.

10:30 Q. Excuse me.

10:30 A. Sorry.

10:30 Q. Let me finish. We can't talk.

10:30 Bottom line, Officer, you did or did not have an opportunity to bring another same sex officer to do pat down; "yes" or "no"?

10:31 A. At that time, no. Because she probably wasn't available.

10:31 Q. Okay. But she came to the scene; true? At the --

10:31 A. Eventually, yes.

10:31 Q. Okay. And your policy does require you -- does recommend you to actually try to get a same-sex officer to prevent harassment or to prevent discomfort to the inmate -- or the detainee; true?

10:31 A. If one is available at the time, yes.

10:31 Q. There is parameters for you to follow in

that policy; true?
A. Yes.
Q. Okay. What are some of the parameters? When can you -- let's look at your policy real quick. Well, we have policy Subsection 314.4, Search Protocol.
Are you aware of this policy, COG 119?
A. Yes.
Q. Okay. It says, you know, "When the person to be searched is of the opposite sex as the searching officer, a reasonable effort should be made to summon an officer of the same sex as the subject to conduct the search."
Did I read it accurately?
A. Yes.
Q. Okay. Then it says, "A search may be undertaken as a member of the opposite sex, when it's not practicable to summon an officer of the same sex" --
A. Uh-huh.
Q. -- "and there are reasonable grounds to believe the individual is armed with a dangerous weapon and there's evidence that an immediate search is necessary."
Did I read it right? This is Subsection F.

A. Yes.
Q. Okay. So I didn't hear you identify any grounds to believe that Ms. Burmayan was dangerous, that she had a dangerous weapon.
Did I miss that?
A. Well, based on the questioning that you asked me, no.
Q. Uh-huh.
A. But she is wearing baggy clothing. I can't see underneath her sweater. And so -- and her sweats. So I can't tell if there's anything in her waistband or anything like that. So because I'm putting her in the back of my police car, yes, I conducted a pat down search.
Q. So basically, Officer, you were investigating a trespass call, not a priority call, the call stated no weapons used, and you still reasonably believed that Ms. Burmayan was armed with a dangerous weapon to necessitate a pat down of her?
A. And as I said, the -- just because someone says there's no weapons in a call, does not mean they do not have a weapon, they just didn't see a weapon.
Q. And yet you --
A. So they could possibly have a weapon

10:33 concealed on their person.
10:33 Q. I see. So --
10:33 (Reporter clarification.)
10:33 THE DEPONENT: Knives are very small and
10:33 they can be hidden anywhere.
10:33 BY MS. MKRTCHYAN:
10:33 Q. Okay. But from what you described, her
10:33 demeanor, you didn't see any violence on her; true?
10:33 You didn't see any violent behavior on her; true?
10:33 A. She was being argumentative.
10:33 Q. Well, is argumentative the same as violence
10:33 to you?
10:33 A. Can escalate.
10:33 Q. Oh, okay. But I want to know what
10:33 specifically you said.
10:33 You didn't identify any violence on her
10:33 part; right? That you observed; true?
10:33 We've already covered this.
10:34 A. Yes.
10:34 Q. And we didn't see her, you know, assaulting
10:34 anyone or combative towards you; true?
10:34 A. Yes.
10:34 Q. And yet you still believe she would have
10:34 been armed with a dangerous weapon, and you couldn't
10:34 wait for a female officer, Nairi Gazandjian to come

10:34 and search her; true?
10:34 A. Yes.
10:34 Q. Okay.
10:34 MS. MKRTCHYAN: Let's take a break.
10:34 10-minute break. Thank you.
10:34 (Recess.)
10:34 BY MS. MKRTCHYAN:
10:43 Q. Okay, Officer. So reminder, you're still
10:43 under oath.
10:43 A. Yes.
10:43 Q. Now, we stopped at the point in time when
10:44 you placed her in the patrol car; true?
10:44 A. Yes.
10:44 Q. Did you turn on your audio recorder then?
10:44 A. Which one?
10:44 Q. At the time that when you placed her in the
10:44 patrol car?
10:44 A. No, I know. Which camera?
10:44 Q. Oh. Video. In the car, the patrol car.
10:44 A. It was turned on. I don't know if I turned
10:44 it on or if Officer Armendariz turned it on.
10:44 Q. But it's your car that you placed her in?
10:44 A. Yes.
10:44 Q. Where was your car parked?
10:44 A. In front of the CVS.

10:44 Q. How far from the entrance, approximately? How many feet?
10:44 A. Anywhere from maybe 60 to 80 feet.
10:44 Q. Was there a parking spot or parking slot that you parked your car?
10:44 A. No.
10:44 Q. No.
10:44 So it was, like, a random location?
10:44 A. It was in front of the entrance.
10:44 Q. Okay.
10:44 A. About 60, 80 feet away.
10:44 Q. Okay. So you left her with Officer Armendariz?
10:44 A. Uh-huh.
10:44 Q. True?
10:44 A. Yes.
10:44 Q. Did you have any other conversation with her or Officer Armendariz?
10:45 A. After I spoke with the RP, yes.
10:45 Q. No. At the point in time -- we are going chronologically.
10:45 At this point in time when you searched her and placed her in the patrol car, did you have a conversation with her then?
10:45 A. I don't believe so.

Q. Did you have a conversation with Officer Armendariz?
A. I may have told him what was going on and stay there so I can go talk to the RP, but I don't recall exactly what the conversation was other than that.
Q. So to your understanding at this point in time, she was still not under arrest?
A. Yes.
Q. She was only being detained?
A. Yes.
Q. Pending what?
A. The investigation.
Q. And what was your investigation pending?
A. For the trespassing.
Q. Tell me what you did that next in that investigation.
A. I spoke with the RP.
Q. Reporting party, Guy Garcia?
A. Yes.
Q. And what did you speak about? What did he tell you?
A. That she had been to the location several times.
Q. Uh-huh.

10:46 A. She had been told not to return, and she continued -- and she returned again. And she -- when she did come in, that she would cause a disturbance and record the employees.
10:46 Q. Okay. And to you, what -- what crime was that?
10:46 A. If she was told to leave and she refused and she continued to come back multiple times, then -- or several times, then she's trespassing.
10:46 Q. Okay. Did you verify any of the -- like, for example, you know, let's look at your police report.
10:46 You wrote your police report in this case; true?
10:46 A. Yes.
10:46 Q. So did your conversation with Guy Garcia -- was this recorded in any shape or form?
10:46 A. I believe so.
10:46 Q. Okay. So how is it that we don't have that here now, your audio that has been turned over to us?
10:46 A. If it wasn't turned on, then it wasn't recorded.
10:47 Q. Okay. So but you do not at this point in time, right now, you're sitting here today, you've

not heard of any recording of your conversation with Guy Garcia; true?

A. Not to my knowledge, no.

Q. Okay. But by your policy, if you're investigating a call, you should have turned on your audio; true? As we covered this before.

A. Yes.

Q. Okay. And do you have any understanding why it just was not recorded?

Did you -- did you mistakenly not turn it on, or were you unable to use the equipment --

(Reporter clarification.)

BY MS. MKRTCHYAN:

Q. -- equipment, the audio recorder?

What was going on, to your -- do you have an explanation for this?

A. No.

Q. Did Officer Robin- -- Sergeant Robinson, when he was interviewing you at Internal Affairs, did he verbally counsel you for not turning on your audio that day?

A. I don't know if there was a verbal counsel or not.

Q. Well, he testified in his sworn deposition here that he actually verbally counseled you or

10:47 advised you of that day when he was interviewing you
10:48 in Internal Affairs, that you should have turned on
10:48 your audio.
10:48 A. If he said that, then that's what he said.
10:48 Q. But you don't have a memory of that?
10:48 A. No.
10:48 Q. Okay. So, now, let's look at your report.
10:48 When did you write this report?
10:48 A. It was later that night.
10:48 Q. So let's look at the COG 172 through 173.
10:48 These are three pages actually, 171 through 173.
10:48 These are three pages of your report;
10:48 right?
10:48 A. Yes.
10:48 Q. Right?
10:48 A. Yes.
10:48 Q. And you are trained within the academy and
10:48 in your department to write reports; true?
10:48 A. Yes.
10:48 Q. And material significant facts need to be
10:48 accurately --
10:48 (Reporter clarification.)
10:48 BY MS. MKRTCHYAN:
10:48 Q. -- written in your report; true?
10:48 A. Yes.

10:48 Q. So did you believe, after viewing this report, it's accurate in all its details?
10:48 A. I believed, yes.
10:48 Q. Is there a time stamp on this report when it was written?
10:49 A. If there is, I'm missing it. This is the old system. So I don't remember exactly where everything was.
10:49 Q. Okay. Can I see your report? I want to --
10:49 A. Yes.
10:49 Q. -- identify, authenticate that that's the same report I have in front of me. And maybe we can actually find then -- this is not Bates stamped. But this is Report No. 21-788. So it says reported date, January 19, 2021; reported time, 1:27.
10:49 That's the time, actually, you came to the scene; right?
10:50 A. Yes. Right.
10:50 Q. So we have, here, printed -- printed time, 21:06 of the same day; right? 21:06?
10:50 A. Yes.
10:50 Q. Okay. But that's not the time when it's written, is it?
10:50 A. No. If --
10:50 Q. It says -- go ahead.

10:50 A. Well, I was going to say, if it -- if it was, then -- like I said, this is an old system. I may have wrote the report later that night, if --
10:50 Q. Uh-huh. Uh-huh.
10:50 A. -- if I had -- if I was back that night, then I could have held it over and wrote it the following evening.
10:50 Q. Okay. So let's look at the -- some of the parts here.
10:50 So it says, "Approval date, January 19, 2021. 21:05:09."
10:50 Do you see that approval time on the front narrative portion? Yes.
10:51 So we have approval date, approval time?
10:51 A. Oh, yeah, yeah, yeah. Yes, I do.
10:51 Q. Okay. You see that.
10:51 A. Yes.
10:51 Q. So -- and approving officer, 22000, do you know who that is?
10:51 A. I don't.
10:51 Q. Okay. So this means that this report must have been written, you know, by 21:05 to be -- have been approved by then; true?
10:51 A. Yes.
10:51 Q. Okay. But you don't know who was your --

this approving officer?

A. No.

Q. Generally --

A. Not based on the numbers, no, I don't.

Q. Generally, in your department, is there any sort of sergeant review of reports?

A. Yes.

Q. Who was your sergeant at the time of this incident?

A. I don't recall who.

Q. But they have to review and approve your reports?

A. Yes.

Q. Okay.

A. Whoever's in the --

(Reporter clarification.)

THE DEPONENT: -- watch sergeant's office, yes.

BY MS. MKRTCHYAN:

Q. Okay. So -- all right. So let's, then, continue.

But we don't have exact hour when you wrote, we just have the approval time, we can surmise, then, your report was written?

A. Yes. I could have written it -- wrote the

report either before I got off that night or when I got back the night -- if I was working the next evening.

Q. Uh-huh.

A. But just because -- if I wrote it, sometimes reports can be held --

Q. Uh-huh.

A. -- in the reporting system and be approved later on that day. Then the -- it doesn't get approved right away.

Q. Understood.

A. So that might be your late approving time. I don't -- I can't speak for that.

Q. I see now. All right.

So but in order to write this report, you have to gather information accurately; right?

A. Yes.

Q. So let's look at some parts of this report.

We have person summary, arrestee, Anoush Burmayan, date of birth, 08-18-1975; right?

A. Yes.

Q. How did you get her -- her date of birth when you were writing your report?

A. It was on the citation that I wrote.

Q. How did you get that, though?

10:53 A. I asked her.
10:53 Q. You did. Okay.
10:53 So Guy Garcia's information, RP here, and then we have, you know, his date of birth.
10:53 You presumably asked him about his date of birth; right?
10:53 A. Yes.
10:53 Q. And then involved parties, CVS.
10:53 Here it says, "Summary narrative. Female arrested for trespassing. Female was released with a citation"; right?
10:53 A. Yes.
10:53 Q. This is the narrative summary of the report?
10:53 A. Yes.
10:53 Q. Okay. Now, let's continue with this. We have arrestee. You have her sex, male.
10:53 Was this a mistake by you? She was female; right?
10:53 A. That was.
10:53 Q. Okay. So we have her age, 45; right?
10:53 A. Yes.
10:53 Q. Height, five-foot-two; right?
10:53 A. Yes.
10:53 Q. So this was based on your observations on

10:53 that day; true?
10:53 A. It was either based on my observation or I may have manually entered it from a DAV when I ran her to verify the information.
10:54 Q. Uh-huh.
10:54 A. I may have got it off of that.
10:54 Q. Basically, though, if -- this is an accurate information; right? If you are putting in your report, it must be accurate?
10:54 A. Yes.
10:54 Q. And five-foot-two --
10:54 A. Or -- or I overlooked the descriptors that was entered.
10:54 Q. Okay. So but her height is stated five feet, two inches; right?
10:54 A. Yes.
10:54 Q. That's not a tall person; true?
10:54 A. No.
10:54 Q. 130 weight; right? That's a skinny or fairly small person; true?
10:54 A. Can be.
10:54 Q. Uh-huh. And then you have her home address close by; right? This is Glendale, city of Glendale, Acacia Avenue; right?
10:54 A. Yes.

10:54 Q. She had an operator license ID number -- true? -- that you had?
10:54 A. Yes.
10:54 Q. True?
10:54 You have her phone number; true? This is cell phone, type, 323 --
10:54 A. Yes.
10:54 Q. Okay.
10:55 A. Yes, yes, yes.
10:55 Q. Uh-huh. So presumably, you got this information, this cell phone number from her; right?
10:55 A. Yes.
10:55 Q. Because that's not in the DMV?
10:55 A. Yes.
10:55 Q. So she was cooperative to give you her cell phone number; right?
10:55 A. After the fact, yes.
10:55 Q. Okay. Well, you know, that was -- at any point in time, was she not cooperative, that you told us?
10:55 A. Yes. When we --
10:55 Q. Well --
10:55 A. When we discussed the interaction when she was being argumentative and not listening, yes.
10:55 Q. So that's constitutes to you not

10:55 cooperative? If someone's --
10:55 A. It can be, yes.
10:55 Q. -- upset? Okay. Let's find out.
10:55 So if someone is upset, you know, that's
10:55 considered not cooperative?
10:55 A. Depending on the circumstances.
10:55 Q. Okay. She was verbally not abusive towards
10:55 you, she was not using any cuss words or, you know,
10:55 any type of bad words to you; right?
10:55 A. They don't have to use bad words to --
10:55 Q. Well, sir, please answer the question.
10:55 Did she use any cuss words towards you in
10:55 any shape or form?
10:56 A. I don't remember any cuss words.
10:56 Q. Okay. Did she, you know, use any bad
10:56 language towards other CVS employees in your
10:56 presence?
10:56 Did she use the word F? Did she use this
10:56 and that?
10:56 A. I don't remember.
10:56 Q. Okay. So, now, when she was talking to you
10:56 on -- we have some of it on audio video; right?
10:56 True?
10:56 A. In the car camera, yes.
10:56 Q. Okay. And she was in the patrol car,

10:56 sitting there in handcuffs, upset; true?
10:56 A. Yes.
10:56 Q. Did you hear her in that situation being -- using any kind of bad language?
10:56 A. I was a distance away. So I don't recall what she was exactly saying. But I do remember her being very loud.
10:56 Q. Sir, you heard the video; right?
10:56 A. Yes.
10:56 Q. After this incident?
10:56 A. Yes.
10:56 Q. Did you hear any bad language from her?
10:56 A. I was a distance away, and I don't remember hearing anything what she was exactly saying.
10:56 Q. I'm not talking about exactly, sir. I'm talking about your view of the video recorder after, in preparation for this deposition. After.
10:56 A. Oh.
10:57 Q. Did you see or hear her being, in the car, in any shape or form, resisting?
10:57 A. As far as language, no, I don't recall her using any foul language.
10:57 Q. Uh-huh.
10:57 A. And --
10:57 Q. Uh-huh.

10:57 A. -- resisting, no.
10:57 Q. Okay.
10:57 A. She was seat-belted.
10:57 Q. Because you said at that -- at that -- you know, she was cooperative, but not cooperative at some -- on some occasions of some period of time.
10:57 I want to know: When was she not cooperative other than she was upset when you entered the store?
10:57 Is that all you can point to?
10:57 A. Yes. And I was by myself.
10:57 Q. Okay. Is that a crime? Let me ask you this.
10:57 Was a crime committed in your presence when you arrived to CVS?
10:57 A. She was being -- she was causing a disturbance. So, yes, it's -- there is a crime there.
10:57 Q. If she is -- she's loud, she's talking, that's disturbance to you?
10:57 A. It can be.
10:57 Q. Okay. What penal code section is that?
10:57 A. And -- and the call said that she was refusing to leave. So I'm also there investigating
10:58 a trespass.

10:58 Q. But that is if you take the caller's word as true; right?
10:58 A. Yes.
10:58 Q. You didn't know whether she was refusing to leave when you arrived; true?
10:58 A. That's what the investigation's for.
10:58 Q. Exactly.
10:58 When you arrived and you're investigating, you didn't know whether she was asked to leave, when she was asked to leave, whether she was banned; true? You didn't know any of that; true?
10:58 A. True.
10:58 Q. This was the first time you met this woman; true?
10:58 A. True.
10:58 Q. You had not seen on her prior occasions at CVS; true?
10:58 A. I don't believe so.
10:58 Q. You never arrested her on previous occasions?
10:58 A. I don't believe so.
10:58 Q. You never had any interactions with her on previous occasions?
10:58 A. I don't believe so.
10:58 Q. Okay. So you're coming here -- just asking

10:58 you -- when you arrived at the scene, other than what you described to us, and if you are not even investigating, you don't know if CVS statements are accurate or not.

10:58 Just at your presence -- you come to the store, what crime was being committed in your presence at that point in time?

10:58 MR. KANG: Objection. Asked and answered.

10:58 THE DEPONENT: That's what the investigation's for.

10:59 BY MS. MKRTCHYAN:

10:59 Q. I understand.

10:59 But in other words, what I'm gathering from you, when you arrived, before investigation, you didn't know if she had committed any crime; true?

10:59 A. I -- when I go to any call, I don't know if a crime actually occurred. That's what the investigate's for.

10:59 Q. That's why you didn't arrest her yet; true?

10:59 A. And that's why I explained to you that she was being detained and not arrested, and I explained that to her also.

10:59 Q. So you needed to investigate?

10:59 A. Yes.

10:59 Q. At that point in time, you still had not

10:59 seen her committing a crime; true?
10:59 A. Because I was still conducting my investigation.
10:59 Q. Okay. So then when you placed her in the patrol car, did she complain to you that she had a medical condition that she needed to be accommodated for that?
10:59 A. She did not say anything to me, and I was not around her.
10:59 Q. Okay.
10:59 A. After -- after she was put in the car, I was not around her.
10:59 Q. If -- okay.
10:59 So if you were not around her, you wouldn't know one way or another if she told any other officer whether she needed to be accommodated; true?
10:59 A. Correct.
10:59 Q. Okay. So Officer Armendariz was with her; true?
10:59 A. Yes.
10:59 Q. Was there any other officer that had arrived yet? Duncan, Ruiz, did they arrive yet?
11:00 A. I know Sergeant Duncan and Ruiz arrived at some point. I don't know when they exactly arrived.
11:00 Q. Okay. Based on this radio call log, let's

look at when they arrived.
We have 5L26 Armendariz on scene at 1:31:06; true?
A. Yes.
Q. Then we have -- let me see. We don't have any indication when Duncan and -- let me see. It says backup.
What does that mean? This is on scene?
A. They're backing an officer. And I can't remember with the old CAD system, which is what this is --
Q. Uh-huh.
A. -- I don't remember if that puts them on scene or if that just shows them en route to us.
Q. Uh-huh. Uh-huh.
A. It's been a while. We -- we got a new system since.
Q. I see.
But because we have here, it states, first of all, the unit number before Duncan and Ruiz is 4864; right?
A. Yes.
Q. Because they were together, one of them was a trainee, they were in the same patrol car?
A. Yes.

Q. So here we have 1:33:03, says, "Okay. 5L25," you, "5L26, Armendariz, and 4864, Duncan and Ruiz"; true?
A. Yes.
Q. That meant that all of you were at scene at 1:33:03; true?
A. Yes.
Q. Okay. So fair to say that when you placed Ms. Burmayan in the patrol car and Officer Armendariz was already at the scene, within two minutes of that, you already had two other officers at scene as well; true?
A. Yes.
Q. Okay. So you have four officers at -- at the scene at this point in time when she was in the patrol car; true?
A. Yes.
Q. If that is the case, was there any need for her to be placed in a patrol car?
A. She was still being very loud. And with the apartment buildings around --
Q. Uh-huh.
A. -- and with it being 1:30 in the morning, I did not want her to create a disturbance with those -- with those residences --

Q. Uh-huh.
A. -- in those apartment buildings.
Q. Okay.
A. So we kept her in the back of the car.
Q. Okay. Being loud, you've heard -- you've watched the patrol car video; right?
A. Yes.
Q. She was complaining of breathing; true?
A. Yes.
Q. And she was complaining of wearing face mask, that she couldn't breath, she wanted to get out of the car; true?
A. Yes.
Q. Have you received any training in your department about people who have disabilities, for example, claustrophobia, panic attack, being placed in a patrol car?
A. It's covered in our first aid.
Q. Right. And if someone is, you know, having those kind of issues, she's loud, she's having an anxiety attack, "I'm hyperventilating," aren't you trained to provide aid to that kind of a person?
MR. KANG: Objection. Assumes facts not in evidence.
THE DEPONENT: You can talk to people and

get them to calm down --
BY MS. MKRTCHYAN:
Q. Uh-huh.
A. -- which is exactly what was going on. And she eventually calmed down and was just fine.
Q. Right. But if she was loud -- you said she was loud.
If she was loud because she was having a medical emergency, is that the same to you as disturbing the peace?
MR. KANG: Objection. Assumes facts not in evidence.
THE DEPONENT: You're going to have to repeat the question.
BY MS. MKRTCHYAN:
Q. Well, you said she was loud, that's why we needed to have her in the patrol car; right?
A. Yes.
Q. Okay. But if she's hyperventilating, she's having an anxiety attack and that's why she was loud, and she's asking for help, wouldn't it be reasonable for a police officer to take her out of the patrol car so that she calms down --
A. No.
Q. -- instead of yelling?

No?
A. No.
Q. No? Okay.
But you did have the option; right? You heard her screaming even then, because you were nearby; right?
You were nearby, you were talking with Guy Garcia; right?
A. I did hear her screaming. And a lot of people that go into the back of the police car do not want to be in the back of a police car so they scream, and --
Q. Right.
A. -- they tell us whatever they -- sometimes would like to tell us to get out of the police car.
Q. Okay. But you're trained to distinguish -- true? -- as a police officer, of someone who's just having, you know, basically hysteria or being upset at being in a car, from someone who's having some sort of a medical emergency; true? You're trained as a police officer?
A. Yes. With a basic first aid class that is given, yes.
Q. You don't have other training about people with disabilities?

A. It's covered within our classes, our department classes.
Q. Okay. Does first department -- training that you get about first aid teach you how to respond to someone who's having a panic attack?
A. Yes.
Q. Okay. What do you do in that situation?
A. Try to calm them down.
Q. How?
A. Talk to them, get them to breathe, and just try to -- try to listen to them. And if we need to, we can call fire personnel.
Q. Did you believe when she was screaming she was having hard time of breathing?
A. At no point did she say anything to me about a medical emergency --
Q. I asked you about breathing.
A. -- during my -- during my interaction with her.
Q. Sir, I asked you about breathing specifically.
A. She never said anything to me about it.
Q. Well, you heard the patrol videotape --
A. Yes.
Q. -- right now; right?

A. We watched the video after the fact.
But during my encounter with her, she never made any mention of -- of medical condition or disability or anything to that -- like that to me, prior to her going in the car.
Q. Sure. So audibly, when she's in the car, right now we hear on patrol tape video, she's complaining of breathing, and she's asking Officer Armendariz to lower her face mask; true?
A. On the patrol car, yes.
Q. Right.
And you knew -- you see on patrol video, that she's fully covering her mask -- face with a mask; true?
A. If -- if we're talking about after the fact, yes. But during this time of the incident, I was not made aware of that, and I was away from her. So I cannot speak on -- on what happened in that car.
Q. Yes. But you placed her in the patrol car; true?
A. I did. And no medical -- she made no medical claims to me at all.
Q. How far were you talking with Guy Garcia?
A. I was --

11:05 Q. Let me --
11:05 A. Sorry. Sorry.
11:06 Q. We are going too fast. Very, very bad idea.
11:06 THE REPORTER: Giving me a good workout today.
11:06 THE DEPONENT: I'm sorry.
11:06 BY MS. MKRTCHYAN:
11:06 Q. You know -- I mean, you know, first of all, let's slow down.
11:06 So you placed her in a patrol car, you left her with Armendariz, but you still testified that she was loud, you could hear her being loud, and that's why you needed her being confined in the patrol car, not to disturb apartment residences; true?
11:06 A. I did testify to that.
11:06 Q. Right. Right.
11:06 A. Right. And I also testified that I could not make out what she was saying because of where I was standing. I was a ways away from her.
11:06 Q. Where were you talking with Guy Garcia?
11:06 A. Near the entrance of the CVS.
11:06 Q. You were not inside the store; true?
11:06 A. I was not.

Q. Okay. And you were talking to him outside.
Who was else -- who else was present when you were talking to him?
A. It was just me and him.
Q. Okay. How long was that conversation?
A. Few minutes.
Q. Okay. And what did he tell you?
A. That she had come to the store --
Q. Uh-huh.
A. -- and she had been banned. She had been there three times --
Q. Uh-huh.
A. -- in the past week, and she was not welcome there anymore.
Q. Okay. For the record, you're reading from your report.
A. I am not reading. I'm just scanning.
Q. I understand. But you're --
A. It's not --
Q. -- looking at your report. We want to make sure that -- I'm just making for the record. You don't have to -- you don't have to worry about anything what I'm saying.
For the record, what -- I -- I need to make my record.

11:07 You are looking at -- scanning at your report when testifying; right?
11:07 A. I am scanning, yes.
11:07 Q. Okay. So but I want to make sure to make it clear whether you're testifying from independent memory or you're testifying from your report.
11:07 Are you testifying right now about your spa- -- about your conversation with Guy Garcia based on your report?
11:07 A. I'm -- I've scanned for certain words, but I'm not actually going directly off of my report.
11:07 Q. Then let's look directly at your report.
11:07 A. Okay.
11:07 Q. This is -- you wrote this, fresh in your memory, you know, COG 172.
11:08 We have, first of all, that you're relating to dispatch the fact that Guy Garcia told GPD dispatch that the female was banned from the store last week.
11:08 This is information you gathered from the dispatch; true?
11:08 A. The top paragraph, yes.
11:08 Q. Okay. "Upon arrival, I saw the female standing near the front entrance and was filming the employees with cell phone."

11:08 We covered this.

11:08 A. Yes.

11:08 Q. And you told me you never confirmed or verified whether her cell phone, in fact, had video recording of this incident; true?

11:08 A. True.

11:08 Q. Even though you did confiscate her cell phone; true?

11:08 A. True.

11:08 Q. You did not search her cell phone?

11:08 A. I did not.

11:08 Q. "As I walked towards the entrance to the CVS, I heard her yelling at the employee. I walked inside, and Anoush turned towards me and began to tell me that she was there to speak to the manager regarding a recent purchase that she had made."

11:08 This is what you wrote; right?

11:09 A. Yes.

11:09 Q. Okay. There's -- then there's nothing else about her. Then we go to the next paragraph.

11:09 You did indicate there that you actually handcuffed her at that point in time and placed her in the patrol car; true?

11:09 A. True.

11:09 Q. But under the chronology of the event,

based on your -- based on your memory, you spoke to her, you decided that she was to be detained pending further investigation, you placed her in handcuffs, took her to the patrol car, and then you came back, you spoke with Guy Garcia; true?
A. Yes.
Q. Next, "I spoke with the manager, RP Guy Garcia, and the following is a summary of his statement. Garcia says Anoush has come into CVS three times in the past week."
By the way, at this point in time, you are writing in your report the name of Anoush Burmayan.
However, you did not tell us at what point in time you learned of her name; true?
A. True.
Q. You didn't remember at what point in time you learned of her name?
A. True.
Q. Okay. "I spoke with the manager" -- this is after the fact. Because you learned -- after finished investigation, you learned of her name and you're writing your report based on what you learned prior to that; right?
A. Yes. And I -- and I put in there at the second paragraph, that she was later identified.

11:10 Q. Okay. Right.

11:10 A. I don't want to refer to her in my report as just a female. That way it's clear to the reporter --

11:10 Q. Understood.

11:10 A. -- or the person reading it that this is who I'm talking about.

11:10 Q. Understood. Yeah. So all right.

11:10 "Garcia said Anoush has come into CVS three times in the past week. He said she causes a disturbance by yelling at the managers, and then records them on her phone. He said he told her not to return to the CVS each time she came into the store. Garcia said that he wanted her arrested tonight for trespassing."

11:10 This is what you wrote attributing to him; true?

11:10 A. Yes.

11:11 Q. So to summarize this, basically, he's telling you -- he specifically, personally, had seen her come to the store at least three times in the past week, that she caused a disturbance, recording them. And then he personally told her not to return. He banned her from the location.

11:11 And then he personally asked you to arrest

her for trespassing; true?
A. Yes.
Q. Okay. So this is actually -- in this paragraph, we have -- we're summarizing the fact that he had -- asking you to make a private citizen's arrest.
A. Yes.
Q. And he's telling you she's -- she's been banned from the location?
A. Yes.
Q. And in order for you to make that private citizen's arrest, you need to, basically -- you have to take his statement as true?
A. Yes.
Q. Okay. If any of these statements are not true, for example, that she was not banned from the store and she came back, would you be able to make an arrest for trespassing?
A. I don't quite understand your question.
Q. Well, if any of these statements that he said are not true, for example, that she was not banned from the store, she was never told not to come back, would she be trespassing when she came back?
A. If none of his statements was true, then

yes.
Q. Right. So in other words, you had to take Guy Garcia's statement as true to make this arrest; true?
A. I did.
Q. You didn't verify this information, you didn't have any way to verify this information; true?
A. True.
Q. You didn't know when she came, you didn't look at video surveillance and say, "Look, Guy, I want to see when she came. Do you have any paperwork or video when she came"; right? You didn't do that?
A. I did not.
Q. Basically, in your police officer responsibility, you had to take Guy Garcia's statement as true to make this arrest?
A. Yes.
Q. But also, the police department, your department gives you discretion to decide if it's credible or not; right?
A. Yes.
Q. So, you know, how do you decide if a reporting party is credible? What do you do to

11:13 decide that?
11:13 A. I talk to both parties --
11:13 Q. Uh-huh.
11:13 A. -- and I make the best determination to my ability.
11:13 Q. So but the conversation you had with Ms. Burmayan that we don't have any recording of, consisted of you basically talking to her the two minutes or so prior to handcuffing her and placing her in the patrol car; true?
11:13 A. One more time. Sorry.
11:13 Q. Well, when did you speak with her -- sorry.
11:13 When did you get her side of the story?
11:13 A. When I Mirandized her.
11:13 Q. You Mirandized her.
11:13 A. Yes.
11:13 Q. Initially, you did not Mirandize her; true?
11:13 A. No. Initially she was just being detained.
11:13 Q. When -- to your understanding, when do you have to Miranda someone?
11:13 A. When I placed her under arrest and I needed to ask her specific questions regarding that arrest.
11:13 Q. Okay. So but if you question someone prior to that, prior to actual formal arrest, you don't
11:14 have to Mirandize them?

A. No. If I'm just investigating it.
Q. I see. Okay.
So but in any event, first you spoke with Guy Garcia, and then you spoke with Anoush Burmayan?
A. Yes.
Q. Okay. So let's continue.
Basically, right now, based on these three paragraphs we have, you know, you had to take Guy Garcia's statement as true to make a private citizen's arrest; true?
A. Yes.
Q. And this was a private citizen's arrest, to you?
A. Yes.
Q. You didn't see her committing this crime in your presence; true?
A. She was on the property in my presence.
Q. Uh-huh.
A. And she had been advised already three separate times to not return.
Q. I see.
So but it was not in your presence that she had been advised not to return; true?
A. Yes, this is true.
Q. So when she -- you came, you had to take

11:14 Guy Garcia's statement as true to determine if she was trespassing; true?
11:14 A. Yes.
11:14 Q. Okay. Other than that, was there any other crime she had committed in your presence?
11:15 A. No.
11:15 Q. Okay. So let's continue.
11:15 Now, then you writ in your report -- write in your report, "Due to the fact that Anoush returned this evening, the fact that Guy Garcia advised her not to return to the CVS three times, the fact that she returned and again was causing a disturbance, I placed Anoush under arrest for trespassing."
11:15 Right?
11:15 A. Yes.
11:15 Q. That's what it states?
11:15 A. Yes.
11:15 Q. So from what we're reading, is that, again, you know, in order for you to make this arrest as you identified, you're stating in your report, you had to take Garcia's statement as true, the fact that he had told her not to come back and she came back?
11:15 A. Yes.

Q. So if none of that was true, if none of that was true, that he had not advised her not to return and, you know, that she had returned three times -- if none of that was true, would you be able to make this arrest?

A. No.

Q. Okay. So but you, in other words, took Guy Garcia's statement as true?

A. Yes.

Q. And if -- and then you write in your report, "I read her rights" -- "Miranda Rights, she stated she wanted to talk," and this part is on audio; right? We have audio recording of this part?

A. Yes.

Q. "She said she did not come to the CVS three times, and that she was never told not to return to CVS."

That's what she's stating?

A. Yes.

Q. All right. So in other words, her side was, you know, disputing -- she was contradicting Guy Garcia; right?

A. Yes.

Q. So you have reporting party saying one thing, suspect says another thing; okay? Why did

you take Guy Garcia's statement over hers and make the arrest?

A. We are often lied to a lot. People don't want to go to jail, people don't want to be arrested. So they're going to say what they want to say to try not to get arrested.

Q. Do you automatically discount what suspects tell you?

A. No.

Q. Okay. So was there any reason why you didn't take Ms. Burmayan's statement as true?

Did you have any independent verification that she was lying?

A. My interactions with the employee and the manager at CVS --

Q. Uh-huh.

A. -- I've -- I've -- took his word over it.

Q. Uh-huh.

A. And, yeah, and that's what court's for.

Q. Uh-huh. Okay.

So -- and you actually, in your audio/video, you basically told her -- you made up your mind to make the arrest --

A. I did.

Q. -- based on Guy Garcia's statements; true?

11:17 A. I did.
11:17 Q. You did not take her words credible?
11:17 A. No.
11:17 Q. Right now, as of right now, you're sitting here today, we have Guy Garcia testify that she couldn't -- in fact, he couldn't confirm what he told you.
11:18 He said that "I never banned her. I didn't know who banned her. And I didn't know -- I can't give you the dates when she came back to the CVS store." So she couldn't even verify this information.
11:18 Do you have -- if she -- if he couldn't verify this information himself, does that in any way change your opinion about the arrest that you made?
11:18 A. I went based on what he told me that evening.
11:18 Q. Okay. Which is not recorded; true?
11:18 A. True.
11:18 Q. And which under department policies, you were obligated to record; right?
11:18 A. Yes.
11:18 Q. If you're investigating; true?
11:18 A. Yes.

11:18 Q. Okay. So -- and you also continued
11:18 with your report, you wrote, you know, you advised
11:18 Anoush Burmayan that she's no longer allowed at this
11:18 CVS and if she returned again, she would be arrested
11:18 for trespassing.
11:18 You made it very clear to her that she
11:18 could not come back to this store; true?
11:18 A. Yes.
11:18 Q. What authority under penal code section
11:18 allowed you to tell her not to come back, ever, to
11:19 this location, sir?
11:19 A. I advised her, again, for the -- for the
11:19 store.
11:19 (Audio interruption.)
11:19 THE DEPONENT: There's a gym up there or
11:19 something.
11:19 MS. MKRTCHYAN: I will have -- they're
11:19 doing some serious business here. You know. Yeah.
11:19 I see. I see.
11:19 BY MS. MKRTCHYAN:
11:19 Q. So, right.
11:19 But if, for example, you know, you knew
11:19 Glendale PD policy on, you know, exceptions for
11:19 trespassing, if -- first of all, none of this
11:19 statement by Guy Garcia were verified. Let's say,

you know, she was never banned from this location as she said; right? Let's say. And you never verified that information, how can you just ban her permanently from this location?

A. We can't be -- so the second part of your question, I -- I gave her that advisement based on the store employee. He -- he wished that. So I gave that advisement for him, for the store employee, not to return. Okay?

Which also, based on his statement, that she had already been warned and told not to return three times. And then -- so that was the second part of your question.

What was the first part of your question? I apologize.

Q. What penal code section allowed you to say trespass violation, penal code?

A. For -- that I'm advising her?

Q. Yes.

A. On the trespassing?

Q. Yes.

A. Yeah. It would have been -- it would have been the corrected version, which if this was brought to my attention, there's also a correction process.

11:20 Q. Uh-huh. Uh-huh. Okay.
11:20 And did Guy Garcia ever show you any paperwork, any documentation that she was notified of being banned?
11:20 A. So that's also based on the statements that I got, I made the arrest. But detectives can follow up on that stuff.
11:20 Q. Okay.
11:20 A. After I write this report, they can then go to the CVS and verify all this information.
11:21 Q. Yes. But you are the one who are banning her.
11:21 Basically you're telling her, "You cannot come back to this CVS location"; true?
11:21 A. And at that evening, he asked me to advise her also, again, to not return so I did so.
11:21 Q. Okay. So you believe, as a police officer, you had the authority to take the retail establishment's request to permanently ban someone from the location?
11:21 A. Yes.
11:21 Q. Despite all the exceptions that we have, discrimination on the basis of something, or failure to accommodate, you know, despite all of those -- like, freedom of speech, you were not mindful of

those exceptions -- going back to the Glendale Municipal Code, you were not mindful of any of those considerations when you banned her from this location; true?

A. So as I explained, I would have to read the exceptions. But based on what he told me --

Q. Uh-huh.

A. -- and the reasons why he was banning her from the property, it did not meet those exceptions.

Q. Well, you know, but you told us that you -- last time you had not reviewed -- well, strike that.

These exceptions were not in the back of your mind on the day of this incident; true?

A. They were not.

Q. So anyway. But you basically believed that you had to report it based on entirely Guy Garcia's, one, reporting party statement from CVS Pharmacy to ban her permanently from this location?

A. Yes.

Q. And you didn't speak with Joe Johnson to confirm Guy Garcia's statements; true?

A. No.

Q. Okay. So only from what you heard from Guy Garcia without any verification or

11:22 corroboration, without doing any type of independent investigation, you decided Ms. Burmayan cannot any longer come back to the CVS?
11:22 A. Yes.
11:22 Q. And if she came back, let's say, next day after this citation, and Glendale PD was called again, you would be actually authorized to arrest her again for the same trespass violation?
11:23 A. Yes.
11:23 Q. Okay.
11:23 A. Well, not the one that I wrote. But yes.
11:23 Q. Okay. So but let me ask you this.
11:23 This citation that you gave is a misdemeanor; right?
11:23 A. Yes.
11:23 Q. Trespassing. And this is a citable offense -- right? --
11:23 A. Yes.
11:23 Q. -- under penal code section?
11:23 (Reporter clarification.)
11:23 BY MS. MKRTCHYAN:
11:23 Q. Yeah. What penal code section from the top of your head is this that you're aware of? The penal code?
11:23 A. The 602.1? Are we talking about that one

again or not?
Q. No, no.
What penal code allows you, instead of booking someone and taking to jail, to cite and release them?
A. We have that discretion to either book them or cite them.
Q. Yeah. But what penal -- do you know from the top of your head what penal code is that?
A. I can't think of the -- the penal code off the top of my head.
Q. Okay. Penal Code 849? Does that sound right?
A. 849? No, it doesn't.
Q. Doesn't sound --
A. Doesn't ring a bell.
Q. Well, trespassing, though, a citable offense. You could have basically, you know, initially -- if you were -- or I think it was trespass, you could just write the ticket and give it to her and tell her "go"; right?
A. Which I did.
Q. Okay, but -- right? You could have done that?
A. I did, yes.

11:24 Q. But without placing handcuffs on her; true?
11:24 A. I explained my reasoning for the handcuffs.
11:24 Q. Okay.
11:24 A. But yes. To answer your question, yes. But the reasoning -- there was reasoning for the reason I placed her in handcuffs.
11:24 Q. Okay. So if she testified under oath that initially she was told by you that "You're under arrest. I'm going to take you to jail," that was not true? You never told her that?
11:24 A. No.
11:24 Q. You're denying that?
11:24 A. Yes.
11:24 Q. Okay. But when you placed her in handcuffs and there was a conversation, you know, between her and Armendariz -- have you heard of that conversation in the patrol car?
11:24 A. I watched it after, yes.
11:24 Q. Okay. And isn't it true, he did tell her, "You're under arrest because you were trespassing at this location"?
11:25 A. If he made that comment, then -- without me telling -- or saying anything, then that was on him. But I wasn't around during their conversation.
11:25 Q. Okay.

A. So I can't speak for him.
Q. In other words, Officer, just want to make sure this: That first of all, you had the option to just cite her and release her without placing her in handcuffs and placing her in a patrol car; true?
A. Okay. So is that a yes or no?
Q. Yes.
A. I did it -- I placed her in handcuffs. I detained her in handcuffs, based on what we talked about already, and then I made the determination that she was placed under arrest.
Q. Uh-huh.
A. After my investigation, I took her out of the car.
Q. Uh-huh.
A. And I decided -- gave her a citation and released her on feet.
Q. Understood.
But is there anything that prevented you, initially, by -- for example, you could have stood her by with Officer Armendariz --
(Audio interruption.)
BY MS. MKRTCHYAN:
Q. Anyway, just -- you know, you could have actually have her being detained without handcuffs

11:26 outside of the patrol car by three officers there, while you talked with Guy Garcia, and then you could just cite her and release her; true? That's an opportunity; correct?

11:26 A. If she wasn't acting the way she was, then absolutely. And I've done that multiple times and -- several times in my career. I have cited many people out in the field without putting them in handcuffs if they were acting appropriately.

11:26 Q. Okay.

11:26 A. But based on the reasons why I've already give -- or given, she was placed in handcuffs and put in the back of my seat. And she was taken out after the interview -- after the investigation was done and given a citation.

11:26 Q. And her demeanor, you already described to us, basically she never moved, she never attempted to resist you; true?

11:26 A. The handcuffing was to prevent that.

11:26 Q. Okay. So but handcuffing -- there's a policy on handcuffing; true? Restraints?

11:27 A. Yes.

11:27 Q. Okay. What -- when are you allowed to handcuff someone, do you know?

11:27 A. I can detain somebody who is uncon- -- is

11:27 acting the way that your client was.
11:27 Q. Okay. Well, you know, we've covered --
11:27 A. And for officer safety reasons, yes, I can detain somebody in handcuffs.
11:27 Q. Okay. And you're also trained that handcuffing is not supposed to be a show of authority; right?
11:27 A. And I was not showing my authority to her.
11:27 Q. But the policy -- let's look at the policy of handcuffing.
11:27 A. I was doing it for her safety as well as our safety and my safety.
11:27 Q. Okay. And, generally, you have also policy on use of force; right?
11:27 A. I do.
11:27 Q. And is handcuffing consider- -- restraints, are they considered use of force?
11:27 A. Yes.
11:27 Q. And when someone is complaining of, you know, handcuffs being too tight, what is your obligation in that situation?
11:27 A. To check the cuffs and see if they're too tight and if they are, then you can --
11:28 (Reporter clarification.)
11:28 THE DEPONENT: -- we can loosen them up.

BY MS. MKRTCHYAN:
Q. Do you remember Ms. Burmayan before she was placed in the patrol car telling you, that, "Look, you know, why am I being handcuffed? They are too tight?"
Do you remember that, complaining of handcuffing?
A. No.
Q. You don't remember?
A. No.
Q. And you don't have any recording, obviously, which you should have done to prove one way or another?
A. True.
Q. Okay. And so -- though you testified that, you know, she was not resisting you, she was not violent, and yet you decided still to also handcuff her and place her in the patrol car; right?
A. Yes.
Q. And she would become -- you were also holding her and taking her to the patrol car; true?
A. I was escorting her to the car, yes.
Q. Okay. So -- and, you know, her hands were handcuffed behind her back; true?
A. Yes.

11:28 Q. And she was sitting in the same manner with her handcuffs behind her back in a patrol car; right?
11:28 A. Yes.
11:28 Q. With a face mask on?
11:29 A. Yes.
11:29 Q. And she was complaining of breathing?
11:29 A. To Officer Armendariz, yes.
11:29 Q. Okay. And you never at any point in time, while she was screaming in the patrol car, approached, as you were talking with Guy Garcia, to find out why she was screaming that loud; true?
11:29 A. I trust my partners. So if they didn't see a reason to act on it, then that's on them.
11:29 Q. Okay.
11:29 A. I wasn't around there. I was conducting my investigation.
11:29 Q. Okay. So let's look at the handcuffing policy on your department to what you're allowed to -- handcuffing and restraints.
11:29 So we have, "Restraints shall not be used to punish or to display authority as a show of force."
11:30 Are you aware of this policy by your department?

11:30 A. Yes.

11:30 Q. This is COG 139, policy on the use of restraints.

11:30 So it says, "Use of Restraints. When deciding whether to use any restraint, which includes handcuffing, officers should carefully balance officer safety concerns with factors they approved. But they're not limited to the circumstances of crime leading to the arrest, the demeanor and behavior of the arrested person, the age and health of the person."

11:30 Do you see it? Did I read it accurately?

11:30 A. Yes.

11:30 Q. Okay. So -- and then we have, "Whether the person has a hearing or speaking disability, in such cases, consideration should be given, safety permitting to handcuff -- "

11:30 (Reporter clarification.)

11:30 BY MS. MKRTCHYAN:

11:30 Q. " -- to the front to allow the person to sign or write notes and whether the person has any other apparent disability."

11:31 So use of restraints, basically, your department gives you some considerations to consider when applying handcuffs on individuals, detainees;

11:31 right?
11:31 A. Yes.
11:31 Q. Age and health of the person is consideration; right?
11:31 A. Uh-huh. Yes.
11:31 Q. Demeanor and behavior; right?
11:31 A. Yes.
11:31 Q. And circumstances of the crime; right?
11:31 A. Yes.
11:31 Q. We've covered the circumstances of this crime.
11:31 There were no weapons used by the reporting party to the 911; true?
11:31 A. No weapons seen.
11:31 Q. Okay. Okay. Yes.
11:31 This was not a priority call; true?
11:31 A. As dispatched, yes.
11:31 Q. This is a trespass; true?
11:31 A. Yes.
11:31 Q. And trespass, do you always put people and place handcuffs on people before citing for trespassing?
11:31 A. I have.
11:31 Q. Always?
11:31 A. Not always, but I have. Depends on the

11:31 circumstances.
11:31 Q. On how many occasions, in the ballpark, on
11:31 average, do you actually place handcuffs on someone
11:32 who's a --
11:32 A. I couldn't -- I couldn't even give you a
11:32 ballpark. Because I deal with trespass all the
11:32 time. And I also -- those -- a lot of those
11:32 trespass calls are very unruly homeless people or
11:32 just people that don't want to leave.
11:32 So, yeah, a good portion of them go in
11:32 handcuffs. But also a good portion don't go in
11:32 handcuffs.
11:32 Q. All right. But --
11:32 A. Depends on the circumstance.
11:32 Q. Okay. But, sir, we've covered this.
11:32 Ms. Burmayan, when you came and spoke to
11:32 her, was not unruly, was not combative; right? We
11:32 already covered this; right? Her demeanor?
11:32 A. Yes. But the policy also says demeanor and
11:32 behavior.
11:32 Q. Right.
11:32 A. Which I covered her demeanor --
11:32 Q. Right.
11:32 A. -- based on my experience.
11:32 Q. Uh-huh.

A. And to prevent anything, then, yes, that's why I did what I did for officer safety reasons.

Q. Okay. Prevent anything. Let's -- let's -- you know, first of all, you interrupted me. Let -- thank you very much, but let me make sure that we're clear.

You know, her demeanor, we've covered this. She was not violent; right?

A. Yes.

Q. She was not aggressive towards you or anyone at the CVS? You didn't see her aggressing towards anyone; true?

A. Doesn't mean she couldn't.

Q. "Yes" or "no," sir?

A. Yes.

Q. Okay. You know, she was not leaving the scene from you, she was not evading you; right?

A. There's a possibly, but yes.

Q. Possibilities. We're not talking about possibilities. I'm asking you to describe for us the demeanor that you saw that necessitated you to handcuff her.

So -- because you talked about unruly people, homeless people. Are you comparing homeless people with a school psychologist teacher who was --

you know, we see her on CVS Pharmacy video responding to any questions you were posing to her.
Have you seen that video?
A. Which video?
Q. CVS Pharmacy video --
A. The one --
Q. -- of you arresting her.
A. -- of this case.
Q. Yeah.
A. From the in store.
Q. Uh-huh.
A. No, I have not.
Q. Okay. So but basically, you know, she was not acting like a homeless person; true?
Did she look like a homeless person to you?
A. If you would like me to clarify. I also have dealt with average people who were trespassing.
Q. I see.
A. It's -- all sorts of people that are -- are committing trespassing violations.
Q. So she was a 5-2 -- five-feet-two tall woman. You know, she was -- you know, she was -- didn't look like homeless from the photos. Let's look at her photos again.
And she -- we did not hear any type of foul

11:34 language from her.
11:34 She -- when you came, you didn't verify any of the information from the reporting party.
11:34 And yet you believed, under those circumstances, it was necessary -- instead of you just citing her and releasing her and giving her a ticket, you needed her to be placed in patrol car in handcuffs; is that what you're telling me?
11:34 A. And in my line of work, I have to include all of the possibilities. Things can change in a -- in a split second. So that's why I did what I did.
11:34 Q. Okay. And she was -- how long was she placed in the patrol car, from your recollection?
11:34 A. Not very long.
11:34 Q. For how long? Tell me.
11:34 A. Ten minutes, 15 minutes. I'm not sure.
11:34 Q. Have you watched the patrol video recording?
11:35 A. I have. But I don't remember -- I don't recall the exact time.
11:35 Q. Based on the patrol video recording -- first of all, we don't see her when she's placed in the patrol car; true?
11:35 A. Um --
11:35 Q. You want me to play that?

A. Could you, please?
Q. Yes. Let's play this, and we'll go over it.
Okay. So we have -- this is the patrol video recording.
Is this what you've watched before?
A. Yes.
Q. Okay. On this patrol video, we do not actually -- when -- when it turns on, Axon to video, she's already in the car sitting in handcuffs; true?
A. Yes.
Q. We don't see her actually being placed in the patrol car; true?
A. True.
Q. Okay. So we don't know how long she was already in the patrol car, approximately, when this video is turned on; true?
A. True. We put people in the back of the car, and then we have to go to the front of the car and actually activate the camera because the camera's placed inside the vehicle -- inside the front part, just behind the passenger headrest.
Q. Okay. But do you have any independent recollection as to when you turned on this patrol video?

11:36 A. My practice is as soon as I close that door and I get them -- or I get them in the back of the seat or the back of the car and I close the door, I go in, and I turn on the camera.
11:36 Q. Okay. Your practice is also to use your audio recorder to record conversations and contact with individuals that you're investigating; true?
11:36 A. That is --
11:36 Q. Yes?
11:36 A. Yes.
11:36 Q. And in this case, that practice did not materialize; right?
11:36 A. Yes.
11:36 Q. Okay. So we don't know, in other words, any -- we don't have any independent verification, whether on the documentation or on this video recording when this was turned on; correct?
11:36 A. True.
11:36 Q. So she could have been there 5 minutes, 10 minutes or 3 minutes or 2 minutes; true? You don't know?
11:37 A. Possibility, yes.
11:37 Q. Okay. So when we see this -- and then also, do you happen to know -- well, first of all, also in this patrol, we don't see where she's patted

11:37 down; right? Because she's patted down outside the patrol car; right?

11:37 A. Yes. And it doesn't cover the outside. We don't have body-worn cameras at this time.

11:37 Q. Okay. So this entirety of this patrol recording is 29 minutes, based on this time stamp; true?

11:37 A. True.

11:37 Q. Okay. So she is -- I'm going to establish, for the record -- let's see when she's taken out of this patrol car, when we don't know when she's placed.

11:37 Based on this patrol video, I can see her being taken out, you know, by you at 18:22 seconds; true?

11:37 A. Yes.

11:37 (Video recording playing.)

11:37 BY MS. MKRTCHYAN:

11:37 Q. Okay. So, then, this is you taking her out of the patrol car; right?

11:37 A. Yes.

11:37 Q. Okay. So she was, at the very least, for trespassing, misdemeanor violation -- she was placed in this patrol car in handcuffs with a face mask for at least 18 minutes; true?

A. Yes.
Q. And yet you did have the option initially, to -- first of all -- strike that.
Were you talking with Guy Garcia for 18 minutes?
A. No.
Q. Okay. So you had the option to actually -- once you talked with Guy Garcia -- right? -- and finished your investigation of this trespass incident, you could have come back within five minutes and taken her out of the patrol car and cite her and release her; true?
You had that option; true?
A. Yes.
Q. And let me ask you this: When you spoke with Guy Garcia, did you ask him for -- to provide you any documentation about her being banned from the location?
A. I did not.
Q. Then how would you verify someone telling you the truth, if he's lying or telling the truth?
A. Based on his statement. And then that's what court is also for. There's a court date given on the bottom of the citation.
Q. Yes.

But you need to make -- you're making the arrest; right, Officer?
A. Yes.
Q. What do you -- what -- what is the legal requirement for you to make a --
(Reporter clarification.)
BY MS. MKRTCHYAN:
Q. -- warrantless arrest, do you know?
A. To determine if the crime has been committed.
Q. What is the -- what is it called? What -- what kind of -- how -- what is the standard of you to determine if crime was committed?
A. Based on his statement and the fact that she was advised not to come back three separate times. That was my determination, that she had committed the violation of trespassing.
Q. Okay. And do you know the standard of probable cause to arrest someone?
A. Yes.
Q. What is it -- how -- define for me, what is probable cause?
A. That a crime had occurred.
Q. Okay. So what kind of a level of suspicion do you need to arrest someone?

11:40 A. Just like I said, if there was a crime that had occurred.
11:40 Q. Yeah, but I mean, you know, someone can tell you all kinds of things. Like, let's say CVS employee Guy Garcia had a grudge on her or he didn't like her because she's Armenian, you know, whatever. He didn't like her for whatever reason.
11:40 Maybe he knew her from prior occasion, maybe he had a grudge on her.
11:40 How do you sort this out, Officer? Isn't that your duty to due diligence in investigating to see if someone has a grudge, to see if someone is telling you the truth?
11:41 A. Yes. But if -- I mean, if they're leading me down that path, then I will investigate further. But if they're not making any statements, then I have no reason to believe there is.
11:41 Q. Okay. So but let me -- so you have never seen Ms. Burmayan prior to this day; right?
11:41 A. True.
11:41 Q. You never arrested her; right?
11:41 A. To my knowledge, yes.
11:41 Q. Okay. And did you on that day, when you were -- you actually did -- you booked her on the patrol car, you fingerprinted her, you verified her

11:41 identity; true?
11:41 A. No.
11:41 Q. You didn't book her?
11:41 A. No.
11:41 Q. Okay. What were you -- how did you verify
11:41 her information?
11:41 A. She provided me the information.
11:41 Q. Right.
11:41 A. And I ran her on the MBC.
11:41 Q. Okay.
11:41 A. Which it came back to -- I ran the DMV, and
11:41 it came back to the information as she was giving
11:41 me.
11:41 The fingerprint that you were talking
11:41 about, there's a fingerprint box on the back of
11:41 citation that they can put their fingerprint on,
11:41 which that's what we have to do for misdemeanor
11:41 arrests.
11:41 Q. Okay. So but when you ran her in -- on
11:41 MBC, you saw that she didn't have a prior criminal
11:42 record history; true?
11:42 A. We don't run that.
11:42 Q. You didn't run that?
11:42 A. No. We don't run that.
11:42 Q. Okay. Did you have an option, though,

11:42 Officer, when you -- first time you're seeing this woman, she doesn't look like homeless, she's not using -- she's not violating any of the law in your presence.

11:42 Did you have an option to just give her a warning and say, "Look, ma'am, you know, I don't know what's going on between you and CVS. You know, I'm not liking this, but I'm not going to give you citation, I'm not going to arrest you today. You're warned not to come back."

11:42 Could you give her a warning?

11:42 A. I made the arrest based on Guy Garcia, and I cited her out instead of taking her to jail for this violation.

11:42 Q. I understood that. I understood, that's what you testified.

11:42 You decided to arrest her based on entirely Guy Garcia's statements; true?

11:42 A. Yes.

11:42 Q. But did you have an option not to arrest her on that day, just give her a warning and tell her to leave?

11:42 A. If he didn't want her arrested, then yes.

11:42 Q. So you basically are following entirely the retail establishment's request?

A. Yes.
Q. Okay. But do you believe that you discharged your duty as a police officer on that day by verifying the truthfulness of the statements of Guy Garcia?
A. Did I believe they're true? Yes.
Q. Okay. But on what basis did you believe it was true?
A. Based on what he told me.
Q. Yeah. But, you know, let's say, you know, he's not telling you the truth, did you do any other independent investigation, did you speak with Joe Johnson, say, "Look, who is the manager here? Is there anything above Guy Garcia? I want to confirm to see if this guy is not just, you know, telling me some sort of nonsense"?
Did you do anything like that, sir?
A. Guy Garcia is the manager. So I went to him and spoke with him.
Q. You believe Guy Garcia was the manager?
A. Yes.
Q. Well, we have evidence that Guy Garcia was not the manager. He was only -- he was -- the manager at the scene on that day was Joe Johnson, the black man, the -- the African American guy who

11:43 was present.
11:43 You were not aware of that?
11:44 A. I was not.
11:44 Q. Did Guy Garcia ever tell you that "Sir, here's my manager. Talk to my manager"?
11:44 A. No, he did not.
11:44 Q. Did you ask him, "Who's your manager?"
11:44 A. I don't believe so.
11:44 Q. Would it be a good idea for you?
11:44 Because right now, Joe Johnson testified in this case, that, "Look, I never asked her to be arrested. I thought she was being released."
11:44 Are you aware of that?
11:44 A. I also didn't need the manager. I can just use the employees.
11:44 Q. Understood.
11:44 But if you're doing investigation and your policy tells you that -- you know, let's look again at your private persons arrest.
11:44 And here's another thing I wanted to go over. If you're doing the private persons arrest, reporting requirements by your department, were you aware of that?
11:44 A. I was. And I did not have the form with me and it was not completed.

Q. So let's look at this. This is that 33.5, reporting requirements, "In most circumstances in which a private person is claiming to have made an arrest, the individual should complete and sign the department private persons arrest form under penalty of perjury."

This is your departmental policy COG 117; right?

A. Yes.

Q. And you basically did not follow this policy on that day; true?

A. Yes. I did not have a form. And it says should complete, but it doesn't say shall complete.

Q. Okay. But why is this policy in place? Do you know why this policy is in place?

A. For exactly what it says, under penalty of perjury.

Q. Well, no. Is it also for a reason that the police department wants to make sure that the private persons arrest is properly documented?

MR. KANG: Objection to the extent it calls for speculation.

THE DEPONENT: Which is what the police report is.

///

11:45 BY MS. MKRTCHYAN:
11:45 Q. Okay. But why -- aside from police report, this is the reporting requirement; right?
11:45 A. Should be.
11:45 Q. By your colleague?
11:45 A. Should complete.
11:45 Q. Okay. So in other words, you didn't follow this?
11:45 A. Should complete. I didn't have the form.
11:46 Q. And then we have, "Officer Responsibilities," the COG 116, it says, "Should any officer determine that there's no reasonable cause to believe that a private persons arrest is unlawful, the officer should take no action to further detain or restrain any individual beyond that which reasonably appears necessary to investigate the matter, determine the lawfulness of the arrest, and protect the public safety."
11:46 Do you see -- do you agree with what I read?
11:46 A. Yes.
11:46 Q. This is 335.4 policy on officer responsibilities; right?
11:46 A. Yes.
11:46 Q. Okay. So this presupposes that an officer

11:46 has discretion and is obligated to do investigation
11:46 to determine if there is reasonable cause to believe
11:46 that this arrest is lawful; true?
11:46 A. And I did.
11:46 Q. Okay. I understand. But just confirm with
11:46 me that this is the policy.
11:46 A. It is the policy.
11:46 Q. And you believe that you discharged this
11:46 policy on that day?
11:47 A. I did.
11:47 Q. You spoke only with Guy Garcia, an
11:47 employee, even though there was a manger there,
11:47 Joe Johnson, who would not have confirmed his
11:47 statement; true?
11:47 You didn't speak with Joe Johnson; true?
11:47 A. But I also can't confirm that they actually
11:47 worked together on all the days.
11:47 Q. Okay. But you didn't speak with him;
11:47 right? Right?
11:47 A. I don't need to speak to every single
11:47 employee.
11:47 Q. I see.
11:47 So you don't have to verify the information
11:47 provided by a reporting party; is that what
11:47 you're --

11:47 A. I went off the RP and what he told me.

11:47 Q. Let me finish my question.

11:47 Do you have to verify -- when you're investigating an incident, do you have to confirm what the reporting party states?

11:47 A. I did.

11:47 Q. Do you only talk to reporting party to do that?

11:47 A. I spoke to the one that I called.

11:47 Q. Well, let's say, hypothetically, as I already told you, Joe Johnson would have told you, "I never banned her from this location. I was not aware that she was here multiple occasions, and I would not want her to be arrested to date." That's what she -- he testified to.

11:48 "I did not ask her to be arrested on that date. I didn't know she was banned."

11:48 If you had spoken to Joe Johnson, would you have made an arrest of Ms. Burmayan on that day?

11:48 MR. KANG: Objection to the extent it misstates Mr. Johnson's testimony. Assumes facts not in evidence.

11:48 BY MS. MKRTCHYAN:

11:48 Q. You have to answer.

11:48 A. You said hypothetically. So

hypothetically, what if Mr. Johnson never had a conversation with Guy Garcia about her being banned?

Q. Sir, don't change my hypothetical. I'm giving you hypothetical based on my hypothetical.

If you learned on that day from Joe Johnson after you spoke with Guy Garcia that his statements are not accurate in any shape or form, that she was there three times before, that she was banned from the store in any shape or form, that you -- if you've learned that -- from Joe Johnson, that Guy Garcia is not accurate in rendition of what happened, would you have made this arrest or not?

That's all I want to know. Based on that hypothetical. I don't want other hypotheticals. That's for your lawyers.

Based on that hypothetical, would you have made the arrest?

MR. KANG: And same objections.

THE DEPONENT: Okay. Well, if that came -- if that came about, then yes, I would have just told her to leave.

BY MS. MKRTCHYAN:

Q. And yet you didn't speak with Joe Johnson; true?

A. True.

11:49 Q. There's no indication in your report that, in fact, you spoke with his manager who was present at the scene, Joe Johnson; true?
11:49 A. Because I didn't need to.
11:49 Q. Okay. So and then, yet, she was placed in the patrol car for about at least 18 minutes. We don't know when she was placed there. She was in handcuffs. She had a face mask on her face which, you know, she complained of breathing problems, as we hear on the patrol; true?
11:49 A. True.
11:49 Q. Could that have been prevented? Let's say if you have -- immediately, hypothetically, you came to the scene, let's say you don't trust her. You don't believe her. She's upset, et cetera. She's an unhappy customer. You don't trust her.
11:50 You speak with Joe Johnson, you speak with Guy Garcia, you say my -- that potentially there is a trespass, you could have potentially, instead of placing in a patrol car, cited her and released her with the trespass ticket; true?
11:50 A. There was -- there was a lot in that.
11:50 Q. Well, okay.
11:50 MR. KANG: Objection. Compound.
11:50 ///

11:50 BY MS. MKRTCHYAN:
11:50 Q. There's a lot with what? I gave you -- you know, you had the option to just cite her and release her without placing her in the patrol car; yes or no?
11:50 A. If her demeanor had changed and wasn't the way it was, yes, I could have.
11:50 Q. Well, her demeanor was upset because she was seated in a patrol car; right? She was screaming because she was in a patrol car.
11:50 A. It was before that.
11:50 Q. Okay. But you could have initially, you know, talked to Guy Garcia, you could have had her be detained. You know, there are different ways of detaining someone; right? No. 1, for example; right?
11:50 A. Yes.
11:51 Q. Okay. It actually can be, you know, someone is standing outside of the patrol car, and another officer is next to her to see if she's going to leave or -- you know, et cetera; right?
11:51 A. Yes.
11:51 Q. Okay. There's also detention, you can handcuff her standing outside the patrol car; true?
11:51 A. Yes.

11:51 Q. That's another way of detaining someone. And you have three other officers at least; right?
11:51 A. Yes.
11:51 Q. Nairi Gazandjian arrives, four officers; right?
11:51 A. Yes.
11:51 Q. Five officers at the scene?
11:51 A. Yes.
11:51 Q. Okay. So in other words, you had different options of detaining her, if you needed to do that; true?
11:51 A. Yes.
11:51 Q. But you decided -- you personally decided to actually place her in the patrol car, which is that -- isn't that the most significant intrusion into someone's privacy, when you're detaining and placing them in the patrol car?
11:51 MR. KANG: Objection. Calls for a legal conclusion.
11:51 THE DEPONENT: No.
11:51 BY MR. KANG:
11:51 Q. Well, okay. Is there any other elevated detention? I mean, is there any other way of detaining someone aside from that?
11:52 A. Could have hobbled her, yeah. There's many

11:52 ways actually.
11:52 Q. Okay. So but -- all right.
11:52 So you used, though, this -- making someone sit in a patrol car is a -- it's a -- it's a complete detention; right? The person cannot leave; right?
11:52 A. Yes.
11:52 Q. It's an enclosed space; right?
11:52 A. Yes.
11:52 Q. And if someone is wearing a face mask, do you reasonably think that that person could have difficulty breathing?
11:52 A. No.
11:52 Q. No?
11:52 If the person is claustrophobic, are you trained to recognize signs of someone who's got claustrophobia?
11:52 A. When they bring it up in the first aid.
11:52 Q. Okay. Yes.
11:52 What is claustrophobia?
11:52 A. Someone who can't deal with tight spaces.
11:52 Q. Right. Have you had -- like, in your experience as a police officer for this many years, now six years, how many times have you had people having an anxiety attack in your patrol car?

11:52 A. A lot.
11:52 Q. Okay. And you're trained to, you know -- you know, to recognize those symptoms; right?
11:52 A. Yes.
11:52 Q. What are the symptoms of an anxiety attack?
11:53 A. Someone's who's very anxious, and they say they can't breath and things like that.
11:53 Q. Hyperventilating?
11:53 A. Yes.
11:53 Q. Inability to breathe?
11:53 A. If they calm themselves down, yes.
11:53 Q. Heart palpitations?
11:53 A. I -- I don't know that deep into it.
11:53 Q. Are you trained to call paramedics if you see someone is hyperventilating?
11:53 A. Yes.
11:53 Q. If you see someone is having difficulty breathing?
11:53 A. Yes.
11:53 Q. And anxiety attack can also be someone who's screaming; right?
11:53 A. No, not all the time.
11:53 Q. Really.
11:53 So if someone cannot respond to your questions, is screaming, is unable to have a normal

conversation, that cannot be one of the symptoms of an anxiety attack? You're not trained in that?

A. It can and can't be.

Q. So you're aware that if someone is having panic attack, anxiety attack, that person can be nonresponsive to direct questions; true?

A. Not all the time.

Q. Well, "yes" or "no," have you seen people who have -- you know, you said that you've seen people having panic attack in the car?

A. Yes.

Q. Okay. And in those situations, what do you do? What is your responsibility to do?

A. Try to talk to them. Talk to them and calm them down and -- and get them to focus on their breathing.

Q. Uh-huh.

A. And --

Q. And what --

A. More oftentimes than not, I've been able to do that and not have to call fire departments.

Q. What if it doesn't help?

What if someone is not calming down when you talk to them and they still continue to have anxiety attack, what do you do then?

11:54 A. Then I'll give them -- I'll give them medical aid and roll down the windows and go about it that way.
11:54 Q. Can you try to get them out of the patrol car, out of the enclosed space?
11:54 A. Well, that depends on the person.
11:54 Q. What if someone had -- let me do this.
11:54 You're trained as a police officer. What is the first No. 1 consideration aside from officer safety when you're doing your job duties?
11:55 A. The safety of the person we --
11:55 Q. Right.
11:55 (Simultaneous dialogue.)
11:55 (Reporter clarification.)
11:55 THE DEPONENT: We're dealing with.
11:55 BY MS. MKRTCHYAN:
11:55 Q. Public safety or the suspect safety; right?
11:55 A. Yes.
11:55 Q. Because if the person dies in your custody, what is that to you? Liability for you; right?
11:55 A. Yes.
11:55 Q. Okay. And your -- have specific training how to determine if this is a medical emergency or not; right?
11:55 A. Yes.

11:55 Q. You also have training to recognize if someone's disabled; true?
11:55 A. Yes.
11:55 Q. Okay. So if someone, for example, tells you, that, "Look, I have a medical condition. I have a disability. I cannot breathe with a face mask. Lower my face mask," would that entail some obligation for you to do something in that regard?
11:55 MR. KANG: Objection. Incomplete hypothetical. Assumes facts not in evidence.
11:55 You can answer the question.
11:55 THE DEPONENT: If it were me?
11:55 BY MS. MKRTCHYAN:
11:55 Q. Yes.
11:56 A. It all --
11:56 Q. We're asking you.
11:56 A. It depends on the circumstance also. If it's unsafe for me to do that, then no.
11:56 Q. Okay. So but in this situation, if Ms. Burmayan is sitting in the car, she's saying, "I cannot breathe. Lower my face mask," what would be your obligation in that regard?
11:56 A. I would try to lower the face mask.
11:56 Q. Okay. And we don't see Officer Armendariz doing that; right?

A. I can't speak for him.
Q. Okay. But would you have done that in his place, if she's asking for her face mask to be lowered?
A. Possibly, yes.
Q. Okay. And would you also have tried to take her out of the patrol car if she's hyperventilating, having hard time breathing?
A. No.
Q. Well, she's sitting in the patrol car. You know, let' watch this a little bit.
Did you ever --
A. Before we watch, could we take a break real quick?
MS. MKRTCHYAN: Sure. Yeah. Let's take a -- well, actually we're very close to lunch break. Let's take a lunch break. And then we'll continue.
THE DEPONENT: Okay.
MS. MKRTCHYAN: So let's take --
MR. KANG: 30, 45?
MS. MKRTCHYAN: Yeah, 45, 50 minutes. An hour? Do you --
THE REPORTER: Could we go off the record?
MS. MKRTCHYAN: Huh?
MR. KANG: Yeah, off the record.

THE REPORTER: Off the record?
MS. MKRTCHYAN: Yes.
(Whereupon, a lunch recess was taken from 11:57 a.m. to 12:47 p.m.)

--oo0oo--

Glendale, California
Tuesday, November 21, 2023
12:47 p.m.
-oo0oo-

12:47 MS. MKRTCHYAN: So let's get back on the record after lunch session.

11:57 EXAMINATION (resumed)
11:57 BY MS. MKRTCHYAN:
12:47 So, Officer, you're still under oath --
12:47 A. Yes.
12:47 Q. -- as a reminder.
12:47 So we left off, I was asking you about, you know, the point in time when -- if someone had some sort of a disability placed in a patrol car generally.
12:47 But, you know, as an officer, obviously you also have some training about treating people with some disabilities; right?
12:47 A. Yes.
12:47 Q. Okay. So you have to accommodate such requests; right?
12:47 A. Yes.
12:47 Q. So you told us that if Ms. Burmayan had a

12:47 breathing problem, you know, and if you heard this, you would have lowered her face mask; right?
12:47 A. Yes.
12:47 Q. Okay. But when you wrote your report, we saw your report, did you have any discussions with Officer Armendariz prior to writing your report?
12:48 A. No.
12:48 Q. Why not? If he was present at scene, wouldn't you want to talk and find out what happened while you were gone?
12:48 A. We didn't need to discuss that.
12:48 Q. Why not?
12:48 A. 'Cause we didn't need to.
12:48 Q. Well, then were you aware that she was screaming from breathing problems?
12:48 A. No.
12:48 Q. So if -- for a point in time, you said that you left her in the patrol car with Officer Armendariz and Duncan and Ruiz; right?
12:48 A. They were there, yes.
12:48 Q. But Armendariz was the main officer who was dealing with that; right?
12:48 A. Yes.
12:48 Q. So -- and Duncan, Ruiz, did they ever get involved in your investigation?

12:48 A. I don't -- I don't know.
12:48 Q. Did they come and talk with anyone at the CVS?
12:48 A. I don't know.
12:48 Q. Okay. Did they write reports?
12:48 A. No.
12:48 Q. No.
12:48 So you were the investigating officer --
12:48 A. Yes.
12:48 Q. -- at scene? Okay.
12:48 So if Officer Armendariz was with Ms. Burmayan and you said that you didn't hear what she was screaming about --
12:48 A. Uh-huh.
12:48 Q. -- why wouldn't you talk to him and find out what she was screaming about?
12:49 A. Because he's been an officer for quite some time, and he can handle himself. And if he felt that something needed to be dealt with, then he could have done that.
12:49 Q. Yes. But you -- I mean, from your perspective, when you're writing -- summarizing this incident in your report, generally speaking, when you're working with partners or with other officers in prior incidents, you speak with them prior to

12:49 writing reports; right?
12:49 A. If it's relevant, yes.
12:49 Q. Okay. So if another officer is in any way
12:49 helping you in your investigation, you write that in
12:49 your report; right?
12:49 A. Yes. But in this case, he didn't help me
12:49 other than just stand by with her.
12:49 Q. I see.
12:49 So in other words, you didn't have any
12:49 discussions with Armendariz to find out what was she
12:49 screaming about prior to your writing report?
12:49 A. No.
12:49 Q. And in your report, we don't have any
12:49 indication at all, whatsoever, that she was
12:49 complaining of anything, of, you know, having
12:49 medical issue or having breathing problems in the
12:49 car, there's no word about that in your report;
12:49 true?
12:50 A. True.
12:50 Q. Were you aware of that when you were
12:50 writing this report?
12:50 A. No.
12:50 Q. Okay. But you were aware she was loud and
12:50 screaming, she was sitting in the patrol car; right?
12:50 A. Yes.

12:50 Q. Okay. So what -- what was your understanding she was screaming about?
12:50 A. She was loud and screaming. People do that all the time in the back of a police car.
12:50 Q. Okay. But -- so you were not -- you could not make out -- even though you were -- just like you said -- how many feet away when you were talking outside the store with Guy Garcia?
12:50 A. From the car or from the entrance?
12:50 Q. Yeah. From the -- no.
12:50 So how far was your car from the entrance where you were speaking with Officer Garcia?
12:50 A. Maybe 60 to 80 feet. If I remember -- if I remember right.
12:50 Q. But so you could tell she was screaming, but you could not tell what she was screaming about?
12:50 A. Yes.
12:50 Q. And when you came back, you did have discussions with her; right?
12:50 A. I talked to her about the incident.
12:50 Q. Okay. About anything else?
12:50 A. Not about any medical conditions or anything like that.
12:51 Q. I see.
12:51 So at the time you came, you -- actually,

though, you took her out of the car; right?
A. I believe I spoke to her first, and then I took her out of the car.
Q. How many minutes you spoke to her --
A. I don't know.
Q. -- prior to taking her out of the car?
A. I don't know.
Q. Okay. So in any -- in any event, in your report, even though Officer Armendariz was your partner at the scene or, you know, stand by, being on stand by with this incident, you didn't point any facts to put anyone on notice that Ms. Burmayan was complaining of something; right?
A. I was not made aware of anything that she was saying.
Q. But if you had spoken with Armendariz, you would have learned that she was complaining of breathing in the car; true?
A. But I didn't need her -- I didn't need him to ask her any questions. So anything relevant that he --
Q. Uh-huh.
A. -- if there was any issues, he would have brought it up to me.
And like I said, he's been an officer for

12:51 some time.
12:51 Q. Uh-huh.
12:51 A. So he would have brought up something that should have been documented. And if he didn't, then nothing needed to be documented.
12:52 Q. I see.
12:52 And so but according to your policy -- let me ask you this: Do you have a policy in terms of reporting incidents, writing reports; right?
12:52 A. Uh-huh.
12:52 Q. Right?
12:52 A. Yes.
12:52 Q. And, you know, generally speaking, if a partner does something, you are obligated to writing the report; right?
12:52 A. Depends on what it is.
12:52 Q. Like what? What kind of -- let me ask you this: If -- if -- in this scenario, if she's complaining of breathing and Officer Armendariz is not doing anything, he is not summoning medical attention, he is not lowering her face mask, he's just basically talking to her, telling her, you know, calm down, et cetera -- you heard the patrol tape; right? You heard that?
12:52 A. Yes.

12:52 Q. That's what he's saying. He's, like, "Calm down," you know, basically, et cetera. He's just telling her to calm down and slow down and -- you know, he's talking to her; right?
12:52 A. Uh-huh. Yes.
12:52 Q. That's all he's doing. Doesn't summon medical attention; right?
12:52 A. Yes.
12:52 And I explained, also, that we also talk to people that are having panic attacks and anxiety issues and stuff like that. And we talk to people. And more oftentimes than not, they're able to calm down and slow their breathing down and not have the need to call fire personnel.
12:53 Q. I understand that. My question is different. My focus is on the fact that if Officer Armendariz is involved in this, and, you know, he's involved in this investigation, is it incumbent on you to learn from him, facts that you need to put down in your report?
12:53 A. No, not all the time.
12:53 Q. So his involvement in this investigation is not relevant at all to you?
12:53 A. If there was something concerning, then you would have to take that up with him on his --

12:53 Q. Uh-huh.
12:53 A. -- when you spoke with him. But as far as what -- his involvement and reporting it to me? I -- I was not there. So I have no idea. If I was right there and it was me?
12:53 Q. Uh-huh.
12:53 A. Like you keep asking me?
12:53 Q. Uh-huh.
12:53 A. Then who knows if I would have done anything different.
12:53 But she -- at the end of this video that you're going to play and that I've watched, she is able -- we're able to talk to her and calm her down --
12:54 Q. Uh-huh.
12:54 A. -- and there's no need for that. She's able to actually breathe --
12:54 Q. Uh-huh.
12:54 A. -- with her mask on, catch her breath. And there's no medical concerns or conditions.
12:54 Q. Okay. But at the time, you didn't know of that; right? You didn't watch the patrol video until this deposition; right?
12:54 A. Yes.
12:54 Q. Okay. So at the time she's screaming,

though, you didn't make a point to go and find out what's going on, why she's screaming. Is she screaming because she's upset in the patrol car or is she screaming because she's having an anxiety attack.

A. Well, like you said, there's three other officers there and around --

Q. Right.

A. -- that have been officers for quite some time, and they -- they should know what needs to be done and what --

Q. Okay.

A. -- doesn't need to be done.

Q. Sir, but your policy requires you -- if you witness another officer do something that is outside the policy, you are to report -- you have to report it to your department; true?

A. If I would have known about it, then yes.

Q. Right. But if you -- if you are not making any efforts to learn, how would you know about it?

A. But again, it doesn't meet that criteria. So I don't need to --

Q. Okay.

A. -- be informed of that.

Q. I see.

12:55 So but you're aware that your department requires you, if you watch any officer do something that is outside the bounds of policy or not providing medical aid, first aid, you have to report it to the department or you have to take steps to accommodate that; true?
12:55 A. Yes.
12:55 Q. Okay. So if you, for example, approached at the time when she was screaming, that moment in time when she was screaming and Officer Armendariz was standing by and you saw that she was having breathing problems, would you have done something?
12:55 A. I would have talked to her and -- just like he did.
12:55 Q. Uh-huh.
12:55 A. And talked to her and tried to bring her down. And if she wasn't able to, and calm down and appropriately catch her breath, then yes, I would have called fire. But -- but in this circumstance, and in this video --
12:55 Q. Uh-huh.
12:55 A. -- she was able to calm down --
12:55 Q. Uh-huh.
12:55 A. -- catch her breath --
12:55 Q. Uh-huh.

12:55 A. -- breathe, and had a normal conversation.
12:56 Q. Well, that's what appears to you from the video.
12:56 A. Yes.
12:56 Q. Okay. And you said, though, earlier, that you would have lowered her face mask; right? There's no reason for her to have the face mask fully covering her face when she's alone in a patrol car; true?
12:56 There's no danger to you if you're not in the car?
12:56 A. Well, like you said, we are in a COVID times.
12:56 Q. Okay.
12:56 A. So they need to wear masks.
12:56 Q. Are you backtracking from your earlier testimony?
12:56 A. I'm not backtracking from my earlier testimony.
12:56 Q. Okay.
12:56 A. You're saying we're in COVID times, and people need to wear masks.
12:56 Q. Okay.
A. So I'm just saying --
(Simultaneous dialogue.)

(The reporter requests the parties
speak one at a time.)
BY MS. MKRTCHYAN:
12:56 Q. You are earlier testifying, that if you had known she had a breathing problem, you would have lowered her face mask; "yes" or "no"?
12:56 A. If I was in that situation and the role was reversed --
12:56 Q. Uh-huh.
12:56 A. -- if it was safe enough to do so --
12:56 Q. Uh-huh.
12:56 A. -- then yes, I would -- I would have.
12:56 Q. Okay. And at the time, even though it was a pandemic, are you aware that the State of California Department of Health had certain exemptions for wearing face masks for people with disabilities?
12:57 Are you aware?
12:57 A. Yes.
12:57 Q. What kind of disabilities were those?
12:57 A. I don't know what the -- what exact disabilities it was, but I do know there was something in place to cover the disabilities.
12:57 Q. Right.
12:57 And did Glendale face mask mandate have

such exemptions you were aware of?

A. I would say yes. But I can't be a hundred percent. I mean, they -- they were -- we were following the -- the guidelines pretty strictly.

Q. Okay. So let's look at California Department of Public Health Guidance, Health and Human Services Agency from State of California, June 18, 2020 Guidance For the Use of Face Coverings.

Let's look at some of the guidelines. "People in California must wear face coverings when they are in the high-risk situations listed below," et cetera.

And then it comes down to following, "Individuals are exempt from wearing a face covering: Persons with a medical condition, mental health condition or disability that prevents wearing a face covering.

"This includes persons with medical condition for whom wearing a face cover could obstruct breathing or who are unconscious, incapacitated, or otherwise unable to remove a face covering without assistance."

So is this what you meant when I asked you about exemptions, exceptions, et cetera, about face

12:58 mask mandates?
12:58 A. If that's what the State put out, then yes.
12:58 Q. So you were aware of this at the time?
12:58 A. Yes.
12:58 Q. There was no reason that if she is telling to Officer Armendariz -- let's say you were Officer Armendariz and she's saying, "I cannot breathe, can you lower my face mask," would there be any reason for you not to do that, if she's telling you?
12:58 MR. KANG: Objection. Calls for speculation.
12:59 THE DEPONENT: If it was safe to do so --
12:59 BY MS. MKRTCHYAN:
12:59 Q. Uh-huh.
12:59 A. -- then yes, I would have.
12:59 But I also would have talked to her and tried to calm her down in that way.
12:59 Q. Well, but if she said --
12:59 A. But I would have tried to -- sorry.
12:59 I would have tried to accommodate her.
12:59 Q. Okay. And you don't see any effort by Armendariz to accommodate that, except from talking to her; right?
12:59 A. If that's what he felt was the best way to

12:59 handle the situation, then that's what he felt. I can't answer it for his actions.

12:59 Q. Yes. But it says "are exempt." These people are exempt who have a disability. It doesn't say when it's safe, this entire face mask mandate is aware about safety concerns; right? It's the State of California promulgated departmental guidance; right?

12:59 MR. KANG: Objection. Calls for speculation.

12:59 BY MS. MKRTCHYAN:

12:59 Q. Right?

12:59 MR. KANG: Misstates the document.

12:59 BY MS. MKRTCHYAN:

12:59 Q. Right?

12:59 A. Yes. If that's what was put out the by the State, yes.

12:59 Q. This is for all Californians to follow by the Department of Health, Public Health, in the State of California. We have the governor's stamp there. This is the official document. They're aware of all the safety risks. This is California Department of Public Health publication; right?

13:00 Do you have any doubt?

13:00 MR. KANG: Objection. Calls for

13:00 speculation. Document speaks for itself.
13:00 BY MS. MKRTCHYAN:
13:00 Q. Do you have any doubt that this is the Public Health Department document?
13:00 A. If that's what was put out, then no.
13:00 Q. Okay. So it doesn't say -- it's just exempt, it's people who have a disability; right?
13:00 A. It does not exempt?
13:00 Q. It -- it does exempt people --
13:00 A. Oh, yes.
13:00 Q. -- with disability. Okay.
13:00 So, then, it's not a, you know, discretionary effort. If someone says, "I have a disability, medical condition, I cannot wear a face mask," you're obligated to follow that -- right? -- because the person cannot breathe.
13:00 MR. KANG: Objection. Incomplete hypothetical. Assumes facts not in evidence.
13:00 THE DEPONENT: If she had said that she had a disability or requested fire personnel to respond, then those -- those would have been -- that would have been handled.
13:00 But I wasn't there. So I don't know what was -- what was said between them.
13:00 ///

13:00 BY MS. MKRTCHYAN:
13:00 Q. Okay. So the fire department doesn't come,
13:01 she says, "Can you lower my face mask so that I can
13:01 breathe," you could have done that; right?
13:01 A. If it was safe to do so, then yes.
13:01 Q. If it was safe to do so.
13:01 What do you mean by safe to do so? This
13:01 policy says, you know, they're exempt from wearing
13:01 it entirely.
13:01 MR. KANG: Objection. Asked and answered.
13:01 THE DEPONENT: If it was safe --
13:01 MR. KANG: Objection. No question pending.
13:01 MS. MKRTCHYAN: Excuse me. There is a
13:01 question pending.
13:01 BY MS. MKRTCHYAN:
13:01 Q. Sir --
13:01 MR. KANG: No. You made a statement, "This
13:01 policy says something-something." You never asked a
13:01 question about it.
13:01 MS. MKRTCHYAN: There was a question
13:01 pending, and he was answering it.
13:01 MR. KANG: What is the question?
13:01 Ms. -- Madam Court Reporter, can you please
13:01 read back the question -- what the question was?
13:01 MS. MKRTCHYAN: You know what? You're

13:01 obstructing this deposition. Okay?

13:01 MR. KANG: There is no question pending.

13:01 MS. MKRTCHYAN: Really?

13:01 MR. KANG: Well, let's figure it out, if
13:01 there's a question pending then.

13:01 MS. MKRTCHYAN: Wow, you know what? Your
13:01 attitude. Yeah. Seriously?

MR. KANG: Can you please --

THE REPORTER: Give me a second.

"If it was safe to do so -- "

MS. MKRTCHYAN: That was rude. That was really rude.

13:01 MR. KANG: Can you please also capture her
13:02 comments under --

13:02 MS. MKRTCHYAN: Yeah. It's rude. It's
13:02 being rude.

13:02 MR. KANG: Thank you.

13:02 MS. MKRTCHYAN: Yes.

13:02 THE REPORTER: If I'm going to read back,
13:02 nobody can speak.

13:02 MS. MKRTCHYAN: Read back the question that
13:02 was posed to him.

13:02 (The last question was read by the
13:02 reporter.)

13:02 ///

13:02 BY MS. MKRTCHYAN:
13:02 Q. If it was safe. You're saying if it was safe to do so. But the policy states that they are exempt.
13:02 So the policy doesn't say that if it safe to do so; right?
13:02 Read -- let's read the policy again.
13:02 "The following individuals are exempt from wearing the face covering."
13:02 Does this qualify whether it's safe or not?
13:02 A. According to that policy, no.
13:02 Q. I'm sorry?
13:02 A. According to the policy that's put out, no.
13:03 Q. Okay. So but are you saying that at the time, you were not aware at all of this exemption by the California Department of Health?
13:03 MR. KANG: Objection. Misstates prior testimony.
13:03 THE DEPONENT: I know there was exemptions. I didn't know exactly what.
13:03 BY MS. MKRTCHYAN:
13:03 Q. Okay. And so -- but in any event, let's look at your Glendale Ordinance on face coverings to see if it's in compliance with the State mandates of the -- we have -- you know, were you -- first of

13:03 all, did you get any sort of, like, handouts of the
13:03 Glendale face mask requirements during your training
13:03 as a police officer?
13:03 Like, what guidance were you following
13:03 during pandemic?
13:03 A. I'm sure there was a --
13:03 (Reporter clarification.)
13:03 THE DEPONENT: I'm sure there was a
13:03 handout.
13:03 BY MS. MKRTCHYAN:
13:03 Q. Okay. Were you following some guidance or
13:03 policy or ordinance in place?
13:03 A. Policy.
13:03 Q. Okay. So we have -- right now, I have in
13:03 front of me, ordinance by the Glendale City, you
13:04 know, public measure, or whatever they call that,
13:04 April 10, 2020, "Face coverings for workers and
13:04 customers of potential services."
13:04 Have you ever seen this document?
13:04 A. I can't recall.
13:04 Q. Were you -- okay.
13:04 So how would you know about face mask
13:04 mandates?
13:04 A. We were told during briefings and -- and
13:04 emails and things like that.

13:04 Q. So you were just verbally told?
13:04 A. And emails.
13:04 Q. Okay. You were not handed out any guidance such as this?
13:04 A. We may have.
13:04 Q. You may have.
13:04 A. Yes.
13:04 Q. Okay. So let's look at this and see whether it actually, you know, provides any sort of, you know, accommodations for disabled people.
13:04 It says, Section 4, "All customers and visitors of businesses and organizations described in Section 1 of this Public Order must wear face covering over their noses and mouths to provide additional protection for employees and customers.
13:04 "At this time face coverings need not be medical-grade masks or N95 respirators, but can be fabric coverings, such as scarves and bandana coverings."
13:05 Do you see that?
13:05 A. Yes.
13:05 Q. Okay. So this one, for example, this ordinance does not provide any guidance to anyone about the exemptions by the State Department -- by the State Health Department; true?

13:05 It doesn't say, oh, in what circumstances someone may be exempt; true?

13:05 MR. KANG: Objection. Calls for speculation.

13:05 THE DEPONENT: The section that you're showing me? It does not -- I would have to read through the whole document.

13:05 BY MS. MKRTCHYAN:

13:05 Q. Okay. But if I read this -- you know, if you want, I'll, you know, have you read this entire thing. But I can tell you, I've read it. And it, on its face, doesn't provide that kind of an exemption.

13:05 So all I want to know, if within your city of Glendale, during this period of time, 2020/2021, that you were operating as a police officer, if you ever, ever received any training that there are exemptions for people with disabilities for face mask mandates?

13:06 A. I don't know if it was an actual official training. But like I said, handouts, emails, verbal. Things like that.

13:06 Q. You were aware of the exemptions?

13:06 A. Exact exemptions, I can't be 100 percent if I was told it or if there was just exemptions that

13:06 have been listed --
13:06 Q. Uh-huh.
13:06 A. -- that needed to be followed.
13:06 Q. Uh-huh. But from, you know, outside of your training as a police officer, as a human being, were you aware of exemptions?
13:06 A. Outside of work, only -- only -- only because of work, I knew about these things.
13:06 Q. Okay.
13:06 A. But doing my own research outside of work, no.
13:07 Q. So as an employee, let's say as an employee, if you yourself had a disability, breathing disability, were you aware that you could, you know, be exempt from face mask covering?
13:07 MR. KANG: Objection. Incomplete hypothetical.
13:07 THE DEPONENT: Well, like I said, other than being -- getting the information from work, I didn't do any research on it.
13:07 BY MS. MKRTCHYAN:
13:07 Q. Okay. In other words, though, you were generally aware that some people were exempt?
13:07 A. Yes.
13:07 Q. But you didn't know specific parameters?

13:07 A. Yes.
13:07 Q. So if, though, you know, someone had a medical condition that prevented them from wearing face masks, you were aware of that?
13:07 A. Yes.
13:07 Q. And if, for example, instead of Officer Armendariz, you were next to Ms. Burmayan and she said, "I have a breathing problem, I have a medical condition. Can you lower my face mask," you would have done that; true?
13:07 MR. KANG: Objection. Compound. Assumes facts not in evidence.
13:07 THE DEPONENT: If it were me --
13:07 BY MS. MKRTCHYAN:
13:07 Q. Uh-huh.
13:07 A. -- and I was next to him at the time, if it was safe, yes, I would have.
13:07 Q. Okay. Now -- and generally, if someone is -- let's say they are disabled, what kind of steps -- there are there disabilities that are physical; right? Someone is in wheelchair or someone has some sort of speech problem, other disabilities are not readily apparent; right?
13:08 A. Some disabilities are not apparent?
13:08 Q. Yes.

13:08 A. Like, they would have to tell me that they --
13:08 Q. Yes.
13:08 A. -- actually had it?
13:08 Q. Okay. Yes. I want to know.
13:08 So there are visible and invisible disabilities; right?
13:08 A. Yes.
13:08 Q. Okay. So you do receive training about, you know, accommodating disabled people?
13:08 A. Yes.
13:08 Q. Okay. So if someone has invisible disability, such as developmental disability, speech disability, or breathing disability or mental health condition, how do you find out, that? What do you do to find out?
13:08 A. The questions. And based on the severity of it.
13:08 Q. Well --
13:08 A. Sometimes -- sometimes people have disabilities that are very minor, that you cannot tell on face value. So unless you actually go down the path of asking all those questions, then I will never know.
13:09 Q. Right. So but then what kind of questions

13:09 do you ask of someone?
13:09 A. It depends on the disability.
13:09 Q. Is there any, like -- within the Glendale
13:09 Police Department, do you carry FI cards?
13:09 A. I do.
13:09 Q. Would you?
13:09 Did you fill out FI card with Ms. Burmayan?
13:09 A. No.
13:09 Q. What does those categories cover for field
13:09 interview cards?
13:09 A. It's the descriptives of the person and
13:09 what they're wearing and all that stuff.
13:09 Q. Okay. Does one of those categories cover
13:09 "Do you have a disability?"
13:09 You have one.
13:09 A. Let me find out.
13:09 Q. Let's find out. 'Cause I've seen those.
13:09 Some of them do, some of them don't.
13:10 MS. MKRTCHYAN: For the record, the officer
13:10 is looking at this field interview card that he
13:10 carried with him.
13:10 THE DEPONENT: So it doesn't mention
13:10 disabilities, but it says physical oddities.
13:10 BY MS. MKRTCHYAN:
13:10 Q. Oh. What -- oddities? Okay.

13:10 A. Yes.
13:10 Q. So that's -- that's --
13:10 A. It falls in the same line as tattoos, scars, and things like that.
13:10 Q. I see.
13:10 So that could apply to someone who might have some sort of a disability, you think?
13:10 So if you ask someone you have physical oddities, how do you understand that question?
13:10 How would you explain that question to someone?
13:10 A. Someone that's not very -- you know, maybe have some kind of mobile disability or anything like that. Can't function with, like, their arm or, you know, things like that.
13:10 Q. Okay. So when you're doing this infield investigations, et cetera, such as this with Ms. Burmayan, and before you place them in patrol car, is it your practice, training, and policy to ask this individual, "Ma'am, do you have a disability that I should be aware of?"
13:11 A. Not that I'm aware of, no.
13:11 Q. Why wouldn't you? Let's say someone actually like this covered, with claustrophobia, ended up being in a patrol car, can have heart

13:11 palpitations, can, in fact, have a heart attack, you know, from claustrophobia, because if she has a big heart, she may die, for example. Just giving you hypothetical.

13:11 If that is the case, doesn't your department kind of train you to find out before placing someone in a patrol car if they have some degree of limitation that needs to be accommodated?

13:11 A. No, not in a patrol car. If we're going to go to the jail and actually book that person into a custody facility, then there's a medical questionnaire that we have to ask. If they're simply just being detained in the back of a patrol car, we don't have to ask those medical questions.

13:11 Q. Okay. So the department doesn't require you to find out.

13:11 But if someone is voicing a concern, then you should be alert; right?

13:11 A. If they're voicing those issues, then yes, we should take the --

13:12 Q. Okay.

13:12 A. -- we should take the proper steps.

13:12 Q. So here is what Ms. Burmayan is alleging in this case.

13:12 And you might be aware, she has testified

in this case that, in fact, when you approached her first and initiated contact, she advised you and she showed you medical paperwork that she had a medical disability, that she was having problems with CVS employees because she -- they were not accommodating her face mask mandate, she had a breathing problem, and she was complaining about it, and she was telling you all of that, she was communicating, even though she was upset. She has testified to that.

Are you denying that that happened?

A. Yes.

Q. Okay. And we don't have the recording of this to prove one way or another; right?

A. Yes.

Q. Okay. Would it have been a wonderful thing to have for us this initial contact with Ms. Burmayan on video or -- or audio?

A. It would have.

Q. And then she also advised -- or she testified under oath that she -- before she was placed, you know, to the -- taken to the patrol car, she advised you that, "Sir, why -- I cannot -- you know, I cannot breathe. Why are you handcuffing me? I have a disability."

You know, she was advising you of that.

13:13 Are you denying that, sir?
13:13 A. Yes.
13:13 Q. Okay. Which again, we don't have any
13:13 recording of this conversation.
13:13 A. Yes.
13:13 Q. Okay. And yet, though, in accordance
13:13 consistent with your testimony -- testimony, on
13:13 patrol video, she does complain of breathing
13:13 problems; true?
13:13 A. In the in-car video, yes.
13:13 Q. Okay. So let's play some of this
13:13 audio/video, and I will ask you some questions.
13:13 MS. MKRTCHYAN: So for the record, I'm
13:13 going to play the video patrol car from
13:14 Officer Ross's car.
13:14 (Video recording playing.)
13:14 BY MS. MKRTCHYAN:
13:14 Q. Is this the tape you've heard before?
13:14 A. Yes.
13:14 Q. Okay. How many times on the ballpark she
13:14 has, you know, used the word, "Please, please,
13:14 please"? In the ballpark. Would you have an
13:14 estimate?
13:15 A. Maybe three, four.
13:15 Q. Okay. No, not -- not -- from the entirety

13:15 of the tape that you heard.
13:15 A. Oh. I -- I have no idea.
13:15 Q. Multiple times; right?
13:15 A. Yes.
13:15 Q. A dozen times?
13:15 A. She already started saying it in the 24 seconds that it's been playing.
13:15 Q. Right. And what is your understanding right now, as of right now, you're watching this at 54 minutes -- I mean, 54 seconds, one-minute tape, what is your understanding she's complaining right now about?
13:15 A. She's saying, "Please, sir," and she can't.
13:15 Q. She can't what?
13:15 A. She probably doesn't want to be in the back of the police car.
13:15 Q. That's what you understand?
13:15 A. Yes.
13:15 Q. So you can't tell right now that she's actually saying, "I cannot breathe"?
13:15 A. No.
13:15 MR. KANG: Okay. Whatever. Go ahead.
13:15 BY MS. MKRTCHYAN:
13:15 Q. From --
13:15 MS. MKRTCHYAN: Excuse me, sir, you know,

again --

MR. KANG: Objection. Putting -- putting words into the deponent's mouth. Misstates his prior testimony.

MS. MKRTCHYAN: Speaking objection.

MR. KANG: It's not a speaking objection. I'm making an objection.

MS. MKRTCHYAN: That's a speaking objection.

MR. KANG: I don't think you understand what a speaking objection is.

MS. MKRTCHYAN: You know? I think you don't know how to behave in a deposition.

MR. KANG: That's funny, coming from you.

MS. MKRTCHYAN: Yeah.

MR. KANG: Yeah.

MS. MKRTCHYAN: Okay.

BY MS. MKRTCHYAN:

Q. 54 minutes -- seconds. So let's continue playing this.

So you -- from your watching this video, you cannot tell whether she's actually complaining of having problems with breathing?

A. No.

(Video recording playing.)

13:16 BY MS. MKRTCHYAN:
13:16 Q. And she in handcuffs -- right? -- though? She's in handcuffs; right?
13:16 A. Yes.
13:16 Q. And she's wearing her face mask, fully covering her face; right?
13:16 A. Yes.
13:16 Q. So if she had wanted to lower her face mask, would she have been able to do that?
13:16 A. Yes.
13:16 Q. What do you mean? She.
13:16 A. Yes.
13:16 Q. How?
13:16 A. People do it all the time in the back of the car, all the time.
13:16 Q. How? If -- in handcuffs?
13:16 A. Yes.
13:16 Q. Oh, I see.
13:16 A. They use their shoulders, they use their knees. If they -- if a person wants --
13:17 Q. Uh-huh.
13:17 A. -- that mask off, they will find any reason -- or any way possible to get that mask off. And I've seen it many, many times.
13:17 Q. So you're speculating, though, that she was

13:17 able to do that?
13:17 A. Not speculating. I've seen it done multiple times.
13:17 Q. I see. Okay.
13:17 Well, you can't speak for Ms. Burmayan on her ability to do that, can you?
13:17 A. No.
13:17 Q. I'm asking you, if you know.
13:17 So you're saying you've seen that before it happened, but you can't speak for her on her behalf, whether she could do that; right?
13:17 A. I said I've seen people do it all the time.
13:17 Q. But can you speak on her behalf?
13:17 A. No.
13:17 Q. Okay.
13:17 (Video recording playing.)
13:17 BY MS. MKRTCHYAN:
13:17 Q. If she could handle that, why would she ask this officer, "Please, please, please," you know, "help me"?
13:17 Why would she ask so vehemently a dozen times if she can do that herself?
13:17 MR. KANG: Objection. Calls for speculation.
13:17 You can't testify for her; right?

13:17 MS. MKRTCHYAN: Again, speaking objections.
13:17 BY MS. MKRTCHYAN:
13:17 Q. Seriously, do you have an understanding as to how, you know, could she remove her face mask with handcuffs and why she asking the officer if she can do that?
13:18 MR. KANG: Objection. Compound. Calls for speculation.
13:18 THE DEPONENT: Maybe she hadn't got -- maybe she hadn't thought about it yet or how to take it off.
13:18 (Video recording playing.)
13:18 BY MS. MKRTCHYAN:
13:18 Q. 1:22 seconds, at this point, she makes it clear, what she's pleading about; right?
13:18 A. Yes.
13:18 Q. Okay. This is one minute 24 seconds. She says, "I can't breathe. Please, please, mask. I can't. Please, sir"; right?
13:18 A. Yes.
13:18 Q. And you don't hear any cuss words to the officer, she's respectful; right?
13:18 Right?
13:18 A. Yes.
13:18 Q. She's not in any way, like, resisting,

13:18 she's not trying to get out of the car; right?
13:18 MR. KANG: Objection. Compound.
13:18 BY MS. MKRTCHYAN:
13:18 Q. Right?
13:18 A. You can't get out of the car.
13:18 Q. Okay. But is she trying to get out of the car, sir?
13:18 A. I mean, is she pleading to get out of the car or help -- just open the door? I don't know. I can't answer for what her actions are.
13:19 Q. I see.
13:19 Is she making any effort to hit on the car doors or is she violently resisting in the car?
13:19 MR. KANG: Objection. Compound.
13:19 THE DEPONENT: No, not --
13:19 BY MS. MKRTCHYAN:
13:19 Q. She's cooperative in the car so far as you can see?
13:19 A. Yes.
13:19 Q. Okay.
13:19 (Video recording playing.)
13:19 BY MS. MKRTCHYAN:
13:19 Q. So she's being asked about her name, she cooperates, she provides the answer; right?
13:19 A. I didn't catch if she asked the name.

Sorry.

Q. Well, Officer Armendariz is talking to her. Let's hear that again.

So Officer Armendariz -- it's not your voice; right? This is Officer Armendariz talking to her?

A. Yes.

Q. Okay. Then she -- he's asking her name. She provides the answer, even though she's still pleading for help with breathing; right? Let's -- let's play this, then answer my question.

(Video recording playing.)

BY MS. MKRTCHYAN:

Q. So -- right?

A. Yes.

(Video recording playing.)

BY MS. MKRTCHYAN:

Q. At 1:42, she's saying "please" again, more and more, and she says, "Begging you"; right?

A. Not me. Officer Armendariz. But yes.

Q. Okay. She's saying, "I'm begging you."

A. Yes.

Q. "I'm begging you." Okay.

At any point in time, you watched this tape before, did you see Officer Armendariz do anything

13:20 else from -- to relieve this stress situation, other
13:20 than talking to her?
13:21 A. He's speaking to her.
13:21 Q. Other than talking to her, is there
13:21 anything else?
13:21 A. No.
13:21 (Video recording playing.)
13:21 BY MS. MKRTCHYAN:
13:21 Q. And she's making movements in the car --
13:21 right now, you're watching one or two minutes;
13:21 right? She's making movements as if she's
13:21 uncomfortable; right?
13:21 A. Or she could just be fidgety.
13:21 Q. Okay. Is that consistent with someone
13:21 having an anxiety attack?
13:21 A. Not always.
13:21 Q. No? Okay.
13:21 So from your training and experience,
13:21 having seen people having an anxiety attack or panic
13:21 attack, you don't find this consistent?
13:21 MR. KANG: Objection. Asked and answered.
13:21 THE DEPONENT: Like I said, not always.
13:21 BY MS. MKRTCHYAN:
13:21 Q. In this situation. I'm not asking you
13:21 always, generally. I'm asking you this situation.

From what you're observing her in this patrol car, does this look like she's having a anxiety attack or hyperventilating in the car, sir?
A. No.
Q. No? Okay.
(Video recording playing.)
BY MS. MKRTCHYAN:
Q. And what does Officer Armendariz respond to her at 2.23 minutes, when she's continuously saying, "please, please, please"? What does she -- he respond to her?
MR. KANG: Objection. Video speaks for itself.
MS. MKRTCHYAN: I want him to testify about what the video says.
MR. KANG: Objection. Video speaks for itself.
BY MS. MKRTCHYAN:
Q. What does it state to him -- to her?
A. I'd have to listen to it again. That way I can say word-for-word what he says.
Q. Is there any word you know other than please?
A. Okay.
Q. He states that; right?

A. That's what he said.

MR. KANG: Objection. Misstates. The video speaks for itself.

MS. MKRTCHYAN: Counsel, are you going to not allow us to have this deposition done?

MR. KANG: Are you not going to allow me to make my objections for the record?

MS. MKRTCHYAN: Then let me finish -- let me finish the question because you are interrupting her from taking this down.

BY MS. MKRTCHYAN:

Q. I'm going to ask this question again.

Aside from what he states, do you have, you know, the response that he has to her request and please? Is that -- is there any other word you know; right?

MR. KANG: Objection. Vague, ambiguous. Unintelligible.

BY MS. MKRTCHYAN:

Q. Yes?

A. I mean, like I said, I -- I don't -- I'd have to listen to it again to be able to say exactly everything he's saying.

Q. I don't want you to say exactly.

Let's hear again.

13:23 (Video recording playing.)

13:23 THE DEPONENT: So, then, in summary, he's saying do you know any other word than please. In summary. Not word-for-word.

13:23 BY MS. MKRTCHYAN:

13:23 Q. Okay. Is that -- you know, I mean, what is the -- you know, within your department, what is your motto?

13:24 Do you have a motto within the Glendale Police Department?

13:24 A. It's slipped from my mind.

13:24 Q. Okay. But is it consistent with being a compassionate peace officer who's engaged, concerned about public safety? Is that consistent? Just -- yeah?

13:24 A. Yes, it is.

13:24 Q. Oh, really.

13:24 And when you were being interviewed by the Internal Affairs, Sergeant Pete Robinson -- we discussed this --

13:24 A. Yes.

13:24 Q. -- did he ever verbally counsel you for your attitude on that day?

13:24 A. He spoke about it, yes.

13:24 Q. Okay. So he did advise you that your

13:24 attitude in dealing with Ms. Burmayan was not
13:24 proper; true?
13:24 A. It could have been.
13:24 MR. KANG: Objection. Assumes facts not in
13:24 evidence.
13:24 BY MS. MKRTCHYAN:
13:24 Q. (Indicating.)
13:24 A. I could have handled the situation a little
13:24 better.
13:24 Q. Thank you.
13:24 What specifically did he say about that?
13:24 A. I don't know specifically.
13:24 Q. Okay. But he did -- he testified here
13:25 under oath that he did verbally counsel you for your
13:25 discourteous treatment of Ms. Burmayan.
13:25 MR. KANG: Objection. Misstates
13:25 Lieutenant Robinson's testimony.
13:25 THE DEPONENT: I could have handled the
13:25 situation a little better.
13:25 BY MS. MKRTCHYAN:
13:25 Q. Like how?
13:25 A. A little better.
13:25 Q. What have you learned from this incident
13:25 that you would -- according to your department, you
13:25 would have handled differently?

13:25 A. Could have handled it a little better.
13:25 Q. Like how?
13:25 A. You would have to play the video to show me where I was -- which part you're talking about.
13:25 Q. Okay. Let's continue.
13:25 But -- so but we've covered the fact that Officer Armendariz basically told her is there any other word you know besides from please; right? That's what he said, in paraphrasing; right?
13:25 A. Yes.
13:25 Q. Okay. Let's listen to.
13:25 (Video recording playing.)
13:25 BY MS. MKRTCHYAN:
13:26 Q. Okay. 2:30, in response to that rebuke by Officer Armendariz, she says, "Please. I can't breath. Can you lower my mask?"
13:26 She verbalized it, her breathing is problem; right? She does.
13:26 A. Yes.
13:26 Q. Okay. Does he do anything to alleviate that?
13:26 A. Well, in the video, it's clear he doesn't.
13:26 Q. Okay. And he doesn't lower her face mask; right?
13:26 A. Yes, he does not.

Q. He doesn't take her out of the patrol car; right?
A. Yes.
Q. He doesn't, like, you know, do anything to accommodate that, except from just continuing to talk to her and saying calm down, calm down, calm down; right?
A. Yes.
Q. Okay.
(Video recording playing.)
BY MS. MKRTCHYAN:
Q. He says, "I can't lower your mask"; right?
A. Yes.
Q. Even though we have guidance by the Council of the Department of Health -- here's the interesting thing -- you live in the state of California; right?
A. Uh-huh.
Q. Okay.
A. Yes.
Q. Glendale PD is an area in California; right?
A. Yes.
Q. And presumably, peace officers are trained in the face mask mandate requirement by the

California Department of Health; right?
A. Yes.
Q. And Officer Armendariz is also should be aware of exemption, if someone has a breathing problem; right?
A. Should.
MR. KANG: Objection. Assumes facts.
BY MS. MKRTCHYAN:
Q. So let's --
MR. KANG: Calls for a legal conclusion.
BY MS. MKRTCHYAN:
Q. But if you were, at this point in time, next to that car, and if she said, "Lower my face mask, I have a breathing problem," would you have lowered her face mask?
A. I've answered that. If it's safe to do so, then yes.
(Video recording playing.)
BY MS. MKRTCHYAN:
Q. And she's also saying, "The window is closed. It's hot here."
You know, he could have taken any other steps; right? He could have lowered the window at that point in time, he could have opened the doors to bring more air; right? He could have taken

certain steps without -- without endangering his safety.

She's in handcuffs. She's not running away; true?

MR. KANG: Objection. Compound.

THE DEPONENT: The window does go down later on in the video.

BY MS. MKRTCHYAN:

Q. Okay. But we don't see that on this tape; right? When -- we actually don't see when the window is going down; right? And how much it's going down; right?

A. I would have to see if we can see it.

Q. Well, have you -- okay. We'll play it. But so, you know -- let's continue playing. Let's see.

(Video recording playing.)

BY MS. MKRTCHYAN:

Q. His voice is still in the background. We have hard time of hearing his voice; right?

Right?

A. Yes.

Q. It doesn't appear at this juncture at 2:48 minutes, that he actually opened the door or lowered the window; right?

MR. KANG: Objection. Calls for speculation.

BY MS. MKRTCHYAN:

Q. Yes?

A. Yes.

(Video recording playing.)

BY MS. MKRTCHYAN:

Q. At 3:05, she's continuing to say, "I'm begging you, please," you know, and she's having -- she's panting, she's visibly panting, panting, having hard time of breathing. And he still -- you know, his voice is still in the background. We don't hear any window roll down or door open; true?

MR. KANG: Objection. Compound. Mischaracterizes the video.

BY MS. MKRTCHYAN:

Q. True?

A. In the video, yes.

Q. Okay.

(Video recording playing.)

BY MS. MKRTCHYAN:

Q. Nothing prevented him -- for example, like this three minutes when she's screaming and crying like this -- and by the way, here's the interesting part I have for you. If her windows are rolled up

13:30 and Officer Armendariz's voice is barely heard, you know, window is up, how could you hear her screaming? How -- how was this so loud, if window's up?

13:30 MR. KANG: Objection. Calls for expert opinion. Calls for speculation.

13:30 MS. MKRTCHYAN: He was there.

13:30 MR. KANG: You're asking about sound waves and things like that.

13:30 MS. MKRTCHYAN: Excuse me.

13:30 BY MS. MKRTCHYAN:

13:30 Q. How could you hear her if her windows were up?

13:30 MR. KANG: Calls for an expert conclusion, expert opinion.

13:30 THE DEPONENT: The center divider is made of plastic, and there's holes that it's not completely sealed off. So you can still hear somebody yelling from the back seat of a patrol vehicle, through the front.

13:30 BY MS. MKRTCHYAN:

13:30 Q. You're -- you're assuming in this, that your windows in the front are open, that's what you're assuming?

13:30 A. Yes. I keep my windows down.

13:30 Q. Okay. But how do we know? Do we have any independent corroboration from this video that actually --
13:30 (Simultaneous dialogue.)
13:30 BY MS. MKRTCHYAN:
13:30 Q. -- your window -- excuse me. Let me finish.
13:30 A. Uh-huh.
13:30 Q. Is there any independent corroboration from any video anywhere here, that your windows in the front are open?
13:31 A. No.
13:31 Q. Okay.
13:31 A. You could still hear someone screaming in that car.
13:31 Q. So right now -- as of right now, we are watching here officers voice, Armendariz's voice, and this is the same patrol car.
13:31 What kind -- is this a sedan or is this a SUV?
13:31 A. SUV.
13:31 Q. Okay. So, you know, if this is an SUV, Officer Armendariz is standing next to her door, near -- right? He stand by; right?
13:31 MR. KANG: Objection.

13:31 BY MS. MKRTCHYAN:
13:31 Q. Right?
13:31 MR. KANG: Compound. Calls for
13:31 speculation.
13:31 BY MS. MKRTCHYAN:
13:31 Q. He was standing by --
13:31 A. Yes.
13:31 (Reporter clarification.)
13:31 BY MS. MKRTCHYAN:
13:31 Q. He was standing by, next to her door, to be
13:31 able to talk to her; right?
13:31 A. Yes.
13:31 Q. Okay. And the window for a fact, right
13:31 now, because his voice is barely heard, as opposed
13:31 to her voice that the window is still up; right?
13:31 A. I'm assuming.
13:31 Q. You can hear --
13:31 A. I can't see it, though.
13:31 Q. Okay. We're going to continue with this
13:31 tape, and we will know when the door opens from the
13:32 voices we hear.
13:32 (Video recording playing.)
13:32 BY MS. MKRTCHYAN:
13:32 Q. 3:32 minutes, she confronts in her own
13:32 statement that "Windows are up. I can't calm down,"

13:32 in response to his request, "Calm down"; right?
13:32 Right?
13:32 A. Yes.
13:32 Q. Okay. So she confronts, the window is up.
13:32 There's no way for her to be able to breathe, and
13:32 she's feeling claustrophobic, and she's complaining.
13:32 And so the window is up based on her
13:32 statement and based on the voice that we can hardly
13:32 hear by Armendariz; true?
13:32 A. According to her statement. And -- but I
13:32 can't see if the window's up or down in the video.
13:32 Q. Okay. The inference can be drawn by
13:33 hearing from Officer Armendariz that the voice is
13:33 coming -- hardly audible that the window is up;
13:33 true?
13:33 A. I can't speak for that.
13:33 Q. Okay. Well, if you were there, present at
13:33 this point in time, would you have rolled her window
13:33 down?
13:33 A. I could have.
13:33 Q. Uh-huh. Would you have opened --
13:33 A. But we were also -- but we were also --
13:33 like I explained earlier in the testimony --
13:33 Q. Uh-huh.
13:33 A. -- that she was yelling, and she was put in

13:33 the back of the seat of the patrol vehicle for a
13:33 reason, because of the area, the apartment buildings
13:33 and all that stuff. And we didn't want to cause an
13:33 even bigger disturbance --
13:33 Q. Okay.
13:33 A. -- with the apartment buildings.
13:33 Q. You removed her from the patrol car at some
13:33 point; right?
13:33 A. She was calm.
13:33 Q. Okay.
13:33 A. Not yelling anymore.
13:33 Q. I see.
13:33 So you're saying that, you know, even
13:33 though we don't have any recording, she was yelling
13:33 to such extent that it was necessary for you to
13:33 place her in the patrol car?
13:33 A. She's yelling in the car.
13:33 Q. Well, she's yelling because she can't
13:34 breathe.
13:34 MR. KANG: Objection. Calls for
13:34 speculation.
13:34 BY MS. MKRTCHYAN:
13:34 Q. If you had removed her from the car, she
13:34 would have stopped yelling.
13:34 MR. KANG: Objection. Calls for

speculation.
BY MS. MKRTCHYAN:
Q. Did you try to do that, to see if she's going to stop yelling?
A. She was yelling prior to going into the car.
Q. And we don't see that on this tape; right?
We have to take your word about this, happened over two years ago, and you don't even have an independent recollection of this incident other than your report.
You have your report in front of you the entire time, testifying in this case; true?
MR. KANG: Objection. Misstates prior testimony.
BY MS. MKRTCHYAN:
Q. True? Yeah. We've covered this.
You don't have any independent recollection of this incident, you couldn't even describe my client to me; right?
A. I went based on the --
Q. Right.
A. -- information that was in the call.
Q. Right. So basically, you're testifying here today based on the police reports, based on

13:34 patrol audio/video, based on the radio call log;
13:34 right?
13:34 A. Yes.
13:34 Q. You don't have -- if you saw her right now
13:34 coming inside this room, you wouldn't have known
13:35 whether it was her or not; right?
13:35 A. If I saw a picture, I would.
13:35 Q. Picture. But based on the picture. You
13:35 don't have --
13:35 A. In the picture that I took.
13:35 Q. Right. So but your bottom line, testifying
13:35 here, not based on independent recollection; true?
13:35 MR. KANG: Objection. Misstates prior
13:35 testimony.
13:35 THE DEPONENT: I'm going off my police
13:35 report.
13:35 BY MS. MKRTCHYAN:
13:35 Q. And yet, you're remembering that, you know,
13:35 she was yelling and screaming prior to being placed
13:35 in a patrol car?
13:35 A. Which I documented in my police report.
13:35 (Video recording playing.)
13:35 BY MS. MKRTCHYAN:
13:36 Q. I mean, four minutes, again, she's asking
13:36 for help; okay? You know?

13:36 I mean, we live in 21st century in the most, supposedly, humanitarian country. People come here from other countries, escaping from torture, terrorism, wars, as refugees. Okay?

13:36 You and your ancestors came to this country as refugees, I came to a country as a refugee, and we're here in the United States. When a police officer is being asked for help for just sitting in the patrol car, she's asking for help, "I cannot breath," and you -- none of you have done anything to assist this woman.

13:36 Is this something that you are proud of? I'm just trying to find out.

13:36 MR. KANG: Objection. Argumentative. Harassing.

13:36 I'm going to instruct you not to answer that question.

13:36 MS. MKRTCHYAN: Yeah. Yeah. No, seriously.

13:36 MR. KANG: He's not here to be attacked.

13:36 BY MS. MKRTCHYAN:

13:36 Q. We're going to go to trial with this case, and I'm going to ask everyone in the jury to watch this video and tell me if they're proud to be living in this country. Okay?

I am not proud of being an American by watching this. I'm not shaming you. You're an officer. You were doing your job as you understood. But right now, after the fact, what you've done, are you feeling happy about this?

MR. KANG: Objection. Argumentative. Harassing.

I'm going to instruct you not answer the question.

And if you keep doing this, we're walking out.

MS. MKRTCHYAN: Oh, you're walking out.

MR. KANG: Yeah, if you're going to keep attacking him --

MS. MKRTCHYAN: I'm not attacking him.

MR. KANG: -- and -- and -- you are. You are. You're saying, "Are you proud of yourself?" If you keep doing that, we're walking out.

MS. MKRTCHYAN: I didn't say --

MR. KANG: We're walking out if you keep doing that. So if you want to keep doing that, we're walking out. We're going to get a protective order. And we're going to -- we're not going to suspend this deposition, we're going to end it.

MS. MKRTCHYAN: I see. I'm going to

13:37 continue playing this. I'm going to continue playing this. And I just want reflection on this.
13:37 (Video recording playing.)
13:37 BY MS. MKRTCHYAN:
13:38 Q. 4:15. I'm going to 4:15 minutes. She's continuing to beg. And she's saying, "I'm going to pass out," she's crying.
13:38 Just I want you to confirm that's what's happening?
13:38 MR. KANG: Objection. Misstates the video.
13:38 THE DEPONENT: You're going to have to replay it. I didn't hear it.
13:38 (Video recording playing.)
13:38 MS. MKRTCHYAN: 3:52. I'm going to replay this.
13:38 (Video recording playing.)
13:38 BY MS. MKRTCHYAN:
13:39 Q. Can you confirm my question earlier that she was still begging for help, and she's telling the officer that she's going to pass out?
13:39 A. Yes, she did say that.
13:39 Q. And you still don't hear the officer rolling the window or opening the door?
13:39 A. I can't see the window so I don't know if he's actually trying to open the window or not.

13:39 Q. Is his voice audible?
13:39 A. It was a little louder.
13:39 Q. Is it as audible as her voice?
13:39 A. Well, I mean, she's right in front of the camera.
13:39 Q. Okay. But can you tell from this juncture that the window was actually opened or not?
13:39 A. I can't tell because his voice is actually getting louder. So I can't tell if it's open or not or cracked or anything.
13:39 Q. We'll continue playing this.
13:39 (Video recording playing.)
13:39 BY MS. MKRTCHYAN:
13:40 Q. 4:15 seconds again. She's asking, "Let me come out of the car so that we can talk"; true?
13:40 A. Yes.
13:40 Q. He's not doing anything to do that; right? If she's asking to "Let me get out of the car," he's not doing anything to do that; right?
13:40 A. Yeah. But if we gave everybody their wish and allowed everyone to get out of the car, who knows what's going to happen.
13:40 Q. And she's in handcuffs, though; right?
13:40 A. Yeah. And people fight in handcuffs.
13:40 Q. We don't see anywhere in this video her

being violent; right?
A. Doesn't mean they're not going to be.
Q. I see.
And so but based on this 18 minutes, you know, what we've watched, we have not seen her doing anything violent in that car; true?
A. And as I explained, it can change in a second.
(Video recording playing.)
BY MS. MKRTCHYAN:
Q. I won't ask you about this back -- back seat. There's the window open -- correct? -- in your patrol car, which is the SUV back windshield?
A. Yes.
Q. Is that where the CVS entrance is?
A. No.
Q. So I see figures moving -- moving in the -- on the window.
Is that not you talking with Guy Garcia --
A. No.
Q. -- outside the store?
A. No, it's not. I'm --
Q. So your car was -- how was it parked?
A. On the -- on the -- I'm facing the CVS. So this is -- that -- this angle is out the back of the

13:42 car, which is facing the apartment building and the parking lot that is directly behind the vehicle.
13:42 Q. Thank you.
13:42 So you have no idea who are those figures moving in the back window?
13:42 A. That might be assisting officers.
13:42 (Video recording playing.)
13:42 BY MS. MKRTCHYAN:
13:42 Q. And there was a second voice now, at 5:39.
13:42 Was that your voice?
13:42 A. That was me.
13:42 Q. Okay. So you are actually by her door at 5:39.
13:42 A. I -- I may have walked by it. I don't know if I stayed by it.
13:42 Q. Okay. So this is still five minutes that she's seated in this car. The time stamp is 5:39, we heard your voice.
13:43 A. Yes.
13:43 Q. And what did you tell her?
13:43 A. That I would talk to her in a bit.
13:43 Q. Okay.
13:43 (Video recording playing.)
13:43 BY MS. MKRTCHYAN:
13:43 Q. And she -- while she's also complaining,

13:43 she's also telling that she's -- didn't commit any crime, that she is not guilty, that basically -- I'm paraphrasing -- that she was never told not to come back, and, you know, if they don't want her to come back, she's not going to come back, but please let me out; right?

13:43 That's what she's generally saying?

13:43 A. She is.

13:43 Q. Okay. Did you hear that at the time from her?

13:43 A. I don't know if I stood by the window or not.

13:43 Q. But she continues her innocence, pressing her innocence throughout your conversation with her; right?

13:43 A. People lie to me all the time.

13:43 Q. I understand.

13:43 But I just want you to confirm she told you that --

13:43 MS. MKRTCHYAN: Yes, come on in.

13:43 BY MS. MKRTCHYAN:

13:43 Q. She told you --

13:43 (Arya Sharifan enters the proceedings.)

13:43 MS. MKRTCHYAN: Yeah, this is my assistant.

13:43 Have a seat.

13:43 MR. SHARIFAN: How ya doin'?
13:43 MS. MKRTCHYAN: How are you?
13:43 BY MS. MKRTCHYAN:
13:43 Q. So he told you that -- she -- she told you that she was never told she cannot come back, and if she had known, she would not have come back; right?
13:44 A. That's what she stated.
13:44 Q. And yet, though, here's the thing, you did not find her credible, despite the fact, that we've covered, you only spoke with Guy Garcia and never verified the statement he provided to you; right?
13:44 A. And people lie to me all the time.
13:44 Q. Understood.
13:44 But you did not verify what Guy Garcia told you in any shape or form; right?
13:44 A. I asked -- I questioned her earlier.
13:44 Q. Who? Who did you question?
13:44 A. Anoush.
13:44 Q. Okay. I understand that.
13:44 But when Guy Garcia told you this and that -- we covered your report. We've already covered this -- you didn't ask for any independent evidence from him; right?
13:44 A. Yes.
13:44 Q. You didn't ask him, you know, to please

13:44 provide me some documentation, written proof that she was banned; true?
13:44 A. Don't need to.
13:44 Q. Okay. True? Yes or no, you did not ask for written proof that she was banned?
13:44 A. I don't need to. But, yes, I did not.
13:45 Q. Okay. You didn't speak with Joe Johnson, his manager at the scene; true?
13:45 A. Did not need to. But no, I did not.
13:45 Q. Okay. And you didn't even, you know, go forward and say, "Look, can you maybe show me some video to tell me if she actually came here three times when she was banned from the store"; true?
13:45 A. And again, I didn't need to, but I did not.
13:45 Q. But you are an officer obligated to do investigation of calls; right?
13:45 A. There's detectives for the follow-up investigation.
13:45 Q. But you made the arrest, though; right?
13:45 A. And I made the arrest for the report to go to the detectives to do the follow-up investigation.
13:45 Q. And making an arrest, you need probable cause.
13:45 A. Yes.
13:45 Q. And that requires due diligence in

13:45 investigating calls; right?
13:45 A. And I had that.
13:45 (Video recording playing.)
13:45 BY MS. MKRTCHYAN:
13:46 Q. So she continues talking at 6:09 minutes.
13:46 Were you there when she's continuing to
13:46 profess her innocence?
13:46 A. I've already said that I don't know if I
13:46 was by the window or continuing -- or I was --
13:46 walked by earlier.
13:46 Q. But at least she's telling
13:46 Officer Armendariz; right?
13:46 A. Yeah. And she did say that she came back
13:46 this time.
13:46 Q. Right?
13:46 A. So she was there and came back.
13:46 Q. Right? Okay.
13:46 But she's also indicating that she was
13:46 never told not to come back; true?
13:46 A. Well, she's saying that, but now she's also
13:46 saying other things.
13:46 Q. Other things, what?
13:46 (Reporter clarification.)
13:46 THE DEPONENT: I just said it.
13:46 ///

BY MS. MKRTCHYAN:
Q. Okay. So but, you know, bottom line is that, you know, you basically didn't find her credible on that day; that's it, you just did not take her word as true.
A. That's what the detectives are for, for follow-up.
Q. Yeah, but you're the one -- I don't want to know what detective follow-up.
And by the way, how many times in trespassing, you know, arrests, detectives follow up?
A. I don't follow up -- I don't pay attention to their follow-ups. My job is --
Q. Right.
A. -- the patrol side, not the detective side.
Q. Right. Your job is not to deal with detectives.
You know, and you're not a detective, you've never been a detective; right?
A. No.
Q. You don't know if trespass citations are even investigated by detectives; true?
A. Correct.
Q. Okay. So, I mean, when you're doing your

13:47 job, are you always putting things on detectives?
13:47 A. That's what they're there for.
13:47 Q. Okay. But in a trespass, when you're
13:47 making an arrest, you have to decide, you need to
13:47 file a probable cause declaration; true?
13:47 A. For this, no, 'cause I cited her out.
13:47 Q. I understand.
13:47 But when you are citing someone out, you
13:47 need to verify the accuracy of what happens to cite
13:47 someone for violation of a penal code; true?
13:47 A. And I did that.
13:47 Q. Okay. So this is the -- you know, what I'm
13:47 trying to say is that your investigation resulted
13:47 basically in, you know, completely dismissing her
13:48 statement and taking Guy Garcia's statement as true?
13:48 A. But we're not a patrol --
13:48 MR. KANG: Stop.
13:48 Objection. Argumentative. Misstates his
13:48 prior testimony.
13:48 BY MS. MKRTCHYAN:
13:48 Q. "Yes" or "no"?
13:48 A. I didn't understand. I didn't hear the
13:48 question.
13:48 Q. Well, because your counsel has coached you
13:48 and interrupted you.

13:48 So all I want to know is your investigation basically resulted in you dismissing her statement and taking Guy Garcia's statement as true?

13:48 A. No.

13:48 Q. Well, we have your report.

13:48 You basically did not believe her by arresting her; true?

13:48 A. And spoke to the employee.

13:48 Q. Yes. One employee; right?

13:48 A. That's all I need to speak to.

13:48 Q. Okay. That's all; right?

13:48 So you spoke to two people, suspect and reporting party -- true? -- according to your report?

13:48 A. Yes.

13:48 Q. Based on that, you took reporting party's statement as true and not the arrestee's; true?

13:48 A. Yes.

13:48 Q. That's all I want to know.

13:49 A. Yes.

13:49 Q. You did not take her credible; true?

13:49 A. And the detectives for follow-up can figure that out.

13:49 Q. Okay. But you're the one who's citing her.

13:49 A. Yes.

13:49 Q. You're the one who's obligated to do investigation of a call; right?
13:49 A. To investigate what I have, and then it goes to the detectives for follow-up to do all the stuff you're asking, for the video and all of that.
13:49 Q. Are you aware if any detective investigated this incident?
13:49 A. I'm not.
13:49 Q. Okay. Are you aware if Sergeant Robinson even looked into this incident?
13:49 A. I don't know what his position was, but I know he was in IA at some point. So I don't know if he was the investigating detective for this case.
13:49 Q. Right. So you're -- you're not aware if there's any other investigative report after you submitted your police report to the department; true?
13:49 A. True. Because I don't --
13:49 Q. You have not seen any investigative report; true?
13:49 A. True. Because I am not the detective, and I don't speak on the detective's behalf.
13:49 Q. Okay. So but as of right now -- you're sitting here today -- other than this three-page
13:50 police report about this incident, you have not seen

any other police reports; right?
A. True.
Q. You've not seen police report by Officer Armendariz?
A. True. I haven't read these.
Q. You not seen a police report by -- about this incident by Sergeant Robinson?
A. True.
Q. By Duncan or Ruiz?
A. Tue.
Q. Or Gazandjian; right?
A. True.
Q. You're the officer who is this -- responding to this call, arrested this person and wrote a report; true?
A. Yes.
Q. Okay. So --
(Video recording playing.)
BY MS. MKRTCHYAN:
Q. So we're hearing this, continuing to hear this, 6:21. I want you to please stop me when you hear your voice; okay?
A. Okay.
(Video recording playing.)
///

BY MS. MKRTCHYAN:
Q. Did you hear your voice there?
A. Yes, I did.
Q. Okay. This was in response to her spelling her name; right?
A. It was not.
Q. Oh, okay. Well, first of all, she at this point in time prior to you making that comment -- and what was -- what did you say?
At 6:27, what did you --
A. I made a comment, saying, "Ahhhhhh."
Q. Uh-huh.
A. Because I had asked her a question. She was responding. Also, I had officers that were on the other side of the car, on the passenger side, that were talking at the same time, and I couldn't hear her to get all the information that I need.
Q. I see.
But this was from -- so our perspective, hearing this video, she's spelling her name, Burmayan.
It's not a common name; right? Burmayan is not a common name; true?
A. Yes. I work in the city of Glendale, and there's a lot of not common names.

Q. Okay.
A. So trying to get the spelling and having people talk in the background, it's very difficult to understand and get everything that I need. So I want to be able to spell the name accurately and correctly.
Q. So but what I want to confirm is that when she's spelling her name in response to your question about the name, her name, you made that comment of a comment, "Ahhhhhh"; right?
A. Yes.
Q. Okay. And she interprets this as you ridiculing her name.
You understand that? You're aware of that?
A. It's come to my attention, yes.
Q. Okay. She complained to the department through her attorneys, you know, various attorneys, that her name was ridiculed, as an Armenian name, by you, as a police officer.
You're aware of that, that's the complaint by her; right?
A. Yes.
Q. Because that's what she understood from your comments, your entire demeanor on that day when she was giving her name.

13:52 You're aware of that?
13:52 A. Yes.
13:52 Q. And this is city of Glendale; right?
13:52 A. Yes.
13:52 Q. Predominantly -- well, we have lot of --
13:52 60, 70 percent, you know, speak Armenian population
13:52 in the city of Glendale; right?
13:52 A. Yes.
13:52 Q. A lot of Armenian names; right?
13:52 A. Yes.
13:52 Q. Not common names?
13:52 A. Yes.
13:52 Q. And you're trained to, you know, provide to
13:52 not discriminate people on the basis of their
13:52 cultural -- culture, ethnicity, national origin;
13:52 right?
13:52 A. True.
13:52 Q. And you work with police officers who are
13:53 Armenian; right?
13:53 A. Yes.
13:53 Q. You have Officer Gazandjian who's Armenian;
13:53 right?
13:53 A. Yes.
13:53 Q. You have several lieutenants and sergeants
13:53 who are Armenian; right?

A. Yes.
Q. So if she is getting this kind of a vibe from you, this -- and we're going to hear this entirety of the tape, the whole time you're talking to her, you know, you are unprofessional, you know, the way I'm -- even as an objective observer, you are talking to her by her first name, you are not saying Ms. Burmayan, you're not going by her last name, you are constantly talking to -- down to her as if she's a child. This is a woman who's, you know, educated.
Is this reasonable for her to believe that you were ridiculing her and her national origin?
MR. KANG: Objection. Calls for speculation. Argumentative. Harassing. Misstates the video. Misstates the encounter. Misstates his prior testimony.
BY MS. MKRTCHYAN:
Q. After that string of objections, please provide an answer.
A. No.
Q. No. Okay.
So let's continue playing this, and I'm going to ask you to confirm this exchange.
(Video recording playing.)

13:54 BY MS. MKRTCHYAN:
13:54 Q. And this also, at the same time, your voice is barely audible because we don't have any windows or doors open at this time yet; right?
13:54 MR. KANG: Objection. Calls for speculation.
13:54 THE DEPONENT: At this time, I'm sitting in the car.
13:54 BY MS. MKRTCHYAN:
13:54 Q. You are?
13:54 A. Yes.
13:54 Q. Well, we don't hear you that close by. We don't hear your voice, like, that close.
13:54 A. Because there's that divider that I already spoke about.
13:54 Q. Okay. Well, you know, she's -- let's continue playing this, and let's see that actually can be supported on the face of this video.
13:54 (Video recording playing.)
13:54 BY MS. MKRTCHYAN:
13:55 Q. 6:48, she was asked her name again, second time by you; right?
13:55 A. Yes.
13:55 Q. So first time, you didn't get it. You are asking her second time; right?

13:55 A. Yes.
13:55 Q. And she's looking outside the window when she's giving, you know, this information.
13:55 Are you saying that you're inside the car?
13:55 A. Yes.
13:55 Q. Okay.
13:55 (Video recording playing.)
13:55 BY MS. MKRTCHYAN:
13:55 Q. Okay. You said -- you see here -- okay.
13:55 At 6:57, she's looking, you know, in the front. So maybe you're -- at this point in time, you are sitting in the car.
13:55 But we didn't hear that; right? We didn't hear you open the door or entering the car; true?
13:55 A. Yes.
13:55 Q. Did you? Hear?
13:55 A. I don't know if my door was already open or if I opened it.
13:55 Q. Okay. In any event, you know, so you're asking for her date of birth, et cetera, and then you tell her, "I don't believe you"; right? "I don't believe you."
13:55 You said that on the tape; right?
13:55 A. Yeah. Because I'm pretty sure she was saying, before I said that, that she made a

statement that -- of her innocence.
Q. I see.
A. So I said I didn't believe her.
Q. Is it common for a police officer to talk like that, conversational tone, with other --
(Reporter clarification.)
MS. MKRTCHYAN: Conversational tone.
BY MS. MKRTCHYAN:
Q. Is it common for you to talk with people, citizens that you're detaining, arresting in such a conversational tone?
A. I have told people I don't believe them, yes.
Q. So, you know, the way you're talking with her the whole time, it is casual, you know, conversational tone, for which you verbally were counseled by Sergeant Robinson; right?
Right?
A. Yes.
Q. He told you that your demeanor could have been better; right?
A. Could have been better.
Q. So you're accepting responsibility for that?
A. Yes.

13:56 (Video recording playing.)
13:56 BY MS. MKRTCHYAN:
13:57 Q. Yeah. She's also saying, "I came back here to speak with the manager. I've been a customer here for long"; right?
13:57 A. Yes.
13:57 Q. She's giving you information that is valuable; right?
13:57 A. Yes.
13:57 Q. Did you go back to the manager and say, "Look, you know, after speaking with Guy Garcia," whoever this guy is -- didn't you go back -- couldn't you -- as an officer, weren't you obligated to go back and speak with the manager, say, "Look, she's claiming she's been a customer here for long. And she never had problems, and she came back to talk to you."
13:57 Did you go and confirm with the manager before you said, "I don't believe you," dismissed her comment?
13:57 A. No.
13:57 Q. No.
13:57 You didn't believe it was necessary?
13:57 A. No.
13:57 Q. So you made an arrest of her, dismissing

13:57 her comment, even though you had the opportunity to go speak with Joe Johnson, who was the manager there on that night; true?
13:57 A. I spoke with Guy.
13:57 Q. You didn't speak with Joe Johnson; true?
13:57 A. True. I spoke with Guy.
13:57 Q. Okay. But you never spoke with the manager at the store; true?
13:58 Because she -- to verify her statement, you could have gone and said, "Look, you know, this woman, I'm making her arrest for trespassing. I want to know if it's true, that she -- was she a regular customer here."
13:58 You didn't do that; true?
13:58 A. No.
13:58 Q. You could have done that; true?
13:58 A. If you're asking if I could have? Yes.
13:58 Q. Okay.
13:58 A. I could have. But I did not.
13:58 (Video recording playing.)
13:58 BY MS. MKRTCHYAN:
13:58 Q. And if it's true -- let me -- right now, let's say if whatever she's saying is true, if you took her statement as true, would you have arrested her for trespassing?

13:58 A. After what he told me, yes.
13:58 Q. Still, you would have arrested, if her statements were true? That's what I'm asking you.
13:58 A. Oh. Sorry.
13:58 Q. If she was never banned --
13:58 A. I misunderstood your question.
13:58 Q. -- from the store, if she was never -- knew -- she never knew she can come back, if her statement -- if you took them as credible, would you have arrested her?
13:58 A. If -- I answered that earlier. Yes, I would have tooken that into consideration.
13:59 Q. But would you have arrested her if her statement were true?
13:59 A. Yes --
13:59 Q. Yes or no?
13:59 A. No, I wouldn't have.
13:59 Q. And yet is there any reason why you didn't take her statement?
13:59 A. Because I believed what he was saying and I made the decision.
13:59 Q. So you made the decision to make the arrest based entirely of what Guy Garcia told you?
13:59 A. Yes.
13:59 Q. Regardless of whether he was lying or

13:59 telling the truth?
13:59 A. I wouldn't put it that way, but yes.
13:59 (Video recording playing.)
13:59 BY MS. MKRTCHYAN:
13:59 Q. And she hears -- says -- 7:54, you know, she's explaining to you even the whole conflict with her, CVS -- between herself and CVS employees.
14:00 She says, you know, "I had to -- my face mask not covering my face because I have a breathing problem. I can't breath, with the problem."
14:00 Didn't that register to you that she has a breathing problem? That's why she's having these issues?
14:00 A. At the time, no, it did not.
14:00 Q. I see.
14:00 So and you didn't put anything in your report -- let's go back to your report. Even though you were -- based on this conversation with her, she made it clear to you what was the problem she had with you.
14:00 There's nothing in this paragraph in this report of yours that this is the problem she was having with CVS employees, the face mask mandate, that she had breathing problems, nothing of that in your report; true?

True?

A. Well, if you stop the video right there, then yes, that's true. But if you don't and you continue with the play, she actually calms down and is able to talk and doesn't say anything about a disability before then, nothing.

Q. But, sir, you wrote, you -- basically your job is to write, as we covered --

A. And I don't have to document that.

Q. Excuse me. Sorry. This is not a conversation. Again, as your counsel wants to make it look like, it's not a conversation. This is a formal proceeding. Let me finish. Please let me finish my question, and then answer the question.

MR. KANG: Objection. Argumentative at to the comments regarding me.

BY MS. MKRTCHYAN:

Q. My question is this: In your report, you're obligated to write material significant facts fully and accurately; true?

A. Yes. But not about that.

Q. And you have to paraphrase and you have to write down the statements made by suspect prior to arrest; true?

A. Relative to the case.

14:01 Q. Okay. And relative to the case, you wrote Guy Garcia's statement about what they were calling CVS about; right?
14:01 A. Yes.
14:01 Q. Okay. And you wrote one paragraph of what Ms. Burmayan told you about why she was there, why she was having issues; right?
14:02 A. Yes.
14:02 Q. You wrote here -- let's go back to your report. You basically said, following is the summary of her statement.
14:02 "Anoush said she did not come the CVS three times, and that she was never told not to return to the CVS."
14:02 And then you wrote, "No further questions were asked"; right?
14:02 A. Uh-huh.
14:02 Q. That's what you wrote in your report; true?
14:02 A. Yes.
14:02 Q. And yet, based on this patrol vehicle recording, we have you speaking with her at least two, three minutes that we just covered, and she keeps telling you more things. She's telling you why she was having this conflict, and you were asking her why.

14:02 So why is none of this conversation you had in the patrol car with her reflected in your report?
14:02 A. Because you're asking about the paragraph, and this was her Miranda statement.
14:02 Q. Doesn't matter. You -- Miranda statement -- I don't understand.
14:03 I'm asking you, you wrote her statements to you; right?
14:03 A. Yes.
14:03 Q. In your report?
14:03 A. Yes.
14:03 Q. Okay. We have this patrol vehicle recording of your conversation with her; right?
14:03 A. Yes.
14:03 Q. Okay. Nobody in your report states that, "Look, the problem she has with this face mask issue, CVS employees, you know, are telling this, she's saying this," et cetera.
14:03 None of that is in your report; true?
14:03 A. True.
14:03 Q. Okay. Is that a complete report of this incident?
14:03 A. Yes.
14:03 Q. So if you're leaving out the reason of the conflict and her telling you what happened, she is

14:03 the suspect and you're not finding her credible, but you're not even reporting to your department full and complete statement by the suspect, is that a complete report, sir?

14:03 A. No.

14:03 MR. KANG: Objection. Argumentative. Harassing. Misstates the evidence.

14:03 BY MS. MKRTCHYAN:

14:03 Q. Is that a complete report?

14:03 A. So in my report in the second paragraph, I actually put a couple lines that says what she was there for that was relevant to the report.

14:03 Q. Where? Show me, where does it -- you talk about face mask problems.

14:04 Where is it in you --

14:04 A. I didn't put it in there, it was relevant to the report --

14:04 Q. I didn't find it. I see.

14:04 So she has basically -- according to your report, she make only two statements about what happened, "Anoush said she did not come CVS three times, and that she was never told not to return to the CVS."

14:04 That's basically two statements; right?

14:04 A. Yes. And a summary of.

14:04 Q. I see.
14:04 And never, you wrote anything about what she said; right?
14:04 A. Yes.
14:04 Q. Let's continue playing this.
14:04 (Video recording playing.)
14:04 BY MS. MKRTCHYAN:
14:04 Q. So throughout this conversation you're having inside the car, she's telling you all of this, she's telling you the reason why -- what was happening, why she came back, and yet you are basically taking down her phone number, her address, her name; true?
14:05 A. Yes.
14:05 Q. You're not even basically engaging with her, you're not even interested in learning her side of the story; true?
14:05 A. Yes. And as I've said, people lie to me all the time. Just like your -- you said Guy was -- could possibly be lying to me.
14:05 Q. So why do you automatically -- sir, you're a police officer, you're obligated to investigate calls in non-biased fashion; right?
14:05 A. Yes.
14:05 Q. POST procedure -- aside from what Glendale

police teaches you or not, the POST -- California, you know, POST procedure teaches you to take unbiased reports of everything that happens accurately and honestly; true?

A. Yes.

Q. Okay. And if she -- this woman -- she doesn't look like homeless -- we've covered this -- is not violent. You know, you don't know if she ever -- this is the first time you're seeing her, as you've testified. You don't know if she's a career criminal.

Why would you completely dismiss her statement like this in your investigation? Can you please tell me why?

A. Because I already had -- I already spoke to the RP --

Q. Uh-huh.

A. -- who told me what happened -- what had happened. I made the decision, and there's detectives that will get this report, and they will conduct a follow-up.

Q. So you're relying on some other officer doing your job?

A. No. I did my job.

Q. You did your job?

14:06 A. Yes.
14:06 Q. So if you're dismissing her comments entirely, you're not even listening to her -- let's continue playing.
14:06 A. No, I did listen to her.
14:06 Q. You did.
14:06 A. I did. And I did my job. And like I said, we're not a full-service patrol -- handle everything in patrol. There's -- there's a process which I write the report, it goes -- approved by a sergeant, it goes to detectives.
14:06 Q. Uh-huh.
14:06 A. Detectives will then -- it'll get -- an IO will --
14:06 Q. Uh-huh.
14:06 A. -- be assigned to the case, and they will handle it.
14:06 Q. Uh-huh.
14:06 A. That's their job.
14:06 Q. Okay.
14:06 A. This is my job.
14:06 Q. But you admit to me, that -- earlier you admitted that if you took her statement as true, you would not have arrested her; true?
14:07 A. You didn't word it that way.

14:07 Q. Well, now I'm wording it that way. You know, this is not -- if it's not -- your testimony will stand. But right now, if what we hear, if it's true -- you -- you covered this before.
14:07 If it is true that she never came back there three times, that she was never banned from the location, you would have not arrested her; true?
14:07 A. If things had -- if that came up then, yes, I wouldn't have. The way you worded it earlier.
14:07 Q. I see.
14:07 (Video recording playing.)
14:07 BY MS. MKRTCHYAN:
14:08 Q. So 8:56, she's continuing telling you, "I'm not a criminal. I have no record."
14:08 Did you ever verify if she had a criminal record?
14:08 A. We don't have the capability in our car to do that.
14:08 Q. You don't?
14:08 A. No.
14:08 Q. So you're saying in your entity, you cannot contact with dispatch and say, "Please check with this woman, see if she's telling me the truth or not"?
14:08 A. It wouldn't be dispatch.

14:08 Q. Well, who? Who? You can call your station --
14:08 A. It would be our records --
14:08 Q. -- and say round a rep; right?
14:08 A. It would be our records department.
14:08 Q. Right.
14:08 (Simultaneous dialogue.)
14:08 THE REPORTER: Wait.
14:08 THE DEPONENT: We don't need to do that. It's the detectives that do that.
14:08 BY MS. MKRTCHYAN:
14:08 Q. I see.
14:08 So you're saying that you did not have the opportunity to actually verify and see if this woman had a wrap sheet on that night?
14:08 A. That's not a part of our daily job description.
14:08 Q. I see.
14:08 But so -- and then if she's --
14:08 A. We didn't -- sorry. If we didn't have a detective bureau, then, yeah, that would probably be in our job description, but that's what the detective bureau's for.
14:09 Q. I see.
14:09 So but you have no reason, then, if that's

14:09 the case -- you know, if you didn't have any way of verifying, that you have no reason to disbelief her; right?

14:09 If she's saying, "I have -- I have no record history," do you have any reason to doubt that?

14:09 A. People lie to me all the time.

14:09 Q. I see.

14:09 So you automatically discount what people are telling you except the retail establishment that you keep going to and working at; true?

14:09 That's what you're telling me, you automatically accepted CVS employee statement as true, automatically?

14:09 A. Not automatically. But in this case, I did. I took his -- I took his statement. I went forward with the arrest. And I wrote a court date on the bottom of the citation. And it can get figured out in court.

14:09 Q. Okay. And yet, your department, Internal Affairs sergeant, counseled you for at least three issues as a result of this incident; right?

14:09 A. You would have to refresh me on that one.

14:09 Q. Well, Sergeant Robinson testified in this

14:10 case, under sworn testimony, that he counseled you

for your attitude that day; right?
A. It could have been better, yes.
Q. That he counseled you for not turning on your audio recorder timely; true?
A. Yes.
Q. In violation of policy?
A. Yes.
Q. And he counseled you for writing wrong citation for the wrong misdemeanor code section; true?
A. I wouldn't say it was a counsel.
Q. Okay. But she told you --
A. Or verbally counseled. He told me that I wrote the citation -- or the -- the wrong penal code, but as I explained earlier, there's a process to fix that. There's correction letters that we can do and send out to the suspect and let them know, hey, there's a correction on the actual violation. It's not this, but it's actually going to be this.
Q. But you --
A. And there's also another process when it goes to detectives, detectives can actually file a different charge, when it goes over to the DA's office.
Q. I see.

So you do take responsibility, though, for citing her for wrong citation?
A. I said that, yes.
Q. And did your department actually somehow train you further on the elements for trespass after this incident?
A. No.
Q. So is there any way the department ensure that you're not going to make the same mistake in other instances?
A. No.
Q. So, you know, have you learned some lessons out of this incident, not to make the same mistake?
MR. KANG: Objection. Vague. Argumentative. Unintelligible.
BY MS. MKRTCHYAN:
Q. If you admitted that you gave a wrong citation, have you learned from mistakes?
A. I do.
Q. Have you learned a lesson?
A. Mistakes happen. I try not to make them again.
Q. Okay. So let's continue playing this, finish this up.
(Video recording playing.)

14:11 BY MS. MKRTCHYAN:

14:11 Q. Right. 9:09. Again, she keeps telling you her story, and you say, you know, "Oh, are you accusing them of lying"; right?

14:11 Did you say that to her?

14:12 A. If I said that, then that's what's said. I didn't hear it.

14:12 Q. Well, okay. Let me replay that and tell me if that's what you said. But she appears to be talking to you continuously.

14:12 (Video recording playing.)

14:12 BY MS. MKRTCHYAN:

14:12 Q. Yeah. Did you hear you --

14:12 A. I did.

14:12 Q. -- say that?

14:12 A. I did.

14:12 Q. Okay. And she's saying, "I'm not accusing anyone of lying"; right?

14:12 A. Yes.

14:12 Q. Okay. So basically, throughout this exchange, you basically are dismissing her entire statements; true?

14:12 A. No.

14:12 Q. No. You know, I'm looking, again, at your patrol car windshield, back windshield, and there

are sliding doors, that we can see, and I believe that this is the exit entrance of the CVS store. I do think that your car was parked back -- back in.

A. It's -- it's not. It's a reflection off of it.

Q. Okay.

A. I'm not backed in.

Q. Okay. So I'll take that -- but it looks -- but you agree with me that you can see the sliding doors --

A. Yes.

Q. -- opening and closing?

A. I can. As soon as that vehicle either turned off the light that was behind my car -- either turned off their lights or they left, then you can start seeing reflections and things from the -- from that window.

Q. Uh-huh. But you are close enough to the exit/entrance than to be able to -- for this car to capture that; right?

A. Yeah.

Q. You are close enough?

A. Yeah, I mean the windows are very dark. The entrance is very well lit.

Q. Okay. So but in any event, you're close

14:13 enough for us to be seeing this, the reflection of
14:13 this?
14:13 A. Yeah. I was parked to the front of the
14:13 entrance.
14:13 Q. Okay. Because you said about 80 feet;
14:13 right?
14:14 A. 60 to 80 feet.
14:14 Q. Right. That, to me, is further away. But
14:14 in any event.
14:14 A. That far.
14:14 (Video recording playing.)
14:14 BY MS. MKRTCHYAN:
14:15 Q. This is Officer Armendariz, not you; right?
14:15 A. Yes.
14:15 Q. At this point?
14:15 So she -- he's also not -- you know, he
14:15 says to her -- what is he telling her at this point
14:15 at 10:35?
14:15 A. He's pretty much saying what I've been
14:15 saying this whole time, that someone's lying. I
14:15 took the RP's statement --
14:15 Q. Uh-huh.
14:15 A. -- and I made the decision. And there's a
14:15 day in court for this process.
14:15 Q. Uh-huh. Uh-huh.

14:15 So but basically, he's also -- he's basically telling her someone is not telling the truth; right?

14:15 A. Yes.

14:16 Q. Okay. But he was not present when you spoke with Guy Garcia; right?

14:16 A. True.

14:16 (Video recording playing.)

14:16 BY MS. MKRTCHYAN:

14:16 Q. Is she -- let me ask you this. This is very interesting.

14:16 As a police officer, if the -- if the person is disputing the statements by a reporting party and you were not present when the crime was committed, how would you go about investigating that?

14:16 MR. KANG: Objection. Asked and answered.

14:16 THE DEPONENT: I don't -- I don't understand the question.

14:16 BY MS. MKRTCHYAN:

14:16 Q. She's disputing that she actually was banned from the location and that she came back until, like, for example, that day, to speak with the manager; right?

14:16 She said, "I came back to speak with the

14:16 manager, and I was never told I cannot come back"; true? That's what she said?
14:16 A. That's what she's leading to believe, yes.
14:16 Q. Okay. Guy Garcia told you she was banned and she kept coming; right?
14:16 A. Yes.
14:16 Q. Okay. So if she's disputing that -- and you were not present before, to know whether she came back, et cetera; right?
14:17 A. Yes.
14:17 Q. Okay. You know, wouldn't you go and say, "Look, Guy," or whatever, you know? "Did you have any proof that you actually banned her from the location, that she came back before"?
14:17 A. Like I said earlier, he made a statement. I listened to that statement, I made the decision to make the arrest. The detectives will do the follow-up for that.
14:17 (Video recording playing.)
14:17 BY MS. MKRTCHYAN:
14:18 Q. So at this point, 11 minutes, 22 seconds, we don't hear your voice, but she's turning towards you where you were seated.
14:18 Are you still sitting in the car at this point?

A. If she's still facing that way, then probably.

Q. Uh-huh.

A. And I'm trying to finish the citation up so we can -- I can finish what I need to do with her.

Q. But you're not responding to any of her statements; right? You're not exchanging in the conversation with her at this point?

A. No. Because I'm trying to fill out the citation.

Q. So does it sound like you're actually gathering information from the suspect, that you're trying to investigate what happened?

A. No. Because I was trying to figure -- I was trying to fill out the citation.

Q. In other words, Officer -- let me just get this.

In other words, after you spoke with Guy Garcia, even before that -- because you had come to the CVS before many times before, you worked with these employees, you knew these people, and you had been regularly there, you basically automatically assumed that whatever they were saying is true; right?

MR. KANG: Objection. Misstates prior

testimony. Asked and answered. Argumentative.

THE DEPONENT: I was filling out the citation because I made the determination of what I was going to do, and I haven't started my -- I was going to Mirandize her shortly after this -- or after this.

MS. MKRTCHYAN: Nonresponsive.

BY MS. MKRTCHYAN:

Q. My question was different.

When you came initially -- we already covered this in terms of you knew this location, you knew the employees, you detained Ms. Burmayan within minutes, you've placed her in the patrol car with handcuffs.

Then you automatically assumed that CVS employees were telling you the truth and she was lying; true?

A. I went off what I was told, off the statement.

Q. So you assumed that CVS employees are telling you the truth and she's lying?

MR. KANG: Objection. Asked and answered. Argumentative.

BY MS. MKRTCHYAN:

Q. True?

A. Based on what I was told, I made the determination that, yes, she was in violation of the trespassing.

(Video recording playing.)

BY MS. MKRTCHYAN:

Q. So no matter what she was going to say here in the car, within this -- all this 18 minutes she's seated there, you had already made your decision; right? You already told her that "I've made my decision. No matter what you tell me, I have to arrest you"; true?

MR. KANG: Objection. Asked and answered. Argumentative. Harassing.

THE DEPONENT: Which is why I'm filling out the citation.

BY MS. MKRTCHYAN:

Q. But you did tell her -- let's continue playing this.

(Video recording playing.)

BY MS. MKRTCHYAN:

Q. This is not you, this is Armendariz talking to her -- right? -- at 12:45?

A. Yes.

Q. And he's telling her you've got to go to another CVS, basically?

A. Yes.
Q. And she's saying but why? You know, I know the manager here. I wanted to talk to the manager. She's -- you know, I've known her. I want to talk to her; right?
A. Yes.
Q. Okay.
(Video recording playing.)
BY MS. MKRTCHYAN:
Q. So this time when he's talking to her, are you still in the car or where are you?
A. I -- I don't know.
Q. Would you be getting out of the car at this point?
A. I may have. I don't know.
Q. But where would you go?
A. That's what I'm saying. I don't know. I can't answer that.
Q. Okay. So you don't have any better recollection of what you were doing at this point in time as she's talking to Armendariz at 13:01?
A. No.
(Video recording playing.)
THE DEPONENT: Actually, it looks like I'm still in the driver's seat because I can see the

reflection right there? Off -- if you look to the right?

BY MS. MKRTCHYAN:

Q. Okay.

A. Right here.

Q. Uh-huh.

A. I may be -- you see something with me?

Q. Outside?

A. No. Right here, in this reflection here?

Q. Oh, I see you.

A. I might still be in the driver's seat.

Q. With your computer?

A. Might be, yeah.

Q. I see. Yes. I can see something.

A. Yeah. If you -- if you back it up, like, 15 seconds? That might still be me. I can't confirm that. But that might still be me in the --

Q. Yeah, there's something there. And you have a --

A. Yeah.

Q. -- laptop.

A. Yeah, that's the computer right there.

Q. Okay.

(Video recording playing.)

///

14:23 BY MS. MKRTCHYAN:
14:23 Q. So it seems to me that you -- even though you're not talking, you are still in the car at this 12:20 minutes?
14:23 A. Yes, that's what it appears. But like I said, I can't answer a hundred percent if that's still me or someone who's still on scene.
14:23 Q. Okay.
14:23 (Video recording playing.)
14:24 MS. MKRTCHYAN: Just fast forward here. Okay. I want to make sure that we can see the point in time when the car door is open. So --
14:25 (Video recording playing.)
14:25 MR. KANG: Can we take a break?
14:25 MS. MKRTCHYAN: Let me finish this line of questioning, and we will.
14:25 BY MS. MKRTCHYAN:
14:25 Q. So at this point, 13:59, I can see her patrol car -- the patrol car door opening; right?
14:25 A. Yes.
14:25 Q. And you are no longer in the front seat. So apparently, you're the one who got out of the car and you opened the door for her?
14:25 A. Yes.
14:25 Q. That's when you are deciding to release

14:25 her?
14:25 A. Yes.
14:25 Q. Okay. So let me just make sure that's you.
14:25 (Video recording playing.)
14:25 BY MS. MKRTCHYAN:
14:25 Q. So but, though, we can see now, only now is the door of the patrol car opened; right?
14:25 A. Yes. Yes.
14:25 Q. Prior to that, throughout the time when she was screaming for breathing issues, the door was closed?
14:25 A. Yes.
14:25 (Video recording playing.)
14:25 BY MS. MKRTCHYAN:
14:26 Q. And we can hear you, we can see you actually, you're holding your ticket -- what is it called? -- pad -- the electronic pad?
14:26 A. The cite book?
14:26 Q. Cite --
14:26 A. Yeah, the cite book.
14:26 Q. Right. And then you're by the door, and now you're talking to her by the door at 14:07; right?
14:26 A. Yes.
14:26 MS. MKRTCHYAN: Okay. Well, let's take a

14:26 break, 10 minutes' break, and we'll continue with this.

14:26 (Recess.)

14:26 BY MS. MKRTCHYAN:

14:33 Q. All right. So let's continue. And then at some point, I'm going to cover your audio recording; right? We have your audio.

14:33 (Video recording playing.)

14:33 BY MS. MKRTCHYAN:

14:33 Q. Okay. So it's 14:15, when, you know, you're talking to her next to the patrol car, she's still sitting in the car.

14:34 You are basically -- this is when you're Mirandizing her?

14:34 A. Yes.

14:34 Q. Okay. And she's basically -- you're formally advising her that "You're under arrest"?

14:34 A. Yes.

14:34 Q. At this time?

14:34 A. Yes.

14:34 (Video recording playing.)

14:34 BY MS. MKRTCHYAN:

14:34 Q. And you have -- and she's asking -- she's wondering -- she's, like -- she's protesting. She's saying are you serious, et cetera; right? She's

14:34 still in disbelief that she's getting arrested?
14:34 A. Yes.
14:34 Q. And then you have the citation papers for her; right?
14:34 A. Yes.
14:34 Q. Okay.
14:34 (Video recording playing.)
14:34 BY MS. MKRTCHYAN:
14:34 Q. Okay. And 14:25, when she's reported that I thought we were going to talk, you know, what is happening, why am I getting arrested, you know, et cetera.
14:34 While she's still in the patrol car in handcuffs, you're telling her I already made the decision; right? That's it. I'm done. I'm done with the decision. There's no change in my decision; right?
14:35 A. I don't remember saying that word-for-word. I'd have to listen to it, but yeah, I did say I made the decision.
14:35 Q. Right. Yeah. I mean, I'm paraphrasing your comments.
14:35 But basically you're telling her, I made the decision, Anoush, and you're -- you keep referencing her by her first name; right?

A. Yes.
Q. Why would you reference her by her first name?
A. I do that with everybody that I come in contact with.
Q. Okay. You don't talk to them by last name?
A. If they ask me -- if I'm calling them by their first name, and they want something different --
Q. Uh-huh.
A. -- then I will do that. But I was never --
Q. Uh-huh.
A. I -- I call people by their first name and -- and -- unless I'm told otherwise.
Q. I see.
So your department that -- never counseled you to be more respectful towards citizens?
MR. KANG: Objection. Argumentative.
THE DEPONENT: Not in that manner, no.
BY MS. MKRTCHYAN:
Q. But generally, your department does ask you to be courteous when speaking --
A. Yes.
(Reporter clarification.)
///

BY MS. MKRTCHYAN:
Q. -- with citizens; right?
A. Yes.
Q. And you think that if -- let me ask you this.
Do you like when someone who you don't know, who you don't know, talks to you by first name?
A. Yes.
Q. You're okay with that?
A. I am.
Q. So someone, like, in the street you meet, like, you go store shopping, someone talks to you -- talks to you, like, "James," you know, "Jim," you're okay with that?
A. Yeah. I even -- when I -- when I am out in the public and people ask for my name, I give them my first name.
Q. Uh-huh.
A. Even in uniform.
Q. Okay. All right.
So but, you know, your department never told you that, you know, to treat citizens with last name, just call them by last name rather than by first name?

14:36 A. No.
14:36 Q. Okay. She found it, though -- she believes that this demeanor was disrespectful, you know.
14:36 Do you think she had reason to believe that that's disrespectful?
14:36 A. If that's part of her culture, then that is. But it was never brought to my attention. And if she would have said, "Can you please call me by my last name," I would have.
14:37 Q. Could you say, even, her last name?
14:37 A. I would have tried.
14:37 Q. Okay. You asked to spell it a couple of times at least; right?
14:37 A. There's some long spellings sometimes. But I try my best to pronounce it appropriately.
14:37 Q. I see.
14:37 A. And correctly.
14:37 Q. Right. And -- okay. Let's continue.
14:37 (Video recording playing.)
14:37 BY MS. MKRTCHYAN:
14:37 Q. And you're telling her, "I'm making a private citizen's arrest," and she's protesting, "Sir, why?" And "Why?
14:37 And you're telling her, "Stop. Stop"; right? You're talking to her like that?

A. I am. 'Cause I'm trying to get through it so I can ask her the questions and get her side of -- get her statement for the Miranda interview.

Q. Uh-huh.

A. And, yeah, that's -- that's why I was trying to do that. I was trying to get through that process.

Q. Okay. Is this what your -- Sergeant Robinson advised you, that your attitude could be better?

A. He did. And I explained to him, as I'm explaining right now, that a lot of what was going on was -- had already been said, and I had already heard what was -- what she had to say.

But I was trying to get through the process and get her out of the car and go about our day -- both of us, go about our day.

Q. Right. Have you -- since this incident, have you responded to the criticism by your sergeant and changed your tone of voice with other people?

A. I believe I have. There's always room for improvement. So I believe I have.

Q. As opposed -- for example, other instances -- for example, use-of-force instances -- first of all, let me back up.

In this case, you didn't report use of force; right? You didn't, you know, tell the supervisors that there was use of force in this incidence?

A. No.

Q. Okay. But handcuffing and restraint can be sometimes considered use of force; right?

A. It can. But it doesn't meet the entry that the supervisors have to make.

Q. Okay. In what instances -- let me ask you this.

In what instances is handcuff and restraint considered use of force?

A. For -- I -- I mean, it's a bare minimum -- it's a minimum level of use of force, but handcuffing in this situation is a use of force. But like I said, there's a documentation --

Q. Uh-huh.

A. -- that the sergeants need to be notified, and this didn't meet that.

Q. Okay. Why? Why? Why was this not meeting those standards?

A. Because they have a certain criteria that it has to meet for a certain entry into the -- I think it's called BlueTeam entry.

14:39 Q. Uh-huh.
14:39 A. And this didn't meet that.
14:39 Q. So this is not a reportable use of force --
14:39 A. No.
14:39 Q. -- in other words?
14:39 A. Yes.
14:39 Q. But if someone is complaining of, you know, tight handcuffs or if someone is complaining of sitting in a patrol car in a prolonged fashion like here, as she's complaining, is that considered use of force, reportable use of force --
14:39 A. No.
14:39 Q. -- by your department?
14:39 A. No.
14:39 Q. No?
14:39 A. No.
14:39 Q. Okay. We'll look at your use-of-force policy in a minute. Let's finish listening.
14:39 (Video recording playing.)
14:39 BY MS. MKRTCHYAN:
14:40 Q. So you draw up this 15 minutes -- I mean, at 15:11 time stamp, you're reading her Miranda rights, she's crying, she keeps asking about questions, what she's -- is going to happen, why she's being cited or arrested; true?

14:40 A. Uh-huh. Yes.
14:40 Q. And you're not responding for it -- you're not responding to her questions; true?
14:40 A. Yes. Because I need to get through the questions that I need to ask her, and I need a response from her, and then we can talk about it.
14:41 Q. Okay.
14:41 (Video recording playing.)
14:41 BY MS. MKRTCHYAN:
14:41 Q. So but let me ask you this.
14:41 We saw on this patrol audio/video, you had already spoken to her about this incident without Mirandizing her; right?
14:41 A. And she was detained in handcuffs.
14:41 Q. Right.
14:41 A. And she was -- she knew that she was detained in handcuffs. And then I told her she -- as I opened the door, she was arrested -- she was going to be placed under arrest for trespassing, and she's going to be cited out.
14:41 Q. Right. No, that's not my question.
14:41 My question is this: Are you trained, before questioning suspects, to read their rights, Miranda rights?
14:41 A. If I'm going to place them under arrest.

14:41 But I hadn't made the decision yet, until I started reading her her rights. And that's why I wasn't asking any questions -- investigative questions towards her.

14:42 Q. Okay. Let me ask you this. This is not what I'm asking you.

14:42 Is it your understanding that Miranda rights admonition kicks in only when you are formally placing someone under arrest? Is that what your understanding is?

14:42 A. Yes. When I'm going to get statements from her regarding the arrest and in dispatching where she's at, then yes.

14:42 Q. So if you're detaining someone pending further investigation, before you made the final decision to make an arrest, you don't -- and you're questioning that person and she's making statements, you don't have to advise Miranda?

14:42 A. I'm not asking her questions. And she knows --

14:42 Q. You are --

14:42 A. And she knows she's being detained.

14:42 Q. But you are engaging in conversation, as we saw, in this patrol vehicle; right?

14:42 A. I told her she's being detained.

Q. Okay. But you're not answering any question, sir. Please listen carefully and respond to my question.

Is it your understanding that when someone is being detained, before you've made the decision to formally arrest them and cite them or release them or take them to jail, just detention, pending further investigation, you don't have to Mirandize them when they're talking to you?

A. No.

Q. Okay. Let's continue playing this.

(Video recording playing.)

BY MS. MKRTCHYAN:

Q. So 16 minutes, basically.

Now, when she waives her rights, at this juncture, you continue talking to her; right?

A. Yes.

Q. You are asking questions?

A. Yes.

Q. And then when she's responding to you, she's telling you the same story she had told you before in the patrol car, she's sitting there; right?

A. Yes.

Q. Okay. There's nothing new here that she's

14:44 telling you?
14:44 A. No.
14:44 Q. Okay. You already knew this information?
14:44 A. Yes.
14:44 Q. And then basically, you are telling her
14:44 then -- you probably didn't listen to them -- you're
14:44 still, based on this one- or two-minute -- let's
14:44 finish this conversation with you and her, and I'll
14:44 ask you more questions.
14:44 (Video recording playing.)
14:44 BY MS. MKRTCHYAN:
14:45 Q. So 16:59, you know, we have this exchange
14:45 between you and her after Miranda advisement. She
14:45 keeps protesting, telling you exactly same thing as
14:45 she had told you before, but you're not taking her
14:45 statement as true; true?
14:45 You're telling her, you know, the court --
14:45 that's what the court is for, you're just going to
14:45 go to court.
14:45 Are you going to sign this or not; right?
14:45 A. Yes.
14:45 Q. Paraphrasing.
14:45 A. Yes.
14:45 Q. So basically, you had already made up your
14:45 mind to arrest her, based on the statement by

14:45 Guy Garcia?
14:45 A. Yes.
14:45 (Video recording playing.)
14:45 BY MS. MKRTCHYAN:
14:45 Q. And you're giving her choice, either, you
14:46 know, cite the -- sign the citation and go, or I'm
14:46 going to take you to jail, you tell her; right?
14:46 A. Yes.
14:46 Q. You're now telling her, by the way --
14:46 you're not explaining to her that signing the
14:46 citation is not admitting guilt, that this is just a
14:46 promise to appear; right? You're not explaining
14:46 that to her?
14:46 A. I don't know if that ever came out, no.
14:46 Q. Is this, like -- you know -- and she keeps
14:46 asking, why do I have to sign this? She's
14:46 concerned, you know?
14:46 Isn't it your obligation as a peace officer
14:46 to kind of advise her that, "Look, ma'am, this is
14:46 just a notice to appear. You are not admitting
14:46 guilt. You just sign it so that you don't have
14:46 to -- you're not admitting guilt"?
14:46 A. And if I didn't say that in this video or
14:46 in my audio, then I missed that.
14:46 Q. But that's your obligation -- right? --

14:46 A. It is --
14:46 Q. -- to tell them --
14:46 A. -- to remind them, yes.
14:46 (Video recording playing.)
14:46 BY MS. MKRTCHYAN:
14:47 Q. At 18 minutes, basically you are telling her in very mandatory terms, in very categorical terms, that if you come back to this location, to this CVS, you will be arrested; true?
14:47 A. Yes.
14:47 Q. Okay. And this is the -- we've covered this -- the report you had is entirely CVS employee statement?
14:48 A. Yes.
14:48 Q. And you cannot point to any other independent information you've received whether she was banned, why she was banned, et cetera; right?
14:48 You're basically going from what Guy Garcia told you on that day to make this admonition to her?
14:48 A. Yes.
14:48 (Video recording playing.)
14:48 BY MS. MKRTCHYAN:
14:48 Q. And let me ask you this: If Guy Garcia's statement in any shape or form were not found to be true, right now -- as of right now, you're sitting

14:48 here today, would you be obligated -- would you be actually authorized to make such an admonition to her?
14:48 A. One more time.
14:48 Q. If what Guy Garcia told you on that day --
14:48 A. Yes.
14:48 Q. -- was not true, would you be authorized to ban her from this location?
14:48 A. If it wasn't true and he wanted her advised? Then she would have walked away. But based on his statement and that she was already advised, I placed her under arrest.
14:49 Q. No, that's not my question. My question is different.
14:49 My question is: If -- if you've learned during your investigation -- right now, you're sitting here today, hypothetically, if Guy Garcia -- anything he said is not true and not verified and not corroborated, not true, would you be authorized to ban her from this location, you yourself as a peace officer?
14:49 A. Well, it's already --
14:49 MR. KANG: Objection.
14:49 Hold on.
14:49 Objection. Incomplete hypothetical.

THE DEPONENT: What's already done is done. This date has come and gone.

BY MS. MKRTCHYAN:

Q. I understand. Not that date. After -- after the fact.

A. That's what I'm saying. That's what I'm trying to get to. This day has come and gone. What's happened has happened. If he changes his mind after the fact, I can't -- I can't go off of him.

BY MS. MKRTCHYAN:

Q. No, but --

A. I made my decision that day, based on his statement.

Q. Yeah, but if -- let me ask you this.

If -- you know, to this day, she hasn't been able to go to CVS Pharmacy, from that day on until today, she has not gone to that CVS Pharmacy. Okay?

So, you know, now basically she's permanently banned from that location; okay? Until we get a court to actually make an order, you know. But what I'm trying to say is completely different.

If on that day what Guy Garcia told you was not true, just basically if that was not true, would

14:50 you be able to tell her this admonition, that you cannot come back to this location?

14:50 A. I believe I answered that. That if what he told me right here, this statement, was not true --

14:50 Q. Uh-huh.

14:50 A. -- and I came to find -- I came to find out that what he said was not true --

14:50 Q. Uh-huh.

14:50 A. -- and if I had talked to that other guy, like you -- like you want me to --

14:50 Q. Uh-huh.

14:50 A. -- then, yes, I would have -- and if he just wanted her advised that day?

14:50 Q. Uh-huh.

14:50 A. Then, yes, she would have walked away, and I -- I would advise her. Or if he didn't want her advised, I would have said, "Hey, just leave."

14:50 Q. So another option could have been that, you know, as a police officer, you could have spoken with Joe Johnson on that day, confirmed that he had not banned her as a manager, confirmed that he had not seen her come back three times before, and you could have said, "Ma'am, look, there is some dispute going on between you and CVS employees.

14:51 "I'm warning you -- I'm not going to cite

14:51 you. I'm not going to arrest you. I'm warning you not to come back," could that be an option for you as a police officer on that day, had you spoken with Joe Johnson?

14:51 A. If all of this was found not true, then yes, I would have gave her a warning that day.

14:51 Q. And you had the option, you were -- as an officer, you have the discretion, instead of arresting someone and citing them, to give them a warning; right?

14:51 A. Yes. And I have arrested plenty of people for trespassing, and I've also given plenty of warnings. And you know how many people come back, and I have to then go back and arrest them.

14:51 Q. Right. And you have that power?

14:51 A. Yes.

14:51 Q. Okay.

14:51 (Video recording playing.)

14:51 BY MS. MKRTCHYAN:

14:52 Q. Okay. So 18:26, she's taken out of the patrol car, and then -- let's hear your audio recording.

14:52 (Audio recording playing.)

14:52 BY MS. MKRTCHYAN:

14:52 Q. So, you know, basically, this is your audio

14:52 recording. And I want you to confirm that this audio is basically captured at the time you open the door of the patrol car, and you're starting to talk to her; right?

14:52 A. I'm going to have to listen to it.

14:52 Q. Okay.

14:52 (Audio recording playing.)

14:52 BY MS. MKRTCHYAN:

14:52 Q. Isn't this the time when you're Mirandizing her? That's when you're turning on your audio recorder?

14:53 A. It sounds like it, yes.

14:53 Q. And this is -- we've heard, also -- on some of this, we heard on patrol video, you opened the door, you started Mirandizing her; right?

14:53 A. Yes.

14:53 Q. And this is when your audio is turned on?

14:53 A. Yes.

14:53 Q. Okay. So but basically, you have not heard -- as of right now, you're sitting here today, you have not heard any other tape, audio, from you on that day of the incident?

14:53 A. No, not that I know.

14:53 Q. Other than this --

14:53 (Reporter clarification.)

14:53 BY MS. MKRTCHYAN:
14:53 Q. Other than this tape, you have not heard any other audio from your body on that date?
14:53 A. No.
14:53 (Audio recording playing.)
14:53 BY MS. MKRTCHYAN:
14:55 Q. So during this Miranda conversa- -- or advisement, conversation you were having after Miranda advisement, you're questioning her about if she was told not to come back; right?
14:55 A. Yes.
14:55 Q. And she says, you know, "I was never told not to come back"; right?
14:55 A. Uh-huh. Yes.
14:55 Q. And then you responded to her, you probably didn't listen; right?
14:55 A. Yes.
14:55 Q. So you automatically assume that everything she's saying is not true; right?
14:55 A. I made the judgment that I made.
14:55 Q. And then so -- and throughout the time you're telling her, yes, I've heard your comments, I've heard your story, but I've made the decision, I'm accepting the private citizen's arrest; right?
14:56 A. Yes.

(Audio recording playing.)
BY MS. MKRTCHYAN:
Q. And she insists, "I did not come back here three times," you know.
She insists; right?
A. Uh-huh.
Q. Right?
A. Yes.
Q. And you did not verify whether that is true or not; true?
A. Yes.
(Audio recording playing.)
BY MS. MKRTCHYAN:
Q. You told her that's what the court is for; right?
A. Yes.
(Audio recording playing.)
BY MS. MKRTCHYAN:
Q. So when she says, "What's my option," you know, you're telling her, "If you don't sign the citation, I'm going to take you to jail"; right?
A. Yes.
(Audio recording playing.)
BY MS. MKRTCHYAN:
Q. You're telling her, second you come in,

14:58 you're going to be arrested to this property; right?
14:58 A. Yes.
14:58 Q. And that's entirely, again, based on
14:58 Guy Garcia's statement.
14:58 A. Yes.
14:58 (Audio recording playing.)
14:58 BY MS. MKRTCHYAN:
14:59 Q. So only after you removed her from the
14:59 patrol car, that she was released from handcuffs;
14:59 true?
14:59 A. Yes.
14:59 Q. In order to sign the citation so that she
14:59 can go home?
14:59 A. Yes.
14:59 Q. And prior to that, though, you had her --
14:59 taken pictures -- you took pictures of her?
14:59 A. Yes.
14:59 Q. That's how we have those pictures?
15:00 A. Yes.
15:00 Q. Why did you take her pictures?
15:00 A. Because we weren't booking her, and we
15:00 weren't booking a lot of people, because the COVID
15:00 times, the COVID bail schedule with LA County. So I
15:00 was taking pictures of people since they hadn't been
15:00 in the system.

15:00 Q. I can't hear you.
15:00 A. I was taking pictures of people that I was arresting --
15:00 Q. Uh-huh.
15:00 A. -- and citing, out in the field. That way we had at least pictures of them because they weren't being booked for a lot of the charges, because of that COVID bail system.
15:00 Q. Okay. And during taking pictures, this is the time, obviously, you took pictures; right?
15:00 A. Yes.
15:00 Q. And you used what kind of a -- you had a cell phone?
15:00 How were you taking pictures?
15:00 A. Yeah, it was the cell phone. But it's the -- through the Axon app, the Axon Capture app, and it gets directly uploaded to our evidence.
15:00 Q. And this is next to your patrol car; right?
15:00 A. Yes.
15:00 Q. And this is what you meant, the apartment complex?
15:00 A. There's an apartment building right there, then there's also an apartment building just east, across the street to the left.
15:00 Q. Okay. And in these pictures that you took,

her face mask is lowered, though; right?
You asked her to lower her face mask so that you can take picture of her face?
A. I did.
Q. And so this -- at this point, you were not concerned about safety; right?
A. I'm talking about in the car with the way she was acting before her demeanor, all that stuff.
Q. I'm talking about the face mask issue.
You said that, you know, you would have lowered her face mask initially when she was complaining of breathing, if it was safe; right?
A. I wasn't near the window. And I also said I can't answer for Griffin -- or Officer Armendariz. I -- you asked me if I was there and being told that, I would have done that.
Q. Okay. But in any event, during photographing, you allowed her to lower her face mask, not doing when she was screaming of not being able to breathe; right?
A. I asked her for her picture. And she was out of the car because I was releasing her. But I wouldn't have made a big deal about this. If she was not cooperative with me and didn't want to lower the mask, I would have just called it. I wouldn't

15:02 have taken it any further.
15:02 Q. Well, in other words, my question is,
15:02 basically -- the photograph speaks for itself. When
15:02 you took her picture, her mask is lowered --
15:02 A. And she also --
15:02 Q. -- and you asked her to lower -- can you
15:02 please answer the question: Did you or did you not
15:02 ask her to lower the face mask?
15:02 A. At that time, she was cooperative. In the
15:02 car, she was not. She was yelling and screaming,
15:02 completely different demeanor from that time to
15:02 here.
15:02 Q. Okay. In other words -- let's continue
15:02 playing this tape, then.
15:02 We've seen everything that is in the patrol
15:02 car on that tape; right?
15:02 A. Yes.
15:02 (Audio recording playing.)
15:02 BY MS. MKRTCHYAN:
15:04 Q. You keep insisting that you cannot come
15:04 back on this property even if you want to talk to
15:04 the manager; right?
15:04 A. She's on the property. And that's what
15:04 they don't want. They don't want her there.
15:04 Q. Understood.

15:04 But that's -- I want you to confirm what you're telling her. That, you know, based on this tape, you're telling her you cannot come back onto this property --

15:04 A. Yes.

15:04 Q. -- regardless of whether you want to talk to someone, et cetera, et cetera; right?

15:04 A. Yes. Because if she goes back on the property, she's trespassing. She -- they don't want her there. Even if she wants to have a conversation with them, I get that, but at the same time, they don't want her there.

15:04 Q. Uh-huh.

15:04 (Audio recording playing.)

15:04 BY MS. MKRTCHYAN:

15:04 Q. And if -- you know, we've covered exceptions for this, you know, trespassing thing, and if someone had the grudge on her, someone doesn't like her, that's not a concern to you?

15:05 A. It is. But it never came out in the statement that was given.

15:05 Q. So if you listen to her, she's explaining to you that "I never had problems with these people here. I'm a regular a customer. Manager knows me."

15:05 Maybe this guy, this tall guy who's

15:05 Guy Garcia, has an issue, you know, you -- if you let her, right here on patrol videotape, you would have understood that there might be something going on here with Guy Garcia, wouldn't you? As a police officer? To go in and investigate further before arresting her?

15:05 A. No.

15:05 Q. No?

15:05 A. Because I had dealt with him in the past. And people lie to me all the time, like I said earlier.

15:07 (Audio recording playing.)

15:07 BY MS. MKRTCHYAN:

15:07 Q. So at around eight minutes with your audio recorder, she -- when she's asking you, okay, so you basically take their statements as true, not mine, you say, oh, I work with this business all the time pretty much -- I'm paraphrasing your statement -- but, you know, I come to this business all the time, you know, this happens all the time, and I happen to take their word. I believe what they're saying. Advisements are given all day long, regularly.

15:08 They can refuse, deny anyone service; right? That's what you're saying?

15:08 A. Yes.

15:08 Q. Okay. So basically, you are giving her your intent, your mindset, your mental -- your intent in arresting her by telling her, look, I take their word as true. This happens all the time, you know, with this CVS or other. This is a business establishment. They can refuse service to anyone; right?

15:08 A. Yes.

15:08 Q. Okay. And so basically you did, on that day, take everything Guy Garcia said as true; true?

15:08 A. Yes.

15:09 Q. But --

15:09 A. But I also didn't tell her that I arrest everybody. I said I give a lot of advisements.

15:09 Q. Uh-huh.

15:09 A. So just because this incident led up to an arrest doesn't mean I arrest everybody.

15:09 Q. I see.

15:09 A. I give a lot of advisements, too --

15:09 Q. Right.

15:09 A. -- just like I said in the recording.

15:09 Q. Right. But so, as a police officer, you have an obligation to investigate calls for service impartially in an unbiased fashion.

15:09 A. And I did that.

Q. You did that?
A. Yes, I did.
Q. So if you're taking -- if you're telling her right here, you're admitting to her that, look, I happen to take their word as true, even though whatever you're telling me, you know, is not consistent, I have to take their word for true.
That's not an admission that you're actually biased?
A. That's not what I said. And if you want to put intent in my mouth, then you can go ahead and do that. But I did not say that.
I said I gave advisements all the time, as well as the store gives advisements all the time, but I did not say I arrest everybody.
I did not say that one bit. And there was no intent --
Q. I see.
A. -- in that -- in that statement that I made to her. So if she took it that way and you're taking it that way, then that's -- then you guys can take it that way. But I never -- never said that.
Q. So but you believe that, you know, based on these interactions, based on this arrest, you conducted this investigation in an unbiased fashion?

15:10 A. Yes, I do.
15:10 Q. When you're telling her I happen to believe their word and I don't believe you, that's unbiased?
15:10 A. Yes. Because it's -- he told me one thing, she told me another.
15:10 Q. Okay.
15:10 A. Stories don't add up.
15:10 MR. KANG: You answered the question. You've answered the question. You're good.
15:10 MS. MKRTCHYAN: Excuse me. Excuse me. I am asking questions.
15:10 MR. KANG: Yes. That's a yes-or-no question. He said yes. That's it.
15:10 MS. MKRTCHYAN: Oh.
15:10 BY MS. MKRTCHYAN:
15:10 Q. So, you know -- and we've covered this.
15:10 You spoke to him, you didn't verify his statements; right? You just took his statement as true; right?
15:10 A. Yes.
15:10 Q. Okay.
15:10 MR. KANG: And --
15:10 BY MS. MKRTCHYAN:
15:10 Q. And you spoke to her -- you spoke to her --
15:10 MR. KANG: Give me a chance to object.

MS. MKRTCHYAN: Are you coaching her [sic]?

MR. KANG: No, I am asking him to give me a chance to make an objection.

BY MS. MKRTCHYAN:

Q. Yes. So and you spoke to her; right? You didn't have any independent verification that she's lying; right?

You didn't know if she's lying or telling the truth; right?

MR. KANG: Objection. Asked and answered. Argumentative. Harassing at this point.

BY MS. MKRTCHYAN:

Q. Did you know if she was there three times or one time? You didn't know; right, Officer?

A. I went based off the statement I was given.

Q. Understood.

All I want you is to confirm, sir, that you took his statement as true, not hers?

A. I went based off the statement, so yes.

Q. And basically, it's two people, we have -- okay? -- and you still believed that -- you took one person's statement, the CVS employee statement as true, not hers, and yet you still believe it was an unbiased investigation?

A. Yes.

15:11 Q. Okay.
15:11 (Audio recording playing.)
15:11 BY MS. MKRTCHYAN:
15:12 Q. She also says why was it necessary, pretty much, handcuffing me; right? She asks you that question. You know, so you can just basically take someone's word as true and then handcuff me.
15:12 And you told her what? Tell me what you told her on audio in response to that, why was she handcuffed?
15:12 A. I said, right there, that she was under arrest. But I don't need to go into detail on why -- every action I took during this investigation. I don't need to explain that to her.
15:12 Q. So you don't have to explain upset citizen about what happened to her before releasing her?
15:12 A. No.
15:12 Q. She can file a complaint; right?
15:12 A. Yes. And there's a complaint process.
15:12 Q. Okay. Did you basically tell her, ma'am, you know, if you're unhappy with the way you're being handled today, if you're unhappy with the arrest, you know, contact our department, make a complaint? Did you tell her that?
15:12 A. That was said on the audio.

Q. You told her contact CVS, not Glendale PD.
A. No. There's -- I -- I believe it was Armendariz said there was a complaint process, and she can file a complaint.
Q. With the Glendale PD?
A. I don't know if he said that or -- I don't know what he said. But I know he said on there, there's a complaint process and she could file a complaint.
Q. She told us -- I see.
She told us that she could complain to CVS corporate. No one during this audio recording --
A. Did he say that -- did he say that verbally?
Q. Yes. Throughout this audio recording, no one ever told her and she testified that I was not -- I was not aware what to do when I was released.
You know, nobody told her that, look, ma'am, you're not happy with us, contact the Glendale PD. Or you can call sergeant to see.
In fact, you have a policy; right? If someone is unhappy with the way she's being handled or arrested by you, you can call the supervisor to see; right?

A. Yes. Upon request.
Q. Well, does she know? If she's not told what to do, could you tell her, ma'am, you know, if you are not happy with the way I'm doing business here today, I'm citing you, you're -- you don't want to leave, you know, I can call the supervisor at the scene?
Did you ever tell her that?
A. No.
Q. But you have the option to do that, you have the policy to call supervisor; right?
MR. KANG: Objection. Misstates the policy.
BY MS. MKRTCHYAN:
Q. True?
A. No.
Q. Well, so if someone is --
A. On requests.
Q. Right.
But the person needs to know that she has that right to come -- to make that request; right?
A. I don't have to vocalize that. I said there's -- Griffin Armendariz said there's a complaint process.
Q. That's with CVS.

15:14 But anyway, throughout this audio recording, you never told her, ma'am, I can call my supervisor if you want to talk to supervisor; true? You never told her that?

15:14 A. No, I didn't.

15:14 Q. You just told her, go, leave, leave; right? You said that to her?

15:14 A. No.

15:14 Q. Well --

15:14 A. If I did, then it's -- it's on the audio. But I don't remember just saying go -- like, the way you said it.

15:14 Q. Well, but you told her, leave, you've got to leave. We're done with you, just leave.

15:14 MR. KANG: Objection. Misstates the audio.

15:14 MS. MKRTCHYAN: Let's continue playing.

15:14 (Audio recording playing.)

15:14 BY MS. MKRTCHYAN:

15:15 Q. Yeah. She keeps complaining, and you tell her, you're under arrest. You've said it several times, and you have a problem with listening; right? You said that to her?

15:15 A. I did.

15:15 (Audio recording playing.)

15:15 ///

15:15 BY MS. MKRTCHYAN:
15:15 Q. Yeah, 9:39 minutes, and you're -- on your tape you're telling her, "Anoush, we're going in circles here. You need to leave"; right?
15:15 A. Yes.
15:15 Q. And she keeps asking questions. We have Officers Armendariz present, Gazandjian here, we hear her voice. They are -- they are actually more patient with her.
15:16 They're trying to explain, you know, "You're going to court, ma'am," you know, this and that. You know, just go through the process. Maybe it will be dismissed.
15:16 They're more patient with you than her; right?
15:16 A. She's been explained that multiple times.
15:16 Q. Right. But you're telling her, "Anoush, you got to leave," basically sending her a message that that we're done with you; right?
15:16 A. If you want to take it that way, then okay. But that's --
15:16 Q. That's how she took.
15:16 A. Okay.
15:16 Q. That's what she testified.
15:16 A. Okay. She was free to leave, and we

15:16 needed -- we needed to leave. She had already been
15:16 explained the process in depth. And I was telling
15:16 her she needed to leave.
15:16 Q. Okay. So --
15:16 (Audio recording playing.)
15:16 BY MS. MKRTCHYAN:
15:17 Q. Did you remember when you gave her her cell
15:17 phone, when you released her?
15:17 A. No.
15:17 Q. So, you know -- but you had confiscated the
15:17 cell phone; right?
15:17 A. Yes.
15:17 Q. Okay. So on this tape -- let's continue
15:17 hearing this and see if there is any conversation
15:17 about the cell phone.
15:17 (Audio recording playing.)
15:17 BY MS. MKRTCHYAN:
15:18 Q. There was no conversation about the cell
15:18 phone; right?
15:18 A. No.
15:18 Q. That we could tell? Okay.
15:18 So -- and this is the end of it in terms of
15:18 the audio recording of the conversation; right?
15:18 A. Yes.
15:18 Q. At that point in time, though -- do you

15:18 know what time, actually, you left the scene?
15:18 A. It would be on the -- on the CAD --
(Reporter clarification.)
THE DEPONENT: On the CAD, C-A-D, issue.
MS. MKRTCHYAN: Radio call.
THE DEPONENT: The -- yeah.
MS. MKRTCHYAN: Call log.
BY MS. MKRTCHYAN:
15:18 Q. When you leave the scene, generally, is it
15:18 your practice to inform the dispatch? Clear the
15:18 call?
15:18 A. We inform them either on the radio or on
15:18 the computer in the car.
15:18 Q. So is it possible that you are still in the
15:19 area, but -- you are clearing, but you respond to --
15:19 that you do not tell the dispatch that you have
15:19 cleared the scene?
15:19 A. It is possible, yes. Sometimes we stay on
15:19 scene, and we don't clear right away. We -- we kind
15:19 of hang around there for a second.
15:19 Q. Uh-huh.
15:19 A. But most of the time, we do clear.
15:19 Q. Uh-huh.
15:19 A. And then we'll just hang around and get
15:19 dispatch to do another call from that location.

15:19 Q. Uh-huh. So when you stop your audio recording, you actually turned off your mic; right?
15:19 A. Yes.
15:19 Q. Okay. Did you actually see her leave?
15:19 A. She had a car. So I believe she just drove away.
15:19 Q. She walked away? Okay.
15:19 Did she come back to ask for her cell phone?
15:19 A. I can't remember that.
15:19 Q. Okay. So but you had her cell phone in your possession before you placed her in the patrol car; right?
15:19 A. Yes.
15:19 Q. And during the citation signing, do you remember returning that at that point, or when did you return her cell phone?
15:19 A. I gave it back at some point.
15:20 Q. But you don't remember when?
15:20 A. No.
15:20 Q. Now, when you were talking about use of force policy -- let's talk about when use of force policy needs to be -- use of force has to be reported, according to your policy.
15:20 This is the policy by your department,

COG 127 through 128. We have -- it says, "Duty to report excessive force. You have a duty, as soon as reasonably practicable, an officer or employee shall report potential excessive force to supervisor when present," et cetera -- oh, "and observing another officer or employee using force."

You know, basically, excessive force needs to be reported; right?

A. Yes.

Q. Okay. And then obviously, you -- you know, your policy requires you to use force reasonably; right? You have to use only reasonable force; right?

A. Yes.

Q. To do these detentions; right?

A. Yes.

Q. We covered the handcuffing process, that restraints can be considered use of force; right?

A. Yes.

Q. Also pain compliance techniques. For example, control holds.

Do you know what is a control hold?

A. Yes.

Q. Okay. What is a control hold?

A. It's a hold that we'd be -- you'd able to

control somebody, either by their arm, wrists, whatever means.

Q. So you're guiding someone to the patrol car as you did with Ms. Burmayan, is that considered a control hold with your department?

A. Just merely holding her arm? No.

Q. Okay. So in this instance when you're handcuffing her and placing her in the patrol car and she's complaining of being there in an enclosed space, is that not considered use of force by your department?

A. Handcuffing, yes; putting in the car, no.

Q. No.

So if -- if even if I'm complaining of inability to breathe in an enclosed space, that is not considered force?

A. No.

Q. So you have to actually affirmatively do something on the person's body for it to be considered force?

A. Yes.

Q. Okay. So but even if you place -- you know, you handcuffed her, and you placed her in the patrol car in handcuffs.

You did not report that as a use of force;

right?
A. No.
Q. You did not at any point in time tell the department that, look, you know, even though this was a misdemeanor citation, I utilized restraints, handcuffing?
A. True.
Q. Why was it true? Tell the department?
A. I didn't need to tell the -- the department that I put -- placed her in handcuffs.
Q. I'm sorry?
A. I didn't need to note that, that I had placed her in handcuffs.
Q. But doesn't your policy requires you to say that? To report that?
A. No.
Q. Okay. All right. Well, let's look at the policy.
It says, "Restraint of Detainees. Situations may arise where it may be reasonable to restrain the person who may, after brief investigation, be released without arrest."
303.3.1. Restraints. "Unless arrested, the use of restraints on detainees should continue -- "

(Reporter clarification.)
MS. MKRTCHYAN: I will give you this policy later, but -- I know it's a long day, but --
BY MS. MKRTCHYAN:
15:23 Q. Basically, "Unless arrested, the user restraints on detainees should continue only for as long as it's reasonably necessary to ensure the safety of officers and others. When deciding to" -- "whether to remove restraints from a detainee, officer should continuously weigh the safety interests at hand against the continuing intrusion upon the detainee"; right?
15:23 A. Yes.
15:23 Q. You're aware of this policy; right?
15:23 A. Yes.
15:23 Q. But you have to apply restraints with caution, and there are situations when you have to be mindful of how long it needs to be done; right?
15:24 A. Yes.
15:24 Q. Okay. So if this -- we have our trespass investigation, you said that you were -- you had not yet arrested her when you handcuffed her and placed her in the patrol car; right?
15:24 A. Yes.
15:24 Q. You were detaining her, pending

15:24 investigation; right?
15:24 A. Yes.
15:24 Q. For trespassing?
15:24 A. Yes.
15:24 Q. Which is a citable offense?
15:24 A. Yes.
15:24 Q. Was there any need for you to keep her for 20 -- 18 minutes at least, based on patrol video recording, in handcuffs, without any consideration to the fact that she was complaining of breathing problems?
15:24 A. She didn't make any statements to me --
15:24 Q. Oh, she didn't --
15:24 A. -- until towards the very -- until towards the very end, and --
15:24 Q. Uh-huh. Uh-huh.
15:24 A. -- and no other medical issues either.
15:24 Q. Well, but she made those complaints to Officer Armendariz; right?
15:24 A. And I can't speak for him.
15:24 Q. But you were there within five minutes, we saw on patrol video. You were aware that she was complaining; true?
15:25 A. Yes.
15:25 Q. Okay. So, you know, was there any reason,

15:25 Officer, you didn't release her from handcuffs, if you were deciding just to cite her and release her, why didn't you just do that quickly enough for her not to have been in this situation?

15:25 A. Because she was still agitated in the car.

15:25 Q. You think she was agitated because she was having an anxiety attack?

15:25 A. As soon as she calmed down, it showed in the video, very clearly, that she was able to breathe and catch her breath and have a normal conversation, towards the end of the video.

15:25 Q. I see.

15:25 So in other words, you had the option, though, by your policy, to remove her earlier from the car and release her from handcuffs?

15:25 A. And we did when I opened the door.

15:25 Q. Only after 18 or 20 minutes.

15:25 A. And she was acting was that way for the majority of that time.

15:25 Q. I see.

15:25 So, here, there is another, also, application of handcuffs policy, 303.4.

15:25 The policy says, "There may be extenuating" -- "303.4. There may be extenuating circumstances that do not allow for the handcuffing

of an arrestee such as a physical disability. Any decision not to handcuff an arrestee must be made judiciously and articulated in the police report."

Do you see that?

A. I do.

Q. Were you aware of this policy?

A. Not specifically that line.

Q. I'm sorry?

A. Not specifically that line. But this also was approved by a sergeant, and went upstairs and I was never talked to about it.

Q. Well, regardless what your department does or does not do -- so you're saying that you were never criticized or questioned about handcuffing Ms. Burmayan and putting her in the patrol car --

A. Yes.

Q. -- true? Okay.

But regardless of that, I want to bring your attention to this policy. Your policy says when someone has a disability, physical disability, they're -- you know, you may not want to handcuff that person; right? That's what it says, in the gist; right?

A. I didn't catch that. Sorry.

MR. KANG: Yeah, objection. Vague.

15:26 BY MS. MKRTCHYAN:

15:26 Q. Okay. There may be extenuating circum- -- I read it for you. It's highlighted in yellow.

15:27 MR. KANG: No, what you said was -- I couldn't get it. Can you say it again?

15:27 MS. MKRTCHYAN: Counsel, are you coaching? Are you coaching?

15:27 MR. KANG: Okay. Objection. Unintelligible.

15:27 MS. MKRTCHYAN: Okay.

15:27 BY MS. MKRTCHYAN:

15:27 Q. Then so what I'm -- maybe my question was not clear.

15:27 There are situations when you are advised against handcuffing someone, such as disability; right?

15:27 MR. KANG: Objection. Misstates the policy.

15:27 THE DEPONENT: If they made that claim, then yes.

15:27 BY MS. MKRTCHYAN:

15:27 Q. What claim?

15:27 A. But there was no claim made --

15:27 Q. What claim?

15:27 A. -- of any disabilities.

15:27 Q. Well, but if someone says I have a hard time breathing, can you release me from the car, behind the patrol?

15:27 A. And I explained this, also, numerous times, that people say these things to get out of the back of the car and out of handcuffs, and then a fight ensues.

15:27 Q. I see.

15:27 A. So to prevent that --

15:27 Q. Uh-huh.

15:27 A. -- I did not uncuff her.

15:27 Q. So, sir, in other words, I'm trying to understand.

15:27 If someone says I have hard time breathing and you don't find that credible, and that person, let's say, dies of heart attack or asphyxiation, in any -- you know, in your patrol car, dies, like George Floyd died, basically, after saying, "I can't breath," okay? That's not a concern to you?

15:28 I'm just asking you. I mean, you're saying that you don't find it credible. A lot of people are complaining being in the car, as complaint, you know; right? That's what you said.

15:28 So if someone says I can't breathe, you don't find it credible, you don't do anything to

release that person, that's okay by the department?

A. I never said that it was okay.

Q. So then you -- then why did you not -- she kept asking, can you take me out of the car, I have a breathing problem. I can't breath.

Why aren't you going to pay attention to that?

A. Just because someone wants to get out of the car doesn't mean they get to go out of the car. Like I said, in the video, it shows, as soon as she started calming down and controlling herself --

Q. Uh-huh.

A. -- she was fine.

Q. Okay.

A. And she made no mention of any disabilities or medical problems the entire time other than "I can't breath" and -- or she was having trouble breathing, and as soon as she calmed down --

Q. Uh-huh.

A. -- and was able to calm herself --

Q. Uh-huh.

A. -- she was fine.

Q. So the patrol video will speak for itself.

But in any event, going back to your earlier statement is that a lot of people are

15:29 complaining about being in patrol car and you don't find it credible; true?

15:29 A. It's a case-by-case basis.

15:29 Q. Right. In this case, you didn't find anything Ms. Burmayan said on that day or complained about credible; true?

15:29 A. If Officer Griffin -- Armendariz did not during his encounter and didn't call for paramedics at that time, I trusted his ability. And when I got in there, it was -- we were talking to her, and she calmed down.

15:29 Q. I see.

15:29 But -- and yet your policy -- do you think it was -- you were complying with this policy, you and Armendariz, with this application of handcuff policy 303.4 on that day?

15:29 A. Yes, I do. Because there was no physical disability mentioned.

15:29 Q. I see. Let's go to your use of force history.

15:29 Were you ever counseled by your department that you were too aggressive with other suspects in other instances?

15:30 A. Can you -- can you mention one that you're talking about, if there's any?

15:30 Q. Ever. I'm just asking you, from right now, you're sitting here today, were you ever told by the department supervisor, sergeant, or lieutenants that any use-of-force incident you've been involved in within this period of time was excessive?

15:30 A. Not to my knowledge, no.

15:30 Q. So but you've been involved in use-of-force instances; right?

15:30 A. Yes.

15:30 Q. And you -- many instances, you took active role in applying takedowns, tackling people to the ground, et cetera; right?

15:30 A. Yes.

15:30 Q. Various parts of use of force; right?

15:30 A. Yes.

15:30 Q. You're tasered individuals?

15:30 A. No.

15:30 Q. No?

15:30 A. No.

15:30 Q. Okay. So let's look at some of your use-of-force history. And I'm going to go over some of it.

15:31 Do you recall an incident, arrest that you made with other officers, Brand and Detective Rico, sometime in December 28, 2019 for arrest made,

15:31 resisting police, 485 --

15:31 (Reporter clarification.)

15:31 BY MS. MKRTCHYAN:

15:31 Q. -- theft-related offense. 19 dash --

15:31 CR No. 19-19811.

15:31 Do you recall this incident?

15:31 A. I would have to read over it.

15:31 Q. Okay. Well, let's read some of this. We

15:31 have summary of what happened here.

15:31 "Ross received the dispatch that a male

15:31 attempted to retrieve lost phone at address which he

15:31 tracked," et cetera. "Suspect refused to give it

15:31 back unless the male paid him. Ross arrived at the

15:32 location," et cetera.

15:32 Then, you know, officers -- we have several

15:32 officers.

15:32 "Ross put weight on upper body to prevent

15:32 from further movement. Stapp removed leather" -- or

15:32 "leatherman from holster on belt. Ross and Stapp

15:32 gained control and placed handcuffs on suspect."

15:32 Do you remember this incident?

15:32 A. No.

15:32 Q. Well, if -- you know, this is the rendition

15:32 of what happened.

15:32 Did you want me to actually open the arrest

15:32 reports that you wrote?
15:32 A. Sure.
15:32 Q. Okay. Is that going to refresh your memory
15:32 of this incident?
15:32 A. Yeah. But I mean, I need to read the
15:32 thing -- the whole report. I can't skim through it.
15:32 Q. Well, you know, we don't want to read the
15:32 whole report. All I want is for you to confirm
15:32 that -- let's -- that that's -- that's what you were
15:32 involved in, and that's what, you know, the report
15:32 states.
15:32 So I want to actually read the arrest
15:33 report, 21-4573. Right here. 21-4753. Your arrest
15:33 report -- let me scroll down to your own report and
15:33 see what was your involvement in this incident and
15:34 go over some of what you see here.
15:34 This is an arrest report taken at Macy's
15:34 where you were involved with other officers.
15:34 Ross James on -- 21-4753 on April 14, 2021, this is
15:34 just two years ago. This was related to tampering,
15:34 a vehicle carjacking, obstructing police officer.
15:34 You can begin skimming of this -- I can
15:34 show it for you. You can look at this real quick.
15:34 Does that refresh your memory of this
15:34 incident? Briefly?

15:34 A. Yes.
15:34 Q. Okay. And in this incident, there was -- let me summarize for you what your use of force was.
15:35 You grabbed suspect by wrapping both arms around torso and rapidly took him to the ground. Back of the suspect's hit -- head hit the ground. Other Officer Talamantes placed handcuffs on. Suspect was bleeding from a welt/swollen area from back of his head.
15:35 So there was an injury to the suspect from your actions by grabbing him and taking him down to the ground; right?
15:35 True?
15:35 A. Yes.
15:35 Q. Okay. Okay.
15:35 And basically, part of this was Ross saw run towards him, put both arms around him and he tackles him to the ground.
15:35 You basically were the one who took him to the ground, not other officers; true?
15:35 A. Yes.
15:35 Q. You also had lacerations from taking this person down.
15:35 A. I did.
15:35 Q. So both you and the other person received

injuries.
A. Yes. His tooth came into my head.
Q. Other officers were present, they were not involved in taking him down to the ground; right?
A. Yes.
Q. So did your department ever tell you that your involvement in this incident was too aggressive?
A. No.
Q. No.
So, though, you confirm with me that you're the one, took the person down to ground. And this was -- what investigation was this? Let's look at this.
Basic summary was that on patrol, Officer Talamantes saw vehicle stopped in odd way on roadway. Vehicle still there when he returned. There was a carjacking information from dispatch. He believed the suspect was related -- basically was a carjacking investigation; right? Report?
A. Yeah, I -- I remember this.
Q. Okay. Tell me in your words, what do you remember about this incident?
MR. KANG: And before you begin, I would advise you not -- if you do remember any identifying

15:36 information of the suspect, do not reveal that.

15:36 THE DEPONENT: Okay.

15:36 A fire -- if I remember correctly, a vehicle was found that was stolen, checking the area. A person was located attempting to steal another vehicle, tampering.

15:37 And the officers that I contacted couldn't get through the gate because it was on an electric gate. So myself, Officer Valencia, and I believe Officer Talamantes tried to get through the apartment. We were able to get into the apart- -- the downstairs garage structure where we was.

15:37 BY MS. MKRTCHYAN:

15:37 Q. Uh-huh.

15:37 A. They -- the initial officers were still on the other side of the gate, couldn't make contact. The suspect realized that. He then began to -- running through the back of the structure, and as he came down one of the floors, he came right at me, and I tackled him.

15:37 Q. Uh-huh.

15:37 A. I tackled him to the ground.

15:37 Q. Uh-huh. But the other officers were there; right? Present?

15:37 A. Yes. And I was in front of him. Because

15:37 they were still trying to get through the door.
15:37 Q. And they --
15:37 (Reporter clarification.)
15:37 BY MS. MKRTCHYAN:
15:37 Q. -- had him at gunpoint; right?
15:38 A. No.
15:38 Q. No?
15:38 A. The two initial officers that contacted him
15:38 had him at gunpoint.
15:38 Q. Uh-huh.
15:38 A. Had him proned out.
15:38 Q. Uh-huh.
15:38 A. They could not get through the gate.
15:38 Q. Uh-huh.
15:38 A. So we -- myself, Officer Valencia --
15:38 Q. Uh-huh.
15:38 A. -- and Officer Talamantes --
15:38 Q. Uh-huh.
15:38 A. -- had to go to the back of the
15:38 apartment --
15:38 Q. Right.
15:38 A. -- to get into the lower garage area
15:38 because he was underneath the apartments. And the
15:38 other two that had him at gunpoint couldn't go in
15:38 foot pursuit with him and couldn't give him anymore

15:38 commands because they lost sight of him because he ran through the structure away from them.
15:38 Q. I understand, sir.
15:38 But there were two other officers with you, who did not take him down to the ground; right?
15:38 A. Because I was in front. He was running straight at me.
15:38 Q. I see.
15:38 So basically -- you had other options. You had a taser; right? You could have used the taser?
15:38 A. Yes.
15:38 Q. Instead of taking him down to the ground, could you have tasered him?
15:38 A. Depending on the circumstances. It happened so fast that I didn't have the option to slow down because he was running straight at me.
15:38 Q. I see.
15:38 So you -- basically, based on your rendition of this -- this, you know, this was --
15:39 A. Could we take a break? Is that okay? I have to use the restroom.
15:39 MS. MKRTCHYAN: Sure. But we have -- when there's a question pending, you can't take a break.
15:39 I didn't finish my question. Go ahead. Take a break.

15:39 (Recess.)

15:43 MS. MKRTCHYAN: Let's go back on the record.

15:43 BY MS. MKRTCHYAN:

15:43 Q. Again, I was finishing this incident, 21-4753.

15:43 I just wanted to confirm that that was the use of force by you --

15:43 A. Yes.

15:43 Q. -- where you and the suspect were injured during this investigation of carjacking.

15:43 A. Yes.

15:43 Q. Let's continue with another incident. Arrest Report No. 21-9764. This was shoplifting and resisting police at Macy's.

15:43 So we have -- I'm going to give you some facts and tell me if it refreshes your memory.

15:43 A. No, I remember this one too.

15:43 Q. You do?

15:43 MR. KANG: And before you begin, I'm just going to make a standing objection to every single question involving any sort of incident that's not this one, as beyond the scope and as completely irrelevant, as none of these use-of-force incidents involve any allegations of excessively tight

15:44 handcuffs or prolonged detention of these people.

15:44 So that's a standing objection going throughout this entire line of questioning.

15:44 BY MS. MKRTCHYAN:

15:44 Q. So you remember this incident at Macy's; right?

15:44 A. I do.

15:44 Q. And so, you know, we have you tackling the suspect, again, you know -- let's read what was happening there.

15:44 So Bolton did a custodial search next to his car. He saw blood on his glove and felt a fanny pack under the search. Saw a puncture in abdomen area. Suspect said that's what happened when he was tackled by Ross. Said it was not from jumping the fence.

15:44 So let's go down and see what exactly you did.

15:44 "Ross responded to dispatch to assist Bolton and Lazzaretto with theft. Saw suspect. Pulled vehicle next to him. Suspect turned and walked away, and then started running. Refused to comply with officers' commands. Because he matched the description of suspect and ignored commands and was running, Ross wrapped his arms around him and

15:45 tackled him to the ground.
15:45 "Ross laid on top of him until Lazzaretto arrived to gain control of suspect's arms and putting him in handcuffs. No tools in Ross's uniform that could have caused the puncture. Unknown how he sustained that injury, although victim said it was from being tackled."
15:45 We had also small abrasions on Ross's right elbow, tackling suspect. He Glock magazine was broken during the fall as well.
15:45 So and there was -- the body-worn camera activated and photos of injuries and uniform were taken; right?
15:45 A. Yes.
15:45 Q. So in this incident as well, you tackled the suspect to the ground for whatever reason because, you know, according to your report, he was running; right?
15:45 A. He was.
15:45 Q. Okay. But so you tackled him to the ground, and he was injured, you were injured?
15:46 A. Yes.
15:46 Q. And that's -- that's -- that was never counseled to you, that this was excessive force?
15:46 A. No.

15:46 Q. But it was still injuries to the suspect; right?
15:46 A. Yes.
15:46 Q. And, you know, was this investigated, to your knowledge, this incident?
15:46 A. As far as?
15:46 Q. By your supervisors.
15:46 A. Yes.
15:46 Q. Did anyone --
15:46 A. Supervisors were on scene as well.
15:46 Q. Okay. Did they ever tell you whether this was within policy?
15:46 A. It was within policy.
15:46 Q. Okay. So let's continue.
15:46 So -- and there was body-worn camera at the time of this incident; right?
15:46 A. Yes.
15:46 Q. This happened in August of 3, 2021.
15:46 Presumably at that time, we were equipped with body-worn cameras?
15:46 A. Yes.
15:46 Q. And even in the prior incident that we covered, in April -- date of incident states April -- I believe it was August -- but, you know, when we went to the arrest report, there was

body-worn cameras --
A. Yes.
Q. -- in 2021 already; right?
A. Yes.
Q. Okay. Let's look at another incident, Arrest Report 21-14854. This is again in the same year, '21. This is resisting police and drunk -- intoxication, public intoxication, 647; right?
A. Yes.
Q. Do you remember this incident? Let me read a little bit.
A. I do.
Q. Okay. Good.
So Officers Seddon and Vidal arrive. Ross tries to grab suspect's arm to control hold, but he pulls away. Attempted hammer lock control hold.
What is a hammer lock control hold?
A. It's getting their arm behind their back in this manner, and putting your arm through and putting pressure, pretty much on the shoulder, and taking them down.
Q. And you took him down to the ground?
A. All three of us took him down to the ground. It took all three of us.
Q. So -- so all three officers took him down

15:47 to the ground?
15:48 A. Yes.
15:48 Q. But you were the one who first grabbed him to control him; right?
15:48 A. Yes. Because I was investigating a possible burglary.
15:48 Q. Okay. So but you were -- you initiated the use of force; true?
15:48 A. Not until I had -- responding units arrived and we contacted him, all three of us together.
15:48 Q. Understood.
15:48 But you were the first to grab his -- and use control hold, his arm?
15:48 A. Yes.
15:48 Q. And then you did the hammer lock as you indicated?
15:48 A. While on the ground, yes.
15:48 Q. And then other officers assisted you?
15:48 A. Yes.
15:48 Q. In taking him down to the ground?
15:48 A. Yes. He was already on the ground.
15:48 Q. Huh?
15:48 A. We all had to take him onto the ground, and that's where he stayed.
15:48 Q. Understood.

15:48 You -- but you were the one who initiated the use of force, and this was -- let's see.
15:48 This was basically intoxicated suspect. This is a misdemeanor; right?
15:48 A. After --
15:48 Q. Uh-huh.
15:48 A. -- everything --
15:48 Q. Uh-huh.
15:48 A. -- was investigated?
15:48 Q. Right.
15:48 A. Yes, it was.
15:48 Q. What was he suspected of, though?
15:48 A. Potential burglary.
15:48 Q. Okay. And on what grounds? I don't see anywhere here -- what was he doing that you suspected him as --
15:49 A. Do you have the police report out?
15:49 Q. I'm sorry?
15:49 A. Do you have the police report?
15:49 Q. Yeah.
15:49 A. Because what was going on --
15:49 Q. Right.
15:49 A. -- what was happening is --
15:49 Q. Uh-huh.
15:49 A. -- I was driving in the area --

15:49 Q. Uh-huh.
15:49 A. -- and I saw a male --
15:49 Q. Uh-huh.
15:49 A. -- standing next to a car with a shattered back window.
15:49 Q. I see.
15:49 A. So a vehicle burglary.
15:49 Q. Okay.
15:49 A. I contacted him --
15:49 Q. Uh-huh.
15:49 A. -- and asked him what he was doing. He refused to answer me multiple times. So I asked for a back.
15:49 That back was coming, and he became more aggressive and started walking -- backpedaling, pretty much, towards the house. So then I asked for a Code 3 back. The officers arrived, and he then tried to go to the front door and gain entry into the house.
15:49 I was asking him questions, where he lived, he refused to answer. He refused to identify himself. Based on what I had -- so I thought he was trying to break into that house. So did the other officers.
15:49 So to prevent a possible residential

15:50 burglary of him breaking into that house or going into that house, we stopped that.

15:50 Q. Okay. Did you review, prior to this deposition, this arrest report?

15:50 A. No. Because it doesn't have anything to do with this.

15:50 Q. No, I understand.

15:50 So but how is it that you remember with such details this incident and the other two incidents that I just covered?

15:50 A. Because I can remember the use of force stuff.

15:50 Q. I see.

15:50 So when there's use of force, you have remarkable memory?

15:50 MR. KANG: Objection. Argumentative.

15:50 BY MS. MKRTCHYAN:

15:50 Q. So you remember all use-of-force incidents?

15:50 A. I wouldn't say all.

15:50 Q. Okay. So but you basically -- this happened in 2021, November 26; right?

15:50 A. Yes.

15:50 Q. Here, we have?

15:50 You know, and you do still have very detailed memories about what happened?

A. Yes.
Q. Okay. So -- all right.
Now, though -- even though there's -- this was a vehicle burglary investigation, you were trained by your department to always use reasonable force; right?
A. Yes.
Q. And you believe this was reasonable force for you to do what you did, basically controlled -- use control hold and take him down to the ground?
A. If he's actively trying to resist us, yes. And it takes three officers to actually gain control and compliance of this person, then I would say he's actively trying to fight with us.
Q. Well, you know, I didn't see what -- you know, let's go back to your report on this.
I mean, other than him actually trying to leave, running away, you know, I don't see him actively fighting you. Let's read your report.
Ross James. In fact, this is the one. 21-14854 DR number, COG 327. We have on Friday, I -- this is CT Vidal. I don't know who is that.
A. Charlton Vidal.
Q. I'm sorry?
A. Charlton Vidal.

15:51 Q. Okay. Came -- was working uniform patrol. Dispatched to assist Officer Ross, contacting -- who was contacting him, acting in an aggressive manner, not complying with commands. See Officer Ross's report.

15:52 I thought this is Officer Ross's report, isn't this?

15:52 A. No. This is Charlton Vidal's report, and it even says in his report that he was actively fighting us.

15:52 Q. Well, let's -- I want to read your report, actually. I don't know why in your -- it says --

15:52 A. It says it right there. In that sentence.

15:52 Q. I know. Can we not conversation? Because this is -- you're doing conversation. And it's not -- you know, it's not good for the record. I want to know which one out of this --

15:52 A. Well, I'm trying to point you in the direction and tell you whose report is whose.

15:52 Q. Yes. That's what -- because, here, it states Officer Ross, reporting officer, and yet it's not you reporting; true?

15:52 A. That's Vidal, but I'm the -- this old system?

15:52 Q. Yes.

15:52 A. Will list who the original -- who made the
15:52 arrest. So this is my report, because I'm the
15:53 handling officer.
15:53 Q. I see.
15:53 Can you show me, when I'm scrolling down,
15:53 where is your actual report of this incident?
15:53 A. That's Seddon's?
15:53 Q. This is Seddon.
15:53 A. Yeah.
15:53 Q. Yeah, that's it. We don't have --
15:53 A. Well, then it wasn't attached.
15:53 Q. So basically -- but we have rendition of
15:53 other officers -- let's look at what is saying.
15:53 Upon arrival, I saw Officer Ross and
15:53 Officer Seddon speaking with a male described --
15:53 whatever -- wearing, you know, clothes -- he
15:53 provides the clothes.
15:53 Male was standing -- providing his name --
15:53 while Officer Ross was speaking with him, turned
15:53 towards the front porch, he was going to enter the
15:53 residence.
15:53 Basically he's trying to evade you, he's --
15:53 he's evading talking to you; right? That's not real
15:53 resistance; right? When someone is evading
15:53 conversation with you?

15:53 A. He -- we have no -- we're investigating a vehicle -- I'm investigating a vehicle burglary. He's standing next to at -- whatever -- 3:30 in the morning --
15:54 Q. Uh-huh.
15:54 A. -- he's standing next to a window or a vehicle in a driveway with a shattered-out back window. And now he's not giving me where he lives, he's not giving me any information about him.
15:54 Q. Uh-huh.
15:54 A. Anything. So I think he just committed a vehicle burglary.
15:54 Q. Uh-huh.
15:54 A. Now he's walking to a front door of a residence, which I have no idea if he lives there --
15:54 Q. Uh-huh.
15:54 A. -- and now he's trying to gain entry and avoid us. So now I'm thinking, a residential burglary because he's trying to avoid us.
15:54 Q. Uh-huh. Okay.
15:54 So but other than what you told me on this -- on the face of this police report, we don't know if that is true. If this was his porch, you know, if this is his residence, we don't know; right?

A. I just said that, yes.
Q. Okay. So but, you know, if you're -- you know, are you going to just assume automatically that that's not his residence and he's involved in residential burglary?
A. Do you want me to just drive by your house and have somebody unknown that I don't know and won't identify themselves, possibly a burglar, just breaking into your house because they don't want to answer a simple question?
Q. Uh-huh.
A. "Hey, I live here" or -- or let me just see the identification. Hey, you can go about your day. Okay. Have a good night.
Q. Uh-huh.
A. That's what -- that's all I wanted to do --
Q. He may even --
A. -- just make sure he was -- he lived there.
Q. I see.
A. But he couldn't identify himself. Now he's could potentially break into somebody house and now we possibly have a barricade with people inside.
Q. Sir, but this arrest ended up -- he was not arrested for burglary; right?
A. No.

15:55 Q. You found out that he was not?
15:55 A. After the fact, yes. After he was detained in handcuffs, yes. He was, like, "Oh, hey, I live here."
15:55 Q. Right.
15:55 A. I just didn't pretty much want to give you the information.
15:55 Q. Right. So if someone -- you know, if he's on his own porch, he's drunk, you know, that's what your -- brought your attention to him, and you used force taking him down to the ground, would that be reasonable force under that hypothetical?
15:55 A. Yes.
15:55 Q. I see.
15:55 So in any event, on that day, he was not charged -- he was not arrested for burglary; right?
15:56 A. No. And he wouldn't have been arrested for the other stuff either if he would have just provided the information instead of me having to take what I have in front of me, a possible burglary investigation.
15:56 Q. I see.
15:56 So in other words, you learned later, during this investigation, that this was his own residence, and he was just intoxicated; true?

15:56 A. Yes.
15:56 Q. Okay. And then instead -- bottom line, he was injured as a result of your investigation; right?
15:56 A. I've already answered that.
15:56 Q. I see.
15:56 But no one from your department told you that, look, you know, you should have done some more investigation prior to taking him down?
15:56 A. Not at all.
15:56 Q. No. Okay.
15:56 So your department completely supported your -- approved your actions on that day?
15:56 A. Yes, they did.
15:56 Q. Let's look at some other reports. Arrest Report 22-7707, Officers Lim, Cowell, Ross, Simian. Date of incident, June 26, 2022. We have petty theft, obstruct/resist police.
15:57 This happened at -- theft at a Ross store, witness pointed out suspect. Ross and Simeon attempted to contact suspect. Commanded suspect to stop, but she did not.
15:57 This is a female. Do you remember this incident? Female?
15:57 A. Yes.

Q. Ross grabbed suspect by a bag slung on her back to prevent her from walking away. She turned around, clenched her fist as if she was about to strike the officer," this is a female.

Ross grabbed her arms to regain control, but felt her tensing up. Due to her tensing and still resisting, Ross took her down by the arm. Ross attempted to control suspect's hands on the ground on her back. Ross grabbed her right arm and told her to stop resisting.

Simian and Ross placed her in handcuffs. Suspect complained about left shoulder pain. She was medically cleared. This was also body-worn camera captured.

Did I summarize it accurately?

A. Yes.

Q. So this was a theft incident at a Ross store where the woman was leaving and you stopped her?

A. Yes.

Q. And you used force by taking her down to the ground?

A. Yes.

Q. Why was it necessary in this instance to take her down to the ground?

15:58 A. Because I tried to take her backpack, and she tried to -- she clenched her fist as if she was going to punch me in the face.
15:58 Q. Okay. But there were other officers present with you; right?
15:58 A. No, there wasn't. I was by myself. The other officer was trying to cross the street.
15:58 Q. So you were by yourself, and you're saying that it was necessary for you to take her down to the ground.
15:58 A. Well, I didn't really feel like getting punched in the face.
15:58 Q. Well, 'cause, you know -- I mean, she didn't punch you to the face; true?
15:58 A. Because I stopped it.
15:58 Q. You stopped it?
15:58 A. Yes.
15:58 Q. How did you stop it?
15:58 A. I took her down to the ground, and I was able to hold her down to the ground until other officers got there on scene.
15:58 Q. And this is on body-worn camera; right?
15:59 A. Yes.
15:59 Q. Okay. Other officers did not take her down to the ground.

15:59 A. Because I was by myself.
15:59 Q. Okay. Let's continue.
15:59 A. So they can't take her down to the ground
15:59 if I'm by myself.
15:59 Q. Okay. All right.
15:59 So you're saying a female was a danger to
15:59 you to the extent -- unarmed female that you
15:59 actually have to --
15:59 A. I don't think sex matters.
15:59 Q. Sex doesn't matter, but female --
15:59 A. But you're making it seem like it is.
15:59 Q. Wait a minute. You're a physically huge
15:59 guy; right?
15:59 Describe yourself for the record. You
15:59 are -- how tall are you?
15:59 A. 5-9.
15:59 Q. Okay. And you are fully uniformed when you
15:59 would go work patrol; right?
15:59 A. Yes.
15:59 Q. Okay. And female, you know, is not
15:59 uniformed; right? She doesn't have weapons; right?
15:59 True?
15:59 A. Yes.
15:59 Q. Okay.
15:59 A. That I know of.

15:59 Q. Uh-huh.
15:59 A. She could have something in her backpack which I trying to take -- take away from her --
15:59 Q. Uh-huh.
15:59 A. -- and stop her.
15:59 Q. Uh-huh.
15:59 A. So she could have weapons, she could have weapons in her clothing.
15:59 Q. Did you find weapons on her?
15:59 A. I don't know that what I'm contacting people.
16:00 Q. I see.
16:00 So you have to do preventive work to stop any perceived possible danger to you?
16:00 A. I have to take the proper precautions, yes. And if they're trying to assault me, then yes.
16:00 Q. Uh-huh. I see. Okay. Let's look at the arrest report number.
16:00 And no one, of course, as a result of this incident ever told you that it you had done something -- you used excessive force?
16:00 (Reporter clarification.)
16:00 THE DEPONENT: There was two sergeants on scene.
16:00 ///

16:00 BY MS. MKRTCHYAN:
16:00 Q. Who were the sergeants? The names?
16:00 A. I don't -- I don't recall. I think one was Sergeant Kim. And there was another one. I can't remember who.
16:00 Q. And she was also complaining of left shoulder pain; right?
16:00 A. I believe so.
16:00 Q. Did you sustain any injuries as a result of that?
16:00 A. No, not that I'm aware of.
16:00 Q. Okay. Arrest Report DR No. 2023-1348. That's Bates stamped 344356. This is another instance of a petty theft, Glendale Ralphs.
16:01 We have in the emergency room -- this is already in the emergency room. This is in the hospital. You know. Already in handcuffs.
16:01 The suspect says -- became agitated. Tried moving handcuffs from behind his back to the front by moving below his feet.
16:01 So this is an emergency room, suspect is in handcuffs.
16:01 Do you remember this incident?
16:01 A. Yes.
16:01 Q. Ross put his hand on the right shoulder of

16:01 suspect to stop him, asking him to sit back down in chair, but suspect became argumentative. This is still while he's in handcuffs.
16:01 Ross felt his arm tense up when he grabbed his right arm. After he pulled away and started yelling, Ross grabs his arm to prevent him from walking away, tried to calm him, but he was pulling away and tensing up.
16:01 Ross grabbed right and left shoulder, turned suspect away so he was facing the wall. Suspect tried to turn around to Ross, Ross then pushed him up against wall to gain control. Suspect hit -- head hit the wall and cause an inch laceration.
16:02 I don't know, an inch -- how many inch laceration on his left eyebrow.
16:02 A. An inch laceration.
16:02 Q. Okay. He was kept on the wall --
16:02 (Reporter clarification.)
16:02 BY MS. MKRTCHYAN:
16:02 Q. -- on the wall, by the wall until assisting units arrived.
16:02 So this is -- you remember this incident; right?
16:02 A. Yes.

16:02 Q. And this is based entirely on your police report, rendition by you; right?
16:02 A. Yes.
16:02 Q. And so this is a person in the emergency room, according to you, get agitated, and you had to use this kind of force to push him by the wall where he stained a laceration?
16:02 A. Yes. So suspect was handcuffed, and like I've been saying all day, it can turn just like that. He's been -- he was cooperative the entire time.
16:02 Q. Uh-huh.
16:02 A. Began to be aggravated, and got very angry that he was being arrested for what he was being arrested for. So just like that, he flips.
16:02 Q. Uh-huh.
16:02 A. And he became -- he became angry. Tried to slip his cuffs.
16:03 Q. Uh-huh.
16:03 A. I had to push him up against the wall. And he tried to turn on me. I pressed harder. His head hit the wall. I maintained pressure against the wall so he couldn't move until Officer Shubunka arrived on scene, and he was treated.
16:03 Q. So you remember this incident as well?

16:03 A. Yes.
16:03 Q. Okay. So -- and this was never -- you never were counseled that your actions were excessive that day?
16:03 A. No.
16:03 Q. So we don't have any other -- we have multiple officers, Meyer, Shubunka, Newborg, Heinbechner, Aliaga.
16:03 We have several people involved in this incident.
16:03 A. I was by myself.
16:03 Q. Okay. You're saying you were by yourself. And, you know, why is it that it always happens to you?
16:03 We have multiple arrests that we've covered, multiple officers are present, involved in the arrest. And yet you're the one who's involved in the arrest and use of forces.
16:03 MR. KANG: I would just like to point out that we produced use-of-force reports that involved Officer Ross.
16:04 MS. MKRTCHYAN: Speaking objection.
16:04 MR. KANG: I mean, it's just ridiculous at this point. I mean --
16:04 MS. MKRTCHYAN: There's no need for you to

16:04 make a speaking objection. Thank you.

16:04 MR. KANG: These are use-of-force reports that we produced for Officer Ross. That's why they involve Officer Ross.

16:04 MS. MKRTCHYAN: You're -- you're -- excuse me. Excuse me.

16:04 MR. KANG: (Indicating.)

16:04 MS. MKRTCHYAN: This is highly inappropriate.

16:04 MR. KANG: It's just -- oh, my God. At this point --

16:04 MS. MKRTCHYAN: These are multiple -- excuse me. This is speaking objection. If you're going to continue obstructing this deposition, I will ask for sanctions.

16:04 MR. KANG: Yeah. Okay. Go for it.

16:04 BY MS. MKRTCHYAN:

16:04 Q. This use-of-force reports that I went through actually involved other officers too; right?

16:04 We've covered. Let's go -- back up, if your wonderful counsel who's smiling and making -- for the record, we have the attorney making sarcastic comments.

16:04 MR. KANG: It's just mind-blowing that you don't understand that these are use-of-force reports

16:04 where Officer Ross used force. It's just --
16:04 MS. MKRTCHYAN: Speaking objections and coaching the witness.
16:04 MR. KANG: I just don't understand.
16:04 BY MS. MKRTCHYAN:
16:04 Q. Let's look again for the Arrest Report No. 21-4753. We have Bates stamp 06317. We had other officers involved in this: Julian Talamantes, Officer Kamachi, Officer Stapp, Officer Ross.
16:05 But you were the one who were injured --
16:05 A. And I --
16:05 Q. -- and you were -- and you were -- and the officer -- the suspect was injured because of your actions in the use of force.
16:05 A. And I explained why I was -- I did what I did.
16:05 Q. Okay.
16:05 A. And I was never counseled for it or disciplined.
16:05 Q. I understand, sir. I understand. But I'm just trying to confirm what has been indicated.
16:05 Arrest Report No. 21-9764, you had not only Officer Ross, but Matthew Bolton and Lazzaretto.
16:05 And yet you were the one --
16:05 A. Yes.

16:05 Q. -- who took the -- excuse me. Let me finish.
16:05 You were the one, not Lazzaretto, not Bolton, who actually tackled the suspect to the ground who was injured; true?
16:05 A. Because Bolton was the handling officer. He wasn't on scene when the suspect was located. Officer Lazzaretto located suspect, and it's not my fault that I'm faster than him --
16:05 Q. Mm.
16:05 A. -- in a foot pursuit, which is why I had to tackle him.
16:05 Q. I understand.
16:05 Arrest Report No. 21-14854. There's no need for you to be upset. I'm just trying to explain --
16:06 A. I'm not upset. I'm trying to explain to you --
16:06 Q. Okay.
16:06 A. -- but you're saying why --
16:06 Q. I'm not saying anything.
16:06 A. -- I did things --
16:06 Q. I'm not saying anything.
16:06 A. -- the way I did it, and I'm explaining it to you how you want it, but you're trying to twist

16:06 it.
16:06 Q. Sir, sir, we are trying to cover your arrest reports. That's all. Arrest Report 21-14854. We have Vidal and Seddon who came, and you were the one who covered this -- you were the one who initiated control hold, and they assisted you; true?
16:06 True?
16:06 A. We contacted at the same time.
16:06 Q. Okay. You were the one who initiated the use of force; true?
16:06 A. To prevent a possible burglary at the time.
16:06 Q. I see. I just want to know that there were other officers present, but you were the one who initiated the use of force.
16:06 A. And they were also involved too.
16:06 Q. I see.
16:06 Arrest Report 22-7707 that we just covered, in the emergency room. No. This is not the emergency room. This was the one -- the female walking away.
16:07 You know, we have Officer Nicolas Lim, Officer Cowell, Simian who were responding to the same scene, but you were the one who actually tackled her to the ground; true?

16:07 A. Contacted her by myself.
16:07 Q. Arrest Report --
16:07 And you could have just followed her?
16:07 A. And I did.
16:07 Q. You could have kept watch of her until other officers came -- first of all, let me back up a little bit.
16:07 You're trained in your department to -- not to create dangerous situations; right?
16:07 A. Yes.
16:07 Q. And you're also trained, if you are investigating a crime, to wait for backup to engage suspect so that -- for officer safety; true?
16:07 A. Yes.
16:07 Q. So you're telling me, look, you know, I was the only one. I had to protect myself. I had to get involved in the use of force.
16:07 But your department is telling you, wait for back up. Do not get engaged in use of force or in any type of a dangerous situation that would endanger your safety; true?
16:07 A. So I was at the hospital. He was in handcuffs. Officer Simian was close behind me. So we contacted. He was on scene already, so he was
16:08 there with me. Okay?

16:08 Q. I'm talking about --
16:08 A. So there was that one.
16:08 Q. I'm talking about --
16:08 A. And then the Vidal -- well, I'm answering your question.
16:08 Q. No, we are talking.
16:08 A. And then Vidal and -- and Seddon and me, we were all on the front porch. And, yes, I grabbed his arm to prevent him from going inside where we all contacted at the same time. We were all on the front porch.
16:08 Q. For this incident specifically, I was talking about the Ross store incident. You said, I was the only one. It's not my fault. I was the only one.
16:08 But you could have waited for backup before you engaged the suspect in use of force; true?
16:08 True?
16:08 A. Every single one had backup there.
16:08 Q. Yes. But you're telling me that, oh, I have no other option. I had to stop the person who's running away, you know, et cetera, et cetera. But --
16:08 A. None of these were investigated, and any wrongdoing was found.

16:08 Q. That's not the question. I don't care what
16:08 your department does or does not do. I want to
16:09 confirm what happened to you.
16:09 There were other officers at scene, but you
16:09 were the one who was proactive initiating use of
16:09 force, even when you were solo officer prior to this
16:09 receiving backup; true?
16:09 A. I wasn't solo. I had officers with me.
16:09 Q. Well, in this Ross incident, Ross store
16:09 incident, you said that, you know, you were alone --
16:09 we have Ross and Simian attempted to contact
16:09 suspect, commanded to stop, but she did not.
16:09 You were the one, not Simeon, who grabbed
16:09 suspect by a bag slung on her back, and -- you know,
16:09 to prevent her from walking away, not Simian; right?
16:09 A. I was in front of Simian.
16:09 MR. KANG: Objection. Misstates the
16:09 incident.
16:09 THE DEPONENT: I was --
16:09 MR. KANG: It --
16:09 (Reporter clarification.)
16:09 MR. KANG: Misstates prior testimony.
16:09 You can answer.
16:09 THE DEPONENT: I was in front, and
16:09 Simian -- Officer Simian was behind me. So I

contacted. He was on scene.

BY MS. MKRTCHYAN:

Q. Okay. So you initiated the use of force, in other words?

A. I initiated a contact, not a use of force. And then I was protecting myself.

Q. All right. So in the emergency room, again, you know, it's -- basically, you were -- you say that it was only me, and that's why I had to get involved in the situation and use force; right?

A. What do you mean by it was only me?

Q. This incident, Arrest Report 2023-1348, there were other officers. You could have waited for them. You know, if the suspect became agitated -- he was not running away; right? He was in handcuffs in the emergency room.

A. He's trying --

Q. Where is he going to go away?

A. He was trying to slip his handcuffs to the front and push up against me and tried to resist and was physically resisting.

So I placed him up against the wall --

Q. Uh-huh.

A. -- and his head happened to hit the wall.

I pushed up against him to maintain the

pressure so he wouldn't move and push up against me like he was doing, and other officers responded.

Q. So why did that -- this is what I'm trying to understand.

Why is it that it happens to you, not other officers? This were other officers present.

A. No, there weren't.

Q. Well --

A. They were -- they were on scene for that report. Officer Meyer, Officer Shubunka initially helped me with the report, finding the suspect at 211 North Glendale. They were not at the hospital. No one was at the hospital. It was just me.

Q. So, basically, it's always you involved in the use of force, not other officers?

MR. KANG: Objection. Misstates everything.

BY MS. MKRTCHYAN:

Q. Okay. We have another Arrest Report, DR No. 2023-1791. We have this investigation of, you know, identity theft, you know, 1085. Basically report of stolen vehicle theft.

We have police located suspect who was ordered at gunpoint to the ground. He ran inside the apartment instead. There's a foot chase,

et cetera. Officer apprehended him after he jumped the wall. Ross held him at gunpoint and gave him several commands to show his hands.

Suspect did this. Then suspect run away -- ran away, would not respond to command. Suspect attempted to jump the wall. Then Ross pushed him up against the wall with his shoulder to prevent him from climbing over. Suspect landed on his feet, and Ross took him down to the ground from behind. Took control of his right hand and laid on top of him until assisting officers arrived.

So you, again, it's solo. Basically, you went -- took the initiative to go after these people, this guy, this -- whoever was running away, in solo, without waiting for backup; true?

Do you remember this incident?

A. I do.

Q. Okay. Was there any reason why you took such initiative in going after this suspect who was running away without handcuffs?

A. I'm doing my job.

Q. I understand, sir.

But you are also trained not to place yourself in danger; right?

A. He had jumped out of an apartment window,

16:13 which we heard glass shatter. He ended up going into the next --

16:13 Q. Uh-huh.

16:13 A. -- complex over.

16:13 Q. Uh-huh.

16:13 A. As I came around the corner --

16:13 Q. Uh-huh.

16:13 A. -- he was hiding behind the bush. I put him at gunpoint. He then ran to the back of the property. I holstered my weapon. I hopped the gate.

16:13 And I went -- and as I approached the back of the property, he tried jumping the wall into another property. To prevent that and constant jumping into properties and possibly going into homes, I pushed him -- I tackled him to the ground.

16:13 BY MS. MKRTCHYAN:

16:13 Q. I see.

16:13 But there were other officers present who didn't do that; right?

16:13 A. No. 'Cause they were holding their perimeter spots.

16:13 Q. So, though, you know, you still are maintaining that your actions did not jeopardize you or the suspect?

16:13 A. No. And he actually apologized for everything he did as soon as we put him in handcuffs.
16:13 Q. So no -- okay.
16:13 Even though other officers did not do this?
16:13 A. Because there's perimeter units, and then there's roving units.
16:13 Q. Uh-huh.
16:14 A. Perimeter units have to hold their spots.
16:14 Q. So in other words -- here, let me ask you this. Did you follow your policy of --
16:14 A. Yes, I did.
16:14 Q. Let me finish.
16:14 Do you know which policy I was speaking of?
16:14 A. Go ahead.
16:14 Q. I asked you about the policy of not engaging, not placing yourself in danger by engaging in use of force with suspects alone, without backup.
16:14 A. I did have pickup there.
16:14 Q. What backup? If you're getting involved with someone who's actually dangerous?
16:14 A. I had pickup there. They're on scene. Your -- your question is asking if I'm not waiting for people to be on scene.
16:14 Q. Uh-huh.

16:14 A. There's officers on scene.
16:14 Q. Uh-huh.
16:14 A. If I'm contacting people with no one on scene, that's what you're referring to.
16:14 Q. Okay. But --
16:14 A. But there's officers on scene. So I'm not acting out of policy. There's people -- there's officers there to assist me.
16:14 Q. Understood, sir.
16:14 But the one who's engaged in use of force with the suspect, not other officers. We have, look, how many officers: Detective Lopez, Officer Parseghian, another detective, Burroughs, Detective Torley, Officer Aliaga; right?
16:14 You're the one who -- not them -- getting engaged, hands on, with the suspect; true?
16:15 This is how many instances we've covered?
16:15 You're the one who takes initiative to run after people, tackle them down to the ground aggressively. Good job, you know, detaining people.
16:15 But at the same time you are using force and people are getting injured; true? We've covered this -- how many -- five instances? Five, six instances?
16:15 No? Yes?

16:15 A. Yes.
16:15 Q. Okay. And no one told you --
16:15 A. But I'm not out of policy.
16:15 Q. And no one told you that, you know what? You are too aggressive, you are putting yourself in danger, you are injuring people?
16:15 A. Not at all.
16:15 Q. Your department never advised you of that?
16:15 A. Nope.
16:15 Q. I see.
16:15 And why we are here today, you also had Anoush Burmayan aggressively taken to the patrol car, and yet you're denied; right?
16:15 A. Yes.
16:15 Q. I see.
16:15 And yet we don't have any video recording to prove one way or the other?
16:15 A. Yes.
16:15 Q. Because you did not audio record that?
16:15 A. Yes.
16:15 Q. And her complaints?
16:16 A. Yes.
16:16 Q. Let's continue with the Arrest Report No. 23-3383. That's probably the last one I want to cover for this particular line of questioning.

16:16 We have Officers -- CR numbers already covered. Petty theft again, identity theft. Target. This is Target theft suspect No. 1.

16:16 We have Valencia, officer present, Azodi, Ritter, Calatayud -- I can't say even that name -- Banuelos.

16:16 Do you remember this incident in March of 2023 of this year?

16:16 A. Yes.

16:16 Q. So we have Valencia saw Ross contact suspect, helping handcuff. While Ross was searching suspect, he observed suspect moving his handcuffed hands towards his left front pant pockets, which Ross didn't search yet. Ross told him to stop.

16:16 Ross put him in control hold with his right hand and told him to stop tensing. Ross could feel 16:17 him tensing as he was applying a control hold. Ross controlled suspect's hands while Valencia began search on the left side.

16:17 Suspect tensed up, began pushing back against officers. Ross tightened control hold. Suspect started kicking Ross's left shin, wrapped his right -- right left [sic] around left leg.

16:17 Then we have Valencia grabbed both of -- both of suspect's legs. Ross and Valencia ended on

16:17 the ground. Ross maintained control of suspect's right arm, et cetera.

16:17 So, you know, we have this person who's already in handcuffs. He allegedly has -- you know, in handcuffs, trying to, as you are telling, is tensing up, he's -- you know, what is he doing, you know, that requires you to actually place him in a control hold and then this kind of use of forces?

16:17 A. You already said it. I don't think I need to explain it again.

16:17 Q. Okay.

16:17 MR. KANG: And I'm going to object as misstating the incident.

16:18 BY MS. MKRTCHYAN:

16:18 Q. So -- and then the injuries were sustained. He had bump -- golf-sized bump on right side of his head, abrasion to left side of forehead, laceration on his left hand, lacerations on left hand, et cetera; right?

16:18 We have several injuries sustained -- true? -- by the suspect?

16:18 A. I don't remember all the injuries. But there was also two separate incidents that was going on. So I don't know if that was just my incident or the other suspect's -- his partner.

16:18 Q. Do you want to look at the police report?
16:18 A. It says it in there.
16:18 Q. I covered it. You know?
16:18 But basically we have situation where this is a theft incident, petty theft; right?
16:18 A. And there's two officers --
16:18 Q. Right. Petty theft.
16:18 A. -- that are dealing with this guy that's also handcuffed, and he flips just like that.
16:18 Q. Okay.
16:18 A. Like I've been saying all day, that can happen.
16:18 Q. Right. But it's a petty-theft situation, and the person is in handcuffs. And it's -- becomes -- escalates into serious use of force with you and officers going down to the ground and placing hobble on his feet; true?
16:19 A. Yes. 'Cause he was kicking at us.
16:19 Q. Okay. So then as a result of these sustained injuries, you were never counseled or advised that this was excessive force; true? Never?
16:19 A. True. Was never.
16:19 Q. When the department investigates any type of use-of-force incidents, do you get interviewed?
16:19 A. As far as, like, after?

16:20 Q. Yes. Use of force -- let's say use of force -- you report use of force; right? You have to report?
16:20 A. Yes.
16:20 Q. Do you get interviewed?
16:20 A. They ask what happened, and we give them the details, and then we document it.
16:20 Q. Is it the Internal Affairs that interviews you or it's your sergeant?
16:20 A. It's the sergeant.
16:20 Q. Do you ever -- does any use-of-force incident that you've gone through result in Internal Affairs investigation?
16:20 A. If it has, I was never notified of it, and -- so, therefore, I don't believe so.
16:20 Q. So the only time in your career since 2017 that you've been interviewed by Internal Affairs was a result of this incident --
16:20 A. Yes.
16:20 Q. -- with Anoush Burmayan?
16:20 A. Yes.
16:20 Q. And when you were interviewed, do you remember how long was that interview?
16:20 A. I don't.
16:20 Q. Was Officer Robinson -- first of all, you

16:20 had a right to be represented in that interview; right?
16:20 A. Yes.
16:20 Q. Do you remember Officer Robinson, when he was interviewing you, did he interview other officers?
16:20 A. I don't -- I don't know.
16:20 Q. You don't know?
16:20 A. I don't know.
16:20 Q. So no other officer was present during your interviewing?
16:21 A. Not that I know of, no.
16:21 Q. So it was you and him alone?
16:21 A. Yes.
16:21 Q. And did he ask you those kind of probing questions that I asked you today in this entirety? How many hours we've been going?
16:21 A. I honestly don't remember the questioning in there.
16:21 Q. Okay. So let me play this briefly and go over some -- refresh your memory here about that incident.
16:21 (Audio recording playing.)
16:21 BY MS. MKRTCHYAN:
16:22 Q. I'm going to play this, and I'm going to

16:22 stop it, you know, ask you some questions.
16:22 Do you remember this now? Did it refresh your memory? It was in June of last year?
16:22 A. I remember having the interview. I just don't remember the questions.
16:22 Q. Okay. And this entirety of this interview is about nine minutes; right? Based on this audio; right?
16:22 A. Yes.
16:22 Q. Okay. Let's see what questions he asked you.
16:22 (Audio recording playing.)
16:22 BY MS. MKRTCHYAN:
16:22 Q. So right away, he starts telling you that before he actually audio records this, you had a conversation with him herein where he went over some reports and he reminded you what this is all about; right?
16:22 A. Yes.
16:22 Q. So off the record, off this audio, you already had some conversation about this incident; right?
16:22 A. We had talked about it, but I don't remember exactly what.
16:23 Q. Right.

16:23 So but based on this, you did have some informal conversation?
16:23 A. Yes.
16:23 Q. And he showed you the reports?
16:23 A. I'm assuming so.
16:23 Q. And he showed you --
16:23 A. I don't know.
16:23 Q. -- the allegations against you?
16:23 A. I don't know if he showed me anything. He told me more than likely. Because if he's saying that we discussed things, then we probably went over all that. He's pretty detailed.
16:23 Q. And he watched the audio/video with you?
16:23 A. What was that?
16:23 Q. Audio/video.
16:23 You think he watched the audio/video that we just we watched today?
16:23 A. I don't remember if we went over all that.
16:23 (Audio recording playing.)
16:23 BY MS. MKRTCHYAN:
16:25 Q. Okay. So at 2:15, you are telling him that immediately before your arrival, you heard what you -- you know, argument, that she was loud, and the manager approached you and told you about the trespassing, that she had basically trespassed at

16:25 the location; true?
16:25 A. Yes.
16:25 Q. The manager you meant, who? Guy Garcia,
16:25 reporting party?
16:25 A. The manager. The manager who's listed in
16:25 my report is Guy Garcia.
16:25 Q. Right. But we know for a fact, that he was
16:25 not the manager on scene. He was just the -- you
16:25 know, there was a manager on scene, Joe Johnson.
16:25 So when you told this sergeant that you
16:25 spoke to manager, you meant Guy Garcia, that's what
16:25 I want to --
16:25 A. Yes.
16:25 Q. -- make sure.
16:25 You knew -- you thought that he was the
16:25 manager.
16:25 A. Yes.
16:25 Q. Now, you know, earlier when I was asking
16:25 you the chronology of events, you told me you didn't
16:25 recall talking to employees initially prior to you
16:26 handcuffing and placing her in the patrol car; true?
16:26 Do you remember that?
16:26 A. Yes.
16:26 Q. So how is this consistent with your
16:26 audio-recorded conversation you interviewed with?

16:26 A. I also mentioned that I don't really remember much of it. You know, I was trying, to the best of my knowledge, to remember it.

16:26 Q. Okay. So but is it true that your earlier testimony is not consistent, you do actually remember -- you remember this interview. It's just a year ago -- that, in fact, the manager came and told you about what happened earlier before you placed her in handcuffs?

16:26 A. On this interview, yes.

16:26 Q. Okay. So do you agree with me that your earlier testimony under oath was inconsistent?

16:26 A. Yes. And I was reading the report prior to this, and that's incorrect.

16:26 (Audio recording playing.)

16:26 BY MS. MKRTCHYAN:

16:27 Q. But here, when you are talking with Officer -- Sergeant Robinson, you're not under oath, are you?

16:27 A. No.

16:27 Q. You're not.

16:27 You're here today under oath; right?

16:27 A. Yes.

16:27 Q. Okay.

16:27 (Audio recording playing.)

16:27 BY MS. MKRTCHYAN:
16:27 Q. So you basically told him what you told us today, which is consistent with your testimony today, that pretty much immediately, you placed her in handcuffs and took her to the patrol car within one or two minutes; right?
16:28 A. It was pretty quick, yes.
16:28 (Audio recording playing.)
16:28 BY MS. MKRTCHYAN:
16:28 Q. So you're -- you're making a point here at 5 -- or 3:22 minutes, that in fact, it wasn't you who turned on the patrol video, it was Officer Armendariz; right? On this tape?
16:28 A. I mean, if I said that, then I said that. But I don't -- I also believe I said today that I don't recall if I did or -- or he did. But it was turned on.
16:28 Q. Okay. Either way, today when I asked you who turned on the patrol video, you said it would be my practice, you know.
16:29 A. Yes.
16:29 Q. You don't even remember. You said it would be my practice to go and turn on immediately after I place someone in a patrol car.
16:29 A. Yes.

16:29 Q. Okay. So here, you said you knew that it was Officer Armendariz, meaning that you actually saw Officer Armendariz do that.
16:29 A. No, I can't say that I actually saw him do it.
16:29 Q. Okay.
16:29 (Audio recording playing.)
16:29 BY MS. MKRTCHYAN:
16:29 Q. So just want to confirm that you don't know -- you don't have an independent memory right now --
16:29 A. No.
16:29 Q. -- when and who turned on this patrol video recording?
16:29 A. No, I can't say for sure.
16:29 (Audio recording playing.)
16:29 BY MS. MKRTCHYAN:
16:29 Q. Right. So you confirming that your DAR, or your recorder, was not turned on prior to you placing her in the patrol car?
16:30 A. Yes.
16:30 (Audio recording playing.)
16:30 BY MS. MKRTCHYAN:
16:30 Q. So, you know, at this point in time when he's asking you about the complaints she had that

she was left in the patrol car alone, you know, you told us that you were not close enough to know what was going on because you were talking to the manager, or Guy Garcia; right?
A. Yes.
Q. You told here I didn't know what she was yelling about because you were not close enough, you didn't know what Officer Armendariz was telling her at the time; right?
A. Yes.
Q. So how could you tell me that, look, I didn't leave her alone. It was Officer Armendariz with her.
How could you tell him that, when you didn't even know what she was doing -- what she was yelling about? You were far.
Do you understand my question?
A. No.
Q. You were far, you told us --
A. Yeah.
Q. -- here.
You didn't know what she was saying, what Officer Armendariz was saying; right?
A. Yes.
Q. So how would you know that, you know,

16:31 Officer Armendariz never left her side when you were not there?
16:31 A. I said I was far, but I never said I was inside the store. I was -- I was near the entrance.
16:31 Q. So you were aware of everything that was happening?
16:32 A. I was aware, but I didn't -- I heard the yelling.
16:32 Q. Uh-huh.
16:32 A. But I never heard the yelling and what it was, or the conversation that was taking place.
16:32 (Audio recording playing.)
16:32 BY MS. MKRTCHYAN:
16:32 Q. Okay. So, you know -- you know, he's asking you about her complaining of medical condition, of her having difficulty breathing, and you are telling him that, look, you know, not at the time I saw her; right?
16:32 A. Yes.
16:32 Q. I didn't notice such things; right?
16:32 A. Yes.
16:32 Q. But then yet on patrol video, we can see within five minutes you're talking to her, you know, when she's complaining about face mask and asking to open the door, et cetera; right?

16:33 A. Yes.
16:33 Q. So why wouldn't you tell Officer -- Sergeant Robinson that, look, I heard her complain she couldn't breathe?
16:33 A. There was no, like, actual concerns of getting medical attention. That's how I -- that's how I understood that question.
16:33 Q. So when she kept saying please, please, please, several times, dozen times, pleading and helping, you know, asking for help, help, help and screaming, and, you know, you were concerned about apartment residences, you know, to be disturbed, but you were not concerned about her?
16:33 A. And we continued to talk to her, and she calmed down.
16:33 Q. But why wouldn't you tell -- this is what I'm concerned.
16:33 Why wouldn't you tell Sergeant Robinson that, yes, we did hear her complain, but we didn't think it was an issue because we were talking to her?
16:33 A. I didn't elaborate as much as I -- as you would have liked.
16:33 Q. I see.
16:33 But this is an Internal Affairs interview

16:33 and here to be forthright and honest -- right? --
16:33 A. I was.
16:33 Q. -- with your department?
16:33 And you didn't elaborate about what
16:34 happened. You didn't tell him what happened.
16:34 A. I was honest about it.
16:34 (Audio recording playing.)
16:35 BY MS. MKRTCHYAN:
16:35 Q. Okay. So this is the only time that he's
16:35 going over the part where she complained about her,
16:35 you know, ethnicity being made fun of and the last
16:35 name particularly.
16:35 You know, he's asking you whether this ever
16:35 happened; right?
16:35 A. Uh-huh.
16:35 Q. Right?
16:35 A. Yes.
16:35 Q. So we don't hear that on the tape in terms
16:35 of, like, the actual words spoken, "Do you speak
16:35 English," is that -- we don't hear that on the tape?
16:35 A. Yes.
16:35 Q. But you do hear when you're asking her
16:35 twice, at the very least, to spell her last name;
16:35 true?
16:35 A. Yes.

16:35 Q. And you hear her comments about -- or your comments, your "Arrrrr," like the -- the sound you made, which you said that was to shut down other -- shut up other people so that you could hear her; right?
16:36 A. And that's absolutely what it was.
16:36 Q. Okay. But she interpreted -- she could have reasonably interpreted you with her, that you're actually laughing at her last name; true?
16:36 A. And if she interpreted it that way, it was never meant to be that way.
16:36 Q. Okay.
16:36 A. I would never do that.
16:36 Q. But -- so but, Officer, we are aware that, first of all, not everything has been reported -- we've already covered -- right?
16:36 A. Yes.
16:36 Q. From the point in time you detained her, handcuffed her and placed her in the patrol car, that period of time was not recorded; right?
16:36 A. Yes.
16:36 Q. We've already covered this.
16:36 And we don't have any recording even when she was placed in the patrol car; right?
16:36 A. Yes.

16:36 Q. Searched, placed in the patrol car; right?
16:36 A. Yes.
16:36 Q. And when you search someone, you are also
16:36 trying to identify them; right? That's the first
16:36 protocol; right? You need to know who you are
16:36 detaining; right?
16:36 A. The question will come up of who they are
16:37 at some point.
16:37 Q. Right.
16:37 A. But that could be in the back of the car
16:37 also.
16:37 Q. I understand.
16:37 A. We could -- we could put them in the back
16:37 of the car, shut the door and then ask through the
16:37 window.
16:37 Q. Okay. But generally, when you are placing
16:37 someone in the car, the police protocol to find out
16:37 if they have a wallet, to see if they have an
16:37 identification -- right? -- to know who you are
16:37 detaining?
16:37 A. I wouldn't say it's protocol.
16:37 Q. General practice?
16:37 A. I mean, we like to know who they are,
16:37 right. Yes.
16:37 Q. So in other words, we don't have any audio

16:37 recorder of what happened prior to the time that she was placed and was sitting in the patrol car; right?
16:37 A. Yes.
16:37 Q. So if any of that happened prior to you placing her in the patrol car, you would have no way of knowing, aside from what you are telling us; right?
16:37 A. Yes.
16:37 Q. And she's telling us?
16:37 A. Yes.
16:37 Q. That's why the policy -- why the department is to start recording immediately when you are contacting individuals so that there's no questions about what happened; true?
16:37 A. Yes.
16:37 Q. Transparency, protect your integrity; right?
16:37 A. Yes.
16:37 (Audio recording playing.)
16:37 BY MS. MKRTCHYAN:
16:38 Q. Okay. 6:41 minutes, Sergeant Robinson is the one who actually offering you an explanation about how to interpret and how to present this comment that you made, "Ahhhhhh," in that that tape; true?

He's the one who actually provides you with an excuse; right?

A. No. Because that's exactly how I meant it.

Q. Well, okay. But he's the one -- it's not you spontaneously saying and explaining that; right? It's in response to a leading question that, oh, I hear you make this comment when, you know, you are asking to spell her name, and then I interpret it -- Sergeant Robinson says -- conveniently, he provides this explanation -- I interpret this that you asked everyone to shut up so that you can hear her; right? He said that, not you; right?

MR. KANG: Objection. Compound.

BY MS. MKRTCHYAN:

Q. Right?

A. Yes, he does do that.

Q. Okay. So let's -- and then you basically said, yeah, that's what I meant; right? Let's continue playing it.

(Audio recording playing.)

BY MS. MKRTCHYAN:

Q. They were so -- so you responded, yeah, you know, that's what exactly I meant, you know, because my partners were so loud and noisy. That's what I meant; right?

16:39 A. Yes.
16:39 Q. How convenient, the sergeant, basically, when he's interviewing you, provides you with an explanation so that you provide that back to him.
16:39 MR. KANG: Objection. Argumentative. There's no question pending.
16:40 MS. MKRTCHYAN: Right.
16:40 BY MS. MKRTCHYAN:
16:40 Q. So basically -- and I didn't hear any other noise by other officers there, it was just you and her talking, you know?
16:40 MR. KANG: Objection. Calls for speculation --
16:40 BY MS. MKRTCHYAN:
16:40 Q. Did you hear that?
16:40 MR. KANG: -- as to what Plaintiff's counsel heard or did not hear.
16:40 BY MS. MKRTCHYAN:
16:40 Q. Did you hear other officers being loud or noisy?
16:40 A. If you play it back, I could tell you yes or no. It's been -- there's been a lot of video and audio played --
16:40 Q. Yeah.
16:40 A. -- so I can't remember if there was.

16:40 Q. I understand.
16:40 A. But I'm telling you now, if I did that, then yes, I couldn't hear. I was telling my partners to be quiet.
16:40 Q. Right. Okay. Let's continue playing.
16:40 (Audio recording playing.)
16:40 BY MS. MKRTCHYAN:
16:41 Q. We -- we heard this audio. We didn't hear that part where you actually told her here's your cell phone.
16:41 You didn't hear anything like that; right?
16:41 A. The one that you played, no, I did not hear.
16:41 Q. You didn't verbalize returning her cell phone?
16:41 A. I didn't hear it in another audio that you --
16:41 Q. Yeah.
16:41 A. -- that you played.
16:41 Q. Yeah. So -- right.
16:41 So when he's talking about this part on audio that -- you know, that cell phone return part, we don't -- we didn't hear that today; right?
16:42 A. Not today, no.
16:42 Q. And you don't have independent recollection

16:42 when you returned her cell phone?
16:42 A. No. But if I would -- if I would have had
16:42 it, I would have booked it into property, if it
16:42 would have been left behind. And it would have been
16:42 attached to this -- this report number --
16:42 Q. Right.
16:42 A. -- as -- as safekeeping.
16:42 Q. Understood.
16:42 But in other words, when she's alleging
16:42 that her cell phone was not immediately returned, we
16:42 have no way of discrediting that statement because
16:42 it's not on audio or video; true?
16:42 A. True.
16:42 (Audio recording playing.)
16:42 BY MS. MKRTCHYAN:
16:43 Q. Okay. So we have this tape, on this tape,
16:43 on this recorded interview, it's not audible, we
16:43 don't hear him verbally counseling you for any of
16:43 the actions on that day; true?
16:43 A. Yes.
16:43 Q. But you do remember him telling you about
16:43 the things we discussed, you know, to reconsider
16:43 your attitude and the citation mistake you made and
16:43 the audio recording not done timely; true?
16:43 A. Yes.

Q. So do you have an understanding as to why that's not on audio?
MR. KANG: Objection to the extent it calls for speculation.
BY MS. MKRTCHYAN:
Q. In this conversation that you had with him?
Do you have -- is it the same interview -- during the same interview exchange with him?
A. No. And they don't -- they don't audio record verbal counseling.
Q. After this interview, did you ever receive a letter saying that any of your actions -- you know, that there was a disposition, that everything you did --
(Reporter clarification.)
BY MS. MKRTCHYAN:
Q. -- everything you did, every action you did on that day was written policy?
Did you receive a letter like that from your department?
A. I don't know if it specifically said that, but I did receive a notification from my -- saying that I was cleared.
Q. Cleared?
A. Yes.

16:44 Q. Okay. So other than this Internal Affairs interview, you've never been interviewed by the Internal Affairs for any of the use-of-force instances?
16:44 A. Any of the ones that you posted, no.
16:44 Q. Generally --
16:44 A. Yeah, no.
16:44 Q. -- any use of force?
16:44 A. No.
16:44 Q. Or any other customer complaint about rudeness, discourtesy --
16:44 A. No.
16:44 Q. -- or arrests?
16:44 A. No. I have not been interviewed.
16:44 Q. And as far as -- well, strike that.
16:45 And as of right now, you're sitting here today, do you know who reviewed and approved your report of this incident?
16:45 A. It would be whatever the approving sergeant would be, the 22000.
16:45 Q. Uh-huh. You don't know the name?
16:45 A. Not off the top of my head. I don't know the name to those numbers.
16:45 Q. Okay. So no one talked to you about this incident at all aside from Sergeant Robinson?

16:45 A. Correct.

16:45 MS. MKRTCHYAN: Okay. Well, with that, I'm done with this deposition.

16:45 Does your counsel have any questions?

16:45 MR. KANG: No.

16:45 MS. MKRTCHYAN: Okay. So then for the -- I offer the following stipulation.

16:45 As I requested earlier, you are going to be requested to review the transcript of this proceeding today to certify the truth and accuracy of it; there is an errata sheet for it on the last page where you can actually identify if something was mistakenly taken down or an error, if you want to change your testimony; any changes you make, obviously, it's going to be under oath, but it will be used against you. So that's when you change your testimony.

16:46 THE DEPONENT: Yeah.

16:46 MS. MKRTCHYAN: I offer the following stipulation.

16:46 THE REPORTER: Well, We go by Code.

16:46 MS. MKRTCHYAN: No, we don't go by Code in federal cases.

16:46 So I offer the following stipulation: If for any reason the signed certified copy by this

witness is lost, misplaced, or not signed, the certified unsigned copy will be used for all purposes in this litigation.

So stipulated?

MR. KANG: So stipulated.

THE REPORTER: Would you like a copy on this, Counsel?

MR. KANG: I'll take a copy.

MS. MKRTCHYAN: Let me get the stipulation from the other side.

Do we have the CVS attorney still in there?

MR. KRIDLE: Yes, I'm here.

MS. MKRTCHYAN: Okay. You're stipulating to the unsigned copy, certified copy to be used for all purposes in this litigation?

MR. KRIDLE: Yes.

MS. MKRTCHYAN: Okay. Very good. So with that, we adjourn this deposition at 4:47 p.m.

Madam Court Reporter, you can just ask for any other questions you had.

THE REPORTER: Connor -- sorry, I don't know how to say your name.

Connor, do you want a copy on this?

MR. KRIDLE: What was that?

THE REPORTER: Would you like a copy on

16:47 this? This is the reporter.

16:47 MR. KRIDLE: Yes, please.

THE REPORTER: Okay. Thank you.

(The deposition of OFFICER JAMES ROSS #22471 was adjourned at 4:47 p.m. Pacific Time.)

-oo0oo-

DEPOSITION ERRATA SHEET

Page/Line From To

DEPOSITION ERRATA SHEET (cont'd)

| Page/Line | From | To |
| --- | --- | --- |
| | | |

DEPOSITION ERRATA SHEET (cont'd)

| Page/Line | From | To |
| --- | --- | --- |
| | | |

STATE OF CALIFORNIA )
) ss.
COUNTY OF LOS ANGELES )

I, OFFICER JAMES ROSS #22471, hereby declare under penalty of perjury according to the laws of the State of California that the foregoing testimony is true and correct.

Executed this ______ day of ______________, 20______, at ________________________________________, California.

________________________________
OFFICER JAMES ROSS #22471

DEPOSITION OFFICER'S CERTIFICATE

{FRCP RULE 30(f)(1)}

STATE OF CALIFORNIA )
) ss.
COUNTY OF LOS ANGELES )

I, ELLEN C. SHORE, Certified Shorthand Reporter, Certificate No. 7210, hereby certify:

I am the deposition officer that stenographically recorded the testimony to the best of my ability in the foregoing deposition;

Prior to being examined, the deponent was by me first duly administered the oath;

The foregoing transcript is a true record of testimony given;

Review of the foregoing transcript was requested before completion of the deposition;

Pursuant to Rule 30(e)(1), Federal Rules of Civil Procedure, the deponent has been notified of the availability of the transcript for review and signature.

Dated: December 8, 2023

Ellen C. Shore, CSR No. 7210

**#**

**#22471** 5:23 414:5

**-**

**--oo0oo--** 186:5
**-oo0oo-** 5:4 187:4 414:7

**0**

**06317** 375:7
**08-18-1975** 113:20

**1**

**1** 178:15 183:9 208:13 388:3
**10** 163:19 207:17 292:1
**10-minute** 104:5
**100** 209:24
**1074** 42:25
**108** 40:7
**1085** 382:21
**10:35** 282:18
**11** 284:21
**116** 173:11
**117** 172:7
**119** 101:7
**11:57** 186:4
**127** 331:1
**128** 331:1
**12:20** 290:4
**12:45** 287:22
**12:47** 186:4 187:3
**130** 115:19
**139** 156:2
**13:01** 288:21
**13:59** 290:18
**14** 344:19
**14:07** 291:22
**14:15** 292:10
**14:25** 293:9
**15** 161:16 289:16 299:21
**15:11** 299:22
**16** 302:14
**16:59** 303:12
**17** 42:4
**171** 109:11
**172** 109:10 132:15
**173** 109:10,11
**17:30** 29:10,14
**18** 164:25 165:4 177:6 200:8 246:4 287:7 305:6 335:8 336:17
**18:22** 164:14
**18:26** 309:20
**18:30** 29:11,19
**19** 42:24 110:15 111:10 343:4
**19-19811** 343:5
**1:20** 62:13
**1:22** 222:14
**1:26:36** 66:12 67:17
**1:27** 110:15
**1:27:30** 65:10
**1:28** 62:14
**1:28:37** 67:21
**1:30** 124:23
**1:31:06** 123:3
**1:33:03** 124:1,6
**1:42** 224:18

**2**

**2** 163:20
**2's** 28:18
**2.23** 226:9
**20** 7:1,2 335:8 336:17
**2008** 14:11,12
**2017** 10:24 12:12 15:3, 20 20:8 33:17 391:16
**2019** 18:18 342:25
**2020** 200:8 207:17
**2020/2021** 209:15
**2021** 22:19 24:7 25:18, 20,23 31:17 42:24 69:10 110:15 111:11 344:19 353:18 354:3 358:21
**2022** 365:17
**2023** 5:2,12 187:2 388:8
**2023-1348** 370:12 381:12
**2023-1791** 382:20
**21** 5:2,12 24:7 42:4 187:2 354:7
**21-14854** 354:6 359:21 376:14 377:4
**21-4573** 344:13
**21-4753** 344:13,19 350:6 375:7
**21-788** 110:14
**21-9764** 350:14 375:22
**211** 382:12
**21:05** 111:22
**21:05:09** 111:11
**21:06** 110:20
**21st** 242:1
**22** 284:21
**22-7707** 365:16 377:18
**22000** 111:18 411:20
**23-3383** 387:24
**24** 218:6 222:17
**248** 64:4
**26** 358:21 365:17
**28** 342:25
**29** 164:6
**2:15** 394:21
**2:23-cv-01788** 5:17
**2:30** 230:14
**2:48** 233:23

**3**

**3** 66:21 163:20 353:18 357:17
**30** 185:20
**303.3.1** 333:23
**303.4** 336:22,24 341:16
**314.4** 101:5
**315** 5:10
**323** 116:6
**327** 359:21
**33.5** 172:1
**335.4** 173:22
**344356** 370:13
**37** 6:17,18
**3943** 28:16
**3:05** 234:8
**3:22** 397:11
**3:30** 362:3
**3:32** 237:24
**3:52** 244:14

**4**

**4** 208:11
**415** 93:5
**45** 114:21 185:20,21
**485** 343:1
**4864** 123:21 124:2
**4:15** 244:5 245:14
**4:47** 413:18 414:5

**5**

**5** 163:19 397:11
**5-2** 160:21
**5-7** 89:5
**5-8** 89:5
**5-9** 88:8,9 368:16
**50** 185:21
**54** 218:10 219:19
**5:00** 29:13
**5:30** 29:10,14
**5:39** 247:9,13,17
**5L25** 67:18 124:2
**5L26** 68:8 123:2 124:2

**6**

**60** 105:3,11 191:13 259:6 282:7
**602** 46:3 49:5 52:22
**602.0** 46:2 52:11
**602.1** 50:13,22 54:2 56:10,12 61:10,23 148:25
**6020** 42:25 43:9
**647** 354:8
**6:00** 29:15
**6:09** 251:5
**6:21** 256:21
**6:27** 257:10
**6:30** 29:11,19
**6:41** 405:21
**6:48** 261:21
**6:57** 262:10

**7**

**70** 259:6
**7:00** 29:20
**7:54** 267:5

**8**

**80** 105:3,11 191:13 282:5,7
**807** 5:10
**849** 149:12,14
**8:56** 275:13

**9**

**90015** 5:11
**911** 27:25 62:15 64:21,25 157:13
**9:08** 5:3,12
**9:09** 280:2
**9:39** 327:2
**9th** 5:10

**A**

**A-L-I-A-G-A** 33:10
**A-Y-A-D** 16:24 17:1
**a.m.** 5:3,12 29:13,20 62:14 186:4
**abdomen** 351:13
**ability** 138:5 221:6 341:9
**abrasion** 389:17
**abrasions** 352:8
**absolutely** 152:6 403:6
**abusive** 54:20,21,24 117:7
**Acacia** 115:24
**academy** 12:9,14 14:23 16:8 58:15 109:17
**accepted** 52:7 277:13
**accepting** 263:23 311:24
**accommodate** 146:24 187:22 197:6 201:21,23 231:5
**accommodated** 122:6,16 215:8
**accommodating** 81:3 212:10 216:5
**accommodations** 208:10
**accordance** 217:6
**account** 40:16
**accuracy** 253:9 412:10
**accurate** 8:11,21 42:21 68:6 110:2 115:8,9 121:4 176:7,11
**accurately** 46:15 65:14 101:14 109:21 113:16 156:12 258:5 268:20 273:4 366:15
**accusing** 280:4,17
**act** 40:14 155:14
**acting** 46:11 56:22 85:21 86:24 152:5,9 153:1 160:14 315:8 336:18 360:3 386:7
**action** 6:9 173:14 323:13 410:17
**actions** 33:22 202:2 223:10 345:11 365:13 373:3 375:14 384:24 409:19 410:12
**activate** 162:20
**activated** 352:12
**active** 342:10
**actively** 359:11,14,19 360:9
**activities** 41:3
**acts** 40:13
**actual** 138:24 209:20 278:18 361:6 401:5 402:19
**add** 321:7
**additional** 58:3 208:15
**address** 5:10 14:16 28:13,14 115:22 272:12 343:11
**adequately** 74:22
**adjourn** 55:23 413:18
**adjourned** 414:5
**administered** 5:24
**admission** 320:8
**admit** 274:22
**admitted** 274:23 279:17
**admitting** 304:11,20,22 320:4
**admonish** 55:21
**admonition** 301:8 305:19 306:2 308:1
**advance** 15:7
**advise** 7:18 146:15 228:25 301:18 304:19 308:16 346:25
**advised** 47:22 52:7 109:1 139:19,23 140:11 141:2 144:2,12 166:15 216:2,19,22 297:9 306:10,12 308:13,17 338:14 387:8 390:21
**advisement** 145:6,8 303:13 311:8,9
**advisements** 318:22 319:14,19 320:13,14
**advising** 45:13 145:18 216:25 292:17
**Affairs** 9:22 44:12 108:19 109:2 228:19 277:21 391:8,13,17 401:25 411:1,3
**affirmatively** 332:18
**African** 170:25
**age** 114:21 156:11 157:3
**agencies** 20:11,15
**agency** 15:20 20:13 200:7
**agent** 32:5,6 46:9,12,13 56:16,21,23
**aggravated** 372:13

**aggress** 90:7,11 92:1
**aggressing** 159:11
**aggression** 90:14 91:6
**aggressive** 91:1 159:10 341:22 346:8 357:15 360:3 387:5
**aggressively** 386:20 387:12
**agitated** 336:5,6 370:18 372:5 381:15
**agree** 173:19 281:9 396:11
**ahead** 110:25 218:22 320:11 349:24 385:15
**Ahhhhhh** 257:11 258:10 405:24
**aid** 125:18,22 127:22 128:4 180:18 183:2 197:4
**aiming** 13:13
**air** 232:25
**aired** 62:17
**airplanes** 14:7
**alert** 215:18
**Aliaga** 33:9 373:8 386:14
**allegations** 350:25 394:8
**allegedly** 389:4
**alleging** 215:23 409:9
**alleviate** 85:23 230:20
**allowed** 54:15 144:3,10 145:16 152:23 155:19 245:21 315:18
**ambiguous** 227:17
**American** 170:25 243:1
**amount** 61:4,18
**ample** 38:23 61:18
**analyze** 58:13 59:7
**ancestors** 242:5
**ancestry** 40:16
**Angeles** 5:11 31:2
**angle** 246:25
**angry** 372:13,17
**Anoush** 39:14 49:13 70:18 113:20 133:14 134:9,12 135:9 139:4 140:9,13 144:3 249:18 269:12 271:21 293:24 327:3,17 387:12 391:20
**answering** 204:21 302:1 379:4
**answers** 8:6,15
**anxiety** 125:21 126:20 180:25 181:5,20 182:2,5,25 194:10 196:4 225:15,19 226:3 336:7
**anxious** 181:6
**anymore** 131:14 239:11 348:25
**apart-** 347:11
**apartment** 100:3 124:21 125:2 130:15 239:2,6 247:1 314:20,22,23 347:11 348:20 382:25 383:25 401:12
**apartments** 348:23
**apologize** 145:15
**apologized** 385:1
**app** 314:16
**apparent** 156:22 211:23,24
**apparently** 290:22
**appearing** 96:5
**appears** 89:18 173:16 198:2 280:9 290:5
**application** 40:12 336:22 341:15
**applications** 22:2
**applied** 12:22 20:10 52:11 57:1 97:18
**applies** 46:17
**apply** 7:7 12:17,20 40:11 42:14 49:3 52:2 53:4,7,10,15,18,24 214:6 334:16
**applying** 156:25 342:11 388:17
**apprehended** 383:1
**approached** 71:12 76:11,24 155:11 197:8 216:1 384:12 394:24
**appropriately** 152:9 197:18 296:15
**approval** 111:10,12,14 112:23
**approve** 112:11
**approved** 111:23 113:8,10 156:8 274:10 337:10 365:13 411:17
**approving** 111:18 112:1 113:12 411:19
**approximately** 62:13 105:1 162:16
**April** 207:17 344:19 353:23,24
**area** 7:1 31:3,9 32:4 47:1 67:13 68:18 98:4 100:4 231:21 239:2 329:15 345:8 347:5 348:22 351:14 356:25
**argument** 394:23
**argumentative** 54:5,8 92:19,20,21 100:1 103:10,11 116:24 242:14 243:6 253:18 260:15 268:15 271:6 279:15 286:1,23 287:13 294:18 322:11 358:16 371:2 407:5
**arise** 333:20
**arm** 214:14 332:1,6 354:15,18,19 355:13 366:7,9 371:4,5,6 379:9 389:2
**Arman-** 100:7
**armed** 87:18 89:10 101:22 102:18 103:24
**Armendariz** 63:12,13 68:8 87:20 94:1 96:21 104:21 105:13,18 106:2 122:18 123:2 124:2,10 129:9 130:12 150:16 151:21 155:8 184:24 188:6,19,21 189:11 190:10 192:9,16 193:19 194:17 197:10 201:6,7,23 211:7 224:2,4,5,20,25 226:8 230:7,15 232:3 236:23 238:9,13 251:12 256:4 282:13 287:21 288:21 315:14 324:3 325:23 327:7 335:19 341:7,15 397:13 398:2,3 399:8,12,23 400:1
**Armendariz's** 235:1 236:17
**Armenian** 167:6 258:18 259:6,9,19,21,25
**arms** 345:4,17 351:25 352:3 366:5
**arrest** 34:3,17,22 35:2,6 36:24,25 37:5,10,19 38:3,12,16,19 39:3,4,11,14,21,24 44:7 84:13,15 86:3,9 106:8 121:19 135:25 136:6,12,18 137:3,18 138:21,22,24 139:10,12 140:13,20 141:5 142:2,23 143:15 146:6 148:7 150:9,20 151:11 156:9 166:2,8,19,25 169:9,12,17,20 171:19,21 172:4,5,20 173:13,18 174:3 175:19 176:12,17 250:19,20,22 253:4 264:25 265:11 266:22 268:24 277:17 284:17 287:11 292:17 296:22 300:19,25 301:9,12,16 302:6 303:25 306:12 309:1,14 311:24 319:13,17 320:15,24 323:12,23 326:20 333:22 342:23,25 343:25 344:12,13,17 350:14 353:25 354:6 358:4 361:2 363:23 365:15 369:18 370:12 373:17,18 375:6,22 376:14 377:3,18 378:2 381:12 382:19 387:23

**arrested** 79:17 114:10 120:19 121:21 135:14 142:5,6 144:4 156:10 167:21 169:23 171:12 175:14,16 256:14 265:24 266:2,10,13 274:24 275:7 293:1,11 299:25 300:18 305:9 309:11 313:1 324:24 333:23 334:5,22 363:24 364:16,17 372:14,15

**arrestee** 113:19 114:17 337:1,2

**arrestee's** 254:17

**arresting** 84:21 160:7 254:7 263:10 309:9 314:3 318:6 319:3

**arrests** 30:4 31:18 41:5 168:18 252:11 373:15 411:13

**arrival** 132:23 361:14 394:22

**arrive** 62:3 122:22 354:14

**arrived** 20:1 68:6,9,11, 14,20 69:7,24 70:13 71:7 119:15 120:5,8 121:1,14 122:22,23,24 123:1 343:13 352:3 355:9 357:17 371:22 372:24 383:11

**arrives** 179:4

**arriving** 66:23 67:7

**Arrrrr** 403:2

**articulated** 337:3

**arya** 248:23

**asks** 323:5

**asphyxiation** 339:16

**assault** 369:16

**assaulting** 103:20

**assaultive** 92:6

**assigned** 17:9,17,24 18:6,13,25 20:6 22:15 23:19 24:5 25:18,21,24 26:15 31:25 62:19 81:19 86:14 274:16

**assigning** 72:20

**assignment** 16:7

**assignments** 11:13

**assigns** 74:21

**assist** 242:11 351:19 360:2 386:8

**assistance** 200:23

**assistant** 248:24

**assisted** 355:18 377:6

**assisting** 247:6 371:21 383:11

**assume** 9:3 311:18 363:3

**assumed** 285:23 286:15,20

**Assumes** 81:21 125:23 126:11 175:21 184:10 203:18 211:11 229:4 232:7

**assuming** 235:22,24 237:16 394:5

**athletic** 89:7

**attached** 361:11 409:5

**attack** 125:16,21 126:20 128:5 180:25 181:5,20 182:2,5,10,25 196:5 215:1 225:15,19, 20 226:3 336:7 339:16

**attacked** 242:20

**attacking** 243:14,15

**attacks** 194:10

**attempted** 152:17 343:11 354:16 365:21 366:8 380:11 383:6

**attempting** 56:18 347:5

**attention** 43:20,21 57:17 145:24 193:21 194:7 252:13 258:15 296:7 337:19 340:6 364:10 401:6

**attitude** 205:7 228:23 229:1 278:1 297:9 409:23

**attorney** 7:15,21 43:23 44:3 374:22 413:11

**attorney-client** 43:25 44:5

**attorneys** 258:17

**attributing** 135:16

**audible** 8:15 238:14 245:1,3 261:3 409:17

**audibly** 8:9 129:6

**audio** 9:15 25:23 26:15, 18,22 27:2 72:7,21,25 73:2,10,15,18,20 74:6, 18 75:1,6 79:25 104:14 107:20 108:6,14,21 109:3 117:22 141:13 144:14 151:22 163:6 216:17 278:4 292:6,7 304:24 309:21,23,25 310:2,7,10,17,21 311:3, 5 312:1,12,17,23 313:6 316:18 317:14 318:12, 14 323:2,9,25 324:12, 15 326:1,10,15,17,24 328:5,16,23 330:1 387:19 392:23 393:7, 12,15,20 394:19 396:15,25 397:8 398:7, 16,22 400:12 402:7 404:25 405:19 406:20 407:23 408:6,8,16,22 409:12,14,24 410:2,9

**audio-recorded** 395:25

**audio/video** 25:15 73:5 142:22 217:12 241:1 300:11 394:13, 15,16

**August** 353:18,24

**authenticate** 110:11

**authority** 144:9 146:18 153:7,8 155:22

**authorized** 148:7 306:2,7,19

**automatically** 142:7 272:21 277:9,13,14,15 285:22 286:15 311:18 363:3

**Avenue** 115:24

**average** 89:8 158:3 160:17

**avoid** 362:18,19

**aware** 36:6,9,15 37:2,6, 8,9,20 39:1 40:8,23,24 41:4,14 45:16 46:23 57:7,13 69:13 77:17 78:7,9 95:23 101:7 129:17 148:23 155:24 171:2,13,23 175:13 182:4 188:14 190:20,23 192:14 197:1 199:14,18 200:1 201:3 202:6,22 206:15 209:23 210:6, 14,23 211:4 214:21,22 215:25 232:4 255:6,9, 14 258:14,20 259:1 324:17 334:14 335:22 337:6 370:11 400:5,7 403:14

**Axon** 162:9 314:16

**Ayad** 16:22,24 17:2

**Azodi** 388:4

**B**

**back** 20:9 29:8 32:18 38:16 40:1 51:23 55:24 62:4 69:24 70:13 71:1 73:11 84:22 86:1 93:21 98:17,18,25 99:23 100:2 102:13 107:8 111:5 113:2 125:4 127:10,11 134:4 136:17,23,24 140:23,24 143:10 144:7,10 146:14 147:1,12 148:3,5 152:13 154:24 155:2 162:18 163:2,3 165:10 166:15 168:11,12,15 169:10 187:6 191:4,18 204:24 205:19,21 215:13 218:15 220:14 235:19 239:1 246:11, 13,25 247:5 248:4,5 249:5,6 251:13,16,19 264:3,10,12,14,16 266:8 267:17 269:9 272:11 275:5 280:25 281:3 283:22,25 284:1, 9,14 289:15 297:25 305:8 308:2,22 309:2, 13,14 311:10,13 312:3

316:21 317:3,8 330:8, 18 339:5 340:24 343:13 345:6,9 347:18 348:19 350:2 354:18 357:5,13, 14,17 359:16 362:7 366:2,9 370:19 371:1 374:20 378:6,19 380:14 384:9,12 388:20 404:10,13 407:4,21

**backed** 281:7

**background** 233:19 234:12 258:3

**background-related** 10:22

**backing** 123:9

**backpack** 367:1 369:2

**backpedaling** 357:15

**backside** 98:1

**backtracking** 198:16, 18

**backup** 123:7 378:12 379:16,19 380:7 383:15 385:18,20

**bad** 117:9,10,15 118:4, 12 130:3

**badgering** 54:18 55:14

**bag** 366:1 380:14

**baggy** 98:11 102:9

**bail** 313:23 314:8

**balance** 156:7

**ballistic** 88:14

**ballpark** 6:24 28:7,19 89:3 158:2,6 217:20,22

**ban** 35:25 145:3 146:19 147:18 306:8,20

**band** 97:23

**bandana** 208:18

**banned** 120:10 131:10 132:18 135:24 136:9, 16,22 143:8,9 145:1 146:4 147:3 165:17 175:12,17 176:2,8 250:2,5,13 266:5 275:6 283:22 284:4,13 305:17 307:21 308:21

**banning** 146:11 147:8

**Banuelos** 388:6

**bare** 298:14

**barely** 235:1 237:14 261:3

**barricade** 363:22

**base** 37:24

**based** 35:12 37:23 39:17 52:14 71:22 82:12 83:25 84:1,2 85:20 86:23 93:17 99:22,24 102:6 112:4 114:25 115:2 122:25 132:9 134:1,22 139:7 142:25 143:17 145:6,10 146:5 147:6,16 151:9 152:11 158:24 161:21 164:6,13 165:22 166:14 169:12,17 170:9 176:4, 13,16 212:17 238:7,8 240:21,25 241:1,8,12 246:4 254:16 266:23 267:18 269:20 287:1 303:7,25 306:11 307:13 313:3 317:2 320:23,24 322:15,19 335:8 349:18 357:22 372:1 393:7 394:1

**basic** 13:12 15:5 94:11 97:22 127:22 346:15

**basically** 14:8 17:23 25:4 47:14 49:15 52:7 53:2 57:7 65:8 67:8 102:15 115:7 127:18 135:19 136:12 137:16 138:8 139:7 142:22 146:13 147:15 149:18 152:17 156:23 160:13 169:24 172:10 193:22 194:2 230:7 240:24 248:2 252:3 253:14 254:2,6 268:7 269:10 271:19,24 272:12,15 280:20,21 283:1,2 285:22 287:25 292:13, 16 293:23 302:14 303:5,24 305:6,18 307:20,25 309:25 310:2,19 316:3 318:16 319:1,9 322:20 323:6, 20 327:18 331:7 334:5 339:18 345:16,19 346:19 349:9,18 356:3 358:20 359:9 361:12,22 381:8 382:14,21 383:12 390:4 394:25 397:2 406:17 407:2,9

**basis** 146:23 170:7 259:14 341:3

**Bates** 110:13 370:13 375:7

**beg** 244:6

**began** 133:14 347:17 372:13 388:18,20

**begging** 224:19,21,23 234:9 244:19

**begin** 344:22 346:24 350:20

**behalf** 35:2 221:10,13 255:22

**behave** 55:22 219:13

**behavior** 51:10 55:20 93:10 103:9 156:10 157:6 158:20

**believed** 39:19 102:18 110:3 147:15 161:4 266:20 322:21 346:19

**believes** 296:2

**bell** 149:16

**belonging** 46:5

**belt** 343:19

**benefit** 86:13

**biased** 320:9

**big** 215:2 315:23

**bigger** 239:4

**birth** 113:20,22 114:4,6 262:20

**bit** 20:9 32:18 40:1 55:22 62:5 84:23 185:11 247:21 320:16 354:11 378:7

**black** 65:11 76:3 170:25

**bleeding** 345:8

**blood** 351:12

**Blueteam** 298:25

**body** 23:8,9,10,17 24:6, 13 311:3 332:19 343:17

**body-warn** 74:12

**body-worn** 25:20 26:13,14 27:2,21 75:1 164:4 352:11 353:15,20 354:1 366:13 367:22

**Boise** 13:7

**Bolton** 351:11,20 375:23 376:4,6

**book** 11:14 149:6 168:3 215:10 291:18,20

**booked** 167:24 314:7 409:3

**booking** 149:4 313:21, 22

**borders** 31:1

**bottom** 97:25 100:12 165:24 241:11 252:2 277:18 365:2

**bounds** 197:3

**box** 168:15

**Brand** 342:24

**break** 95:8 104:4,5 185:13,16,17 290:14 292:1 349:20,23,25 357:23 363:21

**breaking** 358:1 363:9

**breath** 125:11 181:7 195:19 197:18,24 230:16 242:10 267:10 336:10 339:19 340:5,17

**breathe** 128:10 181:10 184:6,21 195:17 198:1 201:8 203:16 204:4 216:23 218:20 222:18 238:5 239:19 315:20 332:15 336:10 339:24 401:4

**breathing** 125:8 128:14,17,20 129:8 155:7 177:9 180:12 181:18 182:16 185:8 188:1,15 190:16 192:18 193:19 194:13 197:12 199:5 200:21 210:14

211:8 212:14 216:6 217:8 219:23 224:10 230:17 232:4,14 234:11 267:9,12,24 291:10 315:12 335:10 339:2,14 340:5,18 400:16

**briefings** 207:24

**briefly** 45:6 344:25 392:20

**bring** 21:10 22:8 31:3 51:19 55:24 100:13 180:18 197:16 232:25 337:18

**broke** 59:11

**broken** 352:10

**brought** 11:17 43:20, 21 44:11 57:17 145:24 192:24 193:3 296:7 364:10

**building** 76:15 247:1 314:22,23

**buildings** 100:3 124:21 125:2 239:2,6

**built** 89:6

**bulges** 98:13,21

**bump** 389:16

**bureau** 276:21

**bureau's** 276:23

**burglar** 363:8

**burglary** 355:6 356:13 357:7 358:1 359:4 362:2,12,19 363:5,24 364:16,20 377:12

**Burmayan** 5:15 6:9 39:14 41:18 42:24 49:14 62:1 70:18 73:12 76:13 79:17 81:20 82:19 83:3,21 84:17,24 88:3 96:11 97:10 99:3 102:3,18 113:20 124:9 134:12 138:7 139:4 144:3 148:2 154:2 158:16 167:19 175:19 184:20 187:25 189:12 192:12 211:7 213:7 214:18 215:23 216:17 221:5 229:1,15 257:21, 22 260:8 269:6 286:12 332:4 337:15 341:5 387:12 391:20

**Burmayan's** 142:11

**Burroughs** 386:13

**bus** 31:2

**bush** 384:8

**business** 5:9 14:6 36:1 37:15 39:6 48:6,8 56:15,16,18,20 59:4,18 144:18 318:17,19 319:5 325:4

**businesses** 208:12

**button** 26:7,23 68:3 74:7,8,9

## C

**C-A-D** 329:4

**CAD** 123:10 329:2,4

**Calart** 14:1,5

**Calatayud** 388:5

**California** 5:1,11,14 187:1 199:15 200:5,7, 11 202:7,20,22 206:16 231:17,21 232:1 273:1

**Californians** 202:18

**call** 19:15 27:25 31:22 48:16 62:12,15,19 63:2, 9,15,17 64:1,3,5,11,14, 15,21 65:8,9,17,19,24, 25 66:2,3,7,12,13,17,23 67:7,8,17 68:14,25 70:11 71:20 72:8,14,18 74:1 79:4,7 82:13 83:8 99:13 102:16,17,21 108:5 119:23 121:16 122:25 128:12 157:16 181:14 182:21 194:14 207:16 240:23 241:1 255:2 256:14 276:1 294:13 295:24 296:8 324:21,24 325:6,11 326:2 329:5,7,11,25 341:8

**called** 25:10,24 48:15 148:6 166:11 175:9 197:19 291:17 298:25 315:25

**caller's** 120:1

**callers** 65:1

**calling** 269:2 294:7

**calls** 17:16 18:1 26:4 27:9,12 28:22 30:1,14, 20,21,24 31:8 32:22 49:14 62:25 70:4 81:22 158:8 172:21 179:18 201:11 202:9,25 209:3 221:23 222:7 232:10 234:1 235:5,6,14 237:3 239:20,25 250:16 251:1 260:14 261:5 272:23 319:23 407:12 410:4

**calm** 126:1 128:8 181:11 182:14 193:23 194:1,3,12 195:13 197:17,22 201:18 231:6 237:25 238:1 239:9 340:20 371:7

**calmed** 126:5 336:8 340:18 341:11 401:15

**calming** 182:23 340:11

**calms** 126:23 268:4

**cam** 23:9,17,18 24:6,13

**camera** 9:15 23:9,10 25:13,21 26:13,20 27:22 75:1 98:10 104:18 117:24 162:20 163:4 245:5 352:11 353:15 366:14 367:22

**camera's** 162:21

**cameras** 26:14 27:3 74:12 164:4 353:20 354:1

**capability** 275:17

**capture** 24:1 25:25 26:19 81:9 205:13 281:20 314:16

**captured** 81:8,13 310:2 366:14

**car** 17:15 18:16,25 19:7 20:6 25:7,18 62:18,21 63:21 71:1,8 73:11,12 84:18,25 85:4,14,16 86:1 93:18,22 94:5 96:15,16,17 99:24 100:3 102:13 104:12, 17,19,22,24 105:5,23 117:24,25 118:19 122:5,11 123:24 124:9, 16,19 125:4,6,12,17 126:17,23 127:10,11, 15,19 129:5,6,10,19,20 130:11,15 133:23 134:4 138:10 150:17 151:5,14 152:1 154:3,18,21,22 155:2,10 161:7,13,23 162:10,13,16,19 163:3 164:2,11,20,24 165:11 167:25 177:6,20 178:4, 9,10,19,24 179:14,17 180:4,25 182:10 183:5 184:20 185:7,10 187:16 188:18 190:17,24 191:4,9,11 192:1,3,6,18 196:3 198:9,11 214:19, 25 215:7,9,14 216:21 217:14,15 218:16 220:15 223:1,5,7,9,12, 13,17 225:9 226:2,3 231:1 232:13 236:15,18 239:7,16,17,23 240:6 241:20 242:9 245:15, 18,21 246:6,13,23 247:1,17 257:15 261:8 262:4,12,14 270:2 272:9 275:17 280:25 281:3,14,19 284:24 286:13 287:7 288:11,13 290:3,12,19,22 291:7 292:11,12 293:13 297:16 299:9 302:22 309:21 310:3 313:9 314:18 315:7,22 316:10,16 329:13 330:5,13 332:3,8,12,24 334:23 336:5,15 337:15 339:2,6,17,22 340:4,9 341:1 351:12 357:4 387:13 395:21 397:5,24 398:20 399:1 403:19,24 404:1,10,14,17 405:2,5

**card** 213:7,20

**cards** 213:4,10

**care** 55:11,13 63:9 380:1

**career** 7:4 152:7 273:10 391:16

**carefully** 156:6 302:2

**carjacking** 344:21 346:18,20 350:11

**carried** 56:15 213:21

**carry** 23:3 26:12 42:6, 10 56:18 213:4

**carrying** 23:6 53:6

**case** 5:17 6:20 9:11,20, 23 23:19 34:9 39:13 42:23 86:8 107:13 124:18 160:8 163:11 171:11 190:6 215:5,24 216:1 240:13 242:22 255:13 268:25 269:1 274:16 277:1,15,25 298:1 341:4

**case-by-case** 341:3

**cases** 6:24 156:16 412:23

**casual** 263:15

**catch** 195:19 197:18,24 223:25 336:10 337:24

**categorical** 305:7

**categories** 213:9,13

**catering** 14:5

**caused** 135:22 352:5

**causing** 64:16 119:16 140:12

**caution** 334:17

**cell** 42:10 94:16,20,23 95:3,12 116:6,11,15 132:25 133:4,7,10 314:13,15 328:7,11,15, 18 330:8,11,17 408:10, 14,22 409:1,10

**center** 235:16

**century** 242:1

**certificate** 15:1,14

**certified** 412:25 413:2, 14

**certify** 8:20 412:10

**cetera** 40:17 56:24 58:25 59:15 70:1 79:8 177:15 178:21 193:23 194:2 200:13,25 214:17 262:20 270:18 284:9 292:25 293:12 305:17 317:7 331:5 342:12 343:12,14 379:22 383:1 389:2,19 400:25

**Chaffey** 13:7

**chair** 371:2

**chance** 321:25 322:3

**change** 143:15 161:10 176:3 246:7 293:16 412:14,16

**changed** 178:6 297:20

**charge** 278:23

**charged** 364:16

**charges** 314:7

**Charlton** 359:23,25 360:8

**chase** 382:25

**check** 11:16 42:19 153:22 275:22

**checking** 347:4

**checks** 11:15

**child** 260:10

**choice** 304:5

**Chris** 16:22

**chronologically** 105:21

**chronology** 133:25 395:19

**circles** 327:4

**circum-** 338:2

**circumstance** 158:14 184:17 197:19

**circumstances** 38:20, 21,25 40:12 61:11,12, 24 117:6 156:9 157:8, 10 158:1 161:5 172:2 209:1 336:25 349:14

**citable** 148:16 149:17 335:5

**citation** 43:4,18 44:9 45:17,22 48:18 52:2 57:8 113:24 114:11 148:6,13 151:16 152:15 165:24 168:16 169:9 277:18 278:9,14 279:2, 18 285:4,10,15 286:3 287:15 293:3 304:6,11 312:21 313:12 330:15 333:5 409:23

**citations** 252:22

**cite** 42:8,9,20 47:2,5 57:3 58:23 149:4,7 151:4 152:3 165:11 178:3 253:9 291:18,19, 20 302:6 304:6 308:25 336:2

**cited** 42:25 43:11,14 46:2 152:7 169:13 177:20 253:6 299:25 300:20

**citing** 57:19 157:21 161:6 253:8 254:24 279:2 309:9 314:5 325:5

**citizen** 323:15

**citizen's** 34:3,16 36:23, 24 39:4,11 136:6,12 139:10,12 296:22 311:24

**citizens** 263:10 294:17 295:2,23

**Citrus** 13:7

**city** 5:19 11:19,20,21 13:21,22,25 14:9,16,17 17:10 18:1 32:9 69:17 115:23 207:15 209:14 257:24 259:3,7

**citywide** 17:15,21 18:16 32:8

**civil** 6:9 40:13

**claim** 338:19,22,23,24

**claiming** 172:3 264:15

**claims** 129:23

**clarification** 8:17 12:6 19:21 103:3 108:12 109:22 112:16 148:20 153:24 156:18 166:6 183:14 207:7 237:8 251:23 263:6 294:24 310:25 329:3 334:1 343:2 348:3 369:22 371:19 380:21 410:15

**clarify** 160:16

**class** 127:22

**classes** 13:13 15:21 16:1,2,4,5 128:1,2

**claustrophobia** 125:16 180:17,20 214:24 215:2

**claustrophobic** 180:15 238:6

**clear** 23:3 132:5 135:3 144:6 159:6 222:15 230:22 267:19 329:10, 19,22 338:13

**cleared** 329:17 366:13 410:23,24

**clearing** 329:15

**clenched** 366:3 367:2

**client** 51:17 55:24 83:18 153:1 240:20

**climbing** 383:8

**close** 68:18 115:23 163:1,3 185:16 261:12, 13 281:18,22,25 378:23 399:2,7

**closed** 232:21 291:11

**closing** 281:12

**clothes** 361:16,17

**clothing** 88:19 98:12 102:9 369:8

**coached** 253:24

**coaching** 50:23 51:3, 13 322:1 338:6,7 375:3

**code** 35:19 36:7,16 40:2,5 41:6,15,19,20,21 42:6,7,8,13,15,25 43:9, 13 46:2 48:12 49:2,9, 17,22 50:8,13,21 52:1, 8,16 53:17 54:4 56:25 58:2,12,16,18 59:9 60:1,18 61:2,9,23 66:21 92:22,25 119:22 144:9 145:16,17 147:2 148:19,22,24 149:3,9, 10,12 253:10 278:9,15 357:17 412:21,22

**COG** 40:7 42:25 64:4 101:7 109:10 132:15 156:2 172:7 173:11 331:1 359:21

**cognizant** 8:8

**colleague** 173:5

**college** 13:4,6,7

**color** 40:16

**combative** 92:4 103:21 158:17

**command** 383:5

**commanded** 365:21 380:12

**commands** 349:1 351:23,24 360:4 383:3

**comment** 65:10 150:22 257:8,11 258:9,10 264:20 265:1 405:24 406:7

**comments** 99:8 205:14 258:24 268:16 274:2 293:22 311:22 374:23 403:1,2

**commit** 31:5 248:1

**committed** 37:4,18 39:8,19 85:9,19 119:14 121:6,15 140:5 166:10,13,17 283:15 362:11

**committing** 122:1 139:15 160:20

**common** 257:22,23,25 259:11 263:4,9

**communicate** 24:17 63:21 67:24

**communicating** 65:3 216:8

**communications** 44:1,6

**comparing** 159:24

**compassionate** 228:13

**complain** 122:5 217:8 324:11 401:3,19

**complained** 177:9 258:16 341:5 366:12 402:10

**complaining** 33:22 80:13 125:8,10 129:8 153:19 154:6 155:7 190:15 192:13,17 193:19 216:7 218:11 219:22 238:6 247:25 299:7,8,10 315:12 326:19 332:9,14 335:10,23 339:22 341:1 370:6 400:15,24

**complaint** 31:22 258:20 323:18,19,24 324:3,4,8,9 325:24 339:22 411:10

**complaints** 32:20,21 33:21 335:18 387:21 398:25

**complete** 18:12 172:4,13 173:6,9 180:5 270:21 271:3,4,9

**completed** 171:25

**completely** 235:18 253:14 273:12 307:23 316:11 350:23 365:12

**complex** 314:21 384:4

**compliance** 206:24 331:20 359:13

**comply** 351:23

**complying** 69:25 341:14 360:4

**Compound** 27:6 32:24 177:24 211:11 222:7 223:2,14 233:5 234:14 237:3 406:13

**computer** 51:25 62:18,21 68:3 289:12,22 329:13

**computers** 63:24

**concealed** 103:1

**concern** 215:17 317:19 339:19

**concerned** 228:13 304:17 315:6 401:11,13,17

**concerns** 156:7 195:20 202:6 401:5

**conclusion** 179:19 232:10 235:14

**condition** 80:24 122:6 129:3 184:5 200:16,17,20 203:14 211:3,9 212:15 400:16

**conditions** 191:22 195:20

**conduct** 97:3,7,15 101:13 273:21

**conducted** 99:11 102:14 320:25

**conducting** 98:15 122:2 155:16

**confined** 130:14

**confirm** 143:6 147:22 170:15 174:5,16 175:4 244:8,18 248:18 258:7 260:24 264:18 289:17 310:1 317:1 322:17 344:8 346:11 350:7 375:21 380:3 398:9

**confirmed** 133:3 174:13 308:20,21

**confirming** 398:18

**confiscate** 133:7

**confiscated** 328:10

**confiscating** 94:21

**conflict** 85:23 267:6 269:24 270:25

**confronts** 237:24 238:4

**connected** 25:4

**Connor** 5:20 413:21,23

**consider-** 153:16

**consideration** 70:12 156:16 157:4 183:9 266:12 335:9

**considerations** 147:3 156:24

**considered** 117:5 153:17 298:7,13 299:10 331:18 332:4,10,16,20

**consisted** 138:8

**consistent** 217:7 225:14,20 228:12,14 320:7 395:24 396:5 397:3

**constant** 384:14

**constantly** 260:9

**constitutes** 60:12,19 116:25

**contact** 27:5,8,16,19,20 72:8 73:25 87:8 163:6 216:2,16 275:22 294:5 323:23 324:1,20 347:16 365:21 380:11 381:5 388:10

**contacted** 71:2 347:7 348:8 355:10 357:9 377:9 378:1,24 379:10 381:1

**contacting** 360:2,3 369:10 386:3 405:13

**contacts** 75:20

**continue** 22:11 56:9 112:21 114:16 139:6 140:7 182:24 185:17 219:19 230:5 233:15 237:19 244:1 245:11 260:23 261:17 268:4 272:5 274:4 279:23 287:17 292:1,5 296:18 302:11,16 316:13 326:16 328:13 333:25 334:6 350:13 353:14 368:2 374:14 387:23 406:19 408:5

**continued** 107:2,8 144:1 401:14

**continues** 248:13 251:5

**continuing** 231:5 234:8 244:6 251:6,9 256:20 275:13 334:11

**continuously** 226:9 280:10 334:10

**contradicting** 141:21

**control** 331:21,22,24 332:1,5 343:20 352:3 354:15,16,17 355:4,13 359:10,12 366:5,8 371:12 377:6 383:10

388:15,17,21 389:1,8

**controlled** 359:9 388:18

**controlling** 340:11

**convenient** 407:2

**conveniently** 406:9

**conversa-** 311:7

**conversation** 76:25 81:7,13,20 82:2,7,21 105:17,24 106:1,5 107:16 108:1 131:5 132:8 138:6 150:15,17, 24 176:2 182:1 198:1 217:4 248:14 267:18 268:11,12 270:1,13 272:8 285:8 301:23 303:8 311:8 317:10 328:14,18,23 336:11 360:14,15 361:25 393:16,21 394:2 395:25 400:11 410:6

**conversational** 263:5, 7,11,16

**conversations** 163:6

**cooperates** 223:24

**cooperative** 116:15,19 117:1,5 119:5,8 223:17 315:24 316:9 372:10

**copy** 412:25 413:2,6,8, 14,23,25

**corner** 384:6

**corporate** 324:12

**correct** 8:12 15:15 41:13 43:18 70:14,17 77:24 97:11 122:17 152:4 163:17 246:12 252:24 412:1

**corrected** 145:23

**correction** 145:24 278:16,18

**correctly** 258:6 296:17 347:3

**corroborated** 306:19

**corroboration** 148:1 236:2,9

**Council** 231:14

**counsel** 6:7 7:24 8:20 9:4 50:16 51:12 54:3, 11,24 56:11 108:20,22 227:4 228:22 229:14 253:24 268:11 278:11 338:6 374:21 407:17 412:4 413:7

**counseled** 108:25 263:17 277:21,25 278:3,8,13 294:16 341:21 352:24 373:3 375:18 390:20

**counseling** 409:18 410:10

**countries** 242:3

**country** 242:2,5,6,25

**County** 12:15 313:23

**couple** 10:21 95:10 271:11 296:12

**coupled** 40:13

**courses** 13:11

**court** 6:22,25 7:22 8:3 30:7 165:23 204:23 277:17,19 282:24 303:17,18,19 307:22 312:14 327:11 413:19

**court's** 142:19

**courteous** 294:22

**cover** 70:25 97:12 164:3 199:23 200:20 213:9,13 292:6 377:2 387:25

**covered** 103:18 108:6 125:18 128:1 133:1 153:2 157:10 158:15, 18,22 159:7 214:24 230:6 240:17 249:10, 21,22 268:8 269:22 273:7 275:4 286:11 305:11 317:16 321:16 331:17 353:23 358:10 373:16 374:21 377:5,18 386:17,22 388:2 390:3 403:16,22

**covering** 97:24 129:13 198:8 200:16,18,23 206:9 208:14 210:15

220:6 267:9

**coverings** 200:9,11 206:23 207:17 208:16, 18,19

**COVID** 198:12,21 313:22,23 314:8

**Cowell** 365:16 377:23

**CR** 343:5 388:1

**cracked** 245:10

**create** 124:24 378:9

**created** 67:17 68:14

**credible** 137:22,25 143:2 249:9 252:4 254:21 266:9 271:1 339:15,21,25 341:2,6

**creed** 40:16

**crime** 34:24 35:8 37:4, 18 39:7,19 47:2 48:19 58:23 78:18 79:11 85:9, 19 107:5 119:12,14,17 121:6,15,17 122:1 139:15 140:5 156:9 157:8,11 166:9,13,23 167:1 248:2 283:14 378:12

**criminal** 6:24 168:20 273:11 275:14,15

**criteria** 196:21 298:23

**criticism** 297:19

**criticized** 337:14

**cross** 367:7

**crying** 234:23 244:7 299:23

**CT** 359:22

**cue** 54:3

**cuffed** 85:9

**cuffs** 153:22 372:18

**cultural** 259:15

**culture** 259:15 296:6

**Cursing** 56:2,4

**cuss** 117:8,12,14 222:21

**custodial** 351:11

**custody** 11:2,4,18 183:19 215:11

**customer** 35:25 60:7 91:18 177:16 264:4,15 265:13 317:24 411:10

**customers** 56:18 93:8 207:18 208:11,15

**Cutting** 53:2

**CVS** 5:16 6:10 28:1,5, 14 29:23 30:19 31:12 32:17 34:1,2 39:13,17 48:16 49:14 60:24 64:19,22 67:10 77:14, 22 78:10 79:13 80:14 81:3 104:25 114:8 117:16 119:15 120:17 121:3 130:23 133:13 134:9 135:9,13 140:11 141:15,17 142:15 143:10 144:4 146:10,14 147:18 148:3 159:11 160:1,5 167:4 169:7 189:3 216:4 246:15,24 267:7,23 269:3,12,14 270:17 271:21,23 277:13 281:2 285:20 286:15,20 287:25 305:9,12 307:17,18 308:24 319:5 322:22 324:1,11 325:25 413:11

D

**D-U-N-C-A-N** 19:23

**DA's** 278:23

**daily** 28:23,24 276:16

**damaging** 53:14

**danger** 87:17 198:10 368:6 369:14 383:24 385:17 387:6

**dangerous** 87:18,23, 24 89:10,19 101:22 102:3,4,19 103:24 378:9,20 385:21

**DAR** 398:18

**dark** 281:23

**dash** 343:4

**date** 73:18 110:15 111:10,14 113:20,22 114:4,5 165:23 175:14, 17 262:20 277:17 307:2,4 311:3 353:23 365:17

**dates** 143:10

**DAV** 115:3

**day** 17:18 19:12 22:18 29:6,7,9,11 30:14,16 43:5 57:4 88:19,20 96:5 108:21 109:1 110:20 113:9 115:1 147:13 148:5 167:19,23 169:21 170:3,24 172:11 174:9 175:19 176:5 228:23 252:4 258:24 278:1 282:24 283:23 297:16, 17 305:19 306:5 307:7, 13,16,17,24 308:13,20 309:3,6 310:22 318:22 319:10 334:3 341:5,16 363:13 364:15 365:13 372:9 373:4 390:11 409:19 410:18

**days** 29:8 174:17

**deal** 59:20 158:6 180:21 252:17 315:23

**dealing** 183:15 188:22 229:1 390:8

**dealt** 89:13 160:17 189:19 318:9

**December** 342:25

**decide** 22:11 60:25 137:21,24 138:1 253:4

**decided** 134:2 148:2 151:16 154:17 169:17 179:13

**deciding** 156:5 290:25 334:8 336:2

**decision** 85:22,23 87:1 88:1 266:21,22 273:19 282:23 284:16 287:8,10 293:15,16,17,20,24 301:1,16 302:5 307:13 311:23 337:2

**declaration** 253:5

**deep** 181:13

**Defendant** 63:13

**define** 166:21

**definition** 35:19

**degree** 13:14 39:2 215:8

**demeanor** 85:20 86:18,19,20 90:4,23 93:14,17 99:22 103:8 152:16 156:10 157:6 158:18,19,22 159:7,21 178:6,8 258:24 263:20 296:3 315:8 316:11

**denied** 387:13

**deny** 318:23

**denying** 150:12 216:10 217:1

**department** 9:19 11:2, 22 12:13,16 22:15 27:2 33:2 42:2 48:18 69:16 73:24 81:19 86:14 88:23 95:24 109:18 112:5 125:15 128:2,3 137:20,21 143:21 155:19,25 156:24 171:22 172:5,19 196:17 197:1,5 199:15 200:6 202:19,23 203:4 204:2 206:16 208:24,25 213:4 215:6,15 228:7,10 229:24 231:15 232:1 255:16 258:16 271:2 276:5 277:20 279:4,8 294:16,21 295:22 299:13 323:23 330:25 332:5,11 333:4,8,9 337:12 340:1 341:21 342:3 346:6 359:5 365:7,12 378:8,18 380:2 387:8 390:23 402:3 405:11 410:20

**departmental** 72:20 172:7 202:7

**departments** 12:21 74:21 182:21

**Depending** 117:6 349:14

**depends** 18:23 29:6 38:20,24 61:11,24 66:1, 10 82:6 157:25 158:14 183:6 184:17 193:16 213:2

**deployment** 18:14

**DEPONENT** 9:24 10:2 32:25 80:1 103:4 112:17 121:9 125:25 126:13 130:7 144:15 153:25 172:23 176:19 179:20 183:15 184:12 185:18 201:13 203:19 204:11 206:19 207:8 209:5 210:18 211:13 213:22 222:9 223:15 225:22 228:2 229:18 233:6 235:16 241:15 244:11 251:24 261:7 276:9 283:18 286:2 287:14 288:24 294:19 307:1 329:4,6 338:19 347:2 369:23 380:19,24 412:18

**deponent's** 219:3

**deposition** 5:13,14 6:8,19 9:1,3,14 51:13 55:23,24 56:2 64:8 73:6 77:15 108:24 118:17 195:23 205:1 219:13 227:5 243:24 358:4 374:14 412:3 413:18 414:4

**depth** 328:2

**describe** 76:1 78:22 88:3 89:20 97:20 159:20 240:19 368:14

**description** 78:14 276:17,22 351:24

**descriptives** 213:11

**descriptors** 115:12

**desert** 14:21

**destroying** 53:3,14

**detail** 36:11 323:12

**detailed** 358:25 394:12

**details** 22:1 45:9 110:2 358:9 391:7

**detain** 86:18 87:1 152:25 153:4 173:15

**detained** 85:25 100:2 106:10 121:21 134:2 138:18 151:9,25 178:14 215:13 286:12 300:14, 17 301:22,25 302:5 364:2 403:18

**detainee** 100:23 334:9, 12

**detainees** 156:25 333:19,24 334:6

**detaining** 84:20 178:15 179:1,10,16,24 263:10 301:14 334:25 386:20 404:6,20

**detective** 252:9,16,19, 20 255:6,13,21 276:21, 23 342:24 386:12,13,14

**detective's** 255:22

**detectives** 78:15,18 146:6 250:17,21 252:6, 11,18,23 253:1 254:22 255:4 273:20 274:11,13 276:10 278:22 284:17

**detention** 178:23 179:23 180:5 302:7 351:1

**detentions** 331:15

**determination** 37:22 84:15 138:4 151:10 166:16 286:3 287:2

**determine** 35:5,7,11 79:10 140:1 166:9,13 173:12,17 174:2 183:23

**determined** 85:8

**determining** 85:19

**developmental** 212:13

**device** 63:20

**dialogue** 50:18 51:6 183:13 198:25 236:4 276:7

**die** 215:3

**died** 339:18

**Diego** 20:14

**dies** 183:19 339:16,17

**difference** 84:19 94:8, 9

**differently** 229:25

**difficult** 258:3
**difficulties** 8:8
**difficulty** 180:12 181:17 400:16
**diligence** 167:11 250:25
**direct** 182:6
**direction** 360:19
**directly** 91:4 132:11,12 247:2 314:17
**disabilities** 125:15 127:25 187:20 199:17, 20,22,23 209:18 211:20,23,24 212:7,21 213:23 338:25 340:15
**disability** 81:2,4 129:4 156:15,22 184:6 187:16 200:17 202:4 203:7,11, 14,20 210:13,14 212:13,14 213:2,14 214:7,13,21 216:4,24 268:6 337:1,20 338:15 341:18
**disabled** 184:2 208:10 211:19 212:10
**disbelief** 277:2 293:1
**discharged** 170:3 174:8
**disciplined** 375:19
**disclosed** 21:8
**discomfort** 100:23
**discontinued** 26:15
**discount** 142:7 277:9
**discourteous** 229:15
**discourtesy** 411:11
**discrediting** 409:11
**discretion** 39:3 137:21 149:6 174:1 309:8
**discretionary** 203:13
**discriminate** 259:14
**discriminated** 40:25
**discrimination** 40:15 146:23
**discuss** 43:25 188:11
**discussed** 116:23 228:20 394:11 409:22
**discussions** 43:22 188:5 190:10 191:19
**dismiss** 273:12
**dismissed** 264:19 327:13
**dismissing** 253:14 254:2 264:25 274:2 280:21
**dispatch** 24:17 62:16 63:8,22 65:1,3 67:25 132:17,18,21 275:22,25 329:10,16,25 343:10 346:18 351:19
**dispatched** 62:11,20 63:1,18 64:23 157:17 360:2
**dispatcher** 25:3
**dispatching** 301:12
**display** 155:22
**disposition** 410:13
**dispute** 308:23
**disputing** 141:21 283:13,21 284:7
**disqualified** 20:23
**disrespectful** 296:3,5
**distance** 118:5,13
**distinction** 46:21,23
**distinguish** 127:16
**district** 17:17,24 18:6, 13 28:17 63:4,6,10
**districts** 17:13
**disturb** 130:15
**disturbance** 30:1,15 32:22 64:17 93:6 107:4 119:17,20 124:24 135:11,22 140:13 239:4
**disturbed** 93:9 401:12
**disturbing** 100:4 126:10
**divider** 235:16 261:14
**division** 11:4 17:8
**DMV** 116:13 168:11
**document** 64:6,11 68:5 202:13,21 203:1,4 207:19 209:7 268:9 391:7
**documentation** 146:3 163:16 165:17 250:1 298:17
**documented** 172:20 193:4,5 241:21
**documents** 9:2,13,19 10:12,17
**doin'** 249:1
**door** 77:9,12 163:1,3 223:9 233:24 234:13 236:23 237:10,20 244:23 247:12 262:14, 17 290:12,19,23 291:7, 10,21,22 300:18 310:3, 15 336:16 348:1 357:18 362:14 400:25 404:14
**doors** 223:13 232:24 261:4 281:1,10
**doubt** 202:24 203:3 277:5
**downs** 97:13,18
**downstairs** 347:12
**dozen** 218:5 221:21 401:9
**draw** 68:21 69:6 299:21
**drawn** 69:1 238:12
**drive** 363:6
**driver's** 288:25 289:11
**driveway** 362:7
**driving** 19:7 356:25
**dropped** 31:9
**drove** 330:5
**drug-related** 16:5
**drunk** 354:7 364:9
**due** 140:9 167:11 250:25 366:6
**DUI** 16:4
**Duncan** 19:23 122:22, 23 123:6,20 124:2 188:19,24 256:9
**duties** 59:20 183:10
**duty** 23:8 167:11 170:3 331:1,2

**E**

**earlier** 57:18 198:5,16, 18 199:4 238:23 244:18 249:16 251:10 266:11 274:22 275:9 278:15 284:15 318:11 336:14 340:25 395:18 396:4,8, 12 412:8
**east** 314:23
**ed** 13:12
**educated** 260:11
**education** 15:10
**educational** 13:1
**Edward** 5:19
**efficiently** 74:23
**effort** 91:11 101:11 201:22 203:13 223:12
**efforts** 196:20
**elaborate** 401:22 402:4
**elbow** 352:9
**electric** 347:8
**electronic** 291:17
**element** 47:4 58:3 59:16
**elements** 38:2,10,11 39:20 43:8 47:1,9,12 48:4,21 52:17 57:19 58:23 59:7 60:19 279:5
**elevated** 179:22
**Ellen** 5:9
**email** 44:24
**emails** 207:25 208:2 209:21
**emergency** 126:9

127:20 128:16 183:23 370:15,16,21 372:4 377:19,20 381:7,16

**employee** 34:2,22 35:17 37:14 39:17 133:13 142:14 145:7,9 167:5 174:12,21 210:12,13 254:8,9 277:13 305:12 322:22 331:3,6

**employees** 30:10 59:19 65:13 70:16 72:4 75:17,19,21,23 76:7 77:11 79:13 80:14 81:3 82:17 107:4 117:16 132:25 171:15 208:15 216:5 267:7,23 270:17 285:21 286:12,16,20 308:24 395:20

**employment** 21:16,17, 20,24 22:2

**en** 63:17 64:22 123:14

**enclosed** 180:8 183:5 332:9,15

**encounter** 129:2 260:16 341:8

**end** 8:18 29:13,15,20 195:11 243:24 328:22 335:15 336:11

**endanger** 378:21

**endangering** 233:1

**ended** 214:25 363:23 384:1 388:25

**enforce** 36:16

**enforcement** 12:17 15:19 16:4 20:10,24 40:24 58:19

**enforcing** 41:21 58:18

**engage** 378:12

**engaged** 228:13 378:19 379:17 386:10, 16

**engaging** 272:15 301:23 385:17

**English** 402:20

**ensues** 339:7

**ensure** 279:8 334:7

**entail** 184:7

**enter** 71:15 76:12 78:20 361:20

**entered** 69:8 71:23 72:12 75:7 77:6 82:9 83:2 115:3,13 119:9

**entering** 83:7 262:14

**enters** 248:23

**entire** 202:5 209:10 240:13 258:24 280:21 340:16 351:3 372:10

**entirety** 164:5 217:25 260:4 392:16 393:6

**entitled** 51:16

**entity** 275:21

**entrance** 105:1,9 130:23 132:24 133:12 191:9,11 246:15 281:2, 24 282:4 400:4

**entry** 73:2 298:8,24,25 357:18 362:17

**equipment** 23:2,5 25:8 74:21 108:11,14

**equipped** 88:10 353:19

**errata** 412:11

**error** 412:13

**escalate** 66:2 90:1 103:13

**escalates** 390:15

**escalating** 85:24

**escaping** 242:3

**escorting** 154:22

**establish** 38:3 164:9

**established** 69:23 71:10

**establishment** 34:21 35:17,25 37:3,14 46:24 47:6,10 48:7 56:16,20 58:10 59:20 60:22,24 277:10 319:6

**establishment's** 146:19 169:25

**establishments** 30:22 52:11

**estimate** 28:20 217:23

**estimates** 10:14

**et al** 5:16

**ethnicity** 259:15 402:11

**evade** 361:22

**evading** 87:7 91:11 159:17 361:23,24

**evening** 111:7 113:3 140:10 143:18 146:15

**event** 10:11 45:1 133:25 139:3 192:8 206:22 262:19 281:25 282:9 315:17 340:24 364:15

**events** 82:25 83:5 395:19

**eventually** 96:7 100:19 126:5

**evidence** 81:22 101:23 125:24 126:12 170:22 175:22 184:10 203:18 211:12 229:5 249:23 271:7 314:17

**exact** 22:23 79:19 112:22 161:20 199:21 209:24

**EXAMINATION** 6:1 187:9

**examine** 84:9

**examined** 5:25

**exceptions** 36:9,14,17, 21 40:6,7,9,10,18,19 41:5,15 144:23 146:22 147:1,6,9,12 200:25 317:17

**excessive** 331:2,4,7 342:5 352:24 369:21 373:4 390:21

**excessively** 350:25

**exchange** 260:24 280:21 303:12 410:8

**exchanging** 285:7

**excuse** 50:3,6,11 81:16 100:9 204:13 218:25 235:10 236:6 268:10 321:10 374:5,6,13 376:1 406:2

**exempt** 200:15 202:3,4 203:7,8,9 204:8 206:4,8 209:2 210:15,23

**exemption** 206:15 209:13 232:4

**exemptions** 199:16 200:1,25 206:19 208:24 209:18,23,24,25 210:6

**exit** 281:2

**exit/entrance** 281:19

**experience** 158:24 180:23 225:18

**expert** 235:5,14,15

**explain** 214:10 323:14, 15 327:10 376:16,17 389:10

**explained** 121:20,21 147:5 150:2 194:9 238:23 246:7 278:15 297:11 327:16 328:2 339:4 375:15

**explaining** 267:6 297:12 304:10,12 317:22 376:24 406:5

**explanation** 108:16 405:22 406:10 407:4

**extent** 172:21 175:20 239:15 368:7 410:3

**extenuating** 336:24 338:2

**exterior** 97:7,22 98:12

**extremely** 17:17

**extremities** 98:17

**eyebrow** 371:16

F

**fabric** 208:18

**face** 30:10 69:11,18 70:1,5,7,16,19,25 71:17 125:10 129:9,13 155:5

164:24 177:8 180:10 184:6,7,21,23 185:3 188:2 193:21 198:6,7,8 199:6,16,25 200:8,11, 15,18,20,22,25 201:8 202:5 203:14 204:3 206:9,23 207:2,17,22 208:13,16 209:12,18 210:15 211:4,9 212:22 216:6 220:5,6,8 222:4 230:23 231:25 232:13, 15 261:18 267:8,9,23 270:16 271:14 315:1,2, 3,9,11,18 316:8 362:22 367:3,12,14 400:24

**facility** 215:11

**facing** 246:24 247:1 285:1 371:10

**fact** 7:8 71:3 116:17 129:1,16 132:17 133:4 134:20 136:4 140:9,10, 12,22 143:6 166:14 177:2 194:16 215:1 216:1 230:6 237:13 243:4 249:9 307:5,9 324:22 335:10 359:20 364:2 395:7 396:7 397:11

**factors** 156:7

**facts** 81:21 109:20 125:23 126:11 175:21 184:10 192:12 194:19 203:18 211:12 229:4 232:7 268:19 350:17

**failing** 46:4

**failure** 146:23

**fair** 124:8

**fairly** 115:20

**fall** 352:10

**falls** 29:7 214:3

**fanny** 351:12

**fashion** 272:23 299:9 319:24 320:25

**fast** 130:3 290:10 349:15

**faster** 376:9

**fault** 376:9 379:14

**Fears** 5:20

**federal** 6:9 412:23

**feel** 367:11 388:16

**feeling** 238:6 243:5

**feet** 105:2,3,11 115:15 151:17 191:7,13 282:5, 7 370:20 383:8 390:17

**Feliz** 31:12

**felt** 85:22 99:3 189:18 201:25 202:1 351:12 366:6 371:4

**female** 64:16 65:10,11 72:3 75:14 78:24 79:7 96:14,22 98:11 103:25 114:9,10,18 132:18,23 135:3 365:23,24 366:4 368:6,7,10,20 377:20

**fence** 351:16

**Fernando** 28:16 31:13

**FI** 213:4,7

**fidgety** 225:13

**field** 16:11,21 152:8 213:9,20 314:5

**fight** 21:11 89:14 245:24 339:6 359:14

**fighting** 359:19 360:10

**figure** 205:4 254:22 285:14

**figured** 277:19

**figures** 246:17 247:4

**file** 253:5 278:22 323:18 324:4,8

**filed** 44:19,22

**fill** 213:7 285:9,15

**filled** 43:4

**filling** 286:2 287:14

**filming** 72:3 132:24

**final** 301:15

**find** 79:5,13 95:19 110:13 117:3 155:12 188:9 189:15 190:10 196:1 212:15,16 213:16,17 215:6,16

220:22 225:20 242:13 249:9 252:3 271:18 308:6 339:15,21,25 341:2,4 369:9 404:17

**finding** 271:1 382:11

**fine** 21:14 55:13 126:5 340:13,22

**fingerprint** 168:14,15, 16

**fingerprinted** 167:25

**finish** 16:16 18:10 48:25 54:25 60:15,17 95:9 100:11 175:2 227:8,9 236:7 268:13, 14 279:24 285:4,5 290:15 299:18 303:8 349:24 376:2 385:13

**finished** 134:21 165:9

**finishes** 8:19

**finishing** 350:5

**fire** 128:12 182:21 194:14 197:19 203:20 204:2 347:3

**fist** 366:3 367:2

**five-feet-two** 160:21

**five-foot-two** 114:23 115:11

**fix** 278:16

**flashlight** 23:7

**fleeing** 91:11

**flips** 372:15 390:9

**floors** 347:19

**Floyd** 339:18

**FMO-AGR** 5:17

**focus** 182:15 194:16

**follow** 57:19 100:25 146:6 172:10 173:7 202:18 203:15 252:11, 13 385:11

**follow-up** 250:17,21 252:7,9 254:22 255:4 273:21 284:18

**follow-ups** 252:14

**foot** 348:25 376:11 382:25

**footage** 78:17

**force** 32:23 33:18,19 85:24 153:14,17 155:23 298:2,3,7,13,15,16 299:3,11 330:22,23 331:2,4,6,7,11,12,18 332:10,16,20,25 341:19 342:14 345:3 350:8 352:24 355:8 356:2 358:11,14 359:6,8 364:11,12 366:21 369:21 372:6 375:1,14 377:11,15 378:17,19 379:17 380:6 381:3,5, 10 382:15 385:18 386:10,21 390:15,21 391:1,2 411:8

**forces** 373:18 389:8

**forehead** 389:17

**form** 33:23 87:8 107:17 117:13 118:20 171:24 172:5,12 173:9 176:7,9 249:15 305:24

**formal** 7:10 138:24 268:13

**formally** 15:13 292:17 301:9 302:6

**forthright** 402:1

**forward** 250:11 277:17 290:10

**forward-facing** 25:13

**foul** 118:22 160:25

**found** 296:2 305:24 309:5 347:4 364:1 379:25

**free** 327:25

**freedom** 41:4 146:25

**freehold** 53:10

**fresh** 132:14

**Friday** 359:21

**front** 9:8 98:2,18 104:25 105:9 110:12 111:12 132:24 156:20 162:19,22 207:15 235:20,23 236:11

240:12 245:4 262:11 282:3 290:21 347:25 349:6 357:18 361:20 362:14 364:20 370:19 379:8,11 380:16,24 381:20 388:13

**FTO** 16:5,12 18:12 32:6,11,14

**full** 96:24 97:2,9 98:15 271:2

**full-service** 274:8

**fully** 70:24 88:10 129:13 198:8 220:5 268:20 368:17

**fun** 402:11

**function** 214:14

**funny** 219:14

**G**

**gain** 352:3 357:18 359:12 362:17 371:12

**gained** 343:20

**garage** 347:12 348:22

**Garcia** 75:24 76:9 82:18 83:15 85:12,17 93:19 106:19 107:16 108:2 127:8 129:24 130:22 132:8,17 134:5, 8,9 135:9,14 139:4 140:10 141:22 143:5 144:25 146:2 147:25 152:2 155:11 165:4,8, 16 167:5 169:12 170:5, 14,18,20,22 171:4 174:11 176:2,6,11 177:18 178:13 191:8,12 246:19 249:10,14,20 264:11 266:23 283:6 284:4 285:19 304:1 305:18 306:5,17 307:24 318:1,4 319:10 395:3,6, 11 399:4

**Garcia's** 114:3 137:3, 17 139:9 140:1,22 141:8 142:1,25 147:17, 22 169:18 253:15 254:3 269:2 305:23 313:4

**gate** 347:8,9,16 348:13 384:11

**gather** 113:16

**gathered** 132:20

**gathering** 121:13 285:12

**gave** 37:24 41:18 43:15,18 45:17 57:7 145:6,8 148:13 151:16 178:2 245:20 279:17 309:6 320:13 328:7 330:18 383:2

**Gazandjian** 96:4 99:15 103:25 179:4 256:11 259:21 327:7

**general** 13:12 30:20 36:13 43:11 46:7,19 47:7,13 404:22

**generally** 19:2 29:22 42:13 70:3 112:3,5 153:13 187:17 189:23 193:13 210:23 211:18 225:25 248:7 294:21 329:9 404:16 411:6

**George** 339:18

**gesture** 87:16 91:6

**get all** 257:17

**gist** 337:23

**give** 29:25 38:23 45:23 48:19 61:3,13 89:14 116:15 143:10 149:20 152:12 158:5 169:5,8, 11,21 183:1 205:9 295:17 309:9 319:14,19 321:25 322:2 334:2 343:12 348:25 350:16 364:6 391:6

**giving** 7:18 92:13 130:5 161:6 168:12 176:4 215:3 258:25 262:3 264:7 304:5 319:1 362:8,9

**glass** 384:1

**Glendale** 5:1,14,20 10:24 11:19,20,21 12:18 13:22,25 14:9,13 17:9 18:1,25 22:15 28:3 30:22 32:20 36:6,16 37:10 40:2,4 41:6,20 69:16,17 88:23 115:23, 24 144:23 147:1 148:6 187:1 199:25 206:23 207:2,15 209:15 213:3 228:9 231:21 257:24 259:3,7 272:25 324:1,5, 21 370:14 382:12

**Glock** 352:9

**glove** 351:12

**God** 374:10

**golf-sized** 389:16

**good** 6:3 89:14 130:5 158:10,11 171:9 321:9 354:13 360:16 363:14 386:20 413:17

**Gotcha** 10:10 18:17 19:19 25:16 80:4

**governor's** 202:20

**GPD** 132:17

**grab** 98:12 354:15 355:12

**grabbed** 345:4 355:3 366:1,5,9 371:4,9 379:8 380:13 388:24

**grabbing** 345:11

**grabs** 371:6

**graduate** 12:5,11 13:18

**graduated** 14:24 16:8

**graduation** 12:14

**graveyard** 29:4

**gray** 65:11

**grieved** 60:7

**Griffin** 63:13 82:13 87:19 315:14 325:23 341:7

**ground** 342:12 345:5,6, 12,18,20 346:4,12 347:22 349:5,12 352:1, 16,21 354:22,24 355:1, 17,20,21,23 359:10 364:11 366:9,22,25 367:10,19,20,25 368:3 376:5 377:25 382:24 383:9 384:16 386:19 389:1 390:16

**grounds** 36:3 47:16 54:14 101:21 102:3 356:14

**grudge** 167:5,9,12 317:18

**guidance** 200:6,8 202:7 207:4,11 208:3, 23 231:14

**guidelines** 200:4,10

**guiding** 332:3

**guilt** 304:11,21,22

**guilty** 56:23 248:2

**gun** 23:8

**gunpoint** 348:5,9,24 382:24 383:2 384:9

**guy** 75:24 76:8,9 82:18 83:15 85:12,17 93:19 106:19 107:16 108:2 114:3 127:8 129:24 130:22 132:8,17 134:5, 8 137:3,11,17 139:4,9 140:1,10 141:8,22 142:1,25 143:5 144:25 146:2 147:17,22,25 152:2 155:11 165:4,8, 16 167:5 169:12,18 170:5,14,15,18,20,22, 25 171:4 174:11 176:2, 6,11 177:18 178:13 191:8 246:19 249:10, 14,20 253:15 254:3 264:11,12 265:4,6 266:23 269:2 272:19 283:6 284:4,12 285:19 304:1 305:18,23 306:5, 17 307:24 308:9 313:4 317:25 318:1,4 319:10 368:13 383:14 390:8 395:3,6,11 399:4

**guys** 20:6 320:21

**gym** 144:15

**H**

**H-E-I-N-B-E-C-H-N-E-R** 33:14

**hammer** 354:16,17 355:15

**hand** 5:21 98:2,18,25 334:11 370:25 383:10 388:16 389:18

**handcuff** 84:17,24 85:18 152:24 154:17 156:17 159:22 178:24 298:12 323:7 337:2,21 341:15 388:11

**handcuffed** 85:3,15 86:4,11 133:22 154:4, 24 323:10 332:23 334:22 372:8 388:12 390:9 403:19

**handcuffing** 84:20 85:13 138:9 152:19,20, 21 153:6,10,16 154:7 155:18,20 156:6 216:23 298:6,16 323:5 331:17 332:8,12 333:6 336:25 337:14 338:15 395:21

**handcuffs** 23:11 85:25 87:1,11 88:2 89:12 93:17 100:2 118:1 134:3 150:1,2,6,14 151:5,8,9,25 152:9,12 153:4,20 155:2 156:25 157:21 158:3,11,12 161:8 162:10 164:24 177:8 220:2,3,16 222:5 233:3 245:23,24 286:14 293:14 299:8 300:14,17 313:9 332:24 333:10,13 335:9 336:1,15,22 339:6 343:20 345:7 351:1 352:4 364:3 366:11 370:17,19,22 371:3 378:23 381:16,19 383:20 385:3 389:4,5 390:14 396:9 397:5

**handed** 208:3

**handle** 189:18 202:1 221:18 274:8,17

**handled** 203:22 229:8, 18,25 230:1 323:22 324:23

**handling** 361:3 376:6

**handout** 207:9

**handouts** 207:1 209:21

**hands** 95:4 154:23 366:8 383:3 386:16 388:13,18

**hang** 329:20,24

**happen** 8:18 163:24 245:22 279:21 299:24 318:20 320:5 321:2 390:12

**happened** 28:15 34:11 74:25 99:6 129:18 176:12 188:9 216:10 221:10 240:9 270:25 271:21 273:18,19 285:13 307:8 323:16 343:9,24 349:15 351:14 353:18 358:21,25 365:19 380:3 381:24 391:6 396:8 402:5,14 405:1,4,14

**happening** 34:8 71:24 87:5 244:9 272:11 293:11 351:10 356:23 400:6

**happy** 243:5 324:20 325:4

**Harassing** 242:15 243:7 260:15 271:7 287:13 322:11

**harassment** 100:22

**hard** 128:14 185:8 233:20 234:11 339:1,14

**harder** 372:21

**head** 19:14 31:19 42:12 45:24 49:6 52:18 148:23 149:9,11 345:6, 9 346:2 371:13 372:21 381:24 389:17 411:22

**heading** 63:9

**headrest** 162:22

**health** 156:11 157:3 199:15 200:6,17 202:19,23 203:4 206:16 208:25 212:14 231:15 232:1

**hear** 62:15 64:21,25 65:3 102:2 118:3,12,19 127:9 129:7 130:13 160:25 177:10 189:12 222:21 224:3 227:25 234:13 235:2,12,18 236:14 237:17,21 238:9 244:12,22 248:9 253:22 256:20,22 257:2,17 260:3 261:12,13 262:13,14,16 275:3 280:7,13 284:22 291:15 309:21 314:1 327:8 401:19 402:18,20,22 403:1,4 406:7,11 407:9, 15,17,19 408:3,8,11,13, 16,23 409:18

**heard** 62:17 71:25 73:5, 15,17 78:24 108:1 118:8 125:5 127:5 128:23 133:13 147:24 150:16 188:1 193:23,24 217:18 218:1 235:1 237:14 247:18 297:14 310:13,14,20,21 311:2, 22,23 384:1 394:22 400:7,10 401:3 407:17 408:8

**hearing** 118:14 156:15 233:20 238:13 256:20 257:20 328:14

**hears** 267:5

**heart** 181:12 214:25 215:1,3 339:16

**heavier** 76:2

**heavy** 30:23

**height** 114:23 115:14

**heightened** 90:24

**Heinbechner** 33:13 373:8

**held** 111:6 113:6 383:2

**helped** 382:11

**helping** 190:4 388:11 401:10

**hey** 278:18 308:17 363:12,13 364:3

**hidden** 103:5

**hiding** 384:8

**high** 12:24 14:21 65:24 66:9,11 67:2 71:20

**high-risk** 200:12

**highlighted** 338:3

**highly** 51:10 55:20 374:8

**hired** 10:23 13:25

**Hispanic** 76:2

**history** 21:16,18,21,24 168:21 277:5 341:20 342:21

**hit** 223:12 345:6 371:13 372:22 381:24

**hobble** 390:17

**hobbled** 179:25

**hold** 74:9 306:24 331:22,24,25 332:5 354:15,16,17 355:13 359:10 367:20 377:6 385:9 388:15,17,21 389:8

**holding** 154:21 291:16 332:6 384:21

**holds** 331:21

**holes** 235:17

**holster** 343:19

**holstered** 384:10

**home** 115:22 313:13

**homeless** 31:3 158:8 159:24 160:14,15,23 169:2 273:7

**homes** 384:16

**honest** 402:1,6

**honestly** 273:4 392:18

**hopped** 384:10

**hospital** 370:17 378:22 382:12,13

**hot** 232:21

**hour** 112:22 185:22

**hours** 392:17

**house** 357:16,19,23 358:1,2 363:6,9,21

**huge** 368:12

**human** 200:7 210:5

**humanitarian** 242:2

**hundred** 200:2 290:6

**hyperventilating** 125:21 126:19 181:8,15 185:8 226:3

**hypo-** 52:6

**hypothetical** 176:3,4, 14,16 184:10 203:18 210:17 215:4 306:25 364:12

**hypothetically** 175:10, 25 176:1 177:13 306:17

**hypotheticals** 176:14

**hysteria** 127:18

**I**

**IA** 255:12

**ID** 116:1

**idea** 34:9 130:4 171:9 195:4 218:2 247:4 362:15

**identification** 363:13 404:19

**identified** 134:25 140:21

**identify** 6:15 102:2 103:16 110:11 357:21 363:8,20 404:4 412:12

**identifying** 346:25

**identity** 168:1 382:21 388:2

**immediately** 65:16 76:24 84:16 85:2,3,5 97:15 177:13 394:22 397:4,23 405:12 409:10

**impartially** 319:24

**implemented** 69:20

**important** 8:4,23

**improvement** 297:22

**in-car** 9:15 63:23 70:23 217:10

**inability** 181:10 332:15

**inappropriate** 50:5,17 51:10 55:16,20 374:9

**incapacitated** 200:22

**inch** 371:13,15,17

**inches** 115:15

**incidence** 298:4

**incident** 9:23 19:9 22:18 25:17 28:14 33:4 34:13 39:14 44:14 45:2 61:25 73:21 78:4 112:9 118:10 129:16 133:5 147:13 165:10 175:4 189:23 191:20 192:11 229:23 240:10,19 255:7,10,25 256:7 270:22 277:22 279:6,13 297:18 300:12 310:22 319:16 342:4,23 343:6, 21 344:4,15,25 345:2 346:7,23 350:5,13,22 351:5 352:15 353:5,16, 22,23 354:5,10 358:9 361:6 365:17,24 366:17 369:20 370:23 371:23 372:25 373:10 379:12, 13 380:9,10,18 381:12 383:16 388:7 389:13,24 390:5 391:12,18 392:22 393:21 411:18,25

**incidents** 24:3 25:25 30:8 78:7,12 189:25 193:9 350:24 358:10,18 389:23 390:24

**include** 161:9

**included** 61:6

**includes** 156:6 200:19

**Incomplete** 184:9 203:17 210:16 306:25

**inconsistent** 396:12

**incorrect** 396:14

**incumbent** 194:19

**independent** 64:10 75:5,9 83:24 132:5 142:12 148:1 162:23 163:15 170:12 236:2,9 240:10,18 241:12 249:22 305:16 322:6 398:10 408:25

**indicating** 14:18 229:7 251:18 374:7

**indication** 123:6 177:1 190:14

**individual** 101:22 172:4 173:15 214:20

**individuals** 156:25 163:7 200:15 206:8 342:16 405:13

**inference** 238:12

**infield** 214:16

**inform** 329:10,12

**informal** 17:4 394:2

**information** 65:18 113:16 114:3 115:4,8 116:11 132:20 137:6,7 143:12,14 145:3 146:10 161:3 168:6,7,12 174:23 210:19 240:23 257:17 262:3 264:7 285:12 303:3 305:16 346:18 347:1 362:9 364:7,19

**informed** 46:10 196:24

**Inhibition** 41:2

**initial** 216:16 347:15 348:8

**initially** 72:11 76:20,22 79:17 82:8,10,11,12 138:17,18 149:19 150:8 151:20 165:2 178:12 286:10 315:11 382:10 395:20

**initiated** 216:2 355:7 356:1 377:6,10,15 381:3,5

**initiating** 27:15 72:8 73:25 380:5

**initiative** 383:13,19 386:18

**injured** 350:10 352:21 365:3 375:10,13 376:5 386:22

**injuries** 346:1 352:12 353:1 370:9 389:15,20, 22 390:20

**injuring** 53:3,9 387:6

**injury** 345:10 352:6

**inmate** 100:23

**inmates** 11:14,17

**innocence** 248:13,14 251:7 263:1

**inside** 130:24 133:14 162:21 241:5 262:4 272:9 363:22 379:9 382:24 400:4

**insisting** 316:20

**insists** 312:3,5

**instance** 49:3 52:3 332:7 366:24 370:14

**instances** 279:10 297:24 298:10,12 341:23 342:8,10 386:17,23,24 411:4

**instruct** 21:1,8,12 54:9, 12,15 55:17 242:16 243:8

**instructing** 22:5

**instruction** 7:23

**integrity** 405:16

**intent** 319:2,3 320:11, 17

**intentional** 59:3

**intentionally** 56:14 59:14

**interacted** 76:13 77:6

**interaction** 116:23 128:18

**interactions** 30:11 120:22 142:14 320:24

**interested** 272:16

**interesting** 231:16 234:24 283:11

**interests** 334:11

**interfere** 59:14

**interference** 59:4

**interferes** 56:14

**interfering** 58:7,8,11 59:18 60:5

**interject** 55:3

**intermediate** 15:7,11, 14

**Internal** 9:22 44:12 108:19 109:2 228:19 277:20 391:8,13,17 401:25 411:1,3

**interpret** 405:23 406:8, 10

**interpreted** 403:7,8,10

**interprets** 258:12

**interrupted** 159:4 253:25

**interrupting** 227:9

**interruption** 79:25 144:14 151:22

**interview** 9:22 20:20 37:23 45:5,8,11 57:11 152:14 213:10,20 297:3 391:23 392:1,5 393:4,6 396:6,10 401:25 409:17 410:7,8,11 411:2

**interviewed** 44:13,16 45:2 228:18 390:24 391:5,17,22 395:25 411:2,14

**interviewing** 108:19 109:1 392:5,11 407:3

**interviews** 391:8

**intimidate** 59:15

**intimidating** 56:17 59:5

**intoxicated** 356:3 364:25

**intoxication** 354:8

**intrusion** 179:15 334:11

**investigate** 121:23 167:15 173:17 255:3 272:22 285:13 318:5 319:23

**investigate's** 121:18

**investigated** 252:23 255:6 353:4 356:9 379:24

**investigates** 390:23

**investigating** 27:12 79:4 83:8 102:16 108:5 119:24 120:8 121:3 139:1 143:24 163:7 167:11 175:4 189:8 251:1 255:13 283:15 355:5 362:1,2 378:12

**investigation** 33:3,5 106:13,14,17 121:14 122:3 134:3,21 148:2 151:13 152:14 155:17 165:9 170:12 171:17 174:1 188:25 190:4 194:18,22 250:16,18,21 253:13 254:1 255:2 273:13 301:15 302:8 306:16 320:25 322:24 323:14 333:22 334:21 335:1 346:13,20 350:11 359:4 364:21,24 365:3, 9 382:20 391:13

**investigation's** 120:6 121:10

**investigations** 214:17

**investigative** 255:15, 19 301:3

**invisible** 212:6,12

**involve** 350:25 374:4

**involved** 114:8 188:25 194:17,18 342:4,7 344:10,18 346:4 363:4 373:9,16,17,20 374:19 375:8 377:16 378:17 381:10 382:14 385:20

**involvement** 194:22 195:3 344:15 346:7

**involving** 350:22

**IO** 274:13

**irrelevant** 350:24

**issue** 22:12 190:16 270:17 315:9 318:1 329:4 401:20

**issues** 29:23,24 125:20 192:23 194:11 215:19 267:13 269:7 277:22 291:10 335:17

**J**

**J-A-M-E-S** 6:6

**jail** 11:20,21 86:10 142:4 149:4 150:9 169:13 215:10 302:7 304:7 312:21

**James** 5:15,23 6:6 43:5 67:19 295:14 344:19 359:20 414:4

**January** 18:18 22:19 25:17,20,23 31:17 42:24 69:10 110:15 111:10

**jeopardize** 384:24

**Jim** 295:14

**job** 8:5 78:14 183:10 243:3 252:14,17 253:1 268:8 273:23,24,25 274:7,19,21 276:16,22 383:21 386:20

**jobs** 13:21 14:4

**Joe** 76:4 147:21 170:13, 24 171:10 174:13,15 175:11,18 176:5,10,23 177:3,17 250:7 265:2,5 308:20 309:4 395:9

**Johnson** 76:4 147:21 170:13,24 171:10 174:13,15 175:11,18 176:1,5,10,23 177:3,17 250:7 265:2,5 308:20 309:4 395:9

**Johnson's** 175:21

**judge** 7:9,17 21:7,10 22:9,12

**judgment** 311:20

**judiciously** 337:3

**Julian** 375:8

**jump** 383:6

**jumped** 383:1,25

**jumping** 351:15 384:13,15

**juncture** 233:23 245:6 302:16

**June** 200:8 365:17 393:3

**jury** 242:23

**K**

**Kamachi** 375:9

**Kang** 5:19 9:25 20:25 21:4,6,17,20,23 22:1,4, 8 26:3 27:6 32:24 47:18 49:20 50:1,5,7,12,15, 21,25 51:4 54:5,8,16, 18,20,22,25 55:3,6,9 56:1 81:15,21 95:7 99:17 121:8 125:23 126:11 172:21 175:20 176:18 177:24 179:18, 21 184:9 185:20,25 201:11 202:9,13,25 203:17 204:10,12,17,22 205:2,4,8,13,17 206:17 209:3 210:16 211:11 218:22 219:2,6,10,14, 16 221:23 222:7 223:2, 14 225:21 226:12,16 227:2,6,17 229:4,16 232:7,10 233:5 234:1, 14 235:5,8,14 236:25 237:3 239:20,25 240:14 241:13 242:14,20 243:6,13,16,20 244:10 253:17 260:14 261:5 268:15 271:6 279:14 283:17 285:25 286:22 287:12 290:14 294:18 306:23 321:8,12,22,25 322:2,10 325:12 326:15 337:25 338:4,8,17 346:24 350:20 358:16 373:19,23 374:2,7,10, 16,24 375:4 380:17,20, 22 382:16 389:12 406:13 407:5,12,16 410:3 412:5 413:5,8

**kicking** 388:22 390:18

**kicks** 301:8

**Kim** 370:4

**kind** 16:2 24:10 29:22 30:21 47:4 49:13 53:3,6 55:22 65:17,18,19 88:13 118:4 125:20,22 166:12,24 193:17

199:20 209:12 211:19 212:25 214:13 215:6 236:19 260:2 304:19 314:12 329:19 372:6 389:8 392:15

**kinds** 29:24 167:4

**knees** 220:20

**knew** 67:10 71:14 76:6 129:12 144:22 167:8 210:8 266:8 285:21 286:11,12 300:16 303:3 395:15 398:1

**knife** 23:8

**Knives** 103:4

**knowing** 30:11 405:6

**knowledge** 9:17 77:18 87:9 99:7 108:3 167:22 342:6 353:5 396:3

**Kridle** 5:20 413:12,16, 24 414:2

**L**

**LA** 12:15 313:23

**labor** 41:2,3

**laceration** 371:14,16, 17 372:7 389:17

**lacerations** 345:22 389:18

**laid** 352:2 383:10

**land** 46:5,18

**landed** 383:8

**language** 117:16 118:4,12,21,22 161:1

**laptop** 289:21

**late** 29:12 113:12

**laughing** 403:9

**law** 5:19 12:17 15:19 20:10,23 40:14 42:14 58:19 169:3

**lawful** 41:3 46:9,12,14 56:15 59:4 174:3

**lawfully** 46:6

**lawfulness** 173:17

**lawsuit** 44:7,19,22,23 57:17 77:21,25

**lawyers** 176:15

**Lazzaretto** 351:20 352:2 375:23 376:3,8

**leading** 156:9 167:14 284:3 406:6

**learn** 44:23 76:16 80:4 194:19 196:20

**learned** 77:3 134:14, 17,20,21,22 176:5,10 192:17 229:23 279:12, 18,20 306:15 364:23

**learning** 272:16

**leather** 343:18

**leatherman** 343:19

**leave** 35:21 38:8,19,24 46:5,7,18,25 47:15,16 48:2,5,7,17 49:14,16 56:19,21 57:24 59:5,13, 17,24 60:2,9,21,22 61:1,4,8,15,17,19 65:12,20 67:9 79:8,24 107:7 119:24 120:5,9, 10 158:9 169:22 176:21 178:21 180:5 308:17 325:6 326:6,13,14 327:4,18,25 328:1,3 329:9 330:4 359:18 399:12

**leaves** 61:1

**leaving** 58:10 61:9,22 159:16 270:24 366:18

**led** 319:16

**left** 105:12 130:11 187:14 188:18 281:15 314:24 329:1 366:12 370:6 371:9,16 388:13, 19,22,23 389:17,18 399:1 400:1 409:4

**leg** 97:25 388:23

**legal** 166:4 179:18 232:10

**legs** 98:4,16 388:25

**lesson** 279:20

**lessons** 279:12

**let'** 185:11

**letter** 410:12,19

**letters** 278:16

**level** 15:14 166:24 298:15

**levels** 15:8

**Liability** 183:20

**license** 116:1

**lie** 248:16 249:12 272:18 277:7 318:10

**lied** 142:3

**Lieutenant** 229:17

**lieutenants** 259:24 342:3

**light** 66:21 281:14

**lights** 67:2 281:15

**liking** 169:8

**Lim** 365:16 377:22

**limitation** 215:8

**limited** 156:8

**lines** 16:6 80:1,7 271:11

**list** 361:1

**listed** 200:12 210:1 395:5

**listen** 86:24 128:11 226:20 227:22 230:11 274:5 293:19 302:2 303:6 310:5 311:16 317:22

**listened** 284:16

**listening** 89:22 90:5 91:14,17 92:10,12 93:13 100:1 116:24 274:3 299:18 326:21

**lit** 281:24

**litigation** 413:3,15

**live** 14:13,15 231:16 242:1 363:12 364:3

**lived** 357:20 363:18

**lives** 362:8,15

**living** 242:24

**LLP** 5:20

**loading** 14:7

**located** 347:5 376:7,8 382:23

**location** 28:8 30:5 31:18 34:2 67:10 105:8 106:23 135:24 136:9 144:11 145:1,4 146:14, 20 147:4,19 150:21 165:18 175:12 275:7 283:22 284:14 286:11 305:8 306:8,20 307:21 308:2 329:25 343:14 395:1

**locations** 15:24

**lock** 354:16,17 355:15

**log** 122:25 241:1 329:7

**long** 11:6 16:18 32:14 67:14 77:19 82:1 131:5 161:12,14,15 162:15 264:5,15 296:14 318:22 334:3,7,18 391:23

**longer** 144:3 148:3 290:21

**looked** 9:4,18,21 15:12 52:9 255:10

**loosen** 153:25

**Lopez** 386:12

**Los** 5:11 31:2,12

**lost** 343:11 349:1 413:1

**lot** 9:2 12:21 28:10 30:4 31:3,8,10 45:7 52:23 53:19 89:13 100:3 127:9 142:3 158:7 177:22 178:2 181:1 247:2 257:25 259:5,9 297:12 313:22 314:7 319:14,19 339:21 340:25 407:22

**loud** 8:15 71:25 72:3 78:24,25 79:1 86:21 89:21 90:5 91:21 92:24 93:12 99:25 118:7 119:19 124:20 125:5,20 126:6,7,8,16,21 130:13

155:12 190:23 191:3 235:3 394:23 406:24 407:19

**louder** 245:2,9

**loudly** 78:21

**low** 65:24

**lower** 129:9 184:7,21, 23 201:8 204:3 211:9 220:8 230:16,23 231:12 232:13 315:2,18,24 316:6,8 348:22

**lowered** 185:4 188:2 198:6 199:6 232:15,23 233:24 315:1,11 316:4

**lowering** 193:21

**lunch** 185:16,17 186:3 187:7

**lying** 142:13 165:21 266:25 272:20 280:4,18 282:20 286:17,21 322:7,8

**M**

**Macy's** 344:17 350:15 351:5

**Madam** 204:23 413:19

**made** 21:15 31:18 39:14,21 57:13 80:11 84:14 85:22 86:25 88:1 99:7,8 101:12 129:3,17, 22 133:16 142:22 143:16 144:6 146:6 150:22 151:10 169:12 172:3 175:19 176:12,17 192:14 204:17 235:16 250:19,20 257:11 258:9 262:25 264:25 266:21, 22 267:19 268:23 273:19 282:23 284:15, 16 286:3 287:1,8,9 293:14,19,23 301:1,15 302:5 303:24 307:13 311:20,23 315:23 320:19 335:18 337:2 338:19,23 340:15 342:24,25 361:1 402:11 403:3 405:24 409:23

**magazine** 352:9

**magistrate** 51:19

**main** 10:15 188:21

**maintain** 381:25

**maintained** 372:22 389:1

**maintaining** 384:24

**majority** 336:19

**make** 7:16,21 30:4 34:2 35:6 37:5,19 38:3,12, 16,19 44:7 48:21 74:10, 13 91:1,5 94:11 98:20 130:20 131:20,24 132:4 136:5,11,17 137:3,18 138:4 139:9 140:20 141:5 142:1,23 151:2 159:5 166:1,5 172:19 191:6 196:1 227:7 266:22 268:11 271:20 279:9,13,21 284:17 290:11 291:3 298:9 301:16 305:19 306:2 307:22 322:3 323:23 325:21 335:12 347:16 350:21 363:18 374:1 395:14 406:7 412:14

**makes** 222:14

**making** 7:17 18:14 30:19 34:16 35:2 36:23 37:22 39:3 41:5 51:13 53:13 91:11 131:21 166:1 167:16 180:3 196:19 219:7 223:12 225:9,11 250:22 253:4 257:8 265:11 296:21 301:17 368:11 374:21, 22 397:10

**male** 114:17 343:10,13 357:2 361:15,18

**maliciously** 53:9

**man** 170:25

**manager** 60:8,9 76:3 80:8 133:15 134:7,19 142:15 170:13,18,20, 23,24 171:5,7,14 177:2 250:8 264:4,10,14,18 265:2,7 283:24 284:1 288:3 308:21 316:22 317:24 394:24 395:3,5, 8,9,11,16 396:7 399:4

**managers** 80:14 135:11

**mandate** 69:18 199:25 202:5 216:6 231:25 267:23

**mandated** 70:9

**mandates** 201:1 206:24 207:23 209:19

**mandatory** 69:20 305:7

**manger** 174:12

**manner** 51:18 155:1 294:19 354:19 360:3

**manually** 115:3

**March** 388:7

**mask** 69:11,18 70:5,8, 19,25 125:11 129:9,13, 14 155:5 164:24 177:8 180:10 184:7,21,23 185:3 188:2 193:21 195:19 198:6,7 199:6, 25 201:1,8 202:5 203:15 204:3 207:2,22 209:19 210:15 211:9 216:6 220:5,9,22,23 222:4,18 230:16,23 231:12,25 232:14,15 267:9,23 270:16 271:14 315:1,2,9,11,19,25 316:4,8 400:24

**masks** 70:1,16 198:15, 22 199:16 208:17 211:4

**matched** 351:23

**material** 109:20 268:19

**materialize** 163:12

**matter** 5:15 89:16 173:17 270:5 287:6,10 368:10

**matters** 368:9

**Matthew** 375:23

**MAV** 25:11,13

**MBC** 168:9,20

**meaning** 89:20 398:2

**means** 98:3 111:21 332:2

**meant** 68:17 124:5 200:24 314:20 395:3,11 403:11 406:3,18,23,25

**measure** 207:16

**medical** 80:24 81:2 122:6 126:9 127:20 128:16 129:3,22,23 183:2,23 184:5 190:16 191:22 193:20 194:7 195:20 197:4 200:16,19 203:14 211:3,9 215:11, 14 216:3 335:17 340:16 400:15 401:6

**medical-grade** 208:17

**medically** 366:13

**meet** 47:5 48:4 58:11 69:3 147:9 196:21 295:12 298:8,20,24 299:2

**meeting** 298:21

**meets** 38:10

**member** 101:17

**memories** 358:25

**memory** 10:13,17 88:4 109:5 132:6,15 134:1 344:3,24 350:17 358:15 392:21 393:3 398:10

**mental** 200:16 212:14 319:2

**mention** 129:3 213:22 340:15 341:24

**mentioned** 341:18 396:1

**mere** 48:5

**message** 327:18

**met** 15:9 38:12 39:20 47:2 48:22 120:13

**Meyer** 373:7 382:10

**mic** 330:2

**mind** 69:25 70:13 142:23 147:13 228:11 303:25 307:9

**mind-blowing** 374:24

**mindful** 70:5 146:25 147:2 334:18

**mindset** 319:2

**mine** 318:16

**minimum** 298:14,15

**minor** 212:21

**minute** 222:17 299:18 368:12

**minutes** 67:12,22 68:9, 13 85:7,11 124:11 131:6 138:9 161:16 163:19,20 164:6,25 165:5,11 177:6 185:21 192:4 218:10 219:19 225:10 226:9 233:24 234:23 237:24 241:24 244:5 246:4 247:16 251:5 269:22 284:21 286:13 287:7 290:4 299:21 302:14 305:6 318:14 327:2 335:8,21 336:17 393:7 397:6,11 400:23 405:21

**minutes'** 292:1

**Miranda** 138:20 141:11 270:4,5 297:3 299:22 300:24 301:7,18 303:13 311:7,9

**Mirandize** 138:17,25 286:5 302:8

**Mirandized** 138:14,15

**Mirandizing** 292:14 300:13 310:9,15

**Mischaracterizes** 234:15

**misdemeanor** 43:1 46:1 56:23 148:14 164:23 168:17 278:9 333:5 356:4

**misplaced** 413:1

**missed** 304:24

**missing** 110:6

**misstates** 47:18 99:18 175:21 202:13 206:17 219:3 227:2 229:16 240:14 241:13 244:10 253:18 260:15,16 271:7 285:25 325:12 326:15 338:17 380:17,22 382:16

**misstating** 389:13

**mistake** 114:18 279:9, 13 409:23

**mistakenly** 108:10 412:13

**mistakes** 279:18,21

**misunderstood** 266:6

**Mkrtchyan** 5:18,19 6:2,8,13,14 10:5 12:7 19:22 21:3,5,14,19,22, 25 22:3,7,10,13 26:5 27:7 33:1 47:20 49:24 50:3,6,10,14,16,23 51:2,9,22 54:6,10,17, 19,21,23 55:2,4,8,18 56:4,8 80:3 81:16,17,23 95:9,11 99:20 103:6 104:4,7 108:13 109:23 112:19 121:11 126:2,15 130:8 144:17,20 148:21 151:23 154:1 156:19 164:18 166:7 173:1 175:23 176:22 178:1 183:16 184:13 185:15, 19,21,24 186:2 187:6, 10 199:3 201:14 202:11,14 203:2 204:1, 13,15,20,25 205:3,6,11, 15,18,21 206:1,21 207:10 209:8 210:21 211:14 213:19,24 217:13,17 218:23,25 219:5,8,12,15,17,18 220:1 221:17 222:1,2, 13 223:3,16,22 224:13, 17 225:8,23 226:7,14, 18 227:4,8,11,19 228:5 229:6,20 230:13 231:11 232:8,11,19 233:8,18 234:3,7,16,21 235:7,10, 11,21 236:5 237:1,5,9, 23 239:22 240:2,16 241:17,23 242:18,21 243:12,15,19,25 244:4, 14,17 245:13 246:10 247:8,24 248:20,21,24 249:2,3 251:4 252:1 253:20 256:19 257:1 260:18 261:1,9,20 262:8 263:7,8 264:2 265:21 267:4 268:17 271:8 272:7 275:12 276:11 279:16 280:1,12 282:12 283:9,20 284:20 286:7,8,24 287:5,16,20 288:9 289:3 290:1,10, 15,17 291:5,14,25 292:4,9,22 293:8 294:20 295:1 296:20 299:20 300:9 302:13 303:11 304:4 305:5,22 307:3,11 309:19,24 310:8 311:1,6 312:2,13, 18,24 313:7 316:19 317:15 318:13 321:10, 14,15,23 322:1,4,12 323:3 325:14 326:16,18 327:1 328:6,17 329:5,7, 8 334:2,4 338:1,6,10, 11,21 343:3 347:13 348:4 349:22 350:2,4 351:4 358:17 370:1 371:20 373:22,25 374:5,8,12,17 375:2,5 381:2 382:18 384:17 389:14 392:24 393:13 394:20 396:16 397:1,9 398:8,17,23 400:13 402:8 405:20 406:14,21 407:7,8,14,18 408:7 409:15 410:5,16 412:2, 6,19,22 413:9,13,17

**Mm** 376:10

**mobile** 25:15 214:13

**moment** 87:23 197:9

**month** 15:4 28:20 31:17

**months** 18:7,9

**morning** 6:3,4 29:17 124:23 362:4

**Motorola** 24:16

**motto** 228:8,9

**mouth** 219:3 320:11

**mouths** 208:14

**move** 372:23 382:1

**moved** 152:17

**movement** 91:1 343:18

**movements** 225:9,11

**moving** 246:17 247:5 370:19,20 388:12

**multiple** 107:8 152:6 175:13 218:3 221:3 327:16 357:12 373:7, 15,16 374:12

**municipal** 36:7,16 40:2,5 41:6,20 147:2

**mutilating** 53:14

**N**

**N95** 208:17

**Nairi** 96:4 99:14 103:25 179:4

**names** 16:23 30:12 76:25 257:25 259:9,11 370:2

**Narine** 5:18 6:8

**narrative** 111:13 114:9, 13

**national** 40:17 259:15 260:13

**nature** 68:25

**nearby** 127:6,7

**necessitate** 102:19

**necessitated** 89:11 159:21

**needed** 96:17 99:23 121:23 122:6,16 126:17 130:14 138:21 161:7 179:10 189:19 193:5 210:3 328:1,3

**Newborg** 373:7

**Nick** 16:22

**Nicolas** 377:22

**night** 30:14 62:6 63:11 64:12 85:21 109:9 111:3,5 113:1,2 265:3 276:15 363:14

**nightshift** 29:1,4 62:6

**Nine-and-a-half** 11:7

**noise** 407:10

**noisy** 406:24 407:20

**non-biased** 272:23

**non-glendale** 13:21

**nonresponsive** 182:6 286:7

**nonsense** 170:16

**normal** 181:25 198:1 336:10

**North** 382:12

**noses** 208:14

**note** 333:12

**noted** 82:22

**notes** 156:21

**notice** 22:14 24:9 192:12 304:20 400:20

**notification** 410:22

**notified** 146:3 298:19 391:14

**November** 5:2,12 187:2 358:21

**number** 5:17 43:5 116:1,5,11,16 123:20 272:12 359:21 369:18 409:5

**numbers** 112:4 388:1 411:23

**numerous** 339:4

**O**

**O-R-L-O-F-F** 17:3

**oath** 5:24 7:8,11 104:9 150:7 187:11 216:20 229:14 396:12,18,22 412:15

**object** 321:25 389:12

**objection** 20:25 26:3 27:6 32:24 47:18 49:20, 25 51:9,11 54:5,8 81:15,21 99:17 121:8 125:23 126:11 172:21 175:20 177:24 179:18 184:9 201:11 202:9,25 203:17 204:10,12 206:17 209:3 210:16 211:11 219:2,5,6,7,9,11 221:23 222:7 223:2,14 225:21 226:12,16 227:2,17 229:4,16 232:7 233:5 234:1,14 235:5 236:25 239:20,25 240:14 241:13 242:14 243:6 244:10 253:18 260:14 261:5 268:15 271:6 279:14 283:17 285:25 286:22 287:12 294:18 306:23,25 322:3,10 325:12 326:15 337:25 338:8,17 350:21 351:2 358:16 373:22 374:1,13 380:17 382:16 406:13 407:5,12 410:3

**objections** 7:16,21 51:13,21 176:18 222:1 227:7 260:19 375:2

**objective** 260:6

**obligated** 7:25 27:3,15 72:24 73:23 143:22 174:1 193:14 203:15 250:15 255:1 264:13 268:19 272:22 306:1

**obligation** 78:19 153:21 184:8,22 304:18,25 319:23

**obligations** 34:15

**observation** 115:2

**observations** 114:25

**observed** 103:17 388:12

**observer** 260:6

**observing** 226:1 331:5

**obstruct** 51:12 59:14 200:21

**obstruct/resist** 365:18

**obstructing** 56:17 58:8 59:4 205:1 344:21 374:14

**obstruction** 60:3,4

**occasion** 167:8

**occasions** 76:7 78:2 119:6 120:16,20,23 158:2 175:13

**occupation** 56:15

**occupied** 46:6

**occurred** 34:24 35:10 79:11 121:17 166:23 167:2

**odd** 346:16

**oddities** 213:23,25 214:9

**offense** 148:17 149:18 335:5 343:4

**offer** 7:11 412:7,19,24

**offering** 405:22

**office** 15:17 112:17 278:24

**officer** 5:15,21,23 6:3 7:5 10:25 12:1,5,8,9 16:21 23:4 32:13 34:16 46:8,10 56:22 58:19 63:12,25 66:18,20 67:19 68:8 71:9 87:17, 20 89:10 90:18,20,24 94:1 95:24 96:14,21,22 99:14 100:7,12,14,22 101:11,12,18 102:15 103:25 104:8,21 105:13,18 106:2 108:18 111:18 112:1 122:16, 18,21 123:9 124:10 126:22 127:17,21 129:9 137:16 146:18 151:2,21 153:3 155:8 156:7 159:2 166:2 167:10 169:1 170:3 173:10,12, 14,22,25 178:20 180:23 183:8,9 184:24 187:11, 18 188:6,19,21 189:8, 11,17 190:3 191:12 192:9,25 193:19 194:17 196:15 197:2,10 201:6, 7 207:3 209:16 210:5 211:7 213:19 217:15 221:19 222:5,22 224:2, 4,5,20,25 226:8 228:13 230:7,15 232:3 235:1 236:23 238:13 242:8 243:3 244:20,22 250:15 251:12 256:4,13 258:19 259:21 263:4 264:13 272:22 273:22 282:13 283:12 285:16 304:18 306:21 308:19 309:3,8 315:14 318:5 319:22 322:14 331:3,6 334:10 335:19 336:1 341:7 344:21 345:7 346:16 347:9,10 348:15,17 360:2,4,6,21 361:3,14, 15,19 366:4 367:7 372:23 373:21 374:3,4 375:1,9,13,23 376:6,8 377:22,23 378:13,23 380:6,25 382:10 383:1 386:13,14 388:4 391:25 392:4,10 396:18 397:13 398:2,3 399:8,12,23 400:1 401:2 403:14 414:4

**officers** 19:17,25 24:19 25:3 62:24 82:4 124:12, 14 152:1 156:6 179:2,4, 7 189:24 196:7,9 231:24 236:17 247:6 257:14 259:18 327:7 334:8 342:24 343:15,16 344:18 345:20 346:3 347:7,15,23 348:8 349:4 354:14,25 355:18 357:17,24 359:12 361:13 365:16 367:4, 21,24 373:7,16 374:19 375:8 377:14 378:6 380:4,8 381:13 382:2,6, 15 383:11 384:19 385:5 386:1,6,8,11,12 388:1, 21 390:6,16 392:6 407:10,19

**officers'** 351:23

**official** 202:21 209:20

**oftentimes** 182:20 194:12

**one's** 96:3

**one-** 303:7

**one-minute** 218:10

**ongoing** 65:6 77:19

**open** 46:6,18,24 47:6,7, 10,13 51:25 52:11,18 56:16 223:9 234:13 235:23 236:11 244:25 245:9 246:12 261:4 262:14,17 290:12 310:2 343:25 400:25

**opened** 232:24 233:24 238:21 245:7 262:18 290:23 291:7 300:18 310:14 336:16

**opening** 244:23 281:12 290:19

**opens** 237:20

**operating** 209:16

**operator** 116:1

**opinion** 143:15 235:6, 15

**opportunity** 62:24 99:12,21 100:6,13 152:4 265:1 276:14

**opposed** 237:14 297:23

**opposite** 101:10,17

**option** 127:4 151:3 165:2,7,13 168:25 169:5,20 178:3 308:18 309:2,7 312:19 325:10 336:13 349:15 379:21

**options** 179:10 349:9

**order** 12:4,8 21:7 47:5 83:4 113:15 136:11 140:20 208:13 243:23 307:22 313:12

**ordered** 382:24

**ordinance** 206:23 207:12,15 208:23

**organizations** 208:12

**origin** 40:17 259:15 260:13

**original** 361:1

**Orloff** 16:22 17:3

**overlooked** 115:12

**owner** 37:15 39:6 46:8, 11,13 47:25 56:16,21, 22

**owner's** 46:9,12,13 56:21,23

**P**

**P-H-E-L-A-N** 14:19

**p.m.** 29:10,11,14,19 186:4 187:3 413:18 414:5

**pace** 71:17,18

**Pacific** 5:12 414:6

**pack** 351:13

**packages** 14:7

**pad** 291:17

**pages** 109:11,12

**paid** 343:13

**pain** 331:20 366:12 370:7

**palpitations** 181:12 215:1

**pandemic** 69:14 70:3 199:14 207:5

**panic** 125:16 128:5 182:5,10 194:10 225:19

**pant** 388:13

**panting** 234:10

**pants** 65:11 88:24 98:14

**papers** 293:3

**paperwork** 80:18,19, 21,24 137:13 146:3 216:3

**paragraph** 132:22 133:20 134:25 136:4 267:21 269:5 270:3 271:10

**paragraphs** 139:8

**paramedics** 181:14 341:8

**parameter** 68:17

**parameters** 35:4 69:3 100:25 101:3 210:25

**paraphrase** 268:22

**paraphrasing** 230:9 248:3 293:21 303:22 318:18

**parked** 104:24 105:5 246:23 281:3 282:3

**parking** 31:10 105:4 247:2

**pars** 94:8

**Parseghian** 386:13

**part** 18:12 58:5,11 103:17 141:12,13 145:5,13,14 162:22 230:4 234:25 276:16 296:6 345:16 402:10 408:9,21,22

**parties** 50:19 51:7 79:15 83:9 95:5 114:8 138:2 199:1

**partner** 18:22 63:4,10 192:10 193:14 389:25

**partnered** 18:22

**partners** 19:3,13 155:13 189:24 406:24 408:4

**parts** 111:9 113:18 342:14

**party** 83:11,14 106:19 137:25 141:24 147:17 157:13 161:3 174:24 175:5,7 254:13 283:14 395:4

**party's** 254:16

**pass** 12:9 244:7,20

**passed** 85:7

**passenger** 162:22 257:15

**passing** 20:18

**past** 22:2 56:3 131:13 134:10 135:10,22 318:9

**pat** 94:6,10,11,20 95:25 96:18,25 97:3,7,12,15, 18,19,20,21 98:3,9 99:10,11 100:14 102:14,19

**path** 167:15 212:23

**patient** 327:9,14

**patrol** 16:9,10 17:5,11, 18,25 18:21,25 25:7 29:7 32:1 42:1 73:11,12 84:17,25 85:4,13,16 93:18,22 94:4 104:12, 17,19 105:23 117:25 122:5 123:24 124:9,16, 19 125:6,17 126:17,23 128:23 129:7,10,12,20 130:11,15 133:23 134:4 138:10 150:17 151:5 152:1 154:3,18,21 155:2,10 161:7,13,17, 21,23 162:4,8,13,16,24 163:25 164:2,5,11,13, 20,24 165:11 167:25 177:6,10,20 178:4,9,10, 19,24 179:14,17 180:4, 25 183:4 185:7,10 187:16 188:18 190:24 193:23 195:22 196:3 198:8 214:18,25 215:7, 9,13 216:21 217:8,14 226:2 231:1 235:19 236:18 239:1,7,16 241:1,20 242:9 246:13 252:16 253:16 269:20 270:2,12 274:8,9 280:25 286:13 290:19 291:7 292:11 293:13 299:9 300:11 301:24 302:22 309:21 310:3,14 313:9 314:18 316:15 318:2 330:12 332:3,8, 24 334:23 335:8,22 337:15 339:3,17 340:23 341:1 346:15 360:1 368:18 387:12 395:21 397:5,12,19,24 398:13, 20 399:1 400:22 403:19,24 404:1 405:2, 5

**patrolling** 28:23

**patted** 95:15 96:10,22 163:25 164:1

**pause** 7:18

**pauses** 8:10

**pay** 252:13 340:6

**Payne** 5:20

**PD** 10:24 18:25 37:10 144:23 148:6 231:21 324:1,5,21

**peace** 12:1,4 32:23 46:8,10 56:21 58:19 71:9 93:6 100:4 126:10 228:13 231:24 304:18 306:21

**peaceful** 41:2

**penal** 35:19 41:19,21 42:6,7,13,15,25 43:9,13

46:2 49:9,17,22 50:8, 13,21 52:1,8,16 58:2, 16,18 59:9 60:1,18 61:2,9,23 92:22,25 119:22 144:9 145:16,17 148:19,22,24 149:3,8,9, 10,12 253:10 278:14

**penalties** 7:7

**penalty** 172:5,16

**pending** 63:2,6 106:12, 14 134:2 204:12,14,21 205:2,5 301:14 302:7 334:25 349:23 407:6

**people** 31:3 55:10 76:6, 24 89:13,23,25 125:15, 25 127:10,24 142:3,4 152:8 157:20,21 158:8, 9 159:24,25 160:17,19 162:18 180:24 182:8,10 187:19 191:3 194:10,11 198:22 199:16 200:11 202:4 203:7,9 208:10 209:18 210:23 212:10, 20 220:14 221:12 225:19 242:2 245:24 248:16 249:12 254:12 258:3 259:14 263:9,12 272:18 277:7,9 285:21 294:13 295:17 297:20 309:11,13 313:22,24 314:2 317:23 318:10 322:20 339:5,21 340:25 342:11 351:1 363:22 369:11 373:9 383:14 385:24 386:3,7,19,20, 22 387:6 403:4

**perceived** 369:14

**percent** 200:3 209:24 259:6 290:6

**perimeter** 384:22 385:6,9

**period** 15:20 16:14 17:9 18:10 20:8 28:4 32:19 33:17 44:6 119:6 209:15 342:5 403:20

**perjury** 7:8 172:6,17

**permanently** 145:4 146:19 147:18 307:21

**permitting** 156:17

**person** 23:22 35:13 38:15,18,24 40:15 46:9, 12,13,25 47:2 48:19 56:14 59:21 61:1,19 96:2 101:9 103:1 113:19 115:17,20 125:22 135:6 156:10, 11,15,20,21 157:3 160:14,15 172:3 180:5, 11,15 182:5 183:6,11, 19 203:16 213:11 215:10 220:20 256:14 283:13 301:17 325:20 333:21 337:22 339:15 340:1 345:23,25 346:12 347:5 359:13 372:4 379:21 389:3 390:14

**person's** 38:5 322:22 332:19

**personally** 135:20,23, 25 179:13

**personnel** 32:21 128:12 194:14 203:20

**persons** 37:10 39:24 171:19,21 172:5,20 173:13 200:16,19

**perspective** 189:22 257:19

**Pete** 44:13 45:1 228:19

**petty** 30:1 58:25 365:17 370:14 388:2 390:5,7

**petty-theft** 390:13

**Pharmacy** 5:16 6:10 28:1,5,14 29:23 30:19 31:12 32:17 34:1 39:13 48:16 64:19 81:3 147:18 160:1,5 307:17, 18

**Phelan** 14:17,19,20

**phone** 42:11 51:24 84:4,8,10 94:17,20,23 95:3,12 116:5,6,11,16 132:25 133:4,8,10 135:12 272:12 314:13, 15 328:8,11,15,19 330:9,11,17 343:11 408:10,15,22 409:1,10

**photograph** 316:3

**photographing** 315:18

**photographs** 26:19 88:22

**photos** 160:23,24 352:12

**physical** 91:5 211:21 213:23 214:8 337:1,20 341:17

**physically** 90:7,11,14 91:1,24 92:1 368:12 381:21

**pick** 62:25

**picketing** 41:2

**pickup** 385:19,22

**picture** 241:7,8,10 315:3,21 316:4

**pictures** 88:19 313:16, 18,20,24 314:2,6,9,10, 14,25

**place** 48:18 88:2 154:18 157:21 158:3 172:14,15 179:14 185:3 199:23 207:12 214:18 239:16 300:25 332:22 383:23 389:7 397:24 400:11

**placing** 85:13 89:11 138:9 150:1 151:4,5 177:20 178:4 179:17 215:7 301:9 332:8 385:17 390:17 395:21 398:20 404:16 405:5

**Plaintiff's** 6:7 407:16

**plastic** 235:17

**play** 161:25 162:2 195:12 217:11,14 224:11 230:3 233:14 268:4 392:20,25 407:21

**played** 407:23 408:12, 19

**playing** 164:17 217:16 218:7 219:20,25 221:16 222:12 223:21 224:12, 16 225:7 226:6 228:1 230:12 231:10 232:18 233:15,17 234:6,20 237:22 241:22 244:1,2, 3,13,16 245:11,12 246:9 247:7,23 251:3 256:18,24 260:23,25 261:17,19 262:7 264:1 265:20 267:3 272:5,6 274:4 275:11 279:23,25 280:11 282:11 283:8 284:19 287:4,18,19 288:8,23 289:24 290:9, 13 291:4,13 292:8,21 293:7 296:19 299:19 300:8 302:11,12 303:10 304:3 305:4,21 309:18, 23 310:7 311:5 312:1, 12,17,23 313:6 316:14, 18 317:14 318:12 323:2 326:16,17,24 328:5,16 392:23 393:12 394:19 396:15,25 397:8 398:7, 16,22 400:12 402:7 405:19 406:19,20 408:5,6 409:14

**pleading** 222:15 223:8 224:10 401:9

**plenty** 309:11,12

**pocket** 42:7 95:1

**pockets** 94:12 95:2 97:22 388:13

**point** 20:11 56:6 57:6 66:3 72:10 76:18,21,25 77:4 84:5,10 85:6 90:13 91:10 95:7,19,21 99:15 104:11 105:20,22 106:7 107:24 116:19 119:10 121:7,25 122:24 124:15 128:15 133:22 134:11, 13,16 155:9 187:15 188:17 192:11 196:1 222:14 224:24 232:12, 24 238:18 239:8 255:12 257:8 262:11 282:15,17 284:21,25 285:8 288:14,20 290:11,18 292:6 305:15 315:5 322:11 328:25 330:16, 18 333:3 360:18 373:19,24 374:11 397:10 398:24 403:18 404:8

**pointed** 365:20

**pointing** 80:20

**police** 7:5 9:6,8,10 10:25 11:22 12:8,9,14

15:23 22:15 23:4 34:16 49:15 58:15 69:16 87:17 88:23 89:10 99:14,24 102:13 107:11,13 126:22 127:10,11,15,17,21 137:16,20 146:17 170:3 172:19,23 173:2 180:23 183:8 191:4 207:3 209:16 210:5 213:4 218:16 228:10 240:25 241:15,21 242:7 255:16,25 256:1,3,6 258:19 259:18 263:4 272:22 273:1 283:12 308:19 309:3 318:4 319:22 337:3 343:1 344:21 350:15 354:7 356:17,19 362:22 365:18 372:1 382:23 390:1 404:17

**policies** 143:21

**policy** 9:19 23:20 27:1 37:10,13 39:2 72:20 74:4 97:12,18 99:13 100:20 101:1,4,5,7 108:4 144:23 152:21 153:9,13 155:19,24 156:2 158:19 171:18 172:7,11,14,15 173:22 174:6,7,9 193:7,8 196:14,16 197:3 204:8, 18 206:3,5,7,11,13 207:12,13 214:19 278:6 299:18 324:22 325:11, 13 330:22,23,24,25 331:11 333:14,18 334:2,14 336:14,22,23 337:6,19 338:18 341:13,14,16 353:12,13 385:11,14,16 386:7 387:3 405:11 410:18

**population** 259:6

**porch** 361:20 362:23 364:9 379:8,11

**portion** 111:13 158:10, 11

**posed** 205:22

**posing** 160:2

**position** 12:2 20:23 32:6 255:11

**positions** 12:18

**possession** 46:9,12, 14 330:12

**possibilities** 159:19, 20 161:10

**Possibility** 163:22

**possibly** 83:4 102:25 159:18 185:5 272:20 363:8,22 384:15

**POST** 14:24 15:2,5 272:25 273:1,2

**posted** 411:5

**potential** 207:18 331:4 356:13

**potentially** 26:3 177:18,19 363:21

**power** 309:15

**practicable** 101:18 331:3

**practice** 83:7 163:1,5, 11 214:19 329:10 397:20,23 404:22

**precautions** 90:16 369:15

**precise** 32:16

**Predominantly** 259:5

**premises** 56:19

**preparation** 9:14 118:17

**prepared** 9:3

**presence** 34:25 117:17 119:14 121:5,7 139:16, 17,22 140:5 169:4

**present** 5:18 7:9 131:2 171:1 177:2 188:8 238:17 283:5,14 284:8 327:7 331:5 346:3 347:24 367:5 373:16 377:14 382:6 384:19 388:4 392:10 405:23

**press** 26:7,23 68:3 74:6

**pressed** 372:21

**pressing** 248:13

**pressure** 354:20 372:22 382:1

**presupposes** 173:25

**pretty** 11:15 22:24 30:23 69:14 85:2 200:4 262:24 282:19 318:18 323:4 354:20 357:16 364:6 394:12 397:4,7

**prevalent** 29:25

**prevent** 87:4 100:22 152:19 159:1,3 339:9 343:17 357:25 366:2 371:6 377:12 379:9 380:15 383:7 384:14

**prevented** 151:19 177:12 211:3 234:22

**preventive** 369:13

**prevents** 200:17

**previous** 75:20 76:7 78:1 80:11 120:19,23

**previously** 6:22

**printed** 110:19

**prior** 12:18 13:21 47:18 64:8 73:6,18 85:12 96:14 99:18 120:16 129:5 134:23 138:9,23, 24 167:8,19 168:20 188:6 189:25 190:11 192:6 206:17 219:4 240:5,14 241:13,19 253:19 257:8 260:17 268:23 285:25 291:9 313:15 353:22 358:3 365:9 380:6,22 395:20 396:13 398:19 405:1,4

**priority** 65:24,25 66:6, 9,11,13,16,17 67:2 71:20 102:16 157:16

**privacy** 21:1 179:16

**private** 34:2,16 36:23, 24 37:10 39:3,11,24 40:5 46:18 136:5,11 139:9,12 171:19,21 172:3,5,20 173:13 296:22 311:24

**proactive** 380:5

**probable** 166:19,22 250:22 253:5

**probation** 16:18 18:10, 19

**probing** 392:15

**problem** 188:1 199:5 211:8,22 216:6 230:18 232:5,14 267:10,12,19, 22 270:16 326:21 340:5

**problems** 177:9 188:15 190:16 197:12 216:4 217:9 219:23 264:16 267:24 271:14 317:23 335:11 340:16

**procedure** 272:25 273:2

**proceeding** 7:10 268:13 412:10

**proceedings** 248:23

**process** 18:11 20:6,20 34:20,23 37:12 48:20 77:19 145:25 274:9 278:15,21 282:24 297:7,15 323:19 324:3, 8 325:24 327:12 328:2 331:17

**produce** 21:21 78:10

**produced** 21:16,23 88:22 373:20 374:3

**profess** 251:7

**professional** 51:18

**professionally** 55:22

**prohibited** 40:6,13,15

**prolonged** 299:9 351:1

**promise** 304:12

**promulgated** 202:7

**proned** 348:11

**pronounce** 296:15

**proof** 250:1,5 284:13

**proper** 50:8 215:22 229:2 369:15

**properly** 172:20

**properties** 384:15

**property** 35:20 40:5 46:5,18 139:17 147:9 313:1 316:21,23 317:4,

9 384:10,13,14 409:3
**protect** 173:18 378:16 405:16
**protecting** 381:6
**protection** 208:15
**protective** 243:22
**protesting** 292:24 296:22 303:14
**protocol** 101:6 404:5, 17,21
**proud** 242:12,24 243:1, 17
**prove** 86:15 154:12 216:13 387:17
**provide** 7:22,25 8:14 10:13 125:22 165:16 208:14,23 209:12 250:1 259:13 260:20 407:4
**provided** 168:7 174:24 249:11 364:19
**providing** 197:4 361:18
**provision** 40:14
**psychologist** 159:25
**public** 27:5,8,20 46:7, 19,24 47:6,7,11,13 52:12 56:17 72:9 73:25 173:18 183:17 200:6 202:19,23 203:4 207:16 208:13 228:14 295:17 354:8
**publication** 202:23
**pull** 98:12
**pulled** 351:21 371:5
**pulling** 371:7
**pulls** 354:16
**punch** 367:3,14
**punched** 367:12
**puncture** 351:13 352:5
**punish** 155:22
**purchase** 80:11 133:16
**purple** 65:11 88:25
**purposes** 413:3,15
**pursuit** 348:25 376:11
**push** 372:6,20 381:20 382:1
**pushed** 371:12 381:25 383:6 384:16
**pushing** 388:20
**put** 21:6 23:21,23 51:11 63:16 68:3 71:3 84:23 85:16 87:17 90:24 96:16,17 122:11 134:24 152:13 157:20 162:18 168:16 192:12 194:20 201:2 202:16 203:5 206:13 238:25 267:2,16 271:11,16 320:11 333:10 343:17 345:17 370:25 384:8 385:2 388:15 404:13
**puts** 18:16 123:13
**putting** 96:15 102:13 115:8 152:8 219:2 253:1 332:12 337:15 352:4 354:19,20 387:5

**Q**

**qualified** 20:17 39:23
**qualify** 206:10
**question** 8:16 21:2,9, 13 51:23 52:6 54:23 87:6 90:10 91:4 95:10 117:11 126:14 136:19 138:23 145:6,13,14 150:4 175:2 184:11 194:15 204:12,14,19, 20,22,24 205:2,5,21,23 214:9,10 224:11 227:9, 12 242:17 243:9 244:18 249:17 253:23 257:13 258:8 266:6 268:14,18 283:19 286:9 300:21,22 302:2,3 306:13,15 316:2,7 321:8,9,13 323:6 338:12 349:23,24 350:22 363:10 379:5 380:1 385:23 399:17 401:7 404:7 406:6 407:6
**questioned** 249:16
337:14
**questioning** 79:20 80:2 102:6 290:16 300:23 301:17 311:9 351:3 387:25 392:18
**questionnaire** 215:12
**questions** 7:24 8:6 10:22 51:14,17 55:15 92:8,18 95:10 138:22 160:2 181:25 182:6 192:20 212:17,23,25 215:14 217:12 269:15 297:2 299:24 300:3,5 301:3,19 302:18 303:9 321:11 327:6 357:20 392:16 393:1,5,10 405:13 412:4 413:20
**quick** 101:5 185:14 344:23 397:7
**quickly** 89:25 336:3
**quiet** 408:4

**R**

**R-I** 16:25
**R-O-S-S** 6:6
**R-U-I-Z** 19:23
**race** 40:16
**radio** 23:7,15 24:16,25 25:1,2 62:25 63:15,23 64:3 68:1,2 122:25 241:1 329:5,12
**radioed** 96:20
**raise** 5:21 22:12
**Ralphs** 370:14
**ran** 115:3 168:9,11,19 349:2 382:24 383:5 384:9
**random** 105:8
**rapidly** 345:5
**read** 5:6 46:15 48:21 52:24 53:16,20 54:2 58:12 65:14 101:14,25 141:11 147:5 156:12 173:20 204:24 205:19, 21,23 206:7 209:6,9,10, 11 256:5 300:23 338:3 343:7,8 344:5,7,12 351:9 354:10 359:19 360:11
**readily** 211:23
**reading** 131:15,17 135:6 140:19 299:22 301:2 396:13
**real** 46:5 101:4 185:13 344:23 361:23
**realize** 74:15
**realized** 347:17
**reason** 60:25 142:10 150:6 155:14 167:7,17 172:18 198:7 201:5,9 220:23 239:2 266:18 270:24 272:10 276:25 277:2,5 296:4 335:25 352:16 383:18 412:25
**reasonable** 90:21 101:11,21 126:22 173:12 174:2 260:12 331:12 333:20 359:5,8 364:12
**reasoning** 150:2,5
**reasons** 22:4 86:2 147:8 152:11 153:3 159:2
**rebuke** 230:14
**recall** 10:1,7,16 15:23 17:20 20:13 28:13 30:9 33:6 37:1 41:11 44:14 45:13,15 69:12,21 70:2, 9 71:24 75:22 76:14 77:10,13 78:23 79:19 80:15 82:3,20 88:6 93:11 95:18 106:5 112:10 118:5,21 161:20 207:20 342:23 343:6 370:3 395:20 397:16
**receive** 14:24 15:19 62:25 212:9 410:11,19, 22
**received** 15:16 17:5 41:24 58:15 64:12 80:13 125:14 209:17 305:16 343:10 345:25
**receiving** 380:7

**recent** 133:16

**recently** 13:24 31:21, 24 52:24

**recess** 104:6 186:3 292:3 350:1

**recognize** 75:18 180:16 181:3 184:1

**recollect** 36:20

**recollection** 33:24 64:11,13 75:5,10,11 83:24 96:12 161:13 162:24 240:10,18 241:12 288:20 408:25

**recommend** 100:21

**reconsider** 409:22

**record** 5:7,8 6:5,16 7:16 8:11 23:3 55:7,11 75:2 81:7 88:7 107:4 131:15,21,24,25 143:22 163:6 164:10 168:21 185:23,25 186:1 187:7 213:19 217:13 227:7 275:14,16 277:5 350:3 360:16 368:14 374:22 387:19 393:20 410:10

**recorded** 84:11 107:17,23 108:9 143:19 403:20 409:17

**recorder** 24:10,14 25:8,15,24 26:16,18,21 72:7 74:18 75:1 81:6,9, 11,12,18 86:14 104:14 108:14 118:16 163:6 278:4 310:11 318:15 398:19 405:1

**recorders** 27:2 72:21

**recording** 25:25 73:21 83:21 84:5 108:1 133:5 135:22 138:7 141:13 154:11 161:18,21 162:5 163:17 164:6,17 216:12 217:4,16 219:25 221:16 222:12 223:21 224:12, 16 225:7 226:6 228:1 230:12 231:10 232:18 233:17 234:6,20 237:22 239:14 241:22 244:3, 13,16 245:12 246:9 247:7,23 251:3 256:18, 24 260:25 261:19 262:7 264:1 265:20 267:3 269:21 270:13 272:6 275:11 279:25 280:11 282:11 283:8 284:19 287:4,19 288:8,23 289:24 290:9,13 291:4, 13 292:6,8,21 293:7 296:19 299:19 300:8 302:12 303:10 304:3 305:4,21 309:18,22,23 310:1,7 311:5 312:1,12, 17,23 313:6 316:18 317:14 318:12 319:21 323:2 324:12,15 326:2, 17,24 328:5,16,23 330:2 335:9 387:16 392:23 393:12 394:19 396:15,25 397:8 398:7, 14,16,22 400:12 402:7 403:23 405:12,19 406:20 408:6 409:14,24

**recordings** 77:23 78:3

**records** 9:4 26:24 135:12 276:3,5 393:15

**refer** 80:6 135:2

**reference** 294:2

**referencing** 293:25

**referring** 386:4

**reflected** 270:2

**reflection** 244:2 281:4 282:1 289:1,9

**reflections** 281:16

**refresh** 10:12,17 88:4 277:23 344:3,24 392:21 393:2

**refreshes** 350:17

**refugee** 242:6

**refugees** 242:4,6

**refusal** 48:5 57:24

**refuse** 36:4 38:8 48:2 60:21 61:17,19 318:23 319:6

**refused** 107:7 343:12 351:22 357:12,21

**refuses** 35:20 56:19 59:5

**refusing** 38:18,22 46:4, 17,25 47:15 48:16 49:14,16 59:12,13,17, 23 60:2 65:12,20 67:9 79:7 119:24 120:4

**regain** 366:5

**regard** 33:25 184:8,22

**register** 267:11

**regular** 13:12 28:22 265:13 317:24

**regularly** 11:15 28:11 285:22 318:22

**reject** 37:3

**rejected** 20:11,13 36:24 39:11

**rejection** 20:15,16

**related** 9:23 32:21 344:20 346:19

**relating** 40:14 132:16

**relative** 268:25 269:1

**release** 149:5 151:4 152:3 165:12 178:4 290:25 302:6 336:1,2, 15 339:2 340:1

**released** 114:10 151:17 171:12 177:20 313:9 324:18 328:8 333:22

**releasing** 161:6 315:22 323:16

**relevant** 65:19 190:2 192:20 194:23 271:12, 16

**relieve** 225:1

**religion** 40:16

**relying** 273:22

**remarkable** 358:15

**remember** 9:24 14:1 24:8 31:23 32:10 34:7, 10 36:20 39:12 44:16, 24,25 45:5,6,7 62:17,20 63:16,18 64:23 70:12, 15,20 71:2,5,19 72:6,13 73:7,13,20 75:3 77:18, 21 80:17,20,23 81:1 82:17,25 83:4,18 87:12 91:9 92:18,19 95:22 96:8 110:7 117:14,20 118:6,13 123:10,13 134:16 154:2,6,9 161:19 191:13,14 293:18 326:11 328:7 330:10,16,19 343:21 346:21,23,25 347:3 350:18 351:5 354:10 358:8,11,18 365:23 370:5,23 371:23 372:25 383:16 388:7 389:22 391:23 392:4,18 393:2, 4,5,24 394:18 395:22 396:2,3,6 397:22 407:25 409:21

**remembering** 241:18

**remind** 305:3

**reminded** 393:17

**reminder** 104:8 187:13

**remove** 200:22 222:4 334:9 336:14

**removed** 239:7,23 313:8 343:18

**rendition** 176:11 343:23 349:19 361:12 372:2

**rep** 276:4

**repeat** 126:14

**replay** 244:12,14 280:8

**report** 9:7,8,10 33:12 82:22,23,24 83:25 84:1, 2 107:12,13 109:7,8,12, 24 110:2,4,9,12,14 111:3,21 112:24 113:1, 15,18,23 114:14 115:9 131:16,20 132:2,6,9,11, 12 134:12,22 135:2 140:8,9,21 141:11 144:2 146:9 147:16 172:24 173:2 177:1 188:4,5,6 189:23 190:5, 11,13,17,21 192:9 193:15 194:20 196:16 197:4 240:11,12 241:16,21 249:21 250:20 254:5,14 255:15,16,19,25 256:3, 6,15 267:17,22,25 268:18 269:10,18

270:2,10,15,19,21 271:4,9,10,12,17,20 273:20 274:10 298:1 305:12 331:2,4 332:25 333:15 337:3 344:6,8, 10,13,14,17 346:20 350:14 352:17 353:25 354:6 356:17,19 358:4 359:16,19 360:5,6,8,9, 11,19 361:2,6 362:22 365:16 369:18 370:12 372:2 375:6,22 376:14 377:3,18 378:2 381:12 382:10,11,19,22 387:23 390:1 391:2,3 395:6 396:13 409:5 411:18

**reportable** 299:3,11

**reported** 110:14,15 293:9 330:24 331:8 403:15

**reporter** 5:8 6:11 7:22 8:3 12:6 19:21 50:19 51:7 95:5 103:3 108:12 109:22 112:16 130:5 135:4 148:20 153:24 156:18 166:6 183:14 185:23 186:1 199:1 204:23 205:9,19,24 207:7 237:8 251:23 263:6 276:8 294:24 310:25 329:3 334:1 343:2 348:3 369:22 371:19 380:21 410:15 412:21 413:6,19,21,25 414:1,3

**reporting** 83:11,14 106:19 113:8 137:25 141:24 147:17 157:12 161:3 171:22 172:2 173:3 174:24 175:5,7 193:9 195:3 254:13,16 271:2 283:13 360:21,22 395:4

**reports** 109:18 112:6, 12 113:6 189:5 190:1 193:9 240:25 256:1 273:3 344:1 365:15 373:20 374:2,18,25 377:3 393:17 394:4

**represented** 45:10 392:1

**request** 39:17 46:8,11 56:22 146:19 169:25 227:14 238:1 325:1,21

**requested** 34:1 46:7 47:16 56:20 203:20 412:8,9

**requesting** 48:7

**requests** 50:19 51:7 95:5 187:23 199:1 325:18

**require** 100:20 215:15

**required** 58:4 70:7

**requirement** 166:5 173:3 231:25

**requirements** 69:17, 18 171:22 172:2 207:2

**requires** 72:21 95:24 196:14 197:2 250:25 331:11 333:14 389:7

**requiring** 69:1

**rescheduling** 55:25

**reschedulings** 56:7

**research** 210:10,20

**residence** 361:21 362:15,24 363:4 364:25

**residences** 124:25 130:15 401:12

**residential** 357:25 362:18 363:5

**resist** 87:10 152:18 359:11 381:20

**resistance** 361:24

**resisting** 87:13 91:24 118:20 119:1 154:16 222:25 223:13 343:1 350:15 354:7 366:7,10 381:21

**respectful** 8:7 222:22 294:17

**respirators** 208:17

**respond** 128:5 181:24 203:20 226:8,11 302:2 329:15 383:5

**responded** 31:24 64:1 297:19 311:15 351:19 382:2 406:22

**responding** 17:25 27:9,25 29:23 31:22 62:23 67:15 70:4 72:14, 18 92:8 160:2 256:14 257:14 285:6 300:2,3 302:20 355:9 377:23

**response** 73:25 78:11 227:14 230:14 238:1 257:4 258:8 300:6 323:9 406:6

**responsibilities** 173:11,23

**responsibility** 137:17 182:13 263:23 279:1

**restaurant** 14:6

**restrain** 173:15 333:21

**restraint** 156:5 298:6, 12 333:19

**restraints** 152:21 153:16 155:20,21 156:3,4,23 331:18 333:5,23,24 334:6,9,16

**restroom** 349:21

**result** 277:22 365:3 369:19 370:9 390:19 391:12,18

**resulted** 253:13 254:2

**results** 40:12

**resumed** 187:9

**retail** 30:21 34:21 35:16,25 37:3,14 46:24 47:6,10 60:24 146:18 169:25 277:10

**retrieve** 343:11

**return** 107:1 135:13,24 139:20,23 140:11 141:3,16 145:9,11 146:16 269:13 271:22 330:17 408:22

**returned** 107:2 140:10, 12 141:3 144:4 346:17 409:1,10

**returning** 330:16 408:14

**reveal** 347:1

**reversed** 199:8

**review** 8:20 9:2 36:12, 18 41:7,9 48:14 49:8 112:6,11 358:3 412:9

**reviewed** 9:10,14 41:11 64:6 147:11 411:17

**reviewing** 10:11

**reviews** 10:12

**Rico** 342:24

**ridiculed** 258:18

**ridiculing** 258:13 260:13

**ridiculous** 373:23

**rights** 6:9 40:14 141:11 299:23 300:23,24 301:2,8 302:15

**ring** 149:16

**risks** 202:22

**Ritter** 388:5

**Riverside** 20:14

**road** 7:12

**roadway** 346:17

**robberies** 30:2

**robbery** 58:25

**Robin-** 108:18

**Robinson** 9:22 44:13 45:2 57:9 108:18 228:19 255:9 256:7 263:17 277:24 297:9 391:25 392:4 396:18 401:3,18 405:21 406:9 411:25

**Robinson's** 229:17

**role** 32:6 199:7 342:11

**roll** 183:2 234:13

**rolled** 234:25 238:18

**rolling** 244:23

**room** 241:5 297:21 370:15,16,21 372:5 377:19,20 381:7,16

**Ross** 5:15,21,23 6:6

43:5 67:19 343:10,13, 17,19 344:19 345:16 351:15,19,25 352:2 354:14 359:20 360:2,21 361:14,19 365:16,19,20 366:1,5,7,8,9,11,17 370:25 371:4,6,9,11 373:21 374:3,4 375:1,9, 23 379:13 380:9,11 383:2,6,9 388:10,11,14, 15,16,17,21,25 389:1 414:4

**Ross's** 217:15 352:4,8 360:4,6 388:22

**round** 276:4

**route** 63:17 64:22 123:14

**roving** 385:7

**RP** 65:12 84:14 105:19 106:4,18 114:3 134:8 175:1 273:16

**RP's** 282:21

**rude** 205:11,12,15,16

**rudeness** 411:11

**Ruiz** 19:23 20:3,4 122:22,23 123:20 124:3 188:19,24 256:9

**rule** 36:10,21

**rules** 7:7 10:4

**ruling** 21:15

**rulings** 7:17

**run** 91:12 168:22,23,24 345:17 383:4 386:18

**running** 233:3 347:18 349:6,16 351:22,25 352:18 359:18 379:22 381:15 383:14,20

## S

**safe** 199:10 201:13 202:5 204:5,6,7,11 205:10 206:2,3,5,10 211:17 232:16 315:12

**safekeeping** 409:7

**safety** 86:1 90:18,20,24 153:3,11,12 156:7,16 159:2 173:18 183:10, 11,17 202:6,22 228:14 233:2 315:6 334:8,10 378:13,21

**same-sex** 100:21

**San** 20:14 28:16 31:13

**sanctions** 374:15

**sarcastic** 374:23

**scanned** 132:10

**scanning** 131:17 132:1,3

**scars** 214:4

**scarves** 208:18

**scenario** 193:18

**scene** 20:1 62:3 63:17 67:18,21,25 68:4,6,15 70:13 72:17 82:5,14 96:5,6 99:15 100:17 110:17 121:1 123:2,8, 14 124:5,10,12,15 159:17 170:24 177:3,14 179:7 188:8 189:10 192:10 250:8 290:7 325:7 329:1,9,17,19 353:10 367:21 369:24 372:24 376:7 377:24 378:24 380:4 381:1 382:9 385:22,24 386:1, 4,6 395:8,9

**schedule** 313:23

**school** 12:24 159:25

**scope** 350:23

**scream** 127:12

**screaming** 72:2 127:5, 9 128:13 155:10,12 178:10 181:21,25 188:15 189:13,16 190:11,24 191:2,3,15, 16 195:25 196:2,3,4 197:9,10 234:23 235:3 236:14 241:19 291:10 315:19 316:10 401:11

**screen** 9:2

**scroll** 53:23 344:14

**scrolling** 46:3 361:5

**scrutinized** 33:19

**SD** 30:2

**sealed** 235:18

**search** 49:21 51:5 94:5, 7,10,11,19,23 95:25 96:14,24 97:2,10 98:16 99:11 101:6,13,16,23 102:14 104:1 133:10 351:11,13 388:14,19 404:3

**searched** 101:10 105:22 404:1

**searching** 101:11 388:11

**seat** 152:13 163:3 235:19 239:1 246:12 248:25 288:25 289:11 290:21

**seat-belted** 119:3

**seated** 178:9 247:17 284:23 287:8

**seconds** 66:12 67:17, 21 164:14 218:7,10 219:19 222:14,17 245:14 284:21 289:16

**section** 40:10 41:7,9, 19,20 42:25 43:9,14 46:3 48:12,22 49:3,5, 17,23 50:8,13,22 52:8 54:1,4 56:13,25 57:10 58:2,12 59:10 60:1,18 61:2,9,23 92:22,25 119:22 144:9 145:16 148:19,22 208:11,13 209:5 278:9

**sections** 41:21 42:8,13 49:9 52:1,16 53:17 58:16,19

**sedan** 236:19

**Seddon** 354:14 361:8, 15 377:4 379:7

**Seddon's** 361:7

**self-dispatched** 63:19 64:24

**send** 278:17

**sending** 327:18

**sentence** 360:13

**separate** 139:20 166:15 389:23

**sequence** 82:25 83:1

**sergeant** 9:22 18:13 33:7,9,13 44:13 45:1 57:9 108:18 112:6,8 122:23 228:19 255:9 256:7 263:17 274:10 277:21,24 297:9,19 324:21 337:10 342:3 370:4 391:9,10 395:10 396:18 401:3,18 405:21 406:9 407:2 411:19,25

**sergeant's** 112:17

**sergeants** 33:13 259:24 298:19 369:23 370:2

**serial** 43:5

**service** 15:11 30:20,24 32:22 36:5 64:5 72:14 318:23 319:6,23

**services** 200:7 207:18

**session** 51:15 187:7

**set** 76:2

**severing** 53:9

**severity** 212:17

**sex** 95:24 100:13 101:10,12,17,19 114:17 368:9,10

**shaming** 243:2

**shape** 33:23 87:8 107:17 117:13 118:20 176:7,9 249:15 305:24

**Sharifan** 248:23 249:1

**shatter** 384:1

**shattered** 357:4

**shattered-out** 362:7

**sheet** 18:14 276:15 412:11

**Sheriff's** 12:15,16 20:14

**shift** 18:23 29:4,14

**shin** 388:22
**shirt** 65:11 88:25 89:1
**shoes** 65:12
**shoplifting** 350:14
**shopping** 295:13
**Shore** 5:9
**short** 17:18
**shortly** 286:5
**shoulder** 354:20 366:12 370:7,25 371:9 383:7
**shoulders** 220:19
**show** 50:12 51:25 88:4 90:14 98:9 146:2 153:6 155:22 230:3 250:11 271:13 344:23 361:5 383:3
**showed** 19:15 41:16 82:13 216:3 336:8 394:4,6,9
**showing** 80:17,24 153:8 209:6
**shows** 123:14 340:10
**Shubunka** 372:23 373:7 382:10
**shut** 403:3,4 404:14 406:11
**sic** 322:1 388:23
**side** 74:8 98:2 138:13 141:20 252:16 257:15 272:16 297:2 347:16 388:19 389:16,17 400:1 413:10
**sight** 349:1
**sign** 156:21 172:4 303:20 304:6,16,21 312:20 313:12
**signature** 43:6
**signed** 412:25 413:1
**significant** 109:20 179:15 268:19
**signing** 304:10 330:15
**signs** 53:14 180:16
**Simeon** 365:20 380:13
**Simian** 365:16 366:11 377:23 378:23 380:11, 15,16,25
**similar** 22:24 32:21 48:16
**simple** 54:23 363:10
**simply** 215:13
**simultaneous** 50:18 51:6 183:13 198:25 236:4 276:7
**single** 42:17 174:20 350:21 379:19
**sir** 39:7 117:11 118:8,15 128:20 144:11 158:15 159:14 170:17 171:4 176:3 196:14 204:16 216:22 217:1 218:13,25 222:19 223:7 226:3 268:7 271:4 272:21 296:23 302:2 322:17 339:12 349:3 363:23 375:20 377:2 383:22 386:9
**sirens** 66:21 67:2
**sit** 180:4 371:1
**sitting** 43:17 54:11 56:7 73:12 107:25 118:1 143:4 155:1 162:10 184:20 185:10 190:24 242:8 255:24 261:7 262:12 284:24 292:12 299:9 302:22 305:25 306:17 310:20 342:2 405:2 411:16
**situation** 27:24 49:13 53:18,24 57:1 79:22 118:3 128:7 153:21 184:19 199:7 202:1 225:1,24,25 229:8,19 298:16 336:4 378:20 381:10 390:4,13
**situations** 182:12 200:12 333:20 334:17 338:14 378:9
**skim** 344:6
**skimming** 344:22
**skinny** 115:19
**sliding** 281:1,9
**slip** 372:18 381:19
**slipped** 228:11
**slot** 105:4
**slow** 8:24 71:18 130:10 194:3,13 349:16
**slowly** 8:9
**slung** 366:1 380:14
**small** 103:4 115:20 352:8
**smaller** 89:13
**smiling** 374:21
**solo** 18:22 19:3,4,5,10 20:6 62:9 71:10 380:6,8 383:12,15
**someone's** 94:20 98:4 117:1 179:16 181:6 184:2 282:20 323:7
**something-something** 204:18
**sort** 23:13 112:6 127:20 167:10 170:16 187:16 207:1 208:9 211:22 214:7 350:22
**sorts** 160:19
**sound** 149:12,15 235:8 285:11 403:2
**sounds** 310:12
**spa-** 132:8
**space** 180:8 183:5 332:10,15
**spaces** 180:21
**speak** 6:12 8:9,24 35:13,16 50:20 51:8 55:12 60:8 76:3 83:2,8, 11,16 85:12 95:6 106:21 113:13 129:18 133:15 138:12 147:21 151:1 170:12 174:15, 18,20 176:23 177:17 185:1 189:25 199:2 205:20 221:5,10,13 238:16 250:7 254:10 255:22 259:6 264:4,14 265:2,5 283:23,25 335:20 340:23 402:19
**speaking** 49:24 51:13, 21 55:13 76:17 82:19 84:14 156:15 189:23 191:12 193:13 219:5,6, 8,11 222:1 225:3 264:11 269:21 294:22 361:15,19 373:22 374:1,13 375:2 385:14
**speaks** 60:9 203:1 226:12,16 227:3 316:3
**specific** 17:8 18:6 19:9 138:22 183:22 210:25
**specifically** 17:24 49:13 72:17 103:15 128:21 135:20 229:11, 12 337:7,9 379:12 410:21
**speculate** 10:16
**speculating** 220:25 221:2
**speculation** 26:4 81:22 172:22 201:12 202:10 203:1 209:4 221:24 222:8 234:2 235:6 237:4 239:21 240:1 260:15 261:6 407:13 410:4
**speech** 41:4 146:25 211:22 212:13
**spell** 6:5 16:23 258:5 296:12 402:23 406:8
**spelling** 257:4,20 258:2,8
**spellings** 296:14
**split** 161:11
**spoke** 75:22 83:17,18, 19 85:8,16 93:19 105:19 106:18 134:1,5, 7,19 139:3,4 158:16 165:15 170:19 174:11 175:9 176:6 177:2 192:2,4 195:2 228:24 249:10 254:8,12 261:15 265:4,6,7 273:15 283:6 285:18 321:17,24 322:5 395:11
**spoken** 175:18 192:16 300:12 308:19 309:3

402:19

**spontaneously** 406:5

**spot** 105:4

**spots** 384:22 385:9

**stained** 372:7

**stamp** 110:4 164:6 202:20 247:17 299:22 375:7

**stamped** 110:13 370:13

**stand** 190:7 192:10,11 236:24 275:3

**standard** 166:12,18

**standards** 298:22

**standing** 59:13 61:7,21 72:5 75:14 77:9,11 130:21 132:24 178:19, 24 197:11 236:23 237:6,10 350:21 351:2 357:4 361:18 362:3,6

**Stapp** 343:18,19 375:9

**start** 14:10 29:5,19 63:8 281:16 405:12

**started** 62:23 218:6 286:4 301:1 310:15 340:11 351:22 357:15 371:5 388:22

**starting** 310:3

**starts** 73:21 393:14

**state** 6:5 13:8 199:14 200:7 201:2 202:6,17, 20 206:24 208:24,25 226:19 231:16

**stated** 102:17 115:14 141:12 249:7

**statement** 35:12 37:24 134:9 136:13 137:3,18 139:9 140:1,22 141:8 142:1,11 144:25 145:10 147:17 165:22 166:14 174:14 204:17 237:25 238:8,10 249:11 253:15 254:2,3,17 263:1 265:9, 24 266:9,14,19 269:2, 11 270:4,6 271:3 273:13 274:23 277:13, 16 282:21 284:15,16 286:19 297:3 303:16,25 305:13,24 306:11 307:14 308:4 313:4 317:21 318:18 320:19 321:18 322:15,18,19,22 340:25 409:11

**statements** 121:3 136:15,20,25 142:25 146:5 147:22 167:16 169:18 170:4 176:6 266:3 268:23 270:7 271:20,24 280:22 283:13 285:7 301:11,17 318:16 321:18 335:12

**states** 46:4 59:3 67:2 123:19 140:17 175:5 206:3 226:25 227:13 242:7 270:15 344:11 353:23 360:21

**stating** 140:21 141:18

**station** 276:2

**stay** 106:4 329:18

**stayed** 247:15 355:24

**steal** 347:5

**step** 77:5

**steps** 197:5 211:20 215:22 232:23 233:1

**stipulated** 413:4,5

**stipulating** 413:13

**stipulation** 412:7,20, 24 413:9

**stolen** 347:4 382:22

**stood** 96:21 151:20 248:11

**stop** 240:4 253:17 256:21 268:2 296:24 330:1 365:22 366:10 367:18 369:5,13 371:1 379:21 380:12 388:14, 16 393:1

**stopped** 104:11 239:24 346:16 358:2 366:18 367:15,16

**stops** 31:2

**store** 35:3 38:6 47:24 49:15 60:7 69:8 71:6,7, 12,14,15,23 72:12 73:3 75:7,17,18,21 76:12 77:6 78:1 82:9 83:2,7 119:9 121:6 130:24 131:8 132:18 135:14,21 136:17,22 143:11 144:7,13 145:7,8 160:10 176:9 191:8 246:21 250:13 265:8 266:7 281:2 295:13 320:14 365:19 366:18 379:13 380:9 400:4

**Stories** 321:7

**story** 138:13 272:17 280:3 302:21 311:23

**straight** 349:7,16

**street** 5:10 295:12 314:24 367:7

**stress** 225:1

**strictly** 200:4

**strike** 147:11 165:3 366:4 411:15

**string** 260:19

**structure** 347:12,18 349:2

**structures** 46:5

**stuff** 20:20 21:7 146:7 194:11 213:12 239:3 255:5 315:8 358:12 364:18

**subject** 101:13

**submitted** 255:16

**subpoena** 78:11

**subpoenas** 78:13

**subsection** 45:25 48:23 56:13 101:5,25

**subsections** 42:17 49:4 52:23

**sufficient** 48:5 57:25

**Suite** 5:10

**summarize** 135:19 345:3 366:15

**summarizing** 136:4 189:22

**summary** 113:19 114:9,13 134:8 228:2,4 269:11 271:25 343:9 346:15

**summon** 101:12,18 194:6

**summoning** 193:20

**supervising** 17:6 33:7

**supervisor** 324:24 325:6,11 326:3 331:4 342:3

**supervisors** 298:3,9 353:7,10

**supported** 261:18 365:12

**supposed** 45:23 153:6

**supposedly** 242:2

**surmise** 112:24

**surveillance** 77:22 78:3 137:11

**suspect** 35:14 70:18 79:14 141:25 183:17 254:12 268:23 271:1,3 278:17 285:12 343:12, 20 345:4,8,10 346:19 347:1,17 350:10 351:9, 14,20,21,24 352:9,16 353:1 356:3 365:20,21 366:1,12 370:18,21 371:1,2,10,11,12 372:8 375:13 376:4,7,8 378:13 379:17 380:12, 14 381:14 382:11,23 383:4,5,8,19 384:25 386:11,16 388:3,11,12, 20,22 389:21

**suspect's** 345:6 352:3 354:15 366:8 388:18,25 389:1,25

**suspected** 356:12,16

**suspects** 142:7 300:23 341:22 385:18

**suspend** 243:24

**suspicion** 166:24

**sustain** 370:9

**sustained** 352:6 389:15,20 390:20

**SUV** 236:20,21,22 246:13

**sweat** 88:24,25

**sweater** 102:10

**sweats** 102:11

**sworn** 12:1,4,8 108:24 277:25

**symptoms** 181:3,5 182:1

**system** 26:2 73:6 110:7 111:2 113:8 123:10,17 313:25 314:8 360:24

## T

**T-R-A-N** 32:13

**tackle** 376:12 386:19

**tackled** 347:20,22 351:15 352:1,7,15,20 376:4 377:25 384:16

**tackles** 345:18

**tackling** 342:11 351:8 352:9

**takedowns** 342:11

**takes** 359:12 386:18

**taking** 8:4 13:11 16:3 53:13 65:12 79:8 94:20 149:4 154:21 164:19 169:13 192:6 227:10 253:15 254:3 272:12 303:15 313:24 314:2,9, 14 320:3,21 345:11,22 346:4 349:12 354:21 355:20 364:11 365:9 366:21 400:11

**Talamantes** 345:7 346:16 347:10 348:17 375:8

**talk** 79:14,15,16 80:7 100:11 106:4 125:25 128:10 138:2 141:12 171:5 175:7 182:14,24 188:9 189:2,15 194:9, 11 195:13 231:6 237:11 245:15 247:21 258:3 263:4,9 264:17 268:5 271:13 288:3,4 293:10 294:6 300:6 310:3 316:21 317:6 326:3 330:22 401:14

**talked** 76:23 151:9 152:2 159:23 165:8 178:13 191:20 197:13, 16 201:17 308:9 337:11 393:23 411:24

**talking** 49:12 71:25 78:21 87:3 91:12 117:21 118:15,16 119:19 127:7 129:15,24 130:22 131:1,3 135:7 138:8 148:25 155:11 159:19 165:4 168:14 191:7 193:22 194:4 201:23 224:2,5 225:2,4 230:4 246:19 251:5 257:16 260:4,7,9 263:14 280:10 287:21 288:10,21 290:3 291:22 292:11 296:25 302:9,16 315:7,9 330:21 341:10, 25 361:23 379:1,3,6,13 395:20 396:17 399:3 400:23 401:20 407:11 408:21

**talks** 295:7,13,14

**tall** 88:5,6,7 89:4 115:17 160:21 317:25 368:15

**tampering** 344:20 347:6

**tank** 11:15

**tape** 74:9 129:7 193:24 217:18 218:1,10 224:24 233:9 237:20 240:7 260:4 262:23 310:21 311:2 316:14,16 317:3 327:3 328:13 397:13 402:18,20 405:24 409:16

**tapes** 73:10

**Target** 388:3

**taser** 23:7 349:10

**tasered** 342:16 349:13

**tattoos** 214:3

**teach** 128:4

**teacher** 159:25

**teaches** 273:1,2

**techniques** 331:20

**telling** 80:23 81:1 135:20 136:8 146:13 150:23 154:3 161:8 165:20,21 167:13 170:11,16 193:22 194:3 201:5,9 216:8 244:19 248:1 251:11 267:1 269:23 270:17,25 272:9,10 275:13,23 277:10,12 280:2 282:17 283:2 286:16,21 287:24 293:14,23 296:21,24 302:21 303:1,5,14,17 304:9 305:6 311:22 312:20,25 317:2,3 319:3 320:3,6 321:2 322:8 327:3,17 328:2 378:15,18 379:20 389:5 393:14 394:21 399:8 400:17 405:6,9 408:2,3 409:21

**tells** 34:22 171:18 184:4

**Ten** 161:16

**tense** 371:4

**tensed** 388:20

**tensing** 366:6 371:8 388:16,17 389:6

**terminology** 66:20

**terms** 49:11 68:6 193:8 286:11 305:7,8 328:22 402:18

**terrorism** 242:4

**testified** 5:25 6:22,25 8:22 108:24 130:12,19 150:7 154:15 169:16 171:10 175:15 215:25 216:9,20 229:13 273:10 277:24 324:16 327:24

**testify** 30:8 130:17 143:5 221:25 226:14

**testifying** 7:8 8:6 86:8 132:2,5,6,7 199:4 240:13,24 241:11

**testimony** 7:10 8:11 47:19 99:18 175:21 198:17,19 206:18 217:7 219:4 229:17 238:23 240:15 241:14 253:19 260:17 275:2 277:25 286:1 380:22 396:5,12 397:3 412:14,17

**theft** 58:25 351:20 365:18,19 366:17 370:14 382:21,22 388:2,3 390:5,7

**theft-related** 343:4

**thefts** 30:2 31:6

**thighs** 98:4

**thing** 10:15 27:21 89:21 141:25 171:20 209:11 216:16 231:16 249:8 303:14 317:17 321:4 344:6

**things** 25:4 30:2 37:21 85:24 87:4 90:1 97:23 161:10 167:4 181:7 207:25 209:22 210:8 214:4,15 235:9 251:21, 22 253:1 269:23 275:8 281:16 339:5 376:22 394:11 400:20 409:22

**thinking** 362:18

**thought** 171:12 222:10 293:10 357:22 360:6 395:15

**three-12s** 29:9

**three-page** 255:24

**ticket** 41:18 43:15 149:20 161:7 177:21 291:16

**tight** 153:20,23 154:5 180:21 299:8 350:25

**tightened** 388:21

**time** 5:13 7:15 8:8 10:3 13:14 20:11 25:17 28:4 29:2,19 30:16 31:23 32:10,19 33:17 34:7,18 38:23 41:10,11 42:3 43:16 44:6,7 50:20 51:8 55:10,19,24 57:6,9,14 59:19 61:4,18 62:11 68:14 69:14 73:14 74:15 82:19 83:16 84:5, 10 85:8,21 86:4,5,10 90:12,13 91:10 95:6,19

100:15,24 104:11,16 105:20,22 106:8 107:25 110:4,15,16,19,22 111:12,14 112:8,23 113:12 116:19 119:6 120:13 121:7,25 124:15 128:14 129:16 133:22 134:11,14,16 135:13 138:11 147:11 155:9 158:7 161:20 164:4,6 169:1 181:22 182:7 185:8 187:15 188:17 189:18 191:4,25 193:1 194:21 195:21,25 196:10 197:9,10 199:2, 13 201:3 206:15 208:16 209:15 211:16 220:14, 15 221:12 224:24 232:12,24 233:20 234:11 238:18 240:13 247:17 248:9,16 249:12 251:14 257:8,16 260:4 261:2,4,7,22,24,25 262:11 263:15 267:14 272:19 273:9 277:7 282:20 288:10,21 290:12 291:9 292:19 299:22 306:4 310:2,9 311:21 314:10 316:9,11 317:11 318:10,17,19,20 319:4 320:13,14 322:14 328:25 329:1,22 333:3 336:19 339:2,14 340:16 341:9 342:5 353:16,19 372:11 377:9,12 379:10 386:21 391:16 398:24 399:9 400:18 402:9 403:18,20 405:1 414:6

**timely** 278:4 409:24

**times** 6:25 7:1,2 28:20 73:17 106:24 107:8,9 131:11 134:10 135:10, 21 139:20 140:11 141:4,16 145:12 152:6, 7 166:16 176:8 180:24 198:13,21 217:20 218:3,5 220:24 221:3, 22 250:13 252:10 269:13 271:22 275:6 285:20 296:13 308:22 312:4 313:23 322:13 326:21 327:16 339:4 357:12 401:9

**today** 22:15 23:6 26:11 33:17 43:17 107:25 130:6 143:5 169:9 240:25 255:24 306:1,17 307:18 310:20 323:22 325:5 342:2 387:11 392:16 394:17 396:22 397:3,4,15,18 408:23, 24 411:17 412:10

**told** 33:2,18,22 35:23 38:7,15 44:9,25 56:11 57:9,24 60:21 61:8 75:13 79:24 86:9 106:3 107:1,7 116:20 122:15 132:17 133:3 135:12,23 136:22 140:23 141:16 142:22 143:7,17 145:11 147:6,10 150:8,10 170:9 175:1,11 176:20 187:25 207:24 208:1 209:25 230:7 248:3,18, 22 249:4,5,14,20 251:19 263:12,20 266:1,23 269:6,13 271:22 273:18 278:12, 13 284:1,4 286:18 287:1,9 294:14 295:23 300:17 301:25 302:21 303:15 305:19 306:5 307:24 308:4 311:10,12 312:14 315:15 321:4,5 323:8,9 324:1,10,11,16, 19 325:2 326:2,4,6,13 342:2 362:21 365:7 366:10 369:20 387:2,4 388:14,16 394:10,24 395:10,19 396:8 397:2 399:2,6,19 408:9

**tone** 263:5,7,11,16 297:20

**tonight** 135:15

**tooken** 266:12

**tools** 352:4

**tooth** 346:2

**top** 19:14 31:19 42:12 45:24 49:5 52:18 97:25 132:22 148:22 149:9,11 352:2 383:10 411:22

**Torley** 386:14

**torso** 345:5

**torture** 242:3

**touch** 99:9

**touched** 99:5

**touching** 97:24 98:4,7, 23

**tourniquet** 23:8

**tracked** 343:12

**traffic** 25:2 32:22

**train** 74:22 215:6 279:5

**trained** 99:2 109:17 125:22 127:16,20 153:5 180:16 181:2,14 182:2 183:8 231:24 259:13 300:22 359:5 378:8,11 383:23

**trainee** 20:2 123:24

**training** 14:24 15:2,5, 16,20 16:11,21 17:5,15 18:2,3,5,7,11 19:18 20:5 32:12 41:24 49:10 58:16 74:18 125:14 127:24 128:4 183:22 184:1 187:19 207:2 209:17,21 210:5 212:9 214:19 225:18

**Tran** 32:13

**trans-** 25:2 67:1

**transcript** 8:19,21 412:9

**Transients** 31:5

**translate** 65:23

**transmit** 65:18

**Transparency** 405:16

**treat** 295:23

**treated** 372:24

**treating** 187:19

**treatment** 80:13 229:15

**trespass** 35:18 36:7 38:1,12 39:20 41:5,18 47:5,10,17 52:1,15,16 57:20 60:10,13 67:8 102:16 119:25 145:17 148:8 149:20 157:18,20 158:6,8 165:9 177:19, 21 252:22 253:3 279:5 334:20

**trespassed** 394:25

**trespasses** 40:5

**trespassing** 30:1 35:19 38:4 40:2 43:1 48:4,19 60:19,20 64:17 106:15 107:9 114:10 135:15 136:1,18,23 140:2,14 144:5,24 145:20 148:16 149:17 150:20 157:22 160:17, 20 164:23 166:17 252:11 265:11,25 287:3 300:19 309:12 317:9,17 335:3 394:25

**trial** 242:22

**trick** 50:2 51:15

**tricking** 50:3

**trouble** 340:17

**true** 38:13 39:4,15,21 43:3 44:20 53:11,12 57:4,25 58:3,4,9,20,23 59:1,16 64:1 65:1 66:23,24 67:3,22 68:9, 11,18 69:14 72:15,18 73:6,9,10 74:19,23 81:7,10,20 84:11,12 86:11,15,16 88:14,20, 25 89:1,22 90:5 91:19, 21,24,25 92:2,3,5,7,9 93:19 94:24 96:5,23 98:5 99:16 100:17,23 101:1 103:8,9,17,21 104:1,12 105:15 107:14 108:2,6 109:18,24 111:23 115:1,17,20 116:2,4,5 117:23 118:1 120:2,5,11,12,14,15,17 121:15,19 122:1,16,19 123:3 124:3,6,12,16 125:8,12 127:17,20 129:9,14,21 130:16,24 132:21 133:5,6,8,9,23, 24 134:5,14,15,18 135:17 136:1,13,16,21, 25 137:3,4,8,9,18 138:10,17 139:9,10,16, 23,24 140:1,2,22 141:1, 2,4,8 142:11,25 143:19, 20,24 144:7 146:14 147:4,13,22 150:1,10, 19 151:5 152:3,18,21

154:14,21,24 155:12 157:13,16,18 159:12 160:14 161:23 162:10, 13,14,17,18 163:7,18, 20 164:7,8,15,25 165:12,13 167:20 168:1,21 169:18 170:6, 8 172:11 174:3,14,15 176:24,25 177:3,10,11, 21 178:24 179:11 182:6 184:2 190:18,19 192:18 196:17 197:6 198:9 208:25 209:2 211:10 217:9 229:2 233:4 234:13,17 238:9,15 240:13,17 241:12 245:15 246:6 250:2,4,8, 13 251:19 252:5,23 253:5,10,15 254:3,7,13, 17,21 255:17,18,20,21 256:2,5,8,12,15 257:23 259:17 262:14 265:3,5, 6,8,12,14,16,22,23,24 266:3,14 267:25 268:1, 3,20,24 269:18 270:19, 20 272:13,17 273:4 274:23,24 275:4,5,7 277:11,14 278:4,10 280:22 283:7 284:2 285:23 286:17,25 287:11 299:25 300:3 303:16 305:9,25 306:7, 9,18,19 307:25 308:4,7 309:5 311:19 312:9,10 313:10 318:16 319:4,10 320:5,7 321:19 322:18, 23 323:7 325:15 326:3 333:7,8 335:23 337:17 341:2,6 345:13,20 355:8 360:22 362:23 364:25 367:14 368:22 376:5 377:7,8,11,25 378:13,21 379:17,18 380:7 383:15 386:16,22 389:21 390:17,21,22 395:1,21 396:4 402:24 403:9 405:14,25 409:12,13,19,24

**trust** 155:13 177:14,16

**trusted** 341:9

**truth** 8:20 165:21 167:13 170:11 267:1 275:23 283:3 286:16,21 322:9 412:10

**truthfulness** 170:4

**Tue** 256:10

**Tuesday** 5:2 187:2

**turn** 26:6,9 27:4,15 72:7,11,21,24 73:24 74:3,6,7,13 89:25 104:14 108:10 163:4 371:11 372:9,21 397:23

**turned** 73:8,11 74:16 75:1,6,11 104:20,21 107:20,22 108:5 109:2 133:14 162:17,24 163:17 281:14,15 310:17 330:2 351:21 361:19 366:2 371:10 397:12,17,19 398:13,19

**turning** 108:20 278:3 284:22 310:10

**turns** 162:9

**twist** 376:25

**two-minute** 303:7

**type** 33:4 53:19 87:16 116:6 117:9 148:1 160:25 378:20 390:23

**U**

**Uh-huh** 7:20 12:25 17:2,19 18:8,15 19:6,16 28:25 29:16,18 31:4,7, 25 32:7 33:15 34:5 37:16 38:9 44:8 47:23 48:1 57:12,15,21 61:14, 16 62:22 63:3,7 72:1 77:2,8 82:15 86:22 87:22 89:17 93:23 94:22 101:20 102:8 105:14 106:25 111:4 113:4,7 115:5,22 116:10 118:23,25 123:12,15 124:22 125:1 126:3 131:9,12 138:3 139:18 142:16,18,20 146:1 147:7 151:12,15 157:5 158:25 160:11 182:17 189:14 192:22 193:2,10 194:5 195:1,6, 8,15,18 197:15,21,23, 25 199:9,11 201:15 210:2,4 211:15 220:21 231:18 236:8 238:21,24 257:12 269:17 273:17 274:12,15,18 281:18 282:22,25 285:3 289:6 294:10,12 295:19 297:4 298:18 299:1 300:1 308:5,8,11,14 311:14 312:6 314:4 317:13 319:15 329:21,23 330:1 335:16 339:10 340:12, 19,21 347:14,21,23 348:10,12,14,16,18 356:6,8,24 357:1,3,10 362:5,10,13,16,20 363:11,15 369:1,4,6,17 372:12,16,19 381:23 384:3,5,7 385:8,25 386:2 400:9 402:15 411:21

**unable** 108:11 181:25 200:22

**unarmed** 368:7

**unbiased** 273:3 319:24 320:25 321:3 322:24

**uncomfortable** 99:4 225:12

**uncon-** 152:25

**unconscious** 200:21

**uncooperative** 65:21

**uncuff** 339:11

**undecided** 13:17

**underneath** 102:10 348:23

**understand** 7:13 8:1, 16 10:23 12:23 34:15 35:17 46:21 54:14 58:22 59:25 66:5 84:22 121:12 131:18 136:19 174:5 194:15 214:9 218:17 219:10 248:17 249:19 253:7,22 258:4, 14 270:6 283:19 307:4 339:13 349:3 358:7 374:25 375:4,20 376:13 382:4 383:22 399:17 404:12 408:1

**understanding** 27:14 30:25 35:24 48:10 49:10 52:15 60:1 106:7 108:8 138:19 191:2 218:8,11 222:3 301:7, 10 302:4 410:1

**understood** 67:6 90:17 97:17 113:11 135:5,8 151:18 169:15 171:16 243:3 249:13 258:23 316:25 318:3 322:16 355:11,25 386:9 401:7 409:8

**undertaken** 101:17

**undetermined** 13:16

**unhappy** 177:16 323:21,22 324:23

**uniform** 22:14,20,23,24 88:11 89:11 295:20 352:5,12 360:1

**uniformed** 368:17,21

**Unintelligible** 227:18 279:15 338:9

**unit** 67:18 123:20

**United** 242:7

**units** 355:9 371:22 385:6,7,9

**unknown** 352:6 363:7

**unlawful** 173:14

**unloading** 14:7

**unprofessional** 260:5

**Unruh** 40:13

**unruly** 158:8,17 159:23

**unsafe** 184:18

**unsigned** 413:2,14

**uploaded** 314:17

**upper** 343:17

**UPS** 14:2,6

**upset** 80:10 91:18 117:3,4 118:1 119:8 127:18 177:15 178:8 196:3 216:9 323:15 376:15,17

**upstairs** 337:10

**use-of-force** 33:4 297:24 299:17 342:4,7, 21 350:24 358:18 373:20 374:2,18,25

390:24 391:11 411:3
**user** 334:5
**utilized** 333:5

**V**

**Vague** 20:25 26:3 227:17 279:14 337:25
**Valencia** 347:9 348:15 388:4,10,18,24,25
**valuable** 264:8
**VAR** 25:24 26:21,22
**vehemently** 221:21
**vehicle** 162:21 235:20 239:1 247:2 269:20 270:12 281:13 301:24 344:21 346:16,17 347:4,6 351:21 357:7 359:4 362:2,7,12 382:22
**verbal** 108:22 209:22 410:10
**verbalize** 408:14
**verbalized** 230:17
**verbally** 108:20,25 117:7 208:1 228:22 229:14 263:16 278:13 324:14 409:18
**verification** 142:12 147:25 163:15 322:6
**verified** 133:4 144:25 145:2 167:25 249:11 306:18
**verify** 107:10 115:4 137:6,7 143:11,14 146:10 161:2 165:20 168:5 174:23 175:3 249:14 253:9 265:9 275:15 276:14 312:9 321:17
**verifying** 170:4 277:2
**version** 145:23
**versus** 6:9
**vest** 88:14
**vibe** 260:2
**victim** 352:7
**Vidal** 354:14 359:22,23, 25 360:23 377:4 379:4, 7
**Vidal's** 360:8
**video** 10:12 25:8 65:12 70:21,22,23 73:9 77:22 78:3,8,9,11,17 79:8 84:5 104:19 117:22 118:8,16 125:6 129:1,7, 12 133:4 137:11,13 160:1,3,4,5 161:17,21 162:5,8,9,17,25 163:16 164:13,17 195:11,22 197:20 198:3 216:17 217:8,10,14,16 219:21, 25 221:16 222:12 223:21 224:12,16 225:7 226:6,12,15,16 227:3 228:1 230:3,12,22 231:10 232:18 233:7,17 234:6,15,18,20 236:2, 10 237:22 238:11 241:22 242:24 244:3, 10,13,16 245:12,25 246:9 247:7,23 250:12 251:3 255:5 256:18,24 257:20 260:16,25 261:18,19 262:7 264:1 265:20 267:3 268:2 272:6 275:11 279:25 280:11 282:11 283:8 284:19 287:4,19 288:8, 23 289:24 290:9,13 291:4,13 292:8,21 293:7 296:19 299:19 300:8 302:12 303:10 304:3,23 305:4,21 309:18 310:14 335:8,22 336:9,11 340:10,23 387:16 397:12,19 398:13 400:22 407:22 409:12
**videos** 77:14
**videotape** 128:23 318:2
**view** 118:16
**viewing** 110:1
**violating** 43:14 169:3
**violation** 44:10 45:14 47:17 49:17 61:2,9,22 74:4 92:21,25 145:17 148:8 164:23 166:17 169:14 253:10 278:6,18 287:2
**violations** 42:14 160:20
**violence** 103:8,11,16
**violent** 103:9 154:17 159:8 246:1,6 273:8
**violently** 223:13
**visible** 212:6
**visibly** 234:10
**visitors** 208:12
**vocalize** 325:22
**voice** 78:24 224:5 233:19,20 234:12 235:1 236:17 237:14,15 238:8,13 245:1,3,8 247:9,10,18 256:22 257:2 261:2,13 284:22 297:20 327:8
**voices** 237:21
**voicing** 215:17,19

**W**

**waist** 23:18,24 97:23 98:4
**waistband** 94:13 98:20,22,23 102:12
**wait** 99:13 100:7 103:25 276:8 368:12 378:12,18
**waited** 379:16 381:13
**waiting** 96:21 383:15 385:23
**waives** 44:3 302:15
**walk** 91:10
**walked** 71:6,8 72:2 79:2 133:12,13 247:14 251:10 306:10 308:15 330:7 351:22
**walkie-talkie** 23:12 24:21
**walking** 71:17,18 87:2, 7 243:10,12,18,20,22 357:15 362:14 366:2 371:7 377:21 380:15
**wall** 371:10,12,13,18,21 372:6,20,22,23 381:22, 24 383:2,6,7 384:13
**wallet** 94:23 95:17 404:18
**wanted** 40:8 86:18 125:11 135:14 141:12 171:20 220:8 288:3 306:9 308:13 350:7 363:16
**warned** 145:11 169:10
**warning** 169:6,11,21 308:25 309:1,6,10
**warnings** 309:13
**warrantless** 166:8
**wars** 242:4
**watch** 112:17 185:11, 13 195:22 197:2 242:23 378:5
**watched** 77:22 125:6 129:1 150:18 161:17 162:6 195:12 224:24 246:5 394:13,16,17
**watching** 218:9 219:21 225:10 236:17 243:2
**waves** 235:8
**ways** 130:21 178:14 180:1
**weapon** 67:5 68:21 69:6 98:5 101:23 102:4, 19,22,23,25 103:24 384:10
**weapons** 65:13 66:25 67:3,4 68:20 69:1,3 88:13 94:12 98:21 102:17,21 157:12,14 368:21 369:7,8,9
**wear** 65:10 70:7 198:15,22 200:11 203:14 208:13
**wearing** 22:14,19 65:11 69:11 70:16,19, 24 88:24 98:11 102:9 125:10 180:10 199:16 200:15,17,20 204:8

206:9 211:3 213:12 220:5 361:16

**week** 29:7 131:13 132:19 134:10 135:10, 22

**weeks** 73:16

**weigh** 334:10

**weight** 115:19 343:17

**well-being** 11:16,17

**welt/swollen** 345:8

**West** 5:10 14:1,5

**whatnot** 6:25

**whatsoever** 190:14

**wheelchair** 211:21

**whichever** 52:4

**Whoever's** 112:15

**window** 232:20,23 233:6,11,25 234:13 235:2 236:6 237:13,15 238:4,7,14,18 244:23, 24,25 245:7 246:12,18 247:5 248:11 251:9 262:2 281:17 315:13 357:5 362:6,8 383:25 404:15

**window's** 235:3 238:11

**windows** 183:2 234:25 235:12,23,25 236:10 237:25 261:3 281:23

**windshield** 246:13 280:25

**wished** 145:7

**woman** 88:5,18 89:7 96:14 120:13 160:22 169:2 242:11 260:10 265:11 273:6 275:23 276:14 366:18

**wonderful** 8:3 216:15 374:21

**wondering** 292:24

**wood** 53:3,6

**word** 8:5 117:18 120:1 142:17 190:17 217:21 226:22 227:15 228:3 230:8 240:8 252:5 274:25 318:21 319:4 320:5,7 321:3 323:7

**word-for-word** 226:21 228:4 293:18

**worded** 275:9

**wording** 275:1

**words** 39:1 59:25 60:23 68:5 69:7 75:4 117:8,9, 10,12,14 121:13 132:10 137:2 141:7,20 143:2 151:2 163:14 173:7 179:9 190:9 210:22 219:3 222:21 285:16,18 299:5 316:2,13 336:13 339:12 346:22 364:23 381:4 385:10 402:19 404:25 409:9

**work** 13:24 17:23 19:2 26:2 29:8,9,12 161:9 210:7,8,10,19 257:24 259:18 318:17 368:18 369:13

**worked** 21:21,24 174:17 285:20

**workers** 207:17

**working** 11:1,6,24 12:18 13:21 14:5,8 18:21,23 19:10,13 25:5 28:3 29:1 32:4,20 42:2 59:20 62:6,9 71:10 113:2 189:24 277:11 360:1

**workout** 130:5

**works** 17:14

**worry** 131:22

**Wow** 55:8 205:6

**wrap** 276:15

**wrapped** 351:25 388:22

**wrapping** 345:4

**wrists** 332:1

**writ** 140:8

**write** 109:8,18 113:15 140:8 141:10 146:9 149:20 156:21 189:5 190:4 268:8,19,23 274:10

**writing** 113:23 134:12, 22 188:6 189:22 190:1, 11,21 193:9,14 278:8

**written** 109:24 110:5, 23 111:22 112:24 250:1,5 410:18

**wrong** 44:10 45:14 57:8,10 278:8,9,14 279:2,17

**wrongdoing** 379:25

**wrote** 107:13 111:3,6 112:23,25 113:5,24 132:14 133:17 135:16 144:2 148:11 188:4 256:15 268:7 269:1,5,9, 15,18 270:7 272:2 277:17 278:14 344:1

**wrotten** 112:25

**Y**

**ya** 249:1

**year** 14:9 16:19,20 18:5 28:7 45:3 354:7 388:8 393:3 396:7

**years** 6:18 11:7,9,10 14:9 15:9,11 32:15 42:3 180:23,24 240:9 344:20

**yelling** 75:15 126:25 133:13 135:11 235:19 238:25 239:11,14,17, 18,24 240:4,5 241:19 316:10 371:6 399:7,16 400:8,10

**yellow** 338:3

**yes-or-no** 321:12