# EXHIBIT Q

# Deposition Transcript

Case Number: 2:23-cv-01788 FMO-AGR
Date: October 19, 2023

In the matter of:

# BURMAYAN v CVS PHARMACY, INC., et al.

## JOE JOHNSON

CERTIFIED COPY

Reported by:
Christina Bustamante
CSR No. 5529

Steno
Official Reporters

315 W 9th St.
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: FIRM #108F

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANOUSH BURMAYAN,<br><br>Plaintiff,<br><br>vs.<br><br>CVS PHARMACY, INC., a corporation doing business in California, GUY GARCIA, an individual, JOE JOHNSON, an individual; CITY OF GLENDALE, Officer JAMES ROSS #22471, individually and as a peace officer, Officer GRIFFIN ARMENDARIZ #27999, individually and as a peace officer, and DOES 1-10,<br><br>Defendants. | Case No. 2:23-cv-01788 FMO-AGR |

Deposition of JOE JOHNSON, taken on behalf of Plaintiff, Anoush Burmayan, at 622 N. Central Avenue, 17th Floor, Glendale, California, commencing at 9:10 a.m., Thursday, October 19, 2023, before CHRISTINA BUSTAMANTE, a Certified Shorthand Reporter, No. 5529, pursuant to Notice.

-oOo-

APPEARANCES OF COUNSEL:

For the Plaintiff:

MKRTCHYAN LAW
BY: NARINE MKRTCHYAN
Attorney at Law
P.O. BOX 2288
Toluca Lake, California 91610
(818) 388-7022

For the Defendants CVS and Guy Garcia and Joe Johnson:

PAYNE & FEARS LLP
BY: LEILANI E. JONES
Attorney at Law
4 Park Plaza
Suite 1100
Irvine, California 92614
(949) 797-1217

For the Defendant City of Glendale:

CITY OF GLENDALE CITY ATTORNEY'S OFFICE
BY: CARL ARIAS
Principal Assistant City Attorney
613 East Broadway
Suite 220
Glendale, California 91206
(818) 548-2080

I N D E X

| WITNESS | | EXAMINATION |
|---|---|---|
| JOE JOHNSON | | |
| | BY MS. MKRTCHYAN | 5 |
| | BY MS. JONES | 285 |
| | BY MR. ARIAS | 289 |
| | BY MS. MKRTCHYAN | 289 |

NO EXHIBITS OFFERED

NO INFORMATION REQUESTED

GLENDALE, CALIFORNIA, THURSDAY, OCTOBER 19, 2023
AT 9:10 A.M.

--oOo--

THE COURT REPORTER: We are now on the record, and the time is 9:10 a.m. in the matter of Anoush Burmayan Versus CVS, et al.
Would Counsel please state your appearances for the record.
MS. MKRTCHYAN: Narine Mkrtchyan on behalf of Plaintiff.
MS. JONES: Leilani Jones on behalf of the CVS entity defendant and Joe Johnson and Guy Garcia.
MR. ARIAS: Carl Arias on behalf of the Defendants City of Glendale and Officer James Ross and Griffin Armendariz.
THE COURT REPORTER: Thank you, Counsel.
Mr. Johnson, would you please raise your right hand to be sworn.
Do you solemnly swear that the testimony you're

about to give in this deposition shall be the truth, the whole truth and nothing but the truth, so help you God?

THE WITNESS: Yes.

JOE JOHNSON,

the witness herein, called by the Plaintiff, Anoush Burmayan, having been first duly placed under oath, was examined and testified as follows:

THE COURT REPORTER: Thank you.

EXAMINATION

BY MS. MKRTCHYAN:

Q Okay. Good morning, sir.

A Good morning.

Q Please state your name for the record and spell it.

A Joe, J-o-e, Johnson, J-o-h-n-s-o-n.

Q Okay. Joe, I -- you're here as a defendant. I'm sure that your counsel has explained to you all of the rules for depositions. You're testifying under oath.

Do you understand?

A Yes.

Q There are penalties of perjury for any testimony that is not truthful.

Do you understand?

A Yes.

Q Okay. And have you ever been known by any other names?

A No.

Q Has your deposition ever been taken?

A Yes.

Q How long?

A Maybe 25 years ago --

Q In connection?

A -- for a Worker's Comp.

Q Okay. So one of the rules of the engagement, I'd like to remind you, which, of course, is hard to follow, but because we have a court reporter, she needs to take verbatim everything you say and everything I say, everything your attorney says. We have to pause, we have to give each other opportunity to finish and then answer.

We need also audible responses. Even though in a conversation, it's okay for you to nod your head or say, you know, inaudible responses would work in a regular conversation, but in this situation we will ask that you answer audibly.

A That's fine.

Q Do you understand?

A That's fine.

Q Okay. So that -- you had a Worker's Comp case claim?
A Correct.
Q And that was about 25 years ago?
A Correct.
Q Okay. And in that case your deposition was taken.
Did you understand like -- strike that.
Were you testifying in court or at a --
A Just like this.
Q Just like this. Okay.
So do you remember the ground rules, or do you want me to kind of --
A You can go over them, if you want.
Q Okay. The basic ground rules, you know, if I ask you a question, you understand it. If you don't understand it, you have to ask for clarification, but if you provide an answer to any question that I have, it's presumed you understood the question unless you ask for clarification.
Do you understand?
A Yes.
Q We will ask you to provide estimates. We will ask you to give your best testimony about dates and times, distances. You don't have to provide exact numbers, but

we'll just ask you to estimate, not speculate, not assume things.

A Okay.

Q Do you understand?

A Yes.

Q How long have you been working for the CVS?

A A little over six years.

Q When was the date of hire for you?

A August 31st, 2017.

Q Okay. Prior to that, did you hold any other job?

A Yes.

Q And where did you work immediately before the CVS?

A Walmart.

Q Were you working there as a Sales Associate or as a Manager?

A As a Manager.

Q At Walmart was there any section that you worked at?

A No. I was at the same position that I am at CVS, which is Operations Manager.

Q How long did you work for Walmart?

A Two years.

Q And what brought you to CVS? Why did you shift from Walmart to CVS?

A Just the driving distance, too far from home.
Q Where do you live?
A I live in L.A.
Q Okay. Prior to Walmart, what was the longest job you held?
A The longest, Radio Shack,
Q Oh, you worked for Radio Shack?
A I did.
Q What years?
A As a Store Manager.
I started in 1990, and I stopped in 2000.
Q Oh, wow. Okay.
So which -- because I worked at Radio Shack from 1997 through 2001; so we must have crossed some paths.
A Maybe.
Q Interesting. Okay.
Which store were you a Manager?
A I was right here in, I guess, it's L.A. on Hyperion and Silver Lake. I was the Store Manager there and USC.
Q Yes.
And how long were you there?
A About two years.
Q The whole time?
A About ten years total.

Q Got you.
You were in the same district with me. The same district -- Bob Randolph was the Manager --
A I worked for Bob. I worked for Charlie May.
Q Charlie May. There you go.
So we found a ground there, yes, at Radio Shack. Unfortunately, it closed.
A Yes.
Q It was very sad --
A Yeah.
Q -- that was -- for me, before I became a lawyer, that was my profession.
A Okay.
Q Yeah. Very nice.
So you must have then left Radio Shack when it closed?
A Correct.
Q Very good.
And prior to Radio Shack, what was the -- like the job that you held?
A It's always been retail.
Q Retail.
A It's always been.
Q Okay. So you have a lot of experience in the retail business?

A Correct.
Q Very good.
So -- and I assume you have no prior arrests or convictions?
A No.
Q Is that accurate?
A That's accurate.
Q So prior lawsuits, aside from Workers Comp claim, nothing else?
A No.
Q You've never been a party to any other lawsuit?
A No.
Q The Worker's Comp case, was it -- was it like an injury you sustained at the workplace?
A Correct.
Q Okay. Which company was that?
A Ralphs.
Q Ralphs?
A Yeah.
Q Okay. And so what is -- do you have any like, you know, educational background aside from high school? Did you attend any college?
A Only one year of college at L.A. Southwest.
Q Okay. And so your career basically has been in retail?

A Correct.
Q When you started working at CVS in August of 2017, they did some training for you, right? You received some training, basic training?
A What do you mean "training"?
Q Like training?
A Like modules?
Q Yes.
A Yes.
Q So what are the company goals, et cetera?
A Correct.
Q So you went through some training.
A Correct.
Q Was it in-store training or office level?
A In-store.
Q In-store.
And how often do you get those training sessions?
A When you first get hired, there is maybe 30 or 40 that you need to do, and then you get them so often like maybe once a month, two or three, once a month. I don't know.
Q And all of them -- I'm sorry. Finish.
A It's all right.
Q And all of them are in-store?
A Yes.

Q Okay. And do you -- like is there someone like a Manager who goes through the training, or is it like computer online?
A It's computer-based.
Q Computer-based.
What was your first assignment at CVS when you started working?
A Position?
Q Yes.
A Shift Supervisor.
Q Okay. Shift Supervisor.
Okay. For you, what location were you assigned the first time?
A Hollywood.
Q Hollywood.
A Yeah.
Q How long were you working in Hollywood?
A Eight months.
Q Okay. And during that period as a Supervisor, was that like a Manager position, or was it like a lower position?
A Lower than a Manager, but it's still in charge but lower than a Manager.
Q Gotcha. So the ranking -- let me understand the ranking at CVS. So you have a Store Manager?

A Correct.
Q Then you have Shift Manager?
A Operations Manager, which is me, and then you go to Shift Supervisor, and then Cashiers.
Q Cashiers.
So there is two levels?
A There is three levels.
Q Three levels?
A Yeah.
Q So there is --
A Store Manager, Operations Manager, Supervisor.
Q Okay. And then -- so now you are an Operations Manager?
A I am, yes.
Q Who is the Store Manager now?
A His name is Jack.
Q Jack?
A Yeah.
Q What is his full name?
A I don't -- I can't pronounce his last name.
Q Okay. It's okay.
A But I'm sure we can get it for you.
Q At the time of 2021, January of 2021, who was the Store Manager?
A Jack was.

Q Jack.
Okay. And who was the Operations Manager?
A I was -- well, there is four of us.
Q Okay.
A There is myself, there is Adrienne, there was Edith, who is not there anymore, and I forget who the other one was, but there was four.
Q So there were four Operations Managers?
A Correct.
Q Why is there four Operations Managers?
A It's based on volume, store volume.
Q And you work at different hours?
A Sometimes the same hours, sometimes different.
Q Gotcha.
A It just depends.
Q Okay. And so then -- and then there is Shift Supervisor?
A Yes.
Q And Shift Supervisor at the time in January of 2021, who it was? Who was it?
A There is like four.
Q Again four?
A Yeah.
Q And one of them was Guy Garcia?
A One of them, yes.

Q Who were the other three; if you recall?
A That was a long time ago. Timothy Riddle. Guy was one. I can't remember the rest of them.
Q Okay.
A Yeah.
Q Who was at the time Hakop Gevdzhyan?
A That's Jack.
Q Okay. So you call him by the American name?
A Yeah.
Q Hakop. That's the Armenian way. Gotcha.
A Yeah.
Q I see.
And in Hollywood when you were there, you were Shift Supervisor, right?
A Yes.
Q Then you got promoted?
A Yes.
Q When did you get promoted?
A 2020.
Q That was the year of the COVID?
A Yes.
Q Before COVID hit or after?
A It was before COVID hit.
Q Okay. And so then you were promoted.
How did it happen that you moved from Hollywood

to Glendale?
A I moved from Hollywood to Glendale, I was still the Shift Supervisor. I got promoted to this position there.
Q Okay. So when did you move to Glendale from Hollywood?
A Eight months later, from August whatever eight months is.
Q So you've been in Glendale from 2020 -- how long have you been in Glendale at that store, 3943 San Fernando?
A Since 2018.
Q Okay. So basically as you worked at CVS, the only two locations have been Hollywood and Glendale?
A Only two, only two.
Q Do you prefer Glendale over Hollywood?
A Well, I don't like the traffic in Hollywood so yes.
Q Yes, of course.
And Hollywood has -- did you have any problems that forced you to call the police in Hollywood?
A Of course, yes, yes.
Q Okay. So Hollywood overall would you say crime rate was higher that you were experiencing working at the store?

A It's roughly the same.
Q Okay.
A It's roughly the same.
Q Okay. And this was Hollywood -- where was it located?
A On Sycamore and Hollywood Boulevard.
Q Okay. And so when you came to Glendale as a Shift Supervisor, you were there for two years until 2020 you became Operations Manager?
A Yes.
Q And then your next level is Store Manager?
A Yes.
Q Okay. What kind of issues did you have in Hollywood that you called the police ever personally?
A Mostly shoplifting issues, mostly.
Q Okay. And in retail most of the issues that we have, you had is shoplifting, right?
A Yes.
Q Okay. And over the years, though, when you look back, did calls for police change in any shape or form? Like is there any other -- aside from shoplifting, did you call the police for any other reasons?
A I don't know what that means.
Q Well, it's good that you're asking for clarification.

At Hollywood, let's say, how many times do you remember in that period, eight months or nine months you said you were at Hollywood, how many times you or your store called the police?

A That was 2018. I can't answer that. I don't know.

Q Approximately give me an estimate. I'm not holding you to exact numbers, but, as I said, we need some estimates, please.

A At least ten.

Q Okay.

A Yeah, at least ten times.

Q And was it by you personally calling, or was it --

A No, I wasn't -- I was only a Shift Supervisor; so that would be a Manager that would have done that or made the okay for that.

Q Okay. So about ten times?

A Yeah.

Q Okay. And did you receive any particular training about how you need to -- what kind of issues you can call the police for?

A I don't know what you mean. "Any particular training," like in the modules?

Q Yeah.

A I can't recall any particular training on that.
Q Okay.
A It would just be a judgment of how you feel if you feel safe.
Q Okay.
A It's a safety issue so ...
Q A safety issue?
A Yeah.
Q But shoplifting, for example, is not a safety issue, per se, right --
A It could be.
Q -- is it?
A It could be.
Q Have there been situations where you had shoplifting with violence together?
A Yes.
Q Okay. So you obviously have to use common sense in making police calls, right?
A Yes.
Q Okay. And in those ten times or you said approximately ten times, was there any other reason than shoplifting that you called the police for?
A In the ten -- at Hollywood?
Q Uh-huh.
A I don't remember it. If it happened, I don't

remember it.
Q Okay. Was there any other, like, for example, disturbance or trespassing at a location that you called the police for?
A Are you considering trespassing shoplifting?
Q No, no, no.
A Oh.
Q I'm sorry. So let's clarify this.
Do you consider trespassing and shoplifting the same?
A No. I thought you did. No, no. That's why I asked you. I thought you did. No.
Q Right, no.
So shoplifting is different for us, right?
A Yes.
Q It's theft?
A Yeah.
Q And a lot of times did you also have loss prevention at the CVS store, per se, or is it only just you?
A There's a security guard. There is no loss prevention. We had loss prevention last year, but they took that away.
Q I see.
A Yeah.

Q I see.
So basically there is really no loss prevention?
A Right.
Q But there is a security guard?
A Yes.
Q Was there a security guard at Glendale?
A Yes.
Q Throughout the period that you worked there?
A Yes.
Q Okay. So let's look at Glendale at 3943 San Fernando.
From the period of time you worked there in 2020, do you remember the year you went to -- I mean, the month in 2020 you went to Glendale; if you recall?
A In the summer, around -- in the summertime.
Q After COVID hit?
A I was there before COVID hit.
Q So then I'm asking you when did you move to Glendale. If it was before COVID, then would it be January/February sometime?
A COVID hit in 2020. I was there in 2018.
Q Oh, I see. Oh, I'm sorry.
You were there in 2018?
A Yeah.
Q You got promoted in --

A Yeah.
Q Right. I'm sorry. This is good -- you just clarify because we need to have the record --
A That's fine.
Q So 2018.
So summer you moved to Glendale?
A Yeah.
Q Throughout the period until today, how many times have you called the police?
A At Glendale?
Q Yes.
A A lot of times. I mean, I don't know -- do you want a number?
Q Approximately, yes.
A 30 times.
Q 30 times. Okay.
Is there any guidance that you have in the store about calling the police?
A No.
Q So CVS does not provide you any policy and procedure?
A You call the police if you don't feel safe in any situation.
Q Mr. Johnson, let me just -- let's make -- because I need to finish my question.

A Okay.
Q I mean, I understand you want to -- I appreciate your cooperation on giving me answers, but I need to finish my question for the record.
So about 30 times. Basically that's just given to you, your judgment, discretion, common sense about calling the police?
A Yes.
Q Okay. And about 30 times that you called the police, were there -- give me like a percentage, rough percentage, how many of those were for shoplifting, how many of those were other reasons?
A I mean, I can't really answer that. It's mostly of -- most of our issues are shoplifting issues that the police are contacted for. Maybe like 80 percent of them are shoplifting issues.
Q Right, right. That's retail.
Like the 20 percent, what are some of the issues you can tell me you called the police for?
A Just disturbances, people coming in, being obnoxious. We ask them to leave, and they don't leave. Something like that.
Q Okay. Are you trained -- is there any policy at the CVS company that you've been trained on about banning customers from CVS Pharmacy and for what reasons you can

ban someone?
A Well, we are a private company, and we were told that we don't have to -- we can ban anyone we want from our company if we don't -- if we don't want them there, they don't have to be there.
Q So basically you are told by the company that you can refuse service to anyone?
A Of course.
Q Okay. But is there any written policy that you can point to that says that with respect to that issue, that, yes, you can ban just about anyone that you want?
A Written policy?
Q Yes.
A I haven't seen a written one, no.
Q Okay. All right. So during this period, I just want to go back to your training and experience. Did you also supervise other employees?
A Yes.
Q So as a Shift Supervisor, do you supervise others?
A Cashiers.
Q Cashiers?
A Yes.
Q When you become Operations Manager, you supervise all of the Shift Supervisors?

A And everyone also except the Store Manager.
Q So it's a chain of command kind of situation?
A Correct.
Q So in 2021, you were already, as you said, Operations Manager.
A Yes.
Q And you were supervising the Shift Supervisors?
A Yes.
Q And everyone else, Cashiers --
A Yes.
Q Okay. And when the Store Manager is not there, you make the decisions?
A Yes.
Q Okay. And Guy Garcia was under your supervision back in January 2021?
A Yes.
Q Okay. And you worked nightshift, right?
A Yes.
Q The nightshift -- what are the hours for the nightshift?
A You mean the hours of work?
Q Yes.
A From midnight to 8:30.
Q 8:30 in the morning?
A Uh-huh.

Q And during that period of time, did you have a Store Manager present too?
A No.
Q Okay. So I didn't go over another issue.
In preparation for your deposition, did you review any records? Before we -- you know, this deposition, did you review anything?
A No.
Q Aside from talking with your lawyer, I assume?
A No.
Q Nothing?
A No.
Q Okay. Did you review any video surveillance recordings?
A No.
Q Were you ever interviewed prior to this lawsuit -- well, first of all -- strike that.
When did you learn of this lawsuit, Mr. Johnson?
A When I got served.
Q Okay. And did you read the complaint?
A Not really.
Q What did you do with the lawsuit?
A I put it in my box. It's at work.
Q Okay. And so -- but you were not curious to know why you were being sued? Didn't you read the complaint to

find out?
A I mean, I had a rough idea what it was about; so I didn't find the need to read all of it --
Q Okay.
A -- and I didn't.
Q Okay. And then after the lawsuit was filed, did you have any communications with -- other than your lawyers --
A No.
Q -- I don't want to know.
Did you speak with Guy Garcia?
A No, no.
Q You worked together --
A We worked together until right now we still work together.
Q Right. I understand.
A Yeah.
Q So please let me finish my question because you're going above me, and I appreciate this is going to go fast, but I want you to let me finish my question.
Did you speak with anyone else in the store about this lawsuit?
A No. Though the store does know, but it wasn't me.
Q Okay.

A Yeah.
Q So Guy Garcia, you, or anyone else, the Store Manager, Operations Manager, you never discussed this lawsuit together?
A No.
Q Okay. Prior to the lawsuit being filed, did you have conversations with Guy Garcia about this incident?
A Actually, no, not really.
Q So from the time that -- in January of 2021 we have two dates of the incident, right? There were two dates involving Miss Anoush Burmayan, true?
A There were two dates that she said, but there was actually more than that.
Q Okay.
A Yeah.
Q So you -- how many times did you have interactions overall with Miss --
A Well, I didn't really interact with her, but I know that she was there at least three, four times.
Q Okay. Let's back up.
A Okay.
Q So you know who Anoush Burmayan is in this action, the Plaintiff in the action?
A I know who she is.
Q Okay. And throughout the whole time you worked

at CVS from the Glendale CVS 2018 through today, how many times roughly have you seen Miss Burmayan?

A At least three.

Q Okay. And all of those three were in January of 2021?

A I don't know the month. I don't know the month, but I've seen her.

Q Were they near the time when the police was called on her?

A Yes.

Q And can you describe for us, you know, how she looked from your observations? Just describe to me, for the record, what was -- describe to us what --

A I don't remember like her face. I just remember she had her hair like kind of long. She drove a -- when I saw her driving, she was driving a Porsche, and that's really all I remember, and she was super obnoxious.

Q Thank you for that -- but okay. So -- but can you give me characteristics, for example, height, weight --

A I wasn't looking at her like that.

Q -- how tall she was?

A She's short.

Q Short.

How big she was, medium or small? Just provide

us please --
A Maybe medium. I'm thinking medium.
Q Short. Like how -- how tall are you for the record?
A I'm 5'11".
Q Okay. How tall she would be to you?
A I don't know because I didn't look at her like that.
Q How did you --
A It wasn't important for me to look at her.
Q Okay. But you did have interactions with her in the store, right?
A Only to put up her mask. That's it.
Q Okay.
A That's it.
Q But you did see her --
A I have seen her.
Q -- in the store?
A I have seen her.
Q Right.
A That's not an interaction because I saw her.
Q Okay. So you didn't have a conversation with her?
A No, I didn't.
Q So you cannot tell us, you know, her race?

A Her race is Armenian. I know that.
Q Okay. How did you know that?
A Because I know by the last name that she's Armenian.
Q On the time that you interacted with her, did you know her name?
A No.
Q You learned it later?
A Yes.
Q When you were talking to her, did you ever ask her for her name?
A No.
Q Okay. But she spoke English with you, right?
A She was talking English, yes, yes.
Q Okay. So now, were you ever interviewed about this incident by CVS, by anyone in the H.R., or anyone up the chain of command?
A No.
Q Never?
A No.
Q Okay. So --
A Unless you're talking about --
Q No. I'm not -- anytime I ask you questions, and you can clarify, but aside from your attorney --
A Yeah.

Q -- communications, if you -- you know, all I need to know, any other interviews?
A No.
Q Okay. Do you know if when an incident happens, I mean -- strike that.
In your experience when you have had this police calls at CVS in Hollywood or Glendale, we basically covered several police calls, for whatever reason, does CVS management get involved and, you know, do an investigation of those?
A Not that I know of.
Q No. So the Risk Management doesn't, you know, get involved and ask questions when, you know, someone is arrested?
A Not that I know of.
Q So you have no idea if anyone from your store told the Risk Management at CVS at any time that Miss Burmayan was banned from the store because she had shoplifted? Do you --
A I don't know that. I have no idea about that.
Q Are you aware of anyone telling CVS management, either Jack or anyone, Jack or up the chain of command, that Miss Burmayan was arrested, banned from the location because she was shoplifting?
A I've never heard that until right now.

Q And you personally, did you personally ever tell anyone that Miss Burmayan was shoplifting, "That's why we called the police"?
A No. Because I never heard of it; so how would I say it?
Q Okay. So you never have to -- let me ask you this.
For purposes of liability, clearly we have liability when someone gets arrested, right? As a retail person, you worked for many years, there is some liability if someone gets arrested, true?
MS. JONES: Objection.
Vague.
Q (BY MS. MKRTCHYAN:) You have to answer. Anytime there is questions, you still have to answer unless there is an instruction not to answer.
A I mean, I don't know the answer to that.
Q Okay.
A I don't -- so I'm not going to answer that because I don't know the answer.
Q But you've been a Manager for many years at many locations and you know if someone gets arrested that the police comes, and that person can get prosecuted, right? You are aware of that?
MS. JONES: Same objection.

THE WITNESS: I mean, again, I am going to give the same answer. I don't know what happens after. I've never been to court or anything like that so ...

Q (BY MS. MKRTCHYAN:) Okay. So in those arrests that you've made -- let me turn this on now -- Tina, you will have to bear at this point -- in those arrests that you've made, approximately 30 times in Glendale, 10 times in Hollywood, roughly, that you've testified, you never had anyone come and talk to you and explain "justify the arrest"?

A No.

MS. JONES: Objection to the extent it misstates testimony that he was making arrests. He was not making any arrests.

MS. MKRTCHYAN: I understand. Thank you.

Q (BY MS. MKRTCHYAN:) So those times that you called the police, did you ever justify to your company the reasons why the police was called?

MS. JONES: Objection.

Vague, vague as to "your company" --

THE WITNESS: They're not asking me.

MS. JONES: Wait for me to state the objection. Just take a minute after she asks the question so I can state the objection but go ahead.

MS. MKRTCHYAN: Thank you.

THE WITNESS: They never asked me. Why would I say anything if they didn't?

Q (BY MS. MKRTCHYAN:) Okay. So they never asked you about this incident in particular, what was the reason Miss Burmayan was called the police on?

A No.

Q Did you speak with the police officers on the date of the incident?

A Yes. I did speak with them.

Q How many officers did you speak to?

A One, just one that I remember. It was a long time ago.

Q Sure.

A Yeah.

Q After that, did any other officer approach you and talk to you?

A I don't remember it.

Q So let me show you a document, and let's go over some different things that I'd like to.

So this is document 824 produced to us in discovery, CVS 824 through Bates Stamp pages 839 -- 838.

I'd like to bring your attention to this document and see if you have any information where does this come about.

So we have communication between Sedgwick Claims

Managers, Sedgwick -- between Sedgwick Insurance Adjustor and CVS management, I suppose.

Do you know who is Dena Scott? Have you ever heard of that name?

A No.

Q You don't know?

A No.

Q So we have -- I'll read this for you for the record and confirm with me what it states. We have Loss Location Information, address 3943 San Fernando Road, Glendale.

This is the address where the incident occurred, right, where you work?

A Yes.

Q It says "Loss Description: CM was involved in a theft incident on January 13, 2021 and was banned from the store. CM returned to the store on January 19, 2021 and was detained for trespassing. CM was issued a citation by Glendale Police Department. Citation number is provided.

CM has sought legal representation, and the Law Offices of Panos Lagos has sent a letter requesting video surveillance evidence be preserved for both above mentioned dates.

Client stated video evidence for both dates have been retained and will be archived until

November 21, 2021."

Did I read it accurately for you, sir?

A Yes.

Q Okay. Does this describe, to your knowledge, the incident with Miss Anoush Burmayan?

MS. JONES: Objection.

Outside his personal knowledge, calls for speculation since he didn't create this document.

THE WITNESS: I really have no idea.

Q (BY MS. MKRTCHYAN:) Okay. So this is on behalf -- Miss Burmayan was issued a citation, true? You know that she was arrested on the date of the incident of January 19, 2021, true?

MS. JONES: Calls for speculation.

If you know.

THE WITNESS: She -- I mean, the officer told me that they were releasing her, not arresting her. She was released.

Q (BY MS. MKRTCHYAN:) Okay. But she was involved, and the police was called on her on January 19, 2021?

A Right.

Q Do you have any reason to doubt that this information that is put here in Loss Description is related to her incident, that she came to the store on January 13, she was banned from the store, and then she

returned on January 19, was detained for trespassing.
Is this about anyone else other than Anoush Burmayan? That's what I want to know.
A I don't know. How would I know?
Q Well, is there -- you worked there on January 13, 2021, right?
A Yes.
Q Okay. Was anyone there banned from the store on January 13, 2021?
A If they were banned, I don't know, and I didn't ban anyone; so I have no idea.
Q So how -- was there anyone else arrested on January 2021 than Miss Anoush Burmayan?
A I don't know. How would I know that?
Q You were there. You worked there.
A You said was anyone arrested there on that day?
I mean, how do I know besides her? She wasn't arrest. She was released.
Q Okay. From reading this complaint, this portion of the Lost Description it doesn't give you an idea that it's about this incident?
A Not really.
Q No really?
A Not really.
Q Okay. Was there anyone else that you are aware

of as of right now you're sitting here today that was actually issued a citation by Glendale Police Department for trespassing?

A No. I have no idea about that either. I don't know.

Q But you were working there on January 19th --

A You said "issued the citation." I wasn't there. I didn't see any citation issued. I don't know.

Q You don't know.

A I don't know.

Q So on the day when the police arrived, you have no idea what they did with her?

A I don't. Besides release her. They released her. So I don't know how what makes her get arrested if she got released.

Q What did you call the police for?

A Because she was refusing to wear a face mask.

Q Okay. Let's get this straight. So you were -- you called the police on January 19, 2021, true?

A I didn't call the police.

Q Who called the police?

A My Supervisor called the police.

Q And who is your Supervisor?

A Guy is my Supervisor.

Q So wait.

So if Guy was the Shift Supervisor --
A Yes.
Q -- you were supervising him?
A Yeah.
Q So -- okay. So -- but you were -- you had the final say on who to call the police, didn't you, by policy?
A It's not a policy. There is no policy. He called them, and I was okay with it.
Q Okay. So you did not have any objection --
A Yes.
Q -- to him -- let's just make it clear.
A Yeah.
Q Even though you were supervising Guy Garcia on January 19, 2021, you became aware that he was calling the police on --
A Yes.
Q Let me -- excuse me. Please, because we need to have a clear record, let me finish the question and then you answer.
You were aware that Guy Garcia called the police on Anoush Burmayan on January 19, 2021?
A Yes.
Q And you were okay with that. You did not tell him, "No, there is no need for calling the police"?

A No, I didn't.
Q And you were supervising over him?
A Yes.
Q And the policy of CVS before calling the police, anyone, any employee has to get approval by a Supervisor, true?
MS. JONES: Objection.
Misstates testimony. He said there was no policy.
THE WITNESS: He is the Supervisor. He can make that decision.
Q (BY MS. MKRTCHYAN:) So without even going to the Manager or the higher in rank, he can actually make the police call?
A Yes.
Q Okay. Let's look at your policy at CVS for calling police or et cetera situations.
Well, first of all, let me back up.
You said "That we called the police on her because she was refusing to wear a face mask," true? You said that?
A Well, she was refusing to pull it up over her nose. That's why. That was the issue.
Q Okay. So let's go to the face mask policy here, but I wanted to finish this thing here, you know, the --

this segment.
So you are denying that this document that was produced by CVS in this -- in their discovery, that this Loss Description applies to the incident with Anoush Burmayan?
A I'm not --
MS. JONES: Objection.
Misstates testimony.
Go ahead, Joe
THE WITNESS: I'm not denying it. I'm just saying I don't know. I didn't deny it.
Q (BY MS. MKRTCHYAN:) Okay. But you cannot tell me as of right now you're sitting here today, that anyone else on January 19, 2021 was called the police on, true?
A Say that one more time.
Q You cannot tell me one way or another that there was another person that you called the police on January 19, 2021?
A Well, I didn't call the police again, and, no, I cannot tell you.
Q Okay. So there could be other people that were called for the police?
A There could be other people that the police were called on.
Q But you are not aware of any of those?

A No.
Q Okay. So here we have Uninjured Party on section of CVS 827, "First Name Anoush, Last Name Burmayan."
Do you see that?
A Yeah.
Q So this document purportedly represents Loss Description that occurred on Tuesday, January 19, 2021 described before on the record, and the name of the person involved, Injured Party is Anoush Burmayan, true? Just confirm with me.
A Yes.
Q Okay. And then again we have Injury Description briefly. It says, "CM was detained for trespassing." This is page 828. "Was detained for trespassing on January 19, 2021. CM was banned from the store premises for a theft incident on January 13, 2021."
Confirm with me that I read it correctly.
A Yes.
Q Okay. And from what you know about Anoush Burmayan, and this is the Plaintiff in this case? You know her name, true?
A I know her name.
Q Was there any allegation of her shoplifting in the store that you're aware of?
A Not that I'm aware of.

Q Okay. So this, when it says, "CM has been banned from the store premises for a theft incident on January 13, 2021," to your knowledge, is that accurate, an accurate description of the injury?
A Say that again.
Q Is this -- is this an accurate description of the loss claimed by Anoush Burmayan?
A I don't understand what you're asking me.
Q Was she seen Shoplifting? That's all --
A I didn't know anything about her shoplifting until you just told me. I didn't know.
Q Are you aware -- were you aware at the time of this incident in January of 2021 as an Operations Manager that she had been banned from the store premises for a theft incident in January --
A I was not aware.
Q Let me finish.
Again, we are not playing by the games -- by the rules. Please, can I stress the importance of this. This is a federal deposition. This testimony will be transcribed.
Do you want it to be accurately transcribed?
A Well, of course.
Q Okay. Because you don't want your statements to be misconstrued.

A Sure.
Q Or my statements to be misconstrued, true? Everything needs to be clear, right? So please let me finish.
Were you aware that she had been banned from the store at any time for shoplifting, "yes" or "no," "I don't know"?
A No.
Q Okay. Specifically on January 13, 2021, isn't it true that she was banned from the store only because she was allegedly not wearing a face mask --
A Yes.
Q -- to your knowledge?
A Yes.
Q Okay. So there was no shoplifting involved in any point in time that you are aware of --
A Right.
Q -- related to Miss Anoush Burmayan?
A Correct.
Q Okay. Now, did you -- so you said you never watched the video surveillance recordings from the store, right?
A Of this?
Q Yes.
A No.

Q And you're aware, though, that there are cameras in the store?

A Yes.

Q Did you ever in any of your contacts with police, were you ever asked to produce video?

A I wasn't asked.

Q Okay. So if they come and ask you like right now you're the Operations Manager, if anyone comes and asks you for video recordings, if a police officer asks you, what do you do with that request?

A If the police ask, we have to go through Jack, the Store Manager, or Media Relations before we release anything.

Q So that goes through other channels? You personally do not get involved in that?

A Right.

Q And you don't go -- is there a video room in the CVS pharmacy?

A No.

Q So how are the cameras working? How do you even know they work?

A You mean where the monitor is? The monitor is in the Manager's office.

Q Okay. So there is a back office there --

A There is a Manager's office with the monitor.

Q I see.
Have you ever gone and checked the video to see if it works, if it's operational or not?
A I mean, I can see it's working when I can see the picture on there.
Q Okay.
A So it means it's working.
Q How many camera angles are there? Do you know how many cameras are there? Where they are located?
A Cameras are all over, in the front end, the pharmacy, the exits. I don't know how many angles they have.
Q Okay. According to your general policy at CVS, can you ever record any incidents with your cell phone? Are you allowed to do that?
MS. JONES: Objection.
Vague as to "general policy."
You can answer.
THE WITNESS: Have I ever done it? I've done it, yes.
Q (BY MS. MKRTCHYAN:) Okay. So there is no prohibition or any requirement that you would refrain from using your cell phone in recording something for your own personal --
A No.

Q Okay. And when you record those, do you produce it to your management?

A Correct.

Q From -- anytime you called the police before, did you ever make such recordings of the incident?

A Of this? No.

Q No, not of this.

I'm talking about generally. Those 30 times you called the police --

A Oh, I've made recordings, yes.

Q And what kind of instances do you make such recordings?

A Just someone running out of the door, someone shoplifting, someone being belligerent, someone -- it could be anything.

Q So you just take out your cell phone, and you can record?

A Right.

Q Okay. Even though there are cameras there, sometimes you just want to do your own recording, true?

A Right.

Q And there was never anytime you were told you're not allowed to do that?

A No.

Q So did you ever record your contacts or

observations of Plaintiff in this case?
A No.
Q Didn't you take out your cell phone when she was, you know, in the store the second time or third time you said she came?
A I took out my cell phone?
Q Yes?
A No.
Q I mean, wouldn't you do that if -- you said, you used the word she was being obnoxious.
A Yes. I don't need to record that.
Q How do you define obnoxious? What did she do to be obnoxious?
A Well, she comes in, and she seems entitled, "I have a letter. I can do whatever I want." She's obnoxious. She's not friendly.
Q Okay. Okay. But you've had -- so what else? Tell me what else does that, you know --
A I mean, I didn't talk to her long enough to get that much from her, but I knew -- I can tell you that she was obnoxious.
Q You said you had interactions with her three times -- well, you saw her in the store three times in January of 2021? Yes?
A I said I've seen her three times. I didn't tell

you the months. I said I didn't know between what and what.

Q Let's go back to January of 2021 --

A Okay.

Q -- when the police was called, only on January 2021.

How many times do you remember her coming to the store?

A She came three times.

Q Three times?

A Yes.

Q In January of 2021?

A I don't know the month, but I seen her three times total, and if these happened in January, then they happened in January, but I don't know the month.

Q Okay. But the police was called in January --

A Okay.

Q -- 2021.

A Okay.

Q Do you have any doubt --

A No.

Q -- about that?

A No.

Q Okay. So that's why I'm bringing your attention to January of 2021, specifically.

Do you specifically remember seeing her about you said three times in January of 2021?
A Two times.
Q Okay. And the first time when you saw her, what was the interaction like? Just describe to me briefly.
A Just her coming in with a letter in her hand that she -- we asked her to put her face mask on. She was refusing.
Q And what else?
A And that was the only interaction.
Q Okay. So --
A I told her, "No one is going to help you if you don't cover your face."
Q Okay. So you are maintaining that she was actually not wearing a face mask at all?
A She had it over her mouth.
Q Okay. All right. So January 2021 you're saying that she came, she was coming. She had it over her mouth, and you were telling her what specifically?
A To pull up her face mask.
Q Okay. And what was she saying?
A "I don't have to."
Q Okay. And why wouldn't she -- what was her explanation?
A "I have a letter from my lawyer."

Q Okay. "Lawyer"?
A Lawyer. Not doctor, lawyer.
Q Okay. And did you ever look at that letter?
A I'm not going to get close. I didn't want to get close to her. She's not covering her face.
Q What were you saying to her?
A We asked her to pull it up or she needed to leave.
Q Okay.
A There was a mask mandate for California, and she was not doing it.
Q Uh-huh. Okay.
And then that was -- that was it?
A That was it. And she didn't leave. She proceeded to check herself out at the self-checkout.
Q Did you help her with that?
A Oh, no. Oh, no. She's not covering her face.
Q Okay. But you were covered, true?
A Yes.
Q You were fully covered?
A Yes.
Q And everyone else in the store?
A Yes.
Q What time did she come? Was it -- you were, working nightshift so --

A She came after -- it was after 12, I'm assuming. I'm not sure.
Q Was there a lot of traffic in the store, customers?
A There is always traffic.
Q Okay. So let's get to the face masks requirements back in January of 2021.
You received training about face mask mandates or coverage by CVS Pharmacy specifically, true?
A "Training"?
Q Yes.
A What kind of training? There was no training.
Q No?
A It was just -- There was a mandate. You have to wear a mask to come into the store.
Q Mandate. Okay.
There were various mandates throughout California, nationwide, et cetera.
What kind of mandate were you following?
A Everyone that came in needed to wear a face mask and cover their mouth and nose.
Q That was by CVS?
A That was by California.
Q So specifically by CVS Pharmacy, you never received any training advising you what are the parameters

for employees or customers wearing face masks?
A "Parameters"?
I mean, it was pretty clear that they have to cover their nose and mouth.
Q Okay. So that was your understanding.
So I just want to know your understanding --
A Yes.
Q -- based on the policy and training of CVS, that everyone back in January 2021, including employees and customers, were required, mandated to wear face masks?
A Yes.
Q There were no exceptions?
A No.
Q No exceptions?
A No.
Q Not even reasonable accommodations for disabled people?
A I've never heard that. I don't even know what that means.
Q So you were never trained?
A Yeah.
Q Okay. Let's look at some policies here by CVS.
A All right.
Q And, by the way, let me ask you this, another thing.

So you were as far as your understanding was working for CVS is that you could ban anyone if that person was not in compliance with the face mask from the store?
A Ban or just not allow them in.
Q Yeah. The same thing.
A Not really.
Q No?
A Not really. "Ban" means you can't come back.
Q Okay. All right. So let's define this.
Banning meant you tell someone "You cannot come back," right?
A Yes.
Q But isn't that what happened with Miss Burmayan, she was banned from the store premises, and that's why when she came back on January 19, she was arrested, true?
A That's what you said. I don't know. I didn't even know that happened. I don't know anything about that.
Q So you were not aware of that?
A Was I aware that she was stealing? No, I wasn't aware.
Q No, no, not of that.
You were not aware that she was actually banned according to Guy Garcia who called the police?

A No.
Q You were not aware?
A No.
Q Let me finish again, Mr. Johnson, please. Can we do this not in a conversation. This is not a conversation.
Tina is very experienced. She's doing very well, but her patience at some point will expire because she's going through jet lag; so let's bear with her, be nice with her, and we need her, and I want to finish this for your benefit sooner than later so...
But from what you know, she was banned from the location by Guy Garcia who called the police, right?
A I learned today that she was banned.
Q So you didn't know at the time?
A No.
Q So when he comes and tells you, "I'm calling the police on her," did he tell you why he was calling the police for you to approve that?
A He's calling the police because she's not wearing a mask, and she's refusing to leave the store.
Q Okay. So Guy Garcia never told you and never did you know that she was banned from the store?
A I didn't know.
Q You didn't know?

A (The witness shakes head.)
Q So why did you know then -- how did you know that she had been there before?
A Because I had seen her there before.
Q And when you saw her before, you said that she was not wearing a face mask, did you ever tell her, "You cannot come back"?
A Me?
Q Yes.
A No.
Q Okay. So let's make it very clear.
Even though Guy Garcia maintained that calling the police that she was banned from the location, you personally never banned her from the store?
A I didn't.
Q Okay. So you basically told her what? You said, "You" -- "You have to leave if you're not wearing a face mask"?
A Basically, yes.
Q Okay. And that's to you different from banning?
A Yes.
Q Okay. So when you said, "You have to leave," did she leave?
A No.
Q Okay. How long was she in the store?

A Ten minutes.
Q What was she doing?
A Walking around, face uncovered, shopping with a letter in her hand.
Q Did you ever look at that letter?
A You asked me, and I said no, I didn't.
Q But if she's -- you said that the face is not covered. You said she had her face partially covered, right? It was just her nose open?
A But that's not covered. That's not covered.
Q Okay. So -- all right. So you basically from your perspective as a CVS employee, your understanding that your company guideline was that if anyone is not fully complying with the face mask regardless of any disability, regardless of any other exceptions they have to leave the store? That was your understanding?
A We never talked about it in terms of disability.
They have to wear a mask to be here.
Q Okay. But that's what I want to understand.
Even if you as an employee, let's look at you as an employee, if you as an employee had a disability not allowing you to wear a face mask, you would not be able from your perspective ask for accommodations?
A I don't know. I could wear a mask. I don't know.

Q Did you ever hear any employee asking for accommodations about face masks?
A No.
Q And you were also not aware that customers also could not -- they had to mandatory wear a face mask or -- excuse me -- or else they have to leave?
A Yes.
Q Okay. Okay. So let's look at your Huddle Guide on face masks.
I would like to know if you recognize this document? Let's make this larger.
So this is document 00 -- Bates Stamp 47 through -- 47 through 51 produced by CVS in this discovery.
We have "Field Message: CVS Face Covering Policy Reinstatement."
This is as of July 20, 2020. Our records indicates that this is effective July 20, 2020, "CVS has the following recommendation for face mask policies."
It states, "All colleagues regardless of vaccination status are required to wear either a face mask or cloth face covering while working."
Second, "All vendors and customers are encouraged to wear either a face mask or a cloth face covering while in a CVS health store or office location. Local or state

mandates that require face coverings for customers overrides this policy."

Are you with me so far? Did I read it to you correct?

A Yes.

Q So do you see the difference for colleagues and vendors and customers? For colleagues it states that they are required to wear a face mask, right? Did you see that, the word "required"?

A Yes.

Q For customers, are "encouraged," true?

A Yes.

Q It's not mandatory, true?

A Yes.

Q There is a difference. Okay.

So let's continue here --

A And I see also where it says "Local and state mandates," that -- you missed that part. You didn't read that part.

Q Okay. I understand, but it states, "overrides this policy," but let's look down below. Let's look down below and see what your parameters are in terms of conflicts about face coverings with customers. This is Huddle Guide by CVS Pharmacy.

Did you ever get any -- is this document new to

you? Did you ever see this document before?
A I haven't seen it.
Q No, never trained, never given this document?
A No.
Q So let's look at what it states here. It says as of July of 2020 we have guidance by CVS produced to you, "De-Escalating conflicts about face coverings."
We have basically "A customer reports another customer is not wearing a mask. "
We have scenarios -- you know, giving you various scenarios.
Say -- it gives you a scenario how to respond to that. You have to say, "Thank you for letting me know. I will ask them if they have a mask to wear or help them purchase one now."
Another scenario, "You see a customer is not wearing a mask when entering or while shopping."
"Hi. Welcome to CVS. Did you bring a mask or a face covering with you today? If not, I can show you where to find one." It's giving you various scenarios.
Do you see that?
A Yes.
Q And then it gives you "Communication and de-escalation tactics." It says, "Keep your body language and tone friendly and neutral. Be mindful of your

gestures, facial expressions and movements. Show that you care by listening, acknowledging the customer concerns, by being empathetic, non-judgmental," et cetera. "Do not use threatening language or non-verbal behaviors, staring, glaring, smirking, raising voice, get defensive, judge or discount feelings, be disrespectful."

Do you see that?

A Yes.

Q It gives you the de-escalation tactics, true?

A Yes.

Q Okay. Now, it says, "For your own safety do not attempt to deny access to customers who are not wearing a mask."

Did I read that accurately?

A Yes.

Q "If the situation escalates, and if you feel a need to engage law enforcement, engage the Manager on duty for support," true?

A Yes.

Q Okay. Let's continue with the conversation guide, what you're supposed to do.

There is situations where, you know, you're asking the customer who is not wearing the face mask -- who is not wearing a mask, it's giving you guidance what to do when someone is not. It says, "Hi. Welcome to CVS.

Did you bring a mask or a face covering with you today?"

And it gives you arrows what you do when someone says, "No."

It says, let's say, "No, I don't have one. I forgot it."

Then you continue. You have to say, "Okay. We are requiring those for shopper safety right now. We have a variety of styles for sale at different price points. May I show you some?"

Did I read it accurately?

A Yes.

Q And then next it says, "No, I don't want to buy one. I don't want to spend money on one."

Do you see that?

A Yes.

Q And then it gives you a further guidance what to do when the customer says, "No, I don't want to buy one. I don't want to spend money," true?

A Yes.

Q And what does it say? "I am so sorry, but similar to other retailers, we're requiring those for shoppers safety right now. We do have some for as little as 50 cents," et cetera. "Can I give you one of those?"

Do you see it's giving you guidance, true, how to respond to a situation where a customer doesn't want to

buy one, true?
A Yes.
Q Okay. And then the person says, "I refuse to wear it."
"What is your response according to CVS Huddle Guide in terms of de-escalating the situation?" Let's read this.
"I understand you prefer not to wear a face covering right now" -- "wear a face covering right now. If you're picking up a prescription, you don't need a face covering to use the drive-thru. You can also use the CVS.com to order products for home delivery."
Did I read it accurately?
A Yeah.
Q Next it states, "Whether the customer leaves or insists on shopping without a face covering, you have done what you can. Help the customer finish shopping as quickly as possible and remind them to maintain six feet of social distance to help protect other shoppers."
Did I read it accurately?
A Yes.
Q This is CVS 50, Huddle Guide 49 through 50 pages, the Huddle Guide "De-Escalating Conflicts About Face Coverings" as of July of 2020, true?
A Yes.

Q Okay. And this is the first time you've ever seen this document?
A The first time I've seen it.
Q Okay. Did you actually follow this process with Miss Burmayan when she came to the store and she was not fully wearing her face mask?
A I didn't even know the policy; so how could I follow it?
Q And you didn't, true?
A Yeah.
Q So you told her, "You have to leave. You cannot continue" --
A But she didn't leave.
Q Okay. But let me just -- excuse me. Thank you. Can you just make sure I finish the question?
A Yeah.
Q You did not follow this policy in terms of de-escalating the conflict, true?
A True.
Q And when she was partially wearing her face mask, you simply told her, "Ma'am, you have to leave. You cannot be in the store," true?
A Yes.
Q Okay. But you didn't help her finish shopping, true?

A I wasn't working with her. I just told her that no one was going to help her. That's what I said.
Q Okay. So you basically told her that, "Ma'am, because you're not fully covering the face mask, you have to leave. No one is going to help you," true?
A True.
Q And then she was refused service at the cashier register, right?
A Not by me.
Q Okay. But you were the Manager, right?
A I don't see everything.
Q I understand.
But you saw her at the self-checkout, true?
A Yes.
Q And when she was trying to do -- purchase her drugs or whatever she was purchasing in the self-checkout, you didn't help her, true?
A No.
Q Okay. You told her she has to leave?
A When she was checking herself out, she could do whatever she wanted.
Q I see. But you told her she needs to leave, true?
A Yes.
Q And you did not help her to purchase her

medication?
A No.
Q But do you agree with me that that is not -- that is a violation of your own policy, Huddle Guide?
A Okay.
Q Yes? You agree with me?
A I don't agree, but I'll say "Okay."
Q Well, you didn't follow the policy which says help the customer even if the customer refuses, says "I'm not wearing it"? You didn't follow this Huddle Guide, true --
A Okay.
Q -- in de-escalating?
A I didn't know the Huddle Guide existed, and, no, I didn't follow.
Q Okay. Now, let's look at policy on -- you said that you didn't know that the CVS employees could actually ask for exemptions from wearing face masks.
A Employees?
Q Yes. Even employees?
A Yeah, I never had that presented to me; so I don't know anything about that.
Q You didn't know --
A Yeah.
Q So even the customer -- let's say the customer

comes and says, "I have a disability. I cannot wear this mask."

A Employee?

Q Let me finish.

A You keep bouncing around.

Q I'm not, no. But I have to finish my question, sir. Thank you.

So far we're doing well, but I have to remind you constantly.

A Yeah.

Q You were not aware of any exemptions from face masks for employees or customers, true?

A True.

Q So if even Anoush Burmayan was telling you "That I have papers. I don't have to wear a face mask," that was not important to you? It was not really a consideration for you?

MS. JONES: Objection.

Misstates testimony.

THE WITNESS: I was not aware of anything. I didn't know about that, that we could -- if you didn't have a mask, you can't come. That's it.

Q (BY MS. MKRTCHYAN:) So no exemptions were --

A No.

Q -- told?

Okay. So let's look at the policies at CVS for wearing face masks even for CVS employees.

As of 2021, this is CVS 598, Bates Stamped 598. We have "Reasonable Accommodation Requests."

It states, "Colleagues who believe they need a reasonable accomodation because they're unable to wear a face mask, face covering as required by this policy due to a disability or religious belief should contact the Reasonable Accommodations department by calling Advice & Counsel at" a number is given, "and option for reasonable accommodation."

Do you see that?

A Yes.

Q Do you agree with me that this document by CVS provides for reasonable accommodation requests by employees who cannot wear a face mask because of some disability or religious belief?

A Yes.

Q And you were not aware of this?

A I've never read it.

Q So if you personally had a disability, you would not know to ask for one, an accommodation?

A I would not know because this is my first time seeing it, yeah.

Q All right. Okay. There is another one here from

2020. This is number 592, CVS 592. This is as of 2020, the year before even, even the pandemic year, at the height of the pandemic, "Colleagues who believe they need a reasonable accommodation because they are unable to wear a face mask, face covering as required by this policy due to a disability or religious belief should contact the Reasonable Accommodations department by calling Advice & Counsel," at the number provided "option one," true?

A Yes.

Q So it gives even employees who are required by your policy, as we saw, the right to request reasonable accommodations, true?

A Yeah.

Q And you were not aware of that?

A No.

Q Nor were you aware that even customers who can come to the store, first they're encouraged, not required to wear a face mask as we read in the Huddle Guide, true? You were not aware of that?

MS. JONES: Objection.

Misstates the document.

THE WITNESS: Say again.

Q (BY MS. MKRTCHYAN:) You were not aware that customers who come to the store can ask for reasonable accommodations if they cannot wear a face mask?

A I was not aware.
Q No. And you were also not aware of how to deescalate specific situations when a customer is refusing to wear a face mask for whatever reason?
A No.
Q Okay. And, by the way, as we've covered already, Miss Burmayan was partially covering her face, true?
A Her mouth.
Q Okay. But she did -- she was attempting to comply. It wasn't like she was just refusing to comply completely, true?
MS. JONES: Objection.
Vague, calls for speculation about her intent.
THE WITNESS: She was refusing.
Q (BY MS. MKRTCHYAN:) To you it's refusing.
A She was refusing.
Q If someone is partially covering her face but tells you that "I have a letter," that is not partial compliance to you even?
A No.
Q No. Okay.
But she was partially covering her face?
A Her mouth was covered.
Q Okay. Her nose -- only her nose was open, true?
A Yeah, the most important part was not covered.

Q Okay. But you had a six feet distance from her, right?
A I did.
Q And she was holding six feet distance from other customers, true?
A I don't -- I'm not sure about that.
Q Okay. Did you see Guy Garcia following her from aisle-to-aisle and demanding that she cover her nose?
A No.
Q No?
A No, I didn't see that.
Q Okay. So, in order words, you basically refused service to her on January 13, 2021 only because she was not fully covering her face, true?
A Meaning me?
Q Yes. You told her --
A Yes.
Q She was not shoplifting. You didn't tell her to leave --
A I know nothing about her shoplifting, nothing.
Q Right.
So that day when you told her to leave, it wasn't for shoplifting?
A No, no.
Q And it wasn't for disrupting business. It was

basically for her refusing to comply with the face covering mandate, true?

A When you say "disrupting," what do you mean "disrupting"?

Q Disrupting? What was she doing aside from what you told me?

A She was disrupting. She was loud. She was loud. She was showing -- she was trying to show the employees up. She was trying to show me up.

Q What do you mean --

A "I don't have to wear a mask." She was taunting. She was doing lots of stuff. When she left, she flipped everybody off.

Q How did you know that?

A I saw her. I saw her do it.

Q Did you watch any video clips?

A No. It's not -- she was outside flipping people off.

Q Okay.

A That was outside.

Q Okay. But, you know, if -- let's say someone does that, you didn't call the police then, did you? If that --

A If she's leaving the store --

Q Right.

A -- why would I call the police?
Q Okay. But she did not refuse to leave?
A She did.
Q She left?
A After she was done.
Q Well, how many minutes was she there?
A She didn't leave when we asked her to, she didn't.
Q Okay. But you -- let's make this straight.
You asked her to leave because of the reason she was not fully covering her face, true?
A True.
Q Okay. And then she had a conversation with you. She was upset about that, true?
A Not a conversation. She was just saying that she didn't have to and being loud.
Q And you didn't engage in de-escalation according to the Huddle Guide --
A I didn't. I didn't.
Q Let me finish.
So when you see her getting upset -- the reason -- let me strike this.
The reason she got upset was because you were telling her to leave because she doesn't have a full face covering, true?

MS. JONES: Objection.
Calls for speculation about what she feels. How would he know that?
THE WITNESS: I mean, I don't -- I told her to leave the store because she was being obnoxious, being loud, and refusing to cover her face.
Q (BY MS. MKRTCHYAN:) But the first point of your communication with her was what?
A I mean, the first point of communication?
Q Yes, yes.
You told her that she needs to leave because she is not wearing the face mask.
A Yes.
Q Exactly.
And then she got upset, true? She wasn't just entering the store and disrupting the business just for no reason, true?
A She's --
MS. JONES: Same objection.
Calls for speculation.
THE WITNESS: She's not even supposed to be in the store without a face mask on.
Q (BY MS. MKRTCHYAN:) Okay. But we just read the policy.
A I mean, we read that now. I didn't know about

that.

Q I mean, are you saying that you work in the store without following the policies?

MS. JONES: Objection.

Misstates the testimony, argumentative.

THE WITNESS: I didn't know the policy. I didn't know that part of the policy.

Q (BY MS. MKRTCHYAN:) Okay. So you didn't know that someone can ask for accommodations or someone, you know, that you need to deescalate.

Let's say, you know, you're using your common sense. I just want to get the facts here. She came. She was purchasing items. She was not just immediately entering and yelling and being disruptive.

A She's not asking for accommodations either. She's coming in and doing whatever she wants to.

MS. MKRTCHYAN: Move to strike as nonresponsive.

Q (BY MS. MKRTCHYAN:) Can you answer my question, please.

A All right.

Q Thank you.

My question is this. When she entered, she was purchasing items. She wasn't engaging in anything else, true?

MS. JONES: Calls for speculation about what she

entered for.
THE WITNESS: When I saw her, she was already back and forth.
Q (BY MS. MKRTCHYAN:) Okay. With who?
A With Guy.
Q Guy Garcia was asking her to do what?
A Asking her to do -- I don't know. I don't know what he was asking her to do, but he told me, like "She's here again, and I asked her to leave." She didn't leave.
Q Okay. What was she being asked to leave for?
A For being there without covering her face.
Q Okay. Yes. That's what I -- you know, the bottom line, the dispute surrounded -- listen to the question carefully. The dispute that you had with her surrounded her not fully covering her face mask, nothing else, true?
A True.
Q Okay. So -- and then she got upset, right? You had a conversation. You were present, true?
MS. JONES: Objection.
Asked and answered, calls for speculation about her behavior, her feelings.
Go ahead.
THE WITNESS: State it one more time.
Q (BY MS. MKRTCHYAN:) So she got upset. She

appeared to be upset to you, right, and she started disputing the situation that she had to leave, right?

A She appeared to be upset?

Q Right.

A I mean, she was just, like I told you, being obnoxious and loud.

Q Yeah, but that was because in response to her request to accommodate her, you ignored her, true? You did not accommodate her request?

MS. JONES: Objection.

Calls for speculation. Also misstates testimony and lacks foundation.

THE WITNESS: I asked her to leave for not covering her face.

Q (BY MS. MKRTCHYAN:) Okay. And in response to that, though, was that she appeared to be upset, true?

MS. JONES: Objection.

Misstates testimony.

You can repeat your answer.

THE WITNESS: I mean, I don't know. I don't know what she was upset about. I don't know why she's upset. If she's upset -- she could have showed up upset. I don't know.

Q (BY MS. MKRTCHYAN:) I'm talking about you watching her demeanor and observation.

Was she upset before you told her the face mask needs to be fully covering her face or after?

A She could have been. She could have been upset. She could have shown up upset. I don't know.

Q So, in other words, you did not have initial interactions with her --

A No.

Q -- as she entered the store?

A No.

THE COURT REPORTER: I'm sorry. You're both going very fast, very fast. I'm at 75 pages in an hour. That's fast.

THE WITNESS: Okay.

THE COURT REPORTER: So let's take it down a notch, both sides, please.

(The testimony is read back.)

Q (BY MS. MKRTCHYAN:) This is not going the way that it should be going.

The deposition is a court procedure. Even though we do not have a judge here to make rulings, et cetera, I want you to take this seriously enough to let me finish my question. Pause so that your attorney may object, and the attorney -- let me give you another rule about this

policy -- rule.

The attorney may make objections. That's for the record. That's not for you to take cues from or, you know, listen and, you know, feel like you have to respond to. She makes the objection.

Unless she tells you not to answer, you have to answer the question but give her time to object.

Do you understand?

So can we slow down a little bit and go this slower.

So my question was that initially when she entered the store, you did not observe her?

A No.

Q Your observations were brought to her when she was talking with Guy Garcia, true?

A Yes.

Q Okay. And in that interaction, Guy Garcia was telling her that she needs to fully cover her face, otherwise, she has to leave; yes or no?

A Yes.

Q Okay. And then you also told her to leave because she had to fully cover her face?

A Yes.

Q Okay. And then she got upset. She started you said became obnoxious. You used the word "obnoxious,"

true?
A Yes.
MS. JONES: Objection.
Misstates testimony about being upset.
Q (BY MS. MKRTCHYAN:) And obnoxious to you, the way you phrased it, is that "She flipped at us. She argued with us."
What else? Please describe to us her --
A That was it.
Q How long was she there?
A In the store?
Q Yes. After that?
A She was leaving the store.
Q But she was also using the self-checkout to purchase something, true?
A Yes.
Q Did you know what she was purchasing?
A No.
Q Did you ever check it?
A No.
Q Did she ever tell you "I'm not feeling well, sir. Please leave me alone. I'm not feeling well"?
A She didn't tell me that.
Q But you were hovering around her?
A "Hovering"?

Q Yes.
A No.
Q Behind her?
A No.
Q Okay. But she was not helped at the register to purchase the item because you knew she was not wearing a face mask, true?
A True.
Q And who was at the register on that date; do you remember?
A No.
Q Who were any other employees in the store at the time; do you remember?
A No.
Q Was Timothy Riddle there that day?
A It's possible.
Q And Timothy Riddle, can you describe him to us?
A From -- I think he's from Thailand, about 20, 22 years old.
Q Young.
A Young.
Q Filipino, Thailand --
A Yeah.
Q Okay. And so you don't remember if he was there as a Cashier that day?

A I mean, he may have been there.
Q What about -- what is his name? There was Jesus Garcia.
Do you know that person?
A Yes.
Q Okay. Who was that person?
A A Cashier.
Q Okay. And what was his description briefly generally?
A Filipino, about 70.
Q Older?
A Yeah.
Q Okay. And was he the Cashier on the day when Miss Burmayan was there the first time?
A I don't know.
Q So you don't remember who refused to help her with the purchasing the item at the Cashier?
A I don't remember, no.
Q But you, according to the de-escalation guide, the Huddle Guide, you could have offered her if she was not fully wearing the face mask to purchase the item and help her to purchase the item and bring it out to the outside, true? You could have done that, true?
A You mean as far as I could have gone to a register and done it?

Q Yes.
A Yes.
Q But didn't do that? You didn't help her?
A No.
Q Let me ask you this. She is buying medications, and CVS is also -- strike that.
CVS is considered a health care provider, true?
A Yes.
Q And you have a lot of people coming in there for the pharmacy?
A Yes.
Q Is the pharmacy open 24/7?
A No.
Q But people come in there for buying over-the-counter medications as well. You're aware of that?
A Yes.
Q And one of the company goals of CVS, as you're aware, is to be a "Good, excellent healthcare provider and maintain health and well-being of individuals," true?
A Yes.
Q Were you trained that the objective of CVS is to "Help people on their path to better health"?
A Yes.
Q This is 469, and, you know, 468. CVS is the

health -- you know, "Provides welcoming environment for all capstone," true? Have you received training about this?

A Yes, I'm sure.

Q Okay. So the objective it says, "We accomplish this by creating unmatched human connections to transform the healthcare experience. In order to make those connections, our purpose-driven service relies on creating a welcoming environment for all."

Did you get training about this?

A Yes.

Q Okay. So if you have a customer comes there at nighttime to purchase any type of drugs, is that an important consideration to you?

A Yes.

MS. JONES: Objection.

Vague.

Q (BY MS. MKRTCHYAN:) Okay. So if Anoush Burmayan is there to purchase medications for her healthcare condition, and she's asking for help, as she testified, that she was asking for help from you to purchase this item, drugs, medication she was buying, would it be one of your job duties to assist her to accomplish the objective of the CVS company?

MS. JONES: Objection.

Vague, incomplete hypothetical, and lacks foundation.

THE WITNESS: She didn't approach me for help. Not me.

Q (BY MS. MKRTCHYAN:) But she was asking, you know, to purchase the item, and she was refused at the cashier. You were aware. You saw her, true?

MS. JONES: Objection.

Q (BY MS. MKRTCHYAN:) And you --

MS. JONES: Lacks foundation and misstates testimony.

Q (BY MS. MKRTCHYAN:) And you approved that? Let's say you saw the Cashier refused to serve her, you, as the Manager, could have intervened as the Manager, Operations Manager could have said, "Let me" -- "Let me" -- what is it called -- "check her out. Let me help her with that." Would you be able to do that?

MS. JONES: Objection.

Misstates testimony. He didn't even say a Cashier refused to her help.

MS. MKRTCHYAN: Counsel, please, you are coaching the witness. Speaking objections I object.

MS. JONES: I'm going to interrupt if you misstate his testimony. I'm allowed to state that objection.

MS. MKRTCHYAN: Speaking objections are not allowed. You can say "Misstates the testimony" --

MS. JONES: Objection.
Misstates testimony.
MS. MKRTCHYAN: Thank you.
Q (BY MS. MKRTCHYAN:) So, you know, going back to my question, you saw that she was being refused service at the cashier. You were aware of that, right?
MS. JONES: Same objection.
Misstates testimony.
THE WITNESS: Yes.
Q (BY MS. MKRTCHYAN:) Okay. And you could have taken the step and said, "Look, as the Manager let me get in here and I will help her with the self-checkout or with the checkout," true? You could have done that?
A Yes.
Q But you didn't?
A Okay.
Q True?
A True.
Q Okay.
MS. JONES: Is this a good time for a break maybe? We've been going over an hour.
MS. MKRTCHYAN: Yes, let me just finish this line of thought.
Q (BY MS. MKRTCHYAN:) So, in order words, even if -- let me strike that.

You are -- when she was at the self-checkout and she was purchasing the item, you also did not help her at the self-checkout even though you could have, right?
A Correct.
Q Okay.
MS. MKRTCHYAN: Yes, let's take a ten-minute break.
THE COURT REPORTER: Off the record at 10:28.

(A recess is taken in the proceedings at 10:28 a.m., and the proceedings resume at 10:41 a.m.)

THE COURT REPORTER: Back on the record at 10:41.
Q (BY MS. MKRTCHYAN:) So, yes, let's go back to a couple of other points I wanted to make.
So you said that she was obnoxious, and I -- you know -- but you do have training how to deal with difficult customers, right?
A Yes.
Q And throughout your retail experience and training, general rule that the customer is always right unless with some exceptions, true?
A Yes.
Q Okay. So in -- and specifically at CVS, you were given specific training, right, how to deescalate

situations with bad customers, right?
A Yes.
Q Okay. And so you seem like a calm guy from what I can observe. You don't seem like a guy that is -- I would expect Guy Garcia to be a little bit more like aggressive, but you seem like a calm and level-headed guy.
How would you -- like you said that she was obnoxious.
What did you do in terms of kind of calming her down de-escalating the situation?
A I didn't try to calm her down.
Q Why not?
A I just didn't.
Q So you didn't want to deal with her?
A No.
Q Okay. But you could have, right, taken some steps to say, "Look. You know, why is she so upset?"
And this is the time of the pandemic, right?
A Yes.
Q People were upset.
A Yes.
Q And you did have a lot of people coming in with issues, you know, buying prescription drugs or medications, true?
A Yes.

Q Right. You're CVS Pharmacy.
So during the pandemic you did have a lot of people who were disturbed and distressed, lock downs et cetera, true?
A Yes.
Q You personally working as an employee, it was hard for you, right, working in an essential job function.
Was this considered an essential job?
A It was.
Q Right.
You're a Front Store Manager, Operations Manager, and you are sensitive to those issues, right? You know this is a pandemic period. You know all of us are going through a difficult time, and let us try to deescalate situations, right?
A Yes.
Q And so when -- you know, when she is there upset, et cetera, you said that you didn't do anything to calm her down, and she just left?
A After she made her purchase, she left.
Q Okay. And when she left, you said that she was flipping out people.
Who did she specifically flip out?
A Not flip out. She was flipping off.
Q Flipping off. Okay.

A That's not the same.
Q Okay. Tell me. Tell me what flipping off means to you?
A Flipping off is when you give the hand gesture of, you know -- you know what that means.
Q All right.
A Yeah.
Q But was that to you or generally to --
A It was to whoever was there and seeing it.
Q Okay. But it wasn't like -- did you feel threatened by her?
A "Threatened"?
Q Yes.
A No.
Q Did she have any physical aggression towards you?
A No.
Q Did you see her, you know, in any way do anything physical, throw stuff in the store?
A I didn't see it.
Q Did you hear anyone make such allegations that she was throwing stuff?
A No.
Q Did you ever see her make any physical aggressive movement towards -- what is his name -- Guy Garcia, your employee?

A Did I see her, no.
Q So she didn't seem to be a physically aggressive person on the day that she came?
A I didn't see anything.
Q And you didn't call the police on her on that day?
A The first time?
Q Yes
A No.
Q So her behavior was not threatening or violent or disruptive to the point for you to call the police, true?
A The first time, yes, no. I didn't call, and I didn't -- he didn't tell me he was going to call, and he didn't call on the first one.
Q Okay. All right. So then did you -- so we've covered this, but I want to make sure. So you never told her "You cannot come back to the store" when she left?
A No.
Q Neither did you hear Guy Garcia tell her, "You cannot come back to the store"?
A I didn't hear it.
Q Would it be possible that he said that?
MS. JONES: Calls for speculation.
THE WITNESS: I mean, anything is possible.
Q (BY MS. MKRTCHYAN:) Okay.

A I didn't hear it.
Q You didn't hear it?
A No.
Q You were standing together with Guy Garcia?
A No, we weren't standing together.
Q No.
But you were the last point of contact when she left, true?
A No.
The first time?
Q Yes.
A I can't say if it was him or me. Honestly, I don't remember that.
Q You were at the self-check. Let's go back.
And we'll watch the video surveillance to refresh your memory.
A Okay.
Q Well, you were standing by when she was at the self-checkout, right?
A Yes.
Q And then she left after that?
A Yes.
Q So you were there but not Guy Garcia, right?
A I don't remember who was there.
Q Okay. I mean, we both could have been there. I

could have been there. I don't know.

Q But you never watched this video surveillance. Okay.

But you personally did not tell her "You cannot come back"?

A No.

Q Nor did you hear Guy Garcia say that to her?

A I didn't.

Q Okay. Now, going to flash forward to January 19. Between January 13 and January 19th, that time before she was called the police, did you see her again that week period, six-day period?

A I can't remember that. I don't know. Maybe. Possible.

Q Okay.

A I don't know.

Q But it didn't really strike you as a significant encounter?

A No.

Q Okay. So January 19, what first drew you to her? What observations -- strike that.

What was she doing when you first saw her on January 19th?

A Again, that's a long time ago. I don't -- I saw her. I'm sure that Guy must have come to me and told me

like, "She's here again," and we just proceeded from there.

Q Okay. So you believe it was Guy Garcia must have brought your attention to her?

A Yeah.

Q Okay. And what was she doing at that point in time when you first saw her?

A She was in the store with her face not covered.

Q I'm sorry?

A With her face uncovered. It was not covered.

Q It was not covered?

A Well, you know, the same way. It was like down here, (indicating) but, you know, you say that's partial covered. Okay.

Q So she was not fully wearing a face mask again, right?

A Well --

Q Let me finish.

On January 19 when she came, you're maintaining that again her face mask was not fully covering her face?

A Correct.

Q And when Guy Garcia brought your attention to her, what was she doing other than that?

A Just walking around, I guess, shopping. I'm going to assume she was shopping.

Q Did she ask to speak with the Manager on that day?
A No.
Q She didn't say, "I want to talk to a Manager"?
A No.
Q What was she saying?
A I didn't talk to her.
Q So did you hear her talk with Guy Garcia?
A No.
Q Okay. What happened next?
A What happened next?
Q Yes. What happened?
A She just went on with her shopping, whatever she was doing.
I'm pretty sure Guy said, "I'm not going to check her out because she's not covering her face," and she went to the self-checkout again and checked herself out.
Q And then what happened?
A And she left.
Q That was on January 19?
A Is this when the police came?
Q Yes.
A Oh, when the police came, no. She was asked to leave the store. She was being loud. She was -- disturbing the store.

We asked her to go. She refused to go. We said, "We're going to call the police."

She said, "Go ahead. Call them," and we called them.

Q I wanted to make sure that it's clear because my question a minute before was only about her face. The second time you saw her, after January 13 happened, you told her to leave. She left. I'm talking about now the day when the police was called on her.

A Right.

Q So when she came to the store, you're saying that she was again not fully covering her face?

A Again.

Q And then Guy Garcia brought your attention to her and said, "She's here again," right?

A Yes.

Q And then you had a conversation, you know. She -- you know, you told her she had to leave?

A We told her that she needs to leave the store or we're going to call the police on her.

Q You did tell her --

A Yes.

Q -- that you were going to call the police?

A Yes.

Q What did she do?

A She said, "I don't care. Call them."
Q And then what happened next?
A And we called them.
Q You called the police. Okay.
And so how long was she in the store that day?
A Ten minutes, fifteen minutes, maybe.
Q Okay. So did she bring anything up beside from that she was telling you to call the police? Was there anything else that you discussed with her?
A Besides her being disruptive, nothing much.
Q What was she doing being disruptive?
A She was at the front of the store. Customers were like watching her. She's being loud. Again obnoxious, not a nice person, and we called the police, and we asked her to leave, and she wouldn't leave. We called the cops.
Q Okay. Did you ever record --
A No.
Q And obnoxiousness, there are different -- you know, there are different behaviors that fall under obnoxious; so let's just parse it out.
So, you know, was she loud in her tone of voice?
A Yes.
Q Was she physically abusive or aggressive in any shape or form?

A No, not to me.
Q Okay. So that's all. She was loud? Is there any other thing, any other thing that you would call obnoxious?
A She was being loud and refusing to leave the store when asked.
Q That's it?
A That's it.
Q Did you ever see her throw stuff on the store -- in the store, like take stuff and throw it?
MS. JONES: We're talking about the 19th, right?
MS. MKRTCHYAN: Yes.
Q (BY MS. MKRTCHYAN:) We're talking now on the date that she was called the police.
A I didn't see that.
Q Did any employee brought your attention to any items thrown in the store that allegedly was done by Plaintiff?
A No.
Q And on that day was Timothy Riddle working, to your knowledge, to your memory, to your recollection?
MS. JONES: Objection.
Asked and answered.
THE WITNESS: Again, he could have been there. I'm not sure.

Q (BY MS. MKRTCHYAN:) Okay.
A I mean, he doesn't work for CVS now so ...
Q Okay. Right.
But, you know, generally when you have nightshift, how many employees field the nightshift or staff the nightshift? How many people?
A It could be -- besides myself, it could be two to seven people. It just depends on what is going on.
Q Okay. So it's not like it's a specific pattern or practice? It varies?
A It varies because we have loads. We have days that we don't have loads.
Q I see.
Do you have inventory days?
A We don't do inventories.
Q You don't do inventories?
A No.
Q The loads, what do you mean? Items come, and you have to --
A Yeah, put it out.
Q -- put it out.
But you don't remember other than you and Guy Garcia, any other employee present on January 19th?
A I don't recall it.
Q If I played the videos with you, will you be able

to recognize the employees?
A Yes.
Q Okay. Because, to my knowledge, information provided to us, you know, from both sides, is that Timothy Riddle was there.
A Okay.
Q Do you have any reason to doubt that?
A No.
Q We'll watch the video, and we'll confirm, but other than that, did you remember a conversation with her about her having a disability that that is why she was not able to wear a face mask?
A No.
Q Do you remember her show a document to you or attempt to show you a document proving that she had a disability?
A She attempted to show me a letter that she said was from her lawyer.
Q Her lawyer, not a doctor?
A Not a doctor.
Q Okay. But did you try to see that? "What is this woman trying to tell me?"
A No.
Q Why not?
A I didn't. I don't want to read something from

your lawyer.
Q Okay. But the customer comes, and what was she telling you why she wanted to show you the letter?
A Because the letter states that she doesn't have to wear a mask.
Q Okay. Right.
Weren't you curious? I mean, if you're telling her, "You have to leave because you're not wearing a face mask," wouldn't it be your job duty and obligation as a CVS employee to find out if she has good cause or grounds for that?
A It may be, but I didn't read it. I didn't look it at.
Q But you could have?
A I could have.
Q "Let me look at this. Show my Manager. Show" --
A There was no one to show, just me.
Q Right.
But you were the final -- at that point in time --
A Yeah.
Q Let me finish.
On that day, you were the Operations Manager?
A Yeah.
Q And, you know, it was on you. You could have

done that.
A Yes.
Q You didn't?
A No.
Q Is there any reason why you didn't?
A I didn't because I already told her she had to cover her face, and she wasn't complying.
Q So you didn't follow the Huddle Guide by the CVS that states that you cannot refuse service to customers who are not wearing a face mask?
A Correct.
Q And you did not -- you were not aware that even employees at CVS could ask for reasonable accommodations?
A Correct.
Q And when the police -- so, you know, came in, were you present? Did you watch the police?
A When they came in?
Q Yes.
A They came in. I saw them. They asked what was going on. We explained it to them. They took her out.
Q Did you know police officers by face or by name at the time?
A No.
Q No.
So they don't like regularly come there?

A They come regularly.
Q Regularly?
A Yeah.
Q But it's different officers every time?
A Yeah.
Q Okay. So -- but you didn't personally pick up the phone and call the police?
A No.
Q It was Guy Garcia?
A Yes.
Q And do you have -- obviously you have a store phone, telephone in the store, right? Did he use a store telephone to call the police, are you aware, or his own cell phone?
A I don't know.
Q Did you actually see him make the call?
A I did not see it.
Q And you were not present when he talked --
A No.
Q -- to the dispatcher?
A No.
Q Did you know what he told the dispatch when he called?
A I don't know.
Q But when he came to you, you were there, right?

You guys were standing there when he was calling the police, right?
A We were -- I was standing there?
Q Well, weren't you talking together when he was telling you why he was calling the police?
A He wasn't calling at that point.
Q Okay. I understand.
But what was your understanding he was calling the police on her for?
A Because she was refusing to leave, and she was being loud, and that was the reason we were calling because she was asked not to come back already without covering her face, and she came back anyway.
Q Okay. We just covered this.
You said earlier that when she left on January 13, neither you nor you did not hear anyone tell her that she could not come back, true? You remember --
A Right, but I'm saying what he said.
Q Who?
A That's what Guy said. I'm saying what he said.
Q So you were taking Guy's words --
THE COURT REPORTER: I'm sorry. Both of you are going very fast. There is no pauses between the question and the answer; so I'm really ...

(The testimony is read back.)

THE WITNESS: Correct.
Q (BY MS. MKRTCHYAN:) Hold on.
It wasn't like you personally were aware that she was banned from the store?
A Correct.
Q Because you personally did not ban her from the store, true?
A Correct.
Q And let me ask you this.
Is there any policy that you can point to in the CVS guides anywhere that allows you to just basically ban someone from the location?
A Is there any policy?
Q Yes.
A No.
Q No.
So how are you going to -- well, do your job if there is no policy like that?
A Okay. So I've never banned anyone personally; so I don't know about that.
Q Okay. So you in your practice working in retail for how many years 30, 40 years?
A Well, a long time.

Q Right. Yes. I don't want to find out your age.
A Yeah.
Q But in your practice, you never banned someone?
A No.
Q Okay. And you never working for CVS in this six years --
A Yes.
Q -- you never banned anyone from the location?
A No.
Q And when Guy Garcia comes, he's working for you, he's a Shift Supervisor and says, "She was banned from the store, and I am calling the police on her," did you have an option to say, "Look. Excuse me. Wait a minute. Wait a minute. I'd like to know more information before you call the police." Did you do that?
A Did I have an option to know?
I had an option to know, yes.
Q And you didn't do that?
A No.
Q And you allowed him to call the police?
A Yes.
Q Even though you had no personal information as to who banned her from the location, true?
A True.
Q And for what reasons?

A True.
Q It was just Guy telling you, and you took his word?
A Yes.
Q Okay. But you were supervising him?
A Yes.
Q And you could tell him, "Look. Perhaps we should take care of this situation with this difficult customer on our own and by ourselves"?
A You mean I could have said that?
Q Yes.
A I could have said that.
Q Okay. Let's look at some of the policies that we have at CVS for dealing with difficult customers because I understand you said she was being obnoxious, and I get it because I worked in retail, but let's look at what is CVS providing you in treating such customers.
So let me -- have you seen this kind of a training? Have you passed through that Capstone Course 550225 on -- and this is document 482 on -- you know, these are training modules produced by your employer.
Have you ever seen this? Does this look familiar to you?
A I mean, I have probably taken 150 modules.
Q But it looks familiar?

A It's possible.
Q And it's an interactive process, right? You are given some scenarios, quizzes, asked questions, and then you have to click on the button, and then you're told if you got it correct or wrong?
A Yes.
Q Okay. And you remember -- when was the last time that you went through this kind of a training; do you remember?
A Last week.
Q Oh, really? Okay.
So you periodically go through this?
A Yeah.
Q And so here it's giving you, you know, scenarios. It says, "Interact with the customer by choosing an action."
So, you know, it gives you various questions, how you respond. So it says, "I just started my shift. Someone will be right with you."
"You smile to acknowledge the customer."
"You go to see who will be working with today."
"Hi there. Can I help you find anything?"
"You hover around the customer in case they need something."
So these are five options that are given to you

in this quiz, right?
A Yes.
Q Okay. And what -- which one would you choose in this circumstance? You know, what kind of an action would you choose if you were you?
A Probably the second one.
Q Okay. So "You smile to acknowledge the customer."
And so the question then comes in, "Can you help? My wife wants me to get some special shampoo for colored hair." Do you have that here? What do you do next?"
It's giving the options -- several options, but one of them, which is the right one, "Follow me. Let's see what we can find."
So it's giving you an option, several options, and the right one is to actually "Follow and help the customer to find the item," right?
A Yes.
Q Okay. So -- and it provides an answer. It says, "Accompanying the customers to find an item is excellent customer service."
So you're aware of this, that this is what your training is requiring you to do, right?
A Yes.
Q Not to send the customer away, not to ignore

them, true?
A Yes.
Q Okay. So let's continue with this.
Let me find another customer service. "The customer seems annoyed. What do you do?"
So there is three questions, "Can I help you find something?"
Second, "Straighten up the shelves as an inconspicuous way of staying in the aisle in case the customer needs something."
"Avoid eye contact and get out of the customer's way."
Which one would you choose?
A It should be the first one.
Q Okay, let me give you a hypothetical -- well, not a hypothetical, but based on the testimony of Plaintiff, when she came in the second time on the day when the police was called on her, she came into the store and she asked to speak with the Manager about the dispute she had previously, but she was ignored.
So taking that truth and giving you what she testified, if that would happen, would that be consistent with the CVS customer policy and training of ignoring her?
A Say that one more time.
Q If that's what happened, if she was ignored when

she asked to speak with a Manager, would that be consistent with your training in this case?
A No.
Q Because your training and experience says you've got to help them find whatever she needs, and you need to tell them, "Can I help you" --
A Yes.
Q -- right?
That's basically customer service.
A Yeah.
Q All right. So -- and then, you know, we have a customer who says, "Nowhere I can find this item. I don't know why I even try," et cetera, so an annoyed customer.
It gives you scenarios. It says, "Sorry about that. Is there anything I can do?"
Second, "Yeah, that's the problem with big corporations."
Third, "we just ran out. You should have been here earlier this week."
Fourth, "I would be happy to look for you. What were you trying to find?"
So which one would you choose?
A Four.
Q Okay. So common sense or basic training tells you that you have got to help the customer find what

they're here for, right?
A Yes.
Q Not just, you know, displace or ignore the request or divert your attention, right? You have to actually help the person, even if the person is annoyed, to help what they're looking for, right?
A Yes.
Q So if Miss Burmayan testified that, you know, when she was asking to purchase the item, and even when the self-checkout she was having difficulties, but you didn't help her, would that be consistent with your customer service and training?
A No.
Q All right. And you need to have happy customers most of the time, right?
MS. JONES: Objection.
Vague.
THE WITNESS: You want to, right.
Q (BY MS. MKRTCHYAN:) Right. Okay.
So we have even more interesting situation here in the training guide. It says, "Clearly the customer is upset. What steps can you take to deescalate the situation?"
Number one, "Using a calm, quiet tone ask the customer if you can help with anything."

Second, "Mirror the customer's body language."
Third, "Confirm your understanding of the issue by restating it back to the customer."
Fourth, "Empathize. I understand why you would feel that way."
Fifth, "Immediately call the Manager."
How would you go about doing this scenario?
A It should be three.
Q "Confirm your understanding of the issue by restating it back to the customer"?
A Yes.
Q How does this deescalate the situation?
A Well, it means you're listening to them.
Q You're not ignoring, right?
A Yeah.
Q Okay. What else? How else does this deescalate?
A I mean, I just think that it shows that you're listening, and you're actually caring to help them.
Q Okay. So let's see if that was the accurate one. Let's see.
And then it says, "Choose an appropriate body and facial expression for approaching customers."
Obviously it gives you, you know, some options.
Which one would you choose out of this three options? So from left one, two, three?

A Two.
Q Two.
Okay. So the second one?
A No. Well, are they together?
Q You have to pick one of them.
A Okay. So I can pick a different one on each line, right?
MS. JONES: I don't think she would know.
THE WITNESS: All right.
Q (BY MS. MKRTCHYAN:) You know, I think he can --
MS. JONES: It's not her training module; although, this exercise is fun.
Q (BY MS. MKRTCHYAN:) You've seen this, right?
A Yeah.
Q But which one would you choose in this scenario when the customer is upset? What kind of body language would you choose?
A I would say on the first one, I would pick the second one, and on the third one, I would pick -- on the next one, I'd pick the happy face so ...
Q So I didn't understand.
So for the scenario that I just provided to you --
A Because it doesn't make sense. I'm trying to understand it.

Q No. The first one is -- look, the first one is the body language and the facial expression.

A Okay. So it's together. That's what I asked you.

Q Yes.

So the body is corresponding to the -- to the facial expression.

A Okay.

Q So which one would you choose? Number one, the green, the light green, or the yellow?

A The yellow.

Q Okay. So smile, right, smile?

A Yeah.

Q Okay. It says, "Empathy, showing you care. Do's and dont's."

You know, it basically tells you what is appropriate and what is not appropriate. Let's look at this.

"Discount emotions because it seems irrational."

Is that appropriate for you? Would you discount emotions because it's irrational, it's obnoxious?

A Would I discount it?

Q Yes.

A No.

Q In this situation when Miss Burmayan was there

the first or second time, and she was trying to talk with a Manager and explain her situation, provide a letter even from her lawyer or anyone that she believed that she had explanation for why she could not wear a face mask, would it be appropriate to actually take the letter and review it to give her empathetic listening?

A Would it be appropriate?

Q Yes.

A I don't think so.

Q No?

A No.

Q So you don't think that that could de-escalating the situation?

A I don't think so.

Q And when she's going through the self-check aisle and you're standing there but not helping her, is that, according to your policy and training, that, you know, do you think that that is appropriate?

MS. JONES: Objection.

Vague as to "appropriate."

THE WITNESS: She would have to request help. I'm not going to go there and just start helping her.

Q (BY MS. MKRTCHYAN:) But you saw her actually asking to, you know, register. She went to the register, right, first before the self-checkout, true?

A Yes.
Q And you saw that she was trying to purchase it?
A Yeah, yes.
Q We went through this.
You did not actually help to check out the item yourself, true?
A Right, but you asked about the self-checkout.
Q I'm talking about now. She went to self-checkout only because she was refused the service at the register, true?
A Yes.
Q So you could have actually assisted her, you know, in purchasing the item at the register as a Manager?
A Yes.
Q You didn't do that?
A No.
Q Okay. So -- but you think that's consistent with your training?
A It's not.
Q So then let's look at some others.
"Echo the core issues to demonstrate your understanding."
Would you do this in the scenario where you have a customer that is just unsatisfied, unhappy and upset, "Echo the core issue to demonstrate your understanding"?

Would you do that?
A Yes.
Q Okay. Would you "Offer respectful choices"?
A Yes.
Q "See things from the other person's point of view"?
A Yes.
Q "Only focus on the facts without focusing on other things"?
A Yes.
Q And "Get defensive if the person's behavior is belligerent"? Would you do that?
A That's a tough one.
Q So do you think that you did get defensive on the day when Miss Burmayan was basically trying to purchase this item and then she was called the police?
MS. JONES: Which days?
MS. MKRTCHYAN: Both days.
THE WITNESS: I didn't get defensive. I didn't. I just didn't help her.
Q (BY MS. MKRTCHYAN:) What about Guy Garcia, did you actually see him make an attempt to even look at the paper she had in her hand?
A I didn't see it. I didn't pay attention to that.

Q Both of you were standing there when she was attempting to talk, right?

A Yeah.

Q Yes?

A Yes.

Q And when she was there, and you said she was disruptive, did you see any customers, you know, leaving the store feeling, you know, somehow disturbed? Did you see any customers like that?

MS. JONES: Objection.

Vague as to time and which day.

THE WITNESS: I didn't see it, no.

Q (BY MS. MKRTCHYAN:) Did any customer approach you and say, "Look, you know, this is" -- "You know, we don't appreciate this, what is going on"? Did any customer complain to you about her?

A No.

MS. JONES: Same objection.

THE WITNESS: Not to me, no.

Q (BY MS. MKRTCHYAN:) So, yes, so here is the correct ones were, you know, for example, "Don't only focus on the facts," you know, that was something that you cannot do. You could -- you should "Echo the core issue to demonstrate your understanding."

Since this is an interactive process, it doesn't

give us all of the options, but you get the. You get get all of the training to give you basic scenarios how to respond in situations when a customer is being difficult, obnoxious, and disruptive, true?
A Yes.
Q And the core value of CVS is to deescalate the situation and call the police only in extreme situations, true?
A Yes.
Q Okay. And some of the extreme situations, as we discussed, shoplifting, right?
A Yes.
Q Threat of violence --
A Yes.
Q -- for safety, your personal safety?
A Yes.
Q On the day of the -- on any day that you saw Miss Burmayan, did you feel personally threatened by her?
A Because of her not covering her face, yes.
Q You felt threatened?
A Yes.
Q Only COVID situation, right?
A Yes.
Q The pandemic?
A Yes.

Q But not physically threatened, right?
A I mean, I felt threatened that I could get sick from her.
Q But you didn't feel violence from her?
A No violence.
Q Not threatened by any physical aggression or anything like that, true?
A No.
Q So you felt threatened only insofar as you believed that COVID existed, and you needed this to be taken care of?
A Yes.
Q But you were not aware that your policy both accommodated disability for wearing a face mask? You were not aware of that, true?
A Right.
Q And you were not aware that you at the CVS Pharmacy could not deny service to anyone who is not wearing a face mask at all?
A Right.
Q So let's see as a Manager, because as a Manager when you are in a leadership role, you're given a different -- you know, you are a leader, and you -- you deal with other employees handling difficult customers, right? So you were aware of that as a leader of the store

on the night when the police was called, correct?
A Correct.
Q So let's look at some of this training in a leadership role.
517 CVS, for the record -- well, for the record, let's make sure the ones we just looked at were Bates Stamped 482 through 516, and now is the leadership training manuals from 517 through 527.
So you have your employee coming and telling you, "A colleague here" -- let's look at 522. "A colleague reported that Tom, a new front store colleague looked like he needed help with a customer. Their conversation seemed to be getting heated, and you may have to intervene, and you immediately go to see how you can help," right?
So as a Store Manager, this is familiar to you, this kind training? Did you ever receive this kind of training in leadership?
A Yes.
Q So let's see what happens next. "Things have escalated a little further. By the time you reach them, the customer is yelling obscenities. How do you approach the situation?"
Let's make sure you can see this. Anytime you don't see this, I can make this a little bit better and clearer.

So all right. So there are two options here. We have a yelling customer. "Approach the customer and use a calm, quiet voice, 'Excuse me. I'm the Manager on duty. Can I help you?'"

Second, "Approach the customer and use a calm loud voice, 'Excuse me. I'm the Manager on duty. Could I help you?'"

Do you use a quiet or loud tone of voice when you approach this kind of situation?

A Quiet.

Q Of course. It's common sense, right?

So why do you think you should actually -- the customer is yelling, the customer is obnoxious. Why do you have to be quiet? What is the purpose behind that?

A It's not going to help if you yell with them so ...

Q Right. And it's also training specifically for you to deescalate, right?

A Yes.

Q And then -- so that was correct, that you have to use quiet voice in approaching this.

Then what are some of the other effective de-escalation techniques, "Taking notes, explaining to the customer that you want to make sure that you report all of the details of their concerns."

"Grabbing the customer's cell phone so that they are unable to record video."

"Use clear and concise language offering positive choices."

"Offer to call 1(800) shopCVS so the customer can lodge a complaint."

Which one would you choose out of this?

A One.

Q Okay. So you want to make sure that she's being heard, number one, right? Explaining to the customer you want to make sure that you report all of the details of their concerns, which means that you're actively listening, right --

A Yes.

Q -- to respond to her concerns?

Okay. You don't grab the customer's cell phone, right, so that, you know, basically they feel like they cannot do anything, right?

A Correct.

Q Right.

And then you don't tell her, "Go complain, file a complaint with the CVS.com or 1(800) shopCVS," right?

A Correct.

Q There is also another one. It says, "Use clear and concise language using positive choices." That's

another option.
What would you think about that one, sir?
A I mean, it's possible you can use that as well.
Q Okay. So let's look at which one -- well, I guess it's not giving us -- but, you know, it doesn't offer you which one it is, but it gives you some options, and it says, "Who should you call when you need help?"
"All de-escalation tactics have failed. Customer refuses to leave the drive-thru until they get what they want, customer refuses to show proper I.D. for age restricted product. You feel violently threatened, customer has threatened to wait outside to fight you, customer was hurt by another customer in the store."
So those are the situations when you call 911, police, or your leadership for backup?
A Right.
Q Before that, you have to deescalate the situation, right?
A Yes.
Q And the customer has to actually refuse to leave, true?
A Yes.
Q So let's say you are trying everything, you're telling the customer, "Please leave," and the customer is not leaving, and then there is -- violence is imminent.

It's one of the main requirements for you to call the police, true?

A Yes.

Q And then customer has made threats to fight you or is even was hurt -- or is hurting another customer, true?

A Yes.

Q So violence is required one of the reasons for calling 911, true?

A Yes.

Q Okay. And this is 526 for the leader -- of leadership training called Capstone Course 550225, Volume 2 or V2, true?

A Yes.

Q And you remember getting this training?

A Yes.

Q So isn't it true based on this training that we see basically there must be some threats of violence, imminent threats of violence, imminent threats of violence before you call the police?

A Well, she fits under the number two.

Q It gives all of the things that you have to actually fulfill before calling the police, right?

A Those are different reasons to call the police.

Q So you're saying that actually if the customer

is, you know, basically refusing to leave, you can call the police?

A Yes.

Q That's what your understanding is?

A Yes.

Q So let's look -- that's what your basic understanding of the policy is?

A Yes.

Q If you tell a customer she's, you know -- you know, to leave, and that person is not leaving, you can call the police?

A Yes.

Q Regardless of the reasons you are telling her to leave?

A Well, I wouldn't -- yes, yes.

Q So you can just basically tell anyone to leave for whatever reason as a CVS employee?

A Not whatever reason. If they're doing something that the police needs to be called, we call them.

Q Okay. But in this situation, can you tell us all of the reasons what Anoush Burmayan was doing that you allowed Guy Garcia to call the police?

A She was refusing to leave.

Q Is there anything else?

A No. She was refusing to leave.

Q She was not violent towards anyone?
A No.
Q She was not attacking anyone?
A No.
Q You didn't see any customer being bothered by her?
A No.
Q You didn't see her throw anything on the floor?
A I didn't see it, no.
Q And she was in the store about ten minutes?
A Ten, fifteen minutes.
Q We are going fast.
A Sorry.
Q So. Okay. So she was refusing to leave.
Where was she standing where she was refusing to leave?
MS. JONES: On which day?
MS. MKRTCHYAN: On January 19th because we are talking only about the day when --
THE WITNESS: When the police were called?
Q (BY MS. MKRTCHYAN:) Yes?
A Okay. Yeah. So at the self-checkout or -- in the front end of the store when she was being asked to leave.
Q And what was she doing there that was interpreted

to you that she was refusing to leave?
A Besides not leaving?
Q Yeah.
A She wasn't leaving when she was being asked.
Q How many minutes=, first of all, was she told -- who told her to leave, by the way? Strike that -- who told her?
A We both told her to leave. Guy told her to leave. I told her to leave.
Q Okay. Did you tell her the reason why she needed to leave?
A No.
Q Okay. And did you tell her that you were not allowed to come back to the store?
A I did not tell her that.
Q Because you didn't know that?
A Correct.
Q So -- but did you hear Guy Garcia tell her, "You were banned from the store. You've got to leave"?
A I did not hear that.
Q And what made you believe she was refusing to leave if she was standing by the front door?
A She was standing at the self-checkout.
Q Self-checkout.
A Yeah.

Q That's where you believe she was standing where --
A She was standing by the self-checkout, not by the door. She left when she felt to leave.
Q How many minutes passed from the time you told her to leave and when she was arrested by the police officer?
A I don't know how many minutes. I don't know. I don't know. I don't want to guess.
Q And you didn't know what time or when within that period -- ten-minute period that she was in the store, Guy Garcia called the police on her?
A No.
Q How did -- let me ask you this.
Did you see the police officer enter the store?
A Yes.
Q Did you know that officer?
A No.
Q Okay. And you were present when he actually talked to her?
A They took her outside. I was not present.
Q Did you -- were you present when you saw him handcuff her?
A I did not see him handcuff her.
Q Were you present -- did you tell the police

officer that you needed him to arrest her?
A No, I did not say that.
Q So you never asked?
A No, no, no.
Q Mr. Johnson --
A Sorry.
Q -- please, I pray.
Did you ever tell officer -- any officer on the date that you want to make a private citizen's arrest of her?
A No.
Q Are you -- do you know what is private citizen's arrest term?
A I've heard it. I've never used it.
Q And in your training as a retail, you know, Manager or employee, did you ever ask the police to make a private citizen's arrest?
A Never.
Q Okay. But you're aware that you can ask a police officer to arrest someone on your behalf by law?
A On my behalf?
Q Yeah.
A I'm not aware.
Q So you know what does private citizen's arrest mean to you?

A A person that is a non-officer would be arresting them. That's what I would think that means.
Q Okay. So you don't know -- okay. So let me break it down.
Were you ever told by CVS that you actually can -- you yourself as an employee can arrest someone?
A No.
Q Okay. Were you told by CVS that you can ask a police officer to make an arrest on your behalf?
A I think I've heard that.
Q But have you ever used that --
A No.
Q And on this date when the police officer entered the store and spoke to you, right, he spoke to you, right, he must have spoken to you?
A Must have, yeah.
Q Okay. Because after he placed her in the car, he came back and spoke to you?
A Right.
Q Did you tell him the story that -- about Miss Burmayan and why you called the police?
A Yes.
Q Okay. Do you remember what you told him?
A No.
Q What would you have told -- I mean, right now

from the information you know right now, what did you -- what would you have said to him?

A I would have told him that she's refusing to leave. We asked her to leave, and she's not leaving.

Q Okay. You never told the officer that you wanted him to make a private citizen's arrest of her?

A I don't know what -- I didn't use those words, no.

Q Okay. But did you tell the officer who came to you and talked to you about this that you wanted her arrested?

A Maybe, yes, yes.

Q Okay. And those are the things you said that you asked her to leave. She was refusing to leave.

Did you tell the reasons why the police officer --

A Yeah.

Q -- why -- let me finish.

Did you tell them the reasons, everything that you knew at the time about why you wanted her to leave?

A Yes.

Q Okay. And when -- did you -- was Guy Garcia also talking with the police officer, or is it just you?

A It was during a separate time because we didn't talk together.

Q No?
A No.
Q Did you ever tell the police officer that she was banned from the location?
A No.
Q No. So if you told the officer who came to talk to you on the day of Miss Burmayan's arrest that she was banned from the location, that would not be true because you never banned her from the location?
A I didn't even know about the ban; so, no, I didn't say it.
Q You never informed the officer?
A No.
Q Are you aware if Guy Garcia made such statement to an officer?
A I'm not aware.
Q Okay. Have you seen any reports in this case of the arrest?
A No.
Q If I were to tell you that in the police report by the officer who was involved in this arrest it states that "The CVS employees told me," specifically Guy Garcia, "that Miss Burmayan was banned from the location, and she came back, and, therefore, you know, she was asked to leave, and now we want her out, we want her to be

arrested," basically in those words, I can read the report for you, would that sound accurate to you in terms of what you know as of right now as you're sitting here and testifying under oath?

A That sounds accurate. If someone was banned from the store, yeah, you would use those words, yes.

Q But you didn't know that, right?

A Yeah.

Q You are not aware of her being banned from the store?

A I'm not aware.

MS. JONES: Objection.

Asked and answered.

Q (BY MS. MKRTCHYAN:) So if -- you know, if that happened, it was not -- that information did not come from you?

A No.

Q It was from Guy Garcia?

MS. JONES: Objection.

Calls for speculation.

THE WITNESS: Yeah. I don't know that.

Q (BY MS. MKRTCHYAN:) Okay. But you were the Manager, right?

A Yes.

Q And if your employee is providing a statement to

the police officer that you believe is not accurate, what would you do in that circumstance?
A So if she was banned from the store, I didn't know about it. He could have banned her on the day that I wasn't there. I didn't know about it. It's possible. Maybe -- I don't know. I don't know everything. If she was banned, maybe he banned her or told her not to come back.
Q Okay. But let me ask you this. As the store's Operations Manager, you were supervising Guy Garcia, true?
A Yes.
Q Where you worked together, he was under your supervision?
A Yes.
Q Okay. And on nightshift in January of 2021, he was always working under your supervision?
A Unless I'm off, yes.
Q Okay. Were there any off dates that -- well, strike that.
If -- you know, if you are aware that Guy Garcia had interactions with her on January 13 and January 19th, same dates that you were there --
A Okay.
Q -- and he banned her from the location, would -- as a Store Manager or as an Operations Manager, would you

have to have approved that decision?
A No.
Q No.
So there is no obligation by you or by policy, there is no obligation for him to get approval from the higher-up to ban someone from the location?
A No.
Q So then how does CVS monitor if employees are fulfilling the policies or laws in that regard?
A I don't know.
Q Have you ever seen any specific policy or training that you can tell me from memory? I understand you cannot give me numbers, et cetera. Have you ever been trained that you can specifically ban someone from a location?
MS. JONES: Objection.
Asked and answered.
THE WITNESS: If they're doing something, stealing, shoplifting, anything like that, yeah, you can ban them them from the store.
Q (BY MS. MKRTCHYAN:) Okay. Shoplifting, one reason?
A Yeah.
Q Is there any other reason that you can remember that you can ban someone from a location?

A I would not say -- if they're stealing, if they're being unreasonable, if they're being loud, if you feel unsafe with them there, yeah, you can ban them.
Q You can ban them?
A Yes.
Q So -- but can you point to a policy that states that, that those are the reasons you can actually ban -- and banning, you understand the English -- let's define banning.
Banning, it's preventing someone from ever entering that location, true?
A Yes.
Q You understand?
A Yes.
Q So, you know, knowing that definition, can you point to me any policy specifically expressly used by an employee to ban indefinitely someone from a location for whatever reason?
MS. JONES: Sorry. Can you repeat that question? Can you read it back?

(The question is read back.)

MS. JONES: The objection was asked and answered.
THE WITNESS: No.

Q (BY MS. MKRTCHYAN:) Okay. And you were also not trying to get approval by your supervisor before banning someone?
A No.
Q So if you right now were working today -- let's say you're going to be going back to work today, nightshift?
A I hope not.
Q So -- but, you know, what procedure would you have to follow in banning someone for whatever reason?
A Okay. Again, I have never banned anyone. So I don't know what situation I would ever do that. I have never done it.
Q Okay. So you don't know what kind of procedure is it?
A No.
Q And are you aware that you also have to provide some written notice to the person having that person sign acknowledging that they're banned, anything like that that you're aware of?
A No.
Q Have you seen any forms like that at CVS?
A No.
Q So you're just basically saying, you know, "You cannot come back"?

A No.
Q But you have never done that?
A Never.
Q You had Guy Garcia do it in this case to you knowledge with Miss Burmayan?
MS. JONES: Objection.
Misstates testimony.
THE WITNESS: I didn't have him ban her. I didn't know that he had done it.
Q (BY MS. MKRTCHYAN:) Let me ask you this.
You didn't know, but when he tells the police officer -- or, you know, didn't you hear him tell the police officer she was banned from this location?
A No.
Q No.
So you were telling her to leave just for on that day?
A Yes.
Q She could come back?
A Yes, as far as -- yes.
Q So on January 13th when you said "Go, you have to leave" your understanding was that she could come back if she was fully complying --
A Yes.
Q Okay. So let's finish this.

So on January 13th, your understanding when you told her to leave the store, she could come back if she fully complied with the face mask?

A As far as I was concerned, yes.

Q And you did not hear anyone tell her "You cannot" -- "Indefinitely you're banned from this location"?

A No.

Q All right. So now let me just look at this. Let's look at some of the interaction that happened between her and the police officer.

So right before the police officer came in you said that -- did you see her doing anything else aside from just not leaving the store? Is there anything else that struck you?

A Not that I can remember, no.

Q Was she yelling?

A Yes.

Q What was she saying?

A I don't remember what she was saying.

Q Did you ever record that?

A I didn't record anything.

Q Why wouldn't you? Why?

A It's not something I do.

Q If she was yelling and you said that she was

obnoxious, why wouldn't you record that for proof if you're calling the police?
A I didn't.
Q Okay. So did you see Guy Garcia --
A I didn't see it.
Q -- video record?
A I didn't see it.
Q And what else was she doing?
A That is what she was doing.
Q Okay. And at the time you are maintaining still her mask was still not covering her face?
A Right.
Q And then the police officer comes in.
What do you remember of that interaction? How many officers did you see?
MS. JONES: Objection.
Asked and answered.
THE WITNESS: I saw one officer that came in.
Q (BY MS. MKRTCHYAN:) Okay. What happened then?
A And then she went out with them, and I don't know -- I didn't follow.
Q You didn't follow them?
A I did go out after when he told me that he was going to let her go.
Q Okay.

A Yeah.
Q So let me just take it step-by-step.
So he came.
Did she talk to him?
A I'm sure. I didn't hear it.
Q How far were you standing from them when this was happening?
A I don't recall how far. I don't remember.
Q All right. But, you know, give me an estimate. Was it like a minute or two that this interaction happened between the customer Anoush Burmayan and the police officer? How many minutes would you say?
A How many minutes?
Q Of their interaction?
A I can't -- in the store it was quick. It was quick, a minute or so, a minute or two.
Q Okay. Was she explaining things to the officer?
A I didn't hear her.
Q Did you see her showing papers to the officer?
A No.
Q Okay. Did you see the officer handcuff her?
A No.
Q So how did they go out then?
A She walked out.
Q Okay. But was it accompanied by the officer?

A Yes.
Q Was the officer guiding her?
A I don't remember that part.
Q You don't know?
A No.
Q Did you follow them outside?
A I didn't follow them immediately out. I may have went to go out and look and check what is happening, but I didn't go out there and flaunt myself.
Q Okay. But at some point the officer comes back and talks to you?
A Yes.
Q How many minutes passed before the officer left with her and came back?
A Maybe ten minutes, fifteen minutes.
Q So you had no idea of what was happening outside between her and the officer; is that --
A I could hear her from inside of the store screaming in the car.
Q Okay. So you were still inside of the store?
A Yeah.
Q Not leaving?
A Yeah.
Q Wouldn't you be curious to know what is happening with her and the officer to come out and watch? You

called the police.

A No.

Q No.

Did Guy Garcia come out?

A Probably. I would say he did.

Q Okay. So you did not see how she was placed in the patrol car?

A I did not.

Q Do you remember the officer's patrol car outside?

A Yes.

Q How many officer patrol cars?

A I don't remember how many, one or two.

Q Do you normally have patrol cars patrolling the neighborhood in that area of CVS?

A Yes.

Q Okay. So it's a regular occurrence?

A Yes.

Q Is this CVS store in a bad area?

A Yes.

Q Is it? This is Los Felis and Central?

A Right on the border of Glendale.

Q Near the --

A The L.A. River, by the L.A. River.

Q And the Memorial Hospital?

A Yes.

Q So, you know, this is a bad area?
A Yes.
Q Do you have a lot of shoplifting?
A Yes.
Q How often do you -- you said 30 times since you were a Mana -- or working there about 30 times, roughly?
A Yes.
Q And 80 percent of that was shoplifting?
A Yes.
Q So this is a regular occurrence?
A Yes.
Q Okay. So -- but when you had the police come in, do you have some sort of a log or a document in the store to keep track of when you call the police and for what reasons?
A No.
Q So your company doesn't maintain, keep track of that?
A No.
Q Doesn't ask you to keep track of that?
A No.
Q So let's say you called the police on one occasion, and then an issue arises with Risk Management, right? How do you then remember what --
A There is no -- there is no way to -- we just

remember. There is no other way.
Q So no journal?
A No, nothing.
Q No -- you don't have daily reports?
A No.
Q No.
So when an incident happens, basically you do not record or report that in the store?
A No.
Q So later let's say three years pass, someone -- a police comes and talks to you or management talks to you, how do you remember the incident?
A I don't know. This is the first time it's happened.
Q Okay. I see.
So in the police interactions you've had before, aside from this incident, there was never any kind of a lawsuit or litigation?
A No, not for me.
Q I see.
So after this incident, when was the first time you were approached to be questioned about this incident?
A The first time?
Q Uh-huh.
A When I got served with the paperwork.

Q That's it?
A Yes.
Q So when the police left with her to the patrol car, you were inside of the store watching from the windows, through the windows?
A I wasn't watching when they left with her because they didn't leave with her. They let her go.
Q Okay. But they let her go after the police officer spoke to you, came back and spoke to you?
A Yes.
Q Okay. That was how many minutes?
A Ten, fifteen minutes.
Q Okay. That he came back to speak to you?
A Yes.
Q After that, then you -- how did you know she was let go?
A I don't. He said, "We're going to release her."
Q Okay. And I told him, "Okay. If that's what you guys are going to do."
Q He said, "We're going to release her."
Did he ever tell you that he was going to cite her --
A No.
Q -- for anything?
A No.

Q So he never told you he was arresting her or citing her for any activity?
A No.
Q Did he ever tell you -- did you ever tell -- strike that.
When he spoke to you, was it only you or Guy Garcia present?
A Only me.
Q Did you ever tell the officer who came to speak to you -- do you remember his name?
A No.
Q Okay. Did you ever tell him that, "We don't want her to come back to this location ever"?
A I don't remember saying that.
Q Would you say that to him?
A I mean, I may say that, but I don't remember it.
Q If you didn't -- you testified that you did not know and did not believe she was banned from this location, right?
A Right.
Q Then what grounds did you have to tell this officer that she is not allowed to come back to the store?
A I don't know that I said that. I don't remember it.
Q So you don't know?

A Yeah.
Q Would you, though, have said that if you didn't know that she was banned?
A I don't think so. I've never said that about anyone.
Q So if she came back -- let me give you a scenario. If she hypothetically came back to the store a month after this incident that she was arrested, would that be okay for you?
A Yes.
Q Okay. Would you have called the police just for her coming into the store?
A No.
Q So the only reason you have her leave on January 13 was that she was not fully complying with the face mask?
A Yes.
Q And the second time, you know, you approved calling the police by Guy Garcia because she was refusing to leave? That's all?
A Correct.
Q If she came back, that would have been okay for you?
A Correct.
Q So let's -- did the officer give you any papers

to sign?
A No.
Q So there was no paperwork by you?
A No.
Q Did the officer ask to see any video surveillance?
A From me?
Q Yes.
A No.
Q From anyone?
A I mean, I don't know what he did with Guy, or if Guy showed it, but it wasn't me.
Q You were aware that he spoke with Guy Garcia?
A Yes.
Q But you were not present?
A No.
Q So where -- do you have an inside room where officers talk to you?
A No. Just on the sales floor.
Q Sales floor.
Were there any other customers there?
A No.
Q Do you remember if officers spoke with any other employee besides you and Guy Garcia?
A I'm not aware.

Q But -- so -- and he never asked for video surveillance to be watched?
A Not by me.
Q Did he ever ask you if you had cameras in the store?
A No.
Q No.
And then when he left, came out, did you actually see him release the Plaintiff Burmayan from the car?
A No.
Q You never saw it?
A No.
Q He basically told you "I'm going to release her"?
A Yes.
Q And your understanding that that was not an arrest?
A Right.
Q Okay.
MS. MKRTCHYAN: So we're going to take a lunch break. I think --
MS. JONES: Okay.
MS. MKRTCHYAN: So how long of a break do you want?
THE COURT REPORTER: Whatever you want. I'm not going anywhere.
MS. JONES: Can we go off of the record?

THE COURT REPORTER: We're off of the record at 11:43 for a lunch recess.

(A lunch recess is taken in the proceedings at 11:43 a.m., and the proceedings resume at 12:31 p.m.)

THE COURT REPORTER: Back on the record at 12:31 p.m.
Q (BY MS. MKRTCHYAN:) Mr. Johnson, reminder, you're still under oath.
Let's cover some other issues and finish this off. We went through a lot of ground.
During your CVS time working, have you had any customer complaints for any reason?
MS. JONES: Objection.
Vague.
THE WITNESS: I would say yes to that. I'm sure. I cannot remember anything specific.
Q (BY MS. MKRTCHYAN:) Okay. So have you had any like Performance Evaluation where your Manager, your Supervisor spoke to you of any issues that you had to deal with?
A No.
Q And what about Guy Garcia, he has been working with you about -- around the same time, right? Do you

remember when he was hired approximately when?
A When I transferred, he was there.
Q So sometime in 2018 when you went to Glendale, he was there?
A He was there.
Q And throughout this entire period of time, you've known him?
A Yes.
Q You know, do you know if he has had any customer complaints?
A I don't know of any.
Q So none of them were brought to your attention?
A No.
Q Are you aware of if he's -- who does your Performance Evaluations at the store in --
A The Store Manager.
Q So you don't deal with them?
A No.
Q And the Store Manager has been Jack, Hakop Gevdzhyan --
A And Erin.
Q What is her last name?
A Silva.
Q Oh, Erin Silva. Okay.
So basically you have multiple store Managers

working at a time or two?
A Yeah.
Q And then you have four Operations Managers you said or two?
A You mean working in the store currently?
Q Yes.
A Three to four.
Q Was it ever different in January of 2021?
A I don't remember.
Q Okay. And Shift Supervisors? How many Shift Supervisors did you have in general in 2021?
A I'm going -- I don't actually remember the answer, but it's probably four or five.
Q So there are multiple people who are --
A Multiple.
Q Okay. And so you're not aware of any Performance Evaluations by Guy Garcia that fell short?
A No.
Q Do you remember sometime last year in August you had a private investigator by the name of Eddie Shore who reached out to you at the store asking questions about this specific incident? Do you remember that?
A No.
Q No?
A No.

Q But you don't remember, you know, him contacting you and asking you to talk about specifically this incident?
A He's a CVS Associate or a CVS employee or someone else?
Q No, no. So private investigator, someone working for us. For example --
A If that happened, I don't recall it.
Q Okay. You're not letting me finish the question.
So you don't remember anyone else approaching you and trying to talk to you about this incident?
A No.
Q Okay. But are you told by your employer that if you're approached by anyone outside from -- you know, not from the company, that you're not allowed to talk to them?
A Correct.
Q You are.
So you're instructed to give Legal Services Department?
A Correct.
Q That's a policy?
A Yes.
Q And generally about -- I want to know what training have you received about accommodating disabled people. Like have you received any type of training about

that?

MS. JONES: Objection.

Vague, overbroad.

THE WITNESS: No.

Q (BY MS. MKRTCHYAN:) Like if someone comes, you know, is physically a disabled person or, you know, a disabled person and tells you "I'm disabled," or you can see that the person is physically disabled --

A Right.

Q -- in a wheelchair or, you know, some sort of disability and comes over that you can perceive --

A Right.

Q -- you have not received any specific training?

A No.

Q What about your common sense? I mean, you know, as a retail worker, aren't you trained to be accommodating of people who are disabled?

A To everyone but yes.

Q Right.

So -- but no specific training?

A No.

Q So if an employee also is disabled, are you -- do you receive any training about how to accommodate other employees who have a disability?

A There is training for that.

Q Okay. Okay.
So you do know about the reasonable accommodations for CVS employees?
A Yes.
Q Okay. And you know as the Manager, you were aware what are some of the things that you would need to do to accommodate, let's say, an employee who is disabled?
A It depends on what their disability is. Maybe they have to go to the restroom more than normal, maybe they have to sit down more than normal, something like that.
Q So you're trained not to discriminate on the basis of disability?
A Of course.
Q And how do you distinguish or differentiate someone who's disabled -- let's say a customer enters, and, you know, says, "I have a disability," do you have any reason to doubt it? Do you demand an explanation or paperwork from them?
A No.
Q No.
So you take their word for it, right?
A Yes.
Q So if someone comes and says, you know, "I cannot reach out to the aisle" because of some disability, "can

you help me," you're trained to accommodate them?
A Yes.
Q And if someone has, for example, a panic disorder and cannot, you know, breath, and if that person communicates that to you, are you trained to accommodate that kind of request?
MS. JONES: Objection.
Vague, incomplete hypothetical.
THE WITNESS: No.
Q (BY MS. MKRTCHYAN:) No?
A No.
Q So you were not -- you did not receive any training about that?
A No.
Q And we've already covered that you did not receive any training about accommodating individuals who cannot wear face masks due to some disability?
A Correct.
Q About diversity, you have -- you know, you received some training about cultural diversity, right, and type of discrimination?
A Correct.
Q And you are aware that to be cognizant of that and be respectful of that right, correct?
A Correct.

Q What are some of the things you look at in your treatment of people who may be culturally different than from you?
A I don't look at that time. It's not important to me.
Q Okay. So then how -- what kind of training have you received to be cognizant of that, of diversity?
A We've had training.
Q What are some of the dimensions that you look at in terms of diversity? What are the dimensions?
MS. JONES: Objection.
Vague.
THE WITNESS: "Dimensions"? Can you explain "dimensions."
Q (BY MS. MKRTCHYAN:) Well, characteristics? "Dimensions" I talk about is characteristics. Like how do you -- you know, determine if someone might be different from you culturally or ethnically?
A I mean, you can see if the person is different than you.
Q Right.
Okay. So let me give you a specific example. Glendale is predominantly Armenian, right?
A Correct.
Q You have maybe 70 percent of your clients might

had been Armenian customers?
A Maybe more.
Q Maybe more?
A Yeah.
Q So Armenians over the years that you've worked in Hollywood also, I know, predominantly a lot of Armenians, right, in Hollywood?
A Maybe.
Q Not as much as --
A Yeah.
Q Glendale is The Little Armenian, so to speak.
A Yeah.
Q Yeah. Okay. So you've had interactions with a lot of Armenians throughout, and some of the employees are Armenians.
Hakop, Jack, is Armenian?
A Yeah.
Q He's the Manager.
You know Adrianne, you said she's the Operations Manager?
A Yes.
Q She's Armenian.
Who else do you know who is Armenian working at the store?
A Annie, the Pharmacist is Armenian. Haroot,

another Pharmacist is Armenian. I would say 80 percent of the people in Pharmacy are.

Q Okay. All right.

And so in dealing with Armenian customers over the years, did you receive general training about, "Okay, you know, there is cultural differences. Someone might not, for example, speak English very well," et cetera, those issues? Were you trained in being sensitive to the cultural issues?

A Well, I am sensitive it to because I date an Armenian.

Q Okay. Very good. So you are.

A Yes.

Q So if someone comes and, you know, speaks to you, et cetera, is that one of the -- one of the determining -- strike that.

Is there a consideration for you when you have -- are dealing with difficult customers?

MS. JONES: Objection.

Vague.

THE WITNESS: I don't know what you mean.

Q (BY MS. MKRTCHYAN:) I mean, if you have -- let's look at some of the dimensions of diversity in your organization, in your company.

So we have diversity is defined specifically at

CVS, this is page 127, we have three dimensions of diversity that we consider. We have "Physically distinguishing characteristics or life experience, race, gender, age, physical ability, sexual orientation." Those are internal.

External dimensions, "Beliefs, values, personal characteristics, world views, language, work style, relationship, communication style, generations."

Organizational dimensions, which for our purposes we'll skip, but there are organizational dimensions of diversity as well.

Have you ever read this definition at CVS Pharmacy? Are you familiar?

A I'm not familiar.

Q No.

But you do understand that internal dimensions, race, and you, for the record, are African-American?

A Correct.

Q So you're aware of race-based discrimination in our country?

A Correct.

Q Okay. And you are sensitive to issues related to culture?

A Yes.

Q Okay. But let me ask.

If you are working in the City of Glendale predominantly populated by Armenians, is that -- knowing that there are Armenians coming to the store, is that one of the considerations for you in dealings with Armenian customers?

A Not at all.

Q No.

So if -- let's say, you know, a customer comes and looks to you Armenian, do you have any parameters to say, "Look, you know, she has culture" -- "she has cultural issues we need to be sensitive about"?

A No.

Q No.

So if the person doesn't, for example, speak, you know -- if the person speaks with an accent, that is not an important consideration for you in dealing with that customer?

A No.

Q No.

Not at all?

A No.

Q So -- all right.

But you are aware of those differences, right?

A Yes.

Q Okay. So do you respect those differences?

A Yes.
Q So if Anoush Burmayan came to the store, did you become aware that she was Armenian?
A Yes.
Q When did you become aware of it?
A When she walked in when I saw.
Q What made you feel that she's Armenian?
A I mean, I can see it. I have eyes. I can see that she's Armenian.
Q But she never told you that?
A No.
Q But you could see it.
And when she was trying to talk to you, though, she was speaking English, right?
A Yes.
Q Did she have an accent to you?
A Not that I remember.
Q No. Okay.
Did you -- when you were talking to her, did you tell Guy Garcia that she's Armenian?
A No.
Q Did you ever think about in order to approach her better, maybe you should have involved an Armenian Manager of the store?
A No.

Q No.
You didn't think of that?
A No.
Q So, you know, you didn't believe that de-escalating the situation would not -- could not entail to use a Manager to bring someone who is Armenian? You didn't think of that?
A I mean, no. She could have requested it if she wanted that.
Q But she asked -- when she came to the store on January 19, the second time that you saw her, she did ask to speak with Adrianne, true? Do you remember?
A No.
Q You don't remember it?
A No.
Q No.
Have you had any conversations with Adrianne about her?
A No.
Q Did Adrianne ever tell you that she knows Anoush Burmayan?
A No.
Q What about Jack Gevdzhyan, did you speak with him about Anoush Burmayan?
A I spoke with him as far as that I'm coming here

today. That's it.
Q That's it.
So is he aware of why you're here today?
A He's aware.
Q He permitted to you to come because he --
A Yeah.
Q So let's look at another diversity lens from CVS Pharmacy page and see if you're familiar with this.
Page 91 it gives you angles of diversity and differences and similarities related to "Culture, language, religion, ethnicity, gender, experiences, thought patterns, behavior style."
Are you familiar with this policy or guide on differences and similarities in recognizing diversity?
MS. JONES: Is this part of a larger document?
MS. MKRTCHYAN: Yes.
MS. JONES: What is the title of the full document?
MS. MKRTCHYAN: This is page 91; so it must be one of the bates.
If you want, we can find that out.

(A brief pause is taken in the proceedings.)

MS. MKRTCHYAN: It's in the first batch of discovery you have produced.

Q (BY MS. MKRTCHYAN:) But I just wanted to know are you familiar with this?
A This particular --
Q Yes.
A No.
Q So let's see which -- where is this coming out.

(A brief pause is taken in the proceedings.)

Q (BY MS. MKRTCHYAN:) So this is introducing "My Customer Connection, CVS Health."
Is this a familiar document to you?
A I mean, I've seen like a hundred of those.
Q Okay. So this is starting at pages --
MS. JONES: It looks like it starts at CVS 79 --
MS. MKRTCHYAN: Yes, it sounds right.
MS. JONES: -- Managing Diversity."
MS. MKRTCHYAN: Yes.
Q (BY MS. MKRTCHYAN:) But basically it's part of "My Customer Connection, training how to deal with customers and diversity is one of the key components," right?
But is it familiar to you, this components of diversity? Have you received specific training on this?
A No.

Q And what is the purpose, though, of receiving this training about diversity? What do you think?
A In case situations like this arise, you know what to do and how to deal with it.
Q Right.
And you also obviously understand that you -- because we have all of these cultural differences in our society, you need to be sensitive to those when dealing with difficult customers, right?
A Right.
Q And you are not allowed to, you know, as far as you understand to stereotype people based on those?
A Correct.
Q Right.
Even though you are sensitive, you cannot stereotype, right?
A Correct.
Q So -- but as far as this cultural language, religion that I showed you, the differences in similarities in internal and external, you were not specifically trained about that?
A I'm sure I took the module, but I don't remember like every part of it.
Q But you have to incorporate everything that you study in training in your daily work, correct?

A Correct.

Q Right.

So if let's say you have a customer like Anoush Burmayan who feels that she is not treated fairly for whatever reason, and she tells -- you know, she asks you to provide her -- you know, to listen to her and provide some customer service, why -- you know -- strike that. Let me just paraphrase that. This is afternoon already. Let me --

If she comes and talks to you and she says, "You know, I have a situation. I have a medical disability, and I need to speak to the Manager," you know, what would you do? What is your next step to do in that situation?

A I would listen to her and ask her what her disability is and try to help her as much as I could.

Q Okay.

A She didn't do that.

Q She didn't do that?

A No.

Q But her testimony is that she did exactly that. She came to the store the second time, and she attempted to speak with the Manager, but she was ignored by both you and Guy Garcia.

If that is true -- that's what she testified. Is that not true?

A No, it's not true. No.
Q Okay. So if -- though, hypothetically, if that happened, would you actually be required by your policy to listen to her and provide some guidance?
A Yes.
Q And would you actually -- as the Manager -- you were actually the Manager on that night, right?
A Yes.
Q And then if she says, "I want to talk to the Manager," you would be the one to talk to, right?
A Yes.
Q Did you ever tell her, "I am the Manager, ma'am. What is the problem"?
A I don't recall her asking to speak to a Manager --
Q No?
A No.
Q So -- and no one came to me.
Q Okay. But -- so Guy Garcia didn't tell you that she wanted to speak with a Manager?
A No.
Q You didn't hear her say that?
A No.
Q Would you actually have done that if she came and said, "I want to speak to a Manager"?

A Yes.
Q What do you remember her saying then? What is the problem with her? Why was she even complaining? What was she doing?
A I just remember her coming in doing whatever she's doing, shopping, being -- like I told you earlier, flashing her little note and saying that she could be in without a mask, and that is what she was doing.
Q I see.
A Yeah.
Q But she was attempting to communicate with someone about her accommodation, right, that she --
A Not to me.
Q Not to you.
So you had a miscommunication?
A She didn't say anything to me so ...
Q She didn't say anything to you?
A No.
Q Did you approach her?
A No.
Q Okay. So if you didn't approach. You didn't tell her, you didn't -- let me ask you. Strike that.
You never approached and told her that, "Ma'am, I am the Manager in the store tonight," no? You never said that?

A Why would I say that?
Q Well, if she's -- why would you say that? First let's ask the question.
You never did, right?
A Right.
Q Okay. You're saying "Why."
If there is a situation going on with the customer, she's complaining, she's doing this and that, as you said, she was obnoxious, right, that was your word?
A Right.
Q Wouldn't you approach her and say -- according to the leadership guide that we just went through, the policy and training, wouldn't it be appropriate for the Manager to approach and say, "Ma'am, I'm the Manager. Let's hear this out. Let me know the issue"?
A So all I would tell her is that, "You're not wearing a face mask," and that "You need to wear a face mask before we can help you."
Q That was the second day?
A That would be it.
That was both times.
Q Okay. So there was nothing else that you said to her?
A No. That was it.
Q Okay. But there is -- she testified that when

the second time she came, her mask was covering her face entirely.

Are you denying that?

A I am.

Q You are?

A I am.

Q Okay. So you're saying both times her face was not fully covered --

A Correct.

Q -- that you saw her?

Even then, even that, if that was the situation, did you ever tell her, "Ma'am, I am the Manager. Let's solve this situation"?

A No.

Q Okay. You didn't follow the Huddle Guide about taking care of the customer who is not fully covering her face?

A Right, because we were in the middle of the COVID-19, and she wasn't covering her face, and that was my concern for me, for my associates, for the customers. She needs to cover her face.

Q Okay.

A Her note didn't matter.

Q Okay. So we went through this, that you were not aware of the policy that you cannot refuse service to

anyone who is not covering, right?
A Right.
Q And you were not aware that someone may be given accommodations for a disability?
A Right.
Q Okay. Let's look at the video surveillance and let's cover some of the things with you.
A Uh-huh.
Q Thank you.
I'm going to go to January 13th first.

(A brief pause is taken in the proceedings.)

MS. MKRTCHYAN: I'm still figuring out how to use your video clips. It's so difficult, very difficult program.

(A brief pause is taken in the proceedings.)

MS. JONES: I think you use the light one.
MS. MKRTCHYAN: Yeah, the light one is for, what? Is it the January 19th date?
MS. JONES: No. They should both -- if you -- I think you open that up.
MS. MKRTCHYAN: Yeah, but I want to look at January 13.

MS. JONES: Right. Use the light media player. That's just the media player.

Click the media player light, and then you go "file," "open," and then if you scroll down -- or you might have to back up.

MS. MKRTCHYAN: Yeah. I want to back up to --

MS. JONES: There you go.

So those two files that you see within the video at the top, one is -- no, no. Go back.

There you go. Those two -- oh, those look like they were both January 19th.

MS. MKRTCHYAN: Yeah.

You see this is -- no. This is January 13th now. I wanted to start with January 13th. Okay. I got it. Thank you.

Q (BY MS. MKRTCHYAN:) So let me look at my notes.

So I'm going to play this, and I'm going to ask you to see if you recognize yourself here.

A Okay.

Q This is from the January 13th date.

(The video is played.)

Q (BY MS. MKRTCHYAN:) Did you recognize that employee in that fragment?

A That is Jesus Garcia.
Q So this was January 13th Camera F, Segment 845178.
We just saw an employee. You believe that was Jesus Garcia?
A Yes.
Q This was the one who was at the register?
A Yes.
Q Okay. So let me see. Let's find you over here somewhere. I think I know.
Camera F, 846180. Let me play this and see if you can recognize yourself.

(The video is played.)

Q (BY MS. MKRTCHYAN:) 850189. This is Camera F 850189.
A Yeah, that's me.
Q Right. So that's you, right?
A Uh-huh.
Q At 850 Camera F?
A Yes.
Q You saw yourself wearing a face mask?
A Yes.
Q And then is this -- at 12:50:26 a.m. is this --

who is this?
A That's Guy.
Q That is Guy Garcia?
A Yeah.
Q So on January 13th basically we have recognized in the segments Camera F, we recognized Jesus Garcia, and we recognized Guy Garcia.
Are they related?
A No.
Q And you, Joe Johnson?
A Correct.
I mean, they could have been related. I don't know.
Q All right. So -- and then -- and you were fully covered in terms of your mask?
A Yes.
Q So this is Camera F, 853195. Let me see.

(The video is played.)

Q (BY MS. MKRTCHYAN:) That's you, right?
A Yes.
Q Okay. And when you come in, basically what is your first job duty when you come into the floor?
A After I clock in?

Q Uh-huh.
A To go into the office and read whatever e-mails or what I need do.
Q And after that?
A To the floor, whatever we need to do on the floor.
Q All right. And so then this is -- right now do you see Guy Garcia?
A Yes.
Q Okay. So he's more heavyset than you, right?
A Right. I lost weight, though.
Q But he on January -- good for you. January 2021, he was more heavyset?
A Yes.
Q And how tall is he?
A 5'9", 5'10".
Q He's taller than you or shorter?
A Maybe the same.
Q So you're 5'11".
A Yeah.
Q All right. So let's look at Camera E for our purposes, 816116.
And I don't know why they produced to us these clips separately. I don't know -- we'll find out soon. This is why it's very hard to find anything here.

(The video is played.)

Q (BY MS. MKRTCHYAN:) Okay. So Camera E, 816116, do you recognize who is in this camera angle?
A With the basket?
Q Yes.
A Can you make it closer?
Q She's going to come close. Let's wait and maybe you know if you can recognize.

(The video is played.)

Q (BY MS. MKRTCHYAN:) I will represent to you that this is the Plaintiff Anoush Burmayan.
A Okay.
Q I want you to confirm based on your recollection and if you have any reason to doubt, that's her.
A I need to see it closer.
Q Okay. So let's finish this segment, and I will try to play some more.
A Yeah.
Q But from this one, you can't recognize her?
A I can't even see her face.
Q Okay. But let's see when it ends.
/////

(The video is played.)

THE WITNESS: Yeah, that's her.
Q (BY MS. MKRTCHYAN:) Okay. And do you see that she does have a face mask but not fully covering her face?
A Correct.
Q So her nose is visible?
A Correct.
Q Okay. So -- but you do recognize her there?
A Yeah.
Q All right. So this is Camera E -- no, Camera 1. Let's look at Camera 1, Camera 1, 813107.

(The video is played.)

Q (BY MS. MKRTCHYAN:) Let's see if you recognize who is in that.
A Yeah, that's her.
Q Okay. So she enters the store at that camera angle, and we have the time 12:13 a.m., true?
A Yes.
Q Okay. And she does -- as we can see in this camera, she does pull the face mask on, true?
A Yes. Not all the way but yes.
Q Let's replay that.

But bottom line she does try to comply even though she was not fully covering her face?
A Yes.
Q And then let's play another angle.

(The video is played.)

Q (BY MS. MKRTCHYAN:) Okay. This is you entering the store, 2812104, Camera 1?
A Yes.
Q Okay. And you were a little bit more heavy weight?
A See, see. I did good.
Q All right. So you are entering the store at 12:12:03 a.m.?
A Yes.
Q Fair to say that you were already at the store within a minute after she entered the store at 12:13?
A Yes.
Q Okay. And then let's play at 849, Camera 1 -- Camera 1, 849185, let's see when Miss Burmayan is leaving the store.

(The video is played.)

/////

Q (BY MS. MKRTCHYAN:) Do you recognize her?
A Yes.
Q Okay. So she's standing by the exit door, and, you know, she appears to be communicating?
A Yes, she's flipping us off.
Q Okay. But she's outside already, and she's leaving the store, right?
A Yes.
Q So you recognize her?
A Yes.
Q And then let's watch what you do in the camera.

(The video is played)

Q (BY MS. MKRTCHYAN:) So you get out of the store. Isn't that true, that's you?
A That's me.
Q And you have your cell phone in your hand?
A Yeah, but I'm not recording anything.
Q But it does appear -- again, you're talking --
A Sorry. Sorry.
Q Let's make sure.
So you do have a camera --
A Yeah.
Q -- cell phone with you.

You walk out behind her to watch, and then you come in?
A Yes.
Q It appears, though, you're doing something with your cell phone, true?
A Yes.
Q But you're not recording?
A No.
Q Okay. So let's continue playing this.

(The video is played.)

Q (BY MS. MKRTCHYAN:) Do you remember what you were doing at this point in time when -- in this camera angle after she left? What were you doing?
A On the floor working.
Q Yeah but --
A Right here?
Q Yes.
A Maybe I'm trying to see what is happening outside.
Q Okay. And are you talking to anyone inside?
A No.
Q Okay. All right.
Did you see what kind of car did she go in?

A I didn't see, not this time.
Q So you're still waving your hand, your left hand, and you're holding your cell phone, true?
A Yes.
Q Who are you talking to at this time?
A I don't remember.
Q So you're standing by at this point at the exit, and you're watching?
A Yes.
Q Are you watching after Miss Burmayan?
A I'm not sure what I'm looking at there but ...
Q Okay. But you're not -- in this segment that we saw, you are not -- you don't appear to be distressed?
A No.
Q You don't appear to be, you know, shocked?
A "Shocked"?
Q Shocked?
A No.
Q So it doesn't appear to be like a major thing happening. You just -- basically you watched her leaving, and you went out to see where she left, right? That's it?
A Okay. Yes.
Q And you didn't -- you know, to you this was not a serious occurrence to the point of either recording with your cell phone --

A No.
Q -- or calling the police on that day?
A Correct.
Q So according to this video clip we just observed, if she entered at 813 -- I mean, I'm sorry, 12:13 a.m. after midnight, and she left at 12:49ish, then she was in the store about how many minutes, 35 minutes --
A Maybe.
Q -- give or take?
A Yeah.
Q So throughout that period of time, do you know where exactly she was?
A No, I don't.
Q Did you ever see Guy Garcia following her from aisle-to-aisle?
A No, I didn't.
Q Did you follow her aisle-to-aisle?
A No.
Q Okay. So let's then continue playing some of this.

(The video is played.)

Q (BY MS. MKRTCHYAN:) Camera 1, 85188. You're continuing to watch what is happening at 12:50.

(The video is played.)

(BY MS. MKRTCHYAN:) And you're holding your cell phone still with your left hand?
A Yes.
Q And you're still not recording?
A I'm not recording.
Q This is Guy Garcia approaching you?
A Yes.
Q Also he has his cell phone in his right hand that he just put in his pocket? Did you see that?
A Yes, I see that.
Q You guys are talking at this point, true?
A Yes.
Q Do you remember what you were talking?
A No.
Q Did Guy Garcia at this point in time tell you that he had banned her from this location?
A No. I didn't know that she was banned.
Q Okay. So then, you know, he waved at someone.
Do you know who he waved at?
A I don't.
Q And then, you know, you leave the exit area, and he leaves too.
You went there about one minute, right?

A Yeah.
Q And then you approach again, though. Let's finish this clip.

(The video is played.)

Q (BY MS. MKRTCHYAN:) You approach again, though.
You're still holding your cell phone, true?
A Yes.
Q You walked out, actually.
What do you remember doing at that point?
A I don't remember.
Q But you didn't leave the store, right? You were there?
A I was working, yeah.
Q All right. Nevertheless, let's go to Camera 5, which is another angle.
Do you happen to know the actual camera angles in the store?
A I don't.
Q No.
Do you know that there is a camera angle showing the register?
A Yes.
Q Do you know why we don't have that camera angle

from January 13?
A Why we don't have it?
Q Yeah. I'll ask the PMK.
So Camera 5 I will play a couple clips for you.
I'm sure this is more fun for you than answering my questions about diversity.
A No. They're both good. It's fine. You're fine.
Q I'm glad you have a nice attitude.
A That's fine, yeah.
Q Camera 5, 841165. Let's see what is happening here.
A Okay.

(The video is played.)

Q (BY MS. MKRTCHYAN:) This is the angle that shows to the right of the store from the entrance, right?
A Correct.
Q And the self-checkout area, the register is somewhere in the background?
A Yes.
Q Okay. In the corner of the aisle on the left side, do you recognize Miss Burmayan coming out of the aisle, one of the aisles with her basket?
A I see her, yes.

Q And there is another woman closely following her behind, right?

A Yes.

Q Do you see Miss Burmayan walking towards the register?

A Yes.

Q Okay. And she's still -- she has the basket. It appears she has something in this basket, true?

A Yes.

Q And she's still wearing her face mask, but we've established that it was not fully covering her face.

A Yes.

Q But she still has a face mask on --

A Yes.

Q -- true?

Then you can see her approach the register, right?

A Yes.

Q Whereas we've covered it was manned by Jesus Garcia, true?

A I can't see the Cashier, but I would assume, yes.

Q But you remembered that it was Jesus Garcia, not you or Guy Garcia?

A It could have been Guy because he would ring too.

Q Okay.

A Yeah.
Q All right. But it wasn't you?
A It wasn't me.
Q So it was either Guy Garcia or Jesus Garcia?
A Yes.
Q Okay. So she stands there one or two minutes. Let's see what happens next.

(The video is played.)

Q (BY MS. MKRTCHYAN:) This is all Camera 5, 842170.
We can see a continuation of her. At 12:42 she bends forward a little bit forward and leaves the register. She leaves the basket there, and she approaches the self-checkout, true?
A Yes.
Q Okay. So -- and then let's see what happens next.

(The video is played.)

Q (BY MS. MKRTCHYAN:) She's -- according to the clip, she is using the self-checkout register to purchase an item that is in her hand, true?

A Yes.
Q And there are two customers walking towards the register not even paying attention to her, true?
A Correct.
Q Let's continue with this.

(The video is played.)

Q (BY MS. MKRTCHYAN:) 843171 she's continuing to use the self-checkout, and on the left side of the corner we can see you approaching the register section, true?
A Yes.
Q So you are approaching where she's standing now at 12:43, and you appear to be approaching her where she's standing at self-checkout, true?
A Yes.
Q And how many feet would you give at this point in time at 12:43:17 a.m.?
A How many what?
Q How many feet are you standing from her? How many feet away?
A At least six.
Q Okay. So for your safety, you are standing at least six feet away?
A Correct.

Q What were you saying at this point?
A I don't remember.
Q What would you be saying based on this? Does it refresh your memory what would you be saying to her?
A No, it doesn't refresh my memory.
Q Okay. But you testified already that at the point in time she came in, you became aware that she was not fully covering her face, and you told her to leave, true?
A True.
Q Okay. So you would be telling her now as she's using the checkout, "You've got to leave. You have to leave"?
MS. JONES: Objection.
Calls for speculation.
THE WITNESS: I can't remember what I was saying to her.
Q (BY MS. MKRTCHYAN:) So you're not -- you have absolutely no recollection what you're telling her now as she's standing there and using the self-checkout?
A No.
Q But she appears -- let's continue playing this. She appears to be talking to you, right? So let's confirm.
/////

(The video is played.)

Q (BY MS. MKRTCHYAN:) So she turned her head.
Now, unfortunately, we don't have the benefit of audio, but we have to go by this -- interpreting, you know, conduct, behavior, physical behavior, but she turns to you diagonally 15 -- you know, what is it, she's turning to you, and she's turning her face to you, and she's making -- she appears to be talking, true?
A Yes.
Q And you are still standing, and it appears that you are talking to her, right?
A Yes.
Q Okay. But you don't have any recollection?
A No.
Q If she told -- if she testified that she was telling you that she needs to purchase this item, she's not feeling well, she needs to go, please help her to purchase the item and leave, does that sound inaccurate to you?
A I don't remember what we were talking about; so, yeah, it would be inaccurate.
Q So you have no recollection --
A No.
Q -- that she was talking about some medical

condition that she was having?
A No.
Q No.
And you have no recollection of her explanation why she's not even fully covering her face, any explanation?
A No.
Q Did she ever tell you, "Sir, I am" -- you know, "I have a disability. I can't" -- you know, "I am allowed not to wear a face mask"? Did she ever tell you that?
A She did say she's not allowed to wear a face mask, and she had a letter from her lawyer stating that. That was it.
Q All right.
A But that wasn't this day. It wasn't here.
Q Okay. But on this day when she came, when you said, "You are not fully covering" her "face" -- I mean, "your face," what did she respond? We've covered this.
A Yeah, that she had a letter.
Q Exactly.
A Right.
Q So same thing, she was telling you that -- you know, you said that, you used the word "entitled." You used the word "entitled."
A I did.

Q So that she was entitled not to use the face mask fully covering her face, but she had a letter, true?
A Yes.
Q Okay. But you didn't ask to see the letter?
A No.
Q No idea about the letter?
A No.
Q But she was showing you something, true, in her hand?
A Right here?
Q No. Generally. She was showing --
A Yeah, yeah, yeah.
Q And at this point in time when she's talking to you, you don't remember her asking you and complaining about this treatment? You don't remember that?
A No.
Q No.
And then it appears that you approach a little bit, a couple of more feet, and she has her hands to her sides, and she's still talking to you, right?
A She has her hands out.
Q Right. Hands out.
A Yeah.
Q Okay. And she's basically upset. You can tell that she's upset?

MS. JONES: Calls for speculation.
THE WITNESS: I can't tell that.
Q (BY MS. MKRTCHYAN:) No?
A I can't tell that.
Q But you're standing there listening?
A Yes.
Q And you can't tell us whether you're engaged in a conversation or not?
A Correct.
Q If she testified that you were simply ignoring and telling her "You have to leave," is that accurate? Is that going to be consistent with your memory?
MS. JONES: Asked and answered, calls for speculation.
THE WITNESS: Well, I'm sure I was telling her she needs to leave.
Q (BY MS. MKRTCHYAN:) Okay.
A Because she needed to leave.
Q But you didn't try to assist her with the self-checkout process?
A No.
Q And you didn't feel that if you're standing by there, and, you know, watching her and not helping her, it's going to be intimidating to her?
A Say that again.
Q You didn't feel that if you're standing by

watching her to use the self-checkout without helping her, it's not going to be intimidating for her?
A Her back is turned to me. So why would it be intimidating?
Q Yes. Sometimes she's turning from you, and sometimes she's using the self-checkout.
Would you think it's kind of an intimidating behavior?
A Not at all.
Q If she says that she felt intimidated with somebody hovering around her, and that's why she felt distracted, she couldn't even finish using the self-checkout, would that be inaccurate?
MS. JONES: Calls for speculation about her feelings.
THE WITNESS: It would be inaccurate.
Q (BY MS. MKRTCHYAN:) We can see at this point you're close by to her, about five feet.
A That's not hovering.
Q Well, sir, you know, whatever her interpretation is, but at this point just confirm with me the video.
The video shows that you are standing four to five feet here at this point, true?
A Okay.
Q Yes?
A Yes.

(The video is played.)

Q (BY MS. MKRTCHYAN:) So you are continuing.
Throughout this time she's using the self-checkout between the few minutes, two or three minutes that we just observed. You are still standing by and not helping her to use the self-checkout, true?
A Yeah.
Q And you are standing by at least, at least six feet?
A Correct.
Q But there is also points in time you approached her closer?
A Not much.
Q Within five feet or four feet?
A No, I didn't see that.
Q Okay. You just saw a point in time where you were closer, and then you stepped back.
Do you disagree?
A I walked maybe a step closer, but I was not within four feet of her.
Q Okay. So all right. So this was 12:44, and let's continue playing. So same Camera 5.

(The video is played.)

Q (BY MS. MKRTCHYAN:) Okay. And then in this clip we see her actually moved from self-checkout one that she was using to another one, right?
A Uh-huh.
Q So it appears from this clip that she couldn't finish purchasing the item at one self-checkout, and she had to go to another, to another one, true?
A Yes.
Q Okay. Mean time, meanwhile, you did not -- we didn't see you helping her, true, to buy the item?
A She could be buying something else. I don't know like what happened here.
Q Okay. But according to the video clips, I just want you to confirm with me the video clips, we did not see her finish purchasing anything, and we saw her go to another self-checkout?
A I see her at another register, yes.
Q And then you're still not helping her, true?
A True.
Q You confirmed with me?
A True.
Q So even though we just saw a customer leave, this customer is not, you know, looking at her, is not -- does not appear to be shocked by her, true?
A True.

Q Nobody is paying attention to her except you, true?
A Yes.
Q Okay. So -- and in this clip we didn't see her throw anything on the floor, right?
A Yes.
Q And you're still standing there by this -- you know, like about, what is this called, this line for the self-checkouts, right? The line, the demarcation for the self-checkouts, right?
A Right. It's where you would wait.
Q Right.
But you're still standing there and not approaching her, not helping her and while she's using the self-checkout trying to purchase this item, true?
A Correct.
Q This is 12:48. This is already five minutes that we just saw before -- five minutes she's unable to purchase this item that she was trying to buy, true?
A True.
Q Yet you as a Manager of the store, you know, you didn't attempt to help her to purchase that item and go? Let's say you were concerned about her transmitting COVID, as you said, which is legitimately sound for you, why didn't you help her to purchase her item quickly and get

out of there?
A She's not covering her face.
Q Sir, but you were covered.
A Yes.
Q And you're aware if you're covered, you know, you are protected?
A Okay.
Q Okay. So -- but as a customer of CVS, she needed help to purchase this item for five minutes, true?
A Correct.
Q You didn't follow the policy?
A Right, I didn't get close to her.
Q Okay. But you didn't follow the policy in helping a customer to purchase the item and leave quickly?
MS. JONES: Objection.
Vague as to "policy."
THE WITNESS: There is no policy that says I have to get close to her.
Q (BY MS. MKRTCHYAN:) Well, sir, we just covered the Huddle Guide.
According to the Huddled Guide, you are supposed to help the customer to purchase the item and go, right?
Do you want me to go back to the Huddle Guide?
A You can, but I know what I did.
Q I understand, but you didn't follow the Huddle

Guide?
A I didn't get close to her.
Q You didn't follow the Huddle Guide that says help the customer -- if you want me to show it to you.
A My health is more important to me than helping her.
Q Right. Understood.
So -- but bottom line, I understand your reasons, you are entitled to your reasons, but at this point you are working as a CVS employee, right?
A Yes.
Q Your personal reasons -- let me ask you this.
I mean, as a -- I mean, as an employee of CVS, you have to follow policy regardless of your personal, you know, issues, right?
A Yes.
Q Okay. So if the policy says you have to be nice to customers even when they're obnoxious, you have to follow that, right?
A Right.
Q Even though you personally don't want to deal with them?
A Right.
Q There are customers who come and do lots of nasty stuff. They throw stuff. All kinds of issues can come

up, right? So -- but you as the employee, your first job duty is to follow the policy of the company, for whatever reason they have their policy, it can be stupid, it can be nonsensical. You have to follow company policy bottom line whether you like it or not?

A True.

Q And so, you know --

A But I don't have to risk my health.

Q Okay. But, you know -- so you're saying the Huddle Guide that was given to you was forcing you to risk your health?

A Yes.

Q Okay. I see. Okay.

Did you ever bring that to the attention of your corporate office?

A No.

Q And so -- but -- all right. So let's finish playing this so we can see when she finishes finally purchasing that item.

(The video is played.)

Q (BY MS. MKRTCHYAN:) And we see you holding the cell phone in your hand, but you are still maintaining you are not recording at this time?

A Definitely not.
Q Okay.

(The video is played.)

Q (BY MS. MKRTCHYAN:) Let's continue with the other group. Let's see how long it takes to purchase that item. Camera 5, 12:49.

(The video is played.)

Q (BY MS. MKRTCHYAN:) This is about six minutes -- starting from 12:43 six minutes. She's still at the self-checkout trying to purpose.
It appears she has finished at 12:50, and I can see you actually communicating with your hands with Guy Garcia in the background, true?
A Where is Guy?
Oh, in the aisle. Yeah, I see.
Q So you have your right hand -- you're communicating with him, true --
A Yes.
Q -- while she's standing at the self-checkout, right?
A Yes.

Q Okay. So -- and then she leaves. She walks away from the self-checkout.
A Taking off her mask.
Q Yes. Okay.
And she's leaving the store, right?
A Yes.
Q Is there any requirement for her to wear a face mask outside of the store?
A Outside?
Q Yes.
A Not that I know of.
Q Okay. As she leaving, she takes off her face mask, right?
A Well, she's not outside.
Q Okay. But if -- you know, according to her testimony, she was having breathing problems, she had a panic disorder, and you are aware of that, right? She was telling you that "I cannot breathe"?
A No.
Q No.
You never heard that?
A No.
Q But even if she said that, would you take that credible based on your, you know -- you know, overall attitude towards customers?

A During that time?
Q Yes.
A During COVID time? No, I wouldn't have.
Q But you were not trained that someone can have a disability in breathing?
A "Trained"?
Q Yes.
You were not trained to be sensitive to people, as we've testified -- you've testified, you were not trained to be aware of people who need reasonable accommodations for disability?
A Yes.
Q You were not aware?
A I'm aware.
Q So -- okay. If she is telling you that "I have" -- "I'm entitled not to wear a face mask because I have an issue, a medical condition," why would you not take it seriously?
MS. JONES: Objection.
Incomplete hypothetical, lacks foundation.
THE WITNESS: I didn't take it -- What do you mean "Take it seriously"?
I took it seriously. I just wanted her to leave, and that's what -- she refused to do that.
Q (BY MS. MKRTCHYAN:) So despite the fact that she

told you that she is entitled not to wear a face mask because of a medical condition, you still told her to leave?

A Yes.

Q Because you did not believe that you could have provided that kind of an accommodation?

MS. JONES: Objection.

Misstates testimony.

She didn't tell him she had a medical situation.

MS. MKRTCHYAN: I'm sorry. You're coaching him. Counsel, this is speaking objections. You're coaching the witness.

MS. JONES: This is like the fourth objection I've stated in 30 minutes.

MS. MKRTCHYAN: Speaking objection.

MS. JONES: It's not a speaking objection.

MS. MKRTCHYAN: It is a speaking objection.

THE WITNESS: Okay.

Q (BY MS. MKRTCHYAN:) So the question was very clear, that, you know, she told you she had a medical disability --

A She didn't.

Q But then why was she saying, "I have a letter. I'm entitled not to wear it"?

A I don't know what her letter said. I didn't

read.
Q Well, if you had bothered to read it, you would have known, right?
A Okay. Fair.
MS. JONES: Calls for speculation.
THE WITNESS: It's fair.
MS. JONES: It's not fair.
Calls for speculation.
MS. MKRTCHYAN: Counsel, that's just coaching objections and speaking objections. That's not appropriate.
Q (BY MS. MKRTCHYAN:) Anyway, so clearly she's leaving now, and, again, you are standing there with an attitude. Your body language -- let's continue.

(The video is played.)

Q (BY MS. MKRTCHYAN:) It doesn't appear from your body language -- you walk away when she's walking away.
It doesn't appear that you're an empathetic Manager trying to deal with the customer who is upset.
MS. JONES: Objection.
Argumentative.
Q (BY MS. MKRTCHYAN:) We went through your customer training policy.

A I mean, I told you what I told you. I wanted her to leave the store, and she left -- and when she finally left, I walked away.

Q Okay. We just covered the leadership position training which states that as a customer -- or the Manager, you have to provide empathetic customer service to everyone who enters the store to provide welcoming environment, true?

A Yes.

Q Okay. But from this body language, we can see you walk away, and then we have Guy Garcia.

Does it appear to you in any shape or form in this segment that you're actually assisting her in any shape or form?

A I don't know what that appears to be; so I don't know.

Q But throughout her, you know, using the self-checkout, you did not help her?

A No.

Q Throughout her standing by the cash register, you did not help her?

A No.

Q And throughout her, you know, being in the store for -- we have her for about 35 minutes that we covered, you did not personally assist her in resolving her

customer service issue?
A No.
Q Because your main concern was that "My health issue is at risk. You're not wearing a face mask fully covering your face. You've got to leave"?
A Yeah, that's the mandate.
Q Okay. But so you -- "mandate" from where?
A From California.
Q Okay. But your store gives you a policy how to deal with customers who are refusing to follow that mandate based on various reasons, including disability, religion -- I mean, I don't understand. You are trained to perform your job duties, true?
A Yes.
Q Okay. And if your company tells you, "Look, you customers, are encouraged to wear face masks," yes, there is the mandate, but you are not supposed to refuse to serve someone if the customer is not wearing a face mask. You were not aware of that, right?
A Not aware?
Q Yeah. You were not?
A I'm not going to get close to this lady. I'm not going to.
Q Regardless of what --
A Regardless.

Q Regardless of what the policy says?
A She could be sick, and I don't want to get sick.
Q So regardless of what the policy says by CVS, you have to follow what you want to follow?
A No, it's not true. I didn't say that.
Q Okay. Do you want us to go back to the Huddle Guide?
MS. JONES: Sure.
THE WITNESS: If you --
Q (BY MS. MKRTCHYAN:) Let's go back to that.
It says, you know, do not be disrespectful if someone challenges your authority?
A Challenges my authority?
Q Yeah.
You know, do not be disrespectful if someone challenges your authority, for example. That's one of the Huddle Guide -- this is page 49.
MS. JONES: Is there a question?
MS. MKRTCHYAN: Yes.
Q (BY MS. MKRTCHYAN:) Do you remember that?
A I remem -- do I remember me going over it?
Q Yes.
A Yes.
Q And one of them it says, judge or discount feelings because you could see something as being as

irrational, true?
A Yes.
Q Okay. Let's go back to the Huddle Guide because we're having again miscommunication somehow.
Your Huddle Guide states again, "Help the customer finish shopping as quickly as possible and remind them to maintain six feet of social distance to help protect other shoppers," true?
A So if I'm going to maintain six feet, how can I help her without getting close?
Q True?
This is what it states. I just want you to confirm, not your understanding. I just want you to confirm what it states.
A That's what it says.
Q Do you have a disagree with the policy? Do you have a disagreement with the policy?
A You're asking me?
Q Yes.
A I'm just saying -- I don't have any disagreement with anything.
Q Okay. But the policy says "Whether the customer leaves or insists on shopping without a face covering, you have done what you can."
Does it state that you actually can refuse

service, that you can ban the customer, or you can tell her to leave? Does it state that?
A She's got her stuff. She shopped.
Q But you told her "You have to leave."
A Yes.
Q And she was unable to purchase it at the register. She had to use two self-checkouts before she left the store.
A Correct.
Q Right?
A Correct.
Q And you didn't help her?
A No.
Q Okay. But bottom line is the Huddle Guide does not tell you that you can actually refuse to help her, number one. It doesn't authorize you, true? It doesn't authorize you to refuse to help a customer?
A True. It doesn't say I have to help her.
Q Well, it says, "Help the customer finish shopping as quickly as possible," true? And how do you understand that?
A I don't need to get close to her. She was getting help. She's helping herself.
Q She's helping herself --
A Yeah.

Q -- and she's not feeling well. She testified that she could be, you know -- she had incompetence. She could start, you know, right there pooping in her pants because she had a medical condition --

A I don't know anything about that.

Q Excuse me. Let me finish. Thank you.

If a customer is feeling sick and is telling you, "I'm not feeling well. Can you help me to get out of here? Please help me, and I will leave," -- that's what she testified -- you know, is it your obligation hypothetically -- let's say, you know, that's what happens, is it your obligation regardless of what your concerns are, personal concerns about them wearing face masks or not, is it your obligation at CVS to help her to finish and get out?

A It is my obligation to help any customer without jeopardizing my own health.

Q Okay. But you have a problem with this Huddle Guide which says that --

A No.

Q You have a problem with that --

MS. JONES: Objection.

Misstates testimony.

Q (BY MS. MKRTCHYAN:) -- your CVS policy?

A I don't have a problem with anything.

Q Is there anything -- can I ask you to read -- maybe I can give you this Huddle Guide, and you can read it for yourself. There is two pages, 48 -- no, 49 and 50.

Is there anything in this two pages -- Huddle Guide De-Escalating Conflicts About Face Covering pages that I've identified, is there anything on those pages that states that you can tell the customer to leave?

A No.

Q Okay. Is there anything on those pages that states that you should not help the customer, and you should just basically refuse helping her just because she's not wearing a face mask?

A No.

Q So now -- but that's what you did, right? You did not help her, right?

A I did not help her.

Q And you basically told her to leave?

A I told her to leave.

Q Let's finish this.

Now we can go to the January 19th event at CVS.

THE COURT REPORTER: Are you starting a new thing? I need a break if you are.

MS. MKRTCHYAN: Oh, yes, sure.

THE COURT REPORTER: Ten minutes, please.

We are off of the record at 1:32.

(A recess is taken in the proceedings
at 1:32 p.m., and the proceedings resume
at 1:37 p.m.)

THE COURT REPORTER: Back on the record at 1:37.
Q (BY MS. MKRTCHYAN:) So now we will look at Camera 3.
So let's look at first at Camera 1. So Camera 1, 922 -- 922133. Let's see this one.

(The video is played.)

Q (BY MS. MKRTCHYAN:) Do you recognize Miss Burmayan entering the store --
A Yes.
Q -- at 1:22?
A Yes.
Q This is on January 19.
And you confirm with me that she's fully covering her face?
A Yes.
Q So in contrast with the January 13th date, she's fully covering her face?
A Yes.
Q Okay. This is not consistent, though, with your

testimony earlier that both days she was not fully covering her face, true?
A Well, right here it's covered, so true.
Q So then you agree with me that you might have been mistaken earlier when you testified about that?
A Well, I have to see the rest --
Q Okay.
A -- before I can say that.
Q But from this clip, she's fully covering her face?
A Yes.
Q Okay. So then let's continue, Camera 3. This is the camera angle that shows the registers, which we never seen on the January 13th date. So Camera 3.

(The video is played.)

Q (BY MS. MKRTCHYAN:) Do you recognize Camera 3 Guy Garcia entering the register?
A Yes.
Q Okay. Is that Guy Garcia --
A Yes.
Q -- at 1:24?
Okay. And then do you recognize the angle of Miss Burmayan walking?

A Yes.
Q And she appears to be talking with Guy Garcia, true?
A Yes.
Q Okay. Do you remember where you were when this was occurring?
A I don't know where I was.
Q It doesn't refresh your memory?
A No.
Q So -- but let's see. So they are talking, right, still --
A Yes.
Q -- true?
And he's behind the register, and then he's making gestures.
Do you -- did you see him waving towards one of the aisles?
A I thought he was trying to wave her to leave.
Q Oh, that's what you believe?
A That's what it looks like.
Q But, you know, you are not sure, right --
A That's right.
Q -- because you were not there?
A Yeah.
I'm just going by what I see here.

Q Okay.
A Yeah.
Q But it also looks like he waves her. Maybe she's asking for Manager, and he says, "Go that way. Maybe that's where he is"? Maybe?
A Maybe.
Q Okay. So we are speculating, though. So let's not speculate.
A Okay.
Q So he waved at her, and then she went towards one of the aisles, right?
A Yes.
Q And then he follows her, though, right? He gets out of the register. He leaves the customer there, though, and he goes after her, and then he comes back, true?
A Yes.
Q Okay. And then -- so let's see continuing what is going on here. Camera 3. And then continuing 925139, Camera 3.

(The video is played.)

Q (BY MS. MKRTCHYAN:) He goes out again. There is still a customer standing there, right?

A Yes.
Q He's going and leaving the customer and goes out in the aisles -- towards the aisles, true?
A Yes.
Q Okay. Is that consistent with customer service at CVS, to leave the customer at a register unattended?
A It's not consistent with customer service, but I don't know his purpose there.
Q Okay. But if you have a customer.
Does she care -- does she care what issue Guy Garcia might have with Anoush Burmayan?
MS. JONES: Calls for speculation.
THE WITNESS: I don't know. I don't know.
MS. JONES: About what he's doing? About what she's doing?
She could have been asking him to go get something.
MS. MKRTCHYAN: I'm sorry. But you are testifying, Counsel. That's not fair. We are -- we are -- you know, anyway ...
Q (BY MS. MKRTCHYAN:) So -- but we still have now another employee approaches the register. This is Timothy Riddle?
A Correct.
Q And Anoush Burmayan also walks by, right?

A Is that her?
Q Yeah, let's play this again.
A Okay.

(The video is played.)

Q (BY MS. MKRTCHYAN:) So Timothy Riddle enters the register to assist this poor woman standing there. Guy Garcia is between the aisles there, and then Anoush Burmayan is walking by, true?
A Yes.
Q Okay. And we don't know what Guy Garcia is doing, but from his behavior and body language, he's watching towards Anoush Burmayan, true?
MS. JONES: Calls for speculation.
Q (BY MS. MKRTCHYAN:) He's watching her?
A He looks like he's on his phone. It looks like he's on his phone, like he's calling someone.
Q Okay. So he has his phone?
A Yeah.
Q Okay. All right. So -- but he didn't call you, right?
A No.
Q So you don't remember him coming and talking to you and saying, "Oh, you know, I need your help"?

A I don't remember that.
Q Okay. All right. So at this point we don't see you there. In any of these clips so far we have not seen you yet, right?
A Correct.
Q We see now Anoush Burmayan approaching the register, right?
A Correct.
Q Okay. And then now we see you approaching Guy Garcia at 1:25:35, confirming?
A Correct.
Q Okay. And then you're casually standing by.
Guy Garcia is still holding something in his hand, true?
A Sure.
Q And Miss Burmayan appears to be talking towards in the direction of you guys, true?
A True.
Q Meanwhile we have this woman standing by the Cashier, Timothy Riddle helping her, true?
A True.
Q And we don't see the woman turning her face or in any shape or form even being concerned by the presence of Burmayan, true? We don't see that occurring, true?
A I mean, I don't know what that woman is thinking.

Q Well, okay but --
A I don't see her looking at her, no.
Q I'm asking you -- sir, I'm asking you purely to confirm -- you see. We are talking again back and forth.
A Sorry.
Q I'm asking you purely to confirm the behavior of the woman.
Throughout this time that she's standing by the register, we do not see her turning around --
A True.
Q -- and looking at Burmayan, true?
A True.
Q She's standing by the register and not paying attention to her?
A Yes.
Q Okay. And Miss Burmayan is talking there.
Let's continue watching her and tell me if you see her throwing anything on the ground or doing anything physical other than talking, true?
A Okay.
Q I'm just confirming.
A Yeah.

(The video is played.)
/////

Q (BY MS. MKRTCHYAN:) And another customer approaches, and there is a male customer now approaches the female, right, and he approaches her, and basically they have a conversation.
Meanwhile, Anoush Burmayan is standing there, and she's covering her face, true, with a mask?
A Yes.
Q And you approach her --
A But her nose is open on that.
Q That's what you can tell from this?
A Yes.
Q Oh, really?
A Yes.
Q I cannot see it.
A Yeah, I can see it.
Q Okay. You're telling me that this is not fully covered?
A It's not fully covered.
Q Okay. All right. That's your testimony.
Now, you know, you approach her a little bit. Guy Garcia is behind you still holding something in his hand, his cell phone, true?
A Yes.
Q Is this the time when he's calling the police? Are you aware -- no, you don't know?

A I don't know.
Q Were you aware that he was calling the police?
A Yes.
Q Okay. But you did not tell him, "Stop" --
A No.
Q -- "There is no need"?
A No.
Q You fully approved him calling the police?
A I approved.
Q Okay. Meanwhile, you know, at this juncture -- we've already finished. Throughout this period of time when you saw Miss Burmayan, did you see her make any physical movement towards any of you?
A No.
Q Did you see her make any movement that appeared to be aggressive towards you or customers?
A No.
Q Did you see any of the customers turning around and, you know, looking at her as if shocked by her behavior?
A Well, I did see him looking at her.
Q Who?
A The customer that walked up to the lady.
Q The customer walked towards the lady and looked at her, but right now when you're there standing there,

nobody is, you know, looking at her or feeling disrupted the way that you observed her behavior, true?
A Okay. True.
Q And you didn't see Burmayan throw any items on the floor?
A No.
Q Or, you know, acting basically violent or aggressive, true?
A No. True.

(A brief pause is taken in the proceedings.)

Q (BY MS. MKRTCHYAN:) Continuing 926 of Camera 3.

(The video is played.)

Q (BY MS. MKRTCHYAN:) The two -- the couple leaves after purchasing their item, right?
A Correct.
Q And Miss Burmayan now we can see that she took out what appears to be her cell phone?
A Yes.
Q And she is trying to use that cell phone in some, manner that we cannot tell on this, true?
A Yes.

Q But she's still talking with you, right?
A Yes.
Q And then we see Guy Garcia on the phone?
A Yes.
Q Okay. So it appears that Guy Garcia is calling the police.
Do you have any reason to doubt that that is what is happening?
A I don't.
Q But while you're standing there just two feet away from him, you don't know what he's telling the police?
A No.
Q You don't hear what he tells the police?
A No.
Q Wouldn't you be curious as a Manager as to what he's telling the police?
A No.
Q Why not?
A If he's calling the police to come, he just wants them to come.
Q I know but -- let's say -- you know, you are his Supervisor. Let's say he provides false information to the police or exaggerates, aren't you obligated to know what your employee is telling the police?

A Well, yes, but in this case, I didn't ask.
Q Why not?
A I didn't find the need to because I supported him calling because he said that, you know, what had happened in the past. I'll just say that.
Q Well, what happened in the past we've already covered, right?
Is there anything else you left out?
A No.
Q Okay. In this point in time, this observations we just had, you have not seen any threat of violence, true?
A True.
Q We don't even see her making any gestures that would appear to be physically aggressive towards anyone, true?
A True.
Q Okay. So the only reason you're letting Guy Garcia to call the police is what?
A Because she's not leaving.
Q And why is she not leaving? What is there -- what is she supposed to -- strike that.
You told her to leave for what? She's wearing a mask covering her face, true? We saw that.
A Okay. Right there she was not fully covering her

face.
Q If we look at more clips.
You know, you're telling me that she was partially covering her face mask, that's why you're telling her to leave, and she's refusing to leave?
A Right.
Q But she's talking to you.
You're saying she's not entitled to speak with a Manager to clarify the issue?
A She's entitled to speak to the Manager, yes.
Q Okay. And so then why are you calling the police when she's simply trying to talk to you?
A I don't even know what that is. I don't know what she was saying. I don't know what that is.
Q But we saw, we observed --
A Yeah.
Q -- you -- right now on this clip we saw Guy Garcia with his cell phone. That's the time he's calling the police. Here you can tell, right?
A Okay. Yeah.
Q And you're standing by two feet away from him, and you're not telling him "No" --
A No.
Q -- "Let's just try to resolve this dispute. This woman, you know, she's not happy about something. Let's

try to resolve this"? You didn't do that, right?
A No.
Q Okay. And then let's look at Camera -- so in this Camera 5 we saw her, you know, approach one of the aisles, right? She's walking around the aisles, true?
A Yes.

(The video is played.)

Q (BY MS. MKRTCHYAN:) Okay.
A More back and forth but yes.
Q Right.
A Yeah.
Q And then she's approaching the register at this point in time.

(The video is played.)

Q (BY MS. MKRTCHYAN:) She approached the entrance or the exit of the store, entry/exit of the store at night at 1:24, true?
A Yes.
Q And then she went back to the aisles.
Throughout this period of time she's walking by, she's wearing a face mask, true? You saw it?

A Yes.
Q And that's fully covering her face.
A Okay. Yes.
Q Yes.
And then we can see -- let me continue with this.
Camera 5, 925140.

(The video is played.)

Q (BY MS. MKRTCHYAN:) Is this Guy Garcia by one of the aisles?
A Yes.
Q Okay. And this is Miss Burmayan approaches the register.
Basically we had just seen this from another angle, Camera 3, right?
A Yes.
Q I just want to confirm that she approaches it, and now we can see you approach at the angle on top.
We have her standing and talking, true?
A Yes.
Q And then she's still standing there, and you are talking -- appear to be talking to her, and Guy Garcia is very close by to you, right?
A Yes.

Q 926143, Camera 5.

(The video is played.)

Q (BY MS. MKRTCHYAN:) There appears to be talking.
You are holding your -- something in your hands, true? I mean in your hand, true?
A I don't even see myself.
Are you talking about me?
Q Yes.
Is this you?
A That's Guy.
Q No. That's Guy Garcia in the darker.
A Oh.
Q This is you, right --
A Yeah, yeah, yeah.
Q In the green shirt?
A Yeah.
Q Do you see yourself holding something in your hand?
A Yes.
Q Okay. Is that your cell phone?
A It looks like.
Q And Guy Garcia is on the cell phone?
A Yes.

Q But you don't have any recordings from this day?
A No.
Q Do you know what you were doing with your cell phone?
A No.
Q Okay. But she's still -- she goes, you know, back and forth. She's kind of upset. You can tell. She's communicating with you, and you are listening to her that we can tell, right?
A She's talking to me right here?
Q Well, you tell me because you are watching.
A I don't know because I can't -- I can't see her face.
Q Okay. But see -- okay. Let's -- let's see her approaching the camera, and you tell me if you can tell if she's wearing a face mask.

(The video is played.)

Q (BY MS. MKRTCHYAN:) She's wearing a face mask, true?
A Yes.
Q And she's fully covering her face, true?
A For the most part, yes.
Q So -- and then -- so you and, you know,

Mr. Garcia are standing behind.
Let's continue with this.

(The video is played.)

Q (BY MS. MKRTCHYAN:) 928, 1:48.
She's standing by the exit and --
A She's recording.
Q Sorry. Excuse me. Can you please --
A I'm sorry.
Q Yes.
She has a cell in her hand. You believe she's recording. She is holding it, and, you know, it appears she's doing something with her cell phone, true?
A Yes.
Q And she's, you know, still communicating, true, it sounds like?
A Yes.
Q Okay. What do you remember her doing at this time, you yourself?
A I don't remember that.
Q So you don't remember her recording at this moment when she's standing at the exit?
A I remember her being there, but I don't remember that she even had the phone. I have no idea so ...

Q So you don't remember that?
A No.
Q So you couldn't tell whether she was recording or not?
A No.
Q And you were not recording?
A I'm not recording, no.
Q Okay. And then you're standing by. You're kind of, you know, pacing back and forth, pacing, true?
A Yes.
Q Okay. You're not approaching talking to her, right?
A No.
Q I mean, listen, we just -- the reason I went through the de-escalation techniques or quizzes, techniques quiz with CVS policy, I mean, you have an unhappy customer, you have a specific policy to follow to deescalating.
Did you do everything based on this video surveillance that you are actually engaged in deescalation?
A No.
Q Okay. So 930 it looks -- I think we skipped -- we skipped, yeah.
So 929 -- 1:29:08 a.m., Camera 5.

(The video is played.)

Q (BY MS. MKRTCHYAN:) We see you completely leave the area where she's standing, right? We don't see either you or Guy Garcia at all at this point, right, or at this angle?
A Okay. True.
Q True?
A Yeah.
Q There are no customers, true?
A True.
Q There is no one to basically listen to her or basically she's being ignored, true? Nobody is listening to her, 929?
A Listening to her?
Q Uh-huh.
A I don't even know that she's talking to anyone. She looks like she's doing FaceTime or recording.
Q Okay. But we can see her still standing by the exit/entrance, and no one is there.
A Right. I don't know her purpose.
Q But she is a customer?
A Yes.
Q Okay. And you were listening to her. She was upset, and you left. You just walked away, true?

A Yes.
Q Okay. I just want to confirm the video.
And then for just for one minute you said that she was refusing to leave earlier. You remember you testified that she was refusing to leave.
You know, we saw her basically about two minutes by this video surveillance recording, two minutes standing and talking to you at the cash register, true?
A Yes.
Q And now it's about one minute that she was standing by the exit/entrance, you know, with her cell phone on, true, when you left, true --
A Yes.
Q -- one minute?
So basically -- and you testified that the entire time she was at the store, she was about eight to ten minutes there, true?
A Correct.
Q And then right now confirm with the video how many minutes she was there, but you called the police because she was refusing to leave the store for about eight minutes?
MS. JONES: Objection.
Misstates testimony.
THE WITNESS: We called because she was refusing to

leave the store.
Q (BY MS. MKRTCHYAN:) And she was there for about eight minutes?
A Okay. Yes.
Q Okay. So then you approached, and Guy Garcia is following you at 1:29.
We don't see her anymore in this clip, true?
A True.
Q Okay.

(The video is played.)

Q (BY MS. MKRTCHYAN:) Let's go to Camera -- do you remember a point in time when you told Timothy Riddle or -- yes, Timothy Riddle, the young employee who was doing the register, did you ever tell him not to speak with Miss Burmayan?
A I don't recall that.
Q Okay. Do you remember Guy Garcia telling him not to talk with her?
A No.
Q Okay. So let's go to Camera Angle 1, the exit of the store and cover some parts there.

(The video is played.)

Q (BY MS. MKRTCHYAN:) Okay. So this is Camera Angle 1, 92850. We can see the head of Miss Burmayan, her hair, she's standing by how many feet? Like maybe six feet from the exit?
A About.
Q Yeah. So we saw that. That's about not even a minute of this clip; so let's see next what happens.

(The video is played.)

Q (BY MS. MKRTCHYAN:) 1:29:03 -- or 01, Camera 1. This is all Camera 1 now.
We can see her hair, her head, and then we can see the officer entering the store, true?
A True.
Q Do you remember this happening?
A I don't remember it, but I see it is happening.
Q In the video?
A Yes.
Q Okay. But -- so you are confirming with me that this is the officer approaching --
A Yes.
Q -- entering the store --
A Yes.
Q -- right?

And Miss Burmayan is facing him now.
A Yes.
Q You don't see in this clip at 1:29 you or anyone else, true?
A Right.
Q There is only the two of them.
A True.
Q And she was standing, as we said, about six feet away from the exit, true?
A True.
Q And she was appearing to be leaving when the police entered the store, true?
A Yes.
Q Okay. And then so they have interaction.
Let's continue.

(The video is played.)

(BY MS. MKRTCHYAN:) She is taking out something and showing it to him in her hands.
Do you agree? Do you confirm?
A I see it.
Q And she's showing, and then she's pointing her finger. She seems to be upset.
Is she -- does that appear to you that she's

explaining to the officer what is happening and pointing fingers and showing a document?
MS. JONES: Calls for speculation.
THE WITNESS: I don't know what she's showing him.
Q (BY MS. MKRTCHYAN:) Well, I'm not --
A She's telling him something. I don't know what.
Q That's what I want you to confirm with me. I understand there is no audio. I understand that you don't know, but she's pointing her fingers and explaining things to the officer, true?
A True.
Q And she's showing a document in her hand, true?
A True.
Q And she's also turning around.
At some point we can see your head. You're bald, right?
A Thanks. Yeah.
Q Sorry. I have to for the record.
You're baldheaded?
A Yes.
Q And we can see your head here popping out --
A Yeah.
Q -- in the camera angle, and you're standing right close by?
A Yes.

Q But you don't remember it?
A No.
Q And the officer is listening to her, right?
A Yes.
Q At this point you see her fully covering her face?
A I see it, yes.
Q Okay. So this is not partial face mask coverage on that date?
A Yes.
Q So -- and then let's see how long this interaction is.

(The video is played.)

Q (BY MS. MKRTCHYAN:) Several times she turns around, and she looks at you and points finger, right?
A She's looking in the direction of me and Guy.
Q Okay. So -- right.
But she's upset, and she's explaining things to the officer.
A Okay.
Q But at this point she's not walking away from anyone, true? You don't see her walking away from the officer?

A I don't.
Q And you don't see her escaping anything or anyone?
A No.
Q She's not running away?
A No.
Q Okay. And then so let's continue playing.

(The video is played.)

Q (BY MS. MKRTCHYAN:) Camera 930, 1:54, and then we can see more of your body.
A Yes.
Q And you are approaching. You're wearing a green shirt.
A Yes.
Q You're approaching them, and it seems like you are talking to her because she turns to you and points finger, and it looks like you're interacting with her.
A It doesn't look like that to me.
Q No, it doesn't?
A No.
Q But she's interacting to you?
A Okay. Yes.
Q Right?

A Yes.
Q She's telling you something?
A Yeah.
Q But your recollection is that you're not talking?
A I don't think so.
Q Why wouldn't you -- let me ask you this.
If the officer entered the store, wouldn't you try to tell him what is happening?
A She's talking to him.
Would I go and just start talking to him?
Q Yeah. But if the officer wants to hear the story, right, wouldn't you be, you know, also interested in telling him what happened?
A He didn't ask me to come there, and I didn't.
Q So you're waiting until he finishes?
A Correct.
Q You're not interrupting them?
A No.
Q You're not engaging with her?
A No.
Q What about Guy Garcia?
A I don't know.
Q Did Guy Garcia say anything?
A I mean, he may have. I don't know.
Q You don't remember?

A I wasn't -- yeah, I don't know.
Q Was he standing by with you?
A He's standing next to me.
Q Right.
But you don't remember what he said?
A I don't remember.
Q But we can tell she's talking to you?
A She's talking at us, yes.
Q And what was she saying?
A I don't know.
Q All right. And she's still showing something to the officer in her hands, true?
A Yes.
Q And then basically within one minute that he entered, we saw the 1:20 through 1:30, within one minute he entered, now we can see him placing handcuffs on her, true?
A Is he?
Q Yeah, let's watch. Let's watch and continue watching.

(The video is played.)

THE WITNESS: Oh, yes, I see.
Q (BY MS. MKRTCHYAN:) So, yes, within one minute

you see him placing her in handcuffs while she's talking, right? You can see that he's actually handcuffing her, true?
A Yes.
Q He took out his handcuffs, right?
This is within inside of the store already, still inside of the store, and you're standing by. We can see you fully now -- well, your upper body, true?
A Yes.
Q And yet you testified earlier that you didn't see him handcuff?
A I didn't see it. I see it now.
Q But now your recollection is --
A Yeah.
Q Now, your recollection is that --
A Yeah, I see it.
Q Okay. So your earlier testimony was not consistent?
A Not with what actually happened, no.
Q Okay. And she's still fully wearing her face mask.
A Yes.
Q We can tell that clearly?
A Yes.
Q So he handcuffs her.

(The video is played.)

Q (BY MS. MKRTCHYAN:) Do you remember saying anything to the officer at this point in time when he's handcuffing her?
A No, I don't.
Q Were you surprised that he handcuffed her?
A Was I surprised?
Q Yeah.
A No.
Q Okay. So then he removes -- guides her out of the store, true?
A Yes.
Q And you follow behind. You can see --
A I'm looking. I don't know if I'm following. If you want to continue.
Q Correct. We will continue.
But you saw them leave the store --
A Yes.
Q -- after he handcuffed her?
A Yes.

(The video is played.)

Q (BY MS. MKRTCHYAN:) So -- and then Guy Garcia

approaches, and you -- both of you are standing by the exit at this point in time at 1:31 when the officer removes Burmayan in handcuffs from the store?

A Yes.

Q Camera 1, 931157.

(The video is played.)

Q (BY MS. MKRTCHYAN:) Continuing.

You leave -- you walk out of the store following them a little bit. You're standing by near the -- you know, the --

A Of the exit.

Q Right. By the exit.

You and Guy Garcia, true?

A Yes.

Q And you seem to be watching what is happening with Miss Burmayan, right?

A Yes.

Q Do you remember the officer placing her in the patrol car now after watching this?

A I don't remember it, but I see it so -- it was three years ago.

Q Right.

This is Timothy Riddle, right --

A Yes.
Q -- following you guys, right?
A Yes, yes.
Q And this is like at 1:31:27 a.m. This is an employee.
He no longer works there anymore?
A No.
Q When did he leave the store?
A I don't know when. Maybe a year ago, a year and a half ago.
Q Okay. Do you know where he works now?
A I don't.
Q And you're not friends with him?
A No.
Q Okay. So then he walks out.
And let's see. You're standing by outside with Guy Garcia watching what is happening the fate of Miss Burmayan, true?
A Yes.
Q Did you hear her screaming or crying or doing anything when the officer was removing her?
A She was screaming.
Q Did you see her resisting physically?
A I didn't see her resisting there, no.
Q So she was not escaping, she was not physical,

nothing like that? You didn't see anything like that?
A No.
Q Right?
A No.
Q Okay.

(The video is played.)

Q (BY MS. MKRTCHYAN:) 1:32 a.m., same camera angle. You're continuing to watch what is happening.
Timothy Riddle comes inside, but you and Guy Garcia are standing outside by the exit watching the interaction with Miss Burmayan, right?
A Yes.
Q And yet you don't remember what you observed?
A I don't know what is happening right here. I don't.
Q Okay. But you were there watching --
A I see it.
Q -- but you cannot tell us what was happening?
A Right.
Q You don't remember how many officers were there?
A No.
Q You don't remember if she was searched?
A I didn't see that.

Q If she was placed in a car?
A She was in the car. They put her in the car.
Q You saw that?
A I didn't see it, but she was in there.
Q How do you know?
A Because she was in there. I could hear her screaming from the car.
Q From the car?
A Yes.
Q What was she screaming?
A I don't know. She was just screaming, just yelling.
Q Could you remember any words?
A No.
Q So you were -- how far were you standing from that?
A They were in the parking lot; so this is the front entrance. So the parking lot is out more maybe like 20 feet.
Q And the police car was parked in a parking aisle or in the --
A I don't remember that.
Q Okay. Do the police officers have a specific spot to park there or no?
A No.

Q So they just have to use any of the parking spots?
A They just pull up.

(The video is played.)

Q (BY MS. MKRTCHYAN:) Okay. And then so 1:33 we still see you standing by. This is already three minutes you're standing there outside, true?
A Yes.
Q Okay. But you cannot tell us what else you remember other than her sitting in the car?
A That's all I remember.

(The video is played.)

Q (BY MS. MKRTCHYAN:) 1:35. You're still standing there outside, right, walking by at the exit, true?
A Yeah.
Q And you don't remember --
A Like I walked this way. I saw myself walk this way to the left so ...
Q Okay. But you're still standing outside?
A Yeah.
/////

(The video is played.)

Q (BY MS. MKRTCHYAN:) And 1:37 we have a customer coming in.
We see Guy Garcia standing outside, but we don't see you enter the store --
A No -- no. I'm still standing there.
Q Okay. So that's the gist of the camera angle.
Do you remember how many minutes you were standing outside?
A Well, according to this, it was seven.
Q Well, according to this, but we don't see you when you're entering.
We saw you leave the store --
A I don't recall.
Q So you can't tell us, right --
A No.
Q -- how long you were standing outside?
Let's see if some of the other camera angles will show that.
Camera 5.

(The video is played.)

Q (BY MS. MKRTCHYAN:) So everyone was outside.

Guy is using -- at 1:40 you must still be waiting outside, but there is no one manning the register for this customer who is using self-checkout, true?
A True.
Q All right. So it's fair to say at 1:40 you're still waiting outside?
A It's not fair to say. I have to see it.
Q I understand.
But right now at 1:40 we have not seen you enter the store.
A True.
Q And you see a customer using the self-checkout?
A True.
They use self-checkout like 60 percent of the time at night.
Q Okay. You see -- okay. All right.
But we have not seen you with her?
A Yeah. No.
Q Okay. But you cannot tell us other than her screaming, what else happened outside?
A No.
Q Did the officers speak to you inside or outside of the store?
A He came inside.
Q Inside.

And you went inside of the back of the room or --
A No, no. Right at the front right there.
Q Okay. Do you remember if the officer was recording any of your conversation?
A With what?
Q Recording, like with his cell phone or with a recorder?
A No, I don't recall that.
Q Do you remember him having a body-worn camera?
A No.
Q Have you seen body-worn cameras on officers?
A I have.
Q They have this rectangular thing --
A Yes.
Q -- and you can see.
You didn't remember that? Have you seen anything like this on the officer?
A No.
Q In your daily interactions with the officer, was this the first time you ever had interactions with that officer?
A I don't remember. I've had a lot of interactions so -- I mean, I could have interacted with him before.
A I see.
A It's possible.

Q You can't testify --
A No.
Q -- one way or the other?
A No.
Q Is there any one officer that you remember from your interactions at the CVS store, phone calls that you remember, you can tell us, you know, one particular officer?
A No.
Q No?
A No.
Q You're not good with the officer names or --
A No.
Q -- faces?
A No.
Q And in this -- from January 19 we have not received any video from Camera F.
So do you happen to -- Camera F was from -- you know, showing the angle of the aisles, you know, showing the aisles, right? So do you happen to know why we don't have that camera angle for January 19th?
MS. JONES: Calls for speculation.
THE WITNESS: I don't -- that doesn't have -- every aisle doesn't have a camera on it.
Q (BY MS. MKRTCHYAN:) No. I understand, but, you

know, we've covered several camera angles --
A Right.
Q -- right?
One of them is facing -- the one we have seen is the exit/entrance?
A Correct.
Q The other is facing cash register --
A Correct.
Q -- Camera 3.
Camera 1 is the exit/entrance -- entry.
This one right now that we're watching is Camera 5 because it shows to the right of the store.
A Right.
Q And you can see Anoush Burmayan entering.
Camera F that we had seen from January 13th shows the aisles.
If you want, I'll go back, and I'll show it to you.
A Okay.
Q So you don't deal with production, collection of video at the store?
A No, I do not.
Q Someone else does?
A Yes.
Q Is there any specific person at your store who

handles video production?
A No.
Q How do you know -- I mean --
A I mean, anyone can go and look at the camera.
Q Okay. So if you wanted, you could go and check the camera?
A Of course.
Q Oh, okay.
A Yeah.
Q But you don't deal with collection and distribution or archiving?
A No.
Q But do you know if someone -- because, you know, someone must have archived this. Do you know who did this in this case?
A No.
Q It was not brought to your attention at all?
A No.
Q After this incident of January 19, did you ever see Miss Burmayan drive by or come by the store?
A I mean, no.
Q And so from the video that we observed her on both days, we have not seen any physical aggressive behavior from her, right?
A As far as like throwing things?

Q Yes.
A No.
Q So let's play the tape by Guy Garcia, the 911 call. Let's see what he tells the 911 caller.
Let's play this.

(The audio tape is played.)

Q (BY MS. MKRTCHYAN:) First of all, let me turn this off because this is making it more difficult to hear, but could you hear that? Was that --
A Yes.
Q So first thing that happens during this call, you were able to hear, this is Guy Garcia calling 911 on that date.
The dispatch asks for the address where the location occurs, true?
A Yes.
Q And he appears to be asking someone who is next to him for the address because he doesn't remember it, true?
A Yes.
Q Was it you?
A It could have been.
Q So it must be that it was either you or

Timothy Riddle standing by, true?
A True.
Q But from the video clips that we observed, Timothy was by the register when he had his cell phone, true?
A Okay.
Q So it was you probably that he asked for the address?
MS. JONES: Calls for speculation.
THE WITNESS: I don't know that.
Q (BY MS. MKRTCHYAN:) Well, but Timothy Riddle was not next to him, right?
A I don't know that I told him anything.
Q Okay. All right.
But, in any event, he's asking someone for the address confirmation to give the dispatch?
A Yes.
Q And then he makes statements like -- I'm going to stop at some point. Oops. Let me see. This technology is the worst.

(The audio tape is played.)

Q (BY MS. MKRTCHYAN:) Okay. At this juncture at 50, first of all, he indicates to the dispatcher in

response to the question if there are any weapons involved, he says, "No weapons," true?
A Yes.
Q And he says she was banned from the location, true?
A (The witness nods head.)
Q Okay. But you testified that you were not aware of anything like that?
A True.
Q So if he said that, that must be based on entirely on his information from him?
A Okay.
Q Right?
A Yes.
Q So it wasn't like -- you were not privy to that information?
A I was not.

(The audio tape is played.)

Q (BY MS. MKRTCHYAN:) And then he says "She's back" after being banned from the store, true?
A Yes.
Q "She's back."

(The audio tape is played.)

Q (BY MS. MKRTCHYAN:) The dispatcher is asking, you know, COVID symptoms, right? "Does she appear to be coughing," anything like that.
And he says "No," right?
A I heard that, yes.
Q Right.
So, you know, based on his conversation with the dispatch, it appears that Miss Burmayan is not experiencing or is not exhibiting symptoms of COVID-19?
A Okay.
Q Right?
A Okay. Yes.
Q That's important, right?
A Okay.
Q That's important, right?
A Yeah.
Q During the pandemic it was important enough that the dispatcher wanted to know, right?
A Yes.
Q So when you said that "I was always concerned about my health," you know, if Guy Garcia says, "It didn't seem like she was sick," true?
A Okay.

Q Just confirm with me.
A Yes, that's his opinion.
Q I mean, Of course.
On January 19, though, we saw at the very least several clips that she was fully covered?
A Okay.
Q And yet you still asked her to leave the store?
A Yes.
Q Okay. And the reason was we've already covered.
Is there any other reason?
A No.

(The audio tape is played.)

Q (BY MS. MKRTCHYAN:) And then she talks about, you know -- about, you know, the symptoms of COVID.
He says, "We're good," right? That everything -- let's go back to that segment.

(The audio tape is played.)

Q (BY MS. MKRTCHYAN:) Okay. So he says, "We're good." Nobody is sick with COVID. It doesn't appear that anyone is exhibiting symptoms with COVID, right?
A Yes.

(The audio tape is played.)

Q (BY MS. MKRTCHYAN:) And he says, "She's causing problems right now," right?
And this is the time you've watched on the video clips her behavior in the store, right?
A Yes.
Q Is there anything else that we didn't see on that video that you can tell me that was happening?
A I mean, it's possible. I don't know what else happened.
Q But if something happened, would it be fair to see it on the video?
A If it happened in the front --
Q Okay.
A -- where the cameras are, yes.
Q But --
A If it was somewhere else in the store, then we wouldn't know.
Q Sir, we have had several video clips we have covered already.
One covers the aisles, true? Camera angle shows the aisles from the store?
A It didn't show the aisles. It just showed the front.

Q Camera angle -- we have a camera angle that we observed in the store showing the aisles from January 13.
A Okay.
Q Yeah, but that camera angle was available to CVS.
If something happened, would you expect to see on video clips?
A Yes.
Q Okay. We didn't see that, true?
A No.
Q Okay. Whatever has been produced to us, we've seen. We've seen her behavior in the store while Mr. Garcia is telling the dispatch, true?
A Yes.
Q You cannot tell me one way or the other if there was anything else that she was doing that is not in this video, true?
A True.

(The audio tape is played.)

Q (BY MS. MKRTCHYAN:) Okay. He tells the dispatch about the prior incident when, you know, you told her to cover her mask -- I mean, her face, whatever, cover her face, and he says that she threw a thing, and she started throwing things, right?

A Yes.
Q You never saw that, right?
A I didn't see it.
Q Okay.

(The audio tape is played.)

Q (BY MS. MKRTCHYAN:) Okay. And he tells her that she's by the front door, right?
A Yes.
Q Consistent with the video clip we saw her standing by the front door?
A Yes.
Q And this is consistent with us also observing you and him walking around him with his cell phone?
A Yes.

(The audio tape is played.)

Q (BY MS. MKRTCHYAN:) Okay. And the dispatch asks him when she was banned from the store, and he says "last week," previous week?
A Correct.
Q But you were not aware of that?
A No.

Q Did you hear him telling the dispatch about this?
A I heard it.
Q No, not right now but at the time this happened?
A No.
Q If he had told the dispatch that she was banned from the store previously, and you heard it on that day, would you have corrected him that, you know --
A I wouldn't have corrected him. I would have asked him probably like, "What happened?"
Q Right, right.

(The audio tape played.)

(BY MS. MKRTCHYAN:) And he says, "She keeps coming back," you know.
From, you know, your observations that you could tell, and I asked you previously, you saw her you mentioned twice, true?
A Yes.

(The audio tape is played.)

Q (BY MS. MKRTCHYAN:) And he never even -- he doesn't even know her name, true?
So is it fair to say that you -- if you have a

difficult customer, she comes in with a paper, if you had asked to look at her papers, you would have learned the name of her, her name?
A If her name is on the paper, yes.
Q Well -- but you didn't look at the paper.
A Yeah, I didn't.
Q You wouldn't even know what was on that paper?
A Right.
Q You don't know right now?
A Right.
Q Would it be a good idea to look at it?
A I still say no.
Q Why not? Why would you say that?
If you have a customer who comes and says, "I have a paper entitles me not to wear a face mask," and you're telling her, "Leave. You can't" --
A No.
Q -- wouldn't it be important for you as a customer service representative, Manager of a store, to say, "Let me look at your paper. Maybe you have a legitimate reason"?
A No, because we were told they have to wear a face mask to be in the store. That's it.
Q And we covered that?
A Yeah, we covered that.

(The audio tape is played.)

Q (BY MS. MKRTCHYAN:) Okay. So from what we've heard, Guy Garcia is telling the dispatch, there were at least two things that you cannot confirm for me, her being seen throwing stuff on the floor, true?
A True.
Q And her being banned from that location?
A True.
Q Okay. And going back to the police report of Officer Ross, though not going back, but let me show you the police report of Officer Ross, this is taken on, you know -- let's see -- January 19, 2021. This is COG171.
Let's, you know, put on the record what is happening in this police report.
So Officer Ross states in the paragraph one that -- I'm paraphrasing -- that he was dispatched to CVS Pharmacy regarding a female who was causing a disturbance inside of CVS and was trespassing at the location.
So he relates what Guy Garcia told dispatch, that the female was banned from the store last week.
So right away if you don't know that she was banned from the store previously, you wouldn't know if she was trespassing on that day, true?

A True.
Q Okay. So you cannot tell us whether she was or if she was not trespassing?
A True.
Q So this is based entirely on a what Guy Garcia told Ross?
A Yes.
Q "Upon arrival, I saw the female standing near the front entrance was filming the employees with her cell phone."
You didn't remember her filming, true?
A I just saw her right there when she was doing it.
Q Right.
But you cannot tell one way or the other from that video from clip that she was actually filming, right?
A Okay.
Q True? You did not see her filming, true?
A True.
Q Okay. "As I walked towards the entrance to the CVS, I heard her yelling at the employees."
You confirmed that for us later, right? You said that she was yelling but without any physical aggression?
A Yeah.
Q "I walked inside. Anoush turned towards me and began to tell me that she was there to speak to the

Manager" he says "regarding a recent purchase that she had made."

Do you remember her actually telling him that she was trying to talk to the Manager about a recent purchase?

A No.

Q "And she was not trying to talk to you about the recent purchase."

Do you remember anything like that?

A No, I've never heard that.

Q Right.

And then he says, "Summarizing what Gus Garcia says."

We don't see anywhere in his report him summarizing what you told him.

Do you happen to know why?

A I didn't tell him anything.

Q You told me that you were speaking with him after he placed her in the patrol car.

A He just told me that he was going to release her.

Q I see.

A That was it.

Q You did not -- he did not interview you?

A No.

Q You did testify that he did.

A He interviewed me?

Q Yeah.
A No, I didn't.
Q That you spoke to him.
A He said that he told me he was going to release her. That's it.
Q So he didn't ask you any questions --
A No.
Q -- about what happened?
A No.
Q Okay. So he only spoke with Guy Gar --
A Yes.
Q But earlier you said he did speak to you. I don't understand.
A He spoke to me that "We're going to let her go. We're not going to arrest her."
Q That's all?
A That's it.
Q Okay. But -- all right.
Let's look at the summary of Guy Garcia.
A Can I go to the restroom?
Q Sure, absolutely.
MS. JONES: Sure.
THE COURT REPORTER: Off the record at 2:29.
/////
/////

(A recess is taken in the proceedings at 2:29 p.m., and the proceedings resume at 2:31 p.m.)

THE COURT REPORTER: Back on the record at 2:31.
Q (BY MS. MKRTCHYAN:) So going back to the police report by Officer Ross, COG172.
Now, he's relating -- he's summarizing the statements with Guy Garcia, and I want to confirm if you knew that information provided by Guy Garcia. Garcia said that "Anoush has come into CVS three times in the past week."
Were you aware of that? Did you know that at the time?
A No.
Q He said, "She causes a disturbance by yelling at the Managers and then records them on her phone."
Did you know of this information, that she recorded Managers, and then she, you know, yells at them?
A No.
Q He said "He told her not to return to the CVS each time she came into the store." So basically meaning three times she came into the store he told her not to return.
Were you aware of that?

A No.
Q Garcia said that "He wanted her arrested tonight for trespassing."
Were you aware that Garcia asked Ross, Officer Ross to arrest her that night?
A I was not aware that he asked him to.
Q Okay.
A I know that they cuffed her. I didn't know what happened.
Q Okay. But you never asked -- you personally were not aware that Garcia asked him to --
A No.
Q Okay. And since you didn't know she was banned from the location, you didn't know that she was actually trespassing on that day, true?
A True.
Q Now, Anoush returned to -- continuing, "Due to the fact that Anoush returned to CVS, the fact that Garcia advised her not to return to CVS three times, the fact that she returned and again was causing a disturbance, I placed Anoush under arrest for trespassing." Okay.
So that's only information from Guy Garcia. You were not aware of that?
A No.
Q And then he continues. He also says that, "I

also advised Anoush that she is no longer allowed at the CVS, and if she returned again, she would be arrested for trespassing."

Were you aware -- did you ever ask Ross that "She should not come back. We don't want her in the store again"?

A Did I ever ask him --

Q Yes.

A -- or did I ever tell him?

Q Tell him, yes.

A No.

Q Okay. So you never told him or asked him, "Please advise her not to come back again"?

A I don't believe I did, no.

Q So if she came back -- you testified earlier if she came back later after that wearing a face mask, you would not have a problem?

A I wouldn't say anything.

Q Okay. It was Guy Garcia who provided the information about her being banned and no one else?

A Yes.

Q And are you aware of anyone else in the store who was aware that she was banned?

A No.

Q Are you aware of anyone who approved of her being

banned from the store?
A "Approved"?
Q Yes.
A No, I don't know.
Q Like telling her -- telling Guy Garcia that, "Yes, you know, she should be banned. We don't want her here"?
A No.
Q No.
So it's Guy Garcia's decision to ban her from the location?
A If she was banned, yes.
Q Okay.
A Yeah.
Q Okay. And let me just, you know, ask you, you know, have you ever had any situation when you called the police and asked them to arrest someone for trespassing at the location?
A Me?
Q Yes.
A It's possible.
Q Okay.
A But I don't remember when.
Q But you never banned anyone from the location?
A I've never banned anyone.

Q Okay. So, you know, because is it your policy doesn't allow you to ban someone?
A No. It's just I don't find a need to ban anyone. I didn't find a need; so I didn't do it.
Q Okay. So, you know, in all of those 30 times you called the police in the CVS store in Glendale, you never asked the police to arrest someone for trespassing?
A Possibly, yeah. Arrest someone for trespassing, yes, but ban them, no.
Q But how can someone be trespassing if that person was not banned?
A That's true. I mean, yeah, sure.
Q Let me ask you this. If someone -- is trespassing related to a situation where someone had been seen stealing something, and then you called the police on that person again if that person comes back? Has that happened?
A That's happened.
Q If you had a customer who you had seen previously steal, and that person comes back, is that to you considered trespassing?
A Say that one more time.
Q Let me paraphrase it.
You see a customer shoplift.
A Yes.

Q And you don't have a chance to have them arrested and for whatever reason it doesn't get arrested, the person.
A They get away.
Q They run away.
A Okay.
Q They run away, and they're red-handed, and you can't catch them.
A Okay. Yeah.
Q And basically you're trained not to even follow them because it endangers you, right?
A Correct.
Q And so you just, you know, let it go.
When that person comes back and you recognize, have you had a situation where you said, "Leave the store"?
A I haven't. I haven't, no.
Q Because it also, it escalates conflict?
A I haven't done that.
Q And your CVS training is to try to not engage in conflict even with shoplifters, true?
A True.
Q Because it's dangerous for your safety.
A Yes.
Q They can be armed?

A Yes.
Q They can be threatening?
A Yes.
Q Right. So any ways -- so okay.
Have you ever seen this document? This is 585. Do you know what this document represents, CVS 585?
A It looks like an employee log.
Q Have you seen that, though, before?
A Not in this context, no.
Q When you are in the store, is there some sort of screen or some sort of a log of individuals working that day?
A There should be, but there is not always.
Q Okay. So let me ask --
A There is a schedule posted --
Q Right.
A -- that you can go and look at.
Q Gotcha.
So how does it -- let me ask you this.
How is it -- is it possible for someone to be working at the store, but the log is not displaying that person to be there?
A If they're working off schedule, yes.
Q "Off schedule." What do you mean?
A They're not scheduled to be there, and they just

come.
Q So it happens before?
A It's happened, yes.
Q So someone might be substituting or maybe coming --
A Yeah.
Q -- overtime?
A Yeah, yeah, it could be that.
Q Do you get paid overtime?
A Yes.
Q So January 19, even though we saw Timothy Riddle there, we don't see him on this screen, right, in the highlighted --
A On this log?
Q Yes, on January 19 specifically we don't see him there?
A He's here.
Q Where?
A Right there. (Indicating)
Q That's for January 13, though.
A Okay.
Q Look down at January 19 and, you know -- the date of January 19. You don't see him there, true?
A No, I don't see him. No.
Q Okay. But, you know, he was there working?

A Yeah.
Q All right.
MS. MKRTCHYAN: So let me just take a two-minute break, and I think we will be done.
MS. JONES: Okay. That's fine.
MS. MKRTCHYAN: Let me take a two-minute break.
THE COURT REPORTER: Off the record at 2:38.

(A recess is taken in the proceedings at 2:38 p.m. and the proceedings resume at 2:41 p.m.)

THE COURT REPORTER: Back on the record at 2:41.
MS. MKRTCHYAN: Thank you.
I don't have any further questions.
Do you have?
MS. JONES: I just have a couple questions. It shouldn't take too long.
MR. ARIAS: Actually, I have literally just have a couple.
MS. JONES: Do you want to go first, or do you want me to go first?
MR. ARIAS: I don't care.
MS. JONES: I'll go first.
MR. ARIAS: Go ahead.

EXAMINATION
BY MS. JONES:
Q Okay, Mr. Johnson, earlier today we looked at a lot of generalized training modules you stated you have taken or at least recognized since you've been employed at CVS, correct?
A Yes.
Q Those showed a lot of hypothetical customer interactions, correct?
A Correct.
Q We went through and talked about them.
A Correct.
Q Do you also remember stating that some of the suggestions in those modules differed from your interactions with Miss Burmayan, the Plaintiff, in this case?
A Yes.
MS. MKRTCHYAN: Vague and ambiguous objection.
MS. JONES: What was it?
MS. MKRTCHYAN: Vague and ambiguous.
Q (BY MS. JONES:) And you said that it differed with your interactions -- differed from your interactions with her on both days that you saw her on the 13th and the 19th, correct?
A Correct.

MS. MKRTCHYAN: Vague and ambiguous.
Q (BY MS. JONES:) On the 13th specifically, the first day that Miss Burmayan came into the store that we have been discussing, did she specifically ask you for help?
A No.
Q Did she ask you to look for something for her?
A No.
Q Did she ask you for assistance in any way?
A No.
Q And you stated that on the 13th, January 13th, 2021, you did not offer to check her out at the front register because she did not have her mask on all the way, correct?
A Correct.
Q Why did you make that decision?
A I didn't want to be exposed. We were in the middle of a pandemic.
Q Generally did you adjust or I guess scale back the way you interacted with customers during the pandemic?
MS. MKRTCHYAN: Objection.
Vague and ambiguous as to "adjust."
THE WITNESS: Yes.
Q (BY MS. JONES:) And was that across all types of customer interactions that you had?

A Yes.
Q Can you describe some of the ways that you adjusted or scaled back the way you interacted with customers during the pandemic?
A We just had to limit our exposure to them. We put up barriers between us and the customers at the registers. We just had to stay away and maintain at least a safe distance from them.
Q Okay. Did you adjust even some of the more general customer service know-how such as not approaching people as much?
A Yes.
MS. MKRTCHYAN: Vague and ambiguous.
Q (BY MS. JONES:) And also if people were at self-checkout, would you approach them during the pandemic?
A No.
MS. MKRTCHYAN: Leading objection. Leading.
Q (BY MS. JONES:) When you saw Miss Burmayan on the 13th, the first time when she was at the self-checkout, we saw that you were standing in the same vicinity, correct?
A Correct.
Q Did she ask you for help at the self-checkout?
A No.

Q And we also talked about the concept of deescalating situations. Do you recall?
A Yes.
Q Based on everything we have talked about and seen today, specifically with respect to your interactions with Miss Burmayan on the 13th, do you feel that you escalated the situation?
A No.
Q On January 19, which is the second day we talked about, the day that Miss Burmayan was taken by the police, when she came in, do you recall her seeking help from you?
A No.
Q Was she trying to shop, that you recall?
A I don't recall what she was doing.
Q Did she ask you for help finding something?
A No.
Q What was she doing when she came in?
A What --
Q Sorry. That you personally observed?
A I observed her -- when I walked up, she was in the store already with Guy, and Guy was saying that "She is here again."
Q Okay. From everything that we've discussed and from what you observed with respect to January 19, do you feel that you escalated your interaction with

Miss Burmayan?
A No.
Q Okay.
MS. JONES: Those are all of my questions.

EXAMINATION

BY MR. ARIAS:
Q Hi. I just have a couple questions.
On the day Miss Burmayan was detained, did you at any time hear her say to anyone that she was disabled?
A No.
Q And on that same day that Miss Burmayan was detained, did you at any point hear her say that her handcuffs were too tight?
A No.
Q Okay. Thank you.
MR. ARIAS: I don't have any further questions.

EXAMINATION

BY MS. MKRTCHYAN:
Q I have some followup.
A Okay.
Q You said at the height of the pandemic -- we know that this incident happened in January of 2021, right, that was about ten months after the pandemic began, true?

A I don't know when it began. I don't know the exact time.
Q March 2020. Wasn't that the time when the lock downs began?
A Okay.
Q Okay. So March 2021, flash forward, it's about ten months, give or take, that January 2021 occurred, right, this incident occurred, right?
So meanwhile, though, we had certain on-and-off periods for face masks mandates, true? In the summer of 2020 there was some period lock downs were lifted, true?
A I don't remember like that part when they were lifted and when they were ongoing.
Q Okay. But, you know, there was waning off-and-on of the pandemic period, right? During the summer it waned, right?
MS. JONES: Objection.
Vague.
Q (BY MS. MKRTCHYAN:) You don't remember the lock downs being lifted and people being able to come to stores?
A Without wearing face masks?
Q No, no, just generally.
A Well, they could always come.
Q Okay. So -- but there was a period of time when

there was no requirement, as you know, the period -- the face mask requirement was lifted for some period of time, true?

A At some point it was lifted, but I don't know when that was.

Q In any event, you described there were certain things in the store, precautions taken by CVS as a company. You had glass separating the Cashier from the customers, true?

A Yes.

Q The entire -- what is it called, Plexiglass?

A Yes.

Q You had shields, wearing shields sometimes, some of the employees?

A Some.

Q You had masks for the covering of your face, true?

A Yes.

Q And you were distancing yourself six feet?

A Yes.

Q And those were the main guidelines from the CDC?

A Yes.

Q And the -- right? So, you know, there were main guidelines.

So those were certain precautions that were taken

for, you know, employees working such as you in retail, true?
A Yes.
Q And the whole time that Miss Burmayan came to the store, you were maintaining six feet distance from her, true?
A Yes.
Q You already testified.
A Yes.
Q And when she went to the register, there was also the glass protecting the Cashier, true?
A Yes.
Q And she never approached you very close so that you would be exposed, true?
A I wouldn't allow it, so no.
Q Okay. But she didn't even attempt to --
A No.
Q -- approach you to that extent --
A No.
Q -- true?
A No.
Q And you didn't even see her approach other customers, closer than six feet, true?
A No.
Q Okay. So then when you testified about her, you

don't remember her talking about her being disabled.
Isn't it true that you testified earlier that, you know, the first time you remember her coming in, she, you know, displayed this attitude of entitlement, and she was showing some paper that, you know, she was permitted not to wear a face mask, true?
A Yes.
Q So how would you interpret -- how did you interpret that at the time when she is trying to show legal papers and telling you that she's entitled not to wear that mask?
A How did I interpret it?
Q Yes?
A Well, I don't know what she's showing me.
Q Well, you know, if she's trying -- if the customer is trying to tell you, "I'm entitled not to wear it," how do you interpret that, sir? Why would she be entitled not to wear a face mask? What are some of the reasons that you --
A She didn't have a reason.
Q Yeah, but you didn't even look at her paper, true, right?
A I didn't.
Q Right?
A No.

Q So when you testified a moment ago that she never told you that she was disabled, that is not true, right? She was attempting to tell you.
A I don't know what she was attempting to tell me.
Q But you didn't try to listen and find out, true? True? Agree with me.
A Sure.
Q And if you had looked at her legal paper -- but if you had looked at her legal paper that said she has a medical disability, she cannot wear a face mask, would that give you notice that she was disabled?
A If the paper was a legitimate paper, yes.
Q Yes.
But you didn't attempt to look at it?
A Yeah, right.
Q So, in other words, you, as a customer service representative, didn't even attempt to find out --
A I didn't.
Q -- if she was or was not disabled?
A I didn't.
Q And your store guidance, though, does state that you can provide -- you have to provide reasonable accommodations to disabled people, true?
A Yes.
Q And even employees could ask for reasonable

accommodations from wearing a face mask, true?

A Yes.

Q We covered that.

A Yes.

Q Okay. And when you said it never escalated, you know, the CVS training guides are geared towards you de-escalating situations when a customer is unhappy, true?

A True.

Q So, you know, whether you escalate it or not is irrelevant, true?

MS. JONES: Objection.

Argumentative.

THE WITNESS: I don't think it's true.

Q (BY MS. MKRTCHYAN:) Well, okay. So let's say you are not, you know, escalating. Let's say you are not escalating, but the customer is unhappy, but you're not fulfilling the policy of de-escalating the customer who is unhappy. Is that still a violation of the policy?

A "A violation of the policy"?

Q Yes.

A I don't think so.

Q No?

A No.

Q So if you're not engaged in -- that was a bad question.

So you're trained as a Manager of the store to deescalate situations, right?

A Yes.

Q Regardless of who causes them?

A Yes.

Q Let's say you didn't cause it. You didn't cause it. She comes. She's upset for whatever reason. You are -- it's on you, it's incumbent upon you to deescalate that situation, right?

A Okay. Yes.

Q Regardless of what you do, true?

A Right.

Q But let me -- you know, if she says that "I was being ignored, nobody listened to me," you know, "And he stands behind me," we saw it in the video clips, you were standing behind her and were not helping her.

A Right.

Q If she's being ignored, if she's not being heard, if she's an unhappy customer, nobody is helping her to do self-checkout, she's peeing in her pants, she's pooping in her pants because she's having an IBS, whatever she testified, if she right there had pooped in her pants, as she testified "that I was almost doing that" --

A Okay.

Q -- "because I had a medical condition."

MS. JONES: Let her finish the question.
THE WITNESS: Okay.
Q (BY MS. MKRTCHYAN:) And if you did not do anything to assist her, would that be consistent with your policy?
A No.
Q Okay. So all right.
I have no further questions at this time.
MS. MKRTCHYAN: It's 2:53.
Does anyone else have more questions?
THE COURT REPORTER: Okay. I have housekeeping.
MS. MKRTCHYAN: Yes. I need to offer a stipulation.
THE COURT REPORTER: Okay. Federal Court.
Go ahead.
MS. MKRTCHYAN: Yes, Federal Court.
There is going to be a transcript prepared for you to review.
I request that you review it to certify it under oath the truthfulness and accuracy of the statements in terms of the accuracy of what you said and what you testified. Okay. We will give you some period of time, 30 days.
Your attorney will, you know, go over the transcript with you. You're encouraged to review it and sign it under oath.

And you can also make amendments. If there is any notice -- if you notice any mistakes what you said quickly enough, and it was not recorded accurately, you can certify under oath and make amendments on an errata sheet, but, obviously, if any changes are made to the transcript, substantive changes, it will be used against you.

So -- but I offer, you know, the following stipulation:

If for whatever reason, the Certified Copy of the witness' review of the transcript is misplaced or lost or unavailable, a non-Certified Copy is going to be used for all purposes in this litigation.

So stipulated?

MS. JONES: We'll stipulate.

MS. MKRTCHYAN: Okay. So the Original will go to the Defendants for review of the transcript.

The original, goes for them to review and certify.

Like we said, even if they don't certify, even if it's lost or stolen or not certified, the not-certified copy will be accepted as the Original and will be used for all purposes in this litigation; so that's the stipulation, and it's been accepted. So -- but the Original will go to the defense for review, and then I

will retain the original. It will be returned to me. So please send it to them for review, and then it will be returned to us.

I will retain it, but, like I said, if it's misplaced or stolen, then it's not a problem. We will use the Certified Copy. So that was the stipulation.

So we are done.

THE COURT REPORTER: Miss Jones, would you like a Certified Copy for your purposes?

MS. JONES: I just need a copy right now.

THE COURT REPORTER: Yes, a Certified Copy is a copy.

MS. JONES: Yes, we do need a copy.

THE COURT REPORTER: Okay. Thank you.

And, Mr. Arias, do you need a copy?

MR. ARIAS: Yes, please. I'd like to order, I guess, an electronic copy and a hard copy.

THE COURT REPORTER: Sure. Electronic and hard.

MS. JONES: We probably just need an electronic copy.

THE COURT REPORTER: Okay. Electronic copy. Okay.

We are at the conclusion of the deposition of Mr. Johnson, and the time is 2:56 p.m.

(The deposition was concluded at 2:56 p.m.)

STATE OF CALIFORNIA )
) ss.

I, JOE JOHNSON, say I have read the foregoing deposition. I declare under penalty of perjury that my answers, as indicated, are true and correct.

______________________________________
(DATE)

______________________________________
JOE JOHNSON

STATE OF CALIFORNIA )
) ss.
COUNTY OF SAN BERNARDINO )

I, CHRISTINA BUSTAMANTE, a Certified Shorthand Reporter No. 5529 in the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney of any of the parties.

IN WITNESS WHEREOF, I have hereunto subscribed my name this 23rd day of October, 2023.

Christina Bustamante

CHRISTINA BUSTAMANTE
CSR No. 5529

ERRATA SHEET
CHANGES IN TESTIMONY
BURMAYAN v CVS PHARMACY, INC., et al.
Joe Johnson
October 19, 2023

Page Line From To

SIGNATURE:______________________DATE:__________
Joe Johnson

-

**--ooo--** 4:5

0

**00** 60:12
**01** 242:11

1

**1** 183:11,12 184:9,20,21 188:24 219:8 241:22 242:2,11,12 251:5 260:10
**1(800)** 126:5,22
**10** 35:7
**10:28** 89:7,10
**10:41** 89:11,13
**11:43** 155:1,5
**12** 54:1
**127** 165:1
**12:12:03** 184:15
**12:13** 183:20 184:18 188:5
**12:31** 155:6,8
**12:42** 193:13
**12:43** 194:14 207:13
**12:43:17** 194:18
**12:44** 201:22
**12:48** 203:17
**12:49** 207:8
**12:49ish** 188:6
**12:50** 188:25 207:15
**12:50:26** 179:25
**13** 37:16 38:25 39:6,9 44:16 45:3 46:9 73:13 95:10 98:7 106:16 138:21 152:15 177:25 191:1 268:2 283:20
**13th** 142:21 143:1 177:10 178:13,14,20 179:2 180:5 219:22 220:14 260:15 285:23 286:2,11,12 287:20 288:6
**15** 196:7
**150** 109:24
**19** 4:1 37:17 38:13,20 39:1 40:19 41:15,22 43:14,18 44:7,15 56:16 95:9,20 96:19 97:20 168:11 219:18 259:16 261:19 266:4 272:13 283:11,15,22,23 288:9, 24
**1990** 9:11
**1997** 9:14
**19th** 40:6 95:10,23 100:11 101:23 130:18 138:21 177:21 178:11 218:20 259:21 285:24
**1:20** 248:15
**1:22** 219:16
**1:24** 220:23 233:21
**1:25:35** 225:10
**1:29** 241:6 243:3
**1:29:03** 242:11
**1:29:08** 238:25
**1:30** 248:15
**1:31** 251:2
**1:31:27** 252:4
**1:32** 218:25 219:2 253:9
**1:33** 255:7
**1:35** 255:17
**1:37** 219:3,5 256:3
**1:40** 257:1,5,9
**1:48** 237:6
**1:54** 246:11

2

**2** 128:13
**20** 24:18 60:17,18 83:18 254:19
**2000** 9:11
**2001** 9:14
**2017** 8:9 12:3
**2018** 17:12 19:5 22:21, 23 23:5 30:1 156:3
**2020** 16:19 17:9 18:8 22:12,14,21 60:17,18 62:6 65:24 71:1 290:3, 11
**2021** 14:23 15:20 26:4, 15 29:9 30:5 37:16,17 38:1,13,20 39:6,9,13 40:19 41:15,22 43:14, 18 44:7,15,16 45:3,13 46:9 50:24 51:3,6,12, 18,25 52:2,17 54:7 55:9 70:3 73:13 138:15 157:8,11 181:12 272:13 286:12 289:24 290:6,7
**2023** 4:1
**21** 38:1
**22** 83:19
**24/7** 85:12
**25** 6:9 7:4
**2812104** 184:9
**2:29** 275:23 276:2
**2:31** 276:3,5
**2:38** 284:7,10
**2:41** 284:11,13
**2:53** 297:9
**2:56** 299:21,24

3

**3** 219:7 220:12,14,18 222:19,20 229:13 234:16 260:9
**30** 12:18 23:15,16 24:5, 9 35:7 49:8 107:24 148:5,6 210:14 280:5 297:22
**31st** 8:9
**35** 188:7 212:24
**3943** 17:11 22:11 37:10

4

**40** 12:18 107:24
**468** 85:25
**469** 85:25
**47** 60:12,13
**48** 218:3
**482** 109:20 124:7
**49** 65:22 214:17 218:3

5

**5** 190:16 191:4,10 193:11 201:23 207:8 233:4 234:6 235:1 238:25 256:21 260:12
**5'10"** 181:16
**5'11"** 31:5 181:19
**5'9"** 181:16
**50** 64:23 65:22 218:3 263:25
**51** 60:13
**516** 124:7
**517** 124:5,8
**522** 124:10
**526** 128:11
**527** 124:8
**550225** 109:20 128:12
**585** 282:5,6
**592** 71:1
**598** 70:3

6

**60** 257:14

7

**70** 84:10 162:25

**75** 80:11
**79** 170:15

## 8

**80** 24:15 148:8 164:1
**813** 188:5
**813107** 183:12
**816116** 181:22 182:3
**824** 36:20,21
**827** 44:3
**828** 44:14
**838** 36:21
**839** 36:21
**841165** 191:10
**842170** 193:12
**843171** 194:9
**845178** 179:3
**846180** 179:11
**849** 184:20
**849185** 184:21
**850** 179:21
**850189** 179:16,17
**85188** 188:24
**853195** 180:17
**8:30** 26:23,24

## 9

**91** 169:9,18
**911** 127:14 128:9 262:3, 4,14
**922** 219:9
**922133** 219:9
**925139** 222:19
**925140** 234:6
**926** 229:13
**926143** 235:1
**928** 237:6
**92850** 242:2
**929** 238:25 239:14
**930** 238:23 246:11
**931157** 251:5
**9:10** 4:2,11

## A

**a.m.** 4:2,11 89:10,11 155:5 179:25 183:20 184:15 188:5 194:18 238:25 252:4 253:9
**ability** 165:4
**absolutely** 195:19 275:21
**abusive** 99:24
**accent** 166:15 167:16
**accepted** 298:22,24
**access** 63:12
**accommodate** 79:8,9 159:23 160:7 161:1,5
**accommodated** 123:14
**accommodating** 158:24 159:16 161:16
**accommodation** 70:4, 11,15,22 71:4 174:12 210:6
**accommodations** 55:16 59:23 60:2 70:9 71:7,12,25 77:9,15 104:13 160:3 177:4 209:11 294:23 295:1
**accomodation** 70:6
**accompanied** 145:25
**Accompanying** 111:20
**accomplish** 86:5,23
**accuracy** 297:19,20
**accurate** 11:6,7 45:3,4, 6 115:19 137:2,5 138:1 199:11
**accurately** 38:2 45:22 63:14 64:10 65:13,20 298:3
**acknowledge** 110:20 111:7
**acknowledging** 63:2 141:19
**acting** 229:7
**action** 29:23 110:16 111:4
**actively** 126:12
**activity** 151:2
**actual** 190:18
**address** 37:10,12 262:16,20 263:8,16
**adjust** 286:19,22 287:9
**adjusted** 287:3
**Adjustor** 37:1
**Adrianne** 163:19 168:12,17,20
**Adrienne** 15:5
**Advice** 70:10 71:7
**advise** 278:13
**advised** 277:19 278:1
**advising** 54:25
**African-american** 165:17
**afternoon** 172:8
**age** 108:1 127:10 165:4
**aggression** 92:15 123:6 273:22
**aggressive** 90:6 92:23 93:2 99:24 228:16 229:8 231:15 261:23
**agree** 68:3,6,7 70:14 220:4 243:21 294:6
**ahead** 35:24 43:9 78:23 98:3 284:25 297:14
**aisle** 112:9 118:15 160:25 191:22,24 207:19 254:20 259:24
**aisle-to-aisle** 73:8 188:15,17
**aisles** 191:24 221:17 222:11 223:3 224:9 233:5,23 234:11 259:19,20 260:16 267:22,23,24 268:2
**allegation** 44:23
**allegations** 92:20
**allegedly** 46:11 100:17
**allowed** 48:15 49:23 87:23,24 108:20 129:22 131:14 151:22 158:15 171:11 197:9,11 278:1
**allowing** 59:22
**ambiguous** 285:18,20 286:1,22 287:13
**amendments** 298:1,4
**American** 16:8
**angle** 182:4 183:20 184:4 186:15 190:17, 22,25 191:16 220:13,24 234:16,19 239:6 241:22 242:2 244:23 253:10 256:8 259:19,21 267:22 268:1,4
**angles** 48:8,11 169:9 190:18 256:19 260:1
**Annie** 163:25
**annoyed** 112:5 113:13 114:5
**Anoush** 4:11 5:7 29:11, 22 38:5 39:3,13 41:22 43:5 44:3,9,20 45:7 46:18 69:14 86:18 129:21 145:11 167:2 168:21,24 172:4 182:14 223:11,25 224:10,14 225:6 227:5 260:14 273:24 276:11 277:17, 18,21 278:1
**answering** 191:5
**answers** 24:3
**anymore** 15:6 241:7 252:6
**anytime** 32:23 34:14 49:4,22 124:23
**appearances** 4:13

**appeared** 79:1,3,16 228:15

**appearing** 243:11

**appears** 185:4 186:4 192:8 195:22,23 196:9, 11 198:18 202:5 207:15 212:15 221:2 225:16 229:21 230:5 235:5 237:13 262:19 265:10

**applies** 43:4

**approach** 36:15 87:3 121:13 124:21 125:2,5, 9 167:22 174:19,21 175:11,14 190:2,7 192:16 198:18 227:8,20 233:4 234:19 287:15 292:18,22

**approached** 149:22 158:14 174:23 201:12 233:19 241:5 292:13

**approaches** 193:15 223:22 227:2,3 234:13, 18 251:1

**approaching** 115:22 125:21 158:10 189:8 194:11,13,14 203:14 225:6,9 233:14 236:15 238:11 242:21 246:14, 17 287:10

**approval** 42:5 139:5 141:2

**approve** 57:19

**approved** 87:11 139:1 152:18 228:8,9 278:25 279:2

**approximately** 19:7 20:21 23:14 35:7 156:1

**archived** 37:25 261:14

**archiving** 261:11

**area** 147:14,18 148:1 189:23 191:19 239:4

**argued** 82:7

**argumentative** 77:5 211:23 295:12

**Arias** 4:19 284:19,23, 25 289:7,17 299:14,15

**arise** 171:3

**arises** 148:23

**armed** 281:25

**Armendariz** 4:21

**Armenian** 16:10 32:1,4 162:23 163:1,11,16,22, 23,25 164:1,4,11 166:4, 9 167:3,7,9,20,23 168:6

**Armenians** 163:5,6,14, 15 166:2,3

**arrest** 35:10 39:18 133:1,9,13,17,20,24 134:6,9 135:6 136:7,18, 21 154:16 275:15 277:5,21 279:17 280:7, 8

**arrested** 33:14,23 34:9, 11,22 38:12 39:12,16 40:14 56:16 132:6 135:11 137:1 152:8 277:2 278:2 281:1,2

**arresting** 38:17 134:1 151:1

**arrests** 11:3 35:4,6,13, 14

**arrival** 273:8

**arrived** 40:11

**arrows** 64:2

**asks** 35:23 47:8,9 172:5 262:16 269:20

**assigned** 13:12

**assignment** 13:6

**assist** 86:23 199:18 212:25 224:8 297:4

**assistance** 286:9

**assisted** 119:12

**assisting** 212:13

**Associate** 8:15 158:4

**associates** 176:20

**assume** 8:1 11:3 27:9 96:25 192:21

**assuming** 54:1

**attacking** 130:3

**attempt** 63:12 102:15 120:22 203:22 292:16 294:14,17

**attempted** 102:17 172:21

**attempting** 72:9 121:2 174:11 294:3,4

**attend** 11:22

**attention** 36:22 51:24 96:4,22 98:14 100:16 114:4 120:24 156:12 194:3 203:1 206:14 226:14 261:17

**attitude** 191:8 208:25 211:14 293:4

**attorney** 6:16 32:24 80:24,25 81:2 297:23

**audible** 6:18

**audibly** 6:22

**audio** 196:5 244:8 262:7 263:22 264:19 265:1 266:13,20 267:1 268:19 269:6,18 270:12,21 272:1

**August** 8:9 12:2 17:7 157:19

**authority** 214:12,13,16

**authorize** 216:16,17

**Avoid** 112:11

**aware** 33:21 34:24 39:25 41:15,21 43:25 44:24,25 45:12,16 46:5, 16 47:1 56:20,21,22,24 57:2 60:4 69:11,20 70:19 71:14,16,19,23 72:1,2 85:15,19 87:7 88:6 104:12 105:13 107:5 111:22 123:13, 15,17,25 133:19,23 136:14,16 137:9,11 138:20 141:17,20 153:13,25 156:14 157:16 160:6 161:23 165:19 166:23 167:3,5 169:3,4 176:25 177:3 195:7 204:5 208:17 209:10,13,14 213:19,20 227:25 228:2 264:7 269:24 276:13,25 277:4,6,11,23 278:4,22, 23,25

## B

**back** 18:20 25:16 26:15 29:20 42:18 47:24 51:3 54:7 55:9 56:9,12,16 58:7 78:2 80:17 88:4 89:13,14 93:17,20 94:14 95:5 106:12,13, 17 107:1 115:3,10 131:14 134:18 136:24 138:8 140:20,22 141:6, 25 142:19,22 143:2 146:10,14 150:9,13 151:13,22 152:6,7,22 155:8 178:5,6,9 200:3 201:18 204:23 214:6,10 215:3 219:5 222:15 226:4 233:11,23 236:7 238:9 258:1 260:17 264:22,24 266:18 270:15 272:10,11 276:5,6 278:5,13,15,16 280:16,20 281:14 284:13 286:19 287:3

**background** 11:21 191:20 207:17

**backup** 127:15

**bad** 90:1 147:18 148:1 295:24

**bald** 244:15

**baldheaded** 244:19

**ban** 25:1,3,11 39:11 56:2,5,9 107:8,13 136:10 139:6,14,19,25 140:3,4,7,17 142:8 216:1 279:10 280:2,3,9

**banned** 33:18,23 37:16 38:25 39:8,10 44:15 45:1,14 46:5,10 56:15, 24 57:12,14,23 58:13, 14 107:6,21 108:3,8,11, 23 131:19 136:4,8,9,23 137:5,9 138:3,4,7,24 141:11,19 142:13 143:6 151:18 152:3 189:18,19 264:4,22 269:21 270:5 272:8,22,24 277:13 278:20,23 279:1,6,12, 24,25 280:11

**banning** 24:24 56:11 58:20 140:8,9,10 141:2, 10
**barriers** 287:6
**based** 15:11 55:8 112:16 128:17 171:12 182:16 195:3 208:24 213:11 238:19 264:10 265:9 273:5 288:4
**basic** 7:15 12:4 113:24 122:2 129:6
**basically** 11:24 17:13 22:2 24:5 25:6 33:7 58:16,19 59:11 62:8 67:3 73:12 74:1 107:13 113:9 117:16 120:15 126:17 128:18 129:1,16 137:1 141:24 149:7 154:13 156:25 170:19 180:5,23 187:20 198:24 218:11,17 227:3 229:7 234:15 239:12,13 240:6,15 248:14 276:22 281:10
**basis** 160:13
**basket** 182:5 191:24 192:7,8 193:15
**batch** 169:24
**bates** 36:21 60:12 70:3 124:6 169:19
**bear** 35:6 57:9
**began** 273:25 289:25 290:1,4
**behalf** 4:15,17,19 38:11 133:20,21 134:9
**behavior** 78:22 93:10 120:11 169:12 196:6 200:8 224:13 226:6 228:20 229:2 261:24 267:6 268:11
**behaviors** 63:4 99:20
**belief** 70:8,17 71:6
**Beliefs** 165:6
**believed** 118:3 123:10
**belligerent** 49:14 120:12
**bends** 193:14
**benefit** 57:11 196:4
**big** 30:25 113:16
**bit** 81:9 90:5 124:24 184:11 193:14 198:19 227:20 251:11
**Bob** 10:3,4
**body** 62:24 115:1,21 116:16 117:2,6 211:14, 19 212:10 224:13 246:12 249:8
**body-worn** 258:9,11
**border** 147:21
**bothered** 130:5 211:2
**bottom** 78:13 184:1 205:8 206:4 216:14
**Boulevard** 18:6
**bouncing** 69:5
**box** 27:23
**break** 88:20 89:6 134:4 154:19,22 218:22 284:4,6
**breath** 161:4
**breathe** 208:18
**breathing** 208:16 209:5
**briefly** 44:13 52:5 84:8
**bring** 36:22 62:18 64:1 84:22 99:7 168:6 206:14
**bringing** 51:24
**brought** 8:24 81:14 96:4,22 98:14 100:16 156:12 261:17
**Burmayan** 4:11 5:7 29:11,22 30:2 33:18,23 34:2 36:5 38:5,11 39:3, 13 41:22 43:5 44:3,9,20 45:7 46:18 56:14 66:5 69:14 72:7 84:14 86:18 114:8 117:25 120:15 122:18 129:21 134:21 136:23 142:5 145:11 154:9 167:2 168:21,24 172:4 182:14 184:21 187:10 191:23 192:4 219:14 220:25 223:11, 25 224:10,14 225:6,16, 24 226:11,16 227:5 228:12 229:4,20 234:13 241:17 242:3 243:1 251:3,18 252:18 253:13 260:14 261:20 265:10 285:15 286:3 287:19 288:6,10 289:1,9,12 292:4
**Burmayan's** 136:7
**business** 10:25 73:25 76:16
**button** 110:4
**buy** 64:12,17 65:1 202:10 203:19
**buying** 85:5,14 86:22 90:23 202:11

**C**

**California** 4:1 53:10 54:18,23 213:8
**call** 16:8 17:21 18:22 19:22 23:22 40:16,20 41:6 42:14 43:19 74:22 75:1 93:5,11,12,13,14 98:2,3,20,23 99:1,8 100:3 105:7,13,16 108:15,20 115:6 122:7 126:5 127:7,14 128:1, 20,24 129:1,11,19,22 148:14 224:21 231:19 262:4,13
**called** 5:6 18:14 19:4 20:22 21:3 23:9 24:9,19 30:9 34:3 35:17,18 36:5 38:20 40:19,21,22 41:9, 21 42:19 43:14,17,22, 24 49:4,9 51:5,16 56:25 57:13 87:15 95:11 98:3, 9 99:3,4,14,16 100:14 105:23 112:18 120:16 124:1 128:12 129:19 130:20 132:12 134:21 147:1 148:22 152:11 203:8 240:20,25 279:16 280:6,15 291:11
**caller** 262:4
**calling** 19:13 23:18 24:7 41:15,25 42:4,17 57:17,18,20 58:12 70:9 71:7 106:1,5,6,8,11 108:12 128:9,23 144:2 152:19 188:2 224:18 227:24 228:2,8 230:5, 20 231:4 232:11,19 262:14
**calls** 18:20 20:18 33:7,8 38:7,14 72:13 76:2,20 77:25 78:21 79:11 93:23 137:20 195:15 199:1,13 200:14 211:5, 8 223:12 224:15 244:3 259:6,22 263:9
**calm** 90:3,6,11 91:18 114:24 125:3,5
**calming** 90:9
**camera** 48:8 179:2,11, 16,21 180:6,17 181:21 182:3,4 183:11,12,19, 23 184:9,20,21 185:11, 23 186:14 188:24 190:16,18,22,25 191:4, 10 193:11 201:23 207:8 219:7,8 220:12,13,14, 18 222:19,20 229:13 233:3,4 234:6,16 235:1 236:15 238:25 241:13, 22 242:2,11,12 244:23 246:11 251:5 253:9 256:8,19,21 258:9 259:17,18,21,24 260:1, 9,10,12,15 261:4,6 267:22 268:1,4
**cameras** 47:1,20 48:9, 10 49:19 154:4 258:11 267:16
**capstone** 86:2 109:19 128:12
**car** 134:17 146:19 147:7,9 150:4 154:9 186:25 251:21 254:1,2, 7,8,20 255:12 274:18
**care** 63:2 85:7 99:1 109:8 117:14 123:11 176:16 223:10 284:23
**career** 11:24
**carefully** 78:14

**caring** 115:18

**Carl** 4:19

**cars** 147:11,13

**case** 7:1,6 11:13 44:20 50:1 110:23 112:9 113:2 136:17 142:4 171:3 231:1 261:15 285:16

**cash** 212:20 240:8 260:7

**cashier** 67:7 83:25 84:7,13,17 87:7,12,19 88:6 192:21 225:20 291:8 292:11

**Cashiers** 14:4,5 25:21, 22 26:9

**casually** 225:12

**catch** 281:8

**causing** 267:3 272:18 277:20

**CDC** 291:21

**cell** 48:14,23 49:16 50:3,6 105:14 126:1,16 185:18,25 186:5 187:3, 25 189:3,10 190:8 206:24 227:22 229:21, 23 232:18 235:22,24 236:3 237:12,14 240:11 258:6 263:4 269:15 273:9

**Central** 147:20

**cents** 64:23

**certified** 298:10,21 299:6,9,11

**certify** 297:18 298:4, 19,20

**cetera** 12:10 42:17 54:18 63:3 64:23 80:22 91:4,18 113:13 139:13 164:7,15

**chain** 26:2 32:17 33:22

**challenges** 214:12,13, 16

**chance** 281:1

**change** 18:20

**channels** 47:14

**characteristics** 30:19 162:15,16 165:3,7

**charge** 13:22

**Charlie** 10:4,5

**check** 53:15 82:19 87:15 97:15 119:5 146:8 261:5 286:12

**checked** 48:2 97:17

**checking** 67:20

**checkout** 88:13 195:12

**choices** 120:3 126:4,25

**choose** 111:3,5 112:13 113:22 115:21,24 116:15,17 117:9 126:7

**choosing** 110:15

**circumstance** 111:4 138:2

**citation** 37:18,19 38:11 40:2,7,8

**cite** 150:21

**citing** 151:2

**citizen's** 133:9,12,17, 24 135:6

**City** 4:20 166:1

**claim** 7:2 11:8

**claimed** 45:7

**Claims** 36:25

**clarification** 7:17,20 18:25

**clarify** 21:8 23:3 32:24 232:9

**clear** 41:12,19 46:3 55:3 58:11 98:5 126:3, 24 210:20

**clearer** 124:25

**click** 110:4 178:3

**Client** 37:24

**clients** 162:25

**clip** 188:4 190:3 193:24 202:1,5 203:4 220:9 232:17 241:7 242:7 243:3 269:11 273:15

**clips** 74:16 177:15 181:24 191:4 202:13,14 225:3 232:2 263:3 266:5 267:6,20 268:6 296:15

**clock** 180:25

**close** 53:4,5 182:8 200:17 204:12,18 205:2 213:22 215:10 216:22 234:24 244:24 292:13

**closed** 10:7,16

**closely** 192:1

**closer** 182:7,18 201:13, 18,20 292:23

**cloth** 60:22,24

**CM** 37:15,17,18,20 44:13,15 45:1

**coaching** 87:20 210:10,11 211:9

**COG171** 272:13

**COG172** 276:7

**cognizant** 161:23 162:7

**colleague** 124:10,11

**colleagues** 60:20 61:6, 7 70:5 71:3

**collection** 260:20 261:10

**college** 11:22,23

**colored** 111:10

**command** 26:2 32:17 33:22

**common** 20:17 24:6 77:11 113:24 125:11 159:15

**communicate** 174:11

**communicates** 161:5

**communicating** 185:4 207:16,21 236:8 237:16

**communication** 36:25 62:23 76:8,9 165:8

**communications** 28:7 33:1

**Comp** 6:11 7:1 11:8,13

**company** 11:16 12:10 24:24 25:2,4,6 35:17,20 59:13 85:18 86:24 148:17 158:15 164:24 206:2,4 213:15 291:8

**complain** 121:16 126:21

**complaining** 174:3 175:8 198:14

**complaint** 27:20,25 39:19 126:6,22

**complaints** 155:14 156:10

**completely** 72:11 239:3

**compliance** 56:3 72:19

**complied** 143:3

**comply** 72:10 74:1 184:1

**complying** 59:14 104:7 142:23 152:15

**components** 170:21, 23

**computer** 13:3

**computer-based** 13:4,5

**concept** 288:1

**concern** 176:20 213:3

**concerned** 143:4 203:23 225:23 265:22

**concerns** 63:2 125:25 126:12,15 217:13

**concise** 126:3,25

**concluded** 299:23

**conclusion** 299:20

**condition** 86:20 197:1 209:17 210:2 217:4 296:25

**conduct** 196:6

**confirm** 37:9 44:10,17

102:9 115:2,9 182:16 195:24 200:20 202:14 215:13,14 219:19 226:4,6 234:18 240:2, 19 243:21 244:7 266:1 272:5 276:9

**confirmation** 263:16

**confirmed** 202:20 273:21

**confirming** 225:10 226:21 242:20

**conflict** 66:18 281:18, 21

**conflicts** 61:23 62:7 65:23 218:5

**connection** 6:10 170:11,20

**connections** 86:6,8

**consideration** 69:17 86:14 164:17 166:16

**considerations** 166:4

**considered** 85:7 91:8 280:21

**consistent** 112:22 113:2 114:11 119:17 199:12 219:25 223:5,7 249:18 269:11,14 297:4

**constantly** 69:9

**contact** 70:8 71:6 94:7 112:11

**contacted** 24:15

**contacting** 158:1

**contacts** 47:4 49:25

**context** 282:9

**continuation** 193:13

**continue** 61:16 63:20 64:6 66:12 112:3 186:9 188:19 194:5 195:22 201:23 207:6 211:14 220:12 226:17 234:5 237:2 243:15 246:7 248:19 250:16,17

**continues** 277:25

**continuing** 188:25 194:9 201:3 222:18,19 229:13 251:9 253:10 277:17

**contrast** 219:22

**conversation** 6:19,21 31:22 57:5,6 63:20 75:13,15 78:19 98:17 102:10 124:12 199:8 227:4 258:4 265:9

**conversations** 29:7 168:17

**convictions** 11:4

**cooperation** 24:3

**cops** 99:16

**copy** 298:10,12,22 299:6,9,10,11,12,14,16, 18,19

**core** 119:21,25 121:23 122:6

**corner** 191:22 194:10

**corporate** 206:15

**corporations** 113:17

**correct** 7:3,5 10:17 11:1,15 12:1,11,13 14:1 15:9 26:3 46:19 49:3 61:4 89:4 96:21 104:11, 14 107:3,7,10 110:5 121:21 124:1,2 125:20 126:19,23 131:17 152:21,24 158:16,20 161:18,22,24,25 162:24 165:18,21 171:13,17,25 172:1 176:9 180:11 183:6,8 188:3 191:18 194:4,25 199:9 201:11 203:16 204:10 216:9,11 223:24 225:5,8,11 229:19 240:18 247:16 250:17 260:6,8 269:23 281:12 285:6,9,10,12, 24,25 286:14,15 287:22,23

**corrected** 270:7,8

**correctly** 44:17

**coughing** 265:5

**counsel** 4:13,22 5:20 70:10 71:8 87:20 210:11 211:9 223:19

**country** 165:20

**couple** 89:15 191:4 198:19 229:17 284:17, 20 289:8

**court** 4:10,22 5:10 6:14 7:9 35:3 80:10,14,21 89:7,13 106:22 154:23 155:1,8 218:21,24 219:5 275:23 276:5 284:7,13 297:11,13,15 299:8,11,13,17,19

**cover** 52:13 54:21 55:4 73:8 76:6 81:18,22 104:7 155:11 176:21 177:7 241:23 268:23

**coverage** 54:9 245:8

**covered** 33:8 53:18,20 59:8,10 72:6,23,25 93:16 96:8,10,11,14 106:14 161:15 176:8 180:15 192:19 197:18 204:3,5,19 212:4,24 220:3 227:17,18 231:7 260:1 266:5,9 267:21 271:24,25 295:3

**covering** 53:5,17 60:15,22,24 62:19 64:1 65:9,11,16 67:4 70:7 71:5 72:7,17,22 73:14 74:2 75:11,25 78:11,15 79:13 80:2 96:20 97:16 98:12 106:13 122:19 144:11 176:1,16,19 177:1 183:5 184:2 192:11 195:8 197:5,17 198:2 204:2 213:5 215:23 218:5 219:19,23 220:2,9 227:6 231:24, 25 232:4 234:2 236:23 245:5 291:16

**coverings** 61:1,23 62:7 65:24

**covers** 267:22

**COVID** 16:20,22,23 22:16,17,19,21 122:22 123:10 203:23 209:3 265:4 266:16,23,24

**COVID-19** 176:19 265:11

**create** 38:8

**creating** 86:6,8

**credible** 208:24

**crime** 17:23

**crossed** 9:14

**crying** 252:20

**cues** 81:3

**cuffed** 277:8

**cultural** 161:20 164:6,9 166:11 171:7,18

**culturally** 162:2,18

**culture** 165:23 166:10 169:10

**curious** 27:24 103:7 146:24 230:16

**customer** 62:8,9,16 63:2,23 64:17,25 65:15, 17 68:9,25 72:3 86:12 89:21 103:2 109:8 110:15,20,23 111:8,17, 21,25 112:4,5,10,23 113:9,12,13,25 114:12, 21,25 115:3,10 116:16 119:24 121:13,16 122:3 124:12,21 125:2,5,13, 24 126:5,10 127:8,10, 12,13,20,24 128:4,5,25 129:9 130:5 145:11 155:14 156:9 160:16 166:8,17 170:11,20 172:3,7 175:8 176:16 202:22,23 204:8,14,22 205:4 211:21,25 212:5, 6 213:1,18 215:6,22 216:1,17,19 217:7,16 218:7,10 222:14,25 223:2,5,6,7,9 227:1,2 228:23,24 238:17 239:22 256:3 257:2,12 271:1,14,18 280:19,24 285:8 286:25 287:10 293:16 294:16 295:7, 16,17 296:19

**customer's** 112:11 115:1 126:1,16

**customers** 24:25 54:4 55:1,10 60:4,23 61:1,7, 11,23 63:12 69:12 71:16,24 73:5 89:18 90:1 99:12 104:9

109:14,17 111:20 114:14 115:22 121:7,9 123:24 153:21 163:1 164:4,18 166:5 170:21 171:9 176:20 194:2 205:18,24 208:25 213:10,16 228:16,18 239:10 286:20 287:4,6 291:9 292:23

**CVS** 4:12,17 8:6,13,20, 24,25 12:2 13:6,25 17:13 21:19 23:20 24:24,25 30:1 32:16 33:7,9,17,21 36:21 37:2 42:4,16 43:3 44:3 47:18 48:13 54:9,22,24 55:8, 22 56:2 59:12 60:13,15, 18,25 61:24 62:6,18 63:25 65:5,22 68:17 70:1,2,3,14 71:1 85:6,7, 18,22,25 86:24 89:24 91:1 101:2 103:10 104:8,13 107:13 108:5 109:14,16 112:23 122:6 123:18 124:5 129:17 134:5,8 136:22 139:8 141:22 147:14,18 155:13 158:4 160:3 165:1,13 169:8 170:11, 15 204:8 205:10,13 214:3 217:14,24 218:20 223:6 238:16 259:6 268:4 272:18,19 273:20 276:11,21 277:18,19 278:2 280:6 281:20 282:6 285:6 291:7 295:6

**CVS.COM** 65:12 126:22

## D

**daily** 149:4 171:25 258:19

**dangerous** 281:23

**darker** 235:13

**date** 8:8 36:8 38:12 83:9 100:14 133:9 134:13 164:10 177:21 178:20 219:22 220:14 245:9 262:15 283:22

**dates** 7:24 29:10,11,12 37:23,24 138:18,22

**day** 39:16 40:11 73:22 83:15,25 84:13 93:3,6 97:2 98:9 99:5 100:20 103:23 112:17 120:15 121:11 122:17 130:17, 19 136:7 138:4 142:17 175:19 188:2 197:15,16 236:1 270:6 272:25 277:15 282:12 286:3 288:9,10 289:9,12

**days** 101:11,14 120:17, 18 220:1 261:23 285:23 297:22

**de-escalating** 62:7 65:6,23 66:18 68:13 90:10 118:12 168:5 218:5 295:7,17

**de-escalation** 62:24 63:9 75:17 84:19 125:23 127:8 238:15

**deal** 89:17 90:14 123:24 155:21 156:17 170:20 171:4 205:21 211:21 213:10 260:20 261:10

**dealing** 109:14 164:4, 18 166:16 171:8

**dealings** 166:4

**decision** 42:11 139:1 279:10 286:16

**decisions** 26:12

**deescalate** 72:3 77:10 89:25 91:14 114:22 115:12,16 122:6 125:18 127:17 296:2,8

**deescalating** 238:18 288:2

**deescalation** 238:21

**defendant** 4:18 5:19

**Defendants** 4:19 298:17

**defense** 298:25

**defensive** 63:5 120:11, 14,19

**define** 50:12 56:10 140:8

**defined** 164:25

**definition** 140:15 165:12

**delivery** 65:12

**demand** 160:18

**demanding** 73:8

**demarcation** 203:9

**demeanor** 79:25

**demonstrate** 119:21, 25 121:24

**Dena** 37:3

**deny** 43:11 63:12 123:18

**denying** 43:2,10 176:3

**department** 37:19 40:2 70:9 71:7 158:19

**depends** 15:15 101:8 160:8

**deposition** 5:1 6:6 7:6 27:5,7 45:20 80:21 299:20,23

**depositions** 5:21

**describe** 30:11,12,13 38:4 52:5 82:8 83:17 287:2

**description** 37:15 38:23 39:20 43:4 44:7, 12 45:4,6 84:8

**details** 125:25 126:11

**detained** 37:18 39:1 44:13,14 289:9,13

**determine** 162:17

**determining** 164:15

**diagonally** 196:7

**differed** 285:14,21,22

**difference** 61:6,15

**differences** 164:6 166:23,25 169:10,14 171:7,19

**differentiate** 160:15

**difficult** 89:18 91:14 109:8,14 122:3 123:24 164:18 171:9 177:15 262:10 271:1

**difficulties** 114:10

**dimensions** 162:9,10, 13,14,16 164:23 165:1, 6,9,10,16

**direction** 225:17 245:18

**disability** 59:15,17,21 69:1 70:8,17,21 71:6 102:11,16 123:14 159:11,24 160:8,13,17, 25 161:17 172:11,15 177:4 197:9 209:5,11 210:21 213:11 294:10

**disabled** 55:16 158:24 159:6,7,8,17,22 160:7, 16 289:10 293:1 294:2, 11,19,23

**disagree** 201:19 215:16

**disagreement** 215:17, 20

**discount** 63:6 117:19, 20,22 214:24

**discovery** 36:21 43:3 60:14 169:24

**discretion** 24:6

**discriminate** 160:12

**discrimination** 161:21 165:19

**discussed** 29:3 99:9 122:11 288:23

**discussing** 286:4

**disorder** 161:3 208:17

**dispatch** 105:22 262:16 263:16 265:10 268:12,21 269:20 270:1,5 272:4,21

**dispatched** 272:17

**dispatcher** 105:20 263:25 265:3,20

**displace** 114:3

**displayed** 293:4

**displaying** 282:21

**dispute** 78:13,14 112:19 232:24

**disputing** 79:2

**disrespectful** 63:6 214:11,15

**disrupted** 229:1

**disrupting** 73:25 74:3, 4,5,7 76:16

**disruptive** 77:14 93:11 99:10,11 121:7 122:4

**distance** 9:1 65:19 73:1,4 215:7 287:8 292:5

**distances** 7:25

**distancing** 291:19

**distinguish** 160:15

**distinguishing** 165:3

**distracted** 200:12

**distressed** 91:3 187:13

**distribution** 261:11

**district** 10:2,3

**disturbance** 21:3 272:19 276:16 277:20

**disturbances** 24:20

**disturbed** 91:3 121:8

**disturbing** 97:25

**diversity** 161:19,20 162:7,10 164:23,25 165:2,11 169:7,9,14 170:17,21,24 171:2 191:6

**divert** 114:4

**Do's** 117:14

**doctor** 53:2 102:19,20

**document** 36:18,20,22 38:8 43:2 44:6 60:11,12 61:25 62:1,3 66:2 70:14 71:21 102:14,15 109:20 148:13 169:15,17 170:12 244:2,12 282:5, 6

**dont's** 117:15

**door** 49:13 131:22 132:4 185:3 269:9,12

**doubt** 38:22 51:20 102:7 160:18 182:17 230:7

**downs** 91:3 290:4,11, 20

**drew** 95:20

**drive** 261:20

**drive-thru** 65:11 127:9

**driving** 9:1 30:16

**drove** 30:15

**drugs** 67:16 86:13,22 90:23

**due** 70:7 71:5 161:17 277:17

**duly** 5:7

**duties** 86:23 213:13

**duty** 63:17 103:9 125:3, 6 180:24 206:2

**E**

**e-mails** 181:2

**earlier** 106:15 113:19 174:6 220:1,5 240:4 249:10,17 275:12 278:15 285:3 293:2

**Echo** 119:21,25 121:23

**Eddie** 157:20

**Edith** 15:6

**educational** 11:21

**effective** 60:18 125:22

**electronic** 299:16,17, 18,19

**emotions** 117:19,21

**empathetic** 63:3 118:6 211:20 212:6

**Empathize** 115:4

**Empathy** 117:14

**employed** 285:5

**employee** 42:5 59:12, 20,21 60:1 69:3 91:6 92:25 100:16 101:23 103:10 124:9 129:17 133:16 134:6 137:25 140:17 153:24 158:4 159:22 160:7 178:25 179:4 205:10,13 206:1 223:22 230:25 241:15 252:5 282:7

**employees** 25:17 55:1, 9 68:17,19,20 69:12 70:2,16 71:10 74:8 83:12 101:5 102:1 104:13 123:24 136:22 139:8 159:24 160:3 163:14 273:9,20 291:14 292:1 294:25

**employer** 109:21 158:13

**encounter** 95:18

**encouraged** 60:23 61:11 71:17 213:16 297:24

**end** 48:10 130:23

**endangers** 281:11

**ends** 182:24

**enforcement** 63:17

**engage** 63:17 75:17 281:20

**engaged** 199:7 238:20 295:24

**engagement** 6:12

**engaging** 77:23 247:19

**English** 32:13,14 140:8 164:7 167:14

**entail** 168:5

**enter** 132:15 256:6 257:9

**entered** 77:22 78:1 80:8 81:12 134:13 184:18 188:5 243:12 247:7 248:15,16

**entering** 62:17 76:16 77:14 140:11 184:8,14 219:14 220:19 242:14, 23 256:13 260:14

**enters** 160:16 183:19 212:7 224:7

**entire** 156:6 240:15 291:11

**entitled** 50:14 197:23, 24 198:1 205:9 209:16 210:1,24 232:8,10 293:10,16,18

**entitlement** 293:4

**entitles** 271:15

**entity** 4:17

**entrance** 191:17 233:19 254:18 273:9,19

**entry** 260:10

**entry/exit** 233:20

**environment** 86:1,9 212:8

**Erin** 156:21,24

**errata** 298:4

**escalate** 295:9

**escalated** 124:20 288:6,25 295:5

**escalates** 63:16 281:18

**escalating** 295:15,16

**escaping** 246:2 252:25

**essential** 91:7,8

**established** 192:11

**estimate** 8:1 19:7 145:9

**estimates** 7:23 19:9

**et al** 4:12

**ethnically** 162:18

**ethnicity** 169:11

**Evaluation** 155:20

**Evaluations** 156:15 157:17

**event** 218:20 263:15 291:6

**evidence** 37:22,24

**exact** 7:25 19:8 290:2

**exaggerates** 230:24

**EXAMINATION** 5:12 285:1 289:6,19

**examined** 5:8

**excellent** 85:19 111:20

**exceptions** 55:12,14 59:15 89:22

**excuse** 41:18 60:6 66:14 108:13 125:3,6 217:6 237:9

**exemptions** 68:18 69:11,23

**exercise** 116:12

**exhibiting** 265:11 266:24

**existed** 68:14 123:10

**exit** 185:3 187:7 189:23 233:20 237:7,23 241:22 242:4 243:9 251:2,13, 14 253:12 255:18

**exit/entrance** 239:20 240:11 260:5,10

**exits** 48:11

**expect** 90:5 268:5

**experience** 10:24 25:16 33:6 86:7 89:20 113:4 165:3

**experienced** 57:7

**experiences** 169:11

**experiencing** 17:24 265:11

**expire** 57:8

**explain** 35:9 118:2 162:13

**explained** 5:20 104:20

**explaining** 125:23 126:10 145:17 244:1,9 245:20

**explanation** 52:24 118:4 160:18 197:4,6

**exposed** 286:17 292:14

**exposure** 287:5

**expression** 115:22 117:2,7

**expressions** 63:1

**expressly** 140:16

**extent** 35:12 292:18

**external** 165:6 171:20

**extreme** 122:7,10

**eye** 112:11

**eyes** 167:8

**F**

**face** 30:14 40:17 42:20, 24 46:11 52:7,13,15,20 53:5,17 54:6,8,20 55:1, 10 56:3 58:6,17 59:3,7, 8,14,22 60:2,5,9,15,19, 21,22,24 61:1,8,23 62:7,19 63:23 64:1 65:8,9,10,16,23 66:6,20 67:4 68:18 69:11,15 70:2,7,16 71:5,18,25 72:4,7,17,22 73:14 74:1 75:11,24 76:6,12,22 78:11,15 79:14 80:1,2 81:18,22 83:7 84:21 96:8,10,15,20 97:16 98:6,12 102:12 103:8 104:7,10,21 106:13 116:20 118:4 122:19 123:14,19 143:3 144:11 152:16 161:17 175:17 176:1,7,17,19,21 179:23 182:23 183:5,23 184:2 192:10,11,13 195:8 196:8 197:5,10, 11,17,18 198:1,2 204:2 208:7,12 209:16 210:1 213:4,5,16,18 215:23 217:13 218:5,12 219:20,23 220:2,10 225:22 227:6 231:24 232:1,4 233:25 234:2 236:13,16,20,23 245:6, 8 249:20 268:23,24 271:15,22 278:16 290:10,22 291:2,16 293:6,18 294:10 295:1

**faces** 259:14

**Facetime** 239:18

**facial** 63:1 115:22 117:2,7

**facing** 243:1 260:4,7

**fact** 209:25 277:18,19

**facts** 77:12 120:8 121:22

**failed** 127:8

**fair** 184:17 211:4,6,7 223:19 257:5,7 267:12 270:25

**fairly** 172:4

**fall** 99:20

**false** 230:23

**familiar** 109:22,25 124:15 165:13,14 169:8,13 170:2,12,23

**fast** 28:20 80:11,12 106:23 130:12

**fate** 252:17

**federal** 45:20 297:13, 15

**feel** 20:3,4 23:22 63:16 81:4 92:10 115:5 122:18 123:4 126:17 127:11 140:3 167:7 199:21,25 288:6,25

**feeling** 82:21,22 121:8 196:18 217:1,7,8 229:1

**feelings** 63:6 78:22 200:14 214:25

**feels** 76:2 172:4

**feet** 65:18 73:1,4 194:17,20,21,24 198:19 200:17,22 201:10,15,21 215:7,9 230:10 232:21 242:3,4 243:8 254:19 291:19 292:5,23

**Felis** 147:20

**fell** 157:17

**felt** 122:20 123:2,9 132:4 200:10,11

**female** 227:3 272:18,22 273:8

**Fernando** 17:11 22:11 37:10

**field** 60:15 101:5

**fifteen** 99:6 130:11 146:15 150:12

**fight** 127:12 128:4

**figuring** 177:14

**file** 126:21 178:4

**filed** 28:6 29:6

**files** 178:8

**Filipino** 83:22 84:10

**filming** 273:9,11,15,17

**final** 41:6 103:19

**finally** 206:18 212:2

**find** 28:1,3 62:20 103:10 108:1 110:22 111:14,17,20 112:4,6 113:5,12,21,25 169:20 179:9 181:24,25 231:3 280:3,4 294:5,17

**finding** 288:15

**fine** 6:23,25 23:4 191:7, 9 284:5

**finger** 243:24 245:17 246:19

**fingers** 244:2,9

**finish** 6:17 12:22 23:25 24:4 28:18,20 41:19 42:25 45:17 46:4 57:4, 10 65:17 66:15,24 69:4, 6 75:20 80:23 88:22 96:18 103:22 135:18 142:25 155:11 158:9 182:19 190:3 200:12 202:6,15 206:17 215:6 216:19 217:6,15 218:19 297:1

**finished** 207:15 228:11

**finishes** 206:18 247:15

**fits** 128:21

**flash** 95:9 290:6

**flashing** 174:7

**flaunt** 146:9

**flip** 91:23,24

**flipped** 74:12 82:6
**flipping** 74:17 91:22, 24,25 92:2,4 185:5
**floor** 130:8 153:19,20 180:24 181:5,6 186:16 203:5 229:5 272:6
**focus** 120:8 121:22
**focusing** 120:8
**follow** 6:13 66:4,8,17 68:8,10,15 104:8 111:13,16 141:10 144:21,22 146:6,7 176:15 188:17 204:11, 13,25 205:3,14,19 206:2,4 213:10 214:4 238:17 250:14 281:10
**followup** 289:21
**forced** 17:21
**forcing** 206:10
**forget** 15:6
**forgot** 64:5
**form** 18:20 99:25 212:12,14 225:23
**forms** 141:22
**forward** 95:9 193:14 290:6
**found** 10:6
**foundation** 79:12 87:2, 10 209:20
**fourth** 113:20 115:4 210:13
**fragment** 178:25
**friendly** 50:16 62:25
**friends** 252:13
**front** 48:10 91:11 99:12 124:11 130:23 131:22 254:18 258:2 267:14,25 269:9,12 273:9 286:13
**fulfill** 128:23
**fulfilling** 139:9 295:17
**full** 14:19 75:24 169:17
**fully** 53:20 59:14 66:6 67:4 73:14 75:11 78:15 80:2 81:18,22 84:21 96:15,20 98:12 142:23 143:3 152:15 176:8,16 180:14 183:5 184:2 192:11 195:8 197:5,17 198:2 213:4 219:19,23 220:1,9 227:16,18 228:8 231:25 234:2 236:23 245:5 249:8,20 266:5
**fun** 116:12 191:5
**function** 91:7

**G**

**games** 45:18
**Gar** 275:10
**Garcia** 4:18 15:24 26:14 28:11 29:2,7 41:14,21 56:25 57:13, 22 58:12 73:7 78:6 81:15,17 84:3 90:5 92:24 93:19 94:4,23 95:7 96:3,22 97:8 98:14 101:23 105:9 108:10 120:21 129:22 131:18 132:12 135:22 136:14, 22 137:18 138:10,20 142:4 144:4 147:4 151:7 152:19 153:13,24 155:24 157:17 167:20 172:23 173:19 179:1,5 180:3,6,7 181:8 188:14 189:8,17 192:20,22,23 193:4 207:17 212:11 220:19,21 221:2 223:11 224:9,12 225:10,13 227:21 230:3,5 231:19 232:18 234:10,23 235:13,24 237:1 239:5 241:5,19 247:21,23 250:25 251:15 252:17 253:12 256:5 262:3,14 265:23 268:12 272:4,21 273:5 274:11 275:19 276:9,10 277:2,4,11,18, 22 278:19 279:5
**Garcia's** 279:10
**geared** 295:6
**gender** 165:4 169:11
**general** 48:13,17 89:21 157:11 164:5 287:10
**generalized** 285:4
**generally** 49:8 84:9 92:8 101:4 158:23 198:11 286:19 290:23
**generations** 165:8
**gesture** 92:4
**gestures** 63:1 221:15 231:14
**Gevdzhyan** 16:6 156:20 168:23
**gist** 256:8
**give** 5:1 6:17 7:24 19:7 24:10 30:19 35:1 39:20 64:23 80:25 81:7 92:4 112:15 118:6 122:1,2 139:13 145:9 152:6,25 158:18 162:22 188:9 194:17 218:2 263:16 290:7 294:11 297:21
**giving** 24:3 62:10,20 63:24 64:24 110:14 111:12,15 112:21 127:5
**glad** 191:8
**glaring** 63:5
**glass** 291:8 292:11
**Glendale** 4:1,20 17:1,2, 5,9,10,14,16 18:7 22:6, 10,14,19 23:6,10 30:1 33:7 35:7 37:11,19 40:2 147:21 156:3 162:23 163:11 166:1 280:6
**goals** 12:10 85:18
**God** 5:2
**good** 5:14,15 10:18 11:2 18:24 23:2 85:19 88:20 103:10 164:12 181:12 184:13 191:7 259:12 266:17,23 271:11
**Gotcha** 13:24 15:14 16:10 282:18
**grab** 126:16
**Grabbing** 126:1
**green** 117:10 235:17 246:14
**Griffin** 4:21
**ground** 7:12,15 10:6 155:12 226:18
**grounds** 103:10 151:21
**group** 207:7
**guard** 21:21 22:4,6
**guess** 9:18 96:24 127:5 132:9 286:19 299:15
**guidance** 23:17 62:6 63:24 64:16,24 173:4 294:21
**guide** 60:8 61:24 63:21 65:6,22,23 68:4,10,14 71:18 75:18 84:19,20 104:8 114:21 169:13 175:12 176:15 204:20, 21,23 205:1,3 206:10 214:7,17 215:3,5 216:14 217:19 218:2,5
**guideline** 59:13
**guidelines** 291:21,24
**guides** 107:13 250:11 295:6
**guiding** 146:2
**Gus** 274:11
**guy** 4:18 15:24 16:2 26:14 28:11 29:2,7 40:24 41:1,14,21 56:25 57:13,22 58:12 73:7 78:5,6 81:15,17 90:3,4, 5,6 92:24 93:19 94:4,23 95:7,25 96:3,22 97:8,15 98:14 101:23 105:9 106:20 108:10 109:2 120:21 129:22 131:8,18 132:12 135:22 136:14, 22 137:18 138:10,20 142:4 144:4 147:4 151:7 152:19 153:11, 12,13,24 155:24 157:17 167:20 172:23 173:19 180:2,3,7 181:8 188:14 189:8,17 192:23,24 193:4 207:17,18 212:11 220:19,21 221:2 223:11 224:9,12 225:10,13 227:21 230:3,5 231:19 232:18 234:10,23

235:12,13,24 239:5 241:5,19 245:18 247:21,23 250:25 251:15 252:17 253:12 256:5 257:1 262:3,14 265:23 272:4,21 273:5 275:10,19 276:9,10 277:22 278:19 279:5,10 288:21

**Guy's** 106:21

**guys** 106:1 150:19 189:13 225:17 252:2

**H**

**H.R.** 32:16

**hair** 30:15 111:11 242:3,13

**Hakop** 16:6,10 156:20 163:16

**half** 252:10

**hand** 4:24 52:6 59:4 92:4 120:23 185:18 187:2 189:4,10 193:25 198:9 206:24 207:20 225:14 227:22 235:7,20 237:12 244:12

**handcuff** 132:23,24 145:21 249:11

**handcuffed** 250:7,20

**handcuffing** 249:2 250:5

**handcuffs** 248:16 249:1,5,25 251:3 289:14

**handles** 261:1

**handling** 123:24

**hands** 198:19,21,22 207:16 235:6 243:20 248:12

**happen** 16:25 112:22 190:18 259:18,20 274:15

**happened** 20:25 51:14, 15 56:14,18 97:10,11, 12,18 98:7 99:2 112:25 137:15 143:10 144:19 145:10 149:14 158:8 173:3 202:12 231:4,6 247:13 249:19 257:20 267:11,12,14 268:5 270:3,9 275:8 277:9 280:17,18 283:3 289:24

**happening** 145:7 146:8,16,24 186:20 187:20 188:25 191:10 230:8 242:16,17 244:1 247:8 251:17 252:17 253:10,16,20 267:9 272:15

**happy** 113:20 114:14 116:20 232:25

**hard** 6:13 91:7 181:25 299:16,17

**Haroot** 163:25

**head** 6:19 58:1 196:3 242:2,13 244:15,21 264:6

**health** 60:25 85:7,20,23 86:1 170:11 205:5 206:8,11 213:3 217:17 265:23

**healthcare** 85:19 86:7, 19

**hear** 60:1 92:20 93:19, 21 94:1,2 95:7 97:8 106:16 131:18,20 142:12 143:5 145:5,18 146:18 173:22 175:14 230:14 247:11 252:20 254:6 262:10,11,14 270:1 289:10,13

**heard** 33:25 34:4 37:4 55:18 126:10 133:14 134:10 208:21 265:7 270:2,6 272:4 273:20 274:9 296:18

**heated** 124:13

**heavy** 184:11

**heavyset** 181:10,13

**height** 30:19 71:3 289:23

**held** 9:5 10:20

**helped** 83:5

**helping** 118:16,22 199:22 200:1 201:7 202:10,18 203:14 204:14 205:5 216:23,24 218:11 225:20 296:16, 19

**high** 11:21

**higher** 17:24 42:13

**higher-up** 139:6

**highlighted** 283:13

**hire** 8:8

**hired** 12:18 156:1

**hit** 16:22,23 22:16,17,21

**hold** 8:10 107:4

**holding** 19:8 73:4 187:3 189:3 190:8 206:23 225:13 227:21 235:6,19 237:13

**Hollywood** 13:14,15, 17 16:13,25 17:2,6,14, 16,17,20,21,23 18:4,6, 14 19:1,3 20:23 33:7 35:8 163:6,7

**home** 9:1 65:12

**Honestly** 94:12

**hope** 141:8

**Hospital** 147:24

**hour** 80:11 88:21

**hours** 15:12,13 26:19, 21

**housekeeping** 297:11

**hover** 110:23

**hovering** 82:24,25 200:11,18

**Huddle** 60:8 61:24 65:6,22,23 68:4,10,14 71:18 75:18 84:20 104:8 176:15 204:20, 23,25 205:3 206:10 214:7,17 215:3,5 216:14 217:19 218:2,5

**Huddled** 204:21

**human** 86:6

**hundred** 170:13

**hurt** 127:13 128:5

**hurting** 128:5

**Hyperion** 9:19

**hypothetical** 87:1 112:15,16 161:8 209:20 285:8

**hypothetically** 152:7 173:2 217:11

**I**

**I.D.** 127:10

**IBS** 296:21

**idea** 28:2 33:16,20 38:9 39:11,20 40:4,12 146:16 198:6 237:25 271:11

**identified** 218:6

**ignore** 111:25 114:3

**ignoring** 112:23 115:14 199:10

**immediately** 8:12 77:13 115:6 124:14 146:7

**imminent** 127:25 128:19

**importance** 45:19

**important** 31:10 69:16 72:25 86:14 162:4 166:16 205:5 265:15, 17,19 271:18

**in-store** 12:14,15,16,24

**inaccurate** 196:19,22 200:13,15

**inaudible** 6:20

**incident** 29:7,10 32:16 33:4 36:4,8 37:12,16 38:5,12,24 39:21 43:4 44:16 45:2,13,15 49:5 149:7,12,17,21,22 152:8 157:22 158:3,11 261:19 268:22 289:24 290:8

**incidents** 48:14

**including** 55:9 213:11

**incompetence** 217:2

**incomplete** 87:1 161:8 209:20

**inconspicuous** 112:9

**incorporate** 171:24

**incumbent** 296:8

**indefinitely** 140:17 143:6

**indicating** 96:13 283:19

**individuals** 85:20 161:16 282:11

**information** 36:23 37:10 38:23 102:3 108:14,22 135:1 137:15 230:23 264:11,16 276:10,18 277:22 278:20

**informed** 136:12

**initial** 80:5

**initially** 81:11

**Injured** 44:9

**injury** 11:14 44:12 45:4

**inside** 146:18,20 150:4 153:17 186:22 249:6,7 253:11 257:22,24,25 258:1 272:19 273:24

**insists** 65:16 215:23

**instances** 49:11

**instructed** 158:18

**instruction** 34:16

**Insurance** 37:1

**intent** 72:13

**interact** 29:18 110:15

**interacted** 32:5 258:23 286:20 287:3

**interacting** 246:19,23

**interaction** 31:21 52:5,10 81:17 143:10 144:14 145:10,14 243:14 245:12 253:13 288:25

**interactions** 29:17 31:11 50:22 80:6 138:21 149:16 163:13 258:19,20,22 259:6 285:9,15,22 286:25 288:5

**interactive** 110:2 121:25

**interested** 247:12

**interesting** 9:16 114:20

**internal** 165:5,16 171:20

**interpret** 293:8,9,12,17

**interpretation** 200:19

**interpreted** 130:25

**interpreting** 196:5

**interrupt** 87:22

**interrupting** 247:17

**intervene** 124:13

**intervened** 87:13

**interview** 274:22

**interviewed** 27:16 32:15 274:25

**interviews** 33:2

**intimidated** 200:10

**intimidating** 199:23 200:2,4,7

**introducing** 170:10

**inventories** 101:15,16

**inventory** 101:14

**investigation** 33:10

**investigator** 157:20 158:6

**involved** 33:9,13 37:15 38:19 44:9 46:15 47:15 136:21 167:23 264:2

**involving** 29:11

**irrational** 117:19,21 215:1

**irrelevant** 295:10

**issue** 20:6,7,10 25:10 27:4 42:23 115:2,9 119:25 121:23 148:23 175:15 209:17 213:1,4 223:10 232:9

**issued** 37:18 38:11 40:2,7,8

**issues** 18:13,15,16 19:21 24:14,16,18 90:23 91:12 119:21 155:11,21 164:8,9 165:22 166:11 205:15,25

**item** 83:6 84:17,21,22 86:22 87:6 89:2 111:17,20 113:12 114:9 119:5,13 120:16 193:25 196:17,19 202:6,10 203:15,19,22,25 204:9,14,22 206:19 207:8 229:18

**items** 77:13,23 100:17 101:18 229:4

**J**

**J-O-E** 5:18

**J-O-H-N-S-O-N** 5:18

**Jack** 14:16,17,25 15:1 16:7 33:22 47:11 156:19 163:16 168:23

**James** 4:20

**January** 14:23 15:19 26:15 29:9 30:4 37:16,17 38:13,20,25 39:1,6,9,13 40:6,19 41:15,22 43:14,18 44:7,15,16 45:3,13,15 46:9 50:24 51:3,6,12,14,15,16,25 52:2,17 54:7 55:9 56:16 73:13 95:9,10,20,23 96:19 97:20 98:7 101:23 106:16 130:18 138:15,21 142:21 143:1 152:15 157:8 168:11 177:10,21,25 178:11,13,14,20 179:2 180:5 181:12 191:1 218:20 219:18,22 220:14 259:16,21 260:15 261:19 266:4 268:2 272:13 283:11,15,20,22,23 286:12 288:9,24 289:24 290:7

**January/february** 22:20

**jeopardizing** 217:17

**Jesus** 84:3 179:1,5 180:6 192:20,22 193:4

**jet** 57:9

**job** 8:10 9:4 10:20 86:23 91:7,8 103:9 107:19 180:24 206:1 213:13

**Joe** 4:18 5:5,18,19 43:9 180:10

**Johnson** 4:18,23 5:5,18 23:24 27:18 57:4 133:5 155:9 180:10 285:3 299:21

**Jones** 4:17 34:12,25 35:12,19,22 38:6,14 42:7 43:7 48:16 69:18 71:20 72:12 76:1,19 77:4,25 78:20 79:10,17 82:3 86:16,25 87:8,10,17,22 88:1,7,20 93:23 100:11,22 114:16 116:8,11 118:19 120:17 121:10,18 130:17 137:12,19 139:16 140:19,24 142:6 144:16 154:21,25 155:15 159:2 161:7 162:11 164:19 169:15,17 170:15,17 177:19,22 178:1,7 195:14 199:1,13 200:14 204:15 209:19 210:7,13,16 211:5,7,22 214:8,18 217:22 223:12,14 224:15 240:23 244:3 259:22 263:9 275:22 284:5,17,21,24 285:2,19,21 286:2,24 287:14,19 289:4 290:17 295:11 297:1 298:15 299:8,10,12,18

**journal** 149:2

**judge** 63:5 80:22 214:24

**judgment** 20:3 24:6

**July** 60:17,18 62:6 65:24

**juncture** 228:10 263:24

**justify** 35:9,17

K

**key** 170:21

**kind** 7:13 18:13 19:21 26:2 30:15 49:11 54:12, 19 90:9 109:18 110:8 111:4 116:16 124:16 125:9 141:14 149:17 161:6 162:6 186:25 200:7 210:6 236:7 238:8

**kinds** 205:25

**knew** 50:20 83:6 135:20 276:10

**know-how** 287:10

**knowing** 140:15 166:2

**knowledge** 38:4,7 45:3 46:13 100:21 102:3 142:5

L

**L.A.** 9:3,18 11:23 147:23

**lacks** 79:12 87:1,10 209:20

**lady** 213:22 228:23,24

**lag** 57:9

**Lagos** 37:21

**Lake** 9:19

**language** 62:24 63:4 115:1 116:16 117:2 126:3,25 165:7 169:11 171:18 211:14,19 212:10 224:13

**larger** 60:11 169:15

**law** 37:21 63:17 133:20

**laws** 139:9

**lawsuit** 11:11 27:17,18, 22 28:6,22 29:4,6 149:18

**lawsuits** 11:8

**lawyer** 10:11 27:9 52:25 53:1,2 102:18,19 103:1 118:3 197:12

**lawyers** 28:8

**leader** 123:23,25 128:11

**leadership** 123:22 124:4,7,17 127:15 128:12 175:12 212:4

**Leading** 287:18

**learn** 27:18

**learned** 32:8 57:14 271:2

**leave** 24:21 53:8,14 57:21 58:17,22,23 59:16 60:6 66:11,13,21 67:5,19,22 73:19,22 75:2,7,10,24 76:4,11 78:9,10 79:2,13 81:19, 21 82:22 97:24 98:8,18, 19 99:15 100:5 103:8 106:10 127:9,20,24 129:1,10,14,16,23,25 130:14,16,24 131:1,6,8, 9,11,19,22 132:4,6 135:4,14,20 136:25 142:16,22 143:2 150:7 152:14,20 189:23 190:13 195:8,12,13 196:19 199:11,15,17 202:22 204:14 209:23 210:3 212:2 213:5 216:2,4 217:9 218:7,17, 18 221:18 223:6 231:23 232:5 239:3 240:4,5,21 241:1 250:18 251:10 252:8 256:14 266:7 271:16 281:15

**leaves** 65:15 189:24 193:14,15 208:1 215:23 222:14 229:17

**leaving** 74:24 82:13 121:7 127:25 129:10 131:2,4 135:4 143:14 146:22 184:21 185:7 187:20 208:5,12 211:13 223:2 231:20,21 243:11

**left** 10:15 74:12 75:4 91:19,20,21 93:17 94:8, 21 97:19 98:8 106:15 115:25 132:4 146:13 150:3,6 154:8 186:15 187:2,21 188:6 189:4 191:22 194:10 212:2,3 216:8 231:8 239:25 240:12 255:22

**legal** 37:20 158:18 293:10 294:8,9

**legitimate** 271:20 294:12

**legitimately** 203:24

**Leilani** 4:17

**lens** 169:7

**letter** 37:21 50:15 52:6, 25 53:3 59:4,5 72:18 102:17 103:3,4 118:2,5 197:12,19 198:2,4,6 210:23,25

**letting** 62:13 158:9 231:18

**level** 12:14 18:11

**level-headed** 90:6

**levels** 14:6,7,8

**liability** 34:8,9,10

**life** 165:3

**lifted** 290:11,13,20 291:2,4

**light** 117:10 177:19,20 178:1,3

**limit** 287:5

**listen** 78:13 81:4 172:6, 14 173:4 238:14 239:12 294:5

**listened** 296:14

**listening** 63:2 115:13, 18 118:6 126:13 199:5 236:8 239:13,15,24 245:3

**literally** 284:19

**litigation** 149:18 298:13,23

**live** 9:2,3

**loads** 101:11,12,18

**Local** 60:25 61:17

**located** 18:5 48:9

**location** 13:12 21:3 33:23 37:10 57:13 58:13 60:25 107:14 108:8,23 136:4,8,9,23 138:24 139:6,15,25 140:11,17 142:13 143:7 151:13,19 189:18 262:17 264:4 272:8,20 277:14 279:11,18,24

**locations** 17:14 34:22

**lock** 91:3 290:4,11,19

**lodge** 126:6

**log** 148:13 282:7,11,21 283:14

**long** 6:8 8:6,22 9:22 13:17 16:2 17:9 30:15 36:11 50:19 58:25 82:10 95:24 99:5 107:25 154:22 207:7 245:11 256:18 284:18

**longer** 252:6 278:1

**longest** 9:4,6

**looked** 30:12 124:6,11 228:24 285:3 294:8,9

**Los** 147:20

**loss** 21:18,21,22 22:2 37:10,15 38:23 43:4 44:6 45:7

**lost** 39:20 181:11 298:11,21

**lot** 10:24 21:18 23:12 54:3 85:9 90:22 91:2 148:3 155:12 163:6,14 254:17,18 258:22 285:4,8

**lots** 74:12 205:24

**loud** 74:7 75:16 76:5 79:6 97:24 99:13,22 100:2,5 106:11 125:6,8 140:2

**lower** 13:20,22,23

**lunch** 154:19 155:2,4

M

**made** 19:16 35:5,7 49:10 91:20 128:4 131:21 136:14 167:7 274:2 298:5

**main** 128:1 213:3 291:21,23

**maintain** 65:18 85:20 148:17 215:7,9 287:7

**maintained** 58:12

**maintaining** 52:14 96:19 144:10 206:24 292:5

**major** 187:19

**make** 23:24 26:12 41:12 42:10,13 49:5,11 58:11 60:11 66:15 75:9 80:22 81:2 86:7 89:15 92:20,23 93:16 98:5 105:16 116:24 120:22 124:6,23,24 125:24 126:9,11 133:9,16 134:9 135:6 182:7 185:22 228:12,15 286:16 298:1,4

**makes** 40:14 81:5 263:18

**making** 20:18 35:13 196:9 221:15 231:14 262:10

**male** 227:2

**Mana** 148:6

**management** 33:9,12, 17,21 37:2 49:2 148:23 149:11

**Manager** 8:16,17,21 9:10,17,19 10:3 13:2, 20,22,23,25 14:2,3,11, 13,15,24 15:2 18:9,11 19:16 25:24 26:1,5,11 27:2 29:3 34:21 42:13 45:13 47:8,12 63:17 67:10 87:13,14 88:11 91:11 97:1,4 103:16,23 112:19 113:1 115:6 118:2 119:13 123:21 124:15 125:3,6 133:16 137:23 138:10,25 155:20 156:16,19 160:5 163:18,20 167:23 168:6 172:12,22 173:6,7,10, 12,15,20,25 174:24 175:13,14 176:12 203:21 211:21 212:6 222:4 230:16 232:9,10 271:19 274:1,4 296:1

**Manager's** 47:23,25

**Managers** 15:8,10 37:1 156:25 157:3 276:17,19

**Managing** 170:17

**mandate** 53:10 54:14, 16,19 74:2 213:6,7,11, 17

**mandated** 55:10

**mandates** 54:8,17 61:1,18 290:10

**mandatory** 60:5 61:13

**manned** 192:19

**manner** 229:24

**manning** 257:2

**manuals** 124:8

**March** 290:3,6

**mask** 31:13 40:17 42:20,24 46:11 52:7,15, 20 53:10 54:8,15,20 56:3 57:21 58:6,18 59:14,18,22,24 60:5,19, 21,24 61:8 62:9,14,17, 18 63:13,23,24 64:1 66:6,20 67:4 69:2,15,22 70:7,16 71:5,18,25 72:4 74:11 76:12,22 78:15 80:1 83:7 84:21 96:15, 20 102:12 103:5,9 104:10 118:4 123:14,19 143:3 144:11 152:16 174:8 175:17,18 176:1 179:23 180:15 183:5,23 192:10,13 197:10,12 198:1 208:3,8,13 209:16 210:1 213:4,18 218:12 227:6 231:24 232:4 233:25 236:16,20 245:8 249:21 268:23 271:15,23 278:16 286:13 291:2 293:6,11, 18 294:10 295:1

**masks** 54:6 55:1,10 60:2,9 68:18 69:12 70:2 161:17 213:16 217:14 290:10,22 291:16

**matter** 4:11 176:23

**meaning** 73:15 276:22

**means** 18:23 48:7 55:19 56:9 92:2,5 115:13 126:12 134:2

**meant** 56:11

**media** 47:12 178:1,2,3

**medical** 172:11 196:25 209:17 210:2,9,20 217:4 294:10 296:25

**medication** 68:1 86:22

**medications** 85:5,15 86:19 90:24

**medium** 30:25 31:2

**Memorial** 147:24

**memory** 94:16 100:21 139:12 195:4,5 199:12 221:8

**mentioned** 37:23 270:18

**Message** 60:15

**middle** 176:18 286:18

**midnight** 26:23 188:6

**mindful** 62:25

**minute** 35:23 98:6 108:13,14 145:10,16 184:18 189:25 240:3, 10,14 242:7 248:14,15, 25

**minutes** 59:1 75:6 99:6 130:10,11 131:5 132:5, 8 145:12,13 146:13,15 150:11,12 188:7 193:6 201:5,6 203:17,18 204:9 207:12,13 210:14 212:24 218:24 240:6,7, 17,20,22 241:3 255:8 256:9

**Mirror** 115:1

**miscommunication** 174:15 215:4

**misconstrued** 45:25 46:2

**misplaced** 298:11 299:5

**missed** 61:18

**misstate** 87:22

**misstates** 35:12 42:8 43:8 69:19 71:21 77:5 79:11,18 82:4 87:10,18, 25 88:2,8 142:7 210:8 217:23 240:24

**mistaken** 220:5

**mistakes** 298:2

**Mkrtchyan** 4:15 5:13 34:14 35:4,15,16,25 36:3 38:10,19 42:12 43:12 48:21 69:23 71:23 72:15 76:7,23 77:8,17,18 78:4,25 79:15,24 80:19 82:5 86:18 87:5,9,11,20,24 88:3,4,10,22,24 89:6,14 93:25 100:12,13 101:1 107:4 114:19 116:10,13 118:23 120:18,21 121:13,20 130:18,21 137:14,22 139:21 141:1 142:10 144:19 154:19, 22 155:9,19 159:5 161:10 162:15 164:22 169:16,18,24 170:1,10, 16,18,19 177:14,20,24 178:6,12,16,24 179:16 180:21 182:3,13 183:4, 16 184:8 185:1,15 186:13 188:24 189:3 190:7 191:16 193:11,23 194:9 195:18 196:3 199:3,16 200:16 201:3 202:1 204:19 206:23 207:6,12 209:25 210:10,15,17,19 211:9, 12,18,24 214:10,19,20 217:24 218:23 219:6,13 220:18 222:24 223:18, 21 224:7,16 227:1 229:13,17 233:10,19 234:10 235:5 236:20 237:6 239:3 241:2,13 242:1,11 243:19 244:5 245:16 246:11 248:25 250:3,25 251:9 253:9

255:7,17 256:3,25 259:25 262:9 263:11,24 264:21 265:3 266:15,22 267:3 268:21 269:8,20 270:14,23 272:3 276:6 284:3,6,14 285:18,20 286:1,21 287:13,18 289:20 290:19 295:14 297:3,9,12,15 298:16

**module** 116:11 171:22

**modules** 12:7 19:24 109:21,24 285:4,14

**moment** 237:23 294:1

**money** 64:13,18

**monitor** 47:22,25 139:8

**month** 12:20 22:13 30:6 51:13,15 152:8

**months** 13:18 17:7,8 19:2 51:1 289:25 290:7

**morning** 5:14,15 26:24

**mouth** 52:16,18 54:21 55:4 72:8,23

**move** 17:5 22:18 77:17

**moved** 16:25 17:2 23:6 202:2

**movement** 92:24 228:13,15

**movements** 63:1

**multiple** 156:25 157:14,15

**N**

**names** 6:4 259:12

**Narine** 4:15

**nasty** 205:24

**nationwide** 54:18

**needed** 53:7 54:20 123:10 124:12 131:10 133:1 199:17 204:8

**neighborhood** 147:14

**neutral** 62:25

**nice** 10:14 57:9 99:14 191:8 205:17

**night** 124:1 173:7 233:20 257:15 277:5

**nightshift** 26:17,19,20 53:25 101:5,6 138:15 141:7

**nighttime** 86:13

**nod** 6:19

**nods** 264:6

**non-certified** 298:12

**non-judgmental** 63:3

**non-officer** 134:1

**non-verbal** 63:4

**nonresponsive** 77:17

**nonsensical** 206:4

**normal** 160:9,10

**nose** 42:23 54:21 55:4 59:9 72:24 73:8 183:7 227:9

**not-certified** 298:21

**notch** 80:14

**note** 174:7 176:23

**notes** 125:23 178:16

**notice** 141:18 294:11 298:2

**November** 38:1

**number** 23:13 37:19 70:10 71:1,8 114:24 117:9 126:10 128:21 216:16

**numbers** 7:25 19:8 139:13

**O**

**oath** 5:8,21 137:4 155:10 297:19,25 298:4

**object** 80:24 81:7 87:21

**objection** 34:12,25 35:12,19,22,24 38:6 41:10 42:7 43:7 48:16 69:18 71:20 72:12 76:1,19 77:4 78:20 79:10,17 81:5 82:3 86:16,25 87:8,17,23 88:1,7 100:22 114:16 118:19 121:10,18 137:12,19 139:16 140:24 142:6 144:16 155:15 159:2 161:7 162:11 164:19 195:14 204:15 209:19 210:7,13,15,16,17 211:22 217:22 240:23 285:18 286:21 287:18 290:17 295:11

**objections** 81:2 87:21,24 210:11 211:10

**objective** 85:22 86:5,23

**obligated** 230:24

**obligation** 103:9 139:4,5 217:10,12,14,16

**obnoxious** 24:21 30:17 50:10,12,13,16,21 76:5 79:6 81:25 82:5 89:16 90:8 99:14,21 100:4 109:15 117:21 122:4 125:13 144:1 175:9 205:18

**obnoxiousness** 99:19

**obscenities** 124:21

**observation** 79:25

**observations** 30:12 50:1 81:14 95:21 231:10 270:16

**observe** 81:12 90:4

**observed** 188:4 201:6 229:2 232:15 253:15 261:22 263:3 268:2 288:19,20,24

**observing** 269:14

**occasion** 148:23

**occurred** 37:12 44:7 290:7,8

**occurrence** 147:16 148:10 187:24

**occurring** 221:6 225:24

**occurs** 262:17

**OCTOBER** 4:1

**off-and-on** 290:14

**offer** 120:3 126:5 127:6 286:12 297:12 298:8

**offered** 84:20

**offering** 126:3

**office** 12:14 47:23,24,25 60:25 181:2 206:15

**officer** 4:20 36:15 38:16 47:9 132:7,15,17 133:1,8,20 134:9,13 135:5,9,16,23 136:3,6,12,15,21 138:1 142:12,13 143:11,12 144:13,18 145:12,17,19,21,25 146:2,10,13,17,25 147:11 150:9 151:9,22 152:25 153:5 242:14,21 244:1,10 245:3,21,25 247:7,11 248:12 250:4 251:2,20 252:21 258:3,17,19,21 259:5,8,12 272:11,12,16 276:7 277:5

**officer's** 147:9

**officers** 36:7,10 104:21 105:4 144:15 153:18,23 253:22 254:23 257:22 258:11

**Offices** 37:21

**Older** 84:11

**on-and-off** 290:9

**ongoing** 290:13

**online** 13:3

**Oops** 263:19

**open** 59:9 72:24 85:12 177:23 178:4 227:9

**operational** 48:3

**Operations** 8:21 14:3,11,12 15:2,8,10 18:9 25:24 26:5 29:3 45:13 47:8 87:14 91:11 103:23 138:10,25 157:3 163:19

**opinion** 266:2

**opportunity** 6:17

**option** 70:10 71:8

108:13,16,17 111:15 127:1

**options** 110:25 111:12, 15 115:23,25 122:1 125:1 127:6

**order** 65:12 73:12 86:7 88:24 167:22 299:15

**organization** 164:24

**organizational** 165:9, 10

**orientation** 165:4

**original** 298:16,18,22, 25 299:1

**over-the-counter** 85:15

**overbroad** 159:3

**overrides** 61:2,20

**overtime** 283:7,9

**P**

**p.m.** 155:6,8 219:2,3 276:2,3 284:10,11 299:21,24

**pacing** 238:9

**pages** 36:21 65:22 80:11 170:14 218:3,4,6, 7,9

**paid** 283:9

**pandemic** 71:2,3 90:18 91:2,13 122:24 265:19 286:18,20 287:4,16 289:23,25 290:15

**panic** 161:3 208:17

**Panos** 37:21

**pants** 217:3 296:20,21, 22

**paper** 120:23 271:1,4,5, 7,15,20 293:5,21 294:8, 9,12

**papers** 69:15 145:19 152:25 271:2 293:10

**paperwork** 149:25 153:3 160:19

**paragraph** 272:16

**parameters** 54:25 55:2 61:22 166:9

**paraphrase** 172:8 280:23

**paraphrasing** 272:17

**park** 254:24

**parked** 254:20

**parking** 254:17,18,20 255:1

**parse** 99:21

**part** 61:18,19 72:25 77:7 146:3 169:15 170:19 171:23 236:24 290:12

**partial** 72:18 96:13 245:8

**partially** 59:8 66:20 72:7,17,22 232:4

**parts** 241:23

**party** 11:11 44:2,9

**pass** 149:10

**passed** 109:19 132:5 146:13

**past** 231:5,6 276:11

**path** 85:23

**paths** 9:14

**patience** 57:8

**patrol** 147:7,9,11,13 150:3 251:21 274:18

**patrolling** 147:13

**pattern** 101:9

**patterns** 169:12

**pause** 6:16 80:24 169:22 170:8 177:12,17 229:11

**pauses** 106:23

**pay** 120:24

**paying** 194:3 203:1 226:13

**peeing** 296:20

**penalties** 5:24

**people** 24:20 43:21,23 55:17 74:17 85:9,14,23 90:20,22 91:3,22 101:6, 8 157:14 158:25 159:17 162:2 164:2 171:12 209:8,10 287:11,14 290:20 294:23

**perceive** 159:11

**percent** 24:15,18 148:8 162:25 164:1 257:14

**percentage** 24:10,11

**perform** 213:13

**Performance** 155:20 156:15 157:16

**period** 13:19 19:2 22:8, 12 23:8 25:15 27:1 91:13 95:12 132:11 156:6 188:11 228:11 233:24 290:11,15,25 291:1,2 297:21

**periodically** 110:12

**periods** 290:10

**perjury** 5:24

**permitted** 169:5 293:5

**person** 34:10,23 43:17 44:8 56:3 65:3 84:4,6 93:3 99:14 114:5 129:10 134:1 141:18 159:6,7,8 161:4 162:19 166:14,15 260:25 280:10,16,20 281:3,14 282:22

**person's** 120:5,11

**personal** 38:7 48:24 108:22 122:15 165:6 205:12,14 217:13

**personally** 18:14 19:13 34:1 47:15 58:14 70:21 91:6 95:4 105:6 107:5,8,21 122:18 205:21 212:25 277:10 288:19

**perspective** 59:12,23

**Pharmacist** 163:25 164:1

**pharmacy** 24:25 47:18 48:11 54:9,24 61:24 85:10,12 91:1 123:18 164:2 165:13 169:8 272:18

**phone** 48:14,23 49:16 50:3,6 105:7,12,14 126:1,16 185:18,25 186:5 187:3,25 189:4, 10 190:8 206:24 224:17,18,19 227:22 229:21,23 230:3 232:18 235:22,24 236:4 237:14,25 240:12 258:6 259:6 263:4 269:15 273:10 276:17

**phrased** 82:6

**physical** 92:15,18,23 123:6 165:4 196:6 226:19 228:13 252:25 261:23 273:22

**physically** 93:2 99:24 123:1 159:6,8 165:2 231:15 252:23

**pick** 105:6 116:5,6,18, 19,20

**picking** 65:10

**picture** 48:5

**placing** 248:16 249:1 251:20

**Plaintiff** 4:16 5:7 29:23 44:20 50:1 100:18 112:17 154:9 182:14 285:15

**play** 178:17 179:11 182:20 184:4,20 191:4 224:2 262:3,5

**played** 101:25 178:22 179:14 180:19 182:1,11 183:1,14 184:6,24 185:13 186:11 188:22 189:1 190:5 191:14 193:9,21 194:7 196:1 201:1,25 206:21 207:4, 10 211:16 219:11 220:16 222:22 224:5 226:24 229:15 233:8,17 234:8 235:3 236:18 237:4 239:1 241:11,25 242:9 243:17 245:14

246:9 248:22 250:1,23 251:7 253:7 255:5,15 256:1,23 262:7 263:22 264:19 265:1 266:13,20 267:1 268:19 269:6,18 270:12,21 272:1

**player** 178:1,2,3

**playing** 45:18 186:9 188:19 195:22 201:23 206:18 246:7

**Plexiglass** 291:11

**PMK** 191:3

**pocket** 189:11

**point** 25:10 35:6 46:16 57:8 76:7,9 93:11 94:7 96:6 103:19 106:6 107:12 120:5 140:6,16 146:10 186:14 187:7,24 189:13,17 190:11 194:17 195:1,7 198:13 200:16,20,22 201:17 205:9 225:2 231:10 233:15 239:5 241:14 244:15 245:5,23 250:4 251:2 263:19 289:13 291:4

**pointing** 243:23 244:1, 9

**points** 64:8 89:15 201:12 245:17 246:18

**police** 17:21 18:14,20, 22 19:4,22 20:18,22 21:4 23:9,18,22 24:7, 10,15,19 30:8 33:6,8 34:3,23 35:17,18 36:5,7 37:19 38:20 40:2,11,16, 19,20,21,22 41:6,16,21, 25 42:4,14,17,19 43:14, 17,19,22,23 47:4,9,11 49:4,9 51:5,16 56:25 57:13,18,19,20 58:13 74:22 75:1 93:5,11 95:11 97:21,23 98:2,9, 20,23 99:4,8,14 100:14 104:15,16,21 105:7,13 106:2,5,9 108:12,15,20 112:18 120:16 122:7 124:1 127:15 128:2,20, 23,24 129:2,11,19,22 130:20 132:6,12,15,25 133:16,19 134:9,13,21 135:15,23 136:3,20 138:1 142:11,13 143:11,12 144:2,13 145:11 147:1 148:12, 14,22 149:11,16 150:3, 8 152:11,19 188:2 227:24 228:2,8 230:6, 12,14,17,20,24,25 231:19 232:11,19 240:20 243:12 254:20, 23 272:10,12,15 276:6 279:17 280:6,7,15 288:10

**policies** 55:22 60:19 70:1 77:3 109:13 139:9

**policy** 23:20 24:23 25:9,12 41:7,8 42:4,9, 16,24 48:13,17 55:8 60:15 61:2,21 66:7,17 68:4,8,16 70:7 71:5,11 76:24 77:6,7 81:1 107:12,15,20 112:23 118:17 123:13 129:7 139:4,11 140:6,16 158:21 169:13 173:3 175:12 176:25 204:11, 13,16,17 205:14,17 206:2,3,4 211:25 213:9 214:1,3 215:16,17,22 217:24 238:16,17 280:1 295:17,18,19 297:5

**pooped** 296:22

**pooping** 217:3 296:20

**poor** 224:8

**popping** 244:21

**populated** 166:2

**Porsche** 30:16

**portion** 39:19

**position** 8:20 13:8,20, 21 17:3 212:4

**positive** 126:3,25

**Possibly** 280:8

**posted** 282:15

**practice** 101:10 107:23 108:3

**pray** 133:7

**precautions** 291:7,25

**predominantly** 162:23 163:6 166:2

**prefer** 17:16 65:8

**premises** 44:15 45:2, 14 56:15

**preparation** 27:5

**prepared** 297:16

**prescription** 65:10 90:23

**presence** 225:23

**present** 27:2 78:19 101:23 104:16 105:18 132:19,21,22,25 151:7 153:15

**presented** 68:21

**preserved** 37:22

**presumed** 7:19

**pretty** 55:3 97:15

**preventing** 140:10

**prevention** 21:19,22 22:2

**previous** 269:22

**previously** 112:20 270:6,17 272:24 280:19

**price** 64:8

**prior** 8:10 9:4 10:19 11:3,8 27:16 29:6 268:22

**private** 25:2 133:9,12, 17,24 135:6 157:20 158:6

**privy** 264:15

**problem** 113:16 173:13 174:3 217:18,21,25 278:17 299:5

**problems** 17:20 208:16 267:4

**procedure** 23:21 80:21 141:9,14

**proceeded** 53:15 96:1

**proceedings** 89:9,10 155:4,5 169:22 170:8 177:12,17 219:1,2 229:11 276:1,2 284:9, 10

**process** 66:4 110:2 121:25 199:19

**produce** 47:5 49:1

**produced** 36:20 43:3 60:13 62:6 109:21 169:25 181:23 268:10

**product** 127:11

**production** 260:20 261:1

**products** 65:12

**profession** 10:12

**program** 177:15

**prohibition** 48:22

**promoted** 16:16,18,24 17:3 22:25

**pronounce** 14:20

**proof** 144:1

**proper** 127:10

**prosecuted** 34:23

**protect** 65:19 215:8

**protected** 204:6

**protecting** 292:11

**provide** 7:18,23,25 23:20 30:25 118:2 141:17 172:6,7 173:4 212:6,7 294:22

**provided** 37:19 71:8 102:4 116:22 210:6 276:10 278:19

**provider** 85:7,19

**providing** 109:17 137:25

**proving** 102:15

**pull** 42:22 52:20 53:7 183:23 255:3

**purchase** 62:15 67:15, 25 82:15 83:6 84:21,22 86:13,19,21 87:6 91:20 114:9 119:2 120:15 193:24 196:17,19 203:15,19,22,25 204:9,

14,22 207:7 216:6 274:1,4,7

**purchasing** 67:16 77:13,23 82:17 84:17 89:2 119:13 202:6,15 206:19 229:18

**purely** 226:3,6

**purportedly** 44:6

**purpose** 125:14 171:1 207:14 223:8 239:21

**purpose-driven** 86:8

**purposes** 34:8 165:9 181:22 298:13,23 299:9

**put** 27:23 31:13 38:23 52:7 101:20,21 189:11 254:2 272:14 287:6

**Q**

**question** 7:16,18,19 23:25 24:4 28:18,20 35:23 41:19 66:15 69:6 77:18,22 78:14 80:24 81:7,11 88:5 98:6 106:23 111:9 140:19,22 158:9 175:3 210:19 214:18 264:1 295:25 297:1

**questioned** 149:22

**questions** 32:23 33:13 34:15 110:3,17 112:6 157:21 191:6 275:6 284:15,17 289:4,8,17 297:8,10

**quick** 145:15,16

**quickly** 65:18 203:25 204:14 215:6 216:20 298:3

**quiet** 114:24 125:3,8, 10,14,21

**quiz** 111:1 238:16

**quizzes** 110:3 238:15

**R**

**race** 31:25 32:1 165:3, 17

**race-based** 165:19

**Radio** 9:6,7,13 10:6,15, 19

**raise** 4:23

**raising** 63:5

**Ralphs** 11:17,18

**ran** 113:18

**Randolph** 10:3

**rank** 42:13

**ranking** 13:24,25

**rate** 17:24

**reach** 124:20 160:25

**reached** 157:21

**read** 27:20,25 28:3 37:8 38:2 44:17 61:3,18 63:14 64:10 65:7,13,20 70:20 71:18 76:23,25 80:17 102:25 103:12 107:1 137:1 140:20,22 165:12 181:2 211:1,2 218:1,2

**reading** 39:19

**reason** 20:21 33:8 36:4 38:22 72:4 75:10,22,23 76:17 102:7 104:5 106:11 129:17,18 131:10 139:22,24 140:18 141:10 152:14 155:14 160:18 172:5 182:17 206:3 230:7 231:18 238:14 266:9,10 271:21 281:2 293:20 296:7 298:10

**reasonable** 55:16 70:4,6,9,11,15 71:4,7, 11,24 104:13 160:2 209:10 294:22,25

**reasons** 18:22 24:12, 25 35:18 108:25 128:8, 24 129:13,21 135:15,19 140:7 148:15 205:8,9, 12 213:11 293:19

**recall** 16:1 20:1 22:14 101:24 145:8 158:8 173:14 241:18 256:15 258:8 288:2,11,13,14

**receive** 19:20 124:16 159:23 161:12,16 164:5

**received** 12:3 54:8,25 86:2 158:24,25 159:13 161:20 162:7 170:24 259:17

**receiving** 171:1

**recent** 274:1,4,7

**recess** 89:9 155:2,4 219:1 276:1 284:9

**recognize** 60:10 102:1 178:18,24 179:12 182:4,9,22 183:9,16 185:1,9 191:23 219:13 220:18,24 281:14

**recognized** 180:5,6,7 285:5

**recognizing** 169:14

**recollection** 100:21 182:16 195:19 196:14, 23 197:4 247:4 249:13, 15

**recommendation** 60:19

**record** 4:10,14 5:16 23:3 24:4 30:13 31:4 37:9 41:19 44:8 48:14 49:1,17,25 50:11 81:3 89:7,13 99:17 124:5 126:2 143:21,22 144:1, 6 149:8 154:25 155:1,8 165:17 218:25 219:5 244:18 272:14 275:23 276:5 284:7,13

**recorded** 276:19 298:3

**recorder** 258:7

**recording** 48:23 49:20 185:19 186:7 187:24 189:6,7 206:25 237:8, 13,22 238:3,6,7 239:18 240:7 258:4,6

**recordings** 27:14 46:21 47:9 49:5,10,12 236:1

**records** 27:6 60:17 276:17

**rectangular** 258:13

**red-handed** 281:7

**refrain** 48:22

**refresh** 94:15 195:4,5 221:8

**refuse** 25:7 65:3 75:2 104:9 127:20 176:25 213:17 215:25 216:15, 17 218:11

**refused** 67:7 73:12 84:16 87:6,12,19 88:5 98:1 119:9 209:24

**refuses** 68:9 127:9,10

**refusing** 40:17 42:20, 22 52:8 57:21 72:3,10, 14,15,16 74:1 76:6 100:5 106:10 129:1,23, 25 130:14,15 131:1,21 135:3,14 152:19 213:10 232:5 240:4,5,21,25

**regard** 139:9

**register** 67:8 83:5,9 84:25 118:24 119:9,13 179:7 190:23 191:19 192:5,16 193:15,24 194:3,11 202:17 212:20 216:7 220:19 221:14 222:14 223:6,22 224:8 225:7 226:9,13 233:14 234:14 240:8 241:16 257:2 260:7 263:4 286:13 292:10

**registers** 220:13 287:7

**regular** 6:20 147:16 148:10

**regularly** 104:25 105:1, 2

**Reinstatement** 60:16

**related** 38:24 46:18 165:22 169:10 180:8,12 280:14

**relates** 272:21

**relating** 276:8

**Relations** 47:12

**relationship** 165:8

**release** 40:13 47:12 150:17,20 154:9,13 274:19 275:4

**released** 38:18 39:18 40:13,15

**releasing** 38:17

**relies** 86:8

**religion** 169:11 171:19 213:12

**religious** 70:8,17 71:6

**remem** 214:21

**remember** 7:12 16:3 19:2 20:25 21:1 22:13 30:14,17 36:11,17 51:7 52:1 83:10,13,24 84:16, 18 94:13,24 95:13 101:22 102:10,14 106:17 110:7,9 128:15 134:23 139:24 143:16, 20 144:14 145:8 146:3 147:9,12 148:24 149:1, 12 151:10,14,16,23 153:23 155:18 156:1 157:9,12,19,22 158:1, 10 167:17 168:12,14 171:22 174:2,5 186:13 187:6 189:15 190:11,12 195:2,16 196:21 198:14,15 214:20,21 221:5 224:24 225:1 237:19,21,22,24 238:1 240:4 241:14,19 242:16,17 245:1 247:25 248:5,6 250:3 251:20, 22 253:15,22,24 254:13,22 255:12,13,20 256:9 258:3,9,16,22 259:5,7 262:20 273:11 274:3,8 279:23 285:13 290:12,19 293:1,3

**remembered** 192:22

**remind** 6:13 65:18 69:8 215:6

**reminder** 155:9

**removes** 250:11 251:3

**removing** 252:21

**repeat** 79:19 140:19

**replay** 183:25

**report** 125:24 126:11 136:20 137:1 149:8 272:10,12,15 274:13 276:7

**reported** 124:11

**reporter** 4:10,22 5:10 6:14 80:10,14 89:7,13 106:22 154:23 155:1,8 218:21,24 219:5 275:23 276:5 284:7,13 297:11, 13 299:8,11,13,17,19

**reports** 62:8 136:17 149:4

**represent** 182:13

**representation** 37:20

**representative** 271:19 294:17

**represents** 44:6 282:6

**request** 47:10 71:11 79:8,9 114:4 118:21 161:6 297:18

**requested** 168:8

**requesting** 37:21

**requests** 70:4,15

**require** 61:1

**required** 55:10 60:21 61:8,9 70:7 71:5,10,17 128:8 173:3

**requirement** 48:22 208:7 291:1,2

**requirements** 54:7 128:1

**requiring** 64:7,21 111:23

**resisting** 252:23,24

**resolve** 232:24 233:1

**resolving** 212:25

**respect** 25:10 166:25 288:5,24

**respectful** 120:3 161:24

**respond** 62:12 64:25 81:4 110:18 122:3 126:15 197:18

**response** 65:5 79:7,15 264:1

**responses** 6:18,20

**rest** 16:3 220:6

**restating** 115:3,10

**restricted** 127:11

**restroom** 160:9 275:20

**resume** 89:10 155:5 219:2 276:2 284:10

**retail** 10:21,22,25 11:25 18:16 24:17 34:9 89:20 107:23 109:16 133:15 159:16 292:1

**retailers** 64:21

**retain** 299:1,4

**retained** 37:25

**return** 276:21,24 277:19

**returned** 37:17 39:1 277:17,18,20 278:2 299:1,3

**review** 27:6,7,13 118:5 297:17,18,24 298:11, 17,18,25 299:2

**Riddle** 16:2 83:15,17 100:20 102:5 223:23 224:7 225:20 241:14,15 251:25 253:11 263:1,11 283:11

**ring** 192:24

**risk** 33:12,17 148:23 206:8,10 213:4

**River** 147:23

**Road** 37:10

**role** 123:22 124:4

**room** 47:17 153:17 258:1

**Ross** 4:20 272:11,12,16 273:6 276:7 277:4,5 278:4

**rough** 24:10 28:2

**roughly** 18:1,3 30:2 35:8 148:6

**rule** 80:25 81:1 89:21

**rules** 5:21 6:12 7:12,15 45:19

**rulings** 80:22

**run** 281:5,7

**running** 49:13 246:5

**S**

**sad** 10:9

**safe** 20:4 23:22 287:8

**safety** 20:6,7,9 63:11 64:7,22 122:15 194:23 281:23

**sale** 64:8

**sales** 8:15 153:19,20

**San** 17:11 22:11 37:10

**scale** 286:19

**scaled** 287:3

**scenario** 62:12,16 115:7 116:15,22 119:23 152:7

**scenarios** 62:10,11,20 110:3,14 113:14 122:2

**schedule** 282:15,23,24

**scheduled** 282:25

**school** 11:21

**Scott** 37:3

**screaming** 146:19 252:20,22 254:7,10,11 257:20

**screen** 282:11 283:12

**scroll** 178:4

**searched** 253:24

**section** 8:18 44:2 194:11

**security** 21:21 22:4,6

**Sedgwick** 36:25 37:1

**seeking** 288:11

**segment** 43:1 179:3 182:19 187:12 212:13 266:18

**segments** 180:6

**self-check** 94:14 118:15

**self-checkout** 53:15 67:13,16 82:14 88:12 89:1,3 94:19 97:17 114:10 118:25 119:7,8 130:22 131:23,24 132:3 191:19 193:16,24 194:10,15 195:20 199:19 200:1,6,13 201:5,7 202:2,6,16 203:15 207:14,23 208:2 212:18 257:3,12,14 287:15,21,24 296:20

**self-checkouts** 203:9, 10 216:7

**send** 111:25 299:2

**sense** 20:17 24:6 77:12 113:24 116:24 125:11 159:15

**sensitive** 91:12 164:8, 10 165:22 166:11 171:8,15 209:8

**separate** 135:24

**separately** 181:24

**separating** 291:8

**serve** 87:12 213:18

**served** 27:19 149:25

**service** 25:7 67:7 73:13 86:8 88:5 104:9 111:21 112:4 113:9 114:12 119:9 123:18 172:7 176:25 212:6 213:1 216:1 223:5,7 271:19 287:10 294:16

**Services** 158:18

**sessions** 12:17

**sexual** 165:4

**Shack** 9:6,7,13 10:6,15, 19

**shakes** 58:1

**shampoo** 111:10

**shape** 18:20 99:25 212:12,14 225:23

**sheet** 298:5

**shelves** 112:8

**shields** 291:13

**shift** 8:24 13:10,11 14:2,4 15:17,19 16:14 17:3 18:8 19:15 25:19, 25 26:7 41:1 108:11 110:18 157:10,11

**shirt** 235:17 246:15

**shocked** 187:15,16,17 202:24 228:19

**shop** 288:13

**shopcvs** 126:5,22

**shoplift** 280:24

**shoplifted** 33:19

**shoplifters** 281:21

**shoplifting** 18:15,17, 21 20:9,15,22 21:5,9,14 24:11,14,16 33:24 34:2 44:23 45:9,10 46:6,15 49:14 73:18,20,23 122:11 139:19,21 148:3,8

**shopped** 216:3

**shopper** 64:7

**shoppers** 64:22 65:19 215:8

**shopping** 59:3 62:17 65:16,17 66:24 96:24, 25 97:13 174:6 215:6, 23 216:19

**Shore** 157:20

**short** 30:23,24 31:3 157:17

**shorter** 181:17

**show** 36:18 62:19 63:1 64:9 74:8,9 102:14,15, 17 103:3,16,17 127:10 205:4 256:20 260:17 267:24 272:11 293:9

**showed** 79:22 153:12 171:19 267:24 285:8

**showing** 74:8 117:14 145:19 190:22 198:8,11 243:20,23 244:2,4,12 248:11 259:19 268:2 293:5,14

**shown** 80:4

**shows** 115:17 191:16 200:21 220:13 260:12, 15 267:22

**sick** 123:2 214:2 217:7 265:24 266:23

**side** 191:23 194:10

**sides** 80:15 102:4 198:20

**sign** 141:18 153:1 297:25

**significant** 95:17

**Silva** 156:23,24

**Silver** 9:19

**similar** 64:21

**similarities** 169:10,14 171:20

**simply** 66:21 199:10 232:12

**sir** 5:14 38:2 69:7 82:21 127:2 197:8 200:19 204:3,19 226:3 267:20 293:17

**sit** 160:10

**sitting** 40:1 43:13 137:3 255:12

**situation** 6:21 23:23 26:2 63:16 64:25 65:6 79:2 90:10 109:8 114:20,23 115:12 117:25 118:2,13 122:7, 22 124:22 125:9 127:18 129:20 141:12 168:5 172:11,13 175:7 176:11,13 210:9 279:16 280:14 281:15 288:7 296:9

**situations** 20:14 42:17 63:22 72:3 90:1 91:15 122:3,7,10 127:14 171:3 288:2 295:7 296:2

**six-day** 95:12

**skip** 165:10

**skipped** 238:23,24

**slow** 81:9

**slower** 81:10

**small** 30:25

**smile** 110:20 111:7 117:12

**smirking** 63:5

**social** 65:19 215:7

**society** 171:8

**solemnly** 4:25

**solve** 176:13

**sooner** 57:11

**sort** 148:13 159:10 282:10,11

**sought** 37:20

**sound** 137:2 196:19 203:24

**sounds** 137:5 170:16 237:17

**Southwest** 11:23

**speak** 28:11,21 36:7,9, 10 97:1 112:19 113:1 150:13 151:9 163:11 164:7 166:14 168:12,23 172:12,22 173:14,20,25 232:8,10 241:16 257:22 273:25 275:12

**speaking** 87:21,24 167:14 210:11,15,16,17 211:10 274:17

**speaks** 164:14 166:15

**special** 111:10

**specific** 72:3 89:25 101:9 139:11 155:18 157:22 159:13,20 162:22 170:24 238:17 254:23 260:25

**specifically** 46:9 51:25 52:1,19 54:9,24 89:24 91:23 125:17 136:22 139:14 140:16 158:2 164:25 171:21 283:15 286:2,4 288:5

**speculate** 8:1 222:8

**speculating** 222:7

**speculation** 38:8,14

72:13 76:2,20 77:25 78:21 79:11 93:23 137:20 195:15 199:1,13 200:14 211:5,8 223:12 224:15 244:3 259:22 263:9

**spell** 5:16

**spend** 64:13,18

**spoke** 32:13 134:14,18 150:9 151:6 153:13,23 155:21 168:25 275:3, 10,14

**spoken** 134:15

**spot** 254:24

**spots** 255:2

**staff** 101:6

**Stamp** 36:21 60:12

**Stamped** 70:3 124:7

**standing** 94:4,5,18 106:1,3 118:16 121:1 130:15 131:22,23 132:1,3 145:6 185:3 187:7 194:13,15,20,23 195:20 196:11 199:5, 21,25 200:21 201:6,9 203:7,13 207:23 211:13 212:20 222:25 224:8 225:12,19 226:8,13 227:5 228:25 230:10 232:21 234:20,22 237:1,7,23 238:8 239:4, 19 240:7,11 242:3 243:8 244:23 248:2,3 249:7 251:1,11 252:16 253:12 254:15 255:8,9, 17,23 256:5,7,10,18 263:1 269:12 273:8 287:21 296:16

**stands** 193:6 296:15

**staring** 63:4

**start** 118:22 178:14 217:3 247:10

**started** 9:11 12:2 13:7 79:1 81:24 110:18 268:24

**starting** 170:14 207:13 218:21

**starts** 170:15

**state** 4:13 5:16 35:22, 23 60:25 61:17 78:24 87:23 215:25 216:2 294:21

**stated** 37:24 210:14 285:4 286:11

**statement** 136:14 137:25

**statements** 45:24 46:2 263:18 276:9 297:19

**states** 37:9 60:20 61:7, 20 62:5 65:15 70:5 103:4 104:9 136:21 140:6 212:5 215:5,12, 14 218:7,10 272:16

**stating** 197:12 285:13

**status** 60:21

**stay** 287:7

**staying** 112:9

**steal** 280:20

**stealing** 56:21 139:18 140:1 280:15

**step** 88:11 172:13 201:20

**step-by-step** 145:2

**stepped** 201:18

**steps** 90:17 114:22

**stereotype** 171:12,16

**stipulate** 298:15

**stipulated** 298:14

**stipulation** 297:12 298:9,24 299:6

**stolen** 298:21 299:5

**stop** 228:4 263:19

**stopped** 9:11

**store** 9:10,17,19 13:25 14:11,15,24 15:11 17:10,25 18:11 19:4 21:19 23:17 26:1,11 27:2 28:21,23 29:3 31:12,18 33:16,18 37:17 38:24,25 39:8 44:15,24 45:2,14 46:6, 10,21 47:2,12 50:4,23 51:8 53:22 54:3,15 56:4,15 57:21,23 58:14, 25 59:16 60:25 66:5,22 71:17,24 74:24 76:5,16, 22 77:2 80:8 81:12 82:11,13 83:12 91:11 92:18 93:17,20 96:8 97:24,25 98:11,19 99:5, 12 100:6,9,10,17 105:11,12 107:6,9 108:12 112:18 121:8 123:25 124:11,15 127:13 130:10,23 131:14,19 132:11,15 134:14 137:6,10 138:3, 25 139:20 143:2,14 145:15 146:18,20 147:18 148:13 149:8 150:4 151:22 152:7,12 154:5 156:15,16,19,25 157:5,21 163:24 166:3 167:2,24 168:10 172:21 174:24 183:19 184:9, 14,17,18,22 185:7,15 188:7 190:13,19 191:17 203:21 208:5,8 212:2,7, 23 213:9 216:8 219:14 233:20 240:16,21 241:1,23 242:14,23 243:12 247:7 249:6,7 250:12,18 251:3,10 252:8 256:6,14 257:10, 23 259:6 260:12,21,25 261:20 264:22 266:7 267:6,18,23 268:2,11 269:21 270:6 271:19,23 272:22,24 276:22,23 278:5,22 279:1 280:6 281:16 282:10,21 286:3 288:21 291:7 292:5 294:21 296:1

**store's** 138:9

**stores** 290:21

**story** 134:20 247:12

**straight** 40:18 75:9

**Straighten** 112:8

**stress** 45:19

**strike** 7:8 27:17 33:5 75:22 77:17 85:6 88:25 95:17,21 131:6 138:19 151:5 164:16 172:7 174:22 231:22

**struck** 143:15

**study** 171:25

**stuff** 74:12 92:18,21 100:9,10 205:25 216:3 272:6

**stupid** 206:3

**style** 165:7,8 169:12

**styles** 64:8

**substantive** 298:6

**substituting** 283:4

**sued** 27:25

**suggestions** 285:14

**summarizing** 274:11, 14 276:8

**summary** 275:19

**summer** 22:15 23:6 290:10,15

**summertime** 22:15

**super** 30:17

**supervise** 25:17,19,24

**supervising** 26:7 41:3, 14 42:2 109:5 138:10

**supervision** 26:14 138:13,16

**supervisor** 13:10,11, 19 14:4,11 15:17,19 16:14 17:3 18:8 19:15 25:19 40:22,23,24 41:1 42:5,10 108:11 141:2 155:21 230:23

**Supervisors** 25:25 26:7 157:10,11

**support** 63:18

**supported** 231:3

**suppose** 37:2

**supposed** 63:21 76:21 204:21 213:17 231:22

**surprised** 250:7,8

**surrounded** 78:13,15

**surveillance** 27:13 37:22 46:21 94:15 95:2

153:6 154:2 177:6 238:20 240:7

**sustained** 11:14

**swear** 4:25

**sworn** 4:24

**Sycamore** 18:6

**symptoms** 265:4,11 266:16,24

**T**

**tactics** 62:24 63:9 127:8

**takes** 207:7 208:12

**taking** 106:21 112:21 125:23 176:16 208:3 243:19

**talk** 35:9 36:16 50:19 97:4,7,8 118:1 121:2 135:25 136:6 145:4 153:18 158:2,11,15 162:16 167:13 173:9,10 232:12 241:20 274:4,6

**talked** 59:17 105:18 132:20 135:10 285:11 288:1,4,9

**talking** 27:9 32:10,14, 22 49:8 79:24 81:15 98:8 100:11,13 106:4 119:8 130:18 135:23 167:19 185:20 186:22 187:5 189:13,15 195:23 196:9,12,21,25 198:13, 20 221:2,10 224:24 225:16 226:4,16,19 230:1 232:7 234:20,23 235:5,9 236:10 238:11 239:17 240:8 246:18 247:4,9,10 248:7,8 249:1 293:1

**talks** 146:11 149:11 172:10 266:15

**tall** 30:22 31:3,6 181:15

**taller** 181:17

**tape** 262:3,7 263:22 264:19 265:1 266:13,20 267:1 268:19 269:6,18 270:12,21 272:1

**taunting** 74:11

**techniques** 125:23 238:15,16

**technology** 263:19

**telephone** 105:12,13

**telling** 33:21 52:19 69:14 75:24 81:18 99:8 103:3,7 106:5 109:2 124:9 127:24 129:13 142:16 195:11,19 196:17 197:22 199:11, 14 208:18 209:15 217:7 227:16 230:11,17,25 232:3,5,22 241:19 244:6 247:2,13 268:12 270:1 271:16 272:4 274:3 279:5 293:10

**tells** 57:17 72:18 81:6 113:24 117:16 142:11 159:7 172:5 213:15 230:14 262:4 268:21 269:8

**ten** 9:25 19:10,12,18 20:20,21,23 59:1 99:6 130:10,11 146:15 150:12 218:24 240:16 289:25 290:7

**ten-minute** 89:6 132:11

**term** 133:13

**terms** 59:17 61:22 65:6 66:17 90:9 137:2 162:10 180:15 297:20

**testified** 5:8 35:8 86:20 112:22 114:8 151:17 172:24 175:25 195:6 196:16 199:10 209:9 217:1,10 220:5 240:5, 15 249:10 264:7 278:15 292:8,25 293:2 294:1 296:22,23 297:21

**testify** 259:1 274:24

**testifying** 5:21 7:9 137:4 223:18

**testimony** 4:25 5:24 7:24 35:13 42:8 43:8 45:20 69:19 77:5 79:11, 18 80:17 82:4 87:10,18, 23,25 88:2,8 107:1 112:16 142:7 172:20 208:16 210:8 217:23 220:1 227:19 240:24 249:17

**Thailand** 83:18,22

**theft** 21:16 37:16 44:16 45:2,15

**thing** 42:25 55:25 56:6 100:3 187:19 197:22 218:21 258:13 262:13 268:24

**things** 8:2 36:19 120:5, 9 124:19 128:22 135:13 145:17 160:6 162:1 177:7 244:9 245:20 261:25 268:25 272:5 291:7

**thinking** 31:2 225:25

**thought** 21:11,12 88:23 169:12 221:18

**threat** 122:13 231:11

**threatened** 92:11,12 122:18,20 123:1,2,6,9 127:11,12

**threatening** 63:4 93:10 282:2

**threats** 128:4,18,19

**threw** 268:24

**throw** 92:18 100:9,10 130:8 203:5 205:25 229:4

**throwing** 92:21 226:18 261:25 268:25 272:6

**thrown** 100:17

**THURSDAY** 4:1

**tight** 289:14

**time** 4:11 9:24 13:13 14:23 15:19 16:2,6 22:12 27:1 29:9,25 30:8 32:5 33:17 36:12 43:15 45:12 46:6,16 50:4 52:4 53:24 57:15 66:1,3 70:23 78:24 81:7 83:13 84:14 88:20 90:18 91:14 93:7,12 94:10 95:10,24 96:7 98:7 103:20 104:22 105:4 107:25 110:7 112:17,24 114:15 118:1 121:11 124:20 132:5,10 135:20,24 144:10 149:13,21,23 152:18 155:13,25 156:6 157:1 162:4 168:11 172:21 176:1 183:20 186:14 187:1,5 188:11 189:17 194:18 195:7 198:13 201:4,12,17 202:9 206:25 209:1,3 226:8 227:24 228:11 231:10 232:18 233:15,24 237:20 240:16 241:14 250:4 251:2 257:15 258:20 267:5 270:3 276:14,22 280:22 287:20 289:10 290:2,3, 25 291:2 292:4 293:3,9 297:8,21 299:21

**times** 7:24 19:1,3,12,18 20:20,21 21:18 23:8,12, 15,16 24:5,9 29:16,19 30:2 35:7,16 49:8 50:23,25 51:7,9,10,14 52:2,3 148:5,6 175:21 176:7 245:16 276:11,23 277:19 280:5

**Timothy** 16:2 83:15,17 100:20 102:5 223:23 224:7 225:20 241:14,15 251:25 253:11 263:1,4, 11 283:11

**Tina** 35:5 57:7

**title** 169:17

**today** 23:8 30:1 40:1 43:13 57:14 62:19 64:1 110:21 141:5,6 169:1,3 285:3 288:5

**told** 25:2,6 33:17 38:16 45:11 49:22 52:12 57:22 58:16 66:11,21 67:1,3,19,22 69:25 73:16,22 74:6 76:4,11 78:8 79:5 80:1 81:21 93:16 95:25 98:8,18,19 104:6 105:22 110:4 131:5,6,7,8,9 132:5 134:5,8,23,25 135:3,5 136:6,22 138:7 143:2 144:23 150:18 151:1 154:13 158:13 167:10

174:6,23 195:8 196:16 210:1,2,20 212:1 216:4 218:17,18 231:23 241:14 263:13 268:22 270:5 271:22 272:21 273:6 274:14,17,19 275:4 276:21,23 278:12 294:2

**Tom** 124:11

**tone** 62:25 99:22 114:24 125:8

**tonight** 174:24 277:2

**top** 178:9 234:19

**total** 9:25 51:14

**tough** 120:13

**track** 148:14,17,20

**traffic** 17:17 54:3,5

**trained** 24:23,24 55:20 62:3 85:22 139:14 159:16 160:12 161:1,5 164:8 171:21 209:4,6,8, 10 213:12 281:10 296:1

**training** 12:3,4,5,6,12, 14,17 13:2 19:21,24 20:1 25:16 54:8,10,12, 25 55:8 86:2,10 89:17, 21,25 109:19,21 110:8 111:23 112:23 113:2,4, 24 114:12,21 116:11 118:17 119:18 122:2 124:3,8,16,17 125:17 128:12,15,17 133:15 139:12 158:24,25 159:13,20,23,25 161:13,16,20 162:6,8 164:5 170:20,24 171:2, 25 175:13 211:25 212:5 281:20 285:4 295:6

**transcribed** 45:21,22

**transcript** 297:16,24 298:6,11,17

**transferred** 156:2

**transform** 86:6

**transmitting** 203:23

**treated** 172:4

**treating** 109:17

**treatment** 162:2 198:15

**trespassing** 21:3,5,9 37:18 39:1 40:3 44:13, 14 272:19,25 273:3 277:3,15,21 278:3 279:17 280:7,8,10,14, 21

**true** 29:11 34:11 38:11, 13 40:19 42:6,20 43:14 44:9,21 46:2,10 49:20 53:18 54:9 56:16 61:11, 13 63:9,18 64:18,24 65:1,24 66:9,18,19,22, 25 67:5,6,13,17,23 68:11 69:12,13 71:8,12, 18 72:7,11,24 73:5,14 74:2 75:11,12,14,25 76:15,17 77:24 78:16, 17,19 79:8,16 81:15 82:1,15 83:7,8 84:23 85:7,20 86:2 87:7 88:13,17,18 89:22 90:24 91:4 93:11 94:8 106:17 107:9 108:23,24 109:1 112:1 118:25 119:6,10 122:4,8 123:7, 15 127:21 128:2,6,9,13, 17 136:8 138:10 140:11 168:12 172:24,25 173:1 183:20,23 185:16 186:5 187:3 189:13 190:8 192:8,15,20 193:16,25 194:3,11,15 195:9,10 196:9 198:2,8 200:22 201:7 202:7,10,18,19, 21,24,25 203:2,15,19, 20 204:9 206:6 207:17, 21 212:8 213:13 214:5 215:1,8,11 216:16,18, 20 220:2,3 221:3,13 222:16 223:3 224:10,14 225:14,17,18,20,21,24 226:10,11,12,19 227:6, 22 229:2,3,8,9,24 231:12,13,16,17,24 233:5,21,25 234:20 235:7 236:21,23 237:14,16 238:9 239:7, 8,10,11,13,25 240:8,12, 17 241:7,8 242:14,15 243:4,7,9,10,12 244:10, 11,12,13 245:24 248:12,17 249:3,8 250:12 251:15 252:18 255:9,18 257:3,4,11,13 262:17,21 263:1,2,5 264:2,5,9,22 265:24 267:22 268:8,12,16,17 270:18,24 272:6,7,9,25 273:1,4,11,17,18 277:15,16 280:12 281:21,22 283:23 289:25 290:10,11 291:3,9,17 292:2,6,11, 14,20,23 293:2,6,22 294:2,5,6,23 295:1,7,8, 10,13 296:11

**truth** 5:1,2 112:21

**truthful** 5:25

**truthfulness** 297:19

**Tuesday** 44:7

**turn** 35:5 262:9

**turned** 196:3 200:3 273:24

**turning** 196:8 200:5 225:22 226:9 228:18 244:14

**turns** 196:6 245:16 246:18

**two-minute** 284:3,6

**type** 86:13 158:25 161:21

**types** 286:24

## U

**Uh-huh** 20:24 26:25 53:12 149:24 177:8 179:20 181:1 202:4 239:16

**unable** 70:6 71:4 126:2 203:18 216:6

**unattended** 223:6

**unavailable** 298:12

**uncovered** 59:3 96:10

**understand** 5:22 6:1, 24 7:8,16,17,21 8:4 13:24 24:2 28:16 35:15 45:8 59:19 61:20 65:8 67:12 81:8 106:7 109:15 115:4 116:21,25 139:12 140:8,13 165:16 171:6,12 204:25 205:8 213:12 216:20 244:8 257:8 259:25 275:13

**understanding** 55:5,6 56:1 59:12,16 106:8 115:2,9 119:22,25 121:24 129:4,7 142:22 143:1 154:15 215:13

**understood** 7:19 205:7

**unhappy** 119:24 238:17 295:7,16,18 296:19

**Uninjured** 44:2

**unmatched** 86:6

**unreasonable** 140:2

**unsafe** 140:3

**unsatisfied** 119:24

**upper** 249:8

**upset** 75:14,21,23 76:15 78:18,25 79:1,3, 16,21,22 80:1,3,4 81:24 82:4 90:17,20 91:17 114:22 116:16 119:24 198:24,25 211:21 236:7 239:25 243:24 245:20 296:7

**USC** 9:20

## V

**V2** 128:13

**vaccination** 60:21

**vague** 34:13 35:20 48:17 72:13 86:17 87:1 114:17 118:20 121:11 155:16 159:3 161:8 162:12 164:20 204:16 285:18,20 286:1,22 287:13 290:18

**values** 165:6

**varies** 101:10,11

**variety** 64:8

**vendors** 60:23 61:7

**verbatim** 6:15
**Versus** 4:11
**vicinity** 287:22
**video** 27:13 37:22,24 46:21 47:5,9,17 48:2 74:16 94:15 95:2 102:9 126:2 144:6 153:5 154:1 177:6,15 178:8, 22 179:14 180:19 182:1,11 183:1,14 184:6,24 185:13 186:11 188:4,22 189:1 190:5 191:14 193:9,21 194:7 196:1 200:20,21 201:1, 25 202:13,14 206:21 207:4,10 211:16 219:11 220:16 222:22 224:5 226:24 229:15 233:8,17 234:8 235:3 236:18 237:4 238:19 239:1 240:2,7,19 241:11,25 242:9,18 243:17 245:14 246:9 248:22 250:1,23 251:7 253:7 255:5,15 256:1,23 259:17 260:21 261:1,22 263:3 267:5,9, 13,20 268:6,16 269:11 273:15 296:15
**videos** 101:25
**view** 120:6
**views** 165:7
**violation** 68:4 295:18, 19
**violence** 20:15 122:13 123:4,5 127:25 128:8, 18,19 231:11
**violent** 93:10 130:1 229:7
**violently** 127:11
**visible** 183:7
**voice** 63:5 99:22 125:3, 6,8,21
**volume** 15:11 128:13

**W**

**wait** 35:22 40:25 108:13 127:12 182:8 203:11
**waiting** 247:15 257:1,6
**walk** 186:1 211:19 212:11 251:10 255:21
**walked** 145:24 167:6 190:10 201:20 212:3 228:23,24 239:25 255:21 273:19,24 288:20
**walking** 59:3 96:24 192:4 194:2 211:19 220:25 224:10 233:5,24 245:23,24 255:18 269:15
**walks** 208:1 223:25 252:15
**Walmart** 8:14,18,22,25 9:4
**waned** 290:16
**waning** 290:14
**wanted** 42:25 67:21 89:15 98:5 103:3 135:5, 10,20 168:9 170:1 173:20 178:14 209:23 212:1 261:5 265:20 277:2
**watch** 74:16 94:15 102:9 104:16 146:25 185:11 186:1 188:25 248:19 253:10
**watched** 46:21 95:2 154:2 187:20 267:5
**watching** 79:25 99:13 150:4,6 187:8,10 199:22 200:1 224:14,16 226:17 236:11 248:20 251:17,21 252:17 253:12,18 260:11
**wave** 221:18
**waved** 189:20,21 222:10
**waves** 222:3
**waving** 187:2 221:16
**ways** 282:4 287:2
**weapons** 264:1,2
**wear** 40:17 42:20 54:15,20 55:10 59:18, 22,24 60:5,21,24 61:8 62:14 65:4,8,9 69:1,15 70:6,16 71:4,18,25 72:4 74:11 102:12 103:5 118:4 161:17 175:17 197:10,11 208:7 209:16 210:1,24 213:16 271:15,22 293:6,11,16, 18 294:10
**wearing** 46:11 52:15 55:1 57:20 58:6,17 62:9,17 63:12,23,24 66:6,20 68:10,18 70:2 76:12 83:6 84:21 96:15 103:8 104:10 123:14,19 175:17 179:23 192:10 213:4,18 217:13 218:12 231:23 233:25 236:16, 20 246:14 249:20 278:16 290:22 291:13 295:1
**week** 95:11 110:10 113:19 269:22 272:22 276:12
**weight** 30:20 181:11 184:12
**welcoming** 86:1,9 212:7
**well-being** 85:20
**wheelchair** 159:10
**wife** 111:10
**windows** 150:5
**witness'** 298:11
**woman** 102:22 192:1 224:8 225:19,22,25 226:7 232:25
**word** 50:10 61:9 81:25 109:3 160:22 175:9 197:23,24
**words** 73:12 80:5 88:24 106:21 135:7 137:1,6 254:13 294:16
**work** 6:20 8:12,22 15:12 26:21 27:23 28:14 37:13 47:21 77:2 101:2 141:6 165:7 171:25
**worked** 8:18 9:7,13 10:4 17:13 22:8,12 26:17 28:13,14 29:25 34:10 39:5,15 109:16 138:12 163:5
**worker** 159:16
**Worker's** 6:11 7:1 11:13
**Workers** 11:8
**working** 8:6,15 12:2 13:7,17 17:24 40:6 47:20 48:4,7 53:25 56:2 60:22 67:1 91:6,7 100:20 107:23 108:5,10 110:21 138:16 141:5 148:6 155:13,24 157:1, 5 158:6 163:23 166:1 186:16 190:15 205:10 282:11,21,23 283:25 292:1
**workplace** 11:14
**works** 48:3 252:6,11
**world** 165:7
**worst** 263:20
**wow** 9:12
**written** 25:9,12,14 141:18
**wrong** 110:5

**Y**

**year** 11:23 16:20 21:22 22:13 71:2 157:19 252:9
**years** 6:9 7:4 8:7,23 9:9,23,25 18:8,19 34:10,21 83:19 107:24 108:6 149:10 163:5 164:5 251:23
**yell** 125:15
**yelling** 77:14 124:21 125:2,13 143:17,25 254:12 273:20,22 276:16
**yellow** 117:10,11
**yells** 276:19
**you?'** 125:4,7
**young** 83:20,21 241:15