# EXHIBIT R

# Deposition Transcript

Case Number: 2:23-cv-01788 FMO-AGR

Date: October 27, 2023

In the matter of:

# BURMAYAN v CVS PHARMACY, INC., et al.

## GUY GARCIA

CERTIFIED COPY

Reported by:

Elizabeth Greiderer
CSR No. 10566

Steno
Official Reporters

315 W 9th St.
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: FIRM #108F

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ANOUSH BURMAYAN, )
)
Plaintiff, )
)
vs. ) Case No: 2:23-cv-01788
) FMO-AGR
CVS PHARMACY, INC., a )
corporation doing business )
in California, GUY GARCIA, )
an individual, JOE JOHNSON, )
an individual, CITY OF )
GLENDALE, Officer JAMES )
ROSS #22471, individually )
and as a peace officer, )
Officer GRIFFIN ARMENDARIZ )
#27999, individually and )
as a peace officer and )
DOES 1-10, )
)
Defendants. )
____________________________)

VIDEOTAPED DEPOSITION OF GUY GARCIA

GLENDALE, CALIFORNIA

FRIDAY, OCTOBER 27, 2023

9:58 A.M.

Reported by:
Elizabeth Greiderer
CSR NO. 10566
Job No. 741345

VIDEOTAPED DEPOSITION OF GUY GARCIA, taken on behalf of the plaintiff, at 655 North Glendale Avenue, 17th Floor, Glendale, California, at 9:58 a.m., Friday, October 27, 2023, before ELIZABETH GREIDERER, CSR No. 10566, a Certified Shorthand Reporter in and for the State of California pursuant to Notice.

* * * *

A P P E A R A N C E S

FOR THE PLAINTIFF: ANOUSH BURMAYAN

MKRTCHYAN LAW
BY: NARINE MKRTCHYAN, ESQ.
P.O. Box 2288
Toluca Lake, CA 91610
narine57@gmail.com

FOR THE DEFENDANT: CVS

PAYNE & FEARS LLP
ATTORNEYS AT LAW
BY: LEILANI E. JONES, ESQ.
4 Park Plaza, Suite 1100
Irvine, CA 92614
llj@paynefears.com

FOR THE DEFENDANT: CITY OF GLENDALE

CARL ARIAS, CITY ATTORNEY
613 East Broadway, Suite 220
Glendale, CA 91206
carias@glendaleca.gov

Video technician: Narine Mkrtchyan

# I N D E X



| DEPONENT | EXAMINATION | PAGE |
|---|---|---|
| GUY GARCIA | BY MS. MKRTCHYAN | 4 |
| GUY GARCIA | BY MR. ARIAS | 270 |

| EXHIBITS | DESCRIPTION | PAGE |
|---|---|---|
| | (None) | |



Q U E S T I O N S M A R K E D

(None)

I N F O R M A T I O N R E Q U E S T E D

PAGE LINE

(None)

GLENDALE, CALIFORNIA, FRIDAY, OCTOBER 27, 2023

9:58 A.M.

* * * *

GUY-ANTHONY GARCIA,

called as the deponent by the plaintiff, having been first duly sworn, was examined and testified as follows:

09:58 EXAMINATION

BY MS. MKRTCHYAN:

Q Okay. So good morning, sir.

A Good morning, ma'am.

Q Please state and spell your full name for

09:59 the record.

A My name is Guy-Anthony Garcia, G-u-y, hyphen, A-n-t-h-o-n-y, Garcia, G-a-r-c-i-a.

Q Have you ever been known by any other names?

A Well, my family calls me Tony.

09:59 Q Okay. So that's just, you know, smaller or --

A Short for Anthony.

Q -- short for Anthony, yes. Okay.

And describe yourself for the record.

09:59 How tall are you?

A With shoes six feet, without shoes 5'11".
Q Okay. And how much do you weigh as of right now?
A Last time I checked myself I weighed 285.
Q Okay.
A I could have gained weight, I don't know; but as last time I checked it was 285.
Q And at around -- in 2021 was it about the same height or weight, weight?
A No. I'd say it was like maybe 3, around that time 3, 3.
Q 300?
A Yeah.
Q Okay. And for the record, what is your race?
A I am Hispanic.
Q Okay. Have you ever been deposed previously?
A No.
Q Never testified? Never --
A I testified in court.
Q You did?
A Yeah, for CVS.
Q So that was in connection of another lawsuit in CVS?

A It was in connection with a gentleman spitting in my face, and trying -- and took at swing at me and tried to hit me in the face.

Q So you were a victim of an assault --

A Yes.

Q -- at work?

A Yes.

DEPOSITION OFFICER: Hold on.

I'm going to ask you to allow her to finish her question --

THE WITNESS: Okay.

DEPOSITION OFFICER: -- before you start speaking. Okay.

THE WITNESS: Okay. Sorry.

DEPOSITION OFFICER: That's okay. I'll remind you.

BY MS. MKRTCHYAN:

Q Yes, and I'm also going to give you some ground rules for today.

10:00 As you can see we have a Elizabeth taking down verbatim everything we say and do today -- or say basically. So what we request, you know, for you to do is to let me finish my question. Sometimes I'm going to be pausing between trying to, you know,
10:01 articulate my question. Then you might want to pause

before answering for your attorney to make an objection.
A Uh-huh.
Q From time to time she may make objections,
10:01 but of course those objections are for the record. Unless she instructs you not to answer you have to provide an answer.
But just basically give a pause. Let me finish my question, and pause and then answer the
10:01 question.
You understand that?
A Yes.
Q Then another rule is that because she has to take everything, you know, down she cannot take down
10:01 any inaudible responses. When you are nodding your head she cannot take that down.
A Uh-huh.
Q So you would have to provide an audible response -- yes, or no or I don't know -- for her to
10:02 take it down. Okay?
A Okay.
Q Now, another thing is that sometimes I will be asking you to provide, you know, information based on your best recollection of events. Okay. You may
10:02 not necessarily remember everything, like exact

estimates or exact numbers, et cetera, there's no need for that; but you can provide, based on your knowledge and -- knowledge -- personal knowledge the best answer, the best estimate for the question.
10:02 Okay.

So, like, for example, if I ask you to provide me distances you can provide your best estimates based on your training and experience.

Okay?

10:02 A Okay.

Q You understand?

A Yes.

Q Okay. You're testifying under oath under penalty of perjury. So all the, you know,
10:02 requirements for testimony under oath and all the penalties of perjury in case, you know, you testify inaccurately or, you know, falsely will inure to this case.

DEPOSITION OFFICER: Will what? I didn't understand you.

MS. MKRTCHYAN: Inure, inure -- apply, will apply to this case.

BY MS. MKRTCHYAN:

Q Okay. So you were talking about you testifying as a witness.

Was it a criminal case, you went to court in criminal court where you were assaulted?
A Yeah, I believe it was.
Q I see.
How long ago was that?
A About two years ago.
Q Okay. Was it about 2021?
A No, I'd say about '22 -- yeah, about 2021, yes.
Q Okay. And did you call the police in connection with that incident?
A Yes, I did.
Q Okay. So you called the police. The police responded. And they arrested the individual who assaulted you.
A Yes, they did.
Q Okay. And in that connection you went to court to testify as a witness.
A Yes.
Q Okay. Do you know what happened to that case; is it still pending in court?
A No, it's not. He got like anger management. I didn't -- you know, I didn't want him to go to jail I just didn't want him coming back to the store. So he had to -- he got anger management classes. And he

got banned from the store. And he has to stay a hundred feet away from me.
Q I see.
So there is a restraining order in connection with that?
A Yes.
Q Okay. Were you working nightshift in that case?
A Yes, I was.
Q Okay. And at the time were you the chief supervisor?
A Yes, I was.
Q And during that incident did you know this person prior that occasion -- on prior occasion?
A No, I did not.
Q And on that incident did you request the police to arrest him?
A Yes.
Q And did you request the police to ban him from the location?
A Yes, we did -- yes, I did.
Q Okay. Is there any training, specific training, and policy that you got from CVS about calling police -- on what kind of issues you can call the police?

A Not really that I can -- I can remember.
Q Uh-huh.
A But my -- my boss says that, you know, if anybody comes in that tries to assault you or attempts to assault you, that yells and screams or causes any problem in the store call the police, and have them escorted out and banned from the store.
Q Uh-huh.
And your boss is who -- who is your boss?
A At the time it was Aaron.
Q Aaron?
A Yeah. I don't remember his last name.
Q Okay. That's a manager, right?
A That was the store manager at the time.
Q Is that Aaron Silva?
A Yes.
Q Okay. So we have -- how long have you been working for CVS pharmacy?
A In -- March 3rd it'll be six years.
Q Okay. And so you were hired in 2018?
A Yes, March 3rd, 2018.
Q And prior to that where were you working at?
What was the most recent job prior to that?
A I was working in a security company. I was the security guard at that CVS.

Q Oh, okay.
So you were working as a security guard?
A As the security guard for that CVS, but I was with a security company.
10:06 Q Gotcha.
And was this the same CVS at 3943 San Fernando Road?
A Yes, ma'am.
Q Okay. How long had you been working as a security guard in that location?
10:06
A If I remember correctly I'd say about nine, nine months.
Q Nine months.
So you basically were -- did you receive like some sort of a training in security issues as a security guard?
10:06
A For CVS, no.
I was just -- the company I was working for sent me to that, because it was a full-time post.
10:07 Q Right.
So -- and what company was that?
A I could not -- Sterling Silver I think it was Sterling -- it's Silver Security.
Q Okay.
10:07 A Because the building is right next to the --

to the mall.
Q Glendale Galleria?
A Yeah. It's right next -- it's right next to the parking structure of Glendale Galleria.
10:07 Q Okay. So how long -- as a security guard you worked for only nine months?
A I would say nine months to maybe a year if I remember correctly, yeah.
Q Okay. And did they provide you with some
10:07 sort of a training as a security guard?
A No. They just said -- when I got there they just said that I had to walk the floor, keep an eye on the customers. And if the customer needs assistance to assist them. They gave me a shirt that
10:08 said Customer Service Embassador.
Q Uh-huh.
A And I had to help the customers. And I had no idea about what -- about the store, but I learned quickly.
10:08 Q Sure. Sure.
So and then -- so what made you move to work at CVS?
A Well, one day I was doing my work and Aaron, the store manager, walked up to me and said, "You
10:08 know, Guy, all the other managers here they say they

like the way you work and the way you treat our customers. They asked if I can offer you a position." So he offered me the position as shift supervisor for the overnight shift.

10:08 Q I see.

So you basically, you know, shifted from Sterling Silver, the security company, to work for CVS?

A Uh-huh.

10:09 Q You were not terminated from security company?

A No, I was not.

Q Okay. Prior to that assignment, work as a security guard, what did you do?

10:09 A I wasn't really -- at that time I wasn't doing anything, because I was homeless.

Q Okay. I'm sorry.

And how long you were homeless?

A About a year.

10:09 I was living with my -- my ex-wife at the time. And she just kicked me out so I had nowhere to go. And I was living in Azusa.

Q Uh-huh. Azusa.

Okay. Were you receiving any government aid

10:09 at the time?

A I was receiving GR.
Q General relief?
A Yeah.
Q Okay. And so basically no shelter, you didn't have any shelter?
A No. I was -- there was a church where I was staying that let me sleep in their trash area; it was clean, they set up a little bed for me and stuff.
Q So for a year you were homeless and living in Azusa?
A Yeah.
Q With no -- with no other income other than general relief?
A Uh-huh.
Q Okay. During that period of time ever did you have any encounters with law enforcement?
A No.
Q So you were not doing drugs?
A No.
Q No law enforcement contacts --
A No.
Q -- arrests or --
A No. I've never done drugs -- well, I can't say that. That would be a lie.
Q Okay.

A I did smoke weed before.
Q Sure.
A But when my sons were born --
Q Uh-huh.
10:10 A -- that's when I said no, I stopped.
Q Right.
So you have children?
A I have two sons.
Q How old are they?
10:10 A 38 and 28.
Q Uh-huh. And at the time when your wife, ex, kicked you out, what did your sons were doing -- I mean where were they living?
A My older son was living -- had his own apartment. 10:11 He was working as a chef so he had his own apartment. And my younger son was living with his grandmother.
Q Uh-huh.
A And -- but they were there.
10:11 So she let me stay there --
Q Uh-huh.
A -- because I was living with my sister at the time and they wound up moving to Wisconsin.
Q Uh-huh.
10:11 A And they didn't take me with them. I was

mad, but now I'm okay. But, yeah, they didn't take me with them so I wound up moving over there.
Q Uh-huh.
A And my ex-wife and I got in an argument over something and she kicked me out.
Q I see.
A So that's how I wound up homeless.
Q Did you get a formal divorce?
A Oh, we were officially divorced, yes.
Q You were. Okay.
That was filed in court?
A Yes, the first time we filed for divorce it didn't go through for some reason, I have no idea why.
Q Uh-huh.
A But then her and I got together and we went -- we officially got it done.
Q Uh-huh.
A And as -- I believe as of 20- -- 2019 or 2020, I don't remember the actual year, but it's official. It's now official, we are officially divorced.
Q I see.
And no custody or property issues?
A No. Our sons were always full grown adults

already.
Q So you had an official divorce in 2019?
A Well, let's just say end of 2019 beginning of, so I can't actually remember what year.
10:12 Q And that was the time she kicked you out?
A No. I was -- I was there for like maybe a year.
Q Uh-huh.
A And, you know, she -- her and I just didn't
10:12 agree on something and she, you know --
Q Sure.
A -- she got mad and kicked me out.
Q That was in 2020, COVID year?
What year was this when you were homeless?
10:13 A This was, yeah, around the start of the COVID.
Q Wow. So you were on top of COVID --
A Wait. Wait. No. No, because I was working. I was already working CVS during the COVID.
10:13 Q Right, because 2018 you were hired.
A Yeah, 2019 -- 2018, yeah, so this happened in 2018.
Q So you were homeless in 2018?
A Yes.
10:13 Q Okay. But you were also working as a

security guard so I'm confused right now.
So 2018 you get hired at CVS, right?
A (Inaudible response.)
Q Prior to that for about, you said, nine
10:13 months to a year you worked as a security guard.
A Yeah.
Q Then prior to that you were homeless.
A Prior to that I was homeless.
Q So then must have been sometime in 2016?
10:13 A No. It was 20- -- 20- -- 20- -- I can't remember the date, but I know it was close to '18, because when I got the job as a security for CVS I was still homeless.
Q I see. Okay.
10:13 A But because of the job I was able to get me a place -- a hotel.
Q Uh-huh.
A So I was able to live in a hotel for like a few -- a few months.
10:14 Q Okay. Gotcha.
So -- all right.
And then, you know, going back to -- do you have any educational background?
A High school.
10:14 Q High school. Okay.

Where did you go to high school?
A Oklahoma.
Q Okay. And so what was your main career prior to, you know, when you were married and et cetera, prior to working as a security guard did you have a career?
A No. No.
Q You didn't work anywhere else?
A I was doing security --
Q Okay.
A -- and different jobs and stuff, trying to keep my -- me and my family fed.
Q Okay. So mostly your jobs were in security?
A In security, yes.
Q And though you never received any formal training in securities, like how to be a security guard?
A We went to the classes to show us, you know, when we get hired, orientation classes and stuff; but actually going to a security class -- the only class I actually went to was to learn about pepper spray --
Q I see.
A -- to get my mace card.
Q Uh-huh. Okay.
So -- but did you ever learn to shoot?

A No.

Q No shooting.

Did you not carry a gun as a security guard?

A No.

10:15 Q Did you carry a baton?

A No.

Q Nothing.

No weapons?

A No.

10:15 Q Except pepper spray?

A Pepper spray yes.

Q So you were doing like low risk --

A Yes.

Q -- securities?

10:15 Like, not like serious -- like, banks and stuff like that --

A No.

Q -- where you have to carry weapons?

A No. I have never -- I worked for a lobby

10:15 that was connected to a bank, but it wasn't the bank security.

Q Okay.

DEPOSITION OFFICER: Just a reminder, let her finish before you jump in.

THE WITNESS: Okay. Yeah. Sorry.

DEPOSITION OFFICER: Oh, no, it's okay.
THE WITNESS: I apologize.
BY MS. MKRTCHYAN:
Q Yes. Okay, you are doing well so far, but yes, thank you for reminder. Okay.
Sir, have you ever been arrested --
A No.
Q -- in your --
A No.
Q Any convictions?
A No.
Q Even as a minor?
A No.
Q Okay. So, you know, flash forward to CVS Pharmacy when you got hired, what was your first assignment there, position?
A Shift supervisor.
Q So from the very beginning you were offered the job as the shift supervisor --
A Yes.
Q -- not as sales associate?
A Shift supervisor, yes.
Q Okay. And that was by Silva, Aaron Silva?
A By Aaron Silva, yes.
Q Okay. And when you started working there

you received training, right, at CVS, formal training?
A Yes. Yes.
Q Okay. Describe to me some of the training that you received there.
What was -- was it did you go to, you know, some meetings or was it online, et cetera?
A When I first got hired I had to go to an orientation, which was in the Burbank store. And they sent us through -- they have video after video watching this. And this is what you do at CVS and, you know, being a CVS employee, and welcoming us and stuff.
The actual training and modules that I had to do is when I started going to the store.
Q I see.
So you were handling modules online?
A Online through the store, yes.
Q Okay. And throughout this period of time while you've been working at CVS, as a CVS employee, were you ever counseled that your performance somehow fell short of the company's expectations?
A Not that I can remember, no.
Q So you were never told that, you know, your performance needs to improve on any area?

A Well, just recently my -- the store manager now --
Q Uh-huh.
A -- Jack, told me that I have to -- to better -- front face the stores a little bit better.
Q Okay. And what does that mean to you?
You know, what did that -- explain to me what he meant by that?
A Well, overnight we have to -- overnight we have to make sure the store is ready, nice and clean, and the shelves are all straightened up and all the merchandise is brought forward to make it look nice for the -- to make it look nice for the next day. Well, he said if I can just detail it a little bit better.
Q Uh-huh.
So detail it meaning organize things?
A Organize, yes.
Q Okay. What about customer service, specifically related to customer service -- customer contact, customer satisfaction?
Did you receive any type of feedback from any of your managers related to performance issues?
A No.
Q What about any customer complaints, have you

ever been told that a customer -- aside from this case, aside from Plaintiff Anoush Burmayan -- have you received any customer complaints?

A I did receive a customer complaint about

10:19 charging her for bags that she didn't want.

Q Okay.

A Which I never did.

Q Okay. How long ago was this?

A This is like maybe last year.

10:19 Q Uh-huh.

A It was like -- yeah, last year.

Q Okay. So in charging bags -- explain to me a little bit further charging bags.

Like what? You know, you charge for bags,

10:19 right?

CVS Pharmacy does charge for bags.

A Ten cents.

Q Right. Ten cents that's the law right now.

So she was saying what, what was the

10:19 allegation there?

A Apparently she said that I charged her for bags that she didn't get. I gave her one bag. And I didn't even charge her for that.

Q Uh-huh.

10:20 A And she came across -- she told Jack that I

was -- that I charged her for more than one bag. And -- and when Jack came to me he said -- he told me that this lady is -- she's saying that you overcharged her and stuff.

10:20 Q Uh-huh.

A So he said, "We really don't get anything for the bags so just don't charge for the bags at all."

Q Uh-huh.

10:20 A Just give the bags to the customers.

Q I see.

Okay. So let me just -- is there any other customer complaint that you have been advised of?

A That I can remember, no.

10:20 Q How long ago was that you said?

A Last year sometime.

Q Okay. Did you receive any other -- well, counseling related to that issue.

Were you told that, look, you know, you can maybe improve your performance in some way along that issue?

10:21

A No.

Q Okay. How about in this incident, were you ever counseled as related to this case that your performance was not up to the standards --

10:21

A No.
Q -- at CVS?
A No, I was not.
Q Okay. In preparation for this deposition did you review any records?
10:21 A No.
Q Have you ever reviewed -- after this incident have you ever reviewed the video surveillance recordings from this incident?
10:21 A No.
Q You do have video cameras at the store, true?
A True.
Q So do you have access to them, ready access to them, if you go inside the room can you watch them?
10:21 A Yes.
Q Were you ever curious to watch to see what happened in this incident?
10:22 A No.
Q No. Okay.
Did you review any documents in preparation for the deposition today?
A No.
10:22 Q When did you learn of this lawsuit?

A When I got the paper, the lawsuit paper.
Q Who did you get it from?
A Well, it wasn't actually handed to me; it was thrown at me --
10:22 Q Okay.
A -- by the person who was -- who was giving it to us -- giving it to us --
Q Uh-huh.
A -- he -- he asked, "Are you Guy?"
10:22 Q Uh-huh.
A He goes, "Are you Guy Garcia?" I go, "Yes, I am." And he goes, "Well, this is for you." And I said, "I don't want that. I don't know who you are."
Q Right.
10:22 A And he just gave me a look and he goes (gesture made). And he threw it at me.
Q I see.
But you were served -- you understand, you know, you have to be served any legal papers; you
10:23 understand that, right?
A Yeah. I understand that, but he didn't tell me what he was there for. All he just said, "Are you Guy Garcia? Here, this is for you."
Q You were not happy with that that he served
10:23 you with this document?

A Apparently -- I didn't know what they were. I wasn't happy he threw them at me.
Q Sure. Okay.
But other than that did you speak with anyone like Joe Johnson, for example, related to this incident?
A I asked him, you know, "Are you being sued too?" He goes, "Yeah. Yeah. I'm getting sued too."
Q You were surprised?
A Kind of. I was like -- I was surprised because why are they suing us? What did we do, you know?
Q How did you feel about that?
A Really I didn't feel anything about it. I mean I was like -- I was surprised like I said, you know. I wasn't upset about it, or sad about it or anything.
Q Uh-huh. Okay.
A But it just shocked me, like, what did I do, you know.
Q Okay. Uh-huh. Uh-huh. Okay.
So it shocked you in a way that you felt like, you know, you didn't do anything to have caused it?
MS. JONES: Objection. Vague.

You can answer.

THE WITNESS: Well, can you repeat that question. I'm sorry.

BY MS. MKRTCHYAN:

10:24 Q Yeah.

My question is basically you said that I was shocked.

I just want to know -- I want you to elaborate.

10:24 Why were you shocked about this?

The police were called on that date, right?

A Uh-huh.

Q Right.

And so when you called the police you do 10:24 expect that, you know, that the person, the individual gets arrested, true?

MS. JONES: Objection. Vague. Calls for speculation.

THE WITNESS: Well, I didn't know if they 10:24 were going to get arrested or not. I can't actually say, yeah, they're going to get arrested.

Usually when we call the police they come in. To be honest with you, usually when we call the police they already leave.

10:25 BY MS. MKRTCHYAN:

Q Uh-huh.
A The people already leave. If they stay the police come in, they just escort them out. They say, "What do you want do? You want them arrested or what?" No, we just want them banned from the property.
Q Uh-huh.
A But --
Q Uh-huh --
A -- I don't even remember -- I don't even remember what we said about this this young lady.
Q Uh-huh. Uh-huh.
A I have -- I have no idea. I don't even remember what she looks like.
Q Uh-huh.
If I show you a photograph would you recognize her?
A Probably not.
Q No. Okay.
So let me ask you this though: You do have recollection of this incident in general, true?
A Actually, no. I don't remember hardly anything.
Q Okay. So -- but you do remember -- if I show you photographs -- if I show you video

surveillance will you be able to remember this incident?
A I can't say yes and I can't say no, because I don't know. I don't remember.
10:25 Q Okay. So let me do this: You said that, you know, usually when you call the police individuals leave, you know, before the police arrive.
How many times in the ballpark you've called
10:26 the police, like let's say 2020?
A I couldn't even -- I couldn't say.
Q Give me an estimate. I don't need an exact number.
Just in the ballpark, how often on average
10:26 do you call the police right now even?
MS. JONES: Objection. Vague.
THE WITNESS: Well, it's usually -- if I was to call the police it's usually -- let's use per week --
10:26 MS. MKRTCHYAN: Uh-huh.
THE WITNESS: -- or let's use monthly, I'd say like maybe twice a month.
MS. MKRTCHYAN: Uh-huh.
THE WITNESS: If that.
10:26 BY MS. MKRTCHYAN:

Q And what are some of the issues you call the police for?
A If someone comes in and causes -- causes problems, attempts to steel from us.
10:26 Q Uh-huh.
A Usually when they're yelling or screaming at any of the employees we usually call the police to have them escorted out. We ask them to leave first.
Q Uh-huh.
10:27 A If they don't leave then we call the police.
Q Okay. And generally when you, as a shift supervisor, you personally you call the police, right?
A If I'm the one in charge at the time, yes.
10:27 Q Okay. Joe Johnson is in the chain of command higher above you, right?
A Yes, he is.
Q So if Joe Johnson is in the store do you normally go get his approval before calling the
10:27 police?
A Usually we do, yes.
Q So you get these people feedback in calling the -- you don't just do it on your own?
A No.
10:27 Q But do you -- has it ever been situation

when you would tell Joe Johnson, "I'm going to call the police," did he ever say, "No, it's not necessary in this moment -- in this situation."
A I've never told Joe -- told Mr. Johnson "I want to call the police." I ask him, "Do you think we should call the police in this situation?" If he says yes then I will. If he says no then I won't.
Q Okay. In this incident you called the police though, right?
You called the 911 dispatch?
A I don't recall.
Q You don't remember that?
A No.
Q So you have not reviewed any documents, nothing in this, you know, before your deposition?
MS. JONES: Objection. Asked and answered.
THE WITNESS: (Inaudible response.)
BY MS. MKRTCHYAN:
Q No you have not?
A No.
Q Okay. So you have no personal knowledge of what happened in this incident?
A That I can remember, no.
Q So I mean when you got the complaint -- you said that you got the paper served on you.

You read the complaint, right?
A I thumbed through it, yes.
Q Okay. Did that refresh the memory -- by the way, strike that.
10:28 Do you remember when you were served with that complaint sometime?
A No. I don't remember the actual date, no.
Q Not the date, but was it this year?
A No.
10:28 Q Was it last year?
A Again, I don't remember the actual date, or time or year.
Q Uh-huh.
So but when you got it you read the
10:29 complaint, right, curious to know why you were being sued?
A I read through it, not the whole thing. Like I said, I thumbed through it. And then I waited for my supervisor -- I mean for Jack to come in and I
10:29 showed it to him.
Q Uh-huh.
A And Jack told me, "Don't worry about it. Put it in my office. I will take care of it for you."
10:29 Q Okay. But you didn't read the entirety of

the complaint?
A No, not really, no.
Q You weren't concerned with why you were being sued?
10:29 A Not really, no.
Q Okay. So then when you were coming here for a deposition what did you think you are going to be testifying today about?
A I have the slightest idea.
10:29 Q You have no idea?
A Because I don't remember what happened that day, I don't.
Q Okay. So let me go over a couple of issues here.
10:30 So I asked you about your Performance Evaluations, I wanted to go back to that issue.
Were you ever suspended, you know, for performance of any of your job duties?
A Not that I can recall, no.
10:30 Q No. Okay.
So in -- let me see here, so we have what is represented to us Document CVS 0001 for the record. We have Guy Garcia Employee Profile, hired March 3rd, 2018, by Garfield Beach CVS.
10:30 That sounds accurate, right?

You were hired in March 2020, yes?
A Yes.
Q And manager is Marco Gevdzhyan, right?
A Yes.
10:31 Q Also known as Jack.
A Yes.
Q Remember we have to provide audible responses.
A Yes, I'm sorry. Yes.
10:31 Q All right.
So we have -- you know, here we have -- Job and Base Compensation we have three for you.
You started out when you were hired at $14 hourly, right?
10:31 A Yes.
Q And then you received some promotions here and there.
And you right now are at 17.90 an hour?
A No.
10:31 Q What is your current rate?
A Right now I'm 18 -- 18.90.
Q Okay. And, you know, here we have your -- the pay rates, et cetera. So I have effective date February 11, 2013 -- 2023 it says Discussion, you can
10:31 meet approval; but you -- it states there there was

suspension of you in February 11, 2023.
What does that relate to, do you have any idea?
A I have no idea.
10:32 Q Okay. But do you agree with me it does state there was a suspension of -- on February 11, 2023?
A No, I was never suspended.
Q I understand.
10:32 But confirm with me what the document states.
A Yeah, it does say suspension.
Q Okay. And then we have also Employee Attribute. It provides vaccination requirement
10:32 complied.
That means that according to the COVID Guidelines you were vaccinated at the time of COVID, true?
A Yes, I was.
10:32 Q Okay. Now, we have for you -- this is Performance Review for Guy Garcia, as the shift supervisor Aaron de Silva as of April 1, 2019 through May 1st, 2019.
A Uh-huh.
10:33 Q He was your manager at the time, right?

A Aaron Silva, yes, he was.
Q Okay. And we have this performance evaluation for you CVS, Page 6 through 10, 6 through 10.
10:33 For that period it states "Manager Comments: I would like to see Guy complete all of his learned modules within the next 60 days. I would also like to see Guy grow in his role as the overnight shift supervisor and take on a larger role in store by owning the department."
10:33 Do you remember reviewing this Performance Evaluation by manager -- your manager?
A I can't say yes, because I don't remember.
Q When you are going through evaluations do you have to review it with the manager and sign any paperwork?
10:34 A I've never signed paperwork.
Q But how do you become aware of whether your performance meets or does not meet the company guidelines?
10:34 A They would tell us.
Q Okay. So here they have for the rating for this period it says Recommended Rating is needs improvement on various points -- on various performance issues.
10:34

A Uh-huh.
Q Accountability. You know, if you take a look at it it states Rating is 2.2. Accountability needs improvement, Caring needs improvement, Collaboration needs improvement, Innovation needs improvement, Integrity meets expectations.
So we have a variety of performance criteria that for this rating period in 2019 your manager believed that requires improvement -- needs improvement, right?
Do you agree with me?
A Yes.
Q You were not aware of this that -- this Performance Evaluation?
A I said I don't remember it.
Q Okay.
A I said -- I didn't say I wasn't aware of it.
Q Okay. But right now -- you know, because earlier I asked you if you recall -- if you remember were you aware of any performance that fell short of the company guidelines and you couldn't -- you said no you were not aware.
A I wasn't aware. I don't remember, yes.
Q Okay. All right.
So but you really mean that this was a

Performance Evaluation that you did not meet in company guidelines?

A If that's what's on the paper, yes.

Q Okay. And it says Manager Comments further it states that Guy needs to actively seek feedback to learn and grow and respond positive to constructive feedback. Guy needs to take control of his training and really be the best shift supervisor he can be. And to ensure he is meeting the minimum standards that CVS has set up. Right?

Do you agree, did I read that accurately?

A Yes, you did.

Q And Mr. Silva was the one who actually hired you for the job, right?

A Yes.

Q All right.

So now -- and you consider obviously this important, right, that -- here we have another comment by the manager For the Customer Caring: "Guy needs to be sure he's consistently acknowledging customers, immediately checkout and on the sales floor. He also needs to complete assigned tasks accurately, efficiently and on time with minimal supervision."

Do you remember going over this issue with

your Manager Silva?
A I remember him telling me that I need to do a little bit better with working in the store and stuff.
10:36 Q With customers particularly?
A I don't remember anything about customers, no.
Q Okay. Here we have manager's comments on Caring Customer Service: "Guy needs to demonstrate
10:37 my customers behavior to optimize customer experience in store. Guy needs to be sure that while he's the shift in charge he must ensure that the staff is providing the highest level of service for every person that walks into the store."
10:37 Did I read it accurately?
A Yes, you did.
Q Okay. And do you remember going over this specific issue about customer --
A No.
10:37 Q -- satisfaction -- let me finish.
So you don't remember this Performance Evaluation for 2019, April or May of 2019?
A No, I do not.
Q Okay. Since then do you remember going over
10:37 any other issues with your managers about your

performance, Jack or Aaron?
A No, I do not.
Q Okay. So let's continue with some other performance -- okay.
10:38 So we have here in 2021 through -- this is July 1st, 2021, through June 30th, 2022. This is CVS 21 through 25. This is already by Jack Gevdzhyan your other manager, where he has rated you under this Performance Evaluation Rating 2. We have mixed
10:39 performance for you for this period.
Do you remember this?
This is more recent than 2019.
A No, I do not. I have never seen this.
Q So you never went over this Performance
10:39 Evaluation with Jack?
A No.
Q Okay. So let's look at what he has found, some of the criteria that he thinks for you as a shift supervisor. He found that for the criteria
10:39 Customer Service put people first, you know.
We have statement that the company goal is that we are customer obsessed. We walk in others shoes to improve the customer in how they feel. We create an engaging experience where our company
10:40 reflect diversity of our customers.

Do you agree with that statement?
A Yes, I do.
Q And that's one of the company goals at CVS, true?
10:40 A True.
Q And so how -- what are some of the ways we meet this goal to you?
A We have to take care of our customers. We make sure the customers are happy. If they come up
10:40 to -- to our registers and they have an expired tag or an expired coupon -- let's say it expired a couple days, we are told that -- just put it through, make them happy.
Q Right.
10:40 A We got to do our best to make our customers happy.
Q Right.
So customer comes first; is that familiar to you --
10:40 A Yes.
Q -- statement? Okay.
So we also try to minimize any sort of conflicts with them, right?
So isn't it true you are trained to
10:41 deescalate verbally any situations until and such

time it gets violent?

A Yes.

Q So you have to try to talk with customers, right?

10:41 A Yes.

Q And to deescalate situations, right?

A Yes.

Q Did you receive also any type of training to accommodate customers with special needs?

10:41 MS. JONES: Objection. Vague. Overbroad.

THE WITNESS: We've -- we've trained to what -- you know, our modules. We do train with our modules.

MS. MKRTCHYAN: Uh-huh.

10:41 THE WITNESS: Customers with special needs we are -- in fact, if they come in with a wheelchair we help them to the best of our ability. If they come in with crutches or anything like that we do the best to our ability to help them out. We got to make 10:41 sure our aisles are wide enough for wheelchairs to turn in and out of.

BY MS. MKRTCHYAN:

Q Uh-huh.

A Actual gone to classes and stuff about 10:42 training for --

Q Uh-huh.
A -- helping special need people, no.
Q Okay. So but some special needs can be not necessarily physical -- physically visible, true?
10:42 A True.
Q So someone may have a learning or developmental disability, true?
A True.
Q You are aware of that.
10:42 They can have mental health issues, true?
A True.
Q They can have speech disability, true?
A True.
Q You know, so invisible disabilities.
10:42 For example, wheelchair is physical disability, but invisible are others that you don't necessarily see, right, but we have to learn and we have to make an effort to learn, true?
A True.
10:42 Q Are those special needs, to your understanding, does a customer service representative covered by the CVS?
A I have never received training for that.
Q Okay. So if someone comes in and states
10:43 that look, you know, I have a medical disability,

which is not visible to you, okay -- the person is not on wheelchair, not on crutches, you know, it's not visible to you -- what are some of the steps you are trained to do to determine if -- if special needs should be accommodated?

10:43

MS. JONES: Objection. Vague. Incomplete hypothetical.

THE WITNESS: Well, as far as I know if they come in and say, "I need -- okay.

10:43

Let's use our -- this young lady here for example.

MS. MKRTCHYAN: Uh-huh.

THE WITNESS: If she was to come in and tell me I can't wear a mask --

10:43

MS. MKRTCHYAN: Uh-huh.

THE WITNESS: We'd have to ask why.

MS. MKRTCHYAN: Uh-huh.

THE WITNESS: And if she were to say because I have a doctor's note saying that I don't have to wear one. Our next question is do you have that note?

10:43

BY MS. MKRTCHYAN:

Q Uh-huh.

A We have to be able to see the note, see the fact that the doctor said she doesn't have to wear a

10:44

mask. If the doctor says she doesn't have to wear a mask then we're going to come right in no problem.

Q Did you ever have any situation like that with another customer who would come in and say, you know, I need reasonable accommodations for wearing a face mask because of some disability?

A No.

Q Did you ever receive any specific training, what are the steps you need to take in that specific situation?

A We were just told that every person that comes in has to wear a mask.

Q Okay. So your company guideline in 2021 to you was the policy was that everyone who comes in has to wear a face mask?

A Yes.

Q Let's say situation where the customer is not wearing a face mask, what do you do in that situation?

A We have to let them know that they are not allowed in the store without face masks. We even offer them face masks. We have face masks to offer them.

Q Okay. Let's say the person states -- refuses to wear a face mask, according to your

guideline what do you do?
Do you refuse them service?
Are you allowed by the company policy to refuse them service?
10:45 A At that time we were allowed to tell them we can't allow you to come into the store.
Q So you are allowed by CVS to tell them we are not going to serve you?
A Not exactly like that, we're not going to
10:45 serve you.
We were told them I'm sorry if you cannot wear a mask we can't allow you to come into the store --
Q Uh-huh.
10:45 A -- due to the fact that we have to protect our customers and our employees.
Q Uh-huh. Okay. How many times did that happen in a situation like that where customer came in, was not complying with face mask and you were
10:45 allowed to ban them from the location?
A We didn't ban them, we never banned them.
Q So what would you do?
A We would just allow them -- we would just tell them, sorry, you can't come in at this time.
10:46 Q Isn't that the same thing as banning them?

A No.
Q No?
A No, because when they got a mask they were able to come in.
10:46 Q I see.
So you are saying that at the time they are not wearing -- complying with the face mask you would tell them they cannot come in?
A Yes.
10:46 Q You would basically tell them to leave?
A We would tell them you are not allowed to come into the store.
Q And your CVS company policy was that if the person does not leave you can call the police?
10:46 A No.
Q Okay. So under what circumstances then -- let's say the person is refusing to leave and that is not also complying with the face mask; what is your next step under company guideline?
10:46 A If they are refusing to leave and they're causing a problem --
Q Uh-huh.
A -- then I go to the manager and I ask him should we call the police; if he says yes then we
10:46 call the police, if not then we just have to please

-- can you please leave. You are not allowed to come in.
Q Uh-huh. Okay.
So, you -- you -- you know, for this young lady as you said Anoush Burmayan -- do you know her name now?
A That's the first time I heard it.
Q Did you know -- so you didn't know her name?
A No.
Q Did you see her before on previous occasions?
A No.
Q So January 13, 2021, is the first time you ever encountered her?
MS. JONES: Objection. Calls for foundation.
THE WITNESS: Huh?
MS. JONES: You can answer.
MS. MKRTCHYAN: Let me --
THE WITNESS: I don't remember.
BY MS. MKRTCHYAN:
Q Well, but you said "that this young lady" so you do remember this incident?
A I always say young lady --
Q I understand.

A -- whether she's young or old.
Q Okay.
A I'm 58 years old, to me almost everybody's a young lady.
10:47 Q Oh, understood.
But you said that, you know, this incident with this young lady and you went and told me what that she's basically not complying with face mask and you asked her to leave, true?
10:48 A I never said that. I never said I asked her to leave.
Q Okay.
A You asked me what we would do when they come in without a mask.
10:48 Q Uh-huh.
A I never said I asked her to leave. I said I would ask them to leave if they were not coming in with a mask.
Q Okay. So you are telling me that, you know,
10:48 you did not ask her to leave when she came on January 13th?
MS. JONES: Objection. Misstates testimony.
You can answer if you know.
BY MS. MKRTCHYAN:
10:48 Q I didn't -- on January 13, 2021, do you

remember her coming into the store?

A No.

Q You don't remember? Okay.

You called the police on her on January 19, 2021, a week after that.

You don't remember that either?

A This happened almost three years ago, ma'am. I don't remember things that happened last week.

Q I understand.

But you are in a lawsuit as a defendant, right?

A Right.

Q And you've had communications with your counsel about this incident, true?

A True.

Q So you are telling me during those communications the memory of this incident was not refreshed?

A Uh-uh.

MS. JONES: Objection to the extent it calls for attorney/client privilege.

BY MS. MKRTCHYAN:

Q No, it does not.

So why are you testifying here today?

A Because I was asked to come in to do the

deposition.
Q Okay. So you have no idea why you are testifying here today and yet you told me that you knew this incident. You told me that it was a face mask compliant, et cetera, you told me.
A No, I didn't ma'am.
Q You didn't?
A You asked me about the face mask committee -- the face mask incident. I said I don't remember anything about this young lady, this woman. I don't know anything about it. I don't remember anything about it.
Q Okay.
A Okay. You asked how do we -- how did we deal with people not coming in with a mask.
Q Right.
A And I told you we asked them not to come in. If you can't wear a mask you are --
Q Right.
A -- not allowed to come into the store.
Q Okay. So let's look at your company guideline a little bit.
Were you aware of the Huddle Guide by CVS about the customer service issues related to compliance with face masks, were you aware of this?

A No, I never seen this before.
Q You never went through this document with your lawyer?
MS. JONES: With your lawyer?
10:50 MS. MKRTCHYAN: Yeah.
MS. JONES: Objection. Attorney/client communication. He can't answer whether he's reviewed with me.
BY MS. MKRTCHYAN:
10:50 Q Have you looked at this document that has nothing to do with attorney/client communications?
A No.
Q Okay. This is 49 -- CVS 49 through 52. Let's just go over this document.
10:50 So you've never seen this document before this date?
A Not that I can remember, ma'am, no.
Q Okay. So it states here Huddle Guides about face coverings. It states CVS Pharmacy, right, you
10:50 recognize that logo --
A Yeah.
Q -- for the pharmacy?
A Uh-huh. Yes, I do. Sorry.
Q No problem.
10:50 A customer reports another customer not

wearing a mask.
So it gives you scenarios.
You see a customer is not wearing a mask when entering or shopping. Customer refuses to wear a mask even when offered one for free.
So do you see the responses that you're trained to provide by CVS Pharmacy?
A On there yes.
Q Okay. It says say Thank you for letting me know. I will ask them if they have a mask to wear or help them purchase one now, right?
A Yes.
Q Doesn't state you actually can refuse service.
Does it state anywhere here in this scenario that you can refuse service?
You can read it for yourself.
A You are right, it doesn't say that, but --
Q Go ahead.
A -- our boss told us.
Q Uh-huh.
A We were told by our supervisors and our managers that we're not allowed to let anyone in our store without wearing a mask due to the Glendale -- I forget what it was called.

Q That's -- which supervisor was this?
A At the time I believe -- I don't remember. I believe it was Jack at the time --
Q Uh-huh.
10:52 A -- and all our operations managers.
Q All operations managers.
Operations managers at the time were who?
A Joe -- Joe Johnson.
Q Uh-huh.
10:52 A And I believe Adrian.
Q Uh-huh.
A I don't know how to pronounce his last name.
Q So you had store manager Jack Gevdzhyan, right, Aaron Silva?
10:52 A Yes.
Q And then operations managers were Joe Johnson and Adrian, true?
A True.
Q You are telling me they are the ones who
10:52 told you that you can actually tell an individual who's not fully compliant with face mask to leave the store?
A Jack told us that if they are not compliant with the mask mandate we are not allowed to have in
10:53 the store.

Q Gotcha.

Let's look at the communication as it relates to CVS.

So provides various scenarios where the customer is coming in not wearing the mask. And then you basically -- the response you have, for example, one says, you know, I refuse to wear it. So the customer says I refuse to wear it, you can keep it.

The response by your CVS company states as follows: That I understand you prefer not to wear face covering right now. You can -- if you are picking up a prescription you don't need a face covering to use the drive-thru. You can also use CVS.com to order from store products for home delivery.

And then it continues stating from Page 50, this is the same Huddle Guide we went through, whether the customer leaves or insists on shopping without a face covering you have done what you can. Help the customer finish shopping as quickly as possible and remind them to maintain six feet of social distance to help protect other shoppers.

Do you see that?

A Yes.

Q And this is the customer service policy by

CVS related to face mask non compliance, true?
A True.
Q Does it state anywhere in that scenario that you can actually refuse service to a customer and tell them to leave?
A No, it does not.
Q So you agree with me you were never -- you never received training about this policy, true?
A I have never seen this one true.
10:54 Q Okay. So basically you're telling me that you were not aware that you, as a CVS employee, cannot refuse service to anyone who is not complying with face masks?
MS. JONES: Objection. Lacks foundation.
10:54 THE WITNESS: We were told by our store manager --
MS. MKRTCHYAN: Uh-huh.
THE WITNESS: -- do not allow them to come in if they are not wearing a mask.
10:55 BY MS. MKRTCHYAN:
Q So regardless if they are keeping six feet distance, regardless of the, you know, you -- you being covered with a mask and you even vaccinated, regardless of that and regardless of this policy that
10:55 we just saw, the Huddle Guide, you basically were

allowed in your experience to refuse service and tell them leave the store period, leave the store; you could do that?

MS. JONES: Objection. Asked and answered.

10:55 Go ahead.

MS. MKRTCHYAN: Yes, you have to answer regardless of objections.

MS. JONES: You have to answer regardless of the objection.

10:55 THE WITNESS: Yes.

BY MS. MKRTCHYAN:

Q Okay. But if the customer refuses to leave then what you call the police, is that what you were trained to do?

10:55 A If they cause a problem, yes.

Q Like who --

A We called -- like I said, people. I asked the manager in charge, "Do you want me to call the police? Should I call the police?"

10:55 Q Okay.

A If they say, "Yes," then, yes, I will call the police.

Q For January 13th and January 19th your supervisor was Joe Johnson, right, of the store?

10:56 A If I remember correctly I believe so.

Q Okay. And this is nightshift, right?
A Yes.
Q So do you remember going and asking him for approval to call the police ever?
A No. I don't remember anything that happened that day, ma'am.
Q So you don't even remember picking up the phone and calling 911?
A I don't remember. Like I said, this happened three years ago. I don't remember.
Q Okay. So not -- reading the complaint has not refreshed your memory?
A (Inaudible response.)
Q No?
A Again I don't remember.
Q Then how do you remember that what you just told us earlier that this incident involves wearing a face mask as you told me earlier not later?
A You just said.
Q No. You said that young lady, you know, coming into the store and not wearing a face mask, you told me. You told me you remembered about this incident.
A No, I didn't.
Q All right.

So now let's look at another -- so basically this was one of the -- were you also aware -- let me ask you this: Were you also aware that employees of CVS if they can't wear a face mask they can ask for reasonable accommodations, were you aware of that?

A No.

Q No. So, you know, you were not trained as anyone who, including employee your own colleague, has any sort of difficulty wearing a face mask they cannot seek reasonable accommodations for, you know, not to wear a face mask?

A From what I was -- from what I saw what they told us if we can't wear the actual mask we had the plastic ones that come in front, they can wear that one.

Q Okay. So then basically if someone could not wear a face mask you were aware that they could opt out for other options?

MS. JONES: Objection. Misstates testimony.

THE WITNESS: We've -- we offered -- we offer if, like I told you, if they come in without a mask we let them know I'm sorry, but you have to have a mask to come in; if they say I don't have one we offer them one.

Q Okay. And then what?

A If they said, Well, I can't wear that then we offered them the other one. We never try to sell it to them. We offer to give it to them.
Q What other one -- which?
10:58 A The plastic ones, because we also had those.
Q What if the person states I cannot do that either. I cannot handle that either, because I have issues.
Were you trained that you can provide
10:58 reasonable accommodations and you should provide reasonable accommodations to such individuals?
A We offered them the masks. If they say, No, I don't want to wear the masks -- if they say -- if they were to tell us, Well, I have a doctor's note we
10:59 have to ask for it. Can I see the doctor's note.
Q Okay.
A If they can provide the doctor's note we allow them to come into the store. If they don't have the doctor's note we have to tell them, Sorry,
10:59 but you cannot come in the store without a mask.
Q In this situation did you ever ask the young lady, that you referred to plaintiff, to show a medical note?
A I don't remember, ma'am.
10:59 Q Okay. To your knowledge, did your manager,

Joe Johnson, ever ask for medical papers?

MS. JONES: Objection. Vague. Also calls for speculation.

THE WITNESS: I don't remember. I don't remember anything he said.

BY MS. MKRTCHYAN:

Q Okay. So let me ask you this: So this is policy by CVS as of 2020, 5 -- Page 592 of CVS where it says Reasonable Accommodations Requests, colleagues who believe they need a reasonable accommodation, because they are unable to wear face covering as required by this policy due to a disability or religious belief should contact Reasonable Accommodations Department by calling Advise and Counsel, provides a number.

Have you ever seen this policy by CVS?

A No, I have not.

Q Were you aware that anyone who has any sort of disability or has religious beliefs, you know, has a problem wearing a face mask period, can actually be accommodated according to this policy, were you aware of that?

MS. JONES: Objection. Misstates testimony.

THE WITNESS: No, I don't remember. I don't remember seeing this.

BY MS. MKRTCHYAN:
Q Okay. So you personally -- let's say if you personally had some sort of disability, inability to breathe with a face mask or some sort of, you know, religious belief, you didn't believe you could ask for reasonable accommodations for that period of time against wearing a face mask?
MS. JONES: Objection. Misstates testimony.
THE WITNESS: I have problems breathing with those masks, I did have problems.
BY MS. MKRTCHYAN:
Q Uh-huh.
Did you ask for accommodation?
A No, I didn't. I went and got a gator.
Q Gator, what is a gator?
A A gator is a cloth mask that go over your face, your neck and it covers this.
Q I see.
A I was able to breathe through the gators.
Q That's your personal desire, right, that's your --
A Yeah.
Q -- personal option?
A Yes.
That's what I did when I couldn't breathe

through the paper ones and I was having trouble breathing.

Q Did you ever know -- did you ever know -- were you ever told by CVS that you -- if you are having difficulties breathing through the face mask -- you work how many hours, 12 hours?

A No. I work just eight hours a day.

Q Okay. Eight hours.

Were you ever told by CVS that we have a policy if you have a disability or any sort of issue wearing face mask we can accommodate, were you aware of that?

A No.

Q Okay. So let's go back to another -- I asked you about if any customer complaints you have, you didn't remember, right?

A Uh-huh.

MS. JONES: If we're going to change topics can we take a short break?

MS. MKRTCHYAN: Yes, but I didn't finish the question. Let me finish my line of questioning. We didn't -- it hasn't even been an hour.

MS. JONES: I just need to use the restroom.

MS. MKRTCHYAN: Okay. Well --

THE WITNESS: So do I.

MS. MKRTCHYAN: Okay. Let's -- then I'll accommodate.

MS. JONES: Thank you.

MS. MKRTCHYAN: I'll make accommodations.

11:02 MS. JONES: We'll go off the record.

MS. MKRTCHYAN: Let's take a ten-minute break.

MS. JONES: Okay.

(Break taken.)

11:11 BY MS. MKRTCHYAN:

Q Back on the record.

So reminder you are still under oath, sir.

Going back to the some of the performance feedback where we left off actually. I was covering

11:11 if Jack Gevdzhyan for the period of July 1 through 2022 when I -- there was a mixed performance review going back to that. Okay.

So on every category here he put down "mixed review." For example, one of them was "put people

11:12 first." As you can see on this page "customer service" -- for customer service it says, you know, put people first, behavior statement, demonstrates customer behaviors, optimize customer experience in stores. This is Page 22, that was "mixed

11:12 performance, manager rating."

Do you happen to know why -- do you remember this conversation on this Performance Evaluation by management?
A No, I do not.
11:12 Q No.
So in other words, any of this Performance Evaluation you never went through with your manager, never sat down, no one counseled you about?
A No.
11:12 Q No. Okay.
So you never remember actually anyone telling you that, Guy, you need to improve your customer service?
A No, not that I can recall. No.
11:13 Q Okay. So -- and specifically for this -- for this Performance Evaluation in 2021, 2022 you don't remember talking with Jack Gevdzhyan, you know, about this?
A No.
11:13 Q Okay. But you agree with me that that this all categories, for example, there are several categories listed here under "put people first," "rise to the challenge," "join forces," "create simplicity," "inspire -- all of them he scored you --
11:13 he rated you as mixed performance, right?

You see that?
A Uh-huh. Yes, I do.
Q Okay.
A I agree.
11:13 Q Another one we have by Aaron Silva. This is for another Performance Evaluation for dates of 2018 where -- yes, Date Created, September 4, 2018.
It states There was a customer complaint. Comments by Aaron Silva. This is Document CVS 721
11:14 through 722. Aaron Silva wrote here that on August 31, 2018, a customer survey that stated he seemed annoyed that he had a customer. After reviewing the schedule and video it was discovered that Guy Garcia was cashier. Part of our culture is
11:14 to be courteous and friendly to our customers.
Do you remember this Performance Evaluation with Aaron Silva?
A No, I do not. I don't remember.
Q So in expected performance, you know, Aaron
11:14 Silva wrote that, you know, As the colleague of CVS Health you are required to role model our CVS Health Values -- innovation, collaboration, integrity and accountability and support our business in making our work environment professional and productive. I do
11:15 believe you have the ability to be a valuable

resource for our team and succeed. And I encourage you seek assistance, et cetera. And then it provides action plan, comments, et cetera.

So basically he provides you guidance in terms of, you know, how to improve your performance.

Do you see that?

It says, I fully believe you are capable -- do you see that? Let me read this for the record.

DEPOSITION OFFICER: Slowly please.

MS. MKRTCHYAN: I fully believe you are capable of correcting this issue. And we will work together to bring your performance back up to a successful level. However, if your performance is not brought back up to acceptable and additional counseling up to and including termination is possible.

Do you remember having this performance feedback by Aaron Silva as your manager?

A Actually, I don't remember it.

Q Okay. It states further that if you improve your performance for a period of time subsequently have additional performance issues of any nature this current level of counseling maybe reinstated or escalated to the next level up to and including termination. I also need to let you know that while

you are on performance counseling you are not eligible for a promotion or transfer and any merit or bonus amounts for which you are eligible may be impacted.

11:16 You don't remember any of these rating comments by your manager, Aaron Silva, in 2018?

A That was four years ago, ma'am.

Q Okay.

A I do not remember. I'm sorry.

11:16 Q Okay. So you don't remember that one either.

Let's go to CVS 1112 a customer complaint was received against you in 2020 where it stated that there was an e-mail received from a customer who

11:17 related "I have major issues that needs to be discussed about a CVS employee. I recently shopped at one of the locations. And I must say that I've never been so humiliated and disgusted with such shopping experience. This manner cannot be ignored

11:17 and needs immediate action."

And it further provides details of what happened. On Sunday, December 2022, I went in to get an item on sale. I was helped by Guy and he was not helpful at all and very disrespectful. The alcohol

11:18 aisle was blocked off and I asked if they were

selling alcohol. And he said, "Yes, the item I wanted was out of stock. There was one left on the shelf and I went to register to pay. And my husband walked up and down the aisles and found a bunch on the shelf. The employee then started clapping and said, "Good for you, now deal with it." He called the police, because he wanted us to leave. The police said, "You haven't committed a crime, but he doesn't want you to come back to the store. So we are banned from that location. He refused to give us his name, humiliated in front of all the other customers by who claimed to be the manager, not true, customer wants to follow up about this matter."

Do you remember this kind of an incident?

A No, I do not.

Q Okay. But this is a CVS document that was provided to us in litigation.

Are you denying that you had this kind of a customer encounter back in 20- --

A No, I am not denying. I'm just saying I don't remember it.

MS. JONES: Okay. Just let her finish.

THE WITNESS: I'm sorry.

BY MS. MKRTCHYAN:

Q Let me finish.

You don't remember this one either?
A No, I do not.
Q But it does state here that you also called the police on this customer, husband and wife who were looking for some alcohol, right?
11:19
A Yes, that's what it says.
Q And it describes your behavior as being disrespectful and even, you know, clapping and, you know, humiliating them.
11:19 Do you see that?
A Yes, I saw it.
Q Okay. So how do you feel about this?
Do you feel that this is in compliance with CVS company goals and guidelines?
11:19 MS. JONES: Objection. Vague.
THE WITNESS: I guess not.
BY MS. MKRTCHYAN:
Q So you don't remember ever calling the police and, you know, telling the police that they were banned from that location, that they no longer could come back to this location?
11:20
A No, I do not remember.
Q So you don't remember ever -- well, first of all, strike that.
11:20 You said that previously you did call the

police on other occasions, right, when customers you were having issues with customers, right?
A If I was in charge and I was to make that decision if we were having issues with customers that the police needed to be called I would call.
Q Okay. And most of the time when you are in charge -- what do you mean by that work in charge?
You are alone at the store; is that what you mean?
A No, if I'm the MOD in charge.
Q What is MOD?
A Manager on duty.
Q Okay. So you are saying that, you know, if there's no one above you you make the decision -- and you have made the decision to call the police -- and tell them that they are banned from the location?
A If it requires for them to be banned, yes.
Q Okay. Tell me what policy do you have that you can point or remember that allows you to actually ban customers from the location.
A I can't actually say there's a policy for that --
Q Uh-huh.
A -- because I've never seen one, but when I started working there --

Q Uh-huh.
A -- Aaron Silva and even Jack --
Q Uh-huh.
A -- has told us if a person is causing trouble trying to harm you or especially if they are knocking merchandise off our shelves, if they try steal from us they are to be banned from the store.
Q Uh-huh.
A If they start cursing at our employees --
Q Uh-huh.
A -- they have to be banned from the store.
Q Uh-huh. So banning from the store how do you interpret banning from the store?
What does that mean to you when they are telling you banning from the store? What does that mean to you?
A We were told that banning -- when we ban somebody from the store they are not allowed back in the store at all.
Q Okay. But how do you enforce that?
Let's say you tell someone you got to leave and that person is not leaving, what do you do next?
A If we have to ban them from the store and they refuse to leave --
Q Uh-huh.

A -- then we have to call the police to have them escorted out and banned from the store.
Q Okay. So have you received any training and policy on what kind of situations you can actually call the police or not?
A We've been -- I've been told --
Q Uh-huh.
A -- again, by my managers --
Q Uh-huh.
A -- that if people come in our store -- we get customers that come into our stores that cause problems for us in our stores -- cursing at our employees, trying to steal from us, trying to harm us in any way --
Q Physical way.
A -- physical way, spitting in our faces --
Q Uh-huh.
A -- any way -- any form of that they have to be banned from the store.
Q Okay. So as I understand it it's like violent behavior or immanent violence, true?
A Uh-huh.
Q That you can call the police, true?
A Uh-huh.
Q Right. You have to say verbally yes.

A Yes.
Q Shoplifting you call the police for, right?
A Yes.
Q And then you referred, you know, offensive language. So if someone says fuck you for example, sorry for my F, you can call the police on that person if someone says fuck you?
A It all depends.
Q Okay. So you need to have some destructive behavior -- physical destructive behavior, throwing things attacking you or immanently attacking you or shoplifting, physical behavior that you need to call the police, true?
A If they don't leave the store, yes.
Q Right.
And if the person just leaves the store everything is okay, right?
You don't call the police then, do you?
A No, I do not.
Q Okay. So but let's say you tell someone to -- let's go back to this: So let's look at the -- you are trained by your CVS guidelines, you know, to try to not get involved in physical conflicts with customers, true?
A Yes, that's true.

Q So, for example, if a customer is, you know, in any shape or form threatening or violent first you try to deescalate, right?
A Yes, we try.
11:24 Q How do you deescalate them?
Let's say customer starts yelling, what do you do next?
A We approach them and we talk to them in a calm way.
11:24 Q Uh-huh.
A If -- usually that deescalates when you are nice to them start talk to them in a calm way it usually deescalates it.
Q Uh-huh.
11:24 A But if they are beyond that point and they start swinging or cursing and yelling at us --
Q Uh-huh.
A -- and they don't want to listen to what we have to say then we have to call the police to have
11:24 them escorted out of our store.
Q Okay. So just yelling and screaming is actually sufficient for you to call the police?
A If they will not leave the store, yes.
Q So without, for example, an immanent
11:25 violence, if someone is just standing there and

cussing you you are, by your policy and training, allowed to call the police and tell that person to --
A This is what I was told by Aaron Silva.
Q Okay. Understood.
11:25 A He told us. When I got hired he told me he does not allow anybody to come in and start yelling or cursing at his employees. If anyone comes in and yells and curses at their employees they are to be asked to leave the store and banned from the store,
11:25 not allowed back in.
Q So that's the training by Aaron Silva?
A Aaron Silva, yes.
Q Your manager?
A Yes.
11:25 Q But at the same time you have a performance evaluation by him who said in this guideline was that you got to be very careful of your customers, right?
Your job accept the performance is to provide excellent customer service, right?
11:25 A Right.
Q Okay.
A And we do our best to provide that excellent service.
Q Okay. Though we do have some performance
11:26 evaluations by you -- by two managers, Aaron Silva

that we covered and Jack Gevdzhyan, where your performance fell short of company guidelines, true?

A True. Yeah, you showed them to me.

Q And we just covered one customer complaint where you specifically called the police and banned them from the location. And the customers felt humiliated, degraded and disrespected, true?

MS. JONES: Objection. Document speaks for itself. Also, calls for speculation.

THE WITNESS: Yes, you showed it to me.

BY MS. MKRTCHYAN:

Q And you don't remember ever getting any type of counseling or further training on customer satisfaction after that?

A No.

MS. JONES: Objection. Vague as to that.

BY MS. MKRTCHYAN:

Q That customer complaint, no?

A I don't remember that.

Q Okay. So did you ever receive any also training in how to act as a leader?

As a shift manager you are in a leadership role, right?

A Yes.

Q And what does that entail to you?

If you are manager on duty, for example, for that night and if you have a situation with a customer -- unhappy customer, how do you deal with that?

11:27 A We have to try our best to deescalate. If this customer is getting angry we have to try to do our best to deescalate it. If that means that we have to give them let's say a $5 reward -- reward card, then we'll give them a $5 reward card.

11:27 Q Uh-huh.

A We do our best to try to deescalate any problems that cause in our store. Again, if the customer refuses --

Q Uh-huh.

11:28 A -- to deescalate or to cause anymore problems then we have to ask them to leave our store.

Q Okay.

A -- for the safety of our employees and our customers.

11:28 Q Okay. So the way -- I understand that.

Let's look at leadership role training here, CVS 524 Training for Leadership -- for leadership.

The training manual here it says Things have escalated further. By the time you reach them the

11:28 customer is yelling obscenities.

So the customer is yelling obscenities as you stated is being, you know, is basically yelling, et cetera --
A Uh-huh.
11:28 Q -- right, offensive.
How do you approach the situation as the leader?
Give you some examples: Using a calm quiet voice can help to deescalate the situation.
11:28 What are some other effective deescalation tactics?
So it provides -- example, taking notes, explaining to the customer you want to make sure you record all the details of their concerns; second,
11:29 grabbing the customer's cell phone so they are unable to record you. Third, use clear concise language offering positive choices. Fourth, offer to call 1-800-SHOP-CVS so the customer can lodge a complaint.
Which one would you choose out of these four
11:29 options, sir, in that situation?
A I would offer to call so they could make a complaint -- lodge a complaint if they feel that I'm not helping them out. And also explaining to the customer that you want to make sure your record --
11:30 that we record all the details of their concerns.

Q Uh-huh.
A If a customer comes up to us and says they have a problem we have to go What's that problem, can I help you with that problem. If it means we have to take notes to write it down saying, Okay, well, let me take notes, tell me what happened. And then we take it to our manager.
Q Uh-huh.
Have you ever taken notes in situations like that?
A I've never had to take notes, no.
Q What about recording with your cell phone?
A No, I've never recorded anything.
Q Are you allowed by the company --
A We are not.
Q -- let me finish the question.
A Oh, I'm sorry.
Q It's okay.
Taking notes, so you said taking notes is effective method of deescalating the situation, right? Right?
A Sometimes it is. Sometimes it is and sometimes it isn't.
Q Okay. Let's say the customer is still not satisfied and still continuing to yell obscenities.

Are you allowed under that scenario just to call the police?

A If we can't deescalate and then they are yelling and screaming and causing an issue in our store. And if the manager says, Call the police then we'll call the police.

Q I see.

So let's look at some of the ways that your company allows you to deal with the situation. It's CVS 526 on Leadership Role.

So who should you call when you need help, when all deescalation tactics have failed -- we discussed above, customer refuses to leave the drive-thru until they get what they want, customer refuses to show proper ID for age restricted product, you feel violence is immanent, customer has threatened to wait outside to fight you, a customer was hurt by another customer in the store. Gives you options -- call your leadership for back-up or dial 911. Okay.

So do you see the, you know, scenarios where you can actually call 911 or call your leadership for back-up, do you see this?

A Yes.

Q Okay. Do you see that one of the, you know,

requirements for calling 911 or leadership is either you feel violence is immanent, right, you agree?
A Uh-huh. Yes, I do.
Q Customer has threatened to wait outside to fight you specifically, right, that's another, right?
A Right.
Q And then the customer was hurt by another customer, right?
A Right.
Q So you see that there's either threat of violence, immanent violence or actual violence that allows you to call 911, right?
A Right.
Q According to this training guideline?
A Right.
Q Okay. But we don't see anywhere here where it says if the customer still continues yelling obscenities call 911; do you see that?
A Well, all deescalation tactics have failed.
Q Okay. Right. Right.
A If we ask them to calm down and, you know, you can't be talking like that in our store, you can't be yelling or screaming at our employees.
Q Uh-huh.
A You're, you know -- you are offending some

of our customers if that happens, I'm not saying it does, then we can call the police.

Q So according to this thing you still believe that if the customer continues to yell without any threat of violence you are still allowed to call the police?

That's what your understanding is of this policy?

A If all deescalation tactics have failed, yes.

Q And one of the deescalation tactics was to talk to them calmly, take notes as you said, right?

A Right.

Q Yes?

A Yes.

Q All right.

So it says, Although you have taken charge of the deescalated situation you are not alone, we provide you further guidance. If you are unable to keep calm or you start getting defensive remove yourself from the situation. Do you see that?

A Yes.

Q Have you ever done that?

Has it ever been that you felt like, you know, you are getting defensive, you are not able to

remain calm and you just went and asked your -- one of the employee co-workers, say, Hey, can you handle this? I cannot handle it right now. I am going to remove myself from the situation.

11:34 A No, I have never done that.

Q So --

A I've never gotten to that point.

Q Okay. So you don't ever remember getting into that situation?

11:34 A I do not remember ever getting into that.

Q Okay. So let me ask you this: After this, you know -- in this lawsuit -- I mean this incident that happened in January 2021, did any of your human resources or any of your managers talk to you about

11:34 that incident?

A No, they did not.

Q Did the plaintiff?

So when -- just generally when you call police on anyone do you ever -- and you are alone,

11:34 the manager is not there -- you're the one who calls the police.

Did you ever have any counseling by your supervisors about that incident?

A No.

11:35 Q Like this incident -- like that incident

that you spoke about you went to court when you were assaulted, did you ever receive any sort of guideline by CVS about that incident?

MS. JONES: Objection. Vague.

THE WITNESS: No.

BY MS. MKRTCHYAN:

Q About this incident -- no one ever spoke to you about this incident from your company?

A No.

Q Never interviewed?

A No.

Q So you don't remember ever anyone, either Joe Johnson, or Jack Gevdzhyan or Jack -- Jack basically your store manager -- or Aaron or anyone from human resources coming and talking to you about this plaintiff's incident?

A No.

Q Okay. Did you ever -- do you remember ever telling anyone at the store that you banned this plaintiff, this young woman, for shoplifting?

A No, I do not.

Q As far as you are sitting here today do you remember if this incident involved any shoplifting?

A No, I do not.

Q No. Okay.

If I played the 911 call would that refresh your memory about this incident?
A I don't know.
Q Okay. So you are saying you don't know.
11:36 Let me ask you this: Have you -- have you had any difficulties of memory in the past in your life?
A I do forget things.
Q You do.
11:36 A Like I said, there's days -- I forgot my own son's birthday.
Q So you do have health issues?
A No, it's not a health issue. It's just --
Q Have you ever gone to a doctor for that
11:36 issue?
A No, I have not.
Q You are 54?
A 58.
Q That's an age where, you know, it's not old
11:36 age so -- but, you know, you do have memory problems?
MS. JONES: Objection. Misstates testimony.
THE WITNESS: I forget things, yeah.
BY MS. MKRTCHYAN:
Q Okay. Is it short-term memory or long term
11:37 memory?

A I don't know what -- what do you mean by that?
Q Well, you know, for example, do you have easier time to remember things that happened
11:37 yesterday, which would be short-term memory, or long term like four years, five years ago that would long term memory?
A Well, there's times that, like I said, I forgot my son's birthday, it was in August.
11:37 Q But you don't live with your son, right?
A No, I do not.
Q Okay. So that's something it's a fair thing that can happen to you, right?
Do you remember your birthday?
11:37 A Do I remember -- yes, I do.
Q Do you believe that any of the memory issues that you might have noticed have affected your job performance at any point in time?
A Not that I'm aware of, no.
11:37 Q And you never went to doctor and complained about this?
A No, I have not.
Q After COVID you were vaccinated, right?
A Yes, I had all three vaccinations.
11:38 Q Did you ever see any performance issues

related to that after vaccinations?
A No.
Q So as of right now you are sitting here today are you under prescription, you know -- are you taking any prescription medications?
A For my diabetes, yes.
Q Oh, you are diabetic?
A (Inaudible response.)
Q What type of med do you do?
A Metformin -- oh, what kind -- I'm sorry.
I just -- I don't know what it is, I take a pill for it.
Q Insulin?
A No.
Q No.
So it's not Type II Diabetes?
A No.
Q Okay.
A I guess, I don't know what type or --
Q But you are not under care of doctor for that?
A No.
Q Okay. So that's all you have, that's the only thing you have?
A The only medication that I've been taking

would be Metformin, I take one pill every day.

Q And you don't believe that affects your performance at the work?

A Not at all.

11:39 Q Okay. Are you aware of any investigation done in this case at any level of your store or human resources?

A No, I do not.

Q Did anyone ever come and tell you We are

11:39 investigating this incident?

A No, they haven't.

Q Okay. And did you watch any video prior to this --

A No.

11:39 Q -- of this incident?

A No.

Q Let me ask you this: When you got the complaint of the lawsuit wouldn't it be -- weren't you curious about the allegations against you?

11:39 A No.

Q So if you just tossed it away, the lawsuit, the paper?

A Like I said, when I got it I thumbed through it. I gave it -- took it to Jack.

11:39 Q Uh-huh.

A Jack said, "Don't worry about it, put it in my office. I'll take care of it."
Q Okay.
A That's what I did.
11:39 Q What was your understanding by taking care of it?
A He said he was going to take care of it and faxed it over to corporate.
Q So your understanding was that the company
11:40 was going to defend you in this lawsuit?
A In my understanding, yes.
Q And you were not going to have to hire a lawyer?
A I was told no, that the company will take
11:40 care of it.
Q Okay. And you did not -- you were not even curious a bit to go and watch video clips to find out what are the allegations against you?
MS. JONES: Objection. Asked and answered.
11:40 THE WITNESS: No, I wasn't.
BY MS. MKRTCHYAN:
Q And even prior to testifying here today you were not curious to know what you are going to testify?
11:40 A No.

MS. JONES: Same objection.
BY MS. MKRTCHYAN:
Q No?
A No.
11:40 Q Okay. All right.
So sometime last year in August do you recall -- you were still working at the CVS, right?
A Yes.
Q And you were working nightshift, right?
11:40 A Yes, I've been working nightshift.
Q Do you recall a private investigator by the name of Eddy Shore trying to talk to you about this incident -- asking questions about this incident?
A No.
11:40 Q You don't remember?
A (Inaudible response.)
Q And you don't remember refusing to speak with him?
MS. JONES: Audible answers.
11:41 THE WITNESS: No, I don't remember. I'm trying to remember.
MS. MKRTCHYAN: Sure.
THE WITNESS: But it's like I said, it happened a while back.
11:41 BY MS. MKRTCHYAN:

Q Last year in August.
A It happened -- I'm sorry.
I don't remember anybody ever coming up to me and asking me for that.
11:41 Q Okay. Did any employer tell you that you don't have to speak with anyone about this incident?
MS. JONES: Did any employer?
MS. MKRTCHYAN: Yes, employer.
BY MS. MKRTCHYAN:
11:41 Q Your managers.
Did anyone tell you from your managers that, you, you know, you don't even have to speak to anyone about this incident?
A Not that I'm aware of. I don't remember.
11:41 Q Okay. Tell me store about this store in Glendale, the 4939 San Fernando Road.
You've been working there from the beginning of time, right, all this time you're working with CVS, right?
11:42 A Since March 3rd, 2018.
Q Right.
So you remember that date, right?
You don't have difficulty remembering that date.
11:42 A Well, simply because of the fact that

March 3rd, 2023, I get -- I become six years, because I looked it up on the computer to find out which date.

Q Uh-huh.

11:42 A I looked it up to find out which date --

Q Uh-huh.

A -- I started, because on March 3rd, 2023, I become automatic -- I've been working there for six years.

11:42 Q I see.

So automatically do you get a promotion or what? You know, six years pass you get promotion or what happens?

A We go up to top pay.

11:42 Q I see.

A Because we're a union store.

Q Gotcha.

So you got promotion in March of this year?

A Not promotion.

11:42 Q Raise?

A It's a raise and not until March 2024.

Q Oh, I see.

So then you still have to wait for that?

A I still have to wait, yes.

11:43 Q Okay. And meanwhile your performance is

still being evaluated for that, right?
MS. JONES: Objection. Vague.
THE WITNESS: I guess. I'm not too sure.
BY MS. MKRTCHYAN:
11:43 Q How often does your performance get evaluated?
A I don't know, they don't tell us.
Q So you don't get any -- like, you don't have to sign -- let me show you this document.
11:43 When this Performance Evaluations get, you know, promulgated or performed on you, the evaluations, do you get to sign them?
Do you review them and sign them with your manager?
11:43 A I've never signed a --
Q No?
A Not that I can recall signing or --
Q But they are signature pages here, let's look at this, 722 CVS.
11:43 Page 722 we have specific docu- -- signature --
A Uh-huh.
Q -- acknowledgement that we have for manager and the colleague, true, and for date, right?
11:44 There is that kind of place where signature

is, you know, required, right?
MS. JONES: Objection. Document speaks for itself.
THE WITNESS: It's right there, I see it.
11:44 MS. JONES: Also doesn't say required. Misstates, Counsel --
MS. MKRTCHYAN: Counsel, you're speaking -- this is a speaking objection. Please do not make speaking objections. I will make that an issue.
11:44 MS. JONES: Just want the record to be clear, clearly reflect -- accurately reflect the document.
MS. MKRTCHYAN: The document is there. I'm asking him questions.
11:44 BY MS. MKRTCHYAN:
Q There is a signature line for this page, right?
A Right.
Q Okay. And it states also Document will be
11:44 stored in the colleague personnel file, right?
A Right.
Q So you don't remember ever in your six years of working CVS ever signing Performance Evaluation feedbacks with your manager?
11:44 A I don't remember signing anything.

Q No.
And in this document specifically you don't have any signature by you, true?
A True.
11:45 Q We don't have the manager's signature either, true?
A True, manager's signature is not on there.
Q But this is a document that was produced to us in litigation and representing your Performance
11:45 Evaluation for the 2018 specifically for you, Guy Garcia, right?
Aaron Silva is your manager, right?
A Right.
Q And we went through this, you know, that
11:45 there was coaching for correction.
The level for this was the coaching for correction, right?
A Right.
Q We already covered this.
11:45 So none of this -- let's go back to the other Performance Evaluations we went through.
This was with Jack.
You don't remember signing this document?
A No, I don't remember signing it.
11:46 Q Let me see if there was a signature line for

this. So bottom line is that there's no signature line for this one; but basically, you know, you don't sit down with your manager for your performances being evaluated.

11:46 A I've never sat down -- well, okay.
I don't recall sitting down with Jack or signing any paperwork about that particular paperwork, that evaluation.

Q Okay. So, you know, you don't recall either
11:46 this Performance Evaluations or sitting down with your employers ever going over them?

A I don't recall going over any of these -- any of these evaluations with Jack.

Q Okay. When was your last Performance
11:47 Evaluation conducted?

A I don't remember. I don't know.

Q You are not told at all how often you get evaluated?

A I -- I have not been told lately that I've
11:47 been evaluated.

Q Uh-huh.

A And I don't remember ever getting evaluated by any of my managers.

Q Okay. Going back to calling the police.
11:47 You know, as we've covered in this incident

plaintiff has alleged that, you know, you called the police on her, because she came back to the store on January 19th. She was wearing a face mask. She was complying with the face mask, but you called the police and told the police that she was banned from the store and she was not allowed to come back. So that's what plaintiff has testified, that's the allegation in this case.

Do you happen to remember that call that you initiated with the police?

A No, I do not.

Q According to what you told me earlier under oath, is that, you know, you wouldn't ban someone from the store just for failure to wear a face mask, right? That's what you said.

A I said we wouldn't ban them if they refused to wear a face mask. We would actually ask them to leave.

Q Right.

And so leaving, you know, is different to you from banning them indefinitely, right, because they can come back to the store wearing a face mask, true?

A True.

Q So, you know, according to you that

Ms. Burmayan, for example, if she came back on January 19th and she was wearing a face mask fully complying with the face mask, fully covering her face then she was allowed to stay in the store, true?
11:48 A True.
Q Okay. So you did not believe she had been banned from the store under that scenario, right; if she came back before -- for example, let's say a week before she came back, she was not complying with face
11:48 mask, you told her to leave, right, January 13, you told her to leave.
She could come back though, true?
A True.
Q If she complied with the face mask?
11:49 A If she complied with our face mask mandate she was allowed to come back in the store.
Q Okay. So and -- do you now know that, you know, she came back?
She was wearing a face mask and yet you
11:49 called the police on her; do you remember that?
A No, I do not.
Q Let's hear your 911 call. Let's see if that refreshes your memory.
(Audio was played.)
11:51 BY MS. MKRTCHYAN:

Q Okay. Did you hear that, sir?
A Yes, I did.
Q Was that your voice?
A I guess. Yeah, I believe so.
11:51 Q Okay. That was the 911 call you made on January 19th according to the Glendale Communications Department that, you know, was produced to us, that you called from CVS on that night, January 19, 2021, related to Plaintiff's Anoush Burmayan interactions
11:51 with you at the store. Okay.
Do you remember that now after hearing this tape?
A I heard the tape, but I don't actually remember the actual calling them.
11:52 Q I understand.
But does this refresh your memory about what happened that night?
A No, it doesn't. I don't remember what happened.
11:52 Q Okay. Let's cover what is stated on the 911 tape.
This is your voice, right?
You are not denying that's your voice?
A That's my voice.
11:52 Q Okay. And that appears to be you stated to

the 911 caller, There is this woman here causing problems, right. She is yelling, you know, et cetera. She was banned from the store she keeps coming back. She was banned specifically you stated a week before and she keeps coming back. She was very -- you said that she was refusing to wear a face mask and she's back again causing problems. And then you basically stated that you want -- you basically called 911 for help, the police, right?

A Right.

Q Do you see -- do you agree with me that you are telling the dispatch that she had been banned from the location, true?

A If that's what I said yes.

Q Okay. And you told her the dispatch that she had been banned from the location because she had refused to wear a face mask, true? You said that.

A I said that -- from what I remember it saying it said that she was here. She refused the thing. And she was knocking things all over -- all over the store -- all over the floor.

Q Uh-huh. Okay.

A That's probably why she was banned from the store.

Q Do you remember specifically banning her

from the store?
A I didn't ban her from the store.
Q But how did you know -- when you are telling this 911 caller -- I mean 911 dispatch that she had been banned from the location, you sound like you had personal knowledge of that incident, true?
A It's probably because my managers had told me she was banned from the store.
Q It wasn't you that banned her from the store?
A I did not ban her from the store. No, I did not.
Q Joe Johnson testified in this case last week.
A Uh-huh.
Q Are you aware of that?
A Yes, I am.
Q Did he tell you that he testified in this case?
A Yes, he did.
Q Are you aware that he testified that he never banned anyone from the location?
He said that he never -- he did not ban anyone from the store, that it was your decision to ban Ms. Burmayan; you are aware of that?

A No, I am not aware of that.
Q Okay. So are you denying that you actually are the one who banned Ms. Burmayan from the store on January 13th for not wearing a face mask?
11:54 A I'm saying I don't remember banning her from the store.
Q You do remember?
A I do not remember.
Q You do not remember.
11:54 A Again, this happened three years ago. I don't remember things that happened three years ago, two years ago, one year ago.
Q Okay. But you are telling the dispatch right now just confirm with me that you are telling
11:54 her you provided your personal knowledge to the dispatch that to your -- you were informed, and you believe she had been banned from the location, and she came back and that's why you called 911, true?
A If that's the reason why, yes.
11:55 Q Okay. And you also stated to the 911 caller She keeps coming back causing problems, right?
A Right.
Q Okay. Meaning that between the period of time she had been back and January 19th when you
11:55 called the police she had come back several times,

true?
A I don't recall.
Q You don't recall.
But you do tell -- I just want you to confirm. I understand you don't recall anything as far as I can see.
I just want you to confirm the 911 call that was made. Right?
MS. JONES: Objection.
BY MS. MKRTCHYAN:
Q Right?
A (Inaudible response.)
Q You are not denying?
A If that's my voice, yeah, I called.
Q And when you called -- let's go over this again. Just --
(Audio played for record.)
BY MS. MKRTCHYAN:
Q Okay. So this is, you know, first nine minutes of you the 911 call. You introduce yourself as Guy Garcia from the CVS the manager of the store, right?
A Correct.
Q True?
But on January 19th actually you had -- the

manager was Joe Johnson above you, right?
A Right.
Q He's the operations manager, right?
A Right.
11:56 Q Is there any reason why you identified yourself as the manager on duty when you had Joe Johnson at the store, is there any reason?
A Because we always -- we would -- when we call the police we always said I'm the manager.
11:56 Q Okay. But the manager above you was Joe Johnson, right?
A Right.
Q Did you ever tell Joe Johnson, you know, I want you to call the police. I don't want to be
11:56 involved with this. You are the manager on duty.
Did you ever do that?
A I never -- I asked him should I call the police. Every time we have a situation when the manager is there above me I ask them --
11:56 Q Right.
A -- should I call the police.
Q Right.
And what happens?
A If he was there at the time when I made that
11:57 call --

Q Uh-huh.
A -- then I asked him should I call the police.
Q Okay. In any event, he approved you calling the police, right?
A If he said yes then yeah.
Q If he said no you wouldn't call?
A No, I would not have called.
Q Okay. Right.
But so in any event, since you called it means that you got his approval to call, right?
A Right.
Q Okay. A little confusing.
So you said on the dispatch There's this woman, she's back. She's causing problems, et cetera.
Let's play this again and continue what you are telling the dispatch, right.
A Uh-huh.
(Audio being played.)
Q Let's continue.
There is someone standing next to you when you are talking to the dispatch and you are asking for the address, because you cannot tell the address of the location, right?

A Uh-huh.
Q Yes?
A I don't remem- -- I -- at that time I didn't remember -- I didn't know the address.
11:58 Q I just want you to confirm. I'm not asking you what you remember the time independent memory.
I'm asking you to confirm what you are hearing on tape with me. Okay?
A Uh-huh.
11:58 Q So on tape we can hear her asking you about the location of the address, right?
A Right.
Q And you turn to someone and you say I don't remember the address and someone gives you the
11:58 address, right?
A Right.
Q Is that Joe Johnson?
A I don't remember.
Q Okay. Would it be someone, either your
11:58 co-worker or your manager?
A I don't remember who I asked.
Q Okay.
A I don't remember who I asked.
Q At the time of this incident we had either
11:58 Timothy Riddle; do you remember Timothy Riddle?

A I remember Timothy, yes.
Q And Joe Johnson. Okay. That's what his testimony was last week.
A Uh-huh.
11:58 Q So does that in anyway help you to remember was it Joe Johnson or Timothy Riddle?
A It might have been Joe Johnson. It -- I don't know. It could have been the cashier at the desk at the time. I don't know. I don't remember
11:59 who I turned and asked to.
Q Okay. But -- all right.
Let's continue playing this.
(Audio played.)
BY MS. MKRTCHYAN:
11:59 Q Okay. So in this segment of 52 minutes the dispatch asks you if she has any weapons, describe to us who she is -- you know, describe to us general description, if she has any weapons. And then you are telling her, no, you know, but this woman has
12:00 caused problems before; she's been banned from the location.
Right?
A Right.
Q You said that, right?
12:00 A Right, I said that.

Q And then you said Causing problems without exactly identifying what, right?
A Right.
Q Okay. Let's continue playing this.
12:00 (Audio played.)
BY MS. MKRTCHYAN:
Q And then she's asking about COVID symptoms for either the customer or you, right?
A Uh-huh.
12:00 Q Right?
A Right.
Q This is around COVID time and you did not believe any one of you would have COVID, right?
A Right.
12:00 Q You also indicated that the customer, the plaintiff, the -- that the person you complained about, the woman, did not seem to have any COVID symptoms, right?
A Right.
12:01 Q Okay.
(Audio played.)
BY MS. MKRTCHYAN:
Q Okay. You are telling in this segment, 128 minutes, that, you know, the woman came last time
12:01 without wearing a face mask, and then she started

cussing, yelling, throwing things at the floor, right?
A Right.
Q And then basically that's pretty much it, right, there was nothing more at that juncture, right?
A Right.
Q Okay.
(Audio played.)
BY MS. MKRTCHYAN:
Q And then you are telling the dispatcher that she's right now standing by the front door, right?
A Right.
(Audio played.)
BY MS. MKRTCHYAN:
Q Okay. The dispatch asks you, When was she banned from the store," right?
And you tell her last week, right?
A Right.
Q So that would mean according to this incident, you know, it would be January 13th, right, the first time she came to the store, right?
A Right.
(Audio played.)
BY MS. MKRTCHYAN:

12:02

Q And then you say she keeps coming back meaning that after that first incident when you banned her she kept coming back, right?

A Right.

Q Multiple times, right, she keeps coming back; that's what it means, right?

A Yes.

(Audio played.)

BY MS. MKRTCHYAN:

12:02

Q She asks for the name of the customer and you don't know, right?

A I said I didn't ask her.

(Audio played.)

BY MS. MKRTCHYAN:

12:02

Q Okay. So right away in this segment you are telling the dispatcher that she had been banned from the location and upset, you were aware of that within basically a week before the incident, right?

A Right.

12:03

Q You were telling her that, because -- she was banned, because she was refusing to wear a face mask and when you told her to leave she was, you know, giving us attitude, cussing and throwing stuff, right?

12:03

A I never said that she was banned for not

wearing the mask.
Q Okay.
A I never said that on there. I just said she was banned from the store.
12:03 Q Well, what did you ban her for?
A If I did ban her --
Q Uh-huh.
A -- from the store it was probably for her screaming, yelling and throwing stuff all over our
12:03 floor.
Q Okay. All right.
So but, you know, you're telling me now that the reason she was banned --
A I said if I banned her.
12:03 Q You don't believe you banned her?
A I don't believe I did; no, I don't.
Q Who would have banned her to your knowledge?
A I don't know.
Q If Joe Johnson testified he was working with
12:04 you both days, January 13th, January 19th -- okay?
A Uh-huh.
Q Nightshift he was your manager, no one else was above you guys.
Jack was not working nightshift, right?
12:04 A Not that I'm aware of, no.

Q So you and Joe Johnson were the managers on duty both January 13th and January 19th, right?
A Right.
Q He said that I never banned her, that's his testimony, you know.
And then you are telling me you don't -- you didn't ban her.
A I don't remember banning her, no, I don't.
Q So who would have banned her from this location?
A I do not know.
Q So do you think that when you called the police 911 dispatch and you told them that the person was banned you were not telling them the truth?
A Well, she was banned from the store as far as I knew.
Q But you -- how do you know?
If you are telling me you didn't ban, you didn't have Joe Johnson ban her then -- I mean if Joe Johnson didn't ban her, who -- why would you tell -- this is what I'm trying to understand: Why would you tell the dispatch that she had been banned?
What was the source of your information, sir?
A If I was told by a manager that she was

banned from the store then she was banned from the store.

Q Okay.

A I'm the not saying which manager told me, because I don't remember.

Q Okay. So if -- you know, hypothetically we already spoke about this, if she was not wearing a face mask you would just tell her leave the store, right? You would not be banning her according to your -- according to your sworn testimony?

A If I told her, again I don't remember ever seeing this woman --

Q Uh-huh.

A -- but if I told her not -- she -- to wear the -- without the mask she can't come in the store.

Q Uh-huh. Okay.

But you wouldn't ban her, right?

A Not for not wearing a mask, we never ban for not wearing masks.

Q Okay. So but you did tell 911 caller that she was banned from the location and she keeps coming back. You also mentioned that not just she had been banned, but she keeps coming back. And she's not allowed to be here, right?

You heard this?

A Okay.
Q Were you telling the truth to the 911 caller -- I mean the 911, the communication department, were you telling them the truth or were you just trying to get rid of this woman?
A I was telling the truth.
She -- at that time I don't remember, but more than likely if I said she kept -- she keeps coming back then she's been back -- she's come back many times. I don't recall if she has or not, because that happened three, three and a half years ago. I don't remember how long it happened.
Q Right. Okay.
A I can't actually say yes that she was banned for this or banned for that.
Q Okay. But here's what I'm trying to understand: If you are telling the dispatch that she keeps coming back several times, that means you knew the woman pretty well, that you know, you saw her before you banned -- she had been banned. And she keeps coming back. Right? That's what you tell the dispatch.
A At that time I probably did remember seeing her before.
Q I see.

So here's the photographs of this woman. The plaintiff, Anoush Burmayan, taken by the police officers on the date of the incident -- arrest of her.
Does this refresh your memory of seeing her?
A No, I don't remember her. I don't remember ever seeing her. I don't remember.
Q Well, okay. All right.
So even right now sitting here you can't remember seeing her?
A No, I don't remember her face, ma'am, I don't.
Q Okay. Let's look then the arrest report by the officer.
You remember speaking with Officer Ross that day, right, of the arrest made when the -- after this call for service came in the police came in and arrested Ms. Burmayan, right?
A I don't remember if she was arrested.
Q Okay.
A We were asked to have her escort her out and tell her she's no longer welcome in the store.
Q Okay. So you do remember that part when the police came and escorted her out, detained her?
A I don't remember it. I'm just saying if

that happened.
Q Okay. We'll watch the video surveillance clips.
Is that going to help you to remember some of the stuff that happened on that date?
A I don't know.
Q Okay.
A If I don't remember her face --
Q I understand.
We'll try to refresh your memory. So let's look at the police report here by Officer Ross and see if you remember some of the statements you made to Officer Ross.
It states -- on COG 172, 173 it's attributing statements to you.
It states I spoke with the manager reporting party, Guy Garcia, and the following is a summary of his statement. Garcia said that Anoush kept coming to CVS three times in the past week.
Do you remember saying that to the police officer?
A Again, I don't -- no, I don't, because I don't remember it.
Q Okay. Do you have any reason to believe based on this report, official police report, that

this is not what you told him?
A I can't say that. I can't say this is not what I told him. If I don't remember talking to the police officer I can't say that this is not what I told him.
Q Right.
But we just heard you speak on the 911 call, right?
A Yes.
Q And it's consistent with what you told to the 911 call, the dispatch, right?
A That she's been there several times.
Q Right.
It's consistent, right?
A (Inaudible response.)
Q So it sounds like there's no inconsistencies from what you told the dispatch and you told Officer Ross, true?
A That's what it looks like.
Q Okay. And then it continues She causes a disturbance by yelling at the managers and then records them on her phone.
Do you remember saying that?
A No, I don't.
Q Okay. So you never saw Ms. Burmayan

actually record on her phone, true?
A I'm not saying I never saw her. I'm saying I don't remember. I don't recall seeing -- seeing.
Q Do you have any reason to believe that this statement is inaccurate?
A No, I don't.
Q Okay. Then he continues attributing statements to you. He said he told her not to return to the CVS each time she came into the store.
This to me means like you actually told her not to come back to CVS, that you banned her from the location; does that sound accurate to you?
Does that refresh your memory about what you told the police Officer Ross?
A If I told -- if I said it then I can't say that I'm the one that banned her; but if she's come back, like -- you know, she keeps coming back -- I would tell her, you know, you can't come in no more.
Q That means that you are banning her, right?
A If she's already been banned --
Q Okay. But who banned her?
A I don't know, ma'am.
Q All right.
Okay. All right.
But he says -- it states here He said he

told her that you, Garcia, told her not to return to CVS each time she came into the store.
It doesn't state that you learned from another manager that she had been banned, right, it doesn't say that, right?
A Right.
Q It gives you as the -- it puts you down as the person who actually banned the person from the location.
A No, it don't.
Q No, it doesn't?
A No. It says that -- that I kept telling her not to come back.
Q Yes.
A It doesn't say that I'm the one that banned her.
Q Okay. So then it continues saying Garcia said that he wanted her arrested tonight for trespassing, true, that's what it states?
Yes, the last statement?
A Yeah, I see that.
Q Do you agree that that's what it states in the report?
A Yeah, that's what it says.
Q Do you remember saying this to Officer Ross?

A No, I don't.
Q Okay. So do you have any reason to believe that Officer Ross --
A No.
12:12 Q Let me finish.
A I apologize.
Q -- misstated your statements?
Do you have any reason to believe that this is not an accurate statement?
12:12 A No.
Q So then according to this you did tell him that you wanted her arrested for trespassing, right?
A If it says it then I might have said it. I don't --
12:12 Q And according to this -- based on this paragraph of statements is that you wanted her arrested, because you had told her, you, not anyone else, you had told her not to return to the CVS each time on all three occasions in that past week; and
12:12 she came back into that store on that day January 19th, true?
MS. JONES: What's the question?
BY MS. MKRTCHYAN:
Q According to this that's what happened --
12:12 that you wanted her arrested for trespass, because

you had banned her from the location each time she came back three times in that past time, true?

A No, because it doesn't say that I banned her.

12:13 BY MS. MKRTCHYAN:

Q Oh, it says -- how do you understand the term you --

A It says that I asked her not to come back.

Q What does that mean to you, sir, in lay

12:13 person's term?

If I'm telling you not to come back to this place what does that mean to you in common sense?

A That means don't come back to the place.

Q Okay. Okay. So does that mean that I

12:13 cannot come back? Doesn't that mean I'm banned from that location, if I cannot come back?

You're the manager just explain, you know -- just explain to me what does it mean when you are telling someone not to return to the CVS; what does

12:13 that mean to you?

A Me telling someone -- if I ban somebody I would tell them You've been banned and you are not allowed back in our store. Me telling her not to come back to the store, me telling her three times do

12:13 not come back to the store --

Q Uh-huh.
A -- doesn't mean that I'm the one that actually banned her.
Q Well, let's say you are not the --
12:14 A I don't remember, ma'am.
Q Let's say you are saying that initially you were not the one banning her, but you stated here there's no indication anywhere in that paragraph that you knew who actually banned her from the location
12:14 that it was anyone else than you, right?
Read this paragraph again for yourself.
Is there any name of any manager there that you are attributing that ban from the location?
A No, there is not.
12:14 Q And Joe Johnson testified last week, he's your manager, about you. He stated, I did not ban her from the location. And, in fact, she could come back anytime.
So according to this police report are you
12:14 saying that it doesn't say in plain English that you are the one actually who told her not to return?
A I told her on there three times not to come back.
Q Okay.
12:14 A But it doesn't say that I'm the one who

banned her from the store, because I don't remember if I did or not.

Q Well, it doesn't make sense to me.

On one hand you are saying that -- you are admitting that what it states in this report --

A Uh-huh.

Q And you have no reason to believe Officer Ross, you know, somehow misstated you, right, that this is not accurate statements by you, right?

You don't have any reason to believe, do you?

A No.

Q Okay.

A I don't believe he misstated me in any way.

Q Okay. So you did tell him that I told her not to return to the CVS each time that she came into the store during that past week, true?

A True.

Q And then you want her arrested for trespassing that night, right, you said that to him?

A Yes, I did. That's what it says there.

Q Okay. Now, when you told her -- or the Officer Ross you wanted her arrested for trespassing, were you asking him to make a citizens arrest of this individual?

A I don't recall.
Q Do you -- so when it states here you want her arrested for trespassing; how do you understand that?
12:16 What is your authority as a CVS employee working as a manager?
What authority do you have to ask police officer to arrest someone for trespassing according to your policy training?
12:16 A When we call the police officer or an officer to come and help first, we have someone because of their trespassing. They ask us.
Q Uh-huh.
A They ask us would you like them arrested for
12:16 trespassing.
Q Uh-huh.
A And we were always told, yes, if anybody steals from us or they are trespassing we want them arrested.
12:16 Q Okay. So shopping lifting -- you mentioned shoplifting, right?
If someone is shoplifting that's trespass, right; you can ask them obviously you can ask the police officer to arrest them, right? Okay? Yes?
12:17 A Yes.

Q If someone is not wearing face mask is that considered trespassing?
A At the time --
Q Uh-huh.
12:17 A -- when we were told --
Q Uh-huh.
A -- not to allow them to come in without a mask, if they came in without a mask, we tell them you are not allowed to come in without a mask; that's
12:17 not trespassing, no.
Q Right.
So what is considered trespassing to you?
A To me?
Q Uh-huh.
12:17 A Is when a person is asked to not come back to the store --
Q Uh-huh.
A -- and they keep coming back to the store --
Q Uh-huh.
12:17 A -- that's considered trespassing.
Q Okay. And when you tell someone you cannot come back to the store, does CVS provide you with some guidance on how to communicate that to the customer let's say?
12:17 A I was told when we tell a person not to come

back to the store --
Q Uh-huh.
A -- we tell them We need to let you know that you are no longer allowed in our store.
12:17 Q Uh-huh. Okay.
So you communicate that verbally?
A Do I communicate it --
Q Yes.
A -- verbally?
12:18 Q Right.
A Have I -- I've told people many times that they are not allowed back in our store.
Q Okay. Many times like in the ballpark, like more than ten times?
12:18 A I couldn't tell you, I don't remember.
Q And those are issues such as shoplifting, right?
A It would be shoplifting.
Q Uh-huh.
12:18 A Like I said before, shoplifting, if they got aggressive with us, if they cussed out our employees, if they were yelling or screaming at any of our customers they would be asked not to come back to our store.
12:18 Q Is there any document you need to serve on

the customer giving them notice in writing that they are no longer welcome to do that?
A We don't do that.
Q CVS doesn't give you any kind of form?
12:18 A We've never seen a form like that.
Q Okay. So if you were if you to ban someone from a location you just say them verbally?
A If I were to ban them I would tell them You are no longer welcome back in our store.
12:19 Q Okay. And how do you know the person actually hears that?
How do you know that the person actually heard that, understood that?
A I don't know.
12:19 Q But in a situation I want to go specifically in a situation -- not shoplifting, not violence, nothing like that.
In a situation when someone is refusing to comply with face mask requirement that we just went
12:19 through, you said that the person is not banned from the location but is told to leave at that point.
And that person can come back if complies with face mask, right?
A Right.
12:19 Q That's your practice, right?

A Yes.
Q And Joe Johnson also testified that even though we do tell someone to leave if they are not complying with face mask they can come back if they are compliant.
They can go out and fully cover themselves and come back, right?
A Right.
Q Okay. So in a situation like that if someone, let's say, you know, is told leave, because you are not complying with face mask comes back with a face mask fully complying is that person trespassing?
A If they come back with a face mask you are say?
Q Yes. Fully complies with face mask is that trespassing to you?
A If they leave get a mask and come back?
Q Yes.
A No, that's not trespassing.
Q Next day, for example, so next day she comes back, you know, the customer, Ms. Burmayan for example, are you aware that on January 19, 2021, video surveillance recorded to show from your store that when she came back on January 19th she was fully

complying with the face mask, fully covering her face; are you aware of that?

A No, I'm not aware of that.

Q And yet you still called the police and told them that, you know, she's trespassing, even though she was complying with the face mask.

Do you have an explanation for that?

A If she was asked not to come back then, yeah, we called for trespassing.

12:21 Q I see.

So you are still maintaining that you could have banned her from the location as it states on, you know, report, the 911 call, despite the fact she came back with a face masking covering her face, true?

A (Inaudible response.)

Q Yes?

A Yes, but I'm not saying that -- I don't recall is what I'm saying. I don't remember banning her from the store.

Q Okay. But in any event, you called 911 on this day of January 19, 2021, when she was complying with the face mask, true?

A True.

MS. MKRTCHYAN: Okay. Let's take a lunch

hour break. This is a good time for us to take lunch hour break.

MS. JONES: Okay.

(Lunch break taken from 12:21 p.m. to 1:17 p.m.)

01:17 BY MS. MKRTCHYAN:

Q So let's go back on the record, 1:17 p.m.

Mr. Garcia, reminder you are still under oath.

A Yes, ma'am.

01:18 Q So going back to a couple other issues we went through.

So when police officers come -- and generally you testified before that there have been situations when you call the police and ask them to 01:18 arrest someone for trespassing is that considered citizen arrest for you?

A I don't know.

Q Have you received -- do you know what is a citizen's arrest?

01:18 A Yes, I know what a citizen's arrest is.

Q Have you made arrests of someone just privately as a security guard in your position or as a CVS employee?

A When I was working for Paseo Colorado in 01:18 Pasadena if someone was caught shoplifting from the

store they would ask us to arrest them. And our security director he would always be there in the area. And we would look at him, if he went like this to us that means we would cuff them and arrest them.

01:19 Q Gotcha.

So for the record, the witness crossed his hands just to display what he meant.

So but you would arrest personally by placing handcuffs -- did you have handcuffs security?

01:19 A Yes. When I was there I was completely full with the Sam Browne which means the security belt.

Q Uh-huh.

A It was my pepper spray, handcuffs and for my flashlight.

01:19 Q Uh-huh. Gotcha.

But at CVS did you ever make citizen's arrests, private arrest?

A I've never done that, I've never made an arrest.

01:19 Q Okay. Does CVS train you in terms of what kind of situations you can tell the police to arrest someone?

A If they -- like before if they cause problems or -- and like causing problems -- stealing, yelling, screaming, cussing --

01:20

Q Uh-huh.
A -- we ask them to leave.
Q Uh-huh.
A Or if they get -- if we ban them from the store and they come back in for trespassing then we have them arrested for trespassing.
Q I see.
So is there any document -- you've dealt with Glendale Police before in your job as a CVS employee, right?
A Right.
Q You know these officers by face sometimes?
A I'm sorry.
Q Do you know some of the officers by face?
A Some of them. I've seen them, yeah. If they come in, Hey, how you doing. I recognize some of them by face.
Q Do they come as customers or, you know, when you call them for help?
A Some of them do, some of them do come in as customers. When they are on duty they will come in and then buy something to drink or something.
Q Okay. You know some of them?
A Yeah.
Q In those situations when you call the police

for trespassing when the police arrested someone at your request, that has happened, right?
A If we ask hem to arrest them for trespassing, yes.
01:21 Q Okay. Within the last year, for example, how many times did that happen?
A I couldn't tell you.
Q Approximately?
A I don't actually know. I don't know.
01:21 Q But so when you ask for them does the police department ever give you any form to fill out to make that kind of an arrest?
A No, they don't.
Q Do you ask them to ban someone from the
01:21 location, the police banning them from the location?
A We've asked them to let them know they are banned from the store and they are no longer welcome. We don't actually say, Can you ban them from the store.
01:21 Q I see.
A We say, Can you please let them know they've been banned from the store.
Q Okay. In this situation we have -- let's go back to the -- you know, this is the police report by
01:21 Officer Ross, COGVON 73.

It states on that page that he advised Ms. Burmayan -- or Anoush, that she's no longer allowed at this CVS. And if she returned again she would be arrested for trespassing.

01:22 Do you remember telling Officer Ross that she's no longer allowed at the CVS and if she returns you would again be calling for police?

A No, I don't remember.

Q Is there -- so you never told Officer Ross

01:22 that she's banned from the location?

MS. JONES: Objection. Misstates testimony.

THE WITNESS: I don't remember, ma'am.

BY MS. MKRTCHYAN:

Q Okay. But if he states there -- here, that

01:22 actually that's what you told him and do you have any reason to doubt?

A No.

Q So you must have told him that she's banned from the location. I banned her and she's returned.

01:22 And therefore we want you to arrest her.

A It doesn't say that I said I banned her.

Q All right.

A It said she's -- where it says that I told her she can't come back.

01:22 Q Right.

A I never said I banned her.
Q Okay. Isn't that the same to you? No?
A But you are saying I told her -- told him I banned her. I never said -- I never told an officer that I banned somebody.
Q Okay. Well, you know, we went through this police report. I don't want to -- you know, the record will speak for itself. You already told us you don't have any reason to doubt the accuracy of this police report, right?
A I don't.
Q But it also states here that he advised that she's no longer allowed at the CVS, right?
So is there any reason to believe that you did not tell Officer Ross --
A No, there is not.
Q Let me finish.
A Oh, I'm sorry.
Q That she is not allowed --
A Forgive me, I'm sorry.
Q -- at the CVS, right?
So let's make sure it's clear for the record.
So is there any reason to doubt that that's not what happened based on your statements to Police

Officer Ross?
A I'm sorry. Ask it again.
Q That this statement is inaccurate that she's no longer allowed at the CVS and if she returns again she will be arrested for trespassing.
Is there any reason to doubt the accuracy of this?
A No, there is not.
Q Since he wrote in his report that he spoke only to you, there is no other -- on the basis of this police report he didn't speak to Joe Johnson, right?
You already read those two pages, right?
A Right.
Q So he spoke only to you.
If he spoke only to you the source of his information appears to be only you, right?
A Right.
Q There's no one else mentioned, right?
A Right.
Q Okay. And you told me earlier though that you said that, you know, we did not ban -- we will not be banning someone for refusal to wear a face mask. Right?
A Right.

Q We will be banning them for disrupting the business, right?
A Right.
Q Okay. So, you know, to you she must have disrupted business somehow on either occasion for you to ban her from the location, true?
A I don't remember. I've already told you I don't remember banning her.
Q Okay.
A I'm not going to say I banned her when I don't remember I have.
Q Okay. I understand that part.
You don't recall if you banned her. I just want to know if you were banning her based on, you know, your testimony earlier, would it be accurate to say you would be banning her not for refusal to wear a face mask but for disrupting the business, yelling obscenities at you, et cetera?
A If she was doing that if I had to ban her, yes.
Q Uh-huh. Okay.
Okay. And have you ever ban someone for just yelling at the store?
A I don't recall.
Q Okay. So but, you know, did I understand

you right that you told me that if someone comes back wearing the face mask even though before on prior occasion she had not, it would be okay for her to be coming back as long as she is behaving appropriately, right?

A Right.

Q So if Ms. Anoush Burmayan, according to her testimony she came back -- and you look at the video surveillance, she came back to the store January 19, 2021, and she was wearing the face mask complying. And she was only trying to speak with the manager, not disrupting anyone. And we will watch the video, not disrupting anyone at the store.

Would it be fair to say that you banning her would be in violation of the policy, as in your training and practice?

MS. JONES: Objection. Incomplete hypothetical. Also lacks foundation. Sorry.

THE WITNESS: I don't remember banning her.

BY MS. MKRTCHYAN:

Q Okay. But you did tell the officer according to this that you did ban her.

A No, I didn't.

Q Let's get passed that. Let's get -- you told the 911 dispatch that she was banned, and she's

coming back and she keeps disrupting, right?
A Right.
Q Okay. So regardless of who banned her, you are saying you didn't ban her, right, even though you were the only one working with Joe Johnson as managers either of those occasions, January 13th and January 19th, true?
A I believe so. I don't remember.
Q Okay. So let's get passed that.
Whoever banned her, if she's coming back with a face mask, according to her testimony, fully covering her face and she's just asking for the manager, would calling the police on her under those circumstances be appropriate?
A If she's already been banned then, yes.
Q Okay. But you said that you didn't ban her, right?
A I said I don't remember banning her.
Q Well, let me ask you this: If you don't know she's banned how do you know she's banned?
MS. JONES: Objection. Vague.
BY MS. MKRTCHYAN:
Q If you don't know who banned her how would you know and tell the dispatcher, the 911 dispatch, that she was banned from the location if you didn't

ban her?
A I said I don't remember if I banned her or not.
Q Is it possible that you did?
01:27 A I could have.
Q Okay.
A I don't remember.
Q Would you have banned her for not wearing a face mask?
01:28 A I would not have banned her for not wearing a face mask.
Q And what would you have banned her for?
A If she caused a problem with us.
Q What kind of a problem?
01:28 A If she came in argumentative, cursing at us --
Q Uh-huh.
A -- causing any other problem then yes she would have been banned.
01:28 Q Okay. But do you remember that happening actually?
A No, I don't.
Q Okay. All right.
So for January 13, 2021, basically, you
01:28 know, do you remember coming -- you know, working on

that day?
A Actually, no, I don't. I don't remember working.
Q If I show you the video surveillance clips are you going to be able to remember?
A If I'm on the clips then, yeah, I must have worked that day.
Q Okay. Let's try to look at the video clips here.
(Video played.)
BY MS. MKRTCHYAN:
Q Okay. So for January 13th do you -- you recognize this clips, right?
I'm playing the video surveillance clips from CVS for January 13, 2021; you recognize the store on this video?
A Yeah, that's where I work at.
Q Okay. And so let me just see something here. There are three camera angles as we can see on this.
Do you know how many camera angles are in the store, how many cameras are in the store?
A Do I know how many? No, I don't.
Q No?
A I don't really pay attention to that.

Q No, you don't. Okay.
But you do have access to watch the video?
A Yes.
Q You know there are cameras?
01:30 A Yes.
Q But there's no audio, right?
A No.
Q Is there any camera outside of the store that you are aware of?
01:30 A The only one is facing the pharmacy drive-thru.
Q Okay. So at 12:12 we have Joe Johnson entering the store, right?
Is that Joe Johnson?
01:30 A Yes. Yes. I'm sorry. Yes, that's him.
Q So he enters the store. He goes to the back of the store. Okay.
You have 12:13 the plaintiff, Anoush Burmayan, in this action is entering the store.
01:31 Do you see the lady, the young lady as you mentioned, referenced her, on the clip?
A If that's her, yeah, I see a lady walking in.
Q All right.
01:31 So does this refresh your memory about how

she looked on the day of the incident?
A No, I don't.
Q You have absolutely no recollection of her?
A No, I don't, ma'am. I don't remember her.
01:31 Q Okay. All right.
But you can see on this clip at 12:13:02 she enters the store and she's covering her face with a mask, right?
A That's what it seems to look like, yes.
01:31 Q Uh-huh.
And generally at nighttime how is the traffic at the store?
Generally is it a lot of people coming in for various things?
01:32 A It all depends on the day.
Q Okay. So if there's no average type of a situation where you can tell how many people coming in or not, there's no average traffic? Okay.
A I can't actually say yes. There's days that 01:32 we get people coming in one right after the other and there's days maybe three, four, ten.
Q Yeah, that's okay. Okay.
So let's look at this screen over here at the register screen.
01:32 Do you recognize this person as one of the

employees potentially or not?
Let me play this again?
A I --
Q No? It is a customer?
01:33 A That's a customer, not an employee.
Q All right. So that's a customer.
Let's see who else we recognize as employees and if you can recognize yourself.
So we can see on this clip area 12:13:55
01:33 again the plaintiff walks towards the aisles, right?
Yes?
A Yes.
Q Describe to her for me, like in terms of what you watch in the video clips.
01:33 How tall does she appear to be to you from video clips?
A I couldn't tell you. I don't know, maybe four, 4'5", I don't know.
Q Short. You can't tell. Okay.
01:34 Did you know if she was Armenian?
A I have no idea. That's why I said -- on the thing it says white I believe.
Q Okay. So you have no idea what was her name, right?
01:34 A Right.

Q You have no idea about her ethnicity?
A I did not know.
Q Only race, that's all you knew, race?
A Not even race. I didn't know she was -- what her race was.
Q No, you didn't. Okay. All right.
Let's continue playing this.
(Video played.)
BY MS. MKRTCHYAN:
Q Is this you somewhere walking around the aisles? Did you recognize yourself or not yet?
A That might be me. I can't say actually for sure.
Q Okay. So let's continue playing.
So we have Anoush Burmayan, plaintiff, standing there by one of the aisles, right?
A Right.
Q 12:15.
So just looking at her from the video clips you never -- this doesn't refresh your memory of that date?
A No, it doesn't, ma'am.
Q So she picks up a basket and goes toward the aisles, right, the closest thing, right?
A Right.

Q And she's still wearing a face mask, right, that you can tell based on that clip, right?
Yes?
Did you see her wearing a face mask in that clip?
01:36
And now we have at 12:16 her going through one of the other aisles, her wearing face mask.
A Okay. I can see the face mask there.
Q Uh-huh. Uh-huh.
01:36
Do you know the numbers of the -- the numbering of the aisles in the store?
A Those are all from -- makeup all the way to -- to what's it called -- to the fragrant is all Aisle One --
01:36
Q Uh-huh.
A -- because it's all makeup and everything.
Q Uh-huh. Uh-huh. Okay.
A This was already after the remodel.
Q I see.
01:36
So she walked outside of that aisle and she goes into another area. Let's see if we can see her continue.
We can see her walking from aisle to aisle, right?
01:37
A Right.

Q Uh-huh. At 12:17.
I believe she's walked right now by another aisle at 12:18 behind one of the aisles.
Did you see her walk by?
01:37 A No, I didn't see her.
Q I think she's standing somewhere around where my cursor is. Let's see if she's going to move and you can watch her go down the aisle.
A Okay.
01:38 Q Do you see the second person close by in that aisle where she's standing?
A I can see a person moving right there.
Q Okay. When you -- let me ask you this: When you are at the store do you wear uniforms, some
01:38 kind of uniforms, shirts?
A Yeah. Sometimes I do and sometimes I don't.
Q And the shirts that you wear does it have some sort of a logo on the back?
A The heart, yes.
01:38 Q Okay. That's the CVS Health logo, right?
A Yes.
Q So you do wear that sometimes, those kind of shirts?
A Sometimes. Back then I did wear them, now I
01:38 don't wear them no more.

Q Okay. So but they're -- let's see, do you see someone here with that shirt of a shirt walking?
A Yes.
Q Is that you potentially, is that you?
A Potentially that can be me, yes, me ma'am.
Q So let's see 12:20 you saw someone walk around that aisle with that kind of a shirt with the logo, CVS logo, right? Yes?
You have to for the record please.
A Yes, I'm sorry.
Q Thank you. I understand, but we got to make record clear.
A Yes. I understand.
Q Okay. So let's continue watching this.
And you said your height is five -- you said how tall are you?
A With shoes 6', without shoes 5'11".
Q Gotcha.
So between 5'11" and with shoes -- you always wear shoes in the store, right?
A Yes.
Q So 6'. Okay.
Is this someone you recognize?
This person is it the customer or is it a worker carrying something in his hands?

Look to me he's carrying something in his hands.

Is it a customer do you think?

At 12:22:32 a.m.

01:40 A I don't -- that might be Tim; I can't say yes or no, because I don't recognize him.

Q Gotcha. Okay.

But is he wearing any uniform that you can tell. He has a name tag, I can see there's a name tag here somewhere, right?

01:40

A Yeah, there's a name tag but --

Q Uh-huh.

A -- people come in with name tags all the time.

01:41 Q Okay. So you can't tell whether this is one of the employees or not?

A I can't tell whether he's an employee or not.

Q This is the second time you have seen him in the clips, right?

01:41

It's the same guy in the store over here, right?

A Yes.

Q Okay.

01:41 A He walked out earlier.

Q Uh-huh. Uh-huh. Okay.
Yeah, he's --
A He probably is an employee. That probably is Tim, because he's carrying -- he was probably out cleaning the parking lot.
Q Gotcha. And he's wearing some sort of a beanie?
A Uh-huh.
Q Maybe that's -- maybe that's why you can't recognize him.
And Timothy Riddle you are saying was working on that day?
A I don't remember if he was.
Q Do you know Jesus Garcia?
A Jesus Garcia? No. Oh, Jose -- Jesus, yes.
Q He worked at the store --
A Yeah.
Q -- around the same time in January?
A I don't remember if he worked that day but yes.
Q So you know him?
A Yes, I do know who Jesus is.
Q Is he still working there?
A No, he's retired.
Q How old is he?

A Close to 70 right now.
Q You are not related to him?
A No. He -- no.
Q So but this is not Jesus Garcia?
01:42 A I couldn't tell. No, I don't think that is Jesus Garcia.
Q But you can't tell whether it's either Timothy or Jesus?
A I can't tell whether it's either one, I
01:42 don't -- I couldn't tell you.
Q But it appears he is an employee, because he's carrying what is it called, cleaning --
A It's a.
Q -- broom --
01:42 A -- dust pan.
Q But it could be he's cleaning the --
A It looks like he was cleaning the parking lot.
Q Okay. Let's continue.
01:42 He's coming back at 12:22.
Do you have easier time to recognize him at this clip?
A I can't tell which one it is, because I can -- I can possibly say that I don't think it's
01:43 Jesus, because Jesus is real short and real thin.

Q Okay. And Timothy is a younger guy though, right?
A Yeah, he was a younger gentleman and pretty tall. He was pretty thin, but he was a little bit thicker than Jesus.
Q I see.
And both of them were in there working nightshift, right?
A Both of them, yes.
Q Okay. Let's continue.
And then he takes out --
A Okay. Now I'm starting to believe that it might be Jesus, because look at his hair.
Q I see.
So he takes out the cart.
Why would he be taking a cart outside?
A To throw the trash.
Q Oh, I see. Okay.
So it might be Jesus Garcia?
A It might be Jesus Garcia, I can't say for sure though.
Q Okay. But from the employee logs that we have received for that day it appears to be Jesus Garcia was working on that day on January 13th.
Do you have any reason to believe that

that's not accurate?
A No, I don't know. No, I do not.
Q Okay.
A Like I said, I don't remember who was there and who wasn't there.
01:44
Q Either way neither Jesus nor Timothy are working there anymore?
A Jesus retired. And Timothy moved; he quit, because he moved back to Seattle.
01:44
Q I see. Okay.
We have actually both Timothy and Jesus Garcia on this shift to be working on January 13th.
Anyway but so you believe at this juncture 12:22 a.m. on this clip, front store clip, you believe this potentially could be Jesus Garcia?
01:44
A Potentially could be Jesus.
Q Okay. Let's continue.
A There's one way I might be able to tell if it's Jesus.
01:45
Q How?
A Because if he comes in the store with a trash in the -- with the bag of in the trash in the cart it's Jesus.
Q Gotcha.
01:45
What made you think of that?

A Because he was the only one that would do that.
Q Gotcha.
A Me -- Timothy and myself we would take it around to the back.
Q Now, there you go. Here he comes.
A That's Jesus.
Q At 12:24:05 he brings the trash inside the store to throw it away?
A Yeah, to take it to the back. He knows what he's supposed to do, he's supposed to take it around to the back.
Q So this is Jesus Garcia, 12:24?
A I believe it is Jesus Garcia.
Q Okay. Thank you.
And Jesus Garcia was working as a front clerk.
What was his position?
A He was a clerk.
Q Not like -- not a manager -- not a manager position, right?
A No, he was a clerk.
Q So -- so far in the clips we've watched from 12:13 to 12:25 the only time we spotted -- well, let's see, there's somewhere else walking there at

the top.
Do you see -- did you see that?
A Yeah, I see that.
Q Was that you?
01:47 A I didn't notice.
Q Let's see this is you between the aisles; did you see is that you?
A It might have been. I couldn't tell you if it was or not.
01:47 Q So Jesus now just put the cart back and walked out again, right, out of the store, yes?
A Yes.
Q So let's watch the aisles to see if we can spot you again. This aisle -- I think this is stuck,
01:48 has frozen for a second see. I don't think -- do you see some one's image there on top right there?
Yeah, and then walk by.
A Yes, I saw someone walk by.
Q So these are customers, right?
01:49 Behind between the aisles again we see an image of someone, right?
Right there between the aisles there on the left corner did you see the image of someone.
You know, I can turn the lights down a
01:49 little bit so to see better.

Is that okay for court reporter?

DEPOSITION OFFICER: Sure.

BY MS. MKRTCHYAN:

Q We can actually see this better.

01:49 A I did see like a head move.

Q Uh-huh.

A But I couldn't tell you who it was.

Q Okay. All right.

Before January 13, 2021, we have you down in 01:50 the employee logs at working that nightshift.

Do you have any reason to doubt?

A No.

Q That's okay.

Let's -- I just want to make sure that we 01:50 play all of this so we can refresh your memory and confirm.

There are some glitches with the computer clips, video clips, because see now this camera has frozen. Do you see that?

01:50 A Yes.

Q Okay. Did you have any involvement or knowledge when this videos get maintained or upgraded?

A No, I do not.

01:50 Q You don't deal with that?

A No, I don't deal with that.
That if -- anything that is done by -- with operation managers and above.
Q Gotcha.
So you don't deal with that situation?
A No.
Q So the cashier register is by the -- in this camera angle that I'm showing on top right, the right hand corner that's the cashier, right?
A Yes, there's four registers up there.
Q But at nighttime there's only one cashier working, manning the register potentially?
A Usually --
Q Usually.
A -- it's one cashier, but when we get too busy they'll call for a second cashier to come and help.
Q And you also have self-checckout?
A Yeah. Those are the ACOs right there.
Q Okay. Is there a specific person involved in -- just called loss prevention guy in the store?
A At that time as far --
Q Uh-huh.
A -- around that area when I was working that area around that time we didn't have a loss

prevention.
Q Do you have it now?
A Not -- well, now he's -- we do have a loss prevention, but he's overseas right now.
01:53 Q Overseas, what do you mean like traveling?
A Army.
Q Oh, so he left the job?
A No. He's still employed. He's just got called to the service.
01:53 Q Gotcha.
But right now, at the time in January 2021, you didn't have a specific loss prevention person?
A Not that I remember, no.
Q So you and store manager would be dealing
01:53 with any issues that come across you?
A Well, it would be -- if we had to deal with anybody it would be whoever was on duty at that time.
Q Uh-huh.
A If Jack was there and, you know, Jack would
01:53 take care of it; Joe or Adrian, whoever was the manager on duty would take care of it.
Q Uh-huh. Do you see that this camera angle seems to be freezing a lot?
Like there's -- this on the right corner
01:54 showing the aisles. This keeps freezing pretty much.

A Yes, I can see that. Yes.

Q At least from this angle that we are watching. The rest are working fine. You can see the movement going on, but we don't -- it's very hard to see -- see, it phases and then comes back, right?

A Yes.

Q Okay. Does pharmacy -- is pharmacy opened at night?

A Our store or the actual pharmacy itself?

Q Actual pharmacy itself.

A No. It closed at -- it closes -- at that time it was closing at 11. And during the week and weekends it would close at 6.

Q But you do sell other over counter medications, right, in the store retail, right?

A Yes.

Q So are these customers still walking around?

Do you recognize any of the -- any yourself there at 12:40, no?

A No, I believe those are customers.

Q Uh-huh. So your nightshift would start when, what would be your start at the nightshift?

A At midnight.

Q Midnight.

And would end when?

A 8:30 in the morning.
Q So presumably at 12:41 a.m. you would be working there at the store, right?
A Yes.
01:57 Q Is there a backroom in the store where you can go, and sit, and wait and just kind of take a nap or do whatever?
A We have a small break room.
Q Break room?
01:57 A Yes.
Q All right.
So this screen we can see from my end plaintiff -- Plaintiff Anoush Burmayan walking with a basket, right?
01:57 At 12:41 there is another female also behind her, there are two females in the camera angle, right?
Let me --
A I've got to stand up.
01:57 Q Sure.
MS. JONES: Are you okay? Want to take a break?
THE WITNESS: I'm okay.
BY MS. MKRTCHYAN:
01:57 Q You have problem with your feet?

A I have sciatica.
Q Oh, you can stand up, it's fine.
A My legs they just start cramping up.
MS. JONES: You want to take a short break to walk?
THE WITNESS: Can we please.
MR. JONES: Yes, let's just take a five minute break. Off the record.
MS. MKRTCHYAN: Okay.
THE WITNESS: Sorry.
MS. JONES: No problem.
(Break taken.)
BY MS. MKRTCHYAN:
Q So, yes, just going back to this camera view on the -- I think this is the register, the cash -- the front register.
A No, that's the ACO cameras.
Q Uh-huh.
Do you see the two women?
A Yeah, I see the women there.
Q Right.
So and one of them is Anoush Burmayan I represent to you, continuing to carry the basket that we saw previously on these clips, right?
A Uh-huh.

Q Yes?
A I think that's her. It's blurry, so I can't actually see who it is.
Q Okay. So -- all right. Let's continue playing, see what else happens here.
Both women approach the area of the cash register. Ms. Burmayan approaches with her basket the register area, true?
A True.
Q Uh-huh.
This is at 12:41 ACU register clip video recorder.
And then she goes to the register. She puts the basket down on the floor.
And then she's at the register currently at the moment, right, at 12:41, right?
A Right. That would be Register 2.
Q Uh-huh.
Do you remember her -- do you remember yourself being at the register?
A No, I do not.
Q No.
Do you normally do -- you know, man the register at the store?
A When it's more than two people, no, I don't

man the register.
Q I see.
But if, you know, you have -- you saw only Jesus Garcia so far in the tapes, right?
02:02 A Yes, ma'am.
Q If it was only him and Joe Johnson, according to his testimony that night, who would be managing the register that night?
A Jesus.
02:03 Q Jesus.
If you just saw him walking around with trash. We didn't see him so far by the -- we didn't see him so far approaching the register, true?
A True.
02:03 Q Okay. So this clip 12:42 we see Ms. Burmayan leave the register abruptly and approach -- let's see where she's approaching.
And we can see that she's still wearing the face mask although we cannot tell whether it's fully
02:03 covered her face, true?
A True.
Q According to her testimony she was not fully covering, because she testified that she had disability breathing -- inability to breathe as she
02:03 had her nose open. Okay?

A Okay.
Q So do you remember her on that day trying to tell you, or Joe Johnson or any of the employees, Look I have a medical disability, I haven't had time to fully cover my face; do you remember that?
02:04
A I do not remember anything, ma'am. I don't remember what she looks like, ma'am.
Q Okay. All right.
But even playing the 911 call from statements you made to the dispatch that we just heard about her coming back, et cetera and not wearing the face mask does not refresh your memory whatsoever about this incident?
02:04
A No, it doesn't.
Q No. Okay.
02:04
So do you have any reason to doubt that she actually came to the store, she was not fully covering her face, she was telling you, Guy Garcia, and John Johnson, you know, I have a disability, I need to, you know, open my nose to breathe and that she was trying to show you her medical papers that you did not want to see.
02:04
Do you remember that happening?
A No, I don't.
Q No?
02:05

MS. JONES: Objection. Lacks foundation.
BY MS. MKRTCHYAN:
Q Do you have any reason to doubt that that's what happened?
02:05 MS. JONES: Same objection. Lacks foundation.
THE WITNESS: Do I have any reason to believe that that didn't happen?
MS. MKRTCHYAN: Yes.
02:05 THE WITNESS: I can't say yes or no, because I don't remember, ma'am.
BY MS. MKRTCHYAN:
Q But based on your 911 call -- incident -- I mean 911 call that you just heard it doesn't refresh
02:05 your memory about this?
The fact that this woman was arrested on this day do you have --
A I don't remember. I don't recall.
Q Okay.
02:05 A This happened three years ago, ma'am.
Q Understood.
But hearing this 911 call has not at any point in time strike you as, you know, this is the woman that happened this incident, et cetera, no?
02:05 A It tells me that I called on a woman, but --

Q Uh-huh.
A -- I can't actually say it was that woman, because I don't remember her.
Q Gotcha.
02:06 So even -- even you know, in preparation for this deposition you've gone through -- how many hours have you spent?
I don't want to know how much -- the communications between your counsel. I don't want to
02:06 know that, the conversations you had with your counsel.
I just want to know how long have you sat down with your lawyers about this incident?
A The first time I sat down with her was when
02:06 I was talking with her when we called -- when she called me to let me know about the --
Q I don't want to know the communications. I just want to know how much time you've spent prior to coming to this deposition with your lawyer, just give
02:06 me a ballpark -- one hour, two hours, three hours?
A One hour when I got here we were talking.
Q Here, that's when you spoke to the lawyer?
A Yes.
Q Not before this -- coming to this hearing or
02:07 this -- whatever we call this, deposition?

A I've actually -- we've actually spoke on the phone.
Q Uh-huh.
A About --
02:07 MS. JONES: Not the content of the communication. Listen to her question. She's asking you to estimate the time.
BY MS. MKRTCHYAN:
Q Yes, just estimate the time, sir.
02:07 All I want to know, you know, how many times -- how many times you spoke to your lawyer?
A On and off -- well, on the phone like maybe three times.
Q Okay. During the last month or so?
02:07 A The last month was just so we could talk about the deposition.
Q Okay. And how much time?
Just give me in a ballpark, you know, two, three hours you spend talking about this case or five
02:07 hours or six hours?
A I'd say the longest was anywhere between 45 minutes to an hour.
Q That's the longest?
A Uh-huh.
02:08 Q All right.

Let's -- and even having communications with your lawyer, after hearing the 911 tape here, after watching this video surveillance clips you have absolutely no recollection whatsoever about this incident?

02:08

A Ma'am, I don't remember this incident.

Q Does not refresh. Okay.

How does Joe Johnson, who was there on the same day with you January 13th, January 19th, he was able to recollect pretty much everything that happened last week and this incident happened about same time for him too?

02:08

A Well --

MS. JONES: Calls for speculation about what he thinks.

02:08

BY MS. MKRTCHYAN:

Q Do you have any idea?

A That's Joe, I'm not Joe.

Q Okay.

A Joe might have a better memory than me. I don't know, but I am not Joe Johnson.

02:08

Q Okay. But you are the one who called the police, right?

We already established that, right?

A Right.

02:09

Q It wasn't his voice there, right?
A Right, it's me.
Q And you were the only one Officer Ross spoke to on that day, right?
02:09 A Right.
Q Okay. Let's continue playing this.
(Video played.)
BY MS. MKRTCHYAN:
Q So Ms. Burmayan was there from 12:42 a.m. is
02:09 standing by the self-checkout register, right?
She's using that as we speak as we can see, right?
A Right.
Q Okay. And then we can see Joe Johnson
02:09 approaching the area in the frame at 12:43, right, approaching her, right?
A Right.
Q Do you remember this happening --
A No, I don't.
02:09 Q -- on January 13th?
A No, I do not, ma'am.
Q Okay. And he's standing by her as she's using the self-checkout, right?
How many feet do you think he's standing by
02:10 her -- behind her?

Estimate for me, give or take.

A I'd say about maybe six, seven feet.

Q Okay. Does it appear from the clip that, you know, he's, you know, the gestures and her gestures does it appear they are talking?

A It does.

Q Uh-huh.

Do you remember what she said?

A No, I don't know, ma'am.

Q But you were in the store, right?

According to this employee log you were in the store.

A If the store says I was in the store then I was in the store.

Q All right.

So but you have absolutely no recollection of this happening as of right --

A I don't remember, ma'am, no, I don't.

Q Okay. All right.

So let's see how long she's going to use the checkout and then -- and how long Mr. Johnson is standing by her.

So she's still using, 12:44, the checkout and Mr. Johnson is standing by watching her, right, we can tell?

A Right.
Q Uh-huh.
Other customers are coming in and leaving, right?
A Right.
Q No one is paying attention, nobody stops by to watch, right?
A Right.
Q Uh-huh.
Does it appear from this clips that we just saw that she's throwing anything on the floor?
A No, it does not.
Q Did it look like to you that she's actually in any way aggressive towards Joe Johnson physically?
A Right now at this point, no.
Q Okay. Did you ever see her being aggressive -- in these clips ever being aggressive in any clips we've seen so far?
A I can't say yes or no, because I don't know what she was yelling or talking to Joe about.
Q But right now as we can see?
A As of right now?
Q Uh-huh.
A No.
Q We saw customers pass by, right, nobody was

paying attention to her, right?
A Right.
Q Do you believe if she was yelling and screaming some customers would turn around and watch
02:12 her, right?
A I suppose.
Q Okay. Joe Johnson is just standing by there, he's not doing anything of much.
He's not approaching her to help her, right?
02:12 He's not doing anything, he's just standing by, right?
A Right.
Q And how many feet now is he standing there 12:45, 10, 15?
02:13 A Maybe --
Q Maybe?
A -- 15, 20, I don't know, 10, 15.
Q Okay. It doesn't appear he's overly concerned, right?
02:13 A Right.
Q Okay. It doesn't appear that he's distressed, right?
A Right.
Q He's just -- but he's making some gestures
02:13 as if he's talking to someone standing at the

register, right, there's -- you know, right?
A Right.
Q Is this you or is it Jesus Garcia approaching?
02:13 A That's Jesus.
Q So at 12:45 we see Jesus Garcia get out of the register area, right?
A Right.
Q And get out and speak with Joe Johnson while
02:13 Ms. Burmayan is still using the self-checkout, right?
A Right.
Q So based on this video clip we can tell that it would be two manning the register at the time, right?
02:13 A I can say, yeah, that's what it looks like.
Q So here's -- Jesus comes by, puts the basket in its place, right?
This is Jesus Garcia, right?
A Right.
02:14 Q So then according to this video clip it appears that it was Jesus Garcia -- when Ms. Burmayan approached the register it was Jesus Garcia that managed the register, right?
A Right.
02:14 Q Not you, right? True?

A I can't say yes or no.
Q Because you didn't see the register?
A Because I don't know -- I don't remember if I was up there or not.
02:14 Q Okay. So it's possible that you could have been right there, right?
A It's possible, I could have been.
Q And isn't it true your store actually has a video camera overseeing the register, front register,
02:14 just to see if someone stealing money over the register?
MS. JONES: Objection. Calls for speculation.
If you know.
02:14 THE WITNESS: We have -- do we have a camera facing?
MS. MKRTCHYAN: Yes, register.
THE WITNESS: We have --
MS. MKRTCHYAN: Overseeing.
02:14 THE WITNESS: We have this one and then we have one more facing the register.
BY MS. MKRTCHYAN:
Q Right.
That shows clearly the actual register,
02:15 right?

A Right.
Q So we still see Jesus Garcia and Joe Johnson standing by at 12:46 and Anoush Burmayan is still by the register -- I mean the self-checkout register, true?
02:15
A True.
Q And they appear to be talking.
And then Jesus Garcia approaches and stands by closer to Ms. Burmayan, do you see that?
02:15
A Yes.
Q Uh-huh.
We don't see you anywhere at this point yet, right?
A You don't.
02:15
Q Okay. So from this date right now you are watching you don't remember Ms. Burmayan approaching you and telling you that, you know, strike that.
You don't remember Ms. Burmayan answering and you telling her that she should cover her face fully with the mask?
02:16
A No, I don't, ma'am. No, I don't.
Q But would you be doing that if you saw her not fully covering her face, given that what you told us today testified today?
02:16
A If I saw her and her nose wasn't covered I

would ask her can you please cover your nose.

Q Right.

And you told the 911 dispatch that that's exactly what happened -- that she came previously, she was not wearing the face mask -- and when they told her to leave she started, you know, acting up -- I'm paraphrasing your statements -- to the dispatch, right?

A If that's what was on there, yes.

02:16 Q Okay. All right.

We see Ms. Burmayan at this point of 12:47 change register to another one, right?

Do you see that?

A Right.

02:16 Q And Joe Johnson does not approach her to see what's going on. He just approaches basically the other checkout to see, you know, to close that basically, right?

He doesn't help her in short, he doesn't approach and help her to buy her item, true?

A That's what it looks like, yes.

Q Uh-huh. Uh-huh.

Throughout this clip that we just saw we didn't see her again not throwing things on the floor, right?

A No, I don't see her doing that.
Q We didn't see her, you know, doing anything aggressive towards anyone, customer, or Joe Johnson or Jesus Garcia, right?
02:17 A That's what it looked like.
Q She just uses the self-checkout, right?
A Right.
Q Okay. And thus far it doesn't appear that Joe Johnson has told her to leave, right; otherwise
02:17 she wouldn't be standing there at the self-checkout, right?
A Right.
Q And to your knowledge nobody called the police on her on this day, right, earlier?
02:18 A To my knowledge, I can't say yes or no, because I don't remember.
Q Okay. Well, let's see if anyone calls on this day, January 13, 2021.
There's someone standing there by the
02:18 register is that you -- not by the register by the aisles.
Is that you now, can you say that's you?
A I can't say yes or no, I don't know.
Q So Ms. Burmayan at this point at 12:49
02:18 finished her self-checkout and he's walking toward

the exit.
At this point she took off her face mask as she's leaving, right?
A That's what it looks like.
02:19 Q And Joe Johnson is there. He's not doing anything.
Doesn't appear to be distressed, right?
A I guess, yeah, looks good.
Q Behind him there is the, you know, figure
02:19 that I -- you know, he testified at his deposition last week that it is you -- but you can't confirm one way or the other?
A I cannot confirm. I can't say yes or no.
Q Okay. So let's see -- so she leaves the
02:19 store. And you can tell she's not arrested. She flips out, you know, basically at this point maybe it appears to be, you know, does the finger and leaves, right?
Can you tell now at this screen that it was
02:19 you walking towards Joe Johnson?
A It does, I can -- it does look like me.
Q Okay. So it appears that it was you standing by the aisle as Joe Johnson was standing near the self-checkout registers, true?
02:20 A I'd say yes.

Q So it appears that you were watching the encounter with Ms. Joe Johnson and Ms. Burmayan, true?
A It does look that way.
02:20 Q Even though you don't remember anything right now you are watching --
A No, it doesn't.
Q Okay. And then what do you see yourself doing as we watch this clip now, 12:49?
02:20 I'm going to continue playing, you tell me.
So this is you, right, at 12:49, right?
A Yes, it is me. That is me. Yeah, I can actually say that is me.
Q Okay. And we saw Joe Johnson right now get
02:20 out of the store briefly and walk in again at 12:49, right?
A Right.
Q But this is you near the self-checkout areas, right?
02:20 A That is, yes.
Q This is the camera ACO.
A That is me.
Q Right.
Your hair is longer there, right?
02:21 A Yes.

Q And you are a little bit more heavyweight?
A A lot more heavyweight.
Q 300. All right. Good.
So let's see what else happens on this.
02:21 But Ms. Burmayan left. We didn't see police called, right?
A Right.
Q Okay. And it appears you and Joe Johnson are talking, right, you wave -- you wave at someone,
02:21 right?
A Uh-huh.
Q What did you wave?
A I don't remember, I have no idea.
Q And you do -- you are wearing your shirt --
02:21 A Yes.
Q -- with CVS logo?
A Yes, that is me.
Q Right.
So when we saw earlier someone walking
02:21 around the aisles with the shirt with the logo it must be you, right?
A It must have been me, yes.
Q All right.
So, let's see, you walk by, you took out
02:21 your cell phone.

Do you agree you took out your cell phone?
You approached the self-checkout, right?
A I'm at the self-checkout but --
Q Do you know what you were doing by the self-checkout?
A No, I don't.
Q What is Joe Johnson doing right now at the front door?
A I have no idea.
Q He's holding his cell phone, right; and you are also holding your cell phone, right?
A It does look like it's my cell phone.
Q And you approach -- this is the front door clip, video recording camera. You approach Joe Johnson and you are watching outside.
You are watching Ms. Burmayan leave the parking lot, true?
A I don't know.
Q You don't know?
A I don't remember as we were walking.
Q Yeah, but --
A I can't say yes or no.
Q Yeah, but just tell me -- interpret for me -- I understand that you don't have independent recollection of that, I understand that.

All I want you to confirm and interpret with me can you please make -- not make that noise with the --
A Sorry.
02:22 Q It disrupts. I already have this making huge noise. Thank you.
I just want you to interpret with me and would you agree with me of my interpretation of this video is reasonable or not?
02:23 A I'm sorry. What?
Q I just want you to confirm watching this video and interpret with me your actions -- if my interpretation is accurate or not. Okay.
So at 12:50 as Ms. Burmayan left the store,
02:23 walked out of the store, you and Joe Johnson are standing by at the front entrance and watching out, right?
A We're standing there, yes.
Q It appears that you are talking together,
02:23 right, between each other?
A I don't know.
Q You don't know.
From this video it doesn't appear to you that you guys are communicating with each other?
02:23 A Actually, no, it doesn't.

Q Okay. Okay. All right.
So you are standing by there, you are waving your hand. And Mr. Joe Johnson is also standing by and then you come in, right? Right?
02:24 A Right.
Q What -- and you waved at someone, right?
A I don't remember.
Q But no.
On this video did you wave at someone? I don't want you to remember.
02:24
Did you wave at someone on this video?
A It looks like I might have. I don't know.
Q Okay. And then you come in. It appears that you are talking about -- well, that this incident with Anoush Burmayan caused a conversation at least between you and Joe Johnson, true?
02:24
MS. JONES: Calls for speculation.
THE WITNESS: I can't say yes or no.
BY MS. MKRTCHYAN:
02:24 Q I see.
A You know.
Q Based on this video.
A I can't say yes or no, because on this video it doesn't look like we were talking to each other.
02:24 Q I see.

A You know.
Q Well, right now you are waving your hand. Joe Johnson is going back again.
And you are telling me that you guys are not talking at all?
A I said it doesn't look like we're talking.
Q Okay. At 12:50 he goes out. You're clearing the carts. And then you walk back towards the aisles, true?
A True.
Q Okay.
A That's what it looks like, yes.
Q Uh-huh.
Walk back towards the backroom -- but, you know, in other words, this is the clip of the entirety of Ms. Burmayan's presence in that store on that day, right?
We saw that -- her entering the store at 12:13 and leaving the store at 12:49, right, you agree with me?
A That's what it looks like, yes.
Q Okay. And throughout that period we didn't see her engage in anything physical with anyone, true?
A True.

Q We didn't see -- and we saw several occasions of her in the store walking around. We didn't see her throw anything on the ground or any obnoxious behavior, physical behavior on her, true?

02:26 A Well, not here, but I can't say true or not, because in -- when she was in the store --

Q On the video clips -- on the clips that you observed --

A Yes.

02:26 Q You know, you cannot tell me you remember this incident. You said that you have no recollection --

A I don't remember.

Q Let's just finish. Let me finish for the

02:26 record.

You don't remember this incident as of right now you are sitting here today on January 13, 2020, right?

A Right.

02:26 Q Okay. So you cannot tell us one way or the other what she was doing on this day, right?

A Right.

Q Okay. I'm asking you based on the video clips we've observed so far that I showed you

02:26 produced by CVS, you have not seen her engage in any

violent or physical aggressive behavior, true?
A True.
Q Okay. You didn't see her throw anything on the ground, true?
02:27 A From this, no.
Q And when she walked out all she did is just basically she took off the face mask and as she was walking out she appeared to say something and she did this, right, true? (Indicating.)
02:27 A True.
Q She flipped basically?
A True.
Q Okay. From that what we just saw did you interpret that based on this video clip as disruptive
02:27 conduct as you would be calling the police?
A Actually --
Q Uh-huh.
A If she walked out the store --
Q Uh-huh.
02:27 A And was giving us the finger --
Q Uh-huh.
A -- if Joe said call the police then I would have. If he didn't say anything then I would not have called the police.
02:27 Q So you would actually have called the police

for a customer just flipping out and leaving the store?

MS. JONES: Objection. Misstates testimony.

THE WITNESS: If a manager asked me to call the police I would call the police.

BY MS. MKRTCHYAN:

Q No. I'm just asking you right now, from what we observed that behavior you saw if Joe Johnson told you call the police for flipping out on you you would have called the police?

A If Joe Johnson said call the police I would call the police.

Q But so far we haven't seen any other behavior other than that, right?

A That I can see on these clips, no.

Q Can you tell us from her memory if she did anything else on that day that you can tell us?

A I don't remember.

Q Okay. Okay.

So you didn't call the police on that day, true?

A No, not that I can remember.

Q And you didn't ban her on that day, right?

You didn't tell her you cannot come back ever to the store, true?

A I don't remember.
Q Okay. So do you remember her coming back between then and January 19th ever?
A No, I don't.
02:29 Q You don't remember, right?
So from right now we see this -- we are watching this video clips, we haven't seen you even, you know, even engage in a conversation with her, true?
02:29 A What was that question?
Q Based on this video clip that we've seen --
A Yes.
Q -- we haven't seen you even engage in a conversation with her, true?
02:29 A That's what it looks like, yes.
Q So if you would had banned her from the location we would see you conversing with her, right?
A Right.
Q But you see Joe Johnson talking to her,
02:29 right?
A Right.
Q And Joe Johnson testified that, you know, I didn't ban her from the location. Okay.
That's what I'm telling you what he said,
02:29 right?

A Right.

Q So if you didn't ban her from the location, Joe Johnson did not ban her from the location on this day then is it fair to say that when you told her she was banned from the location it's false?

A No.

Q So when did that happen, sir?

A I don't know. I don't know when she's been banned.

Q Uh-huh.

A But in other days that she's been there she could have been banned then.

Q Uh-huh. Okay.

But on this day she came, January 13, 2021, she came to the store, she was not -- at that point in time they hadn't called the police because at that point she had not been banned, right?

A As far as I can recollect, which I don't know --

Q Uh-huh.

A -- I can't say yes or no, because I don't remember.

Q Okay. But at this point in time there's no police call on January 13th, true, yes or no?

A I don't know if there was or not.

Q Right now when you watched the video clip she left the store, right?
A That's what it looks like.
Q Okay. Did it appear to you that police came in this video clips?
A I don't know, ma'am. I don't know what Mr. Johnson did, if he called the police.
Q I'm talking about the video clips that we watched right now from January 13, 2021, from 12:13 through 12:49 when she entered the store and left the store, did you see at any point in time police entering the store?
A No, there wasn't.
Q Okay. So then it must have been that she was not banned from the location on January 13th, true, yes or no?
A I don't know.
Q If she was banned -- let me ask you this: If she was banned from the location prior to January 13, 2021, and she came back on this day, you would be calling the police, true?
A I don't remember.
Q Okay. All right.
Let's continue playing this and see.
So Joe Johnson enters the store and he goes

back to the back room. He walks here and we can see you standing there and you guys -- you seem to be talking, right?

You approach each other and you are talking.

02:31 A It does seem like we are talking then.

Q Okay. 12:53, right? Right?

A Yeah, 12:53.

Q Okay. Do you remember what you were talking about?

02:32 A No, I don't.

Q Does it appear that you are talking about this incident with Ms. Burmayan when she left the store?

A I don't remember.

02:32 Q Okay.

A We could have been talking about the recovery of the store, I don't know.

Q Okay. Let's see how long the conversation, going from 53.

02:32 And then you walk away. He walks in the other side. You walk towards the register or the front door, right?

You walk towards front door, right, and you come out again, right, true?

02:33 A Yes.

Q So, let's see, you came out.
What happens then, do you remember why you came out?
A No, I don't.
02:33 Q So in any event, playing this video, watching, you know, the interactions between you, Mr. Johnson and seeing Anoush Burmayan in the store does not in any way, shape or form refresh your recollection of this incident, true?
02:33 A It does not, ma'am. I mean apparently it happened, but I don't remember recalling ever dealing with this woman.
Q Uh-huh. Okay.
Let's see when you enter the store, because
02:34 you left, you walked out.
Did you go on a break?
A I don't remember.
Q Okay.
A I could have done a million things.
02:34 Q Okay. So you came back at 12:54. You walk back towards the aisles, true, that was you?
A Yes, that's me.
Q Okay. All right.
So now we're going to watch January 19th day
02:34 of 2021. We have camera angle that shows -- this is

what I meant the register.

A That's from behind us.

Q Right. Right.

So we have a camera angle that shows the register on January 19, 2021. And you are standing at the register.

You are manning the register, right, of January 19th, true?

A That's me, right behind the register.

02:35 Q Okay. So we're going -- just confirm what we watch on this tape. And then we'll ask you some questions.

So I represent to you -- and before the tape -- this is the date when Ms. Burmayan was call the police by you. That's the day you called the police. And that's the day she was arrested.

So as we are watching this we can see that there are three camera angles observable on this, right?

There is the front register camera angle. The front entrance and the to the right of the store --

A The ACOs.

Q -- ACOs, right.

And ACO stand for --

A I don't know.
Q -- checkout -- what does ACO, stand for if you know?
A Stands for Automatic something or other. I don't even remember what it stands for.
02:37
Q Okay. So that's the front basically and to the right it shows the self-checkout area?
A Yes, the self-checcкout area, yes.
Q Uh-huh. Uh-huh.
02:37 And we can tell that you are the one who is at the register, right?
A If it was -- if there was only two of us -- if it was just Joe and myself then, yeah, I was the one dealing the register.
02:37 Q But I want you to confirm this is you right now at the register.
A Yes.
Q One of?
A Yes.
02:37 Q But here you are not wearing a logo with CVS, right?
A I'm not too sure. It might be one of the shirts.
Q Uh-huh?
02:38 A We have so many different shirts to wear.

Q Either way this is you?
A Yes.
Q Although it appears you have shorter hair, more like cut short than the day before on January 13th, true?
A Yes, because I cut my hair myself.
Q Okay. So let's just watch this and go over some issues. Okay.
(Video played.)
BY MS. MKRTCHYAN:
Q Okay. I can see -- is this Timothy Riddle of the 1:06, the young man working the CVS, another employee entering the register at 1:06?
A It does seem to be Timothy.
Q Okay. So it appears so far we have seen you, Tim Riddle on January 19th so far working here, right?
A Right.
Q Okay. What do you think you are doing at this point in time with a computer at 1:08?
Can you --
A That's our photos.
Q What?
A Our photo printer.
Q So you are also in charge of printing

photographs or orders of customers?
A No. We don't print them out. It does it automatically when they -- see our -- behind there, see the yellow --
02:40 Q Uh-huh.
A -- monitor? That's our photo center.
Q I see, but you are still kind of inputting that information.
A I have no idea what I'm doing there, but, no, we don't input information into that.
02:40
Q And you have a cell phone in front of you?
A No, that's the associate -- Iron Man.
Q What Iron What?
A Iron Man.
02:41 Q What is Iron Man?
A It's our -- it's called the Zebra, we call it the Iron Man.
Q Uh-huh.
A We use it to scan prices, and check things and stuff.
02:41
Q I see. Oh, I see.
So the gun so to speak?
A Yeah. So it might have asked me for price something and I might have been checking prices, I don't know.
02:41

Q I see. Okay.
Do you have any portable recorders at the store for personal use?
A Portable recorders?
02:41 Q Uh-huh.
A No.
Q Let's say customer comes in -- you are aware that your video doesn't have any audio, right?
A Uh-huh.
02:41 Q If you want to record any conversations with customers for future, what do you do?
A We don't do anything. We're not allowed to record anybody's conversations.
Q With your cell phone you cannot?
02:41 A We cannot.
Q You are not allowed by store?
A We are not allowed to record anybody.
Q I see. Okay.
So it appears 1:09, 1:10 you are having
02:42 conversation with Timothy Riddle, right?
A That's what it looks like.
Q Does it refresh your memory what you guys are up to at that point?
A No, it doesn't. I have even forgotten what
02:42 he looks like.

Q Uh-huh.
A Yeah, that's Timothy.
Q Uh-huh. Right.
So this is 1:11:07. It appears that you and Timothy are the ones at the register.
A Yeah, it does appear that way.
That looked like Martin walking out the door.
Q Who?
02:43 A Martin.
Q Who is that?
A He's another one of our employees.
Q What's his name?
A Martin.
02:43 Q Oh, Martin.
So he was working at that hour?
A Yeah.
Q Is this Martin?
A I can't tell.
02:43 Q So who -- is that the same person who just walked out?
A I think it was, it did look like it.
Q I see.
But you don't think they are the same?
02:43 A I said it looked like him, I can't say it is

for him for sure.
Q Okay.
A What day was the 19th?
Q What day of the week?
02:43 A Yeah.
Q Oh, I don't know right now.
Do you remember?
A No, because if it was a -- if it was on a Tuesday --
02:43 Q Uh-huh.
A -- a Tuesday night or a Friday night and we might have been receiving the load.
Q I see.
Let me see if the police report indicates
02:44 the day of the week. No.
In any event, so let's see --
MS. JONES: It was a Tuesday.
THE WITNESS: Yeah, it was a load day.
BY MS. MKRTCHYAN:
02:44 Q Load?
A Load.
Q So you would get items and you would have to put -- Martin would put in the store, put away?
A Uh-huh. Martin would be there taking apart
02:44 all of our pallets.

Q Okay. Gotcha.

And you are welcome to stand up too. I can't sit for long myself. Okay.

So let's see when we can see action starting.

A I think it was a customer.

Q It is a customer, not Martin?

A I can't tell if it was him or not.

Q Yeah, I don't want you to speculate, sir. We want you to testify based on what you can, reasonably testify based on your recollection. Okay.

So this is January 21st -- I mean 19, 1:22 a.m. We have Ms. Burmayan, the same lady that you saw before, right, enter the store with a face mask covering, fully covering her face, true?

A That's what it looks like, yes.

Q Okay. All right.

So based on the description you provided to the dispatch you gave -- you know, you told dispatch purple shirt -- sweatshirt, black shoes, gray pants; this appears to be the person, right?

A It does appear to be the person.

Q Does this refresh your memory of her?

A No, it doesn't.

Q Let me ask you this: When you called the

police it's not a regular occurrence, right, it doesn't happen every day, right?
A Sometimes we do call police every day and sometimes we don't. I can't tell you yes or no.
02:46 Q Okay. But this is one lawsuit -- you've never been a defendant, right?
A I'm sorry. I didn't understand you.
Q This is one lawsuit you've ever -- you've been a defendant in, right, one lawsuit?
02:46 A Yes, I've never been sued before.
Q Right.
So, you know, this incident it's not just like some regular occurrence that happens every day while you are working, right?
02:46 A Well, actually, we get a lot of occurrences working at work. We get a lot of people coming in causing problems for us.
Q I understand.
But you are not sued every day, right?
02:46 A Am I sued? No.
Q Okay. But you still do not remember, just looking at this video clip of this incident right now, does not refresh your memory?
A No, it doesn't ma'am.
02:47 Q In one way or the other?

A (Inaudible response.)
Q So let's continue playing this.
So we saw her fully covering her face, right?
02:47 And she's coming back. So presumably based on your testimony if, you know, you don't recall banning her, right, you told us, right?
You don't remember banning her, right?
A I don't recall banning her if I remember.
02:47 Q Okay. And if you told her you wouldn't be banning her just for not wearing a face mask, right?
A Right.
Q And she's coming back with a face mask fully covering the face right now is she in trouble right 02:47 now as she entered the store?
A Well, it all depends.
Q Okay. What does it -- right now as of right now she's --
A As of right now --
02:47 Q Uh-huh.
A -- I can say she's not offending anyone.
Q Okay.
A But the other times she's been in she might have been banned then or she's might have trespassed 02:48 then.

Q When? Tell us --
A I don't remember.
Q -- because you are speculating. I want you to testify based on your personal knowledge.
02:48 You testified that you didn't remember January 13th date despite the video clips, right?
A I don't remember it.
Q You didn't -- you are not right now remembering January 19th despite the video clips,
02:48 right, true?
A True.
Q Okay. But you are telling me, you know, even though you don't remember that it might have been possibly she was banned before coming
02:48 January 19th date, right?
You are saying might have been, correct?
A She could have been.
Q Okay. But you are speculating, right? You don't --
02:48 A I don't know.
Q You can't tell me that happened, true?
A True. I can't say that happened.
Q Okay. But so far right now she entered, based on the fact that she's fully covering her face,
02:48 there's no offense. She's not disrupting.

She's right now entering the store not offending any policy, right?

A At this time, no.

Q Let's continue playing this and let's see when she crosses the line according to you.

02:49 So she walks here towards the register and we can see her figure here.

She's walking calmly. She's not running, right?

02:49 There's no -- she just walked, right?

A Right.

Q It appears that she was looking for someone, because she didn't take out basket or because she walks up and down, right, and she appears to be looking through the aisles for someone one, true?

02:49

A True.

Q And she testified actually that she came back to the store, because she wanted to speak with the manager about the earlier interaction she had on January 13th when she was given hard time about her face mask. So that's what she testified.

02:49

And, you know, if she testified to that, taking that as true, would that be consistent with her behavior right now as she's walking around looking for someone?

02:49

A I guess, I don't know.
Q Okay. So and then she walks towards the register area.
And then we can see you, right?
We just saw you, right there in the register area.
You have your hand like this, like pointing at someone right, true?
A That's what it looks like, yes.
Q Towards her direction and she looks back. She looks sort of back, point -- looking back as if she is responding to your comment, right; does is it appear to you?
A It appears to me, yes.
Q Okay. So it appears to us you guys are engaged in an interaction at this point in time of 1:24 a.m., true, agree with me or not?
A It does look that way.
Q Do you remember what you said to her?
A No, I don't.
Q Did you tell her, ma'am, you gotta get out of here, we don't want you here?
A I don't remember.
Q Would you have said that if she came back with a full mask covering -- you know, full face mask

compliance, would you have said that to her Please leave the store right now, would you have said that to her?

A I can't say yes or no, because I don't know -- remember the situation.

Q Okay. But wait a minute.

I gave you the situation. We've already covered January 13th.

We already saw what she did in the store, right? Right?

A Right.

Q You told me you didn't remember ever banning her, right?

A Right.

Q You wouldn't have banned her based on what you saw on January 13th, true?

MS. JONES: Misstates testimony.

BY MS. MKRTCHYAN:

Q True?

A True.

Q Okay. Right now she's coming back and she's doing this.

Would you have told her to leave if that's what we've covered so far?

Based on the information we have covered so

far would you have banned her -- would you have told her to leave now?

A If she was just -- if she wasn't banned from the store, if there wasn't any problem with her then no I wouldn't have told her to leave the store.

Q If this and that -- if this and that, but you cannot point to me under oath to me right now sitting here under oath under penalty of perjury that between January 13th, January 19th you ever saw her in the store, true?

A I can't say yes or no to that, because I don't remember.

Q Okay. You don't remember.

But if you don't remember you cannot tell me that happened, true?

MS. JONES: Objection. Vague.

What's that?

BY MS. MKRTCHYAN:

Q That she came to the store. If you don't remember you cannot tell me that she came back to the store between that period of time, true?

We've covered this already. I mean I don't understand why you are having difficulty.

A I don't remember ma'am.

Q That's what I'm asking you.

If you don't remember can you tell me that actually happened that she came back within January 13th the video clip that we saw and January 19th the clip now?

02:52 A I don't remember.

Q Okay. All right.

So let's continue playing -- let me ask you this: If that happened -- if that happened, according to your 911 call to the dispatch, that she came back several times, would we see that on video clips as we see here now?

02:52

A I don't know if they're -- I don't know if you can see it or not.

Q The store has video clips, it's constantly playing, right?

02:53

A Not all clips are saved.

Q But if that happens and you told that to the police officers, would your management be able have the option to protect themselves and save those clips, would they have the option?

02:53

MS. JONES: Objection. Calls for speculation.

THE WITNESS: I don't know if they can or not. I don't know. I don't deal with the cameras.

02:53 BY MS. MKRTCHYAN:

Q In other words, right now you can't point to me one way or the other that you can tell us what day she came back after January 13th and what she did after when she came back, true?
A True, I don't remember.
Q Okay. All right. So let's continue playing this.
So she's standing by the front door and we can see you continuing to talk with the hand waving. And then you enter the register. She walks back towards you.
And it appears that you are talking, true?
She is talking to you and you are talking to her, true, at this -- at 1:24 a.m., right, true?
A True, it does look like we're talking.
Q You approach the door of the register. You are waving with your hand. And she's waving with her hand.
It appears that you guys are talking, right? Right?
A It appears.
Q Okay. Does it look like at this point in time so far that we have seen that she is disrupting the business in any shape or form at this point?
A At this point I can't say yes or no, because

I don't remember if she was or not.

Q What you are observing on the video clip -- I'm not asking you to remember anymore, because as I understand you don't remember anything.

02:54 I'm just asking you to interpret for me the video.

Is she throwing items on the floor?

A No.

Q Is she physically abusive towards you or in 02:55 any way assaulting you?

A No.

Q Does she appear to be a small woman compared to you?

You are six feet, right? Right, you are six 02:55 feet?

A Yeah.

Q I appreciate, you know, the honesty and, you are testifying here under oath.

And she testified, you know -- well, first 02:55 of all she appears to be 5' -- at most 5.5 feet, 5.4 feet, right?

A Right.

Q Okay. So you didn't get a feel like she's going to attack you, right, this poor little old 02:55 lady?

A It doesn't look like it at this point, no.
Q And you didn't feel frightened at any point in time from her, true?
A I can't say yes or no about that.
02:55 Q So when you called the police even on that day, 911 dispatch, you didn't say you felt threatened by her, true?
A No, I didn't say that.
Q You didn't say she was violent, right?
02:55 A No, I didn't.
Q Okay. You were just saying she was obnoxious basically, that she was disrupting business, right?
A Right.
02:56 Q Okay. And right now we see her behavior on this video.
So far we haven't seen anything obnoxious, true?
A That's what it looks like.
02:56 Q Let's continue.
And then she walks by you and then you follow her. You leave. There is a customer at the register. You leave her actually and you walk after her, right?
02:56 You leave the register, you walk out of the

register and you walk after Ms. Burmayan, true, at 1:24 a.m., true?
You followed her, right?
A I don't remember.
02:56 Q Well, right now I'm asking you again, sir, to interpret for me what you've watched on the tape.
You saw her and you followed her?
A It shows me going out, but it doesn't show me following her.
02:56 Q Okay. Well, she left. And you went after her. And then you came back. And then you are walking around the register. She's still walking around. Timothy comes back. She walks by you.
So far again you don't see her doing
02:57 anything that remotely comes close to throwing items on the floor true, yes?
A Yes.
Q She's walking here. We can see she's walking calmly towards the register area. And she's
02:57 standing. Let's see what she does next.
She's standing by the line waiting at the register, true, right?
A Right.
Q At this point in time you see Joe Johnson.
02:57 Joe Johnson approach you and you with Joe Johnson are

-- appear to be talking to her, because she appears to be talking to you, right, true?
A She could be talking to either one of us.
Q Okay. But, you know, looks like either one
02:57 of you are standing by. Timothy is by the register at 1:25.
She appears to be talking to you, right?
A Right.
Q Okay.
02:58 A Well, she appears to be talking to Joe, because when he came in --
Q Uh-huh.
A -- if he -- because he's a manager --
Q Uh-huh.
02:58 A -- when the manager shows up the manager takes over.
Q Okay. Understood.
But you are still standing by, right? Right?
02:58 A That's what it looks like, yes.
Q Okay. At this point in time she's still standing by the line, right, right, by the register line, right?
A Right.
02:58 Q And there are two customers. Timothy is

helping, you know, couple or male, female, right?
A That's what it looks like, yes.
Q So far it doesn't look like she's disrupting these customers, true? True?
02:58 A True.
Q Okay. It doesn't look like she's in any way throwing any items on the floor, true?
A True.
Q Okay. Let's continue.
02:59 So the customers purchase their items and leave. And, you know, they walk by, does not appear that they are actually even, you know, much concerned about this incident.
They are walking out of the store, right?
02:59 True?
A True.
Q At 1:26 she's still talking with you and Joe Johnson. We can see Joe Johnson, right?
A I think he's there.
02:59 Q Right.
So Joe Johnson is there behind, you know, I think it's Timothy at this point, but -- and then Ms. Burmayan, right.
There's a conversation going on, right?
02:59 True?

A That's what it looks like.
Q Okay. So let me know -- as we are playing this in its entirety you are standing there too, right?
03:00 You are watching this, right?
A Right.
Q Okay. Let me know when you see ever her throwing items or acting disruptive toward your business.
03:00 Just let me know when you see her doing anything physical that appears to be obstructive towards you, the business or any of the customers nearby.
She's walking, talking 1:27:02. You guys
03:00 are standing by there. And she approaches the front door. She now has her cell phone in her hand. She's standing. You can see her head near the entrance/exit door. It appears she's still standing by the front door within feet. And we can see her
03:00 cell phone in her hands, right?
That's what we see her doing, right?
A Right.
Q Do you have any policy at CVS that you can point to me right now as right now you are sitting
03:01 here today that prohibits any customer taking out a

cell phone and taking pictures of the aisles, taking picture of employees; is there any policy like that?
A Our supervisors and managers told us that customers are not allowed to videotape anything in our store.
Q Aside from what your managers tell you is there any policy that you can point to me that she violated --
A At this time, no.
Q Okay. So she's standing by there. She's talking, but nobody's approaching to talk to her, right?
We have Joe Johnson, you know, is not approaching to talk to her, right? True?
A That's what it looks like.
Q Let's say -- let's say this is a customer who is unhappy. We covered a lot of scenarios together. We covered multiple scenarios where customer comes according to CVS guide and basically is unhappy. Unhappy customer, right?
A Right.
Q And we covered the deescalation techniques that you are trained to provide, right?
A Right.
Q You are not happy or even an obnoxious

customer who is yelling obscenities let's say, right?
A Right.
Q Does that one of them allow state that we just went through to ignore the customer and walk away?
03:02 Does that -- is there such a policy that states you can just ignore and walk away that you can tell me?
A Not that I'm aware of, no.
03:02 Q So right now as we can see she's still talking and nobody's talking to her, right? Right?
A Right.
Q Okay. Is this consistent with the CVS training policy and guidelines that, you know,
03:02 basically we have an unhappy customer and instead of dealing with her, deescalating the situation that's required by policy, we just dial 911 and say come and arrest this woman; is that consistent with your policy, sir?
03:03 A I'm a unaware.
Q Okay. See, but right now we see clearly at 1:27 she's talking. She has her cell phone out. Appears to be upset. She testified she was upset. She was trying to speak with the manager. She was
03:03 trying to tell one of the managers that look I have a

disability, why are you treating me like this? And that's why I'm not fully covering my face.

So if that is the scenarios that you have, you are telling me that you don't remember any of this happening, right?

You don't remember her trying to show you medical papers?

A I don't remember anything.

Q Right.

And you don't remember her trying to speak with the manager on this day?

A No, I don't, ma'am.

Q Okay. You don't remember your conversation with her on this day?

A No, I do not, ma'am.

Q Even hearing the 911 tape -- after hearing the 911 tape you don't remember anything that happened on this January 19th?

A I don't remember hardly anything, no, no. Anything.

Q Okay. All right. So even the scenario, take it as true, that she comes to the store and says I want to speak to the manager. And the manager, you know, is Joe Johnson, right, let's say. And then she tells I want to show you my medical papers. I have

disability that I want you to be aware of, because that's why I had a problem of not fully covering my face mask.

Would that be, you know -- what would your training tell you to do under that scenario?

What would you do in that scenario?

MS. JONES: Objection. Incomplete hypothetical. Lacks foundation.

BY MS. MKRTCHYAN:

Q You may answer.

A I'm sorry.

Q You may answer. You have to answer.

So what would you do in that scenario?

Customer comes and tells you I have a disability, what would you do in that circumstance?

A Well, if I was MOD and they asked me I have the paperwork and here it is --

Q Uh-huh.

A I would look at it and say okay.

Q Okay. That's the appropriate way to deal with it, right?

A Okay. You can come in the store without a mask, put your nose down but okay.

Q Right.

So you would do that according to your

training and policy, true?
A To my training -- my training, yes.
Q Right.
But did you do it on this day, on this occasion?
A She wasn't talking to me. She asked for a manager. I wasn't the MOD, Joe was.
Q I see.
And you were there though when she was trying to talk to the manager.
So you initially interacted with her, right, before even Joe Johnson came in, right?
A It looked like I was telling her to leave, but I can't say for sure.
Q Why would you tell her to leave if she was wearing her face mask?
A I don't remember why I was telling her to leave.
Q But you remember telling her to leave?
A No, I don't.
Q Okay.
A This showing -- this for me seeing this it looks like I was asking her to leave.
Q Why would you -- I'm asking you to tell me why would you be asking her to leave if you don't

remember why, why she was -- if you -- strike that.
Why would you tell her to leave?
MS. JONES: Objection. Calls for speculation. Asked and answered.
03:06 THE WITNESS: I don't remember why I asked her to leave, ma'am.
BY MS. MKRTCHYAN:
Q But you did ask her to leave.
Did ask her to leave?
03:06 A I don't remember if I did or not.
Q Okay. So -- but based on that scenario I gave you, it would be appropriate of you to take the papers from her and say Let me take a look, ma'am. You know, let me take a look at your papers, medical 03:06 disability that you are claiming. And I will show it to my manager.
True, that would be the appropriate way to deal with it, right?
A No, it wouldn't, because I wasn't the MOD in 03:06 charge of the day, Joe was. Joe was the one that was supposed to take care of it, not me.
Q But you were standing there when she first approached you, right?
She first approached you, you saw that on 03:06 the tape.

A That's what it looked like, yeah.
Q So she asked a manager, right?
A And -- if she did --
Q Uh-huh.
03:07 A -- again I don't remember. If she did then I probably called Joe.
Q Okay. And Joe came, right?
A (Inaudible response.)
Q And Joe ignored her, right?
03:07 A That's what it looked like.
Q But you are the one who called the police not Joe, right?
Joe did not call the police, right?
A That's what it -- I'm on the call.
03:07 Q So here's the thing, you are pointing finger at Joe, Joe points finger at you. Ross comes and says, Oh, it wasn't me. So everyone says it wasn't me. Everyone else is at fault except me but I just want you to testify --
03:07 A I never said Joe was at fault.
Q Okay. Bottom line is this: You told 911 that she was banned from the location, not Joe, right?
A Yes, that is me telling her.
03:07 Q And she came and spoke to you first before

Joe came in, right?
A That's what it looked like.
Q And her complaint so far has been her testimony is that it was Guy Garcia who first harassed me on January 13, 2021, by telling me Raise up your face mask or you have to leave, not Joe Johnson, that second time when she came in again it was you who appears to be calling the police and, you know, causing the situation. And sure enough we have 911 dispatch that it was you.
So do you have any reason to doubt any of that?
MS. JONES: Objection. Calls for speculation. Misstates testimony.
THE WITNESS: First of all, from what this showed on the 13th --
MS. MKRTCHYAN: Uh-huh.
THE WITNESS: -- I'm not around when she was talking to someone.
MS. MKRTCHYAN: Okay.
THE WITNESS: The register showed -- it showed that Jesus was on the register, not me. Then it shows Joe walking over to her and talking to her, not me.
BY MS. MKRTCHYAN:

Q Uh-huh. Okay.

But we didn't see all the clips on the aisle. So we are talking about January 19th right now. January 19th we clearly see you and her interacting initially when she enters the store, true? We already covered this.

A Yes, it was me talking with her.

Q Right.

And then Joe Johnson come -- you both walked away right now as we are watching this -- let's continue watching this instead of arguing back and forth.

At 1:27:52 a.m. it appears no one is talking to her, either you or Joe Johnson. Basically you just left her, ignoring this customer who is upset who needs to be deescalated, who is having complaint. She's having a complaint and you both, you and Joe Johnson, are ignoring her.

MS. JONES: Objection. Lacks foundation. Calls for speculation.

BY MS. MKRTCHYAN:

Q And then you call the police. You call the police, not Joe Johnson, true?

A Yes, that's me on the phone.

Q And Joe Johnson testified that it wasn't he

who made the decision to call the police, even though he's the manager.

MS. JONES: Calls for speculation about his testimony.

03:09 Is that a question?

MS. MKRTCHYAN: Yes, it's a question.

MS. JONES: What's the question?

BY MS. MKRTCHYAN:

Q Do you have any reason to doubt that, that

03:10 that's what he testified, that it was you that called the police?

MS. JONES: Asked and answered multiple times. No one's disputing he called the police.

MS. MKRTCHYAN: Speaking objections.

03:10 MS. JONES: You are asking him the same questions 57 times. It is very clear that he said he called the police, he said that.

MS. MKRTCHYAN: Okay. Thank you for speaking objections.

03:10 Let's continue playing this and see what happened next 1:27:54 seconds.

BY MS. MKRTCHYAN:

Q You see her standing by talking at the front entrance and no one is approaching her.

03:10 At this point no one is talking to her,

true?

A That's what it looks like, yes.

Q Is this consistent with CVS policy to ignore customer who is unhappy?

03:10 A No.

MS. JONES: Objection. Lacks foundation about what she's feeling.

MS. MKRTCHYAN: I didn't ask about that. Is it consistent and he answered.

03:11 MS. JONES: Same objection. Lacks foundation. Calls for speculation.

You can answer if you understand the question.

MS. MKRTCHYAN: It was answered already.

03:11 THE WITNESS: What was the question if I answered it?

MS. MKRTCHYAN: For the record, the answer was no, true?

DEPOSITION OFFICER: Yeah.

03:11 BY MS. MKRTCHYAN:

Q So now after 1:28 after two minutes of her standing by talking we have Joe Johnson approach, stand by there. And there's -- we still don't know, he walks away.

03:11 He's just standing by there, true?

A That's what it looks like, yes.
Q And he walks away from her. It doesn't appear that he's actively engaged in a active conversation with her, because you can see his face, 03:11 -- not face her, but walk away from her towards the register, true, ignoring her, true?
A I can't -- well, it looks like he's walking away from her.
Q Right.
03:12 And no one is still talking to her, right? She's still talking, her cell phone is in her hands, no one is talking to her, true?
A True.
Q And she's being ignored, true?
03:12 A That's what it looks like.
Q The policies that we covered -- deescalation, leadership, et cetera -- is that consistent -- is this behavior of you and Joe Johnson consistent with that policy of deescalation 03:12 techniques?
A At that time -- certain time, no.
Q And that's why we have the police officer enter -- to this point in time the police officer enters at 1:29 a.m. We have not seen Ms. Burmayan 03:12 throw anything on the floor, right, acting bazaar,

true? We haven't seen --
A In the video clips we haven't seen, no.
Q Okay. You don't remember right now as of right now sitting here today that you can tell us that she threw anything on the floor, right?
A I don't remember if she did or not.
Q And we haven't seen her aggress towards either you or Joe Johnson like physically approach you or being intimidating in any way, shape or form, true?
A I can't say necessity or no to that, because I don't remember what she was telling us, or screaming or yelling at us right there. I don't know if she was or not.
Q Listen carefully to the question, sir.
I asked her based on your observations on the video. I'm asking you physical actions.
Aside from yelling or screaming that we can see here on the video, I'm asking you did you see her take any action physically that can be considered violent or threatening towards anyone so far?
A It doesn't look like it.
Q Okay. So she's standing there. There is a distance between you, and Joe Johnson and herself.
And she's just talking, right?

She's got the cell phone and she's just talking there, right?

MS. JONES: Calls for speculation --

MS. MKRTCHYAN: Sure.

03:14 MS. JONES: -- about what she's doing.

MS. MKRTCHYAN: True?

THE WITNESS: Again, I don't know if she was screaming or yelling at us, but we do know from what it looks like what I can see she was recording us.

03:14 BY MS. MKRTCHYAN:

Q Okay. All right.

A I can't say if she was or not, because I don't remember; but from what I can see on the clip it's showing that she is recording us.

03:14 Q Is that recording physically threatening to you?

A We're not -- they are not allowed to record us at anytime.

Q You can't point that policy, true?

03:14 You can't point to that policy --

A This is what I was told by my manager.

Q But can you point to that policy --

A I can't at this time, no.

Q -- or any law that this disallows me as a

03:14 customer to come into the store and if, you know, for

whatever reason to take pictures of my injuries, to take pictures of anyone else's injuries or to take pictures of anyone that's being physically, you know -- or in any shape or form if I'm unhappy with anyone is there any law you can point to me that tells you that I cannot take pictures of the CVS store?

A I cannot point to those laws.

Q All right.

But so far, you know, we've watched her conduct coming at the store 1:22 a.m., right?

We saw that entering the store, right?

A Yes.

Q And at 1:29 officer enters the store to arrest her, true?

A That's what it looks like.

Q So how many minutes is that she's in the store that you can tell me based on this video clip?

A About seven, eight minutes, something like that.

Q Okay. Seven, eight minutes, right?

A Right.

Q And from this point we have -- we've covered in that entire minutes we saw her throughout the time near the register, right?

A Right.
Q We didn't see her disappear into the aisles, right?
A Right.
03:15 Q The whole time she came towards the register, and walked back towards the line in the register and stood by the front entrance, right?
A Right.
Q So we had pretty much uninterrupted observation of her in that store in that scenario, true?
03:16
A That's what it looked like, yes.
Q All right.
And appears that officer arrives in response to your 911 call, true?
03:16
A That's what it seems like, yes.
Q So it appears within that seven minutes that she was in the store instead of deescalating the situation and talking to her, see what is going on, you actually picked up the phone?
03:16
A Yes.
Q So your patience was very short that basically you didn't even take some time, some time, to deescalate the situation according to your CVS guideline, which says, look, take your time, talk to
03:16

customer who is unhappy, says use calm, quiet voice to deescalate situation. And if none of that works then if all deescalation tactics have failed that we covered this, and if the customer then refuses to leave and if the customer then is violent, et cetera, then you can call the police.

You know, this is the CVS guide we went through, right?

A Yeah.

Q So you are saying in seven minutes you went through all the deescalation techniques to satisfy unhappy customer who came to the store to say I have a medical disability, I'm a regular customer here and please accommodate my disability. I can't fully cover my face.

Is that what you are telling me happened, sir?

A I don't know.

MS. JONES: Objection. Misstates testimony. Also lacks foundation.

THE WITNESS: I don't remember.

MS. JONES: Don't laugh at him.

MS. MKRTCHYAN: Based on this video clip -- he can laugh and I cannot laugh?

MS. JONES: No, you are.

THE WITNESS: I'm not laughing, ma'am.
BY MS. MKRTCHYAN:
Q Okay. Well, you rolled your eyes many times and it's inappropriate. I'm not laughing.
03:18 MS. JONES: You are mocking his answers, it's not appropriate. It's condescending.
MS. MKRTCHYAN: It's not mocking. Okay.
BY MS. MKRTCHYAN:
Q So, you know, basically you are telling me
03:18 that in seven minutes you went through all the deescalation tactics that you are obligated to follow in dealing with unhappy customer?
MS. JONES: Objection. Misstates testimony. He didn't say anything about that.
03:18 THE WITNESS: I can't say yes or no, because, again, I don't remember.
BY MS. MKRTCHYAN:
Q Uh-huh. Uh-huh.
And so we everything you did on that day in
03:18 that store before the police came in and arrested her, true?
A From what I saw it's showing that when she came in I saw her. I asked her to leave, she didn't want to leave.
03:18 Q Why would you ask her to leave?

Let me ask you this: Why did you ask her to leave, sir?
A Because if she -- I'm saying if because I don't remember. If she was banned from the store then we have to ask her to leave.
Q And how do you know she was banned from the store?
A I don't remember, ma'am.
Q But you are immediately telling her that you got to leave, right, that's what you told her?
A If she was banned from the store, yes.
Q Okay. Otherwise, if she was not banned from the location your request to leave the store would not be appropriate, true?
A If she was not banned, yes.
Q And you cannot tell her if she was banned, true?
A I don't remember if she was banned or not, ma'am.
Q Okay. And you can't, you know -- you can't tell me one way or another when she came back between January 13th and January 19th, true?
MS. JONES: Objection. Asked and answered.
THE WITNESS: Because I don't remember.
BY MS. MKRTCHYAN:

03:20

Q My question earlier is the following: That within seven minutes 911 was called, we can tell exactly actually when the 911 came in from the reports. 911 call came in -- initiated at 1:26, 1:26 a.m. basically. 1:26 a.m. CVS Pharmacy calls 911 based on your call. And here we have basically her entering the store at 1:22.

So 1:22 to 1:26 how many minutes is that, sir?

03:20

A Four.

Q Four minutes.

So within four minutes she entered the store you didn't see her conduct anything disruptive. You didn't see her throw any items. You didn't see her engage in any inappropriate conduct thus far on this tape.

03:20

Within four minutes you are telling me that you deescalated the situation, right?

MS. JONES: Objection. Misstates testimony.

03:21

MS. MKRTCHYAN: You called the police, right?

MS. JONES: Objection. Misstates testimony.

THE WITNESS: Ma'am --

MS. MKRTCHYAN: Hm?

03:21

THE WITNESS: -- again, I don't remember,

but if she was banned from the store --

MS. MKRTCHYAN: Uh-huh.

THE WITNESS: -- then we had to ask her to leave.

03:21 MS. MKRTCHYAN: Uh-huh.

THE WITNESS: We didn't have to deescalate it no more, because she's already been banned.

BY MS. MKRTCHYAN:

Q Okay. But you cannot tell us -- well, first

03:21 of all, if she was banned -- this is what I'm trying to understand, sir, again and again.

And, you know, you said that you could not ban her for just not wearing fully the face mask, right, because she could come back any time if she

03:21 complied with the face mask, right?

A I said we wouldn't ban her. I wouldn't ban her.

Q Right.

A Not that I couldn't.

03:21 Q Oh, okay. So now you are changing your story, earlier, your sworn testimony?

MS. JONES: No.

MS. MKRTCHYAN: You said that she can come back --

03:21 THE WITNESS: She can come back.

BY MS. MKRTCHYAN:
Q Let me finish.
You said earlier that she can come back if she fully complied with the face mask, right?
03:21 A Right.
Q Okay. And she came back here on this day. We can see she is fully covering face mask, true?
A Yes, I did see that.
Q Why did you tell her to leave?
03:22 MS. JONES: Objection. Asked and answered.
THE WITNESS: I've answered that question many times, ma'am.
BY MS. MKRTCHYAN:
Q Why? Why? I don't understand. Maybe I am
03:22 slow.
Maybe you can please explain to me if she came back with fully covering her face mask, right?
A Uh-huh.
Q And you told us earlier, no, we never banned
03:22 her for that, you know. We wouldn't be banning someone -- if they comply with the face mask, she comes back that's fine. And that's what Joe Johnson testifies.
So how can you tell her now she comes back
03:22 with face mask fully complying covering her face;

you're telling me that you call the police, we told her you got to leave.

Explain to me, how did that happen?

MS. JONES: Asked and answered.

03:22 You can repeat your answer.

THE WITNESS: Ma'am --

MS. MKRTCHYAN: Uh-huh.

THE WITNESS: -- again, if she was banned from the store and she came in it's considered 03:22 trespassing so we had to ask her to leave.

BY MS. MKRTCHYAN:

Q Okay. And you cannot tell us though what she was banned for?

A I don't remember.

03:23 Q And you cannot tell us when she was banned?

A I don't remember.

Q And by whom she was banned?

A I don't remember.

Q Okay. But in any event, if we look at what 03:23 you telled (sic) us today and put it altogether is it true that actually you have no reason to call the police and tell her leave on January 19th?

A I don't remember, ma'am.

Q Okay. So you cannot tell one way or 03:23 another, you know, whether you had the right --

strike that. Let me continue playing this. Okay.

So then the police comes at 1:29:27, you know, now Joe Johnson and you approach the front, you know, door. She's taking out a paper. And she's showing to police at 1:29.

Do you see that she has a paper in her hand, true?

A It looks like a paper, yes.

Q And she points at you, towards you. Joe Johnson and you are approaching the front door and seem to be watching as she's talking to the police officer, true?

A That's what it looks like, but I can't say that she was pointing directly at me.

Q Okay. Either way she's pointing towards the direction of you?

A She's pointing towards us, yes.

Q Right.

And she's -- you know, at this point she's talking to the police officer. She's explaining her side of the story. She's holding something in her hand. Right?

MS. JONES: Objection. Calls for speculation about what she's saying.

BY MS. MKRTCHYAN:

Q It's appearing, sir, that she's talking to the police officer, true?
A It is appearing that she's talking with a police officer.
03:24 Q And she's pointing her finger towards your direction and she's showing paper to the officer, true?
A She's pointing towards our direction, not particularly me.
03:25 Q Either way then immediately we can see the officer at 1:36:16 while you and Joe Johnson are standing by not even approaching or talking to the police officer.
So far you haven't even spoken to police
03:25 officer, right?
A It doesn't look like we have.
Q Doesn't look like.
Within one minute of conversation of her and the police officer he places her in handcuffs, right?
03:25 You are watching that, right? Right?
Let me continue playing this.
He puts her hands behind her back and he puts handcuffs on her, true?
A That's what it looks like, yes.
03:25 Q Do you remember this happening?

A No, I do not.
Q Okay. So he's got her -- and she's not -- we don't see her engaging anything physical even at this point in time where she's placed in handcuffs, true?
03:25
A That's what it looks like.
Q You are standing by?
A Right.
Q And you haven't seen -- so far we haven't seen officer talk to you or Joe Johnson, right?
03:26
A Doesn't look like it.
Q But does it appear that you are standing by the same area, front entrance?
A It -- I guess. I see Joe.
03:26
Q Okay.
A I might be standing next to him right there.
Q Okay. Okay.
MS. JONES: Can we take a break? It's been a while.
03:26
MS. MKRTCHYAN: Sure.
MS. JONES: Is that okay, Elizabeth?
DEPOSITION OFFICER: Yeah, please. I'm ready.
MS. MKRTCHYAN: Off the record.
03:41
(Break taken.)

BY MS. MKRTCHYAN:
Q So going back on the record, sir, reminder you are under oath.
A Yes, ma'am.
03:41 Q So going back to playing this video.
We can see at 1:30 Anoush Burmayan removed by the officer in handcuffs, true?
And you and Joe Johnson watched it, true?
And you are following them nearby and you
03:41 stood at the front entrance, right?
A Yes.
Q So you saw her being taken out by the officer and placed in a patrol car, true?
A True -- I guess, I don't know if she was
03:41 placed in a patrol car at that time. I don't remember.
Q Okay. Do you remember telling the police officer anything at this point in time?
A No, I do not.
03:41 Q Did you have any -- did it appear on this tape that you were having some sort of any conversation with the police officer?
A At this time, no.
Q And this is Timothy Riddle, right, getting
03:42 out of the store behind you and watching behind you?

A Yes, that is Timothy Riddle.
Q So this is not like -- you know, it appears all three of you are actively observing what's happening with Ms. Burmayan taken to the patrol car, right?
03:42
A True, it appears to be so.
Q Right.
So this is not like a, you know, regular occurrence that happens every night, right?
03:42 A No, that doesn't happen every night.
Q Right.
And then though you are still telling me that even after watching this, you know, after all this conversation we had about this incident it still does not refresh your memory about this thing?
03:42
A I'm sorry, ma'am, no it doesn't. I don't remember this.
Q Even though Joe Johnson remembers?
A Again --
03:42 Q Joe Johnson remembers but not you?
A Again, I'm not Joe. I'm Guy.
Q All right.
So you have no recollection of talking to Joe and what you are talking right now as we watch at 1:32?
03:43

A I have no idea what we were talking about back then.
Q Joe testified last week that it was you who called the police, that he approved it. He basically approved -- he was not -- he didn't prohibit you from calling the police. He approved calling the police.
Do you remember that happening, do you remember?
A No.
Q You going and talking with Joe and getting his approval?
A No, I don't, but usually --
Q Uh-huh.
A -- when a situation calls to have police called I ask the manager should I call the police.
Q Uh-huh.
A If that happened -- I don't remember if it did, but if it did then that's what happened.
Q Right.
And you called generally the police on your own cell phone, right, 911 call?
A If I did I think I might have used my cell phone, I don't know.
Q There are no cell phones given to you at the phone, right?

A No.
Q Okay. Could you have called from the store phone, telephone line?
A Yes.
03:44 Q So but we don't know -- you don't know whether you called from the store line or your cell phone?
A Well, from what the -- from what the video shows it shows that I used my cell phone.
03:44 Q Okay. And yet -- so on your cell phone did you record at any point in time the interaction you had with Ms. Burmayan?
A No, I did not.
Q You told 911 --
03:44 A That I can remember. I don't know if I did or not, because I already told you we are not allowed to record anybody at the store.
Q That's a policy?
A Store policy, yes.
03:44 Q So -- but you told the dispatch, I just want to go back to that, that she came back to the store after she was banned, and she was yelling, throwing things, cussing basically disrupting, right, you told the 911 dispatch?
03:45 A That was before.

Q Oh, not for this day?
A Not for -- I didn't call saying she was throwing anything for this day.
Q Okay. So but for that day January 19th she wasn't doing anything according to you, right now your testimony?
A I don't remember, but from what this is showing us that she wasn't.
If I called the police --
Q Uh-huh.
A -- which it does show that I called the police because of the 911 call.
Q Okay. So in other words, I just want to understand.
On this day when she was -- and you are sitting right now on the pillar watching what's happening with Ms. Burmayan -- you and Joe Johnson are sitting at 1:41 on those pillar, or whatever they call those things, in front of the store and watching what's happening, her fate, right?
A That's what it seems to be, yes.
Q But going back to what you said.
So your testimony is that you don't recall then as of right now you are sitting here today her engaging in any disruptive behavior on January 19,

2021?
A I don't remember what happened that day as of right now, no.
Q Yelling or screaming?
03:46 A I don't remember.
Q Okay. Do you remember her cursing with you on that day?
A No, I don't.
Q So you cannot tell us one way or the other
03:46 whether she was disruptive on January 19th when you called the police on her?
A As of right now?
Q Yes.
A I can't, because I don't remember what
03:46 happened that day.
Q Okay. But from what we've observed on video clips it doesn't refresh your memory whether she was cussing or whether she was --
A No, it doesn't. I don't remember what
03:46 happened that day.
Q Okay. So the only reason you called the police for what?
Why they be -- if she's not disrupting the business that you can tell us right now, why then did
03:47 you call the police on her?

A I have no idea why I called the police. I don't remember, ma'am.
Q Okay. You called the police on her, because she had been banned from the location or was she
03:47 disrupting the business on that day on January 19th that you can tell us?
A From what it says that -- from what I heard on there it said that I called -- when I was calling it said that she was being disruptive.
03:47 Q Uh-huh.
Disruptive on that date on, on January 19th, on this date?
A That she's been banned and she's been trespassing, we need her to get out.
03:47 Q Okay. But that's what I'm asking you.
I want you to tell us right now as we're sitting here today, what can you tell us she was doing on this day when she's arrested that she's disrupting the business?
03:47 A I don't remember.
Q You can't tell us, right?
A I don't remember.
Q Okay. You can't tell us if she was yelling, right?
03:47 A I don't remember if she was.

Q You can't tell us if she was using any obscenities against any one of you, true?
A Because I don't remember.
Q Okay. I understand.
03:48 So you can't tell us if she was making any other conduct, doing anything else that was disrupting the business on this day when you called the police, true?
A I don't remember.
03:48 Q Okay. So let's see how long you are watching outside of the store.
There's another police officer, right, standing by.
Do you see that?
03:48 Is that a police officer?
A I don't know, I couldn't see.
Q Okay. 1:44 you enter the store with Joe Johnson, right?
A Yes, that's what it looks like.
03:48 Q Okay. Let's see if -- where you go and what happens next. Let's see if the officer comes in and who talks with whom, because based on police officer report -- strike that.
So let's watch -- continue watching this.
03:49 What happened? Did you see anything?

A No. One of our regular customers.
Q You know this guy?
A The one who just walked in --
Q Uh-huh.
03:49 A -- yeah, he have comes in almost every day.
Q Uh-huh.
A I didn't realize he was coming in back then.
Q Okay. So he still comes in every day now, yes?
03:50 A Yeah, that young gentleman he comes in every day.
Q Okay. So and that was the guy at 1:49 passed by in white shirt, right?
A Yeah, that was. I believe that was the guy.
03:50 Q So can you tell overall how many times you saw this lady, Ms. Burmayan, in the store, how many times?
A I couldn't even tell you.
Q So she was not a regular to you like this
03:50 guy that just passed by, the guy in the white shirt, white clothes?
A I couldn't -- again, I don't remember her.
Q If she was coming so regularly like this guy that you saw, you would have remembered her, right?
03:50 A If she was regular like him; but like I

said, he comes in every day. He's there every day, every day, every day.
Q Gotcha.
A As a matter of fact, he was there last night and I was talking to him.
Q Okay. Gotcha.
But so basically you can if you had seen Ms. Burmayan so regularly that you could notice her right now if she walked into the store?
A If she was one of our regular customers --
Q Uh-huh.
A -- possibly.
Q Well, she testified that she has come to the store for 15 years regularly, she was a regular there.
MS. JONES: There's no question.
THE WITNESS: I don't remember.
BY MS. MKRTCHYAN:
Q Okay. Do you have any reason to doubt that she testified to that?
MS. JONES: Calls for speculation by her testimony.
THE WITNESS: I don't know.
BY MS. MKRTCHYAN:
Q So you never saw her before?

A I don't remember her.
Q All right.
So 1:52 a.m. we are watching this -- let me ask you this: Is there -- you have a backroom in the store, right, backroom -- back -- break room as you said?
A Our break room, and where our office area is and our stock room is.
Q Right. Stock room.
Is there a door towards parking lot from there?
A No.
Q If a police officer wanted to talk to you about this incident where would he be talking to you?
A Front door.
Q Front door?
A Yeah.
Q But where would he be talking to you?
Like, would you take him to the backroom to talk to or in the store right there?
A It's usually -- when we talk to the officers it's usually at the front door.
Q Okay. So so far we haven't seen the officer come back through the front door to talk to, have we?
A I don't see him.

Q We are watching. Yeah.
Have you seen him come back after he took Ms. Burmayan?
A I have not seen the officer, no.
03:52 Q Okay. Is there any other way he could have accessed the store to talk to you aside from the front entrance?
A No.
Q There's no other entrance?
03:53 A No other entrance.
Q Like Ralphs has two, three entrances.
A We only have one.
Q And towards the backroom there's no entrance?
03:53 A We have a gate that goes out to our loading dock, but that's it.
Q But that's not for officer to enter?
A (Inaudible response.)
Q He must have spoken to you at some point
03:53 based on this police report, right?
A At some point.
Q Let's continue watching to see when he comes in.
Let me ask you this: While you were sitting
03:53 there outside and on those pillars, on those sitting

areas in front of the store, we didn't see you talking with the officer, did you?

A I didn't see -- when we turn around and came back in you said you saw police officer. So he might he might have been talking.

Q He passed by, an officer passed by. I can scroll back to that if you want to -- do you remember seeing in this video you talking with the officer?

A I don't see -- I don't remember seeing me talking with the officer.

Q Are these times -- you know, the CVS Pharmacy timeframe on the video time is it accurate, do you know? Do you remember?

A I don't know if they are.

Q So this is the customer that you knew, self-checckout?

A Yeah, that's --

Q 1:56.

What's his name?

A I don't know the names.

Q So you are not good with names, you don't check with names?

A No, I don't. Every time he comes in I say Hey, what's up, Dude. That's it.

Q When the officer, you know, at some point he

talks to you as we covered in his report.

Did he ever give you a form to fill out, document to fill out?

A Not that I can recall.

Q When officers arrest someone for trespass do they give you form to fill out?

A No, they don't give us forms to fill out. No.

Q And how many officers do you remember talking on that day?

A I don't remember.

Q You don't even remember how many officers came?

A No, I don't.

From what the picture -- that video says it was just one.

Q So but, you know, police report states that he spoke to you. And he recalls the conversation that you had.

Do you think when you told him you wanted her to be arrested for trespassing, you were performing your job duty at CVS?

MS. JONES: Objection. Vague.

THE WITNESS: I don't remember if I told him or not.

BY MS. MKRTCHYAN:
Q If you told him that, we've covered this report, you have no basis to believe that officer wrote statements false, right?
03:57 A Yes.
Q If you said that you believe you were, you know, performing your job functions and having asking him to arrest her for trespass?
A If I asked her to arrest then, yes, I
03:57 believe I was doing my job.
Q You were not -- you don't remember asking him to arrest her?
A I don't remember, no.
Q So if, for example, what we've seen in those
03:57 six minutes of what happened, if she had not done anything to have disturbed the store, customer or you, other than just complain, other than just complain, and, you know, trying to speak with the manager, and voice her concerns, just voicing them,
03:58 trying to talk to someone, would that be performance of your job duty to ask the officer to arrest for trespassing?
A For just want to complain about something?
Q Yes.
03:58 A No.

Q No. And if -- you know, we haven't seen if she had not done anything that you could tell us as you've testified, you can't remember her disturbing anybody else -- even from prior occasion, January 13th, you couldn't tell us -- would that be appropriate of you to have banned her from the store indefinitely?

A I don't remember, because I don't remember banning her.

Q I understand you don't remember, sir. I'm not asking the question.

I'm saying if she had not done anything disrupting the business -- like anything that we've covered, like physical violence, or yelling, obscenities or throwing things -- if she had not done any of that would that have been appropriate of you to have banned her from the location on that scenario -- in that scenario?

A Again, I can't say yes or no about it, because I don't remember what happened that day.

If it was a regular customer -- if it was a regular customer coming in, whether it was her or the guy I told you that he comes in every day, if it was him that came in and was being disruptive or whatever --

Q Uh-huh.
A -- then if we had -- if we had to ban him then we would ban him.
But if she came in, using her as an example --
Q Uh-huh.
A -- this young lady if she came in --
Q Uh-huh.
A -- and was not disruptive or not causing any problem at all to us, no, we would not have banned her.
Q Okay.
A And we would not have had her trespassed.
Q And yet as of right now sitting here right now today you cannot tell us that you are the one who banned her for any type of disturbance, true?
A I don't remember if it was me or not.
Q Uh-huh. Okay.
And you cannot tell us what exactly she did on January 13th that would have caused you to have banned her from the store, true?
A Again, it's been over three years, I don't remember.
Q I understand that. I understand that.
But you cannot point to me any behavior by

her -- tell us any behavior by her that she did on January 13th that caused her to be banned?

A I don't remember.

Q Okay. But my -- let me just try to -- January 19th. I'm not sure why you didn't see the officer enter back.

So we have officer comes and arrests her.

MS. JONES: The second time?

MS. MKRTCHYAN: Yeah. I'm not sure why this -- it is clearly we have the officer talking to Guy Garcia.

MS. JONES: You can speed it up at the pull-down. Do you see the pull-down menu next to the --

MS. MKRTCHYAN: Yeah, I know, but the thing is -- does not really too much, because I want to see when this officer leaves the store.

BY MS. MKRTCHYAN:

Q Let's see if you guys are talking to him at any point in time outside. This is 1:32. We saw her -- saw him take her out, right? And then you are standing there by -- outside.

Is it possible he came to talk to you while you are standing outside?

A It's possibility, yeah. I can't say yes or

no. I don't remember.
Q You don't see that from the store -- from this doors, right, through these doors?
You don't see that, right?
04:02 Is this the officer talking to you?
A I don't know. That looks like Joe.
Q Uh-huh. Okay. We'll ask, we'll find out.
I forgot to ask you follow-up questions about your divorce.
04:02 I wanted to ask you as part of your divorce proceedings was there any restraining order brought by your wife against you?
A What does that have to do with this case?
Q We are entitled to know your background,
04:03 sir?
A I don't think my ex-wife has anything to do with this case.
Q Well, that's for the court to decide.
Are you refusing to answer that question?
04:03 A No, I'm not refusing. I just -- why would you ask a question about my ex-wife?
Q Because we are entitled -- I'm not asking -- I don't want to know anything about her.
I just want to know if there was any
04:03 restraining order brought against you by her. We're

entitled to know that. If you refuse to answer that we'll have to take it up with the court. It's up to you. We can do that, we can bring you up to the court. Unless there is an objection by your counsel to, you know --

MS. JONES: It's not relevant.

You can just answer the question.

THE WITNESS: No, she never did.

BY MS. MKRTCHYAN:

Q Okay. And as far as your divorce papers was there any accusation against you for any physical violence?

A No, there wasn't.

Q Any dishonesty?

A No, there wasn't. She was dishonest. She cheated on me. She had another man's baby.

Q Okay. So but as far as you can tell from your divorce proceedings, never you were under restraining order?

A No, never was.

Q And never there was any physical violence involved between you two?

A No.

Q Nor were you ever arrested for any domestic violence?

A No, I was never arrested for that.
Q Okay. And the divorce was finalized you said about 2019?
A About 2019, 2020 around there.
04:04 Q Okay. You never had any other lawsuits --
A No.
Q -- before? Okay.
After this incident did you have any other interactions with the same officers that came on that
04:04 day arresting Ms. Burmayan?
A I don't remember. I didn't recognize this officer.
Q No, you didn't. Okay.
And you never saw this woman again after
04:05 this incident, true?
A I can actually say true to that. I have never seen her again.
Q And true on this video we didn't see actually as we played that Officer Ross comes in,
04:05 back into the store after he removes Burmayan from the store, true, we didn't see that happen?
A No, I did not see him come back in the store.
Q Okay. So it's fair to say -- well, we can
04:05 see you standing there outside of the front entrance

with Joe?
A Uh-huh.
Q Right, Joe Johnson?
A Yes.
04:05 Q Do you think that that's when -- well, strike that.
Did you see when officers' patrol cars left the scene?
A I don't remember if we were out there.
04:06 Q Uh-huh.
A Sitting out there.
Q Uh-huh.
A It's a possibility we saw them leave.
Q Uh-huh.
04:06 A But I don't remember.
Q Okay. Did you ever tell any of the, you know, employees or employers that Ms. Burmayan was shoplifting that's why she was banned from the location?
04:06 A I don't remember ever saying that.
Q Okay. And on this 911 call there's absolutely no reference to shoplifting, right, that she was banned because she had been shoplifting, right?
04:06 A I don't remember her -- remember me saying

that.

Q Right. Right.

And if she had been banned from the location because of shoplifting you would have made it clear to the 911 dispatch, right?

A More than likely, yes.

Q So there is absolutely -- as of right now you are sitting here today you don't remember ever telling anyone that she was shoplifting and that's why she was banned?

A I don't remember.

Q Okay. So here's -- I can tell officer was standing by there as you and Johnson were conversing.

Let me see, it appears that potentially the officer was talking to you --

A Yeah.

Q -- outside the store, right?

It appears that that was the officer, right?

A It's possible.

Q So then it appears that he was talking to you and Joe Johnson was present, true?

A Yes.

Q Okay. And how long would you say this entire conversation was based on this video?

I know you don't remember anything, based on

this video.

A I couldn't tell you, ma'am.

Q Okay. So about maybe one or two minutes?

A Possibly, yeah. I couldn't --

04:07 Q More than that?

A I don't remember.

Q Let's go back again. Let's play this again.

I just want you to establish for me that it was about one or two minutes that you had a

04:07 conversation with police officer outside. Okay.

So it appears from this clip at 1:44 you come inside and the officer walks away, true?

A That's what it looks like, yes.

Q Initially what we could tell from looking

04:09 through the glass doors you were sitting there and talking with someone at 1:41 sometime, true? True?

Just confirm with me that's the timeframe about two, three minutes that you had a conversation with the officer, true?

04:09 A About three or four minutes, yeah.

Q All right.

So believe it or not I'm done.

If you have any questions?

MS. JONES: I don't have any questions.

04:10 MS. MKRTCHYAN: I have a --

MR. ARIAS: I have a few questions.

EXAMINATION

BY MR. ARIAS:

04:10 Q And, sir, I know you don't seem to have any memory of the plaintiff, but I just want to confirm a couple of things.

At any point in time the day the plaintiff was detained by the police did you ever hear her say

04:10 that the handcuffs were too tight?

A No, I don't remember that.

Q Okay. And on the date the plaintiff was detained by the police did you ever hear her say that she was disabled?

04:10 A No, I don't remember.

Q Okay. Thank you.

I don't have any further questions.

DEPOSITION OFFICER: Do either of you need a copy?

04:10 MS. JONES: Do you want to complete --

MS. MKRTCHYAN: I want to complete the deposition.

MS. JONES: We're done with the deposition.

MS. MKRTCHYAN: Basically I offer the

04:10 following stipulation --

DEPOSITION OFFICER: I'm going to go by Code.

MS. MKRTCHYAN: No. No. No. We don't go by Code in Federal Court.

04:11 DEPOSITION OFFICER: Thank you for reminding me.

MS. MKRTCHYAN: Yes.

So stipulations offered to be entered -- is offered: There's going to be a transcript prepared
04:11 today for your deposition, transcript will be provided for your review. You are going to get that through your lawyer go over that, review that, make any corrections that you you need to do. There is a place you can make those corrections and sanctify
04:11 under oath that it's accurate.

If you make any amendments you are allowed to do that, but that will be used against you, it's still under oath. Okay? So -- but if for whatever reason the original's, you know, signed copy gets
04:11 misplaced or does not get signed for whatever purposes or gets lost a certified unsigned copy will be used for all purposes in this litigation.

MS. JONES: Stipulate to that.

MS. MKRTCHYAN: Okay. Counsel for --

04:12 MR. ARIAS: Yes, so stipulated.

MS. MKRTCHYAN: Very good.

So congratulations you are done.

DEPOSITION OFFICER: Do you need a copy, either of you?

04:12 MR. ARIAS: Yes, I do. Can I get hard copy as well as an electronic copy.

MS. JONES: We're fine with just electronic and you can just send it to me. I will facilitate Mr. Garcia's review.

(The deposition proceedings concluded at 4:12 p.m.)

I, the undersigned, say I have read the foregoing deposition and declare under penalty of perjury that the foregoing is true and correct.

Executed the __________ day of _______________, 2023, at ______________________ ________________________________________________.

GUY GARCIA

STATE OF CALIFORNIA )

I, ELIZABETH GREIDERER, 10566, a Certified Shorthand Reporter within and for the State of California, do hereby declare:

That pursuant to 2093 (b) CCP, I administered the oath to the deponent;

That the foregoing deposition was taken before me at the time and place set forth and was taken down by me in shorthand and thereafter transcribed under my direction and supervision;

That the foregoing deposition is a full, true and correct transcript of my shorthand notes so taken.

I further declare that I am neither counsel for, nor related to, any of the parties to said action, nor in any way interested in the outcome thereof.

I declare under Penalty of Perjury this 10th day of November, 2023, that the foregoing is true and correct.

Elizabeth Greiderer

ELIZABETH GREIDERER, CSR 10566

ERRATA SHEET
CHANGES IN TESTIMONY
BURMAYAN v CVS PHARMACY, INC., et al.
Guy Garcia
October 27, 2023

| Page | Line | From | To |
|---|---|---|---|

SIGNATURE:____________________________DATE:_____________

Guy Garcia

**$**

**$14** 37:13
**$5** 81:8,9

**0**

**0001** 36:22

**1**

**1** 38:22 67:15
**1-800-SHOP-CVS** 82:18
**10** 39:3,4 176:14,17
**11** 37:24 38:1,6 163:12
**1112** 71:12
**12** 66:6
**128** 112:24
**12:12** 146:12
**12:13** 146:18 158:24 188:19 194:9
**12:13:02** 147:6
**12:13:55** 148:9
**12:15** 149:18
**12:16** 150:6
**12:17** 151:1
**12:18** 151:3
**12:20** 152:6
**12:21** 134:4
**12:22** 155:20 157:14
**12:22:32** 153:4
**12:24** 158:13
**12:24:05** 158:8
**12:25** 158:24
**12:40** 163:19
**12:41** 164:2,15 166:11, 16
**12:42** 167:15 173:9
**12:43** 173:15
**12:44** 174:23
**12:45** 176:14 177:6
**12:46** 179:3
**12:47** 180:11
**12:49** 181:24 183:9,11, 15 188:19 194:10
**12:50** 186:14 188:7
**12:53** 195:6,7
**12:54** 196:20
**13** 51:13 52:25 102:10 144:24 145:15 160:9 181:18 189:17 193:14 194:9,20 227:5
**13th** 52:21 60:23 106:4 113:21 115:20 116:2 143:6 145:12 156:24 157:12 172:9 173:20 193:24 194:15 199:5 207:6 208:20 210:8,16 211:9 212:3 213:3 227:16 238:22 261:5 262:20 263:2
**15** 176:14,17 255:14
**17.90** 37:18
**172** 120:14
**173** 120:14
**18** 19:11 37:21
**18.90** 37:21
**19** 53:4 103:8 132:23 133:22 142:9 197:5 204:12 250:25
**19th** 60:23 101:3 102:2 103:6 106:24 107:25 115:20 116:2 124:21 132:25 143:7 172:9 192:3 196:24 197:8 199:16 203:3 207:9,15 211:9 212:4 222:18 228:3,4 238:22 242:22 250:4 251:10 252:5,11 263:5
**1:06** 199:12,13
**1:08** 199:20
**1:09** 201:19
**1:10** 201:19
**1:11:07** 202:4
**1:17** 134:4,6
**1:22** 204:12 234:11 239:7,8
**1:24** 209:17 213:14 216:2
**1:25** 217:6
**1:26** 218:17 239:4,5,8
**1:27** 221:22
**1:27:02** 219:14
**1:27:52** 228:13
**1:27:54** 229:21
**1:28** 230:21
**1:29** 231:24 234:14 243:5
**1:29:27** 243:2
**1:30** 246:6
**1:32** 247:25 263:20
**1:36:16** 244:11
**1:41** 250:18 269:16
**1:44** 253:17 269:11
**1:49** 254:12
**1:52** 256:3
**1:56** 258:18
**1st** 38:23 43:6

**2**

**2** 43:9 166:17
**2.2** 40:3
**20** 176:17
**20-** 17:19 19:10 72:19
**2013** 37:24
**2016** 19:9
**2018** 11:20,21 18:20,21, 22,23 19:2 36:24 69:6, 7,11 71:6 95:20 99:10
**2019** 17:19 18:2,3,21 38:22,23 40:8 42:22 43:12 266:3,4
**2020** 17:20 18:13 32:10 37:1 64:8 71:13 189:17 266:4
**2021** 5:8 9:7,8 43:5,6 48:13 51:13 52:25 53:5 68:16 87:13 103:8 132:23 133:22 142:10 144:24 145:15 160:9 162:11 181:18 193:14 194:9,20 196:25 197:5 227:5 251:1
**2022** 43:6 67:16 68:16 71:22
**2023** 4:1 37:24 38:1,7 96:1,7
**2024** 96:21
**21** 43:7
**21st** 204:12
**22** 9:8 67:24
**25** 43:7
**27** 4:1
**28** 16:10
**285** 5:4,7

**3**

**3** 5:10,11
**300** 5:12 184:3
**30th** 43:6
**31** 69:11
**38** 16:10
**3943** 12:7
**3rd** 11:19,21 36:23 95:20 96:1,7

**4**

**4** 69:7
**4'5"** 148:18
**45** 171:22
**49** 55:13

**4939** 95:16

**4:12** 272:10

**5**

**5** 64:8

**5'** 214:20

**5'11"** 5:1 152:17,19

**5.4** 214:21

**5.5** 214:20

**50** 58:16

**52** 55:13 111:15

**524** 81:22

**526** 84:10

**53** 195:19

**54** 89:17

**57** 229:16

**58** 52:3 89:18

**592** 64:8

**6**

**6** 39:3 163:13

**6'** 152:17,22

**60** 39:7

**7**

**70** 155:1

**721** 69:9

**722** 69:10 97:19,20

**73** 137:25

**8**

**8:30** 164:1

**9**

**911** 34:10 61:8 84:20,22 85:1,12,18 89:1 102:22 103:5,20 104:1,9 105:4 106:18,20 107:7,20 116:13 117:20 118:2,3 121:7,11 133:13,21 142:25 143:24 168:9 169:13,14,22 172:2 180:3 212:9 215:6 221:17 222:16,17 226:21 227:10 235:15 239:2,3,4,6 248:21 249:14,24 250:12 267:21 268:5

**9:58** 4:2

**A**

**A-N-T-H-O-N-Y** 4:17

**a.m.** 4:2 153:4 157:14 164:2 173:9 204:13 209:17 213:14 216:2 228:13 231:24 234:11 239:5 256:3

**Aaron** 11:10,11,15 13:23 22:23,24 38:22 39:1 43:1 57:14 69:5,9,10,17,19 70:18 71:6 75:2 79:3,11,12,25 88:14 99:12

**ability** 45:17,19 69:25

**abruptly** 167:16

**absolutely** 147:3 172:4 174:16 267:22 268:7

**abusive** 214:9

**accept** 79:18

**acceptable** 70:14

**access** 27:14 146:2

**accessed** 257:6

**accommodate** 45:9 66:11 67:2 236:14

**accommodated** 47:5 64:21

**accommodation** 64:11 65:13

**accommodations** 48:5 62:5,10 63:10,11 64:9,14 65:6 67:4

**accountability** 40:2,3 69:23

**accuracy** 139:9 140:6

**accurate** 36:25 122:12 124:9 127:9 141:15 157:1 186:13 258:12 271:15

**accurately** 41:11,23 42:15 98:11

**accusation** 265:11

**acknowledgement** 97:23

**acknowledging** 41:20

**ACO** 165:17 183:21 197:25 198:2

**ACOS** 161:19 197:23,24

**act** 80:21

**acting** 180:6 219:8 231:25

**action** 70:3 71:20 146:19 204:4 232:20

**actions** 186:12 232:17

**active** 231:3

**actively** 41:5 231:3 247:3

**actual** 17:20 23:14 35:7,11 45:24 62:13 85:11 103:14 163:9,10 178:24

**ACU** 166:11

**additional** 70:14,22

**address** 109:24 110:4,11,14,15

**admitting** 127:5

**Adrian** 57:10,17 162:20

**adults** 17:25

**Advise** 64:15

**advised** 26:13 138:1 139:12

**affected** 90:17

**affects** 92:2

**age** 84:15 89:19,20

**aggress** 232:7

**aggressive** 130:21 175:14,17 181:3 190:1

**agree** 18:10 38:5 40:11 41:11 44:1 59:7 68:20 69:4 85:2 104:11 123:22 185:1 186:8 188:20 209:17

**ahead** 56:19 60:5

**aid** 14:24

**aisle** 71:25 150:14,20,23 151:3,8,11 152:7 159:14 182:23 228:3

**aisles** 45:20 72:4 148:10 149:11,16,24 150:7,11 151:3 159:6,13,20,22 162:25 181:21 184:20 188:9 196:21 208:15 220:1 235:2

**alcohol** 71:24 72:1 73:5

**allegation** 25:20 101:8

**allegations** 92:19 93:18

**alleged** 101:1

**allowed** 48:21 49:3,5,7,20 50:11 51:1 54:20 56:23 57:24 60:1 75:18 79:2,10 83:14 84:1 86:5 101:6 102:4,16 117:24 125:23 129:9 130:4,12 138:3,6 139:13,19 140:4 201:12,16,17 220:4 233:17 249:16 271:16

**altogether** 242:20

**amendments** 271:16

**amounts** 71:3

**anger** 9:22,25

**angle** 161:8 162:22 163:2 164:16 196:25 197:4,20

**angles** 145:19,21 197:18

**angry** 81:6

**annoyed** 69:12

**Anoush** 25:2 51:5

103:9 119:2 120:18 138:2 142:7 146:18 149:15 164:13 165:22 179:3 187:15 196:7 246:6

**answering** 7:1 179:18

**answers** 94:19 237:5

**Anthony** 4:22,23

**anybody's** 201:13

**anymore** 81:15 157:7 214:3

**anytime** 126:18 233:18

**apartment** 16:15,16

**apologize** 22:2 124:6

**apparently** 25:21 29:1 196:10

**appeared** 190:8

**appearing** 244:1,3

**appears** 103:25 140:17 155:11 156:23 177:21 182:17,22 183:1 184:8 186:19 187:13 199:3,15 201:19 202:4 204:21 208:12,14 209:14,15 213:12,19,21 214:20 217:1,7,10 219:11,18 221:23 227:8 228:13 235:14,17 247:2,6 268:14,18,20 269:11

**apply** 8:21,22

**approach** 78:8 82:6 166:6 167:16 180:15,20 185:13,14 195:4 213:16 216:25 230:22 232:8 243:3

**approached** 177:22 185:2 225:23,24

**approaches** 166:7 179:8 180:16 219:15

**approaching** 167:13, 17 173:15,16 176:9 177:4 179:16 220:11,14 229:24 243:10 244:12

**appropriately** 142:4

**approval** 33:19 37:25 61:4 109:11 248:11

**approved** 109:4 248:4, 5,6

**Approximately** 137:8

**April** 38:22 42:22

**area** 15:7 23:25 135:3 148:9 150:21 161:24,25 166:6,8 173:15 177:7 198:7,8 209:3,6 216:19 245:13 256:7

**areas** 183:19 258:1

**arguing** 228:11

**argument** 17:4

**argumentative** 144:15

**ARIAS** 270:1,4 271:25 272:5

**Armenian** 148:20

**Army** 162:6

**arrest** 10:17 119:3,13, 16 127:24 128:8,24 134:15,16,19,20 135:1, 4,8,17,19,21 137:3,12 138:20 221:18 234:15 259:5 260:8,9,12,21

**arrested** 9:14 22:6 30:16,20,21 31:4 119:18,19 123:18 124:12,17,25 127:19,23 128:3,14,19 136:6 137:1 138:4 140:5 169:16 182:15 197:16 237:20 252:18 259:21 265:24 266:1

**arresting** 266:10

**arrests** 15:22 134:21 135:17 263:7

**arrive** 32:8

**arrives** 235:14

**articulate** 6:25

**asks** 111:16 113:16 114:10

**assault** 6:4 11:4,5

**assaulted** 9:2,15 88:2

**assaulting** 214:10

**assigned** 41:22

**assignment** 14:13 22:16

**assist** 13:14

**assistance** 13:14 70:2

**associate** 22:21 200:12

**attack** 214:24

**attacking** 77:11

**attempts** 11:5 33:4

**attention** 145:25 175:6 176:1

**attitude** 114:23

**attorney** 7:1

**attorney/client** 53:21 55:6,11

**Attribute** 38:14

**attributing** 120:15 122:7 126:13

**audible** 7:18 37:7 94:19

**audio** 102:24 107:17 109:20 111:13 112:5,21 113:9,14,24 114:8,13 146:6 201:8

**August** 69:11 90:9 94:6 95:1

**authority** 128:5,7

**automatic** 96:8 198:4

**automatically** 96:11 200:3

**average** 32:14 147:16, 18

**aware** 39:18 40:13,17, 20,22,23 46:9 54:23,25 59:11 62:2,3,5,17 64:18,21 66:11 90:19 92:5 95:14 105:16,21, 25 106:1 114:17 115:25 132:23 133:2,3 146:9 201:7 221:9 223:1

**Azusa** 14:22,23 15:10

## B

**baby** 265:16

**back** 9:24 19:22 36:16 66:14 67:11,13,17 70:12,14 72:9,19 73:21 75:18 77:21 79:10 94:24 99:20 100:24 101:2,6,22 102:1,8,9, 12,16,18 104:4,5,7 106:18,21,24,25 109:15 114:1,3,6 117:22,23 118:9,18,21 122:11,17 123:13 124:20 125:2,8, 11,13,15,16,23,24,25 126:18,23 129:15,18,22 130:1,12,23 131:9,22 132:4,7,11,14,18,22,25 133:8,14 134:6,10 136:5 137:24 138:24 142:1,4,8,9 143:1,10 146:16 151:18,24 155:20 157:9 158:5,10, 12 159:10 163:5 165:14 168:11 188:3,8,14 191:24 192:2 194:20 195:1 196:20,21 206:5, 13 208:18 209:10,11,24 210:21 211:20 212:2,10 213:3,4,10 216:11,13 228:11 235:6 238:21 240:14,24,25 241:3,6, 17,22,24 244:22 246:2, 5 248:2 249:21 250:22 254:7 256:5,24 257:2 258:4,7 263:6 266:20, 22 269:7

**back-up** 84:19,23

**background** 19:23 264:14

**backroom** 164:5 188:14 256:4,5,19 257:13

**bag** 25:22 26:1 157:22

**bags** 25:5,12,13,14,16, 22 26:7,10

**ballpark** 32:9,14 130:13 170:20 171:18

**ban** 10:19 49:20,21 74:20 75:17,23 101:13, 16 105:2,11,23,25

115:5,6 116:7,18,19,20 117:17,18 125:21 126:13,16 131:6,8 136:4 137:14,18 140:22 141:6,19,22 142:22 143:4,16 144:1 191:23 192:23 193:2,3 240:13, 16 262:2,3

**bank** 21:20

**banks** 21:15

**banned** 10:1 11:7 31:5 49:21 72:10 73:20 74:16,17 75:7,11 76:2, 19 79:9 80:5 88:19 101:5 102:7 104:3,4,12, 16,23 105:5,8,9,22 106:3,17 111:20 113:17 114:3,16,21,25 115:4, 13,14,15,17 116:4,9,14, 15,22 117:1,21,23 118:14,15,20 122:11, 16,20,21 123:4,8,15 125:1,3,15,22 126:3,9 127:1 131:20 133:12 137:17,22 138:10,18, 19,21 139:1,4,5 141:10, 13 142:25 143:3,10,15, 20,23,25 144:2,8,10,12, 19 192:16 193:5,9,12, 17 194:15,18,19 206:24 207:14 210:15 211:1,3 226:22 238:4,6,11,12, 15,16,18 240:1,7,10 241:19 242:8,13,15,17 249:22 252:4,13 261:6, 17 262:10,16,21 263:2 267:18,23 268:3,10

**banning** 49:25 75:12, 13,15,17 101:21 104:25 106:5 116:8 117:9 122:19 126:7 133:19 137:15 140:23 141:1,8, 14,16 142:14,19 143:18 206:7,8,9,11 210:12 241:20 261:9

**Base** 37:12

**based** 7:23 8:2,8 120:25 124:15 139:25 141:14 150:2 169:13 177:12 187:22 189:23 190:14 192:11 204:10, 11,18 206:5 207:4,24 210:15,25 225:11

232:16 234:18 236:23 239:6 253:22 257:20 268:24,25

**basically** 6:22 7:8 12:14 14:6 15:4 30:6 50:10 52:8 58:6 59:10, 25 62:1,16 70:4 82:2 88:14 100:2 104:8 113:4 114:18 144:24 180:16,18 182:16 190:7,11 198:6 215:12 220:19 221:15 228:14 235:23 237:9 239:5,6 248:4 249:23 255:7 270:24

**basis** 140:10 260:3

**basket** 149:23 164:14 165:23 166:7,14 177:16 208:13

**baton** 21:5

**bazaar** 231:25

**Beach** 36:24

**beanie** 154:7

**bed** 15:8

**beginning** 18:3 22:18 95:17

**behaving** 142:4

**behavior** 42:10 67:22 73:7 76:21 77:10,12 189:4 190:1 191:8,14 208:24 215:15 231:18 250:25 262:25 263:1

**behaviors** 67:23

**belief** 64:13 65:5

**beliefs** 64:19

**believed** 40:9

**belt** 135:11

**birthday** 89:11 90:9,14

**bit** 24:5,14 25:13 42:3 54:22 93:17 156:4 159:25 184:1

**black** 204:20

**blocked** 71:25

**blurry** 166:2

**bonus** 71:3

**born** 16:3

**boss** 11:3,9 56:20

**bottom** 100:1 226:21

**break** 66:19 67:7,9 134:1,2,4 164:8,9,22 165:4,8,12 196:16 245:18,25 256:5,7

**breathe** 65:4,19,25 167:24 168:20

**breathing** 65:9 66:2,5 167:24

**briefly** 183:15

**bring** 70:12 265:3

**brings** 158:8

**broom** 155:14

**brought** 24:12 70:14 264:11,25

**Browne** 135:11

**building** 12:25

**bunch** 72:4

**Burbank** 23:9

**Burmayan** 25:2 51:5 102:1 103:9 105:25 106:3 119:2,18 121:25 132:22 138:2 142:7 146:19 149:15 164:13 165:22 166:7 167:16 173:9 177:10,21 179:3, 9,16,18 180:11 181:24 183:2 184:5 185:16 186:14 187:15 195:12 196:7 197:14 204:13 216:1 218:23 231:24 246:6 247:4 249:12 250:17 254:16 255:8 257:3 266:10,20 267:17

**Burmayan's** 188:16

**business** 69:23 141:2, 5,17 213:24 215:13 219:9,12 251:24 252:5, 19 253:7 261:13

**busy** 161:16

**buy** 136:22 180:20

**C**

**CALIFORNIA** 4:1

**call** 9:10 10:24 11:6 30:22,23 32:6,15,18 33:1,7,10,12 34:1,5,6 50:14,24,25 60:13,18, 19,21 61:4 73:25 74:5, 15 76:1,5,23 77:2,6,12, 18 78:19,22 79:2 82:17, 21 84:2,5,6,11,19,22 85:12,18 86:2,5 87:18 89:1 101:9 102:22 103:5 107:7,20 108:9, 14,17,21,25 109:2,7,11 119:17 121:7,11 128:10 133:13 134:14 136:19, 25 161:16 168:9 169:13,14,22 170:25 190:22 191:4,5,9,11,12, 20 193:24 197:14 200:16 205:3 212:9 226:13,14 228:22 229:1 235:15 236:6 239:4,6 242:1,21 248:15,21 250:2,12,19 251:25 267:21

**called** 4:6 9:13 30:11, 14 32:9 34:8,10 53:4 56:25 60:17 72:6 73:3 74:5 80:5 101:1,4 102:20 103:8 104:9 106:18,25 107:14,15 109:8,10 116:12 133:4, 9,21 150:13 155:12 161:21 162:9 169:25 170:15,16 172:22 181:13 184:6 190:24,25 191:10 193:16 194:7 197:15 200:16 204:25 215:5 226:6,11 229:10, 13,17 239:2,20 248:4, 15,20 249:2,6 250:9,11 251:11,21 252:1,3,8 253:7

**caller** 104:1 105:4 106:20 117:20 118:2

**calling** 10:24 33:19,22 61:8 64:14 73:18 85:1 100:24 103:14 109:4 138:7 143:13 190:15 194:21 227:8 248:6 252:8

**calls** 4:19 30:17 51:15 53:20 64:2 80:9 87:20 172:14 178:12 181:17 187:17 212:21 225:3 227:13 228:20 229:3 230:11 233:3 239:5 243:23 248:14 255:21

**calm** 78:9,12 82:8 85:21 86:20 87:1 236:1

**calmly** 86:12 208:8 216:19

**camera** 145:19,21 146:8 160:18 161:8 162:22 164:16 165:14 178:9,15 183:21 185:14 196:25 197:4,18,20

**cameras** 27:11 145:22 146:4 165:17 212:24

**capable** 70:7,11

**car** 246:13,15 247:4

**card** 20:23 81:9

**care** 35:23 44:8 91:20 93:2,5,7,15 162:20,21 225:21

**career** 20:3,6

**careful** 79:17

**carefully** 232:15

**Caring** 40:4 41:19 42:9

**carry** 21:3,5,18 165:23

**carrying** 152:25 153:1 154:4 155:12

**cars** 267:7

**cart** 156:15,16 157:23 159:10

**carts** 188:8

**case** 8:16,18,22 9:1,21 10:8 25:2 26:24 92:6 101:8 105:13,19 171:19 264:13,17

**cash** 165:15 166:6

**cashier** 69:14 111:8 161:7,9,11,15,16

**categories** 68:21,22

**category** 67:18

**caught** 134:25

**caused** 29:23 111:20 144:13 187:15 262:20 263:2

**causing** 50:21 75:4 84:4 104:1,7 106:21 109:15 112:1 135:24 144:18 205:17 227:9 262:9

**cell** 82:15 83:12 184:25 185:1,10,11,12 200:11 201:14 219:16,20 220:1 221:22 231:11 233:1 248:21,22,24 249:6,9, 10

**center** 200:6

**cents** 25:17,18

**certified** 271:21

**cetera** 8:1 20:5 23:7 37:23 54:5 70:2,3 82:3 104:3 109:16 141:18 168:11 169:24 231:17 236:5

**chain** 33:15

**challenge** 68:23

**change** 66:18 180:12

**changing** 240:20

**charge** 25:14,16,23 26:7 33:14 42:12 60:18 74:3,7,10 86:17 199:25 225:20

**charged** 25:21 26:1

**charging** 25:5,12,13

**cheated** 265:16

**check** 200:19 258:22

**checked** 5:4,7

**checking** 200:24

**checkout** 41:21 174:21,23 180:17 198:2

**chef** 16:15

**chief** 10:10

**children** 16:7

**choices** 82:17

**choose** 82:19

**church** 15:6

**circumstance** 223:15

**circumstances** 50:16 143:14

**citizen** 134:16

**citizen's** 134:19,20 135:16

**citizens** 127:24

**claimed** 72:12

**claiming** 225:15

**clapping** 72:5 73:8

**class** 20:20

**classes** 9:25 20:18,19 45:24

**clean** 15:8 24:10

**cleaning** 154:5 155:12, 16,17

**clear** 82:16 98:11 139:22 152:12 229:16 268:4

**clearing** 188:8

**clerk** 158:17,19,22

**clip** 146:21 147:6 148:9 150:2,5 155:22 157:14 166:11 167:15 174:3 177:12,20 180:23 183:9 185:14 188:15 190:14 192:11 194:1 205:22 212:3,4 214:2 233:13 234:18 236:23 269:11

**clips** 93:17 120:3 145:4,6,8,13,14 148:14, 16 149:19 153:20 158:23 160:18 165:24 172:3 175:10,17,18 189:7,24 191:15 192:7 194:5,8 207:6,9 212:11, 14,16,20 228:2 232:2 251:17

**close** 19:11 151:10 155:1 163:13 180:17 216:15

**closed** 163:11

**closer** 179:9

**closes** 163:11

**closest** 149:24

**closing** 163:12

**cloth** 65:16

**clothes** 254:21

**co-worker** 110:20

**co-workers** 87:2

**coaching** 99:15,16

**Code** 271:2,4

**COG** 120:14

**COGVON** 137:25

**collaboration** 40:5 69:22

**colleague** 62:8 69:20 97:24 98:20

**colleagues** 64:10

**Colorado** 134:24

**command** 33:16

**comment** 41:19 209:12

**comments** 39:5 41:4 42:8 69:9 70:3 71:6

**committed** 72:8

**committee** 54:8

**common** 125:12

**communicate** 129:23 130:6,7

**communicating** 186:24

**communication** 55:7 58:2 118:3 171:6

**communications** 53:13,17 55:11 103:6 170:9,17 172:1

**company** 11:24 12:4, 18,21 14:7,11 39:19 40:21 41:2 43:21,24 44:3 48:13 49:3 50:13, 19 54:21 58:9 73:14 80:2 83:14 84:9 88:8 93:9,14

**company's** 23:22

**compared** 214:12
**Compensation** 37:12
**complain** 260:17,18,23
**complained** 90:20 112:16
**complaint** 25:4 26:13 34:24 35:1,6,15 36:1 61:11 69:8 71:12 80:4, 18 82:18,22 92:18 227:3 228:16,17
**complaints** 24:25 25:3 66:15
**complete** 39:6 41:22 270:20,21
**completely** 135:10
**compliance** 54:25 59:1 73:13 210:1
**compliant** 54:5 57:21, 23 132:5
**complied** 38:15 102:14,15 240:15 241:4
**complies** 131:22 132:16
**comply** 131:19 241:21
**complying** 49:19 50:7, 18 52:8 59:12 101:4 102:3,9 132:4,11,12 133:1,6,22 142:10 241:25
**computer** 96:2 160:17 199:20
**concerned** 36:3 176:19 218:12
**concerns** 82:14,25 260:19
**concise** 82:16
**concluded** 272:10
**condescending** 237:6
**conduct** 190:15 234:11 239:13,15 253:6
**conducted** 100:15
**confirm** 38:10 106:14 107:5,7 110:5,7 160:16 182:11,13 186:1,11 197:10 198:15 269:17 270:6
**conflicts** 44:23 77:23
**confused** 19:1
**confusing** 109:13
**congratulations** 272:2
**connected** 21:20
**connection** 5:24 6:1 9:11,17 10:5
**considered** 129:2,12, 20 134:15 232:20 242:9
**consistent** 121:10,14 208:23 221:13,18 230:3,9 231:18,19
**consistently** 41:20
**constantly** 212:14
**constructive** 41:6
**contact** 24:21 64:13
**contacts** 15:20
**content** 171:5
**continue** 43:3 109:17, 21 111:12 112:4 149:7, 14 150:22 152:14 155:19 156:10 157:17 166:4 173:6 183:10 194:24 206:2 208:4 212:7 213:6 215:20 218:9 228:11 229:20 243:1 244:21 253:24 257:22
**continues** 58:16 85:17 86:4 121:20 122:7 123:17
**continuing** 83:25 165:23 213:9
**control** 41:7
**conversation** 68:2 187:15 192:8,14 195:18 201:20 218:24 222:13 231:4 244:18 246:22 247:14 259:18 268:24 269:10,18
**conversations** 170:10 201:10,13
**conversing** 192:17 268:13
**convictions** 22:10
**copy** 270:19 271:19,21 272:3,5,6
**corner** 159:23 161:9 162:24
**corporate** 93:8
**correct** 107:23 207:16
**correcting** 70:11
**correction** 99:15,17
**corrections** 271:13,14
**correctly** 12:11 13:8 60:25
**counsel** 53:14 64:15 98:6,7 170:9,11 265:4 271:24
**counseled** 23:21 26:24 68:8
**counseling** 26:18 70:15,23 71:1 80:13 87:22
**counter** 163:14
**couple** 36:13 44:11 134:10 218:1 270:7
**coupon** 44:11
**court** 5:21 9:1,2,18,21 17:11 88:1 160:1 264:18 265:2,4 271:4
**courteous** 69:15
**cover** 103:20 132:6 168:5 179:19 180:1 236:15
**covered** 46:22 59:23 80:1,4 99:19 100:25 167:20 179:25 210:8, 24,25 211:22 220:17, 18,22 228:6 231:16 234:23 236:4 259:1 260:2 261:14
**covering** 58:11,13,19 64:12 67:14 102:3 133:1,14 143:12 147:7 167:23 168:18 179:23 204:15 206:3,14 207:24 209:25 222:2 223:2 241:7,17,25
**coverings** 55:19
**covers** 65:17
**COVID** 18:13,16,17,19 38:16,17 90:23 112:7, 12,13,17
**cramping** 165:3
**create** 43:24 68:23
**Created** 69:7
**crime** 72:8
**criminal** 9:1,2
**criteria** 40:7 43:18,19
**crossed** 135:6
**crosses** 208:5
**crutches** 45:18 47:2
**cuff** 135:4
**culture** 69:14
**curious** 27:18 35:15 92:19 93:17,23
**current** 37:20 70:23
**curses** 79:8
**cursing** 75:9 76:12 78:16 79:7 144:15 251:6
**cursor** 151:7
**cussed** 130:21
**cussing** 79:1 113:1 114:23 135:25 249:23 251:18
**custody** 17:24
**customer** 13:13,15 24:19,20,21,25 25:1,3,4 26:13 41:19 42:9,10,18 43:20,22,23 44:18 46:21 48:4,17 49:18 54:24 55:25 56:3,4 58:5,8,18,20,25 59:4 60:12 66:15 67:20,21, 23 68:13 69:8,11,12 71:12,14 72:13,19 73:4 78:1,6 79:19 80:4,13,18 81:3,6,13,25 82:1,13, 18,24 83:2,24 84:13,14, 16,17,18 85:4,7,8,17

86:4 112:8,15 114:10 129:24 131:1 132:22 148:4,5,6 152:24 153:3 181:3 191:1 201:7 204:6,7 215:22 219:25 220:16,19,20 221:1,4, 15 223:14 228:15 230:4 233:25 236:1,4,5,12,13 237:12 258:15 260:16 261:21,22

**customer's** 82:15

**customers** 13:13,17 14:2 26:10 41:21 42:5, 6,10 43:25 44:8,9,15 45:3,9,15 49:16 69:15 72:12 74:1,2,4,20 76:11 77:24 79:17 80:6 81:19 86:1 130:23 136:18,21 159:19 163:17,20 175:3,25 176:4 200:1 201:11 217:25 218:4,10 219:12 220:4 254:1 255:10

**cut** 199:4,6

**CVS** 5:23,25 10:23 11:18,25 12:3,6,17 13:22 14:8 18:19 19:2, 12 22:14 23:1,11,12,20 25:16 27:2 36:22,24 39:3 41:10 43:6 44:4 46:22 49:7 50:13 54:23 55:13,19 56:7 58:3,9 59:1,11 62:4 64:8,16 66:4,9 69:9,20,21 71:12,16 72:16 73:14 77:22 81:22 84:10 88:3 94:7 95:19 97:19 98:23 103:8 107:21 120:19 122:9,11 123:2 124:18 125:19 127:16 128:5 129:22 131:4 134:23 135:16,20 136:10 138:3,6 139:13,21 140:4 145:15 151:20 152:8 184:16 189:25 198:21 199:12 219:23 220:19 221:13 230:3 234:6 235:24 236:7 239:5 258:11 259:22

**CVS.COM** 58:14

## D

**date** 19:11 30:11 35:7, 8,11 37:23 55:16 69:7 95:22,24 96:3,5 97:24 119:3 120:5 149:21 179:15 197:14 207:6,15 252:11,12 270:12

**dates** 69:6

**day** 13:23 24:13 36:12 61:6 66:7 92:1 119:16 124:20 132:21 133:22 145:1,7 147:1,15 154:12,19 156:23,24 168:2 169:17 172:9 173:4 181:14,18 188:17 189:21 191:17,20,23 193:4,14 194:20 196:24 197:15,16 199:4 203:3, 4,15,18 205:2,3,13,19 213:2 215:6 222:11,14 224:4 225:20 237:19 241:6 250:1,3,4,15 251:2,7,15,20 252:5,18 253:7 254:5,8,11 255:1, 2 259:10 261:20,23 266:10 270:8

**days** 39:7 44:12 89:10 115:20 147:19,21 193:11

**de** 38:22

**deal** 54:15 72:6 81:3 84:9 160:25 161:1,5 162:16 212:24 223:20 225:18

**dealing** 162:14 196:11 198:14 221:16 237:12

**dealt** 136:8

**December** 71:22

**decide** 264:18

**decision** 74:4,14,15 105:24 229:1

**deescalate** 44:25 45:6 78:3,5 81:5,7,11,15 82:9 84:3 235:24 236:2 240:6

**deescalated** 86:18 228:16 239:18

**deescalates** 78:11,13

**deescalating** 83:20 221:16 235:18

**deescalation** 82:10 84:12 85:19 86:9,11 220:22 231:17,19 236:3,11 237:11

**defend** 93:10

**defendant** 53:10 205:6,9

**defensive** 86:20,25

**degraded** 80:7

**delivery** 58:15

**demonstrate** 42:9

**demonstrates** 67:22

**denying** 72:18,20 103:23 106:2 107:13

**department** 39:10 64:14 103:7 118:3 137:11

**depends** 77:8 147:15 206:16

**deponent** 4:6

**deposed** 5:17

**deposition** 6:8,12,15 8:19 21:23 22:1 27:4,23 34:15 36:7 54:1 70:9 160:2 170:6,19,25 171:16 182:10 230:19 245:22 270:18,22,23 271:1,5,10 272:3,10

**describe** 4:24 23:4 111:16,17 148:13

**describes** 73:7

**description** 111:18 204:18

**desire** 65:20

**desk** 111:9

**destructive** 77:9,10

**detail** 24:14,17

**details** 71:21 82:14,25

**detained** 119:24 270:9, 13

**determine** 47:4

**developmental** 46:7

**diabetes** 91:6,16

**diabetic** 91:7

**dial** 84:19 221:17

**difficulties** 66:5 89:6

**difficulty** 62:9 95:23 211:23

**direction** 209:10 243:16 244:6,8

**directly** 243:14

**director** 135:2

**disabilities** 46:14

**disability** 46:7,12,16, 25 48:6 64:13,19 65:3 66:10 167:24 168:4,19 222:1 223:1,15 225:15 236:13,14

**disabled** 270:14

**disallows** 233:24

**disappear** 235:2

**discovered** 69:13

**discussed** 71:16 84:13

**Discussion** 37:24

**disgusted** 71:18

**dishonest** 265:15

**dishonesty** 265:14

**dispatch** 34:10 104:12, 15 105:4 106:13,16 109:14,18,23 111:16 113:16 116:13,22 118:17,22 121:11,17 142:25 143:24 168:10 180:3,7 204:19 212:9 215:6 227:10 249:20,24 268:5

**dispatcher** 113:11 114:16 143:24

**display** 135:7

**disputing** 229:13

**disrespected** 80:7

**disrespectful** 71:24

73:8

**disrupted** 141:5

**disrupting** 141:1,17 142:12,13 143:1 207:25 213:23 215:12 218:3 249:23 251:23 252:5,19 253:7 261:13

**disruptive** 190:14 219:8 239:13 250:25 251:10 252:9,11 261:24 262:9

**disrupts** 186:5

**distance** 58:22 59:22 232:24

**distances** 8:7

**distressed** 176:22 182:7

**disturbance** 121:21 262:16

**disturbed** 260:16

**disturbing** 261:3

**diversity** 43:25

**divorce** 17:8,12 18:2 264:9,10 265:10,18 266:2

**divorced** 17:9,22

**dock** 257:16

**doctor** 47:25 48:1 89:14 90:20 91:20

**doctor's** 47:19 63:14, 15,17,19

**docu-** 97:20

**document** 28:25 36:22 38:10 55:2,10,14,15 69:9 72:16 80:8 97:9 98:2,12,13,19 99:2,8,23 130:25 136:8 259:3

**documents** 27:22 34:14

**domestic** 265:24

**door** 113:12 185:8,13 195:22,23 202:8 213:8, 16 219:16,18,19 243:4, 10 256:10,15,16,22,24

**doors** 264:3 269:15

**doubt** 138:16 139:9,24 140:6 160:11 168:16 169:3 227:11 229:9 255:19

**drink** 136:22

**drive-thru** 58:13 84:14 146:11

**drugs** 15:18,23

**Dude** 258:24

**due** 49:15 56:24 64:12

**duly** 4:7

**dust** 155:15

**duties** 36:18

**duty** 74:12 81:1 108:6, 15 116:2 136:21 162:17,21 259:22 260:21

**E**

**e-mail** 71:14

**earlier** 40:19 61:17,18 101:12 140:21 141:15 153:25 181:14 184:19 208:19 239:1 240:21 241:3,19

**easier** 90:4 155:21

**Eddy** 94:12

**educational** 19:23

**effective** 37:23 82:10 83:20

**efficiently** 41:23

**effort** 46:18

**elaborate** 30:9

**electronic** 272:6,7

**eligible** 71:2,3

**Elizabeth** 6:20 245:21

**else's** 234:2

**Embassador** 13:15

**employed** 162:8

**employee** 23:12,20 36:23 38:13 59:11 62:8 71:16 72:5 87:2 128:5 134:23 136:10 148:5 153:17 154:3 155:11 156:22 160:10 174:11 199:13

**employees** 33:7 49:16 62:3 75:9 76:13 79:7,8 81:18 85:23 130:21 148:1,7 153:16 168:3 202:12 220:2 267:17

**employer** 95:5,7,8

**employers** 100:11 267:17

**encounter** 72:19 183:2

**encountered** 51:14

**encounters** 15:16

**encourage** 70:1

**end** 18:3 163:25 164:12

**enforce** 75:20

**enforcement** 15:16,20

**engage** 188:23 189:25 192:8,13 239:15

**engaged** 209:16 231:3

**engaging** 43:24 245:3 250:25

**English** 126:20

**ensure** 41:9 42:12

**entail** 80:25

**enter** 196:14 204:14 213:10 231:23 253:17 257:17 263:6

**entered** 194:10 206:15 207:23 239:12 271:8

**entering** 56:4 146:13, 19 188:18 194:12 199:13 208:1 234:12 239:7

**enters** 146:16 147:7 194:25 228:5 231:24 234:14

**entire** 234:24 268:24

**entirety** 35:25 188:16 219:3

**entitled** 264:14,22 265:1

**entrance** 186:16 197:21 229:24 235:7 245:13 246:10 257:7,9, 10,14 266:25

**entrance/exit** 219:18

**entrances** 257:11

**environment** 69:24

**escalated** 70:24 81:24

**escort** 31:3 119:21

**escorted** 11:7 33:8 76:2 78:20 119:24

**establish** 269:8

**established** 172:24

**estimate** 8:4 32:12 171:7,9 174:1

**estimates** 8:1,8

**ethnicity** 149:1

**evaluated** 97:1,6 100:4,18,20,22

**evaluation** 39:3,12 40:14 41:1 42:22 43:9, 15 68:2,7,16 69:6,16 79:16 98:23 99:10 100:8,15

**evaluations** 36:16 39:14 79:25 97:10,12 99:21 100:10,13

**event** 109:4,10 133:21 196:5 203:16 242:19

**events** 7:24

**everybody's** 52:3

**ex-wife** 14:20 17:4 264:16,21

**exact** 7:25 8:1 32:12

**EXAMINATION** 4:10 270:3

**examined** 4:7

**examples** 82:8

**excellent** 79:19,22

**exit** 182:1

**expect** 30:15
**expectations** 23:22 40:6
**expected** 69:19
**experience** 8:8 42:10 43:24 60:1 67:23 71:19
**expired** 44:10,11
**explain** 24:7 25:12 125:17,18 241:16 242:3
**explaining** 82:13,23 243:20
**explanation** 133:7
**extent** 53:20
**eye** 13:12
**eyes** 237:3

F

**face** 6:2,3 24:5 48:6,15, 18,21,22,25 49:19 50:7, 18 52:8 54:4,8,9,25 55:19 57:21 58:11,12, 19 59:1,13 61:18,21 62:4,9,11,17 64:11,20 65:4,7,17 66:5,11 101:3,4,14,17,22 102:2, 3,9,14,15,19 104:6,17 106:4 112:25 114:21 117:8 119:11 120:8 129:1 131:19,23 132:4, 11,12,14,16 133:1,2,6, 14,23 136:12,14,17 140:23 141:17 142:2,10 143:11,12 144:9,11 147:7 150:1,4,7,8 167:19,20 168:5,12,18 179:19,23 180:5 182:2 190:7 204:14,15 206:3, 11,13,14 207:24 208:21 209:25 222:2 223:3 224:16 227:6 231:4,5 236:15 240:13,15 241:4,7,17,21,25
**faces** 76:16
**facilitate** 272:8
**facing** 146:10 178:16, 21
**fact** 45:16 47:25 49:15 95:25 126:17 133:13 169:16 207:24 255:4
**failed** 84:12 85:19 86:9 236:3
**failure** 101:14
**fair** 90:12 142:14 193:4 266:24
**false** 193:5 260:4
**falsely** 8:17
**familiar** 44:18
**family** 4:19 20:12
**fate** 250:20
**fault** 226:18,20
**faxed** 93:8
**February** 37:24 38:1,6
**fed** 20:12
**Federal** 271:4
**feedback** 24:22 33:22 41:5,7 67:14 70:18
**feedbacks** 98:24
**feel** 29:13,14 43:23 73:12,13 82:22 84:16 85:2 214:23 215:2
**feeling** 230:7
**feet** 5:1 10:2 58:21 59:21 164:25 173:24 174:2 176:13 214:14, 15,20,21 219:19
**fell** 23:22 40:20 80:2
**felt** 29:22 80:6 86:24 215:6
**female** 164:15 218:1
**females** 164:16
**Fernando** 12:7 95:16
**fight** 84:17 85:5
**figure** 182:9 208:7
**file** 98:20
**filed** 17:11,12
**fill** 137:11 259:2,3,6,7
**finalized** 266:2
**find** 93:17 96:2,5 264:7
**fine** 163:3 165:2 241:22 272:7
**finger** 182:17 190:20 226:15,16 244:5
**finish** 6:9,23 7:9 21:24 42:20 58:20 66:20,21 72:22,25 83:16 124:5 139:17 189:14 241:2
**finished** 181:25
**flash** 22:14
**flashlight** 135:14
**flipped** 190:11
**flipping** 191:1,9
**flips** 182:16
**floor** 13:12 41:22 104:21 113:1 115:10 166:14 175:11 180:25 214:7 216:16 218:7 231:25 232:5
**follow** 72:13 215:22 237:11
**follow-up** 264:8
**forces** 68:23
**forget** 56:25 89:8,22
**Forgive** 139:20
**forgot** 89:10 90:9 264:8
**forgotten** 201:24
**form** 76:18 78:2 131:4,5 137:11 196:8 213:24 232:9 234:4 259:2,6
**formal** 17:8 20:15 23:1
**forms** 259:7
**forward** 22:14 24:12
**found** 43:17,19 72:4
**foundation** 51:16 59:14 142:18 169:1,6 223:8 228:19 230:6,11 236:20
**Fourth** 82:17
**fragrant** 150:13
**frame** 173:15
**free** 56:5
**freezing** 162:23,25
**Friday** 4:1 203:11
**friendly** 69:15
**frightened** 215:2
**front** 24:5 62:14 72:11 113:12 157:14 158:16 165:16 178:9 185:8,13 186:16 195:22,23 197:20,21 198:6 200:11 213:8 219:15,19 229:23 235:7 243:3,10 245:13 246:10 250:19 256:15, 16,22,24 257:7 258:1 266:25
**frozen** 159:15 160:19
**fuck** 77:5,7
**full** 4:14 17:25 135:10 209:25
**full-time** 12:19
**fully** 57:21 70:7,10 102:2,3 132:6,12,16,25 133:1 143:11 167:19,22 168:5,17 179:20,23 204:15 206:3,13 207:24 222:2 223:2 236:14 240:13 241:4,7,17,25
**functions** 260:7
**future** 201:11

G

**G-A-R-C-I-A** 4:17
**G-U-Y** 4:16
**gained** 5:6
**Galleria** 13:2,4
**Garcia** 4:5,16,17 28:11, 23 36:23 38:21 69:14 99:11 107:21 120:17,18 123:1,17 134:7 154:14, 15 155:4,6 156:19,20, 24 157:12,15 158:13, 14,16 167:4 168:18 177:3,6,18,21,22 179:2, 8 181:4 227:4 263:11

**Garcia's** 272:9
**Garfield** 36:24
**gate** 257:15
**gator** 65:14,15,16
**gators** 65:19
**gave** 13:14 25:22 28:15 92:24 204:19 210:7 225:12
**general** 15:2,13 31:21 111:17
**generally** 33:11 87:18 134:13 147:11,13 248:20
**gentleman** 6:1 156:3 254:10
**gesture** 28:16
**gestures** 174:4,5 176:24
**Gevdzhyan** 37:3 43:7 57:13 67:15 68:17 80:1 88:13
**give** 6:18 7:8 26:10 32:12 63:3 72:10 81:8,9 82:8 131:4 137:11 170:19 171:18 174:1 259:2,6,7
**giving** 28:6,7 114:23 131:1 190:20
**glass** 269:15
**Glendale** 4:1 13:2,4 56:24 95:16 103:6 136:9
**glitches** 160:17
**goal** 43:21 44:7
**goals** 44:3 73:14
**good** 4:12,13 72:6 134:1 182:8 184:3 258:21 272:1
**Gotcha** 12:5 19:20 58:1 96:17 135:5,15 152:18 153:7 154:6 157:24 158:3 161:4 162:10 170:4 204:1 255:3,6
**gotta** 209:21
**government** 14:24
**GR** 15:1
**grabbing** 82:15
**grandmother** 16:17
**gray** 204:20
**ground** 6:19 189:3 190:4
**grow** 39:8 41:6
**grown** 17:25
**guard** 11:25 12:2,3,10, 16 13:5,10 14:14 19:1,5 20:5,17 21:3 134:22
**guess** 73:16 91:19 97:3 103:4 182:8 209:1 245:14 246:14
**guidance** 70:4 86:19 129:23
**guide** 54:23 58:17 59:25 220:19 236:7
**guideline** 48:13 49:1 50:19 54:22 79:16 85:14 88:2 235:25
**guidelines** 38:17 39:20 40:21 41:2 73:14 77:22 80:2 221:14
**Guides** 55:18
**gun** 21:3 200:22
**guy** 13:25 28:9,11,23 36:23 38:21 39:6,8 41:5,7,19 42:9,11 68:12 69:14 71:23 99:10 107:21 120:17 153:21 156:1 161:21 168:18 227:4 247:21 254:2,12, 14,20,23 261:23 263:10
**Guy-anthony** 4:5,16
**guys** 115:23 186:24 188:4 195:2 201:22 209:15 213:19 219:14 263:19

**H**

**hair** 156:13 183:24 199:3,6
**half** 118:11
**hand** 127:4 161:9 187:3 188:2 209:7 213:9,17, 18 219:16 243:6,22
**handcuffs** 135:9,13 244:19,23 245:4 246:7 270:10
**handed** 28:3
**handle** 63:7 87:2,3
**handling** 23:17
**hands** 135:7 152:25 153:2 219:20 231:11 244:22
**happen** 49:18 68:1 90:13 101:9 137:6 169:8 193:7 205:2 242:3 247:10 266:21
**happened** 9:20 18:21 27:19 34:22 36:11 53:7, 8 61:5,10 71:22 83:6 87:13 90:4 94:24 95:2 103:17,19 106:10,11 118:11,12 120:1,5 124:24 137:2 139:25 169:4,20,24 172:11 180:4 196:11 207:21,22 211:15 212:2,8 222:18 229:21 236:16 248:17, 18 251:2,15,20 253:25 260:15 261:20
**happening** 144:20 168:23 173:18 174:17 222:5 244:25 247:4 248:7 250:17,20
**happy** 28:24 29:2 44:9, 13,16 220:25
**harassed** 227:5
**hard** 163:4 208:20 272:5
**harm** 75:5 76:13
**head** 7:16 160:5 219:17
**health** 46:10 69:21 89:12,13 151:20
**hear** 102:22 103:1 110:10 270:9,13
**heard** 51:7 103:13 117:25 121:7 131:13 168:11 169:14 252:7
**hearing** 103:11 110:8 169:22 170:24 172:2 222:16
**hears** 131:11
**heart** 151:19
**heavyweight** 184:1,2
**height** 5:9 152:15
**helped** 71:23
**helpful** 71:24
**helping** 46:2 82:23 218:1
**hem** 137:3
**Hey** 87:2 136:16 258:24
**high** 19:24,25 20:1
**higher** 33:16
**highest** 42:13
**hire** 93:12
**hired** 11:20 18:20 19:2 20:19 22:15 23:8 36:23 37:1,13 41:13 79:5
**Hispanic** 5:16
**hit** 6:3
**Hm** 239:24
**Hold** 6:8
**holding** 185:10,11 243:21
**home** 58:14
**homeless** 14:16,18 15:9 17:7 18:14,23 19:7,8,13
**honest** 30:23
**honesty** 214:17
**hotel** 19:16,18
**hour** 37:18 66:22 134:1, 2 170:20,21 171:22 202:16
**hourly** 37:14
**hours** 66:6,7,8 170:6, 20 171:19,20

**Huddle** 54:23 55:18 58:17 59:25
**huge** 186:6
**human** 87:13 88:15 92:6
**humiliated** 71:18 72:11 80:7
**humiliating** 73:9
**hundred** 10:2
**hurt** 84:18 85:7
**husband** 72:3 73:4
**hyphen** 4:17
**hypothetical** 47:7 142:18 223:8
**hypothetically** 117:6

**I**

**ID** 84:15
**idea** 13:18 17:13 31:13 36:9,10 38:3,4 54:2 148:21,23 149:1 172:17 184:13 185:9 200:9 248:1 252:1
**identified** 108:5
**identifying** 112:2
**ignore** 221:4,7 230:3
**ignoring** 228:15,18 231:6
**II** 91:16
**image** 159:16,21,23
**immanent** 76:21 78:24 84:16 85:2,11
**immanently** 77:11
**immediately** 41:21 238:9 244:10
**impacted** 71:4
**important** 41:18
**improve** 23:25 26:20 43:23 68:12 70:5,20
**improvement** 39:24 40:4,5,6,9,10
**inability** 65:3 167:24
**inaccurate** 122:5 140:3
**inaccurately** 8:17
**inappropriate** 237:4 239:15
**inaudible** 7:15 19:3 34:17 61:13 91:8 94:16 107:12 121:15 133:16 206:1 226:8 257:18
**incident** 9:11 10:13,16 26:23 27:8,9,19 29:6 31:21 32:2 34:8,22 51:23 52:6 53:14,17 54:4,9 61:17,23 72:14 87:12,15,23,25 88:3,7, 8,16,23 89:2 92:10,15 94:13 95:6,13 100:25 105:6 110:24 113:21 114:2,18 119:3 147:1 168:13 169:13,24 170:13 172:5,6,11 187:15 189:11,16 195:12 196:9 205:12,22 218:13 247:14 256:14 266:8,15
**including** 62:8 70:15, 24
**income** 15:12
**Incomplete** 47:6 142:17 223:7
**inconsistencies** 121:16
**indefinitely** 101:21 261:7
**independent** 110:6 185:24
**Indicating** 190:9
**indication** 126:8
**individual** 9:14 30:16 57:20 127:25
**individuals** 32:7 63:11
**information** 7:23 116:23 140:17 200:8,10 210:25
**informed** 106:16
**initially** 126:6 224:11 228:5 269:14
**initiated** 101:10 239:4
**injuries** 234:1,2
**innovation** 40:5 69:22
**input** 200:10
**inputting** 200:7
**inside** 27:15 158:8 269:12
**insists** 58:18
**inspire** 68:24
**instructs** 7:6
**Insulin** 91:13
**integrity** 40:6 69:22
**interacted** 224:11
**interacting** 228:5
**interaction** 208:19 209:16 249:11
**interactions** 103:9 196:6 266:9
**interpret** 75:13 185:23 186:1,7,12 190:14 214:5 216:6
**interpretation** 186:8, 13
**interviewed** 88:10
**intimidating** 232:9
**introduce** 107:20
**inure** 8:17,21
**investigating** 92:10
**investigation** 92:5
**investigator** 94:11
**invisible** 46:14,16
**involved** 77:23 88:23 108:15 161:20 265:22
**involvement** 160:21
**involves** 61:17
**Iron** 200:12,13,14,15,17
**issue** 26:18,21 36:16 41:25 42:18 66:10 70:11 84:4 89:13,15 98:9
**issues** 10:24 12:15 17:24 24:23 33:1 36:13 39:25 42:25 46:10 54:24 63:8 70:22 71:15 74:2,4 89:12 90:16,25 130:16 134:10 162:15 199:8
**item** 71:23 72:1 180:20
**items** 203:22 214:7 216:15 218:7,10 219:8 239:14

**J**

**Jack** 24:4 25:25 26:2 35:19,22 37:5 43:1,7,15 57:3,13,23 67:15 68:17 75:2 80:1 88:13 92:24 93:1 99:22 100:6,13 115:24 162:19
**jail** 9:23
**January** 51:13 52:21, 25 53:4 60:23 87:13 101:3 102:2,10 103:6,8 106:4,24 107:25 113:21 115:20 116:2 124:21 132:23,25 133:22 142:9 143:6,7 144:24 145:12, 15 154:18 156:24 157:12 160:9 162:11 172:9 173:20 181:18 189:17 192:3 193:14,24 194:9,15,20 196:24 197:5,8 199:5,16 204:12 207:6,9,15 208:20 210:8,16 211:9 212:3,4 213:3 222:18 227:5 228:3,4 238:22 242:22 250:4,25 251:10 252:5,11 261:5 262:20 263:2,5
**Jesus** 154:14,15,22 155:4,6,8,25 156:5,13, 19,20,23 157:6,8,11,15, 16,19,23 158:7,13,14, 16 159:10 167:4,9,10 177:3,5,6,16,18,21,22 179:2,8 181:4 227:22
**job** 11:23 19:12,15 22:19 36:18 37:11

41:14 79:18 90:17 136:9 162:7 259:22 260:7,10,21

**jobs** 20:11,13

**Joe** 29:5 33:15,18 34:1, 4 57:8,17 60:24 64:1 88:13 105:13 108:1,7, 11,13 110:17 111:2,6,7 115:19 116:1,19 126:15 132:2 140:11 143:5 146:12,14 162:20 167:6 168:3 172:8,18,20,21 173:14 175:14,20 176:7 177:9 179:2 180:15 181:3,9 182:5,20,23 183:2,14 184:8 185:7, 14 186:15 187:3,16 188:3 190:22 191:8,11 192:19,22 193:3 194:25 198:13 216:24,25 217:10 218:17,18,21 220:13 222:24 224:7,12 225:20 226:6,7,9,12,13, 16,20,22 227:1,6,23 228:9,14,17,23,25 230:22 231:18 232:8,24 241:22 243:3,9 244:11 245:10,14 246:8 247:18,20,21,24 248:3, 10 250:17 253:18 264:6 267:1,3 268:21

**John** 168:19

**Johnson** 29:5 33:15,18 34:1,4 57:8,17 60:24 64:1 88:13 105:13 108:1,7,11,13 110:17 111:2,6,7 115:19 116:1, 19,20 126:15 132:2 140:11 143:5 146:12,14 167:6 168:3,19 172:8, 21 173:14 174:21,24 175:14 176:7 177:9 179:2 180:15 181:3,9 182:5,20,23 183:2,14 184:8 185:7,15 186:15 187:3,16 188:3 191:8, 11 192:19,22 193:3 194:7,25 196:7 216:24, 25 218:18,21 220:13 222:24 224:12 227:7 228:9,14,18,23,25 230:22 231:18 232:8,24 241:22 243:3,10 244:11 245:10 246:8 247:18,20

250:17 253:18 267:3 268:13,21

**join** 68:23

**JONES** 29:25 30:17 32:16 34:16 45:10 47:6 51:15,18 52:22 53:20 55:4,6 59:14 60:4,8 62:19 64:2,23 65:8 66:18,23 67:3,5,8 72:22 73:15 80:8,16 88:4 89:21 93:19 94:1,19 95:7 97:2 98:2,5,10 107:9 124:22 134:3 138:11 142:17 143:21 164:21 165:4,7,11 169:1,5 171:5 172:14 178:12 187:17 191:3 203:17 210:17 211:16 212:21 223:7 225:3 227:13 228:19 229:3,7, 12,15 230:6,10 233:3,5 236:19,22,25 237:5,13 238:23 239:19,22 240:22 241:10 242:4 243:23 245:18,21 255:16,21 259:23 263:8,12 265:6 269:24 270:20,23 271:23 272:7

**Jose** 154:15

**July** 43:6 67:15

**jump** 21:24

**juncture** 113:5 157:13

**June** 43:6

**K**

**keeping** 59:21

**kicked** 14:21 16:12 17:5 18:5,12

**kind** 10:24 29:10 72:14, 18 76:4 91:10 97:25 131:4 135:21 137:12 144:14 151:15,22 152:7 164:6 200:7

**knew** 54:4 116:16 118:18 126:9 149:3 258:15

**knocking** 75:6 104:20

**knowledge** 8:3 34:21 63:25 105:6 106:15 115:17 160:22 181:13, 15 207:4

**L**

**lacks** 59:14 142:18 169:1,5 223:8 228:19 230:6,10 236:20

**lady** 26:3 31:11 47:10 51:5,22,24 52:4,7 54:10 61:20 63:22 146:20,22 204:13 214:25 254:16 262:7

**language** 77:5 82:16

**larger** 39:9

**laugh** 236:22,24

**laughing** 237:1,4

**law** 15:16,20 25:18 233:24 234:5

**laws** 234:8

**lawsuit** 5:24 27:25 28:1 53:10 87:12 92:18,21 93:10 205:5,8,9

**lawsuits** 266:5

**lawyer** 55:3,4 93:13 170:19,22 171:11 172:2 271:12

**lawyers** 170:13

**lay** 125:9

**leader** 80:21 82:7

**leadership** 80:22 81:21,22 84:10,19,22 85:1 231:17

**learn** 20:21,25 27:25 41:6 46:17,18

**learned** 13:18 39:6 123:3

**learning** 46:6

**leave** 30:24 31:2 32:7 33:8,10 50:10,14,17,20 51:1 52:9,11,16,17,20 57:21 59:5 60:2,12 72:7 75:21,24 77:14 78:23 79:9 81:16 84:13

101:18 102:10,11 114:22 117:8 131:21 132:3,10,18 136:2 167:16 180:6 181:9 185:16 210:2,23 211:2, 5 215:22,23,25 218:11 224:13,15,18,19,23,25 225:2,6,8,9 227:6 236:5 237:23,24,25 238:2,5, 10,13 240:4 241:9 242:2,10,22 267:13

**leaves** 58:18 77:16 182:14,17 263:17

**leaving** 75:22 101:20 175:3 182:3 188:19 191:1

**left** 67:14 72:2 159:23 162:7 184:5 186:14 194:2,10 195:12 196:15 216:10 228:15 267:7

**legal** 28:19

**legs** 165:3

**letting** 56:9

**level** 42:13 70:13,23,24 92:6 99:16

**lie** 15:24

**life** 89:7

**lifting** 128:20

**lights** 159:24

**listed** 68:22

**listen** 78:18 171:6 232:15

**litigation** 72:17 99:9 271:22

**live** 19:18 90:10

**living** 14:20,22 15:9 16:13,14,16,22

**load** 203:12,18,20,21

**loading** 257:15

**lobby** 21:19

**location** 10:20 12:10 49:20 72:10 73:20,21 74:16,20 80:6 104:13, 16 105:5,22 106:17 109:25 110:11 111:21 114:17 116:10 117:21

122:12 123:9 125:1,16 126:9,13,17 131:7,21 133:12 137:15 138:10, 19 141:6 143:25 192:17,23 193:2,3,5 194:15,19 226:22 238:13 252:4 261:17 267:19 268:3

**locations** 71:17

**lodge** 82:18,22

**log** 174:11

**logo** 55:20 151:18,20 152:8 184:16,20 198:20

**logs** 156:22 160:10

**long** 9:5 11:17 12:9 13:5 14:18 25:8 26:15 89:24 90:5,6 118:12 142:4 170:12 174:20,21 195:18 204:3 253:10 268:23

**longer** 73:20 119:22 130:4 131:2,9 137:17 138:2,6 139:13 140:4 183:24

**longest** 171:21,23

**looked** 55:10 96:2,5 147:1 181:5 202:7,25 224:13 226:1,10 227:2 235:12

**loss** 161:21,25 162:3, 12

**lost** 271:21

**lot** 147:13 154:5 155:18 162:23 184:2 185:17 205:15,16 220:17 256:10

**low** 21:12

**lunch** 133:25 134:1,4

M

**mace** 20:23

**mad** 17:1 18:12

**made** 13:21 28:16 74:15 103:5 107:8 108:24 119:16 120:12 134:21 135:18 157:25 168:10 229:1 268:4

**main** 20:3

**maintain** 58:21

**maintained** 160:22

**maintaining** 133:11

**major** 71:15

**make** 7:1,4 24:10,12,13 44:9,12,15 45:19 46:18 67:4 74:3,14 82:13,21, 24 98:8,9 127:3,24 135:16 137:11 139:22 152:11 160:14 186:2 271:12,14,16

**makeup** 150:12,16

**making** 69:23 176:24 186:5 253:5

**male** 218:1

**mall** 13:1

**man** 166:23 167:1 199:12 200:12,14,15,17

**man's** 265:16

**managed** 177:23

**management** 9:22,25 68:3 212:18

**manager** 11:13,14 13:24 24:1 37:3 38:25 39:5,12,15 40:8 41:4,19 42:1 43:8 50:23 57:13 59:16 60:18 63:25 67:25 68:7 70:18 71:6 72:12 74:12 79:13 80:22 81:1 83:7 84:5 87:20 88:14 97:14,23 98:24 99:12 100:3 107:21 108:1,3,6,9,10, 15,19 110:20 115:22 116:25 117:4 120:16 123:4 125:17 126:12,16 128:6 142:11 143:13 158:20 162:14,21 191:4 208:19 217:13,15 221:24 222:11,23 224:7,10 225:16 226:2 229:2 233:21 248:15 260:19

**manager's** 42:8 99:5,7

**managers** 13:25 24:23 42:25 56:23 57:5,6,7,16 76:8 79:25 87:14 95:10, 11 100:23 105:7 116:1 121:21 143:6 161:3 220:3,6 221:25

**managing** 167:8

**mandate** 57:24 102:15

**manner** 71:19

**manning** 161:12 177:13 197:7

**manual** 81:23

**March** 11:19,21 36:23 37:1 95:20 96:1,7,18,21

**Marco** 37:3

**married** 20:4

**Martin** 202:7,10,14,15, 18 203:23,24 204:7

**mask** 47:14 48:1,2,6, 12,15,18,25 49:12,19 50:3,7,18 52:8,14,18 54:5,8,9,15,18 56:1,3,5, 10,24 57:21,24 58:5 59:1,19,23 61:18,21 62:4,9,11,13,17,22,23 63:20 64:20 65:4,7,16 66:5,11 101:3,4,14,17, 22 102:2,3,10,14,15,19 104:7,17 106:4 112:25 114:22 115:1 117:8,15, 18 129:1,8,9 131:19,23 132:4,11,12,14,16,18 133:1,6,23 140:24 141:17 142:2,10 143:11 144:9,11 147:8 150:1,4, 7,8 167:19 168:12 179:20 180:5 182:2 190:7 204:14 206:11,13 208:21 209:25 223:3,23 224:16 227:6 240:13,15 241:4,7,17,21,25

**masking** 133:14

**masks** 48:21,22 54:25 59:13 63:12,13 65:10 117:19

**matter** 72:13 255:4

**meaning** 24:17 106:23 114:2

**means** 38:16 81:7 83:4 109:11 114:6 118:18 122:10,19 125:13 135:4,11

**meant** 24:8 135:7 197:1

**med** 91:9

**medical** 46:25 63:23 64:1 168:4,21 222:7,25 225:14 236:13

**medication** 91:25

**medications** 91:5 163:15

**meet** 37:25 39:19 41:1 44:7

**meeting** 41:9

**meetings** 23:7

**meets** 39:19 40:6

**memory** 35:3 53:17 61:12 89:2,6,20,24,25 90:5,7,16 102:23 103:16 110:6 119:5 120:10 122:13 146:25 149:20 160:15 168:12 169:15 172:20 191:16 201:22 204:23 205:23 247:15 251:17 270:6

**mental** 46:10

**mentioned** 117:22 128:20 140:19 146:21

**menu** 263:13

**merchandise** 24:12 75:6

**merit** 71:2

**Metformin** 91:10 92:1

**method** 83:20

**midnight** 163:23,24

**million** 196:19

**minimal** 41:23

**minimize** 44:22

**minimum** 41:9

**minor** 22:12

**minute** 165:8 210:6 244:18

**minutes** 107:20 111:15 112:24 171:22 230:21 234:17,19,21,24 235:17 236:10 237:10 239:2,8, 11,12,17 260:15 269:3, 9,18,20

**misplaced** 271:20

**misstated** 124:7 127:8, 14

**Misstates** 52:22 62:19 64:23 65:8 89:21 98:6 138:11 191:3 210:17 227:14 236:19 237:13 239:19,22

**mixed** 43:9 67:16,18,24 68:25

**MKRTCHYAN** 4:11 6:17 8:21,23 22:3 30:4, 25 32:20,23,25 34:18 45:14,22 47:12,15,17, 22 51:19,21 52:24 53:22 55:5,9 59:17,20 60:6,11 64:6 65:1,11 66:20,24 67:1,4,6,10 70:10 72:24 73:17 80:11,17 88:6 89:23 93:21 94:2,22,25 95:8,9 97:4 98:7,13,15 102:25 107:10,18 111:14 112:6,22 113:10,15,25 114:9,14 124:23 125:5 133:25 134:5 138:13 142:20 143:22 145:11 149:9 160:3 164:24 165:9,13 169:2,9,12 171:8 172:16 173:8 178:17,19,22 187:19 191:6 199:10 203:19 210:18 211:18 212:25 223:9 225:7 227:17,20, 25 228:21 229:6,8,14, 18,22 230:8,14,17,20 233:4,6,10 236:23 237:2,7,8,17 238:25 239:20,24 240:2,5,8,23 241:1,13 242:7,11 243:25 245:20,24 246:1 255:18,24 260:1 263:9, 15,18 265:9 269:25 270:21,24 271:3,7,24 272:1

**mocking** 237:5,7

**MOD** 74:10,11 223:16 224:7 225:19

**model** 69:21

**modules** 23:14,17 39:7 45:12,13

**moment** 34:3 166:16

**money** 178:10

**monitor** 200:6

**month** 32:22 171:14,15

**monthly** 32:21

**months** 12:12,13 13:6, 7 19:5,19

**morning** 4:12,13 164:1

**move** 13:21 151:7 160:5

**moved** 157:8,9

**movement** 163:4

**moving** 16:23 17:2 151:12

**multiple** 114:5 220:18 229:12

**N**

**names** 4:18 258:20,21, 22

**nap** 164:6

**nature** 70:22

**nearby** 219:13 246:9

**necessarily** 7:25 46:4, 17

**necessity** 232:11

**neck** 65:17

**needed** 74:5

**nice** 24:10,12,13 78:12

**night** 81:2 103:8,17 127:20 163:8 167:7,8 203:11 247:9,10 255:4

**nightshift** 10:7 61:1 94:9,10 115:22,24 156:8 160:10 163:21,22 161:11

**nighttime** 147:11

**nobody's** 220:11 221:11

**nodding** 7:15

**noise** 186:2,6

**nose** 167:25 168:20 179:25 180:1 223:23

**note** 47:19,21,24 63:14, 15,17,19,23

**notes** 82:12 83:5,6,9, 11,19 86:12

**notice** 131:1 159:5 255:8

**noticed** 90:17

**number** 32:13 64:15

**numbering** 150:11

**numbers** 8:1 150:10

**O**

**oath** 8:13,15 67:12 101:13 134:8 211:7,8 214:18 246:3 271:15,18

**objection** 7:2 29:25 30:17 32:16 34:16 45:10 47:6 51:15 52:22 53:20 55:6 59:14 60:4,9 62:19 64:2,23 65:8 73:15 80:8,16 88:4 89:21 93:19 94:1 97:2 98:2,8 107:9 138:11 142:17 143:21 169:1,5 178:12 191:3 211:16 212:21 223:7 225:3 227:13 228:19 230:6,10 236:19 237:13 238:23 239:19,22 241:10 243:23 259:23 265:4

**objections** 7:4,5 60:7 98:9 229:14,19

**obligated** 237:11

**obnoxious** 189:4 215:12,17 220:25

**obscenities** 81:25 82:1 83:25 85:18 141:18 221:1 253:2 261:15

**observable** 197:18

**observation** 235:10

**observations** 232:16

**observed** 189:8,24 191:8 251:16

**observing** 214:2 247:3

**obsessed** 43:22

**obstructive** 219:11

**occasion** 10:14 141:5 142:3 224:5 261:4

**occasions** 51:11 74:1 124:19 143:6 189:2

**occurrence** 205:1,13 247:9

**occurrences** 205:15

**OCTOBER** 4:1

**offending** 85:25 206:21 208:2

**offense** 207:25

**offensive** 77:4 82:5

**offer** 14:2 48:22 62:21, 24 63:3 82:17,21 270:24

**offered** 14:3 22:18 56:5 62:20 63:2,12 271:8,9

**offering** 82:17

**office** 35:23 93:2 256:7

**officer** 6:8,12,15 8:19 21:23 22:1 70:9 119:14, 15 120:11,13,21 121:4, 18 122:14 123:25 124:3 127:7,23 128:8,10,11, 24 137:25 138:5,9 139:4,15 140:1 142:21 160:2 173:3 230:19 231:22,23 234:14 235:14 243:12,20 244:2,4,6,11,13,15,19 245:10,22 246:7,13,18, 22 253:12,15,21,22 256:13,23 257:4,17 258:2,4,6,8,10,25 260:3,21 263:6,7,10,17 264:5 266:12,19 268:12,15,18 269:10, 12,19 270:18 271:1,5

272:3

**officers** 119:3 134:12 136:12,14 212:18 256:21 259:5,9,12 266:9

**officers'** 267:7

**official** 17:21 18:2 120:25

**officially** 17:9,17,21

**Oklahoma** 20:2

**older** 16:14

**one's** 159:16 229:13

**online** 23:7,17,18

**open** 167:25 168:20

**opened** 163:7

**operation** 161:3

**operations** 57:5,6,7,16 108:3

**opt** 62:18

**optimize** 42:10 67:23

**option** 65:23 212:19,20

**options** 62:18 82:20 84:19

**order** 10:4 58:14 264:11,25 265:19

**orders** 200:1

**organize** 24:17,18

**orientation** 20:19 23:9

**original's** 271:19

**Overbroad** 45:10

**overcharged** 26:4

**overly** 176:18

**overnight** 14:4 24:9 39:8

**overseas** 162:4,5

**overseeing** 178:9,19

**owning** 39:10

**P**

**p.m.** 134:4,6 272:10

**pages** 97:18 140:13

**pallets** 203:25

**pan** 155:15

**pants** 204:20

**paper** 28:1 34:25 41:3 66:1 92:22 243:4,6,8 244:6

**papers** 28:19 64:1 168:21 222:7,25 225:13,14 265:10

**paperwork** 39:16,17 100:7,8 223:17

**paragraph** 124:16 126:8,11

**paraphrasing** 180:7

**parking** 13:4 154:5 155:17 185:17 256:10

**part** 69:14 119:23 141:12 264:10

**party** 120:17

**Pasadena** 134:25

**Paseo** 134:24

**pass** 96:12 175:25

**passed** 142:24 143:9 254:13,20 258:6

**past** 89:6 120:19 124:19 125:2 127:17

**patience** 235:22

**patrol** 246:13,15 247:4 267:7

**pause** 6:25 7:8,9

**pausing** 6:24

**pay** 37:23 72:3 96:14 145:25

**paying** 175:6 176:1

**penalties** 8:16

**penalty** 8:14 211:8

**pending** 9:21

**people** 31:2 33:22 43:20 46:2 54:15 60:17 67:19,22 68:22 76:10 130:11 147:13,17,20 153:13 166:25 205:16

**pepper** 20:21 21:10,11 135:13

**performance** 23:21,25 24:23 26:20,25 36:15, 18 38:21 39:2,11,19,25 40:7,14,20 41:1 42:21 43:1,4,9,10,14 67:13, 16,25 68:2,6,16,25 69:6,16,19 70:5,12,13, 17,21,22 71:1 79:15,18, 24 80:2 90:18,25 92:3 96:25 97:5,10 98:23 99:9,21 100:10,14 260:20

**performances** 100:3

**performed** 97:11

**performing** 259:22 260:7

**period** 15:15 23:19 39:5,23 40:8 43:10 60:2 64:20 65:6 67:15 70:21 106:23 188:22 211:21

**perjury** 8:14,16 211:8

**person** 10:14 28:6 30:15 42:14 47:1 48:11, 24 50:14,17 63:6 75:4, 22 77:7,16 79:2 112:16 116:13 123:8 129:15,25 131:10,12,20,22 132:12 147:25 151:10,12 152:24 161:20 162:12 202:20 204:21,22

**person's** 125:10

**personal** 8:3 34:21 65:20,23 105:6 106:15 201:3 207:4

**personally** 33:12 65:2, 3 135:8

**personnel** 98:20

**pharmacy** 11:18 22:15 25:16 55:19,22 56:7 146:10 163:7,9,10 239:5 258:12

**phases** 163:5

**phone** 61:8 82:15 83:12 121:22 122:1 171:2,12 184:25 185:1, 10,11,12 200:11 201:14 219:16,20 220:1 221:22 228:24 231:11 233:1 235:20 248:21,23,25 249:3,7,9,10

**phones** 248:24

**photo** 199:24 200:6

**photograph** 31:16

**photographs** 31:25 119:1 200:1

**photos** 199:22

**physical** 46:4,15 76:15,16 77:10,12,23 188:23 189:4 190:1 219:11 232:17 245:3 261:14 265:11,21

**physically** 46:4 175:14 214:9 232:8,20 233:15 234:3

**picked** 235:20

**picking** 58:12 61:7

**picks** 149:23

**picture** 220:2 259:15

**pictures** 220:1 234:1,2, 3,6

**pill** 91:12 92:1

**pillar** 250:16,18

**pillars** 257:25

**place** 19:16 97:25 125:12,13 177:17 271:14

**places** 244:19

**placing** 135:9

**plain** 126:20

**plaintiff** 4:6 25:2 63:22 87:17 88:20 101:1,7 112:16 119:2 146:18 148:10 149:15 164:13 270:6,8,12

**plaintiff's** 88:16 103:9

**plan** 70:3

**plastic** 62:14 63:5

**play** 109:17 148:2

160:15 269:7

**played** 89:1 102:24 107:17 109:20 111:13 112:5,21 113:9,14,24 114:8,13 145:10 149:8 173:7 199:9 266:19

**playing** 111:12 112:4 145:14 149:7,14 166:5 168:9 173:6 183:10 194:24 196:5 206:2 208:4 212:7,15 213:6 219:2 229:20 243:1 244:21 246:5

**point** 74:19 78:15 87:7 90:18 131:21 169:23 175:15 179:12 180:11 181:24 182:2,16 193:15,17,23 194:11 199:20 201:23 209:11, 16 211:7 213:1,22,24, 25 215:1,2 216:24 217:21 218:22 219:24 220:7 229:25 231:23 233:19,20,22 234:5,8, 23 243:19 245:4 246:18 249:11 257:19,21 258:25 262:25 263:20 270:8

**pointing** 209:7 226:15 243:14,15,17 244:5,8

**points** 39:24 226:16 243:9

**police** 9:10,13 10:17, 19,24,25 11:6 30:11,14, 22,24 31:3 32:6,7,10, 15,18 33:2,7,10,12,20 34:2,5,6,9 50:14,24,25 53:4 60:13,19,22 61:4 72:7,8 73:4,19 74:1,5, 15 76:1,5,23 77:2,6,13, 18 78:19,22 79:2 80:5 84:2,5,6 86:2,6 87:19, 21 100:24 101:2,5,10 102:20 104:9 106:25 108:9,14,18,21 109:3,5 116:13 119:2,17,24 120:11,20,25 121:4 122:14 126:19 128:7, 10,24 133:4 134:12,14 135:21 136:9,25 137:1, 10,15,24 138:7 139:7, 10,25 140:11 143:13 172:23 181:14 184:5 190:15,22,24,25 191:5, 9,10,11,12,20 193:16, 24 194:4,7,11,21 197:15 203:14 205:1,3 212:18 215:5 226:11,13 227:8 228:22,23 229:1, 11,13,17 231:22,23 236:6 237:20 239:20 242:1,22 243:2,5,11,20 244:2,4,13,14,19 246:17,22 248:4,6,14, 15,20 250:9,12 251:11, 22,25 252:1,3 253:8,12, 15,22 256:13 257:20 258:4 259:17 269:10 270:9,13

**policies** 231:16

**policy** 10:23 48:14 49:3 50:13 58:25 59:8,24 64:8,12,16,21 66:10 74:18,21 76:4 79:1 86:8 128:9 142:15 208:2 219:23 220:2,7 221:6, 14,17,19 224:1 230:3 231:19 233:19,20,22 249:18,19

**poor** 214:24

**portable** 201:2,4

**position** 14:3 22:16 134:22 158:18,21

**positive** 41:6 82:17

**possibility** 263:25 267:13

**possibly** 155:24 207:14 255:12 269:4

**post** 12:19

**potentially** 148:1 152:4,5 157:15,16 161:12 268:14

**practice** 131:25 142:16

**prefer** 58:10

**preparation** 27:4,22 170:5

**prepared** 271:9

**prescription** 58:12 91:4,5

**presence** 188:16

**present** 268:21

**pretty** 113:4 118:19 156:3,4 162:25 172:10 235:9

**prevention** 161:21 162:1,4,12

**previous** 51:10

**previously** 5:18 73:25 165:24 180:4

**price** 200:23

**prices** 200:19,24

**print** 200:2

**printer** 199:24

**printing** 199:25

**prior** 10:14 11:22,23 14:13 19:4,7,8 20:4,5 92:12 93:22 142:2 170:18 194:19 261:4

**private** 94:11 135:17

**privately** 134:22

**privilege** 53:21

**problem** 11:6 48:2 50:21 55:24 60:15 64:20 83:3,4 144:13,14, 18 164:25 165:11 211:4 223:2 262:10

**problems** 33:4 65:9,10 76:12 81:12,16 89:20 104:2,7 106:21 109:15 111:20 112:1 135:24 205:17

**proceedings** 264:11 265:18 272:10

**produced** 99:8 103:7 189:25

**product** 84:15

**productive** 69:24

**products** 58:14

**professional** 69:24

**Profile** 36:23

**prohibit** 248:5

**prohibits** 219:25

**promotion** 71:2 96:11, 12,18,19

**promotions** 37:16

**promulgated** 97:11

**pronounce** 57:12

**proper** 84:15

**property** 17:24 31:6

**protect** 49:15 58:22 212:19

**provide** 7:7,18,23 8:2,7 13:9 37:7 56:7 63:9,10, 17 79:19,22 86:19 129:22 220:23

**provided** 72:17 106:15 204:18 271:11

**providing** 42:13

**pull-down** 263:13

**purchase** 56:11 218:10

**purple** 204:20

**purposes** 271:21,22

**put** 35:23 43:20 44:12 67:18,19,22 68:22 93:1 159:10 203:23 223:23 242:20

**puts** 123:7 166:13 177:16 244:22,23

### Q

**question** 6:10,23,25 7:9,10 8:4 30:3,6 47:20 66:21 83:16 124:22 171:6 192:10 229:5,6,7 230:13,15 232:15 239:1 241:11 255:16 261:11 264:19,21 265:7

**questioning** 66:21

**questions** 94:13 98:14 197:12 229:16 264:8 269:23,24 270:1,17

**quickly** 13:19 58:20

**quiet** 82:8 236:1

**quit** 157:8

## R

**race** 5:15 149:3,4,5
**raise** 96:20,21 227:5
**Ralphs** 257:11
**rate** 37:20
**rated** 43:8 68:25
**rates** 37:23
**rating** 39:22,23 40:3,8 43:9 67:25 71:5
**reach** 81:24
**read** 35:1,14,17,25 41:11 42:15 56:17 70:8 126:11 140:13
**reading** 61:11
**ready** 24:10 27:14 245:23
**real** 155:25
**realize** 254:7
**reason** 17:13 106:19 108:5,7 115:13 120:24 122:4 124:2,8 127:7,10 138:16 139:9,14,24 140:6 156:25 160:11 168:16 169:3,7 227:11 229:9 234:1 242:21 251:21 255:19 271:19
**reasonable** 48:5 62:5, 10 63:10,11 64:9,10,14 65:6 186:9
**recall** 34:11 36:19 40:19 68:14 94:7,11 97:17 100:6,9,12 107:2, 3,5 118:10 122:3 128:1 133:19 141:13,24 169:18 206:6,9 250:23 259:4
**recalling** 196:11
**recalls** 259:18
**receive** 12:14 24:22 25:4 26:17 45:8 48:8 80:20 88:2
**received** 20:15 23:1,5 25:3 37:16 46:23 59:8 71:13,14 76:3 134:18 156:23
**receiving** 14:24 15:1 203:12
**recent** 11:23 43:12
**recently** 24:1 71:16
**recognize** 31:17 55:20 136:16 145:13,15 147:25 148:7,8 149:11 152:23 153:6 154:10 155:21 163:18 266:11
**recollect** 172:10 193:18
**recollection** 7:24 31:21 147:3 172:4 174:16 185:25 189:12 196:9 204:11 247:23
**Recommended** 39:23
**record** 4:15,24 5:14 7:5 36:22 67:5,11 70:8 82:14,16,24,25 98:10 107:17 122:1 134:6 135:6 139:8,23 152:9, 12 165:8 189:15 201:10,13,17 230:17 233:17 245:24 246:2 249:11,17
**recorded** 83:13 132:24
**recorder** 166:12
**recorders** 201:2,4
**recording** 83:12 185:14 233:9,14,15
**recordings** 27:9
**records** 27:5 121:22
**recovery** 195:17
**reference** 267:22
**referenced** 146:21
**referred** 63:22 77:4
**reflect** 43:25 98:11
**refresh** 35:3 89:1 103:16 119:5 120:10 122:13 146:25 149:20 160:15 168:12 169:14 172:7 196:8 201:22 204:23 205:23 247:15 251:17
**refreshed** 53:18 61:12
**refreshes** 102:23
**refusal** 140:23 141:16
**refuse** 49:2,4 56:13,16 58:7,8 59:4,12 60:1 75:24 265:1
**refused** 72:10 101:16 104:17,19
**refuses** 48:25 56:4 60:12 81:13 84:13,15 236:4
**refusing** 50:17,20 94:17 104:6 114:21 131:18 264:19,20
**register** 72:3 147:24 161:7,12 165:15,16 166:7,8,11,13,15,17,20, 24 167:1,8,13,16 173:10 177:1,7,13,22, 23 178:2,9,11,17,21,24 179:4 180:12 181:20 195:21 197:1,5,6,7,9,20 198:11,14,16 199:13 202:5 208:6 209:3,5 213:10,16 215:23,25 216:1,12,19,22 217:5, 22 227:21,22 231:6 234:25 235:6,7
**registers** 44:10 161:10 182:24
**regular** 205:1,13 236:13 247:8 254:1,19, 25 255:10,14 261:21,22
**regularly** 254:23 255:8, 14
**reinstated** 70:23
**relate** 38:2
**related** 24:20,23 26:18, 24 29:5 54:24 59:1 71:15 91:1 103:9 155:2
**relates** 58:3
**relevant** 265:6
**relief** 15:2,13
**religious** 64:13,19 65:5
**remain** 87:1
**remem-** 110:3
**remember** 7:25 11:1, 12 12:11 13:8 17:20 18:4 19:11 23:23 26:14 31:10,11,14,22,24 32:1, 4 34:12,23 35:5,7,11 36:11 37:7 39:11,13 40:15,19,23 41:25 42:2, 6,17,21,24 43:11 51:20, 23 53:1,3,6,8 54:9,11 55:17 57:2 60:25 61:3, 5,7,9,10,15,16 63:24 64:4,5,24,25 66:16 68:1,11,17 69:16,18 70:17,19 71:5,9,10 72:14,21 73:1,18,22,23 74:19 80:12,19 87:8,10 88:12,18,23 90:4,14,15 94:15,17,20,21 95:3,14, 22 98:22,25 99:23,24 100:16,22 101:9 102:20 103:11,14,18 104:18,25 106:5,7,8,9,11 110:4,6, 14,18,21,23,25 111:1,5, 9 116:8 117:5,11 118:7, 12,23 119:6,7,10,11,15, 19,23,25 120:4,8,12,20, 23 121:3,23 122:3 123:25 126:5 127:1 130:15 133:19 138:5,8, 12 141:7,8,11 142:19 143:8,18 144:2,7,20,25 145:2,5 147:4 154:13, 19 157:4 162:13 166:19 168:2,5,6,7,23 169:11, 18 170:3 172:6 173:18 174:8,18 178:3 179:16, 18 181:16 183:5 184:13 185:20 187:7,10 189:10,13,16 191:18,22 192:1,2,5 193:22 194:22 195:8,14 196:2, 11,17 198:5 203:7 205:21 206:8,9 207:2,5, 7,13 209:19,23 210:5, 12 211:12,13,14,20,24 212:1,5 213:5 214:1,3,4 216:4 222:4,6,8,10,13, 17,19 224:17,19 225:1, 5,10 226:5 232:3,6,12 233:13 236:21 237:16 238:4,8,18,24 239:25 242:14,16,18,23 244:25 246:16,17 247:17 248:7,8,17 249:15 250:7 251:2,5,6,14,19 252:2,20,22,25 253:3,9

254:22 255:17 256:1 258:7,9,13 259:9,11,12, 24 260:11,13 261:3,8, 10,20 262:17,23 263:3 264:1 266:11 267:9,15, 20,25 268:8,11,25 269:6 270:11,15

**remembered** 61:22 254:24

**remembering** 95:23 207:9

**remembers** 247:18,20

**remind** 6:16 58:21

**reminder** 21:23 22:5 67:12 134:7 246:2

**reminding** 271:5

**remodel** 150:18

**remotely** 216:15

**remove** 86:20 87:4

**removed** 246:6

**removes** 266:20

**repeat** 30:2 242:5

**report** 119:13 120:11, 25 123:23 126:19 127:5 133:13 137:24 139:7,10 140:9,11 203:14 253:23 257:20 259:1,17 260:3

**reporter** 160:1

**reporting** 120:16

**reports** 55:25 239:4

**represent** 165:23 197:13

**representative** 46:21

**represented** 36:22

**representing** 99:9

**request** 6:22 10:16,19 137:2 238:13

**Requests** 64:9

**required** 64:12 69:21 98:1,5 221:17

**requirement** 38:14 131:19

**requirements** 8:15 85:1

**requires** 40:9 74:17

**resource** 70:1

**resources** 87:14 88:15 92:7

**respond** 41:6

**responded** 9:14

**responding** 209:12

**response** 7:19 19:3 34:17 58:6,9 61:13 91:8 94:16 107:12 121:15 133:16 206:1 226:8 235:14 257:18

**responses** 7:15 37:8 56:6

**rest** 163:3

**restraining** 10:4 264:11,25 265:19

**restricted** 84:15

**restroom** 66:23

**retail** 163:15

**retired** 154:24 157:8

**return** 122:8 123:1 124:18 125:19 126:21 127:16

**returned** 138:3,19

**returns** 138:6 140:4

**review** 27:5,22 38:21 39:15 67:16,19 97:13 271:11,12 272:9

**reviewed** 27:7,8 34:14 55:7

**reviewing** 39:11 69:13

**reward** 81:8,9

**rid** 118:5

**Riddle** 110:25 111:6 154:11 199:11,16 201:20 246:24 247:1

**rise** 68:23

**risk** 21:12

**Road** 12:7 95:16

**role** 39:8,9 69:21 80:23 81:21 84:10

**rolled** 237:3

**room** 27:15 164:8,9 195:1 256:5,7,8,9

**Ross** 119:15 120:11,13 121:18 122:14 123:25 124:3 127:8,23 137:25 138:5,9 139:15 140:1 173:3 226:16 266:19

**rule** 7:13

**rules** 6:19

**running** 208:8

**S**

**sad** 29:16

**safety** 81:18

**sale** 71:23

**sales** 22:21 41:21

**Sam** 135:11

**San** 12:7 95:16

**sanctify** 271:14

**sat** 68:8 100:5 170:12, 14

**satisfaction** 24:21 42:20 80:14

**satisfied** 83:25

**satisfy** 236:11

**save** 212:19

**saved** 212:16

**scan** 200:19

**scenario** 56:15 59:3 84:1 102:7 222:21 223:5,6,13 225:11 235:10 261:17,18

**scenarios** 56:2 58:4 84:21 220:17,18 222:3

**scene** 267:8

**schedule** 69:13

**school** 19:24,25 20:1

**sciatica** 165:1

**scored** 68:24

**screaming** 33:6 78:21 84:4 85:23 115:9 130:22 135:25 176:4 232:13,18 233:8 251:4

**screams** 11:5

**screen** 147:23,24 164:12 182:19

**scroll** 258:7

**Seattle** 157:9

**seconds** 229:21

**securities** 20:16 21:14

**security** 11:24,25 12:2, 3,4,10,15,16,23 13:5,10 14:7,10,14 19:1,5,12 20:5,9,13,14,16,20 21:3,21 134:22 135:2,9, 11

**seek** 41:5 62:10 70:2

**segment** 111:15 112:23 114:15

**self-checckout** 161:18 198:8 258:16

**self-checkout** 173:10, 23 177:10 179:4 181:6, 10,25 182:24 183:18 185:2,3,5 198:7

**sell** 63:2 163:14

**selling** 72:1

**send** 272:8

**sense** 125:12 127:3

**September** 69:7

**serve** 49:8,10 130:25

**served** 28:18,19,24 34:25 35:5

**service** 13:15 24:19,20 42:9,13 43:20 46:21 49:2,4 54:24 56:14,16 58:25 59:4,12 60:1 67:21 68:13 79:19,23 119:17 162:9

**set** 15:8 41:10

**shape** 78:2 196:8 213:24 232:9 234:4

**shelf** 72:3,5

**shelter** 15:4,5

**shelves** 24:11 75:6

**shift** 14:3,4 22:17,19,22 33:11 38:21 39:8 41:8 42:12 43:19 80:22 157:12

**shifted** 14:6

**shirt** 13:14 152:2,7 184:14,20 204:20 254:13,20

**shirts** 151:15,17,23 198:23,25

**shocked** 29:19,22 30:7,10

**shoes** 5:1 43:23 152:17,19,20 204:20

**shoot** 20:25

**shooting** 21:2

**shoplifting** 77:2,12 88:20,23 128:21,22 130:16,18,20 131:16 134:25 267:18,22,23 268:4,9

**shopped** 71:16

**shoppers** 58:22

**shopping** 56:4 58:18, 20 71:19 128:20

**Shore** 94:12

**short** 4:22,23 23:22 40:20 66:19 80:2 148:19 155:25 165:4 180:19 199:4 235:22

**short-term** 89:24 90:5

**shorter** 199:3

**show** 20:18 31:16,25 63:22 84:15 97:9 132:24 145:4 168:21 216:8 222:6,25 225:15 250:11

**showed** 35:20 80:3,10 189:24 227:16,21,22

**showing** 161:8 162:25 224:22 233:14 237:22 243:5 244:6 250:8

**shows** 178:24 196:25 197:4 198:7 216:8 217:15 227:23 249:9

**sic** 242:20

**side** 195:21 243:21

**sign** 39:15 97:9,12,13

**signature** 97:18,21,25 98:16 99:3,5,7,25 100:1

**signed** 39:17 97:15 271:19,20

**signing** 97:17 98:23,25 99:23,24 100:7

**Silva** 11:15 22:23,24 38:22 39:1 41:13 42:1 57:14 69:5,9,10,17,20 70:18 71:6 75:2 79:3, 11,12,25 99:12

**Silver** 12:22,23 14:7

**simplicity** 68:24

**simply** 95:25

**sir** 4:12 22:6 67:12 82:20 103:1 116:24 125:9 171:9 193:7 204:9 216:5 221:19 232:15 236:17 238:2 239:9 240:11 244:1 246:2 261:10 264:15 270:5

**sister** 16:22

**sit** 100:3 164:6 204:3

**sitting** 88:22 91:3 100:6,10 119:9 189:17 211:8 219:24 232:4 250:16,18,24 252:17 257:24,25 262:14 267:11 268:8 269:15

**situation** 33:25 34:3,6 48:3,10,17,19 49:18 63:21 81:2 82:6,9,20 83:20 84:9 86:18,21 87:4,9 108:18 131:15, 16,18 132:9 137:23 147:17 161:5 210:5,7 221:16 227:9 235:19,24 236:2 239:18 248:14

**situations** 44:25 45:6 76:4 83:9 134:14 135:21 136:25

**sleep** 15:7

**slightest** 36:9

**slow** 241:15

**Slowly** 70:9

**small** 164:8 214:12

**smaller** 4:20

**smoke** 16:1

**social** 58:22

**son** 16:14,16 90:10

**son's** 89:11 90:9

**sons** 16:3,8,12 17:25

**sort** 12:15 13:10 44:22 62:9 64:18 65:3,4 66:10 88:2 151:18 154:6 209:11 246:21

**sound** 105:5 122:12

**sounds** 36:25 121:16

**source** 116:23 140:16

**speak** 29:4 94:17 95:6, 12 121:7 139:8 140:11 142:11 173:11 177:9 200:22 208:18 221:24 222:10,23 260:18

**speaking** 6:13 98:7,8,9 119:15 229:14,19

**speaks** 80:8 98:2

**special** 45:9,15 46:2,3, 20 47:4

**specific** 10:22 42:18 48:8,9 97:20 161:20 162:12

**specifically** 24:20 68:15 80:5 85:5 99:2,10 104:4,25 131:15

**speculate** 204:9

**speculating** 207:3,18

**speculation** 30:18 64:3 80:9 172:14 178:13 187:17 212:22 225:4 227:14 228:20 229:3 230:11 233:3 243:24 255:21

**speech** 46:12

**speed** 263:12

**spell** 4:14

**spend** 171:19

**spent** 170:7,18

**spitting** 6:2 76:16

**spoke** 88:1,7 117:7 120:16 140:9,15,16 170:22 171:1,11 173:3 226:25 259:18

**spoken** 244:14 257:19

**spot** 159:14

**spotted** 158:24

**spray** 20:21 21:10,11 135:13

**staff** 42:12

**stand** 164:19 165:2 197:25 198:2 204:2 230:23

**standards** 26:25 41:9

**standing** 78:25 109:22 113:12 149:16 151:6,11 173:10,22,24 174:22,24 176:7,10,13,25 179:3 181:10,19 182:23 186:16,18 187:2,3 195:2 197:5 213:8 216:20,21 217:5,18,22 219:3,15,17,18 220:10 225:22 229:23 230:22, 25 232:23 244:12 245:7,12,16 253:13 263:22,24 266:25 268:13

**stands** 179:8 198:4,5

**start** 6:12 18:15 75:9 78:12,16 79:6 86:20 163:21,22 165:3

**started** 22:25 23:15 37:13 72:5 74:25 96:7 112:25 180:6

**starting** 156:12 204:5

**starts** 78:6

**state** 4:14 38:6 56:13, 15 59:3 73:3 123:3 221:3

**stated** 69:11 71:13 82:2 103:20,25 104:4,8 106:20 126:7,16
**statement** 43:21 44:1, 21 67:22 120:18 122:5 123:20 124:9 140:3
**statements** 120:12,15 122:8 124:7,16 127:9 139:25 168:10 180:7 260:4
**states** 37:25 38:11 39:5 40:3 41:5 46:24 48:24 55:18,19 58:9 63:6 69:8 70:20 98:19 120:14,16 122:25 123:19,22 127:5 128:2 133:12 138:1,14 139:12 221:7 259:17
**stating** 58:16
**stay** 10:1 16:20 31:2 102:4
**staying** 15:7
**steal** 75:7 76:13
**stealing** 135:24 178:10
**steals** 128:18
**steel** 33:4
**step** 50:19
**steps** 47:3 48:9
**Sterling** 12:22,23 14:7
**Stipulate** 271:23
**stipulated** 271:25
**stipulation** 270:25
**stipulations** 271:8
**stock** 72:2 256:8,9
**stood** 235:7 246:10
**stopped** 16:5
**stops** 175:6
**store** 9:24 10:1 11:6,7, 14 13:18,24 23:9,15,18 24:1,10 27:11 33:18 39:9 42:3,11,14 48:21 49:6,13 50:12 53:1 54:20 56:24 57:13,22, 25 58:14 59:15 60:2,24 61:21 63:18,20 72:9 74:8 75:7,11,12,13,15, 18,19,23 76:2,10,19 77:14,16 78:20,23 79:9 81:12,16 84:5,18 85:22 88:14,19 92:6 95:15 96:16 101:2,6,14,22 102:4,7,16 103:10 104:3,21,24 105:1,2,8, 10,11,24 106:3,6 107:21 108:7 113:17,22 115:4,8 116:15 117:1,2, 8,15 119:22 122:9 123:2 124:20 125:23, 24,25 127:1,17 129:16, 18,22 130:1,4,12,24 131:9 132:24 133:20 135:1 136:5 137:17,19, 22 141:23 142:9,13 145:16,22 146:8,13,16, 17,19 147:7,12 150:11 151:14 152:20 153:21 154:16 157:14,21 158:9 159:11 161:21 162:14 163:9,15 164:3,5 166:24 168:17 174:10, 12,13,14 178:8 182:15 183:15 186:14,15 188:16,18,19 189:2,6 190:18 191:2,25 193:15 194:2,10,11,12,25 195:13,17 196:7,14 197:22 201:3,16 203:23 204:14 206:15 208:1,18 210:2,9 211:4,5,10,19, 21 212:14 218:14 220:5 222:22 223:22 228:5 233:25 234:7,11,12,14, 18 235:10,18 236:12 237:20 238:4,7,11,13 239:7,12 240:1 242:9 246:25 249:2,6,17,19, 21 250:19 253:11,17 254:16 255:9,14 256:5, 20 257:6 258:1 260:16 261:6 262:21 263:17 264:2 266:20,21,23 268:17
**stored** 98:20
**stores** 24:5 67:24 76:11,12
**story** 240:21 243:21
**straightened** 24:11
**strike** 35:4 73:24 169:23 179:17 225:1 243:1 253:23 267:6
**structure** 13:4
**stuck** 159:14
**stuff** 15:8 20:11,19 21:16 23:13 26:4 42:4 45:24 114:23 115:9 120:5 200:20
**subsequently** 70:21
**succeed** 70:1
**successful** 70:13
**sued** 29:7,8 35:16 36:4 205:10,19,20
**sufficient** 78:22
**suing** 29:11
**summary** 120:17
**Sunday** 71:22
**supervision** 41:24
**supervisor** 10:11 14:4 22:17,19,22 33:12 35:19 38:22 39:9 41:8 43:19 57:1 60:24
**supervisors** 56:22 87:23 220:3
**support** 69:23
**suppose** 176:6
**supposed** 158:11 225:21
**surprised** 29:9,10,15
**surveillance** 27:9 32:1 120:2 132:24 142:9 145:4,14 172:3
**survey** 69:11
**suspended** 36:17 38:8
**suspension** 38:1,6,12
**sweatshirt** 204:20
**swing** 6:2
**swinging** 78:16
**sworn** 4:7 117:10 240:21
**symptoms** 112:7,18

**T**

**tactics** 82:11 84:12 85:19 86:9,11 236:3 237:11
**tag** 44:10 153:9,10,11
**tags** 153:13
**takes** 156:11,15 217:16
**taking** 6:20 82:12 83:19 91:5,25 93:5 156:16 203:24 208:23 219:25 220:1 243:4
**talk** 45:3 78:8,12 86:12 87:14 94:12 171:15 213:9 220:11,14 224:10 235:25 245:10 256:13, 20,21,24 257:6 260:20 263:23
**talking** 8:24 68:17 85:22 88:15 109:23 121:3 170:15,21 171:19 174:5 175:20 176:25 179:7 184:9 186:19 187:14,24 188:5,6 192:19 194:8 195:3,4,5, 8,11,16 213:12,13,15, 19 217:1,2,3,7,10 218:17 219:14 220:11 221:11,22 224:6 227:19,23 228:3,7,13 229:23,25 230:22 231:10,11,12 232:25 233:2 235:19 243:11,20 244:1,3,12 247:23,24 248:1,10 255:5 256:14, 18 258:2,5,8,10 259:10 263:10,19 264:5 268:15,20 269:16
**talks** 253:22 259:1
**tall** 4:25 148:15 152:16 156:4
**tape** 103:12,13,21 110:8,10 172:2 197:11, 13 216:6 222:16,17 225:25 239:16 246:21
**tapes** 167:4
**tasks** 41:22
**team** 70:1

**techniques** 220:22 231:20 236:11

**telephone** 249:3

**telled** 242:20

**telling** 42:2 52:19 53:16 57:19 59:10 68:12 73:19 75:15 88:19 104:12 105:3 106:13,14 109:18 111:19 112:23 113:11 114:16,20 115:12 116:6,14,18 118:2,4,6,17 123:12 125:11,19,21,23,24 138:5 168:18 179:17,19 188:4 192:24 207:12 222:4 224:13,17,19 226:24 227:5 232:12 236:16 237:9 238:9 239:17 242:1 246:17 247:12 268:9

**tells** 169:25 222:25 223:14 234:6

**ten** 25:17,18 130:14 147:21

**ten-minute** 67:6

**term** 89:24 90:6,7 125:7,10

**terminated** 14:10

**termination** 70:15,25

**terms** 70:5 135:20 148:13

**testified** 4:7 5:20,21 101:7 105:13,18,21 115:19 126:15 132:2 134:13 167:23 179:24 182:10 192:22 207:5 208:17,21,22 214:19 221:23 228:25 229:10 248:3 255:13,20 261:3

**testifies** 241:23

**testify** 8:16 9:18 93:24 204:10,11 207:4 226:19

**testifying** 8:13,25 36:8 53:24 54:3 93:22 214:18

**testimony** 8:15 52:22 62:19 64:23 65:8 89:21 111:3 116:5 117:10 138:11 141:15 142:8 143:11 167:7,22 191:3 206:6 210:17 227:4,14 229:4 236:19 237:13 239:19,22 240:21 250:6,23 255:22

**thicker** 156:5

**thin** 155:25 156:4

**thing** 7:22 35:17 49:25 86:3 90:12 91:24 104:20 148:22 149:24 226:15 247:15 263:15

**things** 24:17 53:8 77:11 81:23 89:8,22 90:4 104:20 106:11 113:1 147:14 180:24 196:19 200:19 249:23 250:19 261:15 270:7

**thinks** 43:18 172:15

**threat** 85:10 86:5

**threatened** 84:17 85:4 215:6

**threatening** 78:2 232:21 233:15

**threw** 28:16 29:2 232:5

**throw** 156:17 158:9 189:3 190:3 231:25 239:14

**throwing** 77:10 113:1 114:23 115:9 175:11 180:24 214:7 216:15 218:7 219:8 249:22 250:3 261:15

**thrown** 28:4

**thumbed** 35:2,18 92:23

**tight** 270:10

**Tim** 153:5 154:4 199:16

**time** 5:4,7,11 7:4 10:10 11:10,14 14:15,21,25 15:15 16:11,23 17:12 18:5 23:19 33:14 35:12 38:17,25 41:23 45:1 49:5,24 50:6 51:7,13 57:2,3,7 65:6 70:21 74:6 79:15 81:24 90:4, 18 95:18 106:24 108:18,24 110:3,6,24 111:9 112:12,24 113:22 118:7,23 122:9 123:2 124:19 125:1,2 127:16 129:3 134:1 153:14,19 154:18 155:21 158:24 161:22,25 162:11,17 163:12 168:4 169:23 170:14,18 171:7,9,17 172:12 177:13 193:16, 23 194:11 199:20 208:3,20 209:16 211:21 213:23 215:3 216:24 217:21 220:9 227:7 231:21,23 233:23 234:24 235:5,23,25 240:14 245:4 246:15, 18,23 249:11 258:12,23 263:8,20 270:8

**timeframe** 258:12 269:17

**times** 32:9 49:17 90:8 106:25 114:5 118:10,18 120:19 121:12 125:2,24 126:22 130:11,13,14 137:6 171:10,11,13 206:23 212:10 229:13, 16 237:3 241:12 254:15,17 258:11

**Timothy** 110:25 111:1, 6 154:11 155:8 156:1 157:6,8,11 158:4 199:11,14 201:20 202:2,5 216:13 217:5, 25 218:22 246:24 247:1

**today** 6:19,21 27:23 36:8 53:24 54:3 88:22 91:4 93:22 179:24 189:17 219:25 232:4 242:20 250:24 252:17 262:15 268:8 271:10

**told** 23:24 24:4 25:1,25 26:2,19 34:4 35:22 44:12 48:11 49:11 52:7 54:3,4,5,17 56:20,22 57:20,23 59:15 61:17, 18,22 62:13,21 66:4,9 75:4,17 76:6 79:3,5 93:14 100:17,19 101:5, 12 102:10,11 104:15 105:7 114:22 116:13,25 117:4,11,14 121:1,3,5, 10,17 122:8,10,14,15 123:1 124:17,18 126:21,22 127:15,22 128:17 129:5,25 130:11 131:21 132:10 133:4 138:9,15,18,23 139:3,4, 8 140:21 141:7 142:1, 25 179:23 180:3,6 181:9 191:9 193:4 204:19 206:7,10 210:12,23 211:1,5 212:17 220:3 226:21 233:21 238:10 241:19 242:1 249:14,16,20,23 259:20,24 260:2 261:23

**tonight** 123:18

**Tony** 4:19

**top** 18:17 96:14 159:1, 16 161:8

**topics** 66:18

**tossed** 92:21

**traffic** 147:12,18

**train** 45:12 135:20

**trained** 44:24 45:11 47:4 56:7 60:14 62:7 63:9 77:22 220:23

**training** 8:8 10:22,23 12:15 13:10 20:16 23:1, 2,4,14 41:7 45:8,25 46:23 48:8 59:8 76:3 79:1,11 80:13,21 81:21, 22,23 85:14 128:9 142:16 221:14 223:5 224:1,2

**transcript** 271:9,10

**transfer** 71:2

**trash** 15:7 156:17 157:22 158:8 167:12

**traveling** 162:5

**treat** 14:1

**treating** 222:1

**trespass** 124:25 128:22 259:5 260:8

**trespassed** 206:24 262:13

**trespassing** 123:19 124:12 127:20,23 128:3,8,12,15,18 129:2, 10,12,20 132:13,17,20 133:5,9 134:15 136:5,6

137:1,4 138:4 140:5 242:10 252:14 259:21 260:22

**trouble** 66:1 75:5 206:14

**true** 27:12,13 30:16 31:21 38:18 44:4,5,24 46:4,5,7,8,10,11,12,13, 18,19 52:9 53:14,15 57:17,18 59:1,2,8,9 72:12 76:21,23 77:13, 24,25 80:2,3,7 97:24 99:3,4,6,7 101:23,24 102:4,5,12,13 104:13, 17 105:6 106:18 107:1, 24 121:18 122:1 123:19 124:21 125:2 127:17,18 133:15,23,24 141:6 143:7 166:8,9 167:13, 14,20,21 177:25 178:8 179:5,6 180:20 182:24 183:3 185:17 187:16 188:9,10,24,25 189:4,5 190:1,2,4,9,10,12 191:21,25 192:9,14 193:24 194:16,21 195:24 196:9,21 197:8 199:5 204:15 207:10, 11,21,22 208:15,16,23 209:8,17 210:16,19,20 211:10,15,21 213:4,5, 12,14,15 215:3,7,18 216:1,2,16,22 217:2 218:4,5,7,8,15,16,25 220:14 222:22 224:1 225:17 228:6,23 230:1, 18,25 231:6,12,13,14 232:1,10 233:6,19 234:15 235:11,15 237:21 238:14,17,22 241:7 242:21 243:7,12 244:2,7,23 245:5 246:7, 8,13,14 247:6 253:2,8 262:16,21 266:15,16, 18,21 268:21 269:12, 16,19

**truth** 116:14 118:2,4,6

**Tuesday** 203:9,11,17

**turn** 45:21 110:13 159:24 176:4 258:3

**turned** 111:10

**type** 24:22 45:8 80:12 91:9,16,19 147:16 262:16

**U**

**Uh-huh** 7:3,17 11:2,8 13:16 14:9,23 15:14 16:4,11,18,21,24 17:3, 15,18 18:8 19:17 20:24 24:3,16 25:10,24 26:5,9 28:8,10 29:18,21 30:12 31:1,7,9,12,15 32:20,23 33:5,9 35:13,21 38:24 40:1 45:14,23 46:1 47:12,15,17,23 49:14, 17 50:22 51:3 52:15 55:23 56:21 57:4,9,11 59:17 65:12 66:17 69:2 74:23 75:1,3,8,10,12,25 76:7,9,17,22,24 78:10, 14,17 81:10,14 82:4 83:1,8 85:3,24 92:25 96:4,6 97:22 100:21 104:22 105:15 109:1,19 110:1,9 111:4 112:9 115:7,21 117:13,16 126:1 127:6 128:13,16 129:4,6,14,17,19 130:2, 5,19 135:12,15 136:1,3 141:21 144:17 147:10 150:9,15,17 151:1 153:12 154:1,8 160:6 161:23 162:18,22 163:21 165:18,25 166:10,18 170:1 171:3, 24 174:7 175:2,9,23 179:11 180:22 184:11 188:13 190:17,19,21 193:10,13,20 196:13 198:9,24 200:5,18 201:5,9 202:1,3 203:10, 24 206:20 217:12,14 223:18 226:4 227:17 228:1 237:18 240:2,5 241:18 242:7 248:13,16 250:10 252:10 254:4,6 255:11 262:1,6,8,18 264:7 267:2,10,12,14

**Uh-uh** 53:19

**unable** 64:11 82:15 86:19

**unaware** 221:20

**understand** 7:11 8:11, 20 28:18,20,21 38:9 51:25 53:9 58:10 76:20 81:20 103:15 107:5 116:21 118:17 120:9 125:6 128:3 141:12,25 152:11,13 185:24,25 205:7,18 211:23 214:4 230:12 240:11 241:14 250:14 253:4 261:10 262:24

**understanding** 46:21 86:7 93:5,9,11

**understood** 52:5 79:4 131:13 169:21 217:17

**unhappy** 81:3 220:17, 20 221:15 230:4 234:4 236:1,12 237:12

**uniform** 153:8

**uniforms** 151:14,15

**uninterrupted** 235:9

**union** 96:16

**unsigned** 271:21

**upgraded** 160:23

**upset** 29:16 114:17 221:23 228:15

**V**

**vaccinated** 38:17 59:23 90:23

**vaccination** 38:14

**vaccinations** 90:24 91:1

**Vague** 29:25 30:17 32:16 45:10 47:6 64:2 73:15 80:16 88:4 97:2 143:21 211:16 259:23

**valuable** 69:25

**Values** 69:22

**variety** 40:7

**verbally** 44:25 76:25 130:6,9 131:7

**verbatim** 6:21

**victim** 6:4

**video** 23:10 27:8,11 31:25 69:13 92:12 93:17 120:2 132:24 142:8,12 145:4,8,10,14, 16 146:2 148:14,16 149:8,19 160:18 166:11 172:3 173:7 177:12,20 178:9 185:14 186:9,12, 23 187:9,11,22,23 189:7,23 190:14 192:7, 11 194:1,5,8 196:5 199:9 201:8 205:22 207:6,9 212:3,10,14 214:2,6 215:16 232:2, 17,19 234:18 236:23 246:5 249:8 251:16 258:8,12 259:15 266:18 268:24 269:1

**videos** 160:22

**videotape** 220:4

**view** 165:14

**violated** 220:8

**violation** 142:15

**violence** 76:21 78:25 84:16 85:2,11 86:5 131:16 261:14 265:12, 21,25

**violent** 45:1 76:21 78:2 190:1 215:9 232:21 236:5

**visible** 46:4 47:1,3

**voice** 82:9 103:3,22,23, 24 107:14 173:1 236:1 260:19

**voicing** 260:19

**W**

**wait** 18:18 84:17 85:4 96:23,24 164:6 210:6

**waited** 35:18

**waiting** 216:21

**walk** 13:12 43:22 151:4 152:6 159:17,18 165:5 183:15 184:24 188:8,14 195:20,21,23 196:20 215:23,25 216:1 218:11 221:4,7 231:5

**walked** 13:24 72:4 150:20 151:2 153:25 159:11 186:15 190:6,18 196:15 202:21 208:10 228:9 235:6 254:3 255:9

**walking** 146:22 149:10 150:23 152:2 158:25 163:17 164:13 167:11 181:25 182:20 184:19 185:20 189:2 190:8 202:7 208:8,24 216:12, 18,19 218:14 219:14 227:23 231:7

**walks** 42:14 148:10 195:1,20 208:6,14 209:2 213:10 215:21 216:13 230:24 231:2 269:12

**wanted** 36:16 72:2,7 123:18 124:12,16,25 127:23 208:18 256:13 259:20 264:10

**watch** 27:15,18 92:12 93:17 120:2 142:12 146:2 148:14 151:8 159:13 175:7 176:4 183:9 196:24 197:11 199:7 247:24 253:24

**watched** 158:23 194:1, 9 216:6 234:10 246:8

**watching** 23:11 152:14 163:3 172:3 174:24 179:16 183:1,6 185:15, 16 186:11,16 192:7 196:6 197:17 219:5 228:10,11 243:11 244:20 246:25 247:13 250:16,19 253:11,24 256:3 257:1,22

**wave** 184:9,12 187:9,11

**waved** 187:6

**waving** 187:2 188:2 213:9,17

**ways** 44:6 84:8

**weapons** 21:8,18 111:16,18

**wear** 47:14,20,25 48:1, 12,15,25 49:12 54:18 56:4,10 58:7,8,10 62:4, 11,13,14,17 63:1,13 64:11 101:14,17 104:6, 17 114:21 117:14 140:23 141:16 151:14, 17,22,24,25 152:20 198:25

**wearing** 48:5,18 50:7 56:1,3,24 58:5 59:19 61:17,21 62:9 64:20 65:7 66:11 101:3,22 102:2,19 106:4 112:25 115:1 117:7,18,19 129:1 142:2,10 144:8, 10 150:1,4,7 153:8 154:6 167:18 168:12 180:5 184:14 198:20 206:11 224:16 240:13

**weed** 16:1

**week** 32:19 53:5,8 102:8 104:5 105:14 111:3 113:18 114:18 120:19 124:19 126:15 127:17 163:12 172:11 182:11 203:4,15 248:3

**weekends** 163:13

**weigh** 5:2

**weighed** 5:4

**weight** 5:6,9

**welcoming** 23:12

**whatsoever** 168:13 172:4

**wheelchair** 45:16 46:15 47:2

**wheelchairs** 45:20

**white** 148:22 254:13, 20,21

**wide** 45:20

**wife** 16:11 73:4 264:12

**Wisconsin** 16:23

**woman** 54:10 88:20 104:1 109:15 111:19 112:17,24 117:12 118:5,19 119:1 169:16, 24,25 170:2 196:12 214:12 221:18 266:14

**women** 165:19,20 166:6

**words** 68:6 188:15 213:1 250:13

**work** 6:6 13:21,23 14:1, 7,13 20:8 66:6,7 69:24 70:11 74:7 92:3 145:17 205:16

**worked** 13:6 19:5 21:19 145:7 154:16,19

**worker** 152:25

**working** 10:7 11:18,22, 24 12:2,9,18 16:15 18:19,25 20:5 22:25 23:20 42:3 74:25 94:7, 9,10 95:17,18 96:8 98:23 115:19,24 128:6 134:24 143:5 144:25 145:3 154:12,23 156:7, 24 157:7,12 158:16 160:10 161:12,24 163:3 164:3 199:12,16 202:16 205:14,16

**works** 236:2

**worry** 35:22 93:1

**wound** 16:23 17:2,7

**Wow** 18:17

**write** 83:5

**writing** 131:1

**wrote** 69:10,20 140:9 260:4

**Y**

**year** 13:7 14:19 15:9 17:20 18:4,7,13,14 19:5 25:9,11 26:16 35:8,10, 12 94:6 95:1 96:18 106:12 137:5

**years** 9:6 11:19 52:3 53:7 61:10 71:7 90:6 96:1,9,12 98:22 106:10, 11,12 118:11 169:20 255:14 262:22

**yell** 83:25 86:4

**yelling** 33:6 78:6,16,21 79:6 81:25 82:1,2 84:4 85:17,23 104:2 113:1 115:9 121:21 130:22 135:25 141:17,23 175:20 176:3 221:1 232:13,18 233:8 249:22 251:4 252:23 261:14

**yellow** 200:4

**yells** 11:5 79:8

**yesterday** 90:5

**young** 31:11 47:10 51:4,22,24 52:1,4,7 54:10 61:20 63:21 88:20 146:20 199:12 254:10 262:7

**younger** 16:16 156:1,3

**Z**

**Zebra** 200:16